IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EIS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-1227 (LPS) |
| | ) | |
| WOW TECH INTERNATIONAL GMBH, | ) | |
| WOW TECH USA, LTD., | ) | |
| WOW TECH CANADA, LTD. | ) | |
| and NOVOLUTO GMBH, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff EIS Inc. ("EIS" or "Plaintiff"), for its Second Amended Complaint against

Defendants WOW Tech International GmbH, WOW Tech USA, Ltd., WOW Tech Canada, Ltd.,

and Novoluto GmbH, (collectively "WOW Group" or "Defendants"), hereby alleges as follows:

## THE PARTIES

1.      Plaintiff EIS is a Delaware corporation, having a principal place of business at

110 Wall Street, New York, New York, 10005.

2.      On information and belief, Defendant WOW Tech USA Ltd. ("WOW Tech

USA") is a Delaware corporation.  WOW Tech USA has a registered agent for service of process

at 1209 Orange Street, Wilmington, Delaware, 19801, and a mailing address at 103 Foulk Road,

Suite 202, Wilmington, Delaware, 19803.

3.      On information and belief, Defendant WOW Tech Canada Ltd. ("WOW Tech

Canada") is a company organized and existing under the laws of Canada, with a mailing address

at 330-1130 Morrison Drive, Ottawa ON K2H 9N6, Canada.

4.     On information and belief, Defendant WOW Tech International GmbH ("WOW Tech Intl.") is a company organized and existing under the laws of Germany, with a principal place of business at Friedenstraße 91-91a, 10249, Berlin, Germany.

5.     On information and belief, Defendant Novoluto GmbH ("Novoluto") is a company organized and existing under the laws of Germany, with a principal place of business at Friedenstraße 91-91a, 10249 Berlin, Germany.

6.     On information and belief, WOW Tech USA, WOW Tech Canada, and Novoluto are wholly owned subsidiaries of WOW Tech Intl.

7.     On information and belief, WOW Tech Intl., itself and through its wholly owned subsidiaries (including WOW Tech USA) and agents, is doing business throughout the United States, including in Delaware.

8.     On information and belief, Defendants conduct business in interstate commerce in the United States and the State of Delaware; the claims alleged herein arise from Defendants' acts or omissions in the United States and the State of Delaware; Defendants have purposefully directed their activities to residents in the United States and the State of Delaware; and Defendants' acts or omissions have damaged EIS Inc. and its property in the United States and the State of Delaware.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States, including Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), the Declaratory Judgment Act (28 U.S.C. §§ 2201 and 2202), Section 2 of the Sherman Act (15 U.S.C. § 2), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

10. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this civil action seeks declaratory judgments of patent unenforceability and noninfringement.

11. This action additionally asserts state statutory and common law claims for unfair and deceptive trade practices and tortious interference for which this Court has jurisdiction pursuant to 28 U.S.C. § 1367.

12. This Court has personal jurisdiction over WOW Tech USA because WOW Tech USA is a Delaware corporation.

13. This Court has personal jurisdiction over WOW Tech Intl. by virtue of, *inter alia*, the fact that it has committed, aided, abetted, contributed to, and/or participated in the commission of, tortious acts of unfair competition that have led to foreseeable harm and injury to Plaintiff in the United States and in this District.

14. This Court has personal jurisdiction over WOW Tech Canada by virtue of, *inter alia*, the fact that it has committed, aided, abetted, contributed to, and/or participated in the commission of, tortious acts of unfair competition that have led to foreseeable harm and injury to Plaintiff in the United States and in this District.

15. This Court has personal jurisdiction over Novoluto by virtue of, *inter alia*, the fact that it has committed, aided, abetted, contributed to, and/or participated in the commission of, tortious acts of unfair competition, inequitable conduct, and fraud that have led to foreseeable harm and injury to Plaintiff in the United States and in this District.

16. Moreover, this Court's personal jurisdiction over WOW Tech USA also confers upon it personal jurisdiction over WOW Tech Intl., WOW Tech Canada, and Novoluto. Upon

information and belief, WOW Tech USA is a corporate alter ego of WOW Tech Intl., WOW Tech Canada, and Novoluto.

17.    WOW Tech Intl. is a holding company – it is the parent of WOW Tech USA, WOW Tech Canada, Novoluto, and at least one related entity, WOW Tech Europe GmbH ("WOW Tech Europe").[1]  On information and belief, WOW Tech USA is a sales arm for WOW Tech Intl. and WOW Tech Canada in the United States.  On information and belief, Novoluto is a patent holding company that owns the rights to intellectual property used by the rest of WOW Group.

18.    On information and belief, WOW Group blurs the distinction between its various corporate entities and operates at least defendants WOW Tech USA, WOW Tech Canada, WOW Tech Intl., and Novoluto as a single company.

19.    Johannes Graf von Plettenberg holds himself out as the CEO of the "WOW Tech Group."[2]  On information and belief, Mr. Plettenberg is a director for WOW Tech Canada, and an executive director for Novoluto, Wow Tech Intl., and WOW Tech Europe.  WOW Tech Intl., Novoluto, and WOW Tech Europe also all share a common address (Friedenstraße 91-91a, 10249, Berlin, Germany) and a common German phone number (+49 (0) 30 95999 3814).

20.    On information and belief, WOW Tech Intl. controls, or jointly with WOW Tech Canada, Novoluto, and/or WOW Tech Europe controls, WOW Tech USA.

21.    The WOW Group conducts business in the United States through its website(s), including at least its Womanizer.com website available at https://www.womanizer.com/us/.  The

---

[1]  *See* Ex. 1 (WOW Tech press release), available at https://wowtech.com/2018/06/01/womanizer-group-and-standard-innovation-combine-forces-to-create-a-new-global-pleasure-product-leader/.
[2]  Ex. 2 (Johannes Plettenberg's LinkedIn profile), available at https://www.linkedin.com/in/johannes-plettenberg-3abb24aa/.

Womanizer.com website contains a privacy notice which names "Wow Tech US Ltd" in the title and "Wow Tech Europe GmbH" in the body,[3] and states that orders will be shipped and billed from "WOW Tech USA ltd."[4]   The legal notice on the Womanizer.com website lists the company name as WOW Tech Europe, identifies Johannes Plettenberg as its representative, and provides the common address (Friedenstr. 91a 10249 Berlin) for the German WOW Group entities identified above.[5]

22.   Furthermore, the "Jobs" link on the Womanizer.com website links to a "Career" page at wowtech.com/career, which lists career opportunities at the WOW Group entities worldwide on a single webpage.[6]

23.   On information and belief, WOW Tech Intl. and WOW Tech Canada 1) make strategic business decisions involving WOW Tech USA, 2) control and pay for the development and manufacture of products sold by WOW Tech USA, 3) exert influence and control over WOW Tech USA, and 4) are involved in WOW Tech USA's employee hiring decisions.

24.   This Court also has personal jurisdiction over WOW Tech Intl., WOW Tech Canada, and Novoluto by virtue of the additional acts set forth below.

25.   Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) because WOW Tech USA is incorporated in Delaware, personal jurisdiction over all defendants is proper in this district, and the acts complained of occurred and are occurring in the United States, including in this District.

---

[3] Ex. 3 (Womanizer.com privacy notice), available at https://www.womanizer.com/us/privacy.
[4] Ex. 4 (Womanizer.com shipping and billing information), available at https://www.womanizer.com/us/shipping.
[5] Ex. 5 (Womanizer.com website legal notice), available at https://www.womanizer.com/us/legal-notice.
[6] Ex. 6 (WOW Tech Group Careers), available at https://wowtech.com/career.

**PATENTS-IN-SUIT**

26.    On information and belief, Novoluto is the owner by assignment of United States Patent No. 9,763,851 ("the '851 Patent"), entitled "Stimulation Device," and issued on September 19, 2017.  A true and correct copy of the '851 Patent is attached hereto as Exhibit 19.

27.    On information and belief, Novoluto is the owner by assignment of United States Patent No. 9,849,061 ("the '061 Patent"), entitled "Stimulation Device Having an Appendage," and issued on December 26, 2017.  A true and correct copy of the '061 Patent is attached hereto as Exhibit 22.

28.    On information and belief, Novoluto is the owner by assignment of United States Patent No. 9,937,097 ("the '097 Patent"), entitled "Stimulation Device Having an Appendage," and issued on April 10, 2018.  A true and correct copy of the '097 Patent is attached hereto as Exhibit 21.  The '097 Patent purports, on its face, to be a continuation of the '061 Patent.

29.    On information and belief, Novoluto is the owner by assignment of United States Patent No. 10,869,809 ("the '809 Patent"), entitled "Pin-Shaped Stimulation Device," issued on December 22, 2020.  A true and correct copy of the allowed claims that are expected to be published in the '809 Patent is attached hereto as Exhibit 41.[7]

---

[7] At the time of filing, the '809 Patent had issued but was not yet published.  Plaintiff will supplement this pleading with a copy of the '809 Patent when it is published.  In addition, Plaintiff understands that Novoluto expects to receive two additional patents in the next two weeks.  Specifically, Plaintiff understands that Novoluto is the owner by assignment of (1) United States Patent Application No. 15/965,208, entitled "Stimulation Device," that is expected to issue as United States Patent No. 10,874,580 ("the '4580 Patent") on December 29, 2020 and (2) United States Patent Application No. 15/965,117 that is expected to issue as United States Patent No. 10,881,580 ("the '1580 Patent"), entitled "Stimulation Device," on January 5, 2021.  The '4580 Patent and the '1580 Patent both claim priority to the '851 Patent.  Plaintiff intends to seek leave to add the '4580 Patent and the '1580 Patent to this action as well.

## ACTS GIVING RISE TO THIS ACTION

30.    EIS is a market leader that provides sexual wellness products to consumers and resellers in the United States and in this District.

31.    EIS currently sells a wide variety of products, but is best known for its Satisfyer product line, incorporating its proprietary Air Pulse technology.

32.    EIS's primary competitor in the sexual wellness market is WOW Group, which sells products under the We-Vibe and Womanizer brands.

