# *Exhibit 1*

8/27/2019    Womanizer Group and Standard Innovation combine forces to create a new global pleasure product leader - WOW Tech Group

Case 1:19-cv-01227-GBW   Document 53   Filed 12/22/20   Page 2 of 527 PageID #: 1590



(https://wowtech.com)

STANDARD INNOVATION (HTTPS://WOWTECH.COM/CATEGORY/STANDARD-INNOVATION/), WOMANIZER (HTTPS://WOWTECH.COM/CATEGORY/WOMANIZER/)

# Womanizer Group and Standard Innovation combine forces to create a new global pleasure product leader

on **JUNE 01, 2018 (HTTPS://WOWTECH.COM/2018/06/01/)**

(June 1, 2018) BERLIN/OTTAWA – **Womanizer Group Management GmbH** and **Standard Innovation Corporation**® combine forces to create a new global pleasure product industry leader. The new company will further develop the market-leading **We-Vibe**® and **Womanizer**® brands through new investments in innovation, marketing and promotion, broadening the geographic reach, and management of intellectual property.

*"The combined company brings together two of the industry's most successful, innovative and recognized brands,"* says Johannes Plettenberg, managing director of Womanizer Group. *"We-Vibe and Womanizer have much in common. Both lead the industry in innovation, technology, and superior product design. Bringing together the teams behind these brands provides an exceptional foundation for a new phase of growth."*

8/27/2019 Womanizer Group and Standard Innovation combine forces to create a new global pleasure product leader – Wow Tech Group

Case 1:19-cv-01227-GBW   Document 53-1   Filed 12/22/20   Page 3 of 527 PageID #: 1591

*"We-Vibe and Womanizer are poised to take advantage of their complementary strengths to benefit our retail and distribution partners, and consumers,"* says Frank Ferrari, president of Standard Innovation. *"The industry can expect new innovative products and superior marketing from leading brands that elevate the category, and our customers can expect enhanced service from a trusted, reliable partner."*

Under the terms of the agreement, Womanizer Group acquires all outstanding shares of Standard Innovation, and Standard Innovation shareholders reinvest in the combined entity. The teams behind both brands continue in place to drive future success. Standard Innovation founders, Bruce and Melody Murison, remain investors in the new company but will no longer be involved in management operations.

Subsequent to the transaction both companies will be grouped under the newly founded holding company **WOW Tech Group**.

**About WOW Tech Group**

Headquartered in Berlin, Germany, WOW Tech Group consists of several companies in North America, Europe, and Asia that design and market premium intimate products. WOW Tech Group brands We-Vibe® (http://www.we-vibe.com/) and Womanizer® (_wp_link_placeholder) are available at thousands of retail locations in over 60 countries around the world.

# Press Contact

👤 **Denny Alexander**

📞 +01 (613) 828 - 6678

✉ denny.alexander@wowtech.com

# Lastest press releases

Introducing Moxie – The Latest Product From We-Vibe Is Wearable For Fun On The Go (Https://Wowtech.Com/2019/05/07/Introducing-Moxie-The-Latest-Product-From-We-Vibe-Is-

Case 1:19-cv-01227-GBW Document 63 Filed 12/22/20 Page 4 of 527 PageID #: 1592

Wearable-For-Fun-On-The-Go/)

May 7, 2019

WOW TECH CHOOSES ORION AS FIRST MASTER DISTRIBUTION PARTNER FOR WE-VIBE IN EUROPE (Https://Wowtech.Com/2019/01/29/Wow-Tech-Chooses-Orion-As-First-Master-Distribution-Partner-For-We-Vibe-In-Europe/)

January 29, 2019

WOW Tech Presents An Exclusive Preview Of New We-Vibe And Womanizer Products And Launches Pjur Retailer Program At ANME (Https://Wowtech.Com/2019/01/10/Wow-Tech-Presents-An-Exclusive-Preview-Of-New-We-Vibe-And-Womanizer-Products-And-Launches-Pjur-Retailer-Program-At-Anme/)

January 10, 2019

Partnership With WOW Tech Group To Boost Pjur's North America Exposure, Support, And Sales (Https://Wowtech.Com/2018/12/18/Partnership-With-Wow-Tech-Group-To-Boost-Pjurs-North-America-Exposure-Support-And-Sales/)

December 18, 2018

WOW TECH CONSOLIDATES US DISTRIBUTION FOR WE-VIBE AND WOMANIZER (Https://Wowtech.Com/2018/10/22/Wow-Tech-Consolidates-Us-Distribution-For-We-Vibe-And-Womanizer/)

October 22, 2018

---

WOW Tech™ Group is a world leader in the design, manufacturing, and marketing of premium intimate pleasure products.

---

8/27/2019     Womanizer Group and Standard Innovation combine forces to create a new global pleasure product leader – WOW Tech Group

Case 1:19-cv-01227-GBW   Document 53   Filed 12/22/20   Page 5 of 527 PageID #: 1593

✉ info@wowtech.com

🎧 +49 30 95999 38 10

## OUR BRANDS

**We-Vibe® (https://we-vibe.com)**

**Womanizer™ (https://www.womanizer.com/)**

**Attivia™ (https://attivia.life)**

**pjur® (https://www.pjur.com)**

**Novoluto (https://www.novoluto.com)**

## LINKS

**Press (https://wowtech.com/press/)**

**Contact (https://wowtech.com/contact/)**

**About us (https://wowtech.com/about-us/)**

## LEGAL

**Privacy Policy (https://wowtech.com/privacy-policy/)**

**Competion Conditions (https://wowtech.com/competion-conditions/)**

**Imprint (https://wowtech.com/imprint/)**

## PRESS RELEASES

Introducing Moxie – The Latest Product From We-Vibe Is Wearable For Fun On The Go (Https://Wowtech.Com/2019/05/07/Introducing-Moxie-The-Latest-Product-From-We-Vibe-Is-

Wearable-For-Fun-On-The-Go/)

May 7, 2019

WOW TECH CHOOSES ORION AS FIRST MASTER DISTRIBUTION PARTNER FOR WE-VIBE IN EUROPE (Https://Wowtech.Com/2019/01/29/Wow-Tech-Chooses-Orion-As-First-Master-Distribution-Partner-For-We-Vibe-In-Europe/)

January 29, 2019

© 2019 WOW Tech International GmbH

# *Exhibit 2*



# Johannes Plettenberg

CEO @ WOW Tech

Berlin, Berlin, Germany · 500+ connections

**Join to Connect**

WOW Tech Group (Womanizer
Group Management GmbH)

Technische Universität Berlin

## Activity

Hey you all, we are celebrating our very first "Love & Relationship
Day" with Amorelie at the Humboldt Carré in Berlin in the 6th of
September from...

Liked by **Johannes Plettenberg**

## Experience



### Managing Director
WOW Tech Group (Womanizer Group Management GmbH)

May 2017 – Present · 2 years 5 months

Berlin

### Member of Supervisory Board

**Linked**in

Join now    Sign in

🔍   Johannes Plettenberg

### CFO
Amorelie

Feb 2015 – Apr 2017 · 2 years 3 months

Berlin und Umgebung, Deutschland

### Mentor
Startupbootcamp

Aug 2014 – Mar 2015 · 8 months

Berlin

### Bombardier Transportation
4 years 6 months

● ### Head of Business Incubator
May 2014 – Feb 2015 · 10 months

● ### Corporate Mergers&Acquisition
Sep 2010 – Apr 2014 · 3 years 8 months

### Mergers&Acquisitions
HSBC

Jun 2007 – Jul 2010 · 3 years 2 months

### Mergers&Acquisitions
J.P. Morgan

Oct 2006 – Mar 2007 · 6 months

Frankfurt am Main

---

# Education

### Technische Universität Berlin
Diplom-Ingenieur · Industrial Engineering and Management



**Linked** **in**

Join now    | Sign in |

🔍   Johannes Plettenberg

2005 – 2006

## Languages

**Deutsch**
Native or bilingual proficiency

**Englisch**
Full professional proficiency

**Französisch**
Limited working proficiency

**Spanisch**
Limited working proficiency

**Italienisch**
Elementary proficiency

---

## View Johannes Plettenberg's full profile to

See who you know in common

Get introduced

Contact Johannes Plettenberg directly

| **Join to view full profile** |

## People also viewed

Case 1:19-cv-01227-GBW - Document 53-1 - Filed 12/23/20 - Page 11 of 527 PageID #: 1599

 **Linked** in

Join now                    **Sign in**

🔍  Johannes Plettenberg



 **Tuba Berkovych**
Event Manager

 **Heinrich von Bünau**
Business Development Manager bei Buchler GmbH

 **Tobias Arco-Valley**
Partner

 **Fabian von Trotha**
Managing Director bei Dieter von Holtzbrinck Ventures

 **Thuve von Bremen**
Chief Commercial Officer (CCO) bei WOW Tech Group (formerly Standard Innovation Corporation and Womanizer Group)

 **Lea-Sophie Cramer**
Founder & CEO of Amorelie

 **Dr. Richard K. Lenz**
Managing Partner at Rigeto Unternehmerkapital

 **Ferdinand von Humboldt**
CFO bei Webtrekk Group

# Others named **Johannes Plettenberg**

### Johannes Plettenberg
Berlin Area, Germany

1 other named Johannes Plettenberg is on LinkedIn

**See others named Johannes Plettenberg**

Johannes Plettenberg - Managing Director @ WOW Tech Group (Womanizer Group Management GmbH) | LinkedIn

**Linked**in

🔍 Johannes Plettenberg

CEO @ WOW Tech

Managing Director at WOW Tech Group (Womanizer Group Management GmbH)

Technische Universität Berlin

View profile

Join now    Sign in

**View profile badges**

## View similar profiles

**Stefan Hollaender**

**Philipp Skribanowitz**

© 2019

User Agreement

Cookie Policy

Brand Policy

Community Guidelines

About

Privacy Policy

Copyright Policy

Guest Controls

Language ⌄

*Exhibit 3*



# Data Protection Policy

This website is operated by WOW Tech Europe GmbH ("WOW" "we" or "us "). For further details please see our imprint.

With this Data Protection Policy we inform you about how we use your personal data when you visit our website and when we provide our services and your rights in this respect.

## Processing of Data

### 1. Visiting our website

Each time you visit our website your browser automatically transmits information to us. Such as IP-address of your device, date and time of access, name and address of the requested file, transmitted amount of data, notification as to whether the request was successful, information on the browser and operating system used, name of your internet provider. This data is processed and temporally stored technically facilitate the use of the website (connection setup). In addition, the data is evaluated in anonymous and aggregated form (i.e. drawing conclusions about individual users won't be possible), statistically in the interest of system security, the technical administration of the network infrastructure and to optimize our website. These are all our legitimate interests, so we base the processing on Art. 6 para. 1 f) of the General Data Protection Regulation (GDPR).

### 2. Legal Basis for the Processing of Personal Data

We use our website as an informational platform to answer your enquiries. To make contact requests more personal, you have the option of providing about you, comments and questions via a contact form. The respective legal basis for such processing is our legitimate interest (Art. 6 para. 1 f) GDPR).

We may process your personal data for the purpose of preparing offers and fulfilling contractual obligations (based on Art. 6 para. 1 b) GDPR).

To the extent we process your personal data for accounting, cost accounting and complying with legal obligations (e.g. commercial and tax law), we base this processing on Art. 6 para. 1 c) GDPR.

On the legal basis of Art. 6 para. 1 f) GDPR we collect information through, among other things, participation in conferences and events, personal recommendations and employee registration by employers for the use of our services and by selected external business partners.

Based on your consent (Art. 6 para. 1 a) GDPR) we will use your data to send you information about products, services, events and other information worth knowing about our company. You can revoke your consent at any time with effect for the future under the contact information provided within the imprint.

## 3. User account

You have the possibility to register a user account on our website. We have marked the data that are mandatory for registration within the form as obligatory fields. This information is required for setting up a user account and is processed on the basis of Art. 6 para. 1 b) GDPR. Any other information you provide to us that goes beyond the mandatory information will be processed by us on the basis of our legitimate interest in using your voluntarily provided information for the user account (Art. 6 para. 1 f) GDPR). If you wish to object to data processing with regard to your voluntarily provided information, please contact the e-mail address given in the imprint.

## 4. Ordering process

If you order an article on our website, we need personal data in order to fulfil our contractual obligations towards you. It is possible that you complete an order without registering a user account as well as that you use the information saved under your user account for a faster and more comfortable order. In both cases, details of the billing and shipping address as well as payment information are required for contract execution. The legal basis for the processing of the aforementioned data is Art. 6 para. 1 b) GDPR. On the basis of our legitimate interests (Art. 6 para. 1 f) GDPR), we process information which you provide to us that goes beyond what is necessary for the performance of the contract. If you wish to object to this data processing, please contact the e-mail address given in the imprint.

We offer various payment options in cooperation with service providers. If you decide to use a payment option, payment data will be transmitted to the individual service providers as part of the execution of transactions. In some cases, payment service providers reserve the right to carry out a credit assessment based on mathematical-statistical procedures involving the use of address data. Some payment service providers provide you with information on the credit agencies used, which you can view in the browser window in which the payment option is offered before completing payment. Among the payment service providers with whom we cooperate are the following companies, whose Data Protection Policies can also be accessed via the following links:

- Amazon Pay: Amazon Payments Europe s.c.a., 5, Rue Plaetis, L 2338 Luxembourg - https://pay.amazon.de/help/201751600

- PayPal: PayPal (Europe) S.a.r.l. et Cie, S.C.A, 22-24 Boulevard Royal, L-2449 Luxembourg - https://www.paypal.com/de/webapps/mpp/ua/privacy-full?locale.x=en_DE#rAnnex

- Visa: Visa Europe Management Services Limited, Neue Mainzer Strasse 66-68, 60311 Frankfurt am Main Germany - https://www.visa.de/nutzungsbedingungen/visa-privacy-center.html

- Mastercard: Mastercard Europe SA, Chaussée de Tervuren 198A, B-1410 Waterloo Belgium - https://www.mastercard.de/de-de/privatkunden/produkte-features/features/masterpass/datenschutzhinweise.html

- griropay: giropay GmbH, An der Welle 4, 60322 Frankfurt am Main Germany - https://www.giropay.de/rechtliches/datenschutz-agb/

- Payone: BS PAYONE GmbH, Lyoner Straße 9, D-60528 Frankfurt/Main, Deutschland – https://www.bspayone.com/DE/de/privacy

The legal basis for data processing is Art. 6 para. 1 b) GDPR and data processing which goes beyond what is necessary for the execution of the contract is carried out on the basis of our legitimate interests (Art. 6 para. 1 f) GDPR).

## 5. Warranty & RMA Request

If you, as a buyer of one of our products, make a warranty claim, we will need your personal details as well as information about your purchase from us. You also have the option of submitting attachments to us using the corresponding form. We use the NetSuite service, which is operated by Oracle (ORACLE Deutschland B.V. & Co. KG, Riesstraße 25, D-80992 Munich), for the central recording of enquiries and for forwarding them to us. The data marked as mandatory fields are necessary for checking and processing and, if necessary, for safeguarding your warranty claim and are processed on the basis of Art. 6 para. 1 b) and c) GDPR. We process further information that you voluntarily provide to us on the basis of our legitimate interests in the use of this information (Art. 6 para. 1 f) GDPR). If you wish to object to data processing with regard to your voluntary details, please contact the e-mail address given in the imprint.

## 6. Write a feedback or comment

It is possible that you send us your feedback on one of our products or a comment for any other reason. We process the information you provide in the forms in order to improve your offer and, if necessary, to be able to contact you on the basis of our legitimate interests (Art. 6 para. 1 f) GDPR). We use the NetSuite service, which is operated by Oracle (ORACLE Deutschland B.V. & Co. KG, Riesstraße 25, D-80992 Munich), for the central recording of enquiries and for forwarding them to us. If you want to object to the data processing afterwards, please contact us using the e-mail address in the imprint.

## 7. Business Partner contact form

As a wholesaler you can send us an inquiry on our website. In order to better classify and process your enquiry, we ask you to fill in the relevant information in the form. We process the data entered in the form in order to handle your request. If the processing of the request directly concerns a future contractual relationship with you, the legal basis is Art. 6 para. 1 b) GDPR. In the case of other inquiries, we process the data on the basis of our legitimate interests in processing your inquiry (Art. 6 para. 1 f) GDPR). We use the NetSuite service, which is operated by Oracle (ORACLE Deutschland B.V. & Co. KG, Riesstraße 25, D-80992 Munich), for the central recording of enquiries and for forwarding them to us. In the last-mentioned case, you can object to data processing by sending an e-mail to the address given in the imprint.

## 8. Cookies, Pixel and similar technologies

Cookies are small text files, pixel are small graphic files, that are stored on your computer (together hereinafter "Cookies"). Cookies make it possible to identify you as a specific customer and to store both your personal preferences when using our website and technical information. The main benefit for you is

that you do not have to enter specific information stored in the Cookies every time you visit our website.
Cookies do not necessarily reveal personal information. If, however, you enter personal information on
our website, this may be associated with the data stored in the cookies.

**Unless otherwise expressly stated in the following, we base this processing on our legitimate interest in
offering you a handy website Art. 6 (1) f) GDPR.**

You can deactivate or block the storage of Cookies in your browser generally or only for our site. To find
out how, please see the help function of your browser. Please note that blocking Cookies may impair the
user-friendliness of our website.

**Cookie consent:** In order to be able to tell if you consented to the processing of data in connection with
Cookies, we implement a cookie which informs us if you have consented and to what kind of processing
you gave your consent or not.

**Own cookies:** For some of our services it is necessary that we use our own cookies. The main purpose of
our own cookies is to make the use of our services as time-saving as possible by, for example, saving the
language you have selected. We use our own cookies in particular for login authentication, load
distribution and to note that information placed on our website has been displayed to you.

## 8.1 Google Analytics

On our website we use Google Analytics a web analysis service of Google LLC. (1600 Amphitheatre
Parkway, Mountain View, CA 94043, USA, "Google"). Google Analytics enables the generation of statistics
to help us understand website traffic and its sources. We use Google Analytics solely for statistical
purposes, such as to track how many users have clicked on a particular item or information. The
retention period of the cookie is 2 years. The legal basis is legitimate interests (Art. 6 para. 1 f) GDPR).
Google Analytics is based on cookies and records information about your use of our website including
your IP address. To prevent users being identified by their IP addresses, we use a special code to ensure
that your IP address is recorded solely in truncated and therefore anonymized form. It is no longer
possible to identify individual users with this truncated IP address. Further information on data protection
when using Google Analytics can be found under the following link: . You can prevent the collection of
data through the Google Analytics cookie by installing the plug-in available at the following link:
tools.google.com/dlpage/gaoptout.

**General information on Google's processing:** The information recorded by Google is transmitted to
Google based in the United States. Google has self-certified its adherence to the EU-US Privacy Shield, .
Please click here for further information on data protection at Google: .

You can change your settings by going to the Google Marketing Platform's deactivation page () or the
deactivation page of the NAI (Network Advertising Initiative) . Alternatively, you can deactivate Google
Cookies on the Digital Advertising Alliance website using the following link (). You can also block the
storing of Cookies by changing the settings in your browser.

## 8.2 Google Analytics Audience

We use Google Analytics Audiences, a service provided by Google. Google Analytics Audience uses cookies that are stored on your computer and other mobile devices (e.g. smartphones, tablets, etc.) to help analyze how users use these devices (legal basis is consent (Art. 6 (1) a) GDPR)). The retention period for the cookie is 2 years. Google gains access to the cookies created by Google AdWords and Google Analytics. In the course of use, data, such as the IP address and user activities, is transmitted to a server of Google. You can prevent Google from collecting the data as described under the "General information on Google's processing" section above.

For further information on data protection when using Google Analytics and how to install the browser plugin to prevent Google Analytics from tracking your activities please see the "Google Analytics" section (8.1) above.

## 8.3 Google Tag Manager

On our website we use the Google Tag Manager of Google, which is used to trigger tags that we manage through an interface. The Tag Manager tool itself (which implements the tags) works without the use of cookies and does not collect personal data. However, the tool triggers other tags that may collect personal data. Google Tag Manager does not access such data. If a deactivation has been made at domain or cookie level, it will remain in effect for all tracking tags implemented with Google Tag Manager.

For further information on the processing by Google and how to prevent Google from processing please see the "General information on Google's processing (8.1.)" section above.

## 8.4 Google AdWords / Google AdWords Conversion

We use Google AdWords and Google AdWords Conversion of Google to measure the efficiency of individual ads, offers and functions. A cookie is placed as soon as you click on a Google ad. This cookie is not intended for personal identification but to enable us to ascertain whether you return to the website with the specific offer within the cookie's validity of 30 days. The information obtained by the conversion cookie is for compiling conversion statistics for AdWords customers who opted for conversion tracking. We gain information on the total number of users who clicked on an ad and were forwarded to a website with a conversion tracking tag.

Further information on Google's processing of data and how you can disable the respective processing under the "General information on Google's processing (8.1.)" section above.

## 8.5 DoubleClick

DoubleClick is a service provided by Google. DoubleClick uses cookies to display advertisements that may be relevant to you. A pseudonymous identification number is assigned to your browser in order to check which ads were displayed to you and which ads were viewed. The use of DoubleClick cookies enables Google and its partner websites to display ads based on previous visits to our or other websites. The legal basis is consent (Art. 6 (1) a) GDPR). The information generated by the cookies is transferred to a Google server in the USA. Google only transfers the data to third parties on the basis of legal provisions or within the scope of order processing. Data processed with DoubleClick is stored for up to 2 years and

cookies are deleted after 11 months. For further information on Google's processing of data and how you may prevent Google from doing so please see the <u>"General information on Google's processing (8.1.)"</u> section above.

## 8.6 Google Dynamic Remarketing

Google Dynamic Remarketing is a service provided by Google. Our website uses a pixel which establishes a connection to Google servers. Information transmitted to Google for example includes that you have visited our website. Google associates this information with an ID that is stored on your device in the form of a cookie or is provided by your device. If you visit other websites also using Google Dynamic Remarketing, this information will be linked to your pseudonymous ID. The legal basis is consent (Art. 6 (1) a) GDPR). However, it is not clear to us which other websites you visit. We can also provide our websites with so-called "remarketing tags". This means that we include keywords in our website that contain statements about the content of the page displayed (such as product or service categories). The keywords we use do not contain any personally identifiable information. Google receives and stores these keywords for the above-mentioned recognition features. If you visit a page that we have identified with a specific product category, Google will store the respective keyword and associate it with your recognition characteristics. The processed data is stored for a period of two years. Further information on Google`s processing and how you can prevent it can be found above in the <u>"General information on Google's processing (8.1.)"</u> section.

## 8.7 Digital Window (Awin affiliate marketing)

For affiliate marketing we are members of the affiliate program of AWIN AG, Eichhornstraße 3, 10785 Berlin, Germany. AWIN uses cookies to trace the origin of the conclusion of the contract. Among other things, AWIN recognizes that you have clicked on the partner link provided and have subsequently entered into a contract. The legal basis is our legitimate interest. You can disable cookies from the Network Advertising Initiative (NAI) . deactivation page or from the Digital Advertising Alliance website by using the following link . You can also prevent the storage of cookies using the general settings of your browser. nformation on data processing by AWIN can be found at .

## 8.8 Trusted Shops

To display our Trusted Shops seal of approval and our collected reviews as well as to offer Trusted Shops products to buyers after an order, this website includes the Trusted Shops Trustbadge, an offer of Trusted Shops GmbH, Subbelrather Str. 15C, 50823 Cologne, Germany. When you call up the trust badge, the web server automatically saves a so-called server log file, which contains, for example, your IP address, the date and time of the call, the amount of data transferred and the requesting provider (access data) and documents the request. These access data are not evaluated and are automatically overwritten at the latest seven days after the end of your page visit. Legal basis are our legitimate interests. You can disable cookies from the Network Advertising Initiative (NAI) . deactivation page or from the Digital Advertising Alliance website by using the following link . You can also prevent the storage of cookies by using the general configuration of your browser.

Further personal data will only be transferred to Trusted Shops if you decide to use Trusted Shops products after placing an order or if you have already registered for their use. In this case, the contractual agreement between you and Trusted Shops applies and the legal basis is Art. 6 para. 1 b) and f) GDPR.

## 8. 9 Threat Metrix

In order to secure our orders and to protect ourselves against payment defaults, we check frequent fraud patterns and anomalies. For this purpose, order and payment data (e.g. address, article, payment method) and device information (e.g. device, browser) are processed. Within this scope we work with services ThreatMetrix, Inc. 160 W. Santa Clara St., Suite 1400, San Jose, California 95113, USA "Threat Metrix" together. Threat Metrix compares device data with a network of trusted identities to prevent abuse and crime. In the event that personal data is transferred to the United States, Threat Metrix is self-certified under the Privacy Shield. Data processing is based on our legitimate interest in protecting against misuse and securing orders. You can disable cookies from the Network Advertising Initiative (NAI) . deactivation page or from the Digital Advertising Alliance website by using the following link . You can also prevent the storage of cookies by using the general configuration of your browser.

## 8.10 Amazon Pay and PayPal Cookies

To integrate Amazon Pay and the PayPal payment functions, cookies are used based on our legitimate interests. You can deactivate or delete cookies in your browser, but this will prevent the payment options from working.

## 8.11 ADCELL

On our website we use ADCELL, a German affiliate network for affiliate marketing, which is operated by Firstlead GmbH, Rosenfelder Str. 15-16, 10315 Berlin. Via ADCELL, registered providers can advertise their offers within the framework of programmes. After clicking on Affiliate Markeitng Links, which lead to offers on external websites, a cookie is stored by ADCELL, which contains an ID, which allows an assignment for ADCELL. In this way, it is possible for ADCELL to recognize that you have become aware of the offer via our website and that you have called up the website. Even a possible purchase of the product can be traced and assigned to our affiliate ID. Cookies that we set with the help of ADCELL have a storage period of one year. The purpose of processing the data is to track the various successes (transaction, lead, sale) and to process commission payments. At you have the possibility to prevent data processing with the help of ADCELL. You can disable cookies from the Network Advertising Initiative (NAI) . deactivation page or from the Digital Advertising Alliance website by using the following link . You can also prevent the storage of cookies via the general settings of your browser.

## 9. reCAPTCHA

In order to protect your entries on our website, we use the re-CAPTCHA service of Google on the basis of Art. 6 para. 1 f) DSGVO. The query is used to differentiate whether the entry is made by a human being or misused by automated, machine processing. This purpose also represents our legitimate interest. The query includes sending the IP address to Google for the service reCAPTCHA.

Further information on Google`s processing can be found above in the "General information on Google's processing" section 8.1.

Privacy Policy | Womanizer.com

## 10. Lotteries and surveys

In the context of lotteries, we use personal data for the purpose of conducting the lottery and notifying you of a win. Detailed information can be found in the conditions of participation for the respective lottery. The legal basis for the processing is the lottery contract pursuant to Art. 6 para. 1 lit. b) GDPR.

If you participate in one of our surveys, we use your data for market and opinion research. We evaluate the data anonymously for internal purposes. If surveys are exceptionally not evaluated anonymously, the data will only be collected with your consent. In the case of anonymous surveys, the GDPR is not applicable and in the case of exceptional personal evaluations, the legal basis is the aforementioned consent pursuant to Art. 6 para. 1 a) GDPR.

## 11. Newsletter

When subscribing to our newsletter on our website we will process your data (e.g. name, e-mail address, IP address and date and time of your subscription). For the registration for our newsletter we use a double opt-in procedure: After your subscription you will receive an e-mail asking you to confirm your registration. This confirmation ensures is required so that no unauthorized third party can register with your e-mail address. The collection of personal data serves to send the newsletter. The legal basis is consent (Art. 6 (1) a) GDPR).

The data will be saved as long as the subscription to the newsletter is active. You can revoke your consent for example via the "unsubscribe" link in every newsletter or by sending an e-mail to the e-mail address in the imprint.

In our newsletters, we use common technologies which allow us to measure the interactions with the newsletters (e.g. opening of the e-mail, clicked links). We use this data in pseudonymous form for general statistical evaluations as well as for the optimization and further development of our content and customer communication. This is done with the help of small graphics embedded in the newsletter (so-called pixels). The data is collected exclusively under a pseudonym and is not linked to your other personal data. The legal basis for this is your consent (Art. 6 para. 1 a) GDPR). If you do not want us to analyze the effectiveness of our newsletter, you can deactivate graphics in your e-mail program by default or unsubscribe from the newsletter. The data relating to the interaction with our newsletters is stored pseudonymously for 30 days and then completely anonymized.

## 12. Press mailing list

If you would like to be included in our press mailing list, you can register for it on our website. After registering, you will receive a confirmation e-mail with a link, after clicking on this link you have successfully registered for our press mailing list. We process the information you enter in the form in order to send you press related content and inquires on the basis of your consent (Art. 6 (1) a) DSGVO). To unsubscribe from the press mailing list and revoke your consent, please contact us under press@womanizer.com.

## 13. YouTube videos

We use the provider You Tube to be able to present videos to you. YouTube is operated by YouTube LLC with its headquarters at 901 Cherry Avenue, San Bruno, CA 94066, USA. YouTube is represented by Google. The legal basis for the use of YouTube plug-ins is Article 6 para. 1 f) GDPR.

We use embedded YouTube videos in advanced privacy mode. According to YouTube, this means the following: YouTube does not store cookies for a user who displays a website with an embedded YouTube video player but does not click on the video to start playback. When you click on the YouTube video player, YouTube may store cookies on the user's computer, but we do not store personal cookie information for embedded video playback.

For further information on the processing by please see the "General information on Google's processing" section under (8.1.).

## 14. Social Media Websites

We use the following social media operators:

- Facebook
- LinkedIn
- Twitter
- Instagram
- Pinterest
- Snapchat
- Youtube
- XING

The operators of the social media platforms (e.g. Facebook) are involved in the operation of the websites just listed. They are also responsible (controllers) within the meaning of data protection law. We can hardly influence the data processing carried out by the platform operators and are dependent on the information the respective providers give us. To the extent we can exert influence and have a part in determining data processing, we aim to ensure that the operator of the social media platform treats the data in a manner appropriate to data protection.

# 15. Data processed by us

The data you disclose using our social media pages, such as comments, videos, pictures, likes, public news, etc. are published by the social media platform. We only reserve the right to comment on or delete content if this is necessary. In some cases, we share your content on our site and communicate with you through the social media platform. We use the social media platforms for advertising purposes. The statistics made available to us by the provider of the social media platform can only be influenced to a limited extent and cannot be switched off. The legal basis is our legitimate interest in carrying out the aforementioned processes (Art. 6 para. 1 f) GDPR).

If you wish to object to a specific data processing on which we have an influence, please contact the address given in imprint.

## Data processed by the operators of social media platforms

Social media platform operators use web tracking methods. Web tracking can be performed regardless of whether you are logged in or registered with the social media platform. As already mentioned, we can hardly influence the web tracking methods of the social media platform and for example cannot switch it off. It cannot be excluded that the provider of the social media platform may use data, for example to evaluate habits, personal relationships, preferences, etc. In this area we have no influence on the processing of data by the platform operator.

Further information on data processing by the provider of the social media platform and further possibilities for objection can be found in the data protection declaration of the providers:

Twitter: https://twitter.com/de/privacy

Facebook: https://www.facebook.com/privacy/explanation

YouTube: https://policies.google.com/privacy?hl=de

LinkedIn: https://www.linkedin.com/legal/privacy-policy?trk=hb_ft_priv

Instagram: https://help.instagram.com/155833707900388

Pinterest: https://policy.pinterest.com/de/privacy-policy

Snapchat: https://www.snap.com/de-DE/privacy/privacy-policy

XING: https://privacy.xing.com/de/datenschutzerklaerung

## 15. Disclosure of Data to Third Parties

We work with service providers who assist us in providing our services on this website. These service providers are named in the relevant areas within this Data Protection policy and process data solely on behalf of and under the control of WOW and only for the purposes described in this Data Protection Policy.

## 16. Retention of Data

Personal data is stored for as long as is necessary for the above-mentioned purposes. The data will be deleted at the latest after termination of the contractual relationship and after expiry of the statutory retention periods of civil, commercial and tax law.

Data that is collected while surfing on our website (see section 1) and that can legally be considered personal data (e.g. the complete IP address) is stored for a period of 14 days, unless an unusual incident requires a longer storage period (e.g. after a hacker attack).

If we process data on the basis of legitimate interests (Art. 6 para. 1 f) GDPR), these will be stored until you object to the processing or until your legitimate interests prevail.

# Your Rights / Contact Information

## General Rights

Privacy Policy | Womanizer US

You can request access to the personal data stored about you and have the right to receive the data you provided in a common and machine-readable format. In addition, you may, in justified cases, request the deletion, correction or limitation of the processing of your data. If you have given us your consent, you can revoke it at any time with effect for the future. If your personal data are transferred to a country outside the EU that does not offer adequate protection, you can request a copy of the contract that ensures adequate protection of personal data. You also have a general right to complain to a supervisory authority about our data processing.

## Opt-out

If we use your personal data on the basis of our legitimate interests, you may **object** to the processing and use of your data. In this case, we will no longer use your data unless our interests prevail. You can object to the use of your data for direct marketing purposes at any time without further consideration.

## Contact Information

In order to exercise the aforementioned rights, please contact us directly in writing or via e-mail or contact our Data Protection Officer under datenschutz Nord GmbH, Kurfürstendamm 212, 10719 Berlin, Germany, datenschutz@wowtech.com.

*Exhibit 4*



# Shipping / Delivery

**Discrete Shipping**

Packaged in plain boxes with a discreet label, orders are shipped and billed from "WOW Tech USA ltd."

**Shipping Policies**

WOW Tech USA ltd. delivers within the USA.  WOW Tech USA ltd. will use commercially reasonable efforts to deliver any ordered product as quickly as possible and within any time periods indicated. However, you acknowledge and agree that WOW Tech USA ltd. will not be held responsible for any delays in shipping or delivery.

**Shipping Costs**

WOW Tech USA ltd. offers free shipping throughout the Continental USA on orders over $50.00.

**Delivery Times**

All goods that are available in our warehouse, are placed after payment is made and shipped within 1-2 days of placing your order.

Of course, we always strive to keep all products in stock for you. It may happen that there will be shortages, and in such cases, we will contact you via e-mail.

*Exhibit 5*



# Legal Notice

**Information in accordance with §5 TMG (German Telemedia Act):**

WOW Tech Europe GmbH

Friedenstr. 91a

10249 Berlin

**Postal address:**

Friedenstr. 91a

10249 Berlin

**Represented by:**

Johannes Graf von Plettenberg

Florian Holst

**Contact:**

Phone:                                  +49 (0) 30 95999 3810

E-mail:                                  care@womanizer.com

**Commercial register:**

Entry in the commercial register.
Registry court: Charlottenburg (berlin) Local Court
Registry number: HRB 187587 B

VAT identification number in accordance with §27a of the German
Turnover Tax Law: DE 266 797 062

The European Commission provides a platform for online dispute
resolution: http://ec.europa.eu/consumers/odr/

You can find our email address at the top of this notice.

We are not prepared or obliged to participate in dispute resolution proceedings before a consumer
arbitration board.

**Liability for Content**

As a service provider, we are responsible in accordance with § 7Section 1 of the TMG [German Telemedia Act] for our own content on this site in accordance with the general provisions of law. Pursuant to §§ 8 to 10 of the TMG, we are not obliged as a service provider to monitor transmitted or stored external information or to look for indications of illegal activity.

Obligations to remove or block the use of information in accordance with general laws remain unaffected. Any liability in this respect, however, is only possible from the moment we obtain knowledge of the specific breach of law. Should any corresponding violation of the law come to our knowledge we will remove this content immediately.

**Liability for Links**

Our website includes links to external websites of third parties, over whose content we have no influence. Therefore, we cannot accept any responsibility for their content. Individual providers or operators of the linked pages are always responsible for their content. The linked sites were checked for possible legal violations at the time they were linked. Illegal content was not detected at the time of linking.

Continuous monitoring of the content of linked pages is not, however, reasonable without specific indications of a violation. Should any legal violation come to our knowledge, we will remove such links immediately.

**Copyright**

The contents and work on this website created by the website operator are subject to German copyright law. Copying, editing, distribution and any use of the contents outside the limits of the copyright laws require the written consent of the author or creator. Downloading and copying of these pages is permitted only for private, non-commercial use.

If the content of this page has not been created by the operator, the copyright of third parties will be respected. In particular, third-party content shall be identified as such. Despite this, if you become aware of any copyright infringement, we request that you provide us with the corresponding information. Should any legal violation come to our attention, we will remove such content immediately.

Source: https://www.e-recht24.de

# *Exhibit 6*

Case 1:19-cv-01227-GBW Document 53-1 Filed 12/22/20 Page 31 of 527 PageID #: 1619

**WOW TECH™ GROUP**

(https://wowtech.com)

# Career

Home (https://wowtech.com)  ›  Career



**Career**

# Join our team of dedicated and creative professionals.

Every day, we work with products that make people happy — really, really happy. At most companies, you can't say that.

---

## + Jobs in Germany

---

## − Jobs in North America

---

Production Manager, Creative

Location: Ottawa, Ontario, CanadaDepartment: Product Development

Type: Full TimeMin. Experience: Experienced

+ View details

**WOW Tech Canada** is a member of the WOW Tech Group of companies, one of the world's leading companies in the adult toy market. With our innovative and high-quality brands **Womanizer®** and **We-Vibe®** we delight millions of customers and help them to have a more fulfilling sex life. WOW Tech Group brands We-Vibe® and Womanizer® are available at thousands of retail locations in over 60 countries around the world.

**Why work with us:**

- We offer competitive salaries along with great benefits:
  - Company paid health, dental, life and long term disability insurance plans
  - Company matching contributions to RRSP
  - $150/year toward fitness activities
- We're a small, fun team of professionals that are passionate about developing innovative products and being a leader in our industry

Our Product Development team in Ottawa, has an immediate opening for a **Creative Production Manager** to manage the development of product packaging, user manuals and support material.  The Creative Production Manager will also support Marketing in the development of merchandising programs, tools and plans for all brands and products within the North American region.

**Responsibilities:**

- Lead and manage the design, creation and production of all product packaging

- Lead and manage the creation of all online and print user manuals
- Manage translation of assets
- Manage external suppliers ie Illustrators, Renderers, Designers, Writers and Production, Translation, and Printers to ensure high quality work and deadlines are met.
- Experience and understanding of the prepress and print process, quality checks prototypes, colour proofs for packaging, user manuals and merchandising materials. Attend press checks when necessary.
- Creating work-back schedule for packaging and manuals, ensuring the team stays on target and delivery timelines are met. Identifying potential issues and recommending solutions
- Managing the production of print materials for product launches and marketing campaigns including:
  - Estimating and budgeting
  - Requests for quote (RFQ)
  - Vendor selection and management
  - Statements of work (SOW)
  - Implementation and development of production strategies including scheduling
  - Reporting and measurement of output
  - Documenting best practices
  - Gathering feedback to evaluate program effectiveness
- Managing and overseeing the work of the Production Coordinator
- Working with North American Marketing and Business Development teams to help implement merchandising programs, tools and plans for all brands and products within the region, to support sales, marketing and retailer programs
- Measuring results/effects of campaigns and merchandising tools and adjust as necessary
- Overseeing the workload of team and managing resource allocation of team members and suppliers
- Other related duties;

**Your Qualifications:**

- 5 years of experience in a production management role managing projects in a creative agency or production environment
- Degree or Diploma in marketing, communications, advertising, design or a related creative discipline; project management education/certification an asset

- Highly organized and deadline oriented with solid project management skills and experience building project plans for marketing initiatives
- Experience managing print projects
- Excellent written and verbal communication skills
- Resourceful and solution oriented
- Highly detail oriented with an eye for creative details
- Proficient in Microsoft Suite programs: Word, PowerPoint and Excel.
- Proficient in Adobe Illustrator, InDesign and Photoshop.
- Team player with great interpersonal skills and the ability to coach and teach

If you're an organized, fun and creative production professional,  send us your resume - we'd love to hear from you! To learn more about WOW Tech Group and our brands, visit wowtech.com (http://wowtech.com).

At WOW Tech Group we are committed to fostering an inclusive, barrier-free and accessible environment. Part of this commitment includes arranging accommodations due to disability to ensure an equal opportunity to participate in our recruitment and selection process. If you require an accommodation, please notify your Recruiter once you have been selected for an interview.

Please note: the final stage of our recruitment process includes completion of employment reference checks and a criminal record check.

**Apply Now**    Share Job (http://app.jazz.co/app/share/D3lpAGjyNU)

- Hide details

Warehouse and Inventory Specialist, North America

Location: Ottawa, Ontario, CanadaDepartment: Operations

Type: Full TimeMin. Experience: Mid Level

+ View details

**WOW Tech Canada** is a member of the WOW Tech Group of companies, one of the world's leading companies in the adult toy market. With our innovative and high-quality brands **Womanizer®** and **We-Vibe®** we delight millions of customers and help them to have a more fulfilling sex life. WOW Tech Group brands We-Vibe® and Womanizer® are available at thousands of retail locations in over 60 countries around the world.

**Why work with us:**

- We offer competitive salaries along with great benefits:

- Company paid health, dental, life and long term disability insurance plans
- Company matching contributions to RRSP
- $150/year toward fitness activities

- We're a small, fun team of professionals that are passionate about developing innovative products and being a leader in our industry

Our North American Operations team, in Ottawa, has an opening for a **Warehouse and Inventory Specialist** to be responsible for ensuring the accuracy and movement of all inventory and efficient execution of all third-party warehouse functions in the United States and Canada. The incumbent proactively manages our 3PL partners located in Los Angeles and Ottawa to ensure all business service levels are consistently met and that all internal customers' requirements and issues are addressed.

**RESPONSIBILITIES:**

- Ensures that all inbound shipments are processed by the respective warehouse in a timely and accurate fashion
- Ensures that all outbound customer shipments are executed on time and as requested by the respective warehouse, or collected by the nominated freight forwarding partner
- Directs warehouses in regard to all movements and transactions of goods.
- Responsible for all transactions associated with receipts, shipments, movements, transfers, and stock adjustments in our business system.
- Defines and drives all warehouse rework, sorting, and customization activities that need to be performed in warehouses or in transit.
- Receives and drives all requests through the warehouses for creation and timely shipment of Amazon or Webshop specific product
- Arrange outbound movement of inter-company goods between United States and Canada in support of Operations, Sales, Engineering or Marketing needs.
- Communicates order status, serial number enquiries, tracking information with internal and external customers
- Responsible for the logistics aspects of all incoming and outgoing North American returned product (RMA's) working closely with Customer & Partner Care team.
- Responsible for all courier package shipping support for the North American functional departments and customs documentation as required.
- Proactively monitors all warehouse performance results to ensure internal KPIs are being met. Addresses issues with warehouses proactively and quickly.
- Assist in packaging product when required

- Other related duties

**YOUR QUALIFICATIONS:**

- Post secondary education in materials management, logistics or a related discipline
- 5 years' experience in a warehouse or inventory management role, including experience managing warehouses or 3rd party managed inventory partners, preferably within a small to medium sized manufacturing organization.
- Familiarity with freight forwarding partners, activities and processes
- Familiarity with customs imports/exports and the Harmonized Tariff System.
- A proactive individual with solid problem-solving skills
- Highly organized with strong planning and time management skills
- Excellent communication skills; written and verbal
- Proficient with Microsoft Office 365 and Office Suite (Word, PP, Excel) and experience using ERP systems (ideally NetSuite)
- Strong interpersonal skills; flexible, team player with a strong customer focus and can-do attitude

If you are a driven, organized, and customer-oriented warehousing and inventory management professional, send us your resume - we'd love to hear from you! To learn more about WOW Tech Group and our brands, visit wowtech.com (http://wowtech.com).

At WOW Tech Group we are committed to fostering an inclusive, barrier-free and accessible environment. Part of this commitment includes arranging accommodations due to disability to ensure an equal opportunity to participate in our recruitment and selection process. If you require an accommodation, please notify your Recruiter once you have been selected for an interview.

Please note: the final stage of our recruitment process includes completion of employment reference checks and a criminal record check.

| Apply Now |

Share Job (http://app.jazz.co/app/share/hYY4YUUwix)

- Hide details

eCommerce Channel Specialist - Amazon

Location: Ottawa, Ontario, CanadaDepartment: eCommerce

Type: Full TimeMin. Experience: Mid Level

+ View details

**WOW Tech Canada** is a member of the WOW Tech Group of companies, one of the world's leading companies in the adult toy market. With our innovative and high-quality brands **Womanizer®** and **We-Vibe®** we delight millions of customers and help them to have a more fulfilling sex life. WOW Tech Group brands We-Vibe® and Womanizer® are available at thousands of retail locations in over 60 countries around the world.

**Why work with us:**

- We offer competitive salaries along with great benefits:
  - Company paid health, dental, life and long term disability insurance plans
  - Company matching contributions to RRSP
  - $150/year toward fitness activities
- We're a small, fun team of professionals that are passionate about developing innovative products and being a leader in our industry

Our North American eCommerce, based in Ottawa, has an immediate opening for an eCommerce Channel Specialist to be responsible for helping drive growth and reach financial goals for our direct-to-consumer channel by undertaking day-to-day activities on the North American Amazon marketplaces for all WOW Tech brands – Womanizer, We-Vibe and Pjur.

**Responsibilities:**

- Administer Amazon marketplace activities for all WOW Tech brands (Womanizer, We-Vibe, Pjur etc.)
- Create, manage and optimize listings
- Content management on Amazon.com / Amazon.ca
- Identify product, service or marketplace issues and resolve them
- Content Monitoring, reporting changes to Amazon for correction
- Monitor and run A/B test titles, pictures, categories, keywords
- Build and maintain contacts at each marketplace
- Develop online merchandising strategies and work with Performance Marketing team to grow and drive traffic and sales of WOW Tech products
- Inventory monitoring and management; preparing forecasts
- Cross-selling
- Monitoring of major KPIs - sales, rankings, reviews, stock levels – and providing regular reporting
- Other related responsibilities

**Your Qualifications:**

- Degree or Diploma in online marketing or a related discipline

- 2-5 years of experience working on Amazon seller central
- Experience working with web analytics and reporting tools
- Inventory forecasting experience
- Strong communication skills in English (speak and write); Spanish or French an asset
- Organized and detail-oriented with strong time and project management skills
- Proficient with Microsoft Office 365, Excel, Word, PowerPoint and Outlook
- Flexible, fun, team player

If you are a smart, creative eCommerce professional with experience managing Amazon marketplace, send us your resume. We'd love to hear from you!

To learn more about WOW Tech Group and our brands, visit wowtech.com (http://wowtech.com).

At WOW Tech Group we are committed to fostering an inclusive, barrier-free and accessible environment. Part of this commitment includes arranging accommodations due to disability to ensure an equal opportunity to participate in our recruitment and selection process. If you require an accommodation, please notify your Recruiter once you have been selected for an interview.

Please note: the final stage of our recruitment process includes completion of employment reference checks and a criminal record check.

**Apply Now**    Share Job (http://app.jazz.co/app/share/u33SFC0TVC)

- Hide details

Customer & Partner Service Representative

Location: Ottawa, Ontario, CanadaDepartment: Customer Care

Type: Full TimeMin. Experience: Mid Level

+ View details

**WOW Tech Canada** is a member of the WOW Tech Group of companies, one of the world's leading companies in the adult toy market. With our innovative and high-quality brands **Womanizer®** and **We-Vibe®** we delight millions of customers and help them to have a more fulfilling sex life. WOW Tech Group brands We-Vibe® and Womanizer® are available at thousands of retail locations in over 60 countries around the world.

**Why work with us:**

- We offer competitive salaries along with great benefits:
- Company paid health, dental, life and long term disability insurance plans

- Company matching contributions to RRSP
- $150/year toward fitness activities
- We're a small, fun team of professionals that are passionate about developing innovative products and being a leader in our industry

Our North American Customer Care team, based in Ottawa, has an immediate opening for a **Customer & Partner Service Representative** to be the direct contact with the customer and partners and responsible for new order requests and statuses, refunds or credits, communication of new products, product or company process questions and fulfilment of product or services requested. You will ensure that all your interactions with customers and partners are performed professionally, follow agreed policy and completed in a timely manner.

The Customer & Partner Service Representatives are located globally and are here to find solutions to our customers' & partner's requirements, questions or concerns while looking for opportunities to exceed their expectations through simple actions, education and up-selling. This position works very closely with the North American Business Development and Product Development teams to ensure that 'Best-in-Class' service and most accurate support for our products are delivered.

**Responsibilities:**

- Provide B2C order management and support functions for all eCommerce channel customers globally including:
  - Provide professional and knowledgeable product support for all who contact WOW Tech through email, phone or via the websites
  - First point of contact for customer's issues and tracking problems
  - Take steps necessary to resolve customer dissatisfaction situations in a cost-effective manner
  - Monitor fulfillments at the warehouses to ensure timely (to agreed lead times) dispatch. If issues arise, highlight those to the respective functions.
  - Investigate, approve and process all returns and refunds
  - Troubleshoot customer issues to assist in problem resolution or begin the warranty claim process
- Support all B2B direct partners who submit their Purchase Orders through either the WOW Tech Order Desk or the B2B Portal:
  - Inputting and processing of all customer and partner purchase orders and internal BD or Marketing requests (Free-Of-Charge) within 24 hours of receipt
  - Educate our customers and partners in regard to WOW Tech's business requirements or order management tools.

- Providing feedback on any pricing discrepancies, or availability issues
- Provide all necessary documents required to help the customer with their transport or import requirements
- Monitor availability of all products for our customers and partners to assist them in planning for partial deliveries or their backlog actions
- Monitor fulfillments at the warehouses to ensure timely (to agreed lead times) dispatch. If issues arise, highlight that those to the respective functions.
- Coordinating the communication of any Marketing or Merchandising materials programs as directed by Global Business Development

**Your Qualifications:**

- University or College Post-secondary education OR equivalent experience combined with at least 3 years relevant customer support/order management experience
- Strong customer service and support orientation
- Experience working with Amazon is an asset
- Strong systems orientation and IT skills; solid analytical and data-mining skills and an ability to interpret trends
- Excellent communication skills
- Highly self-motivated and detail oriented with strong organizational and follow up skills
- Good planning and prioritization skills; the ability to plan and schedule work load
- Proficient with Office 365, Microsoft Word, Excel, PowerPoint and a Mac environment
- Proficient with NetSuite, or other CRM/SFA application
- Ability to speak, read, and write English fluently; ability to speak other languages is a plus

If you are a fun, patient, customer-oriented professional who loves helping people and getting stuff done,  send us your resume - we'd love to hear from you! To learn more about WOW Tech Group and our brands, visit wowtech.com.

At WOW Tech Group we are committed to fostering an inclusive, barrier-free and accessible environment. Part of this commitment includes arranging accommodations due to disability to ensure an equal opportunity to participate in our recruitment and selection process. If you require an accommodation, please notify your Recruiter once you have been selected for an interview.

Please note: the final stage of our recruitment process includes completion of employment reference checks and a criminal record check.

Career - WOW Tech Group

| Apply Now |

Share Job (http://app.jazz.co/app/share/5a4tvkPOYS)

- Hide details

HR Coordinator (6 month term position)

Location: Ottawa, Ontario, CanadaDepartment: HR

Type: TemporaryMin. Experience: Entry Level

+ View details

**WOW Tech Canada** is a member of the WOW Tech Group of companies, one of the world's leading companies in the adult toy market. With our innovative and high-quality brands **Womanizer®** and **We-Vibe®** we delight millions of customers and help them to have a more fulfilling sex life. WOW Tech Group brands We-Vibe® and Womanizer® are available at thousands of retail locations in over 60 countries around the world.

**Why work with us?**

- We offer competitive salaries along with great benefits:
- Company paid health, dental, life and long term disability insurance plans
- Company matching contributions to RRSP
- $150/year toward fitness activities
- We're a small, fun team of professionals that are passionate about developing innovative products and being a leader in our industry

WOW Tech is growing and our North American HR team has an immediate opportunity for an **HR Coordinator for a 6 month term**. In this role you'll be involved in all aspects of HR including talent acquisition and onboarding, HR administration to keep us organized, as well as participating in HR projects and the creation of HR programs.

**Responsibilities:**

- Coordinate the recruitment process:
  - Creating job descriptions and postings
  - Posting and sourcing qualified candidates
  - Booking interviews
  - May conduct reference checks and coordinate employment background checks
  - Preparing offer letters and track return of documentation
  - Tracking recruitment costs and statistics, and preparing monthly reports
  - Assist in creation of a global employment brand and creating/maintaining our presence on various sites such as Indeed, Glassdoor, LinkedIn etc.
- Coordinate new employee onboarding and orientation:
  - Coordinating new employee Onboarding process & documentation

- ○ Creating new employee files
- ○ Conducting HR Orientation and facilitate new hire and payroll paperwork
- ○ Facilitating benefits enrolments and orientations
- HR administration and projects:
  - ○ Participate in HRIS implementation and administration
  - ○ Creating and aligning global HR policies
  - ○ Participate in the creation of global HR programs
  - ○ Participate in the Joint Health & Safety Committee & Social Committee
  - ○ Employee Survey administration and reporting
  - ○ Headcount reporting and statistics
  - ○ Assisting in the creation of global employee communication programs
  - ○ HR administration such as filing, benefits administration, and other related duties
  - ○ Provide other office support such as making sure we have good food and drinks in the kitchen!
  - ○ Other related responsibilities

We're growing so there will be lots of other HR projects to work on!

**Your Qualifications:**

- Post-secondary education in Human Resources
- 1-2 years of human resource experience
- Experience with the recruitment process is an asset
- Tech saavy with creative approaches to sourcing and attracting candidates
- Knowledge of employment legislation
- Highly organized and detail oriented with excellent time management skills
- Proficient with MS Office
- Strong communication skills, written and oral
- Ability to manage confidential information with discretion
- Team player with great interpersonal skills and a fun, positive attitude

If this sounds like you, send us your resume! We'd love to hear from you. To learn more about WOW Tech visit wowtech.com (https://wowtech.com/).

At WOW Tech Group we are committed to fostering an inclusive, barrier-free and accessible environment. Part of this commitment includes arranging accommodations due to disability to ensure an equal opportunity to participate in our recruitment and selection process. If you require an accommodation, please notify your Recruiter once you have been selected for an interview.

Please note: the final stage of our recruitment process includes completion of employment reference checks and a criminal record check.

---

**Apply Now**

Share Job (http://app.jazz.co/app/share/0WYBweXYaA)

- Hide details

Final Quality Inspector

Location: Ottawa, Ontario, CanadaDepartment: Product Development

Type: Full TimeMin. Experience: Mid Level

+ View details

**WOW Tech Canada** is a member of the WOW Tech Group of companies, one of the world's leading companies in the adult toy market. With our innovative and high-quality brands **Womanizer®** and **We-Vibe®** we delight millions of customers and help them to have a more fulfilling sex life. WOW Tech Group brands We-Vibe® and Womanizer® are available at thousands of retail locations in over 60 countries around the world.

**Why work with us:**

We offer competitive salaries along with great benefits:

- Company paid health, dental, life and long term disability insurance plans
- Company matching contributions to RRSP
- $150/year toward fitness activities
- We're a small, fun team of professionals that are passionate about developing innovative products and being a leader in our industry

Our North American Product Development team has an immediate opening for a Final Quality Inspector, based in Ottawa, to perform out-of-box inspections on finished product ensuring product specifications are met and all products are in working order.

**Responsibilities:**

- Perform out of box inspection services on finished product
- Document inspection results by completing reports and logs; summarizing re-work and waste; inputting data into quality database.
- Follow work instructions to conduct product verification/validation experiments during product development phase; document results & highlight deficiencies
- Maintain safe and healthy work environment by following standards and procedures; complying with legal regulations.
- Update product knowledge by participating in educational opportunities; reading technical publications

- Occasionally undertake mechanical and electronic assembly
- Other duties as assigned

**Qualifications:**

- 2+ years of quality inspection or related experience in an electronics manufacturing environment
- High school diploma; post-secondary education in assembly or quality inspection or a technology program is an asset
- Organized and highly detail oriented
- Excellent English verbal and written communication skills
- Ability to read and interpret work instructions and drawings and follow instructions
- Some experience with electronic assembly and soldering an asset
- Good basic math skills
- Computer literate with the ability to use webmail, Microsoft Office 365, Microsoft Word and Excel
- Team player with excellent interpersonal skills

If you are an experienced, detail-oriented Quality professional, we'd love to hear from you! To learn more about WOW Tech Group and our brands, visit wowtech.com (http://wowtech.com).

At WOW Tech Group we are committed to fostering an inclusive, barrier-free and accessible environment. Part of this commitment includes arranging accommodations due to disability to ensure an equal opportunity to participate in our recruitment and selection process. If you require an accommodation, please notify your Recruiter once you have been selected for an interview.

| **Apply Now** |

Share Job (http://app.jazz.co/app/share/BZeSzQsuh9)

- Hide details

General Application

Location: Canada

Type: Full TimeMin. Experience: Experienced

+ View details

We're always looking for talented, innovative people who are passionate about what they do. If you thrive in a collaborative, hard-working, fun-loving team that takes pride in delivering world-leading technologies, we invite to consider future opportunities with us. Send us your resume now and we'll keep it for consideration when a suitable opportunity opens up any of the following areas:

- Account Management/Merchandising
- Industrial/Product Designer, Canada
- Customer Service Representative

If you would like to learn more about these positions, please click on the specific job link below to see the job details.  To submit your resume for these or other future opportunities with us, please apply using the Apply Now button and be sure to let us know the type of job you wish to be considered for.

Standard Innovation is an equal opportunity employer committed to diversity and inclusion.  If you are selected to participate in the recruitment process, please inform Human Resources of any accommodations you may require. Standard Innovation will work with you in an effort to ensure that you are able to fully participate in the process.

**Apply Now**

Share Job (http://app.jazz.co/app/share/02oYmo)

- Hide details

POWERED BY **JAZZHR** (https://www.jazzhr.com)

WHY YOU WILL LOVE TO WORK WITH

# THE WOW-DNA



### We are state of the art

World-class products are at the heart of our business. Our product development and innovatio to ensure that our products set new industry standards for ergonomic design, high performanc



## We are unique

Our people come from a wide range of professional backgrounds. We employ engineers, indus
managers, logistics specialists and more. Each and every one is a unique personality. And we lo



## We are passionate

We work closely with health and wellness experts, the sex education community and consume
products on the market. That is our passion.



## We are the Original

We are wildly successful. Our products are now sold on every continent and in more than 60 co
best-selling pleasure products in the world, often copied, never equalled. Moreover, we are grow
success.

WOW Tech™ Group is a world leader in the design, manufacturing, and marketing of premium intimate pleasure products.

---

✉ info@wowtech.com

🎧 +49 30 95999 38 10

## OUR BRANDS

**We-Vibe® (https://we-vibe.com)**

**Womanizer™ (https://www.womanizer.com/)**

**Attivia™ (https://attivia.life)**

**pjur® (https://www.pjur.com)**

**Novoluto (https://www.novoluto.com)**

## LINKS

**Press (https://wowtech.com/press/)**

**Contact (https://wowtech.com/contact/)**

**About us (https://wowtech.com/about-us/)**

## LEGAL

**Privacy Policy (https://wowtech.com/privacy-policy/)**

**Competion Conditions (https://wowtech.com/competion-conditions/)**

**Imprint (https://wowtech.com/imprint/)**

## PRESS RELEASES

Introducing Moxie – The Latest Product From We-Vibe Is Wearable For Fun On The Go
(Https://Wowtech.Com/2019/05/07/Introducing-Moxie-The-Latest-Product-From-We-Vibe-Is-
Wearable-For-Fun-On-The-Go/)

May 7, 2019

WOW TECH CHOOSES ORION AS FIRST MASTER DISTRIBUTION PARTNER FOR WE-VIBE IN
EUROPE (Https://Wowtech.Com/2019/01/29/Wow-Tech-Chooses-Orion-As-First-Master-
Distribution-Partner-For-We-Vibe-In-Europe/)

January 29, 2019

© 2019 WOW Tech International GmbH

*Exhibit 7*

(19) Deutsches Patent- und Markenamt

(10) **DE 10 2013 110 501 B4** 2016.02.18

(12) **Patentschrift**

(21) Aktenzeichen: **10 2013 110 501.7**
(22) Anmeldetag: **23.09.2013**
(43) Offenlegungstag: **26.03.2015**
(45) Veröffentlichungstag
der Patenterteilung: **18.02.2016**

(51) Int Cl.: **A61H 19/00** (2006.01)

Innerhalb von neun Monaten nach Veröffentlichung der Patenterteilung kann nach § 59 Patentgesetz gegen das Patent Einspruch erhoben werden. Der Einspruch ist schriftlich zu erklären und zu begründen. Innerhalb der Einspruchsfrist ist eine Einspruchsgebühr in Höhe von 200 Euro zu entrichten (§ 6 Patentkostengesetz in Verbindung mit der Anlage zu § 2 Abs. 1 Patentkostengesetz).

(62) Teilung in:
**10 2013 022 393.8**

(73) Patentinhaber:
**NOVOLUTO GmbH, 94526 Metten, DE**

(74) Vertreter:
**KUHNEN & WACKER Patent- und Rechtsanwaltsbüro, 85354 Freising, DE**

(72) Erfinder:
**Lenke, Michael, 94526 Metten, DE**

(56) Ermittelter Stand der Technik:
**siehe Folgeseiten**

(54) Bezeichnung: **Stimulationsvorrichtung**

(57) Hauptanspruch: Stimulationsvorrichtung (1) für die Klitoris (12), aufweisend:
eine Druckfelderzeugungseinrichtung (2) mit:
einer ersten Kammer (3); und
einer zweiten Kammer (4) mit einer Öffnung (42) zum Aufsetzen über die Klitoris (12); und
einem Verbindungselement (5), welches die erste Kammer (3) mit der zweiten Kammer (4) verbindet; und
einer Antriebseinheit (6), welche das Volumen der ersten Kammer (3) derart verändert, dass über das Verbindungselement (5) in der zweiten Kammer (4) ein stimulierendes Druckfeld erzeugt wird; und
eine Steuereinrichtung (7), welche die Antriebseinheit (6) ansteuert; und
wobei das in der zweiten Kammer (4) erzeugte Druckfeld aus einem Muster von Unter- und Überdrücken besteht, welche auf den Normaldruck aufmoduliert sind; und
wobei die erste Kammer (3) über das Verbindungselement (5) ausschließlich mit der zweiten Kammer (4) verbunden ist, somit keine andere Verbindung der ersten Kammer (3) als diejenige zur zweiten Kammer (4) besteht, womit die erste Kammer (3) eine einzige Öffnung aufweist, und
wobei die zweite Kammer (4) eine Öffnung (51) von dem Verbindungselement (5) in die zweite Kammer (4) aufweist, und
wobei die Stimulationsvorrichtung (1) keine Ventile aufweist, und
wobei die Stimulationsvorrichtung (1) ein tragbares Handgerät mit einer Batterie (76) ist,
dadurch gekennzeichnet, dass
das Verbindungselement (5) starr ist, und als ein gerader Kanal mit Düsenwirkung ausgestaltet ist, dessen Öffnung

in die ersten Kammer (3) und dessen Öffnung (51) in die zweite Kammer (4) zueinander ausgerichtet sind, so dass eine Medienströmung bei Kompression der ersten Kammer (3) durch die Ausrichtung der Öffnung (51) und des Verbindungselements (5) auf die Klitoris (12) gerichtet ist,
wobei die Öffnung (51) des Verbindungselements (5) der Klitoris (12) durch die zweite Kammer (4) hindurch gegenüberliegt.



(19)



Deutsches
Patent- und Markenamt

(10) **DE 10 2013 110 501 B4** 2016.02.18

(56) Ermittelter Stand der Technik:

| | | |
|---|---|---|
| DE | 14 63 673 | U |
| US | 2013 / 0 012 769 | A1 |
| US | 1 898 652 | A |
| US | 6 099 463 | A |
| WO | 2006/ 058 291 | A2 |

**Focus online 5.12.2004**

**http://www.heilpraxisnet.de/naturheilpraxis/
sex-gegen-bluthochdruck-665.php**

DE 10 2013 110 501 B4    2016.02.18

### Beschreibung

**[0001]** Die vorliegende Erfindung betrifft eine Stimulationsvorrichtung für erogene Zonen, insbesondere für die Klitoris, ein System mit einer Stimulationsvorrichtung, sowie Verfahren zur Stimulation von Körperteilen.

**[0002]** Die erogenen Zonen des menschlichen Körpers können mit einer Vielzahl von Hilfsmitteln stimuliert werden. So werden beispielsweise Vibratoren verwendet, um mittels direkter Berührung einen Reiz auf einen bestimmten Hautbereich auszuüben. Diese Form der Stimulation kann jedoch zu Irritationen oder Hautreizungen führen. Auch kann ein direkter Kontakt der Intimzone mit derartigen Hilfsmitteln aus individuellen Gründen, beispielsweise der Hygiene oder wegen persönlichen Vorbehalten, nicht gewünscht sein.

**[0003]** Insbesondere die direkte Stimulation der Klitoris, beispielsweise mit einem Auflegevibrator, ist problembehaftet. So ist bei der Frau die Klitoris üblicherweise die empfindlichste erogene Zone. Die gesamte Klitoris ist stark mit Nervenendungen ausgestattet, womit diese besonders berührungsempfindlich und empfänglich für sexuelle Reize ist. Hier ist insbesondere die Klitoriseichel, in der sich die Nervenstränge der beiden Schenkel treffen, hervorzuheben. So kommt es einerseits bei häufiger Anwendung eines Auflegevibrators zur direkten Stimulation zu Gewöhnungseffekten bzw. zur Konditionierung der stimulierten erogenen Zone, während andererseits die erstmaligen Anwendungen eines derartigen Gerätes eine gewisse Einübung bzw. Eingewöhnung erfordern.

**[0004]** Weiter haben im Jahre 2006 durchgeführte medizinische Studien die weibliche Klitoris als maßgeblichen Ausgangspunkt des weiblichen Klimax bestimmt und erstmals die unterschiedlichen Empfindungsqualitäten von klitoralem (und vaginalem) Orgasmus neurologisch nachgewiesen, wie die Zeitschrift „Spiegel" in seiner Ausgabe aus 06/2006 auf den Seiten 136 bis 138 in dem Artikel für Frauen „Schmerz und Glückseeligkeit" erläutert. So gilt nach der jüngeren medizinischen Forschung die Stimulation der Klitoris, und nicht der Vagina, als Ausgangspunkt der sexuellen Erregung der Frau und damit als Schlüssel zum weiblichen „sexuellen Vergnügen".

**[0005]** Dabei ist weiter die Empfindlichkeit der menschlichen erogenen Zonen, beispielsweise der Klitoris, der inneren und äußeren Labia oder der Brustwarzen, individuell sehr unterschiedlich. Die Person kann so empfindlich sein, dass eine direkte Stimulierung erst nach längerem Vorspiel, und auch dann nur sehr zart, oder gar nicht in Betracht kommt. Weiter kann sich die Empfindlichkeit der entsprechenden Zone von Situation zu Situation oder sogar während eines Sexualakts stark verändern.

**[0006]** Aus vorgenannten Gründen sind verschiedene indirekte Stimulationsformen als Alternative zur direkten Stimulation gängige Praxis.

**[0007]** Zur indirekten Stimulation von erogenen Zonen und insbesondere der Klitoris werden herkömmliche Vakuumvorrichtungen verwendet, um die erogenen Zonen der betreffenden Person ohne direkte Berührung des zu stimulierenden Hauptbereichs zu reizen. So sind beispielsweise Vakuumpumpen für die weiblichen primären oder sekundären Geschlechtsorgane bekannt, welche üblicherweise eine Saugglocke zum Aufsetzen und eine Handpumpe aufweisen. Der mit dieser Art von Vorrichtung beispielsweise auf die Klitoris ausgeübte Unterdruck erzeugt einen negativen Druck in der Klitoris selbst, welcher üblicherweise niedriger ist als der systolische Blutdruck. Dieser Druckunterschied führt zu einer Erweiterung der Klitoris und/oder stimuliert den Blutfluss in dem betroffenen Bereich. Diese klitorale vaskuläre Blutwallung dient sowohl der Lustförderung durch Steigerung der Empfindlichkeit als auch der optischen und haptischen Manipulation. Auch führt die bessere Durchblutung zu einem erhöhten Austreten von Scheidenfeuchtigkeit, die die Stimulation angenehmer gestaltet. Jedoch ist die manuelle Betätigung der Handpumpe oft lästig oder störend. Zudem kann es auch bei dieser Gerätekategorie durch die langfristigere bzw. ununterbrochene Anwendung von Unterdruck zu Gewöhnungseffekten kommen, die die Wirksamkeit der Vorrichtung auf Dauer einschränken. Zudem reicht eine reine Erhöhung des Blutflusses in der Klitoris oftmals nicht aus, um zum Klimax zu gelangen; somit werden Vakuumpumpen oftmals nur als Vorspiel eingesetzt, um den Klimax mit einer nachfolgenden direkten (Druck-)Massage der erogenen Zone zu erreichen.

**[0008]** Anstelle der manuell betriebenen Vakuumpumpe werden vermehrt auch elektrisch angetriebene Vakuumpumpen verwendet. Als Beispiel hierfür offenbart die WO 2006/05 82 91 A2 eine Vorrichtung zur sexuellen Therapie, wobei die Anordnung aus einer röhrenförmigen Saugkammer für die Klitoris, einer elektrischen Vakuumquelle (Vakuumpumpe) und mehreren Luftflussöffnungen besteht. Durch den Betrieb der Vakuumpumpe wird in der Kammer ein andauernder Luftfluss bzw. Luftaustausch im Bereich der Klitoris erzeugt. Dabei wird nachteilhaft die durch den Unterdruck verstärkt auftretende Scheidenfeuchtigkeit abgesaugt, weshalb ein Trocknungseffekt der stimulierten Hautpartien eintritt. Ebenso führt die abgesaugte feuchte Luft zu einer Verschmutzung der strömungstechnisch nachfolgenden Vakuumanordnung, beispielsweise der Vakuumpumpe. So können derartige Anordnungen mit Vakuumpumpen in ihrer Hygiene problematisch sein, da Vakuumpumpe und

die zugehörigen Ventile bzw. lufttechnischen Bauteile oftmals Toträume bzw. tote Winkel aufweisen und/ oder schwer zu reinigen sind. Weiter dient die Vorrichtung der Therapie der Blutgefäße der Klitoris, und nicht der Stimulation bis zum sexuellen Höhepunkt.

[0009]  Die US 6 099 463 A offenbart eine Vorrichtung zur Stimulation der Klitoris mit einer röhrenförmigen Saugkammer, einer Vakuumquelle bzw. einer Vakuumpumpe und mehreren Ventilen, mit denen die Größe des Vakuums geregelt wird. Das Vakuum kann hierbei auch in zyklischer Form angewandt werden, um eine Stimulationswirkung zu erzielen, wobei auch bei dieser Vorrichtung aufgrund der Anwendung eines andauernden Vakuums Gewöhnungseffekte zu erwarten sind. Auch hier bestehen die vorstehend erläuterten Nachteile der Hygiene und der Austrocknung der zu stimulierenden Hautpartie. Ebenso ist die drucktechnische Anordnung mit mehreren Ventilen, Vakuumpumpe, etc. relativ komplex.

[0010]  Die US 6 464 653 B1 offenbart therapeutische Vorrichtungen und Verfahren, welche eine klitorale Blutwallung mit Hilfe eines mit einer Vakuumpumpe erzeugten Vakuums erzeugen, um die Behandlung von Störungen der Klitoris, beispielsweise von Inkontinenz, zu unterstützen. Mit Hilfe eines Steuerventils bzw. Modulators, das mit dem Finger entsprechend abgedeckt werden kann, wird die Höhe des Vakuums in der Saugkammer manuell eingestellt oder variiert. Dies erfordert die Aufmerksamkeit des Benutzers und kann unter Umständen störend oder ablenkend sein. Auch weist diese relativ komplexe Vorrichtung mit weiteren Ventilen die vorstehend erläuterten Nachteile der Hygiene und der Austrocknung auf, wobei die Vorrichtung zudem langfristigen Therapiezwecken und nicht der kurzfristigen sexuellen Stimulation dient.

[0011]  Die WO 2008/02 80 76 A2 offenbart eine therapeutische Vorrichtung für Frauen, welche vornehmlich der Behandlung sexueller Störungen dient. Dabei beinhaltet die Vorrichtung eine Kombination aus indirekter Stimulation mit Hilfe einer Vakuumkammer und direkter Stimulation mit Hilfe mechanischer Vibratoren und Oszillatoren.

[0012]  Bei dieser therapeutischen Vorrichtung dient der Unterdruck der Erhöhung des Blutflusses in der Klitoris, während die eigentliche Stimulation bzw. Massage des Hautbereichs mit Hilfe direkter mechanischer Vibrationen/Oszillationen erfolgt. So ist eine Saugglocke zum Aufsetzen auf den zu stimulierenden Hautbereich intern über eine mechanische Verbindung mit einem Motor verbunden. Die Saugglocke wird durch den Motor nach Aktivierung der Vorrichtung erweitert, wobei sich das Volumen der Saugglocke vergrößert. Das resultierende Volumen der Saugglocke und damit die Stärke des Vakuums kann mit Hilfe von Steuerungselementen an

der Vorrichtung eingestellt werden. Die durch den Ansaugvorgang in der Vorrichtung verdrängte Luft wird über ein Rohr wieder nach außen abgegeben. Bei dieser Vorrichtung hat das Vakuum nur eine unterstützende Funktion, während die eigentliche Stimulation in direkter Weise erfolgt, was auch die vorstehend erläuterten Nachteile einer direkten Stimulation nach sich zieht.

[0013]  Die US 2013/001 276 9 A1 offenbart eine Vorrichtung, bei der ein pulsierender Überdruck zur Stimulation als Luftdruckmassage verwendet wird. So erzeugt eine Pumpe bzw. ein Kompressor einen pulsierenden Überdruck, welcher mit Hilfe einer Düse auf die zu stimulierende erogene Zone gerichtet wird. Bei dieser Vorrichtung trocknet die betroffene Hautpartie nachteilhaft stark ab bzw. aus. Ebenso besteht üblicherweise ein Temperaturunterschied zwischen der Temperatur der zugeführten Luft und der Temperatur der zu stimulierenden Hautpartie, was unter Umständen als störend empfunden werden kann. Auch treten bei dieser Vorrichtung die vorstehend erläuterten Probleme der Hygiene auf, wobei in diesem Falle eventuell in der Vorrichtung befindliche Erreger oder Keime oder sonstige Verschmutzungen zudem noch direkt zu dem Intimbereich des Benutzers transportiert werden.

[0014]  Die US 1 898 652 A offenbart weiter einen „Pulsator", welcher mit Luft arbeitet, um Hautpartien zu massieren.

[0015]  Die EP 0 365 230 A2 offenbart eine Saugvorrichtung mit einer Saugepumpe, einem Saugventil, und einem Auslassventil.

[0016]  Die WO 2004/004610 A1 offenbart einen tragbaren Penis-Aneurisma-Verbesserer.

[0017]  Die US 3 910 262 offenbart eine therapeutische Vorrichtung zum Erzeugen von männlichen und weiblichen Orgasmen.

[0018]  Die US 2 112 646 offenbart eine Vorrichtung zur Behandlung von Krankheiten von Genitalien.

[0019]  Die DE 14 63 673 U offenbart eine Massagevorrichtung.

[0020]  So haben die Vorrichtungen des Stands der Technik den Nachteil gemein, dass die Komplexität der Unterdruck bzw. Überdruck erzeugenden Anordnungen hoch und diese Vorrichtung hygienische Probleme aufweisen können.

[0021]  Weiter haben die Vorrichtungen des Stands der Technik den weiteren Nachteil gemein, dass bei länger andauernden bzw. bei kontinuierlichen oder häufig wiederkehrenden Anwendungen von Unterdrücken Gewöhnungseffekte auftreten.

DE 10 2013 110 501 B4    2016.02.18

[0022] Ein weiterer Nachteil bei einigen der vorstehend beschriebenen Vakuumvorrichtungen besteht darin, dass erstens der Unterdruck mittels eines Regelventils oder einer Vakuumpumpe begrenzt sein muss, und zweitens der Unterdruck mittels einer manuellen Öffnung eines Freigabeventils abgebaut werden sollte, bevor die Saugglocke von der Haut abgelöst wird. Sollte eines der Ventile einen technischen Defekt aufweisen und/oder der Benutzer das Gerät falsch bedienen, so besteht unter Umständen Verletzungsgefahr.

[0023] So ist es in Anbetracht der vorstehend erläuterten Probleme die der Erfindung zugrunde liegende Aufgabe, eine Stimulationsvorrichtung anzugeben, welche einen einfachen Aufbau aufweist und in der Verwendung einfach und sicher ist.

[0024] Eine weitere Aufgabe der vorliegenden Erfindung besteht darin, eine Stimulationsvorrichtung mit einem effektiven stimulationsauslösenden Effekt anzugeben, welcher für die Stimulation einer erogenen Zone, insbesondere der weiblichen Klitoris, geeignet ist.

[0025] Zudem bestehen Teilaufgaben der Erfindung darin, eine Vorrichtung vorzusehen, welche ein Austrocknen der zu stimulierenden erogenen Zonen vermeidet, hygienisch ist und Gewöhnungseffekte vermeidet.

[0026] Die der Erfindung zugrunde liegende Aufgabe wird durch die Stimulationsvorrichtung gemäß Anspruch 1 gelöst. Vorteilhafte Weiterentwicklungen und Ausführungsformen sind Gegenstand der weiteren nebengeordneten und abhängigen Ansprüche.

[0027] Erfindungsgemäß weist eine Druckfelderzeugungseinrichtung der Stimulationsvorrichtung eine erste Kammer und eine zweite Kammer mit einer Öffnung zum Aufsetzen auf ein Körperteil bzw. auf die erogene Zone und ein Verbindungselement, welches die erste Kammer mit der zweiten Kammer verbindet, auf.

[0028] Durch diese erfindungsgemäße Ausbildung von strömungstechnisch über ein Verbindungselement kommunizierenden Kammern kann durch Änderung des Volumens der ersten Kammer in einfacher Weise ein Druckfeld in der zweiten Kammer erzeugt werden, dass zeitweise auf den zu stimulierenden Hautbereich gerichtet ist.

[0029] Ein Druckfeld im Sinne der Erfindung ist ein sich zeitlich veränderliches Feld von Mediendrücken, welches zeitweise Überdrücke und zeitweise Unterdrücke aufweist, wobei ein Unterdruck ein Mediendruck ist, der unter dem Referenzdruck liegt, und ein Überdruck ein Mediendruck ist, der über dem Referenzdruck liegt.

[0030] Das Medium ist üblicherweise gasförmig, vorzugsweise Luft, kann jedoch beispielsweise alternativ oder additiv ein flüssiges Medium, beispielsweise Wasser oder handelsübliches Gleitmittel, sein. Beispielsweise kann das Gleitmittel vor Benutzung der Stimulationsvorrichtung in die erfindungsgemäßen Kammern eingefüllt werden. Auf diese Weise kann die Stimulation des entsprechenden Hautbereichs anstelle mit Luft auch mit einer geeigneten hautfreundlichen Flüssigkeit erfolgen, was je nach individueller Präferenz des Anwenders gewünscht sein kann. Als weiteres Beispiel kann die Stimulationsvorrichtung auch unter Wasser mit Wasser als Medium verwendet werden (beispielsweise in der Badewanne).

[0031] Der Referenzdruck ist üblicherweise der jeweils bei Beginn der Anwendung (d. h. vor dem Aufsetzen der Stimulationsvorrichtung auf den zu stimulierenden Hautbereich) vorliegende Umgebungsdruck in Bezug auf die Stimulationsvorrichtung. Bei der vorzugsweisen Anwendung der Stimulationsvorrichtung mit Luft ist der Referenzdruck der aktuell vorliegende Luftdruck bzw. der Normaldruck.

[0032] Durch das erfindungsgemäße Druckfeld wird der zu stimulierende Hautbereich einerseits in seiner Durchblutung angeregt, während dieser andererseits indirekt massiert wird. So werden zwei vorteilhafte Effekte kombiniert. Aufgrund der erhöhten Durchblutung ist die erogene Zone der betreffenden Person empfindlicher, während zudem ein Massageeffekt erzeugt wird, der der Stimulation der erogenen Zone, beispielsweise der sexuellen Erregung bis zum Klimax, dient. Der Massageeffekt wird durch die kinetische Energie des aus der ersten Kammer durch das Verbindungselement strömenden Mediums gegen die Oberfläche des zu stimulierenden Hautbereichs erzeugt. Auf diese Weise wird der Massageeffekt indirekt, also ohne direkte Berührung der zu stimulierenden Hautpartie durch einen festen Körper, beispielsweise durch einen Vibrator, erzeugt, was zur Folge hat, dass die eingangs erläuterten Nachteile der direkten Stimulation vermieden werden.

[0033] Durch die beispielhafte Anwendung des sich erfindungsgemäß zeitlich verändernden Druckfeldes auf die Klitoris wird durch das Druckfeld eine Reizung nachgeahmt, welche beim Sexualverkehr üblicherweise stattfindet. Dabei wird durch die Kohabitationsbewegung ebenfalls ein wechselnder Reiz an der Klitoris erzeugt. So handelt es sich um eine lebensnahe Imitation des natürlichen Kohabitationsaktes, wobei ärztliche Aussagen bestätigen, dass die Anwendung des erfindungsgemäßen Druckfeldes weder zu Gewöhnungseffekten noch zur Suchterzeugung führt. Dies ist insbesondere in der abwechselnden Anwendung von Unter- und Überdrücken (bzw. auch in der nicht kontinuierlichen Anwendung nur einer Art eines Drucks) begründet.

DE 10 2013 110 501 B4    2016.02.18

[0034] Weiter ist der maximal anwendbare Druck regelmäßig durch die maximale Belastbarkeit des zu stimulierenden Hautbereichs beschränkt. So birgt beispielsweise ein zu hoher Unterdruck besonders in erogenen Zonen das Risiko von schmerzhaften Verletzungen. Ausschließlich mit Unterdrücken arbeitende Stimulationsvorrichtungen sind in ihrer Arbeitsweise üblicherweise auf dieses Maximum beschränkt. Im Gegensatz dazu wird erfindungsgemäß durch die Kombination von Über- und Unterdrücken ein erweiterter Arbeitsbereich des stimulationsauslösenden Druckfeldes bzw. Effektes geschaffen, da der Arbeitsbereich des Drucks nunmehr sowohl im positiven als auch im negativen Bereich bis zum Maximum ausgenutzt werden kann.

[0035] Durch die Ausrichtung des einen Verbindungselements auf den zu stimulierenden Hautbereich kann das Druckfeld unmittelbar wirken, wobei das Druckfeld maßgeblich durch die Konfiguration des einen Verbindungselements und der einen Öffnung von dem Verbindungselement in die zweite Kammer beeinflusst wird, und so je nach Anwendung der Stimulationsvorrichtung einstellbar ist. So kann die eine Öffnung des Verbindungselements dem zu stimulierenden Körperteil, vorzugsweise direkt, gegenüber liegen. Beispielsweise kann das Verbindungselement bei einer Stimulationsvorrichtung, welche für die Klitoris bestimmt ist, eine einzelne Durchgangsöffnung mit Düsenwirkung auf die Klitoriseichel zwischen der ersten und der zweiten Kammer aufweisen. Alternativ kann das eine Verbindungselement aus mehreren, beispielsweise vier, Durchgangsöffnungen zwischen den Kammern bestehen, wenn ein großflächigerer Hautbereich stimuliert werden soll.

[0036] Weiter entsteht nach dem Aufsetzen der halbseitig bzw. teilweise geöffneten zweiten Kammer auf den zu stimulierenden Hautbereich ein ins abgeschlossenes System der Medien- bzw. Luftströmung in der Druckfelderzeugungseinrichtung. So wird das Medium bzw. die Luft maßgeblich zwischen den Kammern hin- und herbewegt, während ein Austausch mit Medien bzw. mit Luft von außerhalb des Systems zumindest weitgehend vermieden wird. So ist vorzugsweise die erste Kammer über bzw. durch das Verbindungselement ausschließlich mit der zweiten Kammer verbunden. So bestehen keine anderen Verbindungen der ersten Kammer als diejenigen zur zweiten Kammer; beispielsweise besteht keine direkte Verbindung der ersten Kammer mit der Umgebung des Gerätes über ein Druckventil oder über einen Luftabführkanal.

[0037] Beispielsweise wird sich die Temperatur der Luft in dem erfindungsgemäßen Strömungssystem schnell an die Hauttemperatur anpassen, während das störende Zuführen von neuer (beispielsweise kalter) Luft von außerhalb des Systems vermieden wird,

so wie dies beim Stand der Technik u. A. bei der Verwendung von Vakuumpumpen der Fall sein kann. Zudem werden Abtrocknungseffekte vermieden, da in einem geschlossenen System kein oder kaum Abtransport von stimulationsfördernder Flüssigkeit, beispielsweise Körperflüssigkeit, stattfindet.

[0038] Weiter weist die erfindungsgemäße Druckfelderzeugungseinrichtung aufgrund des einfachen Aufbaus den Vorteil einer erhöhten Hygiene und einer verbesserten Reinigungsfähigkeit auf. Dabei vermeidet die vorliegende Erfindung Ventile oder Pumpen/ Kompressoren mit potentiellen Toträumen und nicht zu reinigenden Stellen. So ist die erfindungsgemäße Druckfelderzeugungseinrichtung einfach zu reinigen. Beispielsweise kann eine Reinigung der Stimulationsvorrichtung in einfacher Weise durch Einfüllen einer Reinigungsflüssigkeit in die erste Kammer und aktivieren des Druckfelds erfolgen. Alternativ kann die zweite Kammer austauschbar angeordnet sein, was die Reinigung beider Kammern ebenfalls erleichtert. Weiter können die erfindungsgemäßen Kammern und das Verbindungselement der Druckfelderzeugungseinrichtung einstückig hergestellt sein, wobei diese beispielsweise aus einem einzelnen Plastikformteil (z. B. Gummi) bestehen.

[0039] Zudem führt der erfindungsgemäße Aufbau zur Vermeidung komplexer strömungstechnischer Elemente, wie z. B. Ventile, was zu einer Vereinfachung der Herstellung führt.

[0040] Weiter weist die erfindungsgemäße Stimulationsvorrichtung eine Antriebseinheit, welche das Volumen der ersten Kammer derart verändert, dass über das Verbindungselement in der zweiten Kammer ein Druckfeld erzeugt wird, welches der Stimulation der erogenen Zone dient, und eine Steuerrichtung auf, welche die Antriebseinheit ansteuert.

[0041] Das zwischen den Kammern transportierte Medium ist in seinem Volumen prinzipbedingt auf das maximale Volumen der ersten Kammer begrenzt. Zudem kann das transportierte Volumen durch die maximal mögliche Volumenänderung, welche durch die Antriebseinheit bewirkt wird, weiter konstruktiv beschränkt werden.

[0042] Dies hat zur Folge, dass der maximale Über- bzw. Unterdruck, den die Stimulationsvorrichtung in der zweiten Kammer aufbauen kann, aufgrund der Dimensionierung der Komponenten der Druckfelderzeugungseinrichtung und des Antriebs beschränkt ist. Insbesondere kann der maximale Über- bzw. Unterdruck auf ein Maß beschränkt werden, der eine Verletzungsgefahr für die zu stimulierenden Hautbereiche minimiert oder ausschließt. Beispielsweise erübrigt sich damit ein im Stand der Technik übliches Sicherheitsventil oder ein manuelles Eingreifen des

DE 10 2013 110 501 B4    2016.02.18

Benutzers in den Stimulationsvorgang, beispielsweise ein Öffnen eines Freigabeventils.

[0043] Weiter wird die zeitliche Veränderung des Druckfeldes bzw. die Modulation des Druckfeldes durch die Steuereinrichtung weitgehend automatisch gesteuert. So kann in der Steuereinrichtung die Modulation des Druckfeldes, beispielsweise Intensität, zeitlicher Verlauf oder Abfolge, vorgespeichert sein. Vorzugsweise kann die zeitliche Veränderung des Druckfeldes regelmäßige bzw. wiederkehrende (Stimulations-)Muster aufweisen, beispielsweise Impulse mit einem vorgegebenen Takt oder sich regelmäßig abwechselnde Impulsfolgen. Auf diese Weise kann sich die Interaktion des Benutzers mit der Stimulationsvorrichtung erfindungsgemäß auf das An- und das Ausschalten und die Wahl des Stimulationsmusters beschränken, während die Stimulationsvorrichtung das bevorzugte Stimulationsmuster automatisch ausführt. Somit ist erfindungsgemäß die Anwendungskomplexität der Stimulationsvorrichtung gerade im Vergleich zu den herkömmlichen (medizinischen) Vakuum-Stimulationsvorrichtungen niedrig. Alternativ oder zusätzlich kann der Benutzer die Stimulationsmuster der Stimulationsvorrichtung während oder vor dem Betrieb individuell konfigurieren.

[0044] Gemäß einem weiteren Aspekt der Erfindung wird nach dem nebengeordneten Anspruch 9 ein System mit der erfindungsgemäßen Stimulationsvorrichtung vorgeschlagen, welches eine zu der Stimulationsvorrichtung getrennt angeordnete Fernsteuervorrichtung aufweist, wobei die Steuereinrichtung der Stimulationsvorrichtung von der Fernsteuereinrichtung ferngesteuert wird. So kann eine übliche kabellose (beispielsweise über Funk) oder kabelgebundene Fernsteuerung eingesetzt werden, um die Modulation der Stimulationsvorrichtung oder deren Aktivierung von einem weiteren Benutzer fernzusteuern zu lassen.

[0045] Gemäß einem weiteren Aspekt der Erfindung wird ein Verfahren zur Stimulation von Körperteilen, insbesondere der Klitoris, offenbart. Die zugehörigen vorteilhaften Effekte und Wirkungen sind vorstehend in Bezug auf das Druckfeld näher erläutert.

[0046] Gemäß einem weiteren Aspekt der Erfindung wird nach Anspruch 10 die Verwendung der erfindungsgemäßen Stimulationsvorrichtung als Sexspielzeug zur Stimulation der weiblichen Klitoris vorgeschlagen. Wie eingangs erläutert ist die weibliche Klitoris eine besonders empfindliche erogene Zone der Frau, weshalb die erfindungsgemäße Verwendung einer indirekten Massage- in Kombination mit einer Unterdruckstimulation für dieses Körperteil zur Stimulation bis zum Orgasmus besonders vorteilhaft erscheint.

[0047] Die vorstehend beschriebenen Merkmale und Funktionen der vorliegenden Erfindung sowie weitere Aspekte und Merkmale werden nachfolgend anhand einer detaillierten Beschreibung von bevorzugten Ausführungsformen unter Bezugnahme auf die beigefügten Figuren weiter beschrieben.

KURZE BESCHREIBUNG DER ZEICHNUNGEN

[0048] Hierbei zeigt/zeigen:

[0049] Fig. 1 eine Vorderansicht einer ersten Ausführungsform der erfindungsgemäßen Stimulationsvorrichtung;

[0050] Fig. 2 eine perspektivische Seitenansicht der ersten Ausführungsform der erfindungsgemäßen Stimulationsvorrichtung;

[0051] Fig. 3 einen Querschnitt durch die erfindungsgemäßen Stimulationsvorrichtung der ersten Ausführungsform;

[0052] Fig. 4 einen Querschnitt durch eine Druckfelderzeugungseinrichtung eines ersten Aspekts der vorliegenden Erfindung im ersten Zustand;

[0053] Fig. 5 einen Querschnitt durch eine Druckfelderzeugungseinrichtung eines ersten Aspekts der vorliegenden Erfindung im zweiten Zustand;

[0054] Fig. 6 einen Querschnitt durch eine Druckfelderzeugungseinrichtung eines ersten Aspekts der vorliegenden Erfindung im dritten Zustand;

[0055] Fig. 7 einen Querschnitt durch eine Druckfelderzeugungseinrichtung eines zweiten Aspekts der vorliegenden Erfindung;

[0056] Fig. 8 einen Querschnitt durch eine Druckfelderzeugungseinrichtung eines dritten Aspekts der vorliegenden Offenbarung, der nicht beansprucht ist;

[0057] Fig. 9 einen Querschnitt durch eine Druckfelderzeugungseinrichtung eines vierten Aspekts der vorliegenden Erfindung;

[0058] Fig. 10a), b) und c) Querschnitte durch eine Druckfeld-erzeugungseinrichtung eines fünften Aspekts der vorliegenden Erfindung;

[0059] Fig. 11 einen teilweisen Querschnitt durch eine zweite Ausführungsform der erfindungsgemäßen Stimulationsvorrichtung;

[0060] Fig. 12a) bis f) verschiedene Unter- und Seitenansichten weiterer Aspekte einer zweiten Kammer der vorliegenden Erfindung, wobei die Aspekte der Fig. 12d) und Fig. 12f) nicht beansprucht sind;

DE 10 2013 110 501 B4    2016.02.18

[0061] **Fig.** 13 ein Blockdiagramm einer Ausführungsform der vorliegenden Erfindung;

[0062] **Fig.** 14a) bis c) Diagramme von verschiedenen Muster der Druckmodulationen der vorliegenden Erfindung

BESCHREIBUNG BEVORZUGTER
AUSFÜHRUNGSFORMEN

[0063] Bezugnehmend auf **Fig.** 1 wird eine Vorderansicht einer ersten Ausführungsform der erfindungsgemäßen Stimulationsvorrichtung 1 erläutert, wobei in **Fig.** 2 eine perspektivische Ansicht und in **Fig.** 3 ein Querschnitt der erfindungsgemäßen Stimulationsvorrichtung 1 der ersten Ausführungsform gezeigt ist.

[0064] Die ersten Ausführungsform der Stimulationsvorrichtung 1 ist ein, vorzugsweise tragbares, Elektro- oder Kleingerät, welches ein Gehäuse 8, eine Druckfelderzeugungseinrichtung 2, Bedienelemente 71, eine Anzeige 72, einen An-/Aus-Schalter 74, eine Buchse 75, eine optionale Batterie 76 und eine optionale Beleuchtung 9 aufweist.

[0065] Das Gehäuse 8 ist vorzugsweise derart ergonomisch ausgeführt, dass man es mit einer Hand bequem halten kann und es keine scharfen bzw. spitzen Kanten aufweist. Weiter kann das Gehäuse 8 aus einem Kunststoff, beispielsweise Polycarbonat (PC) oder Acrylnitril-Butadien-Styrol (ABS), bestehen. Zudem können die Griffbereiche oder auch das gesamte Gehäuse mit einem haptisch vorteilhaften Silikon ergänzt bzw. ausgestaltet sein. Das Gehäuse 8 ist vorzugsweise zumindest wasserabweisend oder spritzwasserfest ausgestaltet, beispielsweise Schutzklasse IP 24.

[0066] Die Bedienelemente 71 dienen der Einstellung der Betriebsart des Gerätes, d. h. der Einstellung des Modulationsmusters des Druckfeldes. Die Bedienelemente 71 können beispielsweise als zumindest ein Drucktaster, als zumindest ein Drehschalter, oder als zumindest ein berührungsempfindlicher Schalter ausgeführt sein. Weiter können die Bedienelemente 71 ein optisches Feedback zur Betätigung, beispielsweise mittels in den Schalter integrierter Leuchtdioden (LED), abgeben.

[0067] Eine optionale Anzeige 72 dient der Information des Benutzers über den Gerätezustand und/oder den Einstellzustand. Die Anzeige 72 kann beispielsweise aus einer Mehrzahl von Leuchtdioden oder als LCD-Anzeige ausgestaltet sein. Die angezeigten Informationen können beispielsweise der Ladezustand einer optionalen Batterie oder die aktuelle Einstellung des Modulationsmusters sein.

[0068] Der An-/Aus-Schalter 74 dient der Aktivierung und Deaktivierung der Stimulationsvorrichtung

1. Dieser An-/Aus-Schalter 74 kann beispielsweise ein Drucktaster, welcher die Stimulationsvorrichtung 1 bei längerem Drücken ein- bzw. ausschaltet, oder ein einrastender Schiebeschalter sei.

[0069] Eine Buchse 75 dient der externen Stromversorgung der Stimulationsvorrichtung 1 über einen externen Stecker 73, welcher beispielsweise an einen externen Netzadapter angeschlossen ist. Um die Spritzwasserfestigkeit der Stimulationsvorrichtung 1 sicherzustellen, kann vorzugsweise anstelle der Buchse ein magnetisch-induktiver Überträger vorgesehen sein, welcher eine Leistungsübertragung in die Stimulationsvorrichtung 1 ohne einen elektrischen leitenden Kontakt ermöglicht. Vorzugsweise weist die Stimulationsvorrichtung 1 zudem eine Batterie, beispielsweise einen Nickel-Metalhydrit-Akku (NiMH), für einen kabellosen Betrieb auf. Alternativ kann auch ein (längeres) Stromversorgungskabel aus der Stimulationsvorrichtung herausgeführt sein.

[0070] Die Druckfelderzeugungseinrichtung 2 einer ersten Ausführungsform weist eine erste Kammer 3 im Inneren der Stimulationsvorrichtung 1, eine zweite Kammer 4 zum Aufsetzen auf ein zu stimulierendes Körperteil 11 und ein Verbindungselement 5 auf, welche die erste Kammer 3 mit der zweiten Kammer 4 verbindet.

[0071] Eine Antriebseinheit 6, beispielsweise ein Elektromotor, treibt über eine Achse 61 und mittels eines Exzenters 62 (oder alternativ mittels einer Pleuelstange) die erste Kammer 3 derart an, dass das Volumen der ersten Kammer 3 entsprechend Drehung der Achse 61 der Antriebseinheit 6 verändert wird. Hierzu wird angemerkt, dass in der Stimulationsvorrichtung 1 grundsätzlich alle Antriebsarten einsetzbar sind, welche eine Auslenkung der Wand 31 der ersten Kammer 3 zur Volumenänderung bewirken. So kann dies beispielsweise hydraulisch, pneumatisch, piezoelektrisch, mechanisch oder elektromagnetisch geschehen. Beispiele hierfür werden später noch näher erläutert.

[0072] Eine Steuereinrichtung 7 steuert die Antriebseinheit 6, die Bedienelemente 71 und die Anzeige 72 an. Dabei wird die Steuereinrichtung 7 und die Antriebseinheit 6 von der internen Batterie 76 und/oder der externen Leistungsversorgung 73 mit Leistung versorgt.

[0073] Eine optionale Beleuchtung 9 ist an oder in dem Gehäuse 8 vorgesehen. Dabei dient die Beleuchtung 9 vorzugsweise der Beleuchtung des Inneren der zweiten Kammer 4. Die Beleuchtung 9 kann entweder durch den Benutzer zuschaltbar sein oder bei Aktivierung der Stimulationsvorrichtung 1 automatisch aktiviert sein. Weiter kann die Beleuchtung 9 aus energiesparenden Leuchtdioden ausgebildet sein. Die Beleuchtung kann beispielsweise als Ori-

DE 10 2013 110 501 B4    2016.02.18

entierungshilfe für den Benutzer der Stimulationsvorrichtung **1** im Dunkeln oder als zusätzliche optische Stimulation dienen.

[0074] Bezugnehmend auf die **Fig.** 4, **Fig.** 5 und **Fig.** 6 wird nachstehend der Aufbau und die Funktion eines ersten Aspekts der Druckfelderzeugungseinrichtung **2** der Stimulationsvorrichtung **1** näher erläutert.

[0075] **Fig.** 4 zeigt die Druckfelderzeugungseinrichtung **2** in einem ersten Zustand, wobei die zweite Kammer **4** auf den zu stimulierenden Hautbereich bzw. das Körperteil **11** aufgesetzt ist. Der erste Zustand der Druckfelderzeugungseinrichtung **2** ist durch eine neutrale Auslenkung der ersten Kammer **3** gekennzeichnet, d. h., es wirkt keine externe Kraft, beispielsweise von der Antriebseinheit, auf die erste Kammer **3**. Hierbei ist das Volumen V1 der ersten Kammer das Standardvolumen dieser Kammer **3**.

[0076] Das zu stimulierende Körperteil **11** ist ein Hautbereich des Körpers, wobei hier beispielhaft eine besonders empfindliche erogene Zone, die Klitoris **12**, dargestellt ist. Somit ist die Anwendung der vorliegenden Erfindung jedoch nicht auf die weibliche Klitoris **11** beschränkt, sondern die Stimulationsvorrichtung **1** kann auf alle Körperteile bzw. erogenen Zonen (beispielsweise die Innenseite der Oberschenkel, die Lenden, Nacken, Brustwarzen, etc.) angewandt werden, welche mittels Medien- bzw. Luftdruckmassage und/oder Unterdruck stimuliert werden können.

[0077] Die zweite Kammer **4** bildet durch das Aufsetzen auf das zu stimulierende Körperteil **11** eine zum Äußeren der Druckfelderzeugungseinrichtung **2** weitgehend oder vollständig abgeschlossene Kammer, welche nur noch über das Verbindungselement **5** mit der zweiten Kammer in Verbindung steht, wobei die Ränder der Kammer **4** im Idealfall dicht mit der Oberfläche des Körperteils **11** abschließen. Auf diese Weise entstehen zwei kommunizierende Kammern **3** und **4**, wobei bei Volumenänderung einer der Kammern **3** oder **4** ein entsprechender Druckausgleich zwischen den Kammern **3** und **4** über das Verbindungselement **5** erfolgt.

[0078] Eine Wand **31** der ersten Kammer **3** ist mittels einer Halterung **32** fixiert. Die Halterung **32** ist wiederum an dem Gehäuse **8** befestigt. An der Halterung **32** ist weiter die Wand **41** der zweiten Kammer angebracht. Zwei zueinander ausgerichtete Öffnungen in der Wand **41** der zweiten Kammer und der Halterung **32** bilden gemeinsam das Verbindungselement **5**, welches die erste Kammer **3** und die zweite Kammer **4** verbindet. Dabei sind die Wand **31**, die Halterung **32** und die Wand **41** vorzugsweise miteinander medien- bzw. luftdicht verklebt. Alternativ können diese auch miteinander (beispielweise mit Hilfe von

dichtenden Bereichen zwischen dem Gehäuse **8** und dem jeweiligen Teil) press-gepasst oder verschraubt sein. Auch die Halterung **32** kann mit dem Gehäuse **8** beispielsweise verklebt oder verschraubt sein.

[0079] Die Wand **31** der ersten Kammer **3** besteht vorzugsweise aus einem flexiblen, medien- bzw. luftundurchlässigen Material, beispielsweise Gummi. Die Halterung **32** besteht vorzugsweise aus einem starren Kunststoff, welcher ebenso medien- bzw. luftundurchlässig ist. Die Wand **41** der zweiten Kammer ist vorzugsweise aus einem flexiblen, hautfreundlichen Material hergestellt, beispielsweise Silikon oder Gummi.

[0080] **Fig.** 5 zeigt die Druckfelderzeugungseinrichtung **2** von **Fig.** 4 in einem zweiten Zustand, wobei wiederum die zweite Kammer **4** auf das zu stimulierende Körperteil **11** aufgesetzt ist. Der zweite Zustand ist dadurch gekennzeichnet, dass eine auf die erste Kammer **3** wirkende Kraft A eine Expansion der Kammer **3** bewirkt. Im Detail zieht bei diesem Ausführungsbeispiel die Kraft A die Wand **31** der ersten Kammer **3** in eine Richtung, die von der zweiten Kammer **4** weggerichtet ist.

[0081] Dadurch vergrößert sich das Volumen V2 der Kammer **3**, d. h., V2 > V1. Um den entstandenen Druckunterschied zwischen den Kammern **3** und **4** auszugleichen, strömt nunmehr das Medium bzw. die Luft von der zweiten Kammer **4** in die erste Kammer **3**.

[0082] Unter der Annahme, dass in dem ersten Zustand der in den Kammern **3** und **4** vorliegende Druck dem aktuell herrschendem, äußerem Referenzdruck (beispielsweise dem Luftdruck) entspricht, wird nun der vorliegende Gesamtdruck in dem zweiten Zustand geringer sein, als der äußere Referenzdruck. Dieser Unterdruck ist derart ausgelegt, dass dieser vorzugsweise geringer ist, als der übliche systolische Blutdruck in den Blutgefäßen des Körperteils **11**. Damit erhöht sich die Durchblutung in diesem Bereich und die Klitoris **12** wird in dem zweiten Zustand besser durchblutet.

[0083] **Fig.** 6 zeigt die Druckfelderzeugungseinrichtung **2** in einem dritten Zustand, wobei wiederum die zweite Kammer **4** auf das zu stimulierende Körperteil **11** aufgesetzt ist. Der dritte Zustand ist dadurch gekennzeichnet, dass eine auf die erste Kammer **3** wirkende Kraft B eine Volumenverkleinerung bzw. Kompression der Kammer **3** bewirkt. Im Detail ist die Kraft B in seiner Richtung der Richtung der Kraft A entgegengesetzt und verformt die Wand **31** der ersten Kammer derart, dass das resultierende Volumen V3 der Kammer kleiner ist, als das Volumen V1. Die Kompression der Kammer **3** bewirkt einen Überdruck in der Kammer **3**, welcher durch eine Medien- bzw. Luftströmung durch das Verbindungsele-

DE 10 2013 110 501 B4    2016.02.18

ment **5** in Richtung der zweiten Kammer **4** ausgeglichen wird.

[0084] Diese Medienströmung ist nun durch die Ausrichtung der Öffnung **51** und/oder des Verbindungselements **5** vorzugsweise auf das zu stimulierende Körperteil **11**, insbesondere auf die Eichel der Klitoris **12**, gerichtet. Die erfindungsgemäße indirekte (Druck-)Massage erfolgt durch das auf das Körperteil **11** strömende Medium. Dabei ist die Größe der Öffnung **51** derart dimensioniert, dass diese im Verhältnis zu dem in der ersten Kammer **3** verdrängten Volumen klein genug ist, um das Medium für eine spürbare Massagewirkung ausreichend zu beschleunigen.

[0085] Weiter kann die Art der Strömung nicht nur durch die Größe und die Ausrichtung der Öffnung **51** vorteilhaft beeinflusst werden, sondern auch durch die innere Konfiguration des Verbindungselements. Beispielsweise können helixförmige Rillen in dem Verbindungselement **5** einen Drall der erfindungsgemäßen Strömung verursachen, wobei das Strömungsprofil der Strömung eine „weichere" bzw. turbulentere Wirkung auf das zu stimulierende Körperteil entfaltet. Alternativ kann das sich in der zweiten Kammer **4** ergebende Druckfeld mit Hilfe mehrerer Öffnungen **51** entsprechend der Anwendung angepasst werden.

[0086] Bei der in den **Fig.** 4 bis **Fig.** 6 gezeigten Anordnung ist vorteilhaft, dass diese hygienisch unproblematisch (beispielsweise aufgrund der Vermeidung von Toträumen) und in der Herstellung einfach ist. Beispielsweise sind keine Ventile oder weitere Öffnungen in oder an der ersten Kammer **3** erforderlich.

[0087] **Fig.** 7 zeigt einen zweiten Aspekt der vorliegenden Erfindung mit einem alternativen Aufbau der Druckerzeugungseinrichtung **2**. So können die Wände **31** und **41** der ersten und zweiten Kammer **3** und **4** derart ineinander eingreifen, dass diese ebenso wie bei dem ersten Aspekt des Aufbaus der Druckerzeugungseinrichtung **2** zwei kommunizierende Kammern mit einem Verbindungselement **5** ausbilden. So entfällt eine gesonderte Halterung, während die zweite Kammer **4** austauschbar ist. Zudem kann das Verbindungselement **5** integral oder einstückig mit der Wand **41** der zweiten Kammer **4** ausgestaltet sein. Eine austauschbare Kammer **4** hat den Vorteil, dass auf diese Weise verschiedene, auf das jeweilige Körperteil angepasste Formgebungen der Kammer **4** zum Einsatz kommen können (eine nähere Erläuterung hierzu findet sich später), ohne dazu die gesamte Stimulationsvorrichtung **1** auszutauschen zu müssen. Alternativ kann die zweite Kammer **4** auch an dem Gehäuse **8** steckbar befestigt werden (nicht näher dargestellt). Die Wand **31** der ersten Kammer **3** kann beispielsweise mit dem Gehäuse **8** verklebt oder verschraubt sein.

[0088] Auch kann, wie in **Fig.** 7 durch die gestrichelte Linie und den Doppelpfeil C näher dargestellt, die Expansion und Kompression der ersten Kammer **3** durch eine Kraftwirkung erfolgen, die senkrecht zur der Ausrichtung des Verbindungselements **5** liegt. Grundsätzlich kann die durch die Antriebseinheit **6** mittelbar oder unmittelbar auf die erste Kammer **3** ausgeübte Kraft aus einer beliebigen Richtung erfolgen. Entscheidend ist hier bei nur, dass das Volumen ersten Kammer **3** durch die Antriebseinheit **6** vergrößert und verkleinert werden kann.

[0089] **Fig.** 8 zeigt einen dritten Aspekt der Erfindung mit einem einstückigen bzw. einteiligen Aufbau der Druckfelderzeugungseinrichtung **2**. Dabei kann als Material der Kammern **3** und **4** ein elastisches Material, beispielsweise Silikon oder Gummi, zum Einsatz kommen. Vorteilhaft ist hierbei, dass evtl. hygienisch bedenkliche Spalte vermieden werden und der Herstellungsaufwand niedriger ist. Auch in diesem Falle kann die Druckfelderzeugungseinrichtung **2** mit dem Gehäuse **8** verklebt oder verschraubt sein. Eine Änderung des Volumens der ersten Kammer **3** erfolgt hier in analoger Weise, wie in Zusammenhang mit **Fig.** 7 beschrieben.

[0090] **Fig.** 9 zeigt einen vierten Aspekt der nicht beanspruchten Offenbarung mit einem alternativen Aufbau der Druckfelderzeugungseinrichtung **2**. Dabei sind die zweite Kammer **4**, mehrere Verbindungselemente **5**, sowie Teilabschnitte der Wand **31** der ersten Kammer **3** einstückig ausgebildet. Alternativ kann die Druckfelderzeugungseinrichtung **2** unter Wahrung des geometrischen Vorbilds der **Fig.** 9 in ähnlicher Weise wie in **Fig.** 4 oder **Fig.** 7 dargestellt auch zwei- oder mehrstückig aus Einzelteilen aufgebaut sein.

[0091] Die Volumenänderung der ersten Kammer **3** erfolgt hier in einer zur Kolbenpumpe ähnlichen Weise, jedoch fehlen hier etwaig vorhandene Ventile. So wird ein Kolben **63** durch die Antriebseinheit, beispielsweise eine Elektromotor oder ein Elektromagnet, in den Richtungen des Doppelpfeils D hin- und herbewegt. Diese Art des Antriebs hat den Vorteil, dass das Volumen der ersten Kammer **3** in einfacher Weise auf Null bzw. auf annähernd Null verringert werden kann, und so die erste Kammer **3** fast vollständig entleert werden kann.

[0092] Die nicht beanspruchte Ausgestaltung des Verbindungselements **5** mit mehreren Kanälen **52** und Öffnungen **51** führt zu einer Verteilung des Druckfeldes auf mehrere Konzentrationspunkte. Während die erfindungsgemäße Ausgestaltung des Verbindungselements **5** mit nur einem Kanal, wie in Zusammenhang mit **Fig.** 6 beschrieben, zur Ausbildung eines stark konzentrierten Medien- bzw. Luftstroms auf einen Zielbereich hin führt, kann bei der in **Fig.** 9 gezeigten nicht beanspruchten Ausgestal-

DE 10 2013 110 501 B4    2016.02.18

tung des Verbindungselements 5 der Medien- bzw. Luftstrom auf mehrere Zielbereiche verteilt werden. So kann beispielsweise die Klitoris 11 nicht nur an seiner Eichel angeblasen werden, sondern gleichmäßig von mehreren Seiten. Diese Verteilung der Konzentration der Luftströmung auf mehrere Bereiche kann je nach Anwendung helfen, eine Überstimulation zu vermeiden, und/oder helfen, den Stimulationsbereich zu vergrößern.

[0093] Die **Fig.** 10a bis **Fig.** 10c zeigen einen fünften Aspekt der Erfindung mit (Teil-)Querschnitten eines Aufbaus der Druckfelderzeugungseinrichtung 2 mit einem Biegeelement 64 als Antrieb zur Volumenänderung der ersten Kammer 3. Das Biegeelement 64 kann beispielsweise ein herkömmliches piezoelektrisches Biegeelement sein, welches sich nach Anlegen einer Spannung verformt bzw. biegt. Bei diesem Aspekt der Erfindung ist die Wand 31 der ersten Kammer 3 starr bzw. steif aufgebaut, während das Biegeelement 64 in geeigneter Weise an den Seiten der ersten Kammer 3 eingepasst ist.

[0094] Dabei sind die Übergangsstellen zwischen dem Biegeelement 64 und der Wand 31 abgedichtet (beispielsweise elastisch verklebt). Bei diesem Aufbau ist der Antrieb für die Druckfelderzeugungseinrichtung 2 schon in diese integriert und es entfällt ein externer Antrieb. Beispielsweise entfällt ein Elektromotor mit einem Exzenter. Dadurch können u. A. evtl. störende Eigenschwingungen aufgrund der Exzenterbewegung der Stimulationsvorrichtung verringert werden.

[0095] Im Detail zeigt **Fig.** 10a die Druckfelderzeugungseinrichtung 2 mit dem Biegeelement 64 in Neutralstellung. Somit ist das Volumen der ersten Kammer 3 mit dem Biegeelement 64 in Neutralstellung das Standardvolumen. **Fig.** 10b zeigt weiter die erste Kammer 3 mit einem erregten und in Folge nach Außen gebogenen Biegeelement, weshalb das Volumen der ersten Kammer 3 vergrößert ist; und in Folge herrscht in der Druckfelderzeugungseinrichtung 2 ein Unterdruck. **Fig.** 10c zeigt ein im Vergleich zu **Fig.** 10b entgegengesetzt erregtes Biegeelement der ersten Kammer 3, weshalb das Volumen der ersten Kammer 3 verkleinert ist; und in Folge herrscht in der Druckfelderzeugungseinrichtung 2 ein Überdruck.

[0096] **Fig.** 11 zeigt eine zweite Ausführungsform der Erfindung mit einer örtlich getrennten Anordnung der Kammern 3 und 4 der Druckfelderzeugungseinrichtung 2. Dabei sind die Kammern 3 und 4 über ein ausgedehntes Verbindungselement 5 verbunden, welches ein vergleichsweise flexibler Schlauch oder auch ein starres Rohr sein kann. Beispielsweise kann die Länge des Verbindungselements 5 0,5 m betragen. Damit ist es möglich, das Gehäuse 8 in einer Hand zu halten, während die andere Hand die zweite Kammer 4 auf das zu stimulierende Körperteil 11 hält; oder

aber kann man das Gehäuse 8 einfach zur Seite legen, während der Benutzer nur die zweite Kammer 4 in Händen hält. Bei dieser Ausführungsform kann die Stimulationsvorrichtung auch als Tischgerät ausgestaltet sein.

[0097] Die **Fig.** 12a) bis **Fig.** 12f) zeigen verschiedene Unter- und Seitenansichten weiterer Aspekte der zweiten Kammer 4. Im Detail zeigt **Fig.** 12a) eine Unteransicht einer kreisförmigen zweiten Kammer 4 mit einer mittig angeordneten Öffnung 51; **Fig.** 12b) eine Unteransicht einer dreiecksförmigen zweiten Kammer 4 mit einer mittig angeordneten Öffnung 51; **Fig.** 12c) eine Unteransicht einer ovalen zweiten Kammer 4 mit einer mittig angeordneten Öffnung 51; und die nicht beanspruchte **Fig.** 12d) eine Unteransicht einer annähernd acht-förmigen zweiten Kammer 4 mit zwei zur Mitte versetzt angeordneten Öffnungen 51. **Fig.** 12e) zeigt weiter einen Seitenquerschnitt einer erfindungsgemäßen zweiten Kammer 4, wobei die zweite Kammer 4 zusätzlich eine erweiterte Kontaktfläche 43 zur Haut bzw. ein Auflageteil 43 aufweist, um die (Ab-)Dichtfunktion der zweiten Kammer 4 an der Haut zu verbessern. Die erweiterte Kontaktfläche 43 kann zudem Rillen oder Vorsprünge aufweisen, um die Dichtfunktion noch weiter verbessern. Die nicht beanspruchte **Fig.** 12f) zeigt einen Seitenquerschnitt einer zweiten Kammer 4 mit mehreren getrennten Verbindungselementen 5 und einer erweiterten Kontaktfläche aufgrund des Auflageteils 43.

[0098] So kann die Form der zweiten Kammer 4 grundsätzlich an die Anatomie der zu stimulierenden erogenen Zone angepasst sein. Dabei ist die Form der Kammer 4 von **Fig.** 12a) beispielsweise an die runde Form der Brust angepasst, während die Form der Kammer 4 der **Fig.** 12c) besser an die Form der weiblichen Vulva angepasst ist. Weiter bestimmt die Form der zweiten Kammer 4 zudem auch die Ausprägung des erfindungsgemäßen Druckfeldes. So bestimmt die Größe der zweiten Kammer 4 im Verhältnis zu dem von der Kammer 4 verdrängten Volumen die Höhe des erreichbaren Unter- bzw. Überdrucks. Weiter kann über die Nähe der Öffnung 51 des Verbindungselements 5 zu dem zu stimulierenden Hautbereich die Intensität der erfindungsgemäßen Massagewirkung auf diese bestimmt werden. Mit nicht beanspruchten mehreren Öffnungen 51, vgl. **Fig.** 12d), kann die Massagewirkung auch auf mehrere Bereiche verteilt werden. So kann beispielsweise die Klitoris weniger direkt an der sehr empfindlichen Klitoriseichel stimuliert werden (vgl. **Fig.** 12e)), sondern verstärkt an den die Klitoriseichel umgebenden Bereichen, um eine Überreizung der Klitoris zu vermeiden.

[0099] **Fig.** 13 zeigt ein Blockdiagramm eines Beispiels des funktionellen Aufbaus einer Ausführungsform der vorliegenden Erfindung mit einer Steuerein-

DE 10 2013 110 501 B4    2016.02.18

richtung 7, einer Antriebseinheit 6, einer Beleuchtung 9, einem An-/Aus-Schalter 74, Bedienelementen 71, einer Batterie 76 und einer externen Stromversorgung 73.

[0100] Die Steuereinrichtung 7, welche beispielsweise einen Mikrocontroller aufweist oder festverdrahtet ist, steuert zunächst die Stromversorgung aller Verbraucher der Stimulationsvorrichtung 1, sowie optional einen Lade- und Entladevorgang der Batterie 76 und/oder ein Batteriemanagement. Insbesondere steuert die Steuereinrichtung 7 die Erregung der Antriebseinheit 6, beispielsweise die Größe der Auslenkung, die Frequenz, die Modulation, etc.

[0101] Weiter kann die Steuereinrichtung 7 einen Speicher aufweisen, in dem zumindest ein Modulations- bzw. Stimulationsmuster (diese werden in Zusammenhang mit Fig. 14a) bis c) näher erläutert) abgespeichert ist. Die Antriebseinheit 6 kann nun nach Wahl des Benutzers der Stimulationsvorrichtung 1 über die Bedienelemente 71 entsprechend dieser vorgespeicherten Stimulationsmuster in seiner Erregung angesteuert werden. Die Stimulationsmuster des Druckfeldes können optional auch durch den Benutzer über die Bedienelemente individuell erstellt und abgespeichert werden.

[0102] Fig. 14a) zeigt den zeitlichen Verlauf eines Gesamtdrucks p in der Druckfelderzeugungseinrichtung (2) bei Anwendung dieser zur Stimulation. Die gestrichelte Linie gibt den Referenzdruck, beispielsweise den aktuell herrschende atmosphärischen Druck, an, welcher außerhalb der Druckfelderzeugungseinrichtung (2) vorhanden ist. Wird die zweite Kammer 4 nun auf das zu stimulierende Körperteil 11 aufgesetzt, wird der anfangs herrschende Umgebungsdruck der in der Druckfelderzeugungseinrichtung (2) etwa beibehalten. Nunmehr wird angenommen, dass die zweite Kammer 4 auf das zu stimulierende Körperteil weitgehend dicht aufgesetzt ist. Nach Aktivierung der Stimulationsvorrichtung wird die Antriebseinheit 6 von der Steuereinrichtung 7 gemäß einem vorgespeicherten Stimulationsmusters angesteuert bzw. erregt. Entsprechend werden sich das Volumen der ersten Kammer 3 und damit der Gesamtdruck in der Druckfelderzeugungseinrichtung 2 ändern, wobei die Druckänderungen auf den Referenzdruck aufmoduliert werden. Das in Fig. 14a) beispielhaft gezeigte Druck- bzw. Stimulationsmuster entwickelt ein gepulstes, regelmäßiges Druckfeld. In Phasen der Erhöhung des Drucks wird die zu stimulierende erogene Zone angeblasen bzw. massiert, während in den Zeiten, in denen ein Unterdruck herrscht, die Durchblutung des Körperteils 11, beispielsweise der Klitoris, gefördert wird. So existieren erfindungsgemäß Zeiträume (In Fig. 14a) mit I) gekennzeichnet), in denen ein Unterdruck herrscht, während die Klitoris gleichzeitig indirekt massiert wird.

[0103] Fig. 14b) zeigt drei Beispiele von alternativen Stimulationsmustern. So ist in dem mit II) gekennzeichneten Bereich ein gepulstes Stimulationsmuster mit hoher Amplitude dargestellt. In dem mit III) gekennzeichneten Bereich ist ein gepulstes Stimulationsmuster mit niedriger Amplitude dargestellt. Weiter ist in dem mit IV) gekennzeichneten Bereich ein in der zeitlichen Abfolge und in der Amplitude unregelmäßiges bzw. asymmetrisches Stimulationsmuster abgebildet. Die Muster können je nach körperlicher Wirkung/Anwendung und nach individuellen Wünschen variiert werden.

[0104] Fig. 14c) zeigt ein weiteres Beispiel eines alternativen Stimulationsmusters. So kann die Stärke des Drucks mit der Zeit zunehmen, um sich an den Erregungszustand des Benutzers anzupassen.

[0105] Die Erfindung lässt neben den erläuterten Ausführungsformen weitere Gestaltungsgrundsätze zu. So können verschiedene Anordnungen bzw. Aufbauten der ersten Kammer 3 beliebig mit verschiedenen Ausführungen der zweiten Kammer 4 oder dem Verbindungselement 5 kombiniert werden. Beispielsweise kann die erste Kammer 3 mit dem Antrieb der Fig. 10 mit der zweiten Kammer der Fig. 12f) kombiniert werden, was jedoch nicht beansprucht ist.

[0106] Obschon bei allen Ausführungsformen nur eine erste Kammer 3 dargestellt ist, können auch zwei oder mehr erste Kammern 3 vorhanden sein, welche dann entsprechend simultan oder zeitversetzt derart angetrieben werden, dass diese Ihr Volumen ändern, um ein erfindungsgemäßes Druckfeld aufzubauen.

[0107] Obschon bei den beanspruchten Ausführungsformen nur eine Öffnung aus der ersten Kammer 3 zu dem Verbindungselement 5 dargestellt ist, so können auch mehrere Öffnungen für ein Verbindungselement 5 oder auch mehrere Öffnungen für mehrere Verbindungselemente 5 in der ersten Kammer 3 vorhanden sein, was jedoch nicht beansprucht ist.

[0108] Eine Stimulationsvorrichtung 1 kann mehrere Druckfelderzeugungseinrichtung 2 aufweisen. So können beispielsweise zwei Druckfelderzeugungseinrichtungen vorhanden sein, um zwei erogene Zonen gleichzeitig zu stimulieren.

[0109] Die erfindungsgemäßen Stimulationsmuster können von dem in den Fig. 14a), b) und c) gezeigten Muster abweichen, solange diese eine zeitliche Abfolge von Unter- und Überdrücken aufweisen. Beispielsweise kann zu Beginn bzw. nach Aktivierung der Vorrichtung zunächst ein relativ lang anhaltender Unterdruck aufgebaut sein (beispielsweise 3 Minuten), um die Durchblutung der zu stimulierenden Zone effektiv zu erhöhen, worauf dann langsam in

DE 10 2013 110 501 B4     2016.02.18

der Amplitude größer werdende Pulse von Unter- und Überdrücken folgen.

Bezugszeichenliste

| | |
|---|---|
| 1 | Stimulationsvorrichtung |
| 2 | Druckfelderzeugungseinrichtung |
| 3 | erste Kammer |
| 4 | zweite Kammer |
| 5 | Verbindungselement |
| 6 | Antriebseinheit |
| 7 | Steuereinrichtung |
| 8 | Gehäuse |
| 9 | Beleuchtung |
| 11 | Körperteil |
| 12 | Klitoris |
| 31 | Wand der ersten Kammer |
| 32 | Halterung |
| 41 | Wand der zweiten Kammer |
| 42 | Öffnung der ersten Kammer |
| 43 | Kontaktfläche |
| 51 | Öffnung des Verbindungselements zur zweiten Kammer |
| 61 | Antriebswelle |
| 62 | Exzenter |
| 63 | Kolben |
| 64 | Biegeelement |
| 71 | Bedienelement |
| 72 | Anzeige |
| 73 | Stromversorgung |
| 74 | An-/Aus-Schalter |
| 75 | Buchse |
| 76 | Batterie |
| 77 | Steuerplatine |

**Patentansprüche**

1. Stimulationsvorrichtung (1) für die Klitoris (12), aufweisend:
eine Druckfelderzeugungseinrichtung (2) mit:
einer ersten Kammer (3); und
einer zweiten Kammer (4) mit einer Öffnung (42) zum Aufsetzen über die Klitoris (12); und
einem Verbindungselement (5), welches die erste Kammer (3) mit der zweiten Kammer (4) verbindet; und
einer Antriebseinheit (6), welche das Volumen der ersten Kammer (3) derart verändert, dass über das Verbindungselement (5) in der zweiten Kammer (4) ein stimulierendes Druckfeld erzeugt wird; und
eine Steuereinrichtung (7), welche die Antriebseinheit (6) ansteuert; und
wobei das in der zweiten Kammer (4) erzeugte Druckfeld aus einem Muster von Unter- und Überdrücken besteht, welche auf den Normaldruck aufmoduliert sind; und
wobei die erste Kammer (3) über das Verbindungselement (5) ausschließlich mit der zweiten Kammer (4) verbunden ist, somit keine andere Verbindung der ersten Kammer (3) als diejenige zur zweiten Kammer

(4) besteht, womit die erste Kammer (3) eine einzige Öffnung aufweist, und
wobei die zweite Kammer (4) eine Öffnung (51) von dem Verbindungselement (5) in die zweite Kammer (4) aufweist, und
wobei die Stimulationsvorrichtung (1) keine Ventile aufweist, und
wobei die Stimulationsvorrichtung (1) ein tragbares Handgerät mit einer Batterie (76) ist,
**dadurch gekennzeichnet, dass**
das Verbindungselement (5) starr ist, und als ein gerader Kanal mit Düsenwirkung ausgestaltet ist, dessen Öffnung in die ersten Kammer (3) und dessen Öffnung (51) in die zweite Kammer (4) zueinander ausgerichtet sind, so dass
eine Medienströmung bei Kompression der ersten Kammer (3) durch die Ausrichtung der Öffnung (51) und des Verbindungselements (5) auf die Klitoris (12) gerichtet ist,
wobei die Öffnung (51) des Verbindungselements (5) der Klitoris (12) durch die zweite Kammer (4) hindurch gegenüberliegt.

2. Stimulationsvorrichtung (1) gemäß Anspruch 1, wobei die zweite Kammer (4) aus einem flexiblen Material hergestellt ist oder aus einem zumindest teilweise durchsichtigen Material hergestellt ist und/oder an die Form der vaginalen labia minora derart angepasst ist, dass diese von der Öffnung der zweiten Kammer (4) vollständig überdeckt wird.

3. Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 oder 2, wobei die zweite Kammer (4) mit dem Verbindungselement (5) und der ersten Kammer (3) einstückig ausgebildet ist.

4. Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 oder 2, wobei die zweite Kammer (4) von der Stimulationsvorrichtung (1) auswechselbar angeordnet ist.

5. Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 4, wobei die zweite Kammer (4) ein abdichtendes Auflageteil (43) zur Vergrößerung der Kontaktfläche der zweiten Kammer (4) auf der Haut aufweist.

6. Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 5, wobei die jeweilige Modulation des Druckfeldes mitels eines Bedienelements 71 veränderbar ist.

7. Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 6, wobei die Stimulationsvorrichtung (1) eine Beleuchtung (9) zur Beleuchtung der zweiten Kammer (4) aufweist.

8. System mit einer Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 7, aufweisend:

DE 10 2013 110 501 B4    2016.02.18

eine zu der Stimulationsvorrichtung (**1**) getrennt an-
geordnete Fernsteuervorrichtung,
wobei die Steuereinrichtung (**7**) der Stimulationsvor-
richtung (**1**) von der Fernsteuereinrichtung fernsteu-
erbar ist.

9.  Verwendung der Stimulationsvorrichtung (**1**) ge-
mäß einem der Ansprüche 1 bis 8 als Sexspielzeug
zur Stimulation der weiblichen Klitoris.

Es folgen 7 Seiten Zeichnungen

DE 10 2013 110 501 B4    2016.02.18

**Anhängende Zeichnungen**

Fig. 1



DE 10 2013 110 501 B4    2016.02.18

Fig. 2



Fig. 3



DE 10 2013 110 501 B4    2016.02.18

Fig. 4



Fig. 5



Fig. 6



Fig. 7



Fig. 8



Fig. 9



DE 10 2013 110 501 B4    2016.02.18

Fig. 10a



Fig. 10b



Fig. 10c



Fig. 11



Fig. 12a



Fig. 12b



Fig. 12c



Fig. 12d



Fig. 12e



Fig. 12f



DE 10 2013 110 501 B4    2016.02.18

**Fig. 13**



**Fig. 14a**



**Fig. 14b**



**Fig. 14c**



RWS Group Ltd, of Europa House, Chiltern Park, Chiltern Hill, Chalfont St Peter, Buckinghamshire, United Kingdom, hereby declares that, to the best of its knowledge and belief, the following document, prepared by one of its translators competent in the art and conversant with the English and German languages, is a true and correct translation of the accompanying document DE102013110501B4 in the German language.

Signed this 25th day of June 2019

C. E. SITCH

Managing Director – UK Translation Division

For and on behalf of RWS Group Ltd

– 1 –



(19) German Patent and Trademark Office

(10) **DE 10 2013 110 501 B4**    2016.02.18

(12)                     **Patent Specification**

(21) File reference:           **10 2013 110 501.7**        (51)   Int. Cl.:  *A61H 19/00* (2006.01)
(22) Date of application:      **23.09.2013**
(43) Date laid open:           **26.03.2015**
(45) Date of publication of the
     grant of the patent:       **18.02.2016**

Opposition can be notified within 9 months from the publication of grant pursuant to §59 German Patents Act. The opposition is to be explained and substantiated in writing. An opposition fee of Euro 200 is to be paid within the opposition time limit (§6 of the German Law on Patent Costs in conjunction with the Annex to §2 sub 1 of the German Law on Patent Costs).

| | | | |
|---|---|---|---|
| (62) | Division in:<br>**10 2013 022 393.8** | (72) | Inventor:<br>**Lenke, Michael, 94526 Metten, DE** |
| (73) | Patent proprietor:<br>**NOVOLUTO GmbH, 94526 Metten, DE** | (56) | Identified prior art:<br>**see following pages** |
| (74) | Representative:<br>**KUHNEN & WACKER Patent- und**<br>**Rechtsanwaltsbüro, 85354 Freising, DE** | | |

(54) Title: **Stimulation Device**

(57) Main Claim: A stimulation device (1) for a clitoris (12), comprising:
a pressure field generator (2) comprising:
a first chamber (3); and
a second chamber (4) having an opening (42) for placing over the clitoris (12); and
a connection element (5) connecting the first chamber (3) with the second chamber (4);
a drive unit (6) that changes the volume of the first chamber (3) in such a manner that a stimulating pressure field is generated in the second chamber (4) via the connection element (5); and
a control device (7) that actuates the drive unit (6); and wherein:
the pressure field generated in the second chamber (4) consists of a pattern of negative and positive pressures modulated with respect to normal pressure: and
wherein the first chamber (3) is connected with the second chamber (4) solely by the connection element (5), thus no other connection of the first chamber (3) than that to the second chamber (4) exists, whereby the first chamber (3) has a single opening, and wherein the second chamber (4) has an opening (51) from the connection element (5) into the second chamber (4), and
wherein the stimulation device (1) has no valve, and wherein the stimulation device (1) is a portable hand-held device with a battery (36),

characterized in that the connection element (5) is rigid, and is designed as a straight channel with a nozzle effect, the opening of which into the first chamber (3) and the opening (51) of which into the second chamber (4) are aligned to one another, so that a media flow during compression of the first chamber (3) is directed to the clitoris (12) by the alignment of the opening (51) and the connection element (5),
wherein the opening (51) of the connection element (5) is facing the clitoris (12) through the second chamber (4).



– 2 –



(19) German
Patent and Trademark Office

(10) **DE 10 2013 110 501 B4**   2016.02.18

(56) Identified prior art:

| DE | 14 63 673 | U |
| US | 2013 / 0 012 769 | A1 |
| US | 1 898 652 | A |
| US | 6 099 463 | A |
| WO | 2006/ 058 291 | A2 |

Focus online 5.12.2004
http://www.heilpraxisnet.de/naturheilpraxis/
sex-gegen-bluthochdruck-665.php

DE 10 2013 110 501 B4        - 3 -

## STIMULATION DEVICE

Description

5

The present invention relates to a stimulation device for erogenous zones, in particular for the clitoris, a system with a stimulation device, as well as to methods for stimulating body parts.

10

The erogenous zones of the human body can be stimulated with a variety of tools. For example, vibrators are used to apply a stimulus to a particular area of the skin by direct contact. However, this form of stimulation can

15   lead to irritations or inflammations of the skin. Also, direct contact of the genital area with such tools for individual reasons of hygiene or due to personal reservations, for example, may not be desired.

20   In particular, the direct stimulation of the clitoris with a clitoral massage vibrator, for example, is fraught with problems, as the clitoris is usually a woman's most sensitive erogenous zone. The entire clitoris is equipped with numerous nerve endings, thus making it particularly

25   touch-sensitive and responsive to sexual stimuli. Here, the clitoris glans, in which the nerve cords of the two thighs meet, should be particularly emphasized. Frequent use of a clitoral massage vibrator for direct stimulation, for example, leads to habituation effects or conditioning

30   of the stimulated erogenous zone and the initial use of such a device may require certain practice or familiarization.

Furthermore, medical studies conducted in 2006 determined

35   the female clitoris as definitive starting point of the female climax and neurologically proved the different qualities of sensation of clitoral (and vaginal) orgasm for the first time, as described on pages 136 to 138 of the 06/2006 edition of the "Spiegel" magazine, in the

DE 10 2013 110 501 B4        - 4 -

women's article "Schmerz und Glückseligkeit" [Pain and bliss]. Thus, according to the most recent medical research, the stimulation of the clitoris, rather than the vagina, is considered the starting point of a woman's

5    sexual arousal and thereby the key to female "sexual pleasure".

The sensitivity of the human erogenous zones, such as the clitoris, the inner and outer labia or the nipples,

10   continues to differ greatly individually. The person may be so sensitive that direct stimulation is only possible after prolonged foreplay, and even then only very subtly or ruled out completely. Furthermore, the sensitivity of the corresponding zone can change dramatically from one

15   situation to another or even during a sexual act.

For the aforementioned reasons, various indirect forms of stimulation are common practice as alternatives to direct stimulation.

20

For indirect stimulation of erogenous zones, and especially the clitoris, conventional vacuum devices are used to arouse the erogenous zones of the person concerned without directly contacting the main area to

25   be stimulated. Thus, for example, vacuum pumps for the primary or secondary female sexual organs are known, which usually have a suction cup for placing on the appropriate area and a hand pump. The negative-pressure exerted by this type of device on the clitoris, for

30   example, generates a negative pressure in the clitoris itself, which is usually lower than the systolic blood pressure. This difference in pressure leads to an enlargement of the clitoris and/or stimulates the blood flow in the affected area. This vascular clitoral

35   engorgement serves both to promote desire by increasing sensitivity and for optical and tactile manipulation. The improved blood circulation also leads to an increased leakage of vaginal moisture which makes the stimulation more pleasurable. However, the manual operation of the

DE 10 2013 110 501 B4        - 5 -

hand pump is often annoying or distracting. In addition, the long-term or uninterrupted use of negative-pressure in this device category may lead to habituation effects, which limit the effectiveness of the device in the long

5   run. Moreover, a pure increase in the clitoral blood flow is often insufficient to reach a climax; vacuum pumps are thus often used only as foreplay to achieve the climax with a subsequent direct (pressure) massage of the erogenous zone.

10

Electrically driven vacuum pumps are also used increasingly instead of manually operated vacuum pumps as well. As an example of this, WO 2006/05 82 91 A2 discloses a device for sexual therapy, wherein the

15   arrangement consists of a tubular suction chamber for the clitoris, an electric vacuum source (vacuum pump) and a plurality of airflow openings. The operation of the vacuum pump generates a permanent airflow or air exchange in the chamber in the area of the clitoris. This has the

20   disadvantageous effect of suctioning the increasingly leaking vaginal moisture caused by the negative-pressure, thus having a drying effect on the stimulated parts of skin. Likewise, the suctioned moist air leads to a contamination of the fluidic subsequent vacuum

25   arrangement, of the vacuum pump for example. Such arrangements with vacuum pumps may thus be hygienically problematic, as vacuum pumps and the associated valves or ventilation components often have dead spaces or blind spots and/or are difficult to clean. Furthermore, the

30   device is meant to treat the blood vessels in the clitoris and not to provide stimulation up to sexual climax.

U.S. Pat. No. 6,099,463 A discloses a clitoris stimulation device with a tubular suction chamber, a

35   vacuum source or a vacuum pump and a plurality of valves, which are used to control the size of the vacuum. The vacuum can also be in cyclic form to achieve a stimulation effect, although habituation effects are also to be expected with this device due to the use of a permanent

DE 10 2013 110 501 B4     - 6 -

vacuum. As explained above, the disadvantages relating to hygiene and the dehydration of the skin part to be stimulated are also present here. Likewise, the pressure-related arrangement with a plurality of valves, vacuum
5   pump, etc. is relatively complex.

U.S. Pat. No. 6,464,653 B1 discloses therapeutic devices and methods to generate a clitoral engorgement with the aid of a vacuum generated by a vacuum pump to assist in
10  the treatment of clitoral disorders, such as incontinence. A control valve or modulator that can be correspondingly covered by a finger is used to manually adjust or vary the amount of vacuum in the suction chamber. This requires the user's attention and may be distracting or
15  diverting under certain circumstances. This relatively complex device with additional valves also has the same disadvantages relating to hygiene and dehydration as explained above, although the device is also used for long-term therapeutic purposes and not for short-term
20  sexual stimulation.

WO 2008/02 80 76 A2 discloses a therapeutic device for women, which is mainly dedicated to treating sexual disorders. The device includes a combination of indirect
25  stimulation by means of a vacuum chamber and direct stimulation by means of mechanical vibrators and oscillators.

The negative-pressure in this therapeutic device is used
30  to increase the blood flow in the clitoris, while the area of skin is actually stimulated or massaged by means of direct mechanical vibrations/oscillations. Thus, a suction cup for placing on the area of skin to be stimulated is internally connected with a motor via a
35  mechanical connection. The suction cup is extended by the motor once the device is activated, thus increasing the volume of the suction cup. The resulting volume of the suction cup and thus the strength of the vacuum can be adjusted by means of control elements on the device. The

DE 10 2013 110 501 B4        - 7 -

air displaced in the device by the suction process is discharged outwardly again via a pipe. The vacuum in this device has only a supporting function, while the actual stimulation ensues directly, which also entails the same
5    disadvantages of a direct stimulation as explained above.

US 2013/001 276 9 A1 discloses a device in which a pulsating positive-pressure is used for stimulating an air pressure massage. A pump or compressor thus generates
10    a pulsating positive-pressure, which is directed towards the erogenous zone to be stimulated by means of a nozzle. This device disadvantageously causes the affected area of skin to dry out severely or completely. Likewise, there is usually a temperature difference between the
15    temperature of the supplied air and the temperature of the area of skin to be stimulated, which may be felt to be distracting under certain circumstances. The same problems of hygiene as explained above also occur in this device, although in this case any pathogens or germs or
20    other contaminations located in the device are also transported directly to the user's genital area.

US 1 898 652 A also discloses a "pulsator", which operates with air for massaging main parts.
25
EP 0 365 230 A2 discloses a suction device with a suction pump, a suction valve, and an outlet valve.

WO 2004/004610 A1 discloses a portable penile aneurysm
30    enhancer.

US 3 910 262 discloses a therapeutic apparatus for producing male and female orgasms.

35    US 2 112 646 discloses a device for the treatment of diseases of the genital organs.

DE 14 63 673 U discloses a massage device.

DE 10 2013 110 501 B4      - 8 -

Thus, the prior art devices all have the same disadvantage in common, in that the complexity of the arrangements generating negative-pressure or positive-pressure may be high and this device may have problems
5    of hygiene.

Furthermore, the prior art devices have another disadvantage in common, in that habituation effects occur in the event of longer lasting and/or constant or
10   frequently recurring use of negative-pressures.

Another disadvantage of some of the previously described vacuum devices is, firstly, that the negative-pressure has to be limited by means of a control valve or a vacuum
15   pump and, secondly, that the negative-pressure is supposed to be reduced by means of a manual opening of a release valve, before the suction cup is peeled from the skin. Should one of the valves have a technical defect and/or the user operate the device incorrectly, there may
20   be a risk of injury in certain circumstances.

Thus, in view of the problems as explained above, the problem addressed by the invention is to provide a stimulation device with a simple construction that is
25   easy and safe to use.

Another problem addressed by the present invention is to provide a stimulation device with an effective stimulation-triggering effect, which is suitable for
30   stimulating an erogenous zone, especially the female clitoris.

In addition, partial problems addressed by the invention are to provide a device, which prevents the erogenous
35   zones to be stimulated from drying out, is hygienic and prevents habituation effects.

The problem addressed by the invention is solved by the stimulation device described according to claim 1.

DE 10 2013 110 501 B4      - 9 -

Advantageous developments and embodiments are the subject of the further independent and dependent claims.

According to the invention, a pressure field generator
5  in the stimulation device has a first chamber and a second chamber with an opening for placing on a body part or on the erogenous zone and a connection element that connects the first chamber with the second chamber.

10  This embodiment of chambers according to the invention communicating in a fluidic manner via a connection element allows the first chamber to simply generate a pressure field in the second chamber by modifying the volume in the first chamber, which is occasionally
15  directed at the area of skin to be stimulated.

A pressure field in terms of the invention is a temporally modifiable field of media pressures, with occasional positive-pressures and occasional negative-pressures, a
20  negative-pressure being a media pressure below the reference pressure and a positive-pressure being a media pressure above the reference pressure.

The medium is usually gaseous, preferably air, but may
25  alternatively or additively, for example, be a liquid medium, such as water or commercially available lubricant. For example, the chambers according to the invention may be filled with the lubricant prior to using the stimulation device. This allows the corresponding area
30  of skin to be stimulated with a suitable skin-friendly liquid in lieu of air as well, whatever the user's individual preference. As another example, the stimulation device may also be used under water with water as the medium (in the bathtub, for example).

35

The reference pressure is usually the existing ambient pressure in relation to the stimulation device at the beginning of use (i.e. prior to placing the stimulation device on the area of skin to be stimulated). In the

DE 10 2013 110 501 B4      - 10 -

preferred use of the stimulation device with air, the
reference pressure is the currently existing air pressure
or normal pressure.

5   The pressure field according to the invention excites the
blood circulation of the area of skin to be stimulated,
while said area of skin is indirectly massaged, thus
combining two advantageous effects. The increased blood
circulation makes the erogenous zone of the person
10  concerned more sensitive, while generating an additional
massage effect that serves, for example, to stimulate the
erogenous zone to sexual arousal up to climax. The
massage effect is generated by the kinetic energy of the
medium flowing out of the first chamber through the
15  connection element against the surface of the area of
skin to be stimulated. The massage effect generated in
this way is indirect, i.e. without the area of skin to
be stimulated being directly contacted by a solid body,
such as a vibrator, which results in the avoidance of the
20  initially explained disadvantages of direct stimulation.

By the exemplary use of the temporally modifiable
pressure field according to the invention on the clitoris,
the pressure field imitates a stimulation that usually
25  only occurs during sexual intercourse. Likewise, the
cohabitation movement generates a varying stimulus on the
clitoris. It is thus a true-to-life imitation of the
natural act of cohabitation, with medical statements
confirming that the use of the pressure field according
30  to the invention causes neither habituation effects nor
addiction. This is due in particular to the alternating
use of negative- and positive-pressures (or even to the
non-continuous use of only one type of pressure).

35  Furthermore, the maximum applicable pressure is regularly
limited by the maximum resilience of the area of skin to
be stimulated. Thus, for instance, too high a negative-
pressure harbors the risk of painful injury, especially
in erogenous zones. Only stimulation devices working with

DE 10 2013 110 501 B4      - 11 -

negative-pressures are usually limited to this maximum
in their mode of operation. Conversely, the combination
of positive- and negative-pressures according to the
invention creates an extended working area of the
5    stimulation-triggering pressure field or effect, as the
working area of the pressure can now be exploited to the
maximum in both the positive and negative area.

The orientation of the one connection element towards the
10   area of skin to be stimulated allows the pressure field
to work directly, wherein the pressure field is
decisively influenced by the configuration of the one
connection element and of the one opening from the
connection element into the second chamber, and is thus
15   adjustable after every use of the stimulation device.
Thus, for example, the one opening of the connection
element may be located opposite and preferably directly
opposite the body part to be stimulated. For example, the
connection element in a stimulation device intended for
20   the clitoris may have a single passageway with nozzle
effect on the clitoris glans between the first and second
chamber. Alternatively, the one connection element may
consist of a plurality of, for example four, passageways
between the chambers, if a larger area of skin is to be
25   stimulated.

Furthermore, after placing the halfway or partially
opened second chamber on the area of skin to be stimulated,
a self-contained system of media- and airflow is created
30   in the pressure field generator. Thus, for instance, the
medium or air is moved decisively backwards and forwards
between the chambers, while an interchange with media or
with air from outside the system is at least largely
avoided. Thus, the first chamber is preferably connected
35   exclusively with the second chamber via or through the
connection element. Thus, no first chamber connections
other than those to the second chamber exist; for example,
there is no direct first chamber connection to the

DE 10 2013 110 501 B4        - 12 -

environment of the device via a pressure valve or via an
air discharge channel.

For example, the air temperature in the flow system
5    according to the invention rapidly adjusts to the skin
temperature, while the distracting supply of new
(possibly cold) air from outside the system is avoided,
as may be the case, inter alia, when using vacuum pumps
in prior art. Drying effects are also avoided, as very
10   little or no removal of stimulation-promoting fluid, such
as bodily fluid, occurs in a closed system.

Furthermore, due to the simple construction, the pressure
field generator according to the invention has the
15   advantage of increased hygiene and improved cleanability.
The present invention thus avoids valves or
pumps/compressors with potential dead spaces and places
that cannot be cleaned. The pressure field generator
according to the invention is thus easy to clean. For
20   example, the stimulation device can be simply cleaned by
filling the first chamber with a cleaning fluid and
activating the pressure field. Alternatively, the second
chamber can be arranged to be replaceable, which also
simplifies the cleaning of both chambers. Furthermore,
25   the chambers according to the invention and the
connection element of the pressure field generator can
be designed in one-piece, wherein the latter consists of
a single molded plastic part (e.g. rubber).

30   In addition, the construction according to the invention
avoids complex fluidic elements, such as valves, which
leads to a simplification in production.

Furthermore, the stimulation device according to the
35   invention has a drive unit, which modifies the volume in
the first chamber in such a way that a pressure field is
generated via the connection element in the second
chamber that serves to stimulate the erogenous zone, and
has a control device that activates the drive unit.

DE 10 2013 110 501 B4      - 13 -

As a matter of principle, the volume of the medium transported between the chambers is limited to the maximum volume of the first chamber. In addition, the
5  transported volume can be further constructively limited by the maximum possible volume modification caused by the drive unit.

This means that the maximum positive- or negative-
10  pressure the stimulation device can build up in the second chamber is limited due to the dimensioning of the components of the pressure field generator and of the drive. In particular, the maximum positive- or negative-pressure can be limited to a degree that minimizes or
15  excludes any risk of injury for the areas of skin to be stimulated. As a result, any conventional safety valve in prior art or any manual intervention in the stimulation process by the user, such as the opening of a release valve, is rendered unnecessary.
20

Furthermore, the temporal modification of the pressure field or the modulation of the pressure field by the control device is automatically controlled to a large extent. Thus, for example, the modulation of the pressure
25  field, such as intensity, chronological sequence or evolvement, can be pre-saved in the control device. As a preference, the temporal modification of the pressure field can have a regular or reoccurring (stimulation) pattern, such as impulses with a stipulated cycle or
30  regularly alternating impulse sequences. This allows the user's interaction with the stimulation device according to the invention to be limited to switching on and off and selecting the stimulation pattern, while the stimulation device automatically executes the preferred
35  stimulation pattern. Thus, according to the invention, the user complexity of the stimulation device is low, especially when compared with conventional (medical) vacuum stimulation devices. Alternatively, or additionally, the stimulation pattern of the stimulation

DE 10 2013 110 501 B4      - 14 -

device can be individually configured by the user during or before operation.

According to independent claim 9, another aspect of the
5   invention proposes a system comprising the stimulation device according to the invention, which has a remote control device arranged separately from the stimulation device, wherein the control device of the stimulation device is remotely controlled by the remote control
10  device. This allows a conventional wireless (via radio for example) or wired remote control to be employed, in order to allow the remote controlled modulation of the stimulation device or the activation thereof by another user.

15

Another aspect of the invention proposes a method for stimulating body parts, especially the clitoris. The associated advantageous effects and impacts are explained in more detail above in relation to the pressure field.

20

According to claim 10, another aspect of the invention proposes the use of the stimulation device according to the invention as a sex toy for stimulating the female clitoris. As explained at the beginning, the female
25  clitoris is an especially sensitive erogenous zone of women, which is why the use according to the invention of an indirect massage combined with a negative-pressure stimulation for this body part to provide stimulation up to orgasm seems particularly advantageous.

30

The above-described features and functions of the present invention as well as other aspects and features are further described in the following with the aid of a detailed description of preferred embodiments with
35  reference to the enclosed illustrations.

Brief Description of Drawings

The figures show in:

DE 10 2013 110 501 B4      - 15 -

FIG. 1 a front view of a first embodiment of the stimulation device according to the invention;

5 FIG. 2 a perspective side view of the first embodiment of the stimulation device according to the invention;

FIG. 3 a cross-section through the first embodiment of the stimulation device according to the invention;

10 FIG. 4 a cross-section through a pressure field generator according to a first aspect of the present invention in the first state;

15 FIG. 5 a cross-section through a pressure field generator according to a first aspect of the present invention in the second state;

FIG. 6 a cross-section through a pressure field generator
20 according to a first aspect of the present invention in the third state;

FIG. 7 a cross-section through a pressure field generator according to a second aspect of the present invention;

25 FIG. 8 a cross-section through a pressure field generator according to a third aspect of the present disclosure, which is not claimed;

30 FIG. 9 a cross-section through a pressure field generator according to a fourth aspect of the present invention;

FIG. 10a ), b) and c) cross-sections through a pressure field generator according to a fifth aspect of the
35 present invention;

FIG. 11 a partial cross-section through a second embodiment of the stimulation device according to the invention;

DE 10 2013 110 501 B4     - 16 -

FIG. 12a ) to f) various bottom and side views of other aspects of a second chamber of the present invention, wherein the aspects of Fig. 12d) and Fig. 12f) are not

5    claimed;

FIG. 13 a block diagram of an embodiment of the present invention;

10   FIG. 14a) to c) diagrams of various pressure modulation patterns of the present invention.

Description of Preferred Embodiments

15   With reference to FIG. 1, a front view of a first embodiment of stimulation device 1 is explained, wherein FIG. 2 shows a perspective view and FIG. 3 a cross-section of the first embodiment of stimulation device 1 according to the invention.

20

The first embodiment of stimulation device 1 is a preferably portable electric or small device, comprising a housing 8, a pressure field generator 2, operating elements 71, a display 72, an on/off switch 74, a socket

25   75, an optional battery 76 and optional lighting 9.

Housing 8 is preferably designed so ergonomically that it can be held comfortably in one hand and has no sharp or pointed edges. Furthermore, housing 8 may consist of

30   plastic, such as polycarbonate (PC) or acrylonitrile butadiene styrene (ABS). In addition, the gripping areas or even the entire housing may be supplemented by or designed with a haptically advantageous silicone. Housing 8 is preferably designed to be at least water-resistant

35   or splash-proof, for example protection class IP 24.

Operating elements 71 are used to adjust the device operating mode, i.e. to adjust the pressure field modulation pattern. Operating elements 71 can, for

DE 10 2013 110 501 B4       - 17 -

example, be designed as at least one pushbutton, as at least one rotary switch, or as at least one touch-sensitive switch. Furthermore, operating elements 71 can produce an optical feedback for activating light-emitting diodes (LED) integrated in the center of the switch, for example.

5

An optional display 72 serves to inform the user of the device status and/or the setting status. Display 72 can for example be configured as a plurality of light-emitting diodes or as an LCD display. The displayed information can, for example, be the charge status of an optional battery or the current setting of the modulation pattern.

10

15

On/off switch 74 is used for activating and deactivating stimulation device 1. This on/off switch 74 can, for example, be a pushbutton, which switches stimulation device 1 on or off when held down for longer, or a ratcheting slide switch.

20

A socket 75 is used to supply the external power of stimulation device 1 via an external plug 73, which is connected to an external power adapter, for example. To ensure stimulation device 1 is splash-proof, a magnetic-inductive transformer may be provided instead of the socket, which allows power to be transmitted to stimulation device 1 without any electroconductive contact. Stimulation device 1 preferably also has a battery, such as a nickel metal hydride battery (NiMH) for wireless operation. Alternatively, a (longer) power supply cable may also be led out of the stimulation device.

25

30

Pressure field generator 2 of a first embodiment has a first chamber 3 in the interior of stimulation device 1, a second chamber 4 for placing on a body part 11 to be stimulated, and a connection element 5, which connects the first chamber 3 with the second chamber 4.

35

DE 10 2013 110 501 B4     - 18 -

A drive unit 6, such as an electric motor, drives the
first chamber 3 via an axis 61 and by means of an
eccentric 62 (or alternatively by means of a connecting
rod) in such a way that the volume of the first chamber
5   3 is modified according to the rotation of axis 61 of
drive unit 6. It is hereby annotated that any drive types
causing a deflection in wall 31 of the first chamber 3
for volume modification can basically be used in
stimulation device 1. The latter may, for example, occur
10  hydraulically, pneumatically, piezoelectrically,
mechanically or electromagnetically. Examples of this are
described in more detail later on.

A control device 7 activates drive unit 6, operating
15  elements 71 and display 72. Control device 7 and drive
unit 6 are supplied with power by internal battery 76
and/or external power supply 73.

Optional lighting 9 is provided on or in housing 8.
20  Lighting 9 is preferably used for lighting the interior
of the second chamber 4. Lighting 9 can either be switched
by the user or automatically activated by activating
stimulation device 1. Furthermore, lighting 9 can be
composed of energy-saving light-emitting diodes. The
25  lighting can, for example, serve as an orientation aid
in the dark for the user of stimulation device 1 or as
additional optical stimulation.

With reference to FIGS. 4, 5 and 6, the construction and
30  function of a first aspect of pressure field generator 2
of stimulation device 1 is subsequently described in more
detail.

FIG. 4 shows pressure field generator 2 in a first state,
35  with the second chamber 4 being placed on the area of
skin or body part 11 to be stimulated. The first state
of pressure field generator 2 is characterized by a
neutral deflection of the first chamber 3, i.e. no
external force is exerted on the first chamber 3, for

DE 10 2013 110 501 B4      - 19 -

example, by the drive unit. Here, volume V1 of the first
chamber is the standard volume of this chamber 3.

5   The body part 11 to be stimulated is an area of skin on
the body, wherein for example an especially sensitive
erogenous zone, clitoris 12, is shown. The use of the
present invention is thus not limited to the female
clitoris 11, instead stimulation device 1 can be used on
all body parts or erogenous zones (such as the inside of
10  the upper thighs, the loins, neck, nipples, etc.), which
can be stimulated by means of media- or air-pressure
massage and/or negative-pressure.

Due to being placed on the body part 11 to be stimulated,
15  the second chamber 4 forms a chamber largely or
completely sealed off from the exterior of pressure field
generator 2, which is only still connected to the second
chamber via connection element 5, wherein the edges of
chamber 4 ideally form an air-tight bond with the surface
20  of body part 11. Two communicating chambers 3 and 4 are
created in this way, wherein corresponding pressure
equalization via connection element 5 ensues between
chambers 3 and 4 in the event of a volume modification
in one of chambers 3 or 4.

25

Wall 31 of the first chamber 3 is secured by means of a
holder 32. Holder 32 is in turn attached to housing 8.
Wall 41 of the second chamber is further affixed to holder
32. Two mutually aligned openings in wall 41 of the second
30  chamber and of holder 32 jointly form connection element
5, which connects the first chamber 3 and the second
chamber 4. Wall 31, holder 32 and wall 41 are preferably
adhered to each other media- or air-tightly.
Alternatively, the latter can also be press-fitted or
35  screwed together with each other (for example by means
of sealing areas between housing 8 and the respective
part). Holder 32 can also be adhered or screwed onto
housing 8, for example.

DE 10 2013 110 501 B4      - 20 -

Wall 31 of the first chamber 3 preferably consists of a flexible media- or airtight material, such as rubber. Holder 32 preferably consists of a rigid plastic, which is just as media- and airtight. Wall 41 of the second
5    chamber is preferably made of a flexible, skin-friendly material, such as silicone or rubber.

FIG. 5 shows pressure field generator 2 of FIG. 4 in a second state, wherein the second chamber 4 is in turn
10   placed on the body part 11 to be stimulated. The second state is characterized in that a force A affecting the first chamber 3 causes chamber 3 to expand. In detail, force A in this embodiment draws wall 31 of the first chamber 3 in a direction facing away from the second
15   chamber 4.

Volume V2 in chamber 3 increases as a result, i.e., V2>V1. To equalize the difference in pressure created between chambers 3 and 4, the media or air now flows from the
20   second chamber 4 into the first chamber 3.

Assuming that the first state of the present pressure in chambers 3 and 4 corresponds to the currently prevailing external reference pressure (air pressure for example),
25   the present overall pressure in the second state will now be less than the external reference pressure. This negative-pressure is designed in such a way that it is preferably less than the usual systolic blood pressure in the blood vessels of body part 11. The blood
30   circulation in this area thus increases and clitoris 12 is better supplied with blood in the second state.

FIG. 6 shows pressure field generator 2 in a third state, wherein the second chamber 4 is in turn placed on the
35   body part 11 to be stimulated. The third state is characterized in that a force B influencing the first chamber 3 causes a volume reduction or compression in chamber 3. In detail, the direction of force B is opposed to the direction of force A and distorts wall 31 of the

DE 10 2013 110 501 B4       - 21 -

first chamber in such a way that the resulting volume V3 of the chamber is less than volume V1. The compression of chamber 3 causes a positive-pressure in chamber 3, which is equalized by a media- or airflow through
5   connection element 5 in the direction of the second chamber 4.

This media flow is now preferably directed by the orientation of opening 51 and/or of connection element 5
10  towards the body part 11 to be stimulated, in particular towards the glans of clitoris 12. The indirect (pressure) massage according to the invention ensues due to the medium flowing onto body part 11. The size of opening 51 is dimensioned in such a way that it is small enough in
15  ratio to the volume displaced in the first chamber 3 to sufficiently accelerate the medium for a perceptible massage effect.

Furthermore, the type of flow can not only be
20  advantageously influenced by the size and orientation of opening 51, but also by the inner configuration of the connection element. For example, helix-shaped grooves in connection element 5 can cause the flow according to the invention to swirl, wherein the flow profile of the flow
25  unfurls a "softer" or more turbulent effect on the body part to be stimulated. Alternatively, the resulting pressure field in the second chamber 4 can be adjusted by means of a plurality of openings 51, depending on use.

30  The advantageous factor of the arrangement shown in FIGS. 4 to 6 is that it is hygienically unproblematic (due to the avoidance of dead spaces, for example) and is simple to produce. For example, no valves or other openings in or on the first chamber 3 are required.

35
FIG. 7 shows a second aspect of the present invention with an alternative construction of pressure field generator 2. Walls 31 and 41 of the first and second chambers 3 and 4 respectively can thus engage with one

DE 10 2013 110 501 B4      - 22 -

another in such a way that they also form two
communicating chambers with a connection element 5, as
in the first aspect of the construction of pressure field
generator 2. Thus, the separate holder is no longer

5    required, while the second chamber 4 is replaceable. In
addition, connection element 5 can be designed integrally
or in one-piece with wall 41 of the second chamber 4. A
replaceable chamber 4 has the advantage of allowing the
use of any shapes of chamber 4 adjusted to the respective

10   body part (a more detailed description thereof is
provided later), without the entire stimulation device 1
needing to be replaced. Alternatively, the second chamber
4 can also be pluggably affixed to housing 8 (not shown
in more detail). Wall 31 of the first chamber 3 can be

15   adhered or screwed onto housing 8, for example.

Also, as shown in more detail in FIG. 7 by the broken
line and double arrow C, the first chamber 3 is expanded
and compressed by a force exerted perpendicularly to the

20   axial direction of connection element 5. In principle,
the force exerted directly or indirectly on the first
chamber 3 by drive unit 5 can be exerted from any
direction. The only decisive criterion here is that the
volume of the first chamber 3 can be increased and

25   decreased by drive unit 6.

FIG. 8 shows a third aspect of the invention with an
integral or one-piece structure of pressure field
generator 2. An elastic material, such as silicone or

30   rubber, can be used as material for chambers 3 and 4. The
advantage here is that any hygienically unsafe divide is
avoided and the production effort is reduced. Pressure
field generator 2 can be adhered or screwed onto housing
8 in this case too. Any modification of the volume in the

35   first chamber 3 is analogous here, as described in
conjunction with FIG. 7.

FIG. 9 shows a fourth aspect of the unclaimed disclosure
with an alternative construction of pressure field

DE 10 2013 110 501 B4      - 23 -

generator 2. The second chamber 4, a plurality of connection elements 5, as well as partial sections of wall 31 of the first chamber 3 are designed in one-piece. Alternatively, pressure field generator 2 can be
5    constructed in two or more pieces from individual components, while safeguarding the geometrical example of FIG. 9 in a similar way to that shown in FIG. 4 or 7.

The volume in chamber 3 is modified in a similar way to
10   a piston pump, although no valves are available here. A piston 63 is thus moved backwards and forwards by the drive unit, for example an electric motor or electromagnet, in the directions of the double arrow D. This type of drive has the advantage that the volume of
15   the first chamber 3 can be simply reduced to zero or almost zero, thus allowing the first chamber 3 to be almost completely emptied.

The unclaimed embodiment of connection element 5, with a
20   plurality of channels 52 and openings 51, leads to a distribution of the pressure field to a plurality of concentration points. While the embodiment of connection element 5 according to the invention with only one channel, as described in conjunction with FIG. 6, leads
25   to the formation of a strongly concentrated media- or airflow on a target area, the unclaimed embodiment of connection element 5 shown in FIG. 9 allows the media- or airflow to be distributed to a plurality of target areas, thus allowing clitoris 11 to be blown not just on
30   its glans, but equally from a plurality of directions as well, for example. Depending on use, this distribution of the airflow concentration to a plurality of areas can help to avoid any overstimulation and/or help to increase the stimulation area.

35

FIGS. 10a to 10c show a fifth aspect of the invention with (partial) cross-sections of a construction of pressure field generator 2 with a bending element 64 as drive for modifying the volume in the first chamber 3.

DE 10 2013 110 501 B4      - 24 -

Bending element 64 can, for example, be a conventional piezoelectric bending element, which distorts or bends once voltage is applied. In this aspect of the invention wall 31 of the first chamber 3 is a rigid or stiff
5    construction, while bending element 64 is suitably dovetailed to the sides of the first chamber 3.

The transition points between bending element 64 and wall 31 are sealed (elastically bonded for example). The drive
10   for pressure field generator 2 is already integrated in this construction and an external drive is not required. An electric motor with an eccentric is not needed, for example. This allows, inter alia, the reduction of any disturbing natural oscillations due to the eccentric
15   movement of the stimulation device.

In detail, FIG. 10 a shows pressure field generator 2 with bending element 64 in a neutral position. Thus, the volume of the first chamber 3 with bending element 64 in
20   the neutral position is the standard volume. FIG. 10 b also shows the first chamber 3 with an excited and, consequently, outwardly bent bending element, while the volume of the first chamber 3 is increased, with a negative-pressure consequently prevailing in pressure
25   field generator 2. FIG. 10 c shows a bending element of the first chamber 3 excited in the opposite direction to FIG. 10 b, which is why the volume in the first chamber 3 has decreased, with a positive-pressure consequently prevailing in pressure field generator 2.
30

FIG. 11 shows a second embodiment of the invention with a locally separated arrangement of chambers 3 and 4 of pressure field generator 2. Chambers 3 and 4 are connected via an extended connection element 5, which can
35   be a longer flexible hose or even a rigid pipe. For example, connection element 5 may be 0.5 m in length. This enables housing 8 to be held in one hand, while the other hand holds the second chamber 4 on the body part 11 to be stimulated; or one can simply lay housing 8

DE 10 2013 110 501 B4      - 25 -

aside, while the user holds only the second chamber 4 in his/her hands. The stimulation device in this embodiment can also be designed as a table device.

5   FIGS. 12 a) to 12 f) show various bottom and side views of other aspects of the second chamber 4. In detail, FIG. 12 a) shows a bottom view of a circular second chamber 4 with a centrally arranged opening 51; FIG. 12b) a bottom view of a triangular second chamber 4 with a centrally
10   arranged opening 51; FIG. 12 c) a bottom view of an oval second chamber 4 with a centrally arranged opening 51; and FIG. 12 d) a bottom view of an almost eight-shaped second chamber 4 with two openings 51 shifted to the center. FIG. 12 e) further shows a side cross-section of
15   a second chamber 4 according to the invention, wherein the second chamber 4 has an additional extended contact surface 43 to the skin or a support part 43 to improve the sealing function of the second chamber 4 on the skin. The extended contact surface 43 may also have grooves or
20   projections that improve the sealing function even more. FIG. 12 f) shows a side cross-section of a second chamber 4 with a plurality of separate connection elements 5 and an extended contact surface due to support part 43.

25   In principle, the form of the second chamber 4 can thus be adjusted to the anatomy of the erogenous zone to be stimulated. The form of chamber 4 in FIG. 12 a) is, for example, adjusted to the round shape of the breast, while the form of chamber 4 in FIG. 12 c) is better suited to
30   the form of the female vulva. Furthermore, the shape of the second chamber 4 also determines the characteristic of the pressure field according to the invention. The size of the second chamber 4 in ratio to the volume displaced from chamber 3 thus determines the amount of
35   the achievable negative- or positive-pressure. Furthermore, the proximity of opening 51 of connection element 5 to the area of skin to be stimulated can also be used to determine the intensity of the massage effect according to the invention on said area of skin. A

DE 10 2013 110 501 B4     - 26 -

plurality of unclaimed openings 51, cf. FIG. 12 d) allows
the massage effect to be distributed to a plurality of
areas. Thus, for example, the clitoris can be less
directly stimulated at the very sensitive clitoris glans
5   (cf. FIG. 12 e), and more stimulated at the areas
surrounding the clitoris glans, in order to prevent
overstimulation of the clitoris.

FIG. 13 shows a block diagram of an example of the
10  functional construction of an embodiment of the present
invention with a control device 7, a drive unit 6,
lighting 9, an on/off switch 74, operating elements 71,
a battery 76 and an external power supply 73.

15  Control device 7, which has a microcontroller or is
hardwired, for example, initially controls the power
supply of all users of stimulation device 1, as well as
an optional charging and discharging process of battery
76 and/or a battery management. In particular, control
20  device 7 controls the excitation of drive unit 6, such
as the size of the deflection, the frequency, the
modulation, etc.

Furthermore, control device 7 may have a memory in which
25  at least one modulation or stimulation pattern (described
in more detail in conjunction with FIG. 14 a) to c)) is
saved. The excitation of drive unit 6 can now be activated
via operating elements 71 in compliance with the
previously saved stimulation pattern at the discretion
30  of the user of stimulation device 1. The stimulation
pattern of the pressure field can also be optionally and
individually adjusted and saved by the user via the
operating elements.

35  FIG. 14 a) shows the chronological sequence of a total
pressure p in the pressure field generator (2) when using
the latter for stimulation. The broken line provides the
reference pressure, such as the currently prevailing
atmospheric pressure that exists outside the pressure

DE 10 2013 110 501 B4      - 27 -

field generator (2). If the second chamber 4 is now placed on body part 11 to be stimulated, the originally prevailing ambient pressure in the pressure field generator (2) is maintained, for example. It is now
5    assumed that the second chamber 4 is sealed tightly to the body part to be stimulated for the most part. Once the stimulation device is activated, drive unit 6 is activated or excited by control device 7 according to a previously saved stimulation pattern. Accordingly, the
10   volume of the first chamber 3 and thus the total pressure in pressure field generator 2 are modified, with the pressure modifications being modulated to the reference pressure. The pressure or stimulation pattern shown as an example in FIG. 14 a) develops a pulsed, regular
15   pressure field. In phases of pressure increase, the erogenous zone to be stimulated is blown on or massaged, while in the times when a negative-pressure prevails, the blood circulation of body part 11, the clitoris for example, is promoted. Thus, time periods according to the
20   invention exist (designated in FIG. 14 a) as I)) in which a negative-pressure prevails, while the clitoris is simultaneously indirectly massaged.

FIG. 14 b) shows three examples of alternative
25   stimulation patterns. Thus, the area designated as II) shows a pulsed stimulation pattern with high amplitude. The area designated as III) shows a pulsed stimulation pattern with low amplitude. Furthermore, the area designated as IV) illustrates an irregular and
30   asymmetrical stimulation pattern as regards chronological sequence and amplitude. The patterns can be varied according to individual bodily effect/use and according to individual wishes.

35   FIG. 14 c) shows another example of an alternative stimulation pattern. The strength of pressure may, for example, increase with time, in order to adjust to the user's state of excitement.

DE 10 2013 110 501 B4      - 28 -

In addition to the explained embodiments, the invention allows other basic design principles. For example, different arrangements or constructions of the first chamber 3 may be arbitrarily combined with various
5    embodiments of the second chamber 4 or connection element 5. For example, the first chamber 3 with the drive in FIG. 10 can be combined with the second chamber in FIG. 12 f), which is not, however, claimed.

10   Although only one first chamber 3 is shown in all embodiments, two or more first chambers 3 may be present, which are then appropriately activated simultaneously or time-delayed in such a way that their volume is modified in order to build up a pressure field according to the
15   invention.

Although only one opening from the first chamber 3 to connection element 5 is shown in the claimed embodiments, a plurality of openings for a connection element 5 or
20   even more openings for a plurality of connection elements 5 may be present in the first chamber 3 which is not, however, claimed.

A stimulation device 1 can have a plurality of pressure
25   field generators 2. Thus, for example, two pressure field generators may be available to stimulate two erogenous zones simultaneously.

The stimulation patterns according to the invention can
30   deviate from the pattern shown in FIG. 14 a), b) and c), as long as they have a chronological sequence of positive- and negative-pressures. For example, a relatively long-lasting negative-pressure can initially be built up at the beginning or after activation of the
35   device (3 minutes for example), in order to effectively increase the blood circulation of the zone to be stimulated, whereupon pulsed negative- and positive-pressures of a slowly increasing amplitude then follow.

DE 10 2013 110 501 B4      - 29 -

List of Reference Numerals

| | | |
|---|---|---|
| | 1 | Stimulation device |
| | 2 | Pressure field generator |
| 5 | 3 | First chamber |
| | 4 | Second chamber |
| | 5 | Connection element |
| | 6 | Drive unit |
| | 7 | Control device |
| 10 | 8 | Housing |
| | 9 | Lighting |
| | 11 | Body part |
| | 12 | Clitoris |
| | 31 | Wall of first chamber |
| 15 | 32 | Holder |
| | 41 | Wall of second chamber |
| | 42 | Opening of first chamber |
| | 43 | Contact surface |
| | 51 | Opening of connection element to second chamber |
| 20 | 61 | Drive shaft |
| | 62 | Eccentric |
| | 63 | Piston |
| | 64 | Bending element |
| | 71 | Operating element |
| 25 | 72 | Display |
| | 73 | Power supply |
| | 74 | On/off switch |
| | 75 | Socket |
| | 76 | Battery |
| 30 | 77 | Control board |
| | 78 | Remote control |

DE 10 2013 110 501 B4      - 30 -

Claims

1.  A  stimulation  device  (1)  for  a  clitoris  (12),
comprising:

5

-    a pressure field generator (2) comprising:

-    a first chamber (3); and

10  -    a  second  chamber  (4)  having  an  opening  (42)  for
placing over the clitoris (12); and

-    a  connection  element  (5)  connecting  the  first
chamber (3) with the second chamber (4);

15

-    a  drive  unit  (6)  that  changes  the  volume  of  the
first  chamber  (3)  in  such  a  manner  that  a  stimulating
pressure  field  is  generated  in  the  second  chamber  (4)  via
the connection element (5); and

20

-    a  control  device  (7)  that  actuates  the  drive  unit
(6); and
wherein:

25  -    the  pressure  field  generated  in  the  second  chamber
(4)  consists  of  a  pattern  of  negative  and  positive
pressures modulated with respect to normal pressure: and

-    wherein the first chamber (3) is connected with the
30  second chamber (4) solely by the connection element (5),

thus  no  other  connection  of  the  first  chamber  (3)  than
that  to  the  second  chamber  (4)  exists,  whereby  the  first
chamber  (3)  has  a  single  opening,  and
35  wherein the second chamber (4) has an opening (51) from
the  connection  element  (5)  into  the  second  chamber  (4),
and
wherein the stimulation device (1) has no valve, and

DE 10 2013 110 501 B4      - 31 -

wherein the stimulation device (1) is a portable hand-held device with a battery (36),
characterized in that
the connection element (5) is rigid, and is designed as
5  a straight channel with a nozzle effect, the opening of
which into the first chamber (3) and the opening (51) of
which into the second chamber (4) are aligned to one
another, so that
a media flow during compression of the first chamber (3)
10  is directed to the clitoris (12) by the alignment of the
opening (51) and the connection element (5),
wherein the opening (51) of the connection element (5)
is facing the clitoris (12) through the second chamber
(4).

15

2.   The stimulation device (1) according to claim 1,
wherein the second chamber (4) is made of a flexible
material and/or an at least partially transparent
material and/or is fitted to a shape of a vaginal labia
20  minora in such a way that the latter is completely covered
by the opening of the second chamber (4).

3.   The stimulation device (1) according to either claim
1 or claim 2, wherein the second chamber (4) is designed
25  in one-piece with the connection element (5) and the
first chamber (3).

4.   The stimulation device (1) according to either claim
1 or claim 2, wherein the second chamber (4) of the
30  stimulation device (1) is arranged to be replaceable.

5.   The stimulation device (1) according to one of
claims 1 to 4, wherein the second chamber (4) has a
sealing bearing part (43) to enlarge the contact surface
35  of the second chamber (4) on the skin.

6.   The stimulation device (1) according to one of
claims 1 to 5, wherein the respective modulation of the

DE 10 2013 110 501 B4      - 32 -

pressure field is modifiable by means of an operating element (71).

7.   The stimulation device (1) according to one of
5  claims 1 to 6, wherein the stimulation device (1) has lighting (9) for lighting the second chamber (4).

8.   A system, comprising a stimulation device (1) according to one of claims 1 to 7, comprising:
10
-   a remote control device arranged separately to the stimulation device (1),

wherein the control device (7) of the stimulation device
15  (1) is remotely controllable by the remote control device.

9.   The use of the stimulation device (1) according to one of claims 1 to 8 as a sex toy for stimulating the female clitoris.
20
7 pages of drawings to follow

DE 10 2013 110 501 B4      1/7

Appended figures

## Fig. 1



DE 10 2013 110 501 B4        2/7

Fig. 2



DE 10 2013 110 501 B4      3/7

Fig. 3



DE 10 2013 110 501 B4      4/7

**Fig. 4**



**Fig. 5**



**Fig. 6**



DE 10 2013 110 501 B4        5/7

Fig. 7



Fig. 8



Fig. 9



DE 10 2013 110 501 B4        6/7



Fig. 10a        Fig. 10b        Fig. 10c



Fig. 11



Fig. 12a        Fig. 12b        Fig. 12c



Fig. 12d        Fig. 12e        Fig. 12f

DE 10 2013 110 501 B4        7/7

Fig. 13



Fig. 14a



Fig. 14b



Fig. 14c



*Exhibit 8*

# Eisenführ Speiser

Eisenführ Speiser
Patentanwälte Rechtsanwälte
PartGmbB

Bremen München Berlin Hamburg

**PER KURIER**
Landgericht Hamburg
- Kammer für Wettbewerbssachen -
Sievekingplatz 1
20355 Hamburg

Postfach 10 60 78
28060 Bremen
Am Kaffee-Quartier 3
28217 Bremen
Tel +49 421 3635-0
Fax +49 421 3378788
Fax +49 421 3288631
mail@eisenfuhr.com
www.eisenfuhr.com

Harald Förster
Rechtsanwalt
Fachanwalt für
gewerblichen Rechtsschutz
Tel +49 421 3635-0
hforster@eisenfuhr.com

**Bremen,**        12. Juni 2018

**Unser Zeichen:**    EH 1149-01DE    HAF/jsu

**Geschäfts-Nr.:**    noch nicht vergeben

# K L A G E

**EIS GmbH**, gesetzlich vertreten durch den Geschäftsführer Bojan Neumann, Am Lenkwerk 3, 33609 Bielefeld

**- Klägerin -**

<u>Verfahrensbevollmächtigte:</u> Rechtsanwälte in Sozietät Eisenführ Speiser Patentanwälte Rechtsanwälte PartGmbB, Am Kaffee-Quartier 3, 28217 Bremen

<u>Mitwirkender Patentanwalt:</u> Dipl.-Ing. Jürgen Klinghardt in Sozietät Eisenführ Speiser Patentanwälte Rechtsanwälte PartGmbB, Johannes-Brahms-Platz 1, 20355 Hamburg

**g e g e n**

1. **NOVOLUTO GmbH**, Am Kupfergraben 6a, 10117 Berlin, gesetzlich vertreten durch die Geschäftsführer Johannes Graf von Plettenberg und Florian Holst, ebenda

**- Beklagte zu 1. -**

2. **Orion Versand GmbH & Co. KG**, Schäferweg 14, 24941 Flensburg, gesetzlich vertreten durch die Orion Versand GmbH, diese vertreten durch die Geschäftsführerin Maike Rotermund, ebenda

**- Beklagte zu 2. -**

3. **Orion Versand GmbH**, Schäferweg 14, 24941 Flensburg, gesetzlich vertreten durch die Geschäftsführerin Maike Rotermund, ebenda

**- Beklagte zu 3. -**



*2018368632*

- 2 -

wegen irreführender Werbung und unzulässiger Absatzbehinderung.

Streitwert (vorläufig geschätzt):    EUR 100.000,00

Hiermit zeigen wir an, dass wir die Klägerin unter Mitwirkung des im Rubrum aufgeführten Patentanwalts Dipl.-Ing. Jürgen Klinghardt, vertreten.

Namens und in Vollmacht der Klägerin erheben wir Klage und bitten um Anberaumung eines möglichst nahen Termins zur mündlichen Verhandlung. In der mündlichen Verhandlung werden wir beantragen, wie folgt zu erkennen:

Die Beklagte zu verurteilen,

1.    Die Beklagte zu 1. wird verurteilt

es bei Meidung eines für jeden Fall der Zuwiderhandlung festzusetzenden Ordnungsgeldes bis zu € 250.000,00, ersatzweise Ordnungshaft, oder Ordnungshaft bis zu sechs Monaten, wobei die Ordnungshaft an ihren Geschäftsführern zu vollziehen ist, zu unterlassen,

im geschäftlichen Verkehr folgende Angaben zu machen:

a)

### Schadensersatzanspruch

Ebenfalls bestätigte das Gericht den von Womanizer geltend gemachten Schadensersatzanspruch wegen Patentverletzung. Die EIS GmbH hat Womanizer daher sämtlichen Schaden zu ersetzen, der seit dem 18. Februar 2016 durch die begangenen Handlungen entstanden ist oder noch entstehen wird. Darauf basierend bereitet Womanizer nun entsprechende Schadensersatzklagen in Millionenhöhe gegen die EIS GmbH vor und behält

sich darüber hinaus vor, gegen Händler, die den Satisfyer Pro 2 verkauft haben, entsprechend vorzugehen.

und/oder

- 3 -

b)

## Vernichtung Produkte

Zudem ist die EIS GmbH verpflichtet, den Satisfyer Pro 2 aus jeglichen Vertriebswegen zurückzurufen sowie die noch im Besitz der EIS GmbH befindlichen Geräte zu vernichten.

und/oder

c)

**Johannes von Plettenberg, Geschäftsführer von Womanizer, zeigt sich mehr als zufrieden mit dem Urteil und blickt optimistisch in das Jahr 2018:**

*„Zum wiederholten Mal wird die Stärke unserer Patente unter Beweis gestellt. Wir werden auch in Zukunft gegenüber der EIS GmbH und weiteren Nachahmern unserer Technologie mit entschiedener Härte vorzugehen. Womanizer nimmt das Urteil gegen die EIS GmbH sehr ernst und wird nun entsprechende Konsequenzen einleiten. So werden wir neben der EIS GmbH auch Distributoren, Einzelhändler und andere Marktteilnehmer, die den Satisfyer Pro 2 verkaufen oder verkauft haben, auf Schadensersatz verklagen. Die Bestätigung durch das Landgericht stellt einen zufriedenstellenden Abschluss eines großartigen Jahres für Womanizer dar. Umso mehr freue ich mich jetzt auf 2018. Ich kann versprechen, dass sich bei Womanizer einiges tun wird und sich unsere Kunden auf neuen Produkte freuen dürfen."*

insbesondere wie folgt:

- 4 -



Startseite | Produkte | Fakten | Downloads

# DAS ORIGINAL SETZT SICH DURCH

Landgericht Düsseldorf bestätigt
die Patentverletzung durch Satisfyer Pro 2

Die Novoluto GmbH (c/o Womanizer) gewinnt den erstinstanzlichen Prozess
gegen die EIS GmbH vor dem Düsseldorfer Landgericht mit Urteil vom 14.
Dezember 2017 und verteidigt ihr Patentportfolio gegenüber dem Satisfyer Pro 2.
Die EIS GmbH hat Berufung eingelegt.

Am 14. Dezember 2017 bestätigte das Landgericht Düsseldorf mittels Urteil die
Klage von Womanizer gegen die EIS GmbH. Womanizer behauptet damit erneut
erfolgreich ihre Rechte und geht gegen Rechtsverletzungen von
Marktteilnehmern vor.

### Unterlassungsanspruch

Wesentlicher Bestandteil des Urteils ist die Bestätigung des von Womanizer
erhobenen Unterlassungsanspruchs gegen die EIS GmbH. Diese hat es
nunmehr zu unterlassen, den Satisfyer Pro 2 in der Bundesrepublik Deutschland
anzubieten, in den Verkehr zu bringen oder zu den genannten Zwecken
einzuführen oder zu besitzen.

### Schadensersatzanspruch

Ebenfalls bestätigte das Gericht den von Womanizer geltend gemachten
Schadensersatzanspruch wegen Patentverletzung. Die EIS GmbH hat
Womanizer daher sämtlichen Schaden zu ersetzen, der seit dem 18. Februar
2016 durch die begangenen Handlungen entstanden ist oder noch entstehen
wird. Darauf basierend bereitet Womanizer nun entsprechende
Schadensersatzklagen in Millionenhöhe gegen die EIS GmbH vor und behält

- 5 -

sich darüber hinaus vor, gegen Händler, die den Satisfyer Pro 2 verkauft haben, entsprechend vorzugehen.

## Vernichtung Produkte

Zudem ist die EIS GmbH verpflichtet, den Satisfyer Pro 2 aus jeglichen Vertriebswegen zurückzurufen sowie die noch im Besitz der EIS GmbH befindlichen Geräte zu vernichten.

**Johannes von Plettenberg, Geschäftsführer von Womanizer, zeigt sich mehr als zufrieden mit dem Urteil und blickt optimistisch in das Jahr 2018:**

„Zum wiederholten Mal wird die Stärke unserer Patente unter Beweis gestellt. Wir werden auch in Zukunft gegenüber der EIS GmbH und weiteren Nachahmern unserer Technologie mit entschiedener Härte vorzugehen. Womanizer nimmt das Urteil gegen die EIS GmbH sehr ernst und wird nun entsprechende Konsequenzen einleiten. So werden wir neben der EIS GmbH auch Distributoren, Einzelhändler und andere Marktteilnehmer, die den Satisfyer Pro 2 verkaufen oder verkauft haben, auf Schadensersatz verklagen. Die Bestätigung durch das Landgericht stellt einen zufriedenstellenden Abschluss eines großartigen Jahres für Womanizer dar. Umso mehr freue ich mich jetzt auf 2018. Ich kann versprechen, dass sich bei Womanizer einiges tun wird und sich unsere Kunden auf neuen Produkte freuen dürfen."

**Parallel zu dem erfolgreichen Gerichtsverfahren setzt Womanizer seinen Erfolgskurs fort.** Als Hersteller innovativer Sextoys stehen neue Produkte dabei im Vordergrund, der Womanizer Starlet und der Womanizer InsideOut übertreffen unsere Erwartungen. Das Serviceangebot und Marketing sind intensiviert worden, beispielsweise mit dem Womanizer Do-It-Yourself Store und den umfangreichen PR Aktivitäten der vergangenen Monate.

Und das ist erst der Anfang! Wir arbeiten daran, auch weiterhin ein idealer Partner für Sie zu sein.

- 6 -



2.    Die Beklagten zu 1. bis 3. werden verurteilt,

       der Klägerin Auskunft zu erteilen, gegenüber welchen Unternehmen
       sie die Angaben entsprechend Ziff. 1 schriftlich oder mündlich ge-
       macht haben, unter Angabe der Namen und Anschriften der Unter-
       nehmen und Personen, denen gegenüber diese Angaben gemacht
       wurden, sowie des Datums und des Orts, an welchen die Angaben
       gemacht wurden.

3.    Es wird festgestellt, dass die Beklagten als Gesamtschuldner verpflichtet sind,
       der Klägerin allen Schaden zu ersetzen, der dieser durch die in Ziffer 1. bezeich-
       neten begangenen Handlungen entstanden ist und künftig noch entstehen wird.

4.    Die Beklagten zu 1. und 3. werden als Gesamtschuldner verurteilt, EUR 4.697,88
       an die Klägerin als Kostenerstattung für die Kosten der Abmahnung zu zahlen.

- 7 -

5.   Die Beklagte zu 1. wird verurteilt, EUR 1.096,94 an die Klägerin als Kostenerstattung für die Kosten der Aufforderung zur Abgabe der Abschlusserklärung zu zahlen.

6.   Die Beklagten tragen die Kosten des Verfahrens.


## BEGRÜNDUNG

Die Parteien sind dem Gericht aus den einstweiligen Verfügungsverfahren 327 O 142/18 und 327 O 154/18 bekannt. Die Beklagten zu 2. und 3. haben die Abschlusserklärung abgegeben, die Beklagte zu 1. nicht. Darüber hinaus hat sich keine der Beklagten eine Verpflichtungserklärung hinsichtlich der Annexansprüche abgegeben. Daher ist Klage geboten.

Wir überreichen die Beschlussverfügungen der Zivilkammer 27 vom 3. und 4. April 2018 als

**Anlage K0**,

welche den streitgegenständlichen Sachverhalt betreffen. Die Klägerin verfolgt daher gegen die Beklagte zu 1. die Ansprüche aus irreführender Werbung und Absatzbehinderung entsprechend der Beschlussverfügung vom 3. April 2018, Az. 327 O 142/18, weiter werden die Annexansprüche gegen die Beklagten zu 1. bis 3. geltend gemacht.

Im Einzelnen begründen wir die Klage wie folgt:

### I.    Zur Vorgeschichte dieses Verfahrens

1.   Die Klägerin und die Womanizer-Gruppe sind Wettbewerber u.a. auf dem Gebiet der Herstellung und des Vertriebs von Sextoys, und wir überreichen als

**Anlage K1**

Ausdrucke der Website der Klägerin sowie als

**Anlage K2/1**

- 8 -

Ausdrucke der Website www.womanizer.com. Die Beklagte zu 1. ist die Verwertungs- und Verwaltungsgesellschaft der Womanizer-Gruppe für die gewerblichen Schutzrechte, sie führt u.a. die Patentverletzungsprozesse und ist der Autor der streitgegenständlichen „Presseerklärung". Ferner überreichen wir als

**Anlage K2/2**

Ausdrucke der Website der Beklagten zu 2., welche nach ihren eigenen Angaben Teil des „Womanizer Teams" ist, die Womanizer nach Art eines Großhändlers in Deutschland exklusiv vertreibt und auf ihrer Website die streitgegenständliche „Presseerklärung" veröffentlicht hat.

2. Die Beklagte zu 1. und die Klägerin streiten vor dem Landgericht Düsseldorf um die Verletzung des deutschen Patents DE 10 2013 110 501 B4 mit dem Titel „Stimulationsvorrichtung" (nachfolgend: Klagepatent) durch das Mitte 2017 eingestellte Produkt „Satisfyer Pro 2", und wir überreichen als

**Anlage K3**

das Urteil der 4a. Zivilkammer vom 14. Dezember 2017 sowie als

**Anlage K4**

eine Kopie des deutschen Patents DE 10 2013 110 501 B4.

Das Klagepatent bezieht sich auf eine Stimulationsvorrichtung und wir blenden nachstehend die Merkmale der Merkmalsanalyse des Landgericht Düsseldorf ein:

- 9 -

1    Stimulationsvorrichtung (1) für die Klitoris (12), aufweisend:

2    eine Druckfelderzeugungseinrichtung (2) mit:

    2.1    einer ersten Kammer (3);

    2.2    und einer zweiten Kammer (4) mit einer Öffnung (42) zum Aufsetzen über die Klitoris (12);

    2.3    und einem Verbindungselement (5), welches die erste Kammer (3) mit der zweiten Kammer (4) verbindet;

        2.3.1    wobei die erste Kammer (3) über das Verbindungselement (5) ausschließlich mit der zweiten Kammer (4) verbunden ist, somit keine andere Verbindung der ersten Kammer (3) als diejenige zur zweiten Kammer (4) besteht, womit die erste Kammer (3) eine einzige Öffnung aufweist, und

        2.3.2    wobei die zweite Kammer (4) eine Öffnung (51) von dem Verbindungselement (5) in die zweite Kammer (4) aufweist,

    2.4    und einer Antriebseinheit (6), welche das Volumen der ersten Kammer (3) derart verändert, dass über das Verbindungselement (5) in der zweiten Kammer (4) ein stimulierendes Druckfeld erzeugt wird; wobei das in der zweiten Kammer (4) erzeugte Druckfeld aus einem Muster von Unter- und Überdrücken besteht, welche auf den Normaldruck aufmoduliert sind;

3    und eine Steuereinrichtung (7), welche die Antriebseinheit (6) ansteuert;

4    wobei die Stimulationsvorrichtung (1) keine Ventile aufweist,

5    und wobei die Stimulationsvorrichtung (1) ein tragbares Handgerät mit einer Batterie (76) ist.

6    Das Verbindungselement (5) ist

- 10 -

6.1    starr

6.2    und als ein gerader Kanal mit Düsenwirkung ausgestaltet,

      6.2.1    dessen Öffnung in die ersten Kammer (3) und dessen Öffnung (51) in die zweite Kammer (4) zueinander ausgerichtet sind, so dass eine Medienströmung bei Kompression der ersten Kammer (3) durch die Ausrichtung der Öffnung (51) und des Verbindungselements (5) auf die Klitoris (12) gerichtet ist,

7    wobei die Öffnung (51) des Verbindungselements (5) der Klitoris (12) durch die zweite Kammer (4) hindurch gegenüberliegt.

Das Landgericht Düsseldorf hat in dem seit Mitte 2017 nicht mehr vertriebenen „Satisfyer Pro 2" eine wortsinngemäße Verletzung von Anspruch 1 gesehen (vgl. folgende Schnittzeichnung von Seite 11 LGU):



Das Landgericht hat die Merkmale erste Kammer, zweite Kammer und gerader Kanal als verwirklicht angesehen. Die Klägerin teilt diese rechtliche Bewertung nicht, und wir überreichen als

    **Anlage K5**

unsere Berufungsbegründung vom 21. März 2018, auf welche wir Bezug nehmen.

- 11 -

3.  Die Klägerin hat – ungeachtet der Tatsache, dass sie das Patent DE 10 2013 110 501 B4 für nicht rechtsbeständig und für nicht verletzt hält (siehe <u>Anlage K5</u>) – seit Mitte 2017 den Satisfyer Pro 2 NEXT GENERATION ausschließlich mit folgender Innenkonfiguration (mit nur einer Kammer) vertrieben:



Die neuen und seit Mitte 2017 vertriebenen Satisfyer Pro 2 NEXT GENERATION weisen – wie aus der Abbildung ersichtlich – nur eine einzige Kammer auf, und wir blenden nachstehend ein vergrößertes Foto dieser einen Kammer des Satisfyer Pro 2 NEXT GENERATION ein:

- 12 -



Wie unmittelbar ersichtlich, hat der seit Mitte 2017 vertriebene Satisfyer Pro 2 NEXT GENERATION keine zweite Kammer gemäß <u>Merkmal 2.2</u> und kein Verbindungselement gemäß <u>Merkmalsgruppe 2.3</u>, ebenso sind die <u>Merkmalsgruppe 6</u> und auch <u>Merkmal 7</u> nicht verwirklicht. Daher wird der Satisfyer Pro 2 NEXT GENERATION auch von der Beklagten zu 1. nicht beanstandet.

4.    In der mündlichen Verhandlung vor der Einspruchsabteilung des Deutschen Patent- und Markenamtes am 17. April 2018 wurde das Klagepatent vollständig widerrufen und wir überreichen die Abschrift zur mündlichen Verhandlung als

       **Anlage K6**.

5.    Die Beklagte hat die zur vorläufigen Vollstreckung des Urteils des Landgerichts Düsseldorf vom 14. Dezember 2018, Az. 4a O 78/16, erforderliche Sicherheit in Höhe von € 2,5 Mio. noch nicht erbracht, und die Parteien streiten derzeit vor dem Oberlandesgericht Düsseldorf um den Vollstreckungsschutzantrag der Klägerin. Wir überreichen die wechselseitigen Eingaben als

       **Anlage K7.**

6.    Ferner ist der Beklagten zu 1. bewusst, dass die Klägerin die in jenem Verfahren streitgegenständliche Version des Satisfyer Pro 2 bereits seit langer Zeit nicht mehr vertreibt, und stattdessen seit Mitte 2017 ausschließlich der patentfreie Sa-

- 13 -

tisfyer Pro 2 NEXT GENERATION auf dem Markt ist. Das Verfahren vor dem Land-
gericht Düsseldorf betrifft nur die Vergangenheit, und der patentfreie Satisfyer Pro
2 NEXT GENERATION ist nicht betroffen.

7.    Die Beklagten nutzen das Urteil des Landgerichtes Düsseldorf vom 14. Dezember
2017, um in Deutschland Kunden in irreführender Weise über den Ausgang und
die Reichweite des Verfahrens zu informieren und den Absatz der Klägerin zu ge-
fährden. Wir überreichen als

**Anlage K8**

die von der Beklagten zu 2. auf ihrer Website

https://www.orionerotic.de/bc/servlet/web.webview?5HsLOjY-
ceIQ35pBwrSFsOJI1iYjkoXbguLRfysTojZx1KZgdhoH4N7Oh12x62Sc7

im Auftrag bzw. in Kooperation mit der Womanizer-Gruppe und der Beklagten zu
1. veröffentlichte Pressemitteilung, welche, wie im Antrag eingeblendet, lautet und
welche die drei im Antrag eingeblendeten unzulässigen Angaben enthält.

## II.    Zu den einzelnen Anträgen

1.    Die Beklagten informieren Abnehmer und Käufer des Satisfyer Pro 2 in irreführen-
der Art und Weise über den Stand der Auseinandersetzung zwischen der Klägerin
und der Beklagten zu 1. zum Verfahren 4a O 78/16 (Landgericht Düsseldorf) und
zum Urteil der 4a. Zivilkammer vom 14. Dezember 2017.

2.    Die „Pressemitteilung" der Beklagten ist eine geschäftliche Angabe zu Zwecken
des Wettbewerbs, und sie ist unter mehreren rechtlichen Gesichtspunkten unlau-
ter und daher unzulässig.

3.    Die Pressemitteilung enthält die Angabe:

- 14 -

## Schadensersatzanspruch

Ebenfalls bestätigte das Gericht den von Womanizer geltend gemachten Schadensersatzanspruch wegen Patentverletzung. Die EIS GmbH hat Womanizer daher sämtlichen Schaden zu ersetzen, der seit dem 18. Februar 2016 durch die begangenen Handlungen entstanden ist oder noch entstehen wird. Darauf basierend bereitet Womanizer nun entsprechende Schadensersatzklagen in Millionenhöhe gegen die EIS GmbH vor und behält

sich darüber hinaus vor, gegen Händler, die den Satisfyer Pro 2 verkauft haben, entsprechend vorzugehen.

Die Angabe, dass die Beklagte zu 1. nunmehr entsprechende

„Schadensersatzklagen in Millionenhöhe"

gegen die Klägerin vorbereitet, entbehrt jeglicher Tatsachengrundlage und dient ausschließlich der Abschreckung potentieller Vertriebspartner und Abnehmer der Klägerin:

(1.) Das Urteil vom 14. Dezember 2017 betrifft das Grundverfahren und ist nicht rechtskräftig, aber vorläufig vollstreckbar gegen Sicherheitsleistung. Die Beklagte zu 1. hat noch keine Sicherheitsleistung erbracht, und die Parteien streiten derzeit um die Frage, in welcher Form die Beklagte zu 1. die Sicherheit zu erbringen hat und ob sie - anstelle einer üblichen Bankbürgschaft – die Bürgschaft eines Versicherungsinstituts beibringen darf, und wir nehmen Bezug auf die wechselseitigen Eingaben (Anlage K7).

Da bislang seitens der Beklagten zu 1. noch keine Sicherheit erbracht wurde, hat die Klägerin noch nicht Auskunft erteilt und Rechnung gelegt.

(2.) Die Beklagte zu 1. weiß, dass nur eine verhältnismäßig geringe Stückzahl der streitgegenständlichen Satisfyer Pro 2 verkauft worden ist und dessen Vertrieb Mitte 2017 eingestellt wurde.

- 15 -

(3.)  Der Beklagten zu 1. ist mangels Rechnungslegung nicht bekannt, ob die Klägerin überhaupt einen Gewinn mit dem Produkt Satisfyer Pro2 erzielt hat; denn die Klägerin hat mangels Vollstreckung noch nicht im Hinblick auf das Urteil des Landgerichts Düsseldorf vom 14. Dezember Rechnung gelegt.

(4.)  Schließlich setzt ein Schadensersatzanspruch nach der Methode der Herausgabe des Verletzergewinns voraus, dass der geltend gemachte Gewinnanteil gerade auf der Patentverletzung beruht. Vorliegend hat, wie das Landgericht Düsseldorf im Urteil vom 14. Dezember 2017, Seite 21 ff., bestätigt hatte, die Gestaltung des Innenraums keinen Einfluss auf die Strömungsverhältnisse im Mündungsbereich, d.h. den Bereich, der aus Kundensicht relevant sein könnte.

Das Nachfolgemodell Satisfyer Pro 2 NEXT GENERATION, das ohne erste und zweite Kammer sowie ohne Verbindungselement auskommt, funktioniert identisch wie der frühere Satisfyer Pro 2, und das mit einem noch größeren Markterfolg.

Es ist also von einem Kausalitätsfaktor von höchstens einigen wenigen Prozent auszugehen. Dies wird auch durch den im Urteil des LG Düsseldorf zitierten Vortrag der Beklagten zu 1. bestätigt, die stets argumentiert hatte, dass die Spürbarkeit der patentgemäßen Lösung keine Relevanz für die Patentverletzung haben solle, was ebenfalls für einen extrem niedrigen Kausalitätsfaktor spricht (vgl. Urteil LG Düsseldorf, Seite 21 ff.).

Aus den vorgenannten Gründen ist es zum jetzigen Zeitpunkt somit völlig haltlos und entbehrt jeglicher Tatsachengrundlage, die Kunden darüber zu informieren, dass Schadensersatzklagen in Millionenhöhe vorbereitet würden. Derzeit werden von der Beklagten zu 1. keine Schadensersatzklagen in Millionenhöhe vorbereitet, und diese müsste zumindest die Rechnungslegung vollstrecken und auf Basis der Rechnungslegung den ihr vermeintlich zustehenden Schadensersatzanspruch beziffern. So wie in der „Pressemitteilung" ist die streitgegenständliche Angabe aber eine unzutreffende Information der Kunden ohne jede Tatsachengrundlage, welche die Kreditwürdigkeit der Klägerin und das Vertrauen ihrer Abnehmer beschädigt und damit erheblich ist.

- 16 -

Die vorstehende Angabe ist somit falsch, so dass die Voraussetzungen einer unzutreffenden und irreführenden Angabe gemäß § 5 Abs. 1 UWG erfüllt sind. Zudem erfüllen die unzutreffenden Angaben die Voraussetzungen eines unzulässigen Behinderungswettbewerbs gemäß § 4 Nr. 4 UWG.

4.   Die Pressemitteilung enthält die Angabe:

**Vernichtung Produkte**

Zudem ist die EIS GmbH verpflichtet, den Satisfyer Pro 2 aus jeglichen Vertriebswegen zurückzurufen sowie die noch im Besitz der EIS GmbH befindlichen Geräte zu vernichten.

Die Angabe, dass die Klägerin verpflichtet sei, den „Satisfyer Pro 2" aus allen Vertriebswegen zurückzurufen und die Geräte zu vernichten, ist schon deshalb irreführend und falsch, weil die Beklagte zu 1. bislang noch keine Sicherheit gemäß dem Urteil des Landgerichts Düsseldorf geleistet hat und somit auch die (vorläufige) Vollstreckung noch gar nicht begonnen hat. Nach der Formulierung werden die Kunden aber annehmen, dass die Hinterlegung einer Sicherheit nicht erforderlich ist und die Klägerin insoweit umgehend handeln muss.

Zudem ist der Vertrieb des Satisfyer Pro 2, wie die Beklagten wissen, seit Mitte 2017 eingestellt, und der „Satisfyer Pro 2 NEXT GENERATION" ist patentfrei. Auch wenn die Klägerin ihre gewerblichen Abnehmer entsprechend informiert hat, so ist die streitgegenständlichen Werbung auch an Endkunden gerichtet, sodass von den Beklagten bzw. vom „Womanizer Team" eine entsprechende Klarstellung zu erwarten ist, dass die Ansprüche auf Rückruf und Vernichtung nur die seit rund 9 Monaten eingestellten alten „Satisfyer Pro 2" betreffen. Ohne eine entsprechende Klarstellung oder zumindest eine entsprechend eindeutige Formulierung kann der Endverbraucher bei Lektüre der Presseerklärung hier keine Differenzierung zwischen „Satisfyer Pro 2" und „Satisfyer Pro 2 NEXT GENERATION" vornehmen.

Im Übrigen wäre die Durchführung des Rückrufs – nach erfolgter Sicherheitsleistung – Aufgabe der Klägerin, und die Beklagten dürfen hierüber keine unzutreffenden und irreführenden Angaben machen.

- 17 -

Die streitgegenständlichen Angaben sind somit falsch, und es liegen neben einer irreführenden Werbung gemäß § 5 Abs. 1 UWG die Voraussetzungen einer gezielten Behinderung eines Mittbewerbers gemäß § 4 Nr. 4 UWG vor.

5.     Die Pressemitteilung enthält die Angabe:

> **Johannes von Plettenberg, Geschäftsführer von Womanizer, zeigt sich mehr als zufrieden mit dem Urteil und blickt optimistisch in das Jahr 2018:**
>
> *„Zum wiederholten Mal wird die Stärke unserer Patente unter Beweis gestellt. Wir werden auch in Zukunft gegenüber der EIS GmbH und weiteren Nachahmern unserer Technologie mit entschiedener Härte vorzugehen. Womanizer nimmt das Urteil gegen die EIS GmbH sehr ernst und wird nun entsprechende Konsequenzen einleiten. So werden wir neben der EIS GmbH auch Distributoren, Einzelhändler und andere Marktteilnehmer, die den Satisfyer Pro 2 verkaufen oder verkauft haben, auf Schadensersatz verklagen. Die Bestätigung durch das Landgericht stellt einen zufriedenstellenden Abschluss eines großartigen Jahres für Womanizer dar. Umso mehr freue ich mich jetzt auf 2018. Ich kann versprechen, dass sich bei Womanizer einiges tun wird und sich unsere Kunden auf neuen Produkte freuen dürfen.“*

Nachdem die Beklagte einen „Schadensersatz in Millionenhöhe gegen die EIS GmbH" angekündigt hat und nunmehr die Angabe macht, dass „entsprechende Konsequenzen" gegen die Abnehmer eingeleitet werden, nämlich wie folgt:

> *„So werden wir neben der EIS GmbH auch Distributoren, Einzelhändler und andere Marktteilnehmer, die den Satisfyer Pro 2 verkaufen oder verkauft haben, auf Schadensersatz verklagen",*

müssen auch diese annehmen, dass sie einen Schadensersatz in vergleichbarer Höhe leisten müssen, falls sie den Satisfyer Pro 2 vertreiben.

Demgegenüber ist der etwaige Schadensersatzanspruch bei Vertriebspartnern ohnehin auf dessen Gewinnspanne abzüglich der Vertriebskosten beschränkt und

- 18 -

erfahrungsgemäß bei kleinen Vertriebspartnern sehr niedrig. Die pauschale An-
kündigung, „Distributoren, Einzelhändler und andere Marktteilnehmer" auf Scha-
densersatz zu verklagen, erweckt hier einen völlig unzutreffenden Eindruck.

Zudem kann die Beklagte zu 1. mangels derzeitiger Auskunftserteilung und Rech-
nungslegung die Abnehmer der Klägerin überhaupt nicht auf Schadensersatz ver-
klagen, ihr fehlen hierzu sämtliche Informationen. Ferner ist vor der Schadenser-
satzklage auch gegenüber den Abnehmern zunächst ein Grundverfahren erforder-
lich, welches zusammen mit der Auskunftserteilung erfahrungsgemäß mindestens
12 bis 18 Monate oder länger dauern wird, so dass erst im Anschluss eine Scha-
densersatzklage überhaupt möglich ist.

Aufgrund dieser Angaben gemäß Antrag zu 1. c) werden die Abnehmer umgehend
von dem Vertrieb des „Satisfyer Pro 2", teilweise auch des „Satisfyer Pro 2 Next
Generation" Abstand und insbesondere diese nicht mehr verkaufen wollen.

6.   Der Bundesgerichtshof nahm in der Entscheidung „Fräsautomat" daran Anstoß,
     dass nicht darüber aufgeklärt wurde, unter welchen Voraussetzungen – sprich: bei
     welcher Betriebsweise der fraglichen Maschine – es zur Schutzrechtsverletzung
     kommen kann. Besonders an dieser Pauschalität nahm der Bundesgerichtshof
     Anstoß (Urt. v. 15.1.2009 – I ZR 123/06 – Fräsautomat). Denn die Kunden können
     durch das allgemein gehaltene Schreiben veranlasst werden, vollständig vom
     Erwerb der Maschine abzusehen, um Haftungsfolgen von vornherein
     auszuweichen, was letztlich eine unzulässige Absatzbehinderung begründet (§ 4
     Nr. 4 UWG).

     Mit der Entscheidung „Fräsautomat" hat der Bundesgerichtshof den
     Anwendungsbereich seiner Rechtsprechung zu unzulässigen Information von
     Abnehmern deutlich ausgeweitet. Für die Zulässigkeit einer Äußerung über eine
     etwaige Schutzrechtsverletzung kommt es nicht darauf an, ob sie in eine förmliche
     Abmahnung (mit ausdrücklicher Geltendmachung von Unterlassungs- und ggf.
     weiteren Rechtsansprüchen und Androhung gerichtlicher Schritte) eingekleidet ist,
     sondern welche Wirkungen von ihr zu erwarten sind.

7.   Die streitgegenständlichen Informationen und Angaben gemäß den Anträgen zu
     1. a) bis c) sind irreführend und begründen i.S. der „Fräsautomat"-Entscheidung
     eine unzulässige Absatzbehinderung, weil die Abnehmer der Klägerin davon

- 19 -

ausgehen müssen, dass alle Satisfyer Pro 2 (auch „NEXT GENERATION") unter das Urteil des Landgerichtes Düsseldorf fallen und der Klägerin und den Abnehmern nunmehr unmittelbar massive und pauschal benannte und für Abnehmer damit kaum kalkulierbare rechtliche Risiken drohen. Das Ziel, die Abnehmer der Klägerin zu bedrohen und den Absatz der Klägerin zu behindern, haben die Beklagten nunmehr auch mit ihrer Pressemitteilung erreicht, und die Klägerin wird von ihren Abnehmern entsprechend kontaktiert, welche durch die Pressemitteilung hochgradig verunsichert sind und Sicherheiten verlangen etc.

8.  Es liegen daher hinsichtlich der Anträge zu 1. a) bis c) die Voraussetzungen einer unzulässigen Irreführung der Abnehmer und einer gezielten Behinderung eines Mitbewerbers gemäß §§ 5 Abs. 1, 4 Nr. 4 UWG vor. Die Annexansprüche sind aus den §§ 8, 9 UWG begründet.

9.  Die Klägerin hatte mit Schreiben vom 23. März 2018 die Beklagten zu 1. und 3. wegen der streitgegenständlichen Handlungen abgemahnt, Kopie anbei als

    **Anlage K9**.

    Die Beschlussverfügungen vom 3. und 4. April 2018 wurden den Beklagten ordnungsgemäß zugestellt und wir überreichend die entsprechenden Zustellungsurkunden als

    **Anlage K10**.

    Die Abschlusserklärung wurde nur von den Beklagten zu 2. und 3. abgegeben, Kopie anbei als

    **Anlage K11**.

    Mit Schreiben vom 24. April 2018 wurden die Beklagten zu 1. zur Abgabe der Abschlusserklärung aufgefordert, anbei als

    **Anlage K12**.

    Das Schreiben vom 24. April 2018 blieb allerdings bis heute unbeantwortet.

- 20 -

10. Die durch die Abmahnung und die Aufforderung zur Abgabe der Abschlusserklärung entstandenen mit dem Klagantrag zu 4. geltend gemachten Kosten sind gemäß § 12 Abs. 4 Nr. 3 UWG zu erstatten.

Dem Kostenerstattungsanspruch wird ein Gegenstandswert in Höhe von EUR 100.000,00 zu Grunde gelegt. Dieser Gegenstandswert ist mindestens angemessen und liegt am unteren Rand dessen, was in derartigen Angelegenheiten üblich ist.

Unter diesen Prämissen ergibt sich die folgende Berechnung:

Für die Abmahnung:

Gegenstandswert: **EUR 100.000,00**

| | | |
|---|---|---|
| 1,3 Geschäftsgebühr gem. Nr. 2300 VV RVG, §§ 2 Abs. 2, 13 Abs. 1, 14 Abs. 1 RVG | EUR | 1.953,90 |
| 1,3 Geschäftsgebühr gem. Nr. 2300 VV RVG, §§ 2 Abs. 2, 13 Abs. 1, 14 Abs. 1 RVG i.V.m. § 143 Abs. 3 PatG | EUR | 1.953,90 |
| Auslagenpauschale gem. Nr. 7002 VV RVG | EUR | 20,00 |
| Auslagenpauschale gem. Nr. 7002 VV RVG i.V.m. § 143 Abs. 3 PatG | EUR | 20,00 |
| Umsatzsteuer gem. Nr. 7008 VV RVG | EUR | 375,04 |
| Umsatzsteuer gem. Nr. 7008 VV RVG i.V.m. § 143 Abs. 3 PatG | EUR | 375,04 |
| **Gesamtbetrag** | **EUR** | **4.697,88** |

Für die Aufforderung zur Abgabe der Abschlusserklärung:

Gegenstandswert: **EUR 100.000,00**

| | | |
|---|---|---|
| 0,6 Geschäftsgebühr gem. Nr. 2300 VV RVG, §§ 2 Abs. 2, 13 Abs. 1, 14 Abs. 1 RVG | EUR | 901,80 |
| Auslagenpauschale gem. Nr. 7002 VV RVG | EUR | 20,00 |
| Umsatzsteuer gem. Nr. 7008 VV RVG | EUR | 175,14 |
| **Gesamtbetrag** | **EUR** | **1.096,94** |

- 21 -

### III.    Örtliche Zuständigkeit

Das angerufene Gericht ist örtlich zuständig, da die Beklagten bundesweit tätig sind und auch die Pressemitteilung bundesweit abrufbar ist.

(Harald Förster)
Rechtsanwalt

Anlagen
Anlagen K0 bis K12
3 begl. Abschriften
3 einf. Abschriften

*Bitte nachstehendes Empfangsbekenntnis ausgefüllt und unterzeichnet (frankierter Rückumschlag anbei) zurück an:*

Eisenführ Speiser
Patentanwälte Rechtsanwälte PartGmbB
Postfach 10 60 78
28060 Bremen

Telefax: +49 421 3378788
(ES-Aktz.: EH 1149-01DE)

Geschäftsnummer: **(bitte ergänzen)** _____

Landgericht Hamburg
Sievekingplatz 1
20355 Hamburg

## EMPFANGSBEKENNTNIS

In Sachen

| EIS GmbH | ./. | 1. NOVOLUTO GmbH |
| | | 2. Orion Versand GmbH & Co. KG |
| | | 3. Orion Versand GmbH |

ist die **Klage** der Rechtsanwälte Eisenführ Speiser vom <u>12. Juni 2018</u> nebst Verrechnungsscheck über € 3.078,00

am _____ im Original

eingegangen.

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-
Datum/Unterschrift


*2018368632*

Translation from German into English

Eisenführ Speiser
Patentanwälte Rechtsanwälte
PartGmbB

Bremen München Berlin Hamburg

**BY COURIER**
Landgericht Hamburg
[Hamburg District Court]
- Division for Unfair Competition Matters -
Sievekingplatz 1
D-20355 Hamburg

Postfach 10 60 78
28060 Bremen
Am Kaffee-Quartier 3
28217 Bremen
Tel +49 421 3635-0
Fax +49 421 3378788
Fax +49 421 3288631
mail@eisenfuhr.com
www.eisenfuhr.com

Harald Förster
Rechtsanwalt
Fachanwalt für
gewerblichen Rechtsschutz
Tel +49 421 3635-0
hforster@eisenfuhr.com

**Bremen,**      June 12, 2018

**Our ref.:**      EH 1149-01DE    HAF/jsu

**Docket no.:**    not yet allocated

# S T A T E M E N T   O F   C L A I M

**EIS GmbH**, represented in law by its Managing Director, Bojan Neumann, Am Lenkwerk 3, D-33609 Bielefeld

**– Plaintiff –**

Legal counsel:              Attorneys in the law firm of Eisenführ Speiser Patentanwälte Rechtsanwälte PartGmbB, Am Kaffee-Quartier 3, D-28217 Bremen

Assisting patent attorney:   Dipl.-Ing. Jürgen Klinghardt from the law firm of Eisenführ Speiser Patentanwälte Rechtsanwälte PartGmbB, Johannes-Brahms-Platz 1, D-20355 Hamburg

**v e r s u s**

1. **NOVOLUTO GmbH**, Am Kupfergraben 6a, D-10117 Berlin, represented by its managers, Johannes Graf von Plettenberg and Florian Holst, of the same address

    **– Defendant 1 – -**

2. **Orion Versand GmbH & Co. KG**, Schäferweg 14, D-24941 Flensburg, represented in law by Orion Versand GmbH, the latter represented by its Managing Director, Maike Rotermund, of the same address

    **– Defendant 2 – -**

3. **Orion Versand GmbH**, Schäferweg 14, D-24941 Flensburg, represented in law by its Managing Director, Maike Rotermund, of the same address

    **– Defendant 3 – -**


*2018368632*

- 2 -

in the matter of misleading advertising and impermissible obstruction of business activities.

Value in litigation (preliminary estimate): EUR 100,000.00

We hereby give notice that we represent the plaintiff with the assistance of Dipl.-Ing. Jürgen Klinghardt, the patent attorney named in the recital of parties.

In the name and by authority of the plaintiff, we lodge this statement of claim and request that a date be set for a hearing as soon as possible. At the hearing we shall request that the Court rule as follows:

That the defendant be ordered,

1.   That defendant 1 be ordered

to refrain, under penalty of a fine of up to € 250,000.00 to be set for each case of infringement, or confinement as a substitute, or confinement for up to 6 months – the person to be confined being its Managing Director –

from making the following statements in the course of trade in the Federal Republic of Germany:

a)

### Schadensersatzanspruch

Ebenfalls bestätigte das Gericht den von Womanizer geltend gemachten Schadensersatzanspruch wegen Patentverletzung. Die EIS GmbH hat Womanizer daher sämtlichen Schaden zu ersetzen, der seit dem 18. Februar 2016 durch die begangenen Handlungen entstanden ist oder noch entstehen wird. Darauf basierend bereitet Womanizer nun entsprechende Schadensersatzklagen in Millionenhöhe gegen die EIS GmbH vor und behält

sich darüber hinaus vor, gegen Händler, die den Satisfyer Pro 2 verkauft haben, entsprechend vorzugehen.

- 3 -

English version:

**Claims for damages**

The court also confirmed the claims Womanizer asserted for damages arising from patent infringements. As a result, EIS GmbH must compensate Womanizer for all damages incurred due to actions it has committed since 18 February 2016, and all damages which will be incurred in future. On this basis, Womanizer is currently preparing corresponding suits to claim millions in damages from EIS GmbH, and also reserves the right to take similar action against retailers who sold the Satisfyer Pro 2.

and/or

b)

## Vernichtung Produkte

Zudem ist die EIS GmbH verpflichtet, den Satisfyer Pro 2 aus jeglichen Vertriebswegen zurückzurufen sowie die noch im Besitz der EIS GmbH befindlichen Geräte zu vernichten.

English version:

**Destruction of products**

EIS GmbH is also obliged to recall the Satisfyer Pro 2 from all distribution channels and to destroy any devices still in the possession of EIS GmbH.

and/or

c)

- 4 -

**Johannes von Plettenberg, Geschäftsführer von Womanizer, zeigt sich mehr als zufrieden mit dem Urteil und blickt optimistisch in das Jahr 2018:**

*„Zum wiederholten Mal wird die Stärke unserer Patente unter Beweis gestellt. Wir werden auch in Zukunft gegenüber der EIS GmbH und weiteren Nachahmern unserer Technologie mit entschiedener Härte vorzugehen. Womanizer nimmt das Urteil gegen die EIS GmbH sehr ernst und wird nun entsprechende Konsequenzen einleiten. So werden wir neben der EIS GmbH auch Distributoren, Einzelhändler und andere Marktteilnehmer, die den Satisfyer Pro 2 verkaufen oder verkauft haben, auf Schadensersatz verklagen. Die Bestätigung durch das Landgericht stellt einen zufriedenstellenden Abschluss eines großartigen Jahres für Womanizer dar. Umso mehr freue ich mich jetzt auf 2018. Ich kann versprechen, dass sich bei Womanizer einiges tun wird und sich unsere Kunden auf neuen Produkte freuen dürfen."*

English version:

Johannes von Plettenberg, Managing Director of Womanizer, is more than satisfied with the judgement and looks forward to 2018 with optimism:

*"This proves the strength of our patents once again.*

*In future, we will continue to take decisive action against EIS GmbH and other imitators of our technology.*

*Womanizer takes the judgement against EIS GmbH very seriously and will now initiate appropriate measures as a consequence. For instance, besides EIS GmbH, we will also file suit for damages against distributors, retailers and other market participants who are selling or have sold the Satisfyer Pro 2.*

*The confirmation by the District Court is a satisfactory end to a great year for Womanizer. I am looking forward to 2018 all the more. I promise that a lot will be happening at Womanizer and that our customers can look forward to new products."*

in particular in the following form:

- 5 -



Startseite | Produkte | Fakten | Downloads

# DAS ORIGINAL SETZT SICH DURCH

Landgericht Düsseldorf bestätigt
die Patentverletzung durch Satisfyer Pro 2

Die Novoluto GmbH (c/o Womanizer) gewinnt den erstinstanzlichen Prozess gegen die EIS GmbH vor dem Düsseldorfer Landgericht mit Urteil vom 14. Dezember 2017 und verteidigt ihr Patentportfolio gegenüber dem Satisfyer Pro 2. Die EIS GmbH hat Berufung eingelegt.

Am 14. Dezember 2017 bestätigte das Landgericht Düsseldorf mittels Urteil die Klage von Womanizer gegen die EIS GmbH. Womanizer behauptet damit erneut erfolgreich ihre Rechte und geht gegen Rechtsverletzungen von Marktteilnehmern vor.

### Unterlassungsanspruch

Wesentlicher Bestandteil des Urteils ist die Bestätigung des von Womanizer erhobenen Unterlassungsanspruchs gegen die EIS GmbH. Diese hat es nunmehr zu unterlassen, den Satisfyer Pro 2 in der Bundesrepublik Deutschland anzubieten, in den Verkehr zu bringen oder zu den genannten Zwecken einzuführen oder zu besitzen.

### Schadensersatzanspruch

Ebenfalls bestätigte das Gericht den von Womanizer geltend gemachten Schadensersatzanspruch wegen Patentverletzung. Die EIS GmbH hat Womanizer daher sämtlichen Schaden zu ersetzen, der seit dem 18. Februar 2016 durch die begangenen Handlungen entstanden ist oder noch entstehen wird. Darauf basierend bereitet Womanizer nun entsprechende Schadensersatzklagen in Millionenhöhe gegen die EIS GmbH vor und behält

- 6 -

sich darüber hinaus vor, gegen Händler, die den Satisfyer Pro 2 verkauft haben, entsprechend vorzugehen.

## Vernichtung Produkte

Zudem ist die EIS GmbH verpflichtet, den Satisfyer Pro 2 aus jeglichen Vertriebswegen zurückzurufen sowie die noch im Besitz der EIS GmbH befindlichen Geräte zu vernichten.

**Johannes von Plettenberg, Geschäftsführer von Womanizer, zeigt sich mehr als zufrieden mit dem Urteil und blickt optimistisch in das Jahr 2018:**

*"Zum wiederholten Mal wird die Stärke unserer Patente unter Beweis gestellt. Wir werden auch in Zukunft gegenüber der EIS GmbH und weiteren Nachahmern unserer Technologie mit entschiedener Härte vorzugehen. Womanizer nimmt das Urteil gegen die EIS GmbH sehr ernst und wird nun entsprechende Konsequenzen einleiten. So werden wir neben der EIS GmbH auch Distributoren, Einzelhändler und andere Marktteilnehmer, die den Satisfyer Pro 2 verkaufen oder verkauft haben, auf Schadensersatz verklagen. Die Bestätigung durch das Landgericht stellt einen zufriedenstellenden Abschluss eines großartigen Jahres für Womanizer dar. Umso mehr freue ich mich jetzt auf 2018. Ich kann versprechen, dass sich bei Womanizer einiges tun wird und sich unsere Kunden auf neuen Produkte freuen dürfen."*

**Parallel zu dem erfolgreichen Gerichtsverfahren setzt Womanizer seinen Erfolgskurs fort.** Als Hersteller innovativer Sextoys stehen neue Produkte dabei im Vordergrund, der Womanizer Starlet und der Womanizer InsideOut übertreffen unsere Erwartungen. Das Serviceangebot und Marketing sind intensiviert worden, beispielsweise mit dem Womanizer Do-It-Yourself Store und den umfangreichen PR Aktivitäten der vergangenen Monate.

Und das ist erst der Anfang! Wir arbeiten daran, auch weiterhin ein idealer Partner für Sie zu sein.

English version:



## The original wins out –

### Düsseldorf District Court confirms patent infringement by Satisfyer Pro 2

**Berlin, 23 February 2018** – Novoluto GmbH (c/o Womanizer) wins the first-instance case against EIS GmbH before Düsseldorf District Court per the judgement dated 14 December 2017 and defends its portfolio of patents against Satisfyer Pro 2. EIS GmbH has filed an appeal.

On 14 December 2017, Düsseldorf District Court confirmed Womanizer's suit against EIS GmbH in a court judgement. Womanizer thus once again successfully asserted its rights and took action against infringements of its rights by market participants.

### Injunctive relief

The main component of the judgement is confirmation of the injunction asserted by Womanizer against EIS GmbH. EIS GmbH must now cease and desist from offering the Satisfyer Pro 2 in the Federal Republic of Germany, marketing or importing it, or possessing it for the above-mentioned purposes.

### Claims for damages

The court also confirmed the claims Womanizer asserted for damages arising from patent infringements. As a result, EIS GmbH must compensate Womanizer for all damages incurred due to actions it has committed since 18 February 2016, and all damages which will be incurred in future. On this basis, Womanizer is currently preparing corresponding suits to claim millions in damages from EIS GmbH, and also reserves the right to take similar action against retailers who sold the Satisfyer Pro 2.

### Destruction of products

EIS GmbH is also obliged to recall the Satisfyer Pro 2 from all distribution channels and to destroy any devices still in the possession of EIS GmbH.

- 8 -



Johannes von Plettenberg, Managing Director of Womanizer, is more than satisfied with the judgement and looks forward to 2018 with optimism:

*"This proves the strength of our patents once again.*

*In future, we will continue to take decisive action against EIS GmbH and other imitators of our technology.*

*Womanizer takes the judgement against EIS GmbH very seriously and will now initiate appropriate measures as a consequence. For instance, besides EIS GmbH, we will also file suit for damages against distributors, retailers and other market participants who are selling or have sold the Satisfyer Pro 2.*

*The confirmation by the District Court is a satisfactory end to a great year for Womanizer. I am looking forward to 2018 all the more. I promise that a lot will be happening at Womanizer and that our customers can look forward to new products."*

### About Womanizer

Womanizer Group Management GmbH is a global company with branches in Berlin, San Francisco and Hong Kong, specialising in the development of premium products for lovemaking. The company was founded by Michael Lenke when the Pleasure Air Technologie® was invented in 2013, and the products are now sold in more than 50 countries worldwide. The company's stated goal is to improve its customers' relationships and sex lives and close the "orgasm gap".

### Press contact

Johanna Rief - press@womanizer.com - +49 (0) 157 3131 6954

- 9 -



English translation:
Particularly gratifying: The latest survey of 2300 participants verified:
97% of the women would recommend the Womanizer to others
98% of the women are satisfied with the Womanizer
98% of the women have experienced a unique orgasm with the Womanizer

Best wishes
Your Womanizer Team
[URL, telephone no., fax no., email address, company details]

2.    That defendants 1 – 3 be ordered

to inform the plaintiff of the companies to which it has made the statements in item 1 above either verbally or in writing, stating the names and addresses of the companies and persons to which it has made those statements, as well as the date on which and the place at which those statements were made.

- 10 -

3.   That the Court determine that the defendants are obligated as joint debtors to reimburse the plaintiff for all damages incurred by the latter in the past, present or future as a result of the actions referred to in item 1 above.

4.   That defendants 1 and 3 be ordered as joint debtors to pay the sum of EUR 4,697.88 to the plaintiff as reimbursement for the costs of issuing the warning letter.

5.   That defendant 1 be ordered to pay the sum of EUR 1,096.94 to the plaintiff as reimbursement for the costs of demanding that a final statement be issued.

6.   That the defendants be ordered to bear the costs of the proceedings.

## GROUNDS

The parties are known to the court from the temporary injunction proceedings under docket nos. 327 O 142/18 and 327 O 154/18. Defendants 2 and 3 have issued the final statement, but defendant 1 has not. Nor have any of the defendants issued a declaration of commitment in respect of the annex claims, so the plaintiff is now compelled to bring an action.

We submit the court orders of April 3 and April 4, 2018 issued by Civil Division 27 as

**Exhibit K0**,

which relate to the matter in dispute. The plaintiff is therefore asserting the claims against defendant 1 in respect of misleading advertising and obstruction of business activities in accordance with the court order of April 3, 2018, docket no. 327 O 142/18; the annex claims against defendants 1 – 3 are also being asserted.

We substantiate the statement of claim as follows:

### I.    Antecedents to these proceedings

1.   The plaintiff and the Womanizer Group are competitors in the field of manufacturing and selling sex toys, *inter alia*, and we submit as

- 11 -

**Exhibit K1**

printouts of the plaintiff's website and as

**Exhibit K2/1**

printouts of the www.womanizer.com website. Defendant 1 is the non-practising collection and management company for the intellectual property rights of the Womanizer Group; *inter alia*, it conducts patent litigation and is the author of the press statement in dispute here. We also submit as

**Exhibit K2/2**

printouts of the website of defendant 2, which in its own words is part of the "Womanizer Team" that sells the Womanizer product exclusively as a kind of wholesaler in Germany and that published the press statement in dispute here on its website.

2.    Defendant 1 and the plaintiff are opposing parties in proceedings before the Düsseldorf District Court concerning infringement of German patent no. DE 10 2013 110 501 B4 entitled "*Stimulationsvorrichtung*" ["Stimulation device"] (hereinafter: the patent in suit) by the "Satisfyer Pro 2", sales of which were discontinued in mid-2017, and we submit as

**Exhibit K3**

The judgment of December 14, 2017 handed down by Civil Division 4a, and as

**Exhibit K4**

a copy of German patent no. DE 10 2013 110 501 B4.

The patent in suit relates to a stimulation device, and we insert below the features according to the feature analysis used by the Düsseldorf District Court:

1.    A stimulation device (1) for the clitoris (12), comprising:
2.    a pressure field generator (2) having:

**2.1**    a first chamber (3);

**2.2**    and a second chamber (4) having an opening (42) for placing on the clitoris (12);

2.3    and a connection element (5) that connects the first chamber (3) to the second chamber (4);

    2.3.1 wherein the first chamber (3) is connected solely to the second chamber (4) by the connection element (5), so there is no other connection than that one between the first chamber (3) and the second chamber (4), with which the first chamber (3) has a single opening,

    2.3.2 wherein the second chamber (4) has an opening (51) from the connection element (5) into the second chamber (4),

2.4    and a drive unit (6) which changes the volume of the first chamber (3) in such a way that, by way of the connection element (5), a stimulating pressure field is generated in the second chamber (4), wherein the pressure field generated in the second chamber (4) consists of a pattern of underpressures and overpressures which are modulated in relation to the normal pressure;

3.    and a control device (7) which activates the drive unit (6);

4.    wherein the stimulation device (1) has no valves,

5.    and wherein the stimulation device (1) is a portable, hand-held device with a battery (76),

characterised in that

6.    the connection element (5)

**6.1**    is **stiff**, and

6.2    is designed as a straight channel with a jet effect,

    6.2.1 the opening (3) of which into the first chamber and the opening (51) of which into the second chamber (4) are aligned with each other so that a flow of media is directed onto the clitoris (12) by the orientation of the opening (51) and the connection element (5) when the first chamber (3) is under compression,

7.    wherein the opening (51) of the connection element (5) is arranged opposite the clitoris (12) through the second chamber (4).

The Düsseldorf District Court considered the "Satisfyer Pro 2", which has no longer been sold since mid-2017, to be a literal infringement of claim 1 (cf. the following cutaway drawing from page 11 of the District Court judgment):



The District Court deemed the features first chamber, second chamber and straight channel to be realized. The plaintiff does not accept that legal assessment, and we submit as

**Exhibit K5**

our grounds for appeal of March 21, 2018, to which we refer.

3.  Regardless of the fact that it considers the DE 10 2013 110 501 B4 patent DE 10 2013 110 501 B4 patent to have no validity and to be uninfringed (see Exhibit K5), the plaintiff has sold the Satisfyer Pro 2 NEXT GENERATION since mid-2017 with the following inner configuration only (with only one chamber):

- 14 -



As can be seen from the picture, the new Satisfyer Pro 2 NEXT GENERATION devices sold since mid-2017 have only a single chamber, and below we insert an enlarged photograph of that one chamber of the Satisfyer Pro 2 NEXT GENERATION:

- 15 -



As can immediately be seen, the Satisfyer Pro 2 NEXT GENERATION sold since mid-2017 does not have a second chamber according to <u>feature 2.2</u>, or any connection element according to <u>feature group 2.3</u>, nor are <u>feature group 6</u> or <u>feature 7</u> realized. For that reason, no objection is raised against the Satisfyer Pro 2 NEXT GENERATION by defendant 1, either.

4.  At the oral proceedings before the Opposition Division of the German Patent and Trade Mark Office on April 17, 2018, the patent in suit was nullified in its entirety, and we submit the record of said oral proceedings as

    **Exhibit K6**.

5.  The defendant has not yet provided the € 2.5 million in security that is required for provisional enforcement of the Düsseldorf District Court judgment of December 14, 2018, docket no. 4a O 78/16, and the parties are currently engaged in a dispute before the Düsseldorf Upper District Court regarding the plaintiff's request for protection against enforcement We submit the reciprocal submissions of the parties as

    **Exhibit K7.**

6.  Defendant 1 is also aware that, for some considerable time already, the plaintiff has not been selling the version of the Satisfyer Pro 2 that was in dispute in those proceedings, and that the patent-free Satisfyer Pro 2 NEXT GENERATION has been on the market instead since mid-2017. The proceedings before the

- 16 -

Düsseldorf District Court relate to the past only, and the patent-free Satisfyer Pro 2 NEXT GENERATION is not involved.

7.    The defendants are using the judgment of December 14, 2017 handed down by the Düsseldorf District Court to misleadingly inform customers in Germany about the outcome and the implications of the proceedings and to jeopardize the plaintiff's sales. We submit as

    **Exhibit K8**

the press statement published by defendant 2 on its website

    https://www.orionerotic.de/bc/servlet/web.webview?5HsLOjYceIQ35pBwrS
    FsOJI1iYjkoXbguLRfysTojZx1KZgdhoH4N7Oh12x62Sc7

on behalf of and in co-operation with the der Womanizer Group and defendant 1, said press statement having the content shown in the petition above, and containing the three impermissible statements inserted in the petition.


## II.    The separate petitions

1.    The defendants are informing customers and buyers of the Satisfyer Pro 2 in a misleading manner about the current status of the dispute between the plaintiff and defendant 1 in the proceedings under docket no. 4a O 78/16 (Düsseldorf District Court) and about the judgment of December 14, 2017 handed down by Civil Division 4a.

2.    The defendant's "press statement" is a business statement issued for the purposes of competition, and it is unfair and therefore impermissible in several legal respects.

3.    The press statement includes the statement:

- 17 -

## Schadensersatzanspruch

Ebenfalls bestätigte das Gericht den von Womanizer geltend gemachten Schadensersatzanspruch wegen Patentverletzung. Die EIS GmbH hat Womanizer daher sämtlichen Schaden zu ersetzen, der seit dem 18. Februar 2016 durch die begangenen Handlungen entstanden ist oder noch entstehen wird. Darauf basierend bereitet Womanizer nun entsprechende Schadensersatzklagen in Millionenhöhe gegen die EIS GmbH vor und behält

sich darüber hinaus vor, gegen Händler, die den Satisfyer Pro 2 verkauft haben, entsprechend vorzugehen.

English version:

### Claims for damages

The court also confirmed the claims Womanizer asserted for damages arising from patent infringements. As a result, EIS GmbH must compensate Womanizer for all damages incurred due to actions it has committed since 18 February 2016, and all damages which will be incurred in future. On this basis, Womanizer is currently preparing corresponding suits to claim millions in damages from EIS GmbH, and also reserves the right to take similar action against retailers who sold the Satisfyer Pro 2.

The statement that defendant 1 is now preparing

"claims for millions in damages"

against the plaintiff, is devoid of any factual basis and is solely aimed at deterring potential sales partners and customers of the plaintiff:

(1.)    The judgment of December 14, 2017 relates to the initial infringement proceedings and has not acquired legal force; however, it is provisionally enforceable against lodging of security. Defendant 1 has not provided any security as yet, and the parties are currently in dispute regarding the form in which defendant 1 is to provide the security, and whether, instead of the usual bank guarantee, it may provide a surety issued by an insurance company, and we refer in this regard to the reciprocal submissions (Exhibit K7).

- 18 -

Given that defendant 1 has still not provided any security, the plaintiff has not yet provided any information or rendering of account.

(2.)  Defendant 1 knows that only a relatively small quantity of the accused Satisfyer Pro 2 devices were sold, and that sales of those devices were discontinued in mid-2017.

(3.)  In the absence of any rendering of account, defendant 1 does not know whether the plaintiff made any profit at all with the Satisfyer Pro2 product; given that the Düsseldorf District Court judgment of December 14 is not yet enforceable, the plaintiff has refrained from rendering account.

(4.)  Any claim to damages based on surrender of the infringer's earnings is conditional on the claimed share of earnings being derived from infringement of the patent. As the Düsseldorf District Court affirmed on pages 21 ff. of the judgment dated December 14, 2017, the design of the interior space has no influence, in the case under consideration, on the flow conditions in the region of the opening, i.e., in the region that might be relevant from the customer's perspective.

The successor model, the Satisfyer Pro 2 NEXT GENERATION, which makes do without a first and a second chamber and also without a connection element, works in an identical way to the previous Satisfyer Pro 2, with even greater market success.

A causality factor must be assumed to be a few per cent, at most. This is also verified by the presentation of facts by defendant 1 as quoted in the Düsseldorf District Court judgment. Defendant 1 has always argued that the perceptibility of the solution according to the patent has no relevance for infringement of the patent, which likewise suggests that the causality factor is extremely low (cf. Düsseldorf District Court judgment, pages 21 ff.).

For the aforementioned reasons, informing the customers that claims to damages in the millions are being drafted is totally unfounded and devoid of any factual basis. No claims to damages in the millions are currently being drafted by defendant 1, who must at least enforce the rendering of account and quantify its alleged claim to damages on the basis of such rendering of

account. However, in the form in which it appears in the "press statement", the statement at issue constitutes incorrect information for customers, devoid of any factual basis. It damages the creditworthiness of the plaintiff and the trust vested in it by its customers. It therefore has a substantial impact.

The statement is therefore false, so the criteria defining an incorrect and misleading statement pursuant to Section 5 (1) of the law against unfair competition (UWG) are fulfilled. The incorrect statements also satisfy the criteria for impermissible obstruction of competition pursuant to Section 4 No. 4 UWG.

4.    The press statement contains the statement:

**Vernichtung Produkte**

Zudem ist die EIS GmbH verpflichtet, den Satisfyer Pro 2 aus jeglichen Vertriebswegen zurückzurufen sowie die noch im Besitz der EIS GmbH befindlichen Geräte zu vernichten.

English version:

**Destruction of products**

EIS GmbH is also obliged to recall the Satisfyer Pro 2 from all distribution channels and to destroy any devices still in the possession of EIS GmbH.

The statement that the plaintiff is obliged to recall the "Satisfyer Pro 2" from all the channels of distribution and to destroy the devices is misleading for the simple reason that defendant 1 has not provided any security as yet in accordance with the Düsseldorf District Court judgment, and hence that (provisional) enforcement of the judgment has not even begun yet. Yet according to the wording of the statement, customers will assume that there is no requirement to lodge security and that the plaintiff must take immediate action.

Moreover, as the defendants are well aware, sales of the Satisfyer Pro 2 have been stopped since mid-2017, and the "Satisfyer Pro 2 NEXT GENERATION" product is patent-free. Even though the plaintiff has informed its commercial customers accordingly, the advertising in dispute is also aimed at final customers,

- 20 -

so the defendants and the "Womanizer Team" can be expected to issue the relevant clarification to the effect that the claims to recall and destruction relate solely to the old "Satisfyer Pro 2" product, sales of which have been discontinued for around nine months. Without such clarification or at least suitably unambiguous wording, the final consumer reading the press statement is unable to distinguish between "Satisfyer Pro 2" and "Satisfyer Pro 2 NEXT GENERATION".

What is more, implementing the recall – after providing security – would be a matter for the plaintiff, and the defendants must not make any incorrect and misleading statements in that regard.

The statements at issue are false, therefore, and in addition to constituting misleading advertising within the meaning of Section 5 (1) UWG, they also satisfy the criteria for deliberate obstruction of a competitor within the meaning of Section 4 No. 4 UWG.

5.    The press statement contains the statement:

> **Johannes von Plettenberg, Geschäftsführer von Womanizer, zeigt sich mehr als zufrieden mit dem Urteil und blickt optimistisch in das Jahr 2018:**
>
> „Zum wiederholten Mal wird die Stärke unserer Patente unter Beweis gestellt. Wir werden auch in Zukunft gegenüber der EIS GmbH und weiteren Nachahmern unserer Technologie mit entschiedener Härte vorzugehen. Womanizer nimmt das Urteil gegen die EIS GmbH sehr ernst und wird nun entsprechende Konsequenzen einleiten. So werden wir neben der EIS GmbH auch Distributoren, Einzelhändler und andere Marktteilnehmer, die den Satisfyer Pro 2 verkaufen oder verkauft haben, auf Schadensersatz verklagen. Die Bestätigung durch das Landgericht stellt einen zufriedenstellenden Abschluss eines großartigen Jahres für Womanizer dar. Umso mehr freue ich mich jetzt auf 2018. Ich kann versprechen, dass sich bei Womanizer einiges tun wird und sich unsere Kunden auf neuen Produkte freuen dürfen."

English version:

Johannes von Plettenberg, Managing Director of Womanizer, is more than satisfied with the judgement and looks forward to 2018 with optimism:

'This proves the strength of our patents once again.

In future, we will continue to take decisive action against EIS GmbH and other imitators of our technology.

Womanizer takes the judgement against EIS GmbH very seriously and will now initiate appropriate measures as a consequence. For instance, besides EIS GmbH, we will also file suit for damages against distributors, retailers and other market participants who are selling or have sold the Satisfyer Pro 2.

The confirmation by the District Court is a satisfactory end to a great year for Womanizer. I am looking forward to 2018 all the more. I promise that a lot will be happening at Womanizer and that our customers can look forward to new products.'

After the defendant announced "claims to damages in the millions against EIS GmbH" and is now stating that "appropriate measures" will be initiated against customers as a consequence, namely as follows:

"For instance, besides EIS GmbH, we will also file suit for damages against distributors, retailers and other market participants who are selling or have sold the Satisfyer Pro 2",

the latter must also assume that they will have to pay a similar amount of damages if they sell the Satisfyer Pro 2.

In contrast to that, any claims to damages against sales partners are limited to their profit margin minus the selling expenses, and experience shows that they are very small in the case of small sales partners. The sweeping announcement that "distributors, retailers ad other market participants" will be sued for damages conveys a totally incorrect impression.

Furthermore, defendant 1 cannot sue any of the plaintiff's customers at all for damages, given that no information has been provided and no accounts have been rendered. It lacks all the information it would require in that respect. Before any suit for damages can be filed, also against customers, it is necessary to conduct initial proceedings, which experience shows will take at least 12 to 18 months or more, including the time required for information to be provided. Not until after that is it possible for any suit for damages to be filed in the first place.

- 22 -

Due to these statements according to petition 1.c), customers will immediately refrain from marketing the "Satisfyer Pro 2" and also the "Satisfyer Pro 2 Next Generation" and indeed will no longer want to sell them.

6.     In its "*Fräsautomat*" decision, the Federal Court of Justice found it objectionable that the public was not informed about the conditions – i.e., the particular way of operating the machine in question – that may involve an infringement of intellectual property. It was specifically the sweeping nature of such statements that the Federal Court of Justice objected to (judgment of January 15, 2009 – I ZR 123/06 – *Fräsautomat*). Customers may be prompted by the generally worded letter to refrain completely from buying the machine, in order to avoid any consequential liability from the outset, so this ultimately constitutes impermissible obstruction of business activities (Section 4 No. 4 UWG).

With its "*Fräsautomat*" decision, the Federal Court of Justice significantly broadened the scope of its case law on unlawful misrepresentation to customers. The criterion for admissibility of a statement about a possible infringement of intellectual property is not whether it is dressed as a formal warning (with explicit assertion of claims to injunctive relief and other possible claims, and with the threat of court action), but the effects that the statement is expected to have.

7.     The information and statements pursuant to petitions 1. a) - c) are misleading and constitute impermissible obstruction of business activities within the meaning of the "*Fräsautomat*" decision, because the plaintiff's customers must assume that all Satisfyer Pro 2 products (including the "NEXT GENERATION" version) come under the Düsseldorf District Court judgment, and that the plaintiff and its customers are now exposed directly to massive and broadly specified legal risks that are barely calculable for customers. The defendants also achieved the aim pursued with their press statement, namely to threaten the plaintiff's customers and to obstruct the plaintiff's sales activities, and the plaintiff is contacted accordingly by its customers, who are highly unsettled by the press statement and demand assurances, etc..

8.     The criteria for impermissible misleading of customers and deliberate obstruction of a competitor, within the meaning of Section 5 (1) and Section 4 No. 4 UWG are therefore met in respect of petitions 1. a) – c). The annex claims under Sections 8 and 9 UWG are substantiated.

- 23 -

9.  With its letter of March 23, 2018, the plaintiff issued a warning to defendants 1 and 3 regarding the activities in dispute; a copy is attached as

    **Exhibit K9**.

    The court orders of April 3 and 4, 2018 were duly served on the defendants, and we submit the respective certificates of service as

    **Exhibit K10**.

    The final declaration to cease and desist was made by defendants 2 and 3 only; copies are attached as

    **Exhibit K11**.

    With the letter dated April 24, 2018, defendant 1 was called upon to make the final declaration to cease and desist, which is attached as

    **Exhibit K12**.

    However, said letter of April 24, 2018 has remained unanswered to this day.

10. The costs incurred for issuing the warning letters and for demanding that the final declaration to cease and desist be made, and claimed with petition 4, must be reimbursed pursuant to Section 12 (4) No. 3 UWG.

    The claim to reimbursement of costs is based on a litigational value of EUR 100,000.00. Said value is at least reasonable and at the lower end of the range commonly applied in such matters.

    Based on these premises, the following calculation results:

- 24 -

For the warning letter:

<u>Litigational value:</u> **EUR 100,000.00**

| | | |
|---|---|---|
| 1.3 times the transaction fee pursuant to No. 2300 VV RVG [the law governing attorneys' fees], Sec. 2 (2), Sec. 13 (1), Sec. 14 (1) RVG | EUR | 1,953.90 |
| 1.3 times the transaction fee pursuant to No. 2300 VV RVG, Sec. 2 (2), Sec. 13 (1), Sec. 14 (1) RVG in combination with Sec. 143 (3) PatG [Patent Act] | EUR | 1,953.90 |
| Lump-sum for expenses, pursuant to No. 7002 VV RVG | EUR | 20.00 |
| Lump sum for expenses pursuant to No. 7002 VV RVG in combination with Sec. 143 (3) PatG | EUR | 20.00 |
| Sales tax pursuant to No. 7008 VV RVG | EUR | 375.04 |
| Sales tax pursuant to No. 7008 VV RVG in combination with Sec. 143 (3) PatG | EUR | 375.04 |
| **Total amount** | **EUR** | **4,697.88** |

For the demand to make the final declaration to cease and desist:

<u>Litigational value:</u> **EUR 100,000.00**

| | | |
|---|---|---|
| 0.6 times the transaction fee pursuant to No. 2300 VV RVG, Sec. 2 (2), Sec. 13 (1), Sec. 14 (1) RVG | EUR | 901.80 |
| Lump-sum for expenses, pursuant to No. 7002 VV RVG | EUR | 20.00 |
| Sales tax pursuant to No. 7008 VV RVG | EUR | 175.14 |
| **Total amount** | **EUR** | **1,096.94** |

- 25 -

### III.    Local jurisdiction

The seized Court has local jurisdiction, because the defendants operate throughout Germany and because the press release is available throughout the country.

(Harald Förster)
Attorney-at-law

Enclosures
Exhibits K0 – K12
3 certified copies
3 uncertified copies

*Please complete and sign the following acknowledgment of receipt and return it (in the stamped envelope enclosed) to:*

Eisenführ Speiser
Patentanwälte Rechtsanwälte PartGmbB
Postfach 10 60 78
D-28060 Bremen

Telefax: +49 421 3378788
(ES ref.: EH 1149-01DE)

Docket no.: **(please complete)** _____

Landgericht Hamburg
[Hamburg District Court]
Sievekingplatz 1
D-20355 Hamburg

## <u>ACKNOWLEDGEMENT OF RECEIPT</u>

In the action

EIS GmbH                      vs.    1. NOVOLUTO GmbH
                                     2. Ingenieurbüro Weselmann GmbH &
                                     Co. KG
                                     3. Orion Versand GmbH

the **action** filed by the law firm of Eisenführ Speiser, dated <u>June 12, 2018</u>, and the crossed check for € 3,078.00

were received in the original on _____

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-
Date, signature


*2018368632*

# Spence [trænzˈleɪʃns]

Spence Translations • Kurfürstenallee 114 • 28211 Bremen

**TO WHOM IT MAY CONCERN**

# Verification of Translation

I,     Timothy B. Spence

of     Kurfuerstenallee 114
       28211 Bremen
       Germany

do hereby certify

1.     That I have a full command of both the English and German languages
       and am a competent translator thereof,

and I further certify

2.     That the attached document is a true and correct translation, made by
       me to the best of my knowledge and belief,

**(a)     of the statement of claim filed at the District Court in Hamburg by
         EIS GmbH against NOVOLUTO GmbH et al., in the matter of
         misleading advertising and impermissible obstruction of business
         activities.**

Dated this
20th day of June 2019                    .........................................................
                                         Timothy B. Spence

**Spence Translations**          **Kommunikation**                                   **Bankverbindung**
Kurfürstenallee 114          Fon  [0421] 33 99 022    Mail  info@spence.de    Die Sparkasse Bremen • IBAN: DE 55 2905 0101 0011 0030 19
28211 Bremen                 Fax  [0421] 33 99 123    Web  www.spence.de      Steuernummer: Bremen 60 271 03969 • USt.ID: DE1999945592

Translation from German into English

*Eisenführ Speiser*
*Patentanwälte Rechtsanwälte*
*PartGmbB*

**Bremen München Berlin Hamburg**

**BY COURIER**
Landgericht Hamburg
[Hamburg District Court]
- Division for Unfair Competition Matters -
Sievekingplatz 1
D-20355 Hamburg

Postfach 10 60 78
28060 Bremen
Am Kaffee-Quartier 3
28217 Bremen
Tel +49 421 3635-0
Fax +49 421 3378788
Fax +49 421 3288631
mail@eisenfuhr.com
www.eisenfuhr.com

*Harald Förster*
*Rechtsanwalt*
*Fachanwalt für*
*gewerblichen Rechtsschutz*
Tel +49 421 3635-0
hforster@eisenfuhr.com

**Bremen,**      June 12, 2018

**Our ref.:**      EH 1149-01DE    HAF/jsu

**Docket no.:**      not yet allocated

# S T A T E M E N T   O F   C L A I M

**EIS GmbH**, represented in law by its Managing Director, Bojan Neumann, Am Lenkwerk 3, D-33609 Bielefeld

**– Plaintiff –**

Legal counsel:          Attorneys in the law firm of Eisenführ Speiser Patentanwälte Rechtsanwälte PartGmbB, Am Kaffee-Quartier 3, D-28217 Bremen

Assisting patent attorney:   Dipl.-Ing. Jürgen Klinghardt from the law firm of Eisenführ Speiser Patentanwälte Rechtsanwälte PartGmbB, Johannes-Brahms-Platz 1, D-20355 Hamburg

**v e r s u s**

1. **NOVOLUTO GmbH**, Am Kupfergraben 6a, D-10117 Berlin, represented by its managers, Johannes Graf von Plettenberg and Florian Holst, of the same address

**– Defendant 1 – -**

2. **Orion Versand GmbH & Co. KG**, Schäferweg 14, D-24941 Flensburg, represented in law by Orion Versand GmbH, the latter represented by its Managing Director, Maike Rotermund, of the same address

**– Defendant 2 – -**

3. **Orion Versand GmbH**, Schäferweg 14, D-24941 Flensburg, represented in law by its Managing Director, Maike Rotermund, of the same address

**– Defendant 3 – -**


*2018368632*

- 2 -

in the matter of misleading advertising and impermissible obstruction of business activities.

Value in litigation (preliminary estimate): EUR 100,000.00

We hereby give notice that we represent the plaintiff with the assistance of Dipl.-Ing. Jürgen Klinghardt, the patent attorney named in the recital of parties.

In the name and by authority of the plaintiff, we lodge this statement of claim and request that a date be set for a hearing as soon as possible. At the hearing we shall request that the Court rule as follows:

That the defendant be ordered,

1.    That defendant 1 be ordered

to refrain, under penalty of a fine of up to € 250,000.00 to be set for each case of infringement, or confinement as a substitute, or confinement for up to 6 months – the person to be confined being its Managing Director –

from making the following statements in the course of trade in the Federal Republic of Germany:

a)

### Schadensersatzanspruch

Ebenfalls bestätigte das Gericht den von Womanizer geltend gemachten Schadensersatzanspruch wegen Patentverletzung. Die EIS GmbH hat Womanizer daher sämtlichen Schaden zu ersetzen, der seit dem 18. Februar 2016 durch die begangenen Handlungen entstanden ist oder noch entstehen wird. Darauf basierend bereitet Womanizer nun entsprechende Schadensersatzklagen in Millionenhöhe gegen die EIS GmbH vor und behält

sich darüber hinaus vor, gegen Händler, die den Satisfyer Pro 2 verkauft haben, entsprechend vorzugehen.

- 3 -

English version:

### Claims for damages

The court also confirmed the claims Womanizer asserted for damages arising from patent infringements. As a result, EIS GmbH must compensate Womanizer for all damages incurred due to actions it has committed since 18 February 2016, and all damages which will be incurred in future. On this basis, Womanizer is currently preparing corresponding suits to claim millions in damages from EIS GmbH, and also reserves the right to take similar action against retailers who sold the Satisfyer Pro 2.

and/or

b)

## Vernichtung Produkte

Zudem ist die EIS GmbH verpflichtet, den Satisfyer Pro 2 aus jeglichen Vertriebswegen zurückzurufen sowie die noch im Besitz der EIS GmbH befindlichen Geräte zu vernichten.

English version:

### Destruction of products

EIS GmbH is also obliged to recall the Satisfyer Pro 2 from all distribution channels and to destroy any devices still in the possession of EIS GmbH.

and/or

c)

- 4 -

**Johannes von Plettenberg, Geschäftsführer von Womanizer, zeigt sich mehr als zufrieden mit dem Urteil und blickt optimistisch in das Jahr 2018:**

*„Zum wiederholten Mal wird die Stärke unserer Patente unter Beweis gestellt. Wir werden auch in Zukunft gegenüber der EIS GmbH und weiteren Nachahmern unserer Technologie mit entschiedener Härte vorzugehen. Womanizer nimmt das Urteil gegen die EIS GmbH sehr ernst und wird nun entsprechende Konsequenzen einleiten. So werden wir neben der EIS GmbH auch Distributoren, Einzelhändler und andere Marktteilnehmer, die den Satisfyer Pro 2 verkaufen oder verkauft haben, auf Schadensersatz verklagen. Die Bestätigung durch das Landgericht stellt einen zufriedenstellenden Abschluss eines großartigen Jahres für Womanizer dar. Umso mehr freue ich mich jetzt auf 2018. Ich kann versprechen, dass sich bei Womanizer einiges tun wird und sich unsere Kunden auf neuen Produkte freuen dürfen."*

English version:

Johannes von Plettenberg, Managing Director of Womanizer, is more than satisfied with the judgement and looks forward to 2018 with optimism:

*"This proves the strength of our patents once again.*

*In future, we will continue to take decisive action against EIS GmbH and other imitators of our technology.*

*Womanizer takes the judgement against EIS GmbH very seriously and will now initiate appropriate measures as a consequence. For instance, besides EIS GmbH, we will also file suit for damages against distributors, retailers and other market participants who are selling or have sold the Satisfyer Pro 2.*

*The confirmation by the District Court is a satisfactory end to a great year for Womanizer. I am looking forward to 2018 all the more. I promise that a lot will be happening at Womanizer and that our customers can look forward to new products."*

in particular in the following form:

- 5 -



Startseite | Produkte | Fakten | Downloads

# DAS ORIGINAL SETZT SICH DURCH

Landgericht Düsseldorf bestätigt
die Patentverletzung durch Satisfyer Pro 2

Die Novoluto GmbH (c/o Womanizer) gewinnt den erstinstanzlichen Prozess
gegen die EIS GmbH vor dem Düsseldorfer Landgericht mit Urteil vom 14.
Dezember 2017 und verteidigt ihr Patentportfolio gegenüber dem Satisfyer Pro 2.
Die EIS GmbH hat Berufung eingelegt.

Am 14. Dezember 2017 bestätigte das Landgericht Düsseldorf mittels Urteil die
Klage von Womanizer gegen die EIS GmbH. Womanizer behauptet damit erneut
erfolgreich ihre Rechte und geht gegen Rechtsverletzungen von
Marktteilnehmern vor.

### Unterlassungsanspruch

Wesentlicher Bestandteil des Urteils ist die Bestätigung des von Womanizer
erhobenen Unterlassungsanspruchs gegen die EIS GmbH. Diese hat es
nunmehr zu unterlassen, den Satisfyer Pro 2 in der Bundesrepublik Deutschland
anzubieten, in den Verkehr zu bringen oder zu den genannten Zwecken
einzuführen oder zu besitzen.

### Schadensersatzanspruch

Ebenfalls bestätigte das Gericht den von Womanizer geltend gemachten
Schadensersatzanspruch wegen Patentverletzung. Die EIS GmbH hat
Womanizer daher sämtlichen Schaden zu ersetzen, der seit dem 18. Februar
2016 durch die begangenen Handlungen entstanden ist oder noch entstehen
wird. Darauf basierend bereitet Womanizer nun entsprechende
Schadensersatzklagen in Millionenhöhe gegen die EIS GmbH vor und behält

- 6 -

sich darüber hinaus vor, gegen Händler, die den Satisfyer Pro 2 verkauft haben, entsprechend vorzugehen.

### Vernichtung Produkte

Zudem ist die EIS GmbH verpflichtet, den Satisfyer Pro 2 aus jeglichen Vertriebswegen zurückzurufen sowie die noch im Besitz der EIS GmbH befindlichen Geräte zu vernichten.

**Johannes von Plettenberg, Geschäftsführer von Womanizer, zeigt sich mehr als zufrieden mit dem Urteil und blickt optimistisch in das Jahr 2018:**

*„Zum wiederholten Mal wird die Stärke unserer Patente unter Beweis gestellt. Wir werden auch in Zukunft gegenüber der EIS GmbH und weiteren Nachahmern unserer Technologie mit entschiedener Härte vorzugehen. Womanizer nimmt das Urteil gegen die EIS GmbH sehr ernst und wird nun entsprechende Konsequenzen einleiten. So werden wir neben der EIS GmbH auch Distributoren, Einzelhändler und andere Marktteilnehmer, die den Satisfyer Pro 2 verkaufen oder verkauft haben, auf Schadensersatz verklagen. Die Bestätigung durch das Landgericht stellt einen zufriedenstellenden Abschluss eines großartigen Jahres für Womanizer dar. Umso mehr freue ich mich jetzt auf 2018. Ich kann versprechen, dass sich bei Womanizer einiges tun wird und sich unsere Kunden auf neuen Produkte freuen dürfen."*

**Parallel zu dem erfolgreichen Gerichtsverfahren setzt Womanizer seinen Erfolgskurs fort.** Als Hersteller innovativer Sextoys stehen neue Produkte dabei im Vordergrund, der Womanizer Starlet und der Womanizer InsideOut übertreffen unsere Erwartungen. Das Serviceangebot und Marketing sind intensiviert worden, beispielsweise mit dem Womanizer Do-It-Yourself Store und den umfangreichen PR Aktivitäten der vergangenen Monate.

Und das ist erst der Anfang! Wir arbeiten daran, auch weiterhin ein idealer Partner für Sie zu sein.

English version:



## The original wins out –

### Düsseldorf District Court confirms patent infringement by Satisfyer Pro 2

**Berlin, 23 February 2018** – Novoluto GmbH (c/o Womanizer) wins the first-instance case against EIS GmbH before Düsseldorf District Court per the judgement dated 14 December 2017 and defends its portfolio of patents against Satisfyer Pro 2. EIS GmbH has filed an appeal.

On 14 December 2017, Düsseldorf District Court confirmed Womanizer's suit against EIS GmbH in a court judgement. Womanizer thus once again successfully asserted its rights and took action against infringements of its rights by market participants.

### Injunctive relief

The main component of the judgement is confirmation of the injunction asserted by Womanizer against EIS GmbH. EIS GmbH must now cease and desist from offering the Satisfyer Pro 2 in the Federal Republic of Germany, marketing or importing it, or possessing it for the above-mentioned purposes.

### Claims for damages

The court also confirmed the claims Womanizer asserted for damages arising from patent infringements. As a result, EIS GmbH must compensate Womanizer for all damages incurred due to actions it has committed since 18 February 2016, and all damages which will be incurred in future. On this basis, Womanizer is currently preparing corresponding suits to claim millions in damages from EIS GmbH, and also reserves the right to take similar action against retailers who sold the Satisfyer Pro 2.

### Destruction of products

EIS GmbH is also obliged to recall the Satisfyer Pro 2 from all distribution channels and to destroy any devices still in the possession of EIS GmbH.



THE ORIGINAL

Johannes von Plettenberg, Managing Director of Womanizer, is more than satisfied with the judgement and looks forward to 2018 with optimism:

*"This proves the strength of our patents once again.*

*In future, we will continue to take decisive action against EIS GmbH and other imitators of our technology.*

*Womanizer takes the judgement against EIS GmbH very seriously and will now initiate appropriate measures as a consequence. For instance, besides EIS GmbH, we will also file suit for damages against distributors, retailers and other market participants who are selling or have sold the Satisfyer Pro 2.*

*The confirmation by the District Court is a satisfactory end to a great year for Womanizer. I am looking forward to 2018 all the more. I promise that a lot will be happening at Womanizer and that our customers can look forward to new products."*

### About Womanizer

Womanizer Group Management GmbH is a global company with branches in Berlin, San Francisco and Hong Kong, specialising in the development of premium products for lovemaking. The company was founded by Michael Lenke when the Pleasure Air Technologie® was invented in 2013, and the products are now sold in more than 50 countries worldwide. The company's stated goal is to improve its customers' relationships and sex lives and close the "orgasm gap".

### Press contact

Johanna Rief - press@womanizer.com - +49 (0) 157 3131 6954

- 9 -



English translation:
Particularly gratifying: The latest survey of 2300 participants verified:
97% of the women would recommend the Womanizer to others
98% of the women are satisfied with the Womanizer
98% of the women have experienced a unique orgasm with the Womanizer

Best wishes
Your Womanizer Team
[URL, telephone no., fax no., email address, company details]

2.    That defendants 1 – 3 be ordered

to inform the plaintiff of the companies to which it has made the statements in item 1 above either verbally or in writing, stating the names and addresses of the companies and persons to which it has made those statements, as well as the date on which and the place at which those statements were made.

- 10 -

3.    That the Court determine that the defendants are obligated as joint debtors to reimburse the plaintiff for all damages incurred by the latter in the past, present or future as a result of the actions referred to in item 1 above.

4.    That defendants 1 and 3 be ordered as joint debtors to pay the sum of EUR 4,697.88 to the plaintiff as reimbursement for the costs of issuing the warning letter.

5.    That defendant 1 be ordered to pay the sum of EUR 1,096.94 to the plaintiff as reimbursement for the costs of demanding that a final statement be issued.

6.    That the defendants be ordered to bear the costs of the proceedings.


## GROUNDS


The parties are known to the court from the temporary injunction proceedings under docket nos. 327 O 142/18 and 327 O 154/18. Defendants 2 and 3 have issued the final statement, but defendant 1 has not. Nor have any of the defendants issued a declaration of commitment in respect of the annex claims, so the plaintiff is now compelled to bring an action.

We submit the court orders of April 3 and April 4, 2018 issued by Civil Division 27 as

**Exhibit K0**,

which relate to the matter in dispute. The plaintiff is therefore asserting the claims against defendant 1 in respect of misleading advertising and obstruction of business activities in accordance with the court order of April 3, 2018, docket no. 327 O 142/18; the annex claims against defendants 1 – 3 are also being asserted.

We substantiate the statement of claim as follows:


**I.    Antecedents to these proceedings**


1.    The plaintiff and the Womanizer Group are competitors in the field of manufacturing and selling sex toys, *inter alia*, and we submit as

- 11 -

**Exhibit K1**

printouts of the plaintiff's website and as

**Exhibit K2/1**

printouts of the www.womanizer.com website. Defendant 1 is the non-practising collection and management company for the intellectual property rights of the Womanizer Group; *inter alia*, it conducts patent litigation and is the author of the press statement in dispute here. We also submit as

**Exhibit K2/2**

printouts of the website of defendant 2, which in its own words is part of the "Womanizer Team" that sells the Womanizer product exclusively as a kind of wholesaler in Germany and that published the press statement in dispute here on its website.

2.    Defendant 1 and the plaintiff are opposing parties in proceedings before the Düsseldorf District Court concerning infringement of German patent no. DE 10 2013 110 501 B4 entitled "*Stimulationsvorrichtung*" ["Stimulation device"] (hereinafter: the patent in suit) by the "Satisfyer Pro 2", sales of which were discontinued in mid-2017, and we submit as

**Exhibit K3**

The judgment of December 14, 2017 handed down by Civil Division 4a, and as

**Exhibit K4**

a copy of German patent no. DE 10 2013 110 501 B4.

The patent in suit relates to a stimulation device, and we insert below the features according to the feature analysis used by the Düsseldorf District Court:

1.    A stimulation device (1) for the clitoris (12), comprising:
2.    a pressure field generator (2) having:

- 12 -

**2.1**  a first chamber (3);

**2.2**  and a second chamber (4) having an opening (42) for placing on the clitoris (12);

2.3  and a connection element (5) that connects the first chamber (3) to the second chamber (4);

    2.3.1 wherein the first chamber (3) is connected solely to the second chamber (4) by the connection element (5), so there is no other connection than that one between the first chamber (3) and the second chamber (4), with which the first chamber (3) has a single opening,

    2.3.2 wherein the second chamber (4) has an opening (51) from the connection element (5) into the second chamber (4),

2.4  and a drive unit (6) which changes the volume of the first chamber (3) in such a way that, by way of the connection element (5), a stimulating pressure field is generated in the second chamber (4), wherein the pressure field generated in the second chamber (4) consists of a pattern of underpressures and overpressures which are modulated in relation to the normal pressure;

3.  and a control device (7) which activates the drive unit (6);

4.  wherein the stimulation device (1) has no valves,

5.  and wherein the stimulation device (1) is a portable, hand-held device with a battery (76),

characterised in that

6.  the connection element (5)

    **6.1**  is **stiff**, and

    6.2  is designed as a straight channel with a jet effect,

        6.2.1 the opening (3) of which into the first chamber and the opening (51) of which into the second chamber (4) are aligned with each other so that a flow of media is directed onto the clitoris (12) by the orientation of the opening (51) and the connection element (5) when the first chamber (3) is under compression,

7.  wherein the opening (51) of the connection element (5) is arranged opposite the clitoris (12) through the second chamber (4).

The Düsseldorf District Court considered the "Satisfyer Pro 2", which has no longer been sold since mid-2017, to be a literal infringement of claim 1 (cf. the following cutaway drawing from page 11 of the District Court judgment):

- 13 -



The District Court deemed the features first chamber, second chamber and straight channel to be realized. The plaintiff does not accept that legal assessment, and we submit as

**Exhibit K5**

our grounds for appeal of March 21, 2018, to which we refer.

3.  Regardless of the fact that it considers the DE 10 2013 110 501 B4 patent DE 10 2013 110 501 B4 patent to have no validity and to be uninfringed (see Exhibit K5), the plaintiff has sold the Satisfyer Pro 2 NEXT GENERATION since mid-2017 with the following inner configuration only (with only one chamber):



As can be seen from the picture, the new Satisfyer Pro 2 NEXT GENERATION devices sold since mid-2017 have only a single chamber, and below we insert an enlarged photograph of that one chamber of the Satisfyer Pro 2 NEXT GENERATION:



As can immediately be seen, the Satisfyer Pro 2 NEXT GENERATION sold since mid-2017 does not have a second chamber according to <u>feature 2.2</u>, or any connection element according to <u>feature group 2.3</u>, nor are <u>feature group 6</u> or <u>feature 7</u> realized. For that reason, no objection is raised against the Satisfyer Pro 2 NEXT GENERATION by defendant 1, either.

4.    At the oral proceedings before the Opposition Division of the German Patent and Trade Mark Office on April 17, 2018, the patent in suit was nullified in its entirety, and we submit the record of said oral proceedings as

     **Exhibit K6**.

5.    The defendant has not yet provided the € 2.5 million in security that is required for provisional enforcement of the Düsseldorf District Court judgment of December 14, 2018, docket no. 4a O 78/16, and the parties are currently engaged in a dispute before the Düsseldorf Upper District Court regarding the plaintiff's request for protection against enforcement We submit the reciprocal submissions of the parties as

     **Exhibit K7.**

6.    Defendant 1 is also aware that, for some considerable time already, the plaintiff has not been selling the version of the Satisfyer Pro 2 that was in dispute in those proceedings, and that the patent-free Satisfyer Pro 2 NEXT GENERATION has been on the market instead since mid-2017. The proceedings before the

- 16 -

Düsseldorf District Court relate to the past only, and the patent-free Satisfyer Pro 2 NEXT GENERATION is not involved.

7.    The defendants are using the judgment of December 14, 2017 handed down by the Düsseldorf District Court to misleadingly inform customers in Germany about the outcome and the implications of the proceedings and to jeopardize the plaintiff's sales. We submit as

   **Exhibit K8**

the press statement published by defendant 2 on its website

   https://www.orionerotic.de/bc/servlet/web.webview?5HsLOjYceIQ35pBwrS FsOJI1iYjkoXbguLRfysTojZx1KZgdhoH4N7Oh12x62Sc7

on behalf of and in co-operation with the der Womanizer Group and defendant 1, said press statement having the content shown in the petition above, and containing the three impermissible statements inserted in the petition.

## II.    The separate petitions

1.    The defendants are informing customers and buyers of the Satisfyer Pro 2 in a misleading manner about the current status of the dispute between the plaintiff and defendant 1 in the proceedings under docket no. 4a O 78/16 (Düsseldorf District Court) and about the judgment of December 14, 2017 handed down by Civil Division 4a.

2.    The defendant's "press statement" is a business statement issued for the purposes of competition, and it is unfair and therefore impermissible in several legal respects.

3.    The press statement includes the statement:

- 17 -

## Schadensersatzanspruch

Ebenfalls bestätigte das Gericht den von Womanizer geltend gemachten
Schadensersatzanspruch wegen Patentverletzung. Die EIS GmbH hat
Womanizer daher sämtlichen Schaden zu ersetzen, der seit dem 18. Februar
2016 durch die begangenen Handlungen entstanden ist oder noch entstehen
wird. Darauf basierend bereitet Womanizer nun entsprechende
Schadensersatzklagen in Millionenhöhe gegen die EIS GmbH vor und behält

sich darüber hinaus vor, gegen Händler, die den Satisfyer Pro 2 verkauft haben,
entsprechend vorzugehen.

English version:

### Claims for damages

The court also confirmed the claims Womanizer asserted for damages arising
from patent infringements. As a result, EIS GmbH must compensate Womanizer
for all damages incurred due to actions it has committed since 18 February
2016, and all damages which will be incurred in future. On this basis, Womanizer
is currently preparing corresponding suits to claim millions in damages from EIS
GmbH, and also reserves the right to take similar action against retailers who
sold the Satisfyer Pro 2.

The statement that defendant 1 is now preparing

"claims for millions in damages"

against the plaintiff, is devoid of any factual basis and is solely aimed at deterring
potential sales partners and customers of the plaintiff:

(1.)    The judgment of December 14, 2017 relates to the initial infringement
        proceedings and has not acquired legal force; however, it is provisionally
        enforceable against lodging of security. Defendant 1 has not provided any
        security as yet, and the parties are currently in dispute regarding the form in
        which defendant 1 is to provide the security, and whether, instead of the
        usual bank guarantee, it may provide a surety issued by an insurance
        company, and we refer in this regard to the reciprocal submissions (Exhibit
        K7).

- 18 -

Given that defendant 1 has still not provided any security, the plaintiff has not yet provided any information or rendering of account.

(2.)    Defendant 1 knows that only a relatively small quantity of the accused Satisfyer Pro 2 devices were sold, and that sales of those devices were discontinued in mid-2017.

(3.)    In the absence of any rendering of account, defendant 1 does not know whether the plaintiff made any profit at all with the Satisfyer Pro2 product; given that the Düsseldorf District Court judgment of December 14 is not yet enforceable, the plaintiff has refrained from rendering account.

(4.)    Any claim to damages based on surrender of the infringer's earnings is conditional on the claimed share of earnings being derived from infringement of the patent. As the Düsseldorf District Court affirmed on pages 21 ff. of the judgment dated December 14, 2017, the design of the interior space has no influence, in the case under consideration, on the flow conditions in the region of the opening, i.e., in the region that might be relevant from the customer's perspective.

The successor model, the Satisfyer Pro 2 NEXT GENERATION, which makes do without a first and a second chamber and also without a connection element, works in an identical way to the previous Satisfyer Pro 2, with even greater market success.

A causality factor must be assumed to be a few per cent, at most. This is also verified by the presentation of facts by defendant 1 as quoted in the Düsseldorf District Court judgment. Defendant 1 has always argued that the perceptibility of the solution according to the patent has no relevance for infringement of the patent, which likewise suggests that the causality factor is extremely low (cf. Düsseldorf District Court judgment, pages 21 ff.).

For the aforementioned reasons, informing the customers that claims to damages in the millions are being drafted is totally unfounded and devoid of any factual basis. No claims to damages in the millions are currently being drafted by defendant 1, who must at least enforce the rendering of account and quantify its alleged claim to damages on the basis of such rendering of

- 19 -

account. However, in the form in which it appears in the "press statement", the statement at issue constitutes incorrect information for customers, devoid of any factual basis. It damages the creditworthiness of the plaintiff and the trust vested in it by its customers. It therefore has a substantial impact.

The statement is therefore false, so the criteria defining an incorrect and misleading statement pursuant to Section 5 (1) of the law against unfair competition (UWG) are fulfilled. The incorrect statements also satisfy the criteria for impermissible obstruction of competition pursuant to Section 4 No. 4 UWG.

4.    The press statement contains the statement:

**Vernichtung Produkte**

Zudem ist die EIS GmbH verpflichtet, den Satisfyer Pro 2 aus jeglichen Vertriebswegen zurückzurufen sowie die noch im Besitz der EIS GmbH befindlichen Geräte zu vernichten.

English version:

Destruction of products

EIS GmbH is also obliged to recall the Satisfyer Pro 2 from all distribution channels and to destroy any devices still in the possession of EIS GmbH.

The statement that the plaintiff is obliged to recall the "Satisfyer Pro 2" from all the channels of distribution and to destroy the devices is misleading for the simple reason that defendant 1 has not provided any security as yet in accordance with the Düsseldorf District Court judgment, and hence that (provisional) enforcement of the judgment has not even begun yet. Yet according to the wording of the statement, customers will assume that there is no requirement to lodge security and that the plaintiff must take immediate action.

Moreover, as the defendants are well aware, sales of the Satisfyer Pro 2 have been stopped since mid-2017, and the "Satisfyer Pro 2 NEXT GENERATION" product is patent-free. Even though the plaintiff has informed its commercial customers accordingly, the advertising in dispute is also aimed at final customers,

- 20 -

so the defendants and the "Womanizer Team" can be expected to issue the relevant clarification to the effect that the claims to recall and destruction relate solely to the old "Satisfyer Pro 2" product, sales of which have been discontinued for around nine months. Without such clarification or at least suitably unambiguous wording, the final consumer reading the press statement is unable to distinguish between "Satisfyer Pro 2" and "Satisfyer Pro 2 NEXT GENERATION".

What is more, implementing the recall – after providing security – would be a matter for the plaintiff, and the defendants must not make any incorrect and misleading statements in that regard.

The statements at issue are false, therefore, and in addition to constituting misleading advertising within the meaning of Section 5 (1) UWG, they also satisfy the criteria for deliberate obstruction of a competitor within the meaning of Section 4 No. 4 UWG.

5.    The press statement contains the statement:

> **Johannes von Plettenberg, Geschäftsführer von Womanizer, zeigt sich mehr als zufrieden mit dem Urteil und blickt optimistisch in das Jahr 2018:**
>
> „Zum wiederholten Mal wird die Stärke unserer Patente unter Beweis gestellt. Wir werden auch in Zukunft gegenüber der EIS GmbH und weiteren Nachahmern unserer Technologie mit entschiedener Härte vorzugehen. Womanizer nimmt das Urteil gegen die EIS GmbH sehr ernst und wird nun entsprechende Konsequenzen einleiten. So werden wir neben der EIS GmbH auch Distributoren, Einzelhändler und andere Marktteilnehmer, die den Satisfyer Pro 2 verkaufen oder verkauft haben, auf Schadensersatz verklagen. Die Bestätigung durch das Landgericht stellt einen zufriedenstellenden Abschluss eines großartigen Jahres für Womanizer dar. Umso mehr freue ich mich jetzt auf 2018. Ich kann versprechen, dass sich bei Womanizer einiges tun wird und sich unsere Kunden auf neuen Produkte freuen dürfen."

- 21 -

English version:

*Johannes von Plettenberg, Managing Director of Womanizer, is more than satisfied with the judgement and looks forward to 2018 with optimism:*

*'This proves the strength of our patents once again.*

*In future, we will continue to take decisive action against EIS GmbH and other imitators of our technology.*

*Womanizer takes the judgement against EIS GmbH very seriously and will now initiate appropriate measures as a consequence. For instance, besides EIS GmbH, we will also file suit for damages against distributors, retailers and other market participants who are selling or have sold the Satisfyer Pro 2.*

*The confirmation by the District Court is a satisfactory end to a great year for Womanizer. I am looking forward to 2018 all the more. I promise that a lot will be happening at Womanizer and that our customers can look forward to new products.'*

After the defendant announced "claims to damages in the millions against EIS GmbH" and is now stating that "appropriate measures" will be initiated against customers as a consequence, namely as follows:

> *"For instance, besides EIS GmbH, we will also file suit for damages against distributors, retailers and other market participants who are selling or have sold the Satisfyer Pro 2",*

the latter must also assume that they will have to pay a similar amount of damages if they sell the Satisfyer Pro 2.

In contrast to that, any claims to damages against sales partners are limited to their profit margin minus the selling expenses, and experience shows that they are very small in the case of small sales partners. The sweeping announcement that "distributors, retailers ad other market participants" will be sued for damages conveys a totally incorrect impression.

Furthermore, defendant 1 cannot sue any of the plaintiff's customers at all for damages, given that no information has been provided and no accounts have been rendered. It lacks all the information it would require in that respect. Before any suit for damages can be filed, also against customers, it is necessary to conduct initial proceedings, which experience shows will take at least 12 to 18 months or more, including the time required for information to be provided. Not until after that is it possible for any suit for damages to be filed in the first place.

- 22 -

Due to these statements according to petition 1.c), customers will immediately refrain from marketing the "Satisfyer Pro 2" and also the "Satisfyer Pro 2 Next Generation" and indeed will no longer want to sell them.

6. In its "*Fräsautomat*" decision, the Federal Court of Justice found it objectionable that the public was not informed about the conditions – i.e., the particular way of operating the machine in question – that may involve an infringement of intellectual property. It was specifically the sweeping nature of such statements that the Federal Court of Justice objected to (judgment of January 15, 2009 – I ZR 123/06 – *Fräsautomat*). Customers may be prompted by the generally worded letter to refrain completely from buying the machine, in order to avoid any consequential liability from the outset, so this ultimately constitutes impermissible obstruction of business activities (Section 4 No. 4 UWG).

With its "*Fräsautomat*" decision, the Federal Court of Justice significantly broadened the scope of its case law on unlawful misrepresentation to customers. The criterion for admissibility of a statement about a possible infringement of intellectual property is not whether it is dressed as a formal warning (with explicit assertion of claims to injunctive relief and other possible claims, and with the threat of court action), but the effects that the statement is expected to have.

7. The information and statements pursuant to petitions 1. a) - c) are misleading and constitute impermissible obstruction of business activities within the meaning of the "*Fräsautomat*" decision, because the plaintiff's customers must assume that all Satisfyer Pro 2 products (including the "NEXT GENERATION" version) come under the Düsseldorf District Court judgment, and that the plaintiff and its customers are now exposed directly to massive and broadly specified legal risks that are barely calculable for customers. The defendants also achieved the aim pursued with their press statement, namely to threaten the plaintiff's customers and to obstruct the plaintiff's sales activities, and the plaintiff is contacted accordingly by its customers, who are highly unsettled by the press statement and demand assurances, etc..

8. The criteria for impermissible misleading of customers and deliberate obstruction of a competitor, within the meaning of Section 5 (1) and Section 4 No. 4 UWG are therefore met in respect of petitions 1. a) – c). The annex claims under Sections 8 and 9 UWG are substantiated.

- 23 -

9.   With its letter of March 23, 2018, the plaintiff issued a warning to defendants 1 and 3 regarding the activities in dispute; a copy is attached as

   **Exhibit K9**.

   The court orders of April 3 and 4, 2018 were duly served on the defendants, and we submit the respective certificates of service as

   **Exhibit K10**.

   The final declaration to cease and desist was made by defendants 2 and 3 only; copies are attached as

   **Exhibit K11**.

   With the letter dated April 24, 2018, defendant 1 was called upon to make the final declaration to cease and desist, which is attached as

   **Exhibit K12**.

   However, said letter of April 24, 2018 has remained unanswered to this day.

10.   The costs incurred for issuing the warning letters and for demanding that the final declaration to cease and desist be made, and claimed with petition 4, must be reimbursed pursuant to Section 12 (4) No. 3 UWG.

   The claim to reimbursement of costs is based on a litigational value of EUR 100,000.00. Said value is at least reasonable and at the lower end of the range commonly applied in such matters.

   Based on these premises, the following calculation results:

- 24 -

For the warning letter:

Litigational value: **EUR 100,000.00**

| | | |
|---|---|---|
| 1.3 times the transaction fee pursuant to No. 2300 VV RVG [the law governing attorneys' fees], Sec. 2 (2), Sec. 13 (1), Sec. 14 (1) RVG | EUR | 1,953.90 |
| 1.3 times the transaction fee pursuant to No. 2300 VV RVG, Sec. 2 (2), Sec. 13 (1), Sec. 14 (1) RVG in combination with Sec. 143 (3) PatG [Patent Act] | EUR | 1,953.90 |
| Lump-sum for expenses, pursuant to No. 7002 VV RVG | EUR | 20.00 |
| Lump sum for expenses pursuant to No. 7002 VV RVG in combination with Sec. 143 (3) PatG | EUR | 20.00 |
| Sales tax pursuant to No. 7008 VV RVG | EUR | 375.04 |
| Sales tax pursuant to No. 7008 VV RVG in combination with Sec. 143 (3) PatG | EUR | 375.04 |
| **Total amount** | **EUR** | **4,697.88** |

For the demand to make the final declaration to cease and desist:

Litigational value: **EUR 100,000.00**

| | | |
|---|---|---|
| 0.6 times the transaction fee pursuant to No. 2300 VV RVG, Sec. 2 (2), Sec. 13 (1), Sec. 14 (1) RVG | EUR | 901.80 |
| Lump-sum for expenses, pursuant to No. 7002 VV RVG | EUR | 20.00 |
| Sales tax pursuant to No. 7008 VV RVG | EUR | 175.14 |
| **Total amount** | **EUR** | **1,096.94** |

- 25 -

### III.    Local jurisdiction

The seized Court has local jurisdiction, because the defendants operate throughout Germany and because the press release is available throughout the country.

(Harald Förster)
Attorney-at-law

<u>Enclosures</u>
Exhibits K0 – K12
3 certified copies
3 uncertified copies

*Please complete and sign the following acknowledgment of receipt and return it (in the stamped envelope enclosed) to:*

Eisenführ Speiser
Patentanwälte Rechtsanwälte PartGmbB
Postfach 10 60 78
D-28060 Bremen

Telefax: +49 421 3378788
(ES ref.: EH 1149-01DE)

Docket no.: **(please complete)** _____

Landgericht Hamburg
[Hamburg District Court]
Sievekingplatz 1
D-20355 Hamburg

## ACKNOWLEDGEMENT OF RECEIPT

In the action

| EIS GmbH | vs. | 1. NOVOLUTO GmbH |
| | | 2. Ingenieurbüro Weselmann GmbH & Co. KG |
| | | 3. Orion Versand GmbH |

the **action** filed by the law firm of Eisenführ Speiser, dated June 12, 2018, and the

crossed check for € 3,078.00

were received in the original on _____

--------------------------------------------------
Date, signature


*2018368632*

*Exhibit 9*

Ausfertigung

## Landgericht Hamburg

Az.: 327 O 142/18





Eisenführ Speiser

ANLAGE    K0

# Beschluss

In der Sache

**EIS GmbH**, vertreten durch d. Geschäftsführer Bojan Neumann, Am Lenkwerk 3, 33609 Bielefeld

**- Antragstellerin -**

Prozessbevollmächtigte:
Rechtsanwälte **Eisenführ, Speiser & Partner**, Am Kaffee-Quartier 3, 28217 Bremen, Gz.: EH 1135-01DE

gegen

1) **NOVOLUTO GmbH**, vertreten durch d. Geschäftsführer Johannes Graf von Plettenberg und Florian Holst, Am Kupfergraben 6a, 10117 Berlin

**- Antragsgegnerin -**

2) **Orion Versand GmbH**, vertreten durch d. Geschäftsführerin Maike Rotermund, Schäferweg 14a, 24941 Flensburg

**- Antragsgegnerin -**

beschließt das Landgericht Hamburg - Zivilkammer 27 - durch die Vorsitzende Richterin am Landgericht Zöllner, den Richter am Landgericht Führer und den Richter am Landgericht El Sarise am 03.04.2018:

I.    Im Wege einer einstweiligen Verfügung – der Dringlichkeit wegen ohne mündliche Verhandlung – wird den Antragsgegnerinnen unter Androhung eines vom Gericht für jeden Fall der Zuwiderhandlung festzusetzenden Ordnungsgeldes und für den Fall, dass dieses nicht beigetrieben werden kann, einer Ordnungshaft oder einer Ordnungshaft bis zu sechs Monaten, die Ordnungshaft jeweils zu vollziehen an einem der Geschäftsführer der jeweiligen Antragsgegnerin (Ordnungsgeld im Einzelfall höchstens 250.000,00 €; Ordnungshaft insgesamt höchstens 2 Jahre)

**verboten,**

327 O 142/18                                          - Seite 2 -

im geschäftlichen Verkehr folgende Angaben zu machen:

**a)**

### Schadensersatzanspruch

Ebenfalls bestätigte das Gericht den von Womanizer geltend gemachten Schadensersatzanspruch wegen Patentverletzung. Die EIS GmbH hat Womanizer daher sämtlichen Schaden zu ersetzen, der seit dem 18. Februar 2016 durch die begangenen Handlungen entstanden ist oder noch entstehen wird. Darauf basierend bereitet Womanizer nun entsprechende Schadensersatzklagen in Millionenhöhe gegen die EIS GmbH vor und behält

sich darüber hinaus vor, gegen Händler, die den Satisfyer Pro 2 verkauft haben, entsprechend vorzugehen.

und/oder

**b)**

### Vernichtung Produkte

Zudem ist die EIS GmbH verpflichtet, den Satisfyer Pro 2 aus jeglichen Vertriebswegen zurückzurufen sowie die noch im Besitz der EIS GmbH befindlichen Geräte zu vernichten.

und/oder

**c)**

327 O 142/18                                    - Seite 3 -

**Johannes von Plettenberg, Geschäftsführer von Womanizer, zeigt sich mehr als zufrieden mit dem Urteil und blickt optimistisch in das Jahr 2018:**

*"Zum wiederholten Mal wird die Stärke unserer Patente unter Beweis gestellt. Wir werden auch in Zukunft gegenüber der EIS GmbH und weiteren Nachahmern unserer Technologie mit entschiedener Härte vorzugehen. Womanizer nimmt das Urteil gegen die EIS GmbH sehr ernst und wird nun entsprechende Konsequenzen einleiten. So werden wir neben der EIS GmbH auch Distributoren, Einzelhändler und andere Marktteilnehmer, die den Satisfyer Pro 2 verkaufen oder verkauft haben, auf Schadensersatz verklagen. Die Bestätigung durch das Landgericht stellt einen zufriedenstellenden Abschluss eines großartigen Jahres für Womanizer dar. Umso mehr freue ich mich jetzt auf 2018. Ich kann versprechen, dass sich bei Womanizer einiges tun wird und sich unsere Kunden auf neuen Produkte freuen dürfen."*

insbesondere wie folgt:



Startseite | Produkte | Fakten | Downloads

# DAS ORIGINAL SETZT SICH DURCH

Landgericht Düsseldorf bestätigt
die Patentverletzung durch Satisfyer Pro 2

Die Novoluto GmbH (c/o Womanizer) gewinnt den erstinstanzlichen Prozess
gegen die EIS GmbH vor dem Düsseldorfer Landgericht mit Urteil vom 14.
Dezember 2017 und verteidigt ihr Patentportfolio gegenüber dem Satisfyer Pro 2.
Die EIS GmbH hat Berufung eingelegt.
Am 14. Dezember 2017 bestätigte das Landgericht Düsseldorf mittels Urteil die
Klage von Womanizer gegen die EIS GmbH. Womanizer behauptet damit erneut
erfolgreich ihre Rechte und geht gegen Rechtsverletzungen von
Marktteilnehmern vor.

### Unterlassungsanspruch

Wesentlicher Bestandteil des Urteils ist die Bestätigung des von Womanizer
erhobenen Unterlassungsanspruchs gegen die EIS GmbH. Diese hat es
nunmehr zu unterlassen, den Satisfyer Pro 2 in der Bundesrepublik Deutschland
anzubieten, in den Verkehr zu bringen oder zu den genannten Zwecken
einzuführen oder zu besitzen.

### Schadensersatzanspruch

Ebenfalls bestätigte das Gericht den von Womanizer geltend gemachten
Schadensersatzanspruch wegen Patentverletzung. Die EIS GmbH hat
Womanizer daher sämtlichen Schaden zu ersetzen, der seit dem 18. Februar
2016 durch die begangenen Handlungen entstanden ist oder noch entstehen
wird. Darauf basierend bereitet Womanizer nun entsprechende
Schadensersatzklagen in Millionenhöhe gegen die EIS GmbH vor und behält

327 O 142/18         - Seite 5 -

sich darüber hinaus vor, gegen Händler, die den Satisfyer Pro 2 verkauft haben, entsprechend vorzugehen.

### Vernichtung Produkte

Zudem ist die EIS GmbH verpflichtet, den Satisfyer Pro 2 aus jeglichen Vertriebswegen zurückzurufen sowie die noch im Besitz der EIS GmbH befindlichen Geräte zu vernichten.

**Johannes von Plettenberg, Geschäftsführer von Womanizer, zeigt sich mehr als zufrieden mit dem Urteil und blickt optimistisch in das Jahr 2018:**

*„Zum wiederholten Mal wird die Stärke unserer Patente unter Beweis gestellt. Wir werden auch in Zukunft gegenüber der EIS GmbH und weiteren Nachahmern unserer Technologie mit entschiedener Härte vorzugehen. Womanizer nimmt das Urteil gegen die EIS GmbH sehr ernst und wird nun entsprechende Konsequenzen einleiten. So werden wir neben der EIS GmbH auch Distributoren, Einzelhändler und andere Marktteilnehmer, die den Satisfyer Pro 2 verkaufen oder verkauft haben, auf Schadensersatz verklagen. Die Bestätigung durch das Landgericht stellt einen zufriedenstellenden Abschluss eines großartigen Jahres für Womanizer dar. Umso mehr freue ich mich jetzt auf 2018. Ich kann versprechen, dass sich bei Womanizer einiges tun wird und sich unsere Kunden auf neuen Produkte freuen dürfen."*

**Parallel zu dem erfolgreichen Gerichtsverfahren setzt Womanizer seinen Erfolgskurs fort.** Als Hersteller innovativer Sextoys stehen neue Produkte dabei im Vordergrund, der Womanizer Starlet und der Womanizer InsideOut übertreffen unsere Erwartungen. Das Serviceangebot und Marketing sind intensiviert worden, beispielsweise mit dem Womanizer Do-It-Yourself Store und den umfangreichen PR Aktivitäten der vergangenen Monate.

Und das ist erst der Anfang! Wir arbeiten daran, auch weiterhin ein idealer Partner für Sie zu sein.

327 O 142/18                                          - Seite 6 -

Besonders erfreulich: In der letzten Umfrage bestätigten die 2300 Teilnehmer:

97 % der Frauen würden den Womanizer weiterempfehlen

98 % der Frauen sind zufrieden mit dem Womanizer

98 % der Frauen haben mit dem Womanizer einen einzigartigen Orgasmus erlebt

Beste Grüße
Ihr womanizer Team

womanizer Großhandel
www.womanizer-grosshandel.de
Tel.: +49 (0)461 - 50 40 114
Fax: +49 (0)461 - 50 40 244
info@womanizer-wholesale.com
Impressum

Germany, Sitz Flensburg, Registergericht Flensburg HRA 2514, persönlich haftende Gesellschafterin
Orion Versand GmbH - Sitz Flensburg, Registergericht Flensburg HRB 1417, Geschäftsführerin Maike Rotermund

II.    Die    Antragsgegnerinnen    haben    die    Kosten    des    Verfahrens    wie
       Gesamtschuldnerinnen zu tragen.

III.   Der Streitwert wird auf 100.000,00 € festgesetzt.

- Seite 7 -

# G r ü n d e :

Der Antrag der Antragstellerin auf Erlass einer einstweiligen Verfügung vom 26.03.2018 ist zulässig und begründet.

Der tenorierte Unterlassungsanspruch folgt aus § 8 Abs. 1 Satz 1 UWG i. V. m. den §§ 3, 5 Abs. 1 Sätze 1 und 2 Nr. 3 UWG.

Dabei sind irreführend die Aussage, die Antragsgegnerseite bereite „nun entsprechende Schadensersatzklagen in Millionenhöhe gegen die EIS GmbH vor", sowie die einschränkungslose Bezugnahme der streitgegenständlichen Pressemitteilung auf den „Satisfyer Pro 2".

Zwar hat die Antragsgegnerin zu 1 in einem gegen die Antragstellerin geführten Patentverletzungsverfahren betreffend den Druckwellen-Vibrator „Satisfyer Pro 2" in erster Instanz vor dem *Landgericht Düsseldorf* mit Urteil vom 14.12.2017 (Az. 4a O 78/16), das patentrechtliche Unterlassungs-, Auskunftserteilungs- und Rechnungslegungs-, Rückruf- und Vernichtungsansprüche sowie eine Feststellung der Schadensersatzpflicht der Antragsgegnerin zu 1 dem Grunde nach wegen einer Verletzung eines Patents „Stimulationsvorrichtung" der Antragsgegnerin zu 1 durch den Vibrator „Satisfyer Pro 2" der Antragstellerin tenoriert, obsiegt (Anlage AST 3).

Die im Tenor zu Ziff. I lit. a) bis c) wiedergegebenen Aussagen sind gleichwohl irreführend:

Zum einen ist eine die Behauptung einer Vorbereitung von „Schadensersatzklagen in Millionenhöhe gegen die EIS GmbH" durch die Antragsgegnerseite zu tragen vermöchtende Tatsachengrundlage nicht ersichtlich, zumal die Antragstellerin der Antragsgegnerin zu 1 die letzterer gemäß dem Tenor zu Ziff. 3 des Urteils gemäß Anlage AST 3 geschuldete Auskunft bislang noch gar nicht erteilt hat. Aber auch die in Anlage AST 14 vorgelegte eigene Pressemitteilung der Antragstellerin betreffend den Erfolg des „Satisfyer Pro 2" trägt die Behauptung einer Vorbereitung von „Schadensersatzklagen in Millionenhöhe gegen die EIS GmbH" durch die Antragsgegnerseite nicht. Das Urteil gemäß Anlage AST 3 – und die in diesem tenorierte Feststellung der Schadensersatzpflicht der Antragstellerin dem Grunde nach – ist auf der Grundlage eines deutschen Patents der Antragsgegnerin zu 1 ergangen, so dass auch die in diesem festgestellte Schadensersatzpflicht der Antragstellerin dem Grunde nach auf Deutschland beschränkt ist. Die in Anlage AST 14 vorgelegte

327 O 142/18                                    - Seite 8 -

Pressemitteilung der Antragstellerin ist dahin zu verstehen, dass die Antragstellerin im Zeitpunkt von deren Veröffentlichung weltweit 225.000 „Satisfyer Pro 2" verkauft hat. Verkaufszahlen für Deutschland ergeben sich daraus nicht.

Des Weiteren berücksichtigt die streitgegenständliche Pressemitteilung nicht, dass die Antragstellerin zwischenzeitlich einen das Patent der Antragsgegnerin zu 1 nicht verletzenden Vibrator mit dem Namen „Satisfyer Pro 2 NEXT GENERATION" auf den Markt bringt. Soweit daher in der streitgegenständlichen Pressemitteilung davon die Rede ist, der „Satisfyer Pro 2" müsse von der Antragstellerin aus den Vertriebswegen zurückgerufen und vernichtet werden und es würden Schadensersatzansprüche gegen Händler etc., die den „Satisfyer Pro 2" in der Vergangenheit oder gegenwärtig verkauft haben bzw. noch verkaufen, geltend gemacht werden (oder sich vorbehalten), können diese – in Bezug auf die Produktmodellbezeichnung einschränkungslosen – Aussagen von den angesprochenen Verkehrskreisen auch – unzutreffend – auf das Modell „Satisfyer Pro 2 NEXT GENERATION" bezogen werden.

Unschädlich ist indes, dass die Antragsgegnerin zu 1 noch keine Sicherheitsleistung zur vorläufigen Vollstreckung des Urteils gemäß Anlage AST 3 erbracht hat. Ferner obliegt es den Antragsgegnerinnen nach Auffassung der *Kammer* nicht, im Rahmen ihrer Berichterstattung über das Urteil gemäß Anlage AST 3 darauf hinzuweisen, dass ein Einspruch gegen das Patent der Antragsgegnerin zu 1 eingelegt worden ist.

Die Kostenentscheidung beruht auf § 91 Abs. 1 ZPO.

Der Streitwert ist gemäß § 51 Abs. 2 und 4 GKG festgesetzt worden.


## Rechtsbehelfsbelehrung:

Gegen die Entscheidung kann Widerspruch eingelegt werden. Der Widerspruch ist nicht an eine Frist gebunden.

Der Widerspruch ist bei dem

             Landgericht Hamburg
             Sievekingplatz 1
             20355 Hamburg

zu erheben.

Der Widerspruch muss mit Schriftsatz durch eine Rechtsanwältin oder einen Rechtsanwalt eingelegt werden.

327 O 142/18                                   - Seite 9 -

Gegen die Entscheidung, mit der der Streitwert festgesetzt worden ist, kann Beschwerde eingelegt werden, wenn der Wert des Beschwerdegegenstands 200 Euro übersteigt oder das Gericht die Beschwerde zugelassen hat.

Die Beschwerde ist binnen **sechs Monaten** bei dem

      Landgericht Hamburg
      Sievekingplatz 1
      20355 Hamburg

einzulegen.

Die Frist beginnt mit Eintreten der Rechtskraft der Entscheidung in der Hauptsache oder der anderweitigen Erledigung des Verfahrens. Ist der Streitwert später als einen Monat vor Ablauf der sechsmonatigen Frist festgesetzt worden, kann die Beschwerde noch innerhalb eines Monats nach Zustellung oder formloser Mitteilung des Festsetzungsbeschlusses eingelegt werden. Im Fall der formlosen Mitteilung gilt der Beschluss mit dem dritten Tage nach Aufgabe zur Post als bekannt gemacht.

Die Beschwerde ist schriftlich einzulegen oder durch Erklärung zu Protokoll der Geschäftsstelle des genannten Gerichts. Sie kann auch vor der Geschäftsstelle jedes Amtsgerichts zu Protokoll erklärt werden; die Frist ist jedoch nur gewahrt, wenn das Protokoll rechtzeitig bei dem oben genannten Gericht eingeht. Eine anwaltliche Mitwirkung ist nicht vorgeschrieben.

Rechtsbehelfe können auch als **elektronisches Dokument** eingereicht werden. Eine einfache E-Mail genügt den gesetzlichen Anforderungen nicht.

Das elektronische Dokument muss

- mit einer qualifizierten elektronischen Signatur der verantwortenden Person versehen sein oder
- von der verantwortenden Person signiert und auf einem sicheren Übermittlungsweg eingereicht werden.

Ein elektronisches Dokument, das mit einer qualifizierten elektronischen Signatur der verantwortenden Person versehen ist, darf wie folgt übermittelt werden:

- auf einem sicheren Übermittlungsweg oder
- an das für den Empfang elektronischer Dokumente eingerichtete Elektronische Gerichts- und Verwaltungspostfach (EGVP) des Gerichts.

Wegen der sicheren Übermittlungswege wird auf § 130a Absatz 4 der Zivilprozessordnung verwiesen. Hinsichtlich der weiteren Voraussetzungen zur elektronischen Kommunikation mit den Gerichten wird auf die Verordnung über die technischen Rahmenbedingungen des elektronischen Rechtsverkehrs und über das besondere elektronische Behördenpostfach (Elektronischer-Rechtsverkehr-Verordnung – ERVV) in der jeweils geltenden Fassung sowie auf die Internetseite www.justiz.de verwiesen.

 

Zöllner                                    Führer                              El Sarise

Vorsitzende Richterin                    Richter                              Richter
am Landgericht                         am Landgericht                      am Landgericht

Ausgefertigt

Schmans
Justizhauptsekretärin

als Urkundsbeamter d Geschäftsstelle

I, Lucy Dawn BOUGHTON BA (Hons),

translator to RWS Group Ltd, of Europa House, Chiltern Park, Chiltern Hill, Chalfont St Peter, Buckinghamshire, United Kingdom, hereby declare that I am conversant with the English and German languages and am a competent translator thereof. I declare further that to the best of my knowledge and belief the following is a true and correct translation of the accompanying document "Hamburg Regional Court Injunction Order against Novoluto 3 April 2018 (Encl. K0) (1)" in the German language.

Signed this 21st day of June 2019

L. D. BOUGHTON

For and on behalf of RWS Group Ltd

Copy

**Hamburg Regional Court**                                        **Eisenführ Speiser**

File ref.: 327 O  142/16                                          **ANNEX**       K0

[stamp]                              [crest]


# Order

In the matter


**EIS GmbH**, represented by its Managing Director Bojan Neumann, Am Lenkwerk 3,
33609 Bielefeld,

- Applicant -

Counsel:

the law firm **Eisenführ, Speiser & Partner**, Am Kaffee-Quartier 3, 28217 Bremen,
Gz.: EH 1135-01DE


v


1)   **NOVOLUTO GmbH**, represented by its Managing Directors Johannes Graf von
     Plettenberg and Florian Holst, Am Kupfergraben 6a, 10117 Berlin

- Respondent -


2)   **Orion Versand GmbH**, represented by its Managing Director Maike
     Rotermund, Schäferweg 14a, 24941 Flensburg

- Respondent -

[stamp]


Hamburg Regional Court – Civil Chamber 27 – by means of Presiding Regional
Court Judge Zöllner, Regional Court Judge Führer and Regional Court Judge El
Sarise, on 03.04.2018 issues the following order:


I.    By way of a preliminary injunction – without oral proceedings due to urgency
      – on pain of an administrative fine to be fixed by the Court for each offence
      and in the event that the administrative fine cannot be recovered on pain of


[stamp]

327 O 142/18

- page 2 -

imprisonment, or up to six months' imprisonment, with imprisonment being enforced in each case against one of the managing directors of the Respondent in question (individual administrative fine of at most € 250,000.00; imprisonment of in total at most two years), the Respondents are

**prohibited**

from making the following statements in the course of trade:

a)

**Claim for damages**

The Court likewise confirmed the claim for damages asserted by Womanizer due to patent infringement. EIS GmbH must therefore compensate Womanizer for all damages that it has suffered since 18 February 2016 or may yet suffer as a result of the acts committed. On that basis, Womanizer is now preparing corresponding actions for damages amounting to millions against EIS GmbH and furthermore reserves the right to take corresponding action against traders that have sold the Satisfyer Pro 2

and/or

b)

**Destruction of products**

EIS GmbH is moreover under the obligation to recall the Satisfyer Pro 2 from any distribution channels and to destroy the appliances still in the possession of EIS GmbH

and/or

c)

**Johannes von Plettenberg, Managing Director of Womanizer, is more than satisfied with the judgment and is looking forward to 2018 with optimism:**

327 O 142/18

- page 3 -

*"Once again, the strength of our patents has been proven. In the future we will continue to take action against EIS GmbH and other imitators of our technology with decisive toughness. Womanizer takes the judgment against EIS GmbH very seriously and will now initiate the relevant consequences. In addition to EIS GmbH, we will therefore also seek compensation for damages from distributors, retailers and other market operators that sell or have sold the Satisfyer Pro 2. The confirmation by the Regional Court constitutes a satisfactory conclusion to an excellent year for Womanizer. I am looking forward to 2018 even more now. I can promise that there is a lot going on at Womanizer and our customers should look forward to new products"*

in particular as follows:

*womanizer*

wholesale

**Start | Products | Facts | Downloads**

THE ORIGINAL COMES OUT ON TOP

Düsseldorf Regional Court confirms

the patent infringement by Satisfyer Pro 2

Novoluto GmbH (c/o Womanizer) wins the proceedings at first instance against EIS GmbH before Düsseldorf Regional Court by means of the judgment of 14 December 2017 and defends its patent portfolio with respect to the Satisfyer Pro 2. EIS GmbH has filed an appeal.

On 14 December 2017, by means of a judgment Düsseldorf Regional Court upheld Womanizer's action against EIS GmbH. Womanizer is therefore once again successful in asserting its rights and taking legal action against infringements by market operators.

**Claim for injunctive relief**

A significant component of the judgment is the confirmation of the claim for injunctive relief raised by Womanizer against EIS GmbH, which must now refrain from offering for sale, placing on the market or importing or possessing

327 O 142/18

- page 4 -

for the stated purposes, the Satisfyer Pro 2 in the Federal Republic of Germany.

**Claim for damages**

The Court likewise confirmed the claim for damages asserted by Womanizer due to patent infringement. EIS GmbH must therefore compensate Womanizer for all damages that it has suffered since 18 February 2016 or may yet suffer as a result of the acts committed. On that basis, Womanizer is now preparing corresponding actions for damages amounting to millions against EIS GmbH and furthermore reserves the right to take corresponding action against traders that have sold the Satisfyer Pro 2

**Destruction of products**

EIS GmbH is moreover under the obligation to recall the Satisfyer Pro 2 from any distribution channels and to destroy the appliances still in the possession of EIS GmbH.

**Johannes von Plettenberg, Managing Director of Womanizer, is more than satisfied with the judgment and is looking forward to 2018 with optimism:**

*"Once again, the strength of our patents has been proven. In the future we will continue to take action against EIS GmbH and other imitators of our technology with decisive toughness. Womanizer takes the judgment against EIS GmbH very seriously and will now initiate the relevant consequences. In addition to EIS GmbH, we will therefore also seek compensation for damages from distributors, retailers and other market operators that sell or have sold the Satisfyer Pro 2. The confirmation by the Regional Court constitutes a satisfactory conclusion to an excellent year for Womanizer. I am looking forward to 2018 even more now. I can promise that there is a lot going on at Womanizer and our customers should look forward to new products"*

**In parallel with the successful court proceedings, Womanizer is on course to continue its success.** As the manufacturer of innovative sex toys, new products are always at the forefront; the Womanizer Starlet and the

327 O 142/18

- page 5 -

Womanizer InsideOut are surpassing our expectations. The range of services provided and marketing have been intensified, for example with the Womanizer Do-It-Yourself store and the extensive PR activities of recent months.

And this is only the beginning! We are working hard to remain your ideal partner.

**Particularly gratifying: in the last survey the 2,300 participants confirmed:**

97% of women would recommend the Womanizer

98% of women are satisfied with the Womanizer

98% of women have experienced an unparalleled orgasm with the Womanizer

**Best wishes,**

Your womanizer team

**womanizer wholesale**

www.womanizer-grosshandel.de

Tel.: +49 (0)461 – 50 40 114

Fax: +49 (0)461 – 50 40 244

info@womanizer-wholesale.com

Legal notice

Germany. Registered Office Flensburg. Flensburg Court of Registration HRA 2514, General Partner, Orion Versand GmbH Registered Office Flensburg. Flensburg Court of Registration HRB 1417, Managing Director Maike Rotermund

II.    The Respondents must bear the costs of the proceedings as joint and several debtors.

III.    The value in dispute is fixed at €100,000.00.

327 O 142/18

- page 6 -

# <u>Grounds:</u>

The Applicant's request of 26.03.2018 that a preliminary injunction be issued is admissible and well-founded.

The claim for injunctive relief as ordered results from Section 8(1), first sentence of the German Law against Unfair Competition (*Gesetz gegen den unlauteren Wettbewerb*, UWG) in conjunction with Sections 3, 5(1), first and second sentence, No. 3, UWG.

In this case the statement that the Respondent party "is now preparing corresponding actions for damages amounting to millions against EIS GmbH" and the unqualified reference in the press release at issue to the "Satisfyer Pro 2" are misleading.

Respondent 1 was indeed successful in patent infringement proceedings against the Applicant concerning the pressure-wave vibrator "Satisfyer Pro 2" at the first instance before *Düsseldorf Regional Court* by means of the judgment of 14.12.2017 (file ref. 4a O 78/16), which ordered the claims under patent law for injunctive relief, provision of information and accounting, recall and destruction as well as a finding of the obligation to pay damages to Respondent 1 due to an infringement of a patent "stimulation device" belonging to Respondent 1 by the Applicant's "Satisfyer Pro 2" vibrator (Exhibit AST 3).

The statements reproduced in the operative part under points I a) to c) are however misleading:

Firstly, there is no apparent factual basis enabling the assertion that "actions for damages amounting to millions against EIS GmbH" are being prepared by the Respondent party, especially as the Applicant has not even thus far provided Respondent 1 with the information that it is obliged to furnish to the latter in accordance with point 3 of the operative part of the judgment in accordance with Exhibit AST 3. However the Applicant's own press release submitted in Exhibit AST

327 O 142/18

- page 7 -

14 concerning the success of the "Satisfyer Pro 2" does not support the assertion that "actions for damages amounting to millions against EIS GmbH" are being prepared by the Respondent party. The judgment in accordance with Exhibit AST 3 – and in accordance with the finding of the Applicant's obligation to pay damages ordered therein – is issued on the basis of a German patent belonging to Respondent 1, with the result that the Applicant's obligation to pay damages found in that judgment is thus also limited to Germany. The Applicant's press release submitted in Exhibit AST 14 must be understood to the effect that the Applicant has sold 225,000 "Satisfyer Pro 2" units worldwide at the time of the publication thereof. No sales figures for Germany emerge from this.

Furthermore, the press release at issue does not take into consideration the fact that the Applicant is in the meantime bringing onto the market a vibrator by the name of "Satisfyer Pro 2 NEXT GENERATION", which does not infringe Respondent 1's patent. Therefore to the extent that the press release at issue refers to the "Satisfyer Pro 2" having to be recalled from distribution channels and destroyed by the Applicant and that claims for damages would be asserted against traders etc. that in the past have sold or currently sell or may yet sell the "Satisfyer Pro 2" (or that the right to do so is reserved), these statements – which are unqualified as regards the name of the product model – may also – incorrectly – be referred to by the targeted public to relate to the model "Satisfyer Pro 2 NEXT GENERATION".

However it is harmless that Respondent 1 has not yet provided a security deposit for provisional enforcement of the judgment in accordance with Exhibit AST 3. In the view of the *Chamber*, it is moreover not incumbent on the Respondents to refer to the fact that an opposition has been filed against Respondent 1's patent in the context of its reporting on the judgment in accordance with Exhibit AST 3.

The decision on costs is based on Section 91(1) of the German Code of Civil Procedure (*Zivilprozessordnung*, ZPO).

The value in dispute has been fixed in accordance with Section 51(2) and (4) of the German Law on Court Fees (*Gerichtskostengesetz*, GKG).

327 O 142/18

- page 8 -

# Notice regarding rights of appeal:

An objection can be raised against the decision. The objection is not subject to any time limit.

The objection must be lodged at

> Hamburg Regional Court
> Sievekingplatz 1
> 20355 Hamburg.

The objection must be filed by way of a written submission by an attorney at law.

An appeal may be filed against the decision by which the value in dispute was set if the value of the subject-matter of the appeal is more than 200 euros or the court has held the appeal to be admissible.

The appeal must be filed within **six months** at

> Hamburg Regional Court
> Sievekingplatz 1
> 20355 Hamburg

The period begins upon the decision on the substantive issues becoming legally effective or the proceedings being resolved in some other manner. If the value in dispute was fixed later than one month before the expiry of the six-month period, the appeal can still be filed within one month after service or the informal notification of the order fixing the value in dispute. In the case of an informal notification, the order shall be deemed to have been published on the third day after being posted.

The appeal must be filed in writing or by making a minuted declaration at the registry of the specified court. It can also be the subject of a minuted declaration made at the registry of any district court (*Amtsgericht*); the deadline shall however be met only if the minutes are received at the aforementioned court in good time. The involvement of attorneys is not a requirement.

-

327 O 142/18

- page 9 -

[stamp]

Appeals may also be filed as **electronic documents**. A simple email does not satisfy the legal requirements.

The electronic document must:

- be provided with a qualified electronic signature of the person responsible or
- be signed by the person responsible and filed by a secure means of communication.

An electronic document which has been provided with a qualified electronic signature of the person responsible may be sent as follows:

- by a secure means of communication or
- to the court's Electronic Court and Administration Mailbox (EGVP) set up to receive electronic documents.

As regards secure means of communication, reference is made to Section 130(a)(4) of the German Code of Civil Procedure. With respect to the further requirements for electronic communication with the courts, reference is made to the relevant applicable version of the Regulation on the technical framework conditions for electronic legal correspondence and on the specific electronic official mailbox (Electronic Legal Correspondence Regulation – ERVV), and to the website www.justiz.de.

[stamp]

| Zöllner | Führer | El Sarise |
|---------|--------|-----------|
| Presiding Regional Court Judge | Regional Court Judge | Regional Court Judge |

Official copy issued by:

[stamp] [signature]

Schmans, Senior Court Secretary

acting as Registrar of the Court

[stamp]

*Exhibit 10*





**WOMANIZER™ DUO**                                    **$219.00**

Please select a color

**ADD TO CART**

Immediate shipping

Discreet Packaging

Free delivery

Case 1:19-cv-01227-GBW    Document 53-1    Filed 12/30/20    Page 209 of 527 PageID #: 1797

# Simultaneous stimulation

DUO delivers the perfect blend of clitoral and G-spot stimulation. DUO's clitoral stimulator uses Pleasure Air™ Technology while your G-spot is being massaged with the perfectly curved and powerful vibrator. Get ready for the blended orgasm you've always wanted.

# Concentrate on yourself and your desire

DUO is equipped with the innovative Smart Silence™ Technology. Womanizer Duo only starts when it first comes into contact with your skin and will turn off automatically when DUO is removed from the body. This way you can have the most discreet pleasureable experience.



## PLEASURE AIR™ TECHNOLOGY

Created for you and your body: The clitoris stimulator of your DUO is based on our Pleasure Air™ Technology, which gives you phenomenal orgasms. And before you ask: Yes, multiple orgasms are also possible.



## DUAL-MOTOR CONTROL

With DUO you can control the Pleasure Air™ clitoral stimulator and the G-spot vibrations individually for the most custom experience.

Case 1:19-cv-01227-GBW    Document 53-1    Filed 12/30/20    Page 210 of 527 PageID #: 1798



## INFINITE PLEASURE

DUO offers 12 intensity levels for both clitoral and G-spot simtulation. Experience what you want, when you want it.



## RUN TIME

DUO will run for up to 2 hours of play for as many orgams as you desire.



## INNOVATIVE DESIGN

DUO's ergonomic design fits your body's shape and curves with ease and comfort.



## STIMULATION HEAD

Try a smaller size of stimulation head for closer contact and more intense sensations to your clitoris.



## WATERPROOF

Womanizer DUO rabbit vibrator clitoral and G-spot stimulator
DUO is 100% waterproof for limitless pleasure.

Your Womanizer DUO comes with a satin storage bag, USB charging cable, user manual and an additional silicone head that is smaller in size.

**WRITE YOUR OWN REVIEW**

*Exhibit 11*

Womanizer Starlet | Sexual vibrator for beginners





## WOMANIZER™ STARLET                                    $79.00

Snow

**ADD TO CART**

Immediate shipping

Discreet Packaging

Free delivery

# Womanizer Starlet

Every woman has the right to experience intense orgasms. Everywhere! With the practical format of the Starlet the high-end technology of the original Womanizer is also available on the go. This mobility combined with the modern design make the Womanizer a perfect companion, especially for women, who are still at the beginnings of their sexual development but nonetheless care about a patented premium product. By the way: with the Starlet being smaller it can also be used with partners more easily.

## Specifications









## What's in the box

·   Womanizer Starlet with stimulation head

·   USB charging cable (power adapter not included)

·   Operating instruction

## Product details:

·   Material: ABS, soft touch

·   Material stimulation head: Hypoallergenic medical silicone

·   Size: 85mm x 50mm x 60mm

·   Weight: 70 g

User Manual

 Download

WRITE YOUR OWN REVIEW

## EVERY WOMEN DESERVES THIS

It worked. I still can't believe it, but it did!
It only took me 30 seconds to climax.
I feel like the prettiest, luckiest woman on earth.
The device is small and has a nice touch. The button to higher the intensity is a bit small, but works fine.
The only thing I don't like is the noise, it's still a bit loud, just like a vibrator. But music on the background will fix this problem.
Ladies, treat yourself! You deserve this!

# Choose your favourite..

Everyone has their own color of pleasure. Pick your personal Womanizer out of our numerous designs for endless hours of lust.





**PLEASURE AIR TECHNOLOGY**

Our patented Pleasure Air Technology serves a touchless delight: Pleasant suction and gentle massaging lead to a completely new kind of orgasmic experience. Relax and enjoy the waves of pleasure.



## 4 INTENSITY LEVELS

Whether you like in super soft or super power mode – or somewhere in between –your next orgasm awaits you at the push of a button.





## KLEIN UND HANDLICH

Being the smallest Womanizer, the Starlet fits perfectly in the palm of your hand. He really lives up to his name: your little pleasuremaker.



## SILENT MODE

Don't worry about any loud noises - from the device anyways. We cannot guarantee, that you will be able to keep quiet when using the Womanizer.

# How it works.

**1**



Spread the labia apart slightly so that the clitoris is exposed.

**2**



Enclose the clitoris with the stimulation head, using light pressure to keep a tight seal.



Discover new levels of orgasmic intensity,
experience 100% pleasure and bliss.

**DISCOVER THE
WOMANIZER**

# Accessories





[WOMANIZER HEADS W500/+SIZE/PRO40/STARLET-M](#)

**$12.95**

[WOMANIZER HEADS W500/+SIZE/PRO40/STARLET-S](#)

**$12.95**



Womanizer

Inside Out

**SHOP NOW**



**Womanizer**

# Plus Size



SHOP NOW

*Exhibit 12*

☐   **Try Prime**   All ▾

Deliver to
Washington 20005

Today's Deals    Your Amazon.com    Buy Again

EN ▾   Hello, Sign in
Account & Lists ▾   Orders   Try Prime ▾   🛒 Cart⁰

**Shop Deals of the Day**

# Customer Review

👤 DerTester

**One Star**

July 26, 2016

Very bad quality! No waterproof! After 10 minutes in water the device was dead.

3 people found this helpful

| Helpful |   **Comment**   Report abuse   Permalink |

**Product Details**

678

3.7 out of 5 stars

| | | |
|---|---|---|
| 5 star | | 55% |
| 4 star | | 9% |
| 3 star | | 9% |
| 2 star | | 8% |
| 1 star | | 19% |

| See All Buying Options |
| Add to Wish List |

---

Your recently viewed items and featured recommendations

After viewing product detail pages, look here to find an easy way to navigate back to pages you are interested in.

› View or edit
your browsing
history

Back to top

## Get to Know Us

Careers
Blog
About Amazon
Press Center
Investor Relations
Amazon Devices
Tour an Amazon Fulfillment Center

## Make Money with Us

Sell on Amazon
Sell Under Private Brands
Sell on Amazon Handmade
Sell Your Services on Amazon
Sell on Amazon Business
Sell Your Apps on Amazon
Become an Affiliate
Advertise Your Products
Self-Publish with Us
› See More

## Amazon Payment Products

Amazon Rewards Visa Signature Cards
Amazon.com Store Card
Amazon Business Card
Amazon.com Corporate Credit Line
Shop with Points
Credit Card Marketplace
Reload Your Balance
Amazon Currency Converter

## Let Us Help You

Your Account
Your Orders
Shipping Rates & Policies
Amazon Prime
Returns & Replacements
Manage Your Content and Devices
Amazon Assistant
Help

---

| English | | United States |

Amazon Music
Stream millions
of songs

Amazon Advertising
Find, attract, and
engage customers

Amazon Drive
Cloud storage
from Amazon

6pm
Score deals
on fashion brands

AbeBooks
Books, art
& collectibles

ACX
Audiobook Publishing
Made Easy

Alexa
Actionable Analytics
for the Web

Sell on Amazon
Start a Selling Account

Amazon Business
Everything For
Your Business

AmazonFresh
Groceries & More
Right To Your Door

AmazonGlobal
Ship Orders
Internationally

Home Services
Handpicked Pros
Happiness Guarantee

Amazon Inspire
Digital Educational
Resources

Amazon Rapids
Fun stories for
kids on the go

Amazon Restaurants
Food delivery from
local restaurants

Amazon Web Services
Scalable Cloud
Computing Services

Audible
Listen to Books & Original
Audio Performances

Book Depository
Books With Free
Delivery Worldwide

Box Office Mojo
Find Movie
Box Office Data

ComiXology
Thousands of
Digital Comics

CreateSpace
Indie Print Publishing
Made Easy

DPReview
Digital
Photography

East Dane
Designer Men's
Fashion

Fabric
Sewing, Quilting
& Knitting

Goodreads
Book reviews
& recommendations

IMDb
Movies, TV
& Celebrities

IMDbPro
Get Info Entertainment
Professionals Need

Kindle Direct Publishing
Indie Digital Publishing
Made Easy

Prime Now
FREE 2-hour Delivery
on Everyday Items

Amazon Photos
Unlimited Photo Storage
Free With Prime

Prime Video Direct
Video Distribution
Made Easy

Shopbop
Designer
Fashion Brands

Amazon Warehouse
Great Deals on
Quality Used Products

Whole Foods Market
America's Healthiest
Grocery Store

Woot!
Deals and
Shenanigans

Zappos
Shoes &
Clothing

Ring
Smart Home
Security Systems

eero WiFi
Stream 4K Video
in Every Room

Neighbors App
Real-Time Crime & Safety Alerts

Subscribe with Amazon
Discover & try
subscription services

PillPack
Pharmacy Simplified

Amazon Renewed
Refurbished products
with a warranty

Amazon Second Chance
Pass it on, trade it in,
give it a second life

Conditions of Use    Privacy Notice    Interest-Based Ads    © 1996-2019, Amazon.com, Inc. or its affiliates

# *Exhibit 13*



Prime entdecken

Alle ▾

Liefern nach Vereinigte Staate...

Alle Kategorien ▾    Erneut kaufen

DE ▾    Hallo! Anmelden Konto und Listen ▾    Bestellungen    Entdecken Sie Prime ▾    0 Einkaufs-wagen

# Kundenrezension

 WE-VIBE

**Einmal in der Wanne und schon defekt!**

27. Juni 2016

Von wegen 100% wasserdicht. Wir hatten den Satiafyer 2 1x in der Wanne.
Am anderen Tag war er tot! Es lief an den Batteriekontakten Wasser aus dem Gerät.
Kompletter Fehlkauf!

20 Personen fanden diese Informationen hilfreich

| Nützlich |

1 Kommentar    Missbrauch melden    Permalink

### Produktdetails



SATISFYER PRO 2
von Satisfyer

**215**

3,7 von 5 Sternen

| 5 Sterne | | 57% |
| 4 Sterne | | 9% |
| 3 Sterne | | 8% |
| 2 Sterne | | 7% |
| 1 Stern | | 19% |

28,13 € + 3,00 € Versandkosten

| In den Einkaufswagen |

| Auf meinen Wunschzettel |

## Ihre zuletzt angesehenen Artikel und besonderen Empfehlungen

Nachdem Sie Produktseiten oder Suchergebnisse angesehen haben, finden Sie hier eine einfache Möglichkeit, diese Seiten wiederzufinden.

› Browserverlauf anzeigen oder ändern

Zurück zum Seitenanfang

## Über Amazon

Karriere bei Amazon

Pressemitteilungen

Über uns

Unternehmensblog Day One

Amazon Logistikblog

Impressum

Eine Führung durch ein Amazon Logistikzentrum

## Geld verdienen mit Amazon

Jetzt verkaufen

Verkaufen Sie unter Private Brands

Verkaufen bei Amazon Business

Verkaufen bei Amazon Handmade

Partnerprogramm

Versand durch Amazon

Prime durch Verkäufer

Bewerben Sie Ihre Produkte

Ihr Buch mit uns veröffentlichen

Amazon Pay

› Alle anzeigen

## Amazon-Zahlungsarten

Amazon.de VISA Karte

Einkaufen mit Punkten

Kreditkarten

Gutscheine

Monatsabrechnung

Bankeinzug

Amazon Currency Converter

Mein Amazon-Konto aufladen

Amazon vor Ort aufladen

## Wir helfen Ihnen

Lieferung verfolgen oder Bestellung anzeigen

Versand & Verfügbarkeit

Amazon Prime

Rückgabe & Ersatz

Entsorgung von Elektro- & Elektronikaltgeräten

Meine Inhalte und Geräte

Amazon App

Amazon Assistant

Hilfe

Deutsch    Deutschland

Amazon Advertising
Kunden finden, gewinnen und binden

Amazon Music
Streamen Sie Millionen von Songs

AbeBooks
Bücher, Kunst & Sammelobjekte

Amazon Web Services
Cloud Computing Dienste von Amazon

Audible
Hörbücher herunterladen

Book Depository
Bücher mit kostenfreier Lieferung weltweit

IMDb
Filme, TV & Stars

Kindle Direct Publishing
Ihr E-Book veröffentlichen

Prime Now
1-Stunden-Lieferung Tausender Produkte

Shopbop
Designer Modemarken

Warehouse Deals

ZVAB

Amazon Business

Amazon Second Chance

Reduzierte B-Ware

Zentrales Verzeichnis
Antiquarischer Bücher und mehr

Einbau in der Wichte und/oder Defekt!

Kauf auf Rechnung und Nummern.
Für Unternehmen.

Geben Sie es weiter, tauschen Sie es ein,
geben Sie ihm ein zweites Leben

Unsere AGB   Datenschutzerklärung   Impressum   Hinweise zu Cookies   Hinweise zu interessenbasierter Werbung   © 1998-2019, Amazon.com, Inc. oder Tochtergesellschaften

**Spence** [trænz leɪʃns]

Spence Translations • Kurfürstenallee 114 • 28211 Bremen

**TO WHOM IT MAY CONCERN**

## Verification of Translation

I,    Timothy B. Spence

of    Kurfuerstenallee 114
      28211 Bremen
      Germany

do hereby certify

     1.    That I have a full command of both the English and German languages and am a competent translator thereof,

and I further certify

     2.    That the attached document is a true and correct translation, made by me to the best of my knowledge and belief,

     **(a)    of the four customer reviews, the extract from the Amazon website on promotional content, the Amazon guidelines for customer reviews and the verified profile of "WE-VIBE" on Amazon, all of which in one document with seven sections.**

Dated this
21st day of June 2019

..................................................
Timothy B. Spence

Spence Translations
Kurfürstenallee 114
28211 Bremen

Kommunikation
Fon  [0421] 33 99 022
Fax  [0421] 33 99 123

Mail  info@spence.de
Web  www.spence.de

Bankverbindung
Die Sparkasse Bremen • IBAN: DE 55 2905 0101 0011 0030 19
Steuernummer: Bremen 60 271 03969 • USt.ID: DE1999945592

Translation from German into English

## 1 Customer review: Once in the tub and already defective!

[Amazon Germany customer review page]

WE-VIBE

### Once in the tub and already defective!

June 27, 2016

100% waterproof - no way! We had the Satisfyer 2 once in the tub.
The next day it was dead! Water was running out of the device at the battery contacts. Totally bad buy!

20 people found this helpful

# *Exhibit 14*



Prime entdecken

Alle

Liefern nach Vereinigte Staate...

Alle Kategorien

Erneut kaufen

DE

Hallo! Anmelden Konto und Listen

Bestellungen

Entdecken Sie Prime

0 Einkaufs- wagen

# Kundenrezension

WE-VIBE

**Von wegen 100% wasserdicht!**

4. Juli 2016

Nach dem ersten Gebrauch in der Badewanne lief Wasser aus dem Gerät und die Elektronik war hinüber! Totaler Fehlkauf! Gerät ist nicht wasserdicht so wie beworben.

3 Personen fanden diese Informationen hilfreich

Nützlich    Kommentar    Missbrauch melden    Permalink

## Produktdetails



Klitoris Stimmulator "Satisfyer Pro 2"...
von Satisfyer

7

4,3 von 5 Sternen

| | | |
|---|---|---|
| 5 Sterne | | 86% |
| 4 Sterne | | 0% |
| 3 Sterne | | 0% |
| 2 Sterne | | 0% |
| 1 Stern | | 14% |

43,00 € + Versandkostenfrei

In den Einkaufswagen

Auf meinen Wunschzettel

## Ihre zuletzt angesehenen Artikel und besondere Empfehlungen

Nachdem Sie Produktseiten oder Suchergebnisse angesehen haben, finden Sie hier eine einfache Möglichkeit, diese Seiten wiederzufinden.

› Browserverlauf anzeigen oder ändern

Zurück zum Seitenanfang

| Über Amazon | Geld verdienen mit Amazon | Amazon-Zahlungsarten | Wir helfen Ihnen |
|---|---|---|---|
| Karriere bei Amazon | Jetzt verkaufen | Amazon.de VISA Karte | Lieferung verfolgen oder Bestellung anzeigen |
| Pressemitteilungen | Verkaufen Sie unter Private Brands | Einkaufen mit Punkten | Versand & Verfügbarkeit |
| Über uns | Verkaufen bei Amazon Business | Kreditkarten | Amazon Prime |
| Unternehmensblog Day One | Verkaufen bei Amazon Handmade | Gutscheine | Rückgabe & Ersatz |
| Amazon Logistikblog | Partnerprogramm | Monatsabrechnung | Entsorgung von Elektro- & Elektronikaltgeräten |
| Impressum | Versand durch Amazon | Bankeinzug | Meine Inhalte und Geräte |
| Eine Führung durch ein Amazon Logistikzentrum | Prime durch Verkäufer | Amazon Currency Converter | Amazon App |
| | Bewerben Sie Ihre Produkte | Mein Amazon-Konto aufladen | Amazon Assistant |
| | Ihr Buch mit uns veröffentlichen | Amazon vor Ort aufladen | Hilfe |
| | Amazon Pay | | |
| | › Alle anzeigen | | |

Deutsch    Deutschland

Amazon Advertising
Kunden finden, gewinnen und binden

Amazon Music
Streamen Sie Millionen von Songs

AbeBooks
Bücher, Kunst & Sammelobjekte

Amazon Web Services
Cloud Computing Dienste von Amazon

Audible
Hörbücher herunterladen

Book Depository
Bücher mit kostenfreier Lieferung weltweit

IMDb
Filme, TV & Stars

Kindle Direct Publishing
Ihr E-Book veröffentlichen

Prime Now
1-Stunden-Lieferung Tausender Produkte

Shopbop
Designer Modemarken

Warehouse Deals

ZVAB

Amazon Business

Amazon Second Chance

Reduzierte B-Ware    Zentrales Verzeichnis    Kauf auf Rechnung. Keine Nummern.    Geben Sie es weiter, tauschen Sie es ein,
                     Antiquarischer Bücher und mehr    Für Unternehmen.    geben Sie ihm ein zweites Leben

Unsere AGB    Datenschutzerklärung    Impressum    Hinweise zu Cookies    Hinweise zu interessenbasierter Werbung    © 1998-2019, Amazon.com, Inc. oder Tochtergesellschaften

# Spence [trænz leɪʃns]

Spence Translations • Kurfürstenallee 114 • 28211 Bremen

**TO WHOM IT MAY CONCERN**

## Verification of Translation

I,      Timothy B. Spence

of      Kurfuerstenallee 114
        28211 Bremen
        Germany

do hereby certify

    1.      That I have a full command of both the English and German languages and am a competent translator thereof,

and I further certify

    2.      That the attached document is a true and correct translation, made by me to the best of my knowledge and belief,

    **(a)      of the four customer reviews, the extract from the Amazon website on promotional content, the Amazon guidelines for customer reviews and the verified profile of "WE-VIBE" on Amazon, all of which in one document with seven sections.**

Dated this
21st day of June 2019

..................................................
Timothy B. Spence

**Spence Translations**
Kurfürstenallee 114
28211 Bremen

**Kommunikation**
Fon  [0421] 33 99 022
Fax  [0421] 33 99 123

Mail  info@spence.de
Web  www.spence.de

**Bankverbindung**
Die Sparkasse Bremen • IBAN: DE 55 2905 0101 0011 0030 19
Steuernummer: Bremen 60 271 03969 • USt.ID: DE1999945592

## 2 Customer review: 100% waterproof - no way!

[Amazon Germany customer review page]

WE-VIBE

### 100% waterproof - no way!

July 4, 2016

After it was used for the first time in the bath tub, water was running out of the device and the electronics had had it! Totally bad buy! The device is not as waterproof as advertised.

3 people found this helpful

_____

*Exhibit 15*

Prime entdecken    Alle ▾

Liefern nach    Alle            Erneut kaufen                          DE    Hallo! Anmelden        Bestellungen    Entdecken Sie    0  Einkaufs-
Vereinigte Staate...  Kategorien ▾                                    ▾    Konto und Listen ▾                     Prime ▾           wagen

# Kundenrezension

 WE-VIBE

**Ungenügend**

3. August 2016

Leistung absolut unbefriedigend!Sehr laut und schlecht zu bedienen. Tut teilweise weh, zu hart an der Auflagefläche. Für mich ein glatter Fehlkauf.

| Nützlich | | Kommentar | Missbrauch melden | Permalink |

## Produktdetails

No image available

1

**1,0 von 5 Sternen**

| 5 Sterne | | 0% |
|---|---|---|
| 4 Sterne | | 0% |
| 3 Sterne | | 0% |
| 2 Sterne | | 0% |
| 1 Stern | | 100% |

Alle Kaufoptionen anzeigen

Auf meinen Wunschzettel

## Ihre zuletzt angesehenen Artikel und besonderen Empfehlungen

*Nachdem Sie Produktseiten oder Suchergebnisse angesehen haben, finden Sie hier eine einfache Möglichkeit, diese Seiten wiederzufinden.*

› Browserverlauf anzeigen oder ändern

Zurück zum Seitenanfang

| Über Amazon | Geld verdienen mit Amazon | Amazon-Zahlungsarten | Wir helfen Ihnen |
|---|---|---|---|
| Karriere bei Amazon | Jetzt verkaufen | Amazon.de VISA Karte | Lieferung verfolgen oder Bestellung anzeigen |
| Pressemitteilungen | Verkaufen Sie unter Private Brands | Einkaufen mit Punkten | Versand & Verfügbarkeit |
| Über uns | Verkaufen bei Amazon Business | Kreditkarten | Amazon Prime |
| Unternehmensblog Day One | Verkaufen bei Amazon Handmade | Gutscheine | Rückgabe & Ersatz |
| Amazon Logistikblog | Partnerprogramm | Monatsabrechnung | Entsorgung von Elektro- & Elektronikaltgeräten |
| Impressum | Versand durch Amazon | Bankeinzug | Meine Inhalte und Geräte |
| Eine Führung durch ein Amazon Logistikzentrum | Prime durch Verkäufer | Amazon Currency Converter | Amazon App |
| | Bewerben Sie Ihre Produkte | Mein Amazon-Konto aufladen | Amazon Assistant |
| | Ihr Buch mit uns veröffentlichen | Amazon vor Ort aufladen | Hilfe |
| | Amazon Pay | | |
| | › Alle anzeigen | | |

Deutsch    Deutschland

| Amazon Advertising | Amazon Music | AbeBooks | Amazon Web Services | Audible |
|---|---|---|---|---|
| Kunden finden, gewinnen und binden | Streamen Sie Millionen von Songs | Bücher, Kunst & Sammelobjekte | Cloud Computing Dienste von Amazon | Hörbücher herunterladen |
| Book Depository | IMDb | Kindle Direct Publishing | Prime Now | Shopbop |
| Bücher mit kostenfreier Lieferung weltweit | Filme, TV & Stars | Ihr E-Book veröffentlichen | 1-Stunden-Lieferung Tausender Produkte | Designer Modemarken |
| Warehouse Deals | ZVAB | Amazon Business | Amazon Second Chance | |
| Reduzierte B-Ware | Zentrales Verzeichnis Antiquarischer Bücher und mehr | Kauf auf Rechnung. PO-Nummern. Für Unternehmen. | Geben Sie es weiter, tauschen es ein, geben Sie ihm ein zweites Leben | |

Unsere AGB    Datenschutzerklärung    Impressum    Hinweise zu Cookies    Hinweise zu interessenbasierter Werbung    © 1998-2019, Amazon.com, Inc. oder Tochtergesellschaften

**Spence** [trænz leɪʃns]

Spence Translations • Kurfürstenallee 114 • 28211 Bremen

**TO WHOM IT MAY CONCERN**

## Verification of Translation

I,      Timothy B. Spence

of      Kurfuerstenallee 114
        28211 Bremen
        Germany

do hereby certify

      1.     That I have a full command of both the English and German languages and am a competent translator thereof,

and I further certify

      2.     That the attached document is a true and correct translation, made by me to the best of my knowledge and belief,

      **(a)    of the four customer reviews, the extract from the Amazon website on promotional content, the Amazon guidelines for customer reviews and the verified profile of "WE-VIBE" on Amazon, all of which in one document with seven sections.**

Dated this
21st day of June 2019

.......................................................
Timothy B. Spence

**Spence Translations**
Kurfürstenallee 114
28211 Bremen

**Kommunikation**
Fon  [0421] 33 99 022    Mail  info@spence.de
Fax  [0421] 33 99 123    Web  www.spence.de

**Bankverbindung**
Die Sparkasse Bremen • IBAN: DE 55 2905 0101 0011 0030 19
Steuernummer: Bremen 60 271 03969 • USt.ID: DE1999945592

## 3 Customer review: Unsatisfactory

WE-VIBE

### Unsatisfactory

August 3, 2016

Performance absolutely dissatisfying. Very loud and difficult to operate. Hurts sometimes, too hard at the contact surface. Definitely a bad buy as far as I'm concerned.

*Exhibit 16*

Prime entdecken

Alle ▾

Liefern nach
Vereinigte Staate...

Alle
Kategorien ▾

Erneut kaufen

DE
▾

Hallo! Anmelden
Konto und Listen ▾

Bestellungen

Entdecken Sie
Prime ▾

0 Einkaufs-
wagen

# Kundenrezension

🟣 WOW Tech

**Sehr enttäuscht**

20. Dezember 2016

Bin sehr enttäuscht! Sehr laut und beim Auspacken stinkt das Produkt extrem nach Chemie. Sehr schlecht zu steuern. Glatter Fehlkauf.

6 Personen fanden diese Informationen hilfreich

| Nützlich | Kommentar | Missbrauch melden | Permalink |

## Produktdetails

No image available

360

3,5 von 5 Sternen

| 5 Sterne | 49% |
| 4 Sterne | 17% |
| 3 Sterne | 10% |
| 2 Sterne | 7% |
| 1 Stern | 17% |

Alle Kaufoptionen anzeigen

Auf meinen Wunschzettel

## Ihre zuletzt angesehenen Artikel und besonderen Empfehlungen

Nachdem Sie Produktseiten oder Suchergebnisse angesehen haben, finden Sie hier eine einfache Möglichkeit, diese Seiten wiederzufinden.

› Browserverlauf anzeigen oder ändern

Zurück zum Seitenanfang

| Über Amazon | Geld verdienen mit Amazon | Amazon-Zahlungsarten | Wir helfen Ihnen |
|---|---|---|---|
| Karriere bei Amazon | Jetzt verkaufen | Amazon.de VISA Karte | Lieferung verfolgen oder Bestellung anzeigen |
| Pressemitteilungen | Verkaufen Sie unter Private Brands | Einkaufen mit Punkten | Versand & Verfügbarkeit |
| Über uns | Verkaufen bei Amazon Business | Kreditkarten | Amazon Prime |
| Unternehmensblog Day One | Verkaufen bei Amazon Handmade | Gutscheine | Rückgabe & Ersatz |
| Amazon Logistikblog | Partnerprogramm | Monatsabrechnung | Entsorgung von Elektro- & Elektronikaltgeräten |
| Impressum | Versand durch Amazon | Bankeinzug | Meine Inhalte und Geräte |
| Eine Führung durch ein Amazon Logistikzentrum | Prime durch Verkäufer | Amazon Currency Converter | Amazon App |
| | Bewerben Sie Ihre Produkte | Mein Amazon-Konto aufladen | Amazon Assistant |
| | Ihr Buch mit uns veröffentlichen | Amazon vor Ort aufladen | Hilfe |
| | Amazon Pay | | |
| | › Alle anzeigen | | |

Deutsch

Deutschland

| Amazon Advertising | Amazon Music | AbeBooks | Amazon Web Services | Audible |
|---|---|---|---|---|
| Kunden finden, gewinnen und binden | Streamen Sie Millionen von Songs | Bücher, Kunst & Sammelobjekte | Cloud Computing Dienste von Amazon | Hörbücher herunterladen |
| Book Depository | IMDb | Kindle Direct Publishing | Prime Now | Shopbop |
| Bücher mit kostenfreier Lieferung weltweit | Filme, TV & Stars | Ihr E-Book veröffentlichen | 1-Stunden-Lieferung Tausender Produkte | Designer Modemarken |
| Warehouse Deals | ZVAB | Amazon Business | Amazon Second Chance | |
| Reduzierte B-Ware | Zentrales Verzeichnis Antiquarischer Bücher und mehr | Kauf auf Rechnung. PO-Nummern. Für Unternehmen. | Geben Sie es weiter, tauschen Sie es ein, geben Sie ihm ein zweites Leben | |

Unsere AGB   Datenschutzerklärung   Impressum   Hinweise zu Cookies   Hinweise zu interessenbasierter Werbung   © 1998-2019, Amazon.com, Inc. oder Tochtergesellschaften

**Spence** [trænz leɪʃns]

Spence Translations • Kurfürstenallee 114 • 28211 Bremen

**TO WHOM IT MAY CONCERN**

## Verification of Translation

I,      Timothy B. Spence

of      Kurfuerstenallee 114
        28211 Bremen
        Germany

do hereby certify

    1.      That I have a full command of both the English and German languages and am a competent translator thereof,

and I further certify

    2.      That the attached document is a true and correct translation, made by me to the best of my knowledge and belief,

    **(a)     of the four customer reviews, the extract from the Amazon website on promotional content, the Amazon guidelines for customer reviews and the verified profile of "WE-VIBE" on Amazon, all of which in one document with seven sections.**

Dated this
21st day of June 2019

........................................................
Timothy B. Spence

**Spence Translations**
Kurfürstenallee 114
28211 Bremen

**Kommunikation**
Fon  [0421] 33 99 022    Mail  info@spence.de
Fax  [0421] 33 99 123    Web  www.spence.de

**Bankverbindung**
Die Sparkasse Bremen • IBAN: DE 55 2905 0101 0011 0030 19
Steuernummer: Bremen 60 271 03969 • USt.ID: DE1999945592

- 4 -

## 4 Customer review: Very disappointed

[Amazon Germany customer review page]

WOW Tech

**Very disappointed**

December 20, 2016

Am very disappointed! Very loud, and the product stinks terribly of chemicals when you unpack it. Very difficult to control. Definitely a bad buy.

6 people found this helpful

———————————————————————————————

# *Exhibit 17*



Advertise Your Products    Amazon Currency Converter    Help

Self-Publish with Us

› See More

---

English    United States

| | | | | | | |
|---|---|---|---|---|---|---|
| Amazon Music<br>Stream millions<br>of songs | Amazon Advertising<br>Find, attract, and<br>engage customers | Amazon Drive<br>Cloud storage<br>from Amazon | 6pm<br>Score deals<br>on fashion brands | AbeBooks<br>Books, art<br>& collectibles | ACX<br>Audiobook Publishing<br>Made Easy | Alexa<br>Actionable Analytics<br>for the Web |
| Sell on Amazon<br>Start a Selling Account | Amazon Business<br>Everything For<br>Your Business | AmazonFresh<br>Groceries & More<br>Right To Your Door | AmazonGlobal<br>Ship Orders<br>Internationally | Home Services<br>Handpicked Pros<br>Happiness Guarantee | Amazon Inspire<br>Digital Educational<br>Resources | Amazon Rapids<br>Fun stories for<br>kids on the go |
| Amazon Restaurants<br>Food delivery from<br>local restaurants | Amazon Web Services<br>Scalable Cloud<br>Computing Services | Audible<br>Listen to Books & Original<br>Audio Performances | Book Depository<br>Books With Free<br>Delivery Worldwide | Box Office Mojo<br>Find Movie<br>Box Office Data | ComiXology<br>Thousands of<br>Digital Comics | CreateSpace<br>Indie Print Publishing<br>Made Easy |
| DPReview<br>Digital<br>Photography | East Dane<br>Designer Men's<br>Fashion | Fabric<br>Sewing, Quilting<br>& Knitting | Goodreads<br>Book reviews<br>& recommendations | IMDb<br>Movies, TV<br>& Celebrities | IMDbPro<br>Get Info Entertainment<br>Professionals Need | Kindle Direct Publishing<br>Indie Digital Publishing<br>Made Easy |
| Prime Now<br>FREE 2-hour Delivery<br>on Everyday Items | Amazon Photos<br>Unlimited Photo Storage<br>Free With Prime | Prime Video Direct<br>Video Distribution<br>Made Easy | Shopbop<br>Designer<br>Fashion Brands | Amazon Warehouse<br>Great Deals on<br>Quality Used Products | Whole Foods Market<br>America's Healthiest<br>Grocery Store | Woot!<br>Deals and<br>Shenanigans |
| Zappos<br>Shoes &<br>Clothing | Ring<br>Smart Home<br>Security Systems | eero WiFi<br>Stream 4K Video<br>in Every Room | Neighbors App<br>Real-Time Crime & Safety Alerts | Subscribe with Amazon<br>Discover & try<br>subscription services | PillPack<br>Pharmacy Simplified | Amazon Renewed<br>Refurbished products<br>with a warranty |
| | | | Amazon Second Chance<br>Pass it on, trade it in,<br>give it a second life | | | |

Conditions of Use    Privacy Notice    Interest-Based Ads    © 1996-2019, Amazon.com, Inc. or its affiliates

*Exhibit 18*



 WE-VIBE    Hat ein Produkt bewertet · 4. Juli 2016

**Von wegen 100% wasserdicht!**

Nach dem ersten Gebrauch in der Badewanne lief Wasser aus dem Gerät und die Elektronik war hinüber! Totaler Fehlkauf! Gerät ist nicht wasserdicht so wie beworben.

Vollständige Rezension anzeigen

Klitoris Stimmulator "Satisfyer Pro 2" Gold Satisfyer
7

3 hilfreiche Beurteilungen

---

 WE-VIBE    Hat ein Produkt bewertet · 27. Juni 2016

**Einmal in der Wanne und schon defekt!**

Von wegen 100% wasserdicht. Wir hatten den Satiafyer 2 1x in der Wanne. Am anderen Tag war er tot! Es lief an den Batteriekontakten Wasser aus dem Gerät. Kompletter Fehlkauf!

Vollständige Rezension anzeigen

 SATISFYER PRO 2
215

20 hilfreiche Beurteilungen

---

 WE-VIBE    Hat ein Produkt bewertet · 2. Apr. 2015

**Verifizierter kauf**

**Dieses Buch sollte jeder lesen!**

Hier werden einem die Augen gewaltig geöffnet. Top Info und alles beruht auf Tatsachen. Unbedingt lesen und dann rasch reagieren.

Vollständige Rezension anzeigen

 Der Crash ist die Lösung: Warum der finale Kollaps kommt und wie Sie Ihr Vermögen retten
186

2 hilfreiche Beurteilungen

---

 WE-VIBE    Hat ein Produkt bewertet · 25. Dez. 2013

**Ein super Schlitten**

Sehr sauber verarbeitet, gute Qualität! Unsere Kinder haben sich riesig gefreut. Leider fehlt im Moment der Schnee für den großen Praxistest.!

Vollständige Rezension anzeigen

 Hamax Kinder Rodelschlitten Sno Fire Doppelsitzer Rot/Schwarz, 109x55,5x18,5
89

Zurück zum Seitenanfang

## Über Amazon

Karriere bei Amazon

Pressemitteilungen

Über uns

Unternehmensblog Day One

Amazon Logistikblog

Impressum

Eine Führung durch ein Amazon Logistikzentrum

## Geld verdienen mit Amazon

Jetzt verkaufen

Verkaufen Sie unter Private Brands

Verkaufen bei Amazon Business

Verkaufen bei Amazon Handmade

Partnerprogramm

Versand durch Amazon

Prime durch Verkäufer

Bewerben Sie Ihre Produkte

Ihr Buch mit uns veröffentlichen

Amazon Pay

› Alle anzeigen

## Amazon-Zahlungsarten

Amazon.de VISA Karte

Einkaufen mit Punkten

Kreditkarten

Gutscheine

Monatsabrechnung

Bankeinzug

Amazon Currency Converter

Mein Amazon-Konto aufladen

Amazon vor Ort aufladen

## Wir helfen Ihnen

Lieferung verfolgen oder Bestellung anzeigen

Versand & Verfügbarkeit

Amazon Prime

Rückgabe & Ersatz

Entsorgung von Elektro- & Elektronikaltgeräten

Meine Inhalte und Geräte

Amazon App

Amazon Assistant

Hilfe

---

| Deutsch | | Deutschland |

| Amazon Advertising | Amazon Music | AbeBooks | Amazon Web Services | Audible |
| Kunden finden, gewinnen und binden | Streamen Sie Millionen von Songs | Bücher, Kunst & Sammelobjekte | Cloud Computing Dienste von Amazon | Hörbücher herunterladen |
| Book Depository | IMDb | Kindle Direct Publishing | Prime Now | Shopbop |
| Bücher mit kostenfreier Lieferung weltweit | Filme, TV & Stars | Ihr E-Book veröffentlichen | 1-Stunden-Lieferung Tausender Produkte | Designer Modemarken |
| Warehouse Deals | ZVAB | Amazon Business | Amazon Second Chance | |
| Reduzierte B-Ware | Zentrales Verzeichnis Antiquarischer Bücher und mehr | Kauf auf Rechnung. PO-Nummern. Für Unternehmen. | Geben Sie es weiter, tauschen Sie es ein, geben Sie ihm ein zweites Leben | |

Unsere AGB    Datenschutzerklärung    Impressum    Hinweise zu Cookies    Hinweise zu interessenbasierter Werbung    © 1998-2019, Amazon.com, Inc. oder Tochtergesellschaften

**Spence** [ trænz'leɪʃns ]

Spence Translations • Kurfürstenallee 114 • 28211 Bremen

**TO WHOM IT MAY CONCERN**

## Verification of Translation

I,     Timothy B. Spence

of     Kurfuerstenallee 114
       28211 Bremen
       Germany

do hereby certify

  1.     That I have a full command of both the English and German languages
         and am a competent translator thereof,

and I further certify

  2.     That the attached document is a true and correct translation, made by
         me to the best of my knowledge and belief,

  **(a)     of the Amazon Germany profile of "WE-VIBE".**

Dated this
26th day of June 2019

Timothy B. Spence

**Spence Translations**      **Kommunikation**                                    **Bankverbindung**
Kurfürstenallee 114          Fon  [0421] 33 99 022    Mail  info@spence.de         Die Sparkasse Bremen • IBAN: DE 55 2905 0101 0011 0030 19
28211 Bremen                 Fax  [0421] 33 99 123    Web  www.spence.de           Steuernummer: Bremen 60 271 03969 • USt.ID: DE1999945592

Translation from German into English

# *Exhibit 13*

[Amazon Germany customer profile page]

6/18/2019                                    Profile

| | |
|---|---|
|  | **WE-VIBE**<br>Berlin |
| Have you checked out your Profile yet? Make sure it's up to date!<br>Review your profile | Insights<br>31        6<br>helpful votes    reviews |
| **About**<br>Reviewer ranking:<br># 2,963,774<br>www.wowtech.com | Community activity       View: All activity<br><br> WE-VIBE reviewed a product • 20 Dec 2016<br><br>**Very disappointed**<br><br>Am very disappointed! Very loud, and the product stinks terribly of chemicals when you unpack it. Very difficult to control. Definitely a bad buy.<br><br>See full review<br>Product no longer available<br>6 helpful votes |
| |  WE-VIBE reviewed a product • 3 Aug. 2016<br><br>**Unsatisfactory**<br><br>Performance absolutely dissatisfying. Very loud and difficult to operate. Hurts sometimes, too hard at the contact surface. Definitely a bad buy as far as I'm concerned.<br><br>See full review<br><br>Product no longer available |

 WE-VIBE reviewed a product • 4 July 2016

**100% waterproof - no way!**

After it was used for the first time in the bath tub, water was running out of the device and the electronics had had it! Totally bad buy! The device is not as waterproof as advertised.

See full review



3 helpful votes

 WE-VIBE reviewed a product • 27 June 2016

**Once in the tub and already defective!**

100% waterproof - no way! We had the Satisfyer 2 once in the tub.
The next day it was dead! Water was running out of the device at the battery contacts. Totally bad buy!

See full review



20 helpful votes

 WE-VIBE reviewed a product • 2 April 2015

**Verified purchase**

**Everyone should read this book!**

This is a huge eye-opener. Highly informative and totally fact-based. A must-read you need to respond to fast.
See full review



2 helpful votes

 WE-VIBE reviewed a product • 25 Dec. 2013

**A great toboggan**

Very good workmanship, good quality! Our children were absolutely delighted. There's no snow at the moment for the big test run, unfortunately.
See full review

 Hamax Kinder Rodelschlitten Sno Fire Doppelsitzer Rot/Schwarz, 109x55,5x18,5
89

*Exhibit 19*

US009763851B2

(12) **United States Patent**

Lenke

(10) Patent No.: **US 9,763,851 B2**

(45) Date of Patent: **Sep. 19, 2017**

(54) **STIMULATION DEVICE**

(71) Applicant: **NOVOLUTO GmbH**, Metten (DE)

(72) Inventor: **Michael Lenke**, Metten (DE)

(73) Assignee: **Novoluto GmbH**, Metten (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/023,471**

(22) PCT Filed: **Jul. 22, 2014**

(86) PCT No.: **PCT/EP2014/065734**

§ 371 (c)(1),
(2) Date: **Mar. 21, 2016**

(87) PCT Pub. No.: **WO2015/039787**

PCT Pub. Date: **Mar. 26, 2015**

(65) **Prior Publication Data**

US 2016/0213557 A1    Jul. 28, 2016

(30) **Foreign Application Priority Data**

Sep. 23, 2013    (DE) ........................ 10 2013 110 501

(51) **Int. Cl.**
*A61H 19/00*        (2006.01)
*A61H 9/00*         (2006.01)

(52) **U.S. Cl.**
CPC .............. *A61H 19/34* (2013.01); *A61H 9/00* (2013.01); *A61H 9/005* (2013.01); *A61H 9/0007* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ........ A61H 19/00; A61H 19/30; A61H 19/34; A61H 19/32; A61H 19/50; A61H 7/00;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 787,443 A * | 4/1905 | Godman et al. ........ | A61F 11/00 601/77 |
| 1,042,058 A * | 10/1912 | Hook ...................... | A61F 11/00 340/388.3 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 2153351 Y | 1/1994 |
| CN | 2198900 Y | 5/1995 |

(Continued)

OTHER PUBLICATIONS

"Can." Thefreedictionary.com. The free dictionary by Farlex, 2016. Web. Dec. 26, 2016.*

(Continued)

*Primary Examiner* — Justine Yu
*Assistant Examiner* — Tu Vo
(74) *Attorney, Agent, or Firm* — Chiesa Shahinian & Giantomasi PC

(57) **ABSTRACT**

The invention relates to a stimulation device (**1**) for erogenous zones, in particular for the clitoris (**12**), which device (**1**) has at least one pressure field generator (**2**) with at least a first chamber (**3**) and at least a second chamber (**4**) with at least one opening (**42**) for placing onto a body part (**11**), and at least one connection element (**5**) which connects the first chamber (**3**) to the second chamber (**4**), and with a drive unit (**6**) which changes the volume of the first chamber (**3**) in such a way that, by way of the connection element (**5**), a pressure field is generated in the second chamber (**4**) and serves for stimulation; and a control device (**7**) which controls the drive unit (**6**).

**8 Claims, 7 Drawing Sheets**



## US 9,763,851 B2

Page 2

(52) **U.S. Cl.**
CPC ........... *A61H 9/0057* (2013.01); *A61H 19/00* (2013.01); *A61H 19/30* (2013.01); *A61H 2201/0153* (2013.01); *A61H 2201/0157* (2013.01); *A61H 2201/1207* (2013.01); *A61H 2201/1238* (2013.01); *A61H 2201/1409* (2013.01)

(58) **Field of Classification Search**
CPC ........ A61H 7/008; A61H 7/003; A61H 7/004; A61H 9/00; A61H 9/0007; A61H 9/005; A61H 9/0057; A61H 2009/0064; A61H 9/0071; A61H 2201/0153; A61H 2201/0157; A61H 2201/12; A61H 2201/1207; A61H 2201/1238; A61H 2201/1409; A61H 2201/1418; A61H 2205/087; A61H 2201/5097
USPC ........................................... 601/6, 9; 600/38
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,882,040 | A | 10/1932 | Roehm |
| 1,898,652 | A | 2/1933 | Williams |
| 1,964,590 | A | 6/1934 | Friederich |
| 2,017,284 | A | 10/1935 | Lembright |
| 2,076,410 | A | 4/1937 | McGerry |
| 2,112,646 | A | 3/1938 | Biederman |
| 2,154,427 | A | 4/1939 | Andres |
| 2,218,081 | A * | 10/1940 | Brichieri-Colombi  A61H 23/04 601/139 |
| 2,234,102 | A | 3/1941 | Andres |
| 2,314,590 | A | 3/1943 | McCarty |
| 2,519,790 | A | 8/1950 | Quinn |
| 2,561,034 | A | 7/1951 | Phillips |
| 3,396,720 | A | 8/1968 | Shigeyuki |
| 3,906,940 | A | 9/1975 | Kawada |
| 3,910,262 | A | 10/1975 | Stoughton |
| 4,088,128 | A * | 5/1978 | Mabuchi ........... A61H 23/0254 601/101 |
| 4,203,431 | A | 5/1980 | Abura et al. |
| 4,428,368 | A | 1/1984 | Torii |
| 4,900,316 | A | 2/1990 | Yamamoto |
| 5,003,966 | A | 4/1991 | Saka et al. |
| 5,377,701 | A | 1/1995 | Fang |
| 5,377,702 | A | 1/1995 | Sakurai |
| 5,593,381 | A | 1/1997 | Tannenbaum et al. |
| 6,099,463 | A | 8/2000 | Hockhalter |
| 6,319,211 | B1 * | 11/2001 | Ito ..................... A61M 1/0047 132/320 |
| 6,464,653 | B1 | 10/2002 | Hovland et al. |
| 6,733,438 | B1 * | 5/2004 | Dann .................... A61H 19/34 600/38 |
| 7,079,898 | B2 * | 7/2006 | Cohn ................... A61F 7/007 601/18 |
| 2001/0041848 | A1 | 11/2001 | Ito et al. |
| 2002/0120219 | A1 | 8/2002 | Hovland et al. |
| 2002/0198488 | A1 | 12/2002 | Yao |
| 2003/0114804 | A1 | 6/2003 | Putzer |
| 2003/0176817 | A1 * | 9/2003 | Chang ................. A61H 23/02 601/9 |
| 2004/0236254 | A1 | 11/2004 | Nichols |
| 2004/0260209 | A1 * | 12/2004 | Ella ................. A61B 18/203 601/7 |
| 2005/0159684 | A1 | 7/2005 | Ikadai |
| 2005/0159760 | A1 * | 7/2005 | Ikadai ............... A61M 1/0058 606/131 |
| 2006/0089572 | A1 | 4/2006 | Byon |
| 2006/0116612 | A1 | 6/2006 | Drysdale |
| 2007/0100259 | A1 | 5/2007 | Nan |
| 2008/0071138 | A1 | 3/2008 | Mertens et al. |
| 2008/0106896 | A1 * | 5/2008 | Liu ...................... A61H 9/0057 362/234 |
| 2008/0304984 | A1 | 12/2008 | Chan |
| 2008/0312674 | A1 | 12/2008 | Chen et al. |
| 2009/0048581 | A1 | 2/2009 | Sebban |
| 2009/0118573 | A1 | 5/2009 | Tsao |
| 2010/0298745 | A1 * | 11/2010 | Liu .................... A61H 9/0057 601/12 |
| 2011/0295162 | A1 * | 12/2011 | Chang ................. A61H 9/0057 601/6 |
| 2013/0012769 | A1 | 1/2013 | Carlson |
| 2013/0116503 | A1 | 5/2013 | Mertens et al. |
| 2014/0142374 | A1 | 5/2014 | Makower et al. |
| 2014/0309565 | A1 | 10/2014 | Allen |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 103961246 A | 8/2014 |
| DE | 582196 | 8/1933 |
| DE | 1463673 U | 2/1939 |
| DE | 1703184 U | 7/1955 |
| DE | 3222467 A1 | 12/1983 |
| DE | 9309994.0 | 11/1993 |
| DE | 4243876 A1 | 6/1994 |
| DE | 10011289 A1 | 9/2001 |
| DE | 19853353 C2 | 5/2002 |
| DE | 102004017702 A1 | 10/2005 |
| DE | 202012005414 U1 | 8/2012 |
| DE | 212013000027 U1 | 9/2014 |
| EP | 0365230 A2 | 4/1990 |
| EP | 1554947 B1 | 7/2005 |
| EP | 2042147 A1 | 4/2009 |
| EP | 2712601 A1 | 4/2014 |
| JP | 53135768 | 11/1978 |
| JP | 53149442 | 12/1978 |
| JP | 54115952 B2 | 9/1979 |
| JP | 57099986 A | 6/1982 |
| JP | H05037234 U | 5/1993 |
| JP | 2000197518 A | 7/2000 |
| JP | 2008-125577 | 6/2008 |
| WO | 9205758 A1 | 4/1992 |
| WO | 00/28939 A2 | 5/2000 |
| WO | 2004004610 A1 | 1/2004 |
| WO | 2006058291 A2 | 6/2006 |
| WO | 2008028076 A2 | 3/2008 |
| WO | 2013178223 A2 | 12/2013 |
| WO | 2014131110 A1 | 9/2014 |
| WO | 2015039787 A1 | 3/2015 |

OTHER PUBLICATIONS

"Valve." Merriam-Webster.com. Merriam-Webster, 2016. Web. Dec. 26, 2016.*

"Pump." Merriam-Webster.com. Merriam-Webster, 2016. Web. Dec. 26, 2016.*

"Sex hilft gegen Erkältung," Focus Online, Dec. 5, 2004, 2 pages.

Beate Lakotta, Schmerz und Glückseligkeit, Der Spiegel, pp. 136-138, Jun. 2006.

"Gesundheitsminister: Mehr Sex gegen Bluthochdruck," http://wvw.heilpraxisnet.delnaturheilpraxis/sex-gegen-bluthochdruck-665.php, Apr. 27, 2010.

International Search Report and Written Opinion mailed on Sep. 25, 2014, in connection with International Patent Application No. PCT/EP2014/065734, 13 pages.

International Search Report and Written Opinion mailed Jul. 22, 2016, in connection with International Patent Application No. PCT/EP2015/067017, 22 pages. English translation not available.

Maria M. Kettenring, "Erotische Partnermassage", Gräfe und Unser Publishers, 2004, 4 pp.

* cited by examiner

**U.S. Patent**        Sep. 19, 2017        Sheet 1 of 7        US 9,763,851 B2

Fig. 1



**U.S. Patent**        Sep. 19, 2017        Sheet 2 of 7        US 9,763,851 B2

Fig. 2



Fig. 3



**U.S. Patent**    Sep. 19, 2017    Sheet 4 of 7    US 9,763,851 B2

Fig. 4



Fig. 5



Fig. 6



Fig. 7



Fig. 8



Fig. 9



Fig. 10a    Fig. 10b    Fig. 10c



Fig. 11



Fig. 12a    Fig. 12b    Fig. 12c

Fig. 12d    Fig. 12e    Fig. 12f





Fig. 13



Fig. 14a



Fig. 14b

Fig. 14c



US 9,763,851 B2

**1**

## STIMULATION DEVICE

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a national stage (under 35 U.S.C. 371) of International Patent Application No. PCT/EP2014/065734, filed Jul. 22, 2014, which claims priority to German Patent Application No. 102013110501.7, filed Sep. 23, 2013, both of which are herein incorporated by reference in their entirety.

The present invention relates to a stimulation device for erogenous zones, in particular for the clitoris, a system with a stimulation device, as well as to methods for stimulating body parts.

The erogenous zones of the human body can be stimulated with a variety of tools. For example, vibrators are used to apply a stimulus to a particular area of the skin by direct contact. However, this form of stimulation can lead to irritations or inflammations of the skin. Also, direct contact of the genital area with such tools for individual reasons of hygiene or due to personal reservations, for example, may not be desired.

In particular, the direct stimulation of the clitoris with a clitoral massage vibrator, for example, is fraught with problems, as the clitoris is usually a woman's most sensitive erogenous zone. The entire clitoris is equipped with numerous nerve endings, thus making it particularly touch-sensitive and responsive to sexual stimuli. Here, the clitoris glans, in which the nerve cords of the two thighs meet, should be particularly emphasized. Frequent use of a clitoral massage vibrator for direct stimulation, for example, leads to habituation effects or conditioning of the stimulated erogenous zone and the initial use of such a device may require certain practice or familiarization.

Furthermore, medical studies conducted in 2006 determined the female clitoris as definitive starting point of the female climax and neurologically proved the different qualities of sensation of clitoral (and vaginal) orgasm for the first time. Thus, according to the most recent medical research, the stimulation of the clitoris, rather than the vagina, is considered the starting point of a woman's sexual arousal and thereby the key to female "sexual pleasure".

The sensitivity of the human erogenous zones, such as the clitoris, the inner and outer labia or the nipples, continues to differ greatly individually. The person may be so sensitive that direct stimulation is only possible after prolonged foreplay, and even then only very subtly or ruled out completely. Furthermore, the sensitivity of the corresponding zone can change dramatically from one situation to another or even during a sexual act.

For the aforementioned reasons, various indirect forms of stimulation are common practice as alternatives to direct stimulation.

For indirect stimulation of erogenous zones, and especially the clitoris, conventional vacuum devices are used to arouse the erogenous zones of the person concerned without directly contacting the main area to be stimulated. Thus, for example, vacuum pumps for the primary or secondary female sexual organs are known, which usually have a suction cup for placing on the appropriate area and a hand pump. The negative-pressure exerted by this type of device on the clitoris, for example, generates a negative pressure in the clitoris itself, which is usually lower than the systolic blood pressure. This difference in pressure leads to an enlargement of the clitoris and/or stimulates the blood flow in the affected area. This vascular clitoral engorgement

**2**

serves both to promote desire by increasing sensitivity and for optical and tactile manipulation. The improved blood circulation also leads to an increased leakage of vaginal moisture which makes the stimulation more pleasurable. However, the manual operation of the hand pump is often annoying or distracting. In addition, the long-term or uninterrupted use of negative-pressure in this device category may lead to habituation effects, which limit the effectiveness of the device in the long run. Moreover, a pure increase in the clitoral blood flow is often insufficient to reach a climax; vacuum pumps are thus often used only as foreplay to achieve the climax with a subsequent direct (pressure) massage of the erogenous zone.

Electrically driven vacuum pumps are also used increasingly instead of manually operated vacuum pumps as well. As an example of this, WO 2006/05 82 91 A2 discloses a device for sexual therapy, wherein the arrangement consists of a tubular suction chamber for the clitoris, an electric vacuum source (vacuum pump) and a plurality of airflow openings. The operation of the vacuum pump generates a permanent airflow or air exchange in the chamber in the area of the clitoris. This has the disadvantageous effect of suctioning the increasingly leaking vaginal moisture caused by the negative-pressure, thus having a drying effect on the stimulated parts of skin. Likewise, the suctioned moist air leads to a contamination of the fluidic subsequent vacuum arrangement, of the vacuum pump for example. Such arrangements with vacuum pumps may thus be hygienically problematic, as vacuum pumps and the associated valves or ventilation components often have dead spaces or blind spots and/or are difficult to clean. Furthermore, the device is meant to treat the blood vessels in the clitoris and not to provide stimulation up to sexual climax.

U.S. Pat. No. 6,099,463 A discloses a clitoris stimulation device with a tubular suction chamber, a vacuum source or a vacuum pump and a plurality of valves, which are used to control the size of the vacuum. The vacuum can also be in cyclic form to achieve a stimulation effect, although habituation effects are also to be expected with this device due to the use of a permanent vacuum. As explained above, the disadvantages relating to hygiene and the dehydration of the skin part to be stimulated are also present here. Likewise, the pressure-related arrangement with a plurality of valves, vacuum pump, etc. is relatively complex.

U.S. Pat. No. 6,464,653 B1 discloses therapeutic devices and methods to generate a clitoral engorgement with the aid of a vacuum generated by a vacuum pump to assist in the treatment of clitoral disorders, such as incontinence. A control valve or modulator that can be correspondingly covered by a finger is used to manually adjust or vary the amount of vacuum in the suction chamber. This requires the user's attention and may be distracting or diverting under certain circumstances. This relatively complex device with additional valves also has the same disadvantages relating to hygiene and dehydration as explained above, although the device is also used for long-term therapeutic purposes and not for short-term sexual stimulation.

WO 2008/02 80 76 A2 discloses a therapeutic device for women, which is mainly dedicated to treating sexual disorders. The device includes a combination of indirect stimulation by means of a vacuum chamber and direct stimulation by means of mechanical vibrators and oscillators.

The negative-pressure in this therapeutic device is used to increase the blood flow in the clitoris, while the area of skin is actually stimulated or massaged by means of direct mechanical vibrations/oscillations. Thus, a suction cup for placing on the area of skin to be stimulated is internally

US 9,763,851 B2

3

connected with a motor via a mechanical connection. The suction cup is extended by the motor once the device is activated, thus increasing the volume of the suction cup. The resulting volume of the suction cup and thus the strength of the vacuum can be adjusted by means of control elements on the device. The air displaced in the device by the suction process is discharged outwardly again via a pipe. The vacuum in this device has only a supporting function, while the actual stimulation ensues directly, which also entails the same disadvantages of a direct stimulation as explained above.

US 2013/001 276 9 A1 discloses a device in which a pulsating positive-pressure is used for stimulating an air pressure massage. A pump or compressor thus generates a pulsating positive-pressure, which is directed towards the erogenous zone to be stimulated by means of a nozzle. This device disadvantageously causes the affected area of skin to dry out severely or completely. Likewise, there is usually a temperature difference between the temperature of the supplied air and the temperature of the area of skin to be stimulated, which may be felt to be distracting under certain circumstances. The same problems of hygiene as explained above also occur in this device, although in this case any pathogens or germs or other contaminations located in the device are also transported directly to the user's genital area.

Thus, the prior art devices all have the same disadvantage in common, in that the complexity of the arrangements generating negative-pressure or positive-pressure may be high and this device may have problems of hygiene.

Furthermore, the prior art devices have another disadvantage in common, in that habituation effects occur in the event of constant or frequently recurring use of negative-pressures.

Another disadvantage of some of the previously described vacuum devices is, firstly, that the negative-pressure has to be limited by means of a control valve or a vacuum pump and, secondly, that the negative-pressure is supposed to be reduced by means of a manual opening of a release valve, before the suction cup is peeled from the skin. Should one of the valves have a technical defect and/or the user operate the device incorrectly, there may be a risk of injury in certain circumstances.

Thus, in view of the problems as explained above, the problem addressed by the invention is to provide a stimulation device with a simple construction that is easy and safe to use.

Another problem addressed by the present invention is to provide a stimulation device with an effective stimulation-triggering effect, which is suitable for stimulating an erogenous zone, especially the female clitoris.

In addition, partial problems addressed by the invention are to provide a device, which prevents the erogenous zones to be stimulated from drying out, is hygienic and prevents habituation effects.

The problem addressed by the invention is solved by the stimulation device described herein. Advantageous developments and embodiments are also described herein.

According to the invention, a pressure field generator in the stimulation device has at least one first chamber and at least one second chamber with at least one opening for placing on a body part or on the erogenous zone and at least one connection element that connects the first chamber with the second chamber.

This embodiment of chambers according to the invention communicating in a fluidic manner via at least one connection element allows the first chamber to simply generate a pressure field in the second chamber by modifying the

4

volume in the first chamber, which is occasionally directed at the area of skin to be stimulated.

A pressure field in terms of the invention is a temporally modifiable field of media pressures, with occasional positive-pressures and occasional negative-pressures, a negative-pressure being a media pressure below the reference pressure and a positive-pressure being a media pressure above the reference pressure.

The medium is usually gaseous, preferably air, but may alternatively or additively, for example, be a liquid medium, such as water or commercially available lubricant. For example, the chambers according to the invention may be filled with the lubricant prior to using the stimulation device. This allows the corresponding area of skin to be stimulated with a suitable skin-friendly liquid in lieu of air as well, whatever the user's individual preference. As another example, the stimulation device may also be used under water with water as the medium (in the bathtub, for example).

The reference pressure is usually the existing ambient pressure in relation to the stimulation device at the beginning of use (i.e. prior to placing the stimulation device on the area of skin to be stimulated). In the preferred use of the stimulation device with air, the reference pressure is the currently existing air pressure or normal pressure.

The pressure field according to the invention excites the blood circulation of the area of skin to be stimulated, while said area of skin is indirectly massaged, thus combining two advantageous effects. The increased blood circulation makes the erogenous zone of the person concerned more sensitive, while generating an additional massage effect that serves, for example, to stimulate the erogenous zone to sexual arousal up to climax. The massage effect is generated by the kinetic energy of the medium flowing out of the first chamber through the connection element against the surface of the area of skin to be stimulated. The massage effect generated in this way is indirect, i.e. without the area of skin to be stimulated being contacted by a solid body, such as a vibrator, which results in the avoidance of the initially explained disadvantages of direct stimulation.

By the exemplary use of the temporally modifiable pressure field according to the invention on the clitoris, the pressure field imitates a stimulation that usually only occurs during sexual intercourse. Likewise, the cohabitation movement generates a varying stimulus on the clitoris. It is thus a true-to-life imitation of the natural act of cohabitation, with medical statements confirming that the use of the pressure field according to the invention causes neither habituation effects nor addiction. This is due in particular to the alternating use of negative- and positive-pressures (or even to the non-continuous use of only one type of pressure).

Furthermore, the maximum applicable pressure is regularly limited by the maximum resilience of the area of skin to be stimulated. Thus, for instance, too high a negative-pressure harbors the risk of painful injury, especially in erogenous zones. Only stimulation devices working with negative-pressures are usually limited to this maximum in their mode of operation. Conversely, the combination of positive- and negative-pressures according to the invention creates an extended working area of the stimulation-triggering pressure field or effect, as the working area of the pressure can now be exploited to the maximum in both the positive and negative area.

The orientation of the at least one connection element towards the area of skin to be stimulated allows the pressure field to work directly, wherein the pressure field is decisively influenced by the configuration of the at least one connection

US 9,763,851 B2

5

element and of the at least one opening from the connection element into the second chamber, and is thus adjustable after every use of the stimulation device. Thus, for example, the at least one opening of the connection element may be located opposite and preferably directly opposite the body part to be stimulated. For example, the connection element in a stimulation device intended for the clitoris may have a single passageway with nozzle effect on the clitoris glans between the first and second chamber. Alternatively, the at least one connection element may consist of a plurality, for example four, of passageways between the chambers, if a larger area of skin is to be stimulated.

Furthermore, after placing the halfway or partially opened second chamber on the area of skin to be stimulated, a self-contained system of media- and airflow is created in the pressure field generator. Thus, for instance, the medium or air is moved decisively backwards and forwards between the chambers, while an interchange with media or with air from outside the system being at least largely avoidable. Thus, the first chamber is preferably connected exclusively with the second chamber via or through the connection element. Thus, no first chamber connections other than those to the second chamber exist; for example, there is no direct first chamber connection to the environment of the device via a pressure valve or via an air discharge channel.

For example, the air temperature in the flow system according to the invention rapidly adjusts to the skin temperature, while the distracting supply of new (possibly cold) air from outside the system is avoided, as may be the case, inter alia, when using vacuum pumps in prior art. Drying effects are also avoided, as very little or no removal of stimulation-promoting fluid, such as bodily fluid, occurs in a closed system.

Furthermore, due to the simple construction, the pressure field generator according to the invention has the advantage of increased hygiene and improved cleanability. The present invention thus avoids valves or pumps/compressors with potential dead spaces and places that cannot be cleaned. The pressure field generator according to the invention is thus easy to clean. For example, the stimulation device can be simply cleaned by filling the first chamber with a cleaning agent and activating the pressure field. Alternatively, the second chamber can be arranged to be replaceable, which also simplifies the cleaning of both chambers. Furthermore, the chambers according to the invention and the connection element of the pressure field generator can be designed in one-piece, wherein the latter consists of a single molded plastic part (e.g. rubber).

In addition, the construction according to the invention avoids complex fluidic elements, such as valves, which leads to a simplification in production.

Furthermore, the stimulation device according to the invention has a drive unit, which modifies the volume in the first chamber in such a way that a pressure field is generated via the connection element in the second chamber that serves to stimulate the erogenous zone, and has a control device that activates the drive unit.

As a matter of principle, the medium transported between the chambers is limited to the maximum volume of the first chamber. In addition, the transported volume can be further constructively limited by the maximum possible volume modification caused by the drive unit.

This means that the maximum positive- or negative-pressure the stimulation device can build up in the second chamber is limited due to the dimensioning of the components of the pressure field generator and of the drive. In particular, the maximum positive- or negative-pressure can

6

be limited to degree that minimizes or excludes any risk of injury for the areas of skin to be stimulated. As a result, any conventional safety valve in prior art or any manual intervention in the stimulation process by the user, such as the opening of a release valve, is rendered unnecessary.

Furthermore, the temporal modification of the pressure field or the modification of the pressure field by the control device is automatically controlled to a large extent. Thus, for example, the modulation of the pressure field, such as intensity, chronological sequence or evolvement, can be pre-saved in the control device. As a preference, the temporal modification of the pressure field can have a regular or reoccurring (stimulation) pattern, such as impulses with a stipulated cycle or regularly alternating impulse sequences. This allows the user's interaction with the stimulation device according to the invention to be limited to switching on and off and selecting the stimulation pattern, while the stimulation device automatically executes the preferred stimulation pattern. Thus, according to the invention, the user complexity of the stimulation device is low, especially when compared with conventional (medical) vacuum stimulation devices. Alternatively, or additionally, the simulation pattern of the stimulation device can be individually configured by the user during or before operation.

Another aspect of the invention proposes a system comprising the stimulation device, which has a remote control device arranged separately from the stimulation device, wherein the control device of the stimulation device is remotely controlled by the remote control device. This allows a conventional wireless (via radio for example) or wired remote control to be employed, in order to allow the remote controlled moderation of the stimulation device or the activation thereof by another user.

Another aspect of the invention proposes a method for stimulating body parts, especially the clitoris. The associated advantages effects and impacts are explained in more detail above in relation to the pressure field.

Another aspect of the invention proposes the use of the stimulation device according to the invention as a sex toy for stimulating the female clitoris. As explained at the beginning, the female clitoris is an especially erogenous zone of women, which is why the use according to the invention of an indirect massage combined with a negative-pressure stimulation for this body part to provide stimulation up to orgasm seems particularly advantageous.

The above-described features and functions of the present invention as well as other aspects and features are further described in the following with the aid of a detailed description of preferred embodiments with reference to the enclosed illustrations.

BRIEF DESCRIPTION OF DRAWINGS

The figures show in:

FIG. 1 a front view of a first embodiment of the stimulation device according to the invention;

FIG. 2 a perspective side view of the first embodiment of the stimulation device according to the invention;

FIG. 3 a cross-section through section A-A of the first embodiment of the stimulation device shown in FIG. 1 according to the invention;

FIG. 4 a cross-section through section A-A of a pressure field generator of the stimulation device shown in FIG. 1 according to a first aspect of the present invention in the first state;

US 9,763,851 B2

7

FIG. **5** a cross-section through section A-A of a pressure field generator of the stimulation device shown in FIG. **1** according to a first aspect of the present invention in the second state;

FIG. **6** a cross-section through section A-A of a pressure field generator of the stimulation device shown in FIG. **1** according to a first aspect of the present invention in the third state;

FIG. **7** a cross-section through section A-A of a pressure field generator of the stimulation device shown in FIG. **1** according to a second aspect of the present invention;

FIG. **8** a cross-section through section A-A of a pressure field generator of the stimulation device shown in FIG. **1** according to a third aspect of the present invention;

FIG. **9** a cross-section through section A-A of a pressure field generator of the stimulation device shown in FIG. **1** according to a fourth aspect of the present invention;

FIG. **10**a), b) and c) cross-sections through section A-A of a pressure field generator of the stimulation device shown in FIG. **1** according to a fifth aspect of the present invention;

FIG. **11** a partial cross-section through section A-A of a second embodiment of the stimulation device of FIG. **1** according to the invention;

FIG. **12**a) to f) various bottom and side views of other aspects of a second chamber of the present invention;

FIG. **13** a block diagram of an embodiment of the present invention;

FIG. **14**a) to c) Diagrams of various pressure modulation patterns of the present invention.

DESCRIPTION OF PREFERRED EMBODIMENTS

With reference to FIG. **1**, a front view of a first embodiment of stimulation device **1** is explained, wherein FIG. **2** shows a perspective view and FIG. **3** a cross-section of the first embodiment of stimulation device **1** according to the invention.

The first embodiment of stimulation device **1** is a preferably electric or small device, comprising a housing **8**, a pressure field generator **2**, operating elements **71**, a display **72**, an on/off switch **74**, a socket **75**, an optional battery **76** and optional lighting **9**.

Housing **8** is preferably designed so ergonomically that it can be held comfortably in one hand and has no sharp or pointed edges. Furthermore, housing **8** may consist of plastic, such as polycarbonate (PC) or acrylonitrile butadiene styrene (ABS). In addition, the gripping areas or even the entire housing may be supplemented by or designed in a haptically advantageous silicone. Housing **8** is preferably designed to be at least water-resistant or splash-proof, for example protection class IP **24**.

Operating elements **71** are used to adjust the device operating mode, i.e. to adjust the pressure field modulation pattern. Operating elements **71** can, for example, be designed as at least one pushbutton, as at least one rotary switch, or as at least one touch-sensitive switch. Furthermore, operating elements **71** can produce an optical feedback for activating light emitting diodes (LED) integrated in the center of the switch, for example.

An optional display **72** serves to inform the user of the device status and/or the setting status. Display **72** can for example be configured as a plurality of light diodes or as an LCD display. The displayed information can, for example, be the charge status of an optional battery or the current setting of the modulation pattern.

8

On/off switch **74** is used for activating and deactivating stimulation device **1**. This on/off switch **74** can, for example, be a pushbutton, which switches stimulation device **1** on or off when held down, or a ratcheting slide switch.

A socket **75** is used to supply the external power of stimulation device **1** via an external plug **73**, which is connected to an external power adapter, for example. To ensure stimulation device **1** is splash-proof, a magnetic-inductive transformer may be provided instead of the socket, which allows power to be transmitted to stimulation device **1** without any electroconductive contact. Stimulation device **1** preferably also has a battery, such as a nickel metal hydride battery (NiMH) for wireless operation. Alternatively, a (longer) power supply cable may also be led out of the stimulation device.

Pressure field generator **2** of a first embodiment has a first chamber **3** in the interior of stimulation device **1**, a second chamber **4** for placing on a body part **11** to be stimulated, and a connection element **5**, which connects the first chamber **3** with the second chamber **4**.

A drive unit **6**, such as an electric motor, drives the first chamber **3** via an axis **61** and by means of an eccentric **62** (or alternatively by means of a connecting rod) in such a way that the volume of the first chamber **3** is modified according to the rotation of axis **61** of drive unit **6**. It is hereby annotated that any drive types causing a deflection in wall **31** of the first chamber **3** for volume modification can basically be used in stimulation device **1**. The latter may, for example, occur hydraulically, pneumatically, piezoelectrically, mechanically or electromagnetically. Examples of this are described in more detail later on.

A control device **7** activates drive unit **6**, operating elements **71** and display **72**. Control device **7** and drive unit **6** are supplied with power by internal battery **76** and/or external power supply **73**. Control device **7** of stimulation device **1** may be remotely controlled by remote control device **78**.

Optional lighting **9** is provided on or in housing **8**. Lighting **9** is preferably used for lighting the interior of the second chamber **4**. Lighting **9** can either be switched by the user or automatically activated by activating stimulation device **1**. Furthermore, lighting **9** can be composed of energy-saving light diodes. The lighting can, for example, serve as an orientation aid in the dark for the user of stimulation device **1** or as additional optical stimulation.

With reference to FIGS. **4**, **5** and **6**, the construction and function of a first aspect of pressure field generator **2** of stimulation device **1** is subsequently described in more detail.

FIG. **4** shows pressure field generator **2** in a first state, with the second chamber **4** being placed on the area of skin or body part **11** to be stimulated. The first state of pressure field generator **2** is characterized by a neutral deflection of the first chamber **3**, i.e. no external force is exerted on the first chamber **3**, for example, by the drive unit. Here, volume V1 of the first chamber is the standard volume of this chamber **3**.

The body part **11** to be stimulated is an area of skin on the body, wherein for example an especially sensitive erogenous zone, clitoris **12**, is shown. The use of the present invention is thus not limited to the female clitoris **11**, instead stimulation device **1** can be used on all body parts or erogenous zones (such as the inside of the upper thighs, the loins, neck, nipples, etc.), which can be stimulated by means of media- or air-pressure massage and/or negative-pressure.

Due to being placed on the body part **11** to be stimulated, the second chamber **4** forms a chamber largely or completely

US 9,763,851 B2

9                                                                        10

sealed off from the exterior of pressure field generator **2**, which is only still connected to the second chamber via connection element **5**, wherein the edges of chamber **4** ideally form an air-tight bond with the surface of body part **11**. Two communicating chambers **3** and **4** are created in this way, wherein corresponding pressure equalization via connection element **5** ensues between chambers **3** and **4** in the event of a volume modification in one of chambers **3** or **4**.

Wall **31** of the first chamber **3** is secured by means of a holder **32**. Holder **32** is in turn attached to housing **8**. Wall **41** of the second chamber is further affixed to holder **32**. Two mutually aligned openings in wall **41** of the second chamber and of holder **32** jointly form connection element **5**, which connects the first chamber **3** and the second chamber **5**. Wall **31**, holder **32** and wall **41** are preferably adhered to each other media- or air-tightly. Alternatively, the latter can also be press-fitted or screwed together with each other (for example by means of sealing areas between housing **8** and the respective part). Holder **32** can also be adhered or screwed onto housing **8**, for example.

Wall **31** of the first chamber **3** preferably consists of a flexible media- or airtight material, such as rubber. Holder **32** preferably consists of a rigid plastic, which is just as media- and airtight. Wall **41** of the second chamber is preferably made of a flexible, skin-friendly material, such as silicone or rubber.

FIG. **5** shows pressure field generator **2** of FIG. **4** in a second state, wherein the second chamber **4** is in turn placed on the body part **11** to be stimulated. The second state is characterized in that a force A affecting the first chamber **3** causes chamber **3** to expand. In detail, force A in this embodiment draws wall **31** of the first chamber **3** in a direction facing away from the second chamber **4**.

Volume V**2** in chamber **3** increases as a result, i.e., V**2**>V**1**. To equalize the difference in pressure created between chambers **3** and **4**, the media or air now flows from the second chamber **4** into the first chamber **3**.

Assuming that the first state of the present pressure in chambers **3** and **4** corresponds to the currently prevailing external reference pressure (air pressure for example); the present overall pressure in the second state will now be less than the external reference pressure. This negative-pressure is designed in such a way that it is preferably less than the usual systolic blood pressure in the blood vessels of body part **11**. The blood circulation in this area thus increases and clitoris **12** is better supplied with blood in the second state.

FIG. **6** shows pressure field generator **2** in a third state, wherein the second chamber **4** is in turn placed on the body part **11** to be stimulated. The third state is characterized in that a force B influencing the first chamber **3** causes a volume reduction or compression in chamber **3**. In detail, the direction of force B is opposed to the direction of force A and distorts wall **31** of the first chamber in such a way that the resulting volume V**3** of chamber **3** is less than volume V**1**. The compression of chamber **3** causes an positive-pressure in chamber **3**, which is equalized by a media- or airflow through connection element **5** in the direction of the second chamber **4**.

This media flow is now preferably directed by the orientation of opening **51** and/or of connection element **5** towards the body part **11** to be stimulated, in particular towards the glans of clitoris **12**. The indirect (pressure) massage according to the invention ensues due to the medium flowing onto body part **11**. The size of opening **51** is dimensioned in such a way that it is small enough in ratio to the volume displaced in the first chamber **3** to sufficiently accelerate the medium for a perceptible massage effect.

Furthermore, the type of flow can not only be advantageously influenced by the size and orientation of opening **51**, but also by the inner configuration of the connection element. For example, helix-shaped grooves in connection element **5** can cause the flow according to the invention to swirl, wherein the flow profile of the flow unfurls a "softer" or more turbulent effect on the body part to be stimulated. Alternatively, the resulting pressure field in the second chamber **4** can be adjusted by means of a plurality of openings **51**, depending on use.

The advantageous factor of the arrangement shown in FIGS. **4** to **6** is that it is hygienically unproblematic (due to the avoidance of dead spaces, for example) and is simple to produce. For example, no valves or other openings in or on the first chamber **3** are required.

FIG. **7** shows a second aspect of the present invention with an alternative construction of pressure field generator **2**. Walls **31** and **41** of the first and second chambers **3** and **4** respectively can thus engage with one another in such a way that they also form two communicating chambers with a connection element **5**, as in the first aspect of the construction of pressure field generator **2**. Thus, the separate holder is no longer required, while the second chamber **4** is replaceable. In addition, connection element **5** can be designed integrally or in one-piece with wall **41** of the second chamber **4**. A replaceable chamber **4** has the advantage of allowing the use of any shapes of chamber **4** adjusted to the respective body part (a more detailed description thereof is provided later), without the entire stimulation device **1** needing to be replaced. Alternatively, the second chamber **4** can also be pluggably affixed to housing **8** (not shown in more detail). Wall **31** of the first chamber **3** can be adhered or screwed onto housing **8**, for example.

Also, as shown in more detail in FIG. **7** by the broken line and double arrow C, the first chamber **3** is expanded and compressed by a force exerted perpendicularly to the axial direction of connection element **5**. In principle, the force exerted directly or indirectly on the first chamber **3** by drive unit **5** can be exerted from any direction. The only decisive criterion here is that the volume of the first chamber **3** can be increased and decreased by drive unit **6**.

FIG. **8** shows a third aspect of the invention with an integral or one-piece structure of pressure field generator **2**. An elastic material, such as silicone or rubber, can be used as material for chambers **3** and **4**. The advantage here is that any hygienically unsafe divide is avoided and the production effort is reduced. Pressure field generator **2** can be adhered or screwed onto housing **8** in this case too. Any modification of the volume in the first chamber **3** is analogous here, as described in conjunction with FIG. **7**.

FIG. **9** shows a fourth aspect of the invention with an alternative construction of pressure field generator **2**. The second chamber **4**, a plurality of connection elements **5**, as well as partial sections of wall **31** of the first chamber **3** are designed in one-piece. Alternatively, pressure field generator **2** can be constructed in two or more pieces from individual components, while safeguarding the geometrical example of FIG. **9** in a similar way to that shown in FIG. **4** or **7**.

The volume in chamber **3** is modified in a similar way to a piston pump, although no valves are available here. A piston **63** is thus moved backwards and forwards by the drive unit, for example an electric motor or electromagnet, in the directions of the double arrow D. This type of drive has the advantage that the volume of the first chamber **3** can be simply reduced to zero or almost zero, thus allowing the first chamber **3** to be almost completely emptied.

US 9,763,851 B2

11

The embodiment of connection element **5**, with a plurality of channels **52** and openings **51**, leads to a distribution of the pressure field to a plurality of concentration points. While the embodiment of connection element **5** with only one channel, as described in conjunction with FIG. **6**, leads to the formation of a strongly concentrated media- or airflow on a target area, the embodiment of connection element **5** shown in FIG. **9** allows the media- or airflow to be distributed to a plurality of target areas, thus allowing clitoris **11** to be blown not just on its glans, but equally from a plurality of directions as well, for example. Depending on use, this distribution of the airflow concentration to a plurality of areas can help to avoid any overstimulation and/or help to increase the stimulation area.

FIGS. **10** *a* to **10** *c* show a fifth aspect of the invention with (partial) cross-sections of a construction of pressure field generator **2** with a bending element **64** as drive for modifying the volume in the first chamber **3**. Bending element **64** can, for example, be a conventional piezoelectric bending element, which distorts or bends once voltage is applied. In this aspect of the invention wall **31** of the first chamber **3** is a rigid or stiff construction, while bending element **64** is suitably dovetailed to the sides of the first chamber **3**. The transition points between bending element **64** and wall **31** are sealed (elastically bonded for example). The drive for pressure field generator **2** is already integrated in this construction and an external drive is not required. An electric motor with an eccentric is not needed, for example. This allows, inter alia, the reduction of any disturbing natural oscillations due to the eccentric movement of the stimulation device.

In detail, FIG. **10** *a* shows pressure field generator **2** with bending element **64** in a neutral position. Thus, the volume of the first chamber **3** with bending element **64** in the neutral position is the standard volume. FIG. **10** *b* also shows the first chamber **3** with an excited and, consequently, outwardly bent bending element, while the volume of the first chamber **3** is increased, with a negative-pressure consequently prevailing in pressure field generator **2**. FIG. **10** *c* shows a bending element of the first chamber **3** excited in the opposite direction to FIG. **10** *b*, which is why the volume in the first chamber **3** has decreased, with a positive-pressure consequently prevailing in pressure field generator **2**.

FIG. **11** shows a second embodiment of the invention with a locally separated arrangement of chambers **3** and **4** of pressure field generator **2**. Chambers **3** and **4** are connected via an extended connection element **5**, which can be a longer flexible hose or even a rigid pipe. For example, connection element **5** may be 0.5 m in length. This enables housing **8** to be held in one hand, while the other hand holds the second chamber **4** on the body part **11** to be stimulated; or one can simply lay housing **8** aside, while the user holds only the second chamber **4** in his/her hands. The stimulation device in this embodiment can also be designed as a table device.

FIGS. **12** *a*) to **12** *f*) show various bottom and side views of other aspects of the second chamber **4** of the present invention. In detail, FIG. **12** *a*) shows a bottom view of a circular second chamber **4** with a centrally arranged opening **51**; FIG. **12** *b*) a bottom view of a triangular second chamber **4** with a centrally arranged opening **51**; FIG. **12** *c*) a bottom view of an oval second chamber **4** with a centrally arranged opening **51**; and FIG. **12** *d*) a bottom view of an almost eight-shaped second chamber **4** with two openings **51** shifted to the center. FIG. **12** *e*) further shows a side cross-section of a second chamber **4** according to the invention, wherein the second chamber **4** has an additional extended contact surface or sealing bearing part **43** to the

12

skin or a support part **43** to improve the sealing function of the second chamber **4** on the skin. The extended contact surface **43** may also have grooves or projections that improve the sealing function even more. FIG. **12** *f*) shows a side cross-section of a second chamber **4** with a plurality of separate connection elements **5** and an extended contact surface due to support part **43**.

In principle, the form of the second chamber **4** can thus be adjusted to the anatomy of the erogenous zone to be stimulated. The form of chamber **4** in FIG. **12** *a*) is, for example, adjusted to the round shape of the breast, while the form of chamber **4** in FIG. **12** *c*) is better suited to the form of the female vulva. Furthermore, the shape of the second chamber **4** also determines the characteristic of the pressure field according to the invention. The size of the second chamber **4** in ratio the volume displaced from chamber **3** thus determines the amount of the achievable negative- or positive-pressure. Furthermore, the proximity of opening **51** of connection element **5** to the area of skin to be stimulated can also be used to determine the intensity of the massage effect according to the invention on said area of skin. A plurality of openings **51**, cf. FIG. **12** *d*) allows the massage effect to be distributed to a plurality of areas. Thus, for example, the clitoris can be less directly stimulated at the very sensitive clitoris glans (cf. FIG. **12** *e*), and more stimulated at the areas surrounding the clitoris glans, in order to prevent overstimulation of the clitoris.

FIG. **13** shows a block diagram of an example of the functional construction of an embodiment of the present invention with a control device **7**, a drive unit **6**, lighting **9**, an on/off switch **74**, operating elements **71**, a battery **76** and an external power supply **73**.

Control device **7**, which has a microcontroller or is hardwired, for example, initially controls the power supply of all users of stimulation device **1**, as well as an optional charging and discharging process of battery **76** and/or a battery management. In particular, control device **7** controls the excitation of drive unit **6**, such as the size of the deflection, the frequency, the modulation, etc.

Furthermore, control device **7** may have a memory in which at least one modulation or stimulation pattern (described in more detail in conjunction with FIG. **14** a) to d)) is saved. The excitation of drive unit **6** can now be activated via operating elements **71** in compliance with the previously saved stimulation pattern at the discretion of the user of stimulation device **1**. The stimulation pattern of the pressure field can also be optionally and individually adjusted and saved by the user via the operating elements.

FIG. **14** a) shows the chronological sequence of a total pressure p in the pressure field generator (**2**) when using the latter for stimulation. The broken line provides the reference pressure, such as the currently prevailing atmospheric pressure that exists outside the pressure field generator (**2**). If the second chamber **4** is now placed on body part **11** to be stimulated, the originally prevailing ambient pressure in the pressure field generator (**2**) is maintained, for example. It is now assumed that the second chamber **4** is sealed tightly to the body part to be stimulated for the most part. Once the stimulation device is activated, drive unit **6** is activated or excited by control device **7** according to a previously saved stimulation pattern. Accordingly, the volume of the first chamber **3** and thus the total pressure in pressure field generator **2** are modified, with the pressure modifications being modified to the reference pressure. The pressure or stimulation pattern shown as an example in FIG. **14** a) develops a pulsed, regular pressure field. In phases of pressure increase, the erogenous zone to be stimulated is

US 9,763,851 B2

13

blown on or massaged, while in the times when a negative-pressure prevails, the blood circulation of body part **11**, the clitoris for example, is promoted. Thus, time periods according to the invention exist (designated in FIG. **14** *a*) as I)) in which a negative-pressure prevails, while the clitoris is simultaneously indirectly massaged.

FIG. **14** *b*) shows three examples of alternative stimulation patterns. Thus, the area designated as II) shows a pulsed stimulation pattern with high amplitude. The area designated as III) shows a pulsed stimulation pattern with low amplitude. Furthermore, the area designated as IV) illustrates an irregular and asymmetrical stimulation pattern as regards chronological sequence and amplitude. The patterns can be varied according to individual bodily effect/use and according to individual wishes.

FIG. **14** *c*) shows another example of an alternative stimulation pattern. The strength of pressure may, for example, increase with time, in order to adjust to the user's state of excitement.

In addition to the explained embodiments, the invention allows other basic design principles. For example, different arrangements or constructions of the first chamber **3** may be arbitrarily combined with various embodiments of the second chamber **5** or connection element **5**. For example, the first chamber **3** with the drive in FIG. **10** can be combined with the second chamber in FIG. **12** *f*).

Although only one first chamber **3** is shown in all embodiments, two or more first chambers **3** may be present, which are then appropriately activated simultaneously or time-delayed in such a way that their volume is modified in order to build up a pressure field according to the invention.

Although only one opening from the first chamber **3** to connection element **5** is shown in all embodiments, a plurality of openings for a connection element **5** or even more openings for a plurality of connection elements **5** may be present in the first chamber **3**.

A stimulation device **1** can have a plurality of pressure field generator **2**. Thus, for example, two pressure field generators may be available to stimulate two erogenous zones simultaneously.

The stimulation patterns according to the invention can deviate from the patterns shows in FIG. **14** *a*), *b*) and *c*), as long as they have a chronological sequence of over- and negative-pressures. For example, a relatively long-lasting negative-pressure can initially be built up at the beginning or after activation of the device (3 minutes for example), in order to effectively increase the blood circulation of the zone to be stimulated, whereupon pulsed negative- and over-pressures of a slowly increasing amplitude then follow.

LIST OF REFERENCE NUMERALS

**1** Stimulation device
**2** Pressure field generator
**3** First chamber
**4** Second chamber
Connection element
**6** Drive unit
**7** Control device
**8** Housing
**9** Lighting
**11** Body part
**12** Clitoris
**31** Wall of first chamber
**32** Holder
**41** Wall of second chamber
**42** Opening of first chamber

14

**43** Contact surface
**51** Opening of connection element to second chamber
**61** Drive shaft
**62** Eccentric
**63** Piston
**64** Bending element
**71** Operating element
**72** Display
**73** Power supply
**74** On/off switch
**75** Socket
**76** Battery
**77** Control board
**78** Remote control

The invention claimed is:

**1**. A stimulation device for a clitoris, comprising:

a pressure field generator comprising:
  a first chamber having a single opening;
  a second chamber having first and second openings, the second opening of the second chamber for placing over the clitoris; and
  a connection element having a first opening and a separate second opening thereby forming a straight channel connecting the single opening of the first chamber with the first opening of the second chamber;

a drive unit that changes a volume of the first chamber in such a manner that a stimulating pressure field is generated in the second chamber via the connection element; and

a control device that actuates

the drive unit; and a housing enclosing the pressure field generator, the drive unit, and the control device; wherein:

the pressure field generated in the second chamber consists of a pattern of negative and positive pressures modulated with respect to a reference pressure,

the first chamber is connected with the second chamber solely by the connection element,

the stimulation device has no valves,

the stimulation device is a portable hand-held device with a battery,

the connection element is rigid and the first and second openings of the connection element are aligned to one another so that a media flow during a compression of the first chamber is directed to the clitoris through the straight channel with a nozzle effect, and

the second opening of the connection element is configured to face the clitoris through the second chamber.

**2**. The stimulation device according to claim **1**, wherein the second chamber is made of a flexible material and/or is fitted to a shape of a vaginal labia minora in such a way that the latter is completely covered by the opening of the second chamber.

**3**. The stimulation device according to claim **1**, wherein the second chamber is designed in one-piece with the connection element and the first chamber.

**4**. The stimulation device according to claim **1**, wherein the second chamber of the stimulation device is arranged to be replaceable.

**5**. The stimulation device according to claim **1**, wherein the second chamber has a sealing bearing part to enlarge a contact surface of the second chamber on a skin.

**6**. The stimulation device according to claim **1**, wherein the respective modulation of the pressure field is modifiable by means of an operating element.

US 9,763,851 B2

15

**7**. The stimulation device according to claim **1**, wherein the stimulation device has lighting for lighting the second chamber.

**8**. A system, comprising:

a stimulation device for a clitoris comprising:

a pressure field generator comprising:

a first chamber having a single opening;

a second chamber having first and second openings, the second opening of the second chamber for placing over the clitoris; and

a connection element having a first opening and a separate second opening thereby forming a straight channel connecting the single opening of the first chamber with the first opening of the second chamber;

a drive unit that changes a volume of the first chamber in such a manner that a stimulating pressure field is generated in the second chamber via the connection element; and

a control device that actuates the drive unit;

a housing enclosing the pressure field generator, the drive unit, and the control device; and

16

a remote control device arranged separately to the stimulation device,

wherein:

the pressure field generated in the second chamber consists of a pattern of negative and positive pressures modulated with respect to a reference pressure,

the first chamber is connected with the second chamber solely by the connection element,

the stimulation device has no valves,

the stimulation device is a portable hand-held device with a battery,

the connection element is rigid and the first and second openings of the connection element are aligned to one another so that a media flow during a compression of the first chamber is directed to the clitoris through the straight channel with a nozzle effect, and

the second opening of the connection element is facing the clitoris through the second chamber; and

the control device of the stimulation device is remote controlled by the remote control device.

*   *   *   *   *

*Exhibit 20*







*Exhibit 21*

US009937097B2

(12) **United States Patent**
Lenke

(10) **Patent No.:** US 9,937,097 B2
(45) **Date of Patent:** *Apr. 10, 2018

(54) **STIMULATION DEVICE HAVING AN APPENDAGE**

(71) Applicant: **NOVOLUTO GmbH**, Metten (DE)

(72) Inventor: **Michael Lenke**, Metten (DE)

(73) Assignee: **NOVOLUTO GMBH**, Metten (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/487,123**

(22) Filed: **Apr. 13, 2017**

(65) **Prior Publication Data**

US 2017/0216135 A1    Aug. 3, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 15/302,981, filed as application No. PCT/EP2015/067017 on Jul. 24, 2015.

(30) **Foreign Application Priority Data**

Mar. 13, 2015    (DE) ........................ 10 2015 103 694

(51) **Int. Cl.**
  *A61F 5/00*    (2006.01)
  *A61H 19/00*    (2006.01)
  (Continued)

(52) **U.S. Cl.**
  CPC ........... *A61H 19/34* (2013.01); *A61H 9/0057* (2013.01); *A61H 19/44* (2013.01); *A61H 23/02* (2013.01);
  (Continued)

(58) **Field of Classification Search**
  CPC ........ A61H 19/00; A61H 19/30; A61H 19/34; A61H 19/40; A61H 19/44; A61H 23/00; A61H 9/0057
  (Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

1,730,535 A    10/1929  Rudolph
1,882,040 A    10/1932  Roehm
(Continued)

FOREIGN PATENT DOCUMENTS

CN    2153352 Y    1/1994
CN    2198900 Y    5/1995
(Continued)

OTHER PUBLICATIONS

International Search Report and Written Opinion dated Jul. 22, 2016, in connection with International Patent Application No. PCT/EP2015/067017, 29 pages.

(Continued)

*Primary Examiner* — John Lacyk
(74) *Attorney, Agent, or Firm* — Chiesa Shahinian & Giantomasi PC

(57) **ABSTRACT**

A stimulation device is provided in accordance with one embodiment. The stimulation device includes a chamber which has a flexible wall portion. A drive unit of the stimulation device is in physical communication with the flexible wall portion so as to cause deflections of the flexible wall portion in opposing directions, thereby resulting in a changing volume of the chamber. The changing volume of the chamber results in modulated positive and negative pressures with respect to a reference pressure. An opening of the stimulation device is for applying the modulated positive and negative pressures to a body part. An appendage of the stimulation device may be used as a handle to allow a user to position the stimulation device over the body part. The stimulation device includes a control device for controlling the drive unit.

**30 Claims, 7 Drawing Sheets**



## US 9,937,097 B2

Page 2

(51) **Int. Cl.**
   *A61H 9/00*         (2006.01)
   *A61H 23/02*        (2006.01)
(52) **U.S. Cl.**
   CPC ................ *A61H 2201/0107* (2013.01); *A61H 2201/0188* (2013.01); *A61H 2201/0192* (2013.01); *A61H 2201/5097* (2013.01)
(58) **Field of Classification Search**
   USPC ...................................................... 600/38
   See application file for complete search history.

(56)                    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,898,652 | A | 2/1933 | Williams |
| 1,964,590 | A | 6/1934 | Friederich |
| 2,017,284 | A | 10/1935 | Lembright |
| 2,076,410 | A | 4/1937 | McGerry |
| 2,112,646 | A | 3/1938 | Biederman |
| 2,154,427 | A | 4/1939 | Andres |
| 2,234,102 | A | 3/1941 | Andres |
| 2,314,590 | A | 3/1943 | McCarty |
| 2,519,790 | A | 8/1950 | Quinn |
| 2,561,034 | A | 7/1951 | Phillips |
| 3,396,720 | A | 8/1968 | Shigeyuki |
| 3,906,940 | A | 9/1975 | Kawada |
| 3,910,262 | A | 10/1975 | Stoughton |
| 4,088,128 | A | 5/1978 | Mabuchi |
| 4,203,431 | A | 5/1980 | Abura et al. |
| 4,428,368 | A | 1/1984 | Torii |
| 4,900,316 | A | 2/1990 | Yamamoto |
| 5,003,966 | A | 4/1991 | Saka et al. |
| 5,377,701 | A | 1/1995 | Fang |
| 5,377,702 | A | 1/1995 | Sakurai |
| 5,593,381 | A | 1/1997 | Tannenbaum et al. |
| 6,099,463 | A | 8/2000 | Hockhalter |
| 6,319,211 | B1 | 11/2001 | Ito et al. |
| 6,464,653 | B1 | 10/2002 | Hovland et al. |
| 6,733,438 | B1 | 5/2004 | Dann et al. |
| 7,079,898 | B2 | 7/2006 | Cohn |
| 2001/0041848 | A1 | 11/2001 | Ito et al. |
| 2002/0120219 | A1 | 8/2002 | Hovland et al. |
| 2002/0198488 | A1 | 12/2002 | Yao |
| 2003/0114804 | A1 | 6/2003 | Putzer |
| 2004/0236254 | A1 | 11/2004 | Nichols |
| 2004/0260209 | A1 | 12/2004 | Ella et al. |
| 2005/0159684 | A1 | 7/2005 | Ikadai |
| 2006/0089572 | A1 | 4/2006 | Byon |
| 2006/0116612 | A1 | 6/2006 | Drysdale |
| 2007/0100259 | A1 | 5/2007 | Nan |
| 2008/0071138 | A1 | 3/2008 | Mertens et al. |
| 2008/0106896 | A1 | 5/2008 | Liu et al. |
| 2008/0304984 | A1 | 12/2008 | Chan |
| 2008/0312674 | A1 | 12/2008 | Chen et al. |
| 2009/0048581 | A2 | 2/2009 | Sebban |
| 2009/0118573 | A1 | 5/2009 | Tsao |
| 2010/0298745 | A1 | 11/2010 | Liu et al. |
| 2011/0295162 | A1 | 12/2011 | Chang et al. |
| 2013/0012769 | A1 | 1/2013 | Carlson |
| 2013/0116503 | A1 | 5/2013 | Mertens et al. |
| 2014/0142374 | A1 | 5/2014 | Makower et al. |
| 2014/0309565 | A1 | 10/2014 | Allen |
| 2016/0213557 | A1 | 7/2016 | Lenke |
| 2017/0065483 | A1 | 3/2017 | Lenke |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101848688 | A | 9/2010 |
| CN | 102151219 | A | 8/2011 |
| CN | 202154785 | U | 3/2012 |
| CN | 102600034 | A | 7/2012 |
| CN | 102743275 | A | 10/2012 |
| CN | 102743276 | A | 10/2012 |
| CN | 103517697 | A | 1/2014 |
| CN | 103961246 | A | 8/2014 |
| CN | 104248500 | A | 12/2014 |
| CN | 204931954 | U | 1/2016 |
| CN | 205494128 | U | 8/2016 |
| DE | 582196 | | 8/1933 |
| DE | 1463673 | U | 2/1939 |
| DE | 1703184 | U | 7/1955 |
| DE | 3222467 | A1 | 12/1983 |
| DE | 9309994.0 | | 11/1993 |
| DE | 4243876 | A1 | 6/1994 |
| DE | 10011289 | A1 | 9/2001 |
| DE | 20112384 | U1 | 10/2001 |
| DE | 19853353 | C2 | 5/2002 |
| DE | 102004017702 | A1 | 10/2005 |
| DE | 202012005414 | U1 | 8/2012 |
| DE | 212013000027 | U1 | 9/2014 |
| EP | 0365230 | A2 | 4/1990 |
| EP | 1554947 | B1 | 7/2005 |
| EP | 2042147 | A1 | 4/2009 |
| EP | 2712601 | A1 | 4/2014 |
| JP | 53135768 | | 11/1978 |
| JP | 53149442 | | 12/1978 |
| JP | 54115952 | B2 | 9/1979 |
| JP | 57099986 | A | 6/1982 |
| JP | H05037234 | U | 5/1993 |
| JP | 2000197518 | A | 7/2000 |
| JP | 2008-125577 | | 6/2008 |
| WO | 3205758 | A1 | 4/1992 |
| WO | 2000/28939 | A2 | 5/2000 |
| WO | 2004004610 | A1 | 1/2004 |
| WO | 2006058291 | A2 | 6/2006 |
| WO | 2008028076 | A2 | 3/2008 |
| WO | 2013178223 | A2 | 12/2013 |
| WO | 2014131110 | A1 | 9/2014 |
| WO | 2015039787 | A1 | 3/2015 |

### OTHER PUBLICATIONS

International Search Report and Written Opinion dated Sep. 25, 2014, in connection with International Patent Application No. PCT/EP2014/065734, 14 pages.

"Sex hilft gegen Erkältung," Focus Online, Dec. 5, 2004, 2 pages.

"Gesundheitsminister: Mehr Sex gegen Bluthochdruck," http://www.heilpraxisnet.delnaturheilpraxis/sex-gegen-bluthochdruck-665.php, Apr. 27, 2010.

Beate Lakotta, Schmerz und Glückseligkeit, Der Spiegel, pp. 136-138, Jun. 2006.

Maria M. Kettenring, "Erotische Partnermassage", Gräfe und Unser Publishers, 2004, 4 pp.

Nonfinal Office Action dated Aug. 26, 2016 by the United States Patent and Trademark Office in connection with U.S. Appl. No. 15/023,471, 25 pp.

Final Office Action dated Jan. 6, 2017 by the United States Patent and Trademark Office in connection with U.S. Appl. No. 15/023,471, 28 pp.

Nonfinal Office Action dated Feb. 24, 2017 by the United States Patent and Trademark Office in connection with U.S. Appl. No. 15/354,599, 38 pp.

Examination Report dated Dec. 20, 2017 from Australian Patent Application No. 2017228536; 5 pages.

Document submitted in opposition of German Patent No. 102013110501.7 on Jan. 24, 2018; 34 pages.

Fig. 1



Fig. 2



Fig. 3



Fig. 4



Fig. 5



Fig. 6



Fig. 7



Fig. 8



Fig. 9



Fig. 10a        Fig. 10b        Fig. 10c



Fig. 11



Fig. 12a        Fig. 12b        Fig. 12c



Fig. 12d        Fig. 12e        Fig. 12f



Fig. 13



Fig. 14a



Fig. 14b



Fig. 14c



US 9,937,097 B2

1

# STIMULATION DEVICE HAVING AN APPENDAGE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/302,981, filed Oct. 7, 2016, which is a national stage (under 35 U.S.C. 371) of International Patent Application No. PCT/EP2015/67017, filed Jul. 24, 2015, which claims priority to German Patent Application No. 102015103694.0, filed Mar. 13, 2015, the disclosures of which are herein incorporated by reference in their entirety.

## TECHNICAL FIELD

The present invention relates to a stimulation device having an appendage for erogenous zones, in particular for the clitoris, a system with a stimulation device, and methods for stimulating body parts.

## BACKGROUND

The erogenous zones of the human body can be stimulated with a variety of aids. For example, vibrators are used to apply a stimulus to a particular area of the skin by direct contact. These include stimulation aids for insertion into the human body, such as dildos.

Direct stimulation of the clitoris, for example using a clitoral massage vibrator, is frequently problematic. The clitoris is usually a woman's most sensitive erogenous zone. The entire clitoris is highly innervated, making it particularly touch-sensitive and responsive to sexual stimuli. In this context, the clitoral glans, in which the nerve cords of the two crura meet, should be emphasized in particular. Thus, on the one hand frequent application of a clitoral massage vibrator for direct stimulation leads to habituation effects or conditioning of the stimulated erogenous zone, while on the other the first applications of such a device may require certain practice or familiarization. Moreover, indirect stimulation of the female erogenous zones may be insufficient, or it may be desired to intensity the stimulation effect.

Furthermore, medical studies conducted in 2006 identified the female clitoris as the definitive starting point of the female climax, and for the first time neurologically traced the different qualities of sensation of clitoral and vaginal orgasm. Thus, both the clitoris and the vagina are capable of orgasm.

Furthermore, the sensitivity of the human erogenous zones, such as the clitoris, the inner and outer labia or the nipples, differs greatly from one individual to the next. Moreover, the sensitivity of the corresponding zone can change dramatically from one situation to another or even during a sexual act. Furthermore, a rapid and pronounced stimulation of different erogenous zones is frequently desired.

Various direct and indirect forms of stimulation are usual practice, for example vacuum pumps and dildos.

For indirect stimulation of erogenous zones, and particularly the clitoris, conventional vacuum devices are used to stimulate the erogenous zones of the person concerned without directly contacting the main area to be stimulated. Thus, for example, vacuum pumps for the primary or secondary female sexual organs are known, which usually have a suction cup for placing on the appropriate area and a hand pump. The negative pressure exerted by this type of device on the clitoris, for example, generates a negative

2

pressure in the clitoris itself which is usually below the systolic blood pressure. This difference in pressure results in an enlargement of the clitoris and/or stimulates the blood flow in the affected area. This vascular clitoral engorgement serves both to promote desire by increasing sensitivity and for visual and tactile manipulation. The improved blood circulation also results in an increased secretion of vaginal moisture, which makes the stimulation more pleasurable. However, the manual operation of the hand pump is often onerous or irksome. In addition, the long-term or uninterrupted application of negative pressure with this device category too may result in habituation effects, which limit the effectiveness of the device in the long term.

Electrically driven vacuum pumps are also increasingly used instead of a manually operated vacuum pump. As an example of this, WO 2006/05 82 91 A2 discloses a device for sexual therapy, wherein the arrangement comprises a tubular suction chamber for the clitoris, an electrical vacuum source (vacuum pump) and a plurality of air flow openings. Operation of the vacuum pump generates an ongoing air flow or air exchange in the chamber, in the area of the clitoris. This has the disadvantageous effect of drawing off by suction the vaginal moisture, which is increased as a result of the negative pressure, thus having a drying effect on the stimulated skin parts. Likewise, the drawn-off moist air results in contamination of the fluidically downstream vacuum arrangement, for example the vacuum pump. Such arrangements with vacuum pumps may thus be problematic from the point of view of hygiene, as vacuum pumps and the associated valves or ventilation components often have dead spaces and/or are difficult to clean. Furthermore, the device serves to treat the blood vessels in the clitoris and not to provide stimulation up to sexual climax.

U.S. Pat. No. 6,464,653 B1 discloses therapeutic devices and methods that generate a clitoral engorgement with the aid of a vacuum generated by a vacuum pump to assist in the treatment of clitoral disorders such as incontinence. A control valve or modulator that can be appropriately covered by a finger is used to manually adjust or vary the level of vacuum in the suction chamber. This requires the user's attention and may be irksome or distracting under certain circumstances. This relatively complex device having further valves also has the disadvantages relating to hygiene and dehydration that were mentioned above, with the device moreover serving for long-term therapeutic purposes and not for short-term sexual stimulation.

Thus, the devices of the prior art have the common disadvantage that the complexity of the arrangements generating negative pressure or positive pressure may be high and this device may have problems in respect of hygiene. Moreover, there is a problem of ease of handling the devices, which are frequently uncomfortable to hold and/or require habituation.

Furthermore, the devices of the prior art have the further common disadvantage in that habituation effects occur in the event of long-term, continuous or frequently recurring application of negative pressures.

Another disadvantage of some of the previously described vacuum devices is, firstly, that the negative pressure has to be limited by means of a control valve or a vacuum pump and, secondly, that the negative pressure is supposed to be relieved by means of manually opening a release valve before the suction cup is detached from the skin. Should one of the valves have a technical defect and/or the user operate the device incorrectly, there is a risk of injury in certain circumstances.

US 9,937,097 B2

3

Thus, in view of the problems mentioned above, one object of the embodiments described herein is to provide a stimulation device that has a simple construction, is easy and safe to use, and has a pronounced stimulation effect.

This object is achieved by the stimulation device as described herein. Advantageous developments and embodiments are also described herein.

SUMMARY

A stimulation device is provided in accordance with one embodiment. The stimulation device includes a chamber which has a flexible wall portion. In one embodiment, the flexible wall portion may include silicon and may be integral with the chamber. A drive unit of the stimulation device is in physical communication with the flexible wall portion so as to cause deflections of the flexible wall portion in opposing directions, thereby resulting in a changing volume of the chamber. The changing volume of the chamber results in modulated positive and negative pressures with respect to a reference pressure. The modulated positive and negative pressures are applied to a body part (e.g., a clitoris) through an opening of the stimulation device. For example, the opening of the stimulation device may be placed over the body part to apply the modulated positive and negative pressures. The stimulation device may include an appendage, which can be used as a handle to allow a user to hold and position the stimulation device over the body part. The drive unit is controlled by a control device of the stimulation device.

In one embodiment, the stimulation device includes a second chamber. The changing volume of the chamber results in the modulated positive and negative pressures in the second chamber.

In one embodiment, the stimulation device is rigid such that the stimulation device does not significantly bend. The stimulation device may be a portable, hand-held, battery powered device. The stimulation device may also have an operating element for adjusting the modulated positive and negative pressures and a light emitting diode for indicating a status of the stimulation device.

In accordance with an embodiment, the stimulation device includes a pressure field generator which has a flexible wall portion. A drive unit of the stimulation device is in physical communication with the flexible wall portion so as to cause deflections of the flexible wall portion in opposing directions, thereby resulting in a changing volume of the pressure field generator. The changing volume of the pressure field generator results in modulated positive and negative pressures with respect to a reference pressure. The modulated positive and negative pressures are applied to a body part through an opening of the stimulation device. The stimulation device may include an appendage, which can be used as a handle to allow a user to hold and position the stimulation device over the body part. The drive unit is controlled by a control device of the stimulation device.

In one embodiment, the pressure field generator includes a first chamber and a second chamber. As such, deflections in the flexible wall portion of the first chamber of the pressure field generator result in the modulated positive and negative pressures in the second chamber of the pressure field generator.

The above-described features and functions of the present invention, and further aspects and features, are further

4

described below with the aid of a detailed description of preferred embodiments with reference to the attached illustrations.

BRIEF DESCRIPTION OF THE DRAWINGS

In the figures:

FIG. 1 shows a front view of a first embodiment of the stimulation device according to the invention, with an appendage in a straight position;

FIG. 2 shows a side view of the first embodiment of the stimulation device according to the invention, with the appendage in an angled position;

FIG. 3 shows a schematic cross section through the first embodiment of the stimulation device according to the invention;

FIG. 4 shows a cross section through a pressure field generating arrangement of a first aspect of the present invention, in the first state;

FIG. 5 shows a cross section through a pressure field generating arrangement of a first aspect of the present invention, in the second state;

FIG. 6 shows a cross section through a pressure field generating arrangement of a first aspect of the present invention, in the third state;

FIG. 7 shows a cross section through a pressure field generating arrangement of a second aspect of the present invention;

FIG. 8 shows a cross section through a pressure field generating arrangement of a third aspect of the present invention;

FIG. 9 shows a cross section through a pressure field generating arrangement of a fourth aspect of the present invention;

FIGS. 10 a), b) and c) show cross sections through a pressure field generating arrangement of a fifth aspect of the present invention;

FIG. 11 shows a partial cross section through a second embodiment of the stimulation device according to the invention;

FIGS. 12 a) to f) show various bottom and side views of further aspects of a second chamber of the present invention;

FIG. 13 shows a block diagram of an embodiment of the present invention; and

FIGS. 14 a) to c) show graphs of various pressure modulation patterns of the present invention.

DESCRIPTION OF PREFERRED EMBODIMENTS

According to one embodiment, a pressure field generating arrangement of the stimulation device has at least one first chamber and at least one second chamber having at least one opening for placing on a body part or on the erogenous zone and at least one connection element that connects the first chamber to the second chamber.

In one embodiment the chambers are in fluidic communication via the at least one connection element to allow the simple generation of a pressure field in the second chamber by changing the volume in the first chamber and temporarily direct the generated pressure field to the area of skin to be stimulated.

A pressure field, in the context of the embodiments described herein, is a field of medium pressures that is variable over time and has temporary positive pressures and temporary negative pressures, a negative pressure being a pressure of medium that is below the reference pressure and

US 9,937,097 B2

5

a positive pressure being a pressure of medium that is above the reference pressure. As a result, the medium flows back and forth in the pressure field. Thus, preferably a (largely) intermittent exchange of said medium can occur.

The medium is usually gaseous, preferably air, but may for example alternatively or in addition be a liquid medium, such as water or commercially available lubricant. For example, the chambers may be filled with the lubricant prior to using the stimulation device. This also allows the corresponding area of skin to be stimulated with a suitable skin-friendly liquid instead of air, which may be desired, depending on the user's individual preference. As a further example, the stimulation device may also be used under water with water as the medium (in the bathtub, for example). In this case the stimulation device is waterproof in form.

The reference pressure is usually the atmospheric pressure acting on the stimulation device that prevails when application begins (i.e. prior to placing the stimulation device on the area of skin to be stimulated). In the preferred application of the stimulation device with air, the reference pressure is the currently prevailing air pressure or normal pressure. For example, when the device is applied under the normal standard conditions the reference pressure may be approximately 1 bar, from which it follows that a negative pressure may be for example 0.7 bar and a positive pressure may be for example 1.3 bar.

The pressure field according to one embodiment is used on the one hand to excite blood circulation of the area of skin to be stimulated, while on the other said area of skin is indirectly massaged. This combines two advantageous effects. The increased blood circulation makes the erogenous zone of the person concerned more sensitive, while moreover generating a massaging effect that serves to stimulate the erogenous zone, for example for sexual arousal up to climax. The massaging effect is generated by the kinetic energy of the medium flowing out of the first chamber through the connection element against the surface of the area of skin to be stimulated. In this way, the massaging effect created by the pressure field is generated indirectly, i.e. without the skin part to be stimulated being in direct contact with a solid body such as a vibrator.

By the exemplary application to the clitoris of the pressure field which is variable over time according to one embodiment, the pressure field imitates a stimulation that usually occurs during sexual intercourse. Likewise, the motion of congress during this generates a varying stimulus of the clitoris. It is thus a lifelike simulation of the natural act of congress, with medical findings confirming that application of the pressure field causes neither habituation effects nor addiction. This is due in particular to the alternating application of negative and positive pressures (or indeed to the non-continuous application of only one type of pressure).

Furthermore, the maximum applicable pressure is typically limited by the maximum load that may be put on the area of skin to be stimulated. Thus, for instance, too high a negative pressure harbors the risk of painful injury, in particular in erogenous zones. Stimulation devices working only with negative pressures are usually limited to this maximum in their mode of operation. By contrast, according to the embodiments described herein, the combination of positive and negative pressures creates an extended operational range of the stimulation-triggering pressure field or effect, as the operational range of the pressure can now be exploited to the maximum in both the positive and the negative range.

6

The orientation of the at least one connection element towards the area of skin to be stimulated allows the pressure field to work directly, the pressure field being decisively affected by the configuration of the at least one connection element and the at least one opening from the connection element into the second chamber, and is thus adjustable depending on the application of the stimulation device. Thus, the at least one opening of the connection element may be located opposite, preferably directly opposite, the body part to be stimulated. For example, the connection element in a stimulation device intended for the clitoris may have, between the first and second chamber, a single passage opening having a nozzle effect on the clitoral glans. Alternatively, the at least one connection element may comprise a plurality of passage openings, for example four, between the chambers if a relatively large area of skin is to be stimulated.

Furthermore, after placing the halfway or partially opened second chamber on the area of skin to be stimulated, a closed system of medium or air flow is created in the pressure field generating arrangement. Thus, the medium or air is moved decisively back and forth between the chambers, while an exchange with medium or air from outside the system is at least largely avoided. Thus, the first chamber is preferably connected exclusively to the second chamber via or through the connection element. Thus, the first chamber has no connections other than those to the second chamber; for example, there is no direct connection between the first chamber and the environment surrounding the device via a pressure valve or an air discharge channel.

For example, the temperature of the air in the flow system according to one embodiment rapidly adjusts to skin temperature, while the irksome supply of new (possibly cold) air from outside the system, as may be the case when using vacuum pumps of the prior art inter alia, is avoided. Drying effects are moreover avoided, as very little or no removal of stimulation-promoting fluid, such as bodily fluid, occurs in a closed system.

Furthermore, due to the simple construction, the pressure field generating arrangement according to one embodiment has the advantage of better hygiene and improved cleaning capacity. Here, the pressure field generating arrangement avoids valves or pumps/compressors with potential dead spaces and places that cannot be cleaned. The pressure field generating arrangement is thus easy to clean. For example, the stimulation device can be cleaned in a simple manner by filling the first chamber with a cleaning agent and activating the pressure field. Alternatively, the second chamber can be arranged to be replaceable, which also simplifies the cleaning of both chambers. Furthermore, the chambers and the connection element of the pressure field generating arrangement can be manufactured in one piece, wherein they are made for example of a single plastic molded part (e.g. rubber). As a further alternative, the first chamber, the second chamber and the connection element may be made in one piece.

Moreover, the construction according to one embodiment has the result of avoiding complex fluid engineering elements such as valves, which results in simplified manufacture.

Furthermore, the stimulation device according to one embodiment has a drive unit that varies the volume of the first chamber such that a pressure field is generated via the connection element in the second chamber, this pressure field serving to stimulate the erogenous zone, and a control device that activates the drive unit.

US 9,937,097 B2

7

The principle of the embodiments described herein means that the medium transported between the chambers is limited in volume to the maximum volume of the first chamber. Moreover, the transported volume can be further limited, as a result of its construction, by the maximum possible change in volume brought about by the drive unit.

Consequently, the maximum positive or negative pressure the stimulation device can build up in the second chamber is limited due to the dimensions of the components of the pressure field generating arrangement and the drive. In particular, the maximum positive or negative pressure can be limited to an amount that minimizes or rules out any risk of injury for the areas of skin to be stimulated. As a result, a safety valve that is usual in the prior art, or a manual intervention in the stimulation process by the user, such as the opening of a release valve, is for example rendered unnecessary.

Furthermore, the variation over time in the pressure field or the modulation of the pressure field by the control device is controlled largely automatically. Thus, the modulation of the pressure field, such as intensity, time profile or sequence, can be previously stored in the control device. Preferably, the variation over time in the pressure field can have a regular or recurring (stimulation) pattern, such as pulses at a predetermined cycle rate or regularly alternating pulse sequences. This allows the user's interaction with the stimulation device to be limited to switching on and off and selecting the stimulation pattern, while the stimulation device automatically executes the preferred stimulation pattern. Thus, the complexity of using the stimulation device is low, particularly when compared with conventional (medical) vacuum stimulation devices. Alternatively or in addition, the stimulation pattern of the stimulation device can be individually configured by the user during or before operation.

Moreover, according to one embodiment, the stimulation device is provided with (at least) one appendage. On the one hand this appendage may be used as a handle in order to hold the stimulation device easily and comfortably, and on the other the appendage may also be used as a direct stimulation aid for insertion into the human body or indeed for placing on the human body.

If the appendage is inserted into the human body, it serves for direct stimulation of the body part concerned. Thus, it supplements the indirect stimulation effect of the pressure field generating arrangement. It is thus possible for a direct and an indirect stimulation of a plurality of erogenous zones to occur simultaneously or alternately. For example, the appendage may be inserted into the female vagina, while stimulation of the clitoris may take place at the same time or alternately by means of the pressure field according to one embodiment. Accordingly, the principle of the combined direct and indirect stimulation may also be applied to other body parts, or the erogenous zones thereof. For example, the appendage may be placed on a woman's clitoris while the pressure field generating arrangement stimulates another woman's or the same woman's clitoris.

In this way, the stimulation device having an appendage may be used by only one person or indeed by two different people for the stimulation of a plurality of erogenous zones.

The combination of direct and indirect stimulation results in an improvement in the stimulation effect and a versatile applicability of the stimulation device. Moreover, further, alternative types of play during the sexual act are possible using the inventive stimulation device having an appendage.

Thus, according to one embodiment, a stimulation device which has a plurality of cumulative orgasm- or stimulation-

8

triggering effects and is suitable for the stimulation of a plurality of erogenous zones, in particular the female clitoris, is provided. Furthermore, a device is provided which avoids dehydration of the erogenous zones to be stimulated, is hygienic and avoids habituation effects.

According to one embodiment, the appendage is movable with the pressure field generating arrangement, for example being connected by means of a joint at one end of the appendage. In this way, the stimulation device may be adapted to the anatomy of the human body in question and to its use. For example, the appendage may be inserted into the female vagina in order that to adapt the angle between the pressure field generating arrangement and the appendage such that the opening of the second chamber can be placed precisely over the clitoris. Consequently, the area of the body between the clitoris and the vagina is stimulated from both sides, mutually enhancing the effects of direct and indirect stimulation.

If the appendage is used as a handle for holding the stimulation device, the angle between the handle and the opening of the second chamber can be adapted to suit the preferences of the user of the device.

According to one embodiment, the appendage is a stimulation aid which is shaped such that the appendage can be inserted into the human body, for example the vagina, for direct stimulation. In this case, the appendage preferably takes the form of a dildo. Here, sharp corners in particular are avoided. Thus, the appendage is preferably in a form such that it can be inserted smoothly into body cavities and/or also remain inserted therein.

According to one embodiment, the appendage is an elongate, lens-shaped or pillow-shaped body which is adapted such that the appendage can be inserted smoothly into the female vagina. This improves the direct stimulation effect.

According to one embodiment, the appendage is mounted on the pressure field generating arrangement such that the stimulation device is unitary in form. Here, unitary means in particular that the stimulation device having an appendage and a pressure field generating arrangement takes the form of an integrated, cohesive device. Preferably, in this case the appendage and the pressure field generating arrangement transition into one another seamlessly. This improves hygiene and operability of the stimulation device.

According to one embodiment, the appendage has a vibration device. This vibration device may be actuated such that the appendage vibrates, as known in the case of electromechanically operated dildos. In this case, the vibration may either be activated independently of the other parts of the stimulation device, or indeed the vibration may be controlled by means of the control device, which in that case controls the drive unit of the pressure field generating arrangement as well. Preferably, the vibration may be controllable in a conventional manner as regards intensity, duration and sequence. The vibration intensifies the direct stimulation effect.

According to one embodiment, a system comprises the stimulation device and a remote control device arranged separately from the stimulation device, wherein the control device of the stimulation device is remotely controlled by the remote control device. This allows a conventional wireless (for example via radio) or wired remote control to be employed in order to allow remote-controlled modulation of the stimulation device or activation thereof by another user.

According to one embodiment, methods for stimulating body parts, in particular the clitoris, are described herein.

US 9,937,097 B2

9

The associated advantageous effects are explained in more detail above in relation to the pressure field and the appendage.

According to one embodiment, the stimulation device may be used as a sex toy for stimulating the female clitoris. As explained in the introduction, the female clitoris is a particularly sensitive erogenous zone in women, which is why the use of an indirect massaging stimulation, combined with a negative-pressure stimulation, for this body part for stimulation up to orgasm appears particularly advantageous.

In one embodiment, the methods for stimulating erogenous zones serve for sexual pleasure, and thus the methods do not serve for medical, for example therapeutic, purposes.

With reference to FIGS. 1, 2 and 3, a first embodiment will be explained below. FIG. 1 shows a front view of the first embodiment of the stimulation device 1 with an appendage 140 in a straight position, while FIG. 2 further shows a side view of the stimulation device 1 with the appendage 140 in an angled position, and FIG. 3 shows a cross section of the first embodiment of the stimulation device 1.

The first embodiment of the stimulation device 1 is a preferably portable electrical or small device that has a housing 8, a pressure field generating arrangement 2, an optional on/off switch 74 and an optional light 9.

The housing 8 preferably takes an ergonomic form such that it can be held comfortably in one hand and has no sharp or pointed edges. Furthermore, the housing 8 may be made of a plastics material such as polycarbonate (PC) or acrylonitrile butadiene styrene (ABS). Moreover, the gripping areas or even the entire housing may be supplemented by or be made of a silicone which has advantageous tactile properties. The housing 8 preferably takes an at least water-resistant or splash-proof form, for example protection class IP 24. Furthermore, the broken line in FIG. 2 indicates an optional side edge of the housing 8.

The optional on/off switch 74 serves to activate and deactivate the stimulation device 1. This on/off switch 74 may for example be a push button, which switches the stimulation device 1 on or off when held down, or a latching slide switch. Alternatively, it may be possible to switch the stimulation device 1 on and off by remote control.

The pressure field generating arrangement 2 of a first embodiment has a first chamber 3 in the interior of stimulation device 1, a second chamber 4 for placing on a body part 11 to be stimulated, and a connection element 5 that connects the first chamber 3 to the second chamber 4.

A drive unit 6, for example an electric motor, drives the first chamber 3 via a shaft 61 and by means of a cam 62 (or alternatively by means of a connecting rod) such that the volume of the first chamber 3 changes in accordance with rotation of the shaft 61 of the drive unit 6. On this point, it should be noted that any types of drive that cause a deflection of the wall 31 of the first chamber 3 for a change in volume can in principle be used in the stimulation device 1. This may for example be performed hydraulically, pneumatically, piezoelectrically, mechanically or electromagnetically. Examples of this are described in more detail below.

A control device 7 activates the drive unit 6, optional operating elements 71 and at least one optional display 72. Here, the control device 7 and the drive unit 6 are supplied with power for example by the internal battery 76 and/or the external power supply 73.

The stimulation device 1 further has at least one appendage 140. This appendage 140, which is preferably part of the housing 8, may optionally be moved or angled in relation to the housing part in which the pressure field generating arrangement 2 is accommodated. Here, the appendage may

10

be angled or indeed rotated by means of a joint 141. The joint 141 may for example take the form of a plastically deformable plastic part, an adjustable joint or a hinge. FIG. 2 shows an example of a position of the appendage 140 which is angled in relation to the section of the housing 8 of the stimulation device 1 in which the pressure field generating arrangement 2 is accommodated. Alternatively, the appendage may also take a rigid or immovable form.

The appendage 140 is preferably a stimulation aid for insertion into the human body, for example the vagina or other bodily orifices. Here, the appendage 140 is shaped for example as a conventional dildo. Alternatively, the appendage may be constructed such that it is adapted to the human anatomy of another bodily orifice, for example the mouth. Moreover, the appendage 140 may take a form such that it can also be used as a handle in order to hold the stimulation device 1 comfortably.

Moreover, the appendage 140 may optionally have a vibration device 142 that can be capable of being switched on and/or controlled. The vibration device 142 causes the appendage to undergo mechanical vibrations that support the direct stimulation effect of the appendage 140.

Optionally, the appendage 140 is mounted on the section of the housing 8 that accommodates the pressure field generating arrangement 2 such that the (entire) housing 8 of the stimulation device 1 takes a unitary form. In this way, the housing 8 creates the impression of being in one piece, for example by means of flexible and/or seamless connection elements of the housing 8. Alternatively, the housing 8, including the appendage 140, may have a silicone coating.

In a straight or non-angled orientation of the appendage 140, as shown in FIG. 1, the stimulation device 1 can be comfortably held, or indeed inserted into bodily orifices in a simple manner. If the appendage 140 is angled, as shown in FIG. 2, for example after insertion, the opening 42 can thus be guided out of the body part 11 to be stimulated. In this angled position of the stimulation device 1, both a direct and an indirect stimulation of at least one erogenous zone of the body can take place simultaneously. In this case, the body part 11 to be stimulated is located between the appendage 140 and the pressure field generating arrangement 2.

Furthermore, an optional light 9 can be provided on or in the housing 8. Here, the light 9 preferably serves for lighting the interior of the second chamber 4. The light 9 can either be switched on by the user or automatically activated when the stimulation device 1 is activated. Furthermore, the light 9 can take the form of energy-saving light emitting diodes. The light can for example serve in the dark as an orientation aid for the user of the stimulation device 1, or as additional visual stimulation.

With reference to FIGS. 4, 5 and 6, the construction and function of a first aspect of the pressure field generating arrangement 2 of the stimulation device 1 will be described below in more detail.

FIG. 4 shows the pressure field generating arrangement 2 in a first state, with the second chamber 4 placed on the area of skin or body part 11 to be stimulated. The first state of the pressure field generating arrangement 2 is characterized by a neutral deflection of the first chamber 3, i.e. no external force acts on the first chamber 3, for example from the drive unit. Here, the volume V1 of the first chamber is the standard volume of this chamber 3.

The body part 11 to be stimulated is an area of skin on the body, wherein here for example a particularly sensitive erogenous zone, the clitoris 12, is shown. Thus, use of the stimulation device 1 is not limited to the female clitoris 12, however; rather, the stimulation device 1 can be applied to

US 9,937,097 B2

11                                                                    12

all body parts or erogenous zones (such as the inside of the thighs, lumbar region, nape of the neck, nipples, etc.) which can be stimulated by means of medium- or air-pressure massage and/or negative pressure.

Because it is placed on the body part **11** to be stimulated, the second chamber **4** forms a chamber that is largely or completely closed off from the exterior of the pressure field generating arrangement **2** and whereof the only remaining connection to the second chamber is via the connection element **5**, wherein the edges of chamber **4** ideally form an air-tight enclosure with the surface of the body part **11**. Two communicating chambers **3** and **4** are created in this way, wherein a corresponding pressure equalization between the chambers **3** and **4** via the connection element **5** occurs in the event of a change in volume in one of the chambers **3** or **4**.

A wall **31** of the first chamber **3** is secured by means of a holder **32**. The holder **32** is in turn attached to the housing **8**. The wall **41** of the second chamber is furthermore mounted on the holder **32**. Two mutually aligned openings in the wall **41** of the second chamber and the holder **32** together form the connection element **5**, which connects the first chamber **3** and the second chamber **4**. In this arrangement, the wall **31**, the holder **32** and the wall **41** are preferably joined to each other by adhesion to be medium- or air-tight. Alternatively, they can also be press-fitted or screwed to each other (for example with the aid of sealing areas between the housing **8** and the respective part). The holder **32** can also be joined to the housing **8** for example by adhesion or screws.

The wall **31** of the first chamber **3** is preferably made of a flexible medium- or air-tight material such as rubber. The holder **32** is preferably made of a rigid plastics material which is likewise medium- or air-tight. The wall **41** of the second chamber is preferably made of a flexible, skin-friendly material such as silicone or rubber.

FIG. **5** shows the pressure field generating arrangement **2** of FIG. **4** in a second state, wherein the second chamber **4** is once again placed on the body part **11** to be stimulated. The second state is characterized in that a force A acting on the first chamber **3** causes the chamber **3** to expand. To be precise, in this exemplary embodiment the force A draws the wall **31** of the first chamber **3** in a direction away from the second chamber **4**.

This increases the volume V2 in the chamber **3**, i.e. V2>V1. To equalize the difference in pressure created between the chambers **3** and **4**, the medium or air now flows from the second chamber **4** into the first chamber **3**.

Assuming that in the first state the pressure in the chambers **3** and **4** corresponds to the currently prevailing external reference pressure (air pressure for example), the overall pressure that is present in the second state will be lower than the external reference pressure. This negative pressure is set such that it is preferably lower than the usual systolic blood pressure in the blood vessels of the body part **11**. The blood circulation in this area thus increases, and the clitoris **12** is better supplied with blood in the second state.

FIG. **6** shows the pressure field generating arrangement **2** in a third state, wherein the second chamber **4** is once again placed on the body part **11** to be stimulated. The third state is characterized in that a force B acting on the first chamber **3** causes a volume reduction or compression in the chamber **3**. To be precise, the direction of the force B is opposed to the direction of the force A and deforms the wall **31** of the first chamber such that the resulting volume V3 of the chamber is smaller than the volume V1. The compression of the chamber **3** causes a positive pressure in the chamber **3**,

which is equalized by a medium or air flow through the connection element **5** in the direction of the second chamber **4**.

This flow of medium is now preferably directed, by the orientation of the opening **51** and/or of the connection element **5**, towards the body part **11** to be stimulated, in particular towards the glans of the clitoris **12**. The indirect (pressure) massage according to one embodiment occurs as a result of the medium flowing onto the body part **11**. The size of the opening **51** is in this case dimensioned such that it is small enough in relation to the volume displaced in the first chamber **3** to sufficiently accelerate the medium for a perceptible massaging effect.

Furthermore, the type of flow can not only be advantageously influenced by the size and orientation of the opening **51** but also by the inner configuration of the connection element. For example, helical grooves in the connection element **5** can cause the flow according to one embodiment to swirl, wherein the flow profile develops a "softer" or more turbulent action on the body part to be stimulated. Alternatively, the pressure field produced in the second chamber **4** can be adjusted to suit the application by means of a plurality of openings **51**.

The advantage of the arrangement shown in FIGS. **4** to **6** is that it is unproblematic from the point of view of hygiene (because dead spaces are avoided, for example) and is simple to manufacture. For example, no valves or further openings in or on the first chamber **3** are required.

FIG. **7** shows a second aspect with an alternative construction of the pressure field generating arrangement **2**. Here, the walls **31** and **41** of the first and second chambers **3** and **4** can engage with one another such that, as in the first aspect of construction of the pressure field generating arrangement **2**, they form two communicating chambers with a connection element **5**. Thus, a separate holder is not required, while the second chamber **4** is replaceable. Moreover, the connection element **5** can take a form integral or in one piece with the wall **41** of the second chamber **4**. A replaceable chamber **4** has the advantage that in this way various shapes of the chamber **4** that are adjusted to the respective body part can be used (a more detailed description thereof is provided below) without the need to replace the entire stimulation device **1**. Alternatively, the second chamber **4** can also be attached to the housing **8** by being pushed on (not shown in more detail). The wall **31** of the first chamber **3** can be joined to the housing **8** by adhesion or screws for example.

It is also possible, as shown in more detail in FIG. **7** by the broken line and the double arrow C, for the first chamber **3** to be expanded and compressed by a force acting perpendicularly to the axial direction of the connection element **5**. In principle, the force exerted indirectly or directly on the first chamber **3** by the drive unit **5** can be exerted from any direction. The only decisive criterion here is that the volume of the first chamber **3** can be increased and decreased by the drive unit **6**.

FIG. **8** shows a third aspect of a one-piece structure of the pressure field generating arrangement **2**. Here, a resilient material such as silicone or rubber can be used as material for the chambers **3** and **4**. The advantage here is that any gaps that are dubious from the point of view of hygiene are avoided, and the cost of manufacture is reduced. The pressure field generating arrangement **2** can be joined to the housing **8** by adhesion or screws in this case too. A change in the volume of the first chamber **3** occurs here in a manner analogous to that described in conjunction with FIG. **7**.

US 9,937,097 B2

13

FIG. **9** shows a fourth aspect of an alternative construction of the pressure field generating arrangement **2**. Here, the second chamber **4**, a plurality of connection elements **5**, and partial sections of the wall **31** of the first chamber **3** are constructed in one piece. Alternatively, the pressure field generating arrangement **2** can also be constructed in two or more pieces from individual components, while retaining the geometric shape of FIG. **9**, in a similar way to that shown in FIG. **4** or **7**.

In this case, the volume in the chamber **3** is changed in a manner similar to a piston pump, although there are no valves of any kind here. Thus, a piston **63** is moved back and forth by the drive unit, for example an electric motor or electromagnet, in the directions of the double arrow D. This type of drive has the advantage that the volume of the first chamber **3** can be reduced to zero or approximately zero in a simple manner, thus allowing the first chamber **3** to be almost completely emptied.

The embodiment of the connection element **5**, with a plurality of channels **52** and openings **51**, results in a distribution of the pressure field over a plurality of concentration points. While the embodiment of the connection element **5** with only one channel, as described in conjunction with FIG. **6**, results in the formation of a highly concentrated medium or air flow onto a target area, the embodiment of the connection element **5** shown in FIG. **9** allows the medium or air flow to be distributed over a plurality of target areas. In this way, the flow can for example be blown against the clitoris **11** not just on its glans, but evenly from a plurality of sides. Depending on the application, this distribution of the air flow concentration to a plurality of areas can help to avoid overstimulation and/or help to increase the stimulation area.

FIGS. **10**a to **10**c show (partial) cross sections of one embodiment of a construction of the pressure field generating arrangement **2** with a bending element **64** as the drive for changing the volume in the first chamber **3**. The bending element **64** can for example be a conventional piezoelectric bending element, which is deformed or bent once a voltage is applied. In this embodiment, the wall **31** of the first chamber **3** takes a rigid or stiff form, while the bending element **64** is made to fit suitably against the sides of the first chamber **3**. The transition points between the bending element **64** and the wall **31** are in this case sealed (resiliently joined by adhesion, for example). In this construction, the drive for the pressure field generating arrangement **2** is already integrated therein, and an external drive is not required. An electric motor with a cam is not needed, for example. This allows, inter alia, the reduction of any disruptive natural resonances due to movement of the cam of the stimulation device.

FIG. **10**a shows in detail the pressure field generating arrangement **2** with the bending element **64** in a neutral position. Thus, the volume of the first chamber **3** with the bending element **64** in the neutral position is the standard volume. FIG. **10**b furthermore shows the first chamber **3** with an excited and, consequently, outwardly bent bending element, for which reason the volume of the first chamber **3** has increased; consequently, a negative pressure prevails in the pressure field generating arrangement **2**. FIG. **10**c shows a bending element of the first chamber **3** excited in the opposite direction to FIG. **10**b, for which reason the volume of the first chamber **3** has decreased; consequently, a positive pressure prevails in the pressure field generating arrangement **2**.

FIG. **11** shows a second embodiment of a spatially separated arrangement of the chambers **3** and **4** of the pressure

14

field generating arrangement **2**. The chambers **3** and **4** are in this case connected via an extended connection element **5**, which can be a relatively long flexible hose or a pipe, which may also be rigid. For example, the connection element **5** may be 0.5 m in length. This enables the housing **8** to be held in one hand while the other hand holds the second chamber **4** on the body part **11** to be stimulated; or the housing **8** may simply be laid aside, while the user holds only the second chamber **4** in both hands. Alternatively, the appendage **140** can be inserted into a body part, in which case it is no longer necessary for the stimulation device **1** to be held in the hand.

FIGS. **12** a) to **12** f) show various bottom and side views of further aspects of the second chamber **4** in accordance with one or more embodiments. In detail, FIG. **12** a) shows a bottom view of a circular second chamber **4** with a central opening **51**; FIG. **12** b) shows a bottom view of a triangular second chamber **4** with a central opening **51**; FIG. **12** c) shows a bottom view of an oval second chamber **4** with a central opening **51**; and FIG. **12** d) shows a bottom view of an approximately eight-shaped second chamber **4** with two openings **51** arranged offset from the center. FIG. **12** e) furthermore shows a side cross section of a second chamber **4**, wherein the second chamber **4** additionally has an extended contact surface **43** for the skin or a support part **43** to improve the sealing function of the second chamber **4** on the skin. The extended contact surface **43** may moreover have grooves or projections that improve the sealing function even further. FIG. **12** f) shows a side cross section of a second chamber **4** having a plurality of separate connection elements **5** and an extended contact surface resulting from the support part **43**.

The shape of the second chamber **4** can thus be fundamentally adjusted to the anatomy of the erogenous zone to be stimulated. The shape of the chamber **4** in FIG. **12** a) is, for example, adjusted to the round shape of the breast, while the shape of chamber **4** in FIG. **12** c) is better suited to the shape of the female vulva. Furthermore, the shape of the second chamber **4** also determines how pronounced the pressure field is. The size of the second chamber **4** in relation to the volume displaced from the first chamber **3** thus determines the level of the achievable negative or positive pressure. Furthermore, the proximity of the opening **51** of the connection element **5** to the area of skin to be stimulated can also be used to determine the intensity of the massaging effect on said area of skin. A plurality of openings **51**, cf. FIG. **12** d), allows the massaging effect to be distributed over a plurality of areas. Thus, for example, the clitoris can be stimulated less directly at the very sensitive clitoral glans (cf. FIG. **12** e)) but more at the areas surrounding the clitoral glans, in order to prevent overstimulation of the clitoris.

FIG. **13** shows a block diagram of an example of the functional construction of an embodiment having a control device **7**, a drive unit **6**, a light **9**, an on/off switch **74**, operating elements **71**, a battery **76** and an external power supply **73**.

The control device **7**, which for example has a microcontroller or is hardwired, initially controls the power supply to all the consumers of the stimulation device **1** and optionally controls a process of charging and discharging the battery **76** and/or battery management. In particular, the control device **7** controls the excitation of the drive unit **6**, such as the size of the deflection, the frequency, the modulation, etc.

Optionally provided operating elements **71** serve to set the mode of the device, i.e. to set the modulation pattern of the pressure field. The operating elements **71** may for example take the form of at least one push button, at least one rotary switch, or at least one touch-sensitive switch. Furthermore,

US 9,937,097 B2

15

the operating elements 71 may emit optical feedback for the purpose of confirmation, for example by means of light emitting diodes (LEDs) integrated in the switch.

An optional display 72 serves to inform the user of the device state and/or the set condition. The display 72 may for example take the form of a plurality of light emitting diodes or an LCD display. The displayed information may for example be the charging condition of an optional battery, or the current setting of the modulation pattern.

Furthermore, the control device 7 may have a memory in which at least one modulation or stimulation pattern (described in more detail in conjunction with FIGS. 14 a) to d)) is stored. Excitation of the drive unit 6 can now be activated via the operating elements 71 in accordance with this previously stored stimulation pattern, depending on the choice made by the user of the stimulation device 1. The stimulation pattern of the pressure field can also be optionally and individually generated and stored by the user via the operating elements.

A socket (not shown in detail) can serve to supply external power to the stimulation device 1 via an external plug that is for example connected to an external mains adapter. In order to ensure that the stimulation device 1 is splash-proof, it is also possible, instead of the socket, to provide an electromagnetically inductive transformer that allows power to be supplied to the stimulation device 1 without an electrically conductive contact. Preferably, the stimulation device 1 moreover has a battery, for example a nickel metal hydride battery (NiMH), for wireless operation. Alternatively, a (relatively long) power supply cable may lead out of the stimulation device.

FIG. 14 a) shows the sequence over time of overall pressure p in the pressure field generating arrangement (2) when the latter is used for stimulation. The broken line indicates the reference pressure, for example the currently prevailing atmospheric pressure, outside the pressure field generating arrangement (2). If the second chamber 4 is now placed on the body part 11 to be stimulated, the initially prevailing ambient pressure remains approximately constant in the pressure field generating arrangement (2). It is assumed that the second chamber 4 is placed on the body part to be stimulated such that it is largely air-tight. Once the stimulation device is activated, the drive unit 6 is activated or excited by the control device 7 in accordance with a previously stored stimulation pattern. Accordingly, the volume of the first chamber 3 and thus the overall pressure in the pressure field generating arrangement 2 are changed, with the changes in pressure being modulated onto the reference pressure. The pressure or stimulation pattern shown as an example in FIG. 14 a) develops a pulsed, regular pressure field. In phases of pressure increase, air is blown against or massages the erogenous zone to be stimulated, whereas at times when a negative pressure prevails the blood circulation in the body part 11, for example the clitoris, is favored. Thus, there are time periods (designated in FIG. 14 a) as I)) in which a negative pressure prevails while the clitoris is simultaneously being indirectly massaged.

FIG. 14 b) shows three examples of alternative stimulation patterns. Thus, the area designated as II) shows a pulsed stimulation pattern of high amplitude. The area designated as III) shows a pulsed stimulation pattern of low amplitude. Furthermore, the area designated as IV) illustrates a stimulation pattern which is irregular as regards sequence over time and asymmetrical in amplitude. The patterns can be varied, depending on the effect on the body/application and in accordance with the wishes of the individual.

16

FIG. 14 c) shows a further example of an alternative stimulation pattern. Here, the intensity of the pressure may increase with time in order to adjust to the user's state of excitement.

In addition to the embodiments that have been explained, further constructional principles are allowed. For example, different arrangements or constructions of the first chamber 3 may be combined as desired with different embodiments of the second chamber 4 or the connection element 5. For example, the first chamber 3 having the drive in FIG. 10 can be combined with the second chamber in FIG. 12 f).

Although only one first chamber 3 is shown in all embodiments, two or more first chambers 3 may also be provided, which are then driven accordingly simultaneously or with a time delay such that their volume is changed in order to build up a pressure field.

Although only one opening from the first chamber 3 to the connection element 5 is shown in all embodiments, a plurality of openings for a connection element 5 or indeed a plurality of openings for a plurality of connection elements 5 may also be provided in the first chamber 3.

A stimulation device 1 can have a plurality of pressure field generating arrangements 2. Thus, for example, two pressure field generating arrangements may be provided in order to stimulate two erogenous zones simultaneously.

The stimulation patterns can differ from the patterns shows in FIGS. 14 a), b) and c), provided they have a sequence of positive and negative pressures over time. For example, a relatively long-lasting negative pressure can initially be built up at the beginning or after activation of the device (for example 3 minutes), in order to effectively increase the blood circulation in the zone to be stimulated, after which pulses of negative and positive pressures of slowly increasing amplitude follow.

LIST OF REFERENCE NUMERALS

1 Stimulation device
2 Pressure field generating arrangement
3 First chamber
4 Second chamber
5 Connection element
6 Drive unit
7 Control device
8 Housing
9 Light
11 Body part
12 Clitoris
31 Wall of the first chamber
32 Holder
41 Wall of the second chamber
42 Opening of the first chamber
43 Contact surface
51 Opening from the connection element to the second chamber
61 Drive shaft
62 Cam
63 Piston
64 Bending element
71 Operating element
72 Display
73 Power supply
74 On/off switch
76 Battery
77 Control board
140 Appendage
141 Joint
142 Vibration device

US 9,937,097 B2

17

18

The invention claimed is:

1. A stimulation device, comprising:
a chamber having a flexible wall portion;
a drive unit in physical communication with the flexible wall portion so as to cause deflections of the flexible wall portion in opposing directions, thereby resulting in a changing volume of the chamber,
the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure;
an opening for applying the modulated positive and negative pressures to a body part;
a control device for controlling the drive unit; and
an appendage, wherein the appendage is a dildo configured to be inserted into a vagina.

2. The stimulation device as recited in claim 1, wherein the appendage is a handle for holding the stimulation device.

3. The stimulation device as recited in claim 1, wherein the opening is further for placing over the body part.

4. The stimulation device as recited in claim 1, wherein the body part is a clitoris.

5. The stimulation device as recited in claim 1, further comprising a second chamber.

6. The stimulation device as recited in claim 1, wherein the flexible wall portion is integral with the chamber.

7. The stimulation device as recited in claim 1, wherein the flexible wall portion comprises silicone.

8. The stimulation device as recited in claim 1, wherein the stimulation device has no valves.

9. The stimulation device as recited in claim 1, wherein the stimulation device is a portable hand-held device.

10. The stimulation device as recited in claim 1, wherein the stimulation device is battery powered.

11. The stimulation device as recited in claim 1, further comprising:
a water resistant housing comprising acrylonitrile butadiene styrene (ABS).

12. A method comprising:
causing deflections of a flexible wall portion of a chamber of a stimulation device in opposing directions, thereby resulting in a changing volume of the chamber,
the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure; and
applying the modulated positive and negative pressures to a body part through an opening, wherein the stimulation device is positioned by a user for applying the modulated positive and negative pressures using an appendage of the stimulation device, wherein the appendage is a dildo configured to be inserted into a vagina.

13. The method as recited in claim 12, wherein the appendage is a handle for holding the stimulation device.

14. The method as recited in claim 12, wherein the changing volume of the chamber results in the modulated positive and negative pressures in a second chamber.

15. The method as recited in claim 12, wherein the body part is a clitoris and the opening is placed over the clitoris.

16. The method as recited in claim 12, wherein the flexible wall portion is integral with the chamber.

17. A stimulation device, comprising:
a pressure field generator having a flexible wall portion;
a drive unit in physical communication with the flexible wall portion so as to cause deflections of the flexible wall portion in opposing directions, thereby resulting in a changing volume of the pressure field generator,
the changing volume of the pressure field generator resulting in modulated positive and negative pressures with respect to a reference pressure;
an opening for applying the modulated positive and negative pressures to a body part;
a control device for controlling the drive unit; and
an appendage, wherein the appendage is a dildo configured to be inserted into a vagina.

18. The stimulation device as recited in claim 17, wherein the appendage is a handle for holding the stimulation device.

19. The stimulation device as recited in claim 17, wherein the body part is a clitoris and the opening is further for placing over the body part.

20. The stimulation device as recited in claim 17, wherein the body part is a clitoris.

21. The stimulation device as recited in claim 17, wherein the pressure field generator comprises a first chamber and a second chamber.

22. The stimulation device as recited in claim 17, wherein the flexible wall portion is integral with the pressure field generator.

23. The stimulation device as recited in claim 17, wherein the stimulation device has no valves.

24. The stimulation device as recited in claim 17, wherein the stimulation device is a portable hand-held device.

25. The stimulation device as recited in claim 17, wherein the stimulation device is battery powered.

26. A method comprising:
causing deflections of a flexible wall portion of a pressure field generator of a stimulation device in opposing directions, thereby resulting in a changing volume of the pressure field generator,
the changing volume of the pressure field generator resulting in modulated positive and negative pressures with respect to a reference pressure; and
applying the modulated positive and negative pressures to a body part through an opening, wherein the stimulation device is positioned by a user for applying the modulated positive and negative pressures using an appendage of the stimulation device, wherein the appendage is a dildo configured to be inserted into a vagina.

27. The method as recited in claim 26, wherein the appendage is a handle for holding the stimulation device.

28. The method as recited in claim 26, wherein causing deflections in a flexible wall portion of a pressure field generator in opposing directions comprises:
causing deflections in the flexible wall portion of a first chamber of the pressure field generator, thereby resulting in the modulated positive and negative pressures in a second chamber of the pressure field generator.

29. The method as recited in claim 26, wherein the body part is a clitoris and the opening is placed over the clitoris.

30. The method as recited in claim 26, wherein the flexible wall portion is integral with the pressure field generator.

*   *   *   *   *

# *Exhibit 22*

US009849061B2

(12) **United States Patent**
    Lenke

(10) **Patent No.:**      **US 9,849,061 B2**
(45) **Date of Patent:**      **Dec. 26, 2017**

(54) **STIMULATION DEVICE HAVING AN APPENDAGE**

(71) Applicant: **NOVOLUTO GmbH**, Metten (DE)

(72) Inventor: **Michael Lenke**, Metten (DE)

(73) Assignee: **NOVOLUTO GMBH**, Metten (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/302,981**

(22) PCT Filed: **Jul. 24, 2015**

(86) PCT No.: **PCT/EP2015/067017**
    § 371 (c)(1),
    (2) Date: **Oct. 7, 2016**

(87) PCT Pub. No.: **WO2016/146206**
    PCT Pub. Date: **Sep. 22, 2016**

(65) **Prior Publication Data**
    US 2017/0027809 A1    Feb. 2, 2017

(30) **Foreign Application Priority Data**
    Mar. 13, 2015   (DE) ........................ 10 2015 103 694

(51) **Int. Cl.**
    *A61F 5/00*      (2006.01)
    *A61H 19/00*     (2006.01)
    (Continued)

(52) **U.S. Cl.**
    CPC ............. *A61H 19/30* (2013.01); *A61H 9/005* (2013.01); *A61H 9/0057* (2013.01); *A61H 19/34* (2013.01);
    (Continued)

(58) **Field of Classification Search**
    CPC ........ A61H 19/00; A61H 19/30; A61H 19/34; A61H 19/40; A61H 19/44; A61H 23/02; A61H 9/0057
    (Continued)

(56) **References Cited**

    U.S. PATENT DOCUMENTS

    1,882,040 A    10/1932  Roehm
    1,898,652 A    2/1933   Williams
    (Continued)

    FOREIGN PATENT DOCUMENTS

    CN      2153351 Y     1/1994
    CN      2198900 Y     5/1995
    (Continued)

    OTHER PUBLICATIONS

International Search Report and Written Opinion dated Jul. 22, 2016, in connection with International Patent Application No. PCT/EP2015/067017, 22 pages.
    (Continued)

*Primary Examiner* — John Lacyk
(74) *Attorney, Agent, or Firm* — Chiesa Shahinian & Giantomasi PC

(57) **ABSTRACT**

The invention relates to a stimulation device (**1**) for erogenous zones, in particular for the clitoris (**12**), wherein the stimulation device (**1**) has the following: at least one pressure field generating arrangement (**2**) with at least one first chamber (**3**) and at least one second chamber (**4**) having at least one opening (**42**) for placing on a body part (**11**); at least one connection element (**5**) that connects the first chamber (**3**) to the second chamber (**4**); a drive unit (**6**) that varies the volume of the first chamber (**3**) such that a pressure field that serves for stimulation is generated via the
    (Continued)



## US 9,849,061 B2

Page 2

connection element (**5**) in the second chamber (**4**); a control device (**7**) that activates the drive unit (**6**), and an appendage (**140**).

**26 Claims, 7 Drawing Sheets**

(51) **Int. Cl.**
    **A61H 9/00**     (2006.01)
    **A61H 23/02**     (2006.01)

(52) **U.S. Cl.**
    CPC ............ **A61H 19/40** (2013.01); **A61H 19/44** (2013.01); **A61H 23/02** (2013.01); *A61H 2201/0107* (2013.01); *A61H 2201/0188* (2013.01); *A61H 2201/0192* (2013.01); *A61H 2201/1685* (2013.01); *A61H 2201/5097* (2013.01); *A61H 2205/087* (2013.01)

(58) **Field of Classification Search**
    USPC ........................................................ 600/38
    See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,964,590 | A | 6/1934 | Friederich |
| 2,017,284 | A | 10/1935 | Lembright |
| 2,076,410 | A | 4/1937 | McGerry |
| 2,112,646 | A | 3/1938 | Biederman |
| 2,154,427 | A | 4/1939 | Andres |
| 2,234,102 | A | 3/1941 | Andres |
| 2,314,590 | A | 3/1943 | McCarty |
| 2,519,790 | A | 8/1950 | Quinn |
| 2,561,034 | A | 7/1951 | Phillips |
| 3,396,720 | A | 8/1968 | Shigeyuki |
| 3,906,940 | A | 9/1975 | Kawada |
| 3,910,262 | A | 10/1975 | Stoughton |
| 4,088,128 | A | 5/1978 | Mabuchi |
| 4,203,431 | A | 5/1980 | Abura et al. |
| 4,428,368 | A | 1/1984 | Torii |
| 4,900,316 | A | 2/1990 | Yamamoto |
| 5,003,966 | A | 4/1991 | Saka et al. |
| 5,377,701 | A | 1/1995 | Fang |
| 5,377,702 | A | 1/1995 | Sakurai |
| 5,593,381 | A | 1/1997 | Tannenbaum et al. |
| 6,099,463 | A | 8/2000 | Hockhalter |
| 6,319,211 | B1 | 11/2001 | Ito et al. |
| 6,464,653 | B1 | 10/2002 | Hovland et al. |
| 6,733,438 | B1 | 5/2004 | Dann et al. |
| 7,079,898 | B2 | 7/2006 | Cohn |
| 2001/0041848 | A1 | 11/2001 | Ito et al. |
| 2002/0120219 | A1 | 8/2002 | Hovland et al. |
| 2002/0198488 | A1 | 12/2002 | Yao |
| 2003/0114804 | A1 | 6/2003 | Putzer |
| 2004/0236254 | A1 | 11/2004 | Nichols |
| 2004/0260209 | A1 | 12/2004 | Ella et al. |
| 2005/0159684 | A1 | 7/2005 | Ikadai |
| 2006/0089572 | A1 | 4/2006 | Byon |
| 2006/0116612 | A1 | 6/2006 | Drysdale |
| 2007/0100259 | A1 | 5/2007 | Nan |
| 2008/0071138 | A1 | 3/2008 | Mertens et al. |
| 2008/0106896 | A1 | 5/2008 | Liu et al. |
| 2008/0304984 | A1 | 12/2008 | Chan |
| 2008/0312674 | A1 | 12/2008 | Chen et al. |
| 2009/0048581 | A1 | 2/2009 | Sebban |
| 2009/0118573 | A1 | 5/2009 | Tsao |
| 2010/0298745 | A1 | 11/2010 | Liu et al. |
| 2011/0295162 | A1 | 12/2011 | Chang et al. |
| 2013/0012769 | A1 | 1/2013 | Carlson |
| 2013/0116503 | A1 | 5/2013 | Mertens et al. |
| 2014/0142374 | A1 | 5/2014 | Makower et al. |
| 2014/0309565 | A1 | 10/2014 | Allen |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101848688 A | 9/2010 |
| CN | 102151219 A | 8/2011 |
| CN | 202154785 U | 3/2012 |
| CN | 102600034 A | 7/2012 |
| CN | 102743275 A | 10/2012 |
| CN | 102743276 A | 10/2012 |
| CN | 103517697 A | 1/2014 |
| CN | 103961246 A | 8/2014 |
| CN | 104248500 A | 12/2014 |
| CN | 204931954 U | 1/2016 |
| CN | 205494128 U | 8/2016 |
| DE | 582196 | 8/1933 |
| DE | 1463673 U | 2/1939 |
| DE | 1703184 U | 7/1955 |
| DE | 3222467 A1 | 12/1983 |
| DE | 9309994.0 | 11/1993 |
| DE | 4243876 A1 | 6/1994 |
| DE | 10011289 A1 | 9/2001 |
| DE | 19853353 C2 | 5/2002 |
| DE | 102004017702 A1 | 10/2005 |
| DE | 202012005414 U1 | 8/2012 |
| DE | 212013000027 U1 | 9/2014 |
| EP | 0365230 A2 | 4/1990 |
| EP | 1554947 B1 | 7/2005 |
| EP | 2042147 A1 | 4/2009 |
| EP | 2712601 A1 | 4/2014 |
| JP | 53135768 | 11/1978 |
| JP | 53149442 | 12/1978 |
| JP | 54115952 B2 | 9/1979 |
| JP | 57099986 A | 6/1982 |
| JP | H05037234 U | 5/1993 |
| JP | 2000197518 A | 7/2000 |
| JP | 2008-125577 | 6/2008 |
| WO | 9205758 A1 | 4/1992 |
| WO | 2000/28939 A2 | 5/2000 |
| WO | 2004004610 A1 | 1/2004 |
| WO | 2006058291 A2 | 6/2006 |
| WO | 2008028076 A2 | 3/2008 |
| WO | 2013178223 A2 | 12/2013 |
| WO | 2014131110 A1 | 9/2014 |
| WO | 2015039787 A1 | 3/2015 |

### OTHER PUBLICATIONS

International Search Report and Written Opinion dated Sep. 25, 2014, in connection with International Patent Application No. PCT/EP2014/065734, 11 pages.
"Sex hilft gegen Erkältung," Focus Online, Dec. 5, 2004, 2 pages.
"Gesundheitsminister: Mehr Sex gegen Bluthochdruck," http://www.heilpraxisnet.delnaturheilpraxis/sex-gegen-bluthochdruck-665.php, Apr. 27, 2010.
Beate Lakotta, Schmerz und Glückseligkeit, Der Spiegel, pp. 136-138, Jun. 2006.
Maria M. Kettenring, "Erotische Partnermassage", Gräfe und Unser Publishers, 2004, 4 pp.

Fig. 1



Fig. 2



Fig. 3



Fig. 4

Fig. 5

Fig. 6



Fig. 7

Fig. 8



Fig. 9





Fig. 10a    Fig. 10b    Fig. 10c



Fig. 11



Fig. 12a    Fig. 12b    Fig. 12c



Fig. 12d    Fig. 12e    Fig. 12f

U.S. Patent          Dec. 26, 2017          Sheet 7 of 7          US 9,849,061 B2

Fig. 13



Fig. 14a



Fig. 14b



Fig. 14c



US 9,849,061 B2

1

## STIMULATION DEVICE HAVING AN APPENDAGE

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a national stage (under 35 U.S.C. 371) of International Patent Application No. PCT/EP2015/67017, filed Jul. 24, 2015, which claims priority to German Patent Application No. 102015103694.0, filed Mar. 13, 2015, both of which are herein incorporated by reference in their entirety.

### BACKGROUND OF THE INVENTION

The present invention relates to a stimulation device having an appendage for erogenous zones, in particular for the clitoris, a system with a stimulation device, and methods for stimulating body parts.

The erogenous zones of the human body can be stimulated with a variety of aids. For example, vibrators are used to apply a stimulus to a particular area of the skin by direct contact. These include stimulation aids for insertion into the human body, such as dildos.

Direct stimulation of the clitoris, for example using a clitoral massage vibrator, is frequently problematic. The clitoris is usually a woman's most sensitive erogenous zone. The entire clitoris is highly innervated, making it particularly touch-sensitive and responsive to sexual stimuli. In this context, the clitoral glans, in which the nerve cords of the two crura meet, should be emphasized in particular. Thus, on the one hand frequent application of a clitoral massage vibrator for direct stimulation leads to habituation effects or conditioning of the stimulated erogenous zone, while on the other the first applications of such a device may require certain practice or familiarization. Moreover, indirect stimulation of the female erogenous zones may be insufficient, or it may be desired to intensity the stimulation effect.

Furthermore, medical studies conducted in 2006 identified the female clitoris as the definitive starting point of the female climax, and for the first time neurologically proved the different qualities of sensation of clitoral and vaginal orgasm. Thus, both the clitoris and the vagina are capable of orgasm.

Furthermore, the sensitivity of the human erogenous zones, such as the clitoris, the inner and outer labia or the nipples, differs greatly from one individual to the next. Moreover, the sensitivity of the corresponding zone can change dramatically from one situation to another or even during a sexual act.

Furthermore, a rapid and pronounced stimulation of different erogenous zones is frequently desired.

Various direct and indirect forms of stimulation are usual practice, for example vacuum pumps and dildos.

For indirect stimulation of erogenous zones, and particularly the clitoris, conventional vacuum devices are used to stimulate the erogenous zones of the person concerned without directly contacting the main area to be stimulated. Thus, for example, vacuum pumps for the primary or secondary female sexual organs are known, which usually have a suction cup for placing on the appropriate area and a hand pump. The negative pressure exerted by this type of device on the clitoris, for example, generates a negative pressure in the clitoris itself which is usually below the systolic blood pressure. This difference in pressure results in an enlargement of the clitoris and/or stimulates the blood flow in the affected area. This vascular clitoral engorgement

2

serves both to promote desire by increasing sensitivity and for visual and tactile manipulation. The improved blood circulation also results in an increased secretion of vaginal moisture, which makes the stimulation more pleasurable. However, the manual operation of the hand pump is often onerous or irksome. In addition, the long-term or uninterrupted application of negative pressure with this device category too may result in habituation effects, which limit the effectiveness of the device in the long term.

Electrically driven vacuum pumps are also increasingly used instead of a manually operated vacuum pump. As an example of this, WO 2006/05 82 91 A2 discloses a device for sexual therapy, wherein the arrangement comprises a tubular suction chamber for the clitoris, an electrical vacuum source (vacuum pump) and a plurality of air flow openings. Operation of the vacuum pump generates an ongoing air flow or air exchange in the chamber, in the area of the clitoris. This has the disadvantageous effect of drawing off by suction the vaginal moisture, which is increased as a result of the negative pressure, thus having a drying effect on the stimulated skin parts. Likewise, the drawn-off moist air results in contamination of the fluidically downstream vacuum arrangement, for example the vacuum pump. Such arrangements with vacuum pumps may thus be problematic from the point of view of hygiene, as vacuum pumps and the associated valves or ventilation components often have dead spaces and/or are difficult to clean. Furthermore, the device serves to treat the blood vessels in the clitoris and not to provide stimulation up to sexual climax.

U.S. Pat. No. 6,464,653 B1 discloses therapeutic devices and methods that generate a clitoral engorgement with the aid of a vacuum generated by a vacuum pump to assist in the treatment of clitoral disorders such as incontinence. A control valve or modulator that can be appropriately covered by a finger is used to manually adjust or vary the level of vacuum in the suction chamber. This requires the user's attention and may be irksome or distracting under certain circumstances. This relatively complex device having further valves also has the disadvantages relating to hygiene and dehydration that were mentioned above, with the device moreover serving for long-term therapeutic purposes and not for short-term sexual stimulation.

Thus, the devices of the prior art have the common disadvantage that the complexity of the arrangements generating negative pressure or positive pressure may be high and this device may have problems in respect of hygiene. Moreover, there is a problem of ease of handling the devices, which are frequently uncomfortable to hold and/or require habituation.

Furthermore, the devices of the prior art have the further common disadvantage in that habituation effects occur in the event of long-term, continuous or frequently recurring application of negative pressures.

Another disadvantage of some of the previously described vacuum devices is, firstly, that the negative pressure has to be limited by means of a control valve or a vacuum pump and, secondly, that the negative pressure is supposed to be relieved by means of manually opening a release valve before the suction cup is detached from the skin. Should one of the valves have a technical defect and/or the user operate the device incorrectly, there is a risk of injury in certain circumstances.

Thus, in view of the problems mentioned above, the object of the invention is to provide a stimulation device that has a simple construction, is easy and safe to use, and has a pronounced stimulation effect.

US 9,849,061 B2

3

The object of the invention is achieved by the stimulation device as claimed in claim **1**. Advantageous developments and embodiments are the subject-matter of the further independent claims and dependent claims.

According to the invention, a pressure field generating arrangement of the stimulation device has at least one first chamber and at least one second chamber having at least one opening for placing on a body part or on the erogenous zone and at least one connection element that connects the first chamber to the second chamber.

This embodiment according to the invention, of chambers in fluidic communication via at least one connection element, allows simple generation of a pressure field in the second chamber by changing the volume in the first chamber, this pressure field being temporarily directed at the area of skin to be stimulated.

A pressure field, in the context of the invention, is a field of medium pressures that is variable over time and has temporary positive pressures and temporary negative pressures, a negative pressure being a pressure of medium that is below the reference pressure and a positive pressure being a pressure of medium that is above the reference pressure. As a result, the medium flows back and forth in the pressure field according to the invention. Thus, preferably a (largely) intermittent exchange of said medium can occur.

The medium is usually gaseous, preferably air, but may for example alternatively or in addition be a liquid medium, such as water or commercially available lubricant. For example, the chambers according to the invention may be filled with the lubricant prior to using the stimulation device. This also allows the corresponding area of skin to be stimulated with a suitable skin-friendly liquid instead of air, which may be desired, depending on the user's individual preference. As a further example, the stimulation device may also be used under water with water as the medium (in the bathtub, for example). In this case the stimulation device is waterproof in form.

The reference pressure is usually the atmospheric pressure acting on the stimulation device that prevails when application begins (i.e. prior to placing the stimulation device on the area of skin to be stimulated). In the preferred application of the stimulation device with air, the reference pressure is the currently prevailing air pressure or normal pressure. For example, when the device is applied under the normal standard conditions the reference pressure may be approximately 1 bar, from which it follows that a negative pressure according to the invention may be for example 0.7 bar and a positive pressure according to the invention may be for example 1.3 bar.

The pressure field according to the invention is used on the one hand to excite blood circulation of the area of skin to be stimulated, while on the other hand said area of skin is indirectly massaged. This combines two advantageous effects. The increased blood circulation makes the erogenous zone of the person concerned more sensitive, while moreover generating a massaging effect that serves to stimulate the erogenous zone, for example for sexual arousal up to climax. The massaging effect is generated by the kinetic energy of the medium flowing out of the first chamber through the connection element against the surface of the area of skin to be stimulated. In this way, the massaging effect created by the pressure field is generated indirectly, i.e. without the skin part to be stimulated being in direct contact with a solid body such as a vibrator.

By the exemplary application to the clitoris of the pressure field which is variable over time according to the invention, the pressure field imitates a stimulation that

4

usually occurs during sexual intercourse. Likewise, the motion of congress during this generates a varying stimulus of the clitoris. It is thus a lifelike simulation of the natural act of congress, with medical findings confirming that application of the pressure field according to the invention causes neither habituation effects nor addiction. This is due in particular to the alternating application of negative and positive pressures (or indeed to the non-continuous application of only one type of pressure).

Furthermore, the maximum applicable pressure is typically limited by the configuration of the at least one opening that may be put on the area of skin to be stimulated. Thus, for instance, too high a negative pressure harbors the risk of painful injury, in particular in erogenous zones. Stimulation devices working only with negative pressures are usually limited to this maximum in their mode of operation. By contrast, according to the invention the combination of positive and negative pressures creates an extended operational range of the stimulation-triggering pressure field or effect, as the operational range of the pressure can now be exploited to the maximum in both the positive and the negative range.

The orientation of the at least one connection element towards the area of skin to be stimulated allows the pressure field to work directly, the pressure field being decisively affected by the configuration of the at least one connection element and the at least one opening from the connection element into the second chamber, and is thus adjustable depending on the application of the stimulation device. Thus, the at least one opening of the connection element may be located opposite, preferably directly opposite, the body part to be stimulated. For example, the connection element in a stimulation device intended for the clitoris may have, between the first and second chamber, a single passage opening having a nozzle effect on the clitoral glans. Alternatively, the at least one connection element may comprise a plurality of passage openings, for example four, between the chambers if a relatively large area of skin is to be stimulated.

Furthermore, after placing the halfway or partially opened second chamber on the area of skin to be stimulated, a closed system of medium or air flow is created in the pressure field generating arrangement. Thus, the medium or air is moved decisively back and forth between the chambers, while an exchange with medium or air from outside the system is at least largely avoided. Thus, the first chamber is preferably connected exclusively to the second chamber via or through the connection element. Thus, the first chamber has no connections other than those to the second chamber; for example, there is no direct connection between the first chamber and the environment surrounding the device via a pressure valve or an air discharge channel.

For example, the temperature of the air in the flow system according to the invention rapidly adjusts to skin temperature, while the irksome supply of new (possibly cold) air from outside the system, as may be the case when using vacuum pumps of the prior art inter alia, is avoided. Drying effects are moreover avoided, as very little or no removal of stimulation-promoting fluid, such as bodily fluid, occurs in a closed system.

Furthermore, due to the simple construction, the pressure field generating arrangement according to the invention has the advantage of better hygiene and improved cleaning capacity. Here, the present invention avoids valves or pumps/compressors with potential dead spaces and places that cannot be cleaned. The pressure field generating arrangement according to the invention is thus easy to clean. For example, the stimulation device can be cleaned in a

US 9,849,061 B2

5

simple manner by filling the first chamber with a cleaning agent and activating the pressure field. Alternatively, the second chamber can be arranged to be replaceable, which also simplifies the cleaning of both chambers. Furthermore, the chambers according to the invention and the connection element of the pressure field generating arrangement can be manufactured in one piece, wherein they are made for example of a single plastic molded part (e.g. rubber). As a further alternative, the first chamber, the second chamber and the connection element may be made in one piece.

Moreover, the construction according to the invention has the result of avoiding complex fluid engineering elements such as valves, which results in simplified manufacture.

Furthermore, the stimulation device according to the invention has a drive unit that varies the volume of the first chamber such that a pressure field is generated via the connection element in the second chamber, this pressure field serving to stimulate the erogenous zone, and a control device that activates the drive unit.

The principle of the invention means that the medium transported between the chambers is limited in volume to the maximum volume of the first chamber. Moreover, the transported volume can be further limited, as a result of its construction, by the maximum possible change in volume brought about by the drive unit.

Consequently, the maximum positive or negative pressure the stimulation device can build up in the second chamber is limited due to the dimensions of the components of the pressure field generating arrangement and the drive. In particular, the maximum positive or negative pressure can be limited to an amount that minimizes or rules out any risk of injury for the areas of skin to be stimulated. As a result, a safety valve that is usual in the prior art, or a manual intervention in the stimulation process by the user, such as the opening of a release valve, is for example rendered unnecessary.

Furthermore, the variation over time in the pressure field or the modulation of the pressure field by the control device is controlled largely automatically. Thus, the modulation of the pressure field, such as intensity, time profile or sequence, can be previously stored in the control device. Preferably, the variation over time in the pressure field can have a regular or recurring (stimulation) pattern, such as pulses at a predetermined cycle rate or regularly alternating pulse sequences. This allows the user's interaction with the stimulation device to be limited according to the invention to switching on and off and selecting the stimulation pattern, while the stimulation device automatically executes the preferred stimulation pattern. Thus, according to the invention, the complexity of using the stimulation device is low, particularly when compared with conventional (medical) vacuum stimulation devices. Alternatively or in addition, the stimulation pattern of the stimulation device can be individually configured by the user during or before operation.

Moreover, according to the invention the stimulation device is provided with (at least) one appendage. On the one hand this appendage may be used as a handle in order to hold the stimulation device easily and comfortably, and on the other hand the appendage may also be used as a direct stimulation aid for insertion into the human body or indeed for placing on the human body.

If the appendage is inserted into the human body, it serves for direct stimulation of the body part concerned. Thus, it supplements the indirect stimulation effect of the pressure field generating arrangement. It is thus possible for a direct and an indirect stimulation of a plurality of erogenous zones to occur simultaneously or alternately. For example, the

6

appendage may be inserted into the female vagina, while stimulation of the clitoris may take place at the same time or alternately by means of the pressure field according to the invention. Accordingly, the principle according to the invention of the combined direct and indirect stimulation may also be applied to other body parts, or the erogenous zones thereof. For example, the appendage may be placed on a woman's clitoris while the pressure field generating arrangement stimulates another woman's or the same woman's clitoris.

In this way, the stimulation device having an appendage may be used by only one person or indeed by two different people for the stimulation of a plurality of erogenous zones.

The combination of direct and indirect stimulation results in an improvement in the stimulation effect and a versatile applicability of the stimulation device. Moreover, further, alternative types of play during the sexual act are possible using the inventive stimulation device having an appendage.

Thus, according to the invention a stimulation device which has a plurality of cumulative orgasm- or stimulation-triggering effects and is suitable for the stimulation of a plurality of erogenous zones, in particular the female clitoris, is provided. Furthermore, a device is provided which avoids dehydration of the erogenous zones to be stimulated, is hygienic and avoids habituation effects.

According to a development of the invention, the appendage is movable with the pressure field generating arrangement, for example being connected by means of a joint at one end of the appendage. In this way, the stimulation device may be adapted to the anatomy of the human body in question and to its use. For example, the appendage may be inserted into the female vagina in order then to adapt the angle between the pressure field generating arrangement and the appendage such that the opening of the second chamber can be placed precisely over the clitoris. Consequently, the area of the body between the clitoris and the vagina is stimulated from both sides, mutually enhancing the effects of direct and indirect stimulation.

If the appendage is used as a handle for holding the stimulation device, the angle between the handle and the opening of the second chamber can be adapted to suit the preferences of the user of the device.

According to a development of the invention, the appendage is a stimulation aid which is shaped such that the appendage can be inserted into the human body, for example the vagina, for direct stimulation. In this case, the appendage preferably takes the form of a dildo. Here, sharp corners in particular are avoided. Thus, the appendage is preferably in a form such that it can be inserted smoothly into body cavities and/or also remain inserted therein.

According to a development of the invention, the appendage (140) is an elongate, lens-shaped or pillow-shaped body which is adapted such that the appendage can be inserted smoothly into the female vagina. This improves the direct stimulation effect.

According to a development of the invention, the appendage is mounted on the pressure field generating arrangement such that the stimulation device is unitary in form. Here, unitary means in particular that the stimulation device having an appendage and a pressure field generating arrangement takes the form of an integrated, cohesive device. Preferably, in this case the appendage and the pressure field generating arrangement transition from one another seamlessly. This improves hygiene and operability of the stimulation device.

According to a development of the invention, the appendage has a vibration device. This vibration device may be

7

actuated such that the appendage vibrates, as known in the case of electromechanically operated dildos. In this case, the vibration may either be activated independently of the other parts of the stimulation device, or indeed the vibration may be controlled by means of the control device, which in that case controls the drive unit of the pressure field generating arrangement as well. Preferably, the vibration may be controllable in a conventional manner as regards intensity, duration and sequence. The vibration intensifies the direct stimulation effect.

According to a further aspect of the invention, according to further independent claim 20 a system having the stimulation device according to the invention is proposed which has a remote control device arranged separately from the stimulation device, wherein the control device of the stimulation device is remotely controlled by the remote control device. This allows a conventional wireless (for example via radio) or wired remote control to be employed in order to allow remote-controlled modulation of the stimulation device or activation thereof by another user.

According to a further aspect of the invention, as claimed in claims 21 to 25, methods for stimulating body parts, in particular the clitoris, are proposed. The associated advantageous effects are explained in more detail above in relation to the pressure field and the appendage.

According to a further aspect of the invention as claimed in claim 19, the use of the stimulation device according to the invention as a sex toy for stimulating the female clitoris is proposed. As explained in the introduction, the female clitoris is a particularly sensitive erogenous zone in women, which is why the use according to the invention of an indirect massaging stimulation, combined with a negative-pressure stimulation, for this body part for stimulation up to orgasm appears particularly advantageous.

In the present invention, the methods for stimulating erogenous zones serve for sexual pleasure, and thus the methods do not serve for medical, for example therapeutic, purposes.

The above-described effects and functions of the present invention, and further aspects and features, are further described below with the aid of a detailed description of preferred embodiments with reference to the attached illustrations.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the figures:

FIG. 1 shows a front view of a first embodiment of the stimulation device according to the invention, with an appendage in a straight position;

FIG. 2 shows a side view of the first embodiment of the stimulation device according to the invention, with the appendage in an angled position;

FIG. 3 shows a schematic cross section through the first embodiment of the stimulation device according to the invention;

FIG. 4 shows a cross section through a pressure field generating arrangement of a first aspect of the present invention, in the first state;

FIG. 5 shows a cross section through a pressure field generating arrangement of a first aspect of the present invention, in the second state;

FIG. 6 shows a cross section through a pressure field generating arrangement of a first aspect of the present invention, in the third state;

8

FIG. 7 shows a cross section through a pressure field generating arrangement of a second aspect of the present invention;

FIG. 8 shows a cross section through a pressure field generating arrangement of a third aspect of the present invention;

FIG. 9 shows a cross section through a pressure field generating arrangement of a fourth aspect of the present invention;

FIGS. 10a), b) and c) show cross sections through a pressure field generating arrangement of a fifth aspect of the present invention;

FIG. 11 shows a partial cross section through a second embodiment of the stimulation device according to the invention;

FIGS. 12a) to f) show various bottom and side views of further aspects of a second chamber of the present invention;

FIG. 13 shows a block diagram of an embodiment of the present invention; and

FIGS. 14a) to c) show graphs of various pressure modulation patterns of the present invention.

## DESCRIPTION OF PREFERRED EMBODIMENTS

With reference to FIGS. 1, 2 and 3, a first embodiment will be explained below. FIG. 1 shows a front view of the first embodiment of the stimulation device 1 according to the invention, with an appendage 140 in a straight position, while FIG. 2 further shows a side view of the stimulation device 1 with the appendage 140 in an angled position, and FIG. 3 shows a cross section of the first embodiment of the stimulation device 1 according to the invention.

The first embodiment of the stimulation device 1 is a preferably portable electrical or small device that has a housing 8, a pressure field generating arrangement 2, an optional on/off switch 74 and an optional light 9.

The housing 8 preferably takes an ergonomic form such that it can be held comfortably in one hand and has no sharp or pointed edges. Furthermore, the housing 8 may be made of a plastics material such as polycarbonate (PC) or acrylonitrile butadiene styrene (ABS). Moreover, the gripping areas or even the entire housing may be supplemented by or be made of a silicone which has advantageous tactile properties. The housing 8 preferably takes an at least water-resistant or splash-proof form, for example protection class IP 24. Furthermore, the broken line in FIG. 2 indicates an optional side edge of the housing 8.

The optional on/off switch 74 serves to activate and deactivate the stimulation device 1. This on/off switch 74 may for example be a push button, which switches the stimulation device 1 on or off when held down, or a latching slide switch. Alternatively, it may be possible to switch the stimulation device 1 on and off by remote control.

The pressure field generating arrangement 2 of a first embodiment has a first chamber 3 in the interior of stimulation device 1, a second chamber 4 for placing on a body part 11 to be stimulated, and a connection element 5 that connects the first chamber 3 to the second chamber 4.

A drive unit 6, for example an electric motor, drives the first chamber 3 via a shaft 61 and by means of a cam 62 (or alternatively by means of a connecting rod) such that the volume of the first chamber 3 changes in accordance with rotation of the shaft 61 of the drive unit 6. On this point, it should be noted that any types of drive that cause a deflection of the wall 31 of the first chamber 3 for a change in volume can in principle be used in the stimulation device 1.

US 9,849,061 B2

9

This may for example be performed hydraulically, pneumatically, piezoelectrically, mechanically or electromagnetically. Examples of this are described in more detail below.

A control device 7 activates the drive unit 6, optional operating elements 71 and at least one optional display 72. Here, the control device 7 and the drive unit 6 are supplied with power for example by the internal battery 76 and/or the external power supply 73.

The stimulation device 1 further has at least one appendage 140. This appendage 140, which is preferably part of the housing 8, may optionally be moved or angled in relation to the housing part in which the pressure field generating arrangement 2 is accommodated. Here, the appendage may be angled or indeed rotated by means of a joint 141. The joint 141 may for example take the form of a plastically deformable plastic part, an adjustable joint or a hinge. FIG. 2 shows an example of a position of the appendage 140 which is angled in relation to the section of the housing 8 of the stimulation device 1 in which the pressure field generating arrangement 2 is accommodated. Alternatively, the appendage may also take a rigid or immovable form.

The appendage 140 is preferably a stimulation aid for insertion into the human body, for example the vagina or other bodily orifices. Here, the appendage 140 is shaped for example as a conventional dildo. Alternatively, the appendage may be constructed such that it is adapted to the human anatomy of another bodily orifice, for example the mouth. Moreover, the appendage 140 may take a form such that it can also be used as a handle in order to hold the stimulation device 1 comfortably.

Moreover, the appendage 140 may optionally have a vibration device 142 that can be capable of being switched on and/or controlled. The vibration device 142 causes the appendage to undergo mechanical vibrations that support the direct stimulation effect of the appendage 140.

Optionally, the appendage 140 is mounted on the section of the housing 8 that accommodates the pressure field generating arrangement 2 such that the (entire) housing 8 of the stimulation device 1 takes a unitary form. In this way, the housing 8 creates the impression of being in one piece, for example by means of flexible and/or seamless connection elements of the housing 8. Alternatively, the housing 8, including the appendage 140, may have a silicone coating.

In a straight or non-angled orientation of the appendage 140, as shown in FIG. 1, the stimulation device 1 can be comfortably held, or indeed inserted into bodily orifices in a simple manner. If the appendage 140 is angled, as shown in FIG. 2, for example after insertion, the opening 42 can thus be guided out of the body part 11 to be stimulated. In this angled position of the stimulation device 1, both a direct and an indirect stimulation of at least one erogenous zone of the body can take place simultaneously. In this case, the body part 11 to be stimulated is located between the appendage 140 and the pressure field generating arrangement 2.

Furthermore, an optional light 9 can be provided on or in the housing 8. Here, the light 9 preferably serves for lighting the interior of the second chamber 4. The light 9 can either be switched on by the user or automatically activated when the stimulation device 1 is activated. Furthermore, the light 9 can take the form of energy-saving light emitting diodes. The light can for example serve in the dark as an orientation aid for the user of the stimulation device 1, or as additional visual stimulation.

With reference to FIGS. 4, 5 and 6, the construction and function of a first aspect of the pressure field generating arrangement 2 of the stimulation device 1 will be described below in more detail.

10

FIG. 4 shows the pressure field generating arrangement 2 in a first state, with the second chamber 4 placed on the area of skin or body part 11 to be stimulated. The first state of the pressure field generating arrangement 2 is characterized by a neutral deflection of the first chamber 3, i.e. no external force acts on the first chamber 3, for example from the drive unit. Here, the volume V1 of the first chamber is the standard volume of this chamber 3.

The body part 11 to be stimulated is an area of skin on the body, wherein here for example a particularly sensitive erogenous zone, the clitoris 11, is shown. Thus, use of the present invention is not limited to the female clitoris 11, however; rather, the stimulation device 1 can be applied to all body parts or erogenous zones (such as the inside of the thighs, lumbar region, nape of the neck, nipples, etc.) which can be stimulated by means of medium- or air-pressure massage and/or negative pressure.

Because it is placed on the body part 11 to be stimulated, the second chamber 4 forms a chamber that is largely or completely closed off from the exterior of the pressure field generating arrangement 2 and whereof the only remaining connection to the second chamber is via the connection element 5, wherein the edges of chamber 4 ideally form an air-tight enclosure with the surface of the body part 11. Two communicating chambers 3 and 4 are created in this way, wherein a corresponding pressure equalization between the chambers 3 and 4 via the connection element 5 occurs in the event of a change in volume in one of the chambers 3 or 4.

A wall 31 of the first chamber 3 is secured by means of a holder 32. The holder 32 is in turn attached to the housing 8. The wall 41 of the second chamber is furthermore mounted on the holder 32. Two mutually aligned openings in the wall 41 of the second chamber and the holder 32 together form the connection element 5, which connects the first chamber 3 and the second chamber 4. In this arrangement, the wall 31, the holder 32 and the wall 41 are preferably joined to each other by adhesion to be medium- or air-tight. Alternatively, they can also be press-fitted or screwed to each other (for example with the aid of sealing areas between the housing 8 and the respective part). The holder 32 can also be joined to the housing 8 for example by adhesion or screws.

The wall 31 of the first chamber 3 is preferably made of a flexible medium- or air-tight material such as rubber. The holder 32 is preferably made of a rigid plastics material which is likewise medium- or air-tight. The wall 41 of the second chamber is preferably made of a flexible, skin-friendly material such as silicone or rubber.

FIG. 5 shows the pressure field generating arrangement 2 of FIG. 4 in a second state, wherein the second chamber 4 is once again placed on the body part 11 to be stimulated. The second state is characterized in that a force A acting on the first chamber 3 causes the chamber 3 to expand. To be precise, in this exemplary embodiment the force A draws the wall 31 of the first chamber 3 in a direction away from the second chamber 4.

This increases the volume V2 in the chamber 3, i.e. V2>V1. To equalize the difference in pressure created between the chambers 3 and 4, the medium or air now flows from the second chamber 4 into the first chamber 3.

Assuming that in the first state the pressure in the chambers 3 and 4 corresponds to the currently prevailing external reference pressure (air pressure for example), the overall pressure that is present in the second state will be lower than the external reference pressure. This negative pressure is set such that it is preferably lower than the usual systolic blood pressure in the blood vessels of the body part 11. The blood

US 9,849,061 B2

11

circulation in this area thus increases, and the clitoris 12 is better supplied with blood in the second state.

FIG. 6 shows the pressure field generating arrangement 2 in a third state, wherein the second chamber 4 is once again placed on the body part 11 to be stimulated. The third state is characterized in that a force B acting on the first chamber 3 causes a volume reduction or compression in the chamber 3. To be precise, the direction of the force B is opposed to the direction of the force A and deforms the wall 31 of the first chamber such that the resulting volume V3 of the chamber is smaller than the volume V1. The compression of the chamber 3 causes a positive pressure in the chamber 3, which is equalized by a medium or air flow through the connection element 5 in the direction of the second chamber 4.

This flow of medium is now preferably directed, by the orientation of the opening 51 and/or of the connection element 5, towards the body part 11 to be stimulated, in particular towards the glans of the clitoris 12. The indirect (pressure) massage according to the invention occurs as a result of the medium flowing onto the body part 11. The size of the opening 51 is in this case dimensioned such that it is small enough in relation to the volume displaced in the first chamber 3 to sufficiently accelerate the medium for a perceptible massaging effect.

Furthermore, the type of flow can not only be advantageously influenced by the size and orientation of the opening 51 but also by the inner configuration of the connection element. For example, helical grooves in the connection element 5 can cause the flow according to the invention to swirl, wherein the flow profile develops a "softer" or more turbulent action on the body part to be stimulated. Alternatively, the pressure field produced in the second chamber 4 can be adjusted to suit the application by means of a plurality of openings 51.

The advantage of the arrangement shown in FIGS. 4 to 6 is that it is unproblematic from the point of view of hygiene (because dead spaces are avoided, for example) and is simple to manufacture. For example, no valves or further openings in or on the first chamber 3 are required.

FIG. 7 shows a second aspect of the present invention with an alternative construction of the pressure field generating arrangement 2. Here, the walls 31 and 41 of the first and second chambers 3 and 4 can engage with one another such that, as in the first aspect of construction of the pressure field generating arrangement 2, they form two communicating chambers with a connection element 5. Thus, a separate holder is not required, while the second chamber 4 is replaceable. Moreover, the connection element 5 can take a form integral or in one piece with the wall 41 of the second chamber 4. A replaceable chamber 4 has the advantage that in this way various shapes of the chamber 4 that are adjusted to the respective body part can be used (a more detailed description thereof is provided below) without the need to replace the entire stimulation device 1. Alternatively, the second chamber 4 can also be attached to the housing 8 by being pushed on (not shown in more detail). The wall 31 of the first chamber 3 can be joined to the housing 8 by adhesion or screws for example.

It is also possible, as shown in more detail in FIG. 7 by the broken line and the double arrow C, for the first chamber 3 to be expanded and compressed by a force acting perpendicularly to the axial direction of the connection element 5. In principle, the force exerted indirectly or directly on the first chamber 3 by the drive unit 5 can be exerted from any

12

direction. The only decisive criterion here is that the volume of the first chamber 3 can be increased and decreased by the drive unit 6.

FIG. 8 shows a third aspect of the invention with a one-piece structure of the pressure field generating arrangement 2. Here, a resilient material such as silicone or rubber can be used as material for the chambers 3 and 4. The advantage here is that any gaps that are dubious from the point of view of hygiene are avoided, and the cost of manufacture is reduced. The pressure field generating arrangement 2 can be joined to the housing 8 by adhesion or screws in this case too. A change in the volume of the first chamber 3 occurs here in a manner analogous to that described in conjunction with FIG. 7.

FIG. 9 shows a fourth aspect of the invention with an alternative construction of the pressure field generating arrangement 2. Here, the second chamber 4, a plurality of connection elements 5, and partial sections of the wall 31 of the first chamber 3 are constructed in one piece. Alternatively, the pressure field generating arrangement 2 can also be constructed in two or more pieces from individual components, while retaining the geometric shape of FIG. 9, in a similar way to that shown in FIG. 4 or 7.

In this case, the volume in the chamber 3 is changed in a manner similar to a piston pump, although there are no valves of any kind here. Thus, a piston 63 is moved back and forth by the drive unit, for example an electric motor or electromagnet, in the directions of the double arrow D. This type of drive has the advantage that the volume of the first chamber 3 can be reduced to zero or approximately zero in a simple manner, thus allowing the first chamber 3 to be almost completely emptied.

The embodiment of the connection element 5, with a plurality of channels 52 and openings 51, results in a distribution of the pressure field over a plurality of concentration points. While the embodiment of the connection element 5 with only one channel, as described in conjunction with FIG. 6, results in the formation of a highly concentrated medium or air flow onto a target area, the embodiment of the connection element 5 shown in FIG. 9 allows the medium or air flow to be distributed over a plurality of target areas. In this way, the flow can for example be blown against the clitoris 11 not just on its glans, but evenly from a plurality of sides. Depending on the application, this distribution of the air flow concentration to a plurality of areas can help to avoid overstimulation and/or help to increase the stimulation area.

FIGS. 10a to 10c show a fifth aspect of the invention with (partial) cross sections of a construction of the pressure field generating arrangement 2 with a bending element 64 as the drive for changing the volume in the first chamber 3. The bending element 64 can for example be a conventional piezoelectric bending element, which is deformed or bent once a voltage is applied. In this aspect of the invention, the wall 31 of the first chamber 3 takes a rigid or stiff form, while the bending element 64 is made to fit suitably against the sides of the first chamber 3. The transition points between the bending element 64 and the wall 31 are in this case sealed (resiliently joined by adhesion, for example). In this construction, the drive for the pressure field generating arrangement 2 is already integrated therein, and an external drive is not required. An electric motor with a cam is not needed, for example. This allows, inter alia, the reduction of any disruptive natural resonances due to movement of the cam of the stimulation device.

FIG. 10a shows in detail the pressure field generating arrangement 2 with the bending element 64 in a neutral

US 9,849,061 B2

13                                                          14

position. Thus, the volume of the first chamber **3** with the bending element **64** in the neutral position is the standard volume. FIG. **10***b* furthermore shows the first chamber **3** with an excited and, consequently, outwardly bent bending element, for which reason the volume of the first chamber **3** has increased; consequently, a negative pressure prevails in the pressure field generating arrangement **2**. FIG. **10***c* shows a bending element of the first chamber **3** excited in the opposite direction to FIG. **10***b*, for which reason the volume of the first chamber **3** has decreased; consequently, a positive pressure prevails in the pressure field generating arrangement **2**.

FIG. **11** shows a second embodiment of the invention with a spatially separated arrangement of the chambers **3** and **4** of the pressure field generating arrangement **2**. The chambers **3** and **4** are in this case connected via an extended connection element **5**, which can be a relatively long flexible hose or a pipe, which may also be rigid. For example, the connection element **5** may be 0.5 m in length. This enables the housing **8** to be held in one hand while the other hand holds the second chamber **4** on the body part **11** to be stimulated; or the housing **8** may simply be laid aside, while the user holds only the second chamber **4** in both hands. Alternatively, the appendage **140** can be inserted into a body part, in which case it is no longer necessary for the stimulation device **1** to be held in the hand.

FIGS. **12***a*) to **12***f*) show various bottom and side views of further aspects of the second chamber **4** of the present invention. In detail, FIG. **12***a*) shows a bottom view of a circular second chamber **4** with a central opening **51**; FIG. **12***b*) shows a bottom view of a triangular second chamber **4** with a central opening **51**; FIG. **12***c*) shows a bottom view of an oval second chamber **4** with a central opening **51**; and FIG. **12***d*) shows a bottom view of an approximately eight-shaped second chamber **4** with two openings **51** arranged offset from the center. FIG. **12***e*) furthermore shows a side cross section of a second chamber **4** according to the invention, wherein the second chamber **4** additionally has an extended contact surface **43** for the skin or a support part **43** to improve the sealing function of the second chamber **4** on the skin. The extended contact surface **43** may moreover have grooves or projections that improve the sealing function even further. FIG. **12***f*) shows a side cross section of a second chamber **4** having a plurality of separate connection elements **5** and an extended contact surface resulting from the support part **43**.

The shape of the second chamber **4** can thus be fundamentally adjusted to the anatomy of the erogenous zone to be stimulated. The shape of the chamber **4** in FIG. **12***a*) is, for example, adjusted to the round shape of the breast, while the shape of chamber **4** in FIG. **12***c*) is better suited to the shape of the female vulva. Furthermore, the shape of the second chamber **4** also determines how pronounced the pressure field according to the invention is. The size of the second chamber **4** in relation to the volume displaced from the first chamber **3** thus determines the level of the achievable negative or positive pressure. Furthermore, the proximity of the opening **51** of the connection element **5** to the area of skin to be stimulated can also be used to determine the intensity of the massaging effect according to the invention on said area of skin. A plurality of openings **51**, cf. FIG. **12***d*), allows the massaging effect to be distributed over a plurality of areas. Thus, for example, the clitoris can be stimulated less drastically at the very sensitive clitoral glans (cf. FIG. **12***e*)) but more at the areas surrounding the clitoral glans, in order to prevent overstimulation of the clitoris.

FIG. **13** shows a block diagram of an example of the functional construction of an embodiment of the present invention, having a control device **7**, a drive unit **6**, a light **9**, an on/off switch **74**, operating elements **71**, a battery **76** and an external power supply **73**.

The control device **7**, which for example has a microcontroller or is hardwired, initially controls the power supply to all the consumers of the stimulation device **1** and optionally controls a process of charging and discharging the battery **76** and/or battery management. En particular, the control device **7** controls the excitation of the drive unit **6**, such as the size of the deflection, the frequency, the modulation, etc.

Optionally provided operating elements **71** serve to set the mode of the device, i.e. to set the modulation pattern of the pressure field. The operating elements **71** may for example take the form of at least one push button, at least one rotary switch, or at least one touch-sensitive switch. Furthermore, the operating elements **71** may emit optical feedback for the purpose of confirmation, for example by means of light emitting diodes (LEDs) integrated in the switch.

An optional display **72** serves to inform the user of the device state and/or the set condition. The display **72** may for example take the form of a plurality of light emitting diodes or an LCD display. The displayed information may for example be the charging condition of an optional battery, or the current setting of the modulation pattern.

Furthermore, the control device **7** may have a memory in which at least one modulation or stimulation pattern (described in more detail in conjunction with FIGS. **14***a*) to *d*)) is stored. Excitation of the drive unit **6** can now be activated via the operating elements **71** in accordance with this previously stored stimulation pattern, depending on the choice made by the user of the stimulation device **1**. The stimulation pattern of the pressure field can also be optionally and individually generated and stored by the user via the operating elements.

A socket (not shown in detail) can serve to supply external power to the stimulation device **1** via an external plug that is for example connected to an external mains adapter. In order to ensure that the stimulation device **1** is splash-proof, it is also possible, instead of the socket, to provide an electromagnetically inductive transformer that allows power to be supplied to the stimulation device **1** without an electrically conductive contact. Preferably, the stimulation device **1** moreover has a battery, for example a nickel metal hydride battery (NiMH), for wireless operation. Alternatively, a (relatively long) power supply cable may lead out of the stimulation device.

FIG. **14***a*) shows the sequence over time of overall pressure p in the pressure field generating arrangement (**2**) when the latter is used for stimulation. The broken line indicates the reference pressure, for example the currently prevailing atmospheric pressure, outside the pressure field generating arrangement (**2**). If the second chamber **4** is now placed on the body part **11** to be stimulated, the initially prevailing ambient pressure remains approximately constant in the pressure field generating arrangement (**2**). It is assumed that the second chamber **4** is placed on the body part to be stimulated such that it is largely air-tight. Once the stimulation device is activated, the drive unit **6** is activated or excited by the control device **7** in accordance with a previously stored stimulation pattern. Accordingly, the volume of the first chamber **3** and thus the overall pressure in the pressure field generating arrangement **2** are changed, with the changes in pressure being modulated onto the reference pressure. The pressure or stimulation pattern shown as an example in FIG. **14***a*) develops a pulsed, regular

US 9,849,061 B2

15

pressure field. In phases of pressure increase, air is blown against or massages the erogenous zone to be stimulated, whereas at times when a negative pressure prevails the blood circulation in the body part **11**, for example the clitoris, is favored. Thus, there are time periods according to the invention (designated in FIG. **14***a*) as I)) in which a negative pressure prevails while the clitoris is simultaneously being indirectly massaged.

FIG. **14***b*) shows three examples of alternative stimulation patterns. Thus, the area designated as II) shows a pulsed stimulation pattern of high amplitude. The area designated as III) shows a pulsed stimulation pattern of low amplitude. Furthermore, the area designated as IV) illustrates a stimulation pattern which is irregular as regards sequence over time and asymmetrical in amplitude. The patterns can be varied, depending on the effect on the body/application and in accordance with the wishes of the individual.

FIG. **14***c*) shows a further example of an alternative stimulation pattern. Here, the intensity of the pressure may increase with time in order to adjust to the user's state of excitement.

In addition to the embodiments that have been explained, the invention allows for further constructional principles. For example, different arrangements or constructions of the first chamber **3** may be combined as desired with different embodiments of the second chamber **5** or the connection element **5**. For example, the first chamber **3** having the drive in FIG. **10** can be combined with the second chamber in FIG. **12***f*).

Although only one first chamber **3** is shown in all embodiments, two or more first chambers **3** may also be provided, which are then driven accordingly simultaneously or with a time delay such that their volume is changed in order to build up a pressure field according to the invention.

Although only one opening from the first chamber **3** to the connection element **5** is shown in all embodiments, a plurality of openings for a connection element **5** or indeed a plurality of openings for a plurality of connection elements **5** may also be provided in the first chamber **3**.

A stimulation device **1** can have a plurality of pressure field generating arrangements **2**. Thus, for example, two pressure field generating arrangements may be provided in order to stimulate two erogenous zones simultaneously.

The stimulation patterns according to the invention can differ from the patterns shows in FIGS. **14***a*), *b*) and *c*), provided they have a sequence of positive and negative pressures over time. For example, a relatively long-lasting negative pressure can initially be built up at the beginning or after activation of the device (for example 3 minutes), in order to effectively increase the blood circulation in the zone to be stimulated, after which pulses of negative and positive pressures of slowly increasing amplitude follow.

LIST OF REFERENCE NUMERALS

**1** Stimulation device
**2** Pressure field generating arrangement
**3** First chamber
**4** Second chamber
**5** Connection element
**6** Drive unit
**7** Control device
**8** Housing
**9** Light
**11** Body part
**12** Clitoris
**31** Wall of the first chamber

16

**32** Holder
**41** Wall of the second chamber
**42** Opening of the first chamber
**43** Contact surface
**51** Opening from the connection element to the second chamber
**61** Drive shaft
**62** Cam
**63** Piston
**64** Bending element
**71** Operating element
**72** Display
**73** Power supply
**74** On/off switch
**76** Battery
**77** Control board
**140** Appendage
**141** Joint
**142** Vibration device

The invention claimed is:

1. A stimulation device for erogenous zones, comprising:
at least one pressure field generating arrangement with:
  at least one first chamber;
  at least one second chamber having at least one opening for placing on a body part; and
  at least one connection element that connects the at least one first chamber to the at least one second chamber;
a drive unit that varies the volume of the at least one first chamber such that a stimulating pressure field is generated via the at least one connection element in the at least one second chamber;
a control device that activates the drive unit; and
an appendage;
wherein the stimulating pressure field generated in the at least one second chamber comprises a pattern of negative and positive pressures, modulated onto with respect to a reference pressure;
wherein the at least one first chamber is connected to the at least one second chamber solely by the at least one connection element, and
wherein the appendage is a dildo configured to be inserted into a vagina.

2. The stimulation device as claimed in claim **1**, wherein at least one opening of the at least one connection element is opposite the body part to be stimulated and is directed towards the body part to be stimulated.

3. The stimulation device as claimed in claim **1**, wherein the at least one second chamber is at least one of:
a flexible material,
a transparent material, or
fitted to the shape of a vaginal labia minora such that the vaginal labia minora is completely covered by the opening of the at least one second chamber.

4. The stimulation device as claimed in claim **1**, wherein the at least one second chamber is made in one piece with the at least one connection element and the at least one first chamber.

5. The stimulation device as claimed in claim **1**, wherein the at least one second chamber of the stimulation device is arranged to be replaceable.

6. The stimulation device as claimed in claim **1**, wherein the at least one second chamber is arranged separately from the stimulation device; and
the at least one connection element is a hose or tube.

US 9,849,061 B2

17

**7**. The stimulation device as claimed in claim **1**, wherein the at least one second chamber has a sealing support part for enlarging a contact surface of the at least one second chamber on skin.

**8**. The stimulation device as claimed in claim **1**, wherein the respective modulation of the stimulating pressure field may be changed by means of an operating element.

**9**. The stimulation device as claimed in claim **1**, wherein the stimulation device has a light for lighting the at least one second chamber.

**10**. The stimulation device as claimed in claim **1**, wherein the at least one connection element has an internal shape and an opening to the at least one second chamber that provide a form such that the stimulating pressure field is modulated in direction and intensity.

**11**. The stimulation device as claimed in claim **1**, wherein the stimulation device is a hand-held device.

**12**. The stimulation device as claimed in claim **1**, wherein the appendage is mounted on a housing to be movable.

**13**. The stimulation device as claimed in claim **1**, wherein the appendage is connected to a section of a housing that accommodates the at least one pressure field generating arrangement via a joint.

**14**. The stimulation device as claimed in claim **1**, wherein the appendage is a stimulation aid for insertion into a human body.

**15**. The stimulation device as claimed in claim **1**, wherein the appendage has a vibration device.

**16**. The stimulation device as claimed in claim **1**, wherein the appendage is mounted on a section of a housing that accommodates the at least one pressure field generating arrangement such that the housing of the stimulation device is unitary in form.

**17**. The stimulation device as claimed in claim **1**, wherein the stimulation device is configured in size, movability and shape to fit a female anatomy such that the at least one pressure field generating arrangement is configured to indirectly stimulate a clitoris of a woman while the appendage is configured to simultaneously be inserted into a vagina of the woman.

**18**. The stimulation device as claimed in claim **1**, wherein the appendage is a handle for holding the stimulation device.

**19**. The stimulation device as claimed in claim **1**, wherein the appendage is an elongate lens-shaped body configured to be inserted into the vagina.

**20**. A system comprising:
a stimulation device comprising:
    at least one pressure field generating arrangement with:
        at least one first chamber;
        at least one second chamber having at least one opening for placing on a body part; and

18

        at least one connection element that connects the at least one first chamber to the at least one second chamber;
    a drive unit that varies the volume of the at least one first chamber such that a stimulating pressure field is generated via the at least one connection element in the at least one second chamber;
    a control device that activates the drive unit; and
    an appendage; and
a remote control device, arranged separately from the stimulation device, for remotely controlling the stimulation device;
wherein the stimulating pressure field generated in the at least one second chamber comprises a pattern of negative and positive pressures, modulated with respect to a reference pressure;
wherein the at least one first chamber is connected to the at least one second chamber solely by the at least one connection element; and
wherein the appendage is a dildo configured to be inserted into a vagina.

**21**. A method for stimulating erogenous zones for sexual pleasure, comprising:
    inserting an appendage of a stimulation device into a vagina;
    forming, by a pressure field generating arrangement of the stimulation device, a pressure field directed towards a body part; and
    modulating, by a drive unit of the stimulation device interacting with the pressure field generating arrangement, the pressure field in a pattern of negative and positive pressures with respect to a reference pressure.

**22**. The method for stimulating erogenous zones as claimed in claim **21**, wherein
    a stimulation effect is individually influenced by modulating the pressure field by means of an operating element.

**23**. The method for stimulating erogenous zones as claimed in claim **21**, wherein
    the modulating is pulsed.

**24**. The method for stimulating erogenous zones as claimed in claim **21**, further comprising:
    placing a chamber of the pressure field generating arrangement over the body part.

**25**. The method for stimulating erogenous zones as claimed in claim **21**, wherein
    the appendage vibrates after insertion.

**26**. The method for stimulating erogenous zones as claimed in claim **21**, wherein the body part is a clitoris.

* * * * *

*Exhibit 23*



Deutsches
Patent- und Markenamt



EISENFÜHR SPEISER
EINGEGANGEN/RECEIVED

– 4. Juli 2018

MÜNCHEN

POSTANSCHRIFT Deutsches Patent- und Markenamt · 80297 München

| | |
|---|---|
| HAUSANSCHRIFT | Zweibrückenstraße 12, 80331 München |
| POSTANSCHRIFT | 80297 München |
| KONTAKT | Dr. Ralf Littger |
| TEL | +49 89 2195-3940 |
| FAX | +49 89 2195-2221 |
| INTERNET | www.dpma.de |
| AKTENZEICHEN | 10 2013 110 501.7 |
| ANMELDER/INHABER | NOVOLUTO GmbH |

Eisenführ Speiser Patentanwälte
Rechtsanwälte PartGmbB
Postfach 310260
80102 München

| | |
|---|---|
| IHR ZEICHEN | FA 5208-01DE |
| ERSTELLT AM | 29.06.2018 |

Bitte Aktenzeichen und Anmelder/Inhaber bei allen Eingaben und Zahlungen angeben!

**Beigefügt erhalten Sie zum Beschluss vom 17.04.2018**

- 1 Abschrift(en) einschließlich der Angaben zur elektronischen Signatur





Empfangsbekenntnis

DOKUMENTENANNAHME UND NACHTBRIEFKASTEN nur Zweibrückenstraße 12, HAUSADRESSE (FÜR FRACHT): Zweibrückenstraße 12, 80331 München
ZAHLUNGSEMPFÄNGER: Bundeskasse Halle/DPMA, IBAN: DE84 7000 0000 0070 0010 54, BIC (SWIFT-Code): MARKDEF1700
ANSCHRIFT DER BANK: BUNDESBANKFILIALE MÜNCHEN, LEOPOLDSTR. 234, 80807 MÜNCHEN
A 9016b/5.16



Deutsches
Patent- und Markenamt

Aktenzeichen: **10 2013 110 501.7**

Beschluss, verkündet in der Anhörung vom 17.04.2018

## Beschluss

In der Einspruchssache

betreffend das Patent 10 2013 110 501

mit der Bezeichnung

Stimulationsvorrichtung

der **NOVOLUTO GmbH, 10117 Berlin, DE**                      Patentinhaberin

Verfahrensbevollmächtigte: KUHNEN & WACKER Patent- und Rechtsanwaltsbüro PartG mbB, 85354 Freising, DE

weitere Verfahrensbeteiligte:

**1. ecoaction GmbH, 50858 Köln, DE**                      Einsprechende ecoaction GmbH

Verfahrensbevollmächtigte: BRANDI Rechtsanwälte Partnerschaft mbB, 33602 Bielefeld

**2. Fun Factory GmbH, 28197 Bremen, DE**                Einsprechende Fun Factory GmbH

Verfahrensbevollmächtigte: Eisenführ Speiser Patentanwälte Rechtsanwälte PartGmbB, 80335 München, DE

hat die Patentabteilung 44 des Deutschen Patent- und Markenamts unter Mitwirkung

      des Vorsitzenden:    Dr. Medicus

      des Berichterstatters:  Dr. Littger

      des Beisitzers:      Dr. Zink

am 17.04.2018 beschlossen:

      Das Patent wird widerrufen.

P 2880c/9.17

## Gründe

I.

Am 23. September 2013 wurde die Patentanmeldung 10 2013 110 501.7 beim Deutschen Patent- und Markenamt eingereicht. Das Patent 10 2013 110 501 mit der Bezeichnung „Stimulationsvorrichtung" wurde nach Erteilung am 18. Februar 2016 veröffentlicht.

1. Gegen das Patent hat die Einsprechende ecoaction GmbH

mit Schriftsatz vom 17. November 2016 (eingegangen am selben Tag) Einspruch erhoben und beantragt, erstens das erteilte Patent gem. § 21 (1) Nr. 1, 4 PatG in vollem Umfang zu widerrufen und zweitens hilfsweise eine mündliche Anhörung durchzuführen. Die Einsprechende ecoaction GmbH beruft sich dabei auf mangelnde erfinderische Tätigkeit und das Hinausgehen des Gegenstands des Patents über den Offenbarungsgehalt der ursprünglich eingereichten Anmeldung (unzulässige Erweiterung).



Zur Begründung verweist die Einsprechende ecoaction GmbH auf folgende Druckschriften:

E1 CN 2153351 Y (zusammen mit einer Patent Translate Übersetzung (EPA))

E2 DE 10 2013 110 501 A1 (Offenlegungsschrift des Streitpatents)

E3 Auszug aus Maria M. Kettenring „erotische Partnermassage", 3. Auflage, 2004

E4 CN 2198900 Y (zusammen mit einer Patent Translate Übersetzung (EPA))

2. Gegen das Patent hat die Einsprechende Fun Factory GmbH

mit Schriftsatz vom 17. November 2016 (eingegangen am selben Tag) Einspruch erhoben und beantragt, erstens das erteilte Patent gem. § 21 (1) Nr. 1, 4 PatG in vollem Umfang zu widerrufen und zweitens hilfsweise eine mündliche Anhörung durchzuführen. Die Einsprechende Fun Factory GmbH beruft sich dabei auf mangelnde Neuheit, mangelnde erfinderische Tätigkeit und das Hinausgehen des Gegenstands des Patents über den Inhalt der Anmeldung in der ursprünglich eingereichten Fassung (unzulässige Erweiterung).

Seite 3 von 20    Zur Begründung verweist die Einsprechende Fun Factory GmbH auf folgende Druckschriften:

D1  WO 2006/058291 A2

D2  US 2013/0012769 A1

D3  http://www.heilpraxisnet.de/naturheilpraxis/sex-qeqen-bluthochdruck-665.php

D4  Focus online 5.12.2004

D5  US 6,099,463 A

D6  US 1,898,652 A

D7  DE 14 63 673 U

D8  DE 42 43 876 A1

D9  US 2008/0304984 A1

D10    WO 00/28939 A2

D11    DE 582 196 C

D12    DE20 2012 005 414U1

D13    EP 1 554 947 B1

D14    JP 2008-125577 A (japanisch)

D15    JP 2008-125577 A (englische Übersetzung der D14)

D16    US 2,112,646 A

D17    US 1,882,040 A

D18    US 5,377,701 A

D19    WO 2013/178223 A2

D20    DE 1 703 184 U

D21    DE 32 22 467 A1

D22    DE 93 09 994 U1

D23    DE 198 53 353 C2



Beide Einsprüche sind frist- und formgerecht beim Deutschen Patent- und Markenamt eingegangen. Beide Einsprüche sind auch ausreichend substanziiert und somit zulässig.

Die Patentinhaberin beantragt mit Schreiben vom 18. September 2017 (eingegangen am selben Tag) die Einsprüche zurückzuweisen und das Streitpatent in vollem Umfang aufrecht zu erhalten.

Seite 4 von 20

Mit derselben Eingabe beantragt die Inhaberin weiter hilfsweise eine mündliche Verhandlung, sollte dem Antrag nicht ohne weiteres stattgegeben werden können.

Zur Begründung verweist die Patentinhaberin u.a. auf eine Übersetzung der E1, die laut Schriftsatz der Patentinhaberin vom 18. September 2017 beglaubigt sein soll:

E1-Ü1 englische Übersetzung der E1 (Patentinhaberin)

Mit der umfangreichen Eingabe vom 24. Januar 2018 (eingegangen am selben Tag) teilt die Einsprechende Fun Factory GmbH mit, dass sie die Anträge aus dem Schriftsatz vom 17. November 2016 aufrecht hält.

Zur Begründung verweist die Einsprechende Fun Factory GmbH auf folgende Druckschriften:



D24    US 1,730,535A

D25    DE 201 12 384 U1

A3     Klageschrift vom 5.08.2016, LG Düsseldorf Az 4a O 78/16

A4     Schriftsatz vom 20.07.2017, LG Düsseldorf Az 4a O 78/16

A5     Urteil vom 14.12.2017, LG Düsseldorf Az 4a O 78/16

E1A    Beglaubigte Übersetzung der E1 (Einsprechende Fun Factory GmbH)

E1B    Beglaubigung

In Erwiderung auf den umfangreichen Schriftsatz der Einsprechenden Fun Factory GmbH vom 24. Januar 2018 beantragte die Patentinhaberin eine Terminverlegung der für den 07. Februar 2018 angesetzten mündlichen Verhandlung um 2 Monate. In der entsprechenden Eingabe vom 30. Januar 2018 (eingegangen am selben Tag) hat die Patentinhaberin zudem die Frage aufgeworfen, ob die Einsprechende Fun Factory GmbH ein Hintermann der Eis.de GmbH sei, welche auf Grund einer Nichtangriffsverpflichtung gehindert sei selbst am Einspruchsverfahren gegenüber dem Streitpatent mitzuwirken.

Mit Zwischenbescheid vom 27. März 2018 hat die Patentabteilung den Verfahrensbeteiligten mitgeteilt, dass der Einspruch der Einsprechenden Fun Factory GmbH auf der Basis der bisher vorgetragenen Tatsachen zu deren angeblicher Strohmanneigenschaft zulässig sei.

Mit Eingabe vom 12. April 2018 (eingegangen am selben Tag;  vorab per e-mail an die Verfahrensbeteiligten) beantragte die Patentinhaberin erneut, das Patent unverändert aufrecht zu erhalten. Die Inhaberin kündigte ferner vorsorglich Hilfsanträge 1 bis 6 in der Anhörung an, sowie die Möglichkeit, dass bedarfsweise weitere Hilfsanträge gestellt werden können und zudem die Merkmale oder Merkmalskombinationen der Hilfsanträge 1 bis 6 beliebig miteinander kombiniert werden können.

Bezüglich der Einzelheiten wird auf den Inhalt der Akte verwiesen.

II.



Der geltende Anspruch 1 des erteilten Streitpatents lautet nach Merkmalen gegliedert:

a)      Stimulationsvorrichtung (1) für die Klitoris (12), aufweisend:

b)      eine Druckfelderzeugungseinrichtung (2) mit:

b1)     einer ersten Kammer (3); und

b2)     einer zweiten Kammer (4) mit einer Öffnung (42) zum Aufsetzen über die Klitoris (12);

b3)     einem Verbindungselement (5), welches die erste Kammer (3) mit der zweiten Kammer (4) verbindet; und

b4)     einer Antriebseinheit (6), welche das Volumen der ersten Kammer (3) derart verändert, dass über das Verbindungselement (5) in der zweiten Kammer (4) ein stimulierendes Druckfeld erzeugt wird; und

b5)     eine Steuereinrichtung (7), welche die Antriebseinheit (6) ansteuert; und

b6)     wobei das in der zweiten Kammer (4) erzeugte Druckfeld aus einem Muster von Unter- und Überdrücken besteht, welche auf den Normaldruck aufmoduliert sind; und

b7)     wobei die erste Kammer (3) über das Verbindungselement (5) ausschließlich mit der zweiten Kammer (4) verbunden ist, somit keine andere Verbindung der ersten Kammer (3) als diejenige zur zweiten Kammer (4) besteht, womit die erste Kammer (3) eine einzige Öffnung aufweist, und

Seite 6 von 20

b8)    wobei die zweite Kammer (4) eine Öffnung (51) von dem Verbindungselement (5) in die zweite Kammer (4) aufweist, und

c)    wobei die Stimulationsvorrichtung (1) keine Ventile aufweist, und

d)    wobei die Stimulationsvorrichtung (1) ein tragbares Handgerät

d1)    mit einer Batterie (76) ist,

e1)    dadurch gekennzeichnet, dass das Verbindungselement (5) starr ist,

e2)    und als ein gerader Kanal mit Düsenwirkung ausgestaltet ist,

e21)    dessen Öffnung in die ersten Kammer (3) und dessen Öffnung (51) in die zweite Kammer (4) zueinander ausgerichtet sind,

e22)    so dass eine Medienströmung bei Kompression der ersten Kammer (3) durch die Ausrichtung der Öffnung (51) und des Verbindungselements (5) auf die Klitoris (12) gerichtet ist,

e23)    wobei die Öffnung (51) des Verbindungselements (5) der Klitoris (12) durch die zweite Kammer (4) hindurch gegenüberliegt.



Die geltenden Ansprüche 2-9 des erteilten Streitpatents lauten:


2.    Stimulationsvorrichtung (1) gemäß Anspruch 1, wobei die zweite Kammer (4) aus einem flexiblen Material hergestellt ist und/oder aus einem zumindest teilweise durchsichtigen Material hergestellt ist und/oder an die Form der vaginalen labia minora derart angepasst ist, dass diese von der Öffnung der zweiten Kammer (4) vollständig überdeckt wird.


3.    Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 oder 2, wobei die zweite Kammer (4) mit dem Verbindungselement (5) und der ersten Kammer (3) einstückig ausgebildet ist.


4.    Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 oder 2, wobei die zweite Kammer (4) von der Stimulationsvorrichtung (1) auswechselbar angeordnet ist.


5.    Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 4, wobei die zweite Kammer (4) ein abdichtendes Auflageteil (43) zur Vergrößerung der Kontaktfläche der zweiten Kammer (4) auf der Haut aufweist.

6.	Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 5, wobei die jeweilige Modulation des Druckfeldes mitels eines Bedienelements 71 veränderbar ist.

7.	Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 6, wobei die Stimulationsvorrichtung (1) eine Beleuchtung (9) zur Beleuchtung der zweiten Kammer (4) aufweist.

8.	System mit einer Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 7, aufweisend: Seite 14 eine zu der Stimulationsvorrichtung (1) getrennt angeordnete Fernsteuervorrichtung , wobei die Steuereinrichtung (7) der Stimulationsvorrichtung (1) von der Fernsteuereinrichtung fernsteuerbar ist.

9.	Verwendung der Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 8 als Sexspielzeug zur Stimulation der weiblichen Klitoris.



Offenbarung:

Die Einsprechenden bemängeln in ihren Einspruchsschriftsätzen die unzulässige Erweiterung des Anspruchs 1 des Streitpatents in den Merkmalen e1, e2 (Einsprechende ecoaction GmbH) bzw. in den Merkmalen c, d, d1, e1, e2 (Einsprechende Fun Factory GmbH).

Bzgl. des Merkmals

c)	*wobei die Stimulationsvorrichtung (1) keine Ventile aufweist,*

argumentiert die Einsprechende Fun Factory GmbH in ihrem Einspruchs-Schriftsatz vom 17. November 2016, dass dieses in der Passage *„Bei der in den Figuren 4 bis 6 gezeigten Anordnung ist vorteilhaft, dass diese hygienisch unproblematisch (beispielsweise aufgrund der Vermeidung von Toträumen) und in der Herstellung einfach ist. Beispielsweise sind keine Ventile oder weitere Öffnungen in oder an der ersten Kammer 3 erforderlich"* (vgl. Urspr. Unt.: S. 18, Z. 25-28) in der beanspruchten Breite nicht offenbart ist, da sich die Abwesenheit von Ventilen lediglich auf die erste Kammer (3) bezieht.

Die Vermeidung von Ventilen ist aber in Hinblick auf die vorliegende Erfindung in allgemeiner Form in der Passage *„Weiter weist die erfindungsgemäße Druckfelderzeugungseinrichtung aufgrund des einfachen Aufbaus den Vorteil einer erhöhten Hygiene und einer verbesserten Reinigungsfähigkeit auf. Dabei vermeidet die vorliegende Erfindung Ventile ..."* offenbart (vgl. Urspr. Unt.: S.9, Z. 9-13). Selbst wenn man davon ausgeht, dass sich die Vermeidung von Ventilen lediglich auf die Druckfelderzeugungseinrichtung bezieht und nicht auf die gesamte Stimulationsvorrichtung, kann in Merkmal c) keine unzulässige Erweiterung gesehen werden, da Ventile außerhalb der Druckfelderzeugungseinrichtung keine Funktion hätten.

Zudem ist die Vermeidung von Ventilen in Hinblick auf den erfindungsgemäßen Aufbau in allgemeiner Form in der Passage *„Zudem führt der erfindungsgemäße Aufbau zur Vermeidung komplexer strömungstechnischer Elemente, wie z.B. Ventile, was zu einer Vereinfachung der Herstellung führt."* offenbart (vgl. Urspr. Unt.: S.9, Z. 22-24).

Bzgl. der Merkmale



d)      *wobei die Stimulationsvorrichtung (1) ein tragbares Handgerät*

d1)     *mit einer Batterie (76) ist,*

sieht die Einsprechende Fun Factory GmbH in den Untermerkmalen „tragbares Handgerät" und „Batterie" unzulässige Zwischenverallgemeinerungen gegenüber der Beschreibung einer ersten Ausführungsform, in der neben diesen Merkmalen noch weitere Merkmale genannt sind, u.a. Gehäuse, Bedienelementen, Anzeige (vgl. Urspr. Unt.: S. 13, Z. 22-25).

Neben der genannten Fundstelle sind die Untermerkmale Handgerät und Batterie in den ursprünglich eingereichten Unterlagen zudem in den Ansprüchen und Zeichnungen offenbart (vgl. Urspr. Unt.: Anspruch 13; Fig. 3, Bezugszeichen (76)). Demnach handelt es sich bei der Stimulationsvorrichtung vorzugsweise um ein batteriebetriebenes Handgerät (vgl. Urspr. Unt.: Anspruch 13). Der Begriff tragbar findet sich in Kombination mit dem Begriff Handgerät in der oben genannten Fundstelle, ist zudem aber auch aus den Figuren 1-3 ersichtlich bzw. ist gegenüber dem Begriff Handgerät auch als redundant anzusehen, da jedes Handgerät per se tragbar ist.

Nach deutschem Recht sind Zwischenverallgemeinerungen im übrigen nicht unzulässig, wenn die Merkmale, wie in der oben genannten Aufzählung, in keinem engen Zusammenhang zueinander stehen (vgl. Schulte, PatG, 10. Auflage, Einleitung, Rdn 128).

Seite 9 von 20

Bzgl. der Merkmale

e1)    *dadurch gekennzeichnet, dass das Verbindungselement (5) starr ist,*

e2)    *und als ein gerader Kanal mit Düsenwirkung ausgestaltet ist,*

argumentiert die Einsprechende ecoaction GmbH, dass die Formulierungen „das Verbindungselement (5) starr ist", „gerader Kanal" und „gerader Kanal mit Düsenwirkung" in der ursprünglich eingereichten Anmeldung nicht offenbart sind. Die Einsprechende Fun Factory GmbH sieht eine unzulässige Erweiterung dieser Merkmale hauptsächlich gegenüber dem Ausführungsbeispiel der Fig. 11 in Kombination mit dem zugehörigen Abschnitt in der ursprünglich eingereichten Beschreibung (vgl. Urspr. Unt.: S. 21, Abschnitt 3; Fig. 11).

Die Kombination der Merkmale e1) und e2) ist in den ursprünglich eingereichten Unterlagen des Streitpatents u.a. durch die zusammengehörigen Fig. 4-6 und die entsprechenden Abschnitte der Beschreibung offenbart (vgl. Urspr. Unt.: S. 15, letzter Abschnitt - S. 18, erster Abschnitt; S. 20, dritter Abschnitt; Fig. 4-6).



So zeigt die Fig. 4 eine Halterung (32), die vorzugsweise aus einem starren Kunststoff besteht (vgl.: Urspr. Unt.: S. 17, Z. 5-6; Fig. 4) und welche ein Verbindungselement (5) aufweist, welches die erste Kammer (3) und die zweite Kammer (4) verbindet (vgl. Urspr. Unt.: S. 16, Z. 25-30; Fig. 4). Da das Verbindungselement (5) durch die, aus vorzugsweise starrem Kunststoff bestehende, Halterung (32) begrenzt wird, folgt, dass das das Verbindungselement (5) starr ist.

Die Kanalform des Verbindungselements (5) im Zusammenhang mit den Figuren 4-6 ist in den ursprünglich eingereichten Unterlagen beschrieben (vgl. Urspr. Unt.: S. 20, Z. 15-16). Dabei zeigen die Figuren 4-6 das Verbindungselement (5) in Form eines geraden Kanals. Hinsichtlich der Formulierung „gerader Kanal" innerhalb des Merkmals e2) argumentiert die Einsprechende ecoaction GmbH, dass man den als gerade gezeigten Begrenzungslinien des Kanals 5 bei den Schnittzeichnungen nicht eindeutig entnehmen kann, dass der darauf abgebildete Kanal (5) keine Krümmung aufweisen darf. Es ist aber davon auszugehen, dass wenn die Anmelderin im Zusammenhang mit den Figuren 4-6 einen gekrümmten Kanal im Sinne gehabt hätte oder einen gekrümmten Kanal als mit beabsichtigt angesehen hätte, sie dies durch eine entsprechende Ausführung der Figuren 4-6 gezeigt hätte, z.B. durch Stufungen, Versätze in den Linien, Schattierungen oder eine unterschiedliche Darstellung des Kanals von außen und von innen. Dies ist aber nicht der Fall. Die Figuren 4-6 geben keinen Anhaltspunkt, aus dem man eine Krümmung des Kanals ableiten könnte. Zudem ist auch der mittlere Strömungspfeil bei den Figuren 4-6 gerade dargestellt.

Seite 10 von 20

Die Düsenwirkung des geraden Kanals im Merkmal e2) ergibt sich durch dessen gegenüber der ersten Kammer (3) und der zweiten Kammer (4) verringerten Querschnitt so dass sich die Düsenwirkung des geraden Kanals bei Kompression der ersten Kammer (3), wie in Fig. 6 dargestellt, automatisch ergibt. Auch wird die Düsenwirkung des geraden Kanals in der Fig. 6 durch die drei Pfeile, die von der ersten Kammer (3) zur zweiten Kammer (4) weisen, entsprechen symbolisiert (vgl. Urspr. Unt.: Fig 6).

Die Ansprüche 1-9 des Streitpatents sind somit als ursprünglich offenbart anzusehen.

<u>Patentfähigkeit:</u>

<u>Neuheit:</u>

Die Einsprechende Fun Factory GmbH argumentiert in ihrem Einspruchsschriftsatz vom 17. November 2016, dass der Gegenstand nach Anspruch 1 des Streitpatents nicht neu gegenüber dem Gerät zur Hautbehandlung nach D8 sei. Die Einsprechende argumentiert u.a., dass u.a. die Durchgangsbohrung (22) der Vorrichtung nach D8 dem geraden Kanal des Merkmals e2) nach Anspruch 1 des Streitpatents entsprechen würde.



Zum einen ist die Durchgangsbohrung (22) zumindest in der Fig. 2 der D8 nicht gerade sondern gekrümmt gezeigt und zum anderen besitzt die Durchgangsöffnung (22) nicht wie die Einsprechende argumentiert eine Düsenwirkung. Die Durchgangsöffnung (22) hat die Funktion vom Luftschlauch (4) kommende Saug- und Druckstöße an die Düsen bzw. Durchgangsöffnungen (19) zu liefern. Dafür ist der Luftschlauch verlustfrei mit der Durchgangsöffnung (22) verbunden (vgl. D8: Sp. 7, Z. 11-24; Fig. 3). Die Düsenfunktion ist bei der Vorrichtung nach D8 somit im Bereich der Düsen bzw. Durchgangsöffnungen (19), welche von der Einsprechenden Fun Factory GmbH als zweite Kammer im Sinne des Streitpatents angesehen werden und nicht im Bereich der Durchgangsöffnung (22) angesiedelt. Damit fehlt es an der nötigen Übereinstimmung zumindest dieses Merkmals mit dem des Streitpatents.

Somit ist die Vorrichtung nach Anspruch 1 des Streitpatents neu gegenüber der Vorrichtung nach D8. Die übrigen sich im Verfahren befindlichen Druckschriften scheinen in Bezug auf die Neuheit der Vorrichtung nach Anspruch 1 des Streitpatents noch weiter abzuliegen.

Seite 11 von 20

## Erfinderische Tätigkeit:

Als Fachmann sieht die Patentabteilung einen Entwicklungsingenieur, der auf dem Gebiet der Massagevorrichtungen tätig ist und der sich Spezialkenntnisse bei der Entwicklung von Sexspielzeug angeeignet hat, an.

## Hauptantrag:

Als Ergebnis des Prüfungsverfahrens wurde die gegenüber der D7 abgegrenzte Vorrichtung nach Anspruch 1 des Streitpatents unter Schutz gestellt. Die Erteilung erfolgte, da laut Patentinhaberin die Erfindung in der relativen Anordnung der Kammern (3, 4) und des Verbindungselements (5) in Bezug auf den Anwendungszweck der Klitoralstimulation bestand.

Die Einsprechende ecoaction GmbH beschreibt in ihrem Vortrag die Vorrichtung zur Stimulation von Meridianpunkten mittels pulsierenden Luftdruck nach E1. Dabei belegt die Einsprechende ecoaction GmbH anhand der Vorrichtung nach E1 die Anordnung der ersten Kammer (3), des Verbindungselements (5) und der zweiten Kammer (4) im Sinne der Merkmale des kennzeichnenden Teils des Anspruchs 1 des Streitpatents als aus dem Stand der Technik bekannt.



Laut Merkmalsvergleich und Vortrag der Einsprechenden ecoaction GmbH offenbart die E1 zudem die Merkmale des Oberbegriffs bis auf die an und für sich bekannte Verwendung einer Batterie und den Verwendungszweck Klitoralstimulation.

Zu den Merkmalen im Einzelnen:

Die Vorrichtung nach E1 zeigt nach den Merkmalen des Anspruchs 1 des Streitpatents gegliedert eine

a)    pneumatische Massagevorrichtung zur Stimulierung von Meridianpunkten (vgl. E1: engl. Zusammenfassung; Fig.), die als Stimulationsvorrichtung für die Klitoris geeignet ist, aufweisend:

b)    eine Druckfelderzeugungseinrichtung, welche einen pulsierenden Luftdruck erzeugt (vgl. E1: engl. Zusammenfassung; Fig.) mit:

b1)   einer ersten Kammer in Form des Luftsacks (2) (vgl. E1: engl. Zusammenfassung; Fig.); und

b2)   einer zweiten Kammer im rechten Teil der Gummidüse (1) mit einer rechts gezeigten Öffnung, die zum Aufsetzen über die Klitoris geeignet ist (vgl. E1: engl. Zusammenfassung; Fig.); und

b3)   einem Verbindungselement, welches die erste Kammer in Form des Luftsacks (2) mit der zweiten Kammer, die Bestandteil der Gummidüse (1) ist, verbindet und somit die erste Kammer mit der zweiten Kammer verbindet (vgl. E1: engl. Zusammenfassung; Fig.); und

b4)   einer Antriebseinheit, umfassend den Elektromagnet (5), den Magnet (4) und den mit dem Luftsack (2) und dem Magnet (4) verbundenen Hebel (3), welche ein stimulierendes Luftdruckfeld in Form von pulsierendem Luftdruck erzeugt (vgl. E1: engl. Zusammenfassung; Fig.). Das stimulierende Luftdruckfeld wird offensichtlich über eine Volumenänderung der ersten Kammer, in Form des Luftsacks (2), derart erreicht, dass über das Verbindungselement in der zweiten Kammer ein stimulierendes Druckfeld erzeugt wird; und

b5)   eine Steuereinrichtung, welche die Antriebseinheit so ansteuert, dass über die Bestromung der Drahtwicklung des Elektromagneten (5) mit Wechselstrom eine Umpolung dessen Magnetfelds bewirkt wird, wird als implizit vorbeschrieben angesehen, da sie Voraussetzung dafür ist, dass die Vorrichtung nach E1 einen pulsierender Luftdruck erzeugen kann (vgl. E1: engl. Zusammenfassung; Fig.); und

b6)   wobei das in der zweiten Kammer erzeugte Druckfeld aus einem Muster von Unter- und Überdrücken besteht, welche auf den Normaldruck aufmoduliert sind [Dieses Merkmal ergibt sich automatisch, wenn man annimmt, dass der Magnet (4) bei periodischer Umpolung des Elektromagneten (5) abwechselnd nach links und rechts ausgelenkt wird, dabei der Luftsack gedehnt und gestaucht wird und so der pulsierende Luftdruck erzeugt wird (vgl. E1: engl. Zusammenfassung; Fig.)]; und



b7)   wobei die erste Kammer über das Verbindungselement ausschließlich mit der zweiten Kammer verbunden ist, somit keine andere Verbindung der ersten Kammer als diejenige zur zweiten Kammer besteht, womit die erste Kammer eine einzige Öffnung aufweist (vgl. E1: Fig.), und

b8)   wobei die zweite Kammer offensichtlich eine Öffnung von dem Verbindungselement in die zweite Kammer aufweist (vgl. E1: engl. Zusammenfassung; Fig.), und

c)    wobei die Stimulationsvorrichtung keine Ventile aufweist (vgl. E1: Fig. 1), und

d)    wobei die Stimulationsvorrichtung klein und einfach zu tragen ist (vgl. E1-Patent Translate-Übersetzung: Abschnitt 4; Fig.; E1-Ü1: Abschnitt 3) und damit eine Art tragbares Handgerät darstellt,

e1)   wobei das Verbindungselement als Teil der Gummidüse (1) (vgl. E1: engl. Zusammenfassung; Fig.) zur Erfüllung seiner Funktion bei Druckänderungen (pulsierender Luftdruck) seine Strömungsdurchgängigkeit beibehalten muss, damit eine gewisse

Starrheit aufweisen muss und somit von einem Fachmann als implizit ausreichend starr angesehen wird,

e2)  und als ein gerader Kanal mit Düsenwirkung ausgestaltet ist (vgl. E1: engl. Zusammenfassung; Fig.), wobei sich die Düsenwirkung des Kanals auf Grund seiner Verengung gegenüber der ersten und zweiten Kammer ergibt,

e21)  dessen Öffnung in die erste Kammer in Form des Luftsacks (2) und dessen Öffnung in die zweite Kammer als Bestandteil der Gummidüse (1) zueinander ausgerichtet sind (vgl. E1: Fig.),

e22)  so dass eine Medienströmung bei Kompression der ersten Kammer durch die Ausrichtung der Öffnung und des Verbindungselements auf die Klitoris gerichtet ist (vgl. E1: Fig.),

e23)  wobei die Öffnung des Verbindungselements der Klitoris durch die zweite Kammer hindurch gegenüberliegt (vgl. E1: Fig.).



In der E1 ist das Merkmal *d1) „mit einer Batterie (76) ist"* nicht beschrieben.

Bzgl. des Merkmals d1) folgt die Patentabteilung der Einsprechenden ecoaction GmbH in ihrer Annahme, dass die Vorrichtung nach E1 in ihrer Ausgestaltung als kleine und leicht zu tragende Vorrichtung (vgl. Patent Translate Übersetzung der E1: Abschnitt 4, „small, easy to carry") den Einsatz einer Batterie nahelegt, da die Netzunabhängigkeit die Mitnahme des Geräts ermöglicht und dessen Handhabbarkeit verbessert. Die Nutzung von Batterien als Energiequelle in tragbaren Handgeräten zur Therapie/Stimulation der Klitoris ist beispielsweise aus der D10 bekannt (vgl. gutachterlich D10: S.15, Z. 21-26; Fig. 10-11)

In Bezug auf den Anwendungszweck sollte laut Patentinhaberin der erfindungswesentliche Gedanke des Streitpatents in der besonderen Anordnung der ersten Kammer (3), des Verbindungselements (5) und der zweiten Kammer (4) liegen. Wenn nun eine analoge Anordnung aus der E1 entnehmbar ist, ist davon auszugehen, dass die dortige Anordnung ebenfalls zur (sexuell erregenden (vgl. Merkmal b4 des Hilfsantrags 3)) Klitoralstimulation geeignet ist, zumal die durch die abwechselnde Kompression / Dekompression des Luftsacks (2), der analog zur ersten Kammer (3) des Streitpatents ist, ebenfalls ein Druckfeld erzeugt wird, das aus einem Muster von Unter- und Überdrücken besteht, welches auf den Normaldruck aufmoduliert ist.

Hinsichtlich der Funktionsweise der Vorrichtung nach E1 argumentiert die Patentinhaberin, dass es sich hier nicht um eine pneumatische Massagevorrichtung handelt sondern um eine Vorrichtung zur Meridianbehandlung durch reines Klopfen in Analogie zu einem Meridianhammer, wobei es sich bei der Gummidüse (1) nicht um eine Düse sondern um den Hammerkopf handeln soll. Dabei wird dieser durch den Hebel (3), der periodisch nach links und rechts ausgelenkt wird und vermittelt durch den Luftsack (2), der eine dämpfende Funktion hat, gegen den Körper des Patienten bewegt (vgl. die Eingabe der Patentinhaberin vom 12. April 2018: S. 19, Abschnitt 1 - S. 23, Abschnitt 4). Die Patentinhaberin begründet diese Interpretation mit Hilfe der angeblich beglaubigten Übersetzung E1-Ü1 (eine Kopie der Beglaubigung liegt der Akte nicht bei), nach der die Gummidüse (1) beweglich ist (movable rubber mouthpiece) und nach der in Folge der Hin- und Herbewegung des Luftsacks (2) das an diesen gekoppelte Gummi-Mundstück (1) die Haut berührt (… and airbag (2) to reciprocate, and then the rubber mouthpiece (1) on said airbag (2) touches the skin.).



Zunächst beschreiben sowohl die E1 als auch deren elektronische Patent Translate Übersetzung und deren zwei Übersetzungen E1-Ü1, E1A, dass es sich bei der Vorrichtung der E1 um eine pneumatische Massagevorrichtung handelt, die pulsierenden Luftdruck erzeugt (vgl. z.B. E1-Ü1: Titel; Z. 16-17). Ausgehend von diesen allgemeinen Angaben zur Funktionsweise der Vorrichtung nach E1 und ausgehend von der Zeichnung und den Angaben zu den Bezugszeichen geht die Patentabteilung davon aus, dass der Fachmann den Offenbarungsgehalt der E1 im Sinne der oben beschriebenen Merkmalsanalyse und nicht im Sinne eines automatisierten Meridianhammers auslegt. Diese zweite Auslegung führt nämlich neben dem oben beschriebenen Widerspruch bzgl. der Funktionsweise der Vorrichtung auch zu einem schwer nachvollziehbaren Bewegungsablauf, wobei die Patentinhaberin vorschlägt, dass sich der Luftsack (2) bei der Bewegung nach rechts zusammen mit der Gummidüse (1) über die rechte, vertikale Linie, die der Fachmann als rechte Gehäusewand erkennt, hinausbewegt (vgl. die Eingabe der Patentinhaberin vom 12. April 2018: S. 21, Fig. 4).

Bzgl. der Formulierung „movable rubber mouthpiece" geht die Patentabteilung davon aus, dass movable hier nicht eine Bewegung der Gummidüse (1) meint sondern sich auf eine elastische Verbindung zwischen Gummidüse (1) und Luftsack (2) bezieht, wie dies direkt aus der englischen Zuammenfassung der E1 hervorgeht, die von „The other end of the air bag (2) is movably connected with a rubber nozzle (1)." spricht. Unter Zuhilfenahme eines online-Lexikons (https://dict.leo.org/chinesisch-deutsch/) ergibt sich, dass die chinesische Schriftzeichenfolge ( h der obigen Textstelle auch elastisch bedeuten kann.

Seite 15 von 20

Die Passage „… and airbag (2) to reciprocate, and then the rubber mouthpiece (1) on said airbag (2) touches the skin" läßt keinen kausalen Zusammenhang erkennen, der die Hin- und Herbewegung des Luftsacks (2) mit dem Berühren der Haut durch das Gummi-Mundstück mittels einer durch den Luftsack vermittelten Bewegung des Gummi-Mundstücks erklärt.

Aus den oben genannten Gründen ist die Patentabteilung dem Vorschlag der Patentinhaberin, bei dem Gegenstand nach der E1 handele es sich um eine Vorrichtung zur reinen Klopfmassage, welche für die Klitoralstimulation ungeeignet wäre, nicht gefolgt.

Hinsichtlich der Funktionsweise des Antriebs der Vorrichtung der E1 argumentiert die Patentinhaberin weiter, dass dieser unabhängig von der Orientierung der Polung des Magneten (4) nicht funktionsfähig sei. Bzgl. einer Orientierung der Polung des Magneten (4) bei der dessen Nordpol bzw. Südpol dem Elektromagnet (5) direkt gegenüber liegt erklärt die Patentinhaberin, dass der Magnet (4) unabhängig von der Polung des Elektromagneten (5) in der in der Fig. der E1 gezeigten Mittellage verharren würde (vgl. die Eingabe der Patentinhaberin vom 12. April 2018: S. 15, letzter Abschnitt - S. 18, dritter Abschnitt).



Diese Behauptung steht zunächst in Widerspruch zu der von der Patentinhaberin vorgetragenen Funktionsweise der Vorrichtung nach E1 als automatisierter Meridianhammer, bei der die periodische Links-/Rechtsbewegung des Magneten (4) angenommen wurde (vgl. oben).

Zudem liegt es auf der Hand, dass sich der Magnet (4) bei Annahme der obigen Orientierung in Abhängigkeit von der Bestromung des Elektromagneten (5), vermittelt durch den gelagerten Hebel (3), nach links oder rechts bewegt, da sich gleichnamige Pole anziehen und ungleichnamige Pole abstoßen und dass bei periodischer Änderung der Bestromungsrichtung des Elektromagneten (5) eine entsprechende Hin- und Herbewegung des Magneten (4) entsteht, die durch die Ankopplung des Magneten (4) über den Hebel (3) an den Luftsack (2) den pulsierenden Luftdruck erzeugt.

Insofern hatte es für den Fachmann, der vor die Aufgabe gestellt war eine Vorrichtung zur Klitoralstimulation herzustellen oder zu verbessern, nahegelegen die kleine und leicht zu tragende Vorrichtung nach E1, die zur Klitoralstimulation geeignet ist, mit einer Batterie auszustatten.

Seite 16 von 20

In der mündlichen Verhandlung war es dabei unstrittig, dass die Bereitstellung des Wechselstroms aus dem Gleichstrom der Batterie, zur nötigen periodischen Umpolung des Elektromagneten (5), vom Fachmann mitgelesen wird und keine technische Schwierigkeit darstellt. In der mündlichen Verhandlung wurden von der Einsprechenden ecoaction GmbH beispielhaft Wechselrichter oder zeitgesteuerte Y-Schalter als mögliche, dem Fachmann bekannte Wege zur Umwandlung von Batterie-Gleichstrom in den benötigten Wechselstrom genannt.

Der Gegenstand nach Anspruch 1 des Streitpatents beruht daher gegenüber der E1 in Verbindung mit dem Fachwissen, wie z.B. aus der D10 ersichtlich, nicht auf einer erfinderischen Tätigkeit (vgl. D10: S. 13, Z. 27 ff.).

Ergänzend wird darauf hingewiesen, dass in der mündlichen Verhandlung noch weitere Druckschriften diskutiert worden sind. So wurde auf die D2 verwiesen, die eine Stimulationsvorrichtung offenbart, die einen pulsierenden Luftstrom zur Stimulation der Klitoris erzeugt.



Den Ausführungen der Einsprechenden Fun Factory GmbH zu D17 und D25 ist die Patentabteilung nicht gefolgt, da diese vom Anmeldungsgegenstand weiter abliegen.

Hilfsanträge:

Die Patentinhaberin versuchte in der mündlichen Verhandlung den Gegenstand nach Anspruch 1 des Streitpatents mittels der Hinzunahme der Merkmale von zunächst Hilfsantrag 1 näher zu präzisieren:

f)      wobei die Antriebseinheit (6) ein Elektromotor mit einer Drehachse (61) und einem Exzenter (62) ist und

g1)     wobei die zweite Kammer (4) von der Stimulationsvorrichtung (1) auswechselbar angeordnet ist; und

g2)     wobei die Wand (41) der zweiten Kammer (4) aus einem flexiblen Material hergestellt ist.

Zur Abgrenzung vom Stand der Technik hat die Inhaberin das Merkmal der Antriebseinheit (vgl. Merkmal f) und der zweiten Kammer (vgl. Merkmale g1, g2) näher präzisiert.

Bzgl. des Merkmals f) spricht allerdings bereits die E1 von alternativen Antriebseinheiten (vgl. Patent Translate Übersetzung der E1, Abschnitt 3: „micro-motor … electromagnetic devices, rotary motion"), so dass der Einsatz eines alternativen Antriebs bereits von der E1 nahegelegt wird. Gutachterlich kann auf den Luftmassageapparat nach D7 verwiesen werden, der als Antrieb zur Versetzung einer Membran in Schwingungen einen Motor mit Exzenter vorschlägt (vgl. D7: S. 1, Absatz 3; erste Fig.). Zudem ist die Wahl der Antriebseinheit laut Streitpatent unkritisch (vgl. Urspr. Unt. S. 15, Z. 9-13). Danach sind „grundsätzlich alle Antriebsarten einsetzbar".

Bzgl. des Merkmals g1) spricht die E1 von der Ausrüstung der Vorrichtung mit mehreren therapeutischen Düsen (1) (mouthpieces (1)), die aus der zweiten Kammer und dem Verbindungselement des Streitpatents bestehen (vgl. E1-Ü1: letzter Abschnitt „It (the utility model) can also be equipped with multiple therapeutic mouthpieces."). Durch die Ausrüstung der Vorrichtung der E1 mit mehreren Düsen (1) ist die auswechselbare Anordnung der zweiten Kammer (4) an der Vorrichtung nach E1 implizit vorbeschrieben.

Zudem liegen kleinere konstruktive Abänderungen, wie die Auswechselbarkeit von Auflageeinheiten von Massagegeräten, im Wissen/Können des Fachmanns (vgl. gutachterlich D10: S. 16, Z. 13-17; Fig. 14).



Bzgl. Merkmal g2) zeigt die Figur der E1 auf der rechten Seite die Düse (nozzle) (1), die laut Beschreibung der E1 aus Gummi, also einem flexiblen Material, besteht (vgl. Patent Translate Übersetzung der E1, Abschnitt 5: „rubber nozzle (1)"). Dabei steht laut der Einsprechenden ecoaction GmbH, das flexible Gummimaterial der Düse (1) nicht in Widerspruch zu der nach Anspruch 1 des Streitpatents geforderten Starrheit des Verbindungselements, da die Düse (1) der Vorrichtung nach E1 im Bereich der rechten Kammer dünnwandig (flexibler) und im Bereich des Verbindungselements blockartig (starrer) ausgebildet ist (vgl. E1: Fig.).

Die hinzugefügten Merkmale f), g1) und g2) tragen für sich nichts zu einer erfinderischen Tätigkeit bei. Damit fehlt es dem Gegenstand nach Anspruch 1 in Form des Hilfsantrags 1 auch mit den hinzugefügten Merkmalen weiterhin (siehe Hauptantrag) gegenüber der E1 und dem Wissen/Können des Fachmanns an der nötigen erfinderischen Tätigkeit.

Zu einem ähnlichen Ergebnis kommt man in Bezug auf die Hilfsanträge 2 und 3, die jeweils auf dem vorangehenden Hilfsantrag 1 aufbauen.

Merkmale des Hilfsantrags 2, die in den erteilten Anspruch 1 des Streitpatents aufgenommen wurden, sind:

f)      wobei die Antriebseinheit (6) ein Elektromotor mit einer Drehachse (61) und einem Exzenter (62) ist und

g)      wobei die zweite Kammer (4) zum Aufsetzen über die Klitoris (12) oval und dabei nicht kreisförmig ausgebildet und

g1)     von der Stimulationsvorrichtung (1) auswechselbar angeordnet ist; und

g2)     wobei die Wand (41) der zweiten Kammer (4) aus einem flexiblen Material hergestellt ist

h)      wobei die erste Kammer (3) eine Wand (31) aufweist, welche durch die Antriebseinheit (6) zur Volumenänderung der ersten Kammer (3) ausgelenkt wird, und wobei die Wand (31) aus einem flexiblen und medienundurchlässigen Material besteht, wobei der Kanal des Verbindungselements (5) in einer Halterung (32) für die flexible Wand (31) ausgebildet ist.



Zusätzlich zu Hilfsantrag 1 will sich die Patentinhaberin mit Hilfsantrag 2 durch weitere Präzisierung des Merkmals der zweiten Kammer (Merkmal g) und durch Präzisierung des Merkmals der ersten Kammer und des Verbindungselements (Merkmal h) vom Stand der Technik abgrenzen.

Bzgl. Merkmal g) hatte es für einen Fachmann, dessen Aufgabe darin bestand die Massagevorrichtung der E1, die prinzipiell zur Klitoralstimulation geeignet ist (vgl. das oben zur diesbezüglichen Eignung der Vorrichtung nach E1 Gesagte), in Richtung Klitoralstimulation zu verbessern, auf Grund seines Allgemeinwissens, nahegelegen näher auf die anatomischen Gegebenheiten einzugehen und den der Kammer (4) entsprechenden Teil der Düse (1) der Vorrichtung nach E1 entsprechend der Anatomie der Klitoris oval auszubilden. Die Variation der Form der Düse (1) lag um so mehr nahe, als bereits die E1 davon spricht, dass die Vorrichtung der E1 mit mehreren (unterschiedlichen) Düsen ausgerüstet werden kann. Gutachterlich wird darauf verwiesen, dass es aus dem Stand der Technik zudem bekannt ist den mit der Klitoris in Kontakt kommenden Teil von Unterdruck-Stimulationsvorrichtungen oval auszubilden (vgl. D10: Fig. 4-6, Bezugszeichen (240)).

Bzgl. Merkmal h) zeigt bereits die E1 in ihrer Figur eine erste Kammer in Form des Luftsacks (2), die eine Wand (Kreuzschraffur) aufweist, welche durch die dortige Antriebseinheit zur

Volumenänderung, zwecks Erzeugung eines pulsierenden Luftdrucks, ausgelenkt wird (vgl. Ausführungen zum Hauptantrag). Damit dies entsprechend funktioniert, muss die Wand der ersten Kammer aus einem flexiblen und luftundurchlässigen Material bestehen.

Die E1 offenbart ferner in der Figur die verlangte Ausbildung des Kanals des Verbindungselements (vgl. E1: Fig., Bezugszeichen (1)) mit einer Halterung, in Form einer Einkerbung, in der die flexible Wand aufgenommen ist (vgl. E1: Fig., Bezugszeichen (1)).

Schrift E1 führt demnach in Verbindung mit dem Fachwissen (z.B. belegt mit der D10) in nicht erfinderischer Weise zum Gegenstand nach Hilfsantrag 2.

Merkmale des Hilfsantrags 3, die in den erteilten Anspruch 1 des Streitpatents aufgenommen wurden, sind:

b4)    einer Antriebseinheit (6), welche das Volumen der ersten Kammer (3) derart verändert, dass über das Verbindungselement (5) in der zweiten Kammer (4) ein stimulierendes, sexuell erregendes Druckfeld erzeugt wird; und

f)    wobei die Antriebseinheit (6) ein Elektromotor mit einer Drehachse (61) und einem Exzenter (62) ist und

g)    wobei die zweite Kammer (4) zum Aufsetzen über die Klitoris (12) oval und dabei nicht kreisförmig ausgebildet und

g1).    von der Stimulationsvorrichtung (1) auswechselbar angeordnet ist; und

g2)    wobei die Wand (41) der zweiten Kammer (4) aus einem flexiblen Material hergestellt ist

h)    wobei die erste Kammer (3) eine Wand (31) aufweist, welche durch die Antriebseinheit (6) zur Volumenänderung der ersten Kammer (3) ausgelenkt wird, und wobei die Wand (31) aus einem flexiblen und medienundurchlässigen Material besteht, wobei der Kanal des Verbindungselements (5) in einer Halterung (32) für die flexible Wand (31) ausgebildet ist

i)    wobei ein Medium des Druckfeldes alternativ oder additiv zu einem gasförmigen Medium ein flüssiges Medium sein kann.

Bzgl. Merkmal b4) gilt das im Abschnitt zur erfinderischen Tätigkeit zur Eignung der Vorrichtung nach E1 zur Klitoralstimulation anfangs bereits Gesagte.

Zudem handelt es sich laut der Einsprechenden ecoaction GmbH bei dem Merkmal „sexuell stimulierendes Druckfeld" um ein subjektives Merkmal, welches nicht dazu geeignet ist den Schutzbereich einer Anspruchsfassung festzulegen.

Seite 20 von 20

Das schließlich noch hinzukommende Merkmal i), welches das Medium des Druckfeldes näher bestimmen soll, ist rein optional und gestaltet auch die Vorrichtung in baulicher Hinsicht nicht weiter aus. Der Flüssigkeitsanteil ist im Merkmal i) des Hilfsantrags 3 nicht näher definiert und es ist davon auszugehen, dass auch die Vorrichtung nach E1 zumindest mit einem kleinen Flüssigkeitsanteil des Mediums funktionsfähig bleibt.

Die Hilfsanträge 1-3 sind daher nicht geeignet einen erfinderischen Abstand zum Stand der Technik herzustellen.

Demzufolge war das Patent 10 2013 110 501 zu widerrufen.

Auf die diesem Beschluss beiliegende Rechtsmittelbelehrung wird hingewiesen.

Dr. Medicus                 Dr. Littger                  Dr. Zink

Vorsitzender                Berichterstatter             Beisitzer

Patentabteilung 44



Dr. Claus Medicus
Dr. Ralf Littger
Dr. Hubertus Zink

## Rechtsmittelbelehrung

Gegen diesen Beschluss kann gemäß § 73 Patentgesetz (PatG) das Rechtsmittel der **Beschwerde** eingelegt werden. Die Beschwerde steht den am Verfahren vor dem Deutschen Patent- und Markenamt Beteiligten zu. Sie hat aufschiebende Wirkung. Die Beschwerde ist **innerhalb eines Monats nach Zustellung des Beschlusses schriftlich** beim Deutschen Patent- und Markenamt einzulegen. Die Anschriften lauten:

Deutsches Patent- und Markenamt, 80297 München,
Deutsches Patent- und Markenamt, Dienststelle Jena, 07738 Jena,
Deutsches Patent- und Markenamt, Technisches Informationszentrum Berlin, 10958 Berlin.

Die **Beschwerde** kann stattdessen auch in **elektronischer Form** eingereicht werden (§ 125a Abs. 1 PatG i.V.m. § 130a Abs. 1 Satz 1 und 3, Abs. 3 Zivilprozessordnung (ZPO), § 12 der Verordnung über das Deutsche Patent- und Markenamt (DPMAV), §§ 1 ff. der Verordnung über den elektronischen Rechtsverkehr beim Deutschen Patent- und Markenamt (ERVDPMAV)). Die näheren (technischen) Voraussetzungen sind in der ERVDPMAV aufgeführt.

Innerhalb der Beschwerdefrist ist die **Beschwerdegebühr** in Höhe von **500,-- EUR (Nr. 401 100 des Gebührenverzeichnisses zu § 2 Abs. 1 Patentkostengesetz)** auf das Konto der Bundeskasse Halle für das Deutsche Patent- und Markenamt zu entrichten. Die Beschwerdegebühr ist für jeden Beschwerdeführer gesondert zu zahlen. Wird die Beschwerdegebühr **nicht, nicht vollständig oder nicht rechtzeitig gezahlt, so gilt die Beschwerde als nicht eingelegt (§ 6 Abs. 2 Patentkostengesetz)**.

Hinweise:

Bei der Zustellung durch die Post mittels Einschreiben durch Übergabe gilt dieses am dritten Tag nach der Aufgabe zur Post als zugestellt, es sei denn, dass das zuzustellende Dokument nicht oder zu einem späteren Zeitpunkt zugegangen ist (§ 127 Abs. 1 PatG i.V.m. § 4 Abs. 2 Satz 2 Verwaltungszustellungsgesetz (VwZG)). Bei der Zustellung mittels Einschreiben mit Rückschein gilt diese an dem Tag als bewirkt, den der Rückschein angibt (§ 127 Abs. 1 PatG i.V.m. § 4 Abs. 2 Satz 1 VwZG).

Bei der Zustellung durch die Post mit Zustellungsurkunde ist der Tag der Zustellung auf der übergebenen Abschrift der Zustellungsurkunde oder auf der übergebenen Sendung vermerkt.

Bei Zustellung ins Ausland mittels eingeschriebenen Briefs durch Aufgabe zur Post gilt dieser zwei Wochen nach Aufgabe zur Post als zugestellt (§ 127 Abs. 1 Nr. 2 PatG i. V. m. § 184 Abs. 2 Satz 1 ZPO).

## Zahlungshinweise



1. Die Zahlung der Gebühr bestimmt sich nach der Patentkostenzahlungsverordnung (PatKostZV).

   Danach können Gebühren wie folgt entrichtet werden:

   a) durch Barzahlung bei den Geldstellen des Deutschen Patent- und Markenamts in München, Jena und im Technischen Informationszentrum in Berlin,

   b) durch Überweisung auf das Konto der Bundeskasse Halle/DPMA:
      **IBAN: DE84 7000 0000 0070 0010 54, BIC (SWIFT-Code): MARKDEF1700,**

   c) durch (Bar-) Einzahlung mit Zahlschein bei der Postbank oder bei allen Banken und Sparkassen auf das unter b) angegebene Konto oder

   d) durch Erteilung eines gültigen SEPA-Basis-Lastschriftmandats mit Angaben zum Verwendungszweck. Bitte benutzen Sie hierfür die auf unserer Internetseite www.dpma.de bereitgestellten Formulare (A 9530 und A 9532) und beachten Sie die dort zur Verfügung stehenden Hinweise zum SEPA-Verfahren.

      Das SEPA-Mandat muss dem DPMA immer im Original vorliegen. Bei einer Übermittlung per Fax muss das SEPA-Mandat im Original innerhalb eines Monats nachgereicht werden, damit der Zahlungstag gewahrt bleibt.

2. Bei jeder Zahlung sind das vollständige **Aktenzeichen**, die genaue Bezeichnung des **Anmelders (Inhabers)** und die **Gebührennummern** in deutlicher Schrift anzugeben. Die Gebührennummern ergeben sich aus dem Gebührenverzeichnis des Patentkostengesetzes (PatKostG), das auch im Kostenmerkblatt A 9510 des Deutschen Patent- und Markenamts abgedruckt ist.

   Unkorrekte bzw. unvollständige Angaben führen zu Verzögerungen bei der Bearbeitung.

3. Als **Einzahlungstag** gilt gemäß § 2 PatKostZV

   a) bei Barzahlung der Tag der Einzahlung,

   b) bei Überweisung der Tag, an dem der Betrag auf dem Konto der Bundeskasse Halle für das Deutsche Patent- und Markenamt gutgeschrieben wird,

   c) bei (Bar-) Einzahlung auf ein Konto der Bundeskasse Halle für das Deutsche Patent- und Markenamt der Tag der Einzahlung.

      Da die Bundeskasse Halle die Bareinzahlung von der Überweisung nach b) nicht anhand der Buchungsunterlagen zu unterscheiden vermag, sollte der Bareinzahler, wenn er den nach dieser Zahlungsform vorverlagerten Einzahlungstag geltend machen möchte, dem Amt **unverzüglich** den vom Geldinstitut ausgestellten **Einzahlungsbeleg** vorlegen;

   d) bei Erteilung eines SEPA-Basis-Lastschriftmandats mit Angaben zum Verwendungszweck, der die Kosten umfasst, der Tag des Eingangs beim Deutschen Patent- und Markenamt oder beim Bundespatentgericht, bei zukünftig fällig werdenden Kosten der Tag der Fälligkeit, sofern die Einziehung zu Gunsten der zuständigen Bundeskasse für das Deutsche Patent- und Markenamt erfolgt. Wird das SEPA-Basis-Lastschriftmandat durch Telefax übermittelt, ist dessen Original innerhalb einer Frist von einem Monat nach Eingang des Telefax nachzureichen. Andernfalls gilt als Zahlungstag der Tag des Eingangs des Originals.



Deutsches
Patent- und Markenamt

Abschrift vom **29.06.2018**

Aktenzeichen: **10 2013 110 501.7**

Diese Abschrift wurde als Ausdruck des folgenden elektronischen Dokuments erzeugt:

Dokument:     "Beschluss - Widerruf - Signiert"
              vom: **17.04.2018**

Das elektronische Dokument wurde gemäß der am **29.06.2018** durchgeführten Signaturprüfung qualifiziert signiert von:

Dr. Hubertus Zink                                          29.06.2018

Dr. Ralf Littger                                           29.06.2018

Dr. Claus Medicus                                          29.06.2018



Diese Abschrift wurde maschinell erstellt.

A 9016.1b/4.14



# Morningside IP

The Leader in Global IP Solutions

## TRANSLATOR CERTIFICATION

Date: September 12, 2018

To whom it may concern:

I, Gregory Mehrten, a translator fluent in the German and English languages, on behalf of Morningside Translations, do solemnly and sincerely declare that the following is, to the best of my knowledge and belief, a true and correct translation of the document(s) listed below in a form that best reflects the intention and meaning of the original text.

The documents are designated as:
Docket no.: 10 2013 110 501.7

Decision, announced during the oral hearing on April 17, 2018

[signature]
_____
Signature

Gregory Mehrten    *Gregory Mehrten*
_____
Print

**NEW YORK**
450 Seventh Avenue
10th Floor
New York, NY 10123, USA
P: (212) 643-8800

**SAN FRANCISCO**
111 Pine Street
Suite 1815
San Francisco, CA 94111, USA
P: (415) 580-6360

**KENT**
Corn Exchange House
49 The Pantiles
Tunbridge Wells
Kent TN2 5TE, UK
P: +44 (0)1892 549784

**HAMBURG**
Kurze Mühren 1
2nd Floor
Hamburg, Germany 20095
P: +49 (0) 407 679 6500

**JERUSALEM**
43 Emek Refaim
Entrance B
Jerusalem 9314104, Israel
P: +972 (02) 563-1728

info@morningsideip.com  |  www.morningsideIP.com



**German**

**Patent and Trade Mark Office**

> EISENFÜHR SPEISER
> RECEIVED
>
> July 4, 2018
>
> MUNICH

MAILING ADDRESS: German Patent and Trade Mark Office • 80297 Munich

Eisenführ Speiser Patentanwälte
Rechtsanwälte PartGmbB
PO Box 310260
80102 Munich

STREET ADDRESS Zweibrückenstraße 12, 80331 Munich
MAILING ADDRESS 80297 Munich
CONTACT Dr. Ralf Littger
PHONE +49 89 2195-3940
FAX +49 89 2195-2221
INTERNET www.dpma.de
DOCKET NO. 10 2013110 501.7
APPLICANT/OWNER NOVOLUTO GmbH

YOUR REFERENCE FA 5208-01DE
CREATED ON June 29, 2018

Please indicate reference number and applicant/owner on all submissions and payments!

Please see attached regarding the decision of April 17, 2018

- 1 copy, including information about the electronic signature

[*seal of the German Patent and Trade Mark Office*]

Acknowledgement of receipt

[*letterhead of the German Patent and Trade Mark Office*]

Docket no.: **10 2013 110 501.7**

Decision, announced during the oral hearing on April 17, 2018

**Decision**

In the opposition matter

concerning patent 10 2013 110 501

entitled

"Stimulation device"

of **NOVOLUTO GmbH, 10117 Berlin,  DE**                              Patent holder

Attorneys of record: KUHNEN & WACKER Patent- and Rechtsanwältsbüro PartG mbB, 85354 Freising, DE

Other parties to the proceedings:

**1. ecoaction GmbH, 50858 Cologne, DE**                    Opponent: ecoaction GmbH

Attorneys of record: BRANDI Rechtsanwälte Partnerschaft mbB, 33602 Bielefeld

**2. Fun Factory GmbH, 28197 Bremen, DE**          Opponent: Fun Factory GmbH

Other parties to the proceedings: Eisenführ Speiser Patentanwälte Rechtsanwälte PartGmbB, 80335 Munich, Germany

the Patent Division 44 of the German Patent and Trade Mark Office, in cooperation with

|  |  |
|---|---|
| the presiding judge: | Dr. Medicus |
| the judge-rapporteur: | Dr. Littger |
| the associate judge: | Dr. Zink |

decided on April 17, 2018 that:

the patent be revoked.

**Reasons**

I.

On September 23, 2013, the patent application 10 2013 110 501.7 was filed with the German Patent and Trade Mark Office. Following the grant on February 18, 2016, patent 10 2013 110 501 entitled "Stimulation device" was published.

1. With its brief dated November 17, 2016 (received on the same day), the opponent, ecoaction GmbH, filed opposition against the patent and requested, first, that the patent granted in accordance with sec. 21 (1) No. 1, 4 PatG [German Patent Act] be revoked in its entirety and, second, as an alternative, an oral hearing be held. The opponent, ecoaction GmbH, bases its opposition on the lack of inventive step and the extension of the subject matter of the patent beyond the disclosure content of the originally filed application (inadmissible extension).

In support, the Opponent, ecoaction GmbH, refers to the following documents:

E1 CN 2153351 Y (together with a "Patent Translate" translation (EPO))
E2 DE 10 2013 110 501 A1 (*Offenlegungsschrift (*first publication of the application documents*) of* the Patent in Suit)
E3 Excerpt from Maria M. Kettenring's "Erotic Partner Massage," 3rd edition, 2004
E4 CN 2198900 Y (together with a "Patent Translate" translation (EPO))

2. With its brief dated November 17, 2016 (received on the same day), the opponent, Fun Factory GmbH, filed opposition against the patent and requested, first, that the patent granted in accordance with sec. 21 (1) No. 1, 4 PatG be revoked in its entirety and, second, as an alternative, an oral hearing be held. The opponent, Fun Factory GmbH, bases its opposition on lack of novelty, lack of inventive step and the extension of the subject matter of the patent beyond the originally filed version of the application (inadmissible extension).

In support, the opponent, Fun Factory GmbH, refers to the following publications:

D1 WO 2006/058291 A2

D2US 2013/0012769 A1

D3 http://www.heilpraxisnet.de/naturheilpraxis/sex-qeqen-bluthochdruck-665.php

D4 Focus online December 5, 2004

D5 US 6,099,463 A

D6 US 1,898,652 A

D7 DE 14 63 673 U

D8 DE 42 43 876 A1

D9 US 2008/0304984 A1

D10 WO 00/28939 A2

D11 DE 582 196 C

D12 DE20 2012 005 414U1

D13 EP 1 554 947 S1

D14 JP 2008-125577 A (Japanese)

015 JP 2008-125577 A (English translation of D14)

D16 US 2,112,646 A

017 US 1,882,040 A

D18 US 5,377,701 A

D19 WO 2013/178223 A2

D20 DE 1 703 184 U

021 DE 32 22 467 A1

D22 DE 93 09 994 U1

023 DE 198 53 353 C2

Both oppositions were received by the German Patent and Trade Mark Office on time and in due form. Both oppositions are sufficiently substantiated and thus admissible .

With its letter dated September 18, 2017 (received on the same day), the patent holder requested that the oppositions be rejected and that the Patent in Suit be maintained in its entirety.

In the same submission, the patent holder further requested, as an alternative, an oral hearing if the request cannot be granted without further ado.

In support, the patent holder referred to, among other documents, a translation of E1, which, according to the patent holder's brief dated September 18, 2017, is said to be certified:

E1-Ü1 English translation of E1  (patent holder)

In its comprehensive submission dated January 24, 2018 (received on the same day), the opponent Fun Factory GmbH announced that it maintains the requests it made in the brief dated November 17, 2016.

In support, the opponent Fun Factory GmbH refers to the following documents:

D24    US 1,730,535A

D25    DE 201 12 384 U1

A3    Statement of complaint dated August 5, 2016, Regional Court (*LG*) of Düsseldorf, file reference 4a O 78/16

A4    Brief dated July 20, 2017, Regional Court of Düsseldorf, docket no. 4a O 78/16

A5    Judgment dated December 14, 2017, Regional Court of Düsseldorf, docket no. 4a O 78/16

E1A    Certified translation of E1 (opponent Fun Factory GmbH)

E1B    Certification

In response to the comprehensive brief of the opponent Fun Factory GmbH dated January 24, 2018, the patent holder requested a two-month postponement of the oral hearing scheduled for February 7, 2018. In its corresponding submission dated January 30, 2018 (received on the same day), the patent holder also raised the question of whether the opponent Fun Factory GmbH was acting behind the scenes for Eis.de GmbH, which, due to an obligation of non-dispute [*Nichtangriffs-verpflichtung*], would prevent it from participating in opposition proceedings against the Patent in Suit.

In its preliminary decision of March 27, 2018, the Patent Division informed the parties to the proceedings that the opposition of the opponent Fun Factory GmbH was admissible based on the facts previously brought forward regarding its alleged identity as a straw man.

In its submission dated April 12, 2018 (received on the same day; previously by e-mail to the parties to the proceedings) the patent holder again requested that the patent be maintained unchanged. The patent holder further announced that, as a precaution, [it would submit] auxiliary requests 1 through 6 in the hearing, as well as

the possibility that additional auxiliary requests could be filed, if necessary, and also that the features or combinations of features of auxiliary requests 1 through 6 can be combined arbitrarily.

Please refer to the document itself for details.

II.

<u>The valid claim 1 of the granted Patent in Suit is arranged according to features:</u>

a)    Stimulation device (1) for the clitoris (12), having:

b)    a pressure field generator (2) comprising:

b1)    a first chamber (3); and

b2)    a second chamber (4) with an opening (42) for placing over the clitoris (12);

b3)    a connection element (5), which connects the first chamber (3) to the second chamber (4); and

b4)    a drive unit (6), which changes the volume of the first chamber (3) in such a way that a stimulating pressure field is created via the connection element (5) into the second chamber (4); and

b5)    a control device (7), which controls the drive unit (6); and

b6)    wherein the pressure field created in the second chamber (4) consists of a pattern of overpressures and negative pressures that are modulated to the normal pressure; and

b7)    wherein the first chamber (3) is connected exclusively to the second chamber (4) via the connection element (5); thus, no other connection of the first chamber (3) exists other than that to the second chamber (4), wherein the first chamber (3) has a single opening, and

b8)    wherein the second chamber (4) has an opening (51) from the connection element (5) into the second chamber (4), and

c)    wherein the stimulation device (1) has no valves, and

d)    wherein the stimulation device (1) is a portable handheld device

d1)    with a battery (76),

e1)    characterized in that the connection element (5) is rigid

e2)    and configured as a straight channel with a nozzle effect,

e21)    whose opening in the first chamber (3) and whose opening (51) in the second chamber (4) are aligned with one another,

e22)    so that when the first chamber (3) is compressed, a flow of a medium is directed to the clitoris (12) through the orientation of the opening (51) and of the connection element (5),

e23)    wherein the opening (51) of the connection element (5) faces the clitoris (12) throughout the second chamber (4).

The valid claims 2-9 of the granted Patent in Suit read as follows:

2.    Stimulation device (1) according to claim 1, wherein the second chamber (4) is made of a flexible material and/or of an at least partially transparent material and/or is tailored to the shape of the vaginal labia minora so that the latter is completely covered by the opening of the second chamber (4).

3.    Stimulation device (1) according to either claim 1 or 2, wherein the second chamber (4) is formed in one piece by the connection element (5) and the first chamber (3).

4.    Stimulation device (1) according to either claim 1 or 2, wherein the second chamber (4) is arranged by the stimulation device (1) in a replaceable manner.

5.    Stimulation device (1) according to any of claims 1 through 4, wherein the second chamber (4) has a sealing support part (43) for enlarging the contact surface of the second chamber (4) on the skin.

6.    Stimulation device (1) according to any of claims 1 through 5, wherein each modulation of the pressure field can be changed by means of a control element 71.

7.    Stimulation device (1) according to any of claims 1 through 6, wherein the stimulation device (1) has a light (9) for illuminating the second chamber (4).

8.    System having a stimulation device (1) according to any of claims 1 through 7, having: page 14: a remote-control device separate from the stimulation device (1), wherein the control device (7) of the stimulation device (1) can be remote-

controlled by the remote-control device.

9.      Use of the stimulation device (1) according to any of claims 1 through 8 as a sex toy for stimulation of the female clitoris.

Disclosure:

In their opposition briefs, the opponents criticize the inadmissible extension of claim 1 of the Patent in Suit in features e1 and e2 (opponent ecoaction GmbH) and in features c, d, d1, e1 and e2 (opponent Fun Factory GmbH).

Regarding the feature

c)      *wherein the stimulation device (1) has no valves,*
the opponent Fun Factory GmbH argues in its opposition brief dated November 17, 2016 that this is not disclosed in the claimed breadth in the passage "*In the arrangement shown in Figures 4 through 6, it is advantageous that there is no problem of hygiene here (for example, due to the avoidance of dead spaces) and that it is easy to manufacture. For example, no valves or other openings are necessary in or on the first chamber 3*" (cf. original document: p. 18, lines 25-28), since the absence of valves refers only to the first chamber (3).
However, the present invention discloses the avoidance of valves in a general way in the passage "*Furthermore, the pressure field generator according to the invention has the advantage, due to its simple design, of increased hygiene and is easier to clean. At the same time, the present invention avoids valves* ..."(cf. original document: p. 9, lines 9-13). Even if it is assumed that the avoidance of valves refers only to the pressure field generator and not to the stimulation device as a whole, there can be no inadmissible extension in feature c) because valves would have no function outside of the pressure field generator.
Moreover, the present invention discloses the avoidance of valves in a general way with regard to the design according to the invention in the passage "*Moreover, the design according to the invention leads to the avoidance of complex flow-technology elements, like valves, for example, which simplifies manufacture*" (cf. original document: p. 9, lines 22-24).

Regarding the features

c)      *wherein the stimulation device (1) is a portable handheld device*

d1)     *with a battery (76),*

the opponent Fun Factory GmbH sees in the subfeatures "portable handheld device" and "battery" inadmissible generalizations with regard to the description of a first embodiment, in which other features are named in addition to these features, including housing operating elements, displays, etc. (cf. original document: p. 13, lines 22-25).

In addition to the reference cited, the handheld device and battery subfeatures in the originally submitted documents are also disclosed in the claims and drawings (cf. original documents: claim 13; Fig. 3, reference (76)). Thus, the stimulation device is preferably a battery-operated handheld device (cf. original documents: claim13). The term "portable" can be found in combination with the term "handheld device" in the reference cited above, but it is also clear from Figures 1-3, and the term "handheld device" must also be considered redundant, since every handheld device is portable per se.

By the way, according to German law, generalizations are inadmissible if features like those described above do not stand in close correlation to one another (cf. Schulte, PatG, 10th edition, Introduction, margin no. 128).

Regarding the features

e1)     *characterized in that the connection element (5) is rigid,*

e2)     *and is configured as a straight channel with a nozzle effect,*

the opponent ecoaction GmbH argued that the formulations "the connection element (5) is rigid," "straight channel" and "straight channel with nozzle effect" are not disclosed in the originally filed application. The opponent Fun Factory GmbH sees an inadmissible extension of these features mainly with respect to the exemplary embodiment of Fig. 11 in combination with the related section in the originally filed description (cf. original documents: p. 21, section 3; Fig. 11).

The combination of features e1) and e2) is disclosed in the originally filed documents of the Patent in Suit by the related Figures 4-6 and in, among other places, the corresponding sections of the description (cf. original documents: p. 15, last paragraph; p. 18, first paragraph; p. 20, third paragraph; Figures 4-6).

For example, Fig: 4 shows a holder (32), which preferably is made of a rigid plastic

(cf. original documents: p. 17, lines 5-6; Fig. 4) and which has a connection element (5) that connects the first chamber (3) and the second chamber (4) (cf. original documents: p. 16, lines 25-30; Fig. 4). Since the connection element (5) is constrained by the holder (32) made out of, preferably, rigid plastic, it follows that the connection element (5) is rigid.

The channel shape of the connection element (5) in the context of Figures 4-6 is described in the originally filed documents (cf. original documents: p. 20, lines 15-16). Figures 4-6 show the connection element (5) in the form of a straight channel. Regarding the phrase "straight channel" within feature e2), the opponent ecoaction GmbH argues that it is unclear from the sectional drawings of the already shown boundary lines of the channel 5 that the channel (5) depicted there may not contain a curve. However, it must be assumed that if the applicant had in mind a curved channel in connection with Figures 4-6 or intended to depict a curved channel, it would have shown this by an appropriate execution of Figures 4-6, for example: by gradations, mismatches in the lines, shading or a different representation of the channel from both the outside and the inside. This, however, is not the case. Figures 4-6 give no indication that there could be a curve in the channel. Moreover, the center flow arrow in Figures 4-6 is depicted as straight.

The nozzle effect of the straight channel in feature e2) results from its transverse section that is reduced in size in relation to the first chamber (3) and the second chamber (4), so that the nozzle effect of the straight channel results automatically when the first chamber (3) is compressed, as shown in Fig. 6. In addition, the nozzle effect of the straight channel, symbolized in Fig. 6 by the three arrows pointing from the first chamber (3) to the second chamber (4), corresponds [to the above] (cf. original documents: Fig. 6).

Thus, claims 1-9 of the Patent in Suit are thus to be considered as originally disclosed.

Patentability:

Novelty:

The opponent Fun Factory GmbH argues in its notice of opposition dated November 17, 2016 that the subject matter according to claim 1 of the Patent in Suit is not novel compared to the skin-treatment device according to D8. The opponent argues, among other things, that, among other things, the throughbore (22) of the device according to D8 corresponds to the straight channel of feature e2) according to

claim 1 of the Patent in Suit.

On the one hand, the throughbore (22), at least [as shown] in Fig. 2 of D8, is not straight but, rather, curved and, second, the passage (22) does not have a nozzle effect, as the opponent argues. The function of the passage (22) is to deliver suction and pressure surges coming from the airhose (4) to the nozzles or passages (19). To that end, the airhose is connected loss-free to the passage (22) (cf. D8: column 7, lines 11-24; Fig. 3). Thus, the nozzle function in the case of the device according to D8 is located in the area of the nozzles or passages (19), which are considered by the opponent Fun Factory GmbH as the second chamber within the meaning of the Patent in Suit and not in the area of the passage (22). Thus, this feature, at least, lacks the necessary conformity with that of the Patent in Suit.

Thus, the device according to claim 1 of the Patent in Suit is novel compared to the device according to D8. The other documents [presented] in the proceedings appear even further afield in relation to the novelty of the device according to claim 1 of the Patent in Suit.

Inventive step

The Patent Division considers the person skilled in the art to be a development engineer who works in the field of massage devices and who has gained special knowledge about the development of sex toys.

Main request:

The examination procedure resulted in placing the device according to claim 1 of the Patent in Suit delimited vis-à-vis D7 under protection. The grant [of protection] was made because, according to the patent holder, the invention exists in the relative arrangement of the chambers (3, 4) and of the connection element (5) in relation to the intended use of clitoral stimulation.
In its submission, the opponent ecoaction GmbH describes the device for the stimulation of meridian points by means of pulsating air pressure according to E1. At the same time, by means of the device according to E1, the opponent ecoaction GmbH proves that the arrangement of the first chamber (3), of the connection element (5) and of the second chamber (4) within the meaning of the features of the

characterizing part of claim 1 of the Patent in Suit is known from the prior art.

According to the feature comparison and the submission of the opponent ecoaction GmbH, E1 also discloses the features of the preamble except for the use of a battery and the intended use for clitoral stimulation.

Regarding the features in detail:

According to the features of claim 1 of the Patent in Suit, the device according to E1 describes a

a)      pneumatic massage device for stimulation of meridian points (cf. E1: English summary; figure), which is suitable as a stimulation device for the clitoris, having:

b)      a pressure field generator that generates a pulsating air pressure (cf. E1: English summary; figure) with:

b1)     a first chamber in the form of the airbag (2) (cf. E1: English summary; figure); and

b2)     a second chamber in the right-hand side part of the rubber nozzle (1) with an opening on the right-hand side that is suitable for placing over the clitoris (cf. E1: English summary; figure); and

b3)     a connection element, which connects the first chamber in the form of the airbag (2) to the second chamber, which is part of the rubber nozzle (1), thus connecting the first chamber to the second chamber (cf. E1: English summary; figure); and

b4)     a drive unit, comprising the electromagnet (5), the magnet (4) and the lever (3) connected to the airbag (2) and the magnet (4), which generates a stimulating air-pressure field in the form of pulsating air pressure (cf. E1: English summary; figure). The stimulating air-pressure field is obviously achieved by changing the volume of the first chamber in the form of the airbag (2) in such a way that a stimulating pressure field is generated by means of the connection element to the second chamber; and

b5)     a control device that controls the drive unit so that by energyzing the wire winding of the electromagnet (5) with alternating current, a reversed polarity of its magnetic field is effected, is considered to have been implicitly described beforehand because it is a prerequisite that the device according to E1 can generate a pulsating air pressure (cf. E1: English summary; figure); and

b6)     wherein the pressure field generated in the second chamber consists of a

12

pattern of overpressures and negative pressures that are modulated to the normal pressure [This feature results automatically if it assumed that the magnet (4) alternately moves left and right during periodic polarity reversal of the electromagnet (5); at the same time, the airbag is stretched and compressed, thus generating the pulsating air pressure (cf. E1: English summary; Fig.)]; and

b7)    wherein the first chamber is exclusively connected to the second chamber via the connection element; thus, the only connection of the first chamber is to the second chamber, which is why the first chamber has a single opening (cf. E1; figure); and

b8)    wherein the second chamber obviously has an opening from the connection element into the second chamber (cf. E1: English summary; figure); and

c)    wherein the stimulation device has no valves (cf. E1: Fig. 1); and

d)    wherein the stimulation device is small and easy to carry (cf. E1 Patent Translate translation: section 4; figures; E1-Ü1: section 3) and thus represents a type of portable handheld device;

e1)    wherein the connection element as part of the rubber nozzle (1) (cf. E1: English summary; figure) for fulfilling its function during changes of pressure (pulsating air pressure) has to maintain its flow consistency so that it has a certain rigidity and thus will be seen by a person skilled in the art as implicitly sufficient;

e2)    and is configured as a straight channel with nozzle effect (cf. E1: English summary; figure), wherein the nozzle effect of the channel is the result of its narrowing vis-à-vis the first and second chambers;

e21)    whose opening in the first chamber in the form of the airbag (2) and whose opening in the second chamber are aligned to one another as part of the rubber nozzle (1) (cf. E1: figure)

e22)    so that a flow of medium is directed to the clitoris when the first chamber is compressed as a result of the alignment of the opening and the connection element (cf. E1: figure);

e23)    wherein the opening of the connection element faces the clitoris throughout the second chamber (cf. E1: figure).

E1 does not describe feature *d1) "having a battery (76)."*

With regard to feature d1), the Patent Division follows the opponent ecoaction

13

GmbH's assumption that the device according to E1 in its configuration as a small and easy to carry device (cf. Patent Translate translation of E1: section 4, "small, easy to carry") suggests the use of a battery, since its network independence allows for the device to be carried and improves its portability. The use of batteries as the energy source in portable handheld devices for therapy or stimulation of the clitoris is known, for example, from D10 (cf. expert report D10: p. 15, lines 21-26; Figures 10-11).

With respect to the intended use, according to the patent holder, the essential inventive concept of the Patent in Suit is the special arrangement of the first chamber (3), the connection element (5) and the second chamber (4). If an analogous arrangement can be derived from E1, it must be assumed that the arrangement there is also suitable for (sexually arousing (cf. feature b4 of auxiliary request 3)) clitoral stimulation, especially since the alternating compression and decompression of the airbag (2), which is analogous to the first chamber (3) of the Patent in Suit, also generates a pressure field consisting of a pattern of overpressures and negative pressures that is modulated to the normal pressure.

Regarding the functionality of the device according to E1, the patent holder argues that it is not a pneumatic massage device but rather a device meridian treatment through simple tapping analogous to a meridian hammer, wherein the rubber nozzle (1) is not a nozzle but rather the hammerhead. At the same time, it moves against the body of the patient by means of the lever (3), which periodically moves to the left and right and is conveyed through the airbag (2), which has a dampening function (cf. patent holder's submission dated April 12, 2018: p. 19, paragraph 1, through p. 23, paragraph 4). The patent holder bases this interpretation on the allegedly certified translation E1-Ü1 (the file contains no copy of any certification), according to which the rubber nozzle (1) is movable (movable rubber mouthpiece) and according to which the rubber mouthpiece (1) coupled to it as a result of the reciprocal movement of the airbag (2) touches the skin (... and airbag (2) to reciprocate, and then the rubber mouthpiece (1) on said airbag (2) touches the skin.).

Initially, both E1 and the electronic Patent Translate translation of it, and its two translations E1-Ü1 and E1A, describe that the device of E1 is a pneumatic massage device that generates pulsating air pressure (cf., for example, E1-Ü1: Title; lines 16-17). Based on this general information regarding the functionality of the device

14

according to E1 and based on the drawing and the information regarding the references, the Patent Division assumes that the person skilled in the art will interpret the disclosure content of E1 in the sense of the features analysis described above and not in the sense of an automatic meridian hammer. This second interpretation also specifically leads, in addition to the contradiction described above regarding the functionality of the device, to a hard to understand motion pattern, wherein the patent holder proposes that the airbag (2), when moving to the right together with the rubber nozzle (1), moves beyond the right-hand vertical line that the person skilled in the art recognizes as the right-hand wall of the housing (cf. the patent holder's submission dated April 12, 2018: p. 21, Fig. 4).

With respect to the phrase "movable rubber mouthpiece," the Patent Division assumes that in this case "movable" does not mean a movement of the rubber nozzle (1) but rather refers to an elastic connection between rubber nozzle (1) and airbag (2), as this is taken directly from the English summary of E1, which states "The other end of the air bag (2) is movably connected with a rubber nozzle (1)." With the aid of an online dictionary (https://dict.leo.org/chinesisch-deutsch/), it is clear that the Chinese sequence of characters (section h of the above passage) can also mean "elastic." Page 15 of 20 The passage "... and airbag (2) to reciprocate, and then the rubber mouthpiece (1) on said airbag (2) touches the skin" does nothing to recognize a causal link that explains the reciprocal movement of the airbag (2) with the touching of the skin by the rubber mouthpiece by means of a movement of the rubber mouthpiece conveyed by the airbag.

For the reasons stated above, the Patent Division did not follow the suggestion of the patent holder that the subject matter according to E1 is a device for simple tapping massage, which would be unsuitable for clitoral stimulation.

With respect to the functionality of the drive of the device of E1, the patent holder further argues that this does not depend on the orientation of the polarity of the magnet (4). Regarding an orientation of the polarity of the magent (4), in which its north pole and south pole lie directly opposite the electromagnet (5), the patent holder states that the magnet (4) would, regardless of the polarity of the electromagnet (5), stay put in the center position shown in the figure of E1 (cf. the the patent holder's submission dated April 12, 2018: p. 15, last paragraph, through p. 18, third paragraph).

15

This claim initially contradicts the functionality of the device according to E1 put forth by the patent holder as an automated meridian hammer, in which the periodic left/right movement of the magent (4) was assumed (see above).

Moreover, if it is assumed that the above orientation depends on the energization of the electromagnet (5), it is obvious that the magnet (4), conveyed by the mounted lever (3), moves left or right, since identical poles attract each other and opposite poles repel each other, and that a corresponding reciprocal movement of the magnet (4) occurs as the energization direction of the electromagnet (5) periodically changes, which generates the pulsating air pressure on the airbag (2) by coupling the magnet (4) by means of the lever (3).

In this respect, the person skilled in the art whose task was to develop or improve a device for clitoral stimulation, would have suggested equipping the small and easy to carry device according to E1 that is suitable for clitoral stimulation with a battery. In the oral hearing, it was agreed that supplying the alternating current from the direct current of the battery for the necessary periodic pole reversal of the electromagnet (5) is understood by the person skilled in the art and is not technically difficult. In the oral hearing, the opponent ecoaction GmbH cited as examples power inverters or time-controlled Y-switches as possible ways known to the person skilled in the art for converting battery direct current into the required alternating current.

Therefore, as is clear, for example, from D10, the subject matter according to claim 1 of the Patent in Suit is not based, in terms of E1 in conjunction with current technical knowledge, on an inventive step (cf. D10: p. 13, line 27 *et seqq.*). It should also be noted that other publications were discussed in the oral hearing. For example, cf. D2, which discloses a stimulation device that generates a pulsating air flow for stimulation of the clitoris.

The Patent Division did not concur with the statements of the opponent Fun Factory GmbH regarding D17 and D25 because they are far afield from the subject matter of the application.

Auxiliary requests:

In the oral hearing, the patent holder tried to more precisely define the subject matter according to claim 1 of the Patent in Suit by adding the features of the (for the time being) auxiliary request 1:

f)      wherein the drive unit (6) is an electric motor with an axis of rotation (61) and an eccentric (62); and

g1)     wherein the second chamber (4) can be removed from the stimulation device (1); and

g2)     wherein the wall (41) of the second chamber (4) is made of a flexible material.

To differentiate [the invention] from prior art, the [patent] holder more precisely defined the feature of the drive unit (cf. feature f) and the feature of the second chamber (cf. features g1 and g2).

However, regarding feature f), E1 already speaks of alternative drive units (cf. Patent Translate translation of E1, paragraph 3: "micro-motor ... electromagnetic devices, rotary motion"), so that the use of an alternative drive is already suggested by E1. Experts can point to the air-massage device according to D7, which proposes a motor with eccentrics as the drive for oscillating a membrane (cf. D7, p. 1, paragraph 3; first figure). Moreover, according to the Patent in Suit, the choice of drive unit is not that important (cf. original document, p. 15, lines 9-13). It states that "basically all drive types can be used."

Regarding feature g1), E1 speaks of equipping the device with multiple therapeutic mouthpieces (1) that consist of the second chamber and the connection element of the Patent in Suit (cf. E1-Ü1: last paragraph "It (the utility model) can also be equipped with multiple therapeutic mouthpieces."). By equipping the device of E1 with multiple mouthpieces (1), the replaceable arrangement of the second chamber (4) on the device according to E1 has been implicitly described beforehand.
Moreover, the person skilled in the art knows about and has skills related to small design alterations like the replaceability of pads of massage devices (cf. expert report D10: p. 16, lines 13-17; Fig. 14).

Regarding feature g2), the figure of E1 shows on the right-hand side the nozzle (1), which according to the description of E1 consists of rubber, i.e. a flexible material (cf. Patent Translate translation of E1, paragraph 5: "rubber nozzle (1)"). At the same

time, according to the opponent ecoaction GmbH, the flexible rubber material of the nozzle (1) does not contradict the rigidity of the connection element required according to claim 1 of the Patent in Suit because the nozzle (1) of the device according to E1 in the area of the right-hand chamber has thin (flexible) walls and in the area of the connection element is formed like a block (rigid) (cf. E1: figure).

The added features f), g1) and g2) do not contribute anything to an inventive step. Thus, even with the added features (cf. main request), the subject matter according to claim 1 in the form of auxiliary request 1 lacks the necessary inventive step vis-a-vis E1 and the knowledge/abilities of the person skilled in the art.

The same applies with regards to auxiliary requests 2 and 3, each of which builds on the preceding auxiliary request 1.

The features of auxiliary request 2, which were incorporated into the granted claim 1 of the Patent in Suit, are:

f)      wherein the drive unit (6) is an electric motor with an axis of rotation (61) and an eccentric (62); and

g)      wherein the second chamber (4) is oval-shaped for placement over the clitoris (12) and thus is not round; and

g1)    which can be removed from the stimulation device (1); and

g2)    wherein the wall (41) of the second chamber (4) is made of a flexible material

h)      wherein the first chamber (3) has a wall (31), which is deflected through the drive unit (6) to change the volume of the first chamber (3), and wherein the wall (31) consists of a flexible material impermeable to media, wherein the channel of the connection element (5) in formed in a holder (32) for the flexible wall (31).

With auxiliary request 2 in addition to auxiliary request 1, the patent holder wishes to differentiate [the invention] from the prior art by by further clarification of the feature of the second chamber (feature g) and by clarification of the feature of the first chamber and of the connection element (feature h).

Regarding feature g), a person skilled in the art whose task was to improve the clitoral stimulation of the massage device of E1, which is principally suited for clitoral stimulation (cf. the statements above regarding the suitability of the device according to E1 in this

regard), would, on the basis of his general knowledge, suggest delving further into the anatomic conditions and forming the part of the nozzle (1) of the device according to E1 corresponding to the chamber (4) as an oval corresponding to the anatomy of the clitoris. Varying the shape of the nozzle (1) is all the more obvious, as E1 already states that the device of E1 can be equipped with multiple (different) mouthpieces. Moreover, experts will note that it is known from the prior art that the part of the negative-pressure stimulation device coming in contact with the skin should be oval-shaped (cf. D10: Figures 4-6, reference (240)).

Regarding feature h), the figure in E1 already shows a first chamber in the form of the airbag (2) having a wall (cross-hatching) that is deflected through the drive unit there for changing the volume for the purpose of generating a pulsating air pressure (cf. statements regarding the main request). So that it functions properly, the wall of the first chamber must consist of a flexible and airtight material.

The figure of E1 also discloses that the desired form of the channel of the connection element (cf. E1: figure, reference (1)) has a holder, in the form of a groove, into which the flexible wall enters (cf. E1: figure, reference (1)).

Thus, document E1, in conjunction with the technical knowledge (for example, as documented by D10) leads in a non-inventive manner to the subject matter according to auxiliary request 2.

Features of auxiliary request 3 that were incorporated into the granted claim 1 of the Patent in Suit are:

b4)    a drive unit (6) that changes the volume of the first chamber (3) in such a way that a stimulating, sexually arousing pressure field is generated by means of the connection element (5) into the second chamber (4); and

f)    wherein the drive unit (6) is an electric motor with a rotation of axis (61) and an eccentric (62); and

g)    wherein the second chamber (4) is oval-shaped for placement over the clitoris (12) and not round; and

g1).    can be removed from the stimulation device (1); and

g2)    wherein the wall (41) of the second chamber (4) is made of a flexible material

h)    wherein the first chamber (3) has a wall (31 that is deflected through the drive unit (6) for changing the volume of the first chamber (3), and wherein the wall (31) consists of a flexible material material impermeable to media, wherein the channel of the connection element (5) is formed in a holder (32) for the flexible

wall (31)

i)   wherein a medium of the pressure field can be a liquid medium as an alternative or in addition to a gaseous medium.

Regarding feature b4), what was said initially in the section on the inventive step regarding the suitability of the device according to E1 for clitoral stimulation applies.

Moreover, according to the opponent ecoaction GmbH, the feature "sexually stimulating pressure field" is a subjective featutre that is not suitable for determining the scope of protection of a version of a claim.

The finally to be added feature i), which is intended to specify the medium of the pressure field in greater detail, is purely optional and also does not flesh out the device from a structural perspective. The amount of liquid in feature i) of auxiliary request 3 is not precisely defined and it must be assumed that even the device according to E1 will remain functional with at least a small amount of liquid in the medium.

Auxiliary requests 1-3 are therefore not suitable for establishing inventive difference with regard to prior art.

Accordingly, patent 10 2013 110 501 had to be revoked.

Please see the explanation of the right to appeal attached to this decision.

| | | |
|---|---|---|
| Dr. Medicus | Dr. Littger | Dr. Zink |
| Presiding Judge | Judge-Rapporteur | Associate Judge |

Patent Division 44

|  | Dr. Claus Medicus |
|---|---|
| [*Seal EPO*] | Dr. Ralf Littger |
|  | Dr. Hubertus Zink |

## Explanation of the right to appeal

In accordance with sec. 73 German Patent Act (PatG), this decision can be **appealed**. The parties are entitled to appeal in proceedings before the German Patent and Trade Mark Office. The appeal has a suspensive effect. The appeal must be filed with the German Patent and Trade Mark Office **within one month after notification of the decision in writing**. The addresses are:

German Patent and Trade Mark Office, 80297 Munich,

German Patent and Trade Mark Office, Jena Office, 07738 Jena,

German Patent and Trade Mark Office, Berlin Technical Information Center, 10958 Berlin.

The **appeal** can also be filed **electronically** (sec. 125a para. 1 PatG in conjunction with sec. 130a para. 1 sentences 1 and 3, para. 3 *Zivilprozessordnung* [Code of Civil Procedure] [(ZPO), sec. 12 of the *Verordnung über das Deutsche Patent- und Markenamt* [Order on the German Patent and Trade Mark Office] (DPMAV), §sec. 1 *et seq.* of the *Verordnung über den elektronischen Rechtsverkehr beim Deutsche Patent- und Markenamt* [Order on electronic legal transactions at the German Patent and Trade Mark Office] (ERVDPMAV)). The detailed (technical) requirements are described in the ERVDPMAV.

The **appeal fee** in the amount of **EUR 500.00 (No. 401100 of the fees listed in** sec. **2 para. 1** *Patentkostengesetz* **[Patent Costs Act])** must be paid to the *Bundeskasse* [Federal Funds Office] Halle account for the German Patent and Trade Mark Office within the period of appeal. The appeal fee must be paid for each appellant separately. If the appeal fee **is not paid in full or not paid on time, the appeal shall be deemed not filed** (sec. **6 para. 2 Patent Costs Act).**

Notes:

For service by mail by means of registered mail by physical delivery, the third day after mailing shall be deemed as served, unless the document to be served is not received or received at a later date (sec. 127 para. 1 PatG in conjunction with sec. 4 para. 2 sentence 2 *Verwaltungszustellungsgesetz* [Service in Administrative Procedures Act] (VwZG)). For service by means of registered mail with return receipt requested, the date indicated on the return receipt shall be deemed the date served (sec. 127 para. 1 PatG in conjunction with sec. 4 para. 2 sentence 1 VwZG).

For service by mail with notice of receipt, the date served is noted on the delivered copy of the notice of receipt or on the delivered item of mail.

For service abroad by means of a mailed registered letter, two weeks after mailing shall be deemed as served (sec. 127 para. 1 No. 2 PatG in conjunction with sec. 184 para. 2 sentence 1 ZPO).

## Payment Instructions

1.          Payment of the fee is determined in accordance with *Patentkostenzahlungsverordnung* [Patent Costs Payment Ordinance]          (PatKostZV).

Fees can be paid as follows:

a) by payment in cash to the cash department of the German Patent and Trade Mark Offices in Munich, Jena or to the Technical Information Center in Berlin;

b) by bank transfer to the account of the *Bundeskasse* Halle/DPMA:

**IBAN: DE84 7000 0000 0070 0010 54, BIC (SWIFT code): MARKDEF1700**;

c) by (cash) payment with a payment slip to the account indicated under b) at Postbank or at all banks and savings banks; or

d) by issuing a valid SEPA-based direct debit mandate indicating the intended use. For this, please use the forms (A 9530 and A 9532) available on our website www.dpma.de and follow the instructions provided there for SEPA procedures.

The SEPA mandate presented to the DPMA [German Patent and Trade Mark Office] must be the original. In the case of a transmission by fax, the original SEPA mandate must be delivered within one month to guarantee [receipt by] the payment date.

2.          Each payment must clearly indicate the complete **docket no.,** the exact name of the **applicant (owner)** and the **fee numbers**. The fee numbers can be found in the list of fees of the Patent Costs Act (PatKostG), which is also published in the Schedule of Fees A 9510 of the German Patent and Trade Mark Office.

Incorrect or incomplete information will result in delays in processing.

3.          According to sec. 2 PatKostZV, the **date of payment** shall be deemed

a)          for cash payments, the date of payment;

b)          for bank transfers, the date on which the amount is credited to the account of the Bundeskasse Halle for the German Patent and Trade Mark Office;

c)          for (cash) payment to an account of the Bundeskasse Halle for the German Patent and Trade Mark Office, the date of payment;

Since the Bundeskasse Halle may not be able to discern the bank transfer according to b) by means of accounting records, the cash payer, if he wishes to utilize the later date of payment in accordance with this form of payment, should **immediately** present to the Office the **deposit slip** issued by the bank;

d)          for the issuance of a SEPA-based direct debit mandate indicating the intended use, the costs, the date

received by the German Patent and Trade Mark Office or by the *Bundespatentgericht* [German Federal Patent Court] for costs due in the future, the due date, provided payment is made for the benefit of the Bundeskasse responsible for the German Patent and Trade Mark Office. If the SEPA-based direct debit mandate is transmitted by fax, the original mandate must be delivered within one month after receipt of the fax. Otherwise, the date the original is received shall be deemed the date of payment.


Copy dated **June 29, 2018**


Docket no.: **10 2013110 501.7**


This copy was made from the following electronic document:
Document:                              "Decision – Revocation – Signed"
dated: **April 17, 2018**


Based on the signature verification carried out on **June 29, 2018,** the electronic document was qualified as signed by:

| | |
|---|---|
| Dr. Hubertus Zink | June 29, 2018 |
| Dr. Ralf Littger | June 29, 2018 |
| Dr. Claus Medicus | June 29, 2018 |

*Exhibit 24*

Faxingang: 2016-11-17 12:40:04 AID: D2065058



## BRANDI
### RECHTSANWÄLTE

BRANDI Rechtsanwälte Partnerschaft mbB · Postfach 10 20 73  33520 Bielefeld

Deutsche Patent- und Markenamt

80297 München

**Vorab per Telefax: 089/2195-4000**

D-33602 BIELEFELD
Adenauerplatz 1
Tel. +49 (0) 521 - 96535-0
Fax:+49 (0) 521 - 96535-99
Gerichtsfach 59
E-Mail: Bielefeld@brandi.net
Internet: www.brandi.net

**BIELEFELD**
DR. HENNING HEUER, NOTAR A D
DR. AXEL BRANDI, NOTAR A D 1
DR. HEINRICH SIEMENS, NOTAR A D
DR. HANS-JÜRGEN HIEKEL 2
DR. JÖRG KÖNIG 5 · 18
DR. GERT MÜLLER-BAUMGARTEN, NOTAR 7
ANDREAS KÖNIG, NOTAR
DR. IRENE VLASSOPOULOU 4  22
ULRICH VORSPEL-RÜTER LL.M  11
DR. JÜRGEN LÖBBE, NOTAR 7 · 10
DR. ANNETTE MÜSSINGHOFF-SIEMENS, NOTARIN 8
DR. OLIVER KNODEL, NOTAR 6
DR. KEVIN KRUSE, NOTAR 9  18
DR. SEBASTIAN MEYER LL.M., NOTAR 15  19
DR. ANDREA PIRSCHER 2
ACHIM HEINING, NOTAR 6
PATRIZIA FERRARA 18 · 25
DR. CHRISTIAN KOLLMEIER, NOTAR 8
DR. JANA ILCHMANN 6
DR. RAINER KRÜGER 2
TIMO STALLMANN 5
DR. PAUL CZAPLINSKI
DR. CHRISTOPH REMPE 15
BASTIAN REUTER 14
UTE LIENENLÜKE
STEFFEN KURTH LL.M.

**DETMOLD**
DR. HELMUT DRÖGE 1
DR. BERNHARD KÖNIG
FRANK SCHEMBECKER 9
DR. CHRISTIAN BEHRENDT, NOTAR 1
DR. SÖREN KRAMER 2
DR. FRANK WERTHMANN
DR. JENS HOFFMANN, NOTAR 1  6
DR. RÜDIGER OSTEN
BJÖRN MAI

**GÜTERSLOH**
HARTMUT SANDERING, NOTAR 1  7
DR. FRANZ TEPPER LL.M. 13 · 21
DR. HANS-JÜRGEN BUCHMÜLLER
DR. NILS WIGGINGHAUS, NOTAR
DR. SÖRREN KIENE 13  24
DR. BIRGIT JAENICKE 18 · 23
EVA-MARIA GOTTSCHALK LL.M 6
DR. DANIEL KOLLMEYER
CARSTEN CHRISTOPHERY LL.M.

**PADERBORN**
PROF. DR. S. GRÖNEMEYER (bis 2012)
DR. HUBERTUS EUSTERBROCK, NOTAR
PROF. DR. MARTIN DIPPEL 3
DR. NILS GRÖNEMEYER 3
DR. SANDRA VYAS 2 · 8
DANIELA DEIFUSS-KRUSE 3
DR. JOSEF HEIMANN LL.M., NOTAR 6 · 7
DR. CHRISTOPH JAHN 3 · 16
DR. JÖRG NIGGEMEYER, NOTAR 3
HUBERT SALMEN, NOTAR 1 · 6
NINA DRÜKE
DR. CHRISTOPH WORMS
SIMON SCHMOLLMANN
VICTORIA WESSEL

**MINDEN**
DR. WOLFGANG SUDEROW, NOTAR A.D.
FRANZ PIEPER, NOTAR 5 · 7
DR. MANFRED SCHRÖDER 3
ASTRID KAUFHOLD 4  18
ANDREAS WIEMANN 3
BERND KAUFHOLD 2 · 12· 18
KIRA LEPSIEN 4
DR. ROBERT LEPSIEN, NOTAR 2 · 6
DR. ANDREAS PIEPER 3

**HANNOVER**
DR. JOSEF FULLENKAMP
MICHAEL WEBER-BLANK NLP M. 1  12 · 18
DR. OLIVER EBERT 2
DR. CARSTEN HOPPMANN, NOTAR 6 · 9
RÜDIGER HITZ 1 · 12 · 17
DR. MARIO BERGMANN LL.M  12
CHRISTOPHER JONES 12
DR. CHRISTOPHER HILGENSTOCK LL.M 2
DR. SVEN HASENSTAB
SEBASTIAN SIESENOP, DIPL.-FINW (FH)
JESSICA MÜSSEL

**PARIS**  in Kooperation mit Wenner Avocats
CHRISTOPH SCHÖDEL 20
UWE AUGUSTIN LL.M  20  21
JENS FÖRDERER LL.M. 20

**PEKING**  in Kooperation mit Grandall Law Firm
DR. NILS WIGGINGHAUS

UNSER ZEICHEN·
OUR REF
3624/16
D28/55791

RÜCKFRAGEN BITTE AN·
PLEASE REPLY TO·
Dr. Kruse
Tel.: 0521/96535-820
Fax: 0521/96535-115
Sekr.: Frau Lappenbusch
E-Mail: kevin.kruse@brandi.net

BIELEFELD,

17.11.2016
23/sl

## Einspruch gegen das Patent DE 10 2013 110 501 B4

Sehr geehrte Damen und Herren,

hiermit legen wir namens und in Vollmacht der Fa. ecoaction GmbH, Hermann-Heinrich-Gossen-Str. 4, 50858 Köln, gegen das deutsche Patent DE 10 2013 110 501 B4

### Einspruch

ein und beantragen, das Patent in vollem Umfang zu widerrufen.

Hilfsweise wird die Anberaumung einer Anhörung beantragt, sollte dem Einspruch nicht ohne weiteres stattgegeben werden können.

Wie im Folgenden dargelegt wird, beruht der beanspruchte Gegen-
stand

Exclusive German Member of

**PANGEA NET**
International Network of Independent Law Firms

UStI-ID-Nr DE124598917

Partnerschaftsgesellschaft mbB
PR 2830 AG Essen, Sitz: Bielefeld

Von den auf diesem Briefkopf aufgeführten
Rechtsanwältinnen und Rechtsanwälten sind nur
diejenigen Partner der Partnerschaft, die aus dem
Partnerschaftsregister ersichtlich sind

1  Fachanwalt für Steuerrecht
2  Fachanwalt für Arbeitsrecht
3  Fachanwalt für Verwaltungsrecht
4  Fachanwältin für Familienrecht
5  Fachanwalt für Miet- und Wohnungseigentumsrecht
6  Fachanwalt für Handels- und Gesellschaftsrecht
7  Fachanwalt für Erbrecht
8  Fachanwalt für Bau- und Architektenrecht
9  Fachanwalt für gewerblichen Rechtsschutz
10 Fachanwalt für Bank- und Kapitalmarktrecht
11 Fachanwalt für Versicherungsrecht
12 Fachanwalt für Strafrecht

14 Fachanwalt für Medizinrecht
15 Fachanwalt für IT-Recht
16 Fachanwalt für Transport- und Speditionsrecht
17 Steuerberater
18 Mediator - Wirtschaftsmediator
19 Datenschutzauditor
20 Avocat à la Cour
21 Attorney at Law (New York)
22 Diagcros (Athen)
23 Licence en droit (Université de Tours)
24 Solicitor (England & Wales)
25 Kanzleimanagerin (alle Standorte)

Faxeingang: 2016-11-17 12:40:04 AID: D2065058

**BRANDI**

| RECHTSANWÄLTE

 

i)    nicht auf erfinderischer Tätigkeit, und

ii)    geht über den Offenbarungsgehalt der ursprünglich eingereichten Anmeldung hinaus, ist mithin unzulässig erweitert.

Der Einspruch wird auf folgende Unterlagen geschützt:

E1     CN 2153351, beigefügt zusammen mit einer Maschinenübersetzung von der Webseite des europäischen Patentamtes (Patenttranslate)

E2     DE 10 2013 110 501 A1 (Offenlegungsschrift zum vorliegenden Streitpatent)

E3     Auszug aus Maria M. Kettenring „erotische Partnermassage", GRÄFE UND UNZER Verlag GmbH; Auflage: 3., Aufl. (10. August 2004)

E4     CN 2198900, beigefügt zusammen mit einer Maschinenübersetzung von der Webseite des europäischen Patentamtes (Patenttranslate)

 

## I. Streitpatent

Das Streitpatent umfasst einen Hauptanspruch, der auf eine Simulationsvorrichtung gerichtet ist, sowie formal nebengeordnete Ansprüche 8 (System aus Simulationsvorrichtung und Fernbedienung) sowie 9 (Verwendung).

Anspruch 1 weist folgende Merkmale auf:

1. Stimulationsvorrichtung (**1**) [geeignet] für die Klitoris (**12**), aufweisend:
2. eine Druckfelderzeugungseinrichtung (**2**) mit:
    2.1    einer ersten Kammer (**3**); und
    2.2    einer zweiten Kammer (**4**)
        2.2.1   mit einer Öffnung (**42**) [geeignet] zum Aufsetzen über die Klitoris (**12**); und
    2.3    einem Verbindungselement (**5**), welches die erste Kammer (**3**) mit der zweiten Kammer (**4**) verbindet; und
    2.4    einer Antriebseinheit (**6**), welche das Volumen der ersten Kammer (**3**) derart verändert, dass über das Verbindungselement (**5**) in der zweiten Kammer (**4**) ein stimulierendes Druckfeld erzeugt wird; und
    2.5    eine Steuereinrichtung (**7**), welche die Antriebseinheit (**6**) ansteuert; und

D2065058

Faxeingang: 2016-11-17 12:40:04 AID: D2065058



BRANDI
RECHTSANWÄLTE

2.6     wobei das in der zweiten Kammer (4) erzeugte Druckfeld aus einem Muster von Unter- und Überdrücken besteht, welche auf den Normaldruck aufmoduliert sind;

2.7     und wobei die erste Kammer (3) über das Verbindungselement (5) ausschließlich mit der zweiten Kammer (4) verbunden ist, somit keine andere Verbindung der ersten Kammer (3) als diejenige zur zweiten Kammer (4) besteht, womit die erste Kammer (3) eine einzige Öffnung aufweist, und

2.8     wobei die zweite Kammer (4) eine Öffnung (51) von dem Verbindungselement (5) in die zweite Kammer (4) aufweist, und

3.      wobei die Stimulationsvorrichtung (1) keine Ventile aufweist, und

4.      wobei die Stimulationsvorrichtung (1) ein tragbares Handgerät mit einer Batterie (76) ist,

**dadurch gekennzeichnet,** dass

5.1     das Verbindungselement (5) starr ist, und

5.2     als ein gerader Kanal mit Düsenwirkung ausgestaltet ist, dessen

    5.2.1   Öffnung in die erste Kammer (3) und dessen Öffnung (51) in die zweite Kammer (4) zueinander ausgerichtet sind, so dass eine Medienströmung bei Kompression der ersten Kammer (3) durch die Ausrichtung der Öffnung (51) und des Verbindungselements (5) auf die Klitoris (12) gerichtet ist,

    5.2.2   wobei die Öffnung (51) des Verbindungselements (5) der Klitoris (12) durch die zweite Kammer (4) hindurch gegenüberliegt.

## II. Unzulässige Erweiterung

Der Gegenstand des Anspruchs 1 ist unzulässig erweitert.

a.  Merkmal 5.2, welches im Laufe des Prüfungsverfahrens aus der Beschreibung hochgezogen wurde, beansprucht einen „geraden Kanal". Dieses Merkmal ist in der Beschreibung nirgends erwähnt. Die Zeichnungen zeigen zwar den Kanal 5 und dessen Begrenzungslinien als „gerade", da es sich bei den Darstellungen allerdings um Schnittzeichnungen handelt, ist den Zeichnungen jedenfalls nicht eindeutig zu entnehmen, dass der darauf abgebildete Kanal keine Krümmung aufweisen darf. Gegen die Annahme „gerade" spricht auch, dass jedenfalls Figur 9 eine Ausführungsform zeigt, in der gekrümmte Kanäle (52) dargestellt sind. Folglich ergibt sich das Merkmal des Anspruchs 5.2 nicht eindeutig aus dem gesamten Offenbarungsgehalt.

b.  In Merkmal 5.2 ist zudem im erteilten Patent ein „gerader Kanal mit Düsenwirkung" beansprucht. Dies ist so nicht ursprünglich offenbart. Ursprünglich offenbart ist (vergleiche Abs. 29 der A1 Schrift, E2, Seite 5, linke Spalte, beginnend mit Zeile 8):

D2065058

From:BRANDI Bielefeld          To:008921954000          17/11/2016 12:27     #747 P.004/050

Faxeingang: 2016-11-17 12:40:04 AID: D2065058

# BRANDI
## RECHTSANWÄLTE

„Beispielsweise kann das Verbindungselement bei einer Stimulationsvorrichtung, welche für die Klitoris bestimmt ist, eine einzelne Durchgangsöffnung mit Düsenwirkung auf die Klitoriseichel zwischen der ersten und der zweiten Kammer aufweisen..."

Eine einzelne Durchgangsöffnung muss aber nicht zwingend als Kanal ausgebildet sein, sondern es kann sich lediglich um ein Loch handeln. Aus diesem Grunde ist auch diese Formulierung in Merkmal 52 unzulässig erweitert.

c.  In Merkmal 5.1 heißt es, dass „das Verbindungselement (5) starr ist...". Diese Formulierung ist ebenfalls von der ursprünglichen Offenbarung oder der Patentschrift nicht gestützt. Ursprünglich offenbart ist (E2, Abs. 89):

„...Fig. 11 zeigt eine zweite Ausführungsform der Erfindung mit einer örtlich getrennten Anordnung der Kammern 3 und 4 der Druckfelderzeugungseinrichtung 2. Dabei sind die Kammern 3 und 4 über ein ausgedehntes Verbindungselement 5 verbunden, welches ein längerer flexibler Schlauch oder ein auch starres Rohr sein kann..."

Diese Passage wurde im erteilten Anspruch 1 verallgemeinert in ein *starres Verbindungselement (5)*. Offenbart hingegen ist lediglich ein starres *Rohr*.

Auch das Merkmal 5.1 ist also nicht durch die Beschreibung gestützt und mithin unzulässig erweitert.

d.  Merkmal 5. 2 wurde im erteilten Anspruch 1 so geändert, dass das Verbindungselement als ein gerader Kanal ausgebildet ist...". In Merkmal 2.7 heißt es zudem:

„wobei die erste Kammer (3) über das Verbindungselement (5) ausschließlich mit der zweiten Kammer (4) verbunden ist, somit keine andere Verbindung der ersten Kammer (3) als diejenige zur zweiten Kammer (4) besteht, womit die erste Kammer (3) eine einzige Öffnung aufweist".

D2065058

Faxeingang: 2016-11-17 12:40:04 AID: D2065058

BRANDI

I RECHTSANWÄLTE

Mit anderen Worten fordert Anspruch 1 ein „Verbindungselement mit **nur** einem geraden Kanal". Eine Mehrzahl Kanäle scheidet demnach also genauso aus wie eine Mehrzahl anderer Passagen.

Die Formulierung des Anspruchs 1 steht aber im Widerspruch zur ursprünglichen Offenbarung, in der es in Absatz 86 der E2:

"Während die Ausgestaltung des Verbindungselements 5 mit *nur einem Kanal*, wie im Zusammenhang mit Fig. 6 beschrieben, zur Ausbildung eines stark konzentrierten Medien- bzw. Luftstroms auf einen Zielbereich hin führt, kann bei der in Fig. 9 gezeigten Ausgestaltung des Verbindungselements 5 der Medien- bzw. Luftstrom auf mehrere Zielbereiche verteilt werden, ...."

*„Nur ein gerader Kanal"* ist also nicht offenbart, lediglich die beiden Alternativen, die in Absatz 86 beschrieben sind.

## III. Patentfähigkeit Anspruch 1 und 9

E1 offenbart den nächstliegenden Stand der Technik. Die einzige Figur ist nachfolgend wiedergegeben (aus der Streitpatentschrift stammende Bezugzeichen wurden mit einem vorangestellten                              „SP"                              er-

D2065058

From:BRANDI Bielefeld          To:008921954000          17/11/2016 12:27    #747 P.006/050

Faxeingang: 2016-11-17 12:40:04 AID: D2065058



gänzt):



Der Maschinenübersetzung und der oben abgebildete Zeichnung ist folgendes zu entneh-
men: es handelt sich um ein tragbares Gerät (vierter Absatz der Maschinenübersetzung),
welches einen Elektromagneten 5 und einen Hebel 3 aufweist, an dessen einem Ende ein
Permanentmagnet 4 vorgesehen ist. Dieser Hebel 3 ist etwa mittig zwischen dem Magneten
am freien Ende des Hebels und dem Anlenkpunkt des Hebels mit der einen Stirnseite eines
Ballons oder mit Luft befüllbaren Körpers 2 verbunden. Wird der Elektromagnet eingeschal-
tet, beginnt der Hebel durch seine über den Permanentmagneten 4 vermittelte magnetische
Wechselwirkung mit dem Elektromagneten 5 hin und her zu schwingen. Dabei wird der Kör-
per 2 komprimiert und expandiert (Richtung X), so dass in dem Innenraum befindliche Luft
(hier Gas) ebenfalls stoßweise komprimiert wird. Auf der dem Hebel gegenüberliegenden
Stirnseite des Körpers 2 befindet sich eine Auslassdüse (nozzle 1), durch welche die kom-

D2065058

From:BRANDI Bielefeld          To:008921954000          17/11/2016 12:27     #747 P.007/050

Faxeingang: 2016-11-17 12:40:04 AID: D2065058

**BRANDI**
RECHTSANWÄLTE

primierte Luft aus dem Körper 2 entweichen kann. In der Abbildung ist die Auslassdüse 1 teilweise geschnitten dargestellt, wie auch der Körper 2. Der Körper 2 weist einen das Gas oder die Luft aufnehmenden Hohlraum SP3 (erste Kammer) auf. Die Auslassdüse 1 weist auf der dem Hohlraum SP3 abgewandten Seite einen weiteren Hohlraum auf, welcher eine Austrittsöffnung SP42 aufweist. Wird also der Körper 2 komprimiert, so entweicht die Luft über die Austrittsöffnung SP42 nach außen. Da dies stoßweise erfolgt, wird dadurch ein Massageeffekt erzielt. Der Hohlraum SP3 des Körpers 2 ist mit dem Hohlraum SP4 in der Auslassdüse 1 über einen Kanal SP5 mit einer Kanalöffnung SP51 verbunden. Wird also die Luft im Hohlraum SP3 komprimiert, bildet die Öffnung SP51 die einzige Möglichkeit, mit der Luft aus dem Hohlraum SP3 in die Öffnung SP42 gelangen kann.

Vergleicht man also den Offenbarungsgehalt der E1 mit der obigen Merkmalsanalyse, so ergibt sich folgendes Bild:

E1 offenbart eine Stimulationsvorrichtung (vergleiche Engl. Abstract „health massage device", wobei eine Massagevorrichtung dem Gebrauch nach dazu ausgelegt ist, Gewebe und oder Muskeln zu stimulieren), Merkmal 1. Die Vorrichtung aus E1 weist eine Druckfelderzeugungseinrichtung auf, die oben beschriebene Wechselwirkung der Magnete 4 und 5 sorgt für eine periodische Auslenkung des Hebels und damit eine periodische Druckänderung am Hohlkörper 2, Merkmal 2. Es sind auch entsprechend der Merkmale 2.1 und 2.2 eine erste Kammer (SP3) und eine zweite Kammer (zumindest der Teil SP4 zwischen den Öffnungen SP51 und SP 42), nämlich in der Auslassdüse 1, vorgesehen. Auch ist die Öffnung SP 42 grundsätzlich zum Aufsetzen auf eine Klitoris geeignet, Merkmal 2.2.1. Entsprechend Merkmal 2.3 gibt es ein Verbindungselement, nämlich den Kanal SP5, der die beiden oben beschriebenen Kammern SP3 und den Bereich SP4 miteinander verbindet. Die Antriebseinheit gemäß Merkmal 2.4 wird gebildet durch die beiden Magnete 4 und 5 sowie den Hebel 3. Die entsprechende Funktion ist oben beschrieben. Implizit ist auch eine Steuereinrichtung vorgesehen, welche den Elektromagneten 5 bestromen muss (vergleiche Anschlüsse auf der linken Seite in der Zeichnung oben), anders würde eine Hin- und Herbewegung des Hebels 3 nicht möglich sein, so das Merkmal 2.5 zumindest implizit offenbart sein muss.

Durch die Hin- und Herbewegung entsteht ein periodisches Muster mit Druckschwankungen von Unter- und Überdrücken, gemäß Merkmal 2.6. Überdrücke entstehen bei Kompression des Körpers (Hebel 3 nach rechts) 2, Unterdrücke bei entsprechender Entspannung (Hebel 3

D2065058

Faxeingang: 2016-11-17 12:40:04 AID: D2065058

# BRANDI
## RECHTSANWÄLTE

nach links). Gemäß Merkmal 2.7 ist der Kanal SP5 die einzige Verbindung zwischen den beiden Kammern. Die Luft kann aus dem Körper 2 also nur über den Kanal SP5 entweichen. Entsprechend ist auch Merkmal 2.8 in E1 offenbart, denn die Öffnung SP51 ist von der zweiten Kammer SP4 umfasst.

Ventile sind in der Zeichnung nicht zu erkennen und auch in der Beschreibung der E1 nicht beschrieben. Mithin kommt die Vorrichtung wohl ohne Ventile aus. Damit ist auch Merkmal 3 in E1 offenbart. Gemäß Merkmal 4 handelt es sich bei dem Massagegerät der E1 um ein tragbares Handgerät (vergleiche dritter Absatz der Maschinenübersetzung „small, easy to carry…"). Es fehlt in E1 lediglich eine ausdrückliche Erwähnung des Teilmerkmals, dass das tragbare Handgerät eine Batterie aufweist.

Die Merkmale des kennzeichnenden Teils finden sich größtenteils in der E1 wieder:

Der Kanal SP5 ist in E1 allerdings nicht ausdrücklich beschrieben. Er verläuft geradeaus zwischen dem Hohlraum SP3 und der Öffnung der Düse. Anschaulich ist klar, dass der Kanal eine gerade zylinderförmige Gestalt hat. Diese ist auch starr im Sinne des Patentes denn wäre der Kanal verformbar (insbesondere komprimierbar), würde eine ordnungsgemäße Funktion wohl nicht mehr garantiert werden können. Die Patentschrift selbst schweigt sich im Grunde darüber aus, was genau mit „starr" gemeint ist, einzig Abs. 96 spricht von einem starren Rohr im Gegensatz zu einem flexiblen Schlauch. Mithin ist der Begriff auslegungsbedürftig. Da in der E1 der Kanal SP5 Teil des Bauteils 1 ist, und das Bauteil 1 in dem Bereich des Kanals SP5 im Vergleich zum Bereich der Düsenöffnung SP42 verhältnismäßig dickwandig ist, wird damit zum Ausdruck gebracht, dass im Bereich des Kanals SP5 die Anordnung jedenfalls wesentlich starrer sein soll als im Bereich der Mündung, welche auf einen Körperteil aufgesetzt werden soll. Insofern ist auch das Merkmal 5.1 aus E1 bekannt.

Dasselbe gilt für das Merkmal 5.2. Erkennbar ist in der Zeichnung oben der Kanal SP5 gerade und hat eine Düsenwirkung, sonst würde das Bauteil 1 wohl auch nicht mit Düse (englisch „nozzle") bezeichnet. Dies ergibt sich aus physikalischen Betrachtungen: der Hohlraum SP3 hat im Vergleich zum Kanal SP 5 einen wesentlich größeren Querschnitt, so dass eine Erhöhung des Druckes im Hohlraum SP3 nicht nur eine Expansion des im Hohlraum SP3 befindlichen Gases in Richtung der Mündung SP42, sondern auch eine Beschleunigung des Luftstroms aufgrund eines sich verjüngenden Querschnitts im Kanal SP5 bewirkt.

D2065058

Faxeingang: 2016-11-17 12:40:04 AID: D2065058

BRANDI
RECHTSANWÄLTE

Das Merkmal 5.2.1 geht aus E1 hervor, sofern man das Handgerät vor der Klitoris anordnet. Die Funktionsweise und der Strömungsweg sind weiter oben beschrieben.

Entsprechendes gilt für das Merkmal 5.2.2. Sofern das Handgerät vor eine Klitoris angeordnet wird, liegt die Öffnung SP51 der Klitoris durch die zweite Kammer SP4 gegenüber.

Der in Anspruch 1 des Streitpatents beanspruchte Gegenstand unterscheidet sich also von dem Gegenstand, der in der E1 offenbart ist, lediglich dadurch, dass:

a) die beanspruchte Vorrichtung zur Verwendung für eine Klitoris geeignet sein soll (Zweckangabe);
b) eine Batterie vorhanden ist.

Diese beiden Merkmale weisen keinen Synergieeffekt auf, sondern lösen unterschiedliche Teilaufgaben. Die Batterie ermöglicht die Ausführung der Vorrichtung als Handgerät. Das für sich genommen ist naheliegend, denn wenn der Fachmann die Aufgabe hat, ein ohnehin schon als Handgerät ausgebildetes Gerät mit Energie zu versorgen, dann bleibt entweder die Möglichkeit, einen wieder aufladbaren Akku zu verwenden oder eben stattdessen Batterien einzulegen. Wenn der Fachmann dies bei dem in E1 offenbarten Handgerät nicht ohne weiteres mitliest, so liegt es jedenfalls doch nahe, bei einem Handgerät Batterien zu verwenden.

Auch die Zweckangabe unter a) zeitigt keinen überraschenden Effekt. Nach diesseitiger Auffassung wird für Zweckangabe für die Verwendung „zur Massage im Bereich der Klitoris" ohnehin kein technisches Merkmal angegeben, welches den Schutzbereich in irgendeiner Weise beschränkt. Folglich ist in Anspruch 1 auch kein gegenständliches Merkmal enthalten, durch welches ausgedrückt würde, wie sich das Stimulationsgerät von anderen Stimulationsgeräten (Massagegeräten) unterscheidet, die nicht ausdrücklich für die Massage im Intimbereich vorgesehen sind. Folglich muss davon ausgegangen werden, dass auch das in E1 offenbarte Massagegerät grundsätzlich geeignet ist, in dem erfindungsgemäßen Bereich eingesetzt zu werden.

D2065058

Faxeingang: 2016-11-17 12:40:04 AID: D2065058



BRANDI
RECHTSANWÄLTE

Im Abstract der E1 ist im vorletzten Satz davon die Rede, dass Luftdruck pulsierend einge-
setzt wird, um Meridianpunkte zu stimulieren. Auf solchen Meridianen, die ein wichtiger Be-
standteil der östlichen Medizin sind, und als Energielinien bezeichnet werden können, liegen
Stimulierungspunkte, welche beispielsweise durch Akupunktur oder Akkupressur (= Massa-
ge) angeregt werden. Dies gilt natürlich auch bei der Stimulierung erogener Zonen, verglei-
che Dokument E3.

Da es nun nicht unüblich ist, zur Massage (an welchem Körperteil auch immer) Massagege-
räte einzusetzen, wird der Fachmann das aus E1 bekannte Gerät auch für den erfindungs-
gemäß beanspruchten Verwendungszweck als geeignet in Betracht ziehen. Dies gilt insbe-
sondere vor dem Hintergrund, dass die vorliegende Patentanmeldung (siehe A1-Schrift) ur-
sprünglich ja auf eine Stimulationsvorrichtung für beliebige Körperteile gerichtet war.

Folglich beruht der Gegenstand des Anspruchs 1, und mithin der Gegenstand des Verwen-
dungsanspruchs 9 nicht auf erfinderischer Tätigkeit.

Ähnlich verhält es sich mit der E4, auch hier sind zwei Kammern 9, 12 offenbart, wobei die
erste Kammer 9 durch einen Membranantrieb 10 ein veränderliches Volumen aufweist,
wodurch ein stimuliertes Druckfeld erzeugt wird. Die Einsprechende behält sich vor, hierzu
ausführlicher vorzutragen, sollte dies entscheidungserheblich sein.

## IV. Unteransprüche

Den Unteransprüchen ist nichts von eigenständiger erfinderischer Bedeutung zu entnehmen.

Anspruch 2: Zumindest die erste Alternative des Anspruchs 2, wonach die zweite Kammer
aus einem flexiblen Material hergestellt ist, dürfte durch den Hinweis in der E1 (Abstract) auf
eine „rubber nozzle (1)" vorweggenommen sein, denn zumindest im Bereich der Austrittsöff-
nung SP42 ist das Gummimaterial vergleichsweise dünn ausgebildet, folglich ist die Düse
dort flexibel. Die übrigen Alternativen enthalten lediglich bauliche Ausgestaltungen, die der
Fachmann vorsieht, wenn man ihm eine entsprechende Aufgabe stellt.

D2065058

Faxeingang: 2016-11-17 12:40:04 AID: D2065058

**BRANDI**
RECHTSANWÄLTE

**Anspruch 3:** Das kennzeichnende Merkmal des Anspruchs 3 ist nicht direkt in der E1 offenbart. Sinn der Einstückigkeit ist laut Streitpatent, hygienisch bedenkliche Spalten zu vermeiden [0089].

Für einen Fachmann, dem die E1 bekannt ist, liegt es nahe, die Spalten, die zwangsläufig bei dem Zusammenfügen von Teilen entstehen, zu vermeiden. Die kann geschehen, indem mehrere Materialien in einem Herstellungsvorgang miteinander (z. B. durch Spritzgießen) verbunden werden oder, wenn die Eigenschaften der Teile es zulassen, sogar aus einem Material, also aus nur einem Stück hergestellt werden. Einstückiges Ausbilden ist also im Hinblick auf das angestrebte Ziel für den Fachmann naheliegend.

**Anspruch 4:** Die Abbildung der E1 zeigt eine zweite Kammer mit Verbindungselement, das auf die erste Kammer aufgesteckt ist. Diesen Zusammenbau kann man auch wieder trennen, so dass die zweite Kammer auswechsel<u>bar</u> ist. Das fragliche Merkmal ergibt sich also bereits aus der Entgegenhaltung E1.

**Anspruch 5:** Das kennzeichnende Merkmal des Anspruchs 5 ist nicht unmittelbar in der E1 offenbart. Die zugrundeliegende Aufgabe ist, eine bessere Abdichtung der Kammer von der Außenluft zu erreichen.

Gelöst wird die Aufgabe dadurch, dass die zweite Kammer ein abdichtendes Auflageteil zur Vergrößerung der Kontaktfläche der zweiten Kammer auf der Haut aufweist. Die beanspruchte Maßnahme ist platt selbstverständlich und beruht nicht auf erfinderischem Zutun.

**Anspruch 6:**
Das Merkmal des Anspruchs 6 ist ebenso platt selbstverständlich. Wenn der Fachmann die Stimulation an möglichst viele (individuelle) Anforderungen anpassen möchte, wird er ohne weiteres erkennen, dass man dazu das Druckfeld verändern kann. Dazu liegt es auf der Hand, die jeweilige Modulation des Druckfeldes mittels eines Bedienfeldes zu verändern.

**Anspruch 7:** Auch in der Beleuchtung ist nichts Erfinderisches zu erkennen. Eine Beleuchtung zur Beleuchtung der zweiten Kammer vorzusehen, liegt nahe, wenn der Fachmann beispielsweise die Aufgabe hat, die präzise Positionierung auch bei schlechten Lichtverhältnissen in der Umgebung zu ermöglichen.

D2065058

Faxeingang: 2016-11-17 12:40:04 AID: D2065058

## BRANDI
RECHTSANWÄLTE

## V. Nebengeordneter Anspruch 8

Der nebengeordnete Anspruch 8 beansprucht ein System, welches eine Stimulationsvorrichtung aufweist, welche gemäß einem der Ansprüche 1 bis 7 ausgebildet ist. Weiter umfasst Gegenstand des Anspruchs 8 eine hierzu getrennt angeordnete Fernsteuervorrichtung, welche die Steuereinrichtung der Stimulationsvorrichtung fernsteuert.

Auch ein tragbares Handgerät mit einer Fernsteuerung zu versehen ist nichts grundsätzlich Neues. Wenn der Fachmann also die Aufgabe hat, eine tragbare Stimulationsvorrichtung zu entwickeln, welche zur Anwendung am Körper gedacht ist und leicht und bequem zu bedienen ist, wird er die Vorrichtung mit einer Fernbedienung versehen.

Der Einspruch ist daher vollumfänglich begründet.

Dr. Kevin Kruse
Rechtsanwalt

D2065058

# Morningside IP

450 Seventh Ave.
Tenth Floor
New York, NY 10123
(212) 643-8800

# TRANSLATOR CERTIFICATION

Date: August 30, 2019

To whom it may concern:

I, Kimberly Scherer, a translator fluent in the German and English languages, on behalf of Morningside Translations, do solemnly and sincerely declare that the following is, to the best of my knowledge and belief, a true and correct translation of the documents listed below in a form that reflects the intention and meaning of the original text.

The document is designated as:
- Opposition against the patent DE 10 2013 110 501 B4

_____
Signature

Kimberly Scherer
_____
Print

## The Leader in Global IP Solutions

From:BRANDI Bielefeld        To: 008921954000    11/17/2016    12:29  #747  P. 001/050

[letter head of Brandi Rechtsanwälte]

**D-33602 BIELEFELD**
Adenauerplatz 1
Tel. +49 (0) 521 - 96535-0
Fax +49 (0) 521 - 96535-99
Court box 59
Email: Bielefeld@brandi.net
Web: www.brandi.net

BRANDI Rechtsanwälte Partnerschaft mbB • Postfach 10 20 73 • 33520 Bielefeld

German Patent and Trademark Office

80297 Munich

**In advance via fax: 089/2195-4000**

| OUR REF | PLEASE REPLY TO | BIELEFELD |
|---|---|---|
| 3624/16 | Dr. Kruse | 11/17/2016 |
| D28/55791 | Tel.: 0521/96535-820 | 23/sl |
|  | Fax: 0521/96535-115 |  |
|  | Secr.: Ms. Lappenbusch |  |
|  | Email: kevin.kruse@brandi.net |  |

**Opposition against the patent DE 10 2013 110 501 B4**

To whom it may concern:

For and on behalf of the company ecoaction GmbH, Hermann-Heinrich-Gossen-Str. 4, 50858 Köln, we hereby file an

**opposition**

against the German patent DE 10 2013 110 501 B4 and request that the patent by fully revoked.

Alternatively, the requisition of a hearing is requested, should it not be readily possible to grant the opposition.

As will be described below, the claimed subject-matter is

i) not based on an inventive step, and

ii) extends beyond the disclosure of the application as filed, and is thus inadmissibly extended.

**BIELEFELD**
DR. HENNING HEUER, NOTARY A D
DR. AXEL BRANDI, NOTARY A D 1
DR. HEINRICH SIEMENS, NOTARY A D
DR. HANS-JÜRGEN HIEKEL 2
DR. JÖRG KÖNIG 5 • 18
DR. GERT MÜLLER-BAUMGARTEN, NOTARY 7
ANDREAS KÖNIG, NOTARY
DR. IRENE VLASSOPOULOU 4 22
ULRICH VORSPEL-RÜTER LL.M 11
DR. JÜRGEN LÖBBE, NOTARY 7 • 10
DR. ANNETTE MUSSINGHOFF-SIEMENS, NOTARY 8
DR. OLIVER KNODEL, NOTARY 6
DR. KEVIN KRUSE, NOTARY 9 18
DR. SEBASTIAN MEYER LL.M., NOTARY 15 19
DR. ANDREA PIRSCHER 2
ACHIM HEINING, NOTARY 6
PATRIZIA FERRARA 18 • 25
DR. CHRISTIAN KOLLMEIER, NOTARY 8
DR. JANA ILCHMANN 6
DR. RAINER KRÜGER 2
TIMO STALLMANN 5
DR. PAUL CZAPLINSKI
DR. CHRISTOPH REMPE 15
BASTIAN REUTER 14
UTE LIENENLÜKE
STEFFEN KURTH LL.M.

**DETMOLD**
DR. HELMUT DRÖGE 1
DR. BERNHARD KÖNIG
FRANK SCHEMBECKER 9
DR. CHRISTIAN BEHRENDT, NOTARY 1
DR. SÖREN KRAMER 2
DR. FRANK WERTHMANN
DR. JENS HOFFMANN, NOTARY 1 6
DR. RÜDIGER OSTEN
BJÖRN MAI

**GÜTERSLOH**
HARTMUT SANDERING, NOTARY 1 7
DR. FRANZ TEPPER LL.M. 13 • 21
DR. HANS-JÜRGEN BUCHMÜLLER
DR. NILS WIGGINGHAUS, NOTARY
DR. SÖRREN KIENE 13 24
DR. BIRGIT JAENICKE 18 • 23
EVA-MARIA GOTTSCHALK LL.M 6
DR. DANIEL KOLLMEYER
CARSTEN CHRSTOPHERY LL.M.

**PADERBORN**
PROF. DR. S. GRONEMEYER (until 2012)
DR. HUBERTUS EUSTERBROCK, NOTARY
PROF. DR. MARTIN DIPPEL 3
DR. NILS GRONEMEYER 3
DR. SANDRA VYAS 2 • 8
DANIELA DEIFUSS-KRUSE 3
DR. JOSEF HEIMANN LL.M., NOTARY 6 • 7
DR. CHRISTOPH JAHN 3 • 16
DR. JÖRG NIGGEMEYER, NOTARY 3
HUBERT SALMEN, NOTARY 1 • 6
NINA DRÜKE
DR. CHRISTOPH WORMS
SIMON SCHMOLLMANN
VICTORIA WESSEL

**MINDEN**
DR. WOLFGANG SUDEROW, NOTAR A D.
FRANZ PIEPER, NOTARY 5 • 7
DR. MANFRED SCHRÖDER 3
ASTRID KAUFHOLD 4 18
ANDREAS WIEMANN 3
BERND KAUFHOLD 2 • 12 • 18
KIRA LEPSIEN 4
DR. ROBERT LEPSIEN, NOTARY 2 • 6
DR. ANDREAS PIEPER 3

**HANNOVER**
DR. JOSEF FULLENKAMP
MICHAEL WEBER-BLANK NLP M. 1 12 • 18
DR. OLIVER EBERT 2
DR. CARSTEN HOPPMANN, NOTARY 6 • 9
RÜDIGER HITZ 1 • 12 • 17
DR. MARIO BERGMANN LL.M. 12
CHRISTOPHER JONES 12
DR. CHRISTOPHER HILGENSTOCK LL.M 2
DR. SVEN HASENSTAB
SEBASTIAN SIESENOP, DIPL.-FINW (FH)
JESSICA MÜSSEL

**PARIS** in cooperation with Wenner Avocats
CHRISTOPH SCHÖDEL 20
UWE AUGUSTIN LL.M 20 21
JENS FÖRDERER LL.M 20

**BEIJING** in cooperation with Grandall Law Firm
DR. NILS WIGGINGHAUS

1 Tax attorney
2 Labor attorney
3 Administrative attorney
4 Family attorney
5 Rental and residential property attorney
6 Commercial and corporate attorney
7 Inheritance attorney
8 Construction and architecture attorney
9 Industrial property attorney
10 Banking and capital market attorney
11 Insurance attorney
12 Criminal defense attorney

14 Medical attorney
15 IT attorney
16 Public procurement attorney
17 Tax consultant
18 Mediator • Economic mediator
19 Data protection auditor
20 Avocat à la cour
21 Attorney at law (New York)
22 Dikigoros (Athens)
23 Licence en droit (Université de Tours)
24 Solicitor (England & Wales)
25 Chancellery manager (all locations)

Exclusive German Member of

[logo] PANGEA NET
International Network of
Independent Law firms

VAT ID No. DE124598917

Partnerschaftsgesellschaft mbB
PR 2830 AG Essen, registered office: Bielefeld

Of the attorneys as listed on this letterhead, only those who are
apparent from the partnership index are partners.

[letter head of Brandi Rechtsanwälte]

The opposition is protected by the following documents:

E1    CN 2153351, enclosed along with a machine translation by the European Patent Office's website (Patenttranslate)

E2    DE 10 2013 110 501 A1 (patent application for the present patent in suit)

E3    Excerpt from Maria M. Kettenbring "erotische Partnermassage" (erotic partner massage), GRÄFE UND UNZER Verlag GmbH; Version: 3rd edition (10 August 2004)

E4    CN 2198900, enclosed along with a machine translation by the European Patent Office's website (Patenttranslate)

## I. Patent in suit

The patent in suit comprises a main claim directed toward a stimulation device as well as formally equivalent claims 8 (system from a stimulation device and remote control) and 9 (use).

Claim 1 has the following features:

1. Stimulation device (**1**) [suitable] for the clitoris (**12**) with:
2. a pressure field generator (**2**) with
   - 2.1    a first chamber (**3**); and
   - 2.2    a second chamber (**4**)
     - 2.2.1   with an opening (**42**) [suitable] to be placed on the clitoris (**12**); and
   - 2.3    a connection element (**5**) that connects the first chamber (**3**) with the second chamber (**4**); and
   - 2.4    a drive unit (**6**) that varies the volume of the first chamber (**3**) in such a way that a stimulating pressure field is generated by the connection element (**5**) in the second chamber (**4**); and
   - 2.5    a control device (**7**) that actuates the drive unit (**6**); and
   - 2.6    wherein the pressure field generated in the second chamber (**4**) consists of a pattern of negative- and positive-pressures, modulated with respect to a reference pressure;
   - 2.7    and wherein the first chamber (**3**) is connected solely with the second chamber (**4**) by the connection element (**5**) so that there is no other connection of the first chamber (**3**) than that to the second chamber (**4**), wherein the first chamber (**3**) has a single opening, and
   - 2.8    wherein the second chamber (**4**) has an opening (**51**) from the connection element (**5**) into the second chamber (**4**), and
3. wherein the stimulation device (**1**) has no valves, and
4. wherein the stimulation device (**1**) is a portable hand-held device with a battery (**76**),

**characterized in that**

5.1    the connection element (**5**) is rigid, and
5.2    is designed as a straight channel with nozzle effect, of which
    5.2.1    the opening into the first chamber (**3**) and the opening (**51**) into the second chamber (**4**) are oriented to one another so that a media flow is directed at the clitoris (**12**) upon compression of the first chamber (**3**) due to the orientation of the opening (**51**) and the connection element (**5**),
    5.2.2    wherein the opening (**51**) of the connection element (**5**) is arranged opposite the clitoris (**12**) through the second chamber (**4**).

## II. Inadmissible extension

The subject-matter of claim 1 is inadmissibly extended.

a.   Feature 5.2, which was contended from the description during the course of the examination procedure, claims a "straight channel." This feature is not mentioned anywhere in the description. The illustrations show the channel 5 and its boundary lines as "straight," though because these representations are sectional views, it cannot clearly be taken from the drawings that the channel illustrated therein may not exhibit any curves. It also speaks against the assumption "straight" that Figure 9 shows an embodiment anyway in which curved channels (52) are represented. Thus, the feature of claim 5.2 does not clearly result from the overall disclosure.

b.   In feature 5.2 a "straight channel with nozzle effect" is also claimed in the granted patent. This is not originally disclosed as such. Originally disclosed is (compare para. 29 of the A1 application, E2, page 5, left column, beginning with line 8):
"For example, the connection element in a stimulation device intended for the clitoris may have a <u>single passageway with nozzle effect</u> on the clitoris glans between the first and second chamber…"

A single passageway does not necessarily have to be designed as a channel; instead, it can also merely be a hole. For this reason, this formulation in feature 5.2 is also inadmissibly extended.

c.   In feature 5.1 it is stated that "the connection element (5) is rigid…" This formulation is also not supported by the original disclosure or the patent application. Originally disclosed is (E2, para. 89):

[letter head of Brandi Rechtsanwälte]

"…FIG. 11 shows a second embodiment of the invention with a locally separated arrangement of chambers 3 and 4 of pressure field generator 2. Chambers 3 and 4 are connected via an extended <u>connection element</u> 5, which can be a longer flexible hose or even a <u>rigid pipe</u>…"

This passage was generalized in the granted claim 1 to a *<u>rigid</u> connection element (5)*. Disclosed, however, is merely a rigid *pipe*.

Feature 5.1 is thus also not supported by the description and therefore inadmissibly extended.

d.  Feature 5.2 was changed in the granted claim 1 such that the connection element is designed as <u>a straight channel</u>. In feature 2.7, it is also stated:

"wherein the first chamber (**3**) is connected solely with the second chamber (**4**) by the connection element (**5**) so that there is no other connection of the first chamber (**3**) than that to the second chamber (**4**), wherein the first chamber (**3**) has a single opening."

In other words claim 1 claims a "connection element <u>with **only** a straight channel</u>." A plurality of channels is accordingly just as excluded as a plurality of other passages.

The formulation of claim 1 conflicts with the original disclosure, however, in which it is stated in paragraph 86 of E2:

"While the embodiment of connection element 5 with *<u>only one channel</u>*, as described in conjunction with FIG. 6, leads to the formation of a strongly concentrated media- or airflow on a target area, the embodiment of connection element 5 shown in FIG. 9 allows the media- or airflow to be distributed to a plurality of target areas, …"

*"Only one <u>straight</u> channel"* is thus not disclosed, only the two alternatives that are described in paragraph 86.

**III. Patentability of claims 1 and 9**

E1 discloses the closest prior art. The only figure is reproduced below (reference numerals from the patent application in suit were labeled with the prefix "SP"):



The following can be gathered from the machine translation and the illustration depicted above: it is a portable device (fourth paragraph of the machine translation) with an electromagnet 5 and a lever 3, on the end of which a permanent magnet 4 is provided. This lever 3 is connected approximately centrally between the magnet on the free end of the lever and the connection point of the lever with the one face of a balloon or body 2 that can be filled with air. If the electromagnet is switched on, the lever begins to oscillate back and forth through its magnetic

[letter head of Brandi Rechtsanwälte]

interaction with the electromagnet 5 mediated by the permanent magnet 4. The body 2 is compressed and expanded (direction X) so that air in the interior (here, gas) is also intermittently compressed. On the face of the body 2 opposite the lever is an outlet nozzle (nozzle 1), through which the compressed air can escape the body 2. In the illustration the outlet nozzle 1 is partially displayed in a cross section, as is the body 2. The body 2 has a hollow space SP3 (first chamber) that absorbs the gas or the air. The outlet nozzle 1 has a further hollow space on the side facing away from the hollow space SP3 with an outlet opening SP42, so if the body 2 is compressed, the air escapes via the outlet opening SP42 to the outside. Since this occurs intermittently, a massage effect is thus achieved. The hollow space SP3 of the body 2 is connected with the hollow space SP4 in the outlet nozzle 1 via a channel SP5, so if the air in the hollow space SP3 is compressed, the opening SP51 forms the only possibility by which air can arrive from the hollow space SP3 to the opening SP42.

Thus, if the disclosure from E1 is compared with the above feature analysis, the following image results:

E1 discloses a stimulation device (compare English abstract "health massage device," wherein a massage device is designed according to its use to stimulate tissue or muscles), feature 1. The device from E1 has a pressure field generator; the interaction of the magnets 4 and 5 described above provides for a periodic motion of the lever and thus a periodic pressure change in the hollow body 2, feature 2. According to features 2.1 and 2.2 a first chamber (SP3) and a second chamber (at least the part SP4 between the openings SP51 and SP42), namely in the outlet nozzle 1, are also provided. The opening SP42 is also suitable, in principle, to be placed on the clitoris, feature 2.2.1. According to feature 2.3 there is a connection element, namely the channel SP5, which connects the two chambers SP3 described above and the area SP4 with one another. The drive unit according to feature 2.4 is formed by the two magnets 4 and 5 as well as the lever 3. The corresponding function is described above. A control device is also implicitly provided for, which must supply the electromagnet 5 with a current (compare connections on the left side in the drawing above); otherwise a back and forth motion of the lever 3 would not be possible, so feature 2.5 must be at least implicitly disclosed.

A periodic pattern with pressure oscillations of negative- and positive-pressures develops from the back and forth motion, according to feature 2.6. Positive-pressures develop upon compressing the body (lever 3 to the right) 2; negative-pressures develop after corresponding

decompression (lever 3 to the left). According to feature 2.7 the channel SP5 is the only connection between the two chambers. The air can thus only escape the body 2 via the channel SP5. Feature 2.8 is thus also disclosed in E1 because the opening SP51 is encompassed by the second chamber SP4.

Valves cannot be recognized in the drawing and are also not described in the description from E1. Thus, the device likely gets by without valves. Feature 3 from E1 is therefore also disclosed. According to feature 4 the massage device of E1 is a portable hand-held device (compare third paragraph of the machine translation "small, easy to carry…"). E1 only lacks an explicit mention of the partial feature that the portable hand-held device has a battery.

The features of the characterizing feature can be largely found in E1 again:

The channel SP5 is not explicitly described in E1, however. It runs straight between the hollow space SP3 and the opening of the nozzle. It is demonstratively clear that the channel has a straight, cylinder-shaped form. This is also rigid in the sense of the patent, because the channel would be deformable (particularly compressible) if a proper function could no longer be guaranteed. In principle, the patent application itself does not explain what exactly is meant by "rigid." Only para. 96 speaks of a rigid pipe in contrast to a flexible hose. Thus, the term is open to interpretation. Since the channel SP5 is part of the component 1 in E1, and the component 1 in the area of the channel SP5 is relatively thick-walled in comparison to the area of the nozzle opening SP42, it is thus expressed that the arrangement should in any case be essentially more rigid in the area of the channel SP5 than in the area of the opening, which should be placed on a body part. In this respect the feature 5.1 is also known from E1.

This also applies to feature 5.2. In the drawing above the channel SP5 is recognizably straight and has nozzle effect; otherwise, the component 1 would likely not be designated with the word nozzle. This results from the physical considerations: the hollow space SP3 has an essentially larger cross section in comparison with the channel SP5 so that an increase in the pressure in the hollow space SP3 not only produces an expansion of the gas in the hollow space SP3 toward the opening SP42, but also an acceleration of the airflow due to a tapering cross section in the channel SP5.

[letter head of Brandi Rechtsanwälte]

The feature 5.2.1 arises from E1 provided that the hand-held device is arranged in front of the clitoris. The functionality and the flow path are further described above.

This also applies to feature 5.2.2. Provided that the hand-held device is arranged in front of a clitoris, the opening SP51 is arranged opposite the clitoris through the second chamber SP4.

The subject-matter claimed in claim 1 of the patent in suit thus differs from the subject-matter that is disclosed in E1 only in that:

a)  the claimed device should be suitable for use for a clitoris (specified purpose);
b)  a battery is present.

These two features do not have any synergy effect; rather, they achieve different partial objectives. The battery allows an embodiment of the device as a hand-held device. That is obvious on its own, because if the person skilled in the art has the task of providing a device already designed as a hand-held device with energy, there remains either the possibility of using a rechargeable battery or instead inserting batteries. If the person skilled in the art does not readily understand this for the hand-held device disclosed in E1, it is nevertheless suggested to use batteries in a hand-held device.

The specified purpose under a) also does not yield a surprising effect. In our opinion no technical feature is provided for the use "to massage the area of the clitoris" that limits the range of protection in any way. Thus, no objective features are contained in claim 1 through which it is expressed how the stimulation device differs from other stimulation devices (massage devices) that are not explicitly provided for massaging the intimate area. It must therefore be assumed that the massage device disclosed in E1 is also in principle suitable to be used in the area according to the invention.

In the last sentence in the abstract of E1 it is mentioned that air pressure is used through pulsation to stimulate meridian points. On such meridians, which are an important component of oriental medicine and which can be referred to as energy lines, there are stimulation points that can be stimulated through acupuncture or acupressure (= massage). This also applies to the stimulation of erogenous zones, of course; compare document E3.

[letter head of Brandi Rechtsanwälte]

Since it is not unusual to use massage devices for massages (on whatever body part), the person skilled in the area will also consider the device known from E1 to be suitable for the purpose claimed according to the invention. This also applies considering that the present patent application (see A1 document) was originally directed at a stimulation device for any body part.

Thus, the subject-matter of claim 1, and therefore the subject-matter of the use claim 9, is not based on an inventive step.

This applies similarly to E4: here, too, two chambers 9, 12 are disclosed, wherein the first chamber 9 has a varying volume through a diaphragm drive 10, whereby a stimulated pressure field is generated. The opponent reserves the right to provide greater detail should this be relevant to the case.


## IV. Dependent clauses

No original inventive meaning can be taken from the dependent claims.

Claim 2: At least the first alternative of claim 2, wherein the second chamber is produced using a flexible material, could be anticipated by the reference in E1 (abstract) to a "rubber nozzle (1)" because at least in the area of the outlet opening SP42 the rubber material is comparably thinly designed; thus, the nozzle is flexible there. The remaining alternatives only contain structural embodiments that the person skilled in the art provides if he is given a corresponding task.

Claim 3: The characterizing feature of claim 3 is not directly disclosed in E1. According to the patent in suit the purpose of having only one piece is to avoid hygienically questionable gaps [0089].

For a person skilled in the art to whom E1 is known, it is suggested to avoid gaps that necessarily arise from connecting parts. This can occur when multiple materials are connected in a production process (e.g. injection molding) or when the characteristics of the parts allow it to be produced even out of one material, thus as only one piece. One-piece design is thus suggested for the person skilled in the art with regard to the sought-after objective.

[letter head of Brandi Rechtsanwälte]

Claim 4: The illustration of E1 shows a second chamber with a connection element that is inserted onto the first chamber. This assembly can also be separated again so that the second chamber can be exchanged. The questionable feature therefore already results from the citation E1.

Claim 5: The characterizing feature of claim 5 is not directly disclosed in E1. The underlying objective is to achieve a better seal of the chamber against the outside air.

The objective is achieved in that the second chamber has a sealing seating element to enlarge the contact area of the second chamber on the skin. The claimed measure is, of course, flat and is not based on an inventive step.

Claim 6:
The feature of claim 6 is also evidently flat. If the person skilled in the art would like to adapt the stimulation to as many (individual) demands as possible, he will readily recognize that the pressure field can be varied. It is self-evident to change the respective modulation of the pressure field using a control panel.

Claim 7: There is also nothing inventive to be found in the lighting. It is suggested to provide lighting to illuminate the second chamber if the person skilled in the art has the task, for example, to allow precise positioning even during poor light conditions in the environment.

## V. Equivalent claim 8

The equivalent claim 8 claims a system with a stimulation device that is designed according to one of the claims 1 to 7. The subject-matter of claim 8 furthermore comprises a separately arranged remote control device that remotely controls the control device of the stimulation device.

Providing a portable hand-held device with a remote control is also not novel in principle, so if the person skilled in the art has the task of developing a portable stimulation device that is conceived to be used on the body and is easy and comfortable to use, he will provide for the device with a remote control.

From:BRANDI Bielefeld        To: 008921954000    11/17/2016    12:29  #747   P. 0011/050

[letter head of Brandi Rechtsanwälte]

The opposition is thus fully justified.

[signature]

Dr. Kevin Kruse

Attorney at Law

# *Exhibit 25*



Anlage E1

# Patent Translate
**Powered by EPO and Google**

## Notice

This translation is machine-generated. It cannot be guaranteed that it is intelligible, accurate, complete, reliable or fit for specific purposes. Critical decisions, such as commercially relevant or financial decisions, should not be based on machine-translation output.

## DESCRIPTION CN2153351

The new "gas health massage" is a new medical equipment, including an electromagnet (5) and the magnet (4) cooperating with one end connected to the airbag (2) of the magnet (4) is connected to the lever (3), an airbag (2) is connected to the other end of the movable rubber nozzle (1). The utility model utilizes pulsating pressure to stimulate the meridian points, hypertension, heart disease, cerebral thrombosis, coronary heart disease, digestive system, nervous system, and all kinds of pain have a better effect.

The utility model "Gas health massage" is a new kind of health care equipment. Chinese medicine is based on the meridian theory, the use of modern science and fluid mechanics advanced technology developed from.

Prior art solutions for health care are many, such as acupuncture, cupping, moxibustion, massage and qigong. Acupuncture patients with pain and fear for some patients the needle does not apply; cupping increase or decrease the amount of stimulation difficult; moxibustion temperature is not easy to grasp; massage, chiropractor labor-intensive, and sometimes cause pain to the patient; qigong, and by training hard to take effect. The present applicant has studied meridian painless treatment, micro-motor or mechanical, electronic, electromagnetic devices, rotary motion, pulsating air pressure driven piston reciprocating motion of the piston sleeve in the corresponding structure. The therapy device structure is complicated and costly, noisy when used.

The utility model is intended to provide a small, easy to carry and easy to operate gas health massage.

The present invention is an electromagnet (5) and the magnet (4) cooperating with the magnet (4) is connected to a lever (3) is connected to one end of the balloon (2), the airbag (2) the other end of the rubber mouth (1) Activity connection. Rubber nozzle (1) is a straight or tapered mouth mouth.

The main structure of the present invention to drive the electromagnet, for example, as shown in FIG electromagnet (5) drive magnet (4), the lever (3), the airbag (2) of the wall is reciprocated by the balloon (2) on the rubber mouth (1) contacting muscle body. Power pulsed pressure to stimulate the meridian points in order to achieve therapeutic purposes.

The utility model as compared with the prior art having a balloon instead of a piston and cylinder, simple structure, small size, low cost and no noise pollution, but also a plurality of machine treatment probe and so on.

Figure 1 is a schematic view of a gas-care massager.

Where: 1 - rubber tip, 2 airbags, 3-lever, 4 magnets, 5- electromagnet.



Abstract CN 2153351Y

[EN] The pneumatic health massage device of the utility model is a novel medical device, wherein, an electric magnet (5) cooperates with a magnet (4). A lever (3) connected with the magnet (4) is connected with one end of an air bag (2). The other end of the air bag (2) is movably connected with a rubber nozzle (1). The utility model uses air pressure of pulsation to stimulate meridian points. The utility model produces good curative effect on high blood pressure, heart disease, cerebral thrombosis, coronary heart disease, digestive system, nervous system and all kinds of pains.

14842251961926414667

[19] 中华人民共和国专利局

[11] 授权公告号 CN 2153351Y



[12] 实用新型专利说明书

[21] ZL 专利号 92219988.4

[45] 授权公告日　1994 年 1 月 19 日

[51] Int.Cl⁵

A61H　9/00

[22] 申请日　92.10.22　[24] 颁证日　93.12.11

[73] 专利权人　管程宵
　　　地址　250001 山东省济南市乐山南区 9 号楼 2
　　　　　单元 103 室

[72] 设计人　管程宵

[21] 申请号　92219988.4

说明书页数:　　　　　附图页数:

[54] 实用新型名称　气体保健按摩器

[57] 摘要

　　本新型"气体保健按摩器"是一种新的医疗仪器,其中电磁铁（5）与磁铁（4）相配合,与磁铁（4）相连的杠杆（3）与气囊（2）的一端相连,气囊（2）的另一端与橡胶嘴（1）活动连接。本实用新型利用脉动气压刺激经络穴位,对高血压、心脏病、脑血栓、冠心病、消化系统、神经系统以及各种疼痛均有较好疗效。



**(BJ)第 1452 号**



# 权　利　要　求　书

1、　气体保健按摩器，其特征在于：电磁铁（5）与磁铁（4）相配合，与磁铁（4）相连的杠杆（3）与气囊（2）的一端相连，气囊（2）的另一端与橡胶嘴（1）活动连接。

2、根据权利要求1所述的 气体保健按摩器，其特征在于：所说的橡胶嘴（1）为直嘴或变径嘴。

Case 1:19-cv-01227-GBW    Document 53-1    Filed 12/22/20    Page 394 of 527 PageID #: 1982

# 说　　明　　书

## 气体保健按摩器

本实用新型"气体保健按摩器"是一种新的医疗保健仪器，是根据祖国医学的经络学说，采用现代科学流体力学的先进技术研制而成的。

现有技术用于医疗保健的方案很多。如针刺、拔罐、温灸、推拿按摩、气功等。针刺病人有痛感，且对有的怕针的病人不适用；拔罐刺激量难增减；温灸温度不易掌握；推拿、按摩医生劳动强度大，而且有时给病人造成痛苦；气功，非经训练难以取效。本申请人曾研究过经络无痛治疗仪，采用微电机或机械、电子、电磁装置，将旋转运动，通过相应的结构带动活塞在活塞套中往复运动产生脉动气压。该治疗仪结构复杂、成本高。使用时噪音较大。

本实用新型的目的是提供一种体积小、便于携带、操作方便的气体保健按摩器。

本发明利用电磁铁（5）与磁铁（4）相配合、与磁铁（4）相连的杠杆（3）与气囊（2）的一端相连，气囊（2）的另一端与橡胶嘴（1）活动连接。橡胶嘴（1）为直嘴或变径嘴。

本发明主要结构以电磁铁驱动为例，如图所示电磁铁（5）驱动磁铁（4）、杠杆（3）、气囊（2）的壁作往复运动，由气囊（2）上的橡胶嘴（1）接触肌

—1—



1484225196192641466714842251961926414667

## 说　　明　　书

体。接通电源产生脉动气压，刺激经络穴位，以达治疗目的。

本实用新型与现有技术相比具有以气囊代替了活塞及气缸。结构简单、体积小、成本低及无噪音污染。还可一机多个治疗探头等优点。

图1是气体保健按摩器的示意图。

其中：1—橡胶帽。2—气囊。3—杠杆。4—磁铁。5—电磁铁。



说　明　书　附　图



1004
85.4

*Exhibit 26*

# KUHNEN & WACKER
Patent- und Rechtsanwaltsbüro



**K&W**

Deutsches Patent- und Markenamt
80297 München

RAINER A. KUHNEN (1974-2015 †)
PA  EP  ETD  Dipl.-Ing.
STEPHAN KOPP, LL.M.
PA  EP  ETD  EPL  Dipl.-Ing.
RAINER K. KUHNEN, LL.M.
PA  EP  ETD  Dipl.-Ing.
DR. MICHAEL TOPF
PA  EP  ETD  Dr. rer. nat.  Dipl.-Phys.
DR. CHRISTIAN THOMAS
RA  Dr. iur.
DR. MICHAEL ZEITLER
PA  EP  ETD  Dr. rer. nat.  Dipl.-Phys.
DETLEF v. AHSEN
PA  EP  ETD  Dipl.-Ing.
DR. FLORIAN KÜHBECK
PA  EP  ETD  Dr.-Ing.  Dipl.-Ing.  Dipl.-Chem
DR. JÖRG DORNER
PA  EP  ETD  Dr.-Ing.  Dipl.-Ing.
BIRGIT REITER
RA
SENKO YOSHIDA
JPA  EP
CHRISTOPH LÖSCH
PA  EP  ETD  KLN  Dipl.-W.-Ing.
DR. STEFAN MEDERLE-HOFFMEISTER
PA  EP  ETD  Dr. rer. nat.  Dipl.-Phys.
MALGORZATA GIZINSKA-SCHOHE
PPA  EP  M.Sc.  Ch.E.
CHRISTOPH STRAßL
PA  ETD  Dipl.-Ing.
DR. ULRICH C. WAGNER
PA  EP  ETD  Dr. techn.  Dipl.-Ing. (FH)
CHRISTIAN FLÜGGE
RA
JAN KSIENZYK
PA  ETD  Dipl.-Biochem.
VERONIKA SCHWEPLER
RA

OF COUNSEL:
JAMES A. FORSTNER
Attorney at Law PhD (chem), JD
Admitted Delaware, D.C., USPTO

PA  Patentanwalt/Patent Attorney
EP  European Patent Attorney
ETD European Trademark and Design Attorney
EPL European Patent Litigation Diploma (CEIPI)
JPA Japanese Patent Attorney
PPA Polish Patent Attorney
RA  Rechtsanwalt/Attorney at Law
KLN Kanzlei Lösch Nürnberg

POST/MAIL:
POSTFACH/P.O.BOX 1964
D-85319 FREISING/GERMANY

ANSCHRIFT/ADDRESS:
PRINZ-LUDWIG-STRASSE 40A
D-85354 FREISING/GERMANY

TELEFON  +49 8161 608-0
FAX      +49 8161 608-100
E-MAIL   info@kuhnen-wacker.com
INTERNET www.kuhnen-wacker.com

VAT-Nr.: DE 813 496 485

18. September 2017          RKJ/UWN/VPO
[File: 101603434.docx]

Amtliches Zeichen : 10 2013 110 501.7
Unser Zeichen     : 17/LE11K17E/DE
Einsprechende     : ecoaction gmbh u.a.
Patentinhaber(in) : NOVOLUTO GmbH

_____

Gegen das Patent DE 10 2013 110 501 B4 der Firma NOVOLUTO
GMBH haben die Firmen Fun Factory GmbH (im Folgenden
Einsprechende 1) und ecoaction GmbH (im Folgenden Einsprechende 2)
Einspruch erhoben.

Die Einsprechende 1 stützt Ihren Einspruch auf

- unzulässige Erweiterung des Gegenstands des Anspruchs 1
  gegenüber dem Inhalt der ursprünglichen Anmeldung,

- fehlende Neuheit gegenüber der Druckschrift **DE 42 43 876 A1**
  (in der Nomenklatur der Einsprechenden 1 als D8 bezeichnet),
  sowie

- fehlende erfinderische Tätigkeit gegenüber der Kombination von
  der Druckschrift **US 2008/0304984 A1** (in der Nomenklatur der
  Einsprechenden 1 als D9 bezeichnet) mit der Druckschrift

[File:101603434.docx // LE11K17E]   16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



**WO 00/28939 A2** (in der Nomenklatur der Einsprechenden 1 als D10 bezeichnet).

Die Einsprechende 2 stützt Ihren Einspruch auf

- unzulässige Erweiterung des Gegenstands des Anspruchs 1 gegenüber dem Inhalt der ursprünglichen Anmeldung, sowie

- fehlende erfinderische Tätigkeit gegenüber der Druckschrift **CN 2153351** (in der Nomenklatur der Einsprechenden 2 als E1 bezeichnet).

- Im Übrigen verweist die Einsprechende 2 pauschal auf die **CN 2198900** (in der Nomenklatur der Einsprechenden 2 als E4 bezeichnet). Es wird angemerkt, dass die E4 zwar in der Einspruchsschrift aufgeführt ist, aber weder der Patentinhaberin noch dem Deutschen Patent- und Markenamt vorliegt.

**Es wird beantragt, die Einsprüche als unbegründet zurückzuweisen und das Patent in vollem Umfang aufrecht zu erhalten.**

**Hilfsweise** wird um **Anberaumung einer Anhörung** gebeten, sollte der Aufrechterhaltung des angegriffenen Patents nicht ohne weiteres stattgegeben werden können.

Der Antrag wird wie folgt begründet:

**A.  Beweismittel:**

**A1: Endurteil des Landgerichts München I zum Aktenzeichen: 21 O 22538/15**
**A2: Beglaubigte Übersetzung der CN 2153351 in die englische Sprache**

**B.  Zum angegriffenen Patent DE 10 2013 110 501 B4**

Das Patent DE 10 2013 110 501 B4 betrifft eine Vorrichtung für die Klitoris, die mittels indirekter Stimulation der Klitoris einen Orgasmus zum sexuellen Vergnügen herbeiführen soll. Zu diesem Zweck beaufschlagt die beanspruchte Stimulationsvorrichtung die Klitoris mit einem Druckfeld aus Unter- und Überdrücken, welches in einer sogenannten zweiten Kammer erzeugt wird, die über der Klitoris



[File:101603434.docx // LE11K17E]     16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



aufgesetzt wird. Dabei wirken abwechselnd ein Unterdruck und ein Überdruck auf die Klitoris ein, um sie sowohl in ihrem Blutfluss anzuregen als auch eine stimulierende Kraft auf sie auszuüben.

## C.  Aufgabenstellung des angegriffenen Patents

Die patentgemäße Vorrichtung soll einer Vielzahl von besonderen Problemstellungen, die ihren Hintergrund in der besonderen Anatomie und der besonderen Empfindungsqualität der Klitoris haben, Rechnung tragen. So soll eine direkte Stimulation durch mechanischen Kontakt beispielsweise eines Auflegevibrators vermieden werden, da diese direkte Stimulation zu Irritationen und Hautreizungen führen kann. Andere Vorrichtungen, welche beispielsweise mittels Vakuumtechnik den Blutfluss erhöhen sollen, führen zu Gewöhnungseffekten und können zudem eine Verletzungsgefahr mit sich bringen. Oftmals sind Vorrichtungen zur Anwendung am menschlichen Körper mittels Luftdruck in ihrem Aufbau komplex und somit unhygienisch. Die Vorrichtungen des Stands der Technik erzeugen zudem regelmäßig einen nachteilhaften Abtransport von Scheidenflüssigkeit.

Daraus ergibt sich die Aufgabe der Erfindung, eine Vorrichtung vorzusehen, welche einen einfachen Aufbau aufweist, in der Verwendung einfach und sicher ist (vgl. Absatz [0023]), welche eine effektive  Stimulation eines Körperteils hervorrufen kann (vgl. Absatz [0024]), welche ein Austrocknen der Schleimhäute verhindert, hygienisch ist, und Gewöhnungseffekte vermeidet (vgl. Absatz [0025]).

Festzuhalten ist, dass sich keine der im Einspruchsverfahren befindlichen Druckschriften mit dieser oder einer ähnlich komplexen Aufgabenstellung beschäftigt.

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



## D.  Merkmalsgliederung

Zur Lösung der vorstehend genannten Probleme sieht der Anspruch 1 des angegriffenen Patents eine Vorrichtung vor, die gemäß nachstehender Merkmalsgliederung dargelegt ist:

*1. Stimulationsvorrichtung (1) für die Klitoris (12), aufweisend:*

*2. eine Druckfelderzeugungseinrichtung (2) mit:*

*3. einer ersten Kammer (3); und*

*4. a) einer zweiten Kammer (4)*
*4. b) mit einer Öffnung (42) zum Aufsetzen über die Klitoris (12); und*

*5. einem Verbindungselement (5), welches die erste Kammer (3) mit der zweiten Kammer (4) verbindet; und*

*6. einer Antriebseinheit (6), welche das Volumen der ersten Kammer (3) derart verändert, dass über das Verbindungselement (5) in der zweiten Kammer (4) ein stimulierendes Druckfeld erzeugt wird; und*

*7. eine Steuereinrichtung (7), welche die Antriebseinheit (6) ansteuert; und*

*8. wobei das in der zweiten Kammer (4) erzeugte Druckfeld aus einem Muster von Unter- und Überdrücken besteht, welche auf den Normaldruck aufmoduliert sind; und*

*9. wobei die erste Kammer (3) über das Verbindungselement (5) ausschließlich mit der zweiten Kammer (4) verbunden ist, somit keine andere Verbindung der ersten Kammer (3) als diejenige zur zweiten Kammer (4) besteht, womit die erste Kammer (3) eine einzige Öffnung aufweist, und*



[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH

**10.** *wobei die zweite Kammer (4) eine Öffnung (51) von dem Verbindungselement (5) in die zweite Kammer (4) aufweist, und*

**11.** *wobei die Stimulationsvorrichtung (1) keine Ventile aufweist, und*

**12.** *wobei die Stimulationsvorrichtung (1) ein tragbares Handgerät mit einer Batterie (76) ist,*

*dadurch gekennzeichnet, dass*

**13. a)** *das Verbindungselement (5) starr ist, und*
**13. b)** *als ein gerader Kanal mit Düsenwirkung ausgestaltet ist (13c),*

**14.** *dessen Öffnung in die ersten Kammer (3) und dessen Öffnung (51) in die zweite Kammer (4) zueinander ausgerichtet sind, so dass eine Medienströmung bei Kompression der ersten Kammer (3) durch die Ausrichtung der Öffnung (51) und des Verbindungselements (5) auf die Klitoris (12) gerichtet ist,*

**15.** *wobei die Öffnung (51) des Verbindungselements (5) der Klitoris (12) durch die zweite Kammer (4) hindurch gegenüberliegt.*

## E.   Auslegung des angegriffenen Anspruchs 1 durch den Fachmann

1) Der zuständige Fachmann, welcher mit vorstehend definierter Aufgabe betreut werden würde, ist ein Techniker mit Berufserfahrung in der Entwicklung von Sexspielzeug (vergleiche auch das als Beweismittel A1 beigefügte Endurteil des Landgerichts München I zum Aktenzeichen: 21 O 22538/15, Seite 19 unten).

2) Der Gegenstand des Anspruchs 1 betrifft eine Stimulationsvorrichtung für die Klitoris mittels einem Druckfeld aus Über- und Unterdrücken, die eine klitorale sexuelle Erregung (=Stimulation für die Klitoris im Sinne des angegriffenen Patents) bis zum Orgasmus (Klimax) ermöglicht (vgl. auch Absatz [0007]). Diese Vorgabe



wird der Fachmann bei der Dimensionierung der anspruchsgemäßen Merkmale berücksichtigen. Insbesondere wird er die Druckbereiche des Druckfelds, die Größe der zweiten Kammer und auch das Verhältnis der Volumen der beiden Kammern 3,4 entsprechend einrichten [vgl. Absatz [0028], [0035], [0036], Fig. 4 bis 6 des Streitpatents).

Dazu wird in der Beschreibungseinleitung (vgl. [0008] ff.) weiter erläutert, dass eine Therapie nicht als Stimulation im Sinne des Patents zu verstehen ist. Insofern grenzt sich der Gegenstand des angegriffenen Patents bereits im Obergriff („Stimulationsvorrichtung für die Klitoris") gegenüber allgemeinen therapeutischen Hautbehandlungsvorrichtungen ab.

Mit anderen Worten bedeutet das für die Auslegung des Anspruchs 1, dass Vorrichtungen, welche ausgewiesenermaßen nur der allgemeinen oder medizinischen Hautbehandlung dienen, sich nur dann zur beanspruchten Klitoral-Stimulation eignen, wenn eine entsprechende Dimensionierung des Antriebs, der Ansteuerung und der Geometrie der Druckfelderzeugungseinrichtung, insbesondere der zweiten Kammer, vorgesehen wird, die sich stark von der üblichen Dimensionierung bei herkömmlichen Hautbehandlungsvorrichtungen unterscheidet, da die Klitoris ein komplexes erektiles und äußerst empfindliches Sexualorgan ist (siehe auch https://de.wikipedia.org/wiki/Klitoris). Wird eine solche Dimensionierung aber nirgendwo offenbart, sind solche herkömmliche Hautbehandlungsvorrichtungen offensichtlich ungeeignet zur Klitoral-Stimulation.

Entsprechend sind die Effekte einer Stimulation in Form einer (Druck-)Massage, d.h., in Form einer Krafteinwirkung, für die weibliche Klitoris im Streitpatent beispielsweise in den Absätzen [0032, 0046, 0076, 0084, 0098] näher beschrieben. Zudem ist die Klitoriseichel als eine besonders empfindliche erogene Zone [0046] bekannt, mit der auch kleinste Änderungen oder Anpassungen des Druckfelds verspürt werden können.

3) Eine erste Kammer 3 im Sinne des Anspruchs 1 ist volumenveränderlich (Merkmal 1 in Verbindung mit Merkmal 6).

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



4) Eine zweite Kammer im Sinne des Anspruchs 1 ist *„zum Aufsetzen über die Klitoris"* geeignet. In einer solchen zweiten Kammer muss eine indirekte Stimulation der Klitoriseichel erfolgen können. Gemäß Absatz [0032] wird der erfindungsgemäße stimulierende

> *„...Massageeffekt indirekt, also ohne direkte Berührung der zu stimulierenden Hautpartie durch einen festen Körper... "*

bewirkt.

Folglich muss die die zweite Kammer derart dimensioniert sein, dass diese die übliche Klitoriseichel **berührungsfrei umfassen** kann (vgl. ebenso Fig. 4-6 des Streitpatents, in Verbindung mit dem Absatz [0007] „indirekt")

Konsequenterweise wird dem Fachmann durch die beanspruchte Eignung für die Klitoral-Stimulation eine Minimalgröße der zweiten Kammer 4 vermittelt, die durch die anatomisch vorgegebene durchschnittliche Größe der Klitoris vorgegeben ist (vgl. Fig. 4 des angegriffenen Patents). Damit einhergehend muss die Öffnung 42 einen Mindestdurchmesser aufweisen, der sich eignet, eine durchschnittlich große Klitoriseichel aufzunehmen. Selbstverständlich darf der Durchmesser der Öffnung 42 auch nicht zu groß bemessen werden, da sonst ein Aufsetzen der zweiten Kammer zwischen den Schenkeln der Frau nicht mehr möglich ist. Insofern scheiden klar zu große oder klar zu kleine Kammern, also solche, die nicht zum Aufsetzen über eine Klitoris geeignet sind, als zweite Kammern im Sinne des Streitpatents aus.

Eine vergleichbare implizite Dimensionierung wird auch in dem in den ursprünglichen Anmeldungsunterlagen genannten Stand der Technik US 6 099 463 (von der Einsprechenden 1 als D5 eingeführt) in Spalte 3, Zeile 5 und 6 definiert, wonach eine *„suction chamber 14 is sized for .. fitting around a clitoris ... "*; also eine Saug-Kammer zum Aufsetzen über die Klitoris als *um die herum Klitoris passend* dimensioniert ist.

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



5) Ein Verbindungselement 5 im Sinne des Anspruchs 1 verbindet die erste und die zweite Kammer 3,4 ausschließlich. Daher führt anspruchsgemäß die eine Öffnung des Verbindungselements 5 in die erste Kammer 3, und die andere Öffnung 51 des Verbindungselements 5 in die zweite Kammer 4. Somit ergibt sich aus dem Anspruch weder implizit noch explizit, dass das Verbindungselement 5 anderweitige Elemente als die erste und die zweite Kammer verbindet (vgl. Merkmal 9).

Zudem ist das Verbindungselement, anders als etwa bei den bekannten Schlauchverbindungen, als „starr" beansprucht. Entsprechend unterscheidet das angegriffene Patent an mehreren Stellen zwischen starr und flexibel. Zudem wird dem Fachmann durch die Starrheit des Verbindungselement implizit offenbart, dass auch die relative Position der beiden Kammern zueinander ortsunveränderlich ist: Dies ergibt sich für den Fachmann auch aus der beanspruchten Ausgestaltung als Handgerät, was implizit eine ortsfeste Aufnahme der ersten und zweiten Klammern der Druckfelderzeugungseinrichtung in einem Gehäuse bedingt (vgl. Figuren 1 bis 3).

Die Ausrichtung der Öffnungen des Verbindungselements 5 in die ersten und zweiten Kammern 3, 4 (Merkmal 14) kann mit Hilfe der Fig. 4 bis 6 einfach nachvollzogen werden. Die Ausrichtung der Öffnungen hat auch strömungstechnisch, d.h. funktional, eine Bedeutung. Funktional müssen demnach die Öffnungen der ersten und der zweiten Kammer derart angeordnet sein, dass bei Kompression/Expansion der ersten Kammer 3 die Strömung durch die eine Öffnung jeweils auf die andere Öffnung gerichtet ist. Ein stufenförmiger Versatz der Öffnungen des Verbindungselements zueinander über deren Querschnitt hinaus ist demgemäß nicht mehr anspruchsgemäß.

Ersichtlich falsch ist daher die Auslegung des **Merkmals 15** von Anspruch 1 durch die Einsprechende 1, wonach die Ausrichtung der Öffnung 51 keinerlei Beschränkung des Anspruchsgegenstands bedeute (siehe Seite 6, letzter Absatz bis Seite 7, 1. Absatz Einspruchsschrift). Tatsächlich impliziert dieses Merkmal in Verbindung mit den übrigen Merkmalen bei über die Klitoris aufgesetzter zweiter Kammer eine Beabstandung der Öffnung 51 von der Klitoris zu deren Aufnahme

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



sowie eine Orientierung der Öffnung auf die Klitoris für die Ausrichtung der Medienströmung.

Ebenso unrichtig ist die Auslegung des **Merkmals 13.b** durch die Einsprechende 1 (Seite 7, 3. Absatz). Die Definition zweier Kammern, die mit einem Verbindungselement verbunden sind, führt für sich genommen nicht zu der Auslegung, dass eine Verengung oder Einschnürung im Gesamthohlraum der Vorrichtung vorhanden sein muss. Letztlich bilden Kammern funktional definierte Volumenabschnitte eines Hohlraums der Druckfelderzeugungseinrichtung 2.

Die Notwendigkeit einer „Verengung" des Hohlraums ergibt sich erst aus der anspruchsgemäßen Eigenschaft des Kanals einer „Düsenwirkung". Dabei ist diese Eigenschaft anspruchsgemäß zweifelsfrei dem „geraden Kanal" des Verbindungselements 5 zugeordnet, und nicht der dahinterliegenden zweiten Kammer 4, d.h., der Kanal selbst muss die Düsenwirkung aufweisen. Patentgemäß hat die Düsenwirkung die Funktion, die Strömung in die zweite Kammer auszurichten, wie sich zweifelsfrei aus dem Merkmal 14 und übereinstimmend aus der Beschreibung aus [0029] ergibt.

Im Übrigen sind die physikalischen Anmerkungen der Einsprechenden 1 betreffend der „*nicht ganz zutreffenden*" Argumentation der Patentinhaberin in der Eingabe vom 28. Mai 2014 bezüglich der in US 2013/0012769 A1 (D21) erwähnten „Düse" unverständlich. Zwar ist der Druck in dem Kanal **relativ** zu dem Druck in den beiden Kammer niedriger, jedoch wird aufgrund der **durch die Querschnittsverengung geschaffenen Volumenreduzierung des Gesamthohlraums** im Vergleich zu einem zylindrischen Hohlraum (d.h. ohne Einengung) der **Gesamtdruck** der Druckfelderzeugungseinrichtung erhöht. Mit anderen Worten wird ein Kanal mit einer Düsenwirkung auch zu einem erhöhten Gesamtdruck führen, da das Gesamtvolumen verringert ist. Die Klammeranmerkung der Patentinhaberin in Ihrer Eingabe vom 28. Mai 2014 „*(d.h., Druckerhöhung durch Volumenreduzierung)*" ist somit korrekt.

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



### F. Keine unzulässige Erweiterung

1) **Prüfungsmaßstab:**

Der maßgebliche Inhalt der Anmeldung ist anhand der **Gesamtheit** der ursprünglich eingereichten Unterlagen zu ermitteln. Dies beinhaltet die Figuren, die von den Einsprechenden völlig unzureichend gewürdigt worden sind.

Entscheidend ist, was der mit durchschnittlichen Kenntnissen und Fähigkeiten ausgestattete Fachmann des betreffenden Gebiets der Technik den ursprünglichen Unterlagen als zur Erfindung gehörend entnehmen kann (BGH, Urteil vom 17. Februar 2015 - X ZR 161/12 - *Wundbehandlungsvorrichtung*; m.V.a. BGHZ 194, 107 Rn. 45 – *Polymerschaum*).

Maßgeblich ist bei dieser Bewertung auch, ob die merkmalsgemäße Ausgestaltung nach der Gesamtoffenbarung aus fachmännischer Sicht **als mögliche Ausführungsform** der zum Patent angemeldeten Erfindung erscheint (BGH, Urteil vom 18. Februar 2010 - Xa ZR 52/08 – *Formteil*), wobei unerheblich ist, ob die explizit dargelegten Ausführungsformen auch tatsächlich vom Anspruch umfasst sind, oder nicht.

2) **Zu Merkmal 12: „*wobei die Stimulationsvorrichtung (1) ein tragbares Handgerät mit einer Batterie (76) ist*".**

Die zugehörige Offenbarung ergibt sich schon aus dem **ursprünglich eingereichten Anspruch 13,** aber auch aus den Figuren 1 bis 3. Die Tragbarkeit des Gerätes ergibt sich aus der Bezeichnung „Handgerät". Dabei ist es aber nicht zwingend richtig, dass jedes tragbare Gerät ein Handgerät ist. Beispielsweise ist ein Staubsauger ist in der Regel tragbar, als Handgerät wird man ihn deshalb nicht bezeichnen können. Vielmehr ist ein Handgerät technisch implizit durch Tragbarkeit und eine ergonomische Ausgestaltung zum Halten mit einer Hand gekennzeichnet.

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Eine Stimulationsvorrichtung mit diesen Merkmalen ist zudem in Fig. 3 näher dargestellt. Übereinstimmend erläutert die ursprünglich eingereichte Beschreibung auf Seite 13, vorletzter Absatz:

*„Die erste Ausführungsform der Stimulationsvorrichtung 1 ist ein, **vorzugsweise tragbares**, Elektro- oder Kleingerät, welches ein Gehäuse 8, eine Druckfelderzeugungseinrichtung 2, Bedienelemente 71, eine Anzeige 72, einen An-/Aus- Schalter 74, eine Buchse 75, **eine optionale Batterie** 76 und eine optionale Beleuchtung 9 aufweist“.*

(Hervorhebungen durch den Autor)

Aus den beiden Angaben „vorzugsweise" und „optional" bei dieser lediglich beispielhaften Ausführungsform geht hervor, dass die Merkmale „tragbar" und „Batterie" Ergänzungen darstellen, die im Belieben des Fachmannes stehen. Folglich sind diese Merkmale für den Fachmann erkennbar eigenständig aufgeführt. Damit kann es sich bei der Aufnahme dieser fakultativen Merkmale in den Anspruch 1 grundsätzlich nicht um eine Zwischenverallgemeinerung handeln.

Im Übrigen wäre vorliegend auch eine Zwischenverallgemeinerung ohne weiteres zulässig. So kann der Anmelder nach stehender Rechtsprechung auch einzelne Merkmale eines Ausführungsbeispiels auswählen, solange kein funktional zwingender Zusammenhang besteht (vgl. etwa BGH, Urteil vom 16. 10. 2007 – X ZR 226/02 *Sammelhefter II*; BGH, Urteil vom 15. 11. 2005 – X ZR 17/02 *Koksofentür*).

3)    **Zu Merkmal 13a): „wobei das Verbindungselement (5) starr ist".**

Auf Seite 17, zweiter Absatz der ursprünglichen Beschreibung ist das folgende offenbart:

*„Die Halterung 32 besteht vorzugsweise aus einem **starren** Kunststoff...."*

(Hervorhebungen durch den Autor)



Das Bezugszeichen 32 ist auch in den Figuren 4 bis 6 ersichtlich, wobei der gerade verlaufende Kanal des Verbindungselements 5 durch die Wände der Halterung 32 gebildet wird. Folglich sieht der Fachmann das Verbindungselement 5 der ersten Ausführungsform als starr an. Weiter hat eine „Halterung" den Zweck etwas am Ort zu halten, womit alleine schon aus dieser Bezeichnung offensichtlich ist, dass das zu wählende Material starr sein muss.

Ähnliches zeigen die Fig. 10a bis 10c in Zusammenschau mit dem letzten Absatz der Seite 20 der ursprünglichen Beschreibung. Dort heißt es:

*„Bei diesem Aspekt der Erfindung ist die Wand 31 der ersten Kammer 3 **starr bzw. steif** aufgebaut."*

(Hervorhebungen durch den Autor)

Diese Wand 31 geht in den Figuren 10a bis 10c ununterbrochen, d.h., einstückig, in die Wand des Kanals des Verbindungselements 5 über, womit auch hier ein starres Verbindungselement 5 offenbart ist. Aus der gestrichelten Fortsetzung des Kanals erkennt der Fachmann zudem, dass es hierbei auf die Länge des Kanals des Verbindungselements 5 nicht ankommt.

Auch sind die Ausführungen der Einsprechenden 1 betreffend die Offenbarung der zweiten Ausführungsform fehlerhaft. Auf Seite 21, vorletzter Absatz der ursprünglichen Beschreibung, ist ein Verbindungselement mit einem starren Kanal offenbart:

*„Dabei sind die Kammern 3 und 4 über ein ausgedehntes Verbindungselement 5 verbunden, welches ein längerer flexibler Schlauch oder ein auch **starres Rohr** sein kann. Beispielsweise kann die Länge des Verbindungselements 5 0,5m betragen."*

(Hervorhebungen durch den Autor)

Ein Rohr weist nach dem allgemeinen Verständnis des Fachmanns zwangsweise



[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH

einen Kanal auf (sonst wäre es kein Rohr, sondern ein Stab), wobei übereinstimmend auch das Rohr der zugehörigen Fig. 11 des angegriffenen Patents einen gerade verlaufenden Kanal aufweist. Die Länge von 0,5m der Beschreibung ist hierbei lediglich beispielhaft angegeben.

Daher ist die Patentinhaberin frei in ihrer Wahl, die Lehre des starren Rohrs als starren Kanal zu beanspruchen.

4)    **Zu Merkmal 13b): „als ein gerader Kanal mit Düsenwirkung ausgestaltet ist"**

Auf Seite 8, zweiter Absatz der ursprünglichen Beschreibung heißt es:

*„Beispielsweise kann das Verbindungselement bei einer Stimulationsvorrichtung, welche für die Klitoris bestimmt ist, eine einzelne Durchgangsöffnung mit Düsenwirkung auf die Klitoriseichel zwischen der ersten und der zweiten Kammer aufweisen."*

Eine Durchgangsöffnung offenbart einen Kanal. Eine solche Auslegung wird auch nicht von der Einsprechenden 1 in Zweifel gezogen, wie Ihre Argumentation auf Seite 14, 2. Absatz ihres Einspruchsschriftsatzes belegt. Es ist an dieser Stelle zwar zunächst weiter offengelassen, ob dieser Kanal gerade oder gebogen ausgestaltet ist, jedoch zeigen sämtliche Ausführungsformen der Figuren 3 bis 8, 10 und 11 einen gerade verlaufenden Kanal. Damit ist dem Fachmann klar, dass eine Ausbildung des Verbindungselements 5 als einzelner gerader Kanal mit Düsenwirkung eine mögliche Ausführungsform der Erfindung ist.

Entsprechend wird in Bezug auf die erste Ausführungsform in der Beschreibung auf Seite 16, letzter Absatz der Beschreibung, das Folgende erläutert:

*„Zwei zueinander ausgerichtete Öffnungen in der Wand 41 der zweiten Kammer und der Halterung 32 bilden gemeinsam das Verbindungselement 5"*

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Es heißt weiter in der ursprünglichen Beschreibung auf Seite 20, dritter Absatz:

*„Während die Ausgestaltung des Verbindungselements 5 mit **nur einem Kanal**, wie in Zusammenhang mit Fig. 6 beschrieben, zur Ausbildung eines stark konzentrierten Medien- bzw. Luftstroms auf einen Zielbereich hin führt…"* (Hervorhebungen durch den Autor)

Weiter erkennt der Fachmann, dass die Fig. 6 mit den zugehörigen Pfeilen eine erfindungsgemäße Düsenwirkung des Verbindungselements in Bezug auf eine Strömung darstellt, womit auch die Ausführungsform der Fig. 6 die anspruchsgemäße Ausgestaltung des Verbindungselements offenbart. In den Figuren 4 bis 6 sind keine weiteren Öffnungen der ersten Kammer 3 als diejenige zum Verbindungselement ersichtlich. Auch die Annahme, dass weitere, vom Schnitt in den Figuren 4 bis 6 nicht erfasste Öffnungen vorhanden sein könnten, findet in der Beschreibung jedenfalls keine Stütze [vgl. 0086]. Mithin ist eine erste Kammer mit einer <u>einzigen</u> Öffnung gemäß einer Ausführungsform der Erfindung offenbart.

Folglich offenbart insbesondere die Ausführungsform der Figuren 4 bis 6 alle beanstandeten Merkmale eines geraden Kanals mit Düsenwirkung.

Die Beschreibung offenbart weiter auf Seite 8, letzter Absatz, das Folgende:

*„Weiter entsteht nach dem Aufsetzen der halbseitig bzw. teilweise geöffneten zweiten Kammer auf den zu stimulierenden Hautbereich ein in sich abgeschlossenes System der Medien- bzw. Luftströmung in der Druckfelderzeugungseinrichtung."*

Weiter heißt es im gleichen Absatz:

*„So ist vorzugsweise die erste Kammer über bzw. durch das Verbindungselement **ausschließlich** mit der zweiten Kammer verbunden. **So***



[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH

*bestehen keine anderen Verbindungen der ersten Kammer als diejenigen zur zweiten Kammer; beispielsweise besteht keine direkte Verbindung der ersten Kammer mit der Umgebung des Gerätes über ein Druckventil oder über einen Luftabführkanal."*

(Hervorhebungen durch den Autor)

Entsprechendes findet sich auch in der ursprünglichen Beschreibung auf Seite 16, vorletzter Absatz.

Damit ist dem Fachmann auch aus der Zusammenschau der Lehre der Beschreibung klar, dass die bevorzugte Ausführungsform der Erfindung eine einzige Öffnung der ersten Kammer 3 aufweisen **muss**, die über einen einzelnen geraden Kanal mit Düsenwirkung mit der zweiten Kammer 4 verbunden ist.

Seite 24, Zeile 27 der Beschreibung offenbart dem Fachmann übereinstimmend, dass bei **allen Ausführungsformen** *„nur eine Öffnung aus der ersten Kammer 3"* dargestellt ist.

Zudem spricht Seite 19, Zeile 15 der Beschreibung von einer „Achsrichtung" des Verbindungselements 5, mithin des Kanals der Fig. 7. Eine geometrische Achse weisen nur gerade verlaufende Kanäle auf, womit auch diese Stelle einen geraden Kanal offenbart.

5)    **Zu Merkmal 11): „wobei die Stimulationsvorrichtung (1) keine Ventile aufweist"**

Korrekt ist die Auffassung der Einsprechenden, dass dieses Merkmal beansprucht, dass die Stimulationsvorrichtung 1 „global" kein Ventil aufweist.

Dies ist in der ursprünglichen Beschreibung an zwei Stellen in dieser Allgemeinheit offenbart. Auf Seite 9, zweiter Absatz heißt es entsprechend:



*„Dabei vermeidet **die vorliegende Erfindung Ventile** oder Pumpen/Kompressoren mit potentiellen Toträumen und nicht zu reinigenden Stellen."*

(Hervorhebungen durch den Autor)

Mithin ist offenbart, dass die gesamte Erfindung, d.h., die erfindungsgemäße Stimulationsvorrichtung, Ventile vermeidet.

Gleich im nächsten Absatz auf Seite 9 heißt es:

*„Zudem führt **der erfindungsgemäße Aufbau** zur Vermeidung komplexer strömungstechnischer Elemente, wie z.B. Ventile, was zu einer Vereinfachung der Herstellung führt."*

(Hervorhebungen durch den Autor)

Übereinstimmend ist auch in Fig. 3 der ursprünglichen Anmeldeunterlagen, welche die gesamte Stimulationsvorrichtung im Schnitt wiedergibt, kein Ventil gezeigt.

Weiter muss das Merkmal 11 auch im Zusammenhang der Gesamtoffenbarung gewürdigt werden. Der in der Beschreibung der Seite 3, erster Absatz, bis Seite 4, erster Absatz, und Seite 5, zweiter und vierter Absatz, diskutierte Stand der Technik beschreibt Ventile generell nachteilhaft, und dies unabhängig davon, wo diese angeordnet sind. Beispielsweise ist dem Fachmann aus den Ausführungen des Patents zur US 6 099 463 A auf Seite 2, zweiter Absatz der ursprünglichen Beschreibung klar, dass ein Freigabeventil an einer beliebigen Stelle angeordnet sein kann, solange dieses seine Funktion des Freigebens des Vakuums erfüllt.

**Zusammengefasst sind alle Merkmale des Anspruchs 1 des angegriffenen Patents ursprungsoffenbart und stellen keine unzulässige Erweiterung des Gegenstands des Patents über den Inhalt der ursprünglichen Anmeldung dar.**

[File:101603434.docx // LE11K17E]   16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



**G.   Relevanz von Druckschriften mit Gegenständen, die für die Klitoral-Stimulation ungeeignet sind**

Eine Vorrichtung, die sonst alle in dem Patentanspruch aufgeführten Merkmale besitzt, die aber zu dem angegebenen Zweck (siehe dazu auch bei Punkt D. 2)) ungeeignet wäre oder einer Änderung bedürfte, damit sie zu diesem Zweck verwendet werden kann, sollte normalerweise nicht als ein Gegenstand betrachtet werden, der den Gegenstand des Patentanspruchs vorwegnimmt. (vgl. Prüfungsrichtlinien des EPA, Teil F-IV, 4.13). Diese Auslegungsgrundsätze gelten sinngemäß auch in nationalen Einspruchsverfahren.

Die D8 offenbart ein Gerät zur Hautbehandlung mit kosmetischer oder auch therapeutischer Wirkung und damit erkennbar keine Eignung zur Klitoral-Stimulation im Sinne des Anspruchs 1.

Die D9 offenbart eine Vorrichtung zur Körperfetttherapie, die auf der Haut aufgesetzt wird und damit erkennbar keine Eignung zur Klitoral-Stimulation im Sinne des Anspruchs 1.

Die E1 offenbart eine pneumatische Gesundheitsmassagevorrichtung („pneumatic health massage device") zur Anwendung in der traditionellen Chinesischen medizinischen Meridianmassage. Bekanntermaßen verlaufen durch die Klitoris keine Meridiane, so dass die E1 erkennbar keine Eignung zur Klitoral-Stimulation im Sinne des Anspruchs 1 besitzt. Selbiges gilt in ähnlicher Weise für die E4, auf die die Einsprechende pauschal mit einem Satz verweist, die aber an keiner Stelle eine Klitoral-Stimulation offenbart.

Daher können die D8 und D9, sowie die E1 und E4 schon deswegen nicht neuheitsschädlich sein, da sie erkennbar keine Eignung für die Klitoral-Stimulation im Sinne des Anspruchs 1 besitzen.

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



**H.    Neuheit des Anspruchs 1 gegenüber der Entgegenhaltung D8 (DE 42 43 876 A1)**

Es sind entgegen den Ausführungen der Einsprechenden aus der Druckschrift D8 nicht alle Merkmale des Anspruchs 1 zu entnehmen. Im Übrigen nimmt die D8 schon deswegen nicht den Gegenstand des Anspruchs 1 vorweg, da sie erkennbar keine Eignung für die Klitoral-Stimulation besitzt (siehe F.).

**Insbesondere offenbart die D8 nicht die Merkmale 1), 4.a) und 4.b), 5, 6, 9, 10, 12, 13.a) und 13.b), 14 und 15, wie im Folgenden gezeigt:**

1.   Die D8 offenbart ein Gerät zur Hautbehandlung mit kosmetischer oder auch therapeutischer Wirkung und damit keine Eignung zur Klitoral-Stimulation (**Merkmal 1**). Eine Stimulationsmöglichkeit für die Klitoris ist in der D8 weder implizit noch explizit offenbart. Aufgabenstellung und Anwendungsbereich der D8 unterscheidet sich somit grundlegend von jenen des angegriffenen Patents. Damit wird aber zwangsläufig die gesamte Auslegung des Drucks, die Geometrie der Hohlräume, etc., unterschiedlich zur anspruchsgemäßen Lehre ausfallen.

Der Hinweis der Einsprechenden 1, dass die Klitoris schließlich auch Haut aufweist und daher das Gerät der D8 zur Stimulation für die (äußerst empfindliche) Klitoris geeignet sei, ist abwegig und lässt keinen anderen Schluss zu.

Der Gegenstand des angegriffenen Patents grenzt sich entsprechend gegenüber derartigen therapeutischen Vorrichtungen schon in der Beschreibungseinleitung (vgl. [0008] ff.) klar ab, womit eine Therapie nicht als Stimulation im Sinne des Patents zu verstehen ist (siehe auch Punkt D. 2)).

Es sei nochmals darauf hingewiesen, dass Vorrichtungen, welche nur



allgemein der kosmetischen oder therapeutischen Hautbehandlung dienen, zur beanspruchten Klitoral-Stimulation ungeeignet sind, da eine Klitoral-Stimulation die Behandlung einer empfindlichen Schleimhaut betrifft und entsprechende Dimensionierungen, insbesondere der zweiten Kammer der Stimulationsvorrichtung erfordert.

Die D8 ist daher ein **ungeeigneter und gattungsfremder** Stand der Technik.

2.    Die **Merkmale 4a) und 4b)** sind weder explizit noch implizit in der D8 offenbart. Die D8 offenbart lediglich eine Mehrzahl von „Düsen 19" (vgl. D8, Spalte 7, Zeile 19) oder „Austrittsdüsen" in einer „Behandlungsfläche" (vgl. D8, Spalte 7, Zeile 51). Insbesondere sind die „Austrittsöffnungen" unmittelbar in der Behandlungsfläche des Kopfs der D8 (vgl. D8, Spalte 3, Zeile 7 ff.) ausgebildet, wobei die Behandlungsfläche auf der zu stimulierenden Hautfläche aufliegt. Dabei wirken die *„Saug- und Druckstöße durch die Durchgangslöcher 19 nach außen"*, d.h., eine Wirkung eines Druckfeldes **innerhalb** einer (zweiten) Kammer auf die Klitoriseichel im Sinne der Merkmale 5 und 6 ist in der D8 nicht offenbart.

Aufgrund der fehlenden Eignung zur Klitoral-Stimulation, offenbart die D8 auch nicht, dass die Düsen 19 zur Aufnahme einer Klitoriseichel und zum Aufsetzen über der Klitoris geeignet sind. Beispielsweise offenbart die D8 ausschließlich eine Mehrzahl (vier) von außermittig angeordneten „Düsen 19", weshalb die Klitoriseichel bei Auflage des Kopfteils 18 in jedem Falle unter der Behandlungsfläche zum Liegen käme.

Somit können mit dem Behandlungskopf der D8 nur eben ausgestaltete Hautbereiche erreicht werden. Hautbereiche mit Höhenprofil, wie sie die Klitoriseichel darstellt, können von einem gemäß der D8 ausgestalteten Kopf nicht aufgenommen werden, wodurch ein Aufsetzten über die Klitoris nicht möglich ist.



Ungeachtet dessen macht auch das Vorsehen von mehreren Düsen 19, also mehreren zweiten Kammern, angesichts der weiblichen Anatomie mit einer einzigen Klitoris auch keinen Sinn.

3. Zudem liegt gemäß **Merkmal 15** anspruchsgemäß *„die Öffnung (51) des Verbindungselements (5)* (d.h. des starren, geraden Kanals mit Düsenwirkung) *der Klitoris durch die zweite Kammer 4 hindurch gegenüber"*. Im Gegensatz dazu liegt der Düsenaustritt der D8 unmittelbar auf der Haut auf, womit es auch deshalb bei der D8 an einer beabstandeten zweiten Kammer fehlt.

4. Wie von der Einsprechenden 1 auf Seite 13, Absatz 6 treffend angemerkt, sind die Austrittsöffnungen 19 selbst als Düsen bezeichnet, womit davon ausgegangen werden kann, dass diese eine Funktion entsprechend einer Düse bewirken. Damit wird die Düsenwirkung der D8 in den vermeintlichen zweiten Kammern nicht aber, wie in **Merkmal 13.b)** definiert, von dem Verbindungselement verwirklicht.

   In der D8 ist somit **kein** Verbindungselement mit Düsenwirkung offenbart.

5. **Merkmal 5** ist nicht offenbart. Ein Verbindungselement gemäß Merkmal 5 ist dadurch gekennzeichnet, dass das Verbindungselement die Öffnungen der Kammern 3,4 selbst verbindet, also die erste Kammer und die zweite Kammer **unmittelbar** verbindet. Jegliche andere potentiell in der D8 offenbarten Verbindungen oder Kanäle fallen damit weg, da diese eine andere Funktion haben, d.h., etwas anderes verbinden.

   Da die D8, wie vorangehend erläutert, keine zweite Kammer offenbart, kann auch das anspruchsgemäße Verbindungselement in der D8 nicht offenbart sein.

   Die Einsprechende 1 gibt dazu in ihrer Einspruchsschrift auf Seite 13, Absatz 4 explizit an, dass

[File:101603434.docx // LE11K17E]   16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



„ ... *die erste Kammer eine einzige Öffnung, nämlich die Öffnung in
den Schlauch 4 hinein, aufweist.* "

Der Schlauch ist jedoch flexibel und nicht gerade verlaufend, und damit kein
Verbindungselement im Sinne des Anspruchs. Völlig abwegig ist in diesem
Zusammenhang, dass sich eine Kammer „*über einen Schlauch*" erstreckt, wie
die Einsprechende 1 konträr zu ihrem obigen Vortrag auf Seite 12, vorletzter
Absatz angibt.

Auch die Durchgangsbohrung 22 der Fig. 2 der D8 verläuft gekrümmt, wenn
man die gestrichelten Linien mit dem Bezugzeichen 22 in der Fig. 2
nachvollzieht. Zudem endet die Durchgangsbohrung 22 in einem weiteren
Kanal im Griff 11, und nicht in einer Kammer.

Unverständlich ist die Argumentation der Einsprechenden 1 auf Seite 14,
dritter Absatz, dass

„*Wenn die Öffnungen 19 als Düsen bezeichnet sind, ist hieraus für den
Fachmann verständlich, dass die Durchgangsbohrung 22 einen geringeren
Querschnitt aufweist, als die Öffnungen 19, da diese sonst keine Düse bilden
würden.*"

Hätten die Durchgangsbohrungen 22 einen geringeren Querschnitt, wären
diese selbst als Düse bezeichnet. Dies ist bei der D8 jedoch nicht der Fall.

Vielmehr sind die Öffnungen 19 in der D8 selbst als Düsen bezeichnet, womit
diese den Ort des geringsten Querschnitts darstellen. Die Öffnungen 19
münden entsprechend nach außen.. Die weiteren Überlegungen der
Einsprechenden 1 zu Querschnittsverhältnissen der Durchgangsbohrung 22
und der Öffnung 19 sind Mutmaßungen, aber nicht Bestandteil der
Offenbarung der D8.

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Auch mündet die Durchgangsbohrung 22 gemäß der D8 nicht unmittelbar in den Düsen 19, sondern in der zwischengelagerten Verteilerrinne.

6. **Merkmal 6** in Verbindung mit **Merkmal 14** wird nicht in der D8 offenbart. Es kann dahinstehen bleiben, ob die „bewegliche Membran" der D8 eine kammerartige Ausgestaltung einer druckfelderzeugenden Anordnung offenbart, oder nicht. Hier sind auch Ausgestaltungen einer Pumpe mit einer beweglichen Membran denkbar, die keine Kammer im Sinne des Anspruchs erfordern (beispielsweise eine Schlauchquetschpumpe).

   Es ist anspruchsgemäß für die Existenz einer ersten Kammer 3 mindestens erforderlich, dass diese Kammer eine unmittelbare Öffnung zu dem geraden und starren Verbindungselement 5 aufweist. Dies ist entsprechend der Offenbarung der D8 nicht der Fall. Vielmehr zeigt die D8 in der Fig. 1 einen länglichen gewundenen Luftschlauch mit verschiedenen Abschnitten und winkligen Übergängen, der an den Behandlungskopf 2 der D8 angeschlossen ist.

7. Auch das **Merkmal 9** ist nicht in der D8 offenbart. Wie beispielsweise aus FIG. 2 sowie Spalte 7, Zeile 14 bis 24 der D8 deutlich wird, ist die Durchgangsöffnung 22 nicht ausschließlich mit der zweiten Kammer verbunden, sondern vielmehr mit einer Mehrzahl von Düsen 19 und dem Luftschlauch 4. Die Ausführungsform der D8 offenbart im Detail eine Mehrzahl von auf einer Ebene zueinander beabstandeten Düsen, die mit einer kreisförmigen Verteilerrinne verbunden sind. Es sind somit Abzweigungen im Luftkanal sowie räumliche Versetzungen zwischen Düsen und Durchgangsbohrung vorhanden. Folglich ist die Anordnung der D8 strömungstechnisch und funktionell klar unterschiedlich zu der durch das Merkmal 9 definierten Anordnung eingerichtet.

8. **Merkmal 10** ist in der D8 ebenso nicht offenbart. Die D8 macht keinerlei weitergehende Angaben über den Innenaufbau ihres Generators. Es ist auch funktionell ohne weiteres möglich, dass der Generator mehr als eine



Öffnung aufweist, um ein Druckfeld aus Unter- und Überdrücken aufzubauen, wie beispielsweise aus der D6 oder der D7 ersichtlich.

9.   **Merkmal 12** ist in der D8 ebenso nicht offenbart. Bei der Auslegung dieses Merkmals kommt es auf die bestimmungsgemäße Benutzung an. So soll die beanspruchte Vorrichtung als ein „Handgerät", das die Druckfelderzeugungsvorrichtung insgesamt umfasst, bei **der Benutzung** mit der Hand gehalten werden können und weist dazu eine ergonomische Form auf, die ein Greifen mit der Hand ermöglicht (vgl. Figur 1 und 2). Die D8 weist dagegen einen „stationären Teil 1" (vgl. D8, Spalte 5, Zeile 57) auf, der in Form eines Tischgerätes ausgeführt ist. Dieser stationäre Teil 1 kann zwar auch tragbar sein, das alleine macht aus der Kombination von stationärem Teil 1 und Behandlungskopf 2 noch kein Handgerät im Sinne des Anspruchs 1 (siehe auch bei Punkt E. 2)).

Eine Batterie ist ebenso nicht offenbart. Die Verwendung von stromintensiven Peltier-Elementen und die Ausführung als Tischgerät indizieren für den Fachmann eher eine Netzstromversorgung.

10.  **Merkmale 13. a) und 13. b)** sind auch nicht in der D8 offenbart. Da kein Verbindungselement im Sinne des Merkmals 5 offenbart ist, können durch die D8 auch keine Eigenschaften eines solchen offenbart sein.

Der Durchgangsbohrung 22 der D8 ist weder gerade, noch weist diese eine Düsenwirkung auf, wie vorstehend vorgetragen.

11.  Auch eine Ausrichtung der Öffnung eines geraden Verbindungselements 5 in die erste Kammer und der Öffnung des Verbindungselements 5 in die zweiten Kammer zueinander, mit anderen Worten gemäß **Merkmal 14** gegenüberliegend, ist in der D8 nicht offenbart.

12.  **Merkmal 15** ist ausgehend von obenstehender Argumentation ebenso nicht in der D8 offenbart, da diese keine zweite Kammer offenbart. Eine

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH

Beabstandung der Düse mindestens in der Länge einer Klitoriseichel von der Auflagefläche der Vorrichtung der D8 ist ebenso nicht offenbart.

## I.  Erfinderische Tätigkeit des Anspruchs 1 gegenüber der D8

Wie zuvor dargelegt, ist die D8 gattungsfremd und beschäftigt sich nicht mit der sexuellen Stimulation der Klitoris. Nach stehender Rechtsprechung des BGH wird der Fachmann diese also grundsätzlich nicht zur Realisierung der anspruchsgemäßen Lehre heranziehen.

Zudem offenbart die D8 eine Vielzahl von Merkmalen nicht, wie schon vorstehend in Bezug auf die Neuheit vorgetragen. Der Fachmann würde diese auch nicht in naheliegender Weise ergänzen, da ihm dazu jegliche Anregung in der D8 fehlt.

Der beanspruchte Gegenstand des Anspruchs 1 basiert daher auf erfinderischer Tätigkeit gegenüber der D8.

## J.  Erfinderische Tätigkeit des Hauptanspruchs gegenüber der D9 (US 2008 / 030 49 84 A1) und D10 (WO 00 / 28939 A2)

1.  Die D9 offenbart eine Vorrichtung zur Körperfetttherapie, die auf der Haut aufgesetzt wird. Hierdurch sollen nicht also etwa Nervenenden zur Klitoral-Stimulation angeregt werden, im Gegenteil soll hier auf einen Bereich in der Unterhaut, genauer auf Fettgewebe, eingewirkt werden. Es wäre daher unsinnig anzunehmen, dass der Klitoral-Bereich wegen überflüssigem Körperfett behandelt werden könnte.

Dass sich die anzuwendenden Intensitätsbereiche zwischen der Anregung von Tastrezeptoren, etwa Meissner-Körperchen, die sich in einer Hautschicht oberhalb des Fettgewebes befinden, und an der Klitoris – als besonders empfindliche erogene Zone (siehe Absatz [0046] der Patentschrift) – dicht

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



verteilt vorkommen und der Behandlung von Fettgewebe in der Unterhaut um Größenordnungen unterscheiden, ergibt sich von selbst.

Wie bereits bei Punkt D. 2) erläutert, muss klar zwischen Vorrichtungen zur Stimulation die Klitoris, d.h., zur Verwendung auf der Schleimhaut, und Vorrichtungen zur Behandlung der normalen Haut unterschieden werden.

Medizinisch betrachtet weist die Schleimhaut keine Hornschicht, d.h., keine echte Oberhaut, auf. Eine besondere Eigenschaft der klitoralen Schleimhaut ist die Anwesenheit vieler Sinneszellen und schleimbildender Drüsen.

Damit wird der Fachmann das erfindungsgemäße Druckfeld (beispielsweise in seinem erzielbaren Gesamtdruck) anders auslegen, als wenn er der Lehre der D9 folgen würde. Aufgrund der Hornschicht der normalen Haut wäre der Druck viel zu stark.

Deshalb ist die Lehre der D9 zur Klitoral-Stimulation im Sinne des erteilten Anspruchs 1 erkennbar ungeeignet und der Fachmann wird die D9 als gattungsfremd von vorne herein als Ausgangspunkt der Überlegungen zur Klitoral-Stimulation verwerfen.

Damit würde der Fachmann aber die D9 zur Bewertung der erfinderischen Tätigkeit grundsätzlich nicht in Betracht ziehen.

2.    Rein vorsorglich wird nachstehend noch weiter inhaltlich zur D9 Stellung genommen, da diese - ebenso wie die gattungsfremde D8 - eine Vielzahl von anspruchsgemäßen Merkmalen nicht offenbart:

a)    So offenbart die D9 neben der Eignung zur Klitoral-Stimulation zudem **nicht** die **Merkmale 4b, 5, 6, 8, 9, 10, 13.a), 13.b), 14 sowie 15**, wie nachstehend erläutert:

Wie von der Einsprechenden 1 bereits angemerkt, weißt die D9 keine zweite

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Kammer, kein Verbindungselement und daher auch keine Medienströmung zwischen den Kammern oder etwa eine Ausrichtung dieser auf.

Ebenso spricht die D9 ausschließlich von Unterdrücken (vgl. [0017], „*suction action*", womit die erfindungsgemäßen Überdrücke nicht offenbart sind. Weiter bewegt sich der Kolben der D9 über die gesamte Länge eines Zylinders hin und her, und schlägt deshalb auf der Haut auf. Dies ist eine direkte Stimulation, welche die patentgemäße Lehre gerade zu vermeiden sucht.

b) Die **D10** offenbart weiter **nicht** die **Merkmale 5, 8, 9, 10, 13.b), 14 und 15**, wie im Folgenden dargelegt wird.

Die D10 zeigt eine Vorrichtung bzw. Verfahren zur Behandlung sexueller Dysfunktionen mittels ausschließlichem Vakuum, womit eine patentgemäße Klitoral-Stimulation mit Unter- und Überdrücken nicht offenbart ist. Demnach heißt es: „*Embodiments of the invention are designed to increase blood flow in the clitoris to assist a woman to achieve clitoral engorgement*" (siehe Seite 9, Zeile 19 bis 22 der D10).

Die D10 zeigt entsprechend eine Vakuumpumpe, die jedoch mit den in der Beschreibung des Patents aufgeführten Nachteilen behaftet ist. Insbesondere kann die Daueranwendung des Unterdrucks zu Gewöhnungseffekte, führen und die Wirksamkeit der Vorrichtung auf Dauer einschränken (siehe Absatz [0007] der Patentschrift).

Im Hinblick auf die oben beschriebenen Nachteile und Anwendungsgebiete würde der Fachmann somit nicht zu einer Vakuumpumpe greifen, um eine Vorrichtung zur Klitoral-Stimulation bis zum Orgasmus (Klimax) zu entwickeln.

Darüber hinaus offenbart die D10 die Verwendung von Ventilen (vgl. Seite 9, Zeile 29 oder Seite 11, Zeile 8) und damit nicht Merkmal 11. Weiter wird

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



kein anspruchsgemäßes Verbindungselement offenbart und damit auch keine Ausrichtung von seiner Öffnung (Merkmale 13 a), b) und 15)

c) Weder die D9 noch die D10 können daher für sich den Gegenstand des Anspruchs 1 nahelegen und auch bei einer Kombination der Druckschriften, D9 und D10, würde der Fachmann nicht in naheliegender Weise zu dem beanspruchten Gegenstand gelangen, da die Merkmale 8, 9, 10, 13.b), 14, 15 in keiner der beiden Druckschriften offenbart sind.

Insbesondere ist weder in der D9 noch D10 eine Ausrichtung der Medienströmung auf die Klitoris offenbart, da keine Überdrücke offenbart sind. In der D10 wird ausschließlich ein Unterdruck bewirkt. Zudem wird ein Ventil zur Vakuumpumpensteuerung verwendet (vgl. Seite 9, Zeile 29). In der D9 findet in derselben Kammer, welche auf der Haut aufliegt, eine Volumenänderung statt. Somit wird auch hier keine Strömung ausgerichtet.

Somit zeigt keine der Druckschriften oder eine Kombination dieser beiden eine Anregung für eine Stimulationsvorrichtung, bei welcher eine indirekte Druckmassage (durch die Ausrichtung der Strömung) zur sexuellen Stimulation bis zum Orgasmus (Klimax) verwendet wird.

**Der Gegenstand des Anspruchs 1 beruht daher auf erfinderischer Tätigkeit gegenüber den Druckschriften D9 und D10.**

### K. Patentfähigkeit gegenüber der E1 (CN 2153351)

#### 1. Zum Offenbarungsgehalt im Allgemeinen:

Die E1 betrifft ein Chinesisches Gebrauchsmuster mit einer Seite Beschreibung, zwei Ansprüchen und einer Figur. Die Einsprechende 2 hat dazu eine englische Maschinenübersetzung eingereicht, auf die sie Ihre Argumentation stützt. Die Patentinhaberin bezweifelt aber die

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Qualität von Maschinenübersetzung im Vergleich zu einer humanen Übersetzung, insbesondere bei einer chinesischen Ursprungsoffenbarung, da die Chinesischen Sprache in hohem Maße mehrdeutig und kontextbezogen ist. Eine Maschinenübersetzung mag einen ersten Anhaltspunkt liefern, letztlich entscheidend ist aber ausschließlich der tatsächliche Offenbarungsgehalt einer Druckschrift. Die Anmelderin legt daher eine beglaubigte englische Übersetzung eines chinesischen Übersetzungsbüros als Beweismittel A2 vor. Der Offenbarungsgehalt der E1 unterscheidet sich demnach maßgeblich von der Maschinenübersetzung, die die Einsprechende 2 vorgelegt hat.

- So heißt es etwa in der Maschinenübersetzung „*movable rubber nozzle (1")* während die humane Übersetzung von „*movable rubber mouth (1)"* spricht.
- Des Weiteren heißt es in der Maschinenübersetzung „*gas health massage"* und „*pulsating air pressure"*, in der humanen Übersetzung „*Pneumatic Health Massage Device"* und „*pulse air pressure"*.
- Was in der Maschinenübersetzung nebulös mit „*…a plurality of machine treatment probe …"* erwähnt ist, lautet in der humanen Übersetzung „*It can also be equipped with multiple therapeutic mouthpieces."*.
- Ferner heißt es in der humanen Übersetzung „*Pulse air pressure will be generated when the switch is on, so as to therapeutically stimulate acupoints in the body."* während die Maschinenübersetzung den entsprechenden Satz unverständlich mit *"Power pulsed pressure to stimulate the meridian points in order to achieve therapeutic purposes."* übersetzt.

Zu der sprachlichen Unsicherheit hinsichtlich des tatsächlichen Offenbarungsgehalts kommt, dass die einzige Figur der E1 eine Mischung aus einer schematischen Darstellung einer magnetischen Antriebsanordnung und einer technischen Schnittzeichnung zeigt. Die



Einsprechende hat zudem weitere eigene Bezugszeichen in die Figur eingefügt, um die Offenbarung in augenscheinlich rückschauender Betrachtung zu ergänzen.

Die E1 offenbart daher dem Fachmann keineswegs eine eindeutige technische Lehre, die die Ausführungen der Einsprechenden 2 in tatsächlicher Hinsicht zu stützen vermag.

**2.    Die Druckschrift E1 offenbart dem Fachmann keine Lehre, welche ausführbar ist.**

Es sind bei dem mutmaßlichen magnetischen Antrieb der E1 weder in der knappen Beschreibung noch in der einzigen Figur irgendwelche Bewegungsrichtungen, Ausrichtungen der Magneten, Auslenkungsangaben, etc. angegeben. Damit mangelt es in der E1 an einer unmittelbaren und eindeutigen Offenbarung, wie die gesamte Vorrichtung der E1 denn überhaupt funktionieren könnte.

Es ist insbesondere nicht offenbart, welche Bewegungen des Hebels in welchen Richtungen erfolgen sollen. Eine Hin-und Her-Bewegung des Magneten 4 relativ zu dem Elektromagneten 5 im Sinne einer rechts/links-Bewegung in der Ebene der Figur 1 der E1 scheidet aus, da dies nach den physikalischen Gesetzen nicht möglich ist:

Gleichnamige Pole stoßen sich ab und unterschiedliche Pole ziehen sich an. Unter der Annahme, dass der Magnet 4 seinen Südpol an der linken Seite, und seinen Nordpol an der rechten Seite aufweist, so werden beide Seiten unabhängig von der Polung des Elektromagneten 5 gleich stark angezogen oder abgestoßen, womit der Magnet 4 an Ort und Stelle verbleiben würde. Dasselbe gilt natürlich auch für die umgekehrte Anordnung der Pole des Magneten 4.

18_09_2017-01-00031-00000031

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Letztlich würde ein Magnet 4 bei Bestromung des Elektromagneten (in der Papierebene der Fig. 1) nur entweder nach oben zu dem Elektromagneten 5 hingezogen oder von diesem weggedrückt werden (die Feldkräfte wirken stets senkrecht zu den Feldlinien, die vorliegend den Magneten 4 von links nach rechts oder umgekehrt schneiden). Dies entspräche einem herkömmlichen „Hubmagnetantrieb". Bei diesen ist jedoch zudem im Grundsatz nur ein Antrieb in eine Richtung möglich (d.h., entweder nur ein Drücken oder nur ein Ziehen), solange kein Rückstellelement, beispielsweise eine Feder, vorhanden ist. Eine solche ist jedoch in der E1 nicht offenbart.

Zudem ist nicht ersichtlich, wo der Drehpunkt des Hebels 3 sein könnte. Es fehlen hierzu jegliche Angaben. Ohne einen Hebelpunkt ist die Bewegung des Hebels nicht ersichtlich. In der Folge kann man der E1 nicht entnehmen, wie eine Krafteinwirkung über den Hebel 3 auf den Airbag 2 erfolgen könnte, und ebenso, wie irgendein „Druck" erzeugt werden könnte.

Ebenso ist nicht ersichtlich, wie oder in welche Richtung der „movable rubber mouth" der E1 bewegt werde könnte.

Es werden in der E1 ebenso keine Angaben zu einer Lagerung des Airbags 2 oder des Mundstücks 1 gemacht, weshalb der Fachmann auch hier der E1 keine ausführbare Lehre entnehmen kann.

Insbesondere bleibt offen, ob sich bei einer Bewegung des Hebels nur der Airbag verformt oder ob sich der Airbag verformt und sich das Mundstück auch hin und her bewegt. Somit gibt die E1 dem Fachmann keine eindeutige und ausführbare Lehre an die Hand. Ausführbarkeit ist aber eine Vorraussetzung für eine technische Lehre, um sich als relevanter Stand der Technik zu qualifizieren.

**Die Druckschrift E1 stellt daher keinen vom Fachmann zu**

[File:101603434.docx // LE11K17E]     16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



berücksichtigenden Stand der Technik dar.

**3.     Die E1 ist gattungsfremd**

Die Druckschrift E1 offenbart weder implizit noch explizit eine Stimulationsvorrichtung für die Klitoris, sondern vielmehr eine pneumatische Gesundheitsmassagevorrichtung zur Anwendung in der traditionellen Chinesischen medizinischen Meridianmassage und bekanntermaßen verlaufen durch die Klitoris keine Meridiane.

Etwas anderes ergibt sich auch nicht auf den pauschalen Hinweis der Einsprechenden 2 zur E3 und Stimulierung von erogenen Zonen. Denn auch die E3 empfiehlt keineswegs eine Klitoral-Stimulation mittels Meridianmassage, sondern weist in der Einleitung „Sexuelle Stimulierungspunkte" darauf hin, dass:

> *„Wären wir alleine auf die <u>westliche Sichtweise</u> und wissenschaftlichen Erkenntnisse angewiesen, würden sich die sexuellen Stimulierungspunkte auf <u>Klitoris</u> und Brustwarzen bei der Frau und auf den Penis beim Mann beschränken und das Kapitel wäre im Nu beendet. <u>Ganz anders die östliche Weltsicht</u>, die auch bei uns durch Akupunktur, Kampfkünste und Meditation mehr und mehr verbreitet wird. Hier finden wir einen reichen Erfahrungsschatz, was Körperbewusstsein und sexuelle Stimulation betrifft."*

Das heißt, die E3 regt den interessierten Leser (der in den seltensten Fällen ein Fachmann für die Entwicklung von Sexspielzeug sein wird) dazu an, es bei der Erotischen Partnermassage doch einmal mit östlicher, nicht schulmedizinischer Meridiantherapie zu probieren, die eben gerade auch <u>andere</u> Stimulierungspunkte als die Klitoris für eine <u>direkte manuelle</u> Massage verwendet. Damit erhält der Fachmann der E3 aber keine Anregung zur Verwendung der Vorrichtung der E1 zur sexuellen Klitoral-Stimulation.

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Die in der E1 genannte Meridianmassage ist eine in China praktizierte Form einer Massage, bei der besondere Punkte (Meridianpunkte) auf der Haut rhythmisch „abgeklopft" werden. Das Klopfen erfolgt dabei beispielsweise mit den Fingerknöcheln oder einem speziellen Hämmerchen, und soll Linderung für körperliche Beschwerden bewirken.

Weiter widerspricht die Lehre einer „Meridiantherapie" klar der in Europa praktizierten Schulmedizin. Die Meridiantherapie ist in Europa wissenschaftlich nicht anerkannt. Eine solche Schrift mit einer „fiktiven" Heilwirkung wird vom dem hier anzunehmenden Fachmann bei der Schaffung einer Stimulationsvorrichtung für die Klitoris verworfen werden. Vielmehr ist die Vorrichtung der E1 bei Betrachtung der einzigen Figur, ungeachtet dessen dass sie leicht tragbar ist (vgl. auch E. 2), erkennbar ungeeignet für ein Handgerät zur Klitoral-Stimulation im Sinne des erteilten Anspruchs 1.

Einen derart gattungsfremden Gegenstand in einer Druckschrift, die zudem keine ausführbare technische Lehre vermittelt, würde der Fachmann **zur Bewertung der erfinderischen Tätigkeit** grundsätzlich nicht in Betracht ziehen.

Ungeachtet der mangelnden Ausführbarkeit unterscheidet sich die gattungsfremde E1 zudem grundlegend von der beanspruchten Lehre des Patents, wie nachstehend dargelegt:

4.    **Die E1 offenbart keine Volumenveränderung einer ersten Kammer**

Es würde der „Airbag" 2 der E1 – selbst wenn man irgendeine Bewegung des Hebels 2 in Axialrichtung des Airbags gemäß den Ausführungen der Einsprechenden 2 annehmen wollte – nicht in seinem Volumen verändert werden. Betrachtet man den Schnitt der Fig. 1 der

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



E1, ist dem Fachmann ersichtlich, dass der Airbag bei axialer Längung schlicht länger und schmäler werden würde, und bei axialer Stauchung entsprechend runder, womit das Volumen konstant bleiben würde. Mit einem solchen „Airbag 2", wie in der Fig. 1 dargestellt, ist ein „Pumpen" von beispielsweise Luft oder Wasser im Sinne der vorliegenden Anmeldung überhaupt nicht möglich.

Damit überhaupt eine Volumenänderung des Airbags 2 der E1 stattfinden könnte, müsste bei einseitiger Krafteinwirkung eine haltende Gegenkraft auf den Airbag 2 wirken können. Aus der Beschreibung und auch der einzigen Figur ist jedoch keine Lagerung oder ähnliches des Airbags ersichtlich. Tatsächlich ist auch der Airbag 2 frei beweglich angeordnet, weshalb er nicht komprimiert werden kann, so wie das die Einsprechende 2 vorträgt.

Der Fachmann schließt übereinstimmend zu der vorstehend erläuterten Erkenntnis aus Fig. 1 der E1 auch aus der Bezeichnung dieses Merkmals selbst als „Airbag 2" auf dessen Funktion: Ein Airbag hat bekannter Weise die Funktion, sein Volumen bei Veränderung seiner äußerlichen Form konstant zu halten, **um einen Stoß abzufedern**.

Übereinstimmend heißt es in der Übersetzung der E1 im fünften Absatz der Beschreibung auch, dass der Magnet 4, der Hebel 3 und der Airbag 2, d.h., der Airbag 2 **als Ganzes** reziprok bewegt werden (sollten). Allerdings ist auch hier vollkommen unklar, in welche Richtungen die Gesamtanordnung 2, 3 und 4 bewegt werden soll.

5.    **Die E1 offenbart keine zweite Kammer zum Aufsetzen über die Klitoris**

Nach der übersetzten Beschreibung der E1 ist das Mundstück 1 („mouth piece 1") beweglich („movable"). So muss es sich in irgendeiner Art mit der Bewegung des Airbag 2 und des Hebels 3 („Lever 3")

18_09_2017-01-00031-00000035

[File:101603434.docx // LE11K17E]   16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



mitbewegen. Damit kann das Mundstück 1 denknotwendig nicht zum andauernden Aufsetzen auf ein Körperteil im Sinne der vorliegenden Anmeldung dienen. Zudem wird im letzten Absatz beschrieben, dass die Vorrichtung <u>mehrere</u> therapeutische Mundstücke aufweisen kann, der weibliche Körper besitzt aber bekanntermaßen nur eine Klitoris.

Mutmaßen kann der Fachmann hier nur, dass entsprechend der vorstehend dargelegten Lehre der „Meridiantherapie" (vgl. E1, Beschreibung, erster Absatz) ein rhythmisches Abklopfen der Haut mit dem Mundstück 1 zur positiven Beeinflussung von Meridianpunkten erfolgen soll. Damit könnte man vielleicht mutmaßen, dass die E1 ein hammerschlagartiges Anschlagen des Mundstück 1 auf die Hautoberfläche erfolgen soll, das durch den Airbag abgefedert werden soll. Jedoch ist auch hier unklar, wie dieses Klopfen erfolgen könnte.

Mit einer solchen klopfenden Anordnung ist eine Erzeugung von Unterdrücken unmöglich, da kein durch ein andauerndes Aufsetzen einer Kammer über der Klitoris beschränktes Volumen vorliegt, in dem ein Unterdruck erzeugt werden könnte. Folglich ist aus der E1 das erfindungsgemäße Druckfeld aus Unter- und Überdrücken weder explizit noch implizit zu entnehmen.

**6.    Die E1 offenbart auch weitere Merkmal des Anspruchs 1 nicht:**

Wie vorstehend vorgetragen offenbart die E1 keine zweite Kammer (4) mit einer Öffnung (42) zum Aufsetzen über die Klitoris (12) (Merkmal **4. b))**. Da sich der Anwendungsbereich der Vorrichtung der E1 zudem von dem patentgemäßen Anwendungsbereich unterscheidet, offenbart die E1 auch nicht, dass die Öffnung des Mundstücks entsprechend der Anatomie der Klitoris (also etwa zur Aufnahme der Klitoriseichel) ausgestaltet ist. Somit offenbart die E1 keine zweite Kammer mit einer Öffnung zum Aufsetzen über die Klitoris. Ist jedoch keine zweite Kammer 4 offenbart, ist auch kein zugehöriges anspruchsgemäßes

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Verbindungselement 5 offenbart.

Auch zeigt die E1 keine patentgemäße erste Kammer, deren Volumen durch die Antriebseinheit verändert werden kann (Merkmal 3 in Verbindung mit Merkmal 6). Wie vorstehend vorgetragen ändert sich bei einem Aufbau des Airbags der E1 gemäß deren Fig. 1 nur dessen Form, nicht aber sein Volumen.

Somit kann auch das **Merkmal 8**, der Erzeugung eines Druckfelds, das aus einem Muster von Unter- und Überdrücken besteht, welche auf den Normaldruck aufmoduliert sind, nicht der E1 klar und eindeutig entnommen werden.

Zudem offenbart die E1 keinerlei weitergehende Information über den Aufbau der Vorrichtung. Es fehlen Angaben zu Steuerung, zum Gehäuse, zum inneren Aufbau, zur Stromversorgung, etc.

Zusammenfassend kann der Fachmann der E1 zumindest das Folgende nicht klar und eindeutig entnehmen:

-    keine erste Kammer, da das Volumen des Airbag 2 nicht verändert wird,

-    keine zweite Kammer, da das Mundstück 1 nicht zum Aufsetzen über der Klitoris dient,

-    kein Verbindungselement 5, welches die beiden Kammern verbinden müsste,

-    kein Druckfeld aus Unter- und Überdrücken, da zumindest keine Unterdrücke offenbart sind,

-    keine Steuereinrichtung zur Steuerung der Modulation des Druckfeldes,

-    keine Antriebseinheit, die eine Volumenveränderung einer ersten Kammer bewirken würde, und

-    keine Eignung der Vorrichtung zur Stimulation der Klitoris bis



zum sexuellen Höhepunkt.

**7. Es liegt kein konkreter Anlass für den Fachmann vor, erfindungsgemäß vorzugehen.**

Es wird darauf hingewiesen wird, dass aus Sicht der Anmelderin auch schon die Begründung der Einsprechenden bezüglich des Mangels an erfinderischer Tätigkeit des ursprünglichen Anspruchs 1 nicht ausreichend ist.

Im Detail fehlt es bei der Begründung des Naheliegens an der Darstellung eines konkreten Anlasses für den Fachmann, auch erfindungsgemäß vorzugehen. Der Fachmann würde also aus Sicht der Anmelderin die E1 nicht einfach mit einer beliebigen weiteren Schrift (vorliegend beispielsweise der D7) kombinieren.

Bedenklich erscheint es der Anmelderin insbesondere, wenn die Veranlassung auf eine bloße - rückschauend formulierte - Aufgabe reduziert wird. In anderen Worten kann es nicht die bloße Aufgabe des Fachmanns sein, genau die - nach Auffassung der Einsprechenden 2 - fehlenden Merkmale zu ersetzen. Mit dieser Argumentation gäbe es kein positives Vorliegen einer erfinderischen Tätigkeit mehr, da man denknotwendig auf jeden beliebigen Gegenstand schließen könnte.

Die fiktive Person des Fachmanns handelt tatsächlich immer zielgerichtet und nicht spontan. So muss sich für den Fachmann eine konkrete Anregung bzw. der Anlass aus den Druckschriften selbst ergeben, anspruchsgemäß vorzugehen. Vermittelt also eine Druckschrift dem Fachmann nicht die Anregung in einer bestimmten Richtung nach einer Lösung zu suchen, fehlt es auch an einer Anregung für die Lösung selbst (vgl. u.A.: Benkard, 11. Auflage, § 4 Rdn. 90 mit Verweis auf BPatG GRUR 1986, 307, 309 – Digitale Signalverarbeitungsanordnung).

> [File:101603434.docx // LE11K17E]   16. Mai 2017
> Stimulationsvorrichtung
> NOVOLUTO GmbH

**L. Ergebnis:**

Alle Änderungen des Anspruchs 1 im Prüfungsverfahren sind ursprungsoffenbart. Es liegt somit **keine unzulässige Erweiterung** des Gegenstands der Erfindung über den Inhalt der ursprünglichen Anmeldung vor.

Keine der im Verfahren befindlichen Druckschriften des Stands der Technik, insbesondere nicht D8, D9, D10 oder E1, beschäftigt sich mit einer effektiven Klitoral-Stimulation bis zum sexuellen Höhepunkt, was die Aufgabe der Lehre des Anspruchs 1 des angegriffenen Patents ist (vgl. Absatz [0004], [0007], [0008], [0032] [0046]).

Des Weiteren ist festzuhalten, dass sich im Gesamten im Verfahren stehenden Stand der Technik kein Vorbild oder Hinweis zu einer derartigen Vorrichtung mit den geschilderten Merkmalen findet, die den Gegenstand des Anspruchs 1 des Patents vorwegnehmen oder einem Fachmann nahelegen könnten. Deshalb ist der patentgemäße Anspruch 1 **neu und erfinderisch**.

**Das Patent ist damit unverändert aufrechtzuerhalten.**

Patentanwalt
**Rainer K. Kuhnen**
(☎ 08161 608 318)

Anlagen
A1: Endurteil des Landgerichts München I zum Aktenzeichen: 21 O 22538/15
A2: Beglaubigte Übersetzung der CN 2153351 in die englische Sprache

I, Scott Gareth TATCHELL BA (Hons), MA, PhD,

translator to RWS Group Ltd, of Europa House, Chiltern Park, Chiltern Hill, Chalfont St Peter, Buckinghamshire, United Kingdom, hereby declare that I am conversant with the English and German languages and am a competent translator thereof. I declare further that to the best of my knowledge and belief the following is a true and correct translation of the accompanying document in the German language.

Signed this 2nd day of September 2019

S. G. TATCHELL

For and on behalf of RWS Group Ltd

[Document on the headed paper of Kuhnen & Wacker, firm of patent attorneys and attorneys at law, Freising, Germany, addressed to the German Patent and Trademark Office, Munich, Germany]

18 September 2017          RKJ/UWN/VPO

[File: 101603434.docx]

Official reference:      10 2013 110 501.7

Our reference:           17/LE11K17E/DE

Opponents:               ecoaction gmbh and others

Patentee:                NOVOLUTO GmbH

---

The companies Fun Factory GmbH (hereafter Opponent 1) and ecoaction GmbH (hereafter Opponent 2) have filed oppositions against the patent DE 10 2013 110 501 B4 of the company NOVOLUTO GMBH.

Opponent 1 bases its opposition on
- inadmissible extension of the subject-matter of claim 1 vis-à-vis the content of the original application,
- lack of novelty over document **DE 42 43 876 A1** (referred to as D8 in the nomenclature of Opponent 1), and
- lack of inventive step vis-à-vis a combination of document **US 2008.0304984 A1** (referred to as D9 in the nomenclature of Opponent 1) with document **WO 00/28939 A2** (referred to as D10 in the nomenclature of Opponent 1).

Opponent 2 bases its opposition on
- inadmissible extension of the subject-matter of claim 1 vis-à-vis the content of the original application,
- lack of inventive step vis-à-vis document **CN 2153351** (referred to as E1 in the nomenclature of Opponent 2).
- In addition, Opponent 2 makes sweeping references to **CN 2198900** (referred to as E4 in the nomenclature of Opponent 2). It is noted that although E4 is cited in the grounds of opposition, it has not been provided either to the Patentee or to the German Patent and Trademark Office.

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

**It is requested that the oppositions be rejected for being unfounded and that the patent be maintained in its entirety.**

**In the alternative**, it is requested that **a hearing be arranged** if the maintenance of the contested patent cannot be granted without further steps.

The grounds for the request are as follows:

**A.        Evidence:**

> **A1:    Final judgment of the Munich I Regional Court in relation to case: 21 O 22538/15**
>
> **A2:    Certified translation into English of CN 2153351**

**B.        The contested patent DE 10 2013 110 501 B4**

The patent DE 10 2013 110 501 B4 relates to a device for the clitoris which is intended to bring about an orgasm for the purposes of sexual pleasure by means of indirect stimulation of the clitoris. To this end, the claimed stimulation device acts on the clitoris with a pressure field consisting of negative and positive pressures, which is generated in a so-called second chamber which is placed over the clitoris. A negative pressure and a positive pressure then act alternately on the clitoris in order both to stimulate its blood flow and to exert a stimulating force on it.

**C.        The problems posed in the challenged patent**

The device according to the patent is intended to take account of a number of particular problems which have their background in the particular anatomy and the particular qualities of sensation of the clitoris. For instance, direct stimulation by mechanical contact, by a contact vibrator for example, is to be avoided as this direct stimulation can lead to irritations and inflammations of the skin. Other devices which

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

are intended to increase the blood flow, for example by means of vacuum technology, lead to habituation effects and can additionally entail a risk of injury. Often, devices for application on the human body by means of air pressure are complex in their structure and are thus unhygienic. In addition, the devices of the prior art regularly give rise to a disadvantageous evacuation of vaginal fluid.

This gives rise to the problem of the invention of providing a device with a simple construction that is easy and safe to use (cf. paragraph [0023]), which is able to create effective stimulation of a body part (cf. paragraph [0024]) and which prevents the mucous membranes from drying out, is hygienic and prevents habituation effects (cf. paragraph [0025]).

It should be noted that none of the documents in the opposition proceedings deals with these problems or ones of similar complexity.


**D.**    **Breakdown of features**

To solve the aforementioned problems, claim 1 of the contested patent provides a device which is described in accordance with the breakdown of features below:

*1.*    *A stimulation device (1) for the clitoris (12), comprising:*
    *2. a pressure field generator (2) with:*
    *3. a first chamber (3); and*
    *4. a) a second chamber (4)*
    *4. b) with an opening (42) for placing over the clitoris (12); and*

    *5. a connection element (5) connecting the first chamber (3) with the second chamber (4); and*

    *6. a drive unit (6) that changes the volume of the first chamber (3) in such a manner that a stimulating pressure field is generated in the second chamber (4) via the connection element (5); and*

**7.** *a control device (7) that actuates the drive unit (6); and*

**8.** *wherein the pressure field generated in the second chamber (4) consists of a pattern of negative and positive pressures modulated with respect to a reference pressure; and*

**9.** *wherein the first chamber (3) is connected solely with the second chamber (4) by the connection element (5), there therefore being no other connection of the first chamber (3) than that to the second chamber (4), as a result of which the first chamber (3) has a single opening, and*

**10.** *wherein the second chamber (4) has an opening (51) from the connection element (5) into the second chamber (4), and*

**11.** *wherein the stimulation device (1) has no valves, and*

**12.** *wherein the stimulation device (1) is a portable hand-held device with a battery (76),*

*characterised in that*

**13. a)** *the connection element (5) is rigid and*
**13. b)** *is designed as a straight channel with a nozzle effect (13c),*

**14.** *the opening of which into the first chamber (3) and the opening (51) of which into the second chamber (4) are aligned to one another so that a media flow during a compression of the first chamber (3) is directed to the clitoris (12) through the alignment of the opening (51) and the connection element (5),*

**15.** *wherein the opening (51) of the connection element (5) faces the clitoris (12) through the second chamber (4).*

[File: 101603434.docx // LE11K17E]  16 May 2017
Stimulation device
NOVOLUTO GmbH

**E.    Interpretation of contested claim 1 by a person skilled in the art**

1)    The relevant person skilled in the art who would be entrusted with the above-defined problem is a technician with professional experience in the development of sex toys (cf. also the final judgment of Munich I Regional Court under case no: 21 O 22538/15 which is annexed as Exhibit A1, bottom of page 19).

2)    The subject-matter of claim 1 relates to a stimulation device for the clitoris by means of a pressure field consisting of positive and negative pressures which enables clitoral sexual stimulation (= stimulation for the clitoris within the meaning of the contested patent) until orgasm (climax) (cf. also paragraph [0007]). The person skilled in the art will take this stipulation into account in the context of the dimensioning of the features according to the claims. In particular, he or she will establish the pressure ranges of the pressure field, the size of the second chamber and also the ratio of the volumes of the two chambers 3, 4 accordingly (cf. paragraphs [0028], [0035], [0036], Figs. 4 to 6 of the patent in suit).

In this regard, it is further explained in the introduction to the description (cf. [0008] ff.) that a therapy cannot be understood as being a stimulation within the meaning of the patent. Accordingly, the subject-matter of the contested patent is already delimited against general therapeutic skin treatment devices in the preamble ("Stimulation device for the clitoris").

In other words, for the purposes of the interpretation of claim 1 this means that devices which are only used for general or medical skin treatment are suitable for the claimed clitoral stimulation only when a corresponding dimensioning of the drive, of the actuator and of the geometry of the pressure field generator, in particular of the second chamber, which differs significantly from the customary dimensioning in conventional skin treatment devices, is provided, since the clitoris is a complex, erectile and extremely sensitive sexual organ (see also http://de.wikipedia.org/wiki/Klitoris). If such dimensioning is not disclosed

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

anywhere, however, such conventional skin treatment devices are obviously unsuitable for clitoral stimulation.

Accordingly, the effects of a stimulation in the form of a (pressure) massage, i.e. in the form of an exertion of force, for the female clitoris are described in more detail in the patent in suit in paragraphs [0032, 0046, 0076, 0084, 0098], for example. In addition, the clitoris glans is known to be a particularly sensitive erogenous zone [0046] with which even the slightest changes or adjustments to the pressure field can be sensed.

3)    A first chamber 3 within the meaning of claim 1 is changeable in terms of its volume (feature 1 in combination with feature 6).

4)    A second chamber within the meaning of claim 1 is suitable "*for placing over the clitoris*". In such a second chamber, an indirect stimulation of the clitoris glans must be able to take place. According to paragraph [0032], the stimulating "*massage effect*" according to the invention is brought about

>    "*indirectly, i.e. without the area of skin to be stimulated being directly contacted by a solid body ...*"

Consequently, the second chamber must be dimensioned in such a way that it can **envelop** the standard clitoris glans **in a contactless manner** (cf. also Figs. 4-6 of the patent in suit in conjunction with paragraph [0007] "indirect").

Consequently, by virtue of the claimed suitability for clitoral stimulation, a minimum size of the second chamber 4 which is dictated by the anatomically prescribed average size of the clitoris is conveyed to the person skilled in the art (cf. Fig. 4 of the contested patent). Concomitantly, the opening 42 must have a minimum diameter which is suitable for accommodating an average-sized clitoris glans. Of course, the diameter of the opening 42 also cannot be dimensioned to be too large, because otherwise it is no longer possible to place the second chamber between the woman's thighs. Accordingly,

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

chambers that are clearly too large or small, i.e. ones which are not suitable for being placed over a clitoris, cannot be second chambers within the meaning of the patent in suit.

A comparable implicit dimensioning is also defined in column 3, lines 5 and 6 of the prior art US 6 099 463 that is cited in the original application documents (introduced by Opponent 1 as D5), according to which a "*suction chamber 14 is sized for ... fitting around a clitoris ...*"; i.e. a suction chamber for placing over the clitoris is dimensioned for *fitting around the clitoris*.

5)    A connection element 5 within the meaning of claim 1 connects solely the first and the second chamber 3, 4. Therefore, according to the claim one opening of the connection element 5 leads into the first chamber 3 and the other opening 51 of the connection element 5 leads into the second chamber 4. It is therefore neither implicit nor explicit from the claim that the connection element 5 connects elements other than the first and the second chamber (cf. feature 9).

In addition, the connection element is claimed, in contrast to the known hose connections, for example, as being "rigid". Accordingly, the contested patent distinguishes at several points between rigid and flexible. In addition, it is implicitly disclosed to the person skilled in the art by virtue of the rigidity of the connection element that the relative position of the two chambers to one another is also spatially unchangeable: this is also evident to the person skilled in the art from the claimed embodiment as a hand-held device, which implicitly requires a spatially fixed accommodation of the first and second brackets of the pressure field generator in a housing (cf. Figures 1 to 3).

The alignment of the openings of the connection element 5 into the first and second chambers 3, 4 (feature 14) can easily be followed with the aid of Figs. 4 to 6. The alignment of the openings also has a significance in terms of flow technology, i.e. in functional terms. Accordingly, from a functional perspective the openings of the first chamber and of the second chamber must be arranged in such a way that, in the event of compression/expansion of the

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

first chamber 3, the flow is directed through one opening onto the respective other opening. Accordingly, a stepped offset of the openings of the connection element with respect to one another beyond their cross section is no longer in accordance with the claim.

Therefore, the interpretation by Opponent 1 of **feature 15** of claim 1, according to which the alignment of the opening 51 supposedly does not mean any limitation whatsoever to the subject-matter of the claim (see page 6, last paragraph to page 7, 1st paragraph of the grounds of opposition), is clearly incorrect. In fact, this feature, in combination with the remaining features, implies, when the second chamber is placed over the clitoris, a spacing apart of the opening 51 from the clitoris for the purposes of its accommodation as well as an orientation of the opening onto the clitoris for the alignment of the media flow.

The interpretation of **feature 13.b** by Opponent 1 (page 7, 3rd paragraph) is just as incorrect. The definition of two chambers which are connected with a connection element does not by itself lead to the interpretation that a constriction or narrowing must be present in the overall cavity of the device. Ultimately, chambers constitute functionally defined portions of the volume of a cavity of the pressure field generator 2.

The need for a "constriction" of the cavity arises only from the channel's property according to the claim of having a "nozzle effect". In this context, according to the claim this property is undoubtedly assigned to the "straight channel" of the connection element 5, and not to the second chamber 4 lying behind it, i.e. the channel itself must have the nozzle effect. According to the patent, the nozzle effect has the function of aligning the flow into the second chamber, as is undoubtedly evident from feature 14 and, in a corresponding manner, from the description in [0029].

Moreover, the physics-related observations of Opponent 1 regarding the "*not quite correct*" arguments of the Patentee in the submission of 28 May 2014 in relation to the "nozzle" mentioned in US 2013/0012769 A1 (D21) are

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

incomprehensible. It is true that the pressure in the channel is lower **relative** to the pressure in the two chambers, but, on account of the **volume reduction of the overall cavity created by the cross-sectional constriction,** the **overall pressure** of the pressure field generator is increased in comparison with a cylindrical cavity (i.e. without constriction). In other words, a channel with a nozzle effect will also lead to an increased overall pressure because the overall volume is reduced. The observation in brackets made by the Patentee in its submission of 28 May 2014 "*(i.e. pressure increase as a consequence of volume reduction)*" is therefore correct.

**F.    No inadmissible extension**

**1)    Assessment criteria**

The material content of the application must be determined on the basis of the **entirety** of the originally filed documents. This includes the figures, which have been considered in a completely inadequate manner by the Opponents.

What is decisive is what a person skilled in the art in the relevant field of technology who is equipped with average knowledge and skills can gather to be belonging to the invention from the orginal documents (BGH (Federal Court of Justice), judgment of 17 February 2015 – X ZR 161/12 – *Wundbehandlungsvorrichtung*; with reference to BGHZ 194, 107 para. 45 – *Polymerschaum*).

It is also decisive in this assessment whether, on the basis of the entirety of the disclosure, the configuration according to the feature appears, from the point of view of a person skilled in the art, **to be a possible embodiment** of the invention that is the subject of the patent application (BGH, judgment of 18 February 2010 – Xa ZR 52/08 – *Formteil*), with it being irrelevant whether or not the explicitly described embodiments are in fact also covered by the claim.

9/36

2)    **Feature 12: "*wherein the stimulation device (1) is a portable hand-held device with a battery (76)*"**.

The associated disclosure already arises from the **originally filed claim 13**, but also from Figures 1 to 3. The portability of the device is evident from the designation "hand-held device". In this context, however, it is not necessarily correct that every portable device is a hand-held device. For example, a vacuum cleaner is generally portable but that does not mean that it can be called a hand-held device. Rather, a hand-held device is from a technical perspective implicitly characterised by portability <u>and</u> an ergonomic configuration for the purposes of being held in a hand.

A stimulation device having these features is, in addition, described in more detail in Fig. 3. The originally filed description accordingly explains on page 13, penultimate paragraph:

"*The first embodiment of the stimulation device 1 is a **preferably portable** electric or small device, comprising a housing 8, a pressure field generator 2, operating elements 71, a display 72, an on/off switch 74, a socket 75, an **optional battery 76** and optional lighting 9*".

(emphasis by the author)

It is evident from these two statements "preferably" and "optional" in this embodiment, which is merely exemplary, that the features "portable" and "battery" constitute supplementations which are at the discretion of the person skilled in the art. Consequently, these features are presented in a recognisably independent manner for the person skilled in the art. Thus, the inclusion of these optional features in claim 1 cannot, as a matter of principle, constitute an intermediate generalisation.

Moreover, in the present case an intermediate generalisation would also be straightforwardly admissible. Specifically, according to established case-law,

10/36

the applicant can also select individual features of an exemplary embodiment as long as no functionally necessary relationship exists (cf. for example BGH, judgment of 16.10.2007 – X ZR 226/02 *Sammelhefter II*; BGH, judgment of 15.11.2005 – X ZR 17/02 *Koksofentür*).

3)      **Feature 13a): "wherein the connection element (5) is rigid".**

On page 17, second paragraph of the original description, the following is disclosed:

"*The holder 32 preferably consists of a **rigid** plastic …*".

(emphasis by the author)

The reference symbol 32 can also be seen in Figures 4 to 6, with the straight channel of the connection element 5 being formed by the walls of the holder 32. Consequently, the person skilled in the art regards the connection element 5 of the first embodiment as being rigid. Furthermore, a "holder" has the purpose of holding something in place, and so it is obvious from this designation alone that the material to be selected must be rigid.

Figs 10a and 10c considered together with the last paragraph of page 20 of the original description show something similar. There, it is stated:

"*In this aspect of the invention the wall 31 of the first chamber 3 is of **rigid or stiff** construction*".

(emphasis by the author)

In Figures 10a to 10c, this wall 31 merges into the wall of the channel of the connection element 5 in a continuous manner, i.e. as one piece, as a consequence of which a rigid connection element 5 is disclosed here too. In addition, the person skilled in the art recognises from the dashed continuation of the channel that the length of the channel of the connection element 5 is

11/36

not important here.

The arguments of Opponent 1 in relation to the disclosure of the second embodiment are also incorrect. On page 21, penultimate paragraph of the original description, a connection element with a rigid channel is disclosed:

"*The chambers 3 and 4 are connected via an extended connection element 5, which can be a longer flexible hose or even a **rigid pipe**. For example, the connection element 5 may be 0.5 m in length.*".

(emphasis by the author)

On the basis of the person skilled in the art's general understanding, a pipe necessarily has a channel (otherwise it would be not a pipe, but rather a rod), and, in a manner corresponding to this, the pipe of the associated Fig. 11 of the contested patent also has a straight channel. The length of 0.5 m in the description is stated merely by way of example here.

Therefore, the Patentee is free to choose to claim the teaching of the rigid pipe as a rigid channel.

**4)**     **Feature 13b): "is designed as a straight channel with a nozzle effect"**

On page 8, second paragraph of the original description, it is stated:

"*For example, the connection element in a stimulation device intended for the clitoris may have a single passageway with a nozzle effect on the clitoris glans between the first and second chamber.*"

A passageway discloses a channel. Such an interpretation is not questioned by Opponent 1 either, as its arguments on page 14, 2nd paragraph of its grounds of opposition prove. Although it is initially still left open at this point whether this channel is designed in a straight or curved manner, all of the embodiments of Figures 3 to 8, 10 and 11 show a straight channel. It is thus

clear to the person skilled in the art that a configuration of the connection element 5 as a single straight channel with a nozzle effect is a possible embodiment of the invention.

Accordingly, the following is explained in relation to the first embodiment in the description on page 16, last paragraph of the description:

"*Two mutually aligned openings in the wall 41 of the second chamber and of the holder 32 jointly form the connection element 5*".

It is further stated in the original description on page 20, 3rd paragraph:

"*While the embodiment of connection element 5 with **only one channel**, as described in conjunction with Fig. 6, leads to the formation of a strongly concentrated media- or airflow on a target area ...*"
(emphasis by the author)

The person skilled in the art additionally recognises that Fig. 6 with the associated arrows represents a nozzle effect according to the invention of the connection element in relation to a flow, as a consequence of which the embodiment of Fig. 6 also discloses the configuration of the connection element according to the claim. No further openings of the first chamber 3 other than that to the connection element can be seen in Figures 4 to 6. The assumption that further openings not caught by the cross-section in Figures 4 to 6 could be present also does not find any support in the description in any event [cf. 0086]. Thus, a first chamber with a <u>single</u> opening is disclosed in accordance with an embodiment of the invention.

Consequently, in particular the embodiment of Figures 4 to 6 discloses all of the challenged features of a straight channel with a nozzle effect.

The description further describes the following on page 8, last paragraph:

"*Furthermore, after placing the halfway or partially opened second chamber*

*on the area of skin to be stimulated, a self-contained system of media- and airflow is created in the pressure field generator*."

It is further stated in the same paragraph:

"*Thus, the first chamber is preferably connected* **exclusively** *with the second chamber via or through the connection element.* **Thus**, *no first chamber connections other than those to the second chamber exist; for example, there is no direct first chamber connection to the environment of the device via a pressure valve or via an air discharge channel*"

(emphasis by the author)

The same thing can also be found in the original description on page 16, penultimate paragraph.

Thus, it is also clear to the person skilled in the art from an overall view of the teaching of the description that the preferred embodiment of the invention **must** have a single opening of the first chamber 3 which is connected to the second chamber 4 via a single straight channel having a nozzle effect.

Page 24, line 27 of the description discloses to the person skilled in the art, in a corresponding manner, that "*only one opening from the first chamber 3*" is shown in **all embodiments**.

In addition, page 19, line 15 of the description refers to an "axial direction" of the connection element 5, and thus of the channel of Fig. 7. Only straight channels have a geometric axis, as a consequence of which this passage also discloses a straight channel.

**5)    Feature 11: "wherein the stimulation device (1) has no valves"**

The Opponents' opinion that this feature claims that the stimulation device 1 does not have any valves "overall" is correct.

This is disclosed in this degree of generality in two passages in the original description. On page 9, second paragraph it is stated accordingly:

"***The present invention*** *thus avoids* ***valves*** *or pumps/compressors with potential dead spaces and places that cannot be cleaned.*"

(emphasis by the author)

It is thus disclosed that the entire invention, i.e. the stimulation device according to the invention, avoids valves.

In the very next paragraph on page 9, it is stated:

"*In addition,* ***the construction according to the invention*** *avoids complex fluidic elements, such as valves, which leads to a simplification in production.*"

(emphasis by the author)

In the same way, nor is a valve shown in Fig. 3 of the original application documents, which reproduces a cross-section of the entire stimulation device.

Furthermore, feature 11 must be considered in the context of the entirety of the disclosure. The prior art discussed in the description from page 3, first paragraph to page 4, first paragraph and on page 5, second and fourth paragraphs describes valves as being generally disadvantageous, regardless of where they are arranged. For example, it is clear to the person skilled in the art from the patent's comments on US 6 099 463 A on page 2, second paragraph of the original description, that a release valve can be arranged at any desired location as long as this fulfils its function of releasing the vacuum.

**In summary, all of the features of claim 1 of the contested patent are originally disclosed and do not constitute an inadmissible extension of the subject-matter of the patent beyond the content of the original**

15/36

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

**application.**

G.    **Relevance of documents having subject-matters which are unsuitable for clitoral stimulation**

A device which otherwise possesses all of the features specified in the patent claim but which would be unsuitable for the stated purpose (see in this regard also point D.2)) or would require a modification to enable it to be used for this purpose should not normally be considered to be a subject-matter which anticipates the subject-matter of the patent claim (cf. Guidelines for Examination of the EPO, Part F-IV, 4.13). These principles of interpretation also apply *mutatis mutandis* in national opposition proceedings.

D8 discloses a device for skin treatment with cosmetic or else therapeutic effect, and therefore clearly no suitability for clitoral stimulation within the meaning of claim 1.

D9 discloses a device for body fat therapy which is placed on the skin and therefore clearly no suitability for clitoral stimulation within the meaning of claim 1.

E1 discloses a pneumatic health massage device for application in traditional Chinese medical meridian massage. It is known that no meridians run through the clitoris, and so E1 clearly has no suitability for clitoral stimulation within the meaning of claim 1. The same thing applies in a similar fashion for E4, to which the Opponent refers in a sweeping manner with one sentence but which does not disclose a clitoral stimulation at any point.

Therefore, D8 and D9, as well as E1 and E4, cannot be prejudicial to novelty quite simply on the basis that they clearly possess no suitability for clitoral stimulation within the meaning of claim 1.

H.    **Novelty of claim 1 over citation D8 (DE 42 43 876 A1)**

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

Contrary to the arguments made by the Opponents, not all of the features of claim 1 can be derived from document D8. Moreover, D8 does not anticipate the subject-matter of claim 1 quite simply because it clearly has no suitability for clitoral stimulation (see F.).

**In particular, D8 does not disclose features 1), 4.a) and 4.b), 5, 6, 9, 10, 12, 13.a) and 13.b), 14 and 15, as shown below:**

1.    D8 discloses a device for skin treatment with cosmetic or else therapeutic effect, and therefore no suitability for clitoral stimulation (**feature 1**). A possibility of stimulation for the clitoris is not disclosed in D8 either implicitly or explicitly. The stated problems and the scope of protection of D8 thus differ fundamentally from those of the contested patent. This means, however, that the entire configuration of the pressure, the geometry of the cavities etc. will necessarily end up being different from the teaching according to the claim.

The statement by Opponent 1 that the clitoris ultimately also has skin and therefore the device of D8 is suitable for stimulation for the (extremely sensitive) clitoris is absurd and permits no other conclusion to be drawn.

The subject-matter of the contested patent is already clearly delimited from such therapeutic devices in a corresponding manner  in the introduction to the description (cf. [0008]ff.), as a consequence of which a therapy cannot be understood as being stimulation within the meaning of the patent (see also point D. 2)).

It should be mentioned once again that devices which are only generally used for cosmetic or therapeutic skin treatment are unsuitable for the claimed clitoral stimulation because clitoral stimulation relates to the treatment of a sensitive mucous membrane and requires corresponding dimensioning, in particular of the second chamber of the stimulation device.

17/36

D8 is therefore **unsuitable** prior art which is **not of the same generic type**.

2.　　**Features 4a) and 4b)** are neither implicitly nor explicitly disclosed in D8. D8 merely discloses a plurality of "nozzles 19" (cf. D8, column 7, line 19) or "outlet nozzles" in a "treatment surface" (cf. D8, column 7, line 51). In particular, the "outlet openings" are formed directly in the treatment surface of the head of D8 (cf. D8, column 3, lines 7ff.), with the treatment surface bearing on the skin surface to be stimulated. Here, the "*suction and pressure surges* [act] *through the through-holes 19 in an outward direction*", i.e. an effect of a pressure field **inside** a (second) chamber on the clitoris glans within the meaning of features 5 and 6 is not disclosed in D8.

On account of the lack of suitability for clitoral stimulation, D8 also does not disclose that the nozzles 19 are suitable for accommodating a clitoris glans and for being placed over the clitoris. For example, D8 discloses only a plurality (four) of "nozzles 19" arranged off-centre, and for this reason, upon the head part 18 being applied, the clitoris glans would in each case come to rest below the treatment surface.

Thus, only flatly configured skin areas can be reached with the treatment head of D8. Skin areas having a height profile, such as the clitoris glans, cannot be accommodated by a head configured in accordance with D8, as a consequence of which it is not possible to place it over the clitoris.

Independently of this, the provision of a plurality of nozzles 19, i.e. of a plurality of second chambers, makes no sense either in view of the female anatomy, which has only one single clitoris.

3.　　In addition, in accordance with **feature 15**, in the claim "*the opening (51) of the connection element (5)* (i.e. of the rigid, straight channel

18/36

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

with a nozzle effect) *faces the clitoris through the second chamber 4*". In contrast to this, the nozzle outlet of D8 bears directly on the skin, and so for this reason too there is no spaced-apart second chamber in D8.

4.    As was correctly noted by Opponent 1 on page 13, paragraph 6, the outlet openings 19 are themselves referred to as nozzles, as a consequence of which it can be assumed that they perform a function corresponding to a nozzle. This means, however, that the nozzle effect of D8 in the supposed second chambers is not, as defined in **feature 13.b)**, realised by the connection element.

**No** connection element with a nozzle effect is thus disclosed in D8.

5.    **Feature 5** is not disclosed. A connection element according to feature 5 is characterised in that the connection element connects the openings of the chambers 3, 4 itself, i.e. **directly** connects the first chamber and the second chamber. Any other connections or channels potentially disclosed in D8 thus fall away because they have a different function, i.e. connect something different.

Since D8, as has been explained above, does not disclose a second chamber, the connection element according to the claim cannot be disclosed in D8 either.

In this regard, Opponent 1 expressly states in its grounds of opposition, on page 13, paragraph 4, that

"*... the first chamber has a single opening, namely the opening into the hose 4.*"

However, the hose is flexible and not straight and is therefore not a connection element within the meaning of the claim. It is completely absurd in this context for a chamber to extend "*via a hose*", as

19/36

Opponent 1 states on page 12, penultimate paragraph, contrary to its above observation.

The through-bore 22 of Fig. 2 of D8 also runs in a curve if the dashed lines with the reference symbol 22 in Fig. 2 are followed. In addition, the through-bore 22 ends in a further channel in the handle 11, and not in a chamber.

The argument of Opponent 1 on page 14, third paragraph that

"*If the openings 19 are referred to as nozzles, the person skilled in the art is able to understand from this that the through-bore 22 has a smaller cross-section than the openings 19 because the latter otherwise would not form a nozzle.*"

is incomprehensible.

If the through-bores 22 had a smaller cross-section, they would themselves be referred to as a nozzle. However, this is not the case in D8.

Rather, the openings 19 in D8 are themselves referred to as nozzles, as a consequence of which they represent the location of the smallest cross-section. Accordingly, the openings 19 open in an outward direction. The further considerations of Opponent 1 on cross-sectional ratios of the through-bore 22 and of the opening 19 are speculation but are not part of the disclosure of D8.

The through-bore 22 according to D8 also does not open directly into the nozzles 19 but rather opens into the intercalated distributor channel.

6.    **Feature 6** in conjunction with **feature 14** is not disclosed in D8. The question of whether or not the "movable membrane" of D8 discloses

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

a chamber-like configuration of a pressure-field-generating arrangement need not be addressed. In this context, configurations of a pump with a movable membrane are also conceivable which do not require a chamber within the meaning of the claim (for example a peristaltic pump).

According to the claim, it is necessary for the existence of a first chamber 3 at least that this chamber has a direct opening to the straight and rigid connection element 5. This is not the case according to the disclosure of D8. Rather, D8 shows in Fig. 1 an elongate, wound air hose with various sections and angular transitions which is connected to the treatment head 2 of D8.

7.  **Feature 9** is not disclosed in D8 either. As is clear from Fig. 2 and column 7, lines 14 to 24 of D8, for example, the passageway 22 is not exclusively connected with the second chamber, but rather is connected with a plurality of nozzles 19 and the air hose 4. The embodiment of D8 discloses in detail a plurality of nozzles spaced apart from one another on a plane which are connected with a circular distributor channel. There are therefore branch-offs in the air channel as well as spatial offsets between nozzles and through-bore. Consequently, the arrangement of D8 in fluidic and functional terms is set up in a clearly different way from the arrangement defined by feature 9 .

8.  **Feature 10** is not disclosed in D8 either. D8 provides no further information about the internal structure of its generator. It is also straightforwardly possible from a functional perspective for the generator to have more than one opening in order to create a pressure field consisting of negative and positive pressures, as can be seen from D6 or D7 for example.

9.  **Feature 12** is not disclosed in D8 either. When interpreting this feature, what is important is the intended use. Specifically, the

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

claimed device, as a "hand-held device" which encompasses the pressure field generator as a whole, is intended to be able to be held in the hand during **use** and to that end has an ergonomic shape which enables it to be gripped with the hand (cf. Figures 1 and 2). By contrast, D8 has a "stationary part 1" (cf. D8, column 5, line 57) which is designed in the form of a tabletop device. Although this stationary part 1 can also be portable, this alone does not mean that the combination of stationary part 1 and treatment head 2 amounts to a hand-held device within the meaning of claim 1 (see also point E.2)).

A battery is not disclosed either. The use of electricity-intensive Peltier elements and the design in the form of a tabletop device indicate to the person skilled in the art that a mains electricity supply is more likely.

10.   **Features 13.a) and 13.b)** are not disclosed in D8 either. Since no connection element within the meaning of feature 5 is disclosed, no properties of one can be disclosed by D8 either.

The through-bore 22 of D8 is not straight and nor does it have a nozzle effect, as has been argued above.

11.   An alignment of the opening of a straight connection element 5 into the first chamber and of the opening of the connection element 5 into the second chamber with respect to one another, in other words facing one another in accordance with **feature 14**, is not disclosed in D8 either.

12.   On the basis of the above arguments, **feature 15** is not disclosed in D8 either because the latter does not disclose a second chamber. A spacing apart of the nozzle from the bearing surface of the device of D8, at least over the length of a clitoris glans, is not disclosed either.

22/36

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

**I.     Inventive step of claim 1 vis-à-vis D8**

As has been demonstrated above, D8 is not of the same generic type and is not concerned with the sexual stimulation of the clitoris. Thus, according to the settled case-law of the Federal Court of Justice, a person skilled in the art will generally not take it into account for the purposes of realising the teaching according to the claim.

In addition, D8 does not disclose a number of features, as has already been argued above in relation to novelty. Nor would it be obvious for a person skilled in the art to add these because there is no encouragement whatsoever in D8 for him or her to do so.

The claimed subject-matter of claim 1 is therefore based on an inventive step vis-à-vis D8.

**J.     Inventive step of the main claim vis-à-vis D9 (US 2008 / 030 49 84 A1) and D10 (WO 00 / 28939 A2)**

1.     D9 discloses a device for body fat therapy which is placed on the skin. The intention is therefore specifically not to stimulate nerve endings for the purposes of clitoral stimulation; on the contrary, the intention here is to act on an area in the subcutis, more specifically on fatty tissue. It would therefore be nonsensical to assume that the clitoral area could be treated for excess body fat.

It is obvious that the intensity ranges to be applied differ by orders of magnitude between the stimulation of touch receptors, for example Meissner's corpuscles, which are found in the skin layer above the fatty tissue and are densely distributed on the clitoris – as a particularly sensitive erogenous zone (see paragraph [0046] of the patent specification – and the treatment of fatty tissue in the subcutis.

As has already been explained in point D.2), a clear distinction must be made between devices for the stimulation of the clitoris, i.e. for use on mucous membrane, and devices for the treatment of the normal skin.

Considered from a medical perspective, a mucous membrane does not have a cornified layer, i.e. has no true epidermis. A particular characteristic of the clitoral mucous membrane is the presence of a large number of sensory cells and mucus-producing glands.

A person skilled in the art will thus design the pressure field according to the invention differently (for example in terms of the achievable overall pressure thereof) from how he or she would if he or she were following the teaching of D9. On account of the cornified layer of normal skin, the pressure would be much too strong.

It is for that reason that the teaching of D9 is clearly unsuitable for the purposes of clitoral stimulation within the meaning of claim 1 as granted, and a person skilled in the art will from the outset reject D9 as a starting point for considerations relating to clitoral stimulation because it is not of the same generic type.

This means, however, that a person skilled in the art would as a matter of principle not take D9 into consideration for the purposes of the assessment of inventive step.

2.    It is purely on a precautionary basis that further substantive observations regarding D9 are set out below because the latter – like D8, which is not of the same generic type – does not disclose a number of features according to the claim:

a)      for instance, D9 does **not** disclose, in addition to the suitability for clitoral stimulation, also **features 4b, 5, 6, 8, 9, 10, 13.a), 13.b), 14 and 15**, as explained below:

24/36

As has already been noted by Opponent 1, D9 has no second chamber and no connection element and therefore no media flow between the chambers or else an orientation of them either.

D9 also refers exclusively to negative pressures (cf. [0017], "*suction action*"), which means that the positive pressures according to the invention are not disclosed. Furthermore, the piston of D9 moves back and forth over the entire length of a cylinder and therefore also strikes the skin. This is a direct stimulation, which is specifically what the teaching according to the patent is seeking to avoid.

b)     In addition, **D10** does **not** disclose **features 5, 8, 9, 10, 13.b), 14 and 15**, as is demonstrated below.

D10 exhibits a device and method for treating sexual dysfunctions exclusively by means of a vacuum, as a consequence of which a clitoral stimulation according to the patent with positive and negative pressures is not disclosed. Accordingly, it states the following: "*Embodiments of the invention are designed to increase blood flow in the clitoris to assist a woman to achieve clitoral engorgement*" (see page 9, lines 19 to 22 of D10).

Accordingly, D10 exhibits a vacuum pump which is, however, affected by the disadvantages listed in the description of the patent. In particular, the sustained application of a negative pressure may lead to habituation effects and permanently limit the effectiveness of the device (see paragraph [0007] of the patent specification).

In view of the above-described advantages and fields of

25/36

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

application, a person skilled in the art therefore would not have recourse to a vacuum pump in order to develop a device for clitoral stimulation up to orgasm (climax).

In addition, D10 discloses the use of valves (cf. page 9, line 29 or page 11, line 8) and therefore does not disclose feature 11. Furthermore, no connection element according to the claim is disclosed and therefore nor is any alignment of its opening (features 13 a), b) and 15).

c)     Therefore, neither D9 nor D10 can by itself render obvious the subject-matter of claim 1, and, even given a combination of documents D9 and D10, it would not be obvious for a person skilled in the art to arrive at the claimed subject-matter because features 8, 9, 10, 13.b), 14 and 15 are not disclosed in either of the two documents.

In particular, an alignment of the media flow with the clitoris is not disclosed in either D9 or D10 because no positive pressures are disclosed. Only a negative pressure is brought about in D10. In addition, a valve is used for vacuum pump control (cf. page 9, line 29). In D9, a volume change takes place in the same chamber which bears against the skin. Therefore, no flow is aligned here either.

Thus, none of the documents provides encouragement for a simulation device in which an indirect pressure massage (resulting from the alignment of the flow) is used for sexual stimulation up to orgasm (climax), and nor does a combination of these two documents.

**The subject-matter of claim 1 therefore involves an inventive step vis-à-vis documents D9 and D10.**

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

**K.     Patentability vis-à-vis E1 (CN 2153351)**

**1.     Regarding the disclosure content generally**

E1 relates to a Chinese utility model with one page of description, two claims and a figure. Opponent 2 has filed an English machine translation of it on which it bases its arguments. However, the Patentee has doubts regarding the quality of machine translation in comparison with a translation by a human, in particular in the case of a Chinese original disclosure, because the Chinese language is highly ambiguous and context-based. A machine translation may provide an initial indication, but what is ultimately decisive is only the actual disclosure content of a document. The applicant therefore submits a certified English translation by a Chinese translation agency as Exhibit A2. According to that translation, the disclosure content of E1 differs decisively from the machine translation which was submitted by Opponent 2.

- For instance, the machine translation states "*movable rubber nozzle (1")*" while the translation by a human refers to "*movable rubber mouth (1)*".
- Furthermore, the machine translation states "*gas health massage*" and "*pulsating air pressure*", and the translation by a human states "*Pneumatic Health Massage Device*" and "*pulse air pressure*".
- Where the machine translation nebulously mentions *"... a plurality of machine treatment probe ..."*, the translation by a human states "*It can also be equipped with multiple therapeutic mouthpieces.*".
- It is further stated in the translation by a human "*Pulse air pressure will be generated when the switch is on, so as to therapeutically stimulate acupoints in the body.*" Whereas the machine translation translates the sentence incomprehensibly with "*Power pulsed pressure to stimulate the meridian points*

27/36

*in order to achieve therapeutic purposes.*".

In addition to the linguistic uncertainty regarding the actual disclosure content, it is also the case that the single figure of E1 shows a mixture of a schematic representation of a magnetic drive arrangement and a technical sectional drawing. In addition, the Opponent has inserted further reference symbols of its own into the figure in order to supplement the disclosure in what appears to be a retrospective approach.

E1 therefore does not in any way disclose to the person skilled in the art an unambiguous technical teaching which is capable of supporting the arguments of Opponent 2 from a factual point of view.

## 2.    Document E1 does not disclose to the person skilled in the art a teaching which is able to be carried out

In relation to the supposed magnetic drive of E1, no directions of movement, alignments of the magnets, deflection details etc. are specified either in the brief description or in the single figure. Thus, E1 lacks a direct and unambiguous disclosure of how the overall device of E1 could function at all.

In particular, it is not disclosed which movements of the lever should take place in which directions. A back-and-forth movement of the magnet 4 relative to the electromagnet 5 in the sense of a right/left movement in the plane of Figure 1 of E1 can be ruled out because this is not possible in accordance with the laws of physics.

Like poles repel each other and opposite poles attract each other. Assuming that the magnet 4 has its south pole on the left-hand side and its north pole on the right-hand side, then both sides are equally strongly attracted or repelled irrespective of the polarity of the

electromagnet 5, as a consequence of which the magnet 4 would stay where it is. The same of course also applies for the reverse arrangement of the poles of the magnet 4.

Ultimately, upon current being passed through the electromagnet (in the plane of the paper of Fig. 1), a magnet 4 would only be either drawn upwards towards the electromagnet 5 or be pushed away from the latter (the field forces always act perpendicularly to the field lines, which in the present case cut through the magnet 4 from left to right or vice versa). This would correspond to a conventional "solenoid drive". In these, however, additionally in principle only one drive in one direction is possible (i.e. either only pushing or only drawing) unless a return element, for example a spring, is present. Nothing of this nature is disclosed in E1, however.

In addition, it is not apparent where the pivot point of the lever 3 could be. No information about this is provided. Without a fulcrum, the movement of the lever is not apparent. Consequently, it is not possible to gather from E1 how forces could act on the airbag 2 by way of the lever 3 and likewise how any "pressure" whatsoever could be generated.

Nor is it apparent how or in which direction the "movable rubber mouth" of E1 could be moved.

It is also the case that in E1 no details about a mounting of the airbag 2 or of the mouth piece 1 are provided, and so here too the person skilled in the art is unable to derive from E1 a teaching which is capable of being carried out.

In particular, it remains open whether, when the lever moves, only the airbag deforms or whether the airbag deforms and the mouth piece also moves back and forth. Thus, E1 does not provide the person skilled in the art with an unambiguous teaching which is capable of

being carried out. However, the ability to be carried out is a prerequisite for a technical teaching in order for it to be classified as relevant prior art.

**Document E1 therefore does not constitute prior art to be taken into consideration by a person skilled in the art.**

### 3.     E1 is not of the same generic type

Document E1 does not disclose, either implicitly or explicitly, a stimulation device for the clitoris, but rather discloses a pneumatic health massage device for application in traditional Chinese medical meridian massage, and it is known that no meridians flow through the clitoris.

The sweeping reference by Opponent 2 to E3 and stimulation of erogenous zones also does nothing to change this. This is because E3 likewise in no way recommends a clitoral stimulation by means of meridian massage, but rather indicates in the introduction "Sexual stimulation points" that:

"*If we were reliant only on the <u>western approach</u> and scientific findings, the sexual stimulation points would be limited to the <u>clitoris</u> and nipples in women and the penis in men and the chapter would be finished in no time. <u>The eastern world-view</u>, which is becoming more and more widespread here too by virtue of acupuncture, martial arts and meditation, <u>is completely different</u>. Here, we find a rich treasury of experience as regards bodily awareness and sexual stimulation.*"

That is to say that E3 encourages the interested reader (who, in very rare cases, will be a person skilled in the art in the development of sex toys), in the context of erotic partner massage, to try out eastern, non-conventional medical meridian therapy which specifically also uses stimulation points <u>other</u> than the clitoris for a <u>direct manual</u> massage.

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

This means, however, that the person skilled in the art does not obtain from E3 any encouragement to use the device of E1 for sexual clitoral stimulation.

The meridian massage referred to in E1 is a form of massage practised in China in which particular points (meridian points) on the skin are "tapped" rhythmically. In this context, the tapping is undertaken for example by the knuckles or a special little hammer, and is intended to bring about an alleviation of physical complaints.

Furthermore, the teaching of a "meridian therapy" is clearly inconsistent with the conventional medicine practised in Europe. Meridian therapy is not scientifically recognised in Europe. Such a document with a "fictitious" healing effect will be rejected by the relevant person skilled in the art when creating a stimulation device for the clitoris. Rather, when one considers the single figure, the device of E1, irrespective of the fact that it is easily portable (cf. also E. 2), is recognisably unsuitable for a hand-held device for clitoral stimulation within the meaning of claim 1 as granted.

**For the purposes of the assessment of inventive step**, a person skilled in the art would absolutely not take into consideration a subject-matter that is not of the same generic type in this way, in a document which, in addition, does not convey any technical teaching capable of being carried out.

Irrespective of the inability to be carried out, E1, which is not of the same generic type, is in addition substantially different from the claimed teaching of the patent, as is demonstrated below:

4.      **E1 does not disclose a change in volume of a first chamber**

The "airbag" 2 of E1 – even if any movement at all of the lever 2 in the axial direction of the airbag in accordance with the arguments of

31/36

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

Opponent 2 were to be assumed – would not be changed in terms of its volume. If one considers the sectional view of Fig. 1 of E1, it is clear to a person skilled in the art that, if the airbag were axially lengthened, it would simply become longer and thinner, and if it were axially squeezed, it would become correspondingly rounder, which would mean that the volume would remain constant. "Pumping" of, for example, air or water within the meaning of the present application is not possible at all with such an "airbag 2" as is shown in Fig. 1.

In order for a change in the volume of the airbag 2 of E1 to be able to take place in the first place, in the event of forces acting on one side, a holding counterforce would have to be able to act on the airbag 2. However, no mounting or similar of the airbag is evident from the description or the single figure. In fact, the airbag 2 is also arranged in a freely movable manner, which is why it cannot be compressed, as argued by Opponent 2.

In a manner corresponding to the finding from Fig. 1 of E1 that is explained above, a person skilled in the art also infers the function of this feature from the designation of the feature itself as an "airbag 2": an airbag is known to have the function of keeping its volume constant when its outer shape changes **in order to absorb a shock**.

It is also stated, in a corresponding manner, in the fifth paragraph of the description in the translation of E1 that the magnet 4, the lever 3 and the airbag 2, i.e. the airbag 2 **as a whole**, are (intended to be) moved reciprocally. However, here too it is completely unclear in which directions the overall arrangement 2, 3 and 4 should be moved.

5.    **E1 does not disclose a second chamber for placing over the clitoris**

According to the translated description of E1, the "mouth piece 1" is "movable". It must therefore in some way move along with the movement of the airbag 2 and of the "lever 3". As a consequence, the

mouth piece 1 logically cannot be used for being placed on a body part in a prolonged manner within the meaning of the present application. In addition, it is described in the last paragraph that the device can have a plurality of therapeutic mouth pieces, whereas it is known that the female body has only one clitoris.

A person skilled in the art can only surmise that, in accordance with the above-described teaching of "meridian therapy" (cf. E1, description, first paragraph), a rhythmical tapping of the skin with the mouth piece 1 is intended to influence meridian points in a positive manner. One might therefore surmise that E1 intends a hammer-blow-like striking of the mouth piece 1 on the surface of the skin to take place, which is intended to be absorbed by the airbag. However, here too it is unclear how this tapping could be undertaken.

The generation of negative pressures is impossible with such a tapping arrangement because no volume limited by a prolonged placement of a chamber over the clitoris exists in which a negative pressure could be generated. Consequently, the pressure field consisting of negative and positive pressures according to the invention cannot be derived from E1 either explicitly or implicitly.

**6.    E1 also does not disclose further features of claim 1:**

As has been argued above, E1 does not disclose a second chamber (4) with an opening (42) for placing over the clitoris (12) (feature **4.b**)). Since, in addition, the field of application of the device of E1 differs from the field of application according to the patent, E1 also does not disclose that the opening of the mouth piece is configured in accordance with the anatomy of the clitoris (that is to say for example so as to accommodate the clitoris glans). Thus, E1 does not disclose a second chamber with an opening for placing over the clitoris. However, if no second chamber 4 is disclosed, then no associated connection element 5 according to the claim is disclosed either.

33/36

E1 also does not exhibit a first chamber according to the patent whose volume can be changed by the drive unit (feature 3 in conjunction with feature 6). As has been argued above, when the airbag of E1 is designed in accordance with Fig. 1 thereof, only its shape changes, but not its volume.

Thus, **feature 8**, the generation of a pressure field which consists of a pattern of negative and positive pressures which are modulated with respect to the reference pressure, cannot be derived from E1 in a clear and unambiguous manner either.

In addition, E1 does not disclose any further information about the structure of the device. There are no details provided about control, the housing, the internal structure, the power supply, etc.

In summary, a person skilled in the art is unable to gather in a clear and unambiguous manner from E1 at least the following:

- no first chamber because the volume of the airbag 2 is not changed,
- no second chamber because the mouth piece 1 is not used for placing over the clitoris
- no connection element 5 which would have to connect the two chambers,
- no pressure field consisting of negative and positive pressures because at least no negative pressures are disclosed,
- no control device for controlling the modulation of the pressure field,
- no drive unit which would bring about a change in the volume of a first chamber, and
- no suitability of the device for stimulating the clitoris up to sexual climax.

**7.**     **There is no concrete reason for a person skilled in the art to proceed in a manner according to the invention**.

It is pointed out that, from the applicant's point of view, the Opponents' statement of reasons in relation to the lack of inventive step of the original claim 1 is insufficient in the first place.

In detail, the arguments in favour of obviousness lack any explanation of a concrete reason why a person skilled in the art would proceed in a manner according to the invention. In the applicant's view, a person skilled in the art would therefore not simply combine E1 with an arbitrary further document (in the present case D7 for example).

In particular, it appears to the applicant to be concerning if the provision of a reason is reduced to a mere – retrospectively formulated – task. In other words, it cannot be the only task of a person skilled in the art to replace precisely the features which – in the opinion of Opponent 2 – are missing. On the basis of this line of argument there would no longer be any positive existence of an inventive step because the logic of this would mean that any desired subject-matter could be inferred.

In fact, the fictitious person of the person skilled in the art always acts in a target-oriented manner, and not spontaneously. For instance, a concrete encouragement or a reason for a person skilled in the art to proceed in a manner according to the claims must always arise from the documents themselves. Therefore, if a document does not provide a person skilled in the art with encouragement to search for a solution in a particular direction, then there is no encouragement for the solution itself either (cf. inter alia Benkard, 11th edition, Section 4 para. 90 with reference to BPatG GRUR 1986, 307, 309 – *Digitale Signalverarbeitungsanordnung*).

**L.**     **Conclusion:**

[File: 101603434.docx // LE11K17E]   16 May 2017
Stimulation device
NOVOLUTO GmbH

All of the amendments to claim 1 in the examination proceedings are originally disclosed. There is therefore **no inadmissible extension** of the subject-matter of the invention beyond the content of the original application.

None of the prior-art documents in the proceedings, in particular D8, D9, D10 or E1, is concerned with an effective clitoral stimulation up to sexual climax, which is the object of the teaching of claim 1 of the contested patent (cf. paras. [0004], [0007], [0008], [0032], [0046]).

Furthermore, it can be stated that, in the entirety of the prior art that is in the proceedings, no exemplary model or indication of such a device having the features described can be found which could anticipate the subject-matter of claim 1 of the patent or render it obvious to a person skilled in the art. Claim 1 according to the patent is therefore **novel and inventive**.

**The patent must therefore be maintained in unchanged form.**


[signed]

Patent Attorney

**Rainer K. Kuhnen**

(Tel. 08161 608 318)


Enclosures

A1:    Final judgment of the Munich I Regional Court in relation to case: 21 O 22538/15

A2:    Certified translation into English of CN 2153351

*Exhibit 27*

[19] State Patent Office of the People's Republic of China          [11] Authorized Announcement No.: CN 2153351Y



# [12] Specifications of Utility Model Patent

## [21] ZL Patent No.: 92219988.4

[51] Int.Cl$^5$

A61H   9/00

[45] Date of Authorized Announcement: Jan. 19, 1994

---

[22] Application Date: Oct. 22, 1992          [24] Issue Date: Dec. 11, 1993          [21] Application No.: 92219988.4

[73] Patentee: Guan Chengxiao

Address: Room 103, Unit 2, Building No. 9, South Leshan Xiaoqu, Jinan, Shandong, 250001

[72] Designer: Guan Chengxiao

Pages of Specifications          Drawing Sheets

---



[54] Name of Utility Model: Pneumatic Health Massage Device

[57] Abstract

The utility model is a new medical device, wherein an electromagnet (5) and a magnet (4) interact with each other. The magnet (4) links to a lever (3) which is connected to an end of an airbag (2), whose another end is connecting with a movable rubber mouthpiece (1). By adopting pulse air pressure to stimulate meridian points related to human health in the body, the utility model has therapeutic effects on high blood pressure, heart disease, cerebral thrombosis, coronary heart disease, digestive system, nervous system and various pains.



(BJ) No. 1452

# CLAIMS

1. A pneumatic health message device is characterized in that, an electromagnet (5) and a magnet (4) interact with each other, the magnet (4) linking to a lever (3) which is connected with an end of an airbag (2), whose another end is connecting with a movable rubber mouthpiece (1).

2. The pneumatic health message device as described in claim 1 is characterized in that, the said rubber mouthpiece (1) is straight or reduced.



1002

# SPECIFICATIONS

## Pneumatic Health Massage Device

The utility model is a new device for medical health based on the traditional Chinese medical theory of meridians and collaterals, adopting the advanced technology of modern hydromechanics.

There are many existing technologies for medical health, such as acupuncture, cupping, moxibustion, massage, acupressure and qigong. Acupuncture causes pain and is not applicable to patients afraid of needles. Cupping produces stimulation that is difficult to recalibrate. Massage and acupressure consume much energy of the doctor and sometimes hurt the patient. Qigong would not be effective if the practitioner was not trained properly. The patentee had once worked on meridians- and collaterals- focused painless treatment device comprising a micro-motor or mechanical, electronic, or electromagnetic installation. The said device was complicated in its structure with high costs and loud noises as it generated pulse air pressure by rotating to activate the reciprocation of a piston in its sheath through according structures.

The utility model aims to provide a small and portable pneumatic health massage device easy to operate.

The utility model has an electromagnet (5) and a magnet (4) interacting with each other. The magnet (4) links to a lever (3) which is connected with an end of an airbag (2), whose another end is connecting with a movable rubber mouthpiece (1). The mouthpiece (1) is straight or reduced.

The utility model has its main structure driven by electromagnet. As is depicted on the drawing sheet, the electromagnet (5) drives the magnet (4), lever (3) and airbag (2) to reciprocate, and then the rubber mouthpiece (1) on the said airbag (2) touches the skin. Pulse air pressure will be generated when the switch is on, so as to therapeutically stimulate acupoints in the body.

The utility model replaces the piston and cylinder used in existing devices with the airbag, making it a simple and portable device with low costs and no noises. It can also be equipped with multiple therapeutic mouthpieces.

FIG. 1 is a view of the pneumatic health massage device.

FIG: 1 – rubber mouthpiece; 2 – airbag; 3 – lever; 4 – magnet; 5 – electromagnet.

1003

# Drawing





1004

*Exhibit 28*



# Espacenet

## Bibliographic data: CN2153351 (Y) — 1994-01-19

### PNEUMATIC HEALTH MASSAGE DEVICE

| | |
|---|---|
| **Inventor(s):** | CHENGXIAO GUAN  [CN] ± (GUAN CHENGXIAO) |
| **Applicant(s):** | GUAN CHENGXIAO  [CN] ± (GUAN CHENGXIAO) |
| **Classification:** | - international:    *A61H9/00;* (IPC1-7): A61H9/00 <br> - cooperative: |
| **Application number:** | CN1992219988U 19921022 |
| **Priority number(s):** | CN1992219988U 19921022 |

### Abstract of  CN2153351 (Y)

The pneumatic health massage device of the utility model is a novel medical device, wherein, an electric magnet (5) cooperates with a magnet (4). A lever (3) connected with the magnet (4) is connected with one end of an air bag (2). The other end of the air bag (2) is movably connected with a rubber nozzle (1). The utility model uses air pressure of pulsation to stimulate meridian points. The utility model produces good curative effect on high blood pressure, heart disease, cerebral thrombosis, coronary heart disease, digestive system, nervous system and all kinds of pains.

EIS EXHIBIT 1011



# [12] 实用新型专利说明书

[21] ZL 专利号　92219988.4

[51]Int.Cl⁵

$$A61H\quad 9/00$$

[45]授权公告日　1994 年 1 月 19 日

| | |
|---|---|
| [22]申请日　92.10.22　[24]颁证日　93.12.11 | [21]申请号　92219988.4 |
| [73]专利权人　管程霄 | |
| 　　　　地址　250001山东省济南市乐山南区9号楼2 | |
| 　　　　　　　单元 103 室 | |
| [72]设计人　管程霄 | |
| | 说明书页数：　　　　附图页数： |

[54]实用新型名称　气体保健按摩器

[57]摘要

　　本新型"气体保健按摩器"是一种新的医疗仪器，其中电磁铁（5）与磁铁（4）相配合，与磁铁（4）相连的杠杆（3）与气囊（2）的一端相连，气囊（2）的另一端与橡胶嘴（1）活动连接。本实用新型利用脉动气压刺激经络穴位，对高血压、心脏病、脑血栓、冠心病、消化系统、神经系统以及各种疼痛均有较好疗效。



# 权　利　要　求　书

　　1、　气体保健按摩器，其特征在于：电磁铁（5）与磁铁（4）相配合，与磁铁（4）相连的杠杆（3）与气囊（2）的一端相连，气囊（2）的另一端与橡胶嘴（1）活动连接。

　　2、根据权利要求1所述的 气体保健按摩器，其特征在于：所说的橡胶嘴（1）为直嘴或变径嘴。

## 气体保健按摩器

本实用新型"气体保健按摩器"是一种新的医疗保健仪器，是根据祖国医学的经络学说，采用现代科学流体力学的先进技术研制而成的。

现有技术用于医疗保健的方案很多，如针刺、拔罐、温灸、推拿按摩、气功等。针刺病人有痛感，且对有的怕针的病人不适用；拔罐刺激量难增减；温灸温度不易掌握；推拿、按摩医生劳动强度大，而且有时给病人造成痛苦；气功，非经训练难以取效。本申请人曾研究过经络无痛治疗仪，采用微电机或机械、电子、电磁装置，将旋转运动，通过相应的结构带动活塞在活塞套中往复运动产生脉动气压。该治疗仪结构复杂、成本高，使用时噪音较大。

本实用新型的目的是提供一种体积小，便于携带、操作方便的气体保健按摩器。

本发明利用电磁铁（5）与磁铁（4）相配合、与磁铁（4）相连的杠杆（3）与气囊（2）的一端相连，气囊（2）的另一端与橡胶嘴（1）活动连接。橡胶嘴（1）为直嘴或变径嘴。

本发明主要结构以电磁铁驱动为例，如图所示电磁铁（5）驱动磁铁（4）、杠杆（3）、气囊（2）的壁作往复运动，由气囊（2）上的橡胶嘴（1）接触肌

说明书

体。接通电源产生脉动气压，刺激经络穴位，以达治疗目的。

　本实用新型与现有技术相比具有以气囊代替了活塞及气缸。结构简单、体积小、成本低及无噪音污染。还可一机多个治疗探头等优点。

　图1是气体保健按摩器的示意图。

　其中：1—橡胶嘴。2—气囊。3—杠杆。4—磁铁。5—电磁铁。



*Exhibit 29*

**[19] Patent Office of the People's Republic of China**

**[11] Authorized Announcement No.:** CN 2153351Y



## [12] Utility Model Patent Specifications

**[21] ZL Patent No.:   92219988.4**

**[45] Date of Authorized Announcement:** Wednesday, January 19, 1994

**[51] Int.Cl$^5$**

A61H 9/00

| | | |
|---|---|---|
| **[22] Filed:** October 22, 1992 | **[24] Issue Date:** December 11, 1993 | **[21] Application No.:**  92219988.4 |

**[73] Patentee:** Guan Chengxiao

**Address:** Room 103, Unit 2, Building 9, Leshan South District, Jinan 250001, Shandong Province

**[72] Inventor:**  Guan Chengxiao

Number of pages of the description:

Number of pages of the figures:

**[54] Utility Model**

A Gas Health Massager

**[57] Abstract**

The "gas health massager" of the present utility model is a new medical instrument, wherein an electromagnet (5) is matched with a magnet (4), and a lever (3) connected to the magnet (4) is connected to one end of an air bag (2), and the other end of the air bag (2) is movably connected to a rubber mouth (1). The utility model utilizes pulsating air pressure to stimulate the six meridians, and has good curative effect on blood pressure, heart disease, cerebral thrombosis, coronary heart disease, digestive system, nervous system and various pains.



(BJ) No. 1452

EIS EXHIBIT 1007

## Claims

1. A gas health massager, characterized in that, an electromagnet (5) is matched with a magnet (4), and a lever (3) connected to the magnet (4) is connected to one end of an air bag (2), and the other end of the air bag (2) is movably connected to a rubber mouth (1).

2. The gas health massager as specified in claim 1, characterized in that, the rubber mouth (1) is a straight mouth or a reducing mouth.

1

Description

# A Gas Health Massager

The "gas health massager" of the present utility model is a new medical instrument. It is based on the meridian theory of traditional Chinese medicine and is developed using advanced techniques of modern scientific fluid mechanics.

There are many solutions for medical care in the prior art, such as acupuncture, cupping, warming moxibustion, massage, qigong, etc., among which, acupuncture causes pain to patients, and it is not suitable for some patients who are afraid of needles; in cupping, it is difficult to increase or decrease the amount of stimuli; the temperature of warming moxibustion is difficult to control; massage is labor intensive for the doctor and sometimes causes pain to the patient; and qigong is difficult to be effective without training. The applicant has conducted research on a meridian painless therapeutic device, wherein micro-motor or mechanical, electronic, electromagnetic units make rotary motion, and through corresponding structures, drive a piston to have reciprocating motion in a piston sleeve, so as to generate a pulsating air pressure. The therapeutic device features a complicated structure, high cost, and high noise during use.

The purpose of the utility model is to provide a gas health massager which is small in size, convenient to carry and easy to operate.

In the present utility model, the following arrangement is adopted: an electromagnet (5) is matched with a magnet (4), and a lever (3) connected to the magnet (4) is connected to one end of an air bag (2), and the other end of the air bag (2) is movably connected to a rubber mouth (1). The rubber mouth (1) is a straight mouth or a reducing mouth.

In the present utility model, the main structure can be driven by, for example, an electromagnet; as shown in the figure, the electromagnet (5) drives the magnet (4), the lever (3), and the wall of the air bag (2) to have reciprocating motion, and the rubber mouth (1) on the air bag (2) contacts the body. Power is turned on to generate a pulsating air pressure and to stimulate the meridian points for therapeutic purposes.

1

Description

Compared with the prior art, the present utility model has the following advantages: an airbag to replace the piston and the cylinder, simple structure, small size, low cost, no noise pollution, possibility to have multiple treatment probes in one instrument, and the like.

Figure 1 is a schematic view showing the gas health massager,

wherein, 1 - rubber mouth; 2 - air bag; 3 - lever; 4 - magnet; 5 - electromagnet.

2

## Figures Attached to the Description





The Leader in Global IP Solutions

## TRANSLATOR CERTIFICATION

Date: September 14, 2018

To whom it may concern:

I, Andy Men, a translator fluent in the Chinese and English languages, on behalf of Morningside Translations, do solemnly and sincerely declare that the following is, to the best of my knowledge and belief, a true and correct translation of the document(s) listed below in a form that best reflects the intention and meaning of the original text.

The documents are designated as:
Application No.: 92219988.4

_Andy Men_
_____
Signature

Andy Men

_____
Print

**NEW YORK**
450 Seventh Avenue
10th Floor
New York, NY 10123, USA
P: (212) 643-8800

**SAN FRANCISCO**
111 Pine Street
Suite 1815
San Francisco, CA 94111, USA
P: (415) 580-6360

**KENT**
Corn Exchange House
49 The Pantiles
Tunbridge Wells
Kent TN2 5TE, UK
P: +44 (0)1892 549784

**HAMBURG**
Kurze Mühren 1
2nd Floor
Hamburg, Germany 20095
P: +49 (0) 407 679 6500

**JERUSALEM**
43 Emek Refaim
Entrance B
Jerusalem 9314104, Israel
P: +972 (02) 563-1728

info@morningsideip.com  |  www.morningsideIP.com



# [12] 实用新型专利说明书

[21] ZL 专利号  92219988.4

[51]Int.Cl⁵

A61H  9/00

[45]授权公告日  1994 年 1 月 19 日

| | |
|---|---|
| [22]申请日  92.10.22  [24]颁证日  93.12.11 | [21]申请号  92219988.4 |
| [73]专利权人  管程霄 | |
| 地址  250001山东省济南市乐山南区9号楼2<br>单元 103 室 | |
| [72]设计人  管程霄 | |

说明书页数:    附图页数:

[54]实用新型名称  气体保健按摩器

[57]摘要

本新型"气体保健按摩器"是一种新的医疗仪器，其中电磁铁（5）与磁铁（4）相配合，与磁铁（4）相连的杠杆（3）与气囊（2）的一端相连，气囊（2）的另一端与橡胶嘴（1）活动连接。本实用新型利用脉动气压刺激经络穴位，对高血压、心脏病、脑血栓、冠心病、消化系统、神经系统以及各种疼痛均有较好疗效。



(BJ)第 1452 号

权　利　要　求　书

　　1、　气体保健按摩器，其特征在于：电磁铁（5）与磁铁（4）相配合，与磁铁（4）相连的杠杆（3）与气囊（2）的一端相连，气囊（2）的另一端与橡胶嘴（1）活动连接。

　　2、根据权利要求1所述的　气体保健按摩器，其特征在于：所说的橡胶嘴（1）为直嘴或变径嘴。

# 气体保健按摩器

本实用新型"气体保健按摩器"是一种新的医疗保健仪器，是根据祖国医学的经络学说，采用现代科学流体力学的先进技术研制而成的。

现有技术用于医疗保健的方案很多，如针刺、拔罐、温灸、推拿按摩、气功等。针刺病人有痛感，且对有的怕针的病人不适用；拔罐刺激量难增减；温灸温度不易掌握；推拿、按摩医生劳动强度大，而且有时给病人造成痛苦；气功，非经训练难以取效。本申请人曾研究过经络无痛治疗仪，采用微电机或机械、电子、电磁装置，将旋转运动，通过相应的结构带动活塞在活塞套中往复运动产生脉动气压。该治疗仪结构复杂、成本高。使用时噪音较大。

本实用新型的目的是提供一种体积小，便于携带、操作方便的气体保健按摩器。

本发明利用电磁铁（5）与磁铁（4）相配合、与磁铁（4）相连的杠杆（3）与气囊（2）的一端相连，气囊（2）的另一端与橡胶嘴（1）活动连接。橡胶嘴（1）为直嘴或变径嘴。

本发明主要结构以电磁铁驱动为例，如图所示电磁铁（5）驱动磁铁（4）、杠杆（3）、气囊（2）的壁作往复运动，由气囊（2）上的橡胶嘴（1）接触肌

说 明 书

体。接通电源产生脉动气压，刺激经络穴位，以达治疗目的。

本实用新型与现有技术相比具有以气囊代替了活塞及气缸。结构简单、体积小、成本低及无噪音污染。还可一机多个治疗探头等优点。

图1是气体保健按摩器的示意图。

其中：1—橡胶嘴。2—气囊。3—杠杆。4—磁铁。5—电磁铁。



*Exhibit 30*

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/965,117 | 04/27/2018 | Michael Lenke | N6324-005-USSWOHd | 5118 |

| | |
|---|---|
| 34431        7590        06/27/2019 | EXAMINER |
| HANLEY, FLIGHT & ZIMMERMAN, LLC | TSAI, MICHAEL JASPER |
| 150 S. WACKER DRIVE | |
| SUITE 2200 | ART UNIT / PAPER NUMBER |
| CHICAGO, IL 60606 | 3785 |
| | NOTIFICATION DATE / DELIVERY MODE |
| | 06/27/2019        ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

jflight@hfzlaw.com
mailroom@hfzlaw.com
mhanley@hfzlaw.com

| *Office Action Summary* | Application No. 15/965,117 | Applicant(s) Lenke, Michael | |
|---|---|---|---|
| | Examiner MICHAEL J TSAI | Art Unit 3785 | AIA (FITF) Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☑ Responsive to communication(s) filed on <u>6/6/2019</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a) ☐ This action is **FINAL.**    2b) ☑ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s)  <u>1-3,5-11,13-18,20-26 and 28-43</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☑ Claim(s) <u>1-3,5-11,13-18,20-26 and 28-43</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10) ☐ The specification is objected to by the Examiner.

11) ☑ The drawing(s) filed on <u>4/27/2018</u> is/are: a) ☑ accepted or b) ☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☑ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☑ All    b) ☐ Some**    c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☑ Certified copies of the priority documents have been received in Application No. <u>15/023,471</u>.
   3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)
2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date <u>6/6/2019</u>.

3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date _____.
4) ☐ Other: _____.

Application/Control Number: 15/965,117                                          Page 2
Art Unit: 3785

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

1.      The present application, filed on or after March 16, 2013, is being examined under the

first inventor to file provisions of the AIA.

### *Response to Amendment*

2.      This office action is in response to the amendment filed 6/6/2019. Claims 1-3, 5-11, 13-

18, 20-26, and 28-30 have been amended. Claims 4, 12, 19, and 27 have been cancelled. New

claims 31-43 have been added. Therefore, claims 1-3, 5-11, 13-18, 20-26, and 28-43 are

presently pending in this application.

### *Claim Rejections - 35 USC § 103*

3.      The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness

rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is
> not identically disclosed as set forth in section 102, if the differences between the claimed invention
> and the prior art are such that the claimed invention as a whole would have been obvious before the
> effective filing date of the claimed invention to a person having ordinary skill in the art to which the
> claimed invention pertains. Patentability shall not be negated by the manner in which the invention
> was made.

4.      Claim 1-3, 5, 7, 10, 16-18, 20, 22, 25, 31, 33-39, 41, and 43 is/are rejected under 35

U.S.C. 103 as being unpatentable over Guan (CN2153351) in view of Fang (5,377,701).

        Regarding claim 1 and 16, Guan discloses a stimulation device, comprising: a

chamber/pressure field generator (2; airbag) having a flexible wall (wall of airbag connected to

lever 3 as shown in Guan's FIG. 1) to cause at least a portion of the flexible wall to deflect in

opposing directions (reciprocate), thereby resulting in a changing volume of the chamber, the

changing volume of the chamber resulting in the modulated positive and negative pressures

Application/Control Number: 15/965,117                                          Page 3
Art Unit: 3785

with respect to ambient pressure (generate pulsating air pressure) (See page 2, line 3-6 of

translation); an opening configured to sealingly engage a portion of a body of a user (1; rubber

mouth contact the body) (page 2, line 3-6), the modulated positive and negative pressures

being applied to the body via the opening ((1) contact the body stimulate the meridian points

for therapeutic purposes – used to contact the body), the opening being a sole opening of the

chamber to an exterior of the stimulation device (See Figure of Guan), the flexible wall to

sealingly separate the drive unit from the portion of the body (the wall is engaged completely

with lever's arm and separates the exterior/body form the drive 5); a housing enclosing the

drive unit (see Guan's FIG.) (page 2, lines 1-6). Guan discloses turning on the power which

suggests a control device, but does not explicitly disclose a control device configured to receive

input from the user and control the drive unit to create the modulated positive and negative

pressures.

Fang teaches a vacuum stimulation device that similarly uses a drive mechanism to drive

a diaphragm comprising a housing (13; case) enclosing a drive unit (DC motor) and a control

device (12; adjustable speed switch) that is configured to receive input from the user and

control the drive unit to create the reciprocation motion for imparting deflection of a

diaphragm to impart therapy (adjustable speed can be switched) (col. 4, lines 55-66).

Therefore, it would have been obvious to one of ordinary skill in the art  before the filing

date of the claimed invention to have added to Guan a control device that is also enclosed in

the housing as taught by Fang in order to allow the device to vary power to a driving

mechanism to impart different pulses, to provide a more convenient location for controlling the

device while applying the modulated pressure therapy, and to keep the device compact.

Application/Control Number: 15/965,117                                                   Page 4
Art Unit: 3785

    The functional language has been carefully considered but deemed not to impose any

structural limitation on the claims distinguishable over the structure of the opening of the

modified device of Guan. Since the opening of the modified device of Guan has the same

structures as claimed, the opening is able to be sealingly engage a portion of a body of a user

including a clitoris.


    Regarding claims 2, 3, 17, and 18, the functional language has been carefully considered

but deemed not to impose any structural limitation on the claims distinguishable over the

structure of the stimulation device and the opening of the modified device of Guan. Since the

stimulation device and the opening of the modified device of Guan has the same structure as

claimed, the is able to be used in the same manner as set forth in the claim for placing over the

clitoris glans and affect the flow of blood to the clitoris as the modulated pressure is capable of

stimulating tissue that it is applied to.

    Regarding claims 5 and 20, the modified device of Guan discloses that the flexible wall

portion (wall of the airbag) is integral with the chamber/pressure field generator (integrated

with chamber) (see Guan's FIG).

    Regarding claims 7 and 22, the modified device of Guan has everything as claimed

including the stimulation device being a portable hand-held device (convenient to carry) (page

1, penultimate paragraph), but does not explicitly disclose a battery.

    Fang teaches a stimulation device that is a portable hand-held device (see FIG. 2 of

Fang) that includes a battery (recharged battery connected) (col. 4, lines 60-66).

Application/Control Number: 15/965,117                                                Page 5
Art Unit: 3785

Therefore, it would have been obvious to one of ordinary skill in the art before the filing date of the claimed invention to have added to the modified device of Guan a battery as taught by Fang since batteries are well known in the art to provide power to portable devices and removes the need to be tethered to an external power source in order to use the device.

Regarding claim 10 and 25, the modified device of Guan discloses an operating element (connection between adjustable speed switch with DC motor) in communication with the drive unit (DC motor) to cause the drive unit to adjust the creation of the modulated positive and negative pressures (as modified by Fang, adjustable speed switch connects the DC motor and battery – motor to be electrically driven) (Fang, col. 4, lines 55-66).

Regarding claim 31, the modified device of Guan discloses that the opening includes a flexible material (rubber mouth) (page 2, line 2).

Regarding claim 33, the modified device of Guan discloses that at least a portion of the flexible material protrudes from the housing (see Guan's FIG. – rubber mouth is protruding from the housing).

Regarding claim 34, the modified device of Guan discloses that the flexible wall and the flexible material of the opening are integral with one another, but does not explicitly disclose that the flexible wall and the flexible material of the opening form one piece. However, since there is no criticality, one of ordinary skill in the art would have found making the flexible material and the flexible wall to be one piece to be a matter of obvious engineering choice and would have modified the flexible material and the flexible wall to form a singular piece in order to ease the manufacturing process such that less assembly is required and can reduce the gaps in the device to ensure proper seal. See MPEP 2144.04(V)(B).

Application/Control Number: 15/965,117                                               Page 6
Art Unit: 3785

Regarding claim 36, the modified device of Guan discloses that the opening has a first width defined by an edge of the opening that is to contact the portion of the body (see tip of rubber mouth/nozzle 1), and a portion of the housing including the flexible wall has a second width (any part of the housing's width), the second width greater than the first width (housing is clearly wider than the opening as shown in Guan's FIG.).

Regarding claim 37, the modified device of Guan discloses that the drive unit is to selectively cause the flexible wall to deflect based on first stimulation pattern or a second stimulation pattern (as modified by Fang, adjustable speed switch – different speeds will cause different stimulation patterns).

Regarding claim 38, the modified device of Guan discloses that at least a portion of the pressure field generator protrudes from the housing (see Guan's FIG. – rubber mouth is protruding from the housing).

Regarding claims 35 and 42, the modified device of Guan suggests that the flexible wall includes a first material and the flexible material of the opening includes a second material different from the first material (as shown in Guan's FIG., airbag and rubber mouth are separate components that are different from one another). However, Guan does not explicitly disclose that the first material and the second material are different in composition. However, diaphragms that impart air pulsations and rubber mouths used for application of the vacuum pulsations to the body are well known in the art to be different materials including natural rubbers and silicone rubbers, respectively. Therefore, it would have been obvious to one of ordinary skill in the art before the filing date of the claimed invention to have modified the first and second material to be different since natural rubbers for diaphragms and silicones for

interfaces are well known in the art for providing sufficient resilience to endure actuation of a

driving member and silicone is a well known material that is used to contact a patient's body for

comfortable application of therapy.

Regarding claim 39, the modified device of Guan discloses that  portion of the pressure

field generator protruding from the housing includes flexible material (see Guan's FIG. – <u>rubber</u>

mouth is protruding from the housing).

Regarding claim 41, the modified device of Guan disclose that the flexible wall and the

portion of the pressure field generator protruding from the housing form an integral surface

(the flexible wall and the chamber and rubber mouth are integrated to one another, see FIG. of

Guan).

Regarding claim 43, the modified device of Guan discloses that the at least a portion of

the flexible wall is supported by the housing (flexible wall of the air bag is supported by the

housing either indirectly or directly through the other components such as the rubber mouth or

the lever, see FIG. of Guan).


5.      Claim 6 and 21 is/are rejected under 35 U.S.C. 103 as being unpatentable over Guan

(CN2153351) in view of Fang (5,377,701) as applied to claim 1 and 16 above, and in further view

of Dann  (6,733,438).

Regarding claims 6 and 21, the modified device of Guan has everything as claimed,

including a flexible wall (airbag that is reciprocated), but fails to disclose that the flexible wall

portion comprises silicone.

However, Dann teaches a stimulation device (10, fig. 1, Col 4, lines 30-42) being used to stimulate a clitoris (39, fig. 6, Col 6, lines 39-48) having a flexible wall (upper wall chamber) (see figs. 6 and 6A) that is made out of silicone (Col 5, lines 38-40).

Therefore, it would have been obvious to one of the ordinary skill in the art before the effective filing date of the claimed invention to modify the material of the flexible wall of the modified device of Guan to be Silicone material as taught by Dann for the purpose of substituting one well-known elastomeric material for providing negative pressure to a body with another well-known elastomeric material.

6.      Claim 8, 9, 23 and 24 is/are rejected under 35 U.S.C. 103 as being unpatentable over Guan (CN2153351) in view of Fang (5,377,701) as applied to claim 1 and 16 above, and and in further view of Hovland (6,464,653).

Regarding claim 8, 9, 23, 24, the modified device of Guan has everything as claimed including a housing and even shows the housing containing all the components (see Guan's FIG.), but does not explicitly disclose the housing being a water resistant material, but fails to disclose that the housing made of a water resistant material comprises acrylonitrile butadiene styrene (ABS).

However, Hovland teaches a stimulation device (device shown in figs. 4-8) having a water resistant material housing (210, fig. 4, Col 7, lines 32-44) comprising acrylonitrile butadiene styrene (ABS)( Col 7, lines 32-44).

Therefore, it would have been obvious to one of the ordinary skill in the art before the effective filing date of the claimed invention to modify the material of the water resistant

Application/Control Number: 15/965,117                                                Page 9
Art Unit: 3785

housing of the modified device of Guan to be the material acrylonitrile butadiene styrene (ABS)

as taught by Hovland for the purpose of providing a medical grade plastic that is biocompatible

and will not cause adverse tissue reactions when placed in contact with the patient's skin (Col 7,

lines 32-44 of Hovland).

7.      Claim 11, 13-15, 26 and 28-30 is/are rejected under 35 U.S.C. 103 as being unpatentable

over Guan (CN2153351) and in view of Biederman (2,112,646).

        Regarding claims 11 and 26, Guan discloses a method comprising: activating, in

response to a user input received by a stimulation device, a drive unit of the stimulation device

(Turn on the power to generate pulsating air pressure – electromagnet drives the magnet)

(page 2, lines 4-6 of translation of Guan); applying, via the drive unit, a force to at least a

portion of a flexible wall (drive the magnet, the lever, and the wall of the airbag) (page 2, lines

4-6) of  chamber/pressure field generator (see FIG. of Guan) to deflect in opposing directions

(reciprocate) thereby resulting in a changing volume of the chamber/pressure field generator

(airbag wall reciprocated), the changing volume of the chamber/pressure field generator to

generate modulated positive and negative pressures with respect to an ambient pressure

(generate pulsating air pressure), the modulated positive and negative pressures to be applied

to the portion of a body of a user (stimulate the meridian points for therapeutic purposes) via

the opening configured to sealingly engage the portion of the body (rubber nozzle, contact the

body), the flexible wall to sealingly separate the portion of the body from the drive unit (the

wall is engaged completely with lever's arm and separates the exterior/body form the drive 5).

Guan does not specifically disclose that the modulated positive and negative pressures are to be applied to a body of the user including the clitoris via an opening.

However, Biederman teaches an alternating pressure applicator for application on the genital (including the clitoris) a modulated positive and negative pressure wherein the applicator has a lip or membrane surrounding the applicator (apply alternating pressures, above and below atmospheric pressure) (Biederman, page 1, lines 30-45).

Therefore, it would have been obvious to one of ordinary skill in the art before the filing date of the claimed invention to modify the method of Guan for to apply on the genital a modulated positive and negative pressure and add to the applicator a lip or membrane surrounding the applicator as taught by Biederman to provide a means of a mechanical nature whereby blood circulation may be stimulated to an even higher degree to treat disorders of the genital organ and possibly stimulate favorably the virility of the organ when impaired either by disease or sympathetic conditions (Biederman, page 1, lines 1-25).

Regarding claims 13 and 28, the modified method of Guan discloses that the modulated positive and negative pressure are to affect a flow of blood to the clitoris (application of the modulated pressure, as modified by Biederman, would affect a flow blood to the clitoris).

Regarding claims 14 and 29, the modified method of Guan discloses that the opening is configured to be placed over a clitoris glans (as modified by Biederman, will be placed over the genitals).

Regarding claims 15 and 30, the modified method of Guan discloses that the flexible wall is integral with the chamber/pressure field generator (see Guan's FIG.).

Application/Control Number: 15/965,117                                                Page 11
Art Unit: 3785

8.      Claims 40 is/are rejected under 35 U.S.C. 103 as being unpatentable over Guan

(CN2153351) in view of Fang (5,377,701) as applied to claim 16 above, and in further view of

Chan (2008/0304984).

        Regarding claim 40, the modified device of Guan discloses a flexible material of the

portion of the pressure field generator protruding from the housing (rubber) (page 2, lines 1-2

of Guan's translation), but does not explicitly disclose the housing material being less flexible

than the flexible material of the pressure field generator protruding from the housing.

        Chan discloses a pressure field generator device comprising a housing made from

moulded plastics (para. 0013).

        Therefore, it would have been obvious to one of ordinary skill in the art before the filing

date of the claimed invention to modify the material of the housing of the modified device of

Guan to be moulded plastic as taught by Chan since plastics are well known material for

enclosing parts of a handheld therapy device to protect the mechanical and electrical

components.

        The now modified device discloses the flexibility of the material of the portion of the

pressure field generator (rubber mouth of Guan) protruding from the hosuing is greater than

the material of the housing (plastic as modified by Chan).

Application/Control Number: 15/965,117                                    Page 12
Art Unit: 3785

### *Response to Arguments*

9.      Applicant's arguments with respect to claims 1-3, 5-11, 13-18, 20-26, and 28-43 have

been considered but are moot because the arguments do not apply to any of the references

being used in the current rejection.

### *Conclusion*

10.     The prior art made of record and not relied upon is considered pertinent to applicant's

disclosure. Chan (GB1,049,972), Heywood (GB18973), Ikadai et al.(2005/0159760), Kawada

(3,906,940), Andres (2,234,102), Robert (1,502,440), Ward (1,378,922), and Yao (6,517,511) all

disclose vacuum pulsation devices comprising a drive mechanism for reciprocating a diaphragm

or piston.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to MICHAEL JASPER TSAI whose telephone number is (571)270-

5246.  The examiner can normally be reached on Mon - Fri 8:30AM-5PM.

Examiner interviews are available via telephone, in-person, and video conferencing

using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is

encouraged to use the USPTO Automated Interview Request (AIR) at

http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Justine Yu can be reached on 571-272-4835.  The fax phone number for the

organization where this application or proceeding is assigned is 571-273-8300.

Application/Control Number: 15/965,117                                                   Page 13
Art Unit: 3785

      Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private

PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you

would like assistance from a USPTO Customer Service Representative or access to the

automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


                                                     MICHAEL TSAI
                                                     Primary Examiner
                                                     Art Unit 3785


/MICHAEL J TSAI/
Primary Examiner, Art Unit 3785

# *Exhibit 31*

# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/965,208 | 04/27/2018 | Michael Lenke | N6324-005-USRWOHd | 8746 |

34431        7590        08/22/2019

HANLEY, FLIGHT & ZIMMERMAN, LLC
150 S. WACKER DRIVE
SUITE 2200
CHICAGO, IL 60606

| EXAMINER |
|---|
| TSAI, MICHAEL JASPER |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3785 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/22/2019 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

jflight@hfzlaw.com
mailroom@hfzlaw.com
mhanley@hfzlaw.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. 15/965,208 | | Applicant(s) Lenke, Michael | |
|---|---|---|---|---|
| | Examiner MICHAEL J TSAI | | Art Unit 3785 | AIA (FITF) Status Yes |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on <u>6/10/2019</u>.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☐ This action is **FINAL.**     2b)☑ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) <u>1-3,5-11,13-18,20-26 and 28-46</u> is/are pending in the application.
    5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☑ Claim(s) <u>1-3,5-11,13-18,20-26 and 28-46</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.
11)☑ The drawing(s) filed on <u>4/27/2018</u> is/are: a)☑ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☑ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
    a)☑ All    b)☐ Some**    c)☐ None of the:
      1.☐ Certified copies of the priority documents have been received.
      2.☑ Certified copies of the priority documents have been received in Application No. <u>15/023471</u>.
      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)
2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date <u>12/18/2018, 6/10/2019</u>
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date _____.
4) ☐ Other: _____.

Application/Control Number: 15/965,208                                                    Page 2
Art Unit: 3785

## DETAILED ACTION

### Notice of Pre-AIA or AIA Status

1.      The present application, filed on or after March 16, 2013, is being examined under the

first inventor to file provisions of the AIA.

### Response to Amendment

2.      This office action is in response to the amendment filed 6/10/2019. Claims 1-3, 5-11, 13-

18, 20-26, 28-30 have been amended. Claims 4, 12, 19, and 27 have been cancelled. New claims

31-46 have been added. Therefore, claims 1-3, 5-11, 13-18, 20-26, and 28-46 are presently

pending in this application.

### Claim Rejections - 35 USC § 112

3.      The following is a quotation of 35 U.S.C. 112(b):
(b) CONCLUSION.—The specification shall conclude with one or more claims particularly pointing out
and distinctly claiming the subject matter which the inventor or a joint inventor regards as the
invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:
The specification shall conclude with one or more claims particularly pointing out and distinctly
claiming the subject matter which the applicant regards as his invention.

4.      Claims 40 and 41 are rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second

paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject

matter which the inventor or a joint inventor, or for pre-AIA the applicant regards as the

invention.

        Regarding claim 40 and 41, both claims are dependent upon themselves. It is unclear as

to which claims they should be dependent upon and provides limitations without antecedent

basis. However, in order to advance prosecution and since claim 40 appear to recites "the

Application/Control Number: 15/965,208                                                    Page 3
Art Unit: 3785

pressure field generator", claim 40 will be interpreted as being dependent upon claim 16. Since

claim 41 recites "the flexibility of the material", claim 41 will be interpreted as being dependent

upon claim 40.


### Claim Rejections - 35 USC § 103

5.      The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness

rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is
> not identically disclosed as set forth in section 102, if the differences between the claimed invention
> and the prior art are such that the claimed invention as a whole would have been obvious before the
> effective filing date of the claimed invention to a person having ordinary skill in the art to which the
> claimed invention pertains. Patentability shall not be negated by the manner in which the invention
> was made.

6.      Claim 1-3, 5, 7, 10, 16-18, 20, 22, 25, 31, 32, 34-40, and 42-46 is/are rejected under 35

U.S.C. 103 as being unpatentable over Guan (CN2153351) in view of Fang (5,377,701).

Regarding claim 1 and 16, Guan discloses a stimulation device, comprising: a

chamber/pressure field generator (2; airbag) having a flexible wall (wall of airbag connected to

lever 3 as shown in Guan's FIG. 1); a drive unit (3, 4, 5; lever, magnet, and electromagnet) in

physical communication with the flexible wall (connected to lever 3 as shown in Guan's FIG. 1)

to cause at least a portion of the flexible wall to deflect in opposing directions (reciprocate),

thereby resulting in a changing volume of the chamber, the changing volume of the chamber

resulting in the modulated positive and negative pressures with respect to ambient pressure

(generate pulsating air pressure) (See page 2, line 3-6 of translation); an opening configured to

sealingly engage a portion of a body of a user (1; rubber mouth contact the body) (page 2, line

3-6), the modulated positive and negative pressures being applied to the body via the opening

((1) contact the body stimulate the meridian points for therapeutic purposes – used to contact the body), the opening being a sole opening of the chamber to an exterior of the stimulation device (See Figure of Guan); a housing enclosing the drive unit (see Guan's FIG.) (page 2, lines 1-6). Guan discloses turning on the power which suggests a control device, but does not explicitly disclose a control device configured to receive input from the user and control the drive unit to create the modulated positive and negative pressures.

Fang teaches a vacuum stimulation device that similarly uses a drive mechanism to drive a diaphragm comprising a housing (13; case) enclosing a drive unit (DC motor) and a control device (12; adjustable speed switch) that is configured to receive input from the user and control the drive unit to create the reciprocation motion for imparting deflection of a diaphragm to impart therapy (adjustable speed can be switched) (col. 4, lines 55-66).

Therefore, it would have been obvious to one of ordinary skill in the art  before the filing date of the claimed invention to have added to Guan a control device that is also enclosed in the housing as taught by Fang in order to allow the device to vary power to a driving mechanism to impart different pulses, to provide a more convenient location for controlling the device while applying the modulated pressure therapy, and to keep the device compact.


Regarding claims 2, 3, 17, and 18, the functional language has been carefully considered but deemed not to impose any structural limitation on the claims distinguishable over the structure of the stimulation device and the opening of the modified device of Guan. Since the stimulation device and the opening of the modified device of Guan has the same structure as claimed, the is able to be used in the same manner as set forth in the claim for placing over the

clitoris glans and affect the flow of blood to the clitoris as the modulated pressure is capable of stimulating tissue that it is applied to.

Regarding claims 5 and 20, the modified device of Guan discloses that the flexible wall portion (wall of the airbag) is integral with the chamber/pressure field generator (integrated with chamber) (see Guan's FIG).

Regarding claims 7 and 22, the modified device of Guan has everything as claimed including the stimulation device being a portable hand-held device (convenient to carry) (page 1, penultimate paragraph), but does not explicitly disclose a battery.

Fang teaches a stimulation device that is a portable hand-held device (see FIG. 2 of Fang) that includes a battery (recharged battery connected) (col. 4, lines 60-66).

Therefore, it would have been obvious to one of ordinary skill in the art before the filing date of the claimed invention to have added to the modified device of Guan a battery as taught by Fang since batteries are well known in the art to provide power to portable devices and removes the need to be tethered to an external power source in order to use the device.

Regarding claim 10 and 25, the modified device of Guan discloses an operating element (connection between adjustable speed switch with DC motor) in communication with the drive unit (DC motor) to cause the drive unit to adjust the creation of the modulated positive and negative pressures (as modified by Fang, adjustable speed switch connects the DC motor and battery – motor to be electrically driven) (Fang, col. 4, lines 55-66).

Regarding claim 31, the modified device of Guan discloses the drive unit is to cause the at least the portion of the flexible wall to deflect based on one or more stimulation pattern (as

modified by Fang, adjustable speed switch connects the DC motor and battery – pattern being

the speed according to the switch) (Fang, col. 4, lines 55-66)

Regarding claim 32,  the modified device of Guan discloses that the opening includes a

flexible material (rubber mouth) (page 2, line 2).

Regarding claim 34, the modified device of Guan discloses that at least a portion of the

flexible material protrudes from the housing (see Guan's FIG. – rubber mouth is protruding

from the housing).

Regarding claim 35, the modified device of Guan discloses that the flexible wall and the

flexible material of the opening are integral with one another, but does not explicitly disclose

that the flexible wall and the flexible material of the opening form one piece. However, since

there is no criticality, one of ordinary skill in the art would have found making the flexible

material and the flexible wall to be one piece to be a matter of obvious engineering choice and

would have modified the flexible material and the flexible wall to form a singular piece in order

to ease the manufacturing process such that less assembly is required and can reduce the gaps

in the device to ensure proper seal. See MPEP 2144.04(V)(B).

Regarding claim 37, the modified device of Guan discloses that the opening has a first

width defined by an edge of the opening that is to contact the portion of the body (see tip of

rubber mouth/nozzle 1), and a portion of the housing including the flexible wall has a second

width (any part of the housing's width), the second width greater than the first width (housing

is clearly wider than the opening as shown in Guan's FIG.).

Regarding claim 38, the modified device of Guan discloses the flexible wall is to sealingly separate the drive unit from the portion of the body (see Guan's FIG, flexible wall is separating the drive unit from the portion of the body)

Regarding claim 39, the modified device of Guan discloses that at least a portion of the pressure field generator protrudes from the housing (see Guan's FIG. – rubber mouth is protruding from the housing).

Regarding claim 40, the modified device of Guan discloses that  portion of the pressure field generator protruding from the housing includes flexible material (see Guan's FIG. – <u>rubber</u> mouth is protruding from the housing).

Regarding claims 36and 43, the modified device of Guan suggests that the flexible wall includes a first material and the flexible material of the opening/pressure field generator protruding from the housing includes a second material different from the first material (as shown in Guan's FIG., airbag and rubber mouth are separate components that are different from one another). However, Guan does not explicitly disclose that the first material and the second material are different in composition. However, diaphragms that impart air pulsations and rubber mouths used for application of the vacuum pulsations to the body are well known in the art to be different materials including natural rubbers and silicone rubbers, respectively. Therefore, it would have been obvious to one of ordinary skill in the art before the filing date of the claimed invention to have modified the first and second material to be different since natural rubbers for diaphragms and silicones for interfaces are well known in the art for providing sufficient resilience to endure actuation of a driving member and silicone is a well known material that is used to contact a patient's body for comfortable application of therapy.

Regarding claim 42, the modified device of Guan disclose that the flexible wall and the portion of the pressure field generator protruding from the housing form an integral surface (the flexible wall and the chamber and rubber mouth are integrated to one another, see FIG. of Guan).

Regarding claim 44, the modified device of Guan discloses that the at least a portion of the flexible wall is supported by the housing (flexible wall of the air bag is supported by the housing either indirectly or directly through the other components such as the rubber mouth or the lever, see FIG. of Guan).

Regarding claim 45, the modified device of Guan discloses the drive unit is to cause the at least the portion of the flexible wall to deflect based on one or more stimulation pattern (as modified by Fang, adjustable speed switch connects the DC motor and battery – pattern being the speed according to the switch) (Fang, col. 4, lines 55-66)

Regarding claim 46, the modified device of Guan discloses the flexible wall is to sealingly separate the drive unit from the portion of the body (see Guan's FIG, flexible wall is separating the drive unit from the portion of the body)


7.      Claims 6, 21, 33 is/are rejected under 35 U.S.C. 103 as being unpatentable over Guan (CN2153351) in view of Fang (5,377,701) as applied to claim 1 and 16 above, and in further view of Dann  (6,733,438).

Regarding claims 6 and 21, the modified device of Guan has everything as claimed, including a flexible wall (airbag that is reciprocated), but fails to disclose that the flexible wall portion comprises silicone.

However, Dann teaches a stimulation device (10, fig. 1, Col 4, lines 30-42) being used to stimulate a clitoris (39, fig. 6, Col 6, lines 39-48) having a flexible wall (upper wall chamber) (see figs. 6 and 6A) that is made out of silicone (Col 5, lines 38-40).

Therefore, it would have been obvious to one of the ordinary skill in the art before the effective filing date of the claimed invention to modify the material of the flexible wall of the modified device of Guan to be Silicone material as taught by Dann for the purpose of substituting one well-known elastomeric material for providing negative pressure to a body with another well-known elastomeric material.

Regarding claim 33, the modified device of Guan has everything as claimed including the flexible material of the opening (rubber), but does not disclose the flexible material including silicone.

Dann teaches a stimulation device (10, FIG. 1, col. 4, lines 30-42) being used to stimulate the clitoris (39, fig. 6, Col 6, lines 39-48) having an opening including a flexible material that is made out of silicone (Col 5, lines 38-40).

Therefore, it would have been obvious to one of ordinary skill in the art before the effective filing date of the claimed invention to modify the material of the opening of the modified device of Guan to be silicone material as taught by Dann since silicone is a well-known elastomeric material that is resilient and deformable for application and sealingly engaging the body (col. 5, lines 35-40).

Application/Control Number: 15/965,208                                      Page 10
Art Unit: 3785

8.      Claim 8, 9, 23 and 24 is/are rejected under 35 U.S.C. 103 as being unpatentable over

Guan (CN2153351) in view of Fang (5,377,701) as applied to claim 1 and 16 above, and in

further view of Hovland (6,464,653).

        Regarding claim 8, 9, 23, 24, the modified device of Guan has everything as claimed

including a housing and even shows the housing containing all the components (see Guan's

FIG.), but does not explicitly disclose the housing being a water resistant material, but fails to

disclose that the housing made of a water resistant material comprises acrylonitrile butadiene

styrene (ABS).

        However, Hovland teaches a stimulation device (device shown in figs. 4-8) having a

water resistant material housing (210, fig. 4, Col 7, lines 32-44) comprising acrylonitrile

butadiene styrene (ABS)( Col 7, lines 32-44).

        Therefore, it would have been obvious to one of the ordinary skill in the art before the

effective filing date of the claimed invention to modify the material of the water resistant

housing of the modified device of Guan to be the material acrylonitrile butadiene styrene (ABS)

as taught by Hovland for the purpose of providing a medical grade plastic that is biocompatible

and will not cause adverse tissue reactions when placed in contact with the patient's skin (Col 7,

lines 32-44 of Hovland).


9.      Claim 11, 13-15, 26 and 28-30 is/are rejected under 35 U.S.C. 103 as being unpatentable

over Guan (CN2153351), in view of Fang (5,377,701). and in view of Biederman (2,112,646).

        Regarding claims 11 and 26, Guan discloses a method comprising: activating, in

response to a user input received by a stimulation device, a drive unit of the stimulation device

(Turn on the power to generate pulsating air pressure – electromagnet drives the magnet)

(page 2, lines 4-6 of translation of Guan); applying, via the drive unit, a force to at least a

portion of a flexible wall (drive the magnet, the lever, and the wall of the airbag) (page 2, lines

4-6) of  chamber/pressure field generator (see FIG. of Guan) to deflect in opposing directions

(reciprocate) thereby resulting in a changing volume of the chamber/pressure field generator

(airbag wall reciprocated), the changing volume of the chamber/pressure field generator to

generate modulated positive and negative pressures with respect to an ambient pressure

(generate pulsating air pressure), the modulated positive and negative pressures to be applied

to the portion of a body of a user (stimulate the meridian points for therapeutic purposes) via

the opening configured to sealingly engage the portion of the body (rubber nozzle, contact the

body), the flexible wall to sealingly separate the portion of the body from the drive unit (the

wall is engaged completely with lever's arm and separates the exterior/body form the drive 5).

Guan does not specifically disclose that the drive unit applies force to the flexible wall

based on modulated frequencies.

Fang teaches a vacuum stimulation device and method that similarly uses a drive

mechanism to drive a diaphragm comprising a housing (13; case) enclosing a drive unit (DC

motor) and a control device (12; adjustable speed switch) that is configured to receive input

from the user and control the drive unit to create the reciprocation motion for imparting

deflection of a diaphragm to impart therapy (adjustable speed can be switched) (col. 4, lines 55-

66).

Therefore, it would have been obvious to one of ordinary skill in the art  before the filing

date of the claimed invention to have added to Guan a control device that is also enclosed in

Application/Control Number: 15/965,208                                        Page 12
Art Unit: 3785

the housing as taught by Fang in order to allow the device to vary power to a driving

mechanism to impart different pulses, to provide a more convenient location for controlling the

device while applying the modulated pressure therapy, and to keep the device compact.

The now modified method of Guan discloses that the drive unit drives the flexible wall

based on modulated frequencies (modulated by the adjustable speed switch) (Fang, col. 4, lines

55-66)

Guan does not specifically disclose that the modulated positive and negative pressures

are to be applied to a body of the user including the clitoris via an opening.

However, Biederman teaches an alternating pressure applicator for application on the

genital (including the clitoris) a modulated positive and negative pressure wherein the

applicator has a lip or membrane surrounding the applicator (apply alternating pressures,

above and below atmospheric pressure) (Biederman, page 1, lines 30-45).

Therefore, it would have been obvious to one of ordinary skill in the art before the filing

date of the claimed invention to modify the method of Guan for to apply on the genital a

modulated positive and negative pressure and add to the applicator a lip or membrane

surrounding the applicator as taught by Biederman to provide a means of a mechanical nature

whereby blood circulation may be stimulated to an even higher degree to treat disorders of the

genital organ and possibly stimulate favorably the virility of the organ when impaired either by

disease or sympathetic conditions (Biederman, page 1, lines 1-25).

Regarding claims 13 and 28, the modified method of Guan discloses that the modulated

positive and negative pressure are to affect a flow of blood to the clitoris (application of the

modulated pressure, as modified by Biederman, would affect a flow blood to the clitoris).

Application/Control Number: 15/965,208                                        Page 13
Art Unit: 3785

Regarding claims 14 and 29, the modified method of Guan discloses that the opening is configured to be placed over a clitoris glans (as modified by Biederman, will be placed over the genitals).

Regarding claims 15 and 30, the modified method of Guan discloses that the flexible wall is integral with the chamber/pressure field generator (see Guan's FIG.).


10.      Claims 41 is/are rejected under 35 U.S.C. 103 as being unpatentable over Guan (CN2153351) in view of Fang (5,377,701) as applied to claim 16 above, and in further view of Chan (2008/0304984).

Regarding claim 41, the modified device of Guan discloses a flexible material of the portion of the pressure field generator protruding from the housing (rubber) (page 2, lines 1-2 of Guan's translation), but does not explicitly disclose the housing material being less flexible than the flexible material of the pressure field generator protruding from the housing.

Chan discloses a pressure field generator device comprising a housing made from moulded plastics (para. 0013).

Therefore, it would have been obvious to one of ordinary skill in the art before the filing date of the claimed invention to modify the material of the housing of the modified device of Guan to be moulded plastic as taught by Chan since plastics are well known material for enclosing parts of a handheld therapy device to protect the mechanical and electrical components.

Application/Control Number: 15/965,208                                                          Page 14
Art Unit: 3785

The now modified device discloses the flexibility of the material of the portion of the

pressure field generator (rubber mouth of Guan) protruding from the hosuing is greater than

the material of the housing (plastic as modified by Chan).

### *Response to Arguments*

11.    Applicant's arguments with respect to claims 1-3, 5-11, 13-18, 20-26, and 28-46 have

been considered but are moot because the arguments do not apply to any of the references

being used in the current rejection.

### *Conclusion*

12.    The prior art made of record and not relied upon is considered pertinent to applicant's

disclosure. Chan (GB1,049,972), Heywood (GB18973), Ikadai et al.(2005/0159760), Kawada

(3,906,940), Andres (2,234,102), Robert (1,502,440), Ward (1,378,922), and Yao (6,517,511) all

disclose vacuum pulsation devices comprising a drive mechanism for reciprocating a diaphragm

or piston.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to MICHAEL JASPER TSAI whose telephone number is (571)270-

5246.  The examiner can normally be reached on Mon - Fri 8:30AM-5PM.

Examiner interviews are available via telephone, in-person, and video conferencing

using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is

encouraged to use the USPTO Automated Interview Request (AIR) at

http://www.uspto.gov/interviewpractice.

Application/Control Number: 15/965,208                                            Page 15
Art Unit: 3785

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Justine Yu can be reached on 571-272-4835.  The fax phone number for the

organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private

PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you

would like assistance from a USPTO Customer Service Representative or access to the

automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


                                                            MICHAEL TSAI
                                                            Primary Examiner
                                                            Art Unit 3785


/MICHAEL J TSAI/
Primary Examiner, Art Unit 3785