# Exhibit 1

# KUHNEN & WACKER
## Patent- und Rechtsanwaltsbüro



**K&W**

Deutsches Patent- und Markenamt
80297 München

**RAINER A. KUHNEN (1974-2015†)**
PA  EP  ETD  Dipl.-Ing.

**STEPHAN KOPP, LL.M.**
PA  EP  ETD  EPL  Dipl.-Ing.

**RAINER K. KUHNEN, LL.M.**
PA  EP  ETD  Dipl.-Ing.

**DR. MICHAEL TOPF**
PA  EP  ETD  Dr. rer. nat.  Dipl.-Phys.

**DR. CHRISTIAN THOMAS**
RA  Dr. iur.

**DR. MICHAEL ZEITLER**
PA  EP  ETD  Dr. rer. nat.  Dipl.-Phys.

**DETLEF v. AHSEN**
PA  EP  ETD  Dipl.-Ing.

**DR. FLORIAN KÜHBECK**
PA  EP  ETD  Dr.-Ing.  Dipl.-Ing.  Dipl.-Chem

**DR. JÖRG DORNER**
PA  EP  ETD  Dr.-Ing.  Dipl.-Ing.

**BIRGIT REITER**
RA

**SENKO YOSHIDA**
JPA  EP

**CHRISTOPH LÖSCH**
PA  EP  ETD  KLN  Dipl.-W.-Ing.

**DR. STEFAN MEDERLE-HOFFMEISTER**
PA  EP  ETD  Dr. rer. nat.  Dipl.-Phys.

**MALGORZATA GIZINSKA-SCHOHE**
PPA  EP  M.Sc.  Ch.E.

**CHRISTOPH STRAßL**
PA  ETD  Dipl.-Ing.

**DR. ULRICH C. WAGNER**
PA  EP  ETD  Dr. techn.  Dipl.-Ing. (FH)

**CHRISTIAN FLÜGGE**
RA

**JAN KSIENZYK**
PA  ETD  Dipl.-Biochem.

**VERONIKA SCHWEPLER**
RA

OF COUNSEL:

**JAMES A. FORSTNER**
Attorney at Law PhD (chem), JD
Admitted Delaware, D.C., USPTO

PA    Patentanwalt/Patent Attorney
EP    European Patent Attorney
ETD  European Trademark and Design Attorney
EPL  European Patent Litigation Diploma (CEIPI)
JPA  Japanese Patent Attorney
PPA  Polish Patent Attorney
RA    Rechtsanwalt/Attorney at Law
KLN  Kanzlei Lösch Nürnberg

POST/MAIL:
POSTFACH/P.O.BOX 1964
D-85319 FREISING/GERMANY

ANSCHRIFT/ADDRESS:
PRINZ-LUDWIG-STRASSE 40A
D-85354 FREISING/GERMANY

TELEFON  +49 8161 608-0
FAX      +49 8161 608-100
E-MAIL   info@kuhnen-wacker.com
INTERNET www.kuhnen-wacker.com

VAT-Nr.: DE 813 496 485

18. September 2017          RKJ/UWN/VPO
[File: 101603434.docx]

| | |
|---|---|
| Amtliches Zeichen | : 10 2013 110 501.7 |
| Unser Zeichen | : 17/LE11K17E/DE |
| Einsprechende | : ecoaction gmbh u.a. |
| Patentinhaber(in) | : NOVOLUTO GmbH |

---

Gegen das Patent DE 10 2013 110 501 B4 der Firma NOVOLUTO GMBH haben die Firmen Fun Factory GmbH (im Folgenden Einsprechende 1) und ecoaction GmbH (im Folgenden Einsprechende 2) Einspruch erhoben.

Die Einsprechende 1 stützt Ihren Einspruch auf

- unzulässige Erweiterung des Gegenstands des Anspruchs 1 gegenüber dem Inhalt der ursprünglichen Anmeldung,

- fehlende Neuheit gegenüber der Druckschrift **DE 42 43 876 A1** (in der Nomenklatur der Einsprechenden 1 als D8 bezeichnet), sowie

- fehlende erfinderische Tätigkeit gegenüber der Kombination von der Druckschrift **US 2008/0304984 A1** (in der Nomenklatur der Einsprechenden 1 als D9 bezeichnet) mit der Druckschrift

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



**WO 00/28939 A2** (in der Nomenklatur der Einsprechenden 1 als D10 bezeichnet).

Die Einsprechende 2 stützt Ihren Einspruch auf

- unzulässige Erweiterung des Gegenstands des Anspruchs 1 gegenüber dem Inhalt der ursprünglichen Anmeldung, sowie

- fehlende erfinderische Tätigkeit gegenüber der Druckschrift **CN 2153351** (in der Nomenklatur der Einsprechenden 2 als E1 bezeichnet).

- Im Übrigen verweist die Einsprechende 2 pauschal auf die **CN 2198900** (in der Nomenklatur der Einsprechenden 2 als E4 bezeichnet). Es wird angemerkt, dass die E4 zwar in der Einspruchsschrift aufgeführt ist, aber weder der Patentinhaberin noch dem Deutschen Patent- und Markenamt vorliegt.

**Es wird beantragt, die Einsprüche als unbegründet zurückzuweisen und das Patent in vollem Umfang aufrecht zu erhalten.**

**Hilfsweise** wird um **Anberaumung einer Anhörung** gebeten, sollte der Aufrechterhaltung des angegriffenen Patents nicht ohne weiteres stattgegeben werden können.

Der Antrag wird wie folgt begründet:

**A. Beweismittel:**

**A1: Endurteil des Landgerichts München I zum Aktenzeichen: 21 O 22538/15**
**A2: Beglaubigte Übersetzung der CN 2153351 in die englische Sprache**

**B. Zum angegriffenen Patent DE 10 2013 110 501 B4**

Das Patent DE 10 2013 110 501 B4 betrifft eine Vorrichtung für die Klitoris, die mittels indirekter Stimulation der Klitoris einen Orgasmus zum sexuellen Vergnügen herbeiführen soll. Zu diesem Zweck beaufschlagt die beanspruchte Stimulationsvorrichtung die Klitoris mit einem Druckfeld aus Unter- und Überdrücken, welches in einer sogenannten zweiten Kammer erzeugt wird, die über der Klitoris

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



aufgesetzt wird. Dabei wirken abwechselnd ein Unterdruck und ein Überdruck auf die Klitoris ein, um sie sowohl in ihrem Blutfluss anzuregen als auch eine stimulierende Kraft auf sie auszuüben.

## C.  Aufgabenstellung des angegriffenen Patents

Die patentgemäße Vorrichtung soll einer Vielzahl von besonderen Problemstellungen, die ihren Hintergrund in der besonderen Anatomie und der besonderen Empfindungsqualität der Klitoris haben, Rechnung tragen. So soll eine direkte Stimulation durch mechanischen Kontakt beispielsweise eines Auflegevibrators vermieden werden, da diese direkte Stimulation zu Irritationen und Hautreizungen führen kann. Andere Vorrichtungen, welche beispielsweise mittels Vakuumtechnik den Blutfluss erhöhen sollen, führen zu Gewöhnungseffekten und können zudem eine Verletzungsgefahr mit sich bringen. Oftmals sind Vorrichtungen zur Anwendung am menschlichen Körper mittels Luftdruck in ihrem Aufbau komplex und somit unhygienisch. Die Vorrichtungen des Stands der Technik erzeugen zudem regelmäßig einen nachteilhaften Abtransport von Scheidenflüssigkeit.

Daraus ergibt sich die Aufgabe der Erfindung, eine Vorrichtung vorzusehen, welche einen einfachen Aufbau aufweist, in der Verwendung einfach und sicher ist (vgl. Absatz [0023]), welche eine effektive  Stimulation eines Körperteils hervorrufen kann (vgl. Absatz [0024]), welche ein Austrocknen der Schleimhäute verhindert, hygienisch ist, und Gewöhnungseffekte vermeidet (vgl. Absatz [0025]).

Festzuhalten ist, dass sich keine der im Einspruchsverfahren befindlichen Druckschriften mit dieser oder einer ähnlich komplexen Aufgabenstellung beschäftigt.

| [File:101603434.docx // LE11K17E]    16. Mai 2017 |
| Stimulationsvorrichtung |
| NOVOLUTO GmbH |



## D.  Merkmalsgliederung

Zur Lösung der vorstehend genannten Probleme sieht der Anspruch 1 des angegriffenen Patents eine Vorrichtung vor, die gemäß nachstehender Merkmalsgliederung dargelegt ist:

*1. Stimulationsvorrichtung (1) für die Klitoris (12), aufweisend:*

*2. eine Druckfelderzeugungseinrichtung (2) mit:*

*3. einer ersten Kammer (3); und*

*4. a) einer zweiten Kammer (4)*
*4. b) mit einer Öffnung (42) zum Aufsetzen über die Klitoris (12); und*

*5. einem Verbindungselement (5), welches die erste Kammer (3) mit der zweiten Kammer (4) verbindet; und*

*6. einer Antriebseinheit (6), welche das Volumen der ersten Kammer (3) derart verändert, dass über das Verbindungselement (5) in der zweiten Kammer (4) ein stimulierendes Druckfeld erzeugt wird; und*

*7. eine Steuereinrichtung (7), welche die Antriebseinheit (6) ansteuert; und*

*8. wobei das in der zweiten Kammer (4) erzeugte Druckfeld aus einem Muster von Unter- und Überdrücken besteht, welche auf den Normaldruck aufmoduliert sind; und*

*9. wobei die erste Kammer (3) über das Verbindungselement (5) ausschließlich mit der zweiten Kammer (4) verbunden ist, somit keine andere Verbindung der ersten Kammer (3) als diejenige zur zweiten Kammer (4) besteht, womit die erste Kammer (3) eine einzige Öffnung aufweist, und*

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



**10.** *wobei die zweite Kammer (4) eine Öffnung (51) von dem Verbindungselement (5) in die zweite Kammer (4) aufweist, und*

**11.** *wobei die Stimulationsvorrichtung (1) keine Ventile aufweist, und*

**12.** *wobei die Stimulationsvorrichtung (1) ein tragbares Handgerät mit einer Batterie (76) ist,*

*dadurch gekennzeichnet, dass*

**13. a)** *das Verbindungselement (5) starr ist, und*
**13. b)** *als ein gerader Kanal mit Düsenwirkung ausgestaltet ist (13c),*

**14.** *dessen Öffnung in die ersten Kammer (3) und dessen Öffnung (51) in die zweite Kammer (4) zueinander ausgerichtet sind, so dass eine Medienströmung bei Kompression der ersten Kammer (3) durch die Ausrichtung der Öffnung (51) und des Verbindungselements (5) auf die Klitoris (12) gerichtet ist,*

**15.** *wobei die Öffnung (51) des Verbindungselements (5) der Klitoris (12) durch die zweite Kammer (4) hindurch gegenüberliegt.*

**E.   Auslegung des angegriffenen Anspruchs 1 durch den Fachmann**

1)   Der zuständige Fachmann, welcher mit vorstehend definierter Aufgabe betreut werden würde, ist ein Techniker mit Berufserfahrung in der Entwicklung von Sexspielzeug (vergleiche auch das als Beweismittel A1 beigefügte Endurteil des Landgerichts München I zum Aktenzeichen: 21 O 22538/15, Seite 19 unten).

2)   Der Gegenstand des Anspruchs 1 betrifft eine Stimulationsvorrichtung für die Klitoris mittels einem Druckfeld aus Über- und Unterdrücken, die eine klitorale sexuelle Erregung (=Stimulation für die Klitoris im Sinne des angegriffenen Patents) bis zum Orgasmus (Klimax) ermöglicht (vgl. auch Absatz [0007]). Diese Vorgabe

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



wird der Fachmann bei der Dimensionierung der anspruchsgemäßen Merkmale berücksichtigen. Insbesondere wird er die Druckbereiche des Druckfelds, die Größe der zweiten Kammer und auch das Verhältnis der Volumen der beiden Kammern 3,4 entsprechend einrichten [vgl. Absatz [0028], [0035], [0036], Fig. 4 bis 6 des Streitpatents).

Dazu wird in der Beschreibungseinleitung (vgl. [0008] ff.) weiter erläutert, dass eine Therapie nicht als Stimulation im Sinne des Patents zu verstehen ist. Insofern grenzt sich der Gegenstand des angegriffenen Patents bereits im Obergriff („Stimulationsvorrichtung für die Klitoris") gegenüber allgemeinen therapeutischen Hautbehandlungsvorrichtungen ab.

Mit anderen Worten bedeutet das für die Auslegung des Anspruchs 1, dass Vorrichtungen, welche ausgewiesenermaßen nur der allgemeinen oder medizinischen Hautbehandlung dienen, sich nur dann zur beanspruchten Klitoral-Stimulation eignen, wenn eine entsprechende Dimensionierung des Antriebs, der Ansteuerung und der Geometrie der Druckfelderzeugungseinrichtung, insbesondere der zweiten Kammer, vorgesehen wird, die sich stark von der üblichen Dimensionierung bei herkömmlichen Hautbehandlungsvorrichtungen unterscheidet, da die Klitoris ein komplexes erektiles und äußerst empfindliches Sexualorgan ist (siehe auch https://de.wikipedia.org/wiki/Klitoris). Wird eine solche Dimensionierung aber nirgendwo offenbart, sind solche herkömmliche Hautbehandlungsvorrichtungen offensichtlich ungeeignet zur Klitoral-Stimulation.

Entsprechend sind die Effekte einer Stimulation in Form einer (Druck-)Massage, d.h., in Form einer Krafteinwirkung, für die weibliche Klitoris im Streitpatent beispielsweise in den Absätzen [0032, 0046, 0076, 0084, 0098] näher beschrieben. Zudem ist die Klitoriseichel als eine besonders empfindliche erogene Zone [0046] bekannt, mit der auch kleinste Änderungen oder Anpassungen des Druckfelds verspürt werden können.

3)  Eine erste Kammer 3 im Sinne des Anspruchs 1 ist volumenveränderlich (Merkmal 1 in Verbindung mit Merkmal 6).

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



4)  Eine zweite Kammer im Sinne des Anspruchs 1 ist „*zum Aufsetzen über die Klitoris*"
    geeignet. In einer solchen zweiten Kammer muss eine indirekte Stimulation der
    Klitoriseichel erfolgen können. Gemäß Absatz [0032] wird der erfindungsgemäße
    stimulierende

> „*...Massageeffekt indirekt, also ohne direkte Berührung der zu
> stimulierenden Hautpartie durch einen festen Körper...*"

bewirkt.

Folglich muss die die zweite Kammer derart dimensioniert sein, dass diese die
übliche Klitoriseichel **berührungsfrei umfassen** kann (vgl. ebenso Fig. 4-6 des
Streitpatents, in Verbindung mit dem Absatz [0007] „indirekt")

Konsequenterweise wird dem Fachmann durch die beanspruchte Eignung für die
Klitoral-Stimulation eine Minimalgröße der zweiten Kammer 4 vermittelt, die durch
die anatomisch vorgegebene durchschnittliche Größe der Klitoris vorgegeben ist
(vgl. Fig. 4 des angegriffenen Patents). Damit einhergehend muss die Öffnung 42
einen Mindestdurchmesser aufweisen, der sich eignet, eine durchschnittlich große
Klitoriseichel aufzunehmen. Selbstverständlich darf der Durchmesser der Öffnung
42 auch nicht zu groß bemessen werden, da sonst ein Aufsetzen der zweiten Kammer
zwischen den Schenkeln der Frau nicht mehr möglich ist. Insofern scheiden klar zu
große oder klar zu kleine Kammern, also solche, die nicht zum Aufsetzen über eine
Klitoris geeignet sind, als zweite Kammern im Sinne des Streitpatents aus.

Eine vergleichbare implizite Dimensionierung wird auch in dem in den
ursprünglichen Anmeldungsunterlagen genannten Stand der Technik US 6 099 463
(von der Einsprechenden 1 als D5 eingeführt) in Spalte 3, Zeile 5 und 6 definiert,
wonach eine „*suction chamber 14 is sized for .. fitting around a clitoris ...* "; also
eine Saug-Kammer zum Aufsetzen über die Klitoris als *um die herum Klitoris
passend* dimensioniert ist.

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



5)  Ein Verbindungselement 5 im Sinne des Anspruchs 1 verbindet die erste und die zweite Kammer 3,4 ausschließlich. Daher führt anspruchsgemäß die eine Öffnung des Verbindungselements 5 in die erste Kammer 3, und die andere Öffnung 51 des Verbindungselements 5 in die zweite Kammer 4. Somit ergibt sich aus dem Anspruch weder implizit noch explizit, dass das Verbindungselement 5 anderweitige Elemente als die erste und die zweite Kammer verbindet (vgl. Merkmal 9).

Zudem ist das Verbindungselement, anders als etwa bei den bekannten Schlauchverbindungen, als „starr" beansprucht. Entsprechend unterscheidet das angegriffene Patent an mehreren Stellen zwischen starr und flexibel. Zudem wird dem Fachmann durch die Starrheit des Verbindungselement implizit offenbart, dass auch die relative Position der beiden Kammern zueinander ortsunveränderlich ist: Dies ergibt sich für den Fachmann auch aus der beanspruchten Ausgestaltung als Handgerät, was implizit eine ortsfeste Aufnahme der ersten und zweiten Klammern der Druckfelderzeugungseinrichtung in einem Gehäuse bedingt (vgl. Figuren 1 bis 3).

Die Ausrichtung der Öffnungen des Verbindungselements 5 in die ersten und zweiten Kammern 3, 4 (Merkmal 14) kann mit Hilfe der Fig. 4 bis 6 einfach nachvollzogen werden. Die Ausrichtung der Öffnungen hat auch strömungstechnisch, d.h. funktional, eine Bedeutung. Funktional müssen demnach die Öffnungen der ersten und der zweiten Kammer derart angeordnet sein, dass bei Kompression/Expansion der ersten Kammer 3 die Strömung durch die eine Öffnung jeweils auf die andere Öffnung gerichtet ist. Ein stufenförmiger Versatz der Öffnungen des Verbindungselements zueinander über deren Querschnitt hinaus ist demgemäß nicht mehr anspruchsgemäß.

Ersichtlich falsch ist daher die Auslegung des **Merkmals 15** von Anspruch 1 durch die Einsprechende 1, wonach die Ausrichtung der Öffnung 51 keinerlei Beschränkung des Anspruchsgegenstands bedeute (siehe Seite 6, letzter Absatz bis Seite 7, 1. Absatz Einspruchsschrift). Tatsächlich impliziert dieses Merkmal in Verbindung mit den übrigen Merkmalen bei über die Klitoris aufgesetzter zweiter Kammer eine Beabstandung der Öffnung 51 von der Klitoris zu deren Aufnahme



sowie eine Orientierung der Öffnung auf die Klitoris für die Ausrichtung der Medienströmung.

Ebenso unrichtig ist die Auslegung des **Merkmals 13.b** durch die Einsprechende 1 (Seite 7, 3. Absatz). Die Definition zweier Kammern, die mit einem Verbindungselement verbunden sind, führt für sich genommen nicht zu der Auslegung, dass eine Verengung oder Einschnürung im Gesamthohlraum der Vorrichtung vorhanden sein muss. Letztlich bilden Kammern funktional definierte Volumenabschnitte eines Hohlraums der Druckfelderzeugungseinrichtung 2.

Die Notwendigkeit einer „Verengung" des Hohlraums ergibt sich erst aus der anspruchsgemäßen Eigenschaft des Kanals einer „Düsenwirkung". Dabei ist diese Eigenschaft anspruchsgemäß zweifelsfrei dem „geraden Kanal" des Verbindungselements 5 zugeordnet, und nicht der dahinterliegenden zweiten Kammer 4, d.h., der Kanal selbst muss die Düsenwirkung aufweisen. Patentgemäß hat die Düsenwirkung die Funktion, die Strömung in die zweite Kammer auszurichten, wie sich zweifelsfrei aus dem Merkmal 14 und übereinstimmend aus der Beschreibung aus [0029] ergibt.

Im Übrigen sind die physikalischen Anmerkungen der Einsprechenden 1 betreffend der „*nicht ganz zutreffenden*" Argumentation der Patentinhaberin in der Eingabe vom 28. Mai 2014 bezüglich der in US 2013/0012769 A1 (D21) erwähnten „Düse" unverständlich. Zwar ist der Druck in dem Kanal **relativ** zu dem Druck in den beiden Kammer niedriger, jedoch wird aufgrund der **durch die Querschnittsverengung geschaffenen Volumenreduzierung des Gesamthohlraums** im Vergleich zu einem zylindrischen Hohlraum (d.h. ohne Einengung) der **Gesamtdruck** der Druckfelderzeugungseinrichtung erhöht. Mit anderen Worten wird ein Kanal mit einer Düsenwirkung auch zu einem erhöhten Gesamtdruck führen, da das Gesamtvolumen verringert ist. Die Klammeranmerkung der Patentinhaberin in Ihrer Eingabe vom 28. Mai 2014 „*(d.h., Druckerhöhung durch Volumenreduzierung)*" ist somit korrekt.

<table>
<tr><td>

[File:101603434.docx // LE11K17E]    16. Mai 2017<br/>
Stimulationsvorrichtung<br/>
NOVOLUTO GmbH

</td></tr>
</table>



## F. Keine unzulässige Erweiterung

### 1) Prüfungsmaßstab:

Der maßgebliche Inhalt der Anmeldung ist anhand der **Gesamtheit** der ursprünglich eingereichten Unterlagen zu ermitteln. Dies beinhaltet die Figuren, die von den Einsprechenden völlig unzureichend gewürdigt worden sind.

Entscheidend ist, was der mit durchschnittlichen Kenntnissen und Fähigkeiten ausgestattete Fachmann des betreffenden Gebiets der Technik den ursprünglichen Unterlagen als zur Erfindung gehörend entnehmen kann (BGH, Urteil vom 17. Februar 2015 - X ZR 161/12 - *Wundbehandlungsvorrichtung*; m.V.a. BGHZ 194, 107 Rn. 45 – *Polymerschaum*).

Maßgeblich ist bei dieser Bewertung auch, ob die merkmalsgemäße Ausgestaltung nach der Gesamtoffenbarung aus fachmännischer Sicht **als mögliche Ausführungsform** der zum Patent angemeldeten Erfindung erscheint (BGH, Urteil vom 18. Februar 2010 - Xa ZR 52/08 – *Formteil*), wobei unerheblich ist, ob die explizit dargelegten Ausführungsformen auch tatsächlich vom Anspruch umfasst sind, oder nicht.

### 2) Zu Merkmal 12: „*wobei die Stimulationsvorrichtung (1) ein tragbares Handgerät mit einer Batterie (76) ist*".

Die zugehörige Offenbarung ergibt sich schon aus dem **ursprünglich eingereichten Anspruch 13**, aber auch aus den Figuren 1 bis 3. Die Tragbarkeit des Gerätes ergibt sich aus der Bezeichnung „Handgerät". Dabei ist es aber nicht zwingend richtig, dass jedes tragbare Gerät ein Handgerät ist. Beispielsweise ist ein Staubsauger ist in der Regel tragbar, als Handgerät wird man ihn deshalb nicht bezeichnen können. Vielmehr ist ein Handgerät technisch implizit durch Tragbarkeit und eine ergonomische Ausgestaltung zum Halten mit einer Hand gekennzeichnet.

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Eine Stimulationsvorrichtung mit diesen Merkmalen ist zudem in Fig. 3 näher dargestellt. Übereinstimmend erläutert die ursprünglich eingereichte Beschreibung auf Seite 13, vorletzter Absatz:

*„Die erste Ausführungsform der Stimulationsvorrichtung 1 ist ein, **vorzugsweise tragbares**, Elektro- oder Kleingerät, welches ein Gehäuse 8, eine Druckfelderzeugungseinrichtung 2, Bedienelemente 71, eine Anzeige 72, einen An-/Aus- Schalter 74, eine Buchse 75, **eine optionale Batterie 76** und eine optionale Beleuchtung 9 aufweist".*

(Hervorhebungen durch den Autor)

Aus den beiden Angaben „vorzugsweise" und „optional" bei dieser lediglich beispielhaften Ausführungsform geht hervor, dass die Merkmale „tragbar" und „Batterie" Ergänzungen darstellen, die im Belieben des Fachmannes stehen. Folglich sind diese Merkmale für den Fachmann erkennbar eigenständig aufgeführt. Damit kann es sich bei der Aufnahme dieser fakultativen Merkmale in den Anspruch 1 grundsätzlich nicht um eine Zwischenverallgemeinerung handeln.

Im Übrigen wäre vorliegend auch eine Zwischenverallgemeinerung ohne weiteres zulässig. So kann der Anmelder nach stehender Rechtsprechung auch einzelne Merkmale eines Ausführungsbeispiels auswählen, solange kein funktional zwingender Zusammenhang besteht (vgl. etwa BGH, Urteil vom 16. 10. 2007 – X ZR 226/02 *Sammelhefter II*; BGH, Urteil vom 15. 11. 2005 – X ZR 17/02 *Koksofentür*).

3)    **Zu Merkmal 13a): „wobei das Verbindungselement (5) starr ist".**

Auf Seite 17, zweiter Absatz der ursprünglichen Beschreibung ist das folgende offenbart:

*„Die Halterung 32 besteht vorzugsweise aus einem **starren** Kunststoff...."*

(Hervorhebungen durch den Autor)

[File:101603434.docx // LE11K17E]   16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Das Bezugszeichen 32 ist auch in den Figuren 4 bis 6 ersichtlich, wobei der gerade verlaufende Kanal des Verbindungselements 5 durch die Wände der Halterung 32 gebildet wird. Folglich sieht der Fachmann das Verbindungselement 5 der ersten Ausführungsform als starr an. Weiter hat eine „Halterung" den Zweck etwas am Ort zu halten, womit alleine schon aus dieser Bezeichnung offensichtlich ist, dass das zu wählende Material starr sein muss.

Ähnliches zeigen die Fig. 10a bis 10c in Zusammenschau mit dem letzten Absatz der Seite 20 der ursprünglichen Beschreibung. Dort heißt es:

*„Bei diesem Aspekt der Erfindung ist die Wand 31 der ersten Kammer 3 **starr bzw. steif** aufgebaut."*

(Hervorhebungen durch den Autor)

Diese Wand 31 geht in den Figuren 10a bis 10c ununterbrochen, d.h., einstückig, in die Wand des Kanals des Verbindungselements 5 über, womit auch hier ein starres Verbindungselement 5 offenbart ist. Aus der gestrichelten Fortsetzung des Kanals erkennt der Fachmann zudem, dass es hierbei auf die Länge des Kanals des Verbindungselements 5 nicht ankommt.

Auch sind die Ausführungen der Einsprechenden 1 betreffend die Offenbarung der zweiten Ausführungsform fehlerhaft. Auf Seite 21, vorletzter Absatz der ursprünglichen Beschreibung, ist ein Verbindungselement mit einem starren Kanal offenbart:

*„Dabei sind die Kammern 3 und 4 über ein ausgedehntes Verbindungselement 5 verbunden, welches ein längerer flexibler Schlauch oder ein auch **starres Rohr** sein kann. Beispielsweise kann die Länge des Verbindungselements 5 0,5m betragen."*

(Hervorhebungen durch den Autor)

Ein Rohr weist nach dem allgemeinen Verständnis des Fachmanns zwangsweise

18_09_2017-01-00031-00000014

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



einen Kanal auf (sonst wäre es kein Rohr, sondern ein Stab), wobei übereinstimmend auch das Rohr der zugehörigen Fig. 11 des angegriffenen Patents einen gerade verlaufenden Kanal aufweist. Die Länge von 0,5m der Beschreibung ist hierbei lediglich beispielhaft angegeben.

