IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EIS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-1227 (VAC) (MPT) |
| | ) | |
| INTIHEALTH GER GMBH, | ) | REDACTED - PUBLIC VERSION |
| WOW TECH USA, LTD., | ) | |
| WOW TECH CANADA, LTD. and | ) | |
| NOVOLUTO GMBH, | ) | |
| | ) | |
| Defendants. | ) | |
| NOVOLUTO GMBH, | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EIS, INC., EIS GMBH, | ) | |
| TRIPLE A IMPORT GMBH, | ) | |
| and TRIPLE A MARKETING GMBH, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

## **JOINT CLAIM CONSTRUCTION BRIEF**

MORRIS, NICHOLS, ARSHT &TUNNELL LLP
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

*Attorneys for Plaintiff*

CHIPMAN BROWN CICERO & COLE, LLP
Paul D. Brown (#3903)
Joseph B. Cicero (#4388)
Gregory E. Stuhlman (#4765)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801
(302) 295-0191
brown@chipmanbrown.com
cicero@chipmanbrown.com
stuhlman@chipmanbrown.com

*Attorneys for Defendants*

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

OF COUNSEL:

Naveen Modi
Allan M. Soobert
Chetan Bansal
James Razick
David Valente
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700

OF COUNSEL:

Tammy J. Terry
Califf Cooper
Lisa E. Margonis
Peter C. Schechter
OSHA BERGMAN WATANABE & BURTON LLP
Two Houston Center
909 Fannin, Suite 3500
Houston, TX 77010
(713) 228-8600

Originally Filed:  June 30, 2022
Redacted Version Filed:  July 7, 2022

TABLE OF CONTENTS

Page

I.    Introduction ................................................................................................. 1
      A.    EIS's Introduction ............................................................................ 1
            1.    History of the Parties' Dispute ............................................ 2
      B.    Novoluto's Introduction .................................................................. 3
      C.    EIS's Reply Introduction .................................................................. 5
      D.    Novoluto's Sur-Reply Introduction ................................................ 5
II.   Agreed-Upon Constructions ......................................................................... 5
III.  Disputed Constructions ................................................................................ 6
      A.    Term 1: "connection element" ........................................................ 6
            1.    EIS's Opening Position ......................................................... 6
            2.    Novoluto's Answering Position ............................................ 12
            3.    EIS's Reply Position ............................................................. 19
            4.    Novoluto's Sur-Reply Position ............................................ 24
      B.    Term 2: "stimulation device" ......................................................... 26
            1.    EIS's Opening Position ......................................................... 26
            2.    Novoluto's Answering Position ............................................ 28
            3.    EIS's Reply Position ............................................................. 32
            4.    Novoluto's Sur-Reply Position ............................................ 35
      C.    Term 3: "opening of the chamber" .................................................. 37
            1.    EIS's Opening Position ......................................................... 37
            2.    Novoluto's Answering Position ............................................ 39
            3.    EIS's Reply Position ............................................................. 43
            4.    Novoluto's Sur-Reply Position ............................................ 46
      D.    Term 4: "flexible wall" / "flexible wall portion" ........................... 47
            1.    EIS's Opening Position ......................................................... 47
            2.    Novoluto's Answering Position ............................................ 49
            3.    EIS's Reply Position ............................................................. 52
            4.    Novoluto's Sur-Reply Position ............................................ 53
      E.    Term 5: "pressure field generator" ................................................. 54
            1.    EIS's Opening Position ......................................................... 54
            2.    Novoluto's Answering Position ............................................ 58

TABLE OF CONTENTS
(continued)

Page

      3.      EIS's Reply Position .................................................................. 64

      4.      Novoluto's Sur-Reply Position ................................................... 66

F.     Term 6: "chamber" ................................................................................ 67

      1.      EIS's Opening Position ............................................................... 67

      2.      Novoluto's Answering Position ................................................... 69

      3.      EIS's Reply Position .................................................................. 72

      4.      Novoluto's Sur-Reply Position ................................................... 73

G.    Term 7: "create the modulated positive and negative pressures based on modulated frequencies" ........................................................................... 74

      1.      EIS's Opening Position ............................................................... 74

      2.      Novoluto's Answering Position ................................................... 76

      3.      EIS's Reply Position .................................................................. 78

      4.      Novoluto's Sur-Reply Position ................................................... 79

H.    Term 8: "sealingly engage a portion of a body of a user including a clitoris" ................................................................................................. 80

      1.      EIS's Opening Position ............................................................... 80

      2.      Novoluto's Answering Position ................................................... 82

      3.      EIS's Reply Position .................................................................. 86

      4.      Novoluto's Sur-Reply Position ................................................... 87

I.      Term 9: "reference pressure" ................................................................. 88

      1.      Novoluto's Answering Position ................................................... 88

      2.      EIS's Reply Position .................................................................. 89

      3.      Novoluto's Sur-Reply Position ................................................... 90

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012)..................................................................70

*Advanced Ground Info. Sys. v. Life360, Inc.*,
830 F.3d 1341 (Fed. Cir. 2016)..................................................................55

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001)..................................................................35

*Apex Inc. v. Raritan Comput., Inc.*,
325 F.3d 1364 (Fed. Cir. 2003)..................................................................67

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014), *overruled on other grounds* by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ................................23

*Astrazeneca AB v. Mut. Pharm. Co.*,
384 F.3d 1333 (Fed. Cir. 2004)..................................................................56

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017)..................................................................47

*Ballard Med. Prod. v. Allegiance Healthcare Corp.*,
268 F.3d 1352 (Fed. Cir. 2001)..................................................................87

*Baran v. Med. Device Technologies, Inc.*,
616 F.3d 1309 (Fed. Cir. 2010)..................................................................22

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006)...................................................................11

*Brown v. 3M*,
265 F.3d 1349 (Fed. Cir. 2001)......................................................41, 46, 49

*Camatic Proprietary Ltd. v. Irwin Seating Co.*,
2017 WL 6610873 (W.D. Mich. Dec. 27, 2017) ................................62, 63

*Caterpillar Tractor Co. v. Berco, S.P.A.*,
714 F.2d 1110 (Fed. Cir. 1983)..................................................................23

*Cohesive Techs., Inc. v. Waters Corp.*,
543 F.3d 1351 (Fed. Cir. 2008)..................................................................42

TABLE OF AUTHORITIES
(continued)

Page(s)

*Embrex, Inc. v. Serv. Eng'g Corp.*,
    216 F.3d 1343 (Fed. Cir. 2000)..........................................................................39, 42

*Fenner Invs., Ltd. v. Cellco P'ship*,
    778 F.3d 1320 (Fed. Cir. 2015)..........................................................................33, 66

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
    750 F.3d 1304 (Fed. Cir. 2014)..........................................................30, 32, 50, 63

*Gillette Co. v. Energizer Holdings, Inc.*,
    405 F.3d 1367 (Fed. Cir. 2005)..........................................................................23

*GPNE Corp. v. Apple Inc.*,
    830 F.3d 1365 (Fed. Cir. 2016)..........................................................................9

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l*,
    222 F.3d 951 (Fed. Cir. 2000)..........................................................................48

*Honeywell Int'l, Inc. v. ITT Indus.*,
    452 F.3d 1312 (Fed. Cir. 2006)..........................................................................57

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
    558 F.3d 1368 (Fed. Cir. 2009)..........................................................................9

*Integrated Discrete Devices L.L.C., v. Diodes Inc.*,
    08-cv-888-GMS (D. Del Apr. 28, 2010)..........................................................33

*InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*,
    690 F.3d 1318 (Fed. Cir. 2012)..........................................................................63

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
    814 F.3d 1343 (Fed. Cir. 2016)...................................................................... *passim*

*Mformation Techs., Inc. v. Rsch. in Motion Ltd.*,
    764 F.3d 1392 (Fed. Cir. 2014)..........................................................................30

*Microsoft Corp. v. Multi-Tech Sys.*,
    357 F.3d 1340 (Fed. Cir. 2004)..........................................................................49

*N. Star Innovations, Inc. v. Hirshfeld*,
    2021 WL 5121180 (Fed. Cir. Nov. 4, 2021)..................................................14

*Nautilus, Inc. v. Biosig Instr., Inc.*,
    134 S. Ct. 2120 (2014)..........................................................................74, 76

TABLE OF AUTHORITIES
(continued)

Page(s)

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)................................................................................................76, 86

*Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*,
    868 F.3d 1013 (Fed. Cir. 2017)......................................................................................89

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008)......................................................................................14

*Omega Eng'g, Inc., v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)................................................................................55, 82

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................................................. *passim*

*Promos Techs., Inc. v. Samsung Elecs. Co.*,
    809 F. App'x 825 (Fed. Cir. 2020) ......................................................................16, 25, 30

*Red Dog Mobile Shelters, LLC v. Kat Indus., Inc.*,
    2015 WL 1892502 (N.D. Tex. Apr. 24, 2015) ...............................................................30

*SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001)................................................................................31, 50

*Seachange Int'l, Inc. v. C-COR Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005)......................................................................................11

*SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*,
    983 F.3d 1367 (Fed. Cir. 2021)......................................................................................22

*Sonix Tech. Co. v. Publications Int'l, Ltd.*,
    844 F.3d 1370 (Fed. Cir. 2017)......................................................................................84

*Springs Window Fashions LP v. Novo Indus., L.P.*,
    323 F.3d 989 (Fed. Cir. 2003)........................................................................................47

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985)................................................................................. *passim*

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015)......................................................................................87

*Thorner v. Sony Comput. Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)..............................................................................31, 36, 62

TABLE OF AUTHORITIES
(continued)

Page(s)

*Toro Co. v. White Consolidated Industries, Inc.*,
    199 F.3d 1295 (Fed. Cir. 1999)...................................................................................9

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997)..................................................................................41

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007)..................................................................................57

*Vita-Mix Corp. v. Basic Holding, Inc.*,
    581 F.3d 1317 (Fed. Cir. 2009)..................................................................................51

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015).......................................................................... *passim*

*Wis. Alumni Research Found. v. Apple Inc.*,
    905 F.3d 1341 (Fed. Cir. 2018)....................................................................................9

*X2Y Attenuators, LLC v. Int'l Trade Comm'n*,
    757 F.3d 1358 (Fed. Cir. 2014)..................................................................................28

*Z4 Techs., Inc. v. Microsoft Corp.*,
    507 F.3d 1340 (Fed. Cir. 2007)..................................................................................24

**Statutes**

35 U.S.C. § 112(f)............................................................................................. *passim*

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

## I.    INTRODUCTION

### A.    EIS's Introduction

The five patents-in-suit describe the invention as a specific type of device for stimulating a body part (e.g., the clitoris), having two chambers connected by a connection element that is narrower in cross-section than the first chamber.  *See, e.g.*, '851 patent, Abstract, Figs. 3-6; '061 patent, Abstract, Figs. 3-6.[1]



'851 patent, Fig. 3 (annotated excerpt).  A changing volume in the first chamber directs a media flow through the connection element into the second chamber, which is placed on the body part to be stimulated.  *See, e.g.*, '851 patent, 8:50-9:67, Figs. 4-6.  For example, compressing the first chamber 3 (*see id.*, Fig. 6) pushes media (e.g., air) from that chamber into the second chamber 4, which is placed on the user's body part (e.g, clitoris), thereby creating a "positive" pressure on the body part.  *Id.*, 9:26-67.  The reverse, i.e., expanding the first chamber 3 (*see id*., Fig. 5), draws air out of the second chamber thereby creating a "negative" pressure on that body part.  *Id.*

Three of the five patents-in-suit claim priority to German Patent Application DE102013110501 ("German '501 Patent").  Of those three patents, U.S. Patent No. 9,763,851 is the first-filed U.S. Patent, with Patent Nos. 11,103,418 and 11,090,220 claiming on their face to

---

[1] The patents-in-suit and exhibits 1-11 were included as exhibits with the Appendix to the Joint Claim Construction Chart, D.I. 208.  *See* D.I. 208-1, Exs. A-F), D.I. 208-2, Exs. 1-11.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

have issued via a chain of continuation applications from the '851 patent. The remaining two

patents (U.S. Patent No. 9,849,061 and U.S. Patent No. 9,937,097) are in a different family, but

other than adding an "appendage," the specifications are substantially identical to the '851 patent

family and its narrow disclosure. Of those two patents, the application that issued as the '061

patent was filed first, and the '097 patent claims on its face to be a continuation of that application.[2]

### 1. History of the Parties' Dispute

This dispute began in Germany, where Novoluto alleged infringement of the German '501

Patent by a prior iteration of EIS's products. Those products were found to infringe largely based

on their alleged connection element having a smaller cross-sectional area than the alleged first and

second chambers. Because the German '501 Patent, like the U.S. patents at issue here, only

described a stimulation device having a connection element with a narrower cross-section than the

first chamber, EIS redesigned its products to have no such narrowing. In fact, EIS redesigned its

products so that they have a *single* chamber, as opposed to "the invention['s]" "first chamber,"

"second chamber," and "connection element." *See, e.g.*, '851 patent, 3:58-63, '061 patent, 3:5-10.

Despite the redesigned EIS products, Novoluto continues to contend (wrongly) that EIS

infringes its patents, prompting EIS to bring this declaratory judgment action. To capture EIS's

products that do not have two chambers or a connection element, Novoluto broadened the

specifications filed with the applications that issued as the '097, '220, and '418 patents, despite

representing these applications as "continuations." Specifically, these later patent applications

were filed with specifications that materially differed from those of the '851 and '061 patents,

adding disclosure and expanding claim coverage to a *single* chamber device, even though no such

---

[2] Because Novoluto maintains that the later-filed patents are continuations (i.e., they have no new subject matter), EIS's citations are primarily to the first-filed '851 and '061 patents. And because the specifications in both families are (or are nearly) verbatim in parts relevant to the disputed terms, EIS has cited to both patent families only when necessary.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

disclosure exists in the two earliest patents—the '851 and the '061 patents. *Compare*, *e.g.*, '851 patent, claim 1 *and* '061 patent, claim 1, *with* '097 patent claim 1, '220 patent claim 1, *and* '418 patent claim 1; *see also* Ex. 12 (redline comparison of '851 and '220 patent specifications); Ex. 13 (redline comparison of '061 and '097 patent specifications).[3]  EIS respectfully requests that the Court construe selective claim terms that are at the heart of the parties' dispute.

### B.    Novoluto's Introduction

The original Womanizer® created a brand-new market. Experts in sexual health and behavior were well-aware of potential adverse side effects of using vibrators for sexual stimulation, yet no one had successfully designed a product that facilitated orgasm without also having these potential side effects, despite numerous attempts. Ex. 15, ¶¶ 58-61. Novoluto's novel sexual stimulation device reduced or eliminated these side effects by using modulated negative and positive pressures for clitoral stimulation. *Id*. The sexual stimulation device industry took notice when the commercial embodiments of Novoluto's patents were first released, describing the use of modulating air pressure for indirect clitoral stimulation as innovative, unique, and other similar terms. Ex. 15, ¶ 68.

Shortly thereafter, EIS[4] released its first infringing product, the "Satisfyer." At first, when Novoluto demanded EIS stop infringing, EIS stopped. But within months, EIS released a second product, again copying Novoluto's patented technology, and after being found liable for patent infringement in Germany, launched a worldwide litigation campaign that now includes this lawsuit. Since then, EIS has released nearly 40 iterations of essentially the same infringing product. The five patents-in-suit describe a stimulation device and method for stimulating female erogenous

---

[3] EIS has alleged inequitable conduct and § 112 claims and defenses based on these acts. *See e.g.*, D.I. 132, ¶¶ 191–222.

[4] "EIS" as used in this Section refers to EIS and/or its predecessor(s) and/or affiliate(s) associated with the Satisfyer Brand at the time.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

zones, including the clitoris. *See, e.g.*, '851 Patent, 1:12-15. The patents claim different stimulation device embodiments that include a drive unit that changes a volume of a chamber or pressure field generator. *See, e.g.*, '851 Patent, Claim 1, '220 Patent, Claim 1. The volume change results in modulated positive and negative pressures with respect to a reference pressure. *See id.* Those modulated pressures are used to stimulate a body part, including a clitoris. '851 Patent, 9:59-62. The '097 and '061 Patents also include an appendage for vaginal insertion.

The patents describe various alternative designs including, for example, one or two chambers, a connection element, integrally formed components, or components formed as one piece. The patents also describe a control device for controlling the drive unit. The '851 Patent is the parent of the '220 and '418 Patents and claims priority to German Patent DE 10 2013 110 501 ("German '501 Patent"), filed on September 23, 2013. The '061 Patent is the parent of the '097 Patent[5] and claims priority to German Patent DE 10 2015 103 694, filed on March 13, 2015.

EIS's entire claim construction dispute is intended not to clarify the meanings of legitimately ambiguous terms, but to subvert the claim construction process into a trojan horse for an arsenal of absurd non-infringement positions. The reason is simple: Satisfyer was born and has thrived by having copied Novoluto's technology disclosed in the patents-in-suit; infringement findings would end that run. In fact, in the 2.5 years since EIS filed this lawsuit, EIS has produced not a single document showing its own research and development of its "air pulse technology," yet EIS has released more than thirty additional accused products.

EIS calls eight claim terms into "dispute," not due to legitimate ambiguity, but to advance non-infringement positions through claim construction. Meanwhile, EIS says "reference pressure"

---

[5] Novoluto's citations are primarily to the first-filed '851 and '061 Patents of the two patent families because the later-filed patents introduce no new matter. Where the language between the patent families is the same or substantially the same, one representative parent patent is cited.

needs no construction, even though the PTAB construed that term in related IPRs. EIS's proposed constructions misleadingly confuse plain terms; contradict, mischaracterize, or ignore the intrinsic record; improperly import limitations into claims; or violate other basic claim construction canons.

### C.      EIS's Reply Introduction

The disputed terms stem from Novoluto's demonstrated intent to ignore the intrinsic record, including its own admissions, definitions, and disclaimers on which the public is entitled to rely, in an effort to broaden its claims and ensnare EIS's non-infringing Satisfyer products. The Satisfyer products were redesigned around Novoluto's patents many years ago, following litigation in Germany. Indeed, a German court enjoined Novoluto from representing that the redesigned Satisfyer products at issue here infringe the parent patent to three of the Patents-in-Suit, *see* D.I. 111-1 at 204, and they have never been found to infringe. Thus, EIS's constructions are not litigation-driven non-infringement positions because they need not be. Instead they are necessary to prevent Novoluto from reading its claims far broader than the intrinsic record permits.

### D.      Novoluto's Sur-Reply Introduction

Instead of the patents' claim language, specifications, and prosecution histories, EIS points to *anything* else to support its proposed constructions, including baseless accusations of court order violations, unsupported expert testimony, constructions pulled out of thin air, un-evaluated allegedly "redesigned" products, and foreign cases dealing with different patents. Distractions are not evidence. The evidence—the intrinsic record—supports Novoluto's constructions.

## II.      AGREED-UPON CONSTRUCTIONS

The Parties have not agreed upon any constructions.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## III.    DISPUTED CONSTRUCTIONS

### A.    Term 1: "connection element"

#### 1.    EIS's Opening Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "connection element" ('851 patent, Claim 1; '061 patent, Claims 1, 2; all claims construed to include the term "connection element") | "media flow path with a smaller cross-sectional area than the first chamber" | No construction required. Plain and ordinary meaning: "structure that connects two structures" |

The '851 and '061 patents' claim a "connection element" that connects a "first chamber" and a "second chamber." '851 patent, 14:22-26; '061 patent, 16:28-30. EIS and Novoluto disagree whether the connection element must have a smaller cross-sectional area than the first chamber. EIS's proposal is consistent with the only connection element described in the patents-in-suit, whereas Novoluto's purported plain and ordinary meaning is not informed by the specification as *Phillips* requires. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (*en banc*) ("the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent"). However, under Novoluto's erroneous, litigation-driven construction, a "connection element" is indistinguishable from the "first chamber" or "second chamber."

> #### a)    The Intrinsic Record Confirms the Connection Element Must Have a Smaller Cross-section Than the First Chamber

In the asserted patents, the first chamber (green below) is connected by a connection element (purple) to a second chamber (orange), where the connection element is *consistently* shown and described in every embodiment as having a smaller cross-sectional area compared to the first chamber. *See, e.g.,* '851 patent, Figures 3-11. Indeed, each and every embodiment of the connection element is smaller in cross-sectional area to the first chamber. *See, e.g., id.* This choice is not arbitrary; instead, as explained in further detail below, this configuration of a connection element is described in the specification as necessary to provide a "perceptible massage effect" to

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

the user, which is one of the core tenets and purported inventive aspect of these patents. *See, e.g.,* '851 patent, 4:26-40 (describing the advantages of a massage effect), 6:40-47 (same), 9:62-67 (explaining the connection element is "small enough . . . to sufficiently accelerate the medium for a perceptible massage effect"), 4:66-5:1 (generated pressures are "*decisively influenced* by the configuration of the . . . connection element") (emphasis added).



'851 patent, Figs. 3-6 (annotated).

