**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EIS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>INTIHEALTH GER GMBH, WOW TECH USA, LTD., WOW TECH CANADA, LTD., and NOVOLUTO GMBH,<br><br>Defendants. | C.A. No. 19-1227-GBW |
| NOVOLUTO GMBH,<br><br>Counterclaimant,<br><br>v.<br><br>EIS, INC., EIS GMBH, TRIPLE A IMPORT GMBH, and TRIPLE A MARKETING GMBH,<br><br>Counterclaim Defendants. | |

Jack B. Blumenfeld, Brian P. Egan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Naveen Modi, Allan M. Soobert, Chetan Bansal, James Razick, David Valente, PAUL HASTINGS LLP, Washington, DC.

*Attorneys for Plaintiff/Counterclaim Defendants.*

Paul D. Brown, Joseph B. Cicero, Gregory E. Stuhlman, CHIPMAN BROWN CICERO & COLE LLP, Wilmington, Delaware; Tammy J. Terry, Califf Cooper, Lisa E. Margonis, Peter C. Schechter, OSHA BERGMAN WATANABE & BURTON LLP, Houston, Texas.

*Attorneys for Defendants/Counterclaimant.*

**MEMORANDUM OPINION**

**UNSEALED 1/17/2023**
January 9, 2023
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

In this action filed by Plaintiff EIS, Inc. ("EIS") against Defendants IntiHealth Ger GmbH, WOW Tech USA Ltd., WOW Tech Canada Ltd., and Novoluto GmbH ("Novoluto"), EIS seeks, amongst other claims, declarations of non-infringement of United States Patent Nos. 9,763,851 ("the '851 patent"), 11,090,220 ("the '220 patent"), 11,103,418 ("the '418 patent"), 9,849,061 ("the '061 patent"), and 9,937,097 ("the '097 patent") (collectively, the "Asserted Patents"), which are assigned to Defendant Novoluto. D.I. 111. In response, Novoluto asserts counterclaims of infringement of the Asserted Patents against EIS, EIS GmbH, Triple A Import GmbH, and Triple A Marketing GmbH.[1] D.I. 118. Presently before the Court is the issue of claim construction of multiple terms in the Asserted Patents. The Court has considered the parties' joint claim construction brief and accompanying appendices, *see generally* D.I. 208; 238; D.I. 239; D.I. 240; D.I. 241, and held a *Markman* hearing on November 21, 2022 ("Tr. __"). D.I. 296.

## I. BACKGROUND

While the Court writes for the benefit of the parties and, thus, declines to explain the turbulent history between the parties—including prior litigation in Germany and multiple proceedings before the Patent Trial and Appeal Board—a brief overview of the relevant technology is helpful. The parties are both designers and proprietors of devices related to sexual health and wellness. *See* D.I. 238 at 1-6. The Asserted Patents all relate to a stimulation device for erogenous zones, such as the clitoris. *Id.* As the '851 patent—parent to the '220 and '418 patents—summarizes, the stimulation device is directed to creating positive and negative

[1] For the purpose of clarity throughout this Memorandum Opinion, the Court refers to Plaintiff/Counterclaim Defendants as "EIS," and Defendants/Counterclaimant as "Novoluto."

modulated pressures used to stimulate a user's preferred body part, including a clitoris. *See* '851 patent at 1:12-15, claim 1; *see also* '220 patent at claim 1; '418 patent at claim 1. Similarly, the '061 patent—parent to the '097 patent—is directed to creating positive and negative modulated pressures to stimulate a user's body, but further includes an appendage that can be inserted into the user's body. *See* '061 patent at Abstract; *see also* '097 patent at Abstract. The parties dispute the construction of nine terms across the Asserted Patents. D.I. 238.

## II.    LEGAL STANDARDS

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted); *see also Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989) ("A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention."). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324. The Court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.* The ultimate question of the proper construction of a patent is a question of law, although subsidiary fact-finding is sometimes necessary. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)).

"The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1312–13). A person of ordinary skill in the art "is deemed to read the claim term not only in the context of the particular claim in which the disputed term

appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.

"When construing claim terms, [the court] first look[s] to, and primarily rely[s] on, the intrinsic evidence, including the claims themselves, the specification, and the prosecution history of the patent, which is usually dispositive." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013) (internal quotation marks and citations omitted). "Other claims of the patent in question, both asserted and unasserted, can . . . be valuable" in discerning the meaning of a disputed claim term because "claim terms are normally used consistently throughout the patent," and so, "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314. In addition, "[d]ifferences among claims can also be a useful guide[.]" *Id.* For example, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15.

In addition to the claim, the Court should analyze the specification, which "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citation omitted). "[E]ven when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-*

*Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).  And, the specification "is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

The Court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, (1996).  The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution[.]" *Phillips*, 415 F.3d at 1317.

In some cases, the Court "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980.  Overall, while extrinsic evidence may be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (internal quotation marks and citations omitted).

## III.    CONSTRUCTION OF DISPUTED TERMS

### A.  "connection element"

The claim term "connection element" appears in claim 1 of the '851 patent and claims 1 and 2 of the '061 patent.  The parties' competing proposed constructions for "connection element" are set out in the chart below:

| Claim Term | Plaintiff EIS's Construction | Defendant Novoluto's Construction |
|---|---|---|
| "connection element" | "media flow path with a smaller cross-sectional area than the first chamber" | Plain and ordinary meaning, which means "structure that connects two structures" |

The crux of the parties' dispute is two-fold: first, whether all of the claims of the Asserted Patents, even those claims that do not recite the term "connection element," should be construed to include that term, *see* D.I. 238 at 6, 12; and second, whether "connection element" requires having a smaller cross-sectional area than the first chamber to provide the invention's "perceptible massage effect," *id.* at 8-10, 14-15. For the reasons set out below, the Court construes the claim term "connection element" to mean:

"structure that connects two structures"

The use of the disputed term in claim 1 of the '851 patent is representative.

1. A stimulation device for a clitoris, comprising:

a pressure field generator comprising:

a first chamber having a single opening;

a second chamber having first and second openings, the second opening of the second chamber for placing over the clitoris; and

a ***connection element*** having a first opening and a separate second opening thereby forming a straight channel connecting the single opening of the first chamber with the first opening of the second chamber;

a drive unit that changes a volume of the first chamber in such a manner that a stimulating pressure field is generated in the second chamber via the ***connection element***; and

a control device that actuates the drive unit; and a housing enclosing the pressure field generator, the drive unit, and the control device; wherein:

the pressure field generated in the second chamber consists of a pattern of negative and positive pressures modulated with respect to a reference pressure,

the first chamber is connected with the second chamber solely by the connection element,

the stimulation device has no valves,

the stimulation device is a portable hand-held device with a battery,

> the connection element is rigid and the first and second openings of the connection element are aligned to one another so that a media flow during a compression of the first chamber is directed to the clitoris through the straight channel with a nozzle effect, and
>
> the second opening of the ***connection element*** is configured to face the clitoris through the second chamber.

'851 patent at claim 1 (emphases added).

Throughout its briefing and during oral argument, EIS maintained the position that, while the disputed term "connection element" only appears in the '851 and '061 patents, all claims of the Asserted Patents should be construed to include that term. *See* D.I. 238 at 6; Tr. at 9-10. EIS asserts that, because "one of the core tenets and purported inventive aspects" of the Asserted Patents is creating a "perceptible massage effect" and subsequent "nozzle effect," even those claims of the Asserted Patents that do not explicitly recite "connection element" should be construed to include the same. *Id.* at 6-8. While EIS is correct that, unless otherwise compelled, a claim term should be construed consistently across related patents, *see id.* at 24, this proposition does not permit importing terms or limitations into the claims of related patents that do not recite that disputed term. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1333-35 (Fed. Cir. 2003) (construing the disputed term consistently through multiple related patents because the common term was explicitly recited in the claims of each of the patents-in-suits). Rather, "it is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985). As such, the Court rejects EIS's invitation to apply the construction of the disputed term "connection element" in claims across related patents that simply do not recite the term. Therefore, the only claims

relevant to the Court's construction of the disputed term "connection element" is claim 1 of the '851 patent and claims 1 and 2 of the '061 patent.

Turning to the parties' proposed constructions, EIS contends that its proposed construction is "consistent with the only connection element described" in the specification and disclosed in each embodiment. D.I. 238 at 6; Tr. at 13 ("[S]o if you look at the specification in the figures, every embodiment has a connection element in which that connection element has a smaller cross-sectional area than the first chamber."). In other words, because "each and every embodiment of the connection element is smaller in cross-sectional area to the first chamber," the term "connection element" necessarily requires that its cross-sectional area be smaller than the first chamber. *Id.* EIS asserts that this requirement is not arbitrary, but rather is required to create a "stimulating pressure field" which subsequently produces the "perceptible massage effect." *Id.* at 7 (citing '851 patent at 4:66-5:1 for the proposition that "generated pressures are 'decisively influenced by the configuration . . . of the connection element.'"); *see also* Tr. at 29 ("You cannot, in a two-chamber device with a connection element, create this massage effect and accelerate the airflow back and forth in that connection element unless it's smaller. It's physics. And that's what the specification tells us."). Like placing your thumb over a garden hose, which increases the pressure causing the water to accelerate outward, EIS argues that only when the connection element has a smaller cross-sectional area than the first chamber can the medium, i.e., air or water, be sufficiently accelerated to create a perceptible massage effect. *See* D.I. 238 at 8-9; Tr. at 13 ("[J]ust like putting your thumb over the hose, you can't accelerate that medium unless you reduce the cross-sectional area.").