### Defendants Systematically Employed Unfair Competitive Methods Against EIS and its Corporate Family Worldwide

33.    Defendants have a history of engaging in unfair and deceptive trade practices with the intent to prevent or limit the commercial success of Plaintiff's products in the United States and abroad.  Defendants also have a history of both threatening and litigating patent infringement against EIS's corporate worldwide family.

34.    On information and belief, Defendant Novoluto is a patent procurement and holding company that holds the intellectual property rights for WOW Group.  In August 2016, Novoluto filed a lawsuit in Germany alleging that the Satisfyer Pro 2 product, sold by EIS GmbH (the parent company of Plaintiff EIS), infringed Novoluto's German patent No. DE 10 2013 110 501 B4 ("'501 German Patent").

35.    Novoluto's '501 German Patent was directed toward a device that used a two-chamber assembly to generate modulated positive and negative pressures relative to a reference pressure (e.g., atmospheric air pressure).  An excerpt from Fig. 3 of Novoluto's patent depicts that two chamber structure (chambers 3 and 4 are connected by narrow passage element 5):



Excerpt of Fig. 3 of Novoluto's '501 German Patent
(Exhibit 7 at 17)

36.    Plaintiff's accused product, by contrast, utilized a single-chamber structure, as shown below:



Cross-section of Satisfyer Pro 2 (Exhibit 8 at 10)

37.    Despite the clear differences in structure—and the distinct lack of a dual-chamber design in Plaintiff's products—the German Regional Court found that the accused products infringed Novoluto's '501 German Patent.  Confident that the Regional Court had erred, EIS GmbH promptly appealed the decision.

38.    Novoluto's '501 German Patent was challenged in an opposition proceeding before the German Patent and Trademark Office, which subsequently determined it was invalid

in view of the prior art.  On April 17, 2018, the German Patent and Trademark Office issued a decision revoking Novoluto's patent.[8]

39.     In light of the decision revoking Novoluto's patent in the opposition proceeding, the Higher Regional Court in Germany issued a decision suspending the patent infringement proceeding.

40.     Defendant Novoluto made numerous public statements, concurrent with the challenge to Novoluto's patent, regarding the outcome of the '501 German Patent infringement proceedings, stating, among other things, that EIS GmbH was liable for past and future damages totaling in the millions and that Novoluto would file suit against distributors and retailers of the Satisfyer Pro 2 products.[9]  These statements were false, at least because (as discussed below) EIS GmbH had already discontinued the Satisfyer Pro 2 when these statements were made.

41.     In view of Novoluto's false public statements and the opposition proceeding at the German Patent and Trademark Office, EIS GmbH brought a suit in Germany seeking to enjoin Novoluto from making any such statements and for damages suffered as a result of such statements.  The German court subsequently entered an injunction prohibiting Novoluto and Orion Versand GmbH (a primary distributor for WOW Tech Intl.) from making such statements.[10]

42.     Although EIS GmbH firmly believed that the Satisfyer Pro 2 did not infringe Novoluto's patent throughout the German proceedings, by mid-2017, it had already ceased

---

[8] Novoluto subsequently appealed the German Patent and Trademark Office's revocation decision.
[9] *See* Ex. 8 at 3-9.
[10] *See* Ex. 9 at 1-6.

production and sales of the accused products and developed a new, superior product utilizing a revolutionary design, known as the Satisfyer Pro 2 Next Generation.

43.    The Satisfyer Pro 2 Next Generation (and related products) utilizes a proprietary Air Pulse technology developed by EIS GmbH that maximizes performance, durability, and personal hygiene.  EIS's technology is the subject of patents and patent applications around the world (*e.g.*, patents AU 2018200317 B2, EP 3 228 297, CA 2 943 097 C, and MX 363 260 B, German utility models DE 20 2016 008414 U1 and DE 20 2016 008435 U1; and pending patent applications BR 10 2016 023617 A2, CN 107280939 A, EP 19173156.1, JP 2017 185220 A, RU 2016150905, ZA 2017/00224 and US 2017-281457 A1).

44.    The Satisfyer Pro 2 Next Generation quickly became a commercial success in the United States and around the world.  Since its introduction, EIS has launched over a dozen related products using the same proprietary Air Pulse technology in the United States market.

45.    EIS sells variations of its Satisfyer products at multiple price points in the United States.  Although its high-end luxury models, crafted from brushed aluminum and leather, currently retail at prices as high as $149.95, its entry-level models are available at prices as low as $19.95.  EIS aims to offer a range of products at price points accessible to everyone.

46.    Defendants' competing product is sold under the brand name "Womanizer." According to the Womanizer.com website, Defendants currently sell ten variations of their Womanizer product, ranging in price from $79.00 to $219.00.[11]

---

[11] Ex. 10 (Womanizer Duo, $219), available at https://www.womanizer.com/us/womanizer-duo-bordeaux; Ex. 11 (Womanizer Starlet, $79.00), available at https://www.womanizer.com/us/womanizer-starlet-snow.

**Defendants Posted False Reviews of Plaintiff's Products on Amazon**

47.    On information and belief, beginning as early as June 2016 and continuing through at least December 2016, individuals acting on behalf of Defendants WOW Tech Canada (formerly Standard Innovation Corporation) and Wow Tech Intl. posted false reviews on Amazon.com (Amazon's US website) and Amazon.de (Amazon's German website) disparaging the performance and functionality of Plaintiff's Satisfyer product line.   On information and belief, these reviews contained materially false statements, including statements that Plaintiff's products were not waterproof, performed poorly, were painful to use, and/or smelled of chemicals:

- "Very bad quality! No waterproof! After 10 minutes in water the device was dead."[12]

- "100% waterproof - no way! We had the Satisfyer 2 once in the tub. The next day it was dead! Water was running out of the device at the battery contacts. Totally bad buy!"[13]

- "After it was used for the first time in the bath tub, water was running out of the device and the electronics had had it! Totally bad buy! The device is not as waterproof as advertised."[14]

- "Performance absolutely dissatisfying. Very loud and difficult to operate. Hurts sometimes, too hard at the contact surface. Definitely a bad buy as far as I'm concerned."[15]

---

[12] Ex.12 (Amazon.com review by DerTester (pseudonym for WE-VIBE/WOW Tech)), available at https://www.amazon.com/gp/customer-reviews/R2U8W4VDGBSRQQ/.

[13] Ex. 13 (Amazon.de review by WE-VIBE), available at https://www.amazon.de/gp/customer-reviews/R33KWKQKYQYKWP.

[14] Ex. 14 (Amazon.de review by WE-VIBE), available at https://www.amazon.de/gp/customer-reviews/R1P9I0FL2OE04F.

- "Am very disappointed! Very loud, and the product stinks terribly of chemicals when you unpack it. Very difficult to control. Definitely a bad buy."[16]

48.    On information and belief, these false reviews were not posted by bona-fide consumers.  Amazon has not marked any of the reviews as written by verified purchasers.  On information and belief, these reviews were posted by, at the request of, or in exchange for payment from, WOW Tech Intl., Wow Tech Canada, and/or its agents.

49.    The statements in the reviews were false and misleading.  On information and belief, the statements contained in these reviews were known by WOW Tech Intl. and Wow Tech Canada to be false and/or misleading when made.

50.    The false review posted on Amazon.com was authored under the pseudonym "DerTester":



DerTester Amazon.com Review for Satisfyer Pro 2 (Exhibit 12)

---

[15] Ex. 15 (Amazon.de review by WE-VIBE), available at https://www.amazon.de/gp/customer-reviews/ROC058U3BKWMZ.

[16] Ex. 16 (Amazon.de review by WOW Tech), available at https://www.amazon.de/gp/customer-reviews/R2NM4CSJUWAZ2W.

51.    The username "DerTester" is linked to an account on Amazon.com named "WE-VIBE."  Specifically, clicking on the username "DerTester" shown in the above screenshot leads to the Amazon.com account profile shown below.  This profile indicates that the review posted on Amazon.com was authored under an account named "WE-VIBE" using the username "DerTester."  This account profile also lists the following URL: www.wowtech.com.[17]



WE-VIBE/WOW Tech Account Profile on Amazon.com (Exhibit 17)

_____

[17] Ex. 17 (We-Vibe Account Profile on Amazon.com (U.S.)), available at
https://www.amazon.com/gp/profile/amzn1.account.AFP2MGY2RUXH3J324CPOGA4I4WSQ/.

52.    The reviews posted on Amazon.de were authored under a nearly-identical account named "WE-VIBE" on Amazon.de, which also lists the following URL: www.wowtech.com:[18]



WE-VIBE Account Profile on Amazon.de (Exhibit 18)

53.    Both the Amazon.com and Amazon.de WE-VIBE profiles are "Amazon verified"; denoted by the blue check mark next to the account name:



54.    On information and belief, the WE-VIBE/WOW Tech accounts on Amazon.com and Amazon.de are owned, managed, and controlled by Defendants.  On information and belief, the website located at the URL www.wowtech.com is owned, managed, and controlled by

---

[18]    Ex. 18 (We-Vibe Account Profile on Amazon.de (German)), available at https://www.amazon.de/gp/profile/amzn1.account.AFP2MGY2RUXH3J324CPOGA4I4WSQ/.

Defendants.   The website located at the URL www.wowtech.com also promotes Defendants' products.  Thus, a potential purchaser of EIS's products who clicked on one of the false Amazon reviews would be taken to a website promoting Defendants' competing products.

55.    Defendants' false Amazon reviews have harmed and continue to harm EIS, because its potential customers are exposed to Defendants' false statements at the very moment they are deciding whether to purchase EIS's Satisfyer products.  On information and belief, EIS lost sales as a result of Defendants' false reviews.

**Defendants Have a History of Wrongfully Accusing
Plaintiff's Customers of Patent Infringement**

56.    On information and belief, beginning at least as early as July 2016 and continuing through at least March 2018, Defendant Novoluto, directly or through its agents, began contacting individual retailers and distributors of the Satisfyer Pro 2 throughout the United States and abroad.   In those communications, Defendant Novoluto demanded that retailers and distributors cease and desist their sales of the Satisfyer products on the basis that they infringed Novoluto's purported patent rights.