Daher ist die Patentinhaberin frei in ihrer Wahl, die Lehre des starren Rohrs als starren Kanal zu beanspruchen.

4) **Zu Merkmal 13b): „als ein gerader Kanal mit Düsenwirkung ausgestaltet ist"**

Auf Seite 8, zweiter Absatz der ursprünglichen Beschreibung heißt es:

*„Beispielsweise kann das Verbindungselement bei einer Stimulationsvorrichtung, welche für die Klitoris bestimmt ist, eine einzelne Durchgangsöffnung mit Düsenwirkung auf die Klitoriseichel zwischen der ersten und der zweiten Kammer aufweisen."*

Eine Durchgangsöffnung offenbart einen Kanal. Eine solche Auslegung wird auch nicht von der Einsprechenden 1 in Zweifel gezogen, wie Ihre Argumentation auf Seite 14, 2. Absatz ihres Einspruchsschriftsatzes belegt. Es ist an dieser Stelle zwar zunächst weiter offengelassen, ob dieser Kanal gerade oder gebogen ausgestaltet ist, jedoch zeigen sämtliche Ausführungsformen der Figuren 3 bis 8, 10 und 11 einen gerade verlaufenden Kanal. Damit ist dem Fachmann klar, dass eine Ausbildung des Verbindungselements 5 als einzelner gerader Kanal mit Düsenwirkung eine mögliche Ausführungsform der Erfindung ist.

Entsprechend wird in Bezug auf die erste Ausführungsform in der Beschreibung auf Seite 16, letzter Absatz der Beschreibung, das Folgende erläutert:

*„Zwei zueinander ausgerichtete Öffnungen in der Wand 41 der zweiten Kammer und der Halterung 32 bilden gemeinsam das Verbindungselement 5"*

[File:101603434.docx // LEI1K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH

§

Es heißt weiter in der ursprünglichen Beschreibung auf Seite 20, dritter Absatz:

*„Während die Ausgestaltung des Verbindungselements 5 mit **nur einem Kanal**, wie in Zusammenhang mit Fig. 6 beschrieben, zur Ausbildung eines stark konzentrierten Medien- bzw. Luftstroms auf einen Zielbereich hin führt...“* (Hervorhebungen durch den Autor)

Weiter erkennt der Fachmann, dass die Fig. 6 mit den zugehörigen Pfeilen eine erfindungsgemäße Düsenwirkung des Verbindungselements in Bezug auf eine Strömung darstellt, womit auch die Ausführungsform der Fig. 6 die anspruchsgemäße Ausgestaltung des Verbindungselements offenbart. In den Figuren 4 bis 6 sind keine weiteren Öffnungen der ersten Kammer 3 als diejenige zum Verbindungselement ersichtlich. Auch die Annahme, dass weitere, vom Schnitt in den Figuren 4 bis 6 nicht erfasste Öffnungen vorhanden sein könnten, findet in der Beschreibung jedenfalls keine Stütze [vgl. 0086]. Mithin ist eine erste Kammer mit einer <u>einzigen</u> Öffnung gemäß einer Ausführungsform der Erfindung offenbart.

Folglich offenbart insbesondere die Ausführungsform der Figuren 4 bis 6 alle beanstandeten Merkmale eines geraden Kanals mit Düsenwirkung.

Die Beschreibung offenbart weiter auf Seite 8, letzter Absatz, das Folgende:

*„Weiter entsteht nach dem Aufsetzen der halbseitig bzw. teilweise geöffneten zweiten Kammer auf den zu stimulierenden Hautbereich ein in sich abgeschlossenes System der Medien- bzw. Luftströmung in der Druckfelderzeugungseinrichtung.“*

Weiter heißt es im gleichen Absatz:

*„So ist vorzugsweise die erste Kammer über bzw. durch das Verbindungselement **ausschließlich** mit der zweiten Kammer verbunden. **So***



*bestehen keine anderen Verbindungen der ersten Kammer als diejenigen zur zweiten Kammer; beispielsweise besteht keine direkte Verbindung der ersten Kammer mit der Umgebung des Gerätes über ein Druckventil oder über einen Luftabführkanal."*

(Hervorhebungen durch den Autor)

Entsprechendes findet sich auch in der ursprünglichen Beschreibung auf Seite 16, vorletzter Absatz.

Damit ist dem Fachmann auch aus der Zusammenschau der Lehre der Beschreibung klar, dass die bevorzugte Ausführungsform der Erfindung eine einzige Öffnung der ersten Kammer 3 aufweisen **muss**, die über einen einzelnen geraden Kanal mit Düsenwirkung mit der zweiten Kammer 4 verbunden ist.

Seite 24, Zeile 27 der Beschreibung offenbart dem Fachmann übereinstimmend, dass bei **allen Ausführungsformen** *„nur eine Öffnung aus der ersten Kammer 3"* dargestellt ist.

Zudem spricht Seite 19, Zeile 15 der Beschreibung von einer „Achsrichtung" des Verbindungselements 5, mithin des Kanals der Fig. 7. Eine geometrische Achse weisen nur gerade verlaufende Kanäle auf, womit auch diese Stelle einen geraden Kanal offenbart.

5)  **Zu Merkmal 11): „wobei die Stimulationsvorrichtung (1) keine Ventile aufweist"**

Korrekt ist die Auffassung der Einsprechenden, dass dieses Merkmal beansprucht, dass die Stimulationsvorrichtung 1 „global" kein Ventil aufweist.

Dies ist in der ursprünglichen Beschreibung an zwei Stellen in dieser Allgemeinheit offenbart. Auf Seite 9, zweiter Absatz heißt es entsprechend:

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



*„Dabei vermeidet **die vorliegende Erfindung Ventile** oder Pumpen/Kompressoren mit potentiellen Toträumen und nicht zu reinigenden Stellen."*

(Hervorhebungen durch den Autor)

Mithin ist offenbart, dass die gesamte Erfindung, d.h., die erfindungsgemäße Stimulationsvorrichtung, Ventile vermeidet.

Gleich im nächsten Absatz auf Seite 9 heißt es:

*„Zudem führt **der erfindungsgemäße Aufbau** zur Vermeidung komplexer strömungstechnischer Elemente, wie z.B. Ventile, was zu einer Vereinfachung der Herstellung führt."*

(Hervorhebungen durch den Autor)

Übereinstimmend ist auch in Fig. 3 der ursprünglichen Anmeldeunterlagen, welche die gesamte Stimulationsvorrichtung im Schnitt wiedergibt, kein Ventil gezeigt.

Weiter muss das Merkmal 11 auch im Zusammenhang der Gesamtoffenbarung gewürdigt werden. Der in der Beschreibung der Seite 3, erster Absatz, bis Seite 4, erster Absatz, und Seite 5, zweiter und vierter Absatz, diskutierte Stand der Technik beschreibt Ventile generell nachteilhaft, und dies unabhängig davon, wo diese angeordnet sind. Beispielsweise ist dem Fachmann aus den Ausführungen des Patents zur US 6 099 463 A auf Seite 2, zweiter Absatz der ursprünglichen Beschreibung klar, dass ein Freigabeventil an einer beliebigen Stelle angeordnet sein kann, solange dieses seine Funktion des Freigebens des Vakuums erfüllt.

**Zusammengefasst sind alle Merkmale des Anspruchs 1 des angegriffenen Patents ursprungsoffenbart und stellen keine unzulässige Erweiterung des Gegenstands des Patents über den Inhalt der ursprünglichen Anmeldung dar.**

[File:101603434.docx // LE11K17E]   16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



**G.   Relevanz von Druckschriften mit Gegenständen, die für die Klitoral-Stimulation ungeeignet sind**

Eine Vorrichtung, die sonst alle in dem Patentanspruch aufgeführten Merkmale besitzt, die aber zu dem angegebenen Zweck (siehe dazu auch bei Punkt D. 2)) ungeeignet wäre oder einer Änderung bedürfte, damit sie zu diesem Zweck verwendet werden kann, sollte normalerweise nicht als ein Gegenstand betrachtet werden, der den Gegenstand des Patentanspruchs vorwegnimmt. (vgl. Prüfungsrichtlinien des EPA, Teil F-IV, 4.13). Diese Auslegungsgrundsätze gelten sinngemäß auch in nationalen Einspruchsverfahren.

Die D8 offenbart ein Gerät zur Hautbehandlung mit kosmetischer oder auch therapeutischer Wirkung und damit erkennbar keine Eignung zur Klitoral-Stimulation im Sinne des Anspruchs 1.

Die D9 offenbart eine Vorrichtung zur Körperfetttherapie, die auf der Haut aufgesetzt wird und damit erkennbar keine Eignung zur Klitoral-Stimulation im Sinne des Anspruchs 1.

Die E1 offenbart eine pneumatische Gesundheitsmassagevorrichtung („pneumatic health massage device") zur Anwendung in der traditionellen Chinesischen medizinischen Meridianmassage. Bekanntermaßen verlaufen durch die Klitoris keine Meridiane, so dass die E1 erkennbar keine Eignung zur Klitoral-Stimulation im Sinne des Anspruchs 1 besitzt. Selbiges gilt in ähnlicher Weise für die E4, auf die die Einsprechende pauschal mit einem Satz verweist, die aber an keiner Stelle eine Klitoral-Stimulation offenbart.

Daher können die D8 und D9, sowie E1 und E4 schon deswegen nicht neuheitsschädlich sein, da sie erkennbar keine Eignung für die Klitoral-Stimulation im Sinne des Anspruchs 1 besitzen.



**H.     Neuheit des Anspruchs 1 gegenüber der Entgegenhaltung D8 (DE 42 43 876 A1)**

Es sind entgegen den Ausführungen der Einsprechenden aus der Druckschrift D8 nicht alle Merkmale des Anspruchs 1 zu entnehmen. Im Übrigen nimmt die D8 schon deswegen nicht den Gegenstand des Anspruchs 1 vorweg, da sie erkennbar keine Eignung für die Klitoral-Stimulation besitzt (siehe F.).

**Insbesondere offenbart die D8 nicht die Merkmale 1), 4.a) und 4.b), 5, 6, 9, 10, 12, 13.a) und 13.b), 14 und 15, wie im Folgenden gezeigt:**

1.   Die D8 offenbart ein Gerät zur Hautbehandlung mit kosmetischer oder auch therapeutischer Wirkung und damit keine Eignung zur Klitoral-Stimulation (**Merkmal 1**). Eine Stimulationsmöglichkeit für die Klitoris ist in der D8 weder implizit noch explizit offenbart. Aufgabenstellung und Anwendungsbereich der D8 unterscheidet sich somit grundlegend von jenen des angegriffenen Patents. Damit wird aber zwangsläufig die gesamte Auslegung des Drucks, die Geometrie der Hohlräume, etc., unterschiedlich zur anspruchsgemäßen Lehre ausfallen.

Der Hinweis der Einsprechenden 1, dass die Klitoris schließlich auch Haut aufweist und daher das Gerät der D8 zur Stimulation für die (äußerst empfindliche) Klitoris geeignet sei, ist abwegig und lässt keinen anderen Schluss zu.

Der Gegenstand des angegriffenen Patents grenzt sich entsprechend gegenüber derartigen therapeutischen Vorrichtungen schon in der Beschreibungseinleitung (vgl. [0008] ff.) klar ab, womit eine Therapie nicht als Stimulation im Sinne des Patents zu verstehen ist (siehe auch Punkt D. 2)).

Es sei nochmals darauf hingewiesen, dass Vorrichtungen, welche nur

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



allgemein der kosmetischen oder therapeutischen Hautbehandlung dienen, zur beanspruchten Klitoral-Stimulation ungeeignet sind, da eine Klitoral-Stimulation die Behandlung einer empfindlichen Schleimhaut betrifft und entsprechende Dimensionierungen, insbesondere der zweiten Kammer der Stimulationsvorrichtung erfordert.

Die D8 ist daher ein **ungeeigneter und gattungsfremder** Stand der Technik.

2. Die **Merkmale 4a) und 4b)** sind weder explizit noch implizit in der D8 offenbart. Die D8 offenbart lediglich eine Mehrzahl von „Düsen 19" (vgl. D8, Spalte 7, Zeile 19) oder „Austrittsdüsen" in einer „Behandlungsfläche" (vgl. D8, Spalte 7, Zeile 51). Insbesondere sind die „Austrittsöffnungen" unmittelbar in der Behandlungsfläche des Kopfs der D8 (vgl. D8, Spalte 3, Zeile 7 ff.) ausgebildet, wobei die Behandlungsfläche auf der zu stimulierenden Hautfläche aufliegt. Dabei wirken die *„Saug- und Druckstöße durch die Durchgangslöcher 19 nach außen"*, d.h., eine Wirkung eines Druckfeldes **innerhalb** einer (zweiten) Kammer auf die Klitoriseichel im Sinne der Merkmale 5 und 6 ist in der D8 nicht offenbart.

Aufgrund der fehlenden Eignung zur Klitoral-Stimulation, offenbart die D8 auch nicht, dass die Düsen 19 zur Aufnahme einer Klitoriseichel und zum Aufsetzen über der Klitoris geeignet sind. Beispielsweise offenbart die D8 ausschließlich eine Mehrzahl (vier) von außermittig angeordneten „Düsen 19", weshalb die Klitoriseichel bei Auflage des Kopfteils 18 in jedem Falle unter der Behandlungsfläche zum Liegen käme.

Somit können mit dem Behandlungskopf der D8 nur eben ausgestaltete Hautbereiche erreicht werden. Hautbereiche mit Höhenprofil, wie sie die Klitoriseichel darstellt, können von einem gemäß der D8 ausgestalteten Kopf nicht aufgenommen werden, wodurch ein Aufsetzten über die Klitoris nicht möglich ist.

18_09_2017-01-00031-00000021

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Ungeachtet dessen macht auch das Vorsehen von mehreren Düsen 19, also mehreren zweiten Kammern, angesichts der weiblichen Anatomie mit einer einzigen Klitoris auch keinen Sinn.

3.  Zudem liegt gemäß **Merkmal 15** anspruchsgemäß *„die Öffnung (51) des Verbindungselements (5)* (d.h. des starren, geraden Kanals mit Düsenwirkung) *der Klitoris durch die zweite Kammer 4 hindurch gegenüber"*. Im Gegensatz dazu liegt der Düsenaustritt der D8 unmittelbar auf der Haut auf, womit es auch deshalb bei der D8 an einer beabstandeten zweiten Kammer fehlt.

4.  Wie von der Einsprechenden 1 auf Seite 13, Absatz 6 treffend angemerkt, sind die Austrittsöffnungen 19 selbst als Düsen bezeichnet, womit davon ausgegangen werden kann, dass diese eine Funktion entsprechend einer Düse bewirken. Damit wird die Düsenwirkung der D8 in den vermeintlichen zweiten Kammern nicht aber, wie in **Merkmal 13.b)** definiert, von dem Verbindungselement verwirklicht.

    In der D8 ist somit **kein** Verbindungselement mit Düsenwirkung offenbart.

5.  **Merkmal 5** ist nicht offenbart. Ein Verbindungselement gemäß Merkmal 5 ist dadurch gekennzeichnet, dass das Verbindungselement die Öffnungen der Kammern 3,4 selbst verbindet, also die erste Kammer und die zweite Kammer **unmittelbar** verbindet. Jegliche andere potentiell in der D8 offenbarten Verbindungen oder Kanäle fallen damit weg, da diese eine andere Funktion haben, d.h., etwas anderes verbinden.

    Da die D8, wie vorangehend erläutert, keine zweite Kammer offenbart, kann auch das anspruchsgemäße Verbindungselement in der D8 nicht offenbart sein.

    Die Einsprechende 1 gibt dazu in ihrer Einspruchsschrift auf Seite 13, Absatz 4 explizit an, dass

18_09_2017-01-00031-00000022

[File:101603434.docx // LE11K17E]   16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



> „... *die erste Kammer eine einzige Öffnung, nämlich die Öffnung in den Schlauch 4 hinein, aufweist.*"

Der Schlauch ist jedoch flexibel und nicht gerade verlaufend, und damit kein Verbindungselement im Sinne des Anspruchs. Völlig abwegig ist in diesem Zusammenhang, dass sich eine Kammer „*über einen Schlauch*" erstreckt, wie die Einsprechende 1 konträr zu ihrem obigen Vortrag auf Seite 12, vorletzter Absatz angibt.

Auch die Durchgangsbohrung 22 der Fig. 2 der D8 verläuft gekrümmt, wenn man die gestrichelten Linien mit dem Bezugszeichen 22 in der Fig. 2 nachvollzieht. Zudem endet die Durchgangsbohrung 22 in einem weiteren Kanal im Griff 11, und nicht in einer Kammer.

Unverständlich ist die Argumentation der Einsprechenden 1 auf Seite 14, dritter Absatz, dass

> „*Wenn die Öffnungen 19 als Düsen bezeichnet sind, ist hieraus für den Fachmann verständlich, dass die Durchgangsbohrung 22 einen geringeren Querschnitt aufweist, als die Öffnungen 19, da diese sonst keine Düse bilden würden.*"

Hätten die Durchgangsbohrungen 22 einen geringeren Querschnitt, wären diese selbst als Düse bezeichnet. Dies ist bei der D8 jedoch nicht der Fall.

Vielmehr sind die Öffnungen 19 in der D8 selbst als Düsen bezeichnet, womit diese den Ort des geringsten Querschnitts darstellen. Die Öffnungen 19 münden entsprechend nach außen.. Die weiteren Überlegungen der Einsprechenden 1 zu Querschnittsverhältnissen der Durchgangsbohrung 22 und der Öffnung 19 sind Mutmaßungen, aber nicht Bestandteil der Offenbarung der D8.

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Auch mündet die Durchgangsbohrung 22 gemäß der D8 nicht unmittelbar in den Düsen 19, sondern in der zwischengelagerten Verteilerrinne.

6.  **Merkmal 6** in Verbindung mit **Merkmal 14** wird nicht in der D8 offenbart. Es kann dahinstehen bleiben, ob die „bewegliche Membran" der D8 eine kammerartige Ausgestaltung einer druckfelderzeugenden Anordnung offenbart, oder nicht. Hier sind auch Ausgestaltungen einer Pumpe mit einer beweglichen Membran denkbar, die keine Kammer im Sinne des Anspruchs erfordern (beispielsweise eine Schlauchquetschpumpe).

Es ist anspruchsgemäß für die Existenz einer ersten Kammer 3 mindestens erforderlich, dass diese Kammer eine unmittelbare Öffnung zu dem geraden und starren Verbindungselement 5 aufweist. Dies ist entsprechend der Offenbarung der D8 nicht der Fall. Vielmehr zeigt die D8 in der Fig. 1 einen länglichen gewundenen Luftschlauch mit verschiedenen Abschnitten und winkligen Übergängen, der an den Behandlungskopf 2 der D8 angeschlossen ist.

7.  Auch das **Merkmal 9** ist nicht in der D8 offenbart. Wie beispielsweise aus FIG. 2 sowie Spalte 7, Zeile 14 bis 24 der D8 deutlich wird, ist die Durchgangsöffnung 22 nicht ausschließlich mit der zweiten Kammer verbunden, sondern vielmehr mit einer Mehrzahl von Düsen 19 und dem Luftschlauch 4. Die Ausführungsform der D8 offenbart im Detail eine Mehrzahl von auf einer Ebene zueinander beabstandeten Düsen, die mit einer kreisförmigen Verteilerinne verbunden sind. Es sind somit Abzweigungen im Luftkanal sowie räumliche Versetzungen zwischen Düsen und Durchgangsbohrung vorhanden. Folglich ist die Anordnung der D8 strömungstechnisch und funktionell klar unterschiedlich zu der durch das Merkmal 9 definierten Anordnung eingerichtet.

8.  **Merkmal 10** ist in der D8 ebenso nicht offenbart. Die D8 macht keinerlei weitergehende Angaben über den Innenaufbau ihres Generators. Es ist auch funktionell ohne weiteres möglich, dass der Generator mehr als eine

[File:101603434.docx // LE11K17E]   16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Öffnung aufweist, um ein Druckfeld aus Unter- und Überdrücken aufzubauen, wie beispielsweise aus der D6 oder der D7 ersichtlich.

9.  **Merkmal 12** ist in der D8 ebenso nicht offenbart. Bei der Auslegung dieses Merkmals kommt es auf die bestimmungsgemäße Benutzung an. So soll die beanspruchte Vorrichtung als ein „Handgerät", das die Druckfelderzeugungsvorrichtung insgesamt umfasst, bei **der Benutzung** mit der Hand gehalten werden können und weist dazu eine ergonomische Form auf, die ein Greifen mit der Hand ermöglicht (vgl. Figur 1 und 2). Die D8 weist dagegen einen „stationären Teil 1" (vgl. D8, Spalte 5, Zeile 57) auf, der in Form eines Tischgerätes ausgeführt ist. Dieser stationäre Teil 1 kann zwar auch tragbar sein, das alleine macht aus der Kombination von stationärem Teil 1 und Behandlungskopf 2 noch kein Handgerät im Sinne des Anspruchs 1 (siehe auch bei Punkt E. 2)).

    Eine Batterie ist ebenso nicht offenbart. Die Verwendung von stromintensiven Peltier-Elementen und die Ausführung als Tischgerät indizieren für den Fachmann eher eine Netzstromversorgung.

10. **Merkmale 13. a) und 13. b)** sind auch nicht in der D8 offenbart. Da kein Verbindungselement im Sinne des Merkmals 5 offenbart ist, können durch die D8 auch keine Eigenschaften eines solchen offenbart sein.

    Der Durchgangsbohrung 22 der D8 ist weder gerade, noch weist diese eine Düsenwirkung auf, wie vorstehend vorgetragen.

11. Auch eine Ausrichtung der Öffnung eines geraden Verbindungselements 5 in die erste Kammer und der Öffnung des Verbindungselements 5 in die zweiten Kammer zueinander, mit anderen Worten gemäß **Merkmal 14** gegenüberliegend, ist in der D8 nicht offenbart.

12. **Merkmal 15** ist ausgehend von obenstehender Argumentation ebenso nicht in der D8 offenbart, da diese keine zweite Kammer offenbart. Eine

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH

Beabstandung der Düse mindestens in der Länge einer Klitoriseichel von der Auflagefläche der Vorrichtung der D8 ist ebenso nicht offenbart.

### I.  Erfinderische Tätigkeit des Anspruchs 1 gegenüber der D8

Wie zuvor dargelegt, ist die D8 gattungsfremd und beschäftigt sich nicht mit der sexuellen Stimulation der Klitoris. Nach stehender Rechtsprechung des BGH wird der Fachmann diese also grundsätzlich nicht zur Realisierung der anspruchsgemäßen Lehre heranziehen.

Zudem offenbart die D8 eine Vielzahl von Merkmalen nicht, wie schon vorstehend in Bezug auf die Neuheit vorgetragen. Der Fachmann würde diese auch nicht in naheliegender Weise ergänzen, da ihm dazu jegliche Anregung in der D8 fehlt.

Der beanspruchte Gegenstand des Anspruchs 1 basiert daher auf erfinderischer Tätigkeit gegenüber der D8.

### J.  Erfinderische Tätigkeit des Hauptanspruchs gegenüber der D9 (US 2008 / 030 49 84 A1) und D10 (WO 00 / 28939 A2)

1.  Die D9 offenbart eine Vorrichtung zur Körperfetttherapie, die auf der Haut aufgesetzt wird. Hierdurch sollen nicht also etwa Nervenenden zur Klitoral-Stimulation angeregt werden, im Gegenteil soll hier auf einen Bereich in der Unterhaut, genauer auf Fettgewebe, eingewirkt werden. Es wäre daher unsinnig anzunehmen, dass der Klitoral-Bereich wegen überflüssigem Körperfett behandelt werden könnte.

Dass sich die anzuwendenden Intensitätsbereiche zwischen der Anregung von Tastrezeptoren, etwa Meissner-Körperchen, die sich in einer Hautschicht oberhalb des Fettgewebes befinden, und an der Klitoris – als besonders empfindliche erogene Zone (siehe Absatz [0046] der Patentschrift) – dicht

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



verteilt vorkommen und der Behandlung von Fettgewebe in der Unterhaut um Größenordnungen unterscheiden, ergibt sich von selbst.

Wie bereits bei Punkt D. 2) erläutert, muss klar zwischen Vorrichtungen zur Stimulation die Klitoris, d.h., zur Verwendung auf der Schleimhaut, und Vorrichtungen zur Behandlung der normalen Haut unterschieden werden.

Medizinisch betrachtet weist die Schleimhaut keine Hornschicht, d.h., keine echte Oberhaut, auf. Eine besondere Eigenschaft der klitoralen Schleimhaut ist die Anwesenheit vieler Sinneszellen und schleimbildender Drüsen.

Damit wird der Fachmann das erfindungsgemäße Druckfeld (beispielsweise in seinem erzielbaren Gesamtdruck) anders auslegen, als wenn er der Lehre der D9 folgen würde. Aufgrund der Hornschicht der normalen Haut wäre der Druck viel zu stark.

Deshalb ist die Lehre der D9 zur Klitoral-Stimulation im Sinne des erteilten Anspruchs 1 erkennbar ungeeignet und der Fachmann wird die D9 als gattungsfremd von vorne herein als Ausgangspunkt der Überlegungen zur Klitoral-Stimulation verwerfen.

Damit würde der Fachmann aber die D9 zur Bewertung der erfinderischen Tätigkeit grundsätzlich nicht in Betracht ziehen.

2.   Rein vorsorglich wird nachstehend noch weiter inhaltlich zur D9 Stellung genommen, da diese - ebenso wie die gattungsfremde D8 - eine Vielzahl von anspruchsgemäßen Merkmalen nicht offenbart:

a)  So offenbart die D9 neben der Eignung zur Klitoral-Stimulation zudem **nicht** die **Merkmale 4b, 5, 6, 8, 9, 10, 13.a), 13.b), 14 sowie 15**, wie nachstehend erläutert:

Wie von der Einsprechenden 1 bereits angemerkt, weißt die D9 keine zweite

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Kammer, kein Verbindungselement und daher auch keine Medienströmung zwischen den Kammern oder etwa eine Ausrichtung dieser auf.

Ebenso spricht die D9 ausschließlich von Unterdrücken (vgl. [0017], „*suction action*", womit die erfindungsgemäßen Überdrücke nicht offenbart sind. Weiter bewegt sich der Kolben der D9 über die gesamte Länge eines Zylinders hin und her, und schlägt deshalb auf der Haut auf. Dies ist eine direkte Stimulation, welche die patentgemäße Lehre gerade zu vermeiden sucht.

b) Die **D10** offenbart weiter **nicht** die **Merkmale 5, 8, 9, 10, 13.b), 14 und 15**, wie im Folgenden dargelegt wird.

Die D10 zeigt eine Vorrichtung bzw. Verfahren zur Behandlung sexueller Dysfunktionen mittels ausschließlichem Vakuum, womit eine patentgemäße Klitoral-Stimulation mit Unter- und Überdrücken nicht offenbart ist. Demnach heißt es: „*Embodiments of the invention are designed to increase blood flow in the clitoris to assist a woman to achieve clitoral engorgement*" (siehe Seite 9, Zeile 19 bis 22 der D10).

Die D10 zeigt entsprechend eine Vakuumpumpe, die jedoch mit den in der Beschreibung des Patents aufgeführten Nachteilen behaftet ist. Insbesondere kann die Daueranwendung des Unterdrucks zu Gewöhnungseffekte, führen und die Wirksamkeit der Vorrichtung auf Dauer einschränken (siehe Absatz [0007] der Patentschrift).