The claimed "connection element" provides a "media flow" path between the first and second chambers. *See, e.g.,* '851 patent, 14:43-47 (claim 1). But it is more than that and requires more than merely a "structure that connects two structures," as Novoluto incorrectly proposes. The "connection element" is, as the claims state, responsible for creating a "stimulating pressure field." *See, e.g.*, '851 patent, 14:27-30 (a volume change in the first chamber results in "a *stimulating pressure field* [being] generated in the second chamber *via the connection element*.") (emphasis added); *see also* '061 patent, 16:31-34. The "connection element" also creates a "nozzle effect" when media (e.g., air) flows through it from the first chamber towards the clitoris. '851 patent, 14:22-26, 14:43-47. The claims and specifications of the patents-in-suit, and Novoluto's

7

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

statements, all confirm that the connection element must be smaller in cross-section than the first chamber to create the stimulating pressure field and nozzle effect in the context of these patents.

> (1)    The Claimed "Stimulating Pressure Field" Involves a Massage Effect, Which Necessitates a Narrow Connection Element

The "stimulating pressure field" in the context of these patents involves providing negative and positive pressures to the user's body part (e.g., the clitoral area), where the positive pressures have a "massage effect." *See, e.g.,* Ex. 15 (Declaration of Novoluto's Declarant, Dr. Herbenick in the '851 patent IPR) ¶ 34 ("the idea is to enhance blood flow through suction and to provide indirect massage through positive pressures"), ¶ 47 ("When in operation, a pressure field is generated in the chamber of the pressure field generator, consisting of a pattern of suction pressures (which are negative pressures) and massage pressures (which are positive pressures) . . . ."); '851 patent, 4:26-40.  The patents repeatedly tout the "massage effect" of the generated "pressure field" as a core tenet of the invention.  *See, e.g.,* '851 patent, 4:26-40 ("[t]he pressure field according to *the invention*" creates a "massage effect [which] is generated by the kinetic energy of the medium flowing out of the first chamber through the connection element against the surface of the area of skin to be stimulated") (emphasis added), 6:42-47.  But this "pressure field . . . is *decisively influenced* by the configuration of the [] connection element."  '851 patent, 4:66-5:1 (emphasis added); *see also* '851 patent, 5:52-56.  In fact, to obtain a "perceptible" massage effect, the connection element is configured to be narrower than the first chamber so that it is able to accelerate the media flowing out of the first chamber towards the clitoris, much like an ordinary nozzle. '851 patent, 9:59-67 (the connection element "is dimensioned in such a way that it is small enough in ratio to the volume displaced in the first chamber 3 to sufficiently accelerate the medium for a perceptible massage effect").  This configuration of the connection element is so central to the invention that *each and every* disclosure of a connection element in these patents shows that it

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

is narrower in cross-section than the first chamber. *See, e.g.,* '851 patent, Figs. 3-11, and exemplary figures below.



'851 patent, Figs. 3, 4, 10a (annotated to show how connection element (5, purple) is smaller than first chamber (3, green)).

Where the specification consistently, repeatedly, and only describes a connection element with a cross-section that is smaller than the first chamber, and explains that this configuration is responsible for the massage effect of the "pressure field *according to the invention*" ('851 patent, 4:26-33 (emphasis added)), the only reasonable construction of the "connection element" is that proposed by EIS. *See, e.g., ICU Med., Inc. v. Alaris Med. Sys., Inc.,* 558 F.3d 1368, 1375 (Fed. Cir. 2009) (construing "spike" to require a pointed tip capable of piercing, based on repeated and uniform statements in the specification and absence of anything suggesting that piercing was optional); *Toro Co. v. White Consolidated Industries, Inc.*, 199 F.3d 1295, 1301-02 (Fed. Cir. 1999) (construing a claim "including" a ring to require a "permanently attached" ring where the specification and drawings showed only the ring permanently attached, did not illustrate or describe any other structure, and described the advantages of the attached configuration as important to the invention); *Wis. Alumni Research Found. v. Apple Inc.*, 905 F.3d 1341, 1351-52 (Fed. Cir. 2018) (construing "prediction" to exclude "static predictions" where static predictions were not described in the specification). The patent specifications' declaration that the pressure field of the "invention" involves a massage effect, which is described as being created by the relative narrowness of the connection element, further buttresses EIS's construction. *See GPNE*

9

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

*Corp. v. Apple Inc.*, 830 F.3d 1365, 1368 (Fed. Cir. 2016) (relying on specification statement that "'the invention provides a two-way paging system'" to construe "nodes" as "pagers").

> (2)    The Claimed "Nozzle Effect" Further Supports EIS' Construction

The recitation in claim 1 of the '851 patent that the "straight channel" of the "connection element" has a "nozzle effect" further supports EIS' construction.  As Novoluto recognizes, "a nozzle is . . . characterized by a small opening or constriction that produces a nozzle effect (i.e., pressure increase through volume reduction)."  Ex. 16 (Novoluto's May 28, 2014 submission to the GPTO during prosecution of the '501 German Patent) at 7.  And the '851 patent describes that this pressure increase is due to the relative narrowness of the connection element with respect to the first chamber.  '851 patent, 9:64-67; *see also* Ex. 17 (Novoluto's September 18, 2017 Response in Opposition Proceeding against German '501 Patent) at 8 (explaining that the overall cavity of the device must have a "constriction" to create the "nozzle effect" and that this constriction is provided by the connection element).  In fact, the German Patent Office found that the claimed "nozzle effect" results from the narrowness of the connection element relative to the first chamber.  *See* Ex. 18 at 10 ("The nozzle effect of the straight channel . . . results from its transverse section that is reduced in size in relation to the first chamber . . . so that the nozzle effect of the straight channel results automatically when the first chamber (3) is compressed, as shown in Fig. 6.").  The claimed "connection element" must therefore have a cross-sectional area smaller than the first chamber in order to generate the claimed "nozzle effect."[6]

Whereas EIS' proposed construction "most naturally aligns with the patent's description of the invention," *Phillips*, 415 F.3d at 1316, Novoluto's purported plain and ordinary meaning

---

[6]  The '061 patent claims do not have the "nozzle effect" language.  But the presence of the "nozzle effect" in the '851 patent claims is merely an additional reason supporting EIS' construction.

**HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY**

construction does not.  For example, under Novoluto's construction, the "second chamber" would also qualify as a "connection element" because it also is a structure connecting two other structures (the connection element and the body part (e.g., the clitoris glans)).  *See* '851, Fig 4 (second chamber 4 connects connection element 5 and clitoris glans 12).  Construing "connection element" as Novoluto proposes leaves it indistinguishable from the claimed "second chamber."  This is intentional— EIS's products, in contrast, do not have such a narrowing connection element.  As can be seen from Novoluto's infringement contentions, the alleged connection element in the EIS products is *not* smaller in cross-sectional area than the alleged first chamber.



Ex. 14 (Novoluto's '851 patent infringement contentions for the Satisfyer Pro 2) at 15-16.  This highlights the litigation-inspired nature of Novoluto's proposed construction, which is entirely divorced from the intrinsic record and should be rejected. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim."); *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1368-69 (Fed. Cir. 2005) (different claim terms presumptively have different meanings).

    For the above reasons, EIS' construction should be adopted.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 2. Novoluto's Answering Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| **"connection element"** ('851 patent, Claim 1; '061 Patent, Claims 1, 2) | "media flow path with a smaller cross-sectional area than the first chamber" | No construction required. Plain and ordinary meaning: "structure that connects two structures" |

a) *Intrinsic Record Supports "structure that connects two structures"*

Only claims specifically reciting a disputed term should be construed to include that term. To construe a claim to include terms from another claim or patent would violate well-settled claim construction law. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) ("It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement."). "Connection element" appears only in the claims of the '851 and '061 Patents. Therefore, only these claims are relevant for construction and are "the relevant claims." EIS alleges "connection element" is relevant to "all claims construed to include the term 'connection element'" (*supra* p. 6), to import additional limitations into its proposed construction of "pressure field generator" in claims which recite neither "connection element" nor EIS's narrow construction of "connection element." *See* Section III.E.2. The Court should reject EIS's invitation. The relevant claims recite a stimulation device that includes a first chamber, a second chamber, and a "connection element" that connects a first chamber and a second chamber. "Connection element" has a plain and ordinary meaning to a POSITA, as supported by the patents, of a "structure that connects two structures." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (*en banc*). The '851 and '061 Patents' specifications support this construction. *See*, *e.g.*, '851 Patent, 8:16-20 ("a connection element 5, which connects the first chamber 3 with the second chamber 4"), 9:11-14 ("[t]wo mutually aligned openings in wall 41 of the second chamber and

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

of holder 32 jointly form connection element 5, which connects the first chamber 3 and the second chamber 5"); 3:58-63; *see also* '061 Patent, 8:55-59; 10:32-35; 3:5-10.

The specifications of the patents-in-suit recognize that the pressure field may be influenced by the orientation and configuration of the connection element, including the connection element's opening toward the body. The connection element may be "adjustable" and have different configurations to provide different pressure fields. '851 Patent, 4:64-5:12. The connection element may have, for example, a single passageway with a nozzle effect between the first and second chamber ('851 Patent, 5:6:9), a plurality of passageways between chambers ('851 Patent, 5:9-12), or different inner configurations, such as helix-shaped grooves ('851 Patent, 10:1-5). The connection element may be integrally formed or in one piece with the wall of the second chamber ('851 Patent, 10:25-27) and/or the first chamber ('851 Patent, 5:44-48), or formed with openings at different proximities to the area of skin to be stimulated ('851 Patent, 12:18-21). FIGS. 3-11 of the '851 and '061 Patents show examples of connection elements.

While other expressly recited claim limitations specify additional features of a connection element, nothing in the patents' claims or specifications changes the meaning of "connection element." Claim 1 of the '851 Patent recites:

> a connection element having a first opening and a separate second opening thereby forming a straight channel connecting the single opening of the first chamber with the first opening of the second chamber…a stimulating pressure field is generated in the second chamber via the connection element…the first chamber is connected with the second chamber solely by the connection element…the connection element is rigid and the first and second openings of the connection element are aligned to one another so that a media flow during a compression of the first chamber is directed to the clitoris through the straight channel with a nozzle effect.

The intrinsic record is clear: "connection element" is "a structure that connects two structures."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*b)      EIS's Construction Improperly Imports Limitations*

EIS improperly narrows the meaning of the "connection element" by unduly limiting the claims to one embodiment and importing other limitations from the claims and the specification, in one of many attempts to fold non-infringement positions into the claim construction process.

Absent probative evidence to the contrary, a construction that excludes an embodiment is incorrect. *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008); *N. Star Innovations, Inc. v. Hirshfeld*, 2021 WL 5121180, at *7 (Fed. Cir. Nov. 4, 2021) ("Even where a patent only describes one embodiment, that is not enough to justify limiting broader claim language to unrecited details of that embodiment."). According to the claims as informed by the specification, the connection element is a structure that connects two structures. Neither the claims nor the specification requires the connection element to have a particular cross-sectional area, let alone one smaller than the first chamber. While it is true the connection element provides a media flow path between chambers, that does not mean the connection element *is* a media flow path, or that the media flow path must have a smaller cross-sectional area than the first chamber. EIS misleadingly asserts that the patents only disclose connection elements with smaller cross-sectional areas than corresponding first chambers.



This is not true. As discussed, the specification describes various embodiments with different sizes and configurations of connection elements (*see supra* § III.A.2.a), including an embodiment with a connection element 5 having a plurality of channels 52 and openings 51, where the connection element's cross-sectional area *is not smaller* than the first chamber 31. '851 Patent, 11:1-14; FIG. 9. This embodiment allows the pressure field to be distributed to a plurality of areas to avoid overstimulating a single smaller area. *Id.* EIS has

14

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

shown *no evidence* that limits the term "connection element" to *require* a cross-sectional area smaller than the first chamber.

Nor is it true that the indirect massage effect envisioned by the '851 and '061 Patent specifications requires the connection element to be smaller, as EIS has asserted. The indirect massage effect envisioned by these patents is caused by media flow onto the body, which is the result of the design and interaction of several components of the stimulation device, not just the connection element. *See, e.g.*, '851 Patent, 10:1-10 ("type of flow can not only be advantageously influenced by the size and orientation of opening 51, but also by the inner configuration of the connection element"), 4:66-5:3 ("pressure field is decisively influenced by the configuration of the…connection and…opening from the connection element into the second chamber, and is thus adjustable"), 9:62-64 ("indirect (pressure) massage … ensues due to the medium flowing onto body part 11"), 11:1-3 ("plurality of channels 52 and openings 51, leads to a distribution of the pressure field"), 12:18-20 ("proximity of opening 51 of connection element 5 to the area of skin…can also be used to determine the intensity of the massage effect"), 12:21-25 ("[a] plurality of openings 51… allows the massage effect to be distributed to a plurality of areas…[so] the clitoris can be less directly stimulated"). Indeed, the patents explain that "[t]he only decisive criterion here is that the volume of the first chamber 3 can be increased and decreased by drive unit 6." '851 Patent, 10:40-42. The first chamber's change in volume provides indirect massage due to the medium flowing onto the body part. '851 Patent, 9:62-64; *see also* Ex. 15, ¶ 34 (describing claimed device as "providing both kinds of pressures… to enhance blood flow through suction and to provide indirect massage through positive pressures" without limiting connection element to a specific configuration). The patents would have expressed a need for the connection element to have a smaller cross-section if it were necessary or intended by the inventor.

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

To justify a construction of "connection element" that forces into its definition "a smaller cross-sectional area," EIS points to two *additional express claim limitations*: (1) "a stimulating pressure field [being] generated in the second chamber via the connection element" and (2) "to create the stimulating pressure field and nozzle effect." *Supra* p. 8. But limitation (1) is separately recited in the claims of the '851 and '061 Patents, and limitation (2) is separately recited only in the claims of the '851 Patent:

> **a connection element** having a first opening and a separate second opening thereby **forming a straight channel** connecting the single opening of the first chamber with the first opening of the second chamber;

> a drive unit that changes a volume of the first chamber in such a manner that a **stimulating pressure field is generated in the second chamber via the connection element**; and…

> **the connection element** is rigid and the first and second openings of the connection element are aligned to one another **so that a media flow** during a compression of the first chamber is directed to the clitoris **through the straight channel with a nozzle effect**; and

'851 Patent, 14:22-30, 43-47 (Claim 1). These separate claim limitations must stand on their own and cannot be duplicated and imported into the definition of another claim term. EIS's construction would improperly render the language in these separate limitations redundant. *See Promos Techs., Inc. v. Samsung Elecs. Co.*, 809 F. App'x 825, 834 (Fed. Cir. 2020) ("it is generally improper to construe a patent claim so that express claim limitations or elements are rendered superfluous").

Moreover, limitations (1) and (2) are *not* requirements of the claimed connection element. Regarding limitation (1), the relevant claims of the '851 and '061 Patents require a drive unit that varies the volume of the first chamber to generate a stimulating pressure field in the second chamber *through* the connection element, not that the connection element *creates* the pressure field as EIS claims. In the specification, "via the connection element" simply means "through the

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

connection element." '851 Patent, 5:19-21 ("[t]hus, the first chamber is preferably connected exclusively with the second chamber **via or through** the connection element." (emphasis added)). The term "via" is similarly used throughout the patents to indicate "through," which is consistent with the plain meaning of "via." *See*, *e.g.*, '851 Patent, 5:22-25 ("no direct first chamber connection to the environment of the device via a pressure valve or via an air discharge channel"). Even if "via the connection element" is construed to mean the connection element is "responsible for creating a 'stimulating pressure field,'" as EIS proposes, (1) the connection element need not have a cross-sectional area smaller than the first chamber to create a stimulating pressure field, for the reasons discussed above, and (2) such construction must be limited to *only* the '851 and '061 Patents, as only they have claims that recite "via the connection element."

Regarding limitation (2), EIS argues the "'connection element' must…have a cross-sectional area smaller than the first chamber *in order to generate the claimed 'nozzle effect*.'" *Supra* p. 10 (emphasis added). Nothing in the intrinsic record supports this statement. And, even if the statement were true, EIS's argument construes "nozzle effect," *not* "connection element." Indeed, EIS cites to instances where Novoluto discussed the meaning of "nozzle" and "nozzle effect" in explaining the claims of a *German* Patent with claims that *require* a "*nozzle effect*." *Supra* pp. 10-11; *see also* Ex. 16 at 7 ("a nozzle…has a small opening or constriction that produces a nozzle effect"), Ex. 17 at 8 ("[t]he need for a 'constriction' of the cavity arises *only from* the channel's property *according to the claim of having a 'nozzle effect*'" (emphasis added)). These discussions are irrelevant to the meaning of "connection element" in the '851 and '061 Patents.

In fact, the '851 Patent describes the nozzle effect as an *optional* feature. '851 Patent, 4:64-5:12 ("*For example*, the connection element … *may have* a single passageway *with nozzle effect* on the clitoris glans…Alternatively, the…connection element *may* consist of a  plurality…of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

passageways…if a larger area of skin is to be stimulated." (emphasis added)). "Connection element" does not itself require a nozzle effect and therefore cannot be construed as EIS proposes.

EIS's logic is further flawed because only the '851 Patent claims require "a nozzle effect." Therefore, even if the presence of the term "nozzle effect" suggests a connection element as claimed should have a smaller cross-section than the first chamber, which EIS has not established, "nozzle effect" is nowhere in the claims of the '061 Patent. The '061 Patent claims should not be construed to include a feature that is *only recited in the claims of another patent*. The term "nozzle effect" in the '851 Patent does <u>not</u> support EIS's proposed construction of "connection element."

Finally, EIS argues the plain and ordinary meaning of "connection element" as proposed by Novoluto does not "most naturally align[] with the patent's description of the invention" under *Phillips*. *Supra* p. 10. Instead of a coherent explanation tied to the patent's description for support, EIS points to its own accused device and absurdly swaps words around to allege that Novoluto's proposed construction would "leave [connection element] indistinguishable from the claimed 'second chamber.'" *Id.* EIS again uses confusion as a smoke screen. The plain and ordinary meaning of "connection element" does not transform the meaning of a completely separate term, "chamber." A connection element is a structure connecting two structures. A chamber is a "compartment." Behind the hand-waving, EIS is just making a non-infringement argument (that its products' connection element is allegedly not smaller in cross-sectional area than the first chamber) under the guise of claim construction. *Id.* This approach improperly infects the claim construction process with infringement determinations, which are properly left to the jury.

EIS's strategy—creating confusion to transform claim terms plainly understood by POSITAs into trojan horses for noninfringement positions—defies one of claim construction's primary purposes of resolving legal ambiguity. EIS's motivations are clear: to avoid infringement

18

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

liability, EIS wants to (1) improperly limit "connection element" to require other limitations recited in the claims of certain patents; (2) then require different patents that do not mention a "connection element" (the '220, '418, '097, and '061 Patents) to nevertheless require one (*see supra* p. 6 ("all claims *construed to include* the term 'connection element'") emphasis added); and thereby (3) unjustifiably narrow all patents' plain claim language. The Court should reject EIS's improper litigation-motivated "interpretations," and instead adopt the plain and ordinary meaning of "connection element" as understood by a POSITA: "a structure that connects two structures."

### 3. EIS's Reply Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "connection element" ('851 patent, Claim 1; '061 patent, Claims 1, 2; all claims construed to include the term "connection element") | "media flow path with a smaller cross-sectional area than the first chamber" | No construction required. Plain and ordinary meaning: "structure that connects two structures" |

Novoluto's construction is overly broad and simplistic, ignoring all that the intrinsic record says about connection elements, whereas EIS's construction is consistent with every embodiment in the specification and the functions attributed to the connection element. EIS's construction stems from the features recited in the claims and the related description in the specification. For example, claim 1 of the '851 patent recites that the "connection element" forms a "straight channel." '851 patent at 14:22-26. Later, claim 1 recites that this "straight channel" forms a "media flow" path. *Id.* at 14:43-47. This establishes that a "connection element" is a "media flow" path. But claim 1 doesn't stop there. It further recites that "a stimulating pressure field is generated in the second chamber via the connection element" (*id*. at 14:27-30) and that the connection element is configured "so that" the media is "directed to the clitoris through the straight channel with a nozzle effect" (*id*. at 14:43-47).[7] These express limitations, particularly the last

---

[7] This last feature relating to the "nozzle effect" is not recited in the claims of the '061 patent.

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

two limitations, should dispel any doubt that Novoluto's construction—a "connection element" is merely a "structure that connects two structures"—is overly simplistic and inconsistent with the claims.  A structure that connects two structures cannot, without more, result in a "stimulating pressure field" or produce media flow with a "nozzle effect."  Under Novoluto's interpretation, even the "second chamber" described in the patent is a "connection element."  *Supra* p. 11.