In response, Novoluto argues that the term "connection element" has a plain and ordinary meaning to a person of ordinary skill in the art as simply a "structure that connects two structures."

D.I. 238 at 12. The plain and ordinary meaning is supported by the specifications of the '851 and '061 patents, which Novoluto contends consistently describe the "connection element" as a structure connecting other structures. *See, e.g.*, '851 patent at 8:16-20 ("[A] connection element 5, which connects the first chamber 3 with the second chamber 4."); *id.* at 9:11-14 ("Two mutually aligned openings in wall 41 of the second chamber and of holder 32 jointly form connection element 5, which connects the first chamber 3 and the second chamber 5."); '061 patent at 8:58-59 ("[A]nd a connection element 5 that connects the first chamber 3 to the second chamber 4."). Further, Novoluto refutes EIS's contention that the generated pressures are ***decisively influenced*** by the connection element, *see* D.I. 238 at 7 (emphasis added), citing to portions of the '851 and '061 patents' specifications that recognize that the "connection element may be 'adjustable' and have different configurations to provide different pressure fields." D.I. 238 at 13 (citing '851 patent at 4:64-5:12); *see also* '061 patent at 4:22-29.

The Court agrees with Novoluto that there is no evidence compelling the Court to stray from the disputed term's plain and ordinary meaning. *See Phillips*, 415 F.3d at 1316 (explaining that absent evidence to the contrary, a term's plain and ordinary meaning is the default). Simply put, to a person of ordinary skill in the art, the disputed term "connection element" means a structure that connects two structures. The plain and ordinary meaning is supported by the specifications of both the '851 and '061 patents, which consistently describe the "connection element" as connecting the first chamber and the second chamber. *See, e.g.*, '851 patent at 3:58-63, 8:16-20, 9:11-14; '061 patent at 3:5-10, 8:55-59, 10:32-35. Moreover, the Court disagrees that the "perceptible massage effect" is decisively influenced by the connection element having a smaller cross-sectional area than the first chamber. *See* D.I. 238 at 7. In fact, both the '851 and '061 patents' specifications explain that the perceptible massage effect may vary based on the

design and interaction of several components of the stimulation device. *See, e.g.*, '851 patent, 10:1-10 ("[T]ype of flow can not only be advantageously influenced by the size and orientation of opening 51, but also by the inner configuration of the connection element"); *id.* at 4:66-5:3 ("[P]ressure field is decisively influenced by the configuration of the . . . connection and . . . opening from the connection element into the second chamber, and is thus adjustable"); *id.* at 9:62-64 ("[I]ndirect (pressure) massage . . . ensues due to the medium flowing onto body part 11"); *id.* at 11:1-3 ("plurality of channels 52 and openings 51, leads to a distribution of the pressure field"); '061 patent at 14:58-61 ("[P]roximity of opening 51 of connection element 5 to the area of skin . . . can also be used to determine the intensity of the massaging effect"); *id.* at 14:62-65 ("A plurality of openings 51 . . . allows the massaging effect to be distributed to a plurality of areas . . . [so] the clitoris can be stimulated less directly"). Thus, the intrinsic record supports adopting the plain and ordinary meaning of the term "connection element," which means a "structure that connects two structures."

In addition to being unsupported by the intrinsic record, EIS's proposed construction conflicts with well-established canons of claim construction. First, in arguing that "connection element" requires having a smaller cross-sectional area than the first chamber, EIS improperly narrows the meaning of the term to a single embodiment. *See Supercell Oy v. GREE, Inc.*, 2021 WL 4452082, at *4 (Fed. Cir. Sept. 29, 2021) (cautioning courts to avoid construing a term "on the basis of a single exemplary embodiment"). In doing so, EIS overlooks that the specifications of the '851 patent and the '061 patent disclose that the "connection element" may be adjustable, and variations in the configuration of the connection element provides altering pressure fields. *See* '851 patent at 4:64-5:12; '061 patent at 4:23-28. For example, the "connection element" may have a single passageway with a nozzle effect between the first and second chamber, *see, e.g.*, '851

patent at 5:6-9; '061 patent at 4:31-34, a plurality of passageways between chambers, *see, e.g.*, '851 patent at 5:9-12; '061 patent at 4:34-38, or different inner configurations, such as helix-shaped grooves, *see* '851 patent at 10:1-5. More so, the "connection element" may be integrally formed or in one piece with the wall of the second chamber, *see, e.g.*, '851 patent at 10:25-27; '061 patent at 11:51-54, and/or the first chamber, *see, e.g.*, '851 patent at 5:44-48; '061 patent at 5:4-8, or formed with openings at different proximities to the area of skin to be stimulated, *see, e.g.*, '851 patent at 12:18-21; '061 patent at 13:58-52.

Next, EIS's proposed construction is belied by Figure 9 of the '851 patent, which illustrates a plurality of connection elements wherein the cross-sectional area is not smaller than the first chamber. *See* '851 patent at 11:1-14, Figure 9; *see also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (rejecting a proposed claim interpretation that would exclude disclosed examples in the specification). Furthermore, in arguing that a smaller cross-sectional area of the "connection element" is ***the*** cause of the "stimulating pressure field," EIS ignores that claim 1 of both the '851 and '061 patents separately recite that the drive unit, not the connection element, generates the stimulating pressure field.[2] *See, e.g.*, '851 patent at claim 1 ("[A] drive unit that changes a volume of the first chamber in such a manner that a stimulating pressure field is generated in the second chamber via the connection element . . ."); '061 patent at claim 1 ("[A] drive unit that varies the volume of the at least one first chamber such that a stimulating pressure field is generated via the at least one connection element in the at least one second chamber . . ."). The separately recited "drive unit" limitation must stand on its own and

[2] EIS's argument is premised on mistakenly interpreting "via" to mean "responsible for." However, "via" is used consistently throughout the '851 and '061 patents to mean "through." *See, e.g.*, '851 patent, at 5:19-21 ("Thus, the first chamber is preferably connected exclusively with the second chamber ***via or through*** the connection element." (emphasis added)); '061 patent at 4:45-47 (same).

cannot be imported into the definition of "connection element." *Promos Techs., Inc. v. Samsung Elecs. Co.*, 809 F. App'x 825, 834 (Fed. Cir. 2020) ("[I]t is generally improper to construe a patent claim so that express claim limitations or elements are rendered superfluous.").

Finally, there is no support for EIS's contention that the "'connection element' must . . . have a cross-sectional area smaller than the first chamber in order to generate the claimed 'nozzle effect.'" *See* D.I. 238 at 10. Indeed, EIS concedes that the phrase "nozzle effect" does not even appear in the '061 patent. *Id.* at 10 n.6. More so, EIS acknowledges that the '851 patent describes "nozzle effect" as an optional feature. Tr. at 30; *see also* '851 patent at 4:64-5:12. Even if the '851 patent did not describe "nozzle effect" as an optional feature, EIS fails to proffer any intrinsic evidence that the "nozzle effect" is generated because the "connection element" has a smaller cross-sectional area than the first chamber. EIS's selective citations to Novoluto's statements made during the German prosecution of the '851 patent's counterpart—German Patent Application No. DE102013110501 ("the '501 German Patent")—are similarly unavailing. *See* D.I. 238 at 10-11, 23. These statements, when viewed in their entirety, reveal that the German Patent Office was interpreting the term "nozzle effect" as applied to "straight channel," not "connection element." *Id.* at 17; D.I. 239, Ex. 17 at 8. In fact, in an opposition proceeding involving the '501 German Patent, the German Patent Office concluded that "[t]he definition of two chambers which are connected with a connection element does not by itself lead to the interpretation that a constriction or narrowing must be present in the overall cavity of the device." D.I. 239, Ex. 18 at 10.

Accordingly, finding nothing in the intrinsic record to support EIS's proposed construction, nor evidence compelling a different interpretation, the Court construes "connection element" to have its plain and ordinary meaning—"structure that connects two structures."

**B. "stimulation device"**

The claim term "stimulation device" appears in all independent claims of the Asserted Patents. The parties' competing proposed constructions for "stimulation device" are set out in the chart below:

| Claim Term | Plaintiff EIS's Construction | Defendant Novoluto's Construction |
|---|---|---|
| "stimulation device" | "a device including at least a first chamber, a second chamber, and a connection element connecting the first chamber with the second chamber" | Plain and ordinary meaning, which means "a device that is capable of sexually arousing or exciting" |
| | | **Alternatively**: Plain and ordinary meaning, which means "a device designed to sexually arouse or excite" |

While Novoluto has consistently argued that the Court should construe the term "stimulation device" to have its plain and ordinary meaning, Novoluto's proffered plain and ordinary meaning has changed since the parties filed their Joint Claim Construction Chart. *See* D.I. 207. That is, Novoluto initially asserted that "stimulation device" has a plain and ordinary meaning of "a device that is ***capable of*** sexually arousing or exciting," *see* D.I. 238 at 28; *see also* D.I. 207 at 8-9, but now asserts that the plain and ordinary meaning is actually a "device ***designed to*** sexually arose or excite," *see* D.I. 238 at 28-31. When asked why it modified its proposed construction and whether this modification incorporates more limiting language, Novoluto explained that its new construction would reduce jury confusion because its initial construction failed to account for the argument that ***any*** object could be theoretically "capable of" sexually arousing. Tr. 48-49. Novoluto's newly proposed plain and ordinary meaning, while undisputedly broader than originally proposed in the parties' Joint Claim Construction Chart, is not untimely. Far from being "blindsided," EIS had the opportunity to address Novoluto's new construction both

in its Reply Brief and during the *Markman* hearing. D.I. 238 at 34. As such, the Court need not discount either of Novoluto's proposed constructions when construing "stimulation device."