57.    On information and belief, Defendant Novoluto, directly or through its agents, contacted Eldorado Trading Company in Broomfield, Colorado, in or around July 2016 on behalf of WOW Group.   In that communication, Novoluto accused Eldorado Trading Company of infringing its patent rights by distributing and/or re-selling Plaintiff's Satisfyer Pro 2 product. On information and belief, Novoluto's accusations were made in bad faith because Defendants knew that the two-chamber design of their Womanizer products was not patented in the United States at the time Novoluto communicated with Eldorado Trading Company.[19]

---

[19] *See* Ex. 19 (U.S. Patent 9,763,851, assigned to Novoluto GmbH, issued September 19, 2017).

58.     Defendants, directly or through their agents, and in bad faith, accused Eldorado Trading Company of infringing Defendants' patent rights by distributing and/or re-selling Plaintiff's Satisfyer Pro 2 product even though Defendants did not have enforceable patent rights in the United States at that time.

59.     Defendants knew they did not have enforceable patent rights in the United States when making that statement.  Thus, Defendants and/or their agents, willfully and knowingly made literally false, misleading, and disparaging statements about Plaintiff, Plaintiff's business, and Plaintiff's products to Eldorado Trading Company in bad faith and with the intent to damage Plaintiff.

60.     Defendants' false and misleading statements deceived Eldorado Trading Company about the character of Plaintiff's products and Plaintiff's business because Eldorado Trading Company asked EIS for a letter of assurance that EIS's products did not infringe Defendants' patents.

61.     On information and belief, Defendants knew or should have known that Novoluto's '501 German Patent was invalid in view of the prior art when it engaged in these communications.

**Defendants Coerced Distributors and Retailers to Stop Carrying Plaintiff's Products**

62.     On information and belief, WOW Group has taken additional steps to discourage retailers from carrying EIS's products that go beyond acceptable competitive behavior.

63.     At least as early as 2017, on information and belief, WOW Group placed restrictions in its supply agreements preventing some retailers and distributors that carry its products from also carrying EIS's products, including the Satisfyer product line.  For other retailers and distributors, WOW Group threatened them and demanded they stop selling EIS's products outright.  On information and belief, these coercive communications with EIS's

retailers and distributors included false statements regarding the quality of EIS's products and the scope of WOW Group's intellectual property rights in the United States.

64.    To enforce its demands, WOW Group threatened to raise the price it charged non-compliant retailers and distributors for its own products, effectively rendering them unable to compete against other stores, or to block retailers and distributors from selling its products altogether, unless and until they refrained from carrying EIS's competing products.   Wow Group's coercive actions caused harm to EIS, EIS's distributors, EIS's retailers, and EIS's actual and potential customers.

**Defendants Engaged an Industry Insider to Publish False Statements about Plaintiff**

65.    On information and belief, Defendants, directly or through their agents, hired or otherwise directed Zoë Ligon to publish false, disparaging, and defamatory statements about EIS and its Satisfyer products.   Ms. Ligon is the owner of a well-known sexual wellness store, Spectrum Boutique, in Detroit, Michigan, with a substantial social media following of nearly 70,000 subscribers on its Instagram account (@shopspectrumboutique).

66.    During or around April 2019, Ms. Ligon published false statements on Spectrum Boutique's Instagram account—visible to all its subscribers and the general public—stating, *inter alia*, that EIS "ripped off the . . . technology of Womanizer" and encouraged retailers to pull EIS products from their stores:

  

Screenshots from the @shopspectrumboutique Instagram account (Exhibit 20)

67.    EIS responded by mailing Ms. Ligon a cease and desist letter on April 16, 2019.

### Defendants' Improper Acts Are Harming EIS

68.    On information and belief, each of Defendants' improper acts was designed to deprive EIS of sales and damage its reputation with consumers in Delaware and throughout the United States.  Defendants' false reviews are misleading EIS's potential customers and harming EIS's reputation.  Their false and misleading statements to retailers and distributors are harming its business relationships and depriving EIS of sales.  And Defendants' false advertising and disparaging public statements, such as those made through Zoë Ligon, continue to cause financial and reputational damage to EIS on an ongoing basis.

69.    Defendants, through their ongoing unlawful campaign against EIS have, among other things, willfully and in bad faith misled and deceived the public with false or misleading statements of material fact about EIS and its products, harmed EIS's goodwill and business reputation, and caused EIS financial losses through decreased sales.

**Novoluto Obtained its Patents Through Fraud on
the United States Patent and Trademark Office**

70.     Novoluto's German '501 Patent was challenged before the German Patent and Trademark Office ("GPTO") in opposition proceeding No. 10 2013 110 501.7 ("Opposition Proceeding"). The Opposition Proceeding was initiated by the filing of two Notices of Opposition on November 17, 2016. One Notice of Opposition was filed by Ecoaction GmbH ("Ecoaction Notice").[20] The Ecoaction Notice showed how Novoluto's German '501 Patent was invalid in view of Chinese Patent No. 2153351Y ("*Guan*"). The second Notice of Opposition was filed by Fun Factory GmbH ("Fun Factory Opposition"). The Fun Factory Opposition cited multiple prior art references, as explained below.[21] The GPTO subsequently determined that Novoluto's patent was invalid in view of Chinese Patent No. 2153351Y ("*Guan*") and, on April 17, 2018, issued a decision revoking it.[22]

71.     During the Opposition Proceeding, several of Novoluto's patent applications were pending before the United States Patent and Trademark Office ("USPTO"), including United States Patent Application Nos. 15/023,471 ("the '471 Application"), 15/487,123 ("the '123 Application"), and 15/302,981 ("the '981 Application") (collectively, "Novoluto Applications"), which ultimately issued as the '851 Patent, '097 Patent, and '061 Patent, respectively (collectively, "the Unenforceable Patents").

72.     The '851 Patent claims priority to Novoluto's '501 German Patent, and, although not identified as related to the '501 Patent, the '061 and '097 Patents disclose substantially identical devices—handheld devices for clitoral stimulation using modulated air pressures—with the most notable difference being the latter patents include an appendage configured to be

---

[20] Ex. 24 (Ecoaction GmbH's November 17, 2016, Notice of Opposition).
[21] Ex. 37 (Fun Factory GmbH's November 17, 2016, Notice of Opposition).
[22] Ex. 23 (German Patent Office Decision).

inserted into the vagina. Because of their similarities, the '501 German Patent's validity, and by extension the Opposition Proceeding, was relevant and material to the claims in the then-pending Novoluto Applications.

### At Least Three Individuals Involved in Novoluto's U.S. Patent Prosecution Were Aware of the German Opposition Proceeding and *Guan*

73.    On information and belief, at least Novoluto's executive director Johannes Graf von Plettenberg, its CEO Michael Lenke, and its United States patent prosecution counsel Richard A. Cheng, knew about the Opposition Proceeding and knew about the prior art references involved in that proceeding (including *Guan*). On information and belief, Mr. Plettenberg, Mr. Lenke, and Mr. Cheng knew that the GPTO found Novoluto's '501 German Patent invalid while the Novoluto Applications were pending before the USPTO.

74.    On information and belief, Mr. Plettenberg knew of the Opposition Proceeding and knew about the prior art references involved in that proceeding while one or more of the Novoluto Applications were pending at least because he was Novoluto's Executive Director. Mr. Plettenberg also has an active role in Opposition Proceedings before the GPTO. For instance, Mr. Plettenberg attended a hearing in a different opposition proceeding on April 10, 2018, during the pendency of the Opposition Proceeding (and the same day that Novoluto's '097 Patent issued).

75.    On information and belief, Mr. Lenke knew of the Opposition Proceeding and knew about the prior art references involved in that proceeding, at least because he was the only named inventor on the '501 German Patent, the original applicant for the '501 German Patent, and because he was Novoluto's CEO.

76.    On information and belief, Mr. Cheng knew about the Opposition Proceeding and knew about the prior art references involved in that proceeding, at least because he prosecuted

the Novoluto Applications before the USPTO.[23]  Mr. Cheng also understood the significance of the Opposition Proceedings and prior art references involved (including *Guan*) to the then-pending Novoluto Applications.

77.    The prosecution history of the Novoluto Applications, in view of the Opposition Proceeding filings, confirms that Mr. Cheng had reviewed the Opposition Proceeding filings during the pendency of the Novoluto Applications.  It also confirms that Mr. Cheng understood the Opposition Proceeding filings and prior art therein were relevant to the Novoluto Applications.

78.    For instance, Fun Factory GmbH filed a Notice of Opposition on November 17, 2016, requesting that Novoluto's '501 German Patent be revoked.  The Fun Factory Opposition was filed on the same day as the Ecoaction Opposition based on *Guan*.  In its opposition, Fun Factory identified fifteen references numbered D8–D23 (D15 was an English translation of D14) that it explained were "highly relevant documents . . ., which were not taken into account in the [patent] grant procedure."[24]  Only a month later, on December 21, 2016, Mr. Cheng filed an Information Disclosure Statement ("IDS") with the USPTO in during prosecution of the '471 Application—the Novoluto Application that issued as the '851 Patent.  That IDS listed only two references: D8 and D10 from Fun Factory's November 17, 2016 filing in the Opposition Proceeding.[25]

---

[23] *See* Ex. 32 at 6 (Application Data Sheet from the '851 Patent prosecution signed by Richard A. Cheng and dated March 21, 2016); Ex. 33 at 6 (Application Data Sheet from the '061 Patent prosecution signed by Richard A. Cheng and dated October 7, 2016); Ex. 34 at 6 (Application Data Sheet from the '097 Patent prosecution signed by Richard A. Cheng and dated April 13, 2017).

[24] *See* Ex. 37 at 2-3 (Fun Factory GmbH's November 17, 2016 Opposition).

[25] *See* Ex. 38 at 1 (Novoluto's December 21, 2016 IDS in the '471 Application).