Im Hinblick auf die oben beschriebenen Nachteile und Anwendungsgebiete würde der Fachmann somit nicht zu einer Vakuumpumpe greifen, um eine Vorrichtung zur Klitoral-Stimulation bis zum Orgasmus (Klimax) zu entwickeln.

Darüber hinaus offenbart die D10 die Verwendung von Ventilen (vgl. Seite 9, Zeile 29 oder Seite 11, Zeile 8) und damit nicht Merkmal 11. Weiter wird

[File:101603434.docx // LE11K17E]     16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



kein anspruchsgemäßes Verbindungselement offenbart und damit auch keine Ausrichtung von seiner Öffnung (Merkmale 13 a), b) und 15)

c) Weder die D9 noch die D10 können daher für sich den Gegenstand des Anspruchs 1 nahelegen und auch bei einer Kombination der Druckschriften, D9 und D10, würde der Fachmann nicht in naheliegender Weise zu dem beanspruchten Gegenstand gelangen, da die Merkmale 8, 9, 10, 13.b), 14, 15 in keiner der beiden Druckschriften offenbart sind.

Insbesondere ist weder in der D9 noch D10 eine Ausrichtung der Medienströmung auf die Klitoris offenbart, da keine Überdrücke offenbart sind. In der D10 wird ausschließlich ein Unterdruck bewirkt. Zudem wird ein Ventil zur Vakuumpumpensteuerung verwendet (vgl. Seite 9, Zeile 29). In der D9 findet in derselben Kammer, welche auf der Haut aufliegt, eine Volumenänderung statt. Somit wird auch hier keine Strömung ausgerichtet.

Somit zeigt keine der Druckschriften oder eine Kombination dieser beiden eine Anregung für eine Stimulationsvorrichtung, bei welcher eine indirekte Druckmassage (durch die Ausrichtung der Strömung) zur sexuellen Stimulation bis zum Orgasmus (Klimax) verwendet wird.

**Der Gegenstand des Anspruchs 1 beruht daher auf erfinderischer Tätigkeit gegenüber den Druckschriften D9 und D10.**

## K. Patentfähigkeit gegenüber der E1 (CN 2153351)

### 1. Zum Offenbarungsgehalt im Allgemeinen:

Die E1 betrifft ein Chinesisches Gebrauchsmuster mit einer Seite Beschreibung, zwei Ansprüchen und einer Figur. Die Einsprechende 2 hat dazu eine englische Maschinenübersetzung eingereicht, auf die sie Ihre Argumentation stützt. Die Patentinhaberin bezweifelt aber die

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Qualität von Maschinenübersetzung im Vergleich zu einer humanen Übersetzung, insbesondere bei einer chinesischen Ursprungsoffenbarung, da die Chinesischen Sprache in hohem Maße mehrdeutig und kontextbezogen ist. Eine Maschinenübersetzung mag einen ersten Anhaltspunkt liefern, letztlich entscheidend ist aber ausschließlich der tatsächliche Offenbarungsgehalt einer Druckschrift. Die Anmelderin legt daher eine beglaubigte englische Übersetzung eines chinesischen Übersetzungsbüros als Beweismittel A2 vor. Der Offenbarungsgehalt der E1 unterscheidet sich demnach maßgeblich von der Maschinenübersetzung, die die Einsprechende 2 vorgelegt hat.

- So heißt es etwa in der Maschinenübersetzung „*movable rubber nozzle (1")* während die humane Übersetzung von „*movable rubber mouth (1)"* spricht.

- Des Weiteren heißt es in der Maschinenübersetzung „*gas health massage"* und „*pulsating air pressure"*, in der humanen Übersetzung „*Pneumatic Health Massage Device"* und „*pulse air pressure"*.

- Was in der Maschinenübersetzung nebulös mit „*...a plurality of machine treatment probe ..."* erwähnt ist, lautet in der humanen Übersetzung „*It can also be equipped with multiple therapeutic mouthpieces."*.

- Ferner heißt es in der humanen Übersetzung „*Pulse air pressure will be generated when the switch is on, so as to therapeutically stimulate acupoints in the body."* während die Maschinenübersetzung den entsprechenden Satz unverständlich mit „*Power pulsed pressure to stimulate the meridian points in order to achieve therapeutic purposes."* übersetzt.

Zu der sprachlichen Unsicherheit hinsichtlich des tatsächlichen Offenbarungsgehalts kommt, dass die einzige Figur der E1 eine Mischung aus einer schematischen Darstellung einer magnetischen Antriebsanordnung und einer technischen Schnittzeichnung zeigt. Die

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Einsprechende hat zudem weitere eigene Bezugszeichen in die Figur eingefügt, um die Offenbarung in augenscheinlich rückschauender Betrachtung zu ergänzen.

Die E1 offenbart daher dem Fachmann keineswegs eine eindeutige technische Lehre, die die Ausführungen der Einsprechenden 2 in tatsächlicher Hinsicht zu stützen vermag.

**2.    Die Druckschrift E1 offenbart dem Fachmann keine Lehre, welche ausführbar ist.**

Es sind bei dem mutmaßlichen magnetischen Antrieb der E1 weder in der knappen Beschreibung noch in der einzigen Figur irgendwelche Bewegungsrichtungen, Ausrichtungen der Magneten, Auslenkungsangaben, etc. angegeben. Damit mangelt es in der E1 an einer unmittelbaren und eindeutigen Offenbarung, wie die gesamte Vorrichtung der E1 denn überhaupt funktionieren könnte.

Es ist insbesondere nicht offenbart, welche Bewegungen des Hebels in welchen Richtungen erfolgen sollen. Eine Hin-und Her-Bewegung des Magneten 4 relativ zu dem Elektromagneten 5 im Sinne einer rechts/links-Bewegung in der Ebene der Figur 1 der E1 scheidet aus, da dies nach den physikalischen Gesetzen nicht möglich ist:

Gleichnamige Pole stoßen sich ab und unterschiedliche Pole ziehen sich an. Unter der Annahme, dass der Magnet 4 seinen Südpol an der linken Seite, und seinen Nordpol an der rechten Seite aufweist, so werden beide Seiten unabhängig von der Polung des Elektromagneten 5 gleich stark angezogen oder abgestoßen, womit der Magnet 4 an Ort und Stelle verbleiben würde. Dasselbe gilt natürlich auch für die umgekehrte Anordnung der Pole des Magneten 4.

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Letztlich würde ein Magnet 4 bei Bestromung des Elektromagneten (in der Papierebene der Fig. 1) nur entweder nach oben zu dem Elektromagneten 5 hingezogen oder von diesem weggedrückt werden (die Feldkräfte wirken stets senkrecht zu den Feldlinien, die vorliegend den Magneten 4 von links nach rechts oder umgekehrt schneiden). Dies entspräche einem herkömmlichen „Hubmagnetantrieb". Bei diesen ist jedoch zudem im Grundsatz nur ein Antrieb in eine Richtung möglich (d.h., entweder nur ein Drücken oder nur ein Ziehen), solange kein Rückstellelement, beispielsweise eine Feder, vorhanden ist. Eine solche ist jedoch in der E1 nicht offenbart.

Zudem ist nicht ersichtlich, wo der Drehpunkt des Hebels 3 sein könnte. Es fehlen hierzu jegliche Angaben. Ohne einen Hebelpunkt ist die Bewegung des Hebels nicht ersichtlich. In der Folge kann man der E1 nicht entnehmen, wie eine Krafteinwirkung über den Hebel 3 auf den Airbag 2 erfolgen könnte, und ebenso, wie irgendein „Druck" erzeugt werden könnte.

Ebenso ist nicht ersichtlich, wie oder in welche Richtung der „movable rubber mouth" der E1 bewegt werde könnte.

Es werden in der E1 ebenso keine Angaben zu einer Lagerung des Airbags 2 oder des Mundstücks 1 gemacht, weshalb der Fachmann auch hier der E1 keine ausführbare Lehre entnehmen kann.

Insbesondere bleibt offen, ob sich bei einer Bewegung des Hebels nur der Airbag verformt oder ob sich der Airbag verformt und sich das Mundstück auch hin und her bewegt. Somit gibt die E1 dem Fachmann keine eindeutige und ausführbare Lehre an die Hand. Ausführbarkeit ist aber eine Vorrausetzung für eine technische Lehre, um sich als relevanter Stand der Technik zu qualifizieren.

**Die Druckschrift E1 stellt daher keinen vom Fachmann zu**



berücksichtigenden Stand der Technik dar.

### 3.    Die E1 ist gattungsfremd

Die Druckschrift E1 offenbart weder implizit noch explizit eine Stimulationsvorrichtung für die Klitoris, sondern vielmehr eine pneumatische Gesundheitsmassagevorrichtung zur Anwendung in der traditionellen Chinesischen medizinischen Meridianmassage und bekanntermaßen verlaufen durch die Klitoris keine Meridiane.

Etwas anderes ergibt sich auch nicht auf den pauschalen Hinweis der Einsprechenden 2 zur E3 und Stimulierung von erogenen Zonen. Denn auch die E3 empfiehlt keineswegs eine Klitoral-Stimulation mittels Meridianmassage, sondern weist in der Einleitung „Sexuelle Stimulierungspunkte" darauf hin, dass:

> „Wären wir alleine auf die westliche Sichtweise und wissenschaftlichen Erkenntnisse angewiesen, würden sich die sexuellen Stimulierungspunkte auf Klitoris und Brustwarzen bei der Frau und auf den Penis beim Mann beschränken und das Kapitel wäre im Nu beendet. Ganz anders die östliche Weltsicht, die auch bei uns durch Akupunktur, Kampfkünste und Meditation mehr und mehr verbreitet wird. Hier finden wir einen reichen Erfahrungsschatz, was Körperbewusstsein und sexuelle Stimulation betrifft."

Das heißt, die E3 regt den interessierten Leser (der in den seltensten Fällen ein Fachmann für die Entwicklung von Sexspielzeug sein wird) dazu an, es bei der Erotischen Partnermassage doch einmal mit östlicher, nicht schulmedizinischer Meridiantherapie zu probieren, die eben gerade auch andere Stimulierungspunkte als die Klitoris für eine direkte manuelle Massage verwendet. Damit erhält der Fachmann der E3 aber keine Anregung zur Verwendung der Vorrichtung der E1 zur sexuellen Klitoral-Stimulation.



Die in der E1 genannte Meridianmassage ist eine in China praktizierte Form einer Massage, bei der besondere Punkte (Meridianpunkte) auf der Haut rhythmisch „abgeklopft" werden. Das Klopfen erfolgt dabei beispielsweise mit den Fingerknöcheln oder einem speziellen Hämmerchen, und soll Linderung für körperliche Beschwerden bewirken.

Weiter widerspricht die Lehre einer „Meridiantherapie" klar der in Europa praktizierten Schulmedizin. Die Meridiantherapie ist in Europa wissenschaftlich nicht anerkannt. Eine solche Schrift mit einer „fiktiven" Heilwirkung wird vom dem hier anzunehmenden Fachmann bei der Schaffung einer Stimulationsvorrichtung für die Klitoris verworfen werden. Vielmehr ist die Vorrichtung der E1 bei Betrachtung der einzigen Figur, ungeachtet dessen dass sie leicht tragbar ist (vgl. auch E. 2), erkennbar ungeeignet für ein Handgerät zur Klitoral-Stimulation im Sinne des erteilten Anspruchs 1.

Einen derart gattungsfremden Gegenstand in einer Druckschrift, die zudem keine ausführbare technische Lehre vermittelt, würde der Fachmann **zur Bewertung der erfinderischen Tätigkeit** grundsätzlich nicht in Betracht ziehen.

Ungeachtet der mangelnden Ausführbarkeit unterscheidet sich die gattungsfremde E1 zudem grundlegend von der beanspruchten Lehre des Patents, wie nachstehend dargelegt:

## 4.   Die E1 offenbart keine Volumenveränderung einer ersten Kammer

Es würde der „Airbag" 2 der E1 – selbst wenn man irgendeine Bewegung des Hebels 2 in Axialrichtung des Airbags gemäß den Ausführungen der Einsprechenden 2 annehmen wollte – nicht in seinem Volumen verändert werden. Betrachtet man den Schnitt der Fig. 1 der

[File:101603434.docx // LE11K17E]   16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



E1, ist dem Fachmann ersichtlich, dass der Airbag bei axialer Längung schlicht länger und schmäler werden würde, und bei axialer Stauchung entsprechend runder, womit das Volumen konstant bleiben würde. Mit einem solchen „Airbag 2", wie in der Fig. 1 dargestellt, ist ein „Pumpen" von beispielsweise Luft oder Wasser im Sinne der vorliegenden Anmeldung überhaupt nicht möglich.

Damit überhaupt eine Volumenänderung des Airbags 2 der E1 stattfinden könnte, müsste bei einseitiger Krafteinwirkung eine haltende Gegenkraft auf den Airbag 2 wirken können. Aus der Beschreibung und auch der einzigen Figur ist jedoch keine Lagerung oder ähnliches des Airbags ersichtlich. Tatsächlich ist auch der Airbag 2 frei beweglich angeordnet, weshalb er nicht komprimiert werden kann, so wie das die Einsprechende 2 vorträgt.

Der Fachmann schließt übereinstimmend zu der vorstehend erläuterten Erkenntnis aus Fig. 1 der E1 auch aus der Bezeichnung dieses Merkmals selbst als „Airbag 2" auf dessen Funktion: Ein Airbag hat bekannter Weise die Funktion, sein Volumen bei Veränderung seiner äußerlichen Form konstant zu halten, **um einen Stoß abzufedern**.

Übereinstimmend heißt es in der Übersetzung der E1 im fünften Absatz der Beschreibung auch, dass der Magnet 4, der Hebel 3 und der Airbag 2, d.h., der Airbag 2 **als Ganzes** reziprok bewegt werden (sollten). Allerdings ist auch hier vollkommen unklar, in welche Richtungen die Gesamtanordnung 2, 3 und 4 bewegt werden soll.

5.   **Die E1 offenbart keine zweite Kammer zum Aufsetzen über die Klitoris**

Nach der übersetzten Beschreibung der E1 ist das Mundstück 1 („mouth piece 1") beweglich („movable"). So muss es sich in irgendeiner Art mit der Bewegung des Airbag 2 und des Hebels 3 („Lever 3")

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



mitbewegen. Damit kann das Mundstück 1 denknotwendig nicht zum andauernden Aufsetzen auf ein Körperteil im Sinne der vorliegenden Anmeldung dienen. Zudem wird im letzten Absatz beschrieben, dass die Vorrichtung mehrere therapeutische Mundstücke aufweisen kann, der weibliche Körper besitzt aber bekanntermaßen nur eine Klitoris.

Mutmaßen kann der Fachmann hier nur, dass entsprechend der vorstehend dargelegten Lehre der „Meridiantherapie" (vgl. E1, Beschreibung, erster Absatz) ein rhythmisches Abklopfen der Haut mit dem Mundstück 1 zur positiven Beeinflussung von Meridianpunkten erfolgen soll. Damit könnte man vielleicht mutmaßen, dass die E1 ein hammerschlagartiges Anschlagen des Mundstück 1 auf die Hautoberfläche erfolgen soll, das durch den Airbag abgefedert werden soll. Jedoch ist auch hier unklar, wie dieses Klopfen erfolgen könnte.

Mit einer solchen klopfenden Anordnung ist eine Erzeugung von Unterdrücken unmöglich, da kein durch ein andauerndes Aufsetzen einer Kammer über der Klitoris beschränktes Volumen vorliegt, in dem ein Unterdruck erzeugt werden könnte. Folglich ist aus der E1 das erfindungsgemäße Druckfeld aus Unter- und Überdrücken weder explizit noch implizit zu entnehmen.

6.    **Die E1 offenbart auch weitere Merkmal des Anspruchs 1 nicht:**

Wie vorstehend vorgetragen offenbart die E1 keine zweite Kammer (4) mit einer Öffnung (42) zum Aufsetzen über die Klitoris (12) (Merkmal **4. b))**. Da sich der Anwendungsbereich der Vorrichtung der E1 zudem von dem patentgemäßen Anwendungsbereich unterscheidet, offenbart die E1 auch nicht, dass die Öffnung des Mundstücks entsprechend der Anatomie der Klitoris (also etwa zur Aufnahme der Klitoriseichel) ausgestaltet ist. Somit offenbart die E1 keine zweite Kammer mit einer Öffnung zum Aufsetzen über die Klitoris. Ist jedoch keine zweite Kammer 4 offenbart, ist auch kein zugehöriges anspruchsgemäßes

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



Verbindungselement 5 offenbart.

Auch zeigt die E1 keine patentgemäße erste Kammer, deren Volumen durch die Antriebseinheit verändert werden kann (Merkmal 3 in Verbindung mit Merkmal 6). Wie vorstehend vorgetragen ändert sich bei einem Aufbau des Airbags der E1 gemäß deren Fig. 1 nur dessen Form, nicht aber sein Volumen.

Somit kann auch das **Merkmal 8**, der Erzeugung eines Druckfelds, das aus einem Muster von Unter- und Überdrücken besteht, welche auf den Normaldruck aufmoduliert sind, nicht der E1 klar und eindeutig entnommen werden.

Zudem offenbart die E1 keinerlei weitergehende Information über den Aufbau der Vorrichtung. Es fehlen Angaben zu Steuerung, zum Gehäuse, zum inneren Aufbau, zur Stromversorgung, etc.

Zusammenfassend kann der Fachmann der E1 zumindest das Folgende nicht klar und eindeutig entnehmen:

- keine erste Kammer, da das Volumen des Airbag 2 nicht verändert wird,

- keine zweite Kammer, da das Mundstück 1 nicht zum Aufsetzen über der Klitoris dient,

- kein Verbindungselement 5, welches die beiden Kammern verbinden müsste,

- kein Druckfeld aus Unter- und Überdrücken, da zumindest keine Unterdrücke offenbart sind,

- keine Steuereinrichtung zur Steuerung der Modulation des Druckfeldes,

- keine Antriebseinheit, die eine Volumenveränderung einer ersten Kammer bewirken würde, und

- keine Eignung der Vorrichtung zur Stimulation der Klitoris bis

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



zum sexuellen Höhepunkt.

**7.    Es liegt kein konkreter Anlass für den Fachmann vor, erfindungsgemäß vorzugehen.**

Es wird darauf hingewiesen wird, dass aus Sicht der Anmelderin auch schon die Begründung der Einsprechenden bezüglich des Mangels an erfinderischer Tätigkeit des ursprünglichen Anspruchs 1 nicht ausreichend ist.

Im Detail fehlt es bei der Begründung des Naheliegens an der Darstellung eines konkreten Anlasses für den Fachmann, auch erfindungsgemäß vorzugehen. Der Fachmann würde also aus Sicht der Anmelderin die E1 nicht einfach mit einer beliebigen weiteren Schrift (vorliegend beispielsweise der D7) kombinieren.

Bedenklich erscheint es der Anmelderin insbesondere, wenn die Veranlassung auf eine bloße - rückschauend formulierte - Aufgabe reduziert wird. In anderen Worten kann es nicht die bloße Aufgabe des Fachmanns sein, genau die - nach Auffassung der Einsprechenden 2 - fehlenden Merkmale zu ersetzen. Mit dieser Argumentation gäbe es kein positives Vorliegen einer erfinderischen Tätigkeit mehr, da man denknotwendig auf jeden beliebigen Gegenstand schließen könnte.

Die fiktive Person des Fachmanns handelt tatsächlich immer zielgerichtet und nicht spontan. So muss sich für den Fachmann eine konkrete Anregung bzw. der Anlass aus den Druckschriften selbst ergeben, anspruchsgemäß vorzugehen. Vermittelt also eine Druckschrift dem Fachmann nicht die Anregung in einer bestimmten Richtung nach einer Lösung zu suchen, fehlt es auch an einer Anregung für die Lösung selbst (vgl. u.A.: Benkard, 11. Auflage, § 4 Rdn. 90 mit Verweis auf BPatG GRUR 1986, 307, 309 – Digitale Signalverarbeitungsanordnung).

[File:101603434.docx // LE11K17E]    16. Mai 2017
Stimulationsvorrichtung
NOVOLUTO GmbH



**L.  Ergebnis:**

Alle Änderungen des Anspruchs 1 im Prüfungsverfahren sind ursprungsoffenbart. Es liegt somit **keine unzulässige Erweiterung** des Gegenstands der Erfindung über den Inhalt der ursprünglichen Anmeldung vor.

Keine der im Verfahren befindlichen Druckschriften des Stands der Technik, insbesondere nicht D8, D9, D10 oder E1, beschäftigt sich mit einer effektiven Klitoral-Stimulation bis zum sexuellen Höhepunkt, was die Aufgabe der Lehre des Anspruchs 1 des angegriffenen Patents ist (vgl. Absatz [0004], [0007], [0008], [0032] [0046]).

Des Weiteren ist festzuhalten, dass sich im Gesamten im Verfahren stehenden Stand der Technik kein Vorbild oder Hinweis zu einer derartigen Vorrichtung mit den geschilderten Merkmalen findet, die den Gegenstand des Anspruchs 1 des Patents vorwegnehmen oder einem Fachmann nahelegen könnten. Deshalb ist der patentgemäße Anspruch 1 **neu und erfinderisch**.

**Das Patent ist damit unverändert aufrechtzuerhalten.**

Patentanwalt
**Rainer K. Kuhnen**
(☎ 08161 608 318)

Anlagen
A1: Endurteil des Landgerichts München I zum Aktenzeichen: 21 O 22538/15
A2: Beglaubigte Übersetzung der CN 2153351 in die englische Sprache

# Exhibit 2

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————

EIS GMBH,
Petitioner,

v.

NOVOLUTO GMBH,
Patent Owner.

—————————

Case IPR2019-01302
Patent 9,937,097

**PATENT OWNER'S PRELIMINARY RESPONSE
PURSUANT TO 37 C.F.R. § 42.107**

Case IPR2019-01302
Patent 9,937,097

Dr. Prisco have, without knowledge gleaned from the '097 Patent. Ex. 2001, ¶ 151-152. In fact, no POSITA would do as Petitioner and its expert have done, even with the knowledge of the '097 Patent. *Id.*; Ex. 2004, ¶¶ 28-34.

## X.   ADDITIONAL REASONS GROUND 1 FAILS

Taylor fails to disclose the "modulated positive and negative pressures" limitation required by all challenged claims, and therefore fails to anticipate these claims. Taylor also fails to disclose several other limitations required by all challenged claims, as follows.

### A.   **"deflections" of a "flexible wall portion" of a chamber or pressure field generator "in opposing directions"**

Taylor does not disclose "a chamber" or "a pressure field generator" "having a flexible wall portion," as claimed. Petitioner argues "the accordion-like top wall of bellows 160" of Taylor corresponds to the "flexible wall portion." Pet., 19. Taylor's bellows does not, however, disclose the required "flexible wall portion" that deflects "in opposing directions." Taylor's bellows requires a material structurally stiff enough to fold and unfold as the bellows compresses and expands, otherwise, the bellows would not hold its shape and would not function as required. Ex. 2001, ¶ 79-82. Taylor's bellows wall is structurally very different from the flexible wall that deflects in opposing directions as claimed in the '097 Patent, as illustrated in the figure below.

Case IPR2019-01302
Patent 9,937,097



*Id.*, ¶ 81.

Moreover, the folding and unfolding of the bellows wall does not "cause deflections … in opposing directions."  Rather, as the bellows compresses and expands, the folds move at varying angles and directions with respect to each other (see above).  *Id.*, ¶ 82.

Thus, Taylor's bellows does not disclose this limitation.

B.    **"a drive unit in physical communication with the flexible wall portion so as to cause deflections …. in opposing directions."**

Taylor does not disclose any structure in physical communication with the accordion-like top wall of its bellows.  Rather, the motor 18 is mounted on the arm 26, which is in contact with the back or posteriorly located end of the bellows structure.  Ex. 1004, 3:52-59, Fig. 3; Ex. 2001, ¶ 83-84.

Taylor does not disclose or show the arm or motor in "physical communication" with the accordion-like top wall of the bellows.  Ex. 2001, ¶ 84.

# Exhibit 3

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

EIS GMBH,
Petitioner,

v.

NOVOLUTO GMBH,
Patent Owner.

_____

Case IPR2019-01302
Patent 9,937,097

**PATENT OWNER'S RESPONSE
PURSUANT TO 37 C.F.R. § 42.120**

Case IPR2019-01302
Patent 9,937,097

### A.    Taylor

The Board concluded that "Taylor fails to teach all of the limitations of claims 1-9, 12-24, and 26-30." Paper 17, 12. Novoluto agrees and maintains its arguments regarding Taylor, as discussed below. [2]

Taylor discloses a device that only provides suction, *i.e.*, negative pressure, resulting from a bellows introducing a cyclical vacuum to one or more suction cups. Taylor does not disclose any sort of positive pressure, let alone "modulated positive and negative pressures with respect to a reference pressure" resulting from the change in volume of a chamber or pressure field generator as required by the claims of the '097 Patent.

Petitioner argues that Taylor discloses this limitation because Taylor discloses a "first stimulator 154" that includes "a suction cup member 156 that conformingly and sealingly receives the upper portion of the vulva," "fluidly coupled to bellows 160 via a flexible conduit 162," and that "[w]hen *Taylor*'s drive unit 'compresses and expands bellows 160,' the resulting increase and decrease in the volume of

---

[2] Petitioner argued Taylor's bellows satisfies the "deflections of a flexible wall portion" limitation. Novoluto disagreed. Paper 14, 52-53. The Board did not rely on either party's arguments relating to this limitation in either institution decision. Novoluto now rescinds its argument that Taylor's bellows does not satisfy the "deflections of a flexible wall portion" limitation, and agrees this limitation would capture Taylor's bellows. *See Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1318 (Fed. Cir. 2007).

# Exhibit 4

U.S. Serial No.: 15/965,117
Attorney Docket No. N6324-005-USSWOHd
Response to Office action dated December 6, 2018

## REMARKS

The Applicant has carefully considered the Office action dated December 6, 2018, and the references cited therein.  By way of this response, claims 1–3, 5–11, 13–18, 20–26, and 28–30 have been amended.  Claims 4, 12, 19, and 27 have been cancelled without prejudice to their further prosecution.  New claims 31–43 have been added.  No new matter has been added.  All claims are supported by the specification.  All pending claims are in condition for allowance and favorable reconsideration is respectfully requested.

## Examiner Interview Summary

The Applicant would like to thank Examiner Tsai for the courtesies extended during a telephone call with the undersigned representatives for the Applicant, Marianne Buckley (Reg. No. 68,104) and Mark Zimmerman (Reg. No. 44,006) on April 4, 2019.  During the call, the parties discussed the rejections under 35 U.S.C. § 103.  Although no agreement was reached, the Applicant believes the discussion advanced prosecution.

## The Rejections Under 35 U.S.C. § 103

The Office action rejected claims 1–5, 8, 10, 16–20, 23, and 25 under 35 U.S.C. § 103 as allegedly unpatentable over U.S. Patent No. 1,042,058 ("Van Hook") in view of U.S. Patent No. 5,377,701 ("Fang").  The Office action rejected claims 6 and 21 under § 103 as allegedly unpatentable over Van Hook in view of Fang and U.S. Patent No. 6,733,438 ("Dann et al.").  The Office action rejected claims 7 and 22 under § 103 as allegedly unpatentable over Van Hook in view of Fang and U.S. Patent No. 5,003,766 ("Saka et al.").  The Office action rejected claims 9 and 24 as allegedly unpatentable over Van Hook in view of Fang and U.S. Patent No. 6,464,653

U.S. Serial No.: 15/965,117
Attorney Docket No. N6324-005-USSWOHd
Response to Office action dated December 6, 2018

("Hovland et al."). The Office action rejected claims 11–15 and 26–30 under § 103 as allegedly unpatentable over Van Hook in view of U.S. Patent No. 2,112,646 ("Biederman"). The Applicant traverses all of the art-based rejections.