### a) EIS's Construction Is Supported by the Specification

Consistent with ***every*** embodiment in the specification, the claimed connection element is a "media flow path with a smaller cross-sectional area than the first chamber."  *Supra* pp. 6-10. As explained above, the claim states that a "stimulating pressure field" is generated "via the connection element."  And Novoluto does ***not*** dispute that the claimed "stimulating pressure field" is one that includes a "massage effect."  *Supra* pp. 12-17.  But the specification states that a "perceptible" massage effect requires an acceleration of media flow towards the body part and this acceleration is achieved by ensuring that the connection element has a narrower cross-section than the first chamber.  *Supra* p. 7 (citing '851 patent at 9:62-67).  Unsurprisingly, throughout the specification, the media flow path through the connection element is described as having a narrower cross-section than the first chamber.  '851 patent at FIGS. 3-11; *supra* pp. 8-9.

*First*, Novoluto relies heavily on figure 9 of the '851 patent to assert EIS's construction of connection element is inconsistent with the specification.  *Supra* p. 14.  Figure 9, however, is entirely consistent with EIS's construction because each connection element of its "**plurality** of connection elements 5," '851 patent, 10:52-56, (illustrated below) includes a media flow path with a cross-section smaller than the first chamber.  While Novoluto may contend that the purple highlighted portion is simply a "channel" as opposed to a "connection element," such an argument would be incorrect because the purple highlighted portion also satisfies the definition of "connection element" set forth in the claim.  Specifically, the purple highlighted portion forms a

20

**HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**

"straight channel" having a first and a second opening, which is how the claim describes a

"connection element." '851 patent at 14:22-26. This is further confirmed by the specification,

which states that figure 9 has a "**plurality** of connection elements 5," *id.* at 10:52-56 (emphasis

added), which only makes sense if the purple highlighted portion is also a connection element.



'851 patent, Fig. 9 (annotated).

Indeed, not only does the "straight channel" connection element (highlighted in purple)

include a media flow path with a cross-section smaller than the first chamber, but each of the two

non-straight channel connection elements of the "**plurality** of connection elements 5" also include

media flow paths with a cross-section smaller than the first chamber. Nowhere does Novoluto

explain **how** the figure 9 embodiment allegedly lacks a media flow path with a smaller cross-

sectional area than the first chamber. *Supra* p. 14.

*Second*, even if one were to ignore the "**plurality** of connection elements 5" description

and assume that figure 9 has a single connection element 5 as Novoluto contends, it is still

consistent with EIS's construction because the interior of the connection element (i.e., the total

area of the three channels where the media flows) has a smaller cross-sectional area than the first

chamber. It is the interior cross-sectional area that EIS's construction concerns, because that

defines the media flow path, not the external dimensions of the components.

21

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*Third*, other than its argument about figure 9, which fails for the reasons above, Novoluto was unable to identify a single disclosure of a connection element that was inconsistent with EIS's claim construction. Moreover, figure 9 cannot negate a construction that is otherwise compelled by the claim language and the majority of the specification. *Baran v. Med. Device Technologies, Inc.,* 616 F.3d 1309, 1316 (Fed. Cir. 2010) ("It is not necessary that each claim read on every embodiment."). Indeed, figure 9 is not a "preferred embodiment" and "this court must not allow the disclosed embodiment to 'outweigh the language of the claim, especially when the court's construction is supported by the intrinsic evidence.'" *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367, 1379 (Fed. Cir. 2021) (citations omitted).

b)      *Novoluto's Other Arguments Are Meritless*

Novoluto pulls an out-of-context quote regarding "[t]he only decisive criterion," but that is irrelevant to the dispute as it has nothing to do with the connection element's geometry, and instead concerns the operation of the drive unit. *Supra* p. 15 (quoting '851 patent, 9:62-64). Novoluto's argument that "the patents would have expressed a need for the connection element to have a smaller cross-section if it were necessary or intended by the inventor" is misplaced. *Supra* p. 15. The patents do express such a need by describing, in each embodiment, a device having a connection element consistent with EIS's construction.

Regarding the massage effect, Novoluto concedes that it "is the result of the design and interaction" between the connection element and other components. *Supra* p. 15. Its citations further confirm that the design of the connection element (e.g., its cross-sectional area, among other features) is important to the massage effect. *See, e.g.*, *id.*, quoting '851 patent, 10:1-10 ("the type of flow can not only be advantageously influenced by the size and orientation of opening 51, **but also by the inner configuration of the connection element**"). Furthermore, Novoluto

22

focuses on the **openings** distributing or directing the massage effect, which does nothing to rebut EIS's arguments about the purpose and function of the **connection element**. *Supra* pp. 6-11.

Novoluto also asks this Court to ignore its own statements concerning the German parent to the '851 patent, but those representations are relevant evidence. *Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110, 1116 (Fed. Cir. 1983) (Representations to foreign patent offices should be considered if the material "comprise[s] relevant evidence."); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1312 (Fed. Cir. 2014), *overruled on other grounds* by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (finding that "statements made by [defendant] during prosecution of a related Japanese patent further support [the District Court's] construction"); *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005). Novoluto's argument that those statement are irrelevant because they concerned a "nozzle" and "nozzle effect" is also misleading. The claim explicitly recites that the "connection element" is designed "**so that**" a nozzle effect is generated. '851 patent, 14:43-47. Although Novoluto cites a quote from exhibit 17 concerning "a 'constriction of the cavity,'" Novoluto ignores that the cavity in that quote **is** the connection element, and the constriction of the cavity therefore refers to the smaller cross-sectional area of the connection element, as in EIS's construction. *Supra* p. 17 (quoting Ex. 17 at 8).

Moreover, Novoluto's contention that EIS is construing "nozzle effect" is nothing more than an attempt to detract from the fact that Novoluto admitted that achieving the claimed "nozzle effect" **requires** a constriction. *Id.*; Ex. 17 at 8. EIS is not construing "nozzle effect," but merely considering the proper construction of "connection element" in view of the surrounding claim language, as the law requires. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). And what Novoluto has represented is required to achieve the claimed nozzle effect is certainly relevant to the interpretation of the claims given that the '851 patent's only independent claim requires a

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

nozzle effect.  *See* '851 patent, Claim 1 ("a media flow . . . through the straight channel [of the connection element] with a **nozzle effect**").  Eager to distance itself from its own representations, Novoluto disregards what it claimed and argues the nozzle effect is an optional feature in the '851 patent.  *Supra* pp. 17-18.  It is not optional.

Likewise, Novoluto's invitation to construe "connection element" differently across each of the patents without identifying anything in the specifications that would warrant such different constructions should also be rejected.  *See Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1348 (Fed. Cir. 2007) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.") (quoting *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003)).

### 4. Novoluto's Sur-Reply Position

The plain and ordinary meaning of "connection element" is a structure that connects two structures, and the '851 and '061 Patent claims use the term consistently with this ordinary meaning. EIS attempts to narrow the term to include features neither required by the term, nor supported by the intrinsic record. As noted in Novoluto's Answering Brief, the patent specifications describe the connection element as connecting two structures, a first chamber and a second chamber, and details various configurations. *Supra* pp. 12-13 ("connection element may have, [e.g.], a single passageway …, a plurality of passageways…, or different inner configurations, such as helix-shaped grooves.").

EIS focuses not on the claim term "connection element" itself, but on (1) *additional terms recited in the same claim*; (2) *examples* in the specifications; and (3) *foreign* patents with *different* claim language, while restricting the term's meaning based on those additional terms. The most conspicuous flag that EIS's construction is wrong is EIS's reliance on the phrase "nozzle effect" as support for EIS's argument that the connection element must have a smaller cross-sectional area

HIGHLY CONFIDENTIAL–ATTORNEYS' EYES ONLY

than the first chamber. *Supra* pp. 19-20, 23-24. However, not all connection elements are required to provide a nozzle effect—in fact, "nozzle effect" is a separate term that only appears in claim 1 of the '851 Patent. And, as EIS admits, while claim 1 of the '851 Patent specifically requires "a nozzle effect," the claims of the '061 Patent do not. *Supra* p. 19 n.7. None of the patents say that all "connection elements" must have a "nozzle effect." If anything, EIS's flawed logic leads to the conclusion that the term "nozzle effect" means a smaller cross-sectional area, *not* the term "connection element." "Connection element's" construction should not render "nozzle effect" meaningless or superfluous. *See Promos Techs., Inc. v. Samsung Elecs. Co.*, 809 F. App'x 825, 834 (Fed. Cir. 2020).

Ultimately, nothing in the patents limits "connection element" to having a smaller cross-sectional area than any chamber, and EIS provides no legal or evidentiary basis for such a construction. *See supra* pp. 14-15. EIS's color-coded image does not prove EIS's point either—it highlights only a portion (a channel) of one example "connection element," and, regardless, does not prove all connection elements must have smaller cross-sections. Ex. A, 11:1-3.

EIS's proposed construction also fails to include any structure that *connects* the chambers, as specifically provided for in the specification. *See*, *e.g.*, Ex. A, 8:16-20 ("a connection element 5, which connects the first chamber 3 with the second chamber 4"). Moreover, EIS's expert, while arguing against Novoluto's proposed construction of another claim term, pressure field generator, admits the connection element connects two structures. Ex. 65, ¶ 31 ("the connection element connects a first chamber to a second chamber").

EIS's proposed construction of "connection element" is really an interpretation of *other* limitations recited in claim 1 of the '851 Patent. EIS admits the "straight channel" of the '851 Patent's claim 1 provides the media flow path. *See supra* pp. 19-20 ("claim 1 recites that this

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

'straight channel' forms a 'media flow' path."); *see also supra* pp. 23-24; Ex. A, 14:43-47. EIS also says "[t]he claim explicitly recites that the 'connection element' is designed '**so that**' a nozzle effect is generated." *Supra* p. 23. Claim 1 of the '851 Patent recites these additional limitations because "connection element" alone *does not require these limitations*. EIS provides no rationale for construing "connection element" beyond its ordinary meaning. Nor does EIS provide any basis for construing the '061 Patent claims to include limitations recited only in the '851 Patent claims. The intrinsic record shows that "connection element" means "a structure that connects two structures."

**B.** **Term 2: "stimulation device"**

**1.** **EIS's Opening Position**

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "stimulation device"<br><br>('851 Patent, 1, 2, 4-6; '061 Patent, Claims 1-3, 5, 7, 8, 11-19, 21; '097 patent, Claims 1-13, 17-27; '220 patent, 1, 3-12, 14, 16, 17, and 19-25; '418 patent, 1, 3-13, 15, 17-19, 21-27, 34, and 35)[8] | "a device including at least a first chamber, a second chamber, and a connection element connecting the first chamber with the second chamber" | No construction required.<br><br>Alternatively: "a device that is capable of sexually arousing or exciting." |

The term "stimulation device" is recited in every independent claim at issue in this case. In certain independent claims, it is part of the preamble (*see, e.g.,* '097 patent, claim 1); in others, it is in the claim body (*see, e.g.,* '097 patent, claim 12). EIS seeks a construction of "stimulation device" that limits the scope of each claim to a "device including at least a first chamber, a second chamber, and a connection element connecting the first chamber with the second chamber," which

---

[8]  The '851 and '061 patent claims sufficiently delineate the stimulation device's structure, such that construction is not necessary for those claims.  EIS has, however, included them in this table for the Court's reference because they contain the disputed term.

Novoluto represented was "the invention." *See e.g.*, '851 Patent, 3:58-63. EIS seeks this construction because certain claims at issue in this case do not include at least two chambers and a connection element when Novoluto expressly defined such a configuration as its "invention." While claim 1 of the '851 and '061 patents explicitly recite a two-chamber configuration with a connection element, many claims of the other patents do not (*see, e.g.*, claim 1 of the '097, '220, and '418 patents). For these latter claims (i.e., the asserted claims of the '097, '220, and '418 patents), EIS seeks a construction of "stimulation device" as set forth above.

EIS' construction is supported by Novoluto's disclaimer and lexicography in the '851 patent specification that "[a]ccording to the invention, . . . the stimulation device has at least one first chamber and at least one second chamber . . . and at least one connection element that connects the first chamber with the second chamber." '851 patent, 3:58-63. According to the patentee, the "problem addressed by the invention is solved by [this] stimulation device . . . ." *Id.*, 3:5-57, 3:64-4:2. The '061 patent contains a similar characterization of the patentee's "invention." '061 patent, 3:1-16. These statements limit the claim scope to "stimulation device" that includes at least two chambers and a connection element connecting the two chambers. *See, e.g., Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) ("We have found disavowal or disclaimer based on clear and unmistakable statements by the patentee that limit the claims, such as 'the present invention includes ...' or 'the present invention is ...' or 'all embodiments of the present invention are....'") (citations omitted).

The above limitation on claim scope need not be tied to a particular claim term; instead, the scope of the claim as a whole can be limited based on such disclaimer. *See id.* at 1354 (not construing a claim term but holding that patentee disclaimed "devices driven by rhythmic or metronomic patterns" and the claim thus required "chaotic pivoting"). In other words, even if this

**HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY**

Court does not construe "stimulation device," it can still find that the claims at issue require a device that includes at least two chambers and a connection element connecting the two chambers. That is, the claim scope cannot cover a device without those features.

Furthermore, while the above disclaimer is based on statements in the '851 and '061 patent specifications, it extends to the '097, '220, and '418 patents because they incorporate by reference the specification of the '851 or '061 patents. *X2Y Attenuators, LLC v. Int'l Trade Comm'n*, 757 F.3d 1358, 1363 (Fed. Cir. 2014) ("the disclaimers of the incorporated patents are a part of the asserted patents"); '097 patent, 1:7-13 (incorporating by reference in its entirety the application that issued as the '061 patent); '220 patent, 1:7-15 (incorporating by reference in its entirety the application that issued as the '851 patent); '418 patent, 1:6-15 (same).

For the above reasons, EIS' construction should be adopted.

### 2.    Novoluto's Answering Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| **"stimulation device"** ('851 Patent; '061 Patent; '097 Patent; '220 Patent; '418 Patent) | "a device including at least a first chamber, a second chamber, and a connection element connecting the first chamber with the second chamber" | "a device designed to sexually arouse or excite" |

#### a)    *Intrinsic Record Supports "a device that is capable of sexually arousing or exciting"*

The patents-in-suit, titled "Stimulation Device" ('851, '220, and '418 Patents) or "Stimulation Device having an Appendage" ('061 and '097 Patents), all relate to "a stimulation device *for erogenous zones*, in particular *for the clitoris*." *See, e.g.*, '851 Patent, 1:12-13, '061 Patent, 1:16-18 (emphasis added). All their specifications focus on issues specific to clitoral stimulation for purposes of enhanced sexual pleasure and orgasm—not medical treatment. The '061 Patent, for example, explains, "[i]n the present invention, the methods for *stimulating erogenous zones serve for sexual pleasure*, and thus the methods ***do not serve for medical, for***

28

**HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY**

*example, therapeutic, purpose*s." '061 Patent, 7:37-40. Similarly, the '851 Patent discusses the "use of the stimulation device according to the invention *as a sex toy for stimulating* the female *clitoris*." '851 Patent, 6:40-47. The patents all describe embodiments that "excite[] the blood circulation of the area of skin to be stimulated… stimulat[ing] the erogenous zone *to sexual arousal up to climax*," and can be "adjust[ed] to the *user's state of excitement*." *See*, *e.g.*, '851 Patent, 4:26-40, 13:16-19. Finally, all claims in all patents relate specifically to the clitoris and/or the vagina. *See*, *e.g.*, '851 Patent, 14:16-16:21 ("stimulation device *for a clitoris*," "chamber for placing over the *clitoris*"); '061 Patent, 16:22-18:52 ("appendage is a *dildo* configured to be inserted into a *vagina*," "method for *stimulating erogenous zones for sexual pleasure*," "inserting an appendage of a stimulation device into a *vagina*"). When read in their entirety, the patents are all clearly and exclusively concerned with sexual stimulation. *See*, e.g., '851 Patent, 1:12-3:55, 4:53-56, 6:20-51, 8:58-65, 12:8-27, 14:16-16:21; '220 Patent, 1:19-3:65, 6:4-34, 8:8-20, 9:41-48, 12:54-13:5, 14:60-16:57; '418 Patent, 1:26-64, 1:65-3:65, 6:4-34, 8:8-20, 9:41-48, 12:54-13:5, 14:60-16:64; '061 Patent, 1:16-2:67, 3:50-4:9, 5:55-6:4, 6:14-25, 6:43-47, 7:37-40, 10:9-17, 11:17-26, 16:22-18:52; *and* '097 Patent, 1:17-3:7; 5:27-67; 6:1-18; 7:43-8:19; 8:24-36; 9:4-13; 10:9-12; 10:63-11:4; 12:4-7; 14:32-50; 17:1-18:61.

As such, "stimulation device," which is in all claims in all patents, clearly means "a device designed to sexually arouse or excite" to a POSITA. Exs. 41, ¶¶ 64, 29-37; 42, ¶¶ 62-70.

> b)    *EIS's Construction Improperly Imports Limitations and Renders Claim Limitations Superfluous*

EIS seeks different constructions between patents, urging one construction for the '220, '418, and '097 Patents, but no construction for the '851 and '061 Patents, because, according to EIS, the "claims sufficiently delineate the stimulation device's structure, such that construction is not necessary for those claims." *Supra* p. 26 n.8. In so doing, EIS asks the Court to improperly

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

import limitations from claims of the '851 and '061 Patents into other patents, to narrow those other patents to include features their claims do not require, again, to build a non-infringement position into claim construction. The Court should reject this invitation.

Ignoring the intrinsic record, EIS's proposed construction imports limitations into the preamble, rendering those limitations redundant, and violating the rule of claim differentiation. *See* Ex. 28 (demonstrative of EIS's construction); *see, also e.g.*, '418 Patent, Claims 1 and 18; '097 Patent, Claims 17 and 21; *See Promos Techs.*, 809 F. App'x at 834; *Mformation Techs., Inc. v. Rsch. in Motion Ltd.*, 764 F.3d 1392, 1399 (Fed. Cir. 2014) (favoring a construction that does not render another limitation "superfluous"); *SRI Int'l*, 775 F.2d at 1122; *Red Dog Mobile Shelters, LLC v. Kat Indus., Inc.*, 2015 WL 1892502, at *4 (N.D. Tex. Apr. 24, 2015) (finding it improper to import limitations into the claim language, "especially into the preamble of the claims."). The meaning of "stimulation device" does not require EIS's proposed limitations and the patents clearly envision various embodiments and alternative designs of a stimulation device that provides modulated negative and positive pressures. '851 Patent, 4:41-50, *see also* 10:40-42 ("[t]he only decisive criterion here is that the volume of the first chamber 3 can be increased and decreased by drive unit 6"). EIS's attempted importation of limitations is improper; it would render much of the claim redundant to the preamble and vitiate dependent claims. *SRI Int'l*, 775 F.2d at 1122.[9]

EIS's disclaimer and lexicography arguments (*supra* p. 27) are unfounded. The standards for finding lexicography and disavowal are "exacting." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). To act as a lexicographer, a patentee *must* "clearly set forth

---

[9] EIS's proposed construction for "stimulation device" is actually narrower than EIS represents. If the Court somehow accepts EIS's incorrect construction for "connection element," then all the limitations EIS has imported into "connection element" will also be imported into "stimulation device." *See* § III.A.2.a.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

a definition of the disputed claim term" and "clearly express an intent to redefine the term." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal quotation marks omitted). Similarly, disavowal requires that "the specification [or prosecution history] make[] clear that the invention does not include a particular feature." *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). Novoluto made no such unmistakable statements in any of the patents or their prosecution histories. Rather, both the '851 and '061 Patents describe various "developments and embodiments" of the claimed stimulation device, making clear "the invention" is not limited to EIS's proposed single structural configuration. *See, e.g.*, '851 Patent, 3:55-67, 4:33-36, 5:45-47, 10:25-27, 10:43-44.

EIS insists the phrase "according to the invention" proves disavowal/lexicography, yet *ignores all other language, embodiments, and alternatives disclosed in the patent. Compare supra* p. 27 (citing only the phrase "according to the invention," while ignoring the next sentence in the '851 Patent that says "[t]his *embodiment*…according to the invention"), *with* '851 Patent; 3:55-4:2 *and* '061 Patent, 3:1-16. Read in full context, the phrase refers to different embodiments, constructions, and alternative designs throughout the specifications. Nothing in the intrinsic record indicates the scope of the invention claimed is *exclusively limited* to stimulation devices with two chambers and a connection element connecting the two chambers.

The Court should reject EIS's construction and find "stimulation device" is "a device designed to sexually arouse or excite." *See, e.g., Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) ("[a]bsent lexicography or disavowal, [the Court does] not depart from the plain meaning of the claims." (citation omitted)).