Thus, the remaining dispute turns on whether the term "stimulation device" was disavowed or defined by the Asserted Patents' specifications. D.I. 238 at 26-27, 29-31. For the reasons set out below, the Court finds that the Asserted Patents did not disavow or define the disputed term, and construes "stimulation device" to mean:

"a device that is capable of sexually arousing or exciting"

Absent evidence of lexicography or disavowal, the Court will not depart from the plain meaning of the claim terms. *Thorner*, 669 F.3d at 1365. The standard for finding either lexicography or disavowal are "exacting." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). A patentee may act as its own lexicographer and redefine claim terms in the specification but must "clearly express an intent to redefine the term." *Thorner*, 669 F.3d at 1365 (internal quotation marks omitted). Similarly, disavowal requires that "the specification [or prosecution history] make[] clear that the invention does not include a particular feature." *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). Although such disavowal can occur either explicitly or implicitly, it must be clear and unmistakable. *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016). Courts have routinely found disavowal based on clear and unmistakable statements by the patentee that limit the claims, such as "the present invention includes . . .," or "the present invention is . . .," or "all embodiments of the present invention are . . . ." *See, e.g.*, *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1316-19 (Fed. Cir. 2006); *SciMed Life Sys., Inc.*, 242 F.3d at 1343-44. Ultimately, when a patentee "describes the features of the 'present invention' as a whole," he

implicitly alerts the reader that "this description limits the scope of the invention." *Regents of the Univ. of Minn.*, 717 F.3d at 936.

EIS contends that its proposed construction mirrors what Novoluto represented was "the invention." D.I. 238 at 26-27. That is, Novoluto's use of the phrase "according to the invention" in the '851 patent and the '061 patent specifications prior to reciting components of a "stimulation device" were clear and unmistakable statements that limit the scope of that term. *Id.* Based on this language, EIS summarily asserts that the patentee limited not just the term "stimulation device," but all of the claims at issue across each of the Asserted Patents—even the '097, '220, and '418 patents, which do not include the phrase "according to the invention." *Id.* at 27-28 ("[W]hile the above disclaimer is based on statements in the '851 and '061 patent specifications, it extends to the '097, '220, and '418 patents because they incorporate by reference the specification of the '851 or '061 patents.").

The Court disagrees that Novoluto's use of the phrase "according to the invention" rises to the level of an express disavowal or lexicography. "Language such as 'according to the invention' does not necessarily limit the scope of the claims, at least where the language of the claims is more general than the descriptions of the embodiments of the invention in the specification, and the references in the specification can fairly be read as directed to particular embodiments of the invention rather than characterizing the full reach of the claims." *Zadro Prod., Inc. v. SDI Techs.*, Inc., 2019 WL 10252726, at *6 (D. Del. June 19, 2019); *Creative Integrated Sys., Inc. v. Nintendo of Am., Inc.*, 526 F. App'x 927, 933 (Fed. Cir. 2013) (statements that describe the invention as a whole are more likely to support a limiting definition of a claim term, but "this principle has no application where, as here, the other statements and illustrations make it clear that the limitations do not describe the invention as a whole."). Here, although the common portions of the '851 and

'061 patents' specifications use the expression "according to the invention," the intrinsic evidence indicates that those statements are not characterizations of the full scope of the invention. *See, e.g.*, '851 patent at 3:55-67, 4:33-36, 5:45-47, 10:25-27, 10:43-44; '061 patent at 3:1-10, 3:58-61, 5:4-8. Instead, the intrinsic evidence makes it clear that those statements refer to embodiments that are narrower than the scope dictated by the more general language of the claims. *E.g.*, '851 patent at 3:55-4:2; '061 patent at 3:1-16. The phrase "according to the invention" in the '851 and '061 patents does not define the outer limits of the invention, but instead merely describe embodiments and signals that those phrases cannot properly be interpreted as signaling restrictive characterizations of the invention as a whole. Therefore, the "according to the invention" statements in the '851 and '061 patents' specifications do not support a limiting construction of the term "stimulation device."

As EIS has failed to proffer "exacting" evidence of lexicography or disavowal, the Court declines to depart from the plain meaning of "stimulation device." *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016). Here, the claims relate to a "stimulation device" for "erogenous zones" such as the clitoris. *See, e.g.*, '851 patent at claim 1 ("A stimulation device for a clitoris . . ."); '061 patent at claim 1 ("A stimulation device for erogenous zones . . ."). Similarly, the specifications are plainly directed to stimulation devices for purposes of enhanced sexual pleasure. *See, e.g.*, '851 patent at 6:40-47 ("[U]se of the stimulation device according to the invention as a sex toy for stimulating the female clitoris."); *id.* at 14:16-16:21 ("[S]timulation device for a clitoris," "chamber for placing over the clitoris"); '061 patent at 7:37-39 ("In the present invention, the methods for stimulating erogenous zones serve for sexual pleasure . . ."); *id.* at 16:22-18:52 ("[A]ppendage is a dildo configured to be inserted into a vagina," "method for stimulating erogenous zones for sexual pleasure," "inserting an appendage of a stimulation device

into a vagina"). Notably, the '061 and '097 patents explain that the claimed invention and related methods "do not serve for medical, for example therapeutic, purposes," which further supports that "stimulation device" relates to enhanced sexual pleasure. *See, e.g.*,'061 patent at 7:37-40; '097 patent at 9:11-13.

Although the Court construes "stimulation device" to have its plain and ordinary meaning, the intrinsic record does not support limiting the term to a device "***designed to*** sexually arose or excite." *See* D.I. 238 at 28. Such a construction would improperly limit the invention to a single embodiment, especially considering that each specification of the Asserted Patents explains that "[t]he use of the present invention is thus not limited to the female clitoris 11, instead stimulation device 1 can be used on all body parts or erogenous zones (such as the inside of the upper thighs, the loins, neck, nipples, etc.) . . ." *See, e.g.*, '851 patent at 8:58-64; '220 patent at 9:41-47 (same); '418 patent at 9:41-47 (same); '061 patent at 10:9-15 (same); '410 patent at 10:63-11:2 (same); *Supercell Oy*, 2021 WL 4452082, at *4. More importantly, that the claims recite a stimulation device "for" erogenous zones or the clitoris is indicative of the invention's suitability, fitness, appropriateness, conduciveness, adaptation, and allowance—all of which are consistent with the construction "capable of." Other courts have also recognized that use of the term "for" generally suggests capability of performing a function rather than an invention's intended or preferred use. *See, e.g.*, *Gentex Corp. v. Revision Military Ltd.*, 2020 WL 1875529, at *3 (D. Del. Apr. 15, 2020); *Vizio, Inc. v. ITC*, 605 F.3d 1330, 1339-42 (Fed. Cir. 2010); *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1366 (Fed. Cir. 2001); *Intel Corp. v. Broadcom Corp.*, 172 F. Supp. 2d 516, 546 (D. Del. 2001).

Therefore, as supported by the intrinsic record, the Court adopts the plain and ordinary meaning of the term "stimulation device," meaning "a device that is capable of sexual excitement or arousal."

**C. "opening of the chamber"**

The parties initially indicated that the term "opening of the chamber" required construction. *See generally* D.I. 207. However, it became apparent during oral argument that the crux of the parties' dispute centered around construing the term "opening." Tr. at 56-58; 60-62. Thus, the Court will only construe the disputed term "opening."[3] The term "opening" appears in claims 1 and 2 of the '851 patent, claims 1-3 of the '061 patent, claims 1, 3, 12, 15, 17, 19, 26, and 29 of the '097 patent, claims 1, 3, 10, 17, and 19 of the '220 patent, and claims 1, 3, 11, 19, and 21 of the '418 patent. Both parties agree that "opening" should be construed to have its plain and ordinary meaning. D.I. 238 at 39-41, 43; Tr. 58 (EIS's counsel stating that the term "really truly ought to be a plain and ordinary meaning provided that the plain and ordinary meaning makes clear that it's the actual opening of that chamber."). Yet, as demonstrated by the chart below, the parties' proposed plain and ordinary meaning of "opening" radically differs.

| Claim Term | Plaintiff EIS's Construction | Defendant Novoluto's Construction |
| --- | --- | --- |
| "opening" | "an aperture to the immediately contiguous structure" | Plain and ordinary meaning, which means "a hole that allows access" |

The use of the disputed term in claim 1 of both the '851 patent and the '418 patent are instructive.

[3] "Chamber" is a separate term that the parties argue requires construction. *See infra* Section III.F. Notably, EIS's proposed construction for the term "opening of the chamber" is inconsistent with its proposed construction of the term "chamber," below. *Compare* D.I. 238 at 37 (construing "opening of the chamber" to mean "an aperture to the immediately contiguous structure"), *with* D.I. 238 at 67 (construing "chamber" to mean "enclosed cavity").