79.    Then, on February 2, 2017, Mr. Cheng filed another IDS in the '471 Application. That IDS listed *Guan* (but, as explained below, did not include a full English translation of *Guan*), and also contained references D11–D15, and D20–D23 from Fun Factory's filing in the Opposition Proceeding, along with just a few other references.[26]  Mr. Cheng filed two similar IDS's in the '981 Application, which issued as the '061 Patent.

80.    Notably, between the two IDS's, Mr. Cheng cited *Guan* and every reference in Ecoaction's list of highly relevant new references that he had not previously cited during prosecution of the '471 Application.  On information and belief, Mr. Cheng learned of *Guan* from the Opposition Proceeding.  On information and belief, Mr. Cheng also learned of the references that Fun Factory numbered D8, D10–D15, and D20–D23 from the Opposition Proceeding.  The table below shows the close correspondence between the references cited in the Fun Factory Opposition and Novoluto's subsequent IDS's in the '471 Application.

| Fun Factory Reference | Date Cited on a Novoluto IDS |
|---|---|
| D8 - DE 42 43 876 A1 | December 21, 2016 |
| D9 - US 2008/0304984 A1 | Previously cited on March 21, 2016 |
| D 10 - WO 00/28939 A2 | December 21, 2016 |
| D11 - DE 582 196 C | February 10, 2017 |
| D12 - DE20 2012 005 414U1 | |
| D13 - EP 1 554 947 B1 | |
| D14/D15 - JP 2008-125577 A | |
| D16 - US 2,112,646 A | Previously cited on March 21, 2016 |
| D17 - US 1,882,040 A | |
| D18 - US 5,377,701 A | |
| D19 - WO 2013/178223 A2 | Previously cited on September 7, 2016 |
| D20 - DE 1 703 184 U | February 10, 2017 |
| D21 - DE 32 22 467 A1 | |
| D22 - DE 93 09 994 U | |
| D23 - DE 198 53 353 C2 | |

---

[26] *See* Ex. 39 at 1-2 (Novoluto's February 10, 2017 IDS in the '471 Application).

81.     Mr. Cheng also cited the International Search Report for International Patent Application PCT/EP2014/065734, which claims priority to Novoluto's '501 German patent, during the prosecution of each of the Novoluto Applications.  For example, he cited to the search report in an IDS filed on April 4, 2017 during prosecution of the '097 patent, while the Opposition Proceeding was ongoing.

82.     On information and belief, Mr. Plettenberg and Mr. Lenke were aware of the prosecution of the Novoluto Applications and were either informed about or made decisions concerning their filing, the content of their specifications, the wording of their claims, amendments made during prosecution, or arguments made during prosecution before the USPTO.

83.     Mr. Lenke was aware of and involved in the prosecution of the Novoluto Applications at least because he signed powers of attorney for Novoluto, as its CEO, that were filed with the USPTO during prosecution of both the '851 and '061 Patents.[27]  On information and belief, Mr. Lenke was also aware of and involved in the prosecution of the Novoluto Applications because he was the named inventor on each of the Novoluto Applications.

### Mr. Cheng, Mr. Lenke, and Mr. Plettenberg Owed a Duty of Disclosure, Candor, and Good Faith to the USPTO

84.     As the attorney who prepared and prosecuted the Novoluto Applications, Mr. Cheng owed a duty of disclosure, candor, and good faith to the USPTO, which included a duty to disclose all information known to be material to the patentability of any existing claim in a pending application.[28]

---

[27] *See* Ex. 35 (Power of Attorney by Applicant from '851 Patent prosecution history); Ex. 36 (Power of Attorney by Applicant from '061 Patent prosecution history).

[28] The duty of disclosure applies to "[e]ach attorney or agent who prepares or prosecutes the [patent] application."  37 C.F.R. § 1.56(c)(2).

85.    As the only named inventor in the Novoluto Applications,[29] and as the CEO of Novoluto, Mr. Lenke also owed the same duty of disclosure, candor, and good faith to the USPTO.[30]  On information and belief, Novoluto's executive director, Mr. Plettenberg, was also aware of or oversaw the prosecution of the Novoluto Applications, and thus also owed the same duty to the USPTO.[31]

86.    As such, Mr. Cheng, Mr. Lenke, and Mr. Plettenberg were required to disclose the Opposition Proceeding to the USPTO.[32]  That disclosure should have been made on or around November 17, 2016, the date the Opposition Proceeding was filed, and should have been updated to disclose Novoluto's arguments made therein, on or around September 18, 2017, when it filed its response.[33]  At the very least, Mr. Cheng, Mr. Lenke, and Mr. Plettenberg had a duty to disclose the existence of any material information from the Opposition Proceeding and provide a complete English translation of *Guan* to the USPTO at some point during prosecution of the Novoluto Applications.  But, while Novoluto identified the references cited in the Opposition Proceeding to the USPTO, neither Mr. Cheng, Mr. Lenke, nor Mr. Plettenberg provided a

---

[29] *See* Ex. 32 at 1; Ex. 33 at 1; Ex. 34 at 1.

[30] The duty of disclosure applies to "[e]ach inventor named in the application."   37 C.F.R. § 1.56(c)(1).

[31] The duty of disclosure applies to every "person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c)(3).

[32] The USPTO's guidance explains that applicants must bring litigation related to the subject matter of an application to its attention.   MPEP § 2001.06(c) ("Where the subject matter for which a patent is being sought is or has been involved in litigation and/or a trial proceeding, or the litigation and/or trial proceeding yields information material to currently pending applications, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the examiner or other appropriate official at the U.S. Patent and Trademark Office.").

[33] Novoluto's '851 Patent issued on September 19, 2017, the day after it submitted arguments and a translation of *Guan* in the Opposition Proceeding.   The duty of disclosure, however, continues until the day a patent issues.

complete English translation of Guan to the USPTO or disclosed the existence of the Opposition Proceeding, as the USPTO rules require.

87.    On information and belief, Mr. Cheng, Mr. Lenke, and Mr. Plettenberg never disclosed the German opposition proceeding to the USPTO in connection with the Novoluto Applications.  And, although Novoluto did disclose *Guan's* existence to the USPTO, they withheld two complete English translations of *Guan* that were used or submitted in the Opposition Proceeding, violating their duty of disclosure.  Any person with a duty of disclosure to the USPTO must submit an English translation of non-English references identified during prosecution, if the translation is within their possession, custody or control, or is readily available to them.[34]

88.    On information and belief, Mr. Cheng, Mr. Lenke, and Mr. Plettenberg had two different complete English translations of *Guan* in their possession, custody or control, or readily available to them.  The first complete translation was provided to Novoluto with the Ecoaction Opposition.[35]  Novoluto's German counsel later submitted its own complete translation of *Guan* to the GPTO on September 18, 2017.[36]  Thus, both translations were at least readily available to Novoluto, including its CEO Mr. Lenke (who was also the named inventor on the '501 German Patent that was the subject of the Opposition Proceeding), and to Mr. Cheng, who was aware of the German Opposition Proceeding (as discussed above).  All three of them, however, withheld

---

[34] Information disclosure statements filed with the USPTO shall include "[a] copy of the translation if a written English-language translation of a non-English-language document, or portion thereof, is within the possession, custody, or control of, or is readily available to any individual designated in § 1.56(c)."  37 C.F.R. § 1.98(a)(3)(iii).

[35] Ex. 24 (Ecoaction GmbH's November 17, 2016, Notice of Opposition), Ex. 25 (Machine translation of *Guan* submitted to GPTO with Ecoaction's notice of opposition as E1).

[36] Ex. 26 (Novoluto's September 18, 2017, Opposition Proceeding response); Ex. 27 (Translation of *Guan* submitted by Novoluto to GPTO).

the two *Guan* translations from the USPTO during prosecution of the Novoluto Applications, as well as the existence of the Opposition Proceeding.

89.    On information and belief, Mr. Cheng either possessed or was aware that Novoluto, including Mr. Lenke, possessed the *Guan* translations.  As explained above, the Ecoaction Opposition and Fun Factory Opposition were filed on the same day.  Mr. Cheng subsequently cited references from those Opposition Proceedings to the USPTO.  From reviewing the Ecoaction Opposition and other Opposition Proceeding filings, Mr. Cheng would have been aware Novoluto possessed at least one full English translation of *Guan*, e.g., the translation submitted with the Ecoaction Opposition.  The translations of *Guan* in Novoluto's possession would have been readily available to Mr. Cheng at least because he was Novoluto's counsel.  Thus, Mr. Cheng had a duty to disclose at least one full English translation of Guan to the USPTO.  Mr. Cheng did not disclose either full English translation of *Guan* to the USPTO during the pendency of the Novoluto Applications.

90.    Additionally, in its September 18, 2017, Opposition Proceeding response, Novoluto elaborated on the proper interpretation of its '501 German Patent's claim 1 for five pages, detailing how the claims should be read by a person of skill in the art in view of its specification.[37]  Because substantially similar claims were pending in the Novoluto Applications at that time, Mr. Cheng, Mr. Lenke, and Mr. Plettenberg had a duty to disclose those arguments to the USPTO as well, but again they did not.

---

[37] *See* Ex. 26 (Novoluto's September 18, 2017, Opposition Proceeding response) at 5-9.

91.    On February 7, 2017, Novoluto submitted an Information Disclosure Statement to the USPTO in connection with the prosecution of the '061 Patent, which included a machine-produced, partial English translation of *Guan*—only the abstract.[38]

92.    On February 10, 2017, Novoluto submitted an Information Disclosure Statement to the USPTO in connection with the prosecution of the '851 Patent, which included a machine-produced, partial English translation of *Guan*—only the abstract.[39]

93.    On April 13, 2017, Novoluto submitted an Information Disclosure Statement to the USPTO in connection with the prosecution of the '097 Patent, which included a machine-produced, partial English translation of *Guan*—only the abstract.[40]

94.    On information and belief, Mr. Cheng, Mr. Lenke, and Mr. Plettenberg had at least one complete English translation of *Guan* in their possession, custody, or control, or readily available to them, as of the dates the incomplete English translations of *Guan* were submitted to the USPTO in connection with the applications for the Unenforceable Patents.