Claim 1: Independent claim 1 sets forth a stimulation device including a drive unit in physical communication with a flexible wall to cause at least a portion of the flexible wall to deflect in opposing directions, thereby resulting in a changing volume of the chamber, the changing volume of the chamber resulting in modulated positive and negative pressures with respect to an ambient pressure. The stimulation device of claim 1 includes an opening configured to sealingly engage a portion of a body of a user including a clitoris. In claim 1, the flexible wall is to sealingly separate the drive unit from the portion of the body. None of the cited art teaches or suggests such a stimulation device.

Van Hook mentions an ear massage device including a motor B and a driving shaft or connecting rod 21 coupled to a shaft 11 of the motor B. *See* Van Hook, col. 1, lns. 41–46, col. 2, lns. 59–65: FIG. 1. The ear massage device of Van Hook includes a diaphragm 29. *Id.* at col. 2, lns. 71–73. Van Hook mentions that "[t]he connecting rod 21 is hingedly mounted at the outer end 33 on a supporting head 84, adapted to press against the inner face of the center of the diaphragm and held against lateral movement by means of the screw 35, a washer 36 being interposed between the screw and the diaphragm." *Id.* at col. 2, lns. 82–87, FIG. 1 (emphasis added). Thus, Van Hook teaches that the screw 35 extends through a hole in the diaphragm 29. As a result, the diaphragm 29 of Van Hook is not fluid tight (e.g., not airtight, nor watertight, nor body fluid-tight) due to the screw 35 extending through the hole in the diaphragm 29. Therefore, the diaphragm 29 of Van Hook cannot form a seal to sealingly separate a drive unit from a portion of a body of a user including a clitoris.

- 13 -

U.S. Serial No.: 15/965,117
Attorney Docket No. N6324-005-USSWOHd
Response to Office action dated December 6, 2018

Moreover, Van Hook does not teach or suggest an opening configured to sealingly engage a portion of a body of a user including a clitoris. Van Hook mentions "[a]n ordinary telephone receiver cap 32." *See* Van Hook, col. 2, lns. 78–80 (emphasis added). However, Van Hook does not teach or suggest that the "ordinary telephone receiver cap 32" is an opening that sealingly engages a portion of a body of a user. On the contrary, Van Hook mentions that the instrument is "held close to the ear." *Id.* at col. 2, ln. 100. Simply holding something close to one's body does not mean a seal is formed. Furthermore, even if the telephone receiver cap 32 of Van Hook were placed against a portion of the user's body, the telephone receiver cap would still not sealingly engage the portion of the user's body. Instead, the telephone receiver cap and the portion of the user's body would merely be in contact, which is not the same as being sealingly engaged. Indeed, one of ordinary skill would understand that bringing a telephone receiver cap to one's ear does not form a seal with the ear, much less teach or suggest the desirability of sealingly engaging a portion of the body including the clitoris.

Accordingly, Van Hook does not teach or suggest a stimulation device including a drive unit in physical communication with a flexible wall to cause at least a portion of the flexible wall to deflect in opposing directions, thereby resulting in a changing volume of the chamber, the changing volume of the chamber resulting in modulated positive and negative pressures with respect to an ambient pressure and an opening configured to sealingly engage a portion of a body of a user including a clitoris, the flexible wall to sealingly separate the drive unit from the portion of the body.

In the claimed device, the closed system formed between the flexible wall and the portion of the body in sealing engagement with the opening of the claimed device provides several advantages that cannot be achieved by Van Hook. For example, the sealed environment formed

- 14 -

U.S. Serial No.: 15/965,117
Attorney Docket No. N6324-005-USSWOHd
Response to Office action dated December 6, 2018

between the flexible wall and the portion of the body in the claimed device prevents outside air

from entering the system. *See* present Specification, p. 10, lns. 27–31. Thus, air in the closed

environment formed between the flexible wall and the portion of the body is separated from

outside air, which enables positive and negative pressures to be created <u>relative to ambient</u>

<u>pressure</u> as set forth in claim 1. If the opening of the stimulation device of claim 1 did not

sealingly engage with a portion of the user's body, then the changing volume of the chamber

would not result in modulated positive and negative pressures with respect to an ambient

pressure as set forth in claim 1. Rather, the pressure in the chamber would equalize with and

remain at ambient pressure. Thus, the opening of the claimed device that is configured to

sealingly engage with the portion of the body including the clitoris facilitates the creation of the

modulated positive and negative pressures relative to the ambient environment. Further, as

disclosed in the present Specification "the air temperature in the flow system rapidly adjusts to

the skin temperature, while the distracting supply of new (possibly cold) air from outside the

system is avoided air." *Id.* Also, the sealed environment formed between the flexible wall and

the portion of the body in the claimed device prevents drying effects with respect to bodily fluid

that can occur in a device in which outside air is introduced into the system. *See id.* The sealed

environment formed between the flexible wall and the portion of the body in the claimed device

also enables the device to be used under water (e.g., in a bathtub) without risk of damage to, for

instance, the drive unit of the device. *See id.* at p. 9, lns. 3–4.

  The above advantages of the claimed device cannot be achieved in Van Hook due to the

lack of seal formed between a portion of a body of a user and the diaphragm 29. Because the

diaphragm 29 of Van Hook is not fluid tight, (e.g., not airtight-, nor watertight, nor body fluid-

tight), outside air can be introduced into the region between the diaphragm 29 and skin of a user

U.S. Serial No.: 15/965,117
Attorney Docket No. N6324-005-USSWOHd
Response to Office action dated December 6, 2018

of the ear massage device of Van Hook. Therefore, the ear massage device of Van Hook does not create a closed environment and, thus, cannot create positive and negative pressures <u>relative to ambient pressure</u> as set forth in claim 1. Further, the ear massage device of Van Hook is not intended to be used under water (e.g., in a bathtub). Also, the ear massage device of Van Hook is used for a portion of the body—namely, the eardrum—that does not secrete bodily fluid, does not present a risk of drying out, and/or does not exhibit sensitivity to temperature as does the clitoris. Therefore, the advantages achieved by a fluid-tight seal as discussed above with respect to the claimed device are not relevant to the ear massage device of Van Hook. Thus, Van Hook does not teach or suggest the flexible wall <u>to sealingly separate the drive unit from a portion of the body</u> as recited in claim 1.

Moreover, the ear massage device of Van Hook does not include an opening configured to sealingly engage a portion of a body of a user including a clitoris, much less prevent the introduction of outside air to achieve body temperature effects and/or prevent drying effects as provided by the stimulation device of claim 1. As discussed above, the claimed device facilitates air temperature adjustments relative to skin temperature and can prevent drying effects on the body as a result of the closed environment formed between the portion of the body including the clitoris, which the opening sealingly engages, and the flexible wall, which sealingly separates the drive unit from the portion of the body, as set forth in claim 1.

None of the other cited art (e.g., Fang, Dann et al., Hovland et al., Saka et al., and/or Biederman) cures the deficiencies of Van Hook. Indeed, none of Fang, Dann et al., Hovland et al., Saka et al., or Biederman, alone or in combination, teaches or suggests a stimulation device including a drive unit in physical communication with a flexible wall to cause at least a portion of the flexible wall to deflect in opposing directions, thereby resulting in a changing volume of

U.S. Serial No.: 15/965,117
Attorney Docket No. N6324-005-USSWOHd
Response to Office action dated December 6, 2018

the chamber, the changing volume of the chamber resulting in modulated positive and negative pressures with respect to an ambient pressure and an opening configured to sealingly engage a portion of a body of a user including a clitoris, the flexible wall to sealingly separate the drive unit from the portion of the body.  Accordingly, claim 1 and all claims depending therefrom are in condition for allowance.

Claim 11: Independent claim 11 sets forth a method including applying, via a drive unit, a force to at least a portion of a flexible wall of a chamber of a stimulation device to cause the at least the portion of the flexible wall to deflect in opposing directions, thereby resulting in a changing volume of the chamber, the changing volume of the chamber to generate modulated positive and negative pressures with respect to an ambient pressure, the modulated positive and negative pressures to be applied to the portion of a body of a user including a clitoris via an opening of the stimulation device configured to sealingly engage the portion of the body, the flexible wall to sealingly separate the portion of the body from the drive unit.  None of the cited art teaches or suggests such a method.  Accordingly, claim 11 and all claims depending therefrom are in condition for allowance.

Claim 16: Independent claim 16 sets forth a stimulation device including a pressure field generator including a flexible wall and a drive unit in physical communication with the flexible wall to cause at least a portion of the flexible wall to deflect in opposing directions, thereby resulting in a changing volume of the pressure field generator, the changing volume of the pressure field generator resulting in modulated positive and negative pressures with respect to an ambient pressure.  The stimulation device of claim 16 includes an opening configured to sealingly engage a portion of a body of a user including a clitoris.  In claim 16, the flexible wall is to sealingly separate the drive unit from the portion of the body.  None of the cited art teaches

- 17 -

**U.S. Serial No.: 15/965,117**
**Attorney Docket No. N6324-005-USSWOHd**
**Response to Office action dated December 6, 2018**

or suggests such a stimulation device.  Accordingly, claim 16 and all claims depending therefrom are in condition for allowance.

Claim 26: Independent claim 26 sets forth a method including applying, via a drive unit, a force to at least a portion of a flexible wall of a pressure field generator of a stimulation device to cause the at least the portion of the flexible wall to deflect in opposing directions, thereby resulting in a changing volume of the pressure field generator, the changing volume of the pressure field generator to generate modulated positive and negative pressures with respect to an ambient pressure, the modulated positive and negative pressures to be applied to the portion of a body of a user including a clitoris via an opening of the stimulation device configured to sealingly engage the portion of the body, the flexible wall to sealingly separate the portion of the body from the drive unit.  None of the cited art teaches or suggests such a method.  Accordingly, claim 26 and all claims depending therefrom are in condition for allowance.

## CONCLUSION

In general, the Office makes various statements regarding the pending claims that are now moot in light of the above.  Thus, the Applicant will not address such statements at the present time.  However, the Applicant expressly reserves the right to challenge such statements in the future should the need arise (e.g., if such statement should become relevant by appearing in a rejection of any current or future claim).

The term "comprises" has been replaced with "includes," and the term "comprising" has been replaced with "'including" everywhere they appear in the body of a claim.  These changes are not narrowing.  In fact, they do not change the scope of the claim at all.  These changes are being made to enhance clarity by ensuring the word "comprising" is used only as a transition

U.S. Serial No.: 15/965,117
Attorney Docket No. N6324-005-USSWOHd
Response to Office action dated December 6, 2018

term, thereby unambiguously demarcating the preamble from the body of the claim.  Include,

includes, including and other forms of include are open ended, just as comprise, comprises and

comprising are open ended.  Therefore, these changes do not change the scope of the claim and

do not create prosecution history estoppel.

All claims are in condition for allowance.  If the examiner is of the opinion that a

telephone conference would expedite the prosecution of this case, the examiner is invited to

contact the undersigned at (312) 580-1020.

Enclosed herewith are the fees for the additional claims, a request for continued

examination, and a three-month extension of time.  The Commissioner is hereby authorized to

charge any deficiency or any additional fees which may be required during the pendency of this

application under 37 CFR 1.16 or 1.17 or under other applicable rules (except payment of issue

fees) to Deposit Account No. 50-2455.

> Respectfully submitted,
>
> HANLEY, FLIGHT & ZIMMERMAN, LLC.
> Attorneys for the Applicant
> Customer Number 34431
> 150 S. Wacker Drive, Suite 2200
> Chicago, Illinois 60606
> (312) 580-1020

By:    **/Marianne Buckley/**
Marianne Buckley

June 6, 2019    Registration No. 68,104

- 19 -

# Exhibit 5

# KUHNEN & WACKER
Patent- und Rechtsanwaltsbüro



**K&W**

RAINER A. KUHNEN
PA  EP  ETD  Dipl.-Ing.
STEPHAN KOPP, LL.M.
PA  EP  ETD  EPL  Dipl.-Ing.
RAINER K. KUHNEN, LL.M.
PA  EP  ETD  Dipl.-Ing.
DR. MICHAEL TOPF
PA  EP  ETD  Dr. rer. nat.  Dipl.-Phys.
DR. CHRISTIAN THOMAS
RA  Dr. iur.
DR. MICHAEL ZEITLER
PA  EP  ETD  Dr. rer. nat.  Dipl.-Phys.
DETLEF v. AHSEN
PA  EP  ETD  Dipl.-Ing.
DR. FLORIAN KÜHBECK
PA  EP  ETD  Dr.-Ing.  Dipl.-Ing.  Dipl.-Chem.
DR. JÖRG DORNER
PA  EP  ETD  Dr.-Ing.  Dipl.-Ing.
DR. RAINER STERTHAUS
PA  EP  ETD  Dr. rer. nat.  Dipl.-Chem.
BIRGIT REITER
RA
SENKO YOSHIDA
JPA  EP
CHRISTOPH LÖSCH
PA  EP  ETD  KLN  Dipl.-W.-Ing.
DR. STEFAN MEDERLE-
HOFFMEISTER
PA  EP  ETD  Dr. rer. nat.  Dipl.-Phys.
MALGORZATA GIZINSKA-SCHOHE
PPA  EP  M.Sc.  Ch.E.
ALEXANDER SCHEWTSCHENKO
RA
KARIN LOCHNER
RA
MICHAEL FRITZ
PA  ETD  Dipl.-Ing.
NICOLE OCKL
RA

OF COUNSEL:
PAUL-ALEXANDER WACKER
PA  EP  ETD  Dipl.-Ing.  Dipl.-W.-Ing.
JAMES A. FORSTNER
Attorney at Law PhD (chem), JD
Admitted Delaware, D.C., USPTD

PA   Patentanwalt/Patent Attorney
EP   European Patent Attorney
ETD  European Trademark and Design Attorney
EPL  European Patent Litigation Diploma (CEIPI)
JPA  Japanese Patent Attorney
PPA  Polish Patent Attorney
RA   Rechtsanwalt/Attorney at Law
KLN  Kanzlei Lösch Nürnberg

POST/MAIL:
POSTFACH/P.O.BOX 1964
D-85319 FREISING/GERMANY

ANSCHRIFT/ADDRESS:
PRINZ-LUDWIG-STRASSE 40A
D-85354 FREISING/GERMANY

TELEFON  +49 8161 608-0
FAX      +49 8161 608-100
E-MAIL   info@kuhnen-wacker.com
INTERNET www.kuhnen-wacker.com

VAT-Nr.: DE 813 496 485

Deutsches Patent- und Markenamt
80297 München

28. Mai 2014    RKJ/UWN/UWN/msd
[File: 101176942.doc]

Amtl. Zeichen  : 10 2013 110 501.7
Unser Zeichen  : 11/LE11K17/DE
Anmelder/Inh.  : Michael Lenke
Sache          : Stimulationsvorrichtung

**In Erwiderung auf den Bescheid vom 15. April 2014 werden hiermit**

- geänderte Ansprüche 1 bis 17 im Austausch zu den derzeit gültigen Ansprüchen 1 bis 17,

zur Akte gereicht. Die übrigen Anmeldungsunterlagen bleiben unverändert. Die Übermittlung neuer Unterlagen bedeutet keinen Verzicht auf ursprünglich offenbarte Anmeldungsgegenstände.

Um der Prüfungsstelle das Nachvollziehen der Änderungen zu erleichtern, wird in der Anlage eine Arbeitskopie der neuen Unterlagen beigefügt.

BANKVERBINDUNGEN/BANK ACCOUNTS:

COMMERZBANK AG
IBAN: DE72 7004 0041 0512 0555 00
BIC: COBADEFFXXX

DEUTSCHE BANK MÜNCHEN
IBAN: DE58 7007 0024 0934 3500 00
BIC: DEUTDEDBMUC

OBERBANK AG NDL. DEUTSCHLAND
IBAN: DE42 7012 0700 1111 1028 91
BIC: OBKLDEMX

SPARKASSE FREISING
IBAN: DE18 7005 1003 0000 0265 00
BIC: BYLADEM1FSI

UNICREDIT BANK AG
IBAN: DE14 7002 1180 0004 0325 00
BIC: HYVEDEMM418

[File:101176942.doc // LE11K17]    28. Mai 2014
Stimulationsvorrichtung
Michael Lenke



## 1.    Änderungen und ursprüngliche Offenbarung

Die Patentansprüche 13 und 16 wurden, wie aus der Arbeitskopie ersichtlich, geändert. Die zugehörige Offenbarung findet sich im Anspruch 17 und der Beschreibung auf Seite 1, Zeile 32 und Seite 11, vorletzter Absatz.

Zudem wurde in Anspruch 1 ein überflüssiges Komma gestrichen.

## 2.    Gewährbarkeit

### 2.1    Die Verfahren gemäß den neuen Ansprüchen 13 bis 17 sind nicht vom Patentierungsausschluss gem. § 2a PatG betroffen.

Gemäß dem oben genannten Bescheid ist die Prüfungsstelle weiterhin der Auffassung, dass die Verfahrensansprüche 13 bis 17 auf medizinische Therapieverfahren gerichtet ist.

Grundsätzlich werden die Ausschlusstatbestände des §2a PatG eng ausgelegt. Vom Patentschutz werden nur Verfahren ausgenommen, die ausschließlich zu medizinischen Zwecken angewendet werden (Schulte, Patentgesetz, 9. Auflage, §2a, Rdn. 59). Bei der vorliegenden Erfindung handelt es sich jedoch um ein Sexspielzeug bzw. ein Verfahren zur Stimulation von erogenen Zonen zum sexuellen Vergnügen, mithin zu keinen medizinischen Zwecken.

Um die Abgrenzung zur medizinischen Therapie zu dem bereits in den Ansprüchen befindlichen Merkmal „Stimulation von erogenen Zonen" zusätzlich herauszustellen wurden die Verfahrensansprüche 13 und 17 entsprechend ergänzt (siehe Arbeitskopie der Ansprüche), wobei medizinische Therapieverfahren nun explizit ausgeschlossen sind.

Dabei wird mit dem neuen Merkmal „zum sexuellen Vergnügen" zudem



[File:101176942.doc // LE11K17]    28. Mai 2014
Stimulationsvorrichtung
Michael Lenke

verdeutlicht, dass die Verfahren der Ansprüche 13 und 17 auf das Wohlbefinden von Menschen gerichtet sind und nicht auf deren therapeutische Behandlung (womit die Verfahren der Ansprüche 13 und 17 schon patentierbar sind, vgl. Benkard, Patentgesetz, 10. Auflage, alt § 5 PatG, Rdn. 31).

## 2.2    Neuheit und erfinderische Tätigkeit des Anspruchs 1

Gemäß dem oben genannten Bescheid ist die Prüfungsstelle der Auffassung, dass der Gegenstand des Anspruchs 1 in Bezug auf die Druckschrift 2 (US 2013/0012769 A1) nicht neu sei. Die Anmelderin bittet die Prüfungsstelle, ihre Auffassung angesichts der folgenden Ausführungen zu überdenken und die Erteilung eines Patents zu beschließen.

### 2.2.1. Die D2 offenbart dem Fachmann kein anspruchsgemäßes „Muster von Unter- und Überdrücken", insbesondere keine Unterdrücke zur Stimulation der Klitoris.

Die Prüfungsstelle verblieb in vorgenanntem Bescheid bei Ihrer Auffassung, dass die D2 ein anspruchsgemäßes „Muster von Unter- und Überdrücken" offenbare.

Nachstehend wird anhand der Offenbarung der D2 nunmehr im Detail erläutert werden, dass die D2 dem einschlägige Fachmann <u>ausschließlich</u> die Verwendung eines <u>Überdrucks</u> bzw. eines nur in eine Richtung fließenden Luftstroms zur Stimulation offenbart.

Zunächst lautet [0001] wie folgt:

> „*The tips are easily placed on or near the clitoris area of the female providing <u>direct positive air pressure</u> from the tube.* "
> (Unterstreichungen durch den Autor)

[File:101176942.doc // LE11K17]    28. Mai 2014
Stimulationsvorrichtung
Michael Lenke



Diese Übersicht zur D2 offenbart dem Fachmann einen gerichteten, positiven Luftdruck aus einem Rohr, dessen Düse/Spitze auf oder in der Nähe der Klitoris platziert wird.

Zur Abgrenzung zum Stand der Technik erläutert die D2 weiter in Abs. [0003]:

> *„No prior art female stimulation device uses a current of positive air pressure. Existing stimulation devices typically mechanically vibrate of create a suction effect."*
> (Unterstreichungen durch den Autor)

Hiermit grenzt sich die D2 explizit von Vorrichtungen ab, die einen „Saugeffekt" bzw. einen Unterdruck erzeugen. Zudem wird in dem folgenden Text im gleichen Absatz herausgestellt, dass Unterdrücke ein Problem der D2 darstellen, und damit für den Fachmann als Mittel zur Problemlösung nicht in Betracht kommen. Somit führt die D2 den Fachmann von der anspruchsgemäßen Lösung weg.

Die "summary of the invention" in [0004] führt weiter wie folgt in die Offenbarung der D2 ein:

> *„Briefly summarized, ...., the current invention provides a positive air flow to create the stimulation of the clitoris from the air flow"*
> (Unterstreichungen durch den Autor)

Ein positiver Luftfluss wird durch einen Überdruck herbeigeführt. Dieser positive Luftfluss übt eine Kraft auf die Klitoris aus und ist nach der Lehre der D2 somit der alleinige Ursprung des Stimulationseffektes für die Klitoris.

Nirgends in der D2 ist die Rede davon, dass man die Klitoris auch mit einem anspruchsgemäßen „Muster aus Unter- und Überdrücken" (und den damit jeweiligen, sich ergänzenden Stimulationseffekten) stimulieren könnte.

[File:101176942.doc // LE11K17]   28. Mai 2014
Stimulationsvorrichtung
Michael Lenke



Weiter heißt es in [0004] der D2 als Definition:

> *„Pressure is referred as „positive" when it exceeds atmospheric pressure and "negative" when it is less than atmospheric pressure."*

In diesem Sinne offenbart die Angabe des Druckbereichs von 10 psi bis 60 psi (vgl. Abs. [0026]), mit dem die Vorrichtung der D2 arbeitet, dem Fachmann die <u>ausschließliche</u> Verwendung eines (relativ starken) Überdrucks, denn aufgrund des positiven Vorzeichens und der vorstehend zitierten Definition (und weiter aufgrund der Zusammenschau der restlichen Offenbarung) sind 10 psi als <u>10 psi über Normaldruck</u> zu verstehen.

Damit liegt bei einem üblicherweise vorliegenden Normaldruck von ca. 1 Bar der <u>untere</u> Arbeitsbereich der Vorrichtung der D2 bei einem erheblichen Überdruck von 1,69 bar, und nicht – wie von der Prüfungsstelle angegeben - bei 0,69 bar.

Auch der ganze Sprachschatz der D2 im Hinblick auf den Luftfluss auf die Klitoris offenbart dem Fachmann ausschließlich die Verwendung von Überdrücken, beispielsweise *„positive air flow"* in [0004], [0005], [0006], *„positive air pressure"* [0006], [0009], *„positive air pressure and flow to the female genitalia"* [0009].

Auch Beschreibung der technischen Umsetzung der Vorrichtung der D2 lässt keinen anderen Schluss zu, siehe [0026]:

> *„The compressor supplies compressed air through the container and the tube. The <u>compressed air exits</u> the tube into the tip, which is designed to direct the air flow. ... The maximum amount of <u>air flow from the compressor</u> is about 8-10 cubic feet per minute.*
> (Unterstreichungen durch den Autor)

So wird hier ein einseitig gerichteter, komprimierter Luftstrom offenbart. Dabei ist



der Luftstrom mit mehr als <u>226 Liter pro Minute</u> auch recht groß.

Dass auch die „pulsation" der D2 keine negativen Drücke offenbart, entnimmt der Fachmann [0026]:

> „In an embodiment, the pulsation regulator variably opens and closes an air passage to the tubing by rotating a valve to produce alternating high and low air <u>compression.</u>
> (Unterstreichungen durch den Autor)

Eine Luft<u>kompression</u> ist immer ein Überdruck, auch wenn dieser abwechselnd hoch und niedrig bzw. abwechselnd stärker und schwächer erzeugt wird. Eine „Dekompression" ist in der D2 hingegen nirgends offenbart.

Auch der Begriff „oscillating" in [0027] der D2, auf den die Prüfungsstelle hingewiesen hat, offenbart keinen anspruchsgemäßen Unterdruck, denn [0027] offenbart dem Fachmann nur eine Düse („tip"), die derart geformt ist, dass der -wie vorstehend aufgezeigt- positive Luftstrom oszilliert, d.h. abwechselnd stärker und schwächer ist. Auch hier bleibt der Überdruck ein Überdruck, auch wenn er in der Stärke oszillieren mag.

Der weitere Hinweis der Prüfungsstelle, dass „ein Unterdruck im Übrigen auf den Nullwert bezogen immer noch ein positiver Luftdruck ist" ist der Anmelderin unverständlich. Einen Unterdruck wird der Fachmann immer als einen Unterdruck interpretieren und nicht gegenteilig als einen positiven Luftdruck. Eine solche abwegige Auslegung erscheint daher willkürlich und deutet vielmehr auf eine rückschauende Betrachtung hin, mit dem Ziel, den Stand der Technik gemäß D2 auf die Erfindung lesbar erscheinen zu lassen. In jedem Fall aber sind die Unterdrücke im vorliegenden Anspruch 1 in Bezug auf den Normaldruck eindeutig definiert.

28_05_2014-01-00024-00000041

[File:101176942.doc // LE11K17]    28. Mai 2014
Stimulationsvorrichtung
Michael Lenke



**2.2.2. Die D2 offenbart dem Fachmann nicht das anspruchsgemäße Merkmal der „zweiten Kammer 4 mit zumindest einer Öffnung 42 zum Aufsetzen auf ein Körperteil 11".**

Die Prüfungsstelle ist der Auffassung, dass die D2 eine anspruchsgemäße zweite Kammer 4 („tip", vgl. [0027] bis [0029]) offenbaren würde.

Das Englische Wort „tip" offenbart dem Fachmann übersetzt in der Regel „Spitze", nicht notwendigerweise eine „Düse", die man im Englischen gewöhnlicher Weise mit „nozzle" übersetzt. Aber auch eine Düse ist dadurch gekennzeichnet, dass eine kleine Öffnung bzw. Verengung aufweist, die einen Düseneffekt (d.h. Druckerhöhung durch Volumenreduzierung) erzeugt (vgl. auch Fig. 3 und 4 der D2).

Eine anspruchsgemäße zweite Kammer 4 hingegen ist durch eine Aufweitung im Innendurchmesser gekennzeichnet, wobei die zweite Kammer 4 durch das Aufsetzen auf ein Körperteil geschlossen wird. Eine Kammer 4 wird daher von einem Fachmann nicht mit einer Düse verwechselt werden. Demzufolge wird der Fachmann der D2 auch nicht das anspruchsgemäße Merkmal der „zweiten Kammer 4 mit zumindest einer Öffnung 42 zum Aufsetzen auf ein Körperteil 11" entnehmen.

**2.2.3. Die D2 offenbart dem Fachmann nicht, dass die „erste Kammer 3 über das Verbindungselement 5 ausschließlich mit der zweiten Kammer 4 verbunden ist".**

Gemäß dem Erstbescheid vom 01.10.2013 ist die Prüfungsstelle der Auffassung, dass die anspruchsgemäße erste Kammer 3 dem Fachmann in der D2 durch den „container 17" offenbart würde (vgl. Punkte 2.2 und 2.3 des Erstbescheids).