31

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 3.    EIS's Reply Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "stimulation device"<br><br>('851 Patent, 1, 2, 4-6; '061 Patent, Claims 1-3, 5, 7, 8, 11-19, 21; '097 patent, Claims 1-13, 17-27; '220 patent, 1, 3-12, 14, 16, 17, and 19-25; '418 patent, 1, 3-13, 15, 17-19, 21-27, 34, and 35) | "a device including at least a first chamber, a second chamber, and a connection element connecting the first chamber with the second chamber" | No construction required.<br><br>Alternatively: "a device that is capable of sexually arousing or exciting." |
| | | **Novoluto's Untimely New Construction** |
| | | "a device designed to sexually arouse or excite" |

While EIS's construction is consistent with Novoluto's disclaimer and lexicography in the intrinsic record, Novoluto's new alternative proposed construction tries to improperly limit the claims to a subjective intended use rather. EIS's construction stems in part from the specification's unequivocal statement that "[a]ccording to the invention, . . . the stimulation device has [the features identified in EIS's construction]." *Supra* pp. 26-27 (citing, *inter alia*, '851 patent, 3:58-63); *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016); *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309-10 (Fed. Cir. 2014) ("[W]e have found disavowal or disclaimer based on clear and unmistakable statements by the patentee that limit the claims, such as 'the present invention includes ...' or 'the present invention is ...'."). Novoluto, however, disputes the import of the above and urges that "[r]ead in context, the phrase refers to different embodiments, constructions, and alternative designs throughout the specifications." *Supra* p. 31. Yet, Novoluto does not point to an "alternative" design or an "embodiment" of a "stimulation device" in the specification that does not include at least a first chamber, a second chamber, and a connection element connecting the first chamber with the second chamber. It cannot because such a configuration is the "invention."[10]

---

[10] Novoluto does not respond to EIS's alternative request that, even if this Court does not construe "stimulation device," it should still find each claim *that does not already recite two chambers and a connection element* requires the features in EIS's construction. *Supra* pp. 27-28.

**HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY**

Unable to overcome the clear import of the specification's statements, Novoluto engages in misdirection contending that EIS is rendering claim limitations redundant and importing limitations from one claim into another. *Supra* pp. 29-31. But EIS acknowledged in its opening brief that certain features in its construction were already in some claims, *supra* p. 27, and explained that its construction merely seeks to limit the scope of ***those*** asserted claims that do not already recite two chambers and a connection element. Doing so does not violate claim differentiation, as Novoluto appears to contend. *Supra* pp. 29-30. This is because claim differentiation cannot overcome disclaimer or lexicography, which forms the basis of EIS's construction. *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1327 (Fed. Cir. 2015) ("Although claim differentiation is a useful analytic tool, it cannot enlarge the meaning of a claim beyond that which is supported by the patent documents."). Novoluto cannot start with claims that are already improperly **broader** than "the invention" and use them as a basis to argue those claims—and others—should not be subject to its disclaimer and lexicography.

> a)  *Novoluto's Arguments In Support of Its Untimely Claim Construction Proposals Should be Struck or Disregarded*

This is one of many disputed terms where Novoluto changed its position since the parties' filed the Joint Claim Construction Chart ("JCCC," D.I. 207) and EIS served its opening claim construction brief. Novoluto provided no notice to EIS and simply inserted revised and entirely new proposed constructions into its answering brief. Such conduct violates the Scheduling Order's claim construction procedures, and is highly prejudicial to EIS. *See* Ex. 66, *Integrated Discrete Devices L.L.C., v. Diodes Inc.*, 08-cv-888-GMS (D. Del Apr. 28, 2010) (*Markman* Hearing Tr.), 2:20-5:17 (declining to hear argument on constructions plaintiff revised after the JCCC without leave of Court, and adopting defendant's constructions on those terms); *see also IDD*, 08-cv-888-GMS (D. Del. May 26, 2010). EIS spent several weeks developing its arguments, gathering

33

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

evidence, preparing with its expert, and briefing the parties' respective positions as disclosed in the JCCC in accordance with this Court's Order, only to be blindsided with new constructions in Novoluto's answering brief.  *See* Ex. 62 (comparing Novoluto's original constructions with its untimely constructions).  EIS respectfully requests that the Court strike or disregard Novoluto's new and revised constructions for terms 2 ("stimulation device"), 5 ("pressure field generator"), 7 ("create the modulated positive and negative pressures based on modulated frequencies"), and 8 ("sealingly engage a portion of a body of a user including a clitoris"), and all of Novoluto's related briefing for violating the claim construction procedures set forth in the Scheduling Order in this case, D.I. 65 (modified in other respects by subsequent orders), and prejudicing EIS.

b)      *Novoluto's New Construction is Unduly Narrow and Subjective*

Novoluto's untimely new construction is unsupported by the specification and seeks to read into the claims a ***subjective*** limitation (going to a designer's ***intent***) presumably to avoid invalidating prior art.  Specifically, Novoluto originally proposed in the JCCC that a stimulation device is one that "that is ***capable of*** sexually arousing or exciting" (emphasis added).  But Novoluto now contends that the stimulation device is one that is "***designed to*** sexually arouse or excite."  *Supra* pp. 28-29 (emphasis added).  This surreptitious alteration of its proposed construction is nothing but an unabashed attempt to read an intended use into the preamble to avoid the significant swath of medical device prior art in this field that is capable of sexually "arousing" or "exciting" even if the device's designer intended a different use (e.g., a medical or therapeutic use).  Moreover, Novoluto's construction injects ambiguity into the claim.  For instance, how does one determine whether a stimulation device, even one that can be used on erogenous zones for stimulation is "**designed to** sexually arouse or excite"?  What features, structure, or functions, must a device possess to be "designed to sexually arouse or excite"?  Novoluto does not say.  A construction that requires inquiry into the designer's subjective intent (e.g., their intended purpose

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

use or purpose), rather than an objective one into the apparatus's structure, cannot be correct. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1353 (Fed. Cir. 2001) (refusing to "inject subjective notions" into a claim construction). For this reason alone Novoluto's untimely proposed construction cannot be correct.

Moreover, Novoluto's construction is not supported by the intrinsic evidence. Although Novoluto leans heavily into the specifications to support its proposal, they are not so limiting. For example, the '851 patent states "[t]he present invention relates to **a stimulation device for erogenous zones**" and "methods for **stimulating body parts**" with no requirement that the device sexually arouse or excite those erogenous zones or body parts. '851 patent, 1:12-15. For the above reasons, EIS's construction should be adopted.

### 4.    Novoluto's Sur-Reply Position

A "stimulation device" as used in the patents is "a device designed to sexually arouse or excite." As Novoluto showed, the patent specifications all relate to a stimulation device for erogenous zones, in particular for the clitoris, for sexual pleasure and arousal, and are not medical devices. *Supra* pp. 28-29. In other words, the stimulation devices in the context of these patents are sex toys. *Id*. The patents only describe embodiments of a device designed to sexually arouse or excite by providing modulated negative and positive pressures. *Supra* pp. 29-31; Ex. 67, ¶ 31.

Again, EIS's proposed construction imports limitations specifically recited in some claims of some patents into claims in other patents (*supra* p. 33), defying the intrinsic record, to improperly expand EIS's defenses through claim construction. *Supra* pp. 29-31; *see also* Ex. 67, ¶ 29-30. Novoluto has consistently shown that "[n]othing in the intrinsic record indicates the scope of the invention claimed is *exclusively limited* to stimulation devices with two chambers and a connection element connecting the two chambers" (*supra* p. 31). EIS's failure to read Novoluto's entire brief is not support for EIS's overly narrow reading of the claim term (*supra* p. 32 n.10).

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

Moreover, disclosing a single embodiment is not lexicography. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

EIS's bold accusation that Novoluto provided EIS "no notice" and "inserted revised and entirely new proposed constructions" and thereby "violate[d] the Scheduling Order's claim construction procedures" is also without merit. Novoluto did not violate any orders or procedures, which EIS tacitly admits by citing not the actual Scheduling Order in this case, but a transcript from a hearing 12 years ago in a different case with a different judge and completely different claim construction procedures (*e.g.*, two shotgun briefs filed with the Court, as opposed to four serial briefs exchanged between parties, not filed with the Court), where a party introduced revised constructions of seven of ten disputed claim terms after the other party's only opportunity to respond had passed. Novoluto's slightly modified construction with essentially one word-change and two verb-tense-changes is clear, timely, and better explains Novoluto's position in response to EIS's position, which EIS articulated for the first time in its opening brief. Moreover, unlike the case EIS cites, EIS had another opportunity to reply. The modification does not prejudice EIS. EIS's claim that preparation for its opening brief was wasted is disingenuous; EIS's opening brief did not even address Novoluto's initial proposed construction of "stimulation device." *Supra* pp. 26-28. Again, EIS resorts to dramatic false accusations to distract the Court from the truth: EIS has no defensible basis for its proffered construction. This Court should disregard EIS's red herring.

Finally, Novoluto is not trying to import intended use or subjective intent into "stimulation device's" meaning. The patent claims specifically recite the "features, structure, and functions" of the device that is "designed to sexually arouse or excite." Ex. 67, ¶ 28-31. Nor is an inquiry into

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

the designer's subjective intent necessary (*Id.*), as EIS contends (*supra* pp. 34-35). Novoluto's

proposed construction is consistent with the patents. Ex. 68, ¶ 45. EIS's is not.

### C.    Term 3: "opening of the chamber"

#### 1.    EIS's Opening Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "opening of the chamber" ('220 patent, Claim 1; '418 patent, Claim 1) | "an aperture to the immediately contiguous structure" | No construction required. The plain and ordinary meaning of the term "opening" (noun) is "a hole that allows access." |

The dispute over the construction of "opening of the chamber" is particular to claim 1 of

the '220 and '418 patents, which each recite:

> 1. A stimulation device comprising:
>    a chamber having a flexible wall; . . .
>    an opening configured to sealingly engage a portion of a body of a user
>    including a clitoris, the modulated positive and negative pressures to be applied
>    to the portion of the body via the opening, the opening being a sole opening of
>    *the* chamber to an exterior of the stimulation device . . . .

By their plain language, these claims require that the opening that sealingly engages the body part

is also an opening of "the" chamber having the flexible wall.  This Court's intervention as to the

meaning of "opening of the chamber" has been necessitated by Novoluto's infringement

contentions, which take an overly broad view of this limitation.  Specifically, as shown below,

Novoluto alleges that the EIS products have an "opening" and a "chamber."



Ex. 19 at 2, 5.

37

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

But that "opening" is not an opening of ***the*** alleged "chamber" in EIS's products.  Instead, the alleged "opening" is an opening of an entirely different component (the outer silicone ring). This is confirmed by Novoluto's contentions for the '851 patent (see below), which allege for the same accused products, that the "opening" placed on the clitoris is an opening of an entirely different component (the alleged "second chamber" for purposes of the '851 patent).[11]





Ex. 20, 8 (left), 5 (right).

EIS's construction merely seeks to clarify that an opening of a chamber is an aperture in the wall of ***that*** chamber to whatever is immediately contiguous to the chamber.  *See e.g.*, Ex. 22 at 869 (defining "opening" as "something that is open: . . APERTURE").  The specification is clear that there is "an opening from the first chamber 3 to connection element 5," which is the immediately contiguous structure to the first chamber 3; similarly, there is a ***separate*** "opening [42] of the second chamber" that is configured for placing on the body of the user, which is the immediately contiguous structure to the second chamber.  '220 patent, 14:10-14, 33-34, 45, Figs. 3-11; *see also* '851 patent, 3:58-63 ("According to the invention, a pressure field generator in the stimulation device has at least one first chamber and at least one second chamber with at least one opening for placing on a body part or on the erogenous zone . . . .").  This distinction between the

---

[11]  Novoluto points to the same component as the "first chamber" for purposes of the '851 patent and the "chamber" for purposes of the '220 and '418 patents.

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

openings of the different chambers is apparent, for example, from the '851 patent claims. *See,
e.g.*, '851, claim 1, 14:18-26.



'220 patent, Fig. 4 (annotated); *id.* at 14:45 ("**42** Opening of second chamber").

For the above reasons, EIS' proposed construction should be adopted to clarify that an
opening of a chamber is the aperture of *that* chamber to the immediately contiguous structure.

### 2.    Novoluto's Answering Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| **"opening of the chamber"[12]** | "an aperture to the immediately contiguous structure" | No construction required. The plain and ordinary meaning of the term "opening" (noun) is "a hole that allows access" |

a)    *Intrinsic Record Supports "a hole that allows access"*

The purpose of claim construction is "to understand and explain, but not to change, the
scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000).

---

[12] The claims relevant to the term "an opening" are in the Joint Claim Construction Chart ("JCCC"),
which includes claims in all patents-in-suit. *See* D.I. 207. EIS cites Claim 1 of the '220 and '418
Patents as the only relevant claims and construes only "opening of the chamber," ignoring
"chamber having a single opening," "chamber having at least one opening," and "an opening,"
which appear in the '851, '061, and '097 Patents, respectively. The claims of the '220 and '418
Patent also recite "an opening [of the stimulation device]" and the context of EIS's proposed
term is "the opening being a sole **opening of the chamber** to an exterior of the stimulation device."
'220 Patent, Claim 1 (emphasis added). All claims cited in the JCCC are relevant.

**HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY**

"Opening" and "chamber"[13] have plain and ordinary meanings. The patents consistently use "opening" according to its plain and ordinary meaning of "a hole that allows access." In the '851 Patent (parent to the '220 and '418 Patents), for example, a chamber may have an *opening* for placing on a body part (3:60-61), a connection element may have an *opening* to the second chamber (5:1-2), an *opening* in the second chamber may be aligned with an *opening* of a holder (9:10-13), and a first chamber has an *opening* for media flow out of the first chamber against the surface of the skin without any other valves or other *openings* (4:33-36, 10:11-15). As used in the patents, an opening is simply a hole that allows access. The chamber is simply a compartment.[14]

Thus, "opening of the chamber" means "a hole that allows access [to] the compartment." Reading "opening of the chamber" divorced from the rest of the claim, as EIS does, creates ambiguity where there is none. Isolating the phrase "opening of the chamber" from its antecedent basis in the claim ignores the full context of the relationship between "opening" and "chamber." Specifically, claim 1 of the '220 and the '418 Patents each recite:

> A stimulation device comprising:
> a chamber having a flexible wall portion;
> a drive unit in physical communication…;
> **an opening** configured to sealingly engage a portion of a body of a user including a clitoris, the modulated positive and negative pressures to be applied to the portion of the body via the opening, **the opening being a sole opening of the chamber to an exterior of the stimulation device**. . .

The plain language of the claims is clear – the opening of the device is the only opening of the chamber to an exterior of the stimulation device. The claim language exemplifies embodiments that eliminate valves or other openings from the chamber to the environment of the device to

---

[13] The term "chamber" has a plain and ordinary meaning of "compartment," should construction be required, as discussed in § III.F.2., *infra*.

[14] *See* § III.F.2., *infra*.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

increase hygiene and improve cleanability of the device. '851 Patent, 5:22-25, 5:34-38, 5:49-51, 10:11-16, *see also* Ex. 29 (prosecution history at 16-18 of 3/29/17, 18-20 of 11/16/16 responses).

The intrinsic record consistently supports the plain and ordinary meaning, and EIS shows no disavowal or lexicography. Therefore, the term needs no construction and should be given its plain and ordinary meaning. *See*, *e.g.*, *Luminara Worldwide*, 814 F.3d at 1353. Should the Court construe "opening," however, an opening is "a hole that allows access." If the Court construes "opening of the chamber," then "the opening being a sole opening of the chamber to an exterior of the stimulation device" should be construed as "the hole that allows access to the device is the only hole that allows access from the compartment to the exterior of the stimulation device."

> b)   *EIS's Construction is Unnecessary, Non-Sensical, and Unsupported*

Despite seemingly understanding "opening" elsewhere in its brief (*infra* pp. 67-69), here EIS construes "opening" as "an aperture" (*supra* p. 38), which amounts to a perfunctory exercise in thesaurus usage. *See Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) ("[Terms that] are not technical terms of art ... do not require elaborate interpretation"); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (court need not "repeat or restate every claim term" as claim construction "is not an obligatory exercise in redundancy"); Fed. Judicial Ctr., Pat. Case Mgt. Judicial Guide § 5.1.4.3, at 5-29 (2016) ("FJC") ("If a claim term is nontechnical, is in plain English, and derives no special meaning from the patent and its prosecution history, then the court need not function as a thesaurus."). Next, without citing *any* supporting evidence, EIS construes "of the chamber" as "to the immediately contiguous structure," which, aside from being

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

inconsistent with EIS's other proposed construction for "chamber" as "enclosed cavity,"[15] makes no sense.[16] Again, EIS thwarts the purpose of claim construction. *Embrex, Inc.*, 216 F.3d at 1347.

Tellingly, instead of intrinsic evidence, EIS improperly relies on its own accused products, alleging the openings cited in Novoluto's initial infringement contentions are inconsistent between patents. *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1367 (Fed. Cir. 2008); *SRI Int'l*, 775 F.2d at 1118 ("a claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, not in light of the accused device."). This simply is not true. Novoluto's initial infringement contentions are not inconsistent; different patents have different claim scopes. EIS *again* conveniently ignores surrounding claim language. For example, EIS argues the "opening" identified in the '220 Patent initial infringement contentions is "not an opening of *the* alleged 'chamber'" in EIS's products. *Supra* p. 38 (emphasis in original). First, this is a clear non-infringement argument, not the basis for claim construction. Second, EIS ignores the rest of the claim, which clearly says the "opening" *of the device* is the "sole opening of the chamber *to an exterior of the stimulation device*." *Supra* pp. 37-38, *see also* Ex. 19 at 2, 5 (indicating the opening). The figures EIS identifies (*supra* p. 37 *citing* Ex. 19 at 2, 5) clearly show the *opening of the device* (labeled "opening") and that there is no other opening from the chamber to the exterior of the device.

Meanwhile, the '851 Patent recites "a first chamber having a single opening; a second chamber having…[a] second opening[]…for placing over the clitoris." The claims of the '851 Patent are clear and distinct from the claims of the '220 Patent. The term "opening" is used consistently; however, different words (which EIS ignores) modify "opening" within the claims

---

[15] *Compare supra* pp. 37-38, *with infra* p. 68.
[16] *See* Ex. 61 (demonstrative of EIS's proposed construction of "opening of the chamber").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

of the patents themselves (*e.g.*, opening of first chamber, second chamber, or the device, or sole opening to an exterior), and those words therefore affect the meaning of the claim as a whole. *Compare* '220 Patent, Claim 1 *with* '851 Patent, Claim 1. The real issue is EIS's product infringes two different patents, not that the term has different meanings. (*Supra* pp. 37-38). For example, though not recited in the same claims or even the same patents, the "opening" *of the stimulation device* that is the "sole opening of the chamber *to an exterior of the stimulation device*," in the '220 Patent, can also be the "second opening of the second chamber," in the '851 Patent. "Opening" and "chamber" are used consistently across the patents. EIS doesn't seek clarification; EIS seeks to confuse the Court by refusing to read claims as a whole; EIS repeatedly ignores claim language while importing extraneous limitations. EIS's tortured construction should be rejected as improper efforts to advance non-infringement positions through claim construction. "Opening," "chamber," and "opening of the chamber" should be given their plain and ordinary meanings.

### 3.    EIS's Reply Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "opening of the chamber" ('220 patent, Claim 1; '418 patent, Claim 1) | "an aperture to the immediately contiguous structure" | No construction required. The plain and ordinary meaning of the term "opening" (noun) is "a hole that allows access." |

The dispute concerns the plain meaning of the claim term "opening of the chamber." Novoluto reads the claim as reciting the opening *from* the chamber, when the claim language is *of* the chamber, thereby broadening the claimed opening to encompass openings that are not part of the chamber. This is evident from Novoluto's infringement contentions where it reads "an opening of the chamber [having the flexible wall]," as recited in the '220 and '418 patents, on an opening of a component separate from "the chamber [having the flexible wall]." *Supra* pp. 37-38. But the plain language of these claims requires that the claimed "opening" must be an opening of "the" chamber having the flexible wall. *Id.* Thus, EIS's construction merely clarifies that an opening

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

of a chamber is an opening in the wall of *that* chamber (the one having the flexible wall) to the structure immediately contiguous to *that* chamber. *Supra* pp. 37-39. This term needs a reasonable construction so that the parties do not re-hash this same claim construction dispute before the jury.

EIS's construction is not "divorced from the rest of the claim," as Novoluto contends. *Supra* p. 40. Instead, it seeks to prevent Novoluto from contenting that the limitation can be met by a hole that "allows access to the [chamber]" regardless of where the hole is in relation to the chamber. *Supra* pp. 40-41. Indeed, the hole/opening must be "of" the chamber, i.e., in the chamber. An "opening ***from*** the chamber to the exterior of the device," as Novoluto interprets the limitation, *supra* p. 42 (emphasis added), ignores that the claims recite an "opening ***of*** the chamber." An opening of the chamber must necessarily mean that the opening is in the wall of that chamber and EIS's construction simply seeks to clarify the plain import of the claim language and is consistent with the specification. *See, e.g.,* '220 patent, 14:10-14; '418 patent, 14:9-13.