1. A stimulation device for a clitoris, comprising:

a pressure field generator comprising:

a first chamber having a single ***opening***;

a second chamber having first and second ***openings***, the second ***opening*** of the second chamber for placing over the clitoris; and

a connection element having a first ***opening*** and a separate second ***opening*** thereby forming a straight channel connecting the single ***opening*** of the first chamber with the first ***opening*** of the second chamber;

a drive unit that changes a volume of the first chamber in such a manner that a stimulating pressure field is generated in the second chamber via the connection element; and

a control device that actuates the drive unit; and a housing enclosing the pressure field generator, the drive unit, and the control device; wherein:

the pressure field generated in the second chamber consists of a pattern of negative and positive pressures modulated with respect to a reference pressure,

the first chamber is connected with the second chamber solely by the connection element,

the stimulation device has no valves,

the stimulation device is a portable hand-held device with a battery,

the connection element is rigid and the first and second ***openings*** of the connection element are aligned to one another so that a media flow during a compression of the first chamber is directed to the clitoris through the straight channel with a nozzle effect, and

the second ***opening*** of the connection element is configured to face the clitoris through the second chamber.

'851 patent at claim 1 (emphases added).

1. A stimulation device comprising:

a chamber having a flexible wall;

> a drive unit in physical communication with the flexible wall to cause at least a portion of the flexible wall to deflect in opposing directions, thereby resulting in a changing volume of the chamber, the changing volume of the chamber resulting in modulated positive and negative pressures with respect to an ambient pressure;
>
> an ***opening*** configured to sealingly engage a portion of a body of a user including a clitoris, the modulated positive and negative pressures to be applied to the portion of the body via the ***opening***, the ***opening*** being a sole ***opening*** of the chamber to an exterior of the stimulation device;
>
> a control device configured to receive input from the user and control the drive unit to cause the at least the portion of the flexible wall to deflect to create the modulated positive and negative pressures based on modulated frequencies; and
>
> a housing enclosing the drive unit and the control device.

'418 patent at claim 1 (emphases added).

The Court need not function as a thesaurus when tasked with construing a nontechnical, plain-English word. *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) ("[Terms that] are not technical terms of art . . . do not require elaborate interpretation."). "Opening" is not a technical term of art that requires an elaborate interpretation. On their face, the claims consistently use the term "opening" to mean a "hole." *See, e.g.*, '851 patent at claim 1 ("[A] connection element having a first [hole] and a separate second [hole] thereby forming a straight channel connecting the single [hole] of the first chamber with the first [hole] of the second chamber . . ."); '418 patent at claim 1 ("[A] [hole] configured to sealingly engage a portion of a body of a user including a clitoris, the modulated positive and negative pressures to be applied to the portion of the body via the [hole], the [hole] being a sole [hole] of the chamber to an exterior of the stimulation device . . ."). Similarly, the Asserted Patents' specifications repeatedly refer to "opening" as a "hole." *See, e.g.*, '851 patent at 3:60-61, Figures 12a–12d (illustrating that opening 51 is at least one hole); '418 patent at 4:17-19 ("The modulated positive and negative pressures are applied to a body part . . .

through an opening of the stimulation device."); '061 patent at 6:40-41 ("[T]he angle between the handle and the opening of the second chamber can be adapted to suit the preferences of the user of the device."). Other words are commonly used within the claims to modify the term "opening"—*e.g.*, "of the first chamber," "of the second chamber," "of the device," or "sole"—which indicates that the term "opening," by itself, does not require a spatial limitation as EIS suggests. *Cf.* D.I. 238 at 38 (EIS's proposed construction requiring a spatial limitation of "to the immediately contiguous structure"). Further, EIS's repeated reliance on its accused products to bolster its proposed construction, *see* D.I. 238 at 37-38 (mapping the disputed term in light of EIS's accused products), disregards that a claim is construed in light of the intrinsic record—including the claims themselves, the specification, and the prosecution history of the patent— "not in light of the accused device." *SRT Int'l*, 775 F.2d at 1118.

For the above reasons, the Court will construe the term "opening" to have its plain and ordinary meaning, which means "hole."

**D. "flexible wall"/"flexible wall portion"**

The claim term "flexible wall"/"flexible wall portion" appears in all independent claims of the '097 patent, the '220 patent, and the '418 patent. The parties' competing proposed constructions for "flexible wall"/"flexible wall portion" are set out in the chart below:

| Claim Term | Plaintiff EIS's Construction | Defendant Novoluto's Construction |
|---|---|---|
| "flexible wall"/"flexible wall portion" | "wall/wall portion that deflects without folding and unfolding like a bellows" | Plain and ordinary meaning, which means "a wall that is able to bend or to be bent easily without breaking" |

The parties dispute whether the term "flexible wall"/"flexible wall portion" should be construed in light of Novoluto's purported disclaimer of the word "bellows" from the scope of this disputed term during an *inter partes* review of the '097 patent ("the '097 patent IPR"). *See* D.I.

238 at 47-49. For the reasons set out below, the Court finds that Novoluto did not expressly disclaim the word "bellows" from the scope of term "flexible wall"/"flexible wall portion." Therefore, the Court adopts the plain and ordinary meaning of the claim term "flexible wall"/"flexible wall portion" and construes the term to mean:

> "a wall that is able to bend or to be bent easily without breaking"

The use of the disputed term in claim 1 of the '097 patent is representative.

> 1. A stimulation device, comprising:
>
> a chamber having a ***flexible wall portion***;
>
> a drive unit in physical communication with the ***flexible wall portion*** so as to cause deflections of the ***flexible wall portion*** in opposing directions, thereby resulting in a changing volume of the chamber,
>
> the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure;
>
> an opening for applying the modulated positive and negative pressures to a body part;
>
> a control device for controlling the drive unit; and
>
> an appendage, wherein the appendage is a dildo configured to be inserted into a vagina.

'097 patent at claim 1 (emphases added).

EIS asserts that Novoluto expressly disclaimed the word "bellows" from the scope of the term "flexible wall"/"flexible wall portion" in an effort to overcome a prior art reference—United States Patent No. 5,725,473 ("Taylor")—during the '097 patent IPR. D.I. 238 at 47-48. Specifically, when Novoluto distinguished "bellows" as "structurally different" from the "flexible wall" claimed in the '097 patent because "bellows folds and unfolds but does not deflect in opposing directions," Novoluto purportedly disclaimed the word "bellows" ***generally***. *Id.* at 47 (emphasis added). Further, EIS avers that this disclaimer of "bellows" in the '097 patent can, and

should, be "appl[ied] to all patents-in-suit, including the '220 patent and the '418 patent" because "each asserted patent contains the same description of a flexible wall . . ." D.I. 238 at 48-49 (citing *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004)). Novoluto vehemently disagrees, arguing that EIS's selective citations to statements made during the '097 patent IPR do not demonstrate an express disclaimer of the word "bellows" generally. D.I. 238 at 50-51. Rather, when read in their full context, Novoluto's statements distinguishing the "flexible wall" claimed in the '097 patent were directed specifically to the "bellows" of *Taylor*—not "bellows" generally. *Id.* at 50.

"Under the doctrine of prosecution disclaimer, a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution." *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). Prosecution disclaimer can arise from both claim amendments and arguments made to the United States Patent and Trademark Office. *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013). It can also apply to statements made to the Patent Trial and Appeal Board during an *inter partes* review proceeding. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017). However, courts will not apply the doctrine of prosecution disclaimer unless the disclaimer is "both clear and unmistakable to one of ordinary skill in the art." *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007) (quotations omitted).

The Court disagrees that Novoluto expressly disclaimed "bellows" generally during the '097 patent IPR. The intrinsic record demonstrates that Novoluto's statements distinguishing "bellows" from the '097 patent's claimed "flexible wall" were directed only to the "bellows" disclosed in *Taylor*, not "bellows" generally. To be sure, Novoluto argued that:

> [EIS] argues 'the accordion-like top wall of bellows 160' of Taylor corresponds to the 'flexible wall portion.' Taylor's bellows does not, however, disclose the

> required 'flexible wall portion' that deflects 'in opposing directions.' Taylor's bellows requires a material structurally stiff enough to fold and unfold as the bellows compresses and expands, otherwise, the bellows would not hold its shape and would not function as required. Taylor's bellows wall is structurally very different from the flexible wall that deflects in opposing directions as claimed in the '097 Patent[.]

D.I. 208, Ex. 2 at 52-53 (internal citations omitted).

That is, Novoluto explained that *Taylor* required a stiff structural material to fold and unfold while compressed and expanded, which it argued was plainly distinct from the '097 patent's claimed flexible wall deflecting in opposing directions. *See id.* As illustrated below, because *Taylor*'s bellows is made from a stiff structural material, force must be applied in opposing directions across the bellows, i.e., compressing and expanding, thereby causing *Taylor*'s bellows to fold and unfold. *Id.* at 53.

But this is different from the '097 patent's claimed "flexible wall," whereby force is applied perpendicular to the "flexible wall," causing deflections rather than folding and unfolding. *Id.* ("[T]he folding and unfolding of the bellows wall does not 'cause deflections . . . in opposing directions.' Rather, as the bellows compresses and expands, the folds move at varying angles and directions with respect to each other.").