### *Guan* Was Material to the Patentability of Novoluto's Pending Claims

95.    On information and belief, the Examiner did not consider the *Guan* reference in detail in connection with the applications for the Unenforceable Patents.  *Guan* was one of over 80 references cited by Novoluto during prosecution of each of the Unenforceable Patents.

96.    When compared with the complete English translation, the machine-translated abstract of *Guan* submitted by Novoluto during prosecution of the Unenforceable Patents fails to provide sufficient technical details of *Guan's* apparatus and mode of operation, including, e.g.,

---

[38] Ex. 28 (Partial translation of Guan submitted to USPTO).
[39] *See id.*
[40] *See id.*  The Information Disclosure Statement submitted by Novoluto in connection with the '097 Patent application incorrectly identified *Guan* as CN 215335<u>2</u> instead of CN 215335<u>1</u>.

the mechanism for reciprocally moving a wall of air bag 2 to generate positive and negative air pressures.[41]

97.    On information and belief, Mr. Cheng, Mr. Lenke, and Mr. Plettenberg knew that the English translation of *Guan's* abstract submitted to the USPTO did not disclose all the technical details of *Guan's* apparatus and mode of operation.  Mr. Cheng, Mr. Lenke, and Mr. Plettenberg knowingly allowed the partial English translation submitted by Novoluto to mislead the examiner into believing that *Guan* was not a material prior art reference.  Mr. Cheng, Mr. Lenke, and Mr. Plettenberg ware certainly aware, based on the German Opposition Proceeding, that *Guan* was material to the patentability of the Unenforceable Patents.  Yet, they withheld from the USPTO a complete English translation of the most important parts of *Guan*.

98.    On information and belief, if Mr. Cheng, Mr. Lenke, and Mr. Plettenberg had disclosed the complete English translation of *Guan* to the USPTO, one or more, in particular independent, claims from each of the Unenforceable Patents would not have issued.

99.    For example, on June 27, 2019, during prosecution of Novoluto's United States Patent Application No. 15/965,117 ("the '117 Application") (a then-pending application claiming priority to Novoluto's '851 Patent), the USPTO issued a rejection based on *Guan* (in combination with other references).[42]  On information and belief, the Examiner assigned to the '117 Application independently obtained or located a complete English translation of *Guan* and relied on that complete translation in issuing this rejection.  The pending claims for the '117 Application included features similar to those claimed in the Unenforceable Patents.  Thus,

---

[41] *Compare* Ex. 28 (Machine translation of *Guan* abstract submitted by Novoluto) at 1 with Ex. 29 (Complete certified translation of Guan) at 1-4.
[42] *See* Ex. 30 (June 27, 2019 Rejection for Application No. 15/965,117).

claims having features similar to the claims of the Unenforceable Patents have been rejected as being unpatentable over *Guan* by both the GPTO and USPTO.

100.    As another example, on August 22, 2019, during prosecution of Novoluto's United States Patent Application No. 15/965,208 ("the '208 Application") (another then-pending application claiming priority to Novoluto's '851 Patent), the USPTO issued another rejection based on *Guan* (in combination with other references).[43]   On information and belief, the Examiner assigned to the '208 Application independently obtained or located a complete English translation of *Guan* and relied on that complete translation in issuing this rejection.  The pending claims for the '208 Application included features similar to those claimed in the Unenforceable Patents.  Thus, claims having features similar to the claims of the Unenforceable Patents have been rejected as being unpatentable over *Guan* by both the GPTO and USPTO (on at least three occasions).

101.    Moreover, during prosecution, Novoluto obtained all three Unenforceable Patents by, *inter alia*, arguing that U.S. Patent No. 5,377,701 ("*Fang*") did not disclose every element of the pending claims.

102.    For both the '097 and the '061 Patents, Novoluto argued *Fang* did not disclose generating positive and negative air pressures, a limitation of pending claim 1 for both patents. Indeed, *Fang's* Abstract describes a sucking massage device with a sucking lip and a negative pressure generator.

103.    *Guan*, however, describes a device capable of generating positive and negative pressures.  For example, *Guan* discloses a lever pinned at one end and connected to the wall of an air bag.  The lever is connected to an electromagnetic drive unit which causes the lever to

---

[43] *See* Ex. 31 (August 22, 2019 Rejection for Application No. 15/965,208).

compress and expand the air bag "to have reciprocating motion." Such reciprocal compression and expansion creates increasing and decreasing air pressures at the mouth 1. Indeed, *Guan* uses the term "pulsating air pressure" several times.[44]

104.    The USPTO has also instituted *Inter Partes Review* ("IPR") of Novoluto's '061 Patent, finding that the petitioner EIS GmbH "demonstrated a reasonable likelihood of prevailing with respect to the ground based on Guan for at least one claim."[45]

105.    Thus, *Guan* is material to the patentability of at least claim 1 of Novoluto's '097 and '061 Patents at least because 1) *Guan* discloses a critical limitation that the examiner concluded was absent from the prior art he considered before allowing the patents to issue, and 2) *Guan* was used by the GPTO to invalidate a closely related patent. On information and belief, at least claim 1 of the '097 and '061 Patents would not have issued had Mr. Cheng, Mr. Lenke, or Mr. Plettenberg provided the examiner with one of the complete English translations of *Guan*.

106.    Novoluto's '851 Patent is a continuation of its '501 German Patent. The '851 Patent thus claims priority to the '501 German Patent and the two patents are directly related. Moreover, the '851 Patent and the '501 German patent have similar claims. During prosecution of the application leading to the '851 patent, Novoluto again argued over *Fang* to obtain its patent claims. Particularly, Novoluto argued that the GPTO had accepted similar arguments during its prosecution of the '501 German Patent, the same patent the GPTO later revoked as unpatentable over *Guan*. While Novoluto was quick to advise the examiner that the GPTO had accepted its positions regarding *Fang*, at no time did Novoluto advise the examiner that the '501 German patent was embroiled in the German Opposition Proceeding, that *Guan* was at the center

---

[44] *See* Ex. 29 (Complete certified translation of Guan) at 3.
[45] *EIS GmbH v. Novoluto GmbH*, IPR2019-01302, Paper 23 at 7 (P.T.A.B. June 17, 2020); *see* D.I. 43 (Plaintiff's Notice of Supplemental Authority)

of that opposition, or that the '501 German Patent was revoked by the GPTO as unpatentable based on *Guan*.

107.    For the '851 Patent, the examiner explained in his notice of allowance that the prior art did not teach features such as a drive unit and a stimulation device having no valves. Both of those features are readily found in *Guan* and are immediately apparent from its complete English translation.

108.    As previously described, *Guan* delivers positive and negative air pressures with respect to a reference pressure by using an electromagnetic drive to move the pinned lever so as to impart reciprocating motion upon a wall of the air bag (2). The drive unit is shown in *Guan's* only figure and page 1 explains the structure is "driven by an electromagnet." A review of *Guan's* figure also reveals that there are no valves anywhere in the device. Thus, *Guan* discloses at least the drive unit and valveless stimulation device that the examiner concluded were absent from the art before him. This is consistent with the findings in the German Opposition Proceeding that revoked Novoluto's '501 German Patent.

109.    The USPTO has also instituted *Inter Partes Review* ("IPR") of Novoluto's '851 Patent, finding that the petitioner EIS GmbH "demonstrated a reasonable likelihood of prevailing in showing that claims 5 and 6 are unpatentable as obvious over Guan" in combination with other references.[46]

110.    Thus, *Guan* is material to the patentability of at least claim 1 of Novoluto's '851 Patent at least because 1) *Guan* discloses two critical limitations that the examiner concluded were absent from the prior art he considered before allowing the patents to issue, and 2) *Guan*

---

[46] *EIS GmbH v. Novoluto GmbH*, IPR2019-01444, Paper 18 at 10 (P.T.A.B. Aug. 11, 2020); *see* D.I. 47 (Plaintiff's Notice of Supplemental Authority).

was used by the GPTO to invalidate the '851 Patent's parent. On information and belief, at least claim 1 of the '851 Patent would not have issued had Mr. Cheng, Mr. Lenke, or Mr. Plettenberg provided the examiner with one of the complete English translations of *Guan*.

111.    On information and belief, Mr. Cheng, Mr. Lenke, and Mr. Plettenberg intentionally withheld the existence and substance of the German Opposition Proceeding and misled the USPTO about the content of *Guan* during the pendency of the Novoluto Applications, because disclosing them would have prevented one or more of Novoluto's pending claims from issuing.

112.    Moreover, Novoluto was continuing to violate its duty of disclosure in order to procure additional patents through misrepresentations to the USPTO until after the First Amended Complaint was filed in this case. At that time, it currently had four patent applications pending ("Pending Applications"), which are all related to the Unenforceable Patents. When the First Amended Complaint was filed, however, Novoluto had been inconsistent in providing complete English translations of *Guan* to the examiner in the Pending Applications, in an attempt to mislead the USPTO and gain allowance. For example, on August 22, 2019, Novoluto submitted an Information Disclosure Statement ("IDS") in connection with its pending U.S. Patent Application No. 15/354,599, which for the first time included a complete English translation of *Guan* (as an exhibit to an IPR petition). Novoluto waited to submit that IDS until the day *after* it held an interview with the patent examiner, during which the examiner indicated that the '599 application would be allowed.