[0025] der D2 offenbart in Bezug auf den Container 17 das folgende:

[File:101176942.doc // LE11K17]   28. Mai 2014
Stimulationsvorrichtung
Michael Lenke



*„The housing houses the air compressor 16, a container 17 to hold a fluid, a gel, or the like... The tubing is a hollow, flexible plastic tube <u>connecting the pump to the container (preferably within the housing) and the tip</u>.*
(Unterstreichungen durch den Autor)

Das Rohr der D2 verbindet somit <u>die Pumpe mit dem Container und der Düse</u>.

Im Gegensatz dazu ist gemäß dem vorstehend zitierten Merkmal des vorliegenden Anspruchs 1 eine „ausschließliche" Verbindung der ersten und der zweiten Kammern 3 und 4 miteinander über das Verbindungselement 5 beansprucht. Anders formuliert darf der Container 17 anspruchsgemäß nun nicht mit einer Pumpe / einem Kompressor verbunden sein.

Hierzu wird weiter angemerkt, dass auch ein Kompressor prinzipbedingt einen Einlass und einen Auslass aufweist. Zudem ist der Kompressor der D2 auch gemäß [0025] sowohl mit der Spitze/Düse 30, als auch mit dem Container 17 der D2 verbunden. Damit genügt auch der Kompressor der D2 den Vorgaben des vorliegenden Anspruchs 1 nicht, um eine anspruchsgemäße erste Kammer 3 zu offenbaren.

**2.2.4. Die D2 offenbart dem Fachmann nicht, dass das „Volumen der ersten Kammer 3 derart verändert (wird), dass über das Verbindungselement 5 in der zweiten Kammer 4 ein stimulierendes Druckfeld erzeugt wird".**

Weiter offenbart die D2 dem Fachmann nicht die anspruchsgemäße Volumenänderung einer Kammer. So offenbart die D2 keine Volumenänderung des von der Prüfungsstelle als erste Kammer 3 herangezogenen Containers 17. Dieser von der Prüfungsstelle zitierte „container 17" dient ausschließlich der Aufnahme einer Flüssigkeit (z.B. ein Gel, Öl, ...), welche in den Luftstrom eingebracht wird (vgl. Abs. [0025] der D2). So wird der Fachmann aufgrund vorstehender

28_05_2014-01-00024-00000043

[File:101176942.doc // LE11K17]    28. Mai 2014
Stimulationsvorrichtung
Michael Lenke



Zweckangabe von einem unveränderlichen Volumen des Containers 17 der D2 ausgehen.

## 2.2.5. Gesamtschau

Es sind vorliegend im klaren Gegensatz zum Offenbarungsgehalt der D2 zwei Kammern 3 und 4 beansprucht, die über ein Verbindungselement 5 kommunizieren, wobei die erste Kammer 3 zur Erzeugung des Musters aus Unter- und Überdrücken volumenveränderlich und ist ausschließlich mit der zweiten Kammer 4 verbunden ist.

So wird nach dem Aufsetzen der Stimulationsvorrichtung auf die Haut ein weitgehend geschlossenes System geschaffen, in dem das zwischen den Kammern 3 und 4 hin und her transportierte Luftvolumen verbleibt.

Im Ergebnis führt das erfindungsgemäße Druckfeld der Druckfelderzeugungseinrichtung (2) zu einem intermittierenden Austausch derselben Luft. Insbesondere kommt es so zu keinem Abtransport von feuchter Luft, d.h., der zu stimulierende Hautbereich bleibt vorteilhaft feucht und trocknet nicht aus(vgl. Seite 8, Z. 21 ff. der Beschreibung).

Im Gegensatz zu dem beanspruchten Gegenstand offenbart die D2 eine Art „Stimulationsgebläse", wie vorstehend im Detail aufgezeigt, und führt somit zur unerwünschten Austrocknung der betroffenen Hautpartien.

Zudem benötigt die vorlegende Erfindung keinen Kompressor / keine Pumpe mit den üblichen Ventilen, sondern ist einfacher (und damit auch hygienischer) ausgestaltet.

Zusammengefasst entnimmt der Fachmann der D2 daher keine Anregung, um zum Gegenstand des vorliegenden Anspruchs 1 zu gelangen.

| [File:101176942.doc // LE11K17]    28. Mai 2014 |
| Stimulationsvorrichtung |
| Michael Lenke |



Somit ist der erfindungsgemäße Anspruch 1 neu und erfinderisch gegenüber der Druckschrift 2.

3.    **Abschließende Bemerkungen und Anträge**

Es wird höflich darum gebeten, das weitere Prüfungsverfahren auf der Grundlage der neuen Ansprüche unter Berücksichtigung der obigen Ausführungen abzuschließen.

Falls noch grundsätzliche Bedenken der Prüfungsstelle gegenüber dem neuen Patentbegehren fortbestehen sollten, wird gebeten, den Unterzeichnenden vor der Beschlussfassung telefonisch zu kontaktieren oder hilfsweise zu einer Anhörung zu laden, welche im Hinblick auf die Beschlüsse des Bundespatentgerichts (z.B. 7 W (pat) 57/03 und 21 W (pat) 47/05) in diesem Fall grundsätzlich als sachdienlich anzusehen ist.

Einem neuen Bescheid wird gerne entgegengesehen.

Patentanwalt
**Rainer K. Kuhnen**
(☎ 08161 608 318)

Anlagen
geänderte Ansprüche (Arbeitskopie und Reinschrift)

[File: 101177118.DOC // LE11K17]   Ansprüche   28. Mai 2014
Stimulationsgerät
Michael Lenke



<u>Reinschrift</u>

<u>Ansprüche</u>

1.  Stimulationsvorrichtung (1) für erogene Zonen, aufweisend:

5

    zumindest eine Druckfelderzeugungseinrichtung (2) mit:

        zumindest einer ersten Kammer (3); und

10      zumindest einer zweiten Kammer (4) mit zumindest einer Öffnung (42) zum Aufsetzen auf ein Körperteil (11); und

        zumindest einem Verbindungselement (5), welches die erste Kammer (3) mit der zweiten Kammer (4) verbindet; und

15      einer Antriebseinheit (6), welche das Volumen der ersten Kammer (3) derart verändert, dass über das Verbindungselement (5) in der zweiten Kammer (4) ein stimulierendes Druckfeld erzeugt wird; und

20  eine Steuereinrichtung (7), welche die Antriebseinheit (6) ansteuert; und

    wobei das in der zweiten Kammer (4) erzeugte Druckfeld aus einem Muster von Unter- und Überdrücken besteht, welche auf den Normaldruck aufmoduliert sind; und

25  wobei die erste Kammer (3) über das Verbindungselement (5) ausschließlich mit der zweiten Kammer (4) verbunden ist.

30  2.  Stimulationsvorrichtung (1) gemäß Anspruch 1, wobei

28_05_2014-01-00024-00000047

[File: 101177118.DOC // LE11K17]    Ansprüche    28. Mai 2014
Stimulationsgerät
Michael Lenke



die zumindest eine Öffnung (51) des zumindest einen Verbindungselements (5) dem zu stimulierenden Körperteil (11) gegenüberliegt, und auf das zu stimulierende Körperteil (11) gerichtet ist.

5

3.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 oder 2, wobei

die zweite Kammer (4) aus einem flexiblen Material hergestellt ist und/oder aus einem zumindest teilweise durchsichtigen Material hergestellt ist und/oder an die Form der vaginalen labia minora derart angepasst ist, dass diese von der Öffnung der zweiten Kammer (4) vollständig übergedeckt wird.

10

4.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 3, wobei

15

die zweite Kammer (4) mit dem Verbindungselement (5) und der ersten Kammer (3) einstückig ausgebildet ist.

5.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 3, wobei

20

die zweite Kammer (4) von der Stimulationsvorrichtung (1) auswechselbar angeordnet ist.

25

6.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 3, wobei

die zweite Kammer (4) von der Stimulationsvorrichtung (1) getrennt angeordnet ist, und

30

das Verbindungselement (5) ein Schlauch oder ein Rohr ist.

[File: 101177118.DOC // LE11K17]   Ansprüche   28. Mai 2014
Stimulationsgerät
Michael Lenke



7.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 6, wobei

die zweite Kammer (4) ein abdichtendes Auflageteil (43) zur Vergrößerung der Kontaktfläche der zweiten Kammer (4) auf der Haut aufweist.

8.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 7, wobei

die jeweilige Modulation des Druckfeldes mitels eines Bedienelements 71 veränderbar ist.

9.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 8, wobei

die Stimulationsvorrichtung (1) eine Beleuchtung (9) zur Beleuchtung der zweiten Kammer (4) aufweist.

10.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 9, wobei

das Verbindungselement (5) eine innere Formgebung und eine Öffnung zur zweiten Kammer (4) aufweist, welche derart ausgestaltet sind, dass das Druckfeld in Richtung und Ausprägung moduliert wird.

11.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 10, wobei

die Stimulationsvorrichtung (1) ein Handgerät ist.

[File: 101177118.DOC // LE11K17]    Ansprüche    28. Mai 2014
Stimulationsgerät
Michael Lenke



**12.** System mit einer Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 11, aufweisend:

eine zu der Stimulationsvorrichtung (1) getrennt angeordnete Fernsteuervorrichtung,

wobei die Steuereinrichtung (7) der Stimulationsvorrichtung (1) von der Fernsteuereinrichtung fernsteuerbar ist.

**13.** Verfahren zur Stimulation von erogonen Zonen zum sexuellen Vergnügen und nicht zur medizinischen Therapie, aufweisend folgende Schritte:

Ausbilden eines auf ein Körperteil (11) gerichteten Druckfeldes; und

Modulieren des Druckfeldes mit einem Muster von Unter- und Überdrücken, bezüglich des Normaldrucks.

**14.** Verfahren zur Stimulation von erogonen Zonen gemäß Anspruch 13, wobei

die Stimulationswirkung durch die Modulation des Druckfeldes mittels eines Bedienelements (71) individuell beeinflusst wird.

**15.** Verfahren zur Stimulation von erogonen Zonen gemäß Anspruch 13 oder 14, wobei

die Modulation pulsförmig ist.

[File: 101177118.DOC // LE11K17]   Ansprüche   28. Mai 2014
Stimulationsgerät
Michael Lenke



16.   Verfahren zur Stimulation von erogonen Zonen zum sexuellen Vergnügen und nicht zur medizinischen Therapie mit der Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 11, aufweisend folgende Schritte:

5    Aufsetzen der zweiten Kammer (4) über das Körperteil (11);

Ausbilden eines auf das Körperteil (11) gerichteten Druckfeldes;

Modulieren des Druckfeldes mit einem Muster von Unter- und Überdrücken, bezüglich des Normaldrucks;

10

Absetzen der zweiten Kammer (4) von dem Körperteil (11).

15  17.   Verwendung der Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 11 als Sexspielzeug zur Stimulation der weiblichen Klitoris.

20

28_05_2014-01-00024-00000052

[File: 101176940.DOC // LE11K17]   Ansprüche   28. Mai 2014
Stimulationsgerät
Michael Lenke



Arbeitskopie

## Ansprüche

1.  Stimulationsvorrichtung (1) für erogene Zonen, aufweisend:

5

    zumindest eine Druckfelderzeugungseinrichtung (2) mit:

    zumindest einer ersten Kammer (3); und

10      zumindest einer zweiten Kammer (4) mit zumindest einer Öffnung (42)
        zum Aufsetzen auf ein Körperteil (11); und

        zumindest einem Verbindungselement (5), welches die erste Kammer (3)
        mit der zweiten Kammer (4) verbindet; und

15      einer Antriebseinheit (6), welche das Volumen der ersten Kammer (3)
        derart verändert, dass über das Verbindungselement (5) in der zweiten
        Kammer (4) ein stimulierendes Druckfeld erzeugt wird; und

20  eine Steuereinrichtung (7), welche die Antriebseinheit (6) ansteuert; und

    wobei das in der zweiten Kammer (4) erzeugte Druckfeld aus einem Muster von
    Unter- und Überdrücken besteht, welche auf den Normaldruck, aufmoduliert sind;
    und

25  wobei die erste Kammer (3) über das Verbindungselement (5) ausschließlich mit
    der zweiten Kammer (4) verbunden ist.

30  2.  Stimulationsvorrichtung (1) gemäß Anspruch 1, wobei

[File: 101176940.DOC // LE11K17]  Ansprüche  28. Mai 2014
Stimulationsgerät
Michael Lenke



die zumindest eine Öffnung (51) des zumindest einen Verbindungselements (5) dem zu stimulierenden Körperteil (11) gegenüberliegt, und auf das zu stimulierende Körperteil (11) gerichtet ist.

5

**3.**    Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 oder 2, wobei

die zweite Kammer (4) aus einem flexiblen Material hergestellt ist und/oder aus einem zumindest teilweise durchsichtigen Material hergestellt ist und/oder an die Form der vaginalen labia minora derart angepasst ist, dass diese von der Öffnung der zweiten Kammer (4) vollständig übergedeckt wird.

10

**4.**    Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 3, wobei

15

die zweite Kammer (4) mit dem Verbindungselement (5) und der ersten Kammer (3) einstückig ausgebildet ist.

20 **5.**    Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 3, wobei

die zweite Kammer (4) von der Stimulationsvorrichtung (1) auswechselbar angeordnet ist.

25

**6.**    Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 3, wobei

die zweite Kammer (4) von der Stimulationsvorrichtung (1) getrennt angeordnet ist, und

30

das Verbindungselement (5) ein Schlauch oder ein Rohr ist.

28_05_2014-01-00024-00000054

28_05_2014-01-00024-00000054

[File: 101176940.DOC // LE11K17]   Ansprüche   28. Mai 2014
Stimulationsgerät
Michael Lenke



7.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 6, wobei

die zweite Kammer (4) ein abdichtendes Auflageteil (43) zur Vergrößerung der
Kontaktfläche der zweiten Kammer (4) auf der Haut aufweist.

8.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 7, wobei

die jeweilige Modulation des Druckfeldes mitels eines Bedienelements 71
veränderbar ist.

9.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 8, wobei

die Stimulationsvorrichtung (1) eine Beleuchtung (9) zur Beleuchtung der zweiten
Kammer (4) aufweist.

10.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 9, wobei

das Verbindungselement (5) eine innere Formgebung und eine Öffnung zur zwei-
ten Kammer (4) aufweist, welche derart ausgestaltet sind, dass das Druckfeld in
Richtung und Ausprägung moduliert wird.

11.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 10, wobei

die Stimulationsvorrichtung (1) ein Handgerät ist.

28_05_2014-01-00024-00000055

28_05_2014-01-00024-00000055

[File: 101176940.DOC // LE11K17]    Ansprüche    28. Mai 2014
Stimulationsgerät
Michael Lenke



12.    System mit einer Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 11, aufweisend:

eine zu der Stimulationsvorrichtung (1) getrennt angeordnete Fernsteuervorrichtung,

wobei die Steuereinrichtung (7) der Stimulationsvorrichtung (1) von der Fernsteuereinrichtung fernsteuerbar ist.

13.    Verfahren zur Stimulation von erogonen Zonen zum sexuellen Vergnügen und nicht zur medizinischen Therapie, aufweisend folgende Schritte:

Ausbilden eines auf ein Körperteil (11) gerichteten Druckfeldes; und

Modulieren des Druckfeldes mit einem Muster von Unter- und Überdrücken, bezüglich des Normaldrucks.

14.    Verfahren zur Stimulation von erogonen Zonen gemäß Anspruch 13, wobei

die Stimulationswirkung durch die Modulation des Druckfeldes mittels eines Bedienelements (71) individuell beeinflusst wird.

15.    Verfahren zur Stimulation von erogonen Zonen gemäß Anspruch 13 oder 14, wobei

die Modulation pulsförmig ist.



16.    Verfahren zur Stimulation von erogenen Zonen <u>zum sexuellen Vergnügen und nicht zur medizinischen Therapie</u> mit der Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 11, aufweisend folgende Schritte:

5    Aufsetzen der zweiten Kammer (4) über das Körperteil (11);

Ausbilden eines auf das Körperteil (11) gerichteten Druckfeldes;

Modulieren des Druckfeldes mit einem Muster von Unter- und Überdrücken, 10    bezüglich des Normaldrucks;

Absetzen der zweiten Kammer (4) von dem Körperteil (11).

15    17.    Verwendung der Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 11 als Sexspielzeug zur Stimulation der weiblichen Klitoris.

20

# Exhibit 6

Trials@uspto.gov                                                          Paper 50
571-272-7822                                                  Date: June 14, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

EIS GMBH,
Petitioner,

v.

NOVOLUTO GMBH,
Patent Owner.

_____

IPR2019-01302
Patent 9,937,097 B2

_____

Before SUSAN L. C. MITCHELL, CHRISTOPHER G. PAULRAJ, and
JOHN E. SCHNEIDER, *Administrative Patent Judges.*

SCHNEIDER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Challenged Claims Not Unpatentable
*35 U.S.C. § 318(a)*
Denying Petitioner's Motion to Exclude
*37 C.F.R. § 42.64*

IPR2019-01302
Patent 9,937,097 B2

## C. Claim Construction

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* Furthermore we need only construe the claims to the extent necessary to determine the patentability of the challenged claims. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy . . . .'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

After considering all of the arguments presented by the parties we find that it is only necessary to construe the term "reference pressure." Although the parties have also presented arguments concerning the construction of the term "pressure field generator," we determine that it is not necessary to construe that term to determine the patentability of the challenged claims in light of the asserted grounds.[3]

## 1. Reference Pressure

In our Decision Denying Institution, we construed the term "reference pressure" to mean "a prevailing pressure within the device prior to placing

---

[3] In section IX of its Reply, Petitioner presents argument that we were somehow misled by changes to the Specification of the '097 patent relating to the term "pressure field generator." Reply 27–28. As we declined to construe the term in our decision on institution and in this final decision, we do not address the arguments presented in Section IX of the Reply.

IPR2019-01302
Patent 9,937,097 B2

the stimulation device on the area of the skin to be stimulated." Dec. 10.
While Patent Owner agrees with this construction, Petitioner contends that
we improperly limited the construction to one example in the Specification.
Resp. 19; Reply 9.

In the Petition, Petitioner originally asserted that the "reference
pressure" is "atmospheric pressure." *See* Pet. 22 (stating "[w]hen the
bellows 160 is neither compressed nor expanded, the air within the bellows
160 is at atmospheric pressure (i.e., the reference pressure)"). In its Reply,
Petitioner presents a new interpretation of the term "reference pressure,"
contending that the term should be construed to mean a "given" pressure
around which higher or lower pressures are generated for stimulating the
body, which may be determined prior to application or after application of
the device to the target body part. Reply 10. In support of this construction,
Petitioner points to the discussion in the Specification involving pressures
above and below systolic pressure. *Id.* (citing Ex. 1001, col. 11–57.).

Patent Owner contends that Petitioner is presenting a new argument
not raised in the initial petition. Sur-Reply 2. Patent Owner argues that
Petitioner has improperly argued that the construction adopted by the Board
is limited to atmospheric pressure. *Id.* at 4. Patent Owner also contends that
Petitioner's arguments with regard to systolic pressure are without merit and
that the Board's original construction is proper. *Id.* at 5–6.

We have considered the arguments advanced by the parties and the
evidence of record, and conclude that our original construction was proper.
Contrary to Petitioner's contention, the construction is not limited to a single
example, but is consistent with the overall teachings of the Specification.
*See, e.g.*, Ex. 1001, col. 5, ll. 5–27; col. 15, ll. 34–37; Figure 14. The
construction we adopted is not limited to atmospheric pressure (as originally

IPR2019-01302
Patent 9,937,097 B2

proposed in the Petition), but refers generally to the prevailing pressure in the device before it is applied to the body as described in the Specification of the '097 patent. This refers to the pressure within the device regardless of the environment in which it is used. For instance, the Specification of the '097 patent lists additional environments to include "a liquid medium, such as water or commercially available lubricant." *Id*. at col. 5, ll. 5–27.

Even if we consider Petitioner's new claim construction argument as being properly presented in its Reply, Petitioner's argument regarding systolic pressure is unconvincing. The entire paragraph regarding systolic pressure reads

> Assuming that in the first state the pressure in the chambers 3 and 4 corresponds to the currently prevailing external reference pressure (air pressure for example), the overall pressure that is present in the second state will be lower than the external reference pressure. This negative pressure is set such that it is preferably lower than the usual systolic blood pressure in the blood vessels of the body part 11. The blood circulation in this area thus increases, and the clitoris 12 is better supplied with blood in the second state.

Ex. 1001, col. 11, ll. 49–57. It is clear that, when read in context, the reference pressure referred to in this paragraph is the prevailing pressure in the device *before* the device is applied to the body part. Moreover, only the negative pressure is set with regard to systolic pressure, not the positive pressure. *Id.*

Based on the foregoing, we maintain our original construction of the term "reference pressure" as "a prevailing pressure within the device prior to placing the stimulation device on the area of the skin to be stimulated."

IPR2019-01302
Patent 9,937,097 B2

### 4. *Conclusion*

Based on the foregoing we deny Petitioner's Motion to Exclude as it relates to Exhibit 2028.

### C. *Exhibit 2032*

Petitioner contends that Exhibit 2032 should be excluded on the grounds of hearsay and lack of authenticity. MTE 12–14.

In reaching our decision we did not rely on Exhibit 2032. We therefore deny as moot Petitioner's motion with respect to Exhibit 2032.

### D. *Conclusion*

For the reasons stated above, we deny Petitioner's Motion to Exclude in its entirety.

## IV. CONCLUSION

Weighing the evidence of the disclosures of the references, the competing testimony, the reasoning to combine the references, and the evidence showing secondary indicia of non-obviousness, we determine that Petitioner has failed to show, by a preponderance of the evidence, that any of claims 1–30 of the '097 patent is unpatentable.

We also deny Petitioner's Motion to Exclude.

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–30 of the '097 patent are not determined to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is denied; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2019-01302
Patent 9,937,097 B2

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–9, 12–24, 26–30 | 102 | Taylor | | 1–9, 12–24, 26–30 |
| 1–30 | 103 | Taylor, Hovland | | 1–30 |
| 1–30 | 103 | Guan, Lee, Hovland | | 1–30 |
| **Overall Outcome** | | | | 1–30 |

IPR2019-01302
Patent 9,937,097 B2

For PETITIONER:

Dinesh Melwani
Andrew Sutton
BOOKOFF MCANDREWS, PLLC
dmelwani@bomcip.com
asutton@bomcip.com


For PATENT OWNER:

Tammy Dunn
Lisa Margonis
Califf Cooper
Peter Schechter
OSHA BERGMAN WATANABE & BURTON
terry@obwbip.com
margonis@obwbip.com
cooper@obwbip.com
schechter@obwbip.com

# Exhibit 7

Trials@uspto.gov                                                          Paper 45
571-272-7822                                            Entered: August 5, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

EIS GMBH,
Petitioner,

v.

NOVOLUTO GMBH,
Patent Owner.

———————————

IPR2019-01444
Patent 9,763,851 B2

———————————

Before SUSAN L. C. MITCHELL, SCOTT C. MOORE, and
JOHN E. SCHNEIDER, *Administrative Patent Judges.*

SCHNEIDER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Denying Motion to Exclude
*37 C.F.R. § 42.64*

IPR2019-01444
Patent 9,763,851 B2

## C.  Claim Construction

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* Furthermore we need only construe the claims to the extent necessary to determine the patentability of the challenged claims. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy . . . .'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

In our Decision on Institution, we declined to construe any term because the parties contended that no construction was needed at that stage. Dec. 8. Petitioner now proposes an express construction for the term "reference pressure," arguing that Patent Owner has improperly defined reference pressure to be only the existing ambient pressure in the device prior to use. Reply 8. Petitioner contends that this construction is improper as it is limited to a specific embodiment of the '851 patent and ignores the broader teachings of the '851 patent. *Id.* at 8–9.

Petitioner now contends that the proper construction of the term reference pressure should be "a 'given' pressure around which higher and lower pressures are generated for stimulating the body, which may be determined prior to or after application of the device to the body." Reply, 9 (emphasis omitted). Petitioner explains:

IPR2019-01444
Patent 9,763,851 B2

> The specification describes atmospheric pressure as exemplary, not required. *See* Ex. 1001, 4:20–25, 12:51–53; Ex. 1018 ¶¶11–18; Ex. 1020 ¶¶36–42. Indeed, the '851 teaches that "negative-pressure…is preferably less than the usual systolic blood pressure in the blood vessels of body part 11." Ex. 1001, 9:38–46 (emphasis added), 1:62–65. Accordingly, setting a "negative" pressure that is above systolic pressure–which is indisputably higher than ambient pressure–would require a reference pressure that is also above systolic pressure, and accordingly, above ambient pressure. Ex. 1018 ¶¶14–15; Ex. 1020 ¶¶43–46; Ex. 1049; Ex. 1017 ¶88.

Reply 8–9.

Petitioner supports this proposed construction with the testimony of Messrs. Prisco and Meyst as well as citations to portions of the '851 patent. *Id.* (citing Ex. 1018 ¶¶ 17–18; Ex. 1020 ¶ 46; Ex. 1001, col. 4, ll. 20–25).

Patent Owner responds that both Patent Owner and Petitioner initially applied the same definition of "reference pressure" as the ambient pressure in the device prior to use. Sur-Reply 2. Patent Owner contends that Petitioner's newly proposed construction here is improper and is not supported by the '851 patent. *Id.* at 2–5.

We have considered the arguments advanced by the parties and the evidence of record, and conclude that the original construction used by the parties was proper. Contrary to Petitioner's contention, the construction set forth in our Institution Decision is not limited to a single example, but is consistent with the overall teachings of the Specification of the '851 patent. *See, e.g.*, Ex. 1001, col. 4, ll. 20–25, col. 12, ll. 51–53, Fig. 14. Also, the construction originally used by the parties is not limited to atmospheric pressure, but refers generally to the prevailing pressure in the device before it is applied to the body, *i.e.*, the ambient pressure, as described in the

IPR2019-01444
Patent 9,763,851 B2

Specification of the '851 patent. *See* Pet. 5–6 (stating "the reference pressure is the existing ambient pressure prior to placing the stimulation device on the region of skin to be stimulated"); Ex. 1002 ¶ 28 (same); Prelim. Resp. 5 (stating "[t]he reference pressure is usually the existing ambient pressure in relation to the stimulation device at the beginning of use (*i.e.*, prior to placing the device on the area to be stimulated [Ex. 1001], 4:20–25)"). This "ambient pressure" as described in the Specification of the '851 patent that both parties referenced refers to the pressure within the device regardless of the environment in which it is used. For instance, the Specification of the '851 patent lists additional environments for use of the claimed device to include "a liquid medium, such as water or commercially available lubricant." *Id*. at col. 4, ll. 9–19.

Even if agree with Petitioner that the proposed new construction is in response to arguments raised by Dr. Jensen, Petitioner's reliance on the teachings with regard to systolic pressure does not support its position that the "reference pressure" may not be the prevailing pressure or ambient pressure in the device before it is applied to the body. The entire paragraph regarding systolic pressure, which relates to Figure 5 of the '851 patent, reads:

> Assuming that in the first state the pressure in the chambers 3 and 4 corresponds to the currently prevailing external reference pressure (air pressure for example), the overall pressure that is present in the second state will be lower than the external reference pressure. This negative pressure is set such that it is preferably lower than the usual systolic blood pressure in the blood vessels of the body part 11. The blood circulation in this area thus increases, and the clitoris 12 is better supplied with blood in the second state.