Moreover, Novoluto did not identify a single use of "opening of the[/a] chamber" in the specification that refers to an opening on the opposite end of a passageway or other intervening structure. *See supra* p. 40. Instead, Novoluto paraphrases the '851 patent to suggest it has such statements, when it does not. *See id.* For instance, the '851 patent does not state "a first chamber has an *opening* for media flow out of the first chamber against the surface of the skin without any other valves or *openings*" as Novoluto would have this Court believe. *Supra* p. 40 (citing '851 patent, 4:33-36, 10:11-15). The actual language is much different. '851 patent, 4:33-36 ("the medium flowing **out of the first chamber through the connection element** against the surface of the area of skin"), 10:11-15 ("no valves or **openings in or on the first chamber** 3 are required") (emphasis added). Indeed, these two disparate passages (before being combined and reinterpreted

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

by Novoluto) only discuss openings "**in or on**" the chamber, consistent with EIS's construction, not openings separated from the chamber by an intervening structure.

        *a)*     *Novoluto's Remaining Arguments Lack Merit*

Contrary to Novoluto's contention, EIS's proposed construction and supporting argument do not ignore the surrounding claim language, which EIS discussed at length in its opening brief and need not be repeated here. *Supra* pp. 37-39. Likewise, Novoluto incorrectly accuses EIS of failing to cite "*any* supporting evidence" for the latter half of its construction, *supra* p. 41, but EIS provided voluminous citations to the intrinsic record, *supra* pp. 38-39. Unable to rebut EIS's construction on the merits, Novoluto questions why the parties' set of agreed-upon terms for construction does not include additional terms, when it is clear they are not included because neither party seeks their construction. *Supra* p. 39 n.12. Similarly, while EIS certainly agrees that all claims identified in the JCCC are relevant, neither party seeks construction of "opening of the chamber" in any claim other than claim 1 of the '220 and '418 patents.

Novoluto's transparent attempts to manufacture inconsistencies in EIS's positions by carving up its constructions and pasting the parts into a claim are a side show. *Supra* p. 42 (citing Ex. 61). Novoluto's seasoned counsel can no doubt appreciate that had they viewed EIS's constructions for terms 3 and 6 as a whole, instead of arbitrarily cutting up its construction for term 3, the as-construed claim would have been entirely consistent.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

### 4. Novoluto's Sur-Reply Position

The term "opening of the chamber" is clear and construction is unnecessary.[17] In EIS's own words, "[t]his Court need not construe a term simply because [a party] requests as much."[18] Claim construction is not a perfunctory exercise in thesaurus usage[19], and EIS provides no real evidence that construction is necessary or required by the intrinsic record. The claims of the '220 and '418 Patents clearly define an opening of the stimulation device "configured to sealingly engage a portion of a body," and that "the opening [is] a sole opening of the chamber to an exterior of the stimulation device." EIS continues to ignore the claim as a whole and the language surrounding the term, including the immediately preceding article and adjective "a sole" and the immediately following description "to an exterior of the stimulation device." *See supra* pp. 42-43. EIS seeks an arbitrary construction conjured up under the guise of clarifying things for the jury. *Supra* p. 44. But, EIS's construction is confusing and inconsistent with the claim language. EIS's emphasis on the prepositions "to," "from," and "of" similarly misdirects. The ordinary meaning of the word "opening" is "a hole that allows access."[20] To allow access means to allow access "to" or "from" something (*i.e.* the chamber), not allow access "of" the chamber. Moreover, as noted, "the opening [is] a sole opening of the chamber **to** an exterior of the stimulation device."

Novoluto's Exhibit 61 displaying EIS's constructions embedded in the claim fairly shows the absurdity of EIS's proposed claim construction, as do Exhibits 28 and 36. Proper constructions cannot result in one term having different meanings within the same claim.

---

[17] Novoluto does not believe "opening" needs to be construed in any of the patents-in-suit, and inclusion of this claim term in the JCCC and claim construction briefing is not any indication that Novoluto "agreed" the term needs construction, as EIS appears to insinuate. *Supra* p. 45.

[18] *Infra* p. 89 citing *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

[19] *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001); *See also supra* p. 41.

[20] The JCCC indicates the term to be construed is "'an opening' / 'opening of the/a chamber'."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### D.    Term 4: "flexible wall" / "flexible wall portion"

#### 1.    EIS's Opening Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "flexible wall" / "flexible wall portion" ('097 patent, Claims 1, 6, 7, 12, 16, 17, 22, 26, 28, 30; '220 patent, Claims 1, 4, 5, 14, 16, 17, 20, 21; '418 patent, Claims 1, 4, 5, 10, 15, 17, 19, 22, 23, 34, 35) | "wall/wall portion that deflects without folding and unfolding like a bellows" | No construction required.<br><br>Plain and ordinary meaning: "a wall that is able to bend or to be bent easily without breaking" |

Each of the asserted claims of the '097, '220, and '418 patents require a chamber having a "flexible wall" or a "flexible wall portion" that deflects in opposing directions.  *See, e.g.,* '097 patent, 17:3-7.  In the IPR involving the '097 patent, patentee Novoluto expressly disclaimed a "bellows" from the scope of this term by arguing that a bellows folds and unfolds but does not deflect in opposing directions like the claimed "flexible wall."[21]  There, in an attempt to overcome the *Taylor* prior art reference, which discloses a bellows, Novoluto represented that a bellows was "structurally very different" from the claimed "flexible wall."  *See* Ex. 2 at 52-53.

> Taylor's bellows does not, however, disclose the required "flexible wall portion" that deflects "in opposing directions." . . . [T]he folding and unfolding of the bellows wall does not "cause deflections ... in opposing directions."  Rather, as the bellows compresses and expands, the folds move at varying angles and directions with respect to each other (see [below]). . . . Thus, Taylor's bellows does not disclose this limitation.

*Id.*

---

[21] *See Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent. A patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement.").  Prosecution disclaimer applies to statements made during IPR proceedings.  *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017).

**HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY**

Novoluto illustrated how the folding and unfolding of a bellows is different from deflections of a straight elastic surface like the bending element 64 set forth in Figures 10a-10c of the specification (reproduced below).



*Id.*



Figs. 10a-10c (bending element 64, deflecting in opposing directions, highlighted red).

Relying on this express disclaimer, EIS redesigned the alleged flexible wall in the accused products into a bellows that folds and unfolds, and notified Novoluto it had done so. Ex. 21 (email correspondence with Novoluto's CEO, Johannes Plettenberg). Immediately thereafter, Novoluto attempted to retract its disclaimer. Ex. 3 at 46, n.2. However, EIS had already relied on Novoluto's statements to redesign its products, making it unjust under the circumstances to give any weight to Novoluto's attempted retraction, particularly when that retraction was made with knowledge of EIS's reliance. *See Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l*, 222 F.3d 951, 957 (Fed. Cir. 2000) ("[C]ompetitors are entitled to rely on [a patentee's] representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention.").

Although Novoluto's disclaimer of a bellows was made in reference to the '097 patent, it should apply to all patents-in-suit, including the '220 patent and the '418 patent. While the '220 patent and the '418 patent are not in the same family as the '097 patent, the intrinsic record for

each asserted patent contains the same description of a flexible wall, almost all of the same figures (*compare e.g.*, '220 patent, Figs. 4-6, *with* '097 patent, Figs. 4-6), and provides no basis to interpret "flexible wall" differently across the patents.  *See Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004) (applying prosecution disclaimer to multiple patents that shared a specification, including those already issued at the time of the patentee's disclaimer).

For the above reasons, EIS's proposed construction should be adopted.

### 2.    Novoluto's Answering Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| **"flexible wall" / "flexible wall portion"**<br>('097 Patent, Claims 1, 6, 7, 12, 16, 17, 22, 26, 28, 30; '220 Patent, Claims 1, 4, 5, 14, 17, 20, 21; '418 Patent, Claims 1, 4, 5, 10, 15, 17, 19, 22, 23, 34, 35) | "wall/wall portion that deflects without folding and unfolding like a bellows" | No construction required.<br><br>Plain and ordinary meaning: "a wall that is able to bend or to be bent easily without breaking" |

*a)    Intrinsic Evidence supports "a wall that is able to bend or to be bent easily without breaking"*

This term has a plain and ordinary meaning and does not require construction. *Brown*, 265 F.3d at 1352. Moreover, use of "flexible" in the intrinsic record is consistent with its plain and ordinary meaning, which is "able to bend or to be bent easily without breaking." *See* Ex. 30. The patents say nothing about a "bellows." Rather, the specifications describe the flexible wall as a resilient material including silicone or rubber, for example, and shows it bending without breaking to expand and compress the chamber 3. *See, e.g.*, '097 Patent, 11:31-32, 12:59-61, FIGS. 4-6; '851 Patent, 9:21-22, 10:45-46, FIGS. 4-6. Thus, the plain and ordinary meaning, "a wall [or portion of a wall] that is able to bend or to be bent easily without breaking," should apply.

*b)    Intrinsic Record Does Not Support EIS's Construction*

The true dispute is not about the meaning of "flexible" or "wall" or "portion."  EIS's entire argument really depends on the meaning of "deflections in opposing directions" of a flexible wall

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

as used in the claims of the '097 Patent. EIS's only "evidence" supporting its construction is a disavowal that never happened.

(1)    EIS Misrepresents the Need to Construe "flexible wall"

Claim 1 of the '097 Patent recites "a drive unit in physical communication with the flexible wall portion **so as to cause deflections** of the flexible wall portion in opposing directions." EIS recognizes the distinction between flexible wall and deflections, alleging that Novoluto argued "a bellows folds and unfolds **but does not deflect in opposing directions**," (*supra* pp. 47-48) and that Novoluto illustrated "how the ***folding and unfolding of a bellows is different from deflections***" of an "*elastic surface*" like that described in the patents. *Id.* (emphasis added). But these discussions of folding and unfolding of the bellows are *with respect to deflections*—they do not define "flexible wall." Indeed, EIS describes the "flexible wall" as an "elastic surface" (*Id*), a phrase of EIS's choosing, not found in Novoluto's IPR arguments or the patent specifications. "Elastic surface" is consistent with Novoluto's proposed construction. *Compare* Ex. 30 *with* Ex. 31. Thus, there is no true dispute as to the meaning of "flexible wall," and the term need not be construed. Should the Court construe "flexible wall," the term's plain and ordinary meaning is "a wall that is able to bend or to be bent easily without breaking."

(2)    EIS's Disavowal Argument Fails

Novoluto's arguments about how an IPR prior art reference did not disclose claimed *deflections* of a flexible wall are irrelevant to the meaning of "flexible wall;" EIS introduces them to make a convoluted accusation of disavowal. But, the standards for finding disavowal are "exacting." *GE Lighting,* 750 F.3d at 1309. Disavowal requires that "the specification [or prosecution history] make[] clear that the invention does not include a particular feature." *SciMed Life*, 242 F.3d at 1341. Novoluto did not expressly disclaim a bellows that folds and unfolds. In IPR2019-01302, Novoluto distinguished the claims of the '097 Patent from the *bellows of Taylor*,

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

which did not disclose the "required 'flexible wall portion' that deflects 'in opposing directions.'" Ex. 2 at 52. Taylor required a stiff structural material to fold and unfold and hold its shape as the bellows 162 compressed and expanded. *See* Taylor, FIG. 3 (Cropped); Ex. 2 at 52; Ex. 32, ¶¶ 78-82. Novoluto explained that when Taylor compressed and expanded the bellows to fold and unfold, the rigid folds moved at varying angles and directions with respect to each other; there was no



flexible wall deflecting in opposing directions. *Id*. Novoluto's explanation that the *bellows of Taylor* did not disclose a chamber or pressure field generator having "a flexible wall portion" that deflects "in opposing directions" as claimed in the '097 Patent was not an express disavowal of "a bellows that folds and unfolds." EIS mischaracterizes Novoluto's arguments to deceive the Court into adopting a construction that would unjustifiably narrow claim scope. The claims *as written* would cover a device with a flexible wall that both deflects in opposing directions *and* folds and unfolds; EIS seeks to exclude such coverage. Nothing in the intrinsic record supports such a construction.

Disclaimer is not established by alleged reliance on mischaracterized isolated out-of-context statements, and EIS's alleged design-around is irrelevant to the issue of claim construction in this case. *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1324 (Fed. Cir. 2009) ("Claims are properly construed without the objective of capturing or excluding the accused device."); *SRI Int'l*, 775 F.2d at 1118 ("A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device."). Besides, EIS's products have flexible wall portions (of silicone) that deflect in opposing directions

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

as shown in Novoluto's initial infringement contentions, not bellows as disclosed in Taylor. For the above reasons, EIS's proposed construction should be rejected.

### 3.    EIS's Reply Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "flexible wall" / "flexible wall portion" ('097 patent, Claims 1, 6, 7, 12, 16, 17, 22, 26, 28, 30; '220 patent, Claims 1, 4, 5, 14, 16, 17, 20, 21; '418 patent, Claims 1, 4, 5, 10, 15, 17, 19, 22, 23, 34, 35) | "wall/wall portion that deflects without folding and unfolding like a bellows" | No construction required.

Plain and ordinary meaning: "a wall that is able to bend or to be bent easily without breaking" |

Novoluto's construction is incorrect because it ignores its disclaimer of a bellows from the scope of the claimed "flexible wall," whereas EIS's construction applies Novoluto's disclaimer, consistent with well-settled claim construction law.  Novoluto disclaimed a "bellows" from the scope of "flexible wall" by arguing that a bellows folds and unfolds but does not deflect in opposing directions like the claimed "flexible wall."  *Supra* pp. 47-48; Ex. 2, 52-53.  Trying to distance itself from its disclaimer,[22] Novoluto contends that it was distinguishing Taylor's "stiff structural material" with "rigid folds."  *Supra* p. 51.  But it never used those words in the IPR or prefaced its position regarding "bellows" in that manner.  Ex. 2, 52-53.  Indeed, Novoluto cites its expert Dr. Jensen, who merely said that the "bellows must be made of a material that is **stiff enough** to fold and unfold."  Ex. 32, ¶ 79.  Contrary to Novoluto's representation, its disclaimer was not limited to Taylor's bellows.  Although the disclaimer was made in a discussion of Taylor's bellows, Dr. Jensen identified nothing unique about those bellows, and instead conceded that Taylor discloses "[a] standard suction bellows."  *Id.*, ¶ 80.  Novoluto's disclaimer thus applies to bellows generally.

---

[22]  Novoluto's contention that it never made a disclaimer is belied by its failed attempt to claw that disclaimer back during a subsequent IPR filing, after it learned EIS redesigned products in reliance on Novoluto's statements.  *See* Ex. 3, 46 n.2.

**HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY**

Novoluto is also incorrect that its remarks in the IPR concerned how the prior art did not disclose the claimed deflections and that such arguments "are irrelevant to the meaning of 'flexible wall.'"  *Supra* p. 50.  Novoluto distinguished a bellows from the claimed "flexible wall."  *See* Ex. 2, 52-53 ("Taylor's bellows does not, however, disclose the required 'flexible wall portion' that deflects 'in opposing directions'").  It argued that the wall of a bellows fold and unfolds, and therefore does not deflect in opposing directions like the claimed "flexible wall."  The illustration presented by Novoluto could not have been clearer in distinguishing a bellows (that has folds) from the claimed "flexible wall" that bends without folding.



Ex. 2, 52-53.  Novoluto cannot escape the consequences of its remarks to the Patent Office.

### 4.    Novoluto's Sur-Reply Position

"Flexible wall"/"flexible wall portion" does not need construction. Novoluto's illustration in its IPR brief could not have been clearer in showing that Taylor did not have the claimed flexible wall portion. Ex. 2, 52-53. Novoluto did not contend that folding/unfolding and deflection were mutually exclusive, but that Taylor lacked a flexible wall deflecting in opposing directions. *Id*; *see also supra* p. 50. Taylor appears to show a bellows with stiff walls that do not deflect. EIS misconstrues these IPR arguments as if Novoluto disclaimed folding/unfolding from the meaning of "flexible"—Novoluto did not. EIS's disclaimer arguments (*supra* pp. 52-53) are without basis.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

E.    **Term 5: "pressure field generator"**

1.    **EIS's Opening Position**

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "pressure field generator" ('097 patent, Claims 17, 21, 22, 26, 28, 30; '220 patent, Claims 17, 20; '418 patent Claim 19)[23] | Means plus function term having the following structure and function:<br><br>Structure: "at least a first chamber, at least a second chamber, and at least one connection element that connects the first chamber with the second chamber and equivalents"<br><br>Function: "generating a pressure field"<br><br>Alternatively:<br><br>"at least a first chamber, a second chamber, and a connection element that connects the first chamber with the second chamber" | Not a means-plus-function term.<br><br>"a component that generates a pressure field" |

a)    *Means Plus Function Analysis*

The term "pressure field generator" should be construed pursuant to 35 U.S.C. § 112(f) because each of the identified claims "fails to 'recite sufficiently definite structure'" and/or "recites 'function without reciting sufficient structure for performing that function.'" *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349-50 (Fed. Cir. 2015) (*en banc* in relevant part) (citations omitted) (finding "distributed learning control module" was means plus function because "'module' is simply a generic description for software or hardware that performs a specified function" like "'mechanism,' 'element' 'device,' and other nonce words that reflect nothing more than verbal constructs" that "typically do not connote sufficiently definite structure"). *Williamson* instructs that a term invokes 35 U.S.C. § 112(f) when it "sets forth the same black box recitation of structure

---

[23] The term "pressure field generator" is also recited in claim 1 of the '851 patent. However, that claim already recites the construction EIS seeks.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

for providing the same specified function as if the term 'means' had been used," including when that term is paired with a prefix that "does not impart structure." *Id.* at 1350-51.

Here, the claim term "pressure field generator" sets forth only function (generating a pressure field) without sufficiently definite structure. Taking claim 17 of the '097 patent as an example, the claimed function is generating a pressure field (e.g., "modulated positive and negative pressures with respect to a reference pressure"). '097 patent, 18:7-9. But no structure is recited in claim 17 for the pressure field generator. Ex. 27[24] ¶¶ 40-44. In other words, the applicant's chosen language "pressure field generator" provides no more definite structure than if the claims said "means for generating a pressure field." *See Williamson*, 792 F.3d 1349-51; *see also Advanced Ground Info. Sys. v. Life360, Inc.*, 830 F.3d 1341, 1347-48 (Fed. Cir. 2016) (affirming finding that "symbol generator" was means-plus-function, "analogous to a 'means for generating symbols' because the term is simply a description of the function performed"). Confirming as much, Novoluto's proposed plain and ordinary meaning construction falls decisively into *Williamson*'s ambit, using the nonce word "component" that provides no structure, paired with the function of "generat[ing] a pressure field."

Construing a means-plus-function limitation is a two-step process: first, identifying the claimed function, and second, ascertaining the corresponding structure. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1331 (Fed. Cir. 2003).

Again taking claim 17 of the '097 patent as an example, the claimed function is generating a pressure field (e.g., "modulated positive and negative pressures with respect to a reference pressure"). '097 patent, 18:7-9. Looking to the '061 patent, which the '097 patent incorporates by reference, the corresponding structure is unambiguously identified:

---

[24] EIS submits the declaration of Richard P. Meyst, an expert in the field. *See* Ex. 27, ¶¶ 5-21.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

> According to *the invention*, a pressure field generating arrangement of the stimulation device has at least *one first chamber* and at least *one second chamber* having at least one opening for placing on a body part or on the erogenous zone and *at least one connection element* that connects the first chamber to the second chamber.

'061 patent, 3:5-10 (emphasis added); *see also* Ex. 27, ¶¶ 44-45.  The same is true for the '220 and

'418 patents, which incorporate by reference the '851 patent, which has similar language as above.

*See* '851 patent, 3:58-63.

The specification further explains that this pressure field generating arrangement "allows simple *generation of a pressure field* in the second chamber by *changing the volume* in the first chamber," as recited in claim 17, confirming this is the corresponding structure.  '061 patent, 3:11-16 (emphasis added); *see also* '097 patent, *see also* 4:57-62; '851 patent, 3:64-4:2.  EIS's means-plus-function construction is derived directly from this corresponding structure and function.  Accordingly, the structure of "pressure field generator" should be construed as at least a first chamber, at least a second chamber, and at least one connection element that connects the first chamber to the second chamber and equivalents.

### b)    *Phillips Construction*

Even assuming *arguendo* that the Court finds that the claimed "pressure field generator" has sufficient structure to avoid the means-plus-function analysis for any of the asserted claims, EIS's alternative construction should be applied under the *Phillips* standard.

The specification provides an express definition of "a pressure field generating arrangement" according to "the invention," quoted above.  *See* '061 patent, 3:5-10 (defining pressure generating arrangement to include at least one first chamber, second chamber, and connection element); *see also* '851 patent, 3:58-63.  It is well-established that such descriptions of "the invention" limit claim scope to what the patentee represented as their invention.  *See e.g.*, *Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1339-40 (Fed. Cir. 2004) (holding inventors

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

"deliberately acted as their own lexicographers" and "clearly disavow[ed] nonsurfactant solubilizers," where "specification definitively state[d] '*the solubilizers suitable* for the preparations according to the invention' were a particular type of solubilizers); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (construing "localized gateway system" as limited to the one described as the "present invention"); *Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312, 1318–19 (Fed. Cir. 2006) (affirming construction of "a fuel injection system component" as limited to fuel filters because the "invention" was described as a fuel filter); *Luminara Worldwide,* 814 F.3d at 1353 ("We have found disavowal or disclaimer based on clear and unmistakable statements by the patentee that limit the claims, such as 'the present invention includes ...' or 'the present invention is ...' or 'all embodiments of the present invention are....'") (citations omitted).