Finding no evidence of a clear and unmistakable disavowal of the word "bellows" from the scope of the disputed term, the Court declines to apply the doctrine of prosecution disclaimer to the term "flexible wall"/"flexible wall portion." *See Elbex Video, Ltd.*, 508 F.3d at 1371. Instead,

because a term's plain and ordinary meaning is the default in claim construction, *Phillips*, 415 F.3d at 1316, the Court construes "flexible wall"/"flexible wall portion" according to its plain meaning—"a wall that is able to bend or to be bent easily without breaking." Turning to the intrinsic record, the '851 patent's (parent to the '220 and '418 patents) and the '097 patent's specifications describe the "flexible wall" as made of a resilient material, such as silicone or rubber, which supports that the "flexible wall" must be able to bend. *See, e.g.*, '851 patent at 9:21-22, 10:45-46; '097 patent at 11:31-32, 12:59-61. Various figures of the Asserted Patents similarly illustrate that the "flexible wall" bends without breaking to allow for the expansion and compression of the chamber, thereby creating the desired "stimulating pressure field." *See, e.g.*, '851 patent at Figures 4-6; '097 patent at Figures 4-6. Indeed, EIS does not dispute that the "flexible wall" must be able to bend easily, as it describes the "flexible wall" as an "elastic surface" throughout its briefing. *See* D.I. 238 at 47-48.

Accordingly, the term "flexible wall"/"flexible wall portion" is construed to have its plain and ordinary meaning—"a wall that is able to bend or to be bent easily without breaking."

**E. "pressure field generator"**

The claim term "pressure field generator" appears in claim 1 of the '851 patent,[4] claims 17, 21, 22, 26, 28, and 30 of the '097 patent, claims 17 and 20 of the '220 patent, and claim 19 of the '418 patent. The parties' dispute centers around whether "pressure field generator" is a means-plus-function term. The parties each propose separate constructions for "pressure field generator" depending on whether Court finds that the term is a mean-plus-function term:

[4] Oddly, EIS omits claim 1 of the '851 patent as a claim relevant to the construction of "pressure field generator," arguing that this claim "already recites the construction EIS seeks." D.I. 238 at 54 n.23.

| Claim Term | Plaintiff EIS's Construction | Defendant Novoluto's Construction |
|---|---|---|
| Means-Plus-Function Term:<br><br>"pressure field generator" | Function: "generating a pressure field"<br><br>Structure: "at least a first chamber, at least a second chamber, and at least one connection element that connects the first chamber with the second chamber and equivalents" | Function: "providing modulated positive and negative pressure"<br><br>Structures: "(1) a volume with a flexible wall portion; (2) a chamber with a flexible wall portion; (3) a first chamber with a flexible wall portion, a second chamber; (4) a first chamber, a second chamber with an opening, and a connection element"<br><br>Function: "generating a pressure field with massaging effect"<br><br>Structure: "a first chamber and a connection element"<br><br>Function: "creating media or air flow"<br><br>Structure: "a first chamber, second chamber, connection element, collectively formed as one piece, where first chamber is directly and exclusively connected to the second chamber without a valve to the environment surrounding the device"<br><br>Function: "generating a pressure field"<br><br>Structures: "(1) a chamber with a flexible wall portion; (2) a first chamber with a flexible wall portion, a second chamber; a first chamber and a connection element; (3) a first chamber, a second chamber with an opening, and a connection element; (4) a first chamber; (5) a first chamber in the interior of the |

| | | |
|---|---|---|
| | | stimulation device, a second chamber, and a connection element that connects the first chamber to the second chamber; (6) a chamber that is largely or completely closed off from the exterior of the pressure field generator when the pressure field generator is in contact with the body part to be stimulated, and which includes two chambers and a connection element; (7) a first chamber, a second chamber, a holder, and a connection element that connects the first chamber to the second chamber; (8) a first chamber, a replaceable second chamber, and a connection element; (9) a first chamber, a second chamber, an integrally formed connection element (i.e., formed as one-piece) with the wall of the second chamber; (10) a one-piece structure with a resilient chamber material; (11) a first chamber with a piston and no valves, a second chamber, and a plurality of connection elements constructed in one piece" |
| Not a Means-Plus-Function Term: "pressure field generator" | "at least a first chamber, a second chamber, and a connection element that connects the first chamber with the second chamber" | Plain and ordinary meaning, which means "a component that generates a pressure field" |

Means-plus-function limitations permit a patentee to claim an element of the invention in terms of the element's function without reciting the corresponding structure in the claim itself. *Fraunhofer-Gesellschaft Zur Forderung der angewandten Forschung e.V. v. Sirius XM Radio Inc.*, 2020 WL 549801, at *3 (D. Del. Feb. 4, 2020). As the Federal Circuit has explained:

> Means-plus-function limitations are governed by 35 U.S.C. [§ 112(f)][5], which provides: An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure in support thereof, and such claim shall be construed to cover the corresponding structure described in the specification and equivalents thereof.

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1367 (Fed. Cir. 2012) (original alterations omitted). The Federal Circuit has further explained that "§ [112(f)] represents a *quid pro quo* by permitting inventors to use a generic means expression for a claim limitation provided that the specification indicates what structure(s) constitute(s) the means." *Id.* (quotation omitted).

As a threshold matter, when determining whether a limitation is a means-plus-function limitation, "the use of the word 'means' in a claim element creates a rebuttable presumption that § [112(f)] applies. Applying the converse, . . . the failure to use the word 'means' also creates a rebuttable presumption—this time that § [112(f)] does not apply." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (citation omitted). This presumption can be overcome if "the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1349. However, the presence or absence of the word "means" is not a *per se* indication of a means-plus-function limitation. Rather, "[t]he ultimate question is whether 'the claim language, read in light of the specification, recites sufficiently definite structure to avoid § [112(f)].'" *MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1342 (Fed. Cir. 2019) (quoting *Media Rights Techs. Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015)). "Sufficient structure exists when the claim language specifies the exact structure that performs the functions in question without need to resort to other portions of the

[5] The passing of the American Invents Act renumbered former 35 U.S.C. § 112, ¶ 6 to be 35 U.S.C. § 112(f). *See* America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (Sept. 16, 2011).

specification or extrinsic evidence for an adequate understanding of the structure." *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259-60 (Fed. Cir. 2008).

To construe a means-plus-function claim term, the court must first determine the claimed function. *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012) (citation omitted). The second step is to "identify the corresponding structure in the written description of the patent that performs that function." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006) (internal citation omitted). Means-plus-function claims are statutorily limited to the structure disclosed in the patent specification that corresponds to the claimed function. *See Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003). The identified structure is required to "permit one of ordinary skill in the art to 'know and understand what structure corresponds to the means limitation.'" *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (quoting *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007)). Otherwise, the term is invalid. *Id.*

Claim 17 of the '097 patent is instructive.

17. A stimulation device, comprising:

> a ***pressure field generator*** having a flexible wall portion;
>
> a drive unit in physical communication with the flexible wall portion so as to cause deflections of the flexible wall portion in opposing directions, thereby resulting in a changing volume of the ***pressure field generator***,
>
> the changing volume of the ***pressure field generator*** resulting in modulated positive and negative pressures with respect to a reference pressure;
>
> an opening for applying the modulated positive and negative pressures to a body part;
>
> a control device for controlling the drive unit; and
>
> an appendage, wherein the appendage is a dildo configured to be inserted into a vagina.

’097 patent at Claim 17 (emphases added).

Since this claim—nor any of the claims relevant to “pressure field generator”—does not use the word “means,” there is a rebuttable presumption that § 112(f) does not apply. *Williamson*, 792 F.3d at 1348. Further, the Court finds that EIS has failed to rebut this presumption that “pressure field generator” is not a means-plus-function term because all of the relevant claims articulate a sufficient structure that includes various other structural features recited in each patent for performing the claimed function, i.e., generating a pressure field.

“Pressure field generator,” as used consistently across the ’851, ’097, ’220, and ’418 patents, conveys a sufficiently definite structure. *See, e.g.*, ’851 patent at 14:16-16:21; ’097 patent at 17:1-18:61; ’220 patent at 14:60-16:57; ’418 patent at 14:60-16:64. Beyond the structure connoted by the specifications, each claim further delineates specific structures and explains the relationship between the “pressure field generator” and other structures of the claimed device. For example, the ’851 patent recites a “pressure field generator comprising: a first chamber . . . a second chamber . . . a connection element,” and “a drive unit that changes a volume of the first chamber . . .” *See* ’851 patent at claim 1. Likewise, the ’418 patent recites “a pressure field generator including a first chamber and a second chamber, the first chamber including a flexible wall; a drive unit in physical communication with the flexible wall . . . resulting in a changing volume of the first chamber . . .” ’418 patent at claim 19. The ’097 patent claims that the “pressure field generator” also has a volume that is changed by deflecting the flexible wall portion of the “pressure field generator,” and that the device has a drive unit in physical communication with the flexible wall portion. *See* ’097 patent at claim 1; *see also id.* at claim 17 (“[A] pressure field generator having a flexible wall portion; a drive unit in physical communication with the flexible wall portion . . .”). Moreover, claims 21 and 22 of the ’097 patent further describe that the

"pressure field generator" has "a first chamber and a second chamber" and "wherein the flexible wall portion is integral with the pressure field generator." *See id.* at claim 21, 22. The '220 patent similarly recites a definite structure of the pressure field generator, including "a flexible wall" which is "integral with the pressure field generator." *See* '220 patent at claims 17, 20.