### Mr. Cheng Misrepresented That the '123 Application Was a Continuation

113.    Mr. Cheng made additional material misrepresentations to the USPTO while prosecuting the Novoluto Applications. In particular, Mr. Cheng represented to the USPTO that the '123 Application (which issued as the'097 Patent) was a continuation of the '981 Application

on April 13, 2017. A continuation application cannot contain new matter, *i.e.*, matter that was

not described in the parent application.[47] The '123 Application, however, contained various

material changes to the specification that encompassed new matter not disclosed in the parent

'981 Application, including replacing references to "the invention" with "one embodiment"

requiring a first and second chamber.[48] These changes are shown in Exhibit 40. By including

new subject matter, and misrepresenting to the USPTO that the application was a continuation,

Novoluto improperly obtained claims in the '097 Patent that it could not have obtained without

the new matter in the specification (such as claim 1 of the '097 Patent that recites, among other

things, "a chamber having a flexible wall portion").[49]

114.    On information and belief, Mr. Lenke, the sole named inventor on the '123

Application, was aware of Mr. Cheng's misrepresentation to the USPTO that the '123

Application was a continuation of the '981 Application. On information and belief, Mr. Lenke

did not disclose Mr. Cheng's misrepresentation to the USPTO.

115.    On information and belief, Mr. Cheng's misrepresentation that the '123

Application was a continuation of the '981 Application, misled the examiner into believing the

'981 Application contained written description support for the new claims, when it did not. On

information and belief, at least claim 1 of the '097 Patent would not have issued but for

Mr. Cheng's misrepresentation and Mr. Lenke's failure to disclose that misrepresentation to the

---

[47] *See* M.P.E.P. § 201.07 ("The disclosure presented in the continuation must not include any subject matter which would constitute new matter if submitted as an amendment to the parent application.")

[48] Ex. 40 (Exhibit 24 from *EIS GmbH v. Novoluto GmbH*, IPR2020-0007 (P.T.A.B.), showing the changes between the '061 and '097 Patent specifications).

[49] Ex. 21 at 19.

USPTO, at least because the claims lack written description support as required by 35 U.S.C. § 112(a).

**Novoluto Accused EIS of Infringement and
Tried to Push EIS out of the United States**

116.    André Geske, the owner of EIS, and Mr. Plettenberg met three times between November 2018 and February 2019 at Mr. Plettenberg's request.

117.    Mr. Geske met with Mr. Plettenburg on or about November 8, 2018, in Berlin.  At the meeting, Mr. Plettenberg accused EIS of copying Novoluto's products and alleged that EIS's Air Pulse products infringe the Unenforceable Patents.  Mr. Plettenberg also alleged that EIS's Air Pulse products would infringe additional Novoluto patents, which were then pending as applications—some of which remain pending—once they issued.

118.    Mr. Plettenberg tried to leverage his infringement allegations to convince Mr. Geske to sell EIS (and related entities) to Novoluto, but Mr. Geske refused.  Mr. Plettenburg then told Mr. Geske that if EIS would leave the United States market, they could make a licensing deal for the rest of the world.  Mr. Geske again refused.

119.    The second meeting took place in Las Vegas, on or about January 15, 2019.  For this meeting, Mr. Plettenberg insisted that they meet in the Wynn Hotel's sauna, so he could verify that Mr. Geske was not recording their conversation.  This time, Mr. Plettenberg suggested a deal whereby EIS and Novoluto would sell their products in the United States at a similar price point and share the United States market instead of competing against each other.   Again, Mr. Geske refused.

120.    At a third meeting, again in Berlin, on or about February 9, 2019, Mr. Plettenberg offered to license Novoluto's United States patents (currently issued and those that would issue from its pending applications) to EIS.  No agreement was reached.

121.    At least as recently as July 7, 2020, Mr. Plettenberg told Mr. Geske that the Satisfyer-branded products infringe Novoluto's patents.  EIS continues to sell its allegedly-infringing Satisfyer (Air Pulse) products in the United States.  To date, no agreement has been reached.

### Novoluto Is Attempting to Acquire Monopoly Power Through its Unenforceable Patents

122.    On information and belief, Defendant Novoluto knew about Mr. Cheng, Mr. Lenke, and Mr. Plettenberg's deliberate misrepresentations to the USPTO discussed above because Mr. Cheng is Novoluto's counsel, Mr. Plettenberg is an executive director of Novoluto, and Mr. Lenke is Novoluto's CEO.

123.    On information and belief, despite knowing its patents were procured through fraud and misrepresentation, rendering them unenforceable, Novoluto (through Mr. Plettenberg) used its patents to try to force EIS out of the United States market, either through acquisition or through exclusion.

124.    Novoluto's conduct was specifically intended to monopolize and destroy competition in the United States market for sexual wellness devices incorporating pulsating air for clitoral stimulation ("the Market"), a market presently valued in the millions of dollars annually.  In particular, despite knowing that the '851, '097, and '061 Patents were unenforceable, Novoluto continued to leverage them against EIS during the meetings between Mr. Plettenberg and Mr. Geske.

125.    WOW Group, including Defendant Novoluto, is EIS's direct competitor in the Market.  In the United States, Defendants and EIS are the only companies with an appreciable

market share; together controlling almost the entire Market.[50]  Despite third parties' repeated attempts to enter the Market, none of WOW Group's competitors, other than EIS, have been able to establish a significant presence.  Thus, on information and belief, by attempting to force EIS out of the Market with its patents as described above and below, WOW Group intends to acquire monopoly power over the entire Market in the United States.

126.    Because there are no other major competitors in the Market, and the Market has proven difficult to enter, EIS's existence as a competitor to WOW Tech Intl. (and WOW Group more broadly) is vital to competition in the United States.  Upon information and belief, if Novoluto proves successful in forcing EIS out of the Market (using its invalid and unenforceable patents to do so), Novoluto will create a monopoly for its corporate parent and alter-ego, WOW Tech Intl. (and WOW Group more broadly), in the United States.

127.    On information and belief, Defendants' possession and threatened enforcement of Novoluto's invalid and unenforceable patents have caused EIS harm in the United States at least through lost sales.  Because EIS is competing in the Market with an unfairly restricted selection of its Air Pulse products, EIS's sales, market share, and customer base are reduced as a direct result of Defendants' threatened enforcement of their invalid and unenforceable patents.

**FIRST COUNT**
**UNFAIR COMPETITION**
**LANHAM ACT, § 43(A), 15 U.S.C. § 1125(A)**

128.    Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

129.    Defendants and/or their agents or other persons acting on their behalf, willfully made false or misleading statements of fact regarding Plaintiff, Plaintiff's business, and Plaintiff's Satisfyer products.

---

[50] A third company, LELO, also participates in the market, but on information and belief, has a trivial market share.

130.    Defendants violated Section 43(a)(1)(B) of the Lanham Act by publishing false and misleading reviews of Plaintiff's products on Amazon, by making false statements about alleged infringement of unenforceable and non-existent patent rights, and by hiring or otherwise directing an industry insider to make false and misleading statements on Instagram about Plaintiff, Plaintiff's business, and Plaintiff's products to the public, as set forth above.

131.    Defendants' false and misleading statements were publicly disseminated through the internet (via Instagram and Amazon), where they were available to EIS's actual and potential customers, and the public at large. Defendants' statements deceived or were likely to deceive EIS's actual and potential customers, and the public, in a material way because the statements were likely to influence purchasing decisions.

132.    Ms. Ligon, an industry insider, and the owner of a well-known boutique specializing in sexual wellness products, published false statements on the internet about Plaintiff and its products at Defendants' direction, which she presented as facts.  Her statements were likely to deceive the public because a person in her position (*i.e.,* a specialist or industry insider) is expected to have objective opinions on products and companies that were not secretly provided in exchange for payment.

133.    Similarly, Defendants' false Amazon reviews are likely to deceive the public and influence the purchasing decisions of Plaintiff's potential customers.  The public expects that product reviews are written by purchasers and/or users of the products, and as such would be deceived by Defendants' false reviews posted for the purpose of damaging Plaintiff's business.

134.    Defendants also falsely informed Plaintiff's distributors and retailers that Plaintiff's products infringe or may infringe Defendants' patents, which were found to be invalid in Germany and which did not exist in the United States.  Such statements were likely to deceive

Plaintiff's distributors and retailers about the character and quality of Plaintiff's products and its business.

135.    Defendants' false statements were made in connection with interstate commerce and entered into interstate commerce because they were disseminated nationwide through Amazon and Instagram.  Further, Plaintiff distributes its products nationwide and its interstate sales were affected by Defendants' false statements.

136.    As a result of Defendants' acts, EIS has suffered and will continue to suffer substantial injury, lost income, lost sales, lost profits, and damage to its goodwill associated with its brand and the Satisfyer product line.  By diverting Plaintiff's business, Defendants' continue to unfairly derive income, profits, and business opportunities from their unfair acts.

137.    As the acts alleged herein constitute unfair competition through the use of false and misleading descriptions and representations of fact under 15 U.S.C. § 1125, EIS is entitled to monetary damages and other remedies provided by 15 U.S.C. § 1117, including Defendants' profits, Plaintiff's damages, reasonable attorney's fees, costs, and prejudgment interest.

## SECOND COUNT
## DELAWARE UNIFORM DECEPTIVE TRADE PRACTICES ACT
## 6 DEL. C. § 2531 ET SEQ.

138.    Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

139.    Defendants and/or their agents or other persons acting on their behalf, willfully and knowingly made literally false, misleading, and disparaging statements about Plaintiff, Plaintiff's business, and Plaintiff's products with the intent to damage Plaintiff.

140.    Defendants' statements deceived or were likely to deceive EIS's actual and potential customers, and the public, in a material way because the statements were likely to influence customers' and potential customers' purchasing decisions.  Ms. Ligon, an industry insider, and the owner of a well-known boutique specializing in sexual wellness products,

published false statements on the internet about Plaintiff and its products at Defendants' direction, which she presented as facts. Her statements were likely to deceive the public because a person in her position (*i.e.*, a specialist or industry insider) is expected to have objective opinions on products that were not secretly made in exchange for payment.

141.    Similarly, Defendants' false Amazon reviews are likely to deceive the public and influence the purchasing decisions of Plaintiff's potential customers. The public expects that product reviews are written by purchasers and/or users of the products, and as such would be deceived by Defendants' false reviews posted for the purpose of damaging Plaintiff's business.

142.    Defendants' false and misleading statements were publicly disseminated through the internet (via Amazon and Instagram), and were likely to deceive the public about the character and quality of Plaintiff's products and its business.