IPR2019-01444
Patent 9,763,851 B2

Ex. 1001, col. 9, ll. 38–46. It is clear that, when read in context, the reference pressure referred to in this paragraph is the prevailing pressure in the device.

Based on the foregoing, we construe the term "reference pressure" as "a prevailing pressure within the device prior to placing the stimulation device on the area of the skin to be stimulated."

### D.  Obviousness Based on Guan Combined with Hovland

Petitioner contends that the subject matter of claims 1, 2, and 4–6 would have been obvious to one of ordinary skill in the art at the time the invention was made over Guan combined with Hovland. Pet. 23.

### 1.  Guan

Guan discloses a health massager which generates pulsating air pressure to stimulate meridian points for therapeutic purposes. Ex. 1004, 3. Guan teaches the contraction of an air bag to produce the pulsating air pressure. Id.

### 2.  Hovland

Hovland discloses an electrically-operated stimulation device which can be used to stimulate various body parts including the clitoris. Ex. 1005, Abst.

### 3.  Non-Analogous Art

Before we begin our analysis of the claims we first address Patent Owner's contention that Guan cannot be properly combined with Hovland as Guan is non-analogous art. Resp. 40–42.

"Two criteria have evolved for determining whether prior art is analogous: (1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to

13

IPR2019-01444
Patent 9,763,851 B2

# IV. CONCLUSION

Weighing the evidence of the disclosures of the references, the competing testimony, the reasoning to combine the references, and the evidence showing secondary indicia of non-obviousness, we determine that Petitioner has failed to show, by a preponderance of the evidence, that any of claims 1–6 of the '851 patent is unpatentable.

We also deny Petitioner's Motion to Exclude.

# V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–6 of the '851 patent are not determined to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is denied; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–2, 4–6 | 103 | Guan, Hovland | | 1, 2, 4–6 |
| 3 | 103 | Guan, Hovland, Gloth | | 3 |
| 5, 6 | 103 | Guan, Hovland, Makower | | 5, 6 |
| **Overall Outcome** | | | | 1–6 |

IPR2019-01444
Patent 9,763,851 B2

FOR PETITIONER:

Dinesh Melwani
Andrew Sutton
BOOKOFF McANDREWS, PLLC
dmelwani@bomcip.com
asutton@bomcip.com


FOR PATENT OWNER:

Tammy Dunn
Lisa Margonis
Califf Cooper
Peter Schechter
OSHA BERGMAN WATANABE & BURTON LLP
terry@obwbip.com
margonis@obwbip.com
cooper@obwbip.com
schechter@obwbip.com

# Exhibit 8

Trials@uspto.gov                                             Paper 41
Tel: 571-272-7822                          Entered: September 23, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————

EIS GMBH,
Petitioner,

v.

NOVOLUTO GMBH,
Patent Owner.

—————————

Case IPR2020-00007
Patent 9,849,061 B2

—————————

Before SUSAN L. C. MITCHELL, SCOTT C. MOORE, and
JOHN E. SCHNEIDER, *Administrative Patent Judges*.

MITCHELL, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Challenged Claims Not Unpatentable
*35 U.S.C. § 318(a)*
Granting Patent Owner's Motion to Seal and for Entry of a Protective Order
*37 C.F.R. §§ 42.14, 42.54*
Granting Patent Owner's Unopposed Motion to
Submit Supplemental Information
*37 C.F.R. § 42.123(b)*
Denying Petitioner's Motion to Exclude
*37 C.F.R. § 42.64*

IPR2020-00007
Patent 9,849,061 B2

### C. *Claim Construction*

We construe claims using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100 (2019). Therefore, we construe the challenged claims under the framework set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–19 (Fed. Cir. 2005) (en banc). Under this framework, claim terms are given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art ("POSITA"), at the time of the invention, in light of the language of the claims, the specification, and the prosecution history of record. *Id.* Only those terms that are in controversy need be construed and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

At this stage of the proceeding, we find that it is only necessary to construe expressly the term "reference pressure." Although the parties have also presented arguments concerning the term "pressure field generating arrangement," *see* Pet. 18–20; Resp. 19–22, we determine that it is not necessary to construe that term to determine the patentability of the challenged claims in light of the asserted grounds.[7]

---

[7] Petitioner presents argument that the term "pressure field generator" should be construed as a means-plus-function term limited to the following structure: at least one first chamber, at least one second chamber, and at least one connection element. Reply 25–26. As we find that it is not necessary to construe this term to resolve the issues before us, we do not address these arguments presented by Petitioner.

IPR2020-00007
Patent 9,849,061 B2

*Reference Pressure*

In our Decision Denying Institution, we construed the term "reference pressure" to mean "a prevailing pressure within the device prior to placing the stimulation device on the area of the skin to be stimulated." Dec. 14. In our Decision on Rehearing, we vacated this construction because we found on rehearing that at least a fact question exists concerning whether Taylor teaches positive and negative pressures with respect to a reference pressure, which we resolved in favor of Petitioner at the institution stage. Reh'g Dec. 20–21. We invited the parties to provide further briefing concerning how "reference pressure" should be construed. *Id*. at 21.

Although Patent Owner agrees with this construction with a slight modification of "the prevailing pressure 'acting on' the device, rather than 'within' the device," *see* Resp. 22–26, Petitioner contends that we improperly limited the construction to one example in the Specification, *see* Reply 3–4.

In the Petition, Petitioner originally asserted that the "reference pressure" is "atmospheric pressure." *See* Dec. 12–13; Pet. 7, 35, 64, 69; Ex. 1002 ¶¶ 64, 87. Petitioner presented an alternative construction—"reference pressure" should mean "given pressure"—for the first time in its Rehearing Request. *See* Req. Reh'g 4. In its Request for Rehearing, Petitioner states that "the plain meaning of 'reference pressure' is a 'given pressure' around which higher and lower pressures are generated." *Id*.

Petitioner reiterates this position in its Reply stating again that "reference pressure" should be given its plain meaning, "which is a 'given' pressure around which higher and lower pressures are generated for stimulating the body, which may be determined prior to application <u>or after</u>

18

IPR2020-00007
Patent 9,849,061 B2

application of the device to the target body part." Reply 4 (citing Ex. 1018 ¶ 18; Ex. 1020 ¶ 51, Ex. 1001, 3:38–41. In support of this construction, Petitioner points to the discussion in the Specification involving pressures above and below systolic pressure. Reply 3–4. Petitioner asserts that the statement in the Specification of the '061 patent that "negative pressure is set such that it is *preferably* lower than the usual systolic blood pressure" would encompass embodiments where the negative pressure is above systolic blood pressure, which one of skill in the art would understand is always above ambient pressure, leading to the conclusion that any reference pressure in such a scenario would be above ambient pressure. *See* Reply 3–4 (quoting Ex. 1001, 10:61–67 (emphasis added) (citing Ex. 1018 ¶¶ 12–18; Ex. 1020 ¶¶ 43–51; Ex. 1034 ¶ 88; Ex. 1040)); *see also* Ex. 1001, 3:26–37 (discussing use of the claimed devices with liquid media such as water or lubricants); Ex. 1018 ¶ 17.

Patent Owner responds that Petitioner is inappropriately presenting a new argument that was nowhere raised in the Petition or Dr. Prisco's Declaration (Ex. 1002). Sur-Reply 5–6. Patent Owner also asserts that Petitioner's argument addresses an incorrect construction—that "reference pressure" is limited to atmospheric pressure. *Id*. at 5. Patent Owner asserts that it

> has never taken the position that "reference pressure" must be limited to atmospheric pressure, nor would it, as doing so would ignore the plain language of the '061 Patent. The patent explains the device may be used in various environments, meaning the prevailing pressure acting on the device prior to operation (the reference pressure) would have a different value depending on the environment (*e.g.*., in a bathtub versus on a bed). Ex. 1001, 3:26–49. But always, the reference pressure is that prevailing pressure acting on the device prior to placing the

IPR2020-00007
Patent 9,849,061 B2

> device on the area of skin to be stimulated. *Id*. Petitioner's
> argument that Novoluto's proffered construction would limit
> the term to a single embodiment (Reply 3–4) is baseless and
> misleading.

Sur-Reply 6. Patent Owner also notes that the reference pressure is not an

absolute value because the measure for ambient pressure would change

based on location. *Id*. at 4 (citing Ex. 1001, 3:26–49). Patent Owner points

out that Petitioner's new argument concerning systolic blood pressure does

not take this into account. *Id*. at 6.

We have considered the arguments advanced by the parties and the

evidence of record, and conclude that our original construction set forth in

our Decision Denying Institution was proper. Contrary to Petitioner's

contention, the construction is not limited to a single example, but is

consistent with the overall teachings of the Specification. *See, e.g*., Ex.

1001, 3:26–49, 14:49–54, Figure 14. For instance, the Specification of the

'061 patent sets forth that "[t]he reference pressure is usually the

atmospheric pressure acting on the stimulation device that prevails when

application begins (i.e. prior to placing the stimulation device on the area of

skin to be stimulated)." Ex. 1001, 3:38–41.

The construction we adopted is not limited to atmospheric pressure (as

originally proposed in the Petition), but refers generally to the prevailing

pressure in the device before it is applied to the body as described in the

Specification of the '061 patent. This refers to the prevailing pressure within

the device regardless of the environment in which it is used. For instance,

the Specification of the '061 patent lists additional environments to include

"a liquid medium, such as water or commercially available lubricant." *Id*. at

3:26–28. This is also consistent with the position advanced by Patent Owner

IPR2020-00007
Patent 9,849,061 B2

during prosecution stating that the claimed pattern of negative and positive pressures was not taught by a device that "purely acts with negative pressure (i.e., as a vacuum) on the skin." Ex. 1003, 183.

Even if we consider Petitioner's shifting claim construction argument, Petitioner's argument regarding systolic pressure is unconvincing. The entire paragraph regarding systolic pressure reads

> Assuming that in the first state the pressure in the chambers 3 and 4 corresponds to the currently prevailing external reference pressure (air pressure for example), the overall pressure that is present in the second state will be lower than the external reference pressure. This negative pressure is set such that it is preferably lower than the usual systolic blood pressure in the blood vessels of the body part 11. The blood circulation in this area thus increases, and the clitoris 12 is better supplied with blood in the second state.

Ex. 1001, 10:61–11:2. Petitioner's reading of this description to include a negative pressure that is set *higher* than systolic blood pressure is too strained a reading to support Petitioner's conclusions. When read in context, the reference pressure referred to in this paragraph is the prevailing pressure in the device *before* the device is applied to the body part, which is consistent with our original construction.

Based on this analysis, we conclude that the construction of the term "reference pressure" should be "a prevailing pressure acting on the device prior to placing the stimulation device on the area of skin to be stimulated."[8]

---

[8] We agree with Patent Owner that "acting on" as opposed to "within" is more consistent with what is described in the Specification of the '061 patent. *See* Ex. 1001, 3:38–41.

IPR2020-00007
Patent 9,849,061 B2

## VIII.  ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–3, 5, 7, 8, 11, 14, 15, 17–26 of the '061 patent are not determined to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Seal and for Entry of a Protective Order is *granted*;

FURTHER ORDERED that Petitioner's Motion to Submit Supplemental Information under 37 C.F.R. § 42.123(b) is *granted*;

FURTHER ORDERED that Petitioner's Motion to Exclude is *denied*;

FURTHER ORDERED that the Modified Protective Order (Ex. 2070) is hereby entered and shall govern the conduct of this proceeding unless otherwise modified;

FURTHER ORDERED that Ex. 2056 shall be sealed as "Board Only," and will be kept under seal; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-00007
Patent 9,849,061 B2

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–3, 5, 7, 11, 14, 15, 17–19, 21, 23–26 | 102 | Taylor | | 1–3, 5, 7, 11, 14, 15, 17–19, 21, 23–26 |
| 1–3, 5, 7, 8, 11, 14, 15, 17–19, 21–26 | 103 | Taylor, Hovland | | 1–3, 5, 7, 8, 11, 14, 15, 17–19, 21–26 |
| 20 | 103 | Taylor, Zipper | | 20 |
| 20 | 103 | Taylor, Hovland, Zipper | | 20 |
| **Overall Outcome** | | | | 1–3, 5, 7, 8, 11, 14, 15, 17–26 |

IPR2020-00007
Patent 9,849,061 B2

PETITIONER:

Dinesh N. Melwani
Andrew Sutton
Biju I. Chandran
BOOKOFF MCANDREWS, PLLC
dmelwani@bomcip.com
bchandran@bomcip.com
asutton@bomcip.com


PATENT OWNER:

Tammy Dunn
Lisa E. Margonis
Peter C. Schechter
Califf T. Cooper
OSHA LIANG LLP
TERRY@OBWBIP.COM
MARGONIS@OBWBIP.COM
SCHECHTER@OBWBIP.COM
cooper@obwip.com

# Exhibit 9



**Deutsches
Patent- und Markenamt**



EISENFÜHR SPEISER
EINGEGANGEN/RECEIVED

– 4. Juli 2018

MÜNCHEN

POSTANSCHRIFT  Deutsches Patent- und Markenamt · 80297 München

| | |
|---|---|
| HAUSANSCHRIFT | Zweibrückenstraße 12, 80331 München |
| POSTANSCHRIFT | 80297 München |
| KONTAKT | Dr. Ralf Littger |
| TEL | +49 89 2195-3940 |
| FAX | +49 89 2195-2221 |
| INTERNET | www.dpma.de |
| AKTENZEICHEN | 10 2013 110 501.7 |
| ANMELDER/INHABER | NOVOLUTO GmbH |

Eisenführ Speiser Patentanwälte
Rechtsanwälte PartGmbB
Postfach 310260
80102 München

| | |
|---|---|
| IHR ZEICHEN | FA 5208-01DE |
| ERSTELLT AM | 29.06.2018 |

Bitte Aktenzeichen und Anmelder/Inhaber bei allen Eingaben und Zahlungen angeben!

**Beigefügt erhalten Sie zum Beschluss vom 17.04.2018**

- **1 Abschrift(en) einschließlich der Angaben zur elektronischen Signatur**





Empfangsbekenntnis

DOKUMENTENANNAHME UND NACHTBRIEFKASTEN nur Zweibrückenstraße 12, HAUSADRESSE (FÜR FRACHT): Zweibrückenstraße 12, 80331 München
ZAHLUNGSEMPFÄNGER: Bundeskasse Halle/DPMA, IBAN: DE84 7000 0000 0070 0010 54, BIC (SWIFT-Code): MARKDEF1700
ANSCHRIFT DER BANK: BUNDESBANKFILIALE MÜNCHEN, LEOPOLDSTR. 234, 80807 MÜNCHEN
A 9016b/5.16

**Deutsches
Patent- und Markenamt**

Aktenzeichen: **10 2013 110 501.7**

Beschluss, verkündet in der Anhörung vom 17.04.2018

## Beschluss

In der Einspruchssache

betreffend das Patent 10 2013 110 501

mit der Bezeichnung

Stimulationsvorrichtung

der **NOVOLUTO GmbH, 10117 Berlin, DE**                    Patentinhaberin

Verfahrensbevollmächtigte: KUHNEN & WACKER Patent- und Rechtsanwaltsbüro PartG mbB, 85354 Freising, DE

weitere Verfahrensbeteiligte:

**1. ecoaction GmbH, 50858 Köln, DE**                    Einsprechende ecoaction GmbH

Verfahrensbevollmächtigte: BRANDI Rechtsanwälte Partnerschaft mbB, 33602 Bielefeld

**2. Fun Factory GmbH, 28197 Bremen, DE**                    Einsprechende Fun Factory GmbH

Verfahrensbevollmächtigte: Eisenführ Speiser Patentanwälte Rechtsanwälte PartGmbB, 80335 München, DE

hat die Patentabteilung 44 des Deutschen Patent- und Markenamts unter Mitwirkung

des Vorsitzenden:      Dr. Medicus

des Berichterstatters:  Dr. Littger

des Beisitzers:        Dr. Zink

am 17.04.2018 beschlossen:

Das Patent wird widerrufen.

P 2880c/9.17

Seite 2 von 20

**Gründe**

I.

Am 23. September 2013 wurde die Patentanmeldung 10 2013 110 501.7 beim Deutschen Patent- und Markenamt eingereicht. Das Patent 10 2013 110 501 mit der Bezeichnung „Stimulationsvorrichtung" wurde nach Erteilung am 18. Februar 2016 veröffentlicht.

1. Gegen das Patent hat die Einsprechende ecoaction GmbH

mit Schriftsatz vom 17. November 2016 (eingegangen am selben Tag) Einspruch erhoben und beantragt, erstens das erteilte Patent gem. § 21 (1) Nr. 1, 4 PatG in vollem Umfang zu widerrufen und zweitens hilfsweise eine mündliche Anhörung durchzuführen. Die Einsprechende ecoaction GmbH beruft sich dabei auf mangelnde erfinderische Tätigkeit und das Hinausgehen des Gegenstands des Patents über den Offenbarungsgehalt der ursprünglich eingereichten Anmeldung (unzulässige Erweiterung).



Zur Begründung verweist die Einsprechende ecoaction GmbH auf folgende Druckschriften:

E1 CN 2153351 Y (zusammen mit einer Patent Translate Übersetzung (EPA))

E2 DE 10 2013 110 501 A1 (Offenlegungsschrift des Streitpatents)

E3 Auszug aus Maria M. Kettenring „erotische Partnermassage", 3. Auflage, 2004

E4 CN 2198900 Y (zusammen mit einer Patent Translate Übersetzung (EPA))

2. Gegen das Patent hat die Einsprechende Fun Factory GmbH

mit Schriftsatz vom 17. November 2016 (eingegangen am selben Tag) Einspruch erhoben und beantragt, erstens das erteilte Patent gem. § 21 (1) Nr. 1, 4 PatG in vollem Umfang zu widerrufen und zweitens hilfsweise eine mündliche Anhörung durchzuführen. Die Einsprechende Fun Factory GmbH beruft sich dabei auf mangelnde Neuheit, mangelnde erfinderische Tätigkeit und das Hinausgehen des Gegenstands des Patents über den Inhalt der Anmeldung in der ursprünglich eingereichten Fassung (unzulässige Erweiterung).

Seite 3 von 20    Zur Begründung verweist die Einsprechende Fun Factory GmbH auf folgende Druckschriften:

D1 WO 2006/058291 A2

D2 US 2013/0012769 A1

D3 http://www.heilpraxisnet.de/naturheilpraxis/sex-qeqen-bluthochdruck-665.php

D4 Focus online 5.12.2004

D5 US 6,099,463 A

D6 US 1,898,652 A

D7 DE 14 63 673 U

D8 DE 42 43 876 A1

D9 US 2008/0304984 A1

D10    WO 00/28939 A2

D11    DE 582 196 C

D12    DE20 2012 005 414U1

D13    EP 1 554 947 B1

D14    JP 2008-125577 A (japanisch)

D15    JP 2008-125577 A (englische Übersetzung der D14)

D16    US 2,112,646 A

D17    US 1,882,040 A

D18    US 5,377,701 A

D19    WO 2013/178223 A2

D20    DE 1 703 184 U

D21    DE 32 22 467 A1

D22    DE 93 09 994 U1

D23    DE 198 53 353 C2



Beide Einsprüche sind frist- und formgerecht beim Deutschen Patent- und Markenamt eingegangen. Beide Einsprüche sind auch ausreichend substanziiert und somit zulässig.

Die Patentinhaberin beantragt mit Schreiben vom 18. September 2017 (eingegangen am selben Tag) die Einsprüche zurückzuweisen und das Streitpatent in vollem Umfang aufrecht zu erhalten.

Mit derselben Eingabe beantragt die Inhaberin weiter hilfsweise eine mündliche Verhandlung, sollte dem Antrag nicht ohne weiteres stattgegeben werden können.

Zur Begründung verweist die Patentinhaberin u.a. auf eine Übersetzung der E1, die laut Schriftsatz der Patentinhaberin vom 18. September 2017 beglaubigt sein soll:

E1-Ü1   englische Übersetzung der E1 (Patentinhaberin)

Mit der umfangreichen Eingabe vom 24. Januar 2018 (eingegangen am selben Tag) teilt die Einsprechende Fun Factory GmbH mit, dass sie die Anträge aus dem Schriftsatz vom 17. November 2016 aufrecht hält.

Zur Begründung verweist die Einsprechende Fun Factory GmbH auf folgende Druckschriften:



D24   US 1,730,535A

D25   DE 201 12 384 U1

A3    Klageschrift vom 5.08.2016, LG Düsseldorf Az 4a O 78/16

A4    Schriftsatz vom 20.07.2017, LG Düsseldorf Az 4a O 78/16

A5    Urteil vom 14.12.2017, LG Düsseldorf Az 4a O 78/16

E1A   Beglaubigte Übersetzung der E1 (Einsprechende Fun Factory GmbH)

E1B   Beglaubigung

In Erwiderung auf den umfangreichen Schriftsatz der Einsprechenden Fun Factory GmbH vom 24. Januar 2018 beantragte die Patentinhaberin eine Terminverlegung der für den 07. Februar 2018 angesetzten mündlichen Verhandlung um 2 Monate. In der entsprechenden Eingabe vom 30. Januar 2018 (eingegangen am selben Tag) hat die Patentinhaberin zudem die Frage aufgeworfen, ob die Einsprechende Fun Factory GmbH ein Hintermann der Eis.de GmbH sei, welche auf Grund einer Nichtangriffsverpflichtung gehindert sei selbst am Einspruchsverfahren gegenüber dem Streitpatent mitzuwirken.

Mit Zwischenbescheid vom 27. März 2018 hat die Patentabteilung den Verfahrensbeteiligten mitgeteilt, dass der Einspruch der Einsprechenden Fun Factory GmbH auf der Basis der bisher vorgetragenen Tatsachen zu deren angeblicher Strohmanneigenschaft zulässig sei.

Seite 5 von 20

Mit Eingabe vom 12. April 2018 (eingegangen am selben Tag;  vorab per e-mail an die Verfahrensbeteiligten) beantragte die Patentinhaberin erneut, das Patent unverändert aufrecht zu erhalten. Die Inhaberin kündigte ferner vorsorglich Hilfsanträge 1 bis 6 in der Anhörung an, sowie die Möglichkeit, dass bedarfsweise weitere Hilfsanträge gestellt werden können und zudem die Merkmale oder Merkmalskombinationen der Hilfsanträge 1 bis 6 beliebig miteinander kombiniert werden können.

Bezüglich der Einzelheiten wird auf den Inhalt der Akte verwiesen.


II.


<u>Der geltende Anspruch 1 des erteilten Streitpatents lautet nach Merkmalen gegliedert</u>:



a)      Stimulationsvorrichtung (1) für die Klitoris (12), aufweisend:

b)      eine Druckfelderzeugungseinrichtung (2) mit:

b1)     einer ersten Kammer (3); und

b2)     einer zweiten Kammer (4) mit einer Öffnung (42) zum Aufsetzen über die Klitoris (12);

b3)     einem Verbindungselement (5), welches die erste Kammer (3) mit der zweiten Kammer (4) verbindet; und

b4)     einer Antriebseinheit (6), welche das Volumen der ersten Kammer (3) derart verändert, dass über das Verbindungselement (5) in der zweiten Kammer (4) ein stimulierendes Druckfeld erzeugt wird; und

b5)     eine Steuereinrichtung (7), welche die Antriebseinheit (6) ansteuert; und

b6)     wobei das in der zweiten Kammer (4) erzeugte Druckfeld aus einem Muster von Unter- und Überdrücken besteht, welche auf den Normaldruck aufmoduliert sind; und

b7)     wobei die erste Kammer (3) über das Verbindungselement (5) ausschließlich mit der zweiten Kammer (4) verbunden ist, somit keine andere Verbindung der ersten Kammer (3) als diejenige zur zweiten Kammer (4) besteht, womit die erste Kammer (3) eine einzige Öffnung aufweist, und

Seite 6 von 20

b8)   wobei die zweite Kammer (4) eine Öffnung (51) von dem Verbindungselement (5) in die zweite Kammer (4) aufweist, und

c)   wobei die Stimulationsvorrichtung (1) keine Ventile aufweist, und

d)   wobei die Stimulationsvorrichtung (1) ein tragbares Handgerät

d1)   mit einer Batterie (76) ist,

e1)   dadurch gekennzeichnet, dass das Verbindungselement (5) starr ist,

e2)   und als ein gerader Kanal mit Düsenwirkung ausgestaltet ist,

e21)   dessen Öffnung in die ersten Kammer (3) und dessen Öffnung (51) in die zweite Kammer (4) zueinander ausgerichtet sind,

e22)   so dass eine Medienströmung bei Kompression der ersten Kammer (3) durch die Ausrichtung der Öffnung (51) und des Verbindungselements (5) auf die Klitoris (12) gerichtet ist,

e23)   wobei die Öffnung (51) des Verbindungselements (5) der Klitoris (12) durch die zweite Kammer (4) hindurch gegenüberliegt.



**Die geltenden Ansprüche 2-9 des erteilten Streitpatents lauten:**

2.   Stimulationsvorrichtung (1) gemäß Anspruch 1, wobei die zweite Kammer (4) aus einem flexiblen Material hergestellt ist und/oder aus einem zumindest teilweise durchsichtigen Material hergestellt ist und/oder an die Form der vaginalen labia minora derart angepasst ist, dass diese von der Öffnung der zweiten Kammer (4) vollständig überdeckt wird.

3.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 oder 2, wobei die zweite Kammer (4) mit dem Verbindungselement (5) und der ersten Kammer (3) einstückig ausgebildet ist.

4.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 oder 2, wobei die zweite Kammer (4) von der Stimulationsvorrichtung (1) auswechselbar angeordnet ist.

5.   Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 4, wobei die zweite Kammer (4) ein abdichtendes Auflageteil (43) zur Vergrößerung der Kontaktfläche der zweiten Kammer (4) auf der Haut aufweist.

6.    Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 5, wobei die jeweilige Modulation des Druckfeldes mitels eines Bedienelements 71 veränderbar ist.

7.    Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 6, wobei die Stimulationsvorrichtung (1) eine Beleuchtung (9) zur Beleuchtung der zweiten Kammer (4) aufweist.

8.    System mit einer Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 7, aufweisend: Seite 14 eine zu der Stimulationsvorrichtung (1) getrennt angeordnete Fernsteuervorrichtung , wobei die Steuereinrichtung (7) der Stimulationsvorrichtung (1) von der Fernsteuereinrichtung fernsteuerbar ist.

9.    Verwendung der Stimulationsvorrichtung (1) gemäß einem der Ansprüche 1 bis 8 als Sexspielzeug zur Stimulation der weiblichen Klitoris.



<u>Offenbarung</u>:

Die Einsprechenden bemängeln in ihren Einspruchsschriftsätzen die unzulässige Erweiterung des Anspruchs 1 des Streitpatents in den Merkmalen e1, e2 (Einsprechende ecoaction GmbH) bzw. in den Merkmalen c, d, d1, e1, e2 (Einsprechende Fun Factory GmbH).

Bzgl. des Merkmals

*c)    wobei die Stimulationsvorrichtung (1) keine Ventile aufweist,*

argumentiert die Einsprechende Fun Factory GmbH in ihrem Einspruchs-Schriftsatz vom 17. November 2016, dass dieses in der Passage *„Bei der in den Figuren 4 bis 6 gezeigten Anordnung ist vorteilhaft, dass diese hygienisch unproblematisch (beispielsweise aufgrund der Vermeidung von Toträumen) und in der Herstellung einfach ist. Beispielsweise sind keine Ventile oder weitere Öffnungen in oder an der ersten Kammer 3 erforderlich"* (vgl. Urspr. Unt.: S. 18, Z. 25-28) in der beanspruchten Breite nicht offenbart ist, da sich die Abwesenheit von Ventilen lediglich auf die erste Kammer (3) bezieht.