Moreover, the specification does not describe a pressure field generator other than the one characterized as "the invention."  In fact, the specification touts the alleged benefits to "the invention" that result from the specific pressure field generator having at least a first chamber, second chamber, and a connection element, as well as the resulting pressure field created by that particular configuration.  *See e.g.*, '061 patent, 3:50-5:36 (describing alleged benefits including "temperature of the air in the flow system according to the invention rapidly adjusts to skin temperature" avoiding "the irksome supply of new (possibly cold) air from outside the system [like the prior art]," "simple construction," "advantage of better hygiene and improved cleaning capacity," "avoids valves or pumps/compressors with potential dead spaces and places that cannot be cleaned," "simplified manufacture," "maximum positive or negative pressure can be limited to an amount that minimizes or rules out any risk of injury," "a safety valve that is usual in the prior art . . . is for example rendered unnecessary").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

For each of these reasons, if a pressure field generator is not determined to be a means-plus-function term, it should be construed as "at least a first chamber, a second chamber, and a connection element that connects the first chamber with the second chamber."

### 2. Novoluto's Answering Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| **"pressure field generator"[25]** (' 851 Patent, Claim 1; '097 Patent, Claims 17, 21, 22, 26, 28, 30; '220 Patent, Claims 17, 20; '418 Patent, Claim 19) | Means plus function term having the following structure and function: Structure: "at least a first chamber, at least a second chamber, and at least one connection element that connects the first chamber with the second chamber and equivalents" Function: "generating a pressure field" Alternatively: "at least a first chamber, a second chamber, and a connection element that connects the first chamber with the second chamber" | Not a means-plus-function term. "a component that generates a pressure field" Alternatively: Function (F): providing modulated positive and negative pressure Structures (S): (1) a volume with a flexible wall portion ('097 Patent, 3:44-52); (2) a chamber with a flexible wall portion (12:55-57); (3) a first chamber with a flexible wall portion, a second chamber (3:59-60); (4) a first chamber, a second chamber with an opening, and a connection element (4:51-56; 57-62)<br><br>F: generating a pressure field with massaging effect<br>S: a first chamber and a connection element (5:28-42);<br><br>F: creating media or air flow<br>S: a first chamber, second chamber, connection element, collectively formed as one piece, where first chamber is directly and exclusively connected to the second chamber without a valve to the environment surrounding the device (6:21-57);<br><br>F: generating a pressure field<br>S: (1) a chamber with a flexible wall portion ('097 Patent, 3:44-52); (2) a first chamber with a flexible wall portion, a second chamber (3:59-60); a first chamber and a connection element (5:28-42); (3) a first chamber, a second chamber with an opening, and a connection element (4:51-56; 57-62); (4) a first chamber (6:62-64); (5) a first chamber in the interior of the stimulation device, a second chamber, and a connection element that connects the first chamber to the second chamber (9:42-46; Figs. 1, 2, and 3); (6) a chamber that is largely or completely closed off from the exterior of the pressure field generator when the PFG is in contact with the body |

---

[25] EIS misleadingly omitted Claim 1 of the '851 Patent as an identified "Relevant Claim," despite that it is an asserted claim, includes the disputed claim term, and was identified in the JCCC.

|  |  | part to be stimulated, and which includes two chambers and a connection element; (7) a first chamber, a second chamber, a holder, and a connection element that connects the first chamber to the second chamber (10:55-12:29; Fig. 4-6); (8) a first chamber, a replaceable second chamber, and a connection element (12:30-37; FIG. 7); (9) a first chamber, a second chamber, an integrally formed connection element (*i.e.*, formed as one-piece) with the wall of the second chamber (12:37-39); (10) a one-piece structure with a resilient chamber material (12:58-57; FIG. 8); (11) a first chamber with a piston and no valves, a second chamber, and a plurality of connection elements constructed in one piece (13:1-5; FIG. 9); *and*, 12:25-29; 12:30-48; 12:58-67; 13:1-18; 13:34-37; 13:52-65; 13:65-14:11; 14:32-50; 15:32-58; 15:59-67; 16:1-4; 16:5-24. *See also*, '851 Patent, '220 Patent, '418 Patent citations in JCCC at 5-7. |

EIS boldly asks the Court to construe "pressure field generator" in all patents that use the term, *except* the '851 Patent because the '851 Patent "already recites the construction EIS seeks" (*supra* p. 54 n.23), tacitly admitting that "pressure field generator" is neither a means-plus-function term nor some ambiguous term EIS cannot understand. EIS wants the Court to pay just enough attention to Claim 1 of the '851 Patent to influence the construction of "pressure field generator" in other patents, but not enough to notice that EIS's construction (1) flagrantly and improperly imports limitations from that claim into the claims of other patents without those limitations; and (2) would render nearly a third of the language in Claim 1 of the '851 Patent superfluous. The intrinsic record does not support construing this term in this way.

> a)    A "pressure field generator" is "a component that generates a pressure field"

A POSITA at the time of the invention would understand that "pressure field generator" means "a component that generates a pressure field." Ex. 41, ¶ 65-66. A POSITA would readily understand the meaning of the term "pressure generator." *Id.* The addition of the word "field" merely emphasizes that the pressure is generated within a volume (*i.e.*, within a chamber). *Id.* The

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

intrinsic evidence supports Novoluto's proposed construction. The specifications provide various examples and embodiments of specific structures of a pressure field generator. For example, in one embodiment, a pressure field generator provides a chamber that generates a pressure field by modifying the volume of that chamber. '851 Patent, 3:58-4:2, 10:40-42 ("only decisive criterion here is that the volume of the first chamber can be increased and decreased"). The pressure field generator may have two chambers and a connection element. *Id*., 8:16-20. The pressure field generator may have an integral or one-piece structure. *Id*., 10:43-44.

Further, the term is used consistently within the claims of each of the '851 (14:16-16:21), '097 (17:1-18:61), '220 (14:60-16:57), and '418 Patents (14:60-16:64), and each claim further delineates specific structures of various embodiments and recites the relationship of the pressure field generator to other structures of the device (*e.g.*, drive unit). Therefore, Novoluto proposes that a pressure field generator is "a component that generates a pressure field."

### b)    Not a means-plus-function term

A "pressure field generator" as claimed is not a means-plus-function term. First, the word "means" does not appear in the disputed claim language. Therefore, there is a rebuttable presumption that § 112(f) does not apply. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347-48 (Fed. Cir. 2015). EIS has not rebutted the presumption because it has not demonstrated that the claim term "fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id* (citation omitted).

Second, a POSITA would understand the term as used in the relevant claims to connote structure. As discussed, the term "pressure generator" is commonly known by POSITAs. Ex. 41, ¶¶ 65-66. Mr. Meyst's apparent lack of knowledge of "pressure generators" is surprising as the term is used often in the medical device industry, in which he claims to be an expert. *Id.* Pressure

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

field generator is not a nonce term, rather, it denotes a component that generates a pressure field

that includes the structural features recited in the claims. *Id.* at ¶ 66.

"Pressure field generator" in the context of the claims connotes structure, it does not simply

describe function disembodied from structure. Specifically, Claim 17 of the '097 Patent recites:

> A stimulation device, comprising:
>
> a **pressure field generator** *having a flexible wall portion*;
> a *drive unit in physical communication with* the flexible wall portion so as to
>   cause deflections of the flexible wall portion in opposing directions,
>   thereby *resulting in a changing volume of* the **pressure field generator**,
> the changing volume of the **pressure field generator** resulting in modulated
>   positive and negative pressures with respect to a reference pressure; ....

'097 Patent, 18:1-9 (emphasis added). Despite this, EIS disingenuously represents that "no

structure is recited in claim 17 for the pressure field generator." *Supra* p. 55. However, EIS's own

expert identifies the "flexible wall portion" as a structure of the pressure field generator. Ex. 27, ¶¶

43. Moreover, Mr. Meyst summarily dismisses the specific structure as "not sufficient" without

considering the entire claim. *Id*. For example, EIS ignores that Claim 1 of the '097 Patent says the

pressure field generator also has a volume that is changed by deflecting the flexible wall portion

of the pressure field generator, and that the device has a drive unit in physical communication with

the flexible wall portion. Moreover, Claims 21 and 22 of the '097 Patent further describe the

pressure field generator of Claim 17 as having "a first chamber and a second chamber" and

"wherein the flexible wall portion is integral with the pressure field generator." Claims 17 and 20

of the '220 Patent recite similar definite structure of the pressure field generator. Ex. 33.

Additionally, Claim 19 of the '418 Patent recites, *e.g.*, "a pressure field generator including

*a first chamber* and *a second chamber*, the *first chamber including a flexible wall*; a drive unit in

physical communication with the flexible wall…resulting in *a changing volume of the first*

*chamber*…" Ex. 34. And, Claim 1 of the '851 Patent recites, *e.g.*, "a pressure field generator

comprising: *a first chamber…a second chamber…a connection element*," and "a drive unit that changes *a volume of the first chamber*…" Ex. 35. Thus, all independent claims that recite a pressure field generator also include specific structural features defining the term.

In each instance, the claim recites sufficiently definite structure of the pressure field generator (*e.g.*, a flexible wall, a volume, a first chamber, a second chamber, and/or a connection element) and does not recite any function without reciting sufficient structure for performing that function. EIS's proposed application of § 112(f) would "strip ['pressure field generator'] from its context in an effort to make it a purely functional description, rather than one of several structural components that together form the claimed invention." *Camatic Proprietary Ltd. v. Irwin Seating Co.*, 2017 WL 6610873, at *3 (W.D. Mich. Dec. 27, 2017). Thus, § 112(f) does not apply.

### c)    EIS Imports Limitations and Renders Claim Limitations Superfluous

EIS's proffered construction of "at least a first chamber, at least a second chamber, and a connection element that connects the first chamber with the second chamber" is wrong for several reasons. As an initial matter, it is nearly identical to EIS's proposed construction for "stimulation device," and for that reason alone cannot be correct. Further, no evidence even remotely suggests the entire "stimulation device" has the same meaning as its "pressure field generator." EIS's construction is nonsensical. It also improperly reads limitations from the specification into the claims, and vitiates other claim language, violating the rule of claim differentiation. *See, e.g., SRI Int'l*, 775 F.2d at 1122 ("[W]hen a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim….").

EIS's allegations of acts of lexicography again fall short for the same reasons as above. *See* Section III.B.2.b (regarding "stimulation device"). None of the patents show an intent to redefine the meaning of the term to EIS's proposed construction. *Thorner*, 669 F.3d at 1365. The phrase

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"the invention" in the specification does not rise to the level of disavowal or disclaimer – there is no clear and unmistakable statement that all embodiments of a pressure field generator must include two chambers and a connection element. *GE Lighting*, 750 F.3d at 1309.

"What ultimately controls…is the language of the claims themselves." *Camatic* at *2, *citing Phillips* at 1323. The claims simply do not require a pressure field generator to have at least two chambers and a connection element, yet EIS's construction does. EIS's motives are clear—to avoid patent infringement liability and clear the way for its own products in the marketplace. But EIS's urged construction contradicts and ignores language in the claims. For example, independent Claim 19 of the '418 Patent recites "a pressure field generator including a first chamber and a second chamber," and dependent Claim 21 of the '097 Patent specifically requires a pressure field generator that "comprises a first chamber and a second chamber." EIS's proffered construction would improperly render those limitations meaningless or superfluous. *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n,* 690 F.3d 1318, 1325 (Fed. Cir. 2012) (cautioning "strongly against" claim construction that renders a claim superfluous)*; SRI Int'l*, 775 F.2d at 1122*; see also* Ex. 36 (demonstrative of EIS's proposed construction of "pressure field generator"). EIS provides *no evidence*, let alone strong or even sufficient evidence, to overcome the presumption of claim differentiation. EIS's proffered construction should not be adopted.

> **d)    *Alternatively, if Means-Plus-Function Applies, Intrinsic Record Supports Various Structures and Equivalents***

Even if the Court finds that § 112(f) applies, the claim term should not be limited as EIS proposes. The specification discusses various structural components of a pressure field generator in various embodiments that go well beyond the limited example EIS highlights, including those listed in the table at the beginning of this section. *See also*, Ex. 41, ¶ 67.  Under § 112(f), "pressure field generator" would be construed to cover all of these disclosed structures and their equivalents.

HIGHLY CONFIDENTIAL– ATTORNEYS' EYES ONLY

### 3. EIS's Reply Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "pressure field generator" ('097 patent, Claims 17, 21, 22, 26, 28, 30; '220 patent, Claims 17, 20; '418 patent Claim 19) | Means plus function term having the following structure and function:<br><br>Structure: "at least a first chamber, at least a second chamber, and at least one connection element that connects the first chamber with the second chamber and equivalents"<br><br>Function: "generating a pressure field"<br><br>Alternatively:<br><br>"at least a first chamber, a second chamber, and a connection element that connects the first chamber with the second chamber" | Not a means-plus-function term.<br><br>"a component that generates a pressure field" |
| | | **Novoluto's Untimely New Alternative Construction** |
| | | Alternatively:<br><br>[*See* listing of alleged functions and structures at *supra* p. 58-59] |

EIS's construction applies the specification's express definition of "pressure field generator," which is controlling regardless of whether the term "pressure field generator" is a means-plus-function term (it is). Novoluto's construction simply swaps one means term for another, and its alternative means-plus-function string cite construction has no supporting analysis, making both untenable.

### a) *"Pressure Field Generator" is a Means-Plus-Function Term*

The term "pressure field generator" recites a function (generating a pressure field) without sufficiently definite structure, and is therefore a means-plus-function term. Ex. 65, ¶¶ 24-34. As EIS explained in its opening brief, although claims do not use the term "means," they use a nonce term (pressure field generator) that connotes no generally understood structure, no different than if the patentee claimed a "means for generating a pressure field." *Supra* pp. 54-55; Ex. 65, ¶¶ 25-27. And while a claim that does not use the term "means" is presumed not to invoke section 112(6), the presumption is not "strong" because that would have the "inappropriate practical effect of placing a thumb on what should otherwise be a balanced analytical scale." *Williamson*, 792

**HIGHLY CONFIDENTIAL–ATTORNEYS' EYES ONLY**

F.3d at 1349. EIS and its expert, Mr. Meyst, explained the lack of structure in the claims, and how the claim term simply describes the function performed (generating a pressure field), which is sufficient to rebut that presumption. *Supra* pp. 54-56, Ex. 27, ¶¶ 40-45.

In rebuttal, Novoluto points to the testimony of Dr. Cameron and contends a POSITA would readily understand the meaning of "pressure generator" and the modifier "field." *Supra* pp. 59-60 (citing Ex. 41 ¶¶ 65-66.). However, Dr. Cameron's testimony says no more than that she has heard the term "pressure generator," has seen examples of things she would consider a "pressure generator" and would understand what is meant by "field." Ex. 41, ¶¶ 65-66. To avoid section 112(6), a term must "connote sufficiently definite structure." *Williamson,* 792 F.3d at 1349-50. Dr. Cameron's testimony does not explain what sufficiently definite structure a "pressure field generator" would connote to a POSITA, and only explains that the term would be understood as a generic descriptor for a device that performs a specified function—i.e., generating a pressure field—thereby confirming its means-plus-function nature. Novoluto's march through the language of claim 17 of the '097 patent is no more availing. *Supra* pp. 61-62. A "flexible wall portion," even though structure, cannot accomplish the claimed function. Ex. 28, ¶ 43. That the claim recites a drive unit in physical communication with the pressure field generator also says nothing about the pressure field generator's structure.[26] Ex. 65, ¶ 28-29.

> b)    *Novoluto's Disavowal and Lexicography are Clear*

Even if "pressure field generator" is not found to invoke section 112(f), EIS's construction is supported by the specification's statement that "**[a]ccording to the <u>invention</u>**, a pressure field

---

[26] Novoluto repeats its argument here from term 1, asking the court to apply claim differentiation between means-plus-function claims and claims that recite sufficient structure for the "pressure field generator" (e.g., '851 patent, claim 1). *Supra* p. 63. But a patentee cannot avoid construction of a means-plus-function claim on the basis that another claim recites the structure of the means. *Laitram Corp.*, 939 F.2d at 1538 (Fed. Cir. 1991).

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

generator in the stimulation device has [the features in EIS's construction]." '851 patent, 3:58-63; Ex. 65, ¶ 34. Given Novoluto's express lexicography and disavowal, its argument that some claims, on their face, recite fewer than all features of "the invention" described in the specification, must also fail. Novoluto cannot avoid the specification by drafting broader claims and asking the Court to read them without considering what it said in the specification. *Fenner Invs., Ltd.*, 778 F.3d at 1327. "[T]he specification is 'the single best guide to the meaning of a disputed term' and '[u]sually, it is dispositive.'" *Phillips*, 415 F.3d at 1315.

### c) Novoluto's Untimely Construction Should be Disregarded

Novoluto's alternative means-plus-function construction was not included in the JCCC, nor was each of the citations in it, which is highly prejudicial to EIS. Moreover, Novoluto does not perform a sufficient means-plus-function analysis to support any of its purported functions and structures, and thus has not satisfied its own burden. *C.f.* Ex. 65, ¶¶ 29-33.

### 4.    Novoluto's Sur-Reply Position

"Pressure field generator" as claimed in these patents is not a means-plus-function term. Novoluto's proposed construction remains the same: a "pressure field generator" is "a component that generates a pressure field." EIS waited to reveal its full means-plus-function argument until its opening brief. Novoluto merely responded, showing that EIS's means-plus-function argument was incorrect and EIS's single structure/function was incorrect and incomplete. *Supra* pp. 58-63. Novoluto's pinpoint cites to the patents to show additional structures and functions of the pressure field generator did not prejudice EIS. The patents describe various embodiments with different configurations. *Supra* pp. 58-63. EIS's feigned ignorance of the patent disclosures cannot be used to shift EIS's burden to prove means-plus-function to Novoluto.

EIS and its expert admit the claims disclose specific structure, *e.g.*, flexible wall portion and a volume, but either ignore or dismiss the structures as failing to perform the function of

generating a pressure field, without explaining how or why. *Supra* pp. 64-65; Ex. 65, ¶¶ 28-29.

But, these claimed structures inform the meaning of the claim term. Ex. 67, ¶¶ 35-36; *Williamson*

*v. Citrix Online, LLC*, 792 F.3d 1339, 1351 (Fed. Cir. 2015). And, as Dr. Cameron explains and

the patent specifications show, the claimed structural elements provide a pressure field generator

that generates a pressure field. *Supra* pp. 61-62; Ex. 67, ¶ 35. Means-plus-function does not apply.

*See Apex Inc. v. Raritan Comput., Inc.,* 325 F.3d 1364, 1372-73 (Fed. Cir. 2003) (§ 112(f) will not

apply if the name for a structure that performs a function has sufficiently definite meaning).

Moreover, EIS's proposed *Phillips* construction fails because none of the patents show an

intent to redefine this term. The phrase "the invention" is neither disavowal nor disclaimer, and

the specification plainly envisions various embodiments of a pressure field generator. EIS's

construction also ignores a POSITA's understanding of a pressure field generator and fails to

address pressure generation at all. Ex. 67, ¶¶ 32-36. According to the claims themselves the term

cannot be limited to two chambers and a connection element.

**F.    Term 6: "chamber"**

**1.    EIS's Opening Position**

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "chamber"<br><br>('851 patent, Claims 1, 2, 4-6; '061 patent, Claims 1, 3, 5, 7, 24; '097 patent, Claims 1, 5, 6, 12, 14, 16, 21, 28; '220 patent, Claims 1, 4; '418 patent, Claims 1, 4, 18, 19, 22) | "enclosed cavity" | No construction required.<br><br>Plain and ordinary meaning: "compartment" |

EIS's proposed construction clarifies that a "chamber" is an enclosed cavity.  This

construction is important because, based on Novoluto's infringement contentions, it intends to use

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

a box-drawing exercise to argue that a single chamber in EIS' products includes three distinct components: a first chamber, a second chamber, and a connection element.

The intrinsic evidence, including the claims and the specification, support EIS's construction. Starting with the claims, every claim that recites a chamber specifies each opening of that chamber. Taking the '851 patent's claim 1 as an example, it recites a "first chamber" and a "second chamber." '851 patent, 14:18-21. The first chamber has "a single opening." *Id.* The second chamber has "first and second openings." *Id.* Because a chamber is an enclosed cavity, the recitation of the specific openings is necessary.

Additional claim language further confirms that the only openings to the chambers are those recited in the claims, and that a chamber is otherwise enclosed. For instance, there is "a drive unit that changes a volume of the first chamber in such a manner that a stimulating pressure field is generated in the second chamber via the connection element." *Id.* at 18:27-30 (claim 1). The connection element connects "the single opening of the first chamber with the first opening of the second chamber." *Id.* Only when the first chamber is an enclosed cavity (having a single opening connected to the connection element) does changing its volume cause a pressure field to be transmitted via the connection element to the second chamber. If a chamber were not an enclosed cavity, the pressure field would not be transmitted through its opening via the connection element to the second chamber, and the pressure would instead escape through other voids in the chamber.