Further supporting the Court's conclusion is the opinion of Novoluto's expert, Dr. Cameron, who opined that the term "pressure generator" and "field" are generally known in the art and would convey a definite structure to a person of ordinary skill. *See* D.I. 239 at Ex. 41, ¶ 65. Dr. Cameron explained that, in the context of the medical device industry, a person of ordinary skill would readily understand that use of the word "field" indicates that the pressure is generated within a volume, i.e., a chamber. *See id.* at ¶¶ 65, 66. Thus, when considered in totality with the claim language and specifications of the '851, '097, '220, and '418 patents, the Court is not persuaded that "pressure field generator" fails to connotate a definite structure to a person of ordinary skill in the art such that § 112(f) applies. Rather, "pressure field generator" denotes a component that generates a pressure field via the structural features recited in the claims. *See id.* at ¶¶ 65-67.

Alternatively, EIS argues that, if the Court finds that "pressure field generator" is not a means-plus-function term, the Court should construe the term consistent with Novoluto's purported lexicography. D.I. 238 at 56-57. In other words, "pressure field generator" should be construed to mean "at least a first chamber, a second chamber, and a connection element that connects the first chamber with the second chamber" because Novoluto's alleged use of the phrase "according to the invention" indicates an express limitation of the scope of that term. *Id.* However, as explained above, language such as "according to the invention" does not necessarily limit the scope of the claims where the references in the specification can fairly be read as directed to

particular embodiments of the invention rather than characterizing the full reach of the claims. *Zadro Prod., Inc.,* 2019 WL 10252726, at *6. Here, there is no evidence, let alone rising to the level of "clear and unmistakable," that Novoluto intended to redefine or limit the scope of "pressure field generator." Rather, as clearly shown by the intrinsic evidence, Novoluto's statements refer to embodiments that are narrower than the scope dictated by the more general language of the claims. *E.g.*, '851 patent at 3:58-65 ("According to the invention, a pressure field generator in the simulation device has at least one first chamber and at least one second chamber . . . ***This embodiment*** of chambers according to the invention communicating in a fluidic manner . . .") (emphasis added).

Accordingly, the intrinsic record demonstrates that a person of ordinary skill in the art would understand that "pressure field generator" connotates a sufficient and definite structure. *See* D.I. 239 at Ex. 41, ¶¶ 65-67. The term is used consistently across the '851, '097, '220, and '418 patents to denote a component that generates a pressure field. *See, e.g.*, '851 patent at 14:16-16:21; '097 patent at 17:1-18:61; '220 patent at 14:60-16:57; '418 patent at 14:60-16:64. Thus, the Court construes "pressure field generator" to mean "a component that generates a pressure field." Each of these patents separately recites limitations which define specific structures of various embodiments of that "component," *e.g.*, a flexible wall, a volume, a first chamber, a second chamber, and/or a connection element, and recites the relationship between the pressure field generator and other structures of the device, i.e., drive unit. *Promos Techs.*, 809 F. App'x at 834.

**F. "chamber"**

The claim term "chamber" appears in claims 1, 2, 4, and 5 of the '851 patent, claims 1, 3, 5, 7, and 24 of the '061 patent, claims 1, 5, 6, 12, 14, 16, 21, and 28 of the '097 patent, claims 1

and 4 of the '220 patent, and claims 1, 4, 18, 19, and 22 of the '418 patent. The parties' competing proposed constructions for "chamber" are set out in the chart below:

| Claim Term | Plaintiff EIS's Construction | Defendant Novoluto's Construction |
|---|---|---|
| "chamber" | "enclosed cavity" | Plain and ordinary meaning, which means "compartment" |

The parties' dispute whether the term "chamber" refers to a defined structure and, if so, whether that structure must be "enclosed." For the reasons explained below, the Court construes the term "chamber" to have its plain and ordinary meaning, which means "compartment."

The use of the disputed term in claim 1 of the '851 patent is representative.

1. A stimulation device for a clitoris, comprising:

a pressure field generator comprising:

a first ***chamber*** having a single opening;

a second ***chamber*** having first and second openings, the second opening of the second ***chamber*** for placing over the clitoris; and

a connection element having a first opening and a separate second opening thereby forming a straight channel connecting the single opening of the first ***chamber*** with the first opening of the second ***chamber***;

a drive unit that changes a volume of the first ***chamber*** in such a manner that a stimulating pressure field is generated in the second ***chamber*** via the connection element; and

a control device that actuates the drive unit; and a housing enclosing the pressure field generator, the drive unit, and the control device; wherein:

the pressure field generated in the second ***chamber*** consists of a pattern of negative and positive pressures modulated with respect to a reference pressure,

the first ***chamber*** is connected with the second ***chamber*** solely by the connection element,

the stimulation device has no valves,

> the stimulation device is a portable hand-held device with a battery,
>
> the connection element is rigid and the first and second openings of the connection element are aligned to one another so that a media flow during a compression of the first ***chamber*** is directed to the clitoris through the straight channel with a nozzle effect, and
>
> the second opening of the connection element is configured to face the clitoris through the second ***chamber***.

'851 patent at claim 1 (emphases added).

EIS urges the Court to adopt its proposed construction, "enclosed cavity," arguing that it is directly supported by the intrinsic record and is "important" to help differentiate its accused products from Novoluto's anticipated infringement positions. D.I. 238 at 67-68; Tr. at 93 ("[T]he dispute here arises really because Novoluto intends to argue that a single straight wall involving the accused products comprises two chambers and connection element."). First, EIS argues that "chamber" must be "enclosed" because each claim that recites "chamber" specifies each opening of that chamber. D.I. 238 at 68. Thus, the claim language would not need to specify when, or if, a "chamber" has an opening if the "chamber" was not naturally enclosed. *Id.* Next, EIS contends that a "chamber" must be enclosed because a pressure field could not be physically transmitted through the chamber's opening via the connection element, as required by the claims, if there were other openings in the chamber. *Id.* Finally, EIS argues that because the Asserted Patents' specifications disclose the importance of "tightly sealing" the chambers of the device, "chamber" must necessarily be enclosed. *Id.* at 68-69.

Reviewing both the claim language and the intrinsic record, the Court finds no support for EIS's proposed construction. In fact, and as EIS conceded during the *Markman* hearing, the Asserted Patents neither use the word "cavity" or the word "enclosed" in relation to "chamber," *see* Tr. at 99, 102, which belies EIS's contention that "chamber" necessarily has some defined

borders. *See* D.I. 238 at 73. More so, that the relevant claims specify each opening when reciting the term "chamber" does not necessitate that "chamber" must be enclosed. Rather, specifying each opening simply limits *that* "chamber" to the number of openings recited in the claim—*e.g.*, the '851 patent recites that the first chamber has a single opening, meaning it is limited to one opening rather than two, three, etc. *See* '851 patent at 14:18-19. Further, that the Asserted Patents' specifications disclose "tightly sealing" the chamber from the device's drive unit and other components establishes that the chamber is not naturally enclosed. *See, e.g.*, '851 patent at 5:13-16, 8:66-9:5, 10:27-29; '061 patent at 10:18-24, 14:57-52. Logically, an enclosed chamber would not require sealing because, by definition, an enclosed chamber is already sealed from the outside. EIS's proposed construction also risks introducing undesired ambiguity as to the degree the cavity is "enclosed," i.e., partially or fully, which was not squarely addressed by EIS when probed during the *Markman* hearing. *See* Tr. 102-103 ("The Court: 'But does enclose mean fully enclosed, partially enclosed?' . . . [EIS's Counsel]: 'I think the dispute here, . . . is that they intend to just draw boxes around arbitrary spaces and say that's a chamber. And without the chamber being something that's a little more articulated and defined, that's what it is going to be is just a box-drawing exercise.'"). EIS's proposed construction masquerades as a genuine attempt to promote clarity, *see* D.I. 238 at 67, but is ultimately fueled by its non-infringement positions and unsupported by the intrinsic record. The Court rejects EIS's proposed construction as it is not supported by the intrinsic record.

The Court sees no reason to depart from the term's plain and ordinary meaning. As demonstrated by the Asserted Patents' specification, "chamber" is a nontechnical, plain-English

word that is consistently used to mean "compartment."[6] *See, e.g.*, '851 patent, 5:13-16, 8:16-20, 8:39-40, 8:66-9:5, 10:27-29. Contrary to EIS's position, there is no intrinsic support for construing "chamber" to have "some defined borders," *see* D.I. 238 at 73, because the claim language already recites other claim limitations that define the chamber's structure. *See, e.g.*, '851 patent at claim 1 ("[A] first chamber having a single opening; a second chamber having first and second openings . . ."); '061 patent at claim 1 ("[A]t least one second chamber having at least one opening for placing on a body part . . ."); *id.* at claim 4 ("[W]herein the at least one second chamber is made in one piece with the at least one connection element and the at least one first chamber."); *see also Promos Techs.,* 809 F. App'x at 834 ("[I]t is generally improper to construe a patent claim so that express claim limitations or elements are rendered superfluous."). Thus, the Court finds that "chamber" need not be construed to have some defined borders. Rather, "chamber" is construed to have its plain and ordinary meaning as informed by the intrinsic record, which means "compartment."

### G. "create the modulated positive and negative pressures based on modulated frequencies"

The claim term "create the modulated positive and negative pressures based on modulated frequencies" appears in claims 1 and 19 of the '418 patent. During the *Markman* hearing, the parties agreed that the real dispute centered on construction of the term "based on modulated frequencies." Tr. at 107-08. As such, the Court will only construe the term "based on modulated frequencies."