143.    Defendants also falsely informed Plaintiff's distributors and retailers that Plaintiff's products infringe or may infringe Defendants' patents, which were found to be invalid in Germany and which did not exist in the United States. Such statements were likely to deceive Plaintiff's distributors and retailers about the character and quality of Plaintiff's products and its business.

144.    As a result of Defendants' acts, EIS has suffered and will continue to suffer substantial injury, lost income, lost sales, lost profits, and damage to its goodwill associated with its brand and the Satisfyer product line. By diverting Plaintiff's business, Defendants continue to unfairly derive income, profits, and business opportunities from their unfair acts.

145.    Defendants' acts constitute unfair methods of competition, and unfair or deceptive acts or practices under the Delaware Uniform Deceptive Trade Practices Act, 6 Del. C. §§ 2532(a)(8), (12).

146.    EIS is informed and believes, and on that basis alleges, that Defendants' actions, as alleged herein, show that they willfully violated the Delaware Uniform Deceptive Trade Practices Act.  EIS therefore is entitled to an award of attorneys' fees and costs pursuant to 6 Del. C. § 2533.

### THIRD COUNT
### DELAWARE COMMON LAW UNFAIR COMPETITION

147.    Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

148.    Defendants and/or their agents or other persons acting on their behalf, made false, misleading, and disparaging statements about Plaintiff, Plaintiff's business, and Plaintiff's Satisfyer line of products, with the intent to damage Plaintiff.

149.    Defendants attempted and intended to deceive the public about the character and quality of Plaintiff's products and its business, and thereby interfere with Plaintiff's business interests.  Each of Defendants' unfair acts intended this result: 1) false and misleading Amazon reviews were intended to deceive EIS's potential customers such that they would not purchase EIS's Satisfyer products; 2) Ms. Ligon's Instagram posts about EIS and its Satisfyer products were intended to convince her subscribers, the public, and other retailers not to do business with EIS; and 3) Defendants falsely informed EIS's distributors and retailers that EIS's products infringed or likely infringed Defendants' patents (which had not yet been granted in the U.S. and which were found invalid in Germany), to convince those customers to cease doing business with EIS.

150.    As a result of Defendants' acts, EIS has suffered and will continue to suffer substantial injury, lost income, lost sales, lost profits, and damage to its goodwill associated with its brand and the Satisfyer product line.  By diverting Plaintiff's business, Defendants continue to unfairly derive income, profits, and business opportunities from their unfair acts.

## FOURTH COUNT
## DELAWARE COMMON LAW TORTIOUS INTERFERENCE
## WITH BUSINESS RELATIONS

151.    Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

152.    Upon information and belief, Defendants themselves, and/or through their subsidiaries and/or agents, intentionally and knowingly made false or misleading statements of fact regarding Plaintiff's products and Defendants' patents, with the intent to damage Plaintiff by interfering with its business relations.

153.    Specifically, Defendants falsely informed EIS's distributors and retailers that EIS's products infringed or likely infringed Defendants' patents (which had not yet been granted in the United States and which were found invalid in Germany), to convince those customers to cease doing business with EIS.

154.    Defendants also placed restrictions in their supply agreements preventing retailers that carry its products from also carrying EIS's products, demanded retailers stop selling EIS's products, and threatened to raise its prices or cease sales to coerce non-compliant retailers to stop selling EIS's competing products.

155.    Defendants knew that EIS had ongoing business relationships with its distributors and retailers, or Defendants would not have made the statements detailed.  Furthermore, Defendants' statements constitute a knowing and willful attempt to interfere with Plaintiff's business relations in violation of Delaware common law.

As a result of Defendants' acts, EIS has suffered and will continue to suffer substantial injury, lost income, lost sales, lost profits, and damage to its goodwill associated with its brand and the Satisfyer product line.  By diverting Plaintiff's business, Defendants continue to unfairly derive income, profits, and business opportunities from their unfair acts.

## FIFTH COUNT
## DECLARATORY JUDGMENT OF UNENFORCEABILITY
## FOR INEQUITABLE CONDUCT IN OBTAINING THE ' 851 PATENT

156.    Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

157.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

158.    EIS seeks a judgment declaring that the claims of the '851 Patent are unenforceable under the doctrine of inequitable conduct.

159.    During the prosecution of the '851 patent, Mr. Cheng and Mr. Lenke withheld the existence of the German Opposition Proceeding and complete translations of *Guan* from the USPTO.

160.    The single most reasonable inference to be drawn from Mr. Cheng and Mr. Lenke's conduct is that they intended to deceive the USPTO.

161.    *Guan* is material to at least claim 1 of the '851 Patent.  At least claim 1 of the '851 Patent would not have issued if Mr. Cheng and/or Mr. Lenke had disclosed the German Opposition Proceeding or at least one of the *Guan* translations to the USPTO.

## SIXTH COUNT
## DECLARATORY JUDGMENT OF UNENFORCEABILITY
## FOR INEQUITABLE CONDUCT IN OBTAINING THE ' 061 PATENT

162.    Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

163.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

164.    EIS seeks a judgment declaring that the claims of the '061 Patent are unenforceable under the doctrine of inequitable conduct.

165.   During the prosecution of the '061 Patent, Mr. Cheng and Mr. Lenke withheld the existence of the German Opposition Proceeding and complete translations of *Guan* from the USPTO.

166.   The single most reasonable inference to be drawn from Mr. Cheng and Mr. Lenke's conduct is that they intended to deceive the USPTO.

167.   *Guan* is material to at least claim 1 of the '061 Patent.  At least claim 1 of the '061 Patent would not have issued if Mr. Cheng and/or Mr. Lenke had disclosed the German Opposition Proceeding or at least one of the *Guan* translations to the USPTO.

### SEVENTH COUNT
### DECLARATORY JUDGMENT OF UNENFORCEABILITY
### FOR INEQUITABLE CONDUCT IN OBTAINING THE '097 PATENT

168.   Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

169.   As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

170.   EIS seeks a judgment declaring that the claims of the '097 Patent are unenforceable under the doctrine of inequitable conduct.

171.   During the prosecution of the '097 Patent, Mr. Cheng and Mr. Lenke withheld the existence of the German Opposition Proceeding and complete translations of *Guan* from the USPTO.

172.   During the prosecution of the '097 Patent, Mr. Cheng misrepresented to the USPTO that the '123 Application was a continuation.  On information and belief, Mr. Lenke did not disclose Mr. Cheng's misrepresentation to the USPTO.

173.   The single most reasonable inference to be drawn from Mr. Cheng and Mr. Lenke's conduct is that they intended to deceive the USPTO.

174.    *Guan* is material to at least claim 1 of the '097 Patent.  At least claim 1 of the '097 Patent would not have issued if Mr. Cheng and Mr. Lenke had disclosed the German Opposition Proceeding or at least one of the *Guan* translations to the USPTO.

175.    Mr. Cheng's misrepresentation that the '123 Application was a continuation is material to at least claim 1 of the '097 Patent.  At least claim 1 of the '097 Patent would not have issued if Mr. Cheng had disclosed to the USPTO that the '123 Application was not a continuation or if Mr. Lenke had disclosed Mr. Cheng's misrepresentation to the USPTO.

**EIGHTH COUNT**
**WALKER PROCESS FRAUD, ATTEMPTED MONOPOLIZATION**
**SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)**

176.    Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

177.    Defendant Novoluto obtained the Unenforceable Patents through fraud on the USPTO.  During prosecution of those patents, Mr. Cheng and Mr. Lenke withheld the complete English translations of *Guan* and the existence of the German Opposition Proceeding from the USPTO, among other misrepresentations.

178.    That information was material to the patentability of at least one, in particular independent, claim of each patent because of the similarities between the issued claims and Novoluto's '501 Patent that the GPTO invalidated in the Opposition Proceeding.  At least claim 1 from each of the Unenforceable Patents would not have issued but for the fact that Mr. Cheng and Mr. Lenke withheld the *Guan* translations and the existence and substance of the Opposition Proceeding from the USPTO.

179.    On information and belief, Mr. Cheng and Mr. Lenke knew about the Opposition Proceeding and that *Guan* was central to it.  Mr. Cheng and Mr. Lenke knew about the Novoluto Applications and that they included similar claims to its German '501 patent.  On information and belief Mr. Cheng and Mr. Lenke withheld the Opposition Proceeding and the *Guan*

44

translations from the USPTO because disclosing them would have prevented at least claim 1 of each of the Unenforceable Patents from issuing.

180.    WOW Group, including defendant Novoluto, directly competes against EIS in the market for sexual wellness devices incorporating pulsating air for clitoral stimulation.

181.    WOW Group, including defendant Novoluto, was at least aware of Mr. Cheng and Mr. Lenke's material omissions to the USPTO, but continued to leverage the Unenforceable Patents against EIS to try to drive EIS out of the United States Market at least by threatening to enforce Novoluto's fraudulently enforced patents against EIS and its customers.  Relying on his infringement accusations, Mr. Plettenberg also attempted to purchase EIS or convince EIS to leave the United States Market in exchange for a licensing deal for the rest of the world.

182.    On information and belief, by attempting to force EIS out of the Market in the United States using their fraudulently procured patents, and by pressuring EIS to engage in price fixing (which Mr. Geske refused to do), Defendants intended to increase their own market share. Because EIS is Defendants' only major competitor in the Market, and the Market has proven difficult for additional competitors to enter, Defendants' acts were intended to acquire monopoly power within the market.

183.    There is a dangerous probability that Defendants will achieve monopoly power in the Market.  By actively working to push EIS out of the Market with their invalid and unenforceable patents, Defendants are trying to eliminate their only major competitor.  Without EIS in the market, Defendants will achieve monopoly power.

184.    On information and belief, Defendants' possession and threatened enforcement of Novoluto's invalid and unenforceable patents have caused harm to EIS at least through lost sales, reduced market share, and reduced customer base in the United States.