Die Vermeidung von Ventilen ist aber in Hinblick auf die vorliegende Erfindung in allgemeiner Form in der Passage *„Weiter weist die erfindungsgemäße Druckfelderzeugungseinrichtung aufgrund des einfachen Aufbaus den Vorteil einer erhöhten Hygiene und einer verbesserten Reinigungsfähigkeit auf. Dabei vermeidet die vorliegende Erfindung Ventile ..."* offenbart (vgl. Urspr. Unt.: S.9, Z. 9-13). Selbst wenn man davon ausgeht, dass sich die Vermeidung von Ventilen lediglich auf die Druckfelderzeugungseinrichtung bezieht und nicht auf die gesamte Stimulationsvorrichtung, kann in Merkmal c) keine unzulässige Erweiterung gesehen werden, da Ventile außerhalb der Druckfelderzeugungseinrichtung keine Funktion hätten.

Zudem ist die Vermeidung von Ventilen in Hinblick auf den erfindungsgemäßen Aufbau in allgemeiner Form in der Passage *„Zudem führt der erfindungsgemäße Aufbau zur Vermeidung komplexer strömungstechnischer Elemente, wie z.B. Ventile, was zu einer Vereinfachung der Herstellung führt."* offenbart (vgl. Urspr. Unt.: S.9, Z. 22-24).

Bzgl. der Merkmale

*d)*     *wobei die Stimulationsvorrichtung (1) ein tragbares Handgerät*

*d1)*    *mit einer Batterie (76) ist,*



sieht die Einsprechende Fun Factory GmbH in den Untermerkmalen „tragbares Handgerät" und „Batterie" unzulässige Zwischenverallgemeinerungen gegenüber der Beschreibung einer ersten Ausführungsform, in der neben diesen Merkmalen noch weitere Merkmale genannt sind, u.a. Gehäuse, Bedienelementen, Anzeige (vgl. Urspr. Unt.: S. 13, Z. 22-25).

Neben der genannten Fundstelle sind die Untermerkmale Handgerät und Batterie in den ursprünglich eingereichten Unterlagen zudem in den Ansprüchen und Zeichnungen offenbart (vgl. Urspr. Unt.: Anspruch 13; Fig. 3, Bezugszeichen (76)). Demnach handelt es sich bei der Stimulationsvorrichtung vorzugsweise um ein batteriebetriebenes Handgerät (vgl. Urspr. Unt.: Anspruch 13). Der Begriff tragbar findet sich in Kombination mit dem Begriff Handgerät in der oben genannten Fundstelle, ist zudem aber auch aus den Figuren 1-3 ersichtlich bzw. ist gegenüber dem Begriff Handgerät auch als redundant anzusehen, da jedes Handgerät per se tragbar ist.

Nach deutschem Recht sind Zwischenverallgemeinerungen im übrigen nicht unzulässig, wenn die Merkmale, wie in der oben genannten Aufzählung, in keinem engen Zusammenhang zueinander stehen (vgl. Schulte, PatG, 10. Auflage, Einleitung, Rdn 128).

Bzgl. der Merkmale

e1)    *dadurch gekennzeichnet, dass das Verbindungselement (5) starr ist,*

e2)    *und als ein gerader Kanal mit Düsenwirkung ausgestaltet ist,*

argumentiert die Einsprechende ecoaction GmbH, dass die Formulierungen „das Verbindungselement (5) starr ist", „gerader Kanal" und „gerader Kanal mit Düsenwirkung" in der ursprünglich eingereichten Anmeldung nicht offenbart sind. Die Einsprechende Fun Factory GmbH sieht eine unzulässige Erweiterung dieser Merkmale hauptsächlich gegenüber dem Ausführungsbeispiel der Fig. 11 in Kombination mit dem zugehörigen Abschnitt in der ursprünglich eingereichten Beschreibung (vgl. Urspr. Unt.: S. 21, Abschnitt 3; Fig. 11).

Die Kombination der Merkmale e1) und e2) ist in den ursprünglich eingereichten Unterlagen des Streitpatents u.a. durch die zusammengehörigen Fig. 4-6 und die entsprechenden Abschnitte der Beschreibung offenbart (vgl. Urspr. Unt.: S. 15, letzter Abschnitt - S. 18, erster Abschnitt; S. 20, dritter Abschnitt; Fig. 4-6).



So zeigt die Fig. 4 eine Halterung (32), die vorzugsweise aus einem starren Kunststoff besteht (vgl.: Urspr. Unt.: S. 17, Z. 5-6; Fig. 4) und welche ein Verbindungselement (5) aufweist, welches die erste Kammer (3) und die zweite Kammer (4) verbindet (vgl. Urspr. Unt.: S. 16, Z. 25-30; Fig. 4). Da das Verbindungselement (5) durch die, aus vorzugsweise starrem Kunststoff bestehende, Halterung (32) begrenzt wird, folgt, dass das das Verbindungselement (5) starr ist.

Die Kanalform des Verbindungselements (5) im Zusammenhang mit den Figuren 4-6 ist in den ursprünglich eingereichten Unterlagen beschrieben (vgl. Urspr. Unt.: S. 20, Z. 15-16). Dabei zeigen die Figuren 4-6 das Verbindungselement (5) in Form eines geraden Kanals. Hinsichtlich der Formulierung „gerader Kanal" innerhalb des Merkmals e2) argumentiert die Einsprechende ecoaction GmbH, dass man den als gerade gezeigten Begrenzungslinien des Kanals 5 bei den Schnittzeichnungen nicht eindeutig entnehmen kann, dass der darauf abgebildete Kanal (5) keine Krümmung aufweisen darf. Es ist aber davon auszugehen, dass wenn die Anmelderin im Zusammenhang mit den Figuren 4-6 einen gekrümmten Kanal im Sinne gehabt hätte oder einen gekrümmten Kanal als mit beabsichtigt angesehen hätte, sie dies durch eine entsprechende Ausführung der Figuren 4-6 gezeigt hätte, z.B. durch Stufungen, Versätze in den Linien, Schattierungen oder eine unterschiedliche Darstellung des Kanals von außen und von innen. Dies ist aber nicht der Fall. Die Figuren 4-6 geben keinen Anhaltspunkt, aus dem man eine Krümmung des Kanals ableiten könnte. Zudem ist auch der mittlere Strömungspfeil bei den Figuren 4-6 gerade dargestellt.

Die Düsenwirkung des geraden Kanals im Merkmal e2) ergibt sich durch dessen gegenüber der ersten Kammer (3) und der zweiten Kammer (4) verringerten Querschnitt so dass sich die Düsenwirkung des geraden Kanals bei Kompression der ersten Kammer (3), wie in Fig. 6 dargestellt, automatisch ergibt. Auch wird die Düsenwirkung des geraden Kanals in der Fig. 6 durch die drei Pfeile, die von der ersten Kammer (3) zur zweiten Kammer (4) weisen, entsprechen symbolisiert (vgl. Urspr. Unt.: Fig 6).

Die Ansprüche 1-9 des Streitpatents sind somit als ursprünglich offenbart anzusehen.

<u>Patentfähigkeit:</u>

<u>Neuheit:</u>

Die Einsprechende Fun Factory GmbH argumentiert in ihrem Einspruchsschriftsatz vom 17. November 2016, dass der Gegenstand nach Anspruch 1 des Streitpatents nicht neu gegenüber dem Gerät zur Hautbehandlung nach D8 sei. Die Einsprechende argumentiert u.a., dass u.a. die Durchgangsbohrung (22) der Vorrichtung nach D8 dem geraden Kanal des Merkmals e2) nach Anspruch 1 des Streitpatents entsprechen würde.



Zum einen ist die Durchgangsbohrung (22) zumindest in der Fig. 2 der D8 nicht gerade sondern gekrümmt gezeigt und zum anderen besitzt die Durchgangsöffnung (22) nicht wie die Einsprechende argumentiert eine Düsenwirkung. Die Durchgangsöffnung (22) hat die Funktion vom Luftschlauch (4) kommende Saug- und Druckstöße an die Düsen bzw. Durchgangsöffnungen (19) zu liefern. Dafür ist der Luftschlauch verlustfrei mit der Durchgangsöffnung (22) verbunden (vgl. D8: Sp. 7, Z. 11-24; Fig. 3). Die Düsenfunktion ist bei der Vorrichtung nach D8 somit im Bereich der Düsen bzw. Durchgangsöffnungen (19), welche von der Einsprechenden Fun Factory GmbH als zweite Kammer im Sinne des Streitpatents angesehen werden und nicht im Bereich der Durchgangsöffnung (22) angesiedelt. Damit fehlt es an der nötigen Übereinstimmung zumindest dieses Merkmals mit dem des Streitpatents.

Somit ist die Vorrichtung nach Anspruch 1 des Streitpatents neu gegenüber der Vorrichtung nach D8. Die übrigen sich im Verfahren befindlichen Druckschriften scheinen in Bezug auf die Neuheit der Vorrichtung nach Anspruch 1 des Streitpatents noch weiter abzuliegen.

## Erfinderische Tätigkeit:

Als Fachmann sieht die Patentabteilung einen Entwicklungsingenieur, der auf dem Gebiet der Massagevorrichtungen tätig ist und der sich Spezialkenntnisse bei der Entwicklung von Sexspielzeug angeeignet hat, an.

### Hauptantrag:

Als Ergebnis des Prüfungsverfahrens wurde die gegenüber der D7 abgegrenzte Vorrichtung nach Anspruch 1 des Streitpatents unter Schutz gestellt. Die Erteilung erfolgte, da laut Patentinhaberin die Erfindung in der relativen Anordnung der Kammern (3, 4) und des Verbindungselements (5) in Bezug auf den Anwendungszweck der Klitoralstimulation bestand.

Die Einsprechende ecoaction GmbH beschreibt in ihrem Vortrag die Vorrichtung zur Stimulation von Meridianpunkten mittels pulsierenden Luftdruck nach E1. Dabei belegt die Einsprechende ecoaction GmbH anhand der Vorrichtung nach E1 die Anordnung der ersten Kammer (3), des Verbindungselements (5) und der zweiten Kammer (4) im Sinne der Merkmale des kennzeichnenden Teils des Anspruchs 1 des Streitpatents als aus dem Stand der Technik bekannt.



Laut Merkmalsvergleich und Vortrag der Einsprechenden ecoaction GmbH offenbart die E1 zudem die Merkmale des Oberbegriffs bis auf die an und für sich bekannte Verwendung einer Batterie und den Verwendungszweck Klitoralstimulation.

Zu den Merkmalen im Einzelnen:

Die Vorrichtung nach E1 zeigt nach den Merkmalen des Anspruchs 1 des Streitpatents gegliedert eine

a)      pneumatische Massagevorrichtung zur Stimulierung von Meridianpunkten (vgl. E1: engl. Zusammenfassung; Fig.), die als Stimulationsvorrichtung für die Klitoris geeignet ist, aufweisend:

b)      eine Druckfelderzeugungseinrichtung, welche einen pulsierenden Luftdruck erzeugt (vgl. E1: engl. Zusammenfassung; Fig.) mit:

b1)     einer ersten Kammer in Form des Luftsacks (2) (vgl. E1: engl. Zusammenfassung; Fig.); und

b2)     einer zweiten Kammer im rechten Teil der Gummidüse (1) mit einer rechts gezeigten Öffnung, die zum Aufsetzen über die Klitoris geeignet ist (vgl. E1: engl. Zusammenfassung; Fig.); und

b3)   einem Verbindungselement, welches die erste Kammer in Form des Luftsacks (2) mit der zweiten Kammer, die Bestandteil der Gummidüse (1) ist, verbindet und somit die erste Kammer mit der zweiten Kammer verbindet (vgl. E1: engl. Zusammenfassung; Fig.); und

b4)   einer Antriebseinheit, umfassend den Elektromagnet (5), den Magnet (4) und den mit dem Luftsack (2) und dem Magnet (4) verbundenen Hebel (3), welche ein stimulierendes Luftdruckfeld in Form von pulsierendem Luftdruck erzeugt (vgl. E1: engl. Zusammenfassung; Fig.). Das stimulierende Luftdruckfeld wird offensichtlich über eine Volumenänderung der ersten Kammer, in Form des Luftsacks (2), derart erreicht, dass über das Verbindungselement in der zweiten Kammer ein stimulierendes Druckfeld erzeugt wird; und

b5)   eine Steuereinrichtung, welche die Antriebseinheit so ansteuert, dass über die Bestromung der Drahtwicklung des Elektromagneten (5) mit Wechselstrom eine Umpolung dessen Magnetfelds bewirkt wird, wird als implizit vorbeschrieben angesehen, da sie Voraussetzung dafür ist, dass die Vorrichtung nach E1 einen pulsierender Luftdruck erzeugen kann (vgl. E1: engl. Zusammenfassung; Fig.); und



b6)   wobei das in der zweiten Kammer erzeugte Druckfeld aus einem Muster von Unter- und Überdrücken besteht, welche auf den Normaldruck aufmoduliert sind [Dieses Merkmal ergibt sich automatisch, wenn man annimmt, dass der Magnet (4) bei periodischer Umpolung des Elektromagneten (5) abwechselnd nach links und rechts ausgelenkt wird, dabei der Luftsack gedehnt und gestaucht wird und so der pulsierende Luftdruck erzeugt wird (vgl. E1: engl. Zusammenfassung; Fig.)]; und

b7)   wobei die erste Kammer über das Verbindungselement ausschließlich mit der zweiten Kammer verbunden ist, somit keine andere Verbindung der ersten Kammer als diejenige zur zweiten Kammer besteht, womit die erste Kammer eine einzige Öffnung aufweist (vgl. E1: Fig.), und

b8)   wobei die zweite Kammer offensichtlich eine Öffnung von dem Verbindungselement in die zweite Kammer aufweist (vgl. E1: engl. Zusammenfassung; Fig.), und

c)   wobei die Stimulationsvorrichtung keine Ventile aufweist (vgl. E1: Fig. 1), und

d)   wobei die Stimulationsvorrichtung klein und einfach zu tragen ist (vgl. E1-Patent Translate-Übersetzung: Abschnitt 4; Fig.; E1-Ü1: Abschnitt 3) und damit eine Art tragbares Handgerät darstellt,

e1)   wobei das Verbindungselement als Teil der Gummidüse (1) (vgl. E1: engl. Zusammenfassung; Fig.) zur Erfüllung seiner Funktion bei Druckänderungen (pulsierender Luftdruck) seine Strömungsdurchgängigkeit beibehalten muss, damit eine gewisse

Starrheit aufweisen muss und somit von einem Fachmann als implizit ausreichend starr angesehen wird,

e2)  und als ein gerader Kanal mit Düsenwirkung ausgestaltet ist (vgl. E1: engl. Zusammenfassung; Fig.), wobei sich die Düsenwirkung des Kanals auf Grund seiner Verengung gegenüber der ersten und zweiten Kammer ergibt,

e21)  dessen Öffnung in die erste Kammer in Form des Luftsacks (2) und dessen Öffnung in die zweite Kammer als Bestandteil der Gummidüse (1) zueinander ausgerichtet sind (vgl. E1: Fig.),

e22)  so dass eine Medienströmung bei Kompression der ersten Kammer durch die Ausrichtung der Öffnung und des Verbindungselements auf die Klitoris gerichtet ist (vgl. E1: Fig.),

e23)  wobei die Öffnung des Verbindungselements der Klitoris durch die zweite Kammer hindurch gegenüberliegt (vgl. E1: Fig.).

In der E1 ist das Merkmal *d1) „mit einer Batterie (76) ist"* nicht beschrieben.

Bzgl. des Merkmals d1) folgt die Patentabteilung der Einsprechenden ecoaction GmbH in ihrer Annahme, dass die Vorrichtung nach E1 in ihrer Ausgestaltung als kleine und leicht zu tragende Vorrichtung (vgl. Patent Translate Übersetzung der E1: Abschnitt 4, „small, easy to carry") den Einsatz einer Batterie nahelegt, da die Netzunabhängigkeit die Mitnahme des Geräts ermöglicht und dessen Handhabbarkeit verbessert. Die Nutzung von Batterien als Energiequelle in tragbaren Handgeräten zur Therapie/Stimulation der Klitoris ist beispielsweise aus der D10 bekannt (vgl. gutachterlich D10: S.15, Z. 21-26; Fig. 10-11)

In Bezug auf den Anwendungszweck sollte laut Patentinhaberin der erfindungswesentliche Gedanke des Streitpatents in der besonderen Anordnung der ersten Kammer (3), des Verbindungselements (5) und der zweiten Kammer (4) liegen. Wenn nun eine analoge Anordnung aus der E1 entnehmbar ist, ist davon auszugehen, dass die dortige Anordnung ebenfalls zur (sexuell erregenden (vgl. Merkmal b4 des Hilfsantrags 3)) Klitoralstimulation geeignet ist, zumal die durch die abwechselnde Kompression / Dekompression des Luftsacks (2), der analog zur ersten Kammer (3) des Streitpatents ist, ebenfalls ein Druckfeld erzeugt wird, das aus einem Muster von Unter- und Überdrücken besteht, welches auf den Normaldruck aufmoduliert ist.



Hinsichtlich der Funktionsweise der Vorrichtung nach E1 argumentiert die Patentinhaberin, dass es sich hier nicht um eine pneumatische Massagevorrichtung handelt sondern um eine Vorrichtung zur Meridianbehandlung durch reines Klopfen in Analogie zu einem Meridianhammer, wobei es sich bei der Gummidüse (1) nicht um eine Düse sondern um den Hammerkopf handeln soll. Dabei wird dieser durch den Hebel (3), der periodisch nach links und rechts ausgelenkt wird und vermittelt durch den Luftsack (2), der eine dämpfende Funktion hat, gegen den Körper des Patienten bewegt (vgl. die Eingabe der Patentinhaberin vom 12. April 2018: S. 19, Abschnitt 1 - S. 23, Abschnitt 4). Die Patentinhaberin begründet diese Interpretation mit Hilfe der angeblich beglaubigten Übersetzung E1-Ü1 (eine Kopie der Beglaubigung liegt der Akte nicht bei), nach der die Gummidüse (1) beweglich ist (movable rubber mouthpiece) und nach der in Folge der Hin- und Herbewegung des Luftsacks (2) das an diesen gekoppelte Gummi-Mundstück (1) die Haut berührt (... and airbag (2) to reciprocate, and then the rubber mouthpiece (1) on said airbag (2) touches the skin.).

Zunächst beschreiben sowohl die E1 als auch deren elektronische Patent Translate Übersetzung und deren zwei Übersetzungen E1-Ü1, E1A, dass es sich bei der Vorrichtung der E1 um eine pneumatische Massagevorrichtung handelt, die pulsierenden Luftdruck erzeugt (vgl. z.B. E1-Ü1: Titel; Z. 16-17). Ausgehend von diesen allgemeinen Angaben zur Funktionsweise der Vorrichtung nach E1 und ausgehend von der Zeichnung und den Angaben zu den Bezugszeichen geht die Patentabteilung davon aus, dass der Fachmann den Offenbarungsgehalt der E1 im Sinne der oben beschriebenen Merkmalsanalyse und nicht im Sinne eines automatisierten Meridianhammers auslegt. Diese zweite Auslegung führt nämlich neben dem oben beschriebenen Widerspruch bzgl. der Funktionsweise der Vorrichtung auch zu einem schwer nachvollziehbaren Bewegungsablauf, wobei die Patentinhaberin vorschlägt, dass sich der Luftsack (2) bei der Bewegung nach rechts zusammen mit der Gummidüse (1) über die rechte, vertikale Linie, die der Fachmann als rechte Gehäusewand erkennt, hinausbewegt (vgl. die Eingabe der Patentinhaberin vom 12. April 2018: S. 21, Fig. 4).

Bzgl. der Formulierung „movable rubber mouthpiece" geht die Patentabteilung davon aus, dass movable hier nicht eine Bewegung der Gummidüse (1) meint sondern sich auf eine elastische Verbindung zwischen Gummidüse (1) und Luftsack (2) bezieht, wie dies direkt aus der englischen Zuammenfassung der E1 hervorgeht, die von „The other end of the air bag (2) is movably connected with a rubber nozzle (1)." spricht. Unter Zuhilfenahme eines online-Lexikons (https://dict.leo.org/chinesisch-deutsch/) ergibt sich, dass die chinesische Schriftzeichenfolge ( h der obigen Textstelle auch elastisch bedeuten kann.



Seite 15 von 20

Die Passage „... and airbag (2) to reciprocate, and then the rubber mouthpiece (1) on said airbag (2) touches the skin" läßt keinen kausalen Zusammenhang erkennen, der die Hin- und Herbewegung des Luftsacks (2) mit dem Berühren der Haut durch das Gummi-Mundstück mittels einer durch den Luftsack vermittelten Bewegung des Gummi-Mundstücks erklärt.

Aus den oben genannten Gründen ist die Patentabteilung dem Vorschlag der Patentinhaberin, bei dem Gegenstand nach der E1 handele es sich um eine Vorrichtung zur reinen Klopfmassage, welche für die Klitoralstimulation ungeeignet wäre, nicht gefolgt.

Hinsichtlich der Funktionsweise des Antriebs der Vorrichtung der E1 argumentiert die Patentinhaberin weiter, dass dieser unabhängig von der Orientierung der Polung des Magneten (4) nicht funktionsfähig sei. Bzgl. einer Orientierung der Polung des Magneten (4) bei der dessen Nordpol bzw. Südpol dem Elektromagnet (5) direkt gegenüber liegt erklärt die Patentinhaberin, dass der Magnet (4) unabhängig von der Polung des Elektromagneten (5) in der in der Fig. der E1 gezeigten Mittellage verharren würde (vgl. die Eingabe der Patentinhaberin vom 12. April 2018: S. 15, letzter Abschnitt - S. 18, dritter Abschnitt).

Diese Behauptung steht zunächst in Widerspruch zu der von der Patentinhaberin vorgetragenen Funktionsweise der Vorrichtung nach E1 als automatisierter Meridianhammer, bei der die periodische Links-/Rechtsbewegung des Magneten (4) angenommen wurde (vgl. oben).

Zudem liegt es auf der Hand, dass sich der Magnet (4) bei Annahme der obigen Orientierung in Abhängigkeit von der Bestromung des Elektromagneten (5), vermittelt durch den gelagerten Hebel (3), nach links oder rechts bewegt, da sich gleichnamige Pole anziehen und ungleichnamige Pole abstoßen und dass bei periodischer Änderung der Bestromungsrichtung des Elektromagneten (5) eine entsprechende Hin- und Herbewegung des Magneten (4) entsteht, die durch die Ankopplung des Magneten (4) über den Hebel (3) an den Luftsack (2) den pulsierenden Luftdruck erzeugt.

Insofern hatte es für den Fachmann, der vor die Aufgabe gestellt war eine Vorrichtung zur Klitoralstimulation herzustellen oder zu verbessern, nahegelegen die kleine und leicht zu tragende Vorrichtung nach E1, die zur Klitoralstimulation geeignet ist, mit einer Batterie auszustatten.



In der mündlichen Verhandlung war es dabei unstrittig, dass die Bereitstellung des Wechselstroms aus dem Gleichstrom der Batterie, zur nötigen periodischen Umpolung des Elektromagneten (5), vom Fachmann mitgelesen wird und keine technische Schwierigkeit darstellt. In der mündlichen Verhandlung wurden von der Einsprechenden ecoaction GmbH beispielhaft Wechselrichter oder zeitgesteuerte Y-Schalter als mögliche, dem Fachmann bekannte Wege zur Umwandlung von Batterie-Gleichstrom in den benötigten Wechselstrom genannt.

Der Gegenstand nach Anspruch 1 des Streitpatents beruht daher gegenüber der E1 in Verbindung mit dem Fachwissen, wie z.B. aus der D10 ersichtlich, nicht auf einer erfinderischen Tätigkeit (vgl. D10: S. 13, Z. 27 ff.).

Ergänzend wird darauf hingewiesen, dass in der mündlichen Verhandlung noch weitere Druckschriften diskutiert worden sind. So wurde auf die D2 verwiesen, die eine Stimulationsvorrichtung offenbart, die einen pulsierenden Luftstrom zur Stimulation der Klitoris erzeugt.



Den Ausführungen der Einsprechenden Fun Factory GmbH zu D17 und D25 ist die Patentabteilung nicht gefolgt, da diese vom Anmeldungsgegenstand weiter abliegen.

Hilfsanträge:

Die Patentinhaberin versuchte in der mündlichen Verhandlung den Gegenstand nach Anspruch 1 des Streitpatents mittels der Hinzunahme der Merkmale von zunächst Hilfsantrag 1 näher zu präzisieren:

f)    wobei die Antriebseinheit (6) ein Elektromotor mit einer Drehachse (61) und einem Exzenter (62) ist und

g1)    wobei die zweite Kammer (4) von der Stimulationsvorrichtung (1) auswechselbar angeordnet ist; und

g2)    wobei die Wand (41) der zweiten Kammer (4) aus einem flexiblen Material hergestellt ist.

Zur Abgrenzung vom Stand der Technik hat die Inhaberin das Merkmal der Antriebseinheit (vgl. Merkmal f) und der zweiten Kammer (vgl. Merkmale g1, g2) näher präzisiert.

Bzgl. des Merkmals f) spricht allerdings bereits die E1 von alternativen Antriebseinheiten (vgl. Patent Translate Übersetzung der E1, Abschnitt 3: „micro-motor … electromagnetic devices, rotary motion"), so dass der Einsatz eines alternativen Antriebs bereits von der E1 nahegelegt wird. Gutachterlich kann auf den Luftmassageapparat nach D7 verwiesen werden, der als Antrieb zur Versetzung einer Membran in Schwingungen einen Motor mit Exzenter vorschlägt (vgl. D7: S. 1, Absatz 3; erste Fig.). Zudem ist die Wahl der Antriebseinheit laut Streitpatent unkritisch (vgl. Urspr. Unt. S. 15, Z. 9-13). Danach sind „grundsätzlich alle Antriebsarten einsetzbar".

Bzgl. des Merkmals g1) spricht die E1 von der Ausrüstung der Vorrichtung mit mehreren therapeutischen Düsen (1) (mouthpieces (1)), die aus der zweiten Kammer und dem Verbindungselement des Streitpatents bestehen (vgl. E1-Ü1: letzter Abschnitt „It (the utility model) can also be equipped with multiple therapeutic mouthpieces."). Durch die Ausrüstung der Vorrichtung der E1 mit mehreren Düsen (1) ist die auswechselbare Anordnung der zweiten Kammer (4) an der Vorrichtung nach E1 implizit vorbeschrieben.

Zudem liegen kleinere konstruktive Abänderungen, wie die Auswechselbarkeit von Auflageeinheiten von Massagegeräten, im Wissen/Können des Fachmanns (vgl. gutachterlich D10: S. 16, Z. 13-17; Fig. 14).



Bzgl. Merkmal g2) zeigt die Figur der E1 auf der rechten Seite die Düse (nozzle) (1), die laut Beschreibung der E1 aus Gummi, also einem flexiblen Material, besteht (vgl. Patent Translate Übersetzung der E1, Abschnitt 5: „rubber nozzle (1)"). Dabei steht laut der Einsprechenden ecoaction GmbH, das flexible Gummimaterial der Düse (1) nicht in Widerspruch zu der nach Anspruch 1 des Streitpatents geforderten Starrheit des Verbindungselements, da die Düse (1) der Vorrichtung nach E1 im Bereich der rechten Kammer dünnwandig (flexibler) und im Bereich des Verbindungselements blockartig (starrer) ausgebildet ist (vgl. E1: Fig.).