The specification also explains the importance of tightly sealing the chamber(s) of the stimulation device, citing hygiene and user comfort among other benefits, and disparaging prior art devices with openings out of the chambers, such as valves. *See e.g.*, '851 patent, 2:27-31 (disparaging prior art devices as "often hav[ing] dead spaces or blind spots and/or are difficult to

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

clean"), 5:26-33 (distinguishing the "flow system according to the invention" over prior art that has a "distracting supply of new (possibly cold) air from outside the system"). Moreover, the specification refers to the chambers and connection element as "a closed system," which would not be the case if the chambers were not enclosed cavities. *Id.* at 5:33. The figures also show a chamber only as a well-defined and enclosed cavity. *See e.g.*, *id.* Figs. 3-11.

Turning to extrinsic evidence, the plain and ordinary meaning of "chamber" is "a natural or artificial enclosed space or cavity." Ex. 22 at 205 (defining "chamber"). Thus, the plain dictionary definition mirrors EIS's proposed construction and the intrinsic evidence.

In contrast, Novoluto's proposed "plain and ordinary meaning" construction, "compartment," fails to consider the intrinsic evidence and in particular its contemplation of a chamber as an enclosed cavity. It is therefore not the plain and ordinary meaning as envisioned by *Phillips*. *See Phillips*, 415 F.3d at 1321 ("[T]he 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent."). Novoluto's proposal, however, is even divorced from the meaning of "chamber" commonly found in the dictionary. Indeed, Webster's defines "compartment" as merely "a separate division or section," not an enclosed space. Ex. 22 at 252 (defining "compartment"). Novoluto's contention that "compartment" is the plain and ordinary meaning of "chamber" thus merely confirms that it intends to ignore the context of the patent, and to argue a section of the single open space inside the accused products is a "chamber," emphasizing the need to adopt EIS's construction.

2.    **Novoluto's Answering Position**

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| **"chamber"** | "enclosed cavity" | No construction required. |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| ('851 Patent, Claims 1, 2, 4, 5[27]; '061 Patent, Claims 1, 3, 5, 7, 24; '097 Patent, Claims 1, 5, 6, 12, 14, 16, 21, 28; '220 Patent, Claims 1, 4; '418 Patent, Claims 1, 4, 18, 19, 22) | | Plain and ordinary meaning: "compartment" |

### a)    A "chamber" is a "compartment"

"Chamber" is not an ambiguous term. "Chamber" has a clear meaning and is used in its plain and ordinary way as "a compartment." *See* Ex. 37. The patents support the plain and ordinary meaning describing, *e.g.*, a *chamber* in the interior of the device, connecting two *chambers*, lighting for lighting the interior of the *chamber*, a *chamber* largely sealed from the exterior, edges of the *chamber* forming a seal, a halfway or partially opened second *chamber*, use of any shapes of a *chamber* adjusted to a body part, replaceable *chambers*, etc. *See*, *e.g.*, '851 Patent, 5:13-16, 8:16-20, 8:39-40, 8:66-9:5, 10:27-29. Claim construction is unnecessary. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) (affirming claim term did not need to be construed and adopting the term's plain and ordinary meaning resolved the dispute between the parties), *and* FJC ("the court need not function as a thesaurus.").

### b)    EIS's Proposed Construction is Confusing and Unsupported

EIS unnecessarily confuses the plainly understood term "chamber," turning it into "enclosed cavity," with no support in the intrinsic record to justify the convolution. The term "enclosed" introduces unnecessary ambiguity, because it adds confusion as to the degree of enclosure. An "enclosed cavity" can be partially or fully enclosed. EIS appears to interpret "enclosed cavity" as a "fully enclosed" cavity, but then recognizes the claimed chambers have

---

[27] Novoluto does not include Claim 6 of the '851 Patent because Claim 6 does not include the term "chamber" and provides no insight into the meaning of the term for purposes of construction of the term.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

openings, which means they *cannot be* fully enclosed. Thus, "enclosed" provides no clarity over the term chamber and its plain and ordinary meaning of "compartment."

EIS then makes the backwards argument that "chamber" should be construed as an "enclosed cavity" to show that the recitation of "openings" in the claims is necessary. *Supra* p. 68. This is a *non sequitur*. Patent claims require what their words say are required. For example, the '851 Patent claims require a stimulation device having, among other things, a first chamber with a single opening and a second chamber with two openings. '851 Patent, 14:18-19. This is the result of the words in the claims. Other claim limitations define the chamber's structure. In the '851 Patent, the first chamber is limited to having a single opening. *Id*. Having a single opening does not mean the term "chamber" necessarily is "enclosed" as EIS proposes; it means the first chamber *as claimed in the '851 Patent* can have only one opening instead of two, three, four, etc. or none.

EIS further confuses issues by pointing to discussion in the patents about the importance of tightly sealing the chambers. *Supra* pp. 68-69. This actually proves Novoluto's point, that "chamber" cannot mean "enclosed cavity." Sealing the chamber *from the device's drive unit and other components* is clearly necessary *because the chamber is <u>not</u> fully enclosed*. A fully enclosed chamber would not need sealing because, by definition, as a fully enclosed chamber, it would already be sealed from anything outside of it. Furthermore, the "closed system" of the chambers and connection element referenced by EIS is only created when the device (not enclosed) is placed on the user's body. '851 Patent, 5:13-16 ("after placing the halfway or partially opened second chamber on the area of skin to be stimulated, a self-contained system of media- and airflow is created in the pressure field generator"). EIS's construction improperly imports the limitation "fully enclosed" into the meaning of "chamber," which simply is not supported by the record.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Finally, although one dictionary definition may be "enclosed cavity," it is not the ordinary meaning a POSITA would assign to a "chamber" after reading the entire patent, and dictionary definitions cannot supplant clear meanings in the claims and specification of a patent. *See Phillips*, 415 F.3d at 1321. EIS's proposed construction is also inconsistent with its proposed construction for "chamber" in Section III.C.2.b, *supra*, of "immediately contiguous structure." EIS's proposed construction should be rejected. Should the Court construe "chamber," it means "compartment."

      3.      **EIS's Reply Position**

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "chamber"<br><br>('851 patent, Claims 1, 2, 4-6; '061 patent, Claims 1, 3, 5, 7, 24; '097 patent, Claims 1, 5, 6, 12, 14, 16, 21, 28; '220 patent, Claims 1, 4; '418 patent, Claims 1, 4, 18, 19, 22) | "enclosed cavity" | No construction required.<br><br>Plain and ordinary meaning: "compartment" |

EIS's construction ("enclosed cavity") is consistent with the intrinsic evidence, and necessary to prevent Novoluto from taking an overbroad reading of "chamber," as its briefing confirms it intends to do. On the other hand, Novoluto asks the Court to use a thesaurus and define "chamber" as "compartment," while arguing that a compartment need not be enclosed, ignoring the specification's repeated emphasis on the device being enclosed. Moreover, the claims recite chambers with openings, confirming that chambers are otherwise an enclosed cavity. *Supra* p. 68. Likewise, the specification only shows chambers as enclosed cavities. *Supra* pp. 68-69. And the extrinsic evidence defines a chamber as an "enclosed cavity." *Supra* p. 69.

Most of this is not in dispute. Indeed, Novoluto does not dispute that the figures show chambers as enclosed cavities, or that the dictionary defines a chamber as an "enclosed space or cavity." Nor does Novoluto dispute that the patents emphasize the importance of a fully enclosed system, including enclosed chambers. For instance, Novoluto does not dispute that if a chamber

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

were not an enclosed cavity, then the pressure field from the first chamber would not be transmitted through its opening via the connection element to the second chamber.  Or that the specification emphasizes the importance of tightly sealing the chambers, and disparages prior art devices with openings out of the chambers such as valves.

Instead, Novoluto attempts to sew confusion, making arguments that defy logic, such as (a) the specification's emphasis on ensuring the chambers are tightly sealed means the chambers are not enclosed (i.e., sealed), and (b) because the claims recite openings in the chambers, they are not otherwise enclosed cavities (what structure, then, are the claimed openings in?).  *Supra* p. 71. Novoluto confirms these arguments lack merit by admitting that when the claimed opening of the device is placed on a user's body, it creates a "closed system" within the device.  *Id.*

Although Novoluto contends the term should not be construed (citing FJC, 5-29), EIS presented a fundamental dispute regarding the term's scope, which is properly before the Court. *See* FJC, 5-30 ("[W]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").  Novoluto has made clear that, contrary to the intrinsic and extrinsic evidence, it intends to use a box-drawing exercise to carve up a single chamber in EIS's products to allege it includes three distinct components.  *Supra* pp. 67-68.  Thus, the parties disagree on whether a "chamber" can include an arbitrarily selected region, or whether a "chamber" must have some defined borders, such that it forms an "enclosed cavity."

### 4.    Novoluto's Sur-Reply Position

"Chamber" has a plain and ordinary meaning and EIS's proposed construction defies the purpose of claim construction. EIS argues the chamber must be an enclosed cavity but must also have an opening, as the claims require. This is confusing – what, then, is enclosed? EIS then misleadingly suggests that Novoluto does not dispute EIS's proposed construction. *Supra* p. 72. But Novoluto has repeatedly noted that EIS's proposed construction made no sense, introduced

unnecessary ambiguity, and that what EIS means by "enclosed cavity" is unclear. *Supra* pp. 70-72.

Dispute exists, but not in the way EIS suggests. Dispute arises from EIS's confusing proposed construction and arguments. For example, if the first chamber is connected to the connection element and provides fluid flow from the first chamber to the connection element, how can the first chamber be said to be "enclosed?" EIS points to descriptions of a tight seal or a closed system, but none of this proves the claimed invention has any individually enclosed chambers.

EIS finally confesses it ultimately seeks a construction that "a 'chamber' must have some defined borders." *Supra* p. 73. But, EIS's proposed construction does not accomplish that and if EIS is trying to argue that a chamber must be formed from a single material or component, that is neither supported by the intrinsic record nor is it factually true. A chamber is simply a compartment. EIS's construction adds only confusion. The claims themselves are clear.

### G.    Term 7: "create the modulated positive and negative pressures based on modulated frequencies"

#### 1.    EIS's Opening Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "create the modulated positive and negative pressures based on modulated frequencies"<br><br>('418 patent, Claims 1, 19) | Indefinite | No construction required.<br><br>Not indefinite. |

Claims 1 and 19 of the '418 patent are indefinite because "viewed in light of the specification and prosecution history, [they do not] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instr., Inc.*, 134 S. Ct. 2120, 2129 (2014); *see also* Ex. 27, ¶¶ 47-53. These claims recite, *inter alia*

**HIGHLY CONFIDENTIAL ATTORNEYS' ONLY**

> [**1**] a drive unit in physical communication with the flexible wall to
> cause at least a portion of the flexible wall to deflect in opposing
> directions, thereby resulting in a changing volume of the chamber,
> ***the changing volume of the chamber resulting in modulated
> positive and negative pressures*** with respect to an ambient pressure;
> [**2**] . . . a control device configured to . . . control the drive unit to
> cause the at least the portion of the flexible wall to deflect to ***create
> the modulated positive and negative pressures based on modulated
> frequencies***

'418 patent, claims 1, 18.

In part [1] of the above excerpt, deflecting a flexible wall creates modulated positive and negative pressures. But then in part [2], those same modulated pressures are said to be created "based on modulated frequencies." The scope of the claim cannot be determined with reasonable certainty because (i) the claims purport to have already recited how modulated positive and negative pressures result from, before stating they are "based on" something different (i.e., the "modulated frequencies"), and (ii) the claims do not recite the "modulated frequencies" *of what* it is that the modulated pressures are based on. Ex. 27, ¶ 52. The specification provides no further guidance and does not even recite the term "modulated frequencies." Thus, it is unclear whether the modulated frequencies are of the flexible wall, the drive unit, the current supplied to the drive unit, or something else. Ex. 27, ¶ 51. Indeed, the specification uses the term "frequency" once and only in the context of controlling the drive unit 6. '418 patent, 13:15-18.

Any argument by Novoluto that the "modulated frequencies" refer to, for example, the frequency with which the flexible wall deflects is mere speculation. There is no such disclosure in the patent. Notably, Novoluto did not identify a single citation to the intrinsic evidence in support of its contention that this claim is definite. Moreover, even if the intrinsic evidence made clear what "modulated frequencies" were being referenced, there is no guidance on how the modulated positive and negative pressures are created "based on" those modulated frequencies as opposed to by "the changing volume of the chamber" recited in the claims. Ex. 27, ¶ 53.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

For at least these reasons, the term "create the modulated positive and negative pressures based on modulated frequencies" renders claims 1 and 18 of the '418 patent indefinite for failing to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc.*, 134 S. Ct. at 2129.

### 2.    Novoluto's Answering Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| **"create the modulated positive and negative pressures based on modulated frequencies"** ('418 Patent, Claims 1, 19) | Indefinite | Not indefinite<br>No construction required<br>Alternatively:<br>"based on modulated frequencies" means<br>"based on changes in drive unit speed" |

#### a)    *Claim Term is Not Indefinite*

The parties do not appear to dispute the meaning of "create the modulated positive and negative pressures;" rather EIS contends "based on modulated frequencies" is indefinite. It is not. When read in light of the patent and its prosecution history, this term clearly informs, with reasonable certainty, those skilled in the art about the scope of the invention. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). No more is required.

As described in the '418 Patent's specification and illustrated, *e.g.*, in FIGS. 4-6, modulated positive and negative pressures with respect to ambient pressure are created by deflecting at least a portion of the flexible wall 31 in opposing directions to change the volume of the chamber.



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

As claimed in the '418 Patent, the device includes "a drive unit…to cause… the flexible wall to deflect in opposing directions, thereby resulting in a changing volume of the chamber, … resulting in modulated positive and negative pressures with respect to an ambient pressure." As further claimed, the device includes "a control device configured to…control the drive unit to cause the at least the portion of the flexible wall to deflect to create the modulated positive and negative pressures based on modulated frequencies." The claim language is clear that the modulated positive and negative pressures are based on modulated frequencies of the drive unit. In other words, a POSITA would understand changes in the modulations of positive and negative pressures are based on changes in the drive unit speed. Ex. 41, ¶ 68-71.

The specification makes clear that the modulated positive and negative pressures with respect to ambient pressure may be based on controlling the drive unit to modulate or change "the size of the deflection, the frequency, the modulation, etc." '418 Patent, 13:15-17.[28] The term "frequency" is clear and concise to a POSITA. Ex. 41, ¶ 69. As shown in FIGS. 14a-14c, the modulation of positive and negative pressures may be changed to provide different stimulation patterns by adjusting the amplitude or frequency of the pressure field. '418 Patent, 13:27-63.



Thus, a POSITA would clearly understand the amplitude of the pressure field is adjustable by changing the size of deflection of the flexible wall, and the frequency or rate of change of the

---

[28] Novoluto did not cite specific intrinsic evidence for this term in the JCCC because Novoluto believes construction of this term is not necessary and EIS's bare assertion that an 11-word phrase is "indefinite" with no explanation as to how, failed to provide Novoluto with any notice of the specific issues EIS now raises in its opening brief. Novoluto includes intrinsic record cites to support its position with respect to this limitation in this brief.

pressure field is adjustable by changing the frequency of the drive unit. Ex. 41, ¶ 69; '418 Patent, 13:15-26. For example, a user may press pushbuttons ("operating elements") on the device to adjust the excitation of the drive unit, adjusting the drive unit amplitude (flexible wall deflection size) or drive unit speed (frequency). *Id*. Adjusting the drive unit speed adjusts the rate of deflection of the flexible wall and, therefore, adjusts modulation of the positive and negative pressures.

The phrase, "create the modulated positive and negative pressures based on modulated frequencies," is therefore not indefinite. If the Court finds construction necessary, Novoluto proposes "modulated frequencies" be construed to mean "changes in drive unit speed."

### 3. EIS's Reply Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "create the modulated positive and negative pressures based on modulated frequencies" ('418 patent, Claims 1, 19) | Indefinite | No construction required. Not indefinite. |
| | | **Novoluto's Untimely New Alternative Construction** |
| | | Alternatively: "based on modulated frequencies" means "based on changes in drive unit speed" |

This term renders the claims indefinite because neither the claim language nor the specification informs a person of ordinary skill in the art with reasonable certainty how (1) "the modulated positive and negative pressures" are created "based on modulated frequencies" or (2) what frequencies are being modulated (i.e., modulated frequencies *of what*). *Supra* p. 75; Ex. 65, ¶ 35. The claims first recite how the modulated pressures are created—"*the changing volume of the chamber resulting in modulated positive and negative pressures*"—and then recite that the same modulated pressures are also "based on" "modulated frequencies." *Supra* pp. 75-76. They do not set forth what frequency is being modulated. *Id*. The claims are therefore indefinite. *Id*.

In response, Novoluto asks this Court to swap out the indefinite claim limitation for one that recites something entirely different, arguing that "modulated frequencies" means "changes in

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

drive unit speed."[29]  Novoluto's construction is arbitrary.  There is no intrinsic evidence defining

"modulated frequencies" as "drive unit speed."  Ex. 65, ¶ 36.  Novoluto's cited portion of the

specification ('418 patent at 13:15-17) merely states that the "control device 7 controls the

excitation of drive unit 6, such as the size of the deflection, the frequency, the modulation, etc."

Notably absent is "speed" or any link between "frequency" or "modulation" and speed.  Novoluto

also contends that the specification describes "adjusting . . . frequency of the pressure field."  *Supra*

pp. 77-78.  But there is no mention of any frequency adjustment in the cited portion and nothing

in the specification explains what is meant by "modulated frequencies" or what it is whose

frequencies are modulated.  The claims should therefore be found indefinite.

### 4.    Novoluto's Sur-Reply Position

This claim term clearly informs POSITAs about the scope of the invention.[30]  It is not

indefinite. Again, EIS creates confusion where there is none. EIS's expert alleges the '418 Patent

does not specify "a particular type of drive unit or describe how that drive unit is controlled, from

which a [POSITA] could determine whether its speed is linked to frequency." Ex. 65, ¶ 36. But,

as EIS points out, the specification (at 13:15-17) explicitly notes that "control device 7 controls

the excitation of drive unit 6, such as the size of the deflection, the frequency, the modulation, etc."

*Supra* p. 79. Further, the specification describes the drive unit as being, for example, an electric

---

[29] Novoluto's attempts to justify its failure to follow the Scheduling Order and disclose its
construction or intrinsic evidence in the JCCC should not be rewarded.  Novoluto argues that it
had no explanation of the reasons EIS contends the term is indefinite, but the parties met and
conferred before filing the JCCC, as required by the Court's procedures.  During that meet-and-
confer, Novoluto asked about this term and EIS explained its position.  If Novoluto truly did not
understand EIS's rationale, it should have sought clarification during the procedures ordered by
the Court instead of waiting and making excuses to prejudice EIS at this late stage.

[30] In response to EIS's arguments in its opening brief, Novoluto timely proposed an alternative
construction of the term should the Court require it. Novoluto's alternative construction is based
on the plain and ordinary meanings of "frequency" and "modulated" as used in the context of the
claim.

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

motor, and describes the control device as having, for example, a microcontroller. Ex. E, 9:6-16; 13:11-17.  A POSITA reading the patents would understand that additional information is neither needed nor expected to understand the operation of a drive unit or that the "modulated frequencies" refers to changes in drive unit speed. Ex. 67, ¶¶ 37-38.  The claim language is clear that the control device controls the drive unit frequency (*i.e.*, speed) to change the volume of the chamber to create and/or change the modulated positive and negative pressures. *Id*.

EIS's argument that no link exists between drive unit speed and "modulated frequency" ignores the patent and the knowledge of a POSITA. A POSITA would understand, based on the plain and ordinary meaning of the words in the claims as informed by the specification, that the frequency of a drive unit (*e.g.* a motor) is the rate at which the drive unit operates – in other words, the drive unit speed. *Id*. Accordingly, "based on modulated frequencies" as used in the claim and supported by the specification means "based on changes in drive unit speed."

**H.    Term 8: "sealingly engage a portion of a body of a user including a clitoris"**

**1.    EIS's Opening Position**

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "sealingly engage a portion of a body of a user including a clitoris"<br><br>('220 patent, Claims 1, 17; '418 patent, Claims 1, 19) | Indefinite | No construction required.<br><br>Not indefinite. |

This limitation renders the identified claims indefinite because a person of skill in the art would not understand with reasonable certainty what degree of a seal is required for the opening of the claimed stimulation device to "sealingly engage" a portion of the body of a user.  Ex. 27, ¶¶ 54-63.  The indefiniteness of this limitation is apparent from Novoluto's *inconsistent* positions

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

regarding the required level of seal and the complete lack of explanation in the patent specifications as to the amount of seal necessary to satisfy this claim limitation.