[6] Although EIS highlights that at least one dictionary defines "chamber" as "a natural or artificial enclosed space or cavity," *see* D.I. 239, Ex. 22 at 205, the Court need not function as a thesaurus when construing nontechnical, plain-English terms. *Brown*, 265 F.3d at 1352. More importantly, when a term's meaning is clearly informed by the patent's claim language and specification, as is here, dictionary definitions cannot supplant that term's meaning. *See Phillips*, 415 F.3d at 1321.

The crux of the parties' dispute is whether the term "based on modulated frequencies" is indefinite or, whether a person of ordinary skill in the art would understand, with reasonable certainty, what "frequencies" are required to be modulated. EIS asserts that the term "based on modulated frequencies" is indefinite and, thus, declines to proffer a construction. *See* D.I. 238 at 74. Novoluto disagrees, arguing that, when read in light of the intrinsic evidence, the term "based on modulated frequencies" "clearly informs, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* at 76. Novoluto proposes to construe the term "based on modulated frequencies" as "based on changes in the drive unit speed," which it argues is supported by a person skilled in the art's understanding of the term's plain and ordinary meaning. *Id.* at 77-78.

Section 112 of the Patent Act requires that the claims of a patent "particularly point[] out and distinctly claim[] the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). The "primary purpose of the definiteness requirement" contained in § 112(b) "is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, *e.g.*, competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779–80 (Fed. Cir. 2002).

"A patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). To determine indefiniteness, courts examine "the patent record—the claims, specification, and prosecution history—to ascertain if they convey to one of skill in the art with reasonable certainty the scope of the invention claimed." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*,

789 F.3d 1335, 1341 (Fed. Cir. 2015). While a "'potential infringer'" need not "be able to determine ex ante if a particular act infringes the claims," the patentee must "apprise the public 'of what is still open to them[]'" such that "a person of ordinary skill in the art could determine whether or not an accused product or method infringes the claim." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1346-47 (Fed. Cir. 2022) (citations omitted) (internal quotations omitted). B The challenger must "prov[e] indefiniteness by clear and convincing evidence." *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

Like claim construction, definiteness is a question of law, but the Court must sometimes render factual findings based on extrinsic evidence to resolve the ultimate issue of definiteness. *See, e.g., Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017). "[A]ny fact critical to a holding on indefiniteness must be proven by the challenger by clear and convincing evidence." *One-E-Way, Inc. v. Int'l Trade Comm'n*, 859 F.3d 1059, 1062 (Fed. Cir. 2017) (cleaned up).

The disputed term "based on modulated frequencies" is not indefinite. While EIS is correct that the '418 patent's specification never mentions the phrase "modulated frequencies," *see* D.I. 238 at 75, this alone does not prove with "reasonable certainty" that a person of ordinary skill in the art reading the intrinsic record would not be able to determine the meaning of the disputed term. In fact, the claim language is clear that the modulated positive and negative pressures are based on modulated frequencies of the drive unit:

> ***a drive unit*** in physical communication with the flexible wall ***to cause at least a portion of the flexible wall to deflect in opposing directions***, thereby resulting in a changing volume of the chamber, the changing volume of the chamber ***resulting in modulated positive and negative pressures with respect to an ambient pressure***;
>
> . . .

> a control device configured to receive input from the user and control ***the drive unit to cause the at least the portion of the flexible wall to deflect to create the modulated positive and negative pressures based on modulated frequencies***; . . .

'418 patent at claim 1 (emphases added).

Indeed, the '418 patent's figures confirm that the modulated positive and negative pressures with respect to the ambient pressure are created by the drive unit deflecting at least a portion of the flexible wall in opposing directions to change the volume of the chamber. *See* '418 patent at Figures 4-6. The specification further explains that the modulated positive and negative pressures with respect to ambient pressure may be based on controlling the drive unit—such as "an electric motor," *see* '418 patent at 9:6-16—to modulate, or change, "the size of the deflection, the frequency, the modulation, etc." *See id.* at 13:15-17. The term "frequency," as related to a "drive unit" or "an electric motor," has clear and concise meaning to a person of ordinary skill in the art as "speed." D.I. 238 at 79-80; D.I. 240 at Ex. 67, ¶¶ 37-38. Thus, a person of ordinary skill in the art, reading the entire '418 patent, would understand that changing the frequency, i.e., speed, of the drive unit would affect the rate of deflection of the flexible wall and, thereby, change modulation of the positive and negative pressures.

That the disputed term is not indefinite is further confirmed by Novoluto's expert, Dr. Cameron, who testified during the *Markman* hearing that "frequency," in the context of mechanical engineering, is clearly understood to be the speed of the motor in the drive unit.[7] Tr. at 116 ("[T]he reason we say frequency is that the motor speed is measured like in revolutions per minute or per second . . . but in loose terms we call that the speed."). The "frequency" of an electric motor, i.e.,

[7] Notably, EIS's indefiniteness argument is premised on the '418 patent not reciting what the modulated frequencies are based on. D.I. 238 at 74-75. But merely a few sentences later, EIS acknowledges that "frequency" is used in the '418 patent to refer only to controlling the drive unit. *Id.* at 75. Rather than heed to its own concession, however, EIS continued to pursue a Sisyphean-like indefiniteness argument.

the ’418 patent’s “drive unit,” can be adjusted by the control device, *see* ’418 patent at 13:15-17, thereby changing the size of deflections of the flexible wall. Tr. at 115. Changing the size of deflections of the flexible wall “changes the rate of change in volume, which is basically what creates the modulated pressures.” *Id.* Thus, adjusting the drive unit speed via the control device naturally affects the modulation of positive and negative pressures.

Therefore, when read in light of the entirety of the ’418 patent, a person of ordinary skill in the art would be clearly informed, with reasonable certainty, that the term “based on modulated frequencies” refers to changes in the drive unit speed. EIS has not carried its burden of demonstrating, by clear and convincing evidence, that the term is indefinite. Accordingly, the Court, based on the intrinsic record, construes “based on modulated frequencies” to mean “based on changes in drive unit speed.”

**H. “sealingly engage a portion of a body of a user including a clitoris”**

The term “sealingly engage a portion of a body of a user including a clitoris” appears in claims 1 and 19 of the ’418 patent and claims 1 and 17 of the ’220 patent. Like the term “based on modulated frequencies” above, here the parties dispute whether the term “sealingly engage a portion of a body of a user including a clitoris” is indefinite.

EIS argues that it is indefinite because the term “sealingly” incorporates a degree of approximation—to what degree of a seal is required to be considered “sealingly” engaged—which a person of ordinary skill in the art would not be able to understand with reasonable certainty. D.I. 238 at 80-21. EIS seeks to bolster its indefiniteness argument by contending that Novoluto has inconsistently represented the required degree of a seal. *Id.* That is, Novoluto allegedly represented during the prosecution of the ’220 patent that a ***perfect seal is required*** to obtain positive and negative pressures, but later argued that the device produces “modulated positive and

negative pressures ***without*** a '100 percent airtight seal,'" i.e., "just a tight enough seal," during an *inter partes* review of the '851 patent ("the '851 IPR"). *See* D.I. 238 at 81. Novoluto purportedly advanced the same inconsistent position made in the '851 IPR during litigation of the '501 German Patent when it represented that "a tight seal was not necessary for infringement," and that "alternating positive and negative pressures are possible even in the presence of an air gap." D.I. 238 at 81. Thus, because a person of ordinary skill in the art could not, let alone Novoluto itself, "determine with reasonable certainty how much of a seal is actually required by the claims," "these claims should be found indefinite." D.I. 238 at 82 (citing D.I. 239 at Ex. 27, ¶¶ 57-63).

Applying the same framework as detailed above, *see supra* Section III.G, the Court finds that EIS has not met is burden of demonstrating, by clear and convincing evidence, that "sealingly engage a portion of a body of a user including a clitoris" is indefinite. *See BASF Corp.*, 875 F.3d at 1365. The specifications of the '418 and '220 patents explain that "sealing engagement of the opening of the device with the user's body" is "largely or completely sealed off" such that the edges of a chamber "ideally form an air-tight bond with the surface of body part 11." *See, e.g.*, '418 patent at 9:49-55; '220 patent at 9:49-55; *see also* '851 patent at 8:66-9:5. In other words, the chamber is "sealed tightly to the body part . . . for the most part" by placing the opening of the device on the body part to be stimulated. *See, e.g.*, '418 patent at 13:31-36; '220 patent at 13:31-36. Accordingly, a person of ordinary skill in the art would readily determine, with reasonable certainty, that a "sealing engagement" between the opening of the stimulation device and the body of the user, including a clitoris, is not a 100 percent perfect seal. *See, e.g.*, D.I. 239, Ex. 26 at 94:21-100:15; *id.* at Ex. 41, ¶¶ 72-74; *id.* at Ex. 42, ¶¶ 73-77.

Contrary to EIS's contention, Novoluto consistently represented that "sealingly engage a portion of a body of a user including a clitoris" does not require a perfect seal during the

prosecution of the '220 patent. *See* D.I. 238 at 81, 86-87. There, in distinguishing a prior art reference—United States Patent No. 1,042,058 ("Van Hook")—Novoluto highlighted that Van Hook does not teach or suggest ***any*** seal with the body because Van Hook's claimed telephone receiver cap is "held close to the ear." D.I. 208, Ex. 4 at 14. Novoluto explained that "holding something close to one's body does not mean a seal is formed," and even if Van Hook's telephone receiver cap was placed against the ear, it "would merely be in contact" with the ear rather than "sealingly engaged." *Id.* These statements, when viewed in their full context, demonstrate that Novoluto did not equate "sealingly engage" with forming "a perfect seal." This is consistent with Novoluto's statements made during the '851 patent IPR, where it argued that to create the modulated positive and negative pressures with respect to ambient pressure, a seal between the opening in the device and the body of the user need not be 100 percent airtight. *See* D.I. 239, Ex. 26 at 94:21-100:15.