185.    Defendants have also caused harm to competition in the relevant market within the United States, and harm to consumers in the United States.  EIS's products sell for less than Defendants' products they compete against in the Market while offering equal or better quality, features, and performance.  As a result of Defendants' possession and threatened enforcement of Novoluto's invalid and unenforceable patents, EIS cannot compete freely with Defendants in the Market.  EIS is unable to distribute its complete product line in the United States, ultimately causing harm to consumers because they must shop in a Market with reduced competition, including a smaller selection of more expensive products than would otherwise be available.  If Defendants obtain monopoly power, consumers will further lose access to EIS's more affordable, higher quality, alternatives, causing additional harm.

### NINTH COUNT
### DECLARATORY JUDGMENT OF NONINFRINGEMENT
### OF THE '851 PATENT

186.    Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

187.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

188.    The '851 patent has two independent claims: 1 and 8.  Independent claim 1 of the '851 Patent recites:

1. A stimulation device for a clitoris, comprising:

a pressure field generator comprising:

a first chamber having a single opening;

a second chamber having first and second openings, the second opening of the second chamber for placing over the clitoris; and

a connection element having a first opening and a separate second opening thereby forming a straight channel connecting the single opening of the first chamber with the first opening of the second chamber;

a drive unit that changes a volume of the first chamber in such a manner that a stimulating pressure field is generated in the second chamber via the connection element; and

a control device that actuates

the drive unit; and a housing enclosing the pressure field generator, the drive unit, and the control device; wherein:

the pressure field generated in the second chamber consists of a pattern of negative and positive pressures modulated with respect to a reference pressure,

the first chamber is connected with the second chamber solely by the connection element,

the stimulation device has no valves,

the stimulation device is a portable hand-held device with a battery,

the connection element is rigid and the first and second openings of the connection element are aligned to one another so that a media flow during a compression of the first chamber is directed to the clitoris through the straight channel with a nozzle effect, and

the second opening of the connection element is configured to face the clitoris through the second chamber.

189.    Independent claim 8 includes similar features to independent claim 1.

190.    None of Plaintiff's products include every claimed feature of any independent claim in the '851 patent.  Plaintiff's Satisfyer products do not include, among other things, the claimed "connection element."

191.    For at least these reasons, Plaintiff has not infringed and does not infringe any claim of the '851 Patent under any theory of infringement.

192.    A judicial declaration is necessary and appropriate so that Plaintiff may ascertain its rights regarding the '851 Patent.

### TENTH COUNT
### DECLARATORY JUDGMENT OF NONINFRINGEMENT
### OF THE '061 PATENT

193.    Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

194.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

195.    The '061 patent has three independent claims: 1, 20, and 21.  Independent claim 1 of the '061 Patent recites:

> 1. A stimulation device for erogenous zones, comprising:
>
>> at least one pressure field generating arrangement with:
>>
>>> at least one first chamber;
>>>
>>> at least one second chamber having at least one opening for placing on a body part; and
>>>
>>> at least one connection element that connects the at least one first chamber to the at least one second chamber;
>>
>> a drive unit that varies the volume of the at least one first chamber such that a stimulating pressure field is generated via the at least one connection element in the at least one second chamber;
>>
>> a control device that activates the drive unit; and
>>
>> an appendage;

wherein the stimulating pressure field generated in the at least one second chamber comprises a pattern of negative and positive pressures, modulated onto with respect to a reference pressure;

wherein the at least one first chamber is connected to the at least one second chamber solely by the at least one connection element, and

wherein the appendage is a dildo configured to be inserted into a vagina.

196. Independent claims 20 and 21 include similar features to independent claim 1.

197. None of Plaintiff's products include every claimed feature of any independent claim in the '061 patent. Plaintiff's Satisfyer products do not include, among other things, the claimed "connection element."

198. For at least these reasons, Plaintiff has not infringed and does not infringe any claim of the '061 Patent under any theory of infringement.

199. A judicial declaration is necessary and appropriate so that Plaintiff may ascertain its rights regarding the '061 Patent.

**ELEVENTH COUNT**
**DECLARATORY JUDGMENT OF NONINFRINGEMENT**
**OF THE '097 PATENT**

200. Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

201. As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

202. The '097 patent has four independent claims: 1, 12, 17, and 26. Independent claim 1 of the '061 Patent recites:

1. A stimulation device, comprising:

a chamber having a flexible wall portion;

a drive unit in physical communication with the flexible wall portion so as to cause deflections of the flexible wall portion in opposing directions, thereby resulting in a changing volume of the chamber,

the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure;

an opening for applying the modulated positive and negative pressures to a body part;

a control device for controlling the drive unit; and

an appendage, wherein the appendage is a dildo configured to be inserted into a vagina.

203.   Independent claims 12, 17, and 26 include similar features to independent claim 1.

204.   None of Plaintiff's products, sold in the United States, include every claimed feature of any independent claim in the '097 patent.  Plaintiff's Satisfyer products, sold in the United States, do not include, among other things, the claimed "appendage."

205.   For at least these reasons, Plaintiff has not infringed and does not infringe any claim of the '097 Patent under any theory of infringement.

206.   A judicial declaration is necessary and appropriate so that Plaintiff may ascertain its rights regarding the '097 Patent.

**TWELFTH COUNT**
**DECLARATORY JUDGMENT OF NONINFRINGEMENT**
**OF THE '809 PATENT**

207.   Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

208.   As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

209.    The '809 patent has four independent claims: 1, 20, 23, and 28.  Independent claim 1 of the '809 Patent recites:

> 1. A stimulation device for a clitoris, comprising:
>
> > a housing;
> >
> > a pressure field generation device having a drive unit which generates a pressure field from temporally alternating negative and positive pressures of a medium in a hollow space; and
> >
> > a control device which controls the drive unit;
> >
> > wherein:
> >
> > > the housing has a longitudinal axis, which extends from a front end of the housing up to a back end of the housing,
> > >
> > > an opening for placing over the clitoris is provided in the front end of the housing with a center of the longitudinal axis passing through an opening plane of the opening,
> >
> > wherein the opening plane is defined by outer edges of the opening,
> >
> > > the hollow space is arranged inside the housing and is connected to the opening of the housing,
> > >
> > > the pressure field generation device comprises a flexible wall which is configured to be displaced by the drive unit, and
> > >
> > > a direction of the displacement of the flexible wall is provided by the drive unit at an angle relative to an alignment axis that is defined by an alignment of currents of the medium in the hollow space when generating the positive pressures.

210.    Independent claims 20, 23, and 28 include similar features to independent claim 1.

211.    None of Plaintiff's products include every claimed feature of any independent claim in the '809 patent.  Plaintiff's Satisfyer products do not include, among other things, the claimed "opening . . . with a center of the longitudinal axis passing through an opening plane of the opening" and/or "a direction of the displacement . . . at an angle relative to an alignment axis."

212.    For at least these reasons, Plaintiff has not infringed and does not infringe any claim of the '809 Patent under any theory of infringement.

213.    A judicial declaration is necessary and appropriate so that Plaintiff may ascertain its rights regarding the '809 Patent.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.    That Defendants' statements about Plaintiff and Plaintiff's products were false and misleading under federal, state, and common law;

B.    That Defendants' statements constitute unfair competition and unfair trade practices under federal, state, and common law;

C.    That this is an exceptional case within the meaning of 15 U.S.C. § 1117 and that Defendants' acts of unfair competition were knowing and willful;

D.    That, as to all claims, Plaintiff be awarded Defendants' profits, compensatory damages, punitive damages, reasonable attorney's fees, costs, and prejudgment interest in an amount to be ascertained pursuant to applicable laws including, without limitation, 15 U.S.C. § 1117 and 6 Del. C. § 2533;

E.    That, as to all claims, Plaintiff be awarded injunctive relief barring Defendants and their officers, directors, agents, servants, employees, attorneys, licensees, successors, assigns, and those in active concert or participation with any of them, from making false,

misleading, and/or disparaging statements to the public or to Plaintiff's customers, retailers, and/or distributors, about Plaintiff, Plaintiff's business, and/or Plaintiff's products, including by posting false and misleading product reviews and stating that Plaintiff's products infringe Defendants' patents;

F.      That the '851 Patent, the '061 Patent, and the '097 Patent are unenforceable;

G.      That Plaintiff has not infringed and does not infringe any claim of the '851 Patent, the '061 Patent, the '097 Patent, or the '809 Patent;

H.      A judgment that Defendants and each of their officers, directors, agents, counsel, servants, employees, and all of persons in active concert or participation with any of them, be restrained and enjoined from alleging, representing, or otherwise stating that EIS infringes any claims of the '851 Patent, the '061 Patent, the '097 Patent, or the 809 Patent, or from instituting or initiating any action or proceeding alleging infringement of any claims of the '851 Patent, the '061 Patent, or the '097 Patent, or the '809 Patent against EIS, its corporate family, or any customers, manufacturers, users, importers, or sellers of EIS's products;

I.      That this case be declared "exceptional" under 35 U.S.C. § 285 and Plaintiff be awarded its attorneys' fees, expenses, and costs incurred in this litigation;

J.      That Defendants violated Section 2 of the Sherman Act, 15 U.S.C. § 2, and Plaintiff should be awarded treble damages;

K.      Damages and injunctive relief, as just and proper under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26; and

L.      That Plaintiff be granted such other and further relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

_____

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com

*Attorneys for Plaintiff*

OF COUNSEL:

Naveen Modi
Tad Richman
David Valente
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC  20036
(202) 551-1700

December 22, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 22, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on December 22, 2020, upon the following in the manner indicated:

Paul D. Brown, Esquire                                    *VIA ELECTRONIC MAIL*
Joseph B. Cicero, Esquire
Gregory E. Stuhlman, Esquire
CHIPMAN BROWN CICERO & COLE, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801
*Attorneys for Defendants*

Tammy J. Dunn, Esquire                                    *VIA ELECTRONIC MAIL*
Califf T. Cooper, Esquire
OSHA BERGMAN WATANABE & BURTON LLP
Two Houston Center
909 Fannin Street, Suite 3500
Houston, TX 77057
*Attorneys for Defendants*


                                    */s/ Brian P. Egan*
                                    _____
                                    Brian P. Egan (#6227)