Die hinzugefügten Merkmale f), g1) und g2) tragen für sich nichts zu einer erfinderischen Tätigkeit bei. Damit fehlt es dem Gegenstand nach Anspruch 1 in Form des Hilfsantrags 1 auch mit den hinzugefügten Merkmalen weiterhin (siehe Hauptantrag) gegenüber der E1 und dem Wissen/Können des Fachmanns an der nötigen erfinderischen Tätigkeit.

Zu einem ähnlichen Ergebnis kommt man in Bezug auf die Hilfsanträge 2 und 3, die jeweils auf dem vorangehenden Hilfsantrag 1 aufbauen.

Merkmale des Hilfsantrags 2, die in den erteilten Anspruch 1 des Streitpatents aufgenommen wurden, sind:

f)   wobei die Antriebseinheit (6) ein Elektromotor mit einer Drehachse (61) und einem Exzenter (62) ist und

g)   wobei die zweite Kammer (4) zum Aufsetzen über die Klitoris (12) oval und dabei nicht kreisförmig ausgebildet und

g1)   von der Stimulationsvorrichtung (1) auswechselbar angeordnet ist; und

g2)   wobei die Wand (41) der zweiten Kammer (4) aus einem flexiblen Material hergestellt ist

h)   wobei die erste Kammer (3) eine Wand (31) aufweist, welche durch die Antriebseinheit (6) zur Volumenänderung der ersten Kammer (3) ausgelenkt wird, und wobei die Wand (31) aus einem flexiblen und medienundurchlässigen Material besteht, wobei der Kanal des Verbindungselements (5) in einer Halterung (32) für die flexible Wand (31) ausgebildet ist.



Zusätzlich zu Hilfsantrag 1 will sich die Patentinhaberin mit Hilfsantrag 2 durch weitere Präzisierung des Merkmals der zweiten Kammer (Merkmal g) und durch Präzisierung des Merkmals der ersten Kammer und des Verbindungselements (Merkmal h) vom Stand der Technik abgrenzen.

Bzgl. Merkmal g) hatte es für einen Fachmann, dessen Aufgabe darin bestand die Massagevorrichtung der E1, die prinzipiell zur Klitoralstimulation geeignet ist (vgl. das oben zur diesbezüglichen Eignung der Vorrichtung nach E1 Gesagte), in Richtung Klitoralstimulation zu verbessern, auf Grund seines Allgemeinwissens, nahegelegen näher auf die anatomischen Gegebenheiten einzugehen und den der Kammer (4) entsprechenden Teil der Düse (1) der Vorrichtung nach E1 entsprechend der Anatomie der Klitoris oval auszubilden. Die Variation der Form der Düse (1) lag um so mehr nahe, als bereits die E1 davon spricht, dass die Vorrichtung der E1 mit mehreren (unterschiedlichen) Düsen ausgerüstet werden kann. Gutachterlich wird darauf verwiesen, dass es aus dem Stand der Technik zudem bekannt ist den mit der Klitoris in Kontakt kommenden Teil von Unterdruck-Stimulationsvorrichtungen oval auszubilden (vgl. D10: Fig. 4-6, Bezugszeichen (240)).

Bzgl. Merkmal h) zeigt bereits die E1 in ihrer Figur eine erste Kammer in Form des Luftsacks (2), die eine Wand (Kreuzschraffur) aufweist, welche durch die dortige Antriebseinheit zur

Volumenänderung, zwecks Erzeugung eines pulsierenden Luftdrucks, ausgelenkt wird (vgl. Ausführungen zum Hauptantrag). Damit dies entsprechend funktioniert, muss die Wand der ersten Kammer aus einem flexiblen und luftundurchlässigen Material bestehen.

Die E1 offenbart ferner in der Figur die verlangte Ausbildung des Kanals des Verbindungselements (vgl. E1: Fig., Bezugszeichen (1)) mit einer Halterung, in Form einer Einkerbung, in der die flexible Wand aufgenommen ist (vgl. E1: Fig., Bezugszeichen (1)).

Schrift E1 führt demnach in Verbindung mit dem Fachwissen (z.B. belegt mit der D10) in nicht erfinderischer Weise zum Gegenstand nach Hilfsantrag 2.

Merkmale des Hilfsantrags 3, die in den erteilten Anspruch 1 des Streitpatents aufgenommen wurden, sind:



b4)     einer Antriebseinheit (6), welche das Volumen der ersten Kammer (3) derart verändert, dass über das Verbindungselement (5) in der zweiten Kammer (4) ein stimulierendes, sexuell erregendes Druckfeld erzeugt wird; und

f)     wobei die Antriebseinheit (6) ein Elektromotor mit einer Drehachse (61) und einem Exzenter (62) ist und

g)     wobei die zweite Kammer (4) zum Aufsetzen über die Klitoris (12) oval und dabei nicht kreisförmig ausgebildet und

g1).     von der Stimulationsvorrichtung (1) auswechselbar angeordnet ist; und

g2)     wobei die Wand (41) der zweiten Kammer (4) aus einem flexiblen Material hergestellt ist

h)     wobei die erste Kammer (3) eine Wand (31) aufweist, welche durch die Antriebseinheit (6) zur Volumenänderung der ersten Kammer (3) ausgelenkt wird, und wobei die Wand (31) aus einem flexiblen und medienundurchlässigen Material besteht, wobei der Kanal des Verbindungselements (5) in einer Halterung (32) für die flexible Wand (31) ausgebildet ist

i)     wobei ein Medium des Druckfeldes alternativ oder additiv zu einem gasförmigen Medium ein flüssiges Medium sein kann.

Bzgl. Merkmal b4) gilt das im Abschnitt zur erfinderischen Tätigkeit zur Eignung der Vorrichtung nach E1 zur Klitoralstimulation anfangs bereits Gesagte.

Zudem handelt es sich laut der Einsprechenden ecoaction GmbH bei dem Merkmal „sexuell stimulierendes Druckfeld" um ein subjektives Merkmal, welches nicht dazu geeignet ist den Schutzbereich einer Anspruchsfassung festzulegen.

Seite 20 von 20

Das schließlich noch hinzukommende Merkmal i), welches das Medium des Druckfeldes näher bestimmen soll, ist rein optional und gestaltet auch die Vorrichtung in baulicher Hinsicht nicht weiter aus. Der Flüssigkeitsanteil ist im Merkmal i) des Hilfsantrags 3 nicht näher definiert und es ist davon auszugehen, dass auch die Vorrichtung nach E1 zumindest mit einem kleinen Flüssigkeitsanteil des Mediums funktionsfähig bleibt.

Die Hilfsanträge 1-3 sind daher nicht geeignet einen erfinderischen Abstand zum Stand der Technik herzustellen.

Demzufolge war das Patent 10 2013 110 501 zu widerrufen.

Auf die diesem Beschluss beiliegende Rechtsmittelbelehrung wird hingewiesen.

Dr. Medicus                Dr. Littger                Dr. Zink

Vorsitzender               Berichterstatter           Beisitzer

Patentabteilung 44



Dr. Claus Medicus
Dr. Ralf Littger
Dr. Hubertus Zink

## Rechtsmittelbelehrung

Gegen diesen Beschluss kann gemäß § 73 Patentgesetz (PatG) das Rechtsmittel der **Beschwerde** eingelegt werden. Die Beschwerde steht dem am Verfahren vor dem Deutschen Patent- und Markenamt Beteiligten zu. Sie hat aufschiebende Wirkung. Die Beschwerde ist **innerhalb eines Monats nach Zustellung des Beschlusses schriftlich** beim Deutschen Patent- und Markenamt einzulegen. Die Anschriften lauten:

Deutsches Patent- und Markenamt, 80297 München,
Deutsches Patent- und Markenamt, Dienststelle Jena, 07738 Jena,
Deutsches Patent- und Markenamt, Technisches Informationszentrum Berlin, 10958 Berlin.

Die **Beschwerde** kann stattdessen auch in **elektronischer Form** eingereicht werden (§ 125a Abs. 1 PatG i.V.m. § 130a Abs. 1 Satz 1 und 3, Abs. 3 Zivilprozessordnung (ZPO), § 12 der Verordnung über das Deutsche Patent- und Markenamt (DPMAV), §§ 1 ff. der Verordnung über den elektronischen Rechtsverkehr beim Deutschen Patent- und Markenamt (ERVDPMAV)). Die näheren (technischen) Voraussetzungen sind in der ERVDPMAV aufgeführt.

Innerhalb der Beschwerdefrist ist die **Beschwerdegebühr** in Höhe von **500,-- EUR (Nr. 401 100 des Gebührenverzeichnisses zu § 2 Abs. 1 Patentkostengesetz)** auf das Konto der Bundeskasse Halle für das Deutsche Patent- und Markenamt zu entrichten. Die Beschwerdegebühr ist für jeden Beschwerdeführer gesondert zu zahlen. Wird die Beschwerdegebühr **nicht, nicht vollständig oder nicht rechtzeitig gezahlt, so gilt die Beschwerde als nicht eingelegt (§ 6 Abs. 2 Patentkostengesetz)**.

<u>Hinweise:</u>

Bei der Zustellung durch die Post mittels Einschreiben durch Übergabe gilt dieses am dritten Tag nach der Aufgabe zur Post als zugestellt, es sei denn, dass das zuzustellende Dokument nicht oder zu einem späteren Zeitpunkt zugegangen ist (§ 127 Abs. 1 PatG i.V.m. § 4 Abs. 2 Satz 2 Verwaltungszustellungsgesetz (VwZG)). Bei der Zustellung mittels Einschreiben mit Rückschein gilt diese an dem Tag als bewirkt, den der Rückschein angibt (§ 127 Abs. 1 PatG i.V.m. § 4 Abs. 2 Satz 1 VwZG).

Bei der Zustellung durch die Post mit Zustellungsurkunde ist der Tag der Zustellung auf der übergebenen Abschrift der Zustellungsurkunde oder auf der übergebenen Sendung vermerkt.

Bei Zustellung ins Ausland mittels eingeschriebenen Briefs durch Aufgabe zur Post gilt dieser zwei Wochen nach Aufgabe zur Post als zugestellt (§ 127 Abs. 1 Nr. 2 PatG i. V. m. § 184 Abs. 2 Satz 1 ZPO).

### Zahlungshinweise



1. Die Zahlung der Gebühr bestimmt sich nach der Patentkostenzahlungsverordnung (PatKostZV).

   Danach können Gebühren wie folgt entrichtet werden:

   a) durch Barzahlung bei den Geldstellen des Deutschen Patent- und Markenamts in München, Jena und im Technischen Informationszentrum in Berlin,

   b) durch Überweisung auf das Konto der Bundeskasse Halle/DPMA:
   **IBAN: DE84 7000 0000 0070 0010 54, BIC (SWIFT-Code): MARKDEF1700,**

   c) durch (Bar-) Einzahlung mit Zahlschein bei der Postbank oder bei allen Banken und Sparkassen auf das unter b) angegebene Konto oder

   d) durch Erteilung eines gültigen SEPA-Basis-Lastschriftmandats mit Angaben zum Verwendungszweck. Bitte benutzen Sie hierfür die auf unserer Internetseite www.dpma.de bereitgestellten Formulare (A 9530 und A 9532) und beachten Sie die dort zur Verfügung stehenden Hinweise zum SEPA-Verfahren.

   Das SEPA-Mandat muss dem DPMA immer im Original vorliegen. Bei einer Übermittlung per Fax muss das SEPA-Mandat im Original innerhalb eines Monats nachgereicht werden, damit der Zahlungstag gewahrt bleibt.

2. Bei jeder Zahlung sind das vollständige **Aktenzeichen**, die genaue Bezeichnung des **Anmelders (Inhabers)** und die **Gebührennummern** in deutlicher Schrift anzugeben. Die Gebührennummern ergeben sich aus dem Gebührenverzeichnis des Patentkostengesetzes (PatKostG), das auch im Kostenmerkblatt A 9510 des Deutschen Patent- und Markenamts abgedruckt ist.

   Unkorrekte bzw. unvollständige Angaben führen zu Verzögerungen bei der Bearbeitung.

3. Als **Einzahlungstag** gilt gemäß § 2 PatKostZV

   a) bei Barzahlung der Tag der Einzahlung,

   b) bei Überweisung der Tag, an dem der Betrag auf dem Konto der Bundeskasse Halle für das Deutsche Patent- und Markenamt gutgeschrieben wird,

   c) bei (Bar-) Einzahlung auf ein Konto der Bundeskasse Halle für das Deutsche Patent- und Markenamt der Tag der Einzahlung.

   Da die Bundeskasse Halle die Bareinzahlung von der Überweisung nach b) nicht anhand der Buchungsunterlagen zu unterscheiden vermag, sollte der Bareinzahler, wenn er den nach dieser Zahlungsform vorverlagerten Einzahlungstag geltend machen möchte, dem Amt **unverzüglich** den vom Geldinstitut ausgestellten **Einzahlungsbeleg** vorlegen;

   d) bei Erteilung eines SEPA-Basis-Lastschriftmandats mit Angaben zum Verwendungszweck, der die Kosten umfasst, der Tag des Eingangs beim Deutschen Patent- und Markenamt oder beim Bundespatentgericht, bei zukünftig fällig werdenden Kosten der Tag der Fälligkeit, sofern die Einziehung zu Gunsten der zuständigen Bundeskasse für das Deutsche Patent- und Markenamt erfolgt. Wird das SEPA-Basis-Lastschriftmandat durch Telefax übermittelt, ist dessen Original innerhalb einer Frist von einem Monat nach Eingang des Telefax nachzureichen. Andernfalls gilt als Zahlungstag der Tag des Eingangs des Originals.

1530263500692820804[1]

 **Deutsches**
**Patent- und Markenamt**

Abschrift vom **29.06.2018**

Aktenzeichen: **10 2013 110 501.7**

Diese Abschrift wurde als Ausdruck des folgenden elektronischen Dokuments erzeugt:

Dokument:     "Beschluss - Widerruf - Signiert"
              vom: **17.04.2018**

Das elektronische Dokument wurde gemäß der am **29.06.2018** durchgeführten Signaturprüfung qualifiziert signiert von:

Dr. Hubertus Zink                                          29.06.2018

Dr. Ralf Littger                                           29.06.2018

Dr. Claus Medicus                                          29.06.2018

Diese Abschrift wurde maschinell erstellt.

A 9016.1b/4.14

# Exhibit 10

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————————

EIS GMBH

Petitioner

v.

NOVOLUTO GMBH

Patent Owner

———————————————————

Case IPR2019-01444
U.S. Patent No. 9,763,851


REMOTE DEPOSITION OF

MORTEN OLGAARD JENSEN, PH.D., DR.MED

Wednesday, December 30, 2020

10:16 a.m. Eastern Standard Time


Reported by:

GRETA H. DUCKETT, CCR, RPR, CRR, CVR-S, RVR-M-S

JOB NO.: SYS874

EIS EXHIBIT 1015

Page 4

```
 1                    I N D E X

 2              EXAMINATION INDEX

 3

 4   MORTEN OLGAARD JENSEN, PH.D., DR.MED

 5

 6        BY MR. SUTTON                        6

 7
          BY MS. TERRY                       170
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 45

1    BY MR. SUTTON:

2        Q.    Dr. Jensen, did you communicate

3    with anyone while you were on the break?

4        A.    No.

5        Q.    I'll remind you that you are under

6    oath.

7        A.    Yes.

8        Q.    Thank you.  If you could turn back

9    to Exhibit 1001, the '851 patent.

10       A.    Okay.

11       Q.    Please turn to claim 1.  Can you

12   read claim 1, line 35 to 38 here?

13       A.    The pressure field generated in the

14   second chamber consists of a pattern of

15   negative and positive pressures modulated with

16   respect to a reference pressure.

17       Q.    What does "modulate" mean here?

18       A.    That it is changed with respect to

19   a reference pressure.  Modulation meaning that

20   it is taking different values than the

21   reference pressure.

22       Q.    Okay.  So if the term "modulated"

23   was replaced with the term "oscillated," would

24   that change the meaning of this claim?

25       A.    I have not analyzed that, and I

Page 46

1    would need some time to be able to answer that

2    question.

3        Q.    Is the word "modulated" different

4    from the word "oscillated"?

5        A.    When something is oscillating, my

6    understanding is that it is changing value but

7    it's not necessarily being compared to

8    something else.  When you are modulating

9    something, you are looking at a reference and

10   you're looking at different comparisons of

11   signals in relation to each other and in

12   relation to a reference value.

13        So an oscillation is more of a

14   change that does not necessarily have to be

15   creating a pattern of, in this case, negative

16   and positive pressures.  But, again, as I said,

17   I haven't had time to carefully analyze that

18   and just replace words in the claim language.

19       Q.    So what is your understanding of

20   the definition of the word "oscillate"?

21       A.    I just mentioned that before.

22       Q.    Well, can you provide it to me

23   again?

24                 MS. TERRY:  Objection.  Form.

25       A.    Oscillating is something that is

1    changing its -- whether its value or position

2    or magnitude, around some given level.  So you

3    can have an oscillating crystal, for example.

4    You can have that it changes.  And it -- in the

5    definition of oscillating, it's possible that

6    it -- an oscillation is between one value and

7    another.  But not necessarily.

8         I do believe that the difference

9    between the word "oscillate" and "modulate" --

10   when you modulate something, it's always -- or

11   typically being referred to a reference and

12   compared with another value.  So that's the

13   best I can, right now, define "oscillate" in

14   relation to "modulate."

15        Q.    Thank you.  So you agree that there

16   is a difference between "oscillate" and

17   "modulate"; is that correct?

18        A.    There can be.  But, as I just said

19   earlier, in some instances, they can cover the

20   same meaning.

21        Q.    So in some instances, they can

22   cover the same meaning.  So does that mean in

23   some instances in claim 1?  Could you change

24   "modulated" for "oscillated" and have this be

25   the same meaning in those certain instances you

Page 48

1   just mentioned?

2       A.    No.  I don't believe that would

3   work.  Again, as I said, I haven't had time to

4   carefully analyze that particular language with

5   the word "modulate" being replaced with

6   "oscillate."

7        As I mentioned earlier, my general

8   understanding of the word "oscillate" means

9   it's just changing value, not necessarily with

10  respect to something else; whereas, when you

11  modulate, you typically modulate things that

12  you compare to each other.  And so in the

13  language of claim 1, the modulation is between

14  the negative and positive pressures with

15  respect to a reference pressure.

16      Q.    All right.  How much time would you

17  need to perform this analysis?

18      A.    I don't know.

19      Q.    So you wouldn't be able to do it

20  now if I asked you to?

21              MS. TERRY:  Objection.  Form.

22  BY MR. SUTTON:

23      Q.    Do you understand the question,

24  Dr. Jensen?

25      A.    I don't know.  I would need to get

# Exhibit 11

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

EIS GMBH

Petitioner

v.

NOVOLUTO GMBH

Patent Owner

_____

Case IPR2019-01444
U.S. Patent No. 9,763,851


ZOOM DEPOSITION OF DEBRA HERBENICK, Ph.D.,

(Reported Remotely via Video & Web Videoconference)

Bloomington, Indiana, (Deponent's location)

Wednesday, January 13, 2021


Reported by:

Rebecca L. Romano, RPR, CSR, CCR

Job No.: 875

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

EIS EXHIBIT 1016

```
1                    I N D E X

2   DEPONENT                          EXAMINATION

3   DEBRA HERBENICK, Ph.D.                 PAGE

4

5                BY MR. MELWANI               9

6

7

8                E X H I B I T S

9   NUMBER                                 PAGE

10                    DESCRIPTION

11  Exhibit 1013   Declaration of Debby

12                 Herbenick, Australian

13                 Patent No. 2018203659;      173

14

15  Exhibit 1014   Declaration of Debby

16                 Herbenick, Australian

17                 Patent No. 2015386680;      175

18

19

20

21

22

23

24

25  /////
```

Page 62

1    got that day.

2        Q.    Why is the positive pressure larger in

3    magnitude than the negative pressure?

4            MS. TERRY:    Objection.    Asked and

5    answered.

6            THE DEPONENT:    Yeah, I mean, I -- I'm

7    not -- I think not really sure what you're asking

8    other than that -- so if you're asking to look at

9    that graph and why are the top lines taller, if you

10   will, or further away from the zero line than the

11   negative ones, it's because when it was measured,

12   that would have been the data that he got and

13   therefore shared.

14       Q.    (By Mr. Melwani)   Why does a Womanizer

15   device that was tested generate a greater positive

16   pressure than the negative pressure?

17       A.    I mean, it could -- it could generate any

18   type of modulating positive and negative pressures.

19   They don't have to be a certain proportion to one

20   another.

21            So, you know, certainly in my own testing

22   and observation of them, which I test on my skin --

23   I don't have a machine like this on my home -- but

24   I can feel, you know, the positive/negative

25   pressures on my hand in each of these.   And knowing

1    how this is used in the sense that it can be placed

2    over the clitoris and that there might be

3    different -- you know, different ways that it's

4    held onto a body, for example.  It may be slightly

5    different here and there with positives and

6    negatives, and certainly people can turn -- you

7    know, can use the control buttons to change the

8    intensity if they want to, so this can change here

9    and there.

10           But what is -- does not change is that

11   there are modulated positive and negative pressures

12   with regard to the reference pressure, which is,

13   you know, ambient pressure, as described in the

14   '851 patent.

15        Q.   Can you read -- strike that.

16           Can you please read the last sentence of

17   paragraph 49 into the record.

18        A.   "As shown, the measured pressure of the

19   Womanizer Classic oscillates between negative

20   pressures and positive pressures with respect to

21   ambient pressure (reference pressure)."

22        Q.   With regards to the negative pressures

23   and positive pressures that are shown, do they

24   oscillate about any other pressure besides the

25   ambient/reference pressure?

1           MS. TERRY:  Objection.  Form.

2           THE DEPONENT:  Which pressure -- pressure

3   are you speaking to?  I mean, in the case of the

4   '851 patent, this is about modulated positive and

5   negative pressures in reference to the ambient

6   pressure reference pressure.

7       Q.   (By Mr. Melwani)  What does "oscillate"

8   mean?

9       A.   To vary, to go -- yeah, to vary.  To

10  modulate.

11      Q.   So if I replace the word "oscillate" with

12  "modulate" in that sentence, would it change the

13  meaning of the sentence?

14      A.    In this place -- yeah.  In this context

15  with this sentence, it would still -- just

16  referring to oscillates, modulates, varies between

17  negative pressures and positive pressures.

18           Certainly people can use words in

19  different contexts and use different dictionary

20  definitions and all of that, so certainly in other

21  contexts I would want to look at it.  But to me,

22  this one, the meaning does not change if you were

23  to say "modulate" or "vary."

24      Q.   Did measured pressures here vary around a

25  pressure above atmospheric pressure?

Page 65

1          MS. TERRY:  Objection.  Relevance.

2     Objection.  Scope.

3          THE DEPONENT:  So which pressure are you

4     referring to here?

5       Q.   (By Mr. Melwani)  Let's say a pressure

6     just above the zero line.

7          MS. TERRY:  Objection.  Vague.

8          THE DEPONENT:  So there would still be

9     positive pressures and negative pressures around

10    that line as well if you were to choose something

11    slightly higher.

12      Q.   (By Mr. Melwani)  And if I were to choose

13    something slightly lower, would that still be true?

14      A.   As long as you didn't go below the

15    negative pressures, right.  So it depends where you

16    go.  But, you know, in any case, we still have, you

17    know, modulated positive and negative pressures

18    with -- you know, respect to in this case what we

19    have is the reference pressure because of the '851

20    patent is ambient pressure or, as marked on the

21    graph, atmospheric pressure.

22          So I think, you know, if you started

23    moving the line, then what you did is get away from

24    the '851 patent and how reference pressure is -- is

25    very clearly described.

Page 66

1      Q.   Can we focus on the final pressure curve

2  here?

3      A.   Excuse me?

4      Q.   I'd like to focus on the final pressure

5  curve.

6      A.   Okay.

7      Q.   Do you see that the positive peak is

8  lower than the other peaks that came before it?

9      A.   In which one -- if you were to count from

10  the right, which one are you counting from?

11      Q.   The very first one.

12      A.   Okay.  So that one is lower than the

13  second one, the third one, and the fourth one, but

14  it's not clear to me that it's lower than some of

15  the other ones in the pattern of -- of the

16  modulated pressures.  So it seems to line up pretty

17  well.

18           If I were to draw a line -- they don't

19  have numbers, but you can see each pattern, right,

20  has sort of a taller one, a shorter one, a medium

21  one, and then taller, shorter, medium, taller,

22  shorter, medium.  So it is about the same height as

23  some other ones, if we're looking at the same one.

24      Q.   Why do the positive pressures that are

25  generated vary in the Womanizer device that's

Page 67

1    measured here?

2        A.    Well, the device is described in the

3    patent as having different possible patterns that

4    could be there, and they're varying them certainly

5    to provide a contactless stimulation to the

6    clitoris.  So there is some variability, and they

7    can be in a number of different patterns for the

8    purpose of stimulation.

9        Q.    Let's look at the final negative peak,

10   the first one from the right.

11       A.    Okay.

12       Q.    Why is that one a deeper vacuum than any

13   of the other measured pressures?

14       A.    Well, we, you know, don't know, because

15   you and I are not there in the room when the

16   testing is happened.  But because it's the last

17   one, you know, it would be possible, if I were to

18   ask the person doing the testing, I would ask them

19   if that was when, for example, they were getting

20   ready to -- to end it or remove it or take it off

21   or if there was some touching of it to prepare

22   to -- to do it.  Because it is right at the end

23   where there's a -- a change.

24            But, you know, I'm not there in the room.

25   You're not there in the room.  So that's -- that's

Page 68

1    sort of all I have to go on.  But to me, it still

2    doesn't change all the measures before that of

3    the -- you know, not only the positive and negative

4    pressures that we see in the graph, but again, from

5    my perspective of my own testing, which did not

6    involve, you know, these -- this equipment but just

7    using it on my hand, it's just a feeling of the

8    positive and negative pressures, which is

9    sufficient for me to understand how these devices

10   work and what the patent is describing.

11        Q.   Do you agree with Dr. Jensen that this

12   graph shows oscillation with respect to ambient or

13   reference pressure?

14        A.   I do agree with his -- his statement

15   there, the last statement that I think I've already

16   read into the record about that.

17        Q.   And that oscillation is about the -- the

18   zero line, which is labeled atmospheric pressure?

19        A.   So I'm not, you know, seeing it called

20   the zero line, but the line that he has atmospheric

21   pressure labeled at.  For me, it looks like it's --

22   it's labeled as one on the left, but --

23        Q.   I'll read from the text right below.

24             "Thus, the measured pressure is shown as

25   a difference in pressure (a positive or negative

Page 69

1    value) with respect to a reference pressure of

2    ambient pressure, which is represented as a zero

3    line in the graph."

4         A.   Yes, I understand that part.  I thought

5    you had said labeled, so because of the -- the

6    yellow label on the left, it wasn't clear to me

7    which one you were referencing.

8         Q.   Okay.  So just to make sure we get it for

9    the record, you agree with Dr. Jensen that this

10   graph shows pressure oscillations with respect to

11   the ambient pressure or reference pressure, which

12   Dr. Jensen calls the zero line in the graph?

13        A.   That's correct.

14        Q.   Let's go back to your declaration,

15   Exhibit 2038.

16        A.   Okay.

17        Q.   Let's go to paragraph 38.

18        A.   38.  I'm there.

19        Q.   You state in the first sentence that the

20   Womanizer website describes the Classic as

21   providing contactless -- in quotation --

22   stimulation.

23             What does that mean?

24        A.   Yeah.  So in the context of the Womanizer

25   in the '851 patent, what they are describing is