For example, during prosecution of the '220 patent, Novoluto amended its pending claims to add this term, and argued that "merely . . . in contact [with the user's body]" is "<u>not</u> the same as being sealingly engaged." Ex. 4 (U.S. Patent. App. No. 15/965,117, 2019-06-06, Applicant Remarks) at 14; Ex. 25 (accompanying claim amendments). Instead, a *perfect* seal is purportedly required by the claims. *Id.*, 15-16 (explaining that diaphragm 29 of the prior art is "not fluid tight, (e.g., not airtight-, nor watertight, nor body fluid-tight)" and therefore, cannot "create positive and negative pressures <u>relative to ambient pressure</u> as set forth in claim 1"). Yet, Novoluto argued the exact opposite in the *inter partes* review of the '851 patent. In the IPR, Novoluto's expert performed testing on Novoluto's product (Womanizer Classic) and testified that the device produced modulated positive and negative pressures without a "100 percent airtight seal," which was "just a tight enough seal." Ex. 26 at 94:21-100:15. In litigation in Germany against EIS GmbH, Novoluto did the same. There, the patent claims similarly required that "the pressure field generated in the second chamber (4) consists of a pattern of negative and positive pressures modulated with respect to normal pressure." Ex. 23 ('501 German Patent), claim 1. Novoluto, however, urged that a tight seal was not necessary for infringement. Ex. 24 (Novoluto's reply of 20 July 2017) at 7 ("[T]here can ultimately never be an absolutely sealing attachment of the infringing embodiment."). According to Novoluto, alternating positive and negative pressures are possible even in the presence of an air gap. *Id.* ("Consequently, the skin and silicone always yield to the positive pressure generated by the device in such a way that the positive pressure creates a gap through which air can escape.").

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

In view of Novoluto's inconsistent representations that (1) a perfect seal is required to obtain positive and negative pressures (made to obtain its patents), and (2) devices which do not form a perfect seal create such positive and negative pressures (made to obtain a finding of infringement), it is impossible to determine with reasonable certainty how much of a seal is actually required by the claims at issue. Ex. 27, ¶¶ 57-63. Therefore, these claims should be found indefinite.

To the extent the Court finds the claim term not indefinite, it should hold Novoluto to its unequivocal statements made to overcome the prior art, discussed above, and construe this term to require that the opening form a perfect seal with a portion of the body of a user. Ex. 4 (U.S. Patent. App. No. 15/965,117, 2019-06-06, Applicant Remarks) at 14-16; *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender.").

### 2.    Novoluto's Answering Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "sealingly engage a portion of a body of a user including a clitoris" ('220 Patent, Claims 1, 17; '418 Patent, Claims 1, 19) | Indefinite | Not indefinite. No construction required. Alternatively: "sealingly engage" means "to create a seal for the most part" |

### a)    *Claim Term is Not Indefinite*

When read in the context of the claim, the meaning of this limitation is clear – "an opening [of the stimulation device] is configured to sealingly engage a portion of a body of a user including a clitoris." The term is not indefinite and construction is not required.

The relevant claims require "an opening to sealingly engage a portion of a body of a user including a clitoris." The specification describes sealing engagement of the opening of the device

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

with the user's body in one embodiment as "largely or completely sealed off" such that the edges of a chamber "ideally form an air-tight bond with the surface of body part 11." '851 Patent, 8:66-9:5. The specification also describes other embodiments with features to "improve the sealing function" of the chamber on the skin. '851 Patent, 11:64-12:7. The chamber is "sealed tightly to the body part …for the most part" by placing the opening of the device on the body part to be stimulated. '851 Patent, 12:53-58. Accordingly, changes in the volume of a chamber of the device result in modulated pressures with respect to ambient pressure. '851 Patent, 12:58-64.

As emphasized during the '220 Patent's prosecution, with respect to a device that provides an open system with no seal (Van Hook), an opening of the claimed device configured to sealingly engage a portion of the body of a user forms a sealed environment between the flexible wall and the body to provide a closed environment (separated from outside air) such that the positive and negative pressures can be created relative to ambient pressure. Ex. 4 at 14-15. A POSITA would readily understand that the sealing engagement between the opening of the claimed device and the body of the user including a clitoris is not a perfect seal, nor could it be. Ex. 41, ¶ 72-74; Ex. 42, ¶¶ 71-83. Rather, a POSITA would understand that some media flow may occur (*i.e.*, leak) across the seal as indicated in the specification due to the nature of the seal, and in particular a seal between a device and human skin. '851 Patent, 12:53-58, 8:66-9:5, 5:30-33, 11:64-12:2 ("sealed…for the most part," "largely…sealed off," "very little…removal of stimulation-promoting fluid, such as bodily fluid, occurs in a closed system," "an additional…sealing…part…to improve the sealing function"); Ex. 41, ¶¶ 72-74; Ex. 42, ¶ 73-77.

Similarly, Novoluto has consistently described the claimed device during post-prosecution proceedings as providing sealing engagement to create a closed system for creating modulated positive and negative pressures with respect to ambient pressure, while recognizing the seal need

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

not be "100 percent airtight," because "there can ultimately never be an absolutely sealing attachment." Ex. 26 at 94:21-100:15; Ex. 24 at 7.

Thus, the claim language itself provides "an objective baseline through which to interpret the claims." *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1378 (Fed. Cir. 2017). The term informs a POSITA about the claim scope with reasonable certainty. *Id.* at 1379. Both the claims and the specification provide objective boundaries of the sealing engagement, including exemplary designs and specific examples, that make clear the sealing engagement provides a closed system, while recognizing such systems are imperfect. The sealing engagement between the device and the body is such that modulated positive and negative pressures with respect to ambient pressure can be created within the device. '851 Patent, 8:66-9:8, Ex. 4 at 14-15. Thus, "sealingly engage" is not a "purely subjective" phrase.

For these reasons, "sealingly engage a portion of a body of a user including a clitoris" is not indefinite. If the Court construes the term, it should construe the term as an opening configured to "create a seal for the most part against a portion of a body of a user including a clitoris."

      *b)*      *EIS Creates Ambiguity Where There Is None*

EIS improperly restricts the degree of seal to a "perfect seal," which is neither supported by the specification nor has been argued by Novoluto. Novoluto has consistently presented "sealing engagement." The only inconsistency is EIS's own doing. First, EIS completely ignores every description in the specification, including those discussed above, that shows that "sealingly engage" as used in the claim refers to a seal against a portion of a body of a user including a clitoris to create a closed system, while recognizing there may be minimal leakage. The specification clearly shows the closed system created by the seal allows positive and negative pressures to be modulated with respect to ambient pressure. Second, Novoluto has consistently represented this term to patent offices. As EIS admits, Novoluto has indicated in post-prosecution proceedings that

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

a seal between the opening in the device and the body that is not 100 percent airtight allows for creation of modulated positive and negative pressures with respect to ambient pressure. *Supra* p. 81; Ex. 26 at 94:21-100:15. Further, while the German patent claims are not the same as the claims of the '220 or '418 Patents and do not include the limitation at issue here, Novoluto still represented in those proceedings that there cannot be absolute sealing attachment of the device to the body. *Id*. EIS fabricates inconsistency by isolating certain words while ignoring the totality of the arguments presented. EIS argues that, in distinguishing the claims of the '220 Patent from a prior art reference (Van Hook), Novoluto argued the claims require a "perfect seal." This is not true. During prosecution, Novoluto addressed Van Hook's lack of *any* seal with the body. Ex. 4 at 14-17. Specifically, Novoluto argued that Van Hook "does not teach or suggest an opening configured to sealingly engage a portion of a body of a user including a clitoris," because Van Hook mentions "[a]n ordinary telephone receiver cap" that is "held close to the ear." *Id.* at 14. Novoluto explains that "holding something close to one's body does not mean a seal is formed," and even if the telephone receiver cap is placed against the ear it "would merely be in contact" with the ear and not "sealingly engaged." *Id.* As Novoluto explained, "one of ordinary skill would understand that bringing a telephone receiver cap to one's ear does not form a seal with the ear, much less teach or suggest the desirability of sealingly engaging a portion of the body including the clitoris." *Id*.

Separately, Novoluto noted Van Hook's diaphragm does not "sealingly separate the drive unit from the portion of the body," as recited in the claims, because it includes a hole. *Id.* at 15-16. Therefore, as understood by a POSITA, the diaphragm of Van Hook is "not fluid tight (*e.g*., not airtight, nor watertight, nor body fluid-tight) due to the screw 35 extending through the hole." Ex. 41, ¶ 73. Novoluto's arguments consistently show what the specification explains – the opening

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

of the claimed device is configured to create a seal against a portion of a body of a user including a clitoris, recognizing some leakage is expected. *Id.*, *see also* Ex. 42, ¶¶ 78-79.

Novoluto has never argued that "sealingly engaged" requires a "perfect seal," and EIS provides <u>no</u> intrinsic evidence that so limits the claims. EIS urges its construction because EIS knows a perfect seal between a device and the body is a scientific hypothetical or unachievable ideal that does not exist in real life. Ex. 41, ¶¶ 72-73. This limitation provides enough certainty to a POSITA when read in the context of the invention and is therefore not indefinite. *Nautilus,* 572 U.S. at 901. EIS's arguments fail.

### 3. EIS's Reply Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| "sealingly engage a portion of a body of a user including a clitoris"<br><br>('220 patent, Claims 1, 17; '418 patent, Claims 1, 19) | Indefinite | No construction required.<br><br>Not indefinite.<br><br>**Novoluto's Untimely New Alternative Construction**<br><br>Alternatively:<br><br>"sealingly engage" means "to create a seal for the most part" |

As EIS explained in its opening brief, the claim term is rendered indefinite by virtue of Novoluto's inconsistent statements to the Patent Office. *Supra* pp. 80-82.  In response, Novoluto contends it has consistently represented to the Patent Office that "sealingly engage" does not require a perfect seal between the device opening and the user's skin. *Supra* pp. 84-85.  This is incorrect.  During prosecution, Novoluto argued that Van Hook's diaphragm 29 and the user's skin did not form a "closed environment" because "outside air" could be introduced into the region between the two.  Ex. 4 at 15-16.  It argued that outside air can be introduced in this region because Van Hook's diaphragm 29 is not "**fluid-tight**."  *Id.* (emphasis added).  But this necessarily means that the "opening" of the device that sealingly engages the body must also be "fluid-tight" because

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

a non-fluid-tight opening would leak air into the region between the diaphragm and the skin preventing the "closed environment" Novoluto stated was required by the invention. Ex. 65, ¶¶ 37-42. Indeed, Novoluto stated that an opening "sealing engage[s]" only when it "prevent[s] the introduction of outside air." Ex. 4 at 16. And, as explained above, Novoluto argued that preventing introduction of outside air requires a fluid-tight seal. Thus, Novoluto is wrong in urging that it has been consistent in its arguments to the Patent Office. Even if Novoluto is correct that a perfect seal is not possible, its "scientifically erroneous" prosecution statements still render the claim indefinite. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343-45 (Fed. Cir. 2015).

Despite not proposing a construction for the "sealingly engage" limitation in the parties' joint claim construction chart, Novoluto now newly argues that the court should construe this term as requiring a "seal for the most part." But a "seal for the most part" is not a perfect seal, which Novoluto argued during prosecution. Ex. 4 at 15-16. Moreover, it unclear how much seal would be sufficient for the opening to have a "seal for the most part." The specification provides no guidance to enable a person of ordinary skill to understand with reasonable certainty what is required to achieve a "seal for the most part." Should the Court find that this term is not indefinite, it should hold Novoluto to its prosecution history disclaimer discussed above regarding what is required by the term "sealingly engaged" (i.e., airtight, watertight, and body fluid-tight), because its statements were clear and unambiguous. *See Ballard Med. Prod. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1361 (Fed. Cir. 2001) (citations omitted) (finding patentee disclaimed an imperfect dynamic seal when it described a vacuum valve as using a "static seal feature to eliminate . . . bacterial contamination" during prosecution).

### 4.    Novoluto's Sur-Reply Position

Again, this term is not indefinite and construction is not required. And, again, EIS withheld meaningful explanation of its position on this term during the "meet and confer," revealing it for

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the first time in EIS's opening brief. Novoluto timely responded and showed that "sealingly engage" means "to create a seal for the most part" not a "perfect seal." Novoluto consistently represented to the USPTO that the device's opening is sealed for the most part to the body when the opening is placed on the body part to be stimulated. *Supra* pp. 82-84; Ex. A, 8:66-9:5, 11:64-12:7, 12:53-64; Ex. 4, 14-15; Ex. 26, 94:21-100:15; Ex. 24, 7. In distinguishing Van Hook, Novoluto explained that Van Hook created **no seal** because Van Hook describes a device that is "held close to the ear." Ex. 4, 14-15. Novoluto also explained that even if Van Hook's device were brought to one's ear, it **does not form a seal** with the ear. *Id*. Novoluto's representations to the USPTO regarding a closed system formed by the seal also recognized the seal is not perfect. Ex. 4, 14-15 *citing* Ex. 70, '220 Specification, p. 10, ll. 27-31 ("very little or no removal of … fluid…occurs in a closed system."). Moreover, a POSITA would not equate "fluid tight" or "closed environment" to be a 100% seal and would not understand Novoluto as representing that the invention requires a 100% seal. Ex. 67, ¶ 39; Ex. 68, ¶ 47. EIS's reliance on Novoluto's discussion of Van Hook's diaphragm as not being fluid-tight is also misplaced, because that discussion was about a different term altogether. *Id*.; Ex. 4, 15-16. A POSITA reading the intrinsic record would understand that "sealingly engage" means "to create a seal for the most part." Ex. 67, ¶ 40; Ex. 68, ¶ 46.

### I.    Term 9: "reference pressure"

#### 1.    Novoluto's Answering Position

| Claim Term | EIS's Construction | Novoluto's Construction |
|---|---|---|
| **"reference pressure"**<br><br>All patents, *see* JCCC | No construction required. | "a prevailing pressure acting on the device prior to placing the stimulation device on the area of skin to be stimulated" |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Reference pressure should be construed consistently with the PTAB's construction, *i.e.,* "a prevailing pressure acting on the device prior to placing the stimulation device on the area of skin to be stimulated." *See* Ex. 6 at 12, Ex. 7 at 13, Ex. 8 at 21.

The specifications of the patents explain:

> The reference pressure is usually the [[atmospheric pressure acting on the stimulation device that prevails when application begins]/[existing ambient pressure in relation to the stimulation device at the beginning of use]] (i.e. prior to placing the stimulation device on the area of skin to be stimulated). In the preferred [application/use] of the stimulation device with air, the reference pressure is the currently [prevailing/existing] air pressure or normal pressure.

'097 Patent, 5:17-22; '061, 3:38-43; '851, 4:20-25; '220, 5:65-6:3; '418, 5:65-6:3. The reference pressure is not an absolute value because ambient pressure changes based on location. '061 Patent, 3:34-36; '851 Patent, 4:16-19. The prosecution history of the '097 Patent supports the construction of reference pressure in which Novoluto successfully overcame prior art rejections, explaining that the "reference pressure" is not an arbitrarily selected "medium" or middle point, but that it has meaning tied to the prevailing pressure acting on the stimulation device prior to placing the device on the area of skin to be stimulated. Ex. 38, 258, 244; *see also* Ex. 39. EIS already proposed numerous constructions in the IPRs, all of which the Board rejected. Exs. 6-8. EIS's position that *now* no construction is required is a transparent attempt to distance themselves from their previous arguments and the Board's decisions on this very clear issue.

### 2. EIS's Reply Position

Novoluto requests a construction because the PTAB construed the term, but has not otherwise explained how it is relevant to the current dispute or necessary to resolve a controversy. This Court need not construe a term simply because Novoluto requests as much. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017). Furthermore, Novoluto's representation that "EIS already proposed **numerous constructions** in

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

the IPRs, ***all of which the Board rejected***" is simply false. *Supra* p. 89. EIS proposed ***two*** constructions across three IPRs. One was a construction for this term, which is not necessary here. The Board did not reject the other construction ("pressure field generator"); it merely found construction not necessary. *See e.g.*, Ex. 63.

### 3.     Novoluto's Sur-Reply Position

In each of the three IPRs involving the '097, '851, and '061 Patents, EIS not only called "reference pressure" into dispute, EIS also relied on or proposed more than one potential meaning for "reference pressure" at different stages in all proceedings. The PTAB noted: "In the Petition, [EIS] ***originally asserted that the 'reference pressure' is*** 'atmospheric pressure'…In its Reply, [EIS] ***presents a new interpretation of the term 'reference pressure***,' contending that the term should be construed to mean a 'given' pressure…." *See*, *e.g.,* Ex. 71, 11 (emphasis added). The PTAB recognized EIS changed positions on "reference pressure" in every proceeding, considered EIS's "new" claim construction arguments any way, and rejected EIS's proffered constructions. *Id.* at 12 and 18-19; *see also* Ex. 7, 10-12; *and* Ex. 72, 18-21, 34. In at least one of the IPRs, the PTAB criticized EIS for its "***shifting and incorrect claim construction***" of "**reference pressure**." Ex. 71, 18 (emphasis added). Not only did "EIS already propose[] ***numerous constructions*** in the IPRs, ***all of which the Board rejected***" (*supra* p. 89), EIS did so with respect to "reference pressure." EIS's feigned ignorance about what happened in the IPRs is disingenuous, and its bold accusation that Novoluto's representation "is simply false" could not itself be farther from the truth.

Tellingly, EIS does not dispute the PTAB's construction of "reference pressure."[31] Instead, EIS pretends a dispute does not exist. But, unless EIS adopts the PTAB's construction, which EIS has refused to do in this case, a dispute does exist. Novoluto's counsel requested EIS's position on

---

[31] EIS also did not challenge the Board's construction of "reference pressure" on appeal in the consolidated appeal of all three IPRs. Ex. 69.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

"reference pressure" during the parties' meet and confer and specifically asked if EIS would agree to the PTAB's construction. EIS's counsel said they had not decided and did not convey its position until now, in its Reply. EIS now insists construction is unnecessary, yet still does not adopt the Board's construction. The reason is simple—EIS presumably hopes the Court will not address the dispute so that EIS can have *yet another* try at claim construction at some later date. EIS has taken multiple bites at the claim construction apple for this term (3 IPR petitions, 3 IPR requests for rehearing, 3 IPR replies, and 9 IPR expert declarations), and has failed to convince the PTAB that *any* of EIS's proposed constructions are correct. Exs. 6-8. EIS should not be given yet another chance to rewrite this term. The intrinsic record amply supports the PTAB's construction of "reference pressure," which *EIS does not dispute*. This Court should adopt the correct construction so that, in the words of EIS, "the parties do not re-hash this same claim construction dispute before the jury." *Supra* p. 44.

| | |
|---|---|
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP | CHIPMAN BROWN CICERO & COLE, LLP |
| */s/ Brian P. Egan* | */s/ Gregory E. Stuhlman* |
| Jack B. Blumenfeld (#1014) | Paul D. Brown (#3903) |
| Brian P. Egan (#6227) | Joseph B. Cicero (#4388) |
| 1201 North Market Street | Gregory E. Stuhlman (#4765) |
| P.O. Box 1347 | Hercules Plaza |
| Wilmington, DE 19899 | 1313 North Market Street, Suite 5400 |
| (302) 658-9200 | Wilmington, DE 19801 |
| jblumenfeld@morrisnichols.com | (302) 295-0191 |
| began@morrisnichols.com | brown@chipmanbrown.com |
| | cicero@chipmanbrown.com |
| *Attorneys for Plaintiff* | stuhlman@chipmanbrown.com |
| | *Attorneys for Defendants* |

**HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**

OF COUNSEL:

Naveen Modi
Allan M. Soobert
Chetan Bansal
James Razick
David Valente
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700

June 30, 2022

OF COUNSEL:

Tammy J. Terry
Califf Cooper
Lisa E. Margonis
Peter C. Schechter
OSHA BERGMAN WATANABE & BURTON LLP
Two Houston Center
909 Fannin, Suite 3500
Houston, TX 77010
(713) 228-8600

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2022, I caused the foregoing to be electronically filed with

the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered

participants.

I further certify that I caused copies of the foregoing document to be served on

July 7, 2022, upon the following in the manner indicated:

Paul D. Brown, Esquire                                   *VIA ELECTRONIC MAIL*
Joseph B. Cicero, Esquire
Gregory E. Stuhlman, Esquire
CHIPMAN BROWN CICERO & COLE, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE  19801
*Attorneys for Defendants IntiHealth Ger GmbH,*
*WOW Tech USA, Ltd., WOW Tech Canada, Ltd. and*
*Novoluto GmbH*

Tammy J. Terry, Esquire                                  *VIA ELECTRONIC MAIL*
Califf T. Cooper, Esquire
Lisa E. Margonis, Esquire
Peter C. Schechter, Esquire
OSHA BERGMAN WATANABE & BURTON LLP
1100 Louisiana Street, Suite 4900
Houston, TX  77002
*Attorneys for Defendants IntiHealth Ger GmbH,*
*WOW Tech USA, Ltd., WOW Tech Canada, Ltd. and*
*Novoluto GmbH*

/s/ *Brian P. Egan*
_____
Brian P. Egan (#6227)