Nor did Novoluto make "clear and unmistakable" statements equating "sealingly engage" with "fluid-tight" or "perfect seal" that rise to the level of a prosecution history disclaimer. *See Elbex Video*, 508 F.3d at 1371; D.I. 238 at 87. During the prosecution of the '220 patent, Novoluto separately argued that Van Hook's diaphragm was not fluid-tight because it does not "***sealingly separate*** the drive unit from the portion of the body," as required by claim 1, "due to the screw 35 extending through the hole." D.I. 208, Ex. 4 at 15-16 (emphasis added). But, Novoluto's prosecution statements relate to an entirely different term, "sealingly separate," and are not indicative of a "clear and unmistakable" disclaimer of the disputed term "sealingly engage."

Therefore, a person of ordinary skill viewing the intrinsic record would clearly understand that "sealingly engage" does not require a perfect seal. This makes sense in light of the claims reciting that the opening is configured to "sealingly engage a portion of a body of a user." *See,*

*e.g.*, '418 patent at claim 1; '220 patent at claim 1. In other words, "because you are pressing [the device] against a body party . . . [i]t's unrealistic to think that somebody . . . can apply that much pressure to make, for example, a 100 percent seal of a body without any discomfort." Tr. at 135 (testimony of Novoluto's expert, Dr. Cameron). During the *Markman* hearing, Novoluto's expert, Dr. Herbenick, confirmed this understanding by explaining that the clitoris, which is claimed as engaging with the device, *see, e.g.*, '418 patent at claim 1 ("[A] portion of a body of a user including a clitoris"); '220 patent at claim 1 (same), "var[ies] in size from person to person," and is located in "an uneven a fleshy part of the body." Tr. 150-51. A person of ordinary skill in the art would, therefore, understand that forming "a completely perfect 100 percent seal would be highly unlikely with [this] part of the body." *Id.* at 151. Moreover, a person of ordinary skill understands that stimulating a user's clitoris to organism, *see, e.g.*, '418 patent at 8:13-19; '220 patent at 8:13-19, will vary in time based on the user. *See* Tr. 152-153. As "the average time to organism can be 11-13 minutes," "it would be very unlikely" that a user could hold "a device like this to the body and maintain[] a 100 percent perfect seal for long periods of time without moving it." Tr. at 153. Ultimately, Dr. Herbenick concluded that "sealingly engage" does not require a perfect seal, but rather "a good enough seal for those modulated positive and negative pressures to be working and directed toward the body part including the clitoris." Tr. 154-155.

Accordingly, the Court finds that the disputed term "sealingly engage a portion of a body of a user including a clitoris" is not indefinite. Nor would a person of ordinary skill in the art understand that the disputed term requires "a perfect seal." Rather, as informed by the intrinsic record, *see, e.g.*, '418 patent at 13:31-36; '220 patent at 13:31-36, "sealingly engage a portion of a body of a user including a clitoris" is construed to mean "a sufficient enough seal, which does

not have to be a perfect 100 percent seal, on a portion of a body of a user including a clitoris to allow the creation of positive and negative pressures relative to the ambient pressure."

**I. "reference pressure"**

The claim term "reference pressure" appears in claims 1, 2, and 4-6 of the '851 patent, claims 1-3, 5, 7, 8, 11-19, and 21-26 of the '061 patent, claims 1-30 of the '097 patent, claims 1, 3-12, 14, 16, 17, and 19-25 of the '220 patent, and claims 1, 3-13, 15, 17-19, 21-27, 34, and 35 of the '418 patent. The parties' dispute centers around whether the term needs to be construed at all and, if so, whether "reference pressure" should be construed consistently with the Patent Trial and Appeals Board's ("PTAB") construction during *inter partes* review proceedings involving the '097, '851, and '061 patents (the "Relevant IPRs").

Novoluto argues that "reference pressure" should be construed consistently with the PTAB's construction during the Relevant IPRs, i.e., "a prevailing pressure acting on the device prior to placing the stimulation device on the area of skin to be stimulated." *See, e.g.*, D.I. 238 at 89; D.I. 208 at Ex. 6 at 12, Ex. 7 at 13, Ex. 8 at 21. EIS allegedly proposed "numerous constructions" of "reference pressure" during the Relevant IPRs, but Novoluto contends that all were rejected by the Board. D.I. 89-91. EIS argues that this representation "is simply false," and maintains that the Court "need not construe a term simply because Novoluto requests as much." D.I. 238 at 89 (citing *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017)). Believing that construction "is not necessary here," EIS does not proffer its own construction. *Id.* at 89. Nor does EIS dispute PTAB's construction of "reference pressure."[8] *Id.* at 90.

---

[8] EIS also did not challenge PTAB's construction of "reference pressure" on appeal in a consolidated appeal of all Relevant IPRs. *See* D.I. 240, Ex. 69.

EIS's actions during the Relevant IPRs indicate that there is an actual dispute regarding the proper scope of the term "reference pressure." *See id.* at Exs. 6-8. That is, because EIS previously proposed constructions for "reference pressure" in each of the Relevant IPRs, and even later proposed modified constructions, it is clear that there is a dispute regarding the proper scope of this term which requires the Court's to construe the term. *See O2 Micro*, 521 F.3d at 1360.

Reviewing the claim language and the specifications of the Asserted Patents, the Court construes the term "reference pressure" to mean "a prevailing pressure acting on the device prior to placing the stimulation device on the area of skin to be stimulated." This construction is supported by each of the Asserted Patents' specifications, which explain that:

> The reference pressure is usually the [[atmospheric pressure acting on the stimulation device that prevails when application begins]/[existing ambient pressure in relation to the stimulation device at the beginning of use]] (i.e. prior to placing the stimulation device on the area of skin to be stimulated). In the preferred [application/use] of the stimulation device with air, the reference pressure is the currently [prevailing/existing] air pressure or normal pressure.

*See, e.g.*, '097 patent at 5:17-22; '061 patent at 3:38-43; '851 patent at 4:20-25; '220 patent at 5:65-6:3; '418 patent at 5:65-6:3.

The Court's construction is also consistent with Novoluto's representation of the term during the prosecution of the '097 patent. D.I. 238 at 89. There, in attempting to overcome multiple prior art rejections, Novoluto argued that "reference pressure" is not an arbitrarily selected "medium" or middle point, but rather has meaning tied to the prevailing pressure acting on the stimulation device prior to placing the device on the area of skin to be stimulated. *See* D.I. 239, Ex. 38 at 258, 244 ("[T]he user will experience a low suction, a medium suction and a high suction pressure, wherein the low suction pressure is considered as a positive pressure relative to the medium suction pressure (reference pressure), while the high pressure would be the negative

pressure relative to the medium suction pressure); and a control device for controlling the drive unit."); *see also id.*, Ex. 39 at 16-19.

While the PTAB's construction of a disputed term is not binding on this Court, "where the construction is similar to that of a district court's review," it is appropriate to take the PTAB's claim construction into consideration. *Genuine Enabling Tech., LLC v. Sony Corp.*, No. 17-135, 2020 WL 1140910, at *7 (D. Del. Mar. 9, 2020) (quoting *SunPower Corp. v. PanelClaw, Inc.*, No. 12-1633, 2016 WL 1293479, at *6 (D. Del. April 1, 2016). Here, the Court finds the PTAB's reasoning persuasive. In rejecting each of EIS's proposed constructions during the Relevant IPRs, PTAB explained that its construction of "reference pressure" is:

> [N]ot limited to atmospheric pressure (as originally proposed in [EIS's Petition]), but refers generally to the prevailing pressure in the device before it is applied to the body as described in the Specification of the ['097, '851, and '061 patents]. This refers to the pressure within the device regardless of the environment in which it is used. For instance, the Specification of the ['097, '851, and '061 patents] list[] additional environments to include 'a liquid medium, such as water or commercially available lubricant.' . . . It is clear that, when read in context, the reference pressure referred to in this paragraph is the prevailing pressure in the device before the device is applied to the body part.

*See, e.g.*, D.I. 208, Ex. 6 at 11-12, Ex. 7 at 11-13, Ex. 8 at 20-21 (modified).

The Court agrees with PTAB's reasoning that "reference pressure" is not limited to atmospheric pressure because each of the Asserted Patents' specifications contemplate using the device regardless of the environment, i.e., air, liquid medium, lubricant. *See, e.g.*, '097 patent at 5:5-27; '851 patent at 4:9-25; '061 patent at 3:26-49. Instead, "reference pressure" relates more broadly to the existing ambient pressure, regardless of the medium, prior to placing the device on the user's desired body part. *See, e.g.*, '097 patent at 11:49-57, 15:34-37; '851 patent at 12:51-53; '061 patent at 14:49-54.

Accordingly, the Court is persuaded by PTAB's construction of the term "reference pressure," and construes the term to mean "a prevailing pressure acting on the device prior to placing the stimulation device on the area of skin to be stimulated."

## IV.    CONCLUSION

The Court will construe the disputed claim terms as described above.  The Court will issue an Order consistent with this Memorandum Opinion.