# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EIS, INC.,<br><br>       Plaintiff,<br><br>       v.<br><br>INTIHEALTH GER GMBH, WOW TECH USA, LTD., WOW TECH CANADA, LTD. AND NOVOLUTO GMBH,<br><br>       Defendants.<br><br>NOVOLUTO GMBH,<br><br>       Counterclaimant,<br><br>       v.<br><br>EIS, INC., EIS GMBH,<br>TRIPLE A IMPORT GMBH,<br>and TRIPLE A MARKETING GMBH<br><br>       Counterclaim Defendants. | Civil Action No. 19-1227 (GBW) (MPT) |

## PLAINTIFF AND COUNTERCLAIM–DEFENDANTS'
## ELECTION OF PRIOR-ART-BASED INVALIDITY ARGUMENTS

In accordance with the Scheduling Order (D.I. 288, ¶ 1) and the Stipulation and Order Extending Certain Case Deadlines (D.I. 299), Plaintiff EIS, Inc., and Counterclaim–Defendants EIS GmbH, Triple A Import GmbH, and Triple A Marketing GmbH (collectively, "EIS") hereby elect the below asserted prior art and prior-art-based invalidity arguments.  As provided in the Scheduling Order (D.I. 288, ¶ 1 n.3), the elected prior art below does not extend to or include prior art references used to illustrate the state of the art, the knowledge possessed by a person of ordinary skill, to address alleged secondary considerations, for any other context surrounding obviousness for which prior art is commonly introduced in a patent trial, with respect to any damages theory, or for any purpose in connection with any claim or defense other than anticipation or obviousness.

## I.    U.S. PATENT NO. 9,763,851

| Claim | EIS's Election of Prior-Art-Based Invalidity Arguments |
|---|---|
| 1 | • Yang – Obviousness<br>• Eros & Yang – Obviousness<br>• Guan & Yang – Obviousness<br>• Guan & Hovland – Obviousness |
| 2 | • Yang – Obviousness<br>• Eros & Yang – Obviousness<br>• Guan & Yang – Obviousness<br>• Guan & Hovland– Obviousness |
| 4 | • Yang – Obviousness<br>• Eros & Yang – Obviousness<br>• Guan & Yang – Obviousness<br>• Guan & Hovland – Obviousness |
| 5 | • Yang – Obviousness<br>• Eros & Yang – Obviousness<br>• Guan & Yang – Obviousness<br>• Guan & Hovland – Obviousness |
| 6 | • Yang – Obviousness<br>• Eros & Yang – Obviousness<br>• Guan & Yang – Obviousness<br>• Guan & Hovland – Obviousness |

## II.  U.S. PATENT NO. 11,090,220

| Claim | EIS's Election of Prior-Art-Based Invalidity Arguments |
|---|---|
| 1 | • Witt – Anticipation<br>• Yang & Hovland – Obviousness<br>• Robert & Yang & Hovland – Obviousness<br>• Guan & Hovland – Obviousness |
| 3 | • Witt – Anticipation<br>• Yang & Hovland – Obviousness<br>• Robert & Yang & Hovland– Obviousness<br>• Guan & Hovland – Obviousness |
| 4 | • Witt – Anticipation<br>• Yang & Hovland – Obviousness<br>• Robert & Yang & Hovland – Obviousness<br>• Guan & Hovland – Obviousness |
| 16 | • Witt & Makower 744– Obviousness<br>• Yang & Hovland & Makower 744 – Obviousness<br>• Robert & Yang & Hovland & Makower 744 – Obviousness<br>• Guan & Hovland & Makower 744– Obviousness |

## III.  U.S. PATENT NO. 11,103,418

| Claim | EIS's Election of Prior-Art-Based Invalidity Arguments |
|---|---|
| 1 | • Witt & Hovland – Obviousness<br>• Yang & Hovland – Obviousness<br>• Robert & Yang & Hovland – Obviousness<br>• Guan & Hovland – Obviousness |
| 4 | • Witt & Hovland – Obviousness<br>• Yang & Hovland – Obviousness<br>• Robert & Yang & Hovland – Obviousness<br>• Guan & Hovland – Obviousness |
| 10 | • Witt & Hovland & Makower 744 – Obviousness<br>• Yang & Hovland & Makower 744 – Obviousness<br>• Robert & Yang & Makower 744 – Obviousness<br>• Guan & Hovland & Makower 744– Obviousness |

## IV.  U.S. PATENT NO. 9,849,061

| Claim | EIS's Election of Prior-Art-Based Invalidity Arguments |
|---|---|
| 1 | • Yang & Taylor – Obviousness<br>• Eros & Yang & Taylor – Obviousness<br>• Guan & Taylor – Obviousness<br>• Taylor – Anticipation |
| 8 | • Yang & Taylor – Obviousness<br>• Eros & Yang & Taylor – Obviousness<br>• Guan & Taylor – Obviousness<br>• Taylor & Hovland – Obviousness |

2

| 21 | • Yang & Taylor – Obviousness<br>• Eros & Yang & Taylor – Obviousness<br>• Guan & Taylor – Obviousness<br>• Taylor – Anticipation |

## V.    U.S. PATENT NO. 9,937,097

| Claim | EIS's Election of Prior-Art-Based Invalidity Arguments |
|---|---|
| 1 | • Witt & Taylor – Obviousness<br>• Yang & Taylor – Obviousness<br>• Eros & Yang & Taylor – Obviousness<br>• Guan & Lee & Hovland– Obviousness |
| 10 | • Witt & Taylor – Obviousness<br>• Yang & Taylor – Obviousness<br>• Eros & Yang & Taylor – Obviousness<br>• Guan & Lee & Hovland – Obviousness |
| 12 | • Witt & Taylor – Obviousness<br>• Yang & Taylor – Obviousness<br>• Eros & Yang & Taylor – Obviousness<br>• Guan & Lee & Hovland – Obviousness |

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Jack B. Blumenfeld
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnicholls.com
began@morrisnichols.com
*Attorneys for Plaintiff*

OF COUNSEL:

Naveen Modi
Allan M. Soobert
Chetan Bansal
David Valente
James Razick
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700
January 23, 2023

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 23, 2023, I caused the foregoing to be foregoing document

to be served upon the following in the manner indicated:

Paul D. Brown, Esquire                                    *VIA ELECTRONIC MAIL*
Joseph B. Cicero, Esquire
Gregory E. Stuhlman, Esquire
CHIPMAN BROWN CICERO & COLE, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801
*Attorneys for Defendants IntiHealth Ger GmbH,*
*WOW Tech USA, Ltd., WOW Tech Canada, Ltd.*
*and Novoluto GmbH*

Tammy J. Terry, Esquire                                   *VIA ELECTRONIC MAIL*
Califf T. Cooper, Esquire
OSHA BERGMAN WATANABE & BURTON LLP
1100 Louisiana Street, Suite 4900
Houston, TX 77002
*Attorneys for Defendants IntiHealth Ger GmbH,*
*WOW Tech USA, Ltd., WOW Tech Canada, Ltd.*
*and Novoluto GmbH*

*/s/Jack B. Blumenfeld*
_____
Jack B. Blumenfeld (#1014)

4

# EXHIBIT 2

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

EIS GMBH
Petitioner

v.

NOVOLUTO GMBH
Patent Owner

_____

Patent No. 9,937,097

_____

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 9,937,097**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................v

LISTING OF EXHIBITS...................................................................... vii

I.  INTRODUCTION ...................................................................1

II.  MANDATORY NOTICES .....................................................1

III.  PAYMENT OF FEES ............................................................2

IV.  GROUNDS FOR STANDING................................................2

V.  PRECISE RELIEF REQUESTED AND GROUNDS ...................................2

VI.  LEVEL OF ORDINARY SKILL .................................................3

VII.  THE '097 PATENT AND PRIOR ART ........................................4

    A.  The '097 Patent ..............................................................4

    B.  Prosecution Summary of the '097 patent.........................................7

    C.  The '851 patent family...............................................................8

    D.  The Prior Art ...........................................................9

        1.  *Taylor*..........................................................9

        2.  *Hovland*.........................................................10

        3.  *Guan*............................................................12

        4.  *Lee*.............................................................13

VIII.  CLAIM CONSTRUCTION ............................................................13

    A.  "pressure field generator" ...............................................14

IX.  DETAILED EXPLANATION OF GROUNDS...............................................18

    A.  Ground 1: *Taylor* Anticipates Claims 1-9, 12-24, and 26-30......19

        1.  Claim 1..........................................................19

i

2.    Claim 2..................................................................................25

3.    Claim 3..................................................................................26

4.    Claim 4..................................................................................27

5.    Claim 5..................................................................................27

6.    Claim 6..................................................................................28

7.    Claim 8..................................................................................28

8.    Claim 9..................................................................................28

9.    Claim 12................................................................................29

10.    Claim 13................................................................................33

11.    Claim 14................................................................................34

12.    Claim 15................................................................................35

13.    Claim 16................................................................................36

14.    Claim 17................................................................................36

15.    Claim 18................................................................................39

16.    Claim 19................................................................................39

17.    Claim 20................................................................................39

18.    Claim 21................................................................................39

19.    Claim 22................................................................................40

20.    Claim 23................................................................................40

21.    Claim 24................................................................................41

22.    Claim 26................................................................................41

23.    Claim 27................................................................................42

24.    Claim 28................................................................................43

25.    Claim 29...........................................................................44

26.    Claim 30...........................................................................45

B.    Ground 2 - Claims 1-30 Are Unpatentable Over *Taylor* and *Hovland*...........................................................................45

1.    Claims 1, 12, 17, 26........................................................45

2.    Claims 2-6, 8, 9, 13-16, 18-24, and 27-30.....................49

3.    Claim 7.............................................................................49

4.    Claim 10...........................................................................50

5.    Claim 11...........................................................................51

6.    Claim 25...........................................................................53

C.    Ground 3 - Claims 1-30 Are Unpatentable Over *Guan*, *Lee*, and *Hovland*...........................................................................53

1.    Claim 1.............................................................................53

2.    Claim 2.............................................................................62

3.    Claim 3.............................................................................62

4.    Claim 4.............................................................................62

5.    Claim 5.............................................................................62

6.    Claim 6.............................................................................63

7.    Claim 7.............................................................................64

8.    Claim 8.............................................................................65

9.    Claim 9.............................................................................65

10.    Claim 10...........................................................................66

11.    Claim 11...........................................................................66

12.    Claim 12...........................................................................68

13.  Claim 13.................................................................73

14.  Claim 14.................................................................73

15.  Claim 15.................................................................74

16.  Claim 16.................................................................75

17.  Claim 17.................................................................75

18.  Claim 18.................................................................77

19.  Claim 19.................................................................77

20.  Claim 20.................................................................77

21.  Claim 21.................................................................77

22.  Claim 22.................................................................78

23.  Claim 23.................................................................79

24.  Claim 24.................................................................79

25.  Claim 25.................................................................79

26.  Claim 26.................................................................79

27.  Claim 27.................................................................80

28.  Claim 28.................................................................80

29.  Claim 29.................................................................81

30.  Claim 30.................................................................81

X.    ARGUMENTS FOR DISCRETIONARY DENIAL SHOULD BE
      REJECTED.................................................................82

XI.   CONCLUSION.................................................................83

# TABLE OF AUTHORITIES

**Cases**

*Advanced Ground Information Systems, Inc. v. Life360, Inc.*, 830 F.3d 1341 (Fed. Cir. 2016)................................................................................................................15

*Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015)3

*Comcast Cable Communs., LLC v. Promptu Sys. Corp.*, Case No. IPR2018-00342, slip op. (PTAB July 19, 2018) (Paper 13)...........................................................83

*Fox Factory, Inc. v. SRAM, LLC*, IPR2017-00472 (PTAB Apr. 21, 2017) (Paper 10).................................................................................................................83

*In re Leshin*, 277 F.2d 197 (C.C.P.A. 1960)......................................... 50, 53, 65, 68

*KSR Int'l. Co. v. Teleflex, Inc.*, 550 U.S. 398, 417 (2007) ............................. passim

*Omega Eng'g, Inc. v. Raytek Cor*, 334 F.3d 1314 (Fed. Cir. 2003)........................16

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) .......................................14

*Pure Storage, Inc. v. Realtime Data LLC*, Case No. IPR2018-00549, slip op. (PTAB July 23, 2018) (Paper 7)..........................................................................83

*Toro Co. v. White Consolidated Industries Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999).................................................................................................................17

*Toyota Motor Corp. v. Cellport Sys., Inc.*, IPR2015-00633, Paper No. 11 (Aug. 14, 2015).................................................................................................................14

*Trading Techs Int'l, Inc. v. eSpeed, Inc.,* 595 F.3d 1340 (Fed. Cir. 2010)..............17

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)........................15

**Statutes**

35 U.S.C. § 102(a)(1)...................................................................................2, 3

35 U.S.C. § 103 ...................................................................................... 2, 45, 53

35 U.S.C. § 112(f)........................................................................................15

**Other Authorities**

37 C.F.R. § 42.105(a).....................................................................................86

37 C.F.R. § 42.24(d) .....................................................................................85

37 C.F.R. § 42.6(e).......................................................................................86

## LISTING OF EXHIBITS[1]

| Exhibit | Description |
| --- | --- |
| Exhibit 1001 | U.S. Patent No. 9,937,097 B2 |
| Exhibit 1002 | Declaration of Michael R. Prisco, P.E., Ph.D. |
| Exhibit 1003 | Prosecution History of U.S. Patent No. 9,937,097 B2 |
| Exhibit 1004 | U.S. Patent No. 5,725,473 to Taylor ("*Taylor*") issued on March 10, 1998 |
| Exhibit 1005 | U.S. Patent No. 6,964,643 B2 to *Hovland* et al. ("*Hovland*") issued on November 15, 2005 |
| Exhibit 1006 | U.S. Patent No. 7,828,717 B2 to Lee ("*Lee*") issued on November 9, 2010 |
| Exhibit 1007 | Chinese Patent No. CN 2153351 to Guan ("*Guan*") issued on December 11, 1993, and Certified Translation thereof |
| Exhibit 1008 | German Patent and Trade Mark Office Decision on Opposition Proceedings of German Patent DE 10 2013 110 501 and Certified Translation thereof |
| Exhibit 1009 | Prosecution History of U.S. Patent Application No. 15/354,599 |
| Exhibit 1010 | U.S. Patent No. 9,763,851 B1 to Lenke |
| Exhibit 1011 | Copy of CN 2153351 to Guan submitted by Applicant during prosecution of the '097 patent |

---

[1] Citations to Exs. 1001, 1004-1006, and 1010 are to column:line number of the patents. Citations to Exs. 1003, 1007-1009, and 1011-1015 are to the page numbers of the exhibit. Citations to Ex. 1002 are to paragraph numbers.

vii

| Exhibit 1012 | As-filed copy of U.S. Application No. 15/302,981 |
|---|---|
| Exhibit 1013 | German Patent No. 10 2013 110 501 and Certified Translation Thereof |
| Exhibit 1014 | Kevin L. Billups, *The Role of Mechanical Devices in Treating Female Sexual Dysfunction and Enhancing the Female Sexual Response*, 20 World J. Urol. 137 (2002) |
| Exhibit 1015 | Prosecution History of U.S. Patent Application No. 15/965,117 |

## I.    INTRODUCTION

EIS GmbH ("Petitioner") requests *inter partes* review of claims 1-30 ("the challenged claims") of U.S. Patent No. 9,937,097 ("the '097 patent") (Ex. 1001), assigned to Novoluto GmbH ("Patent Owner").  As explained below, the challenged claims should be found unpatentable and cancelled.

## II.    MANDATORY NOTICES

**Real Party-in-Interest**:  Petitioner identifies the following as real parties-in-interest:  EIS GmbH; EIS Inc.; Triple A Import GmbH; Triple A Marketing GmbH; Triple A Sales GmbH; and Triple A Internetshops GmbH (formerly known as "Internetsupport Bielefeld").

**Related Matters**:  The '097 patent is a continuation of U.S. Application No. 15/302,981 ("the '981 application"), which matured into U.S. Patent No. 9,849,061.

U.S. Application No. 15/888,568 is pending before the USPTO and claims priority to the application that matured into the '097 patent.

In addition, pending U.S. Application Nos. 15/354,599; 15/965,117; and 15/965,208, also assigned to the Patent Owner, include claims drawn to subject matter claimed in the '097 patent.

**Counsel and Service Information**: Lead counsel is Dinesh N. Melwani (Reg. No. 60,670), and Backup counsel is Biju I. Chandran (Reg. No. 63,684).

1

Service information is:  Bookoff McAndrews, PLLC, 2020 K Street, NW, Suite 400, Washington, DC 20006; Tel.: 202.808.3497; Fax.: 202.450.5538; email: docketing@bomcip.com, dmelwani@bomcip.com, and bchandran@bomcip.com. Petitioner consents to electronic service.

## III.   PAYMENT OF FEES

The PTO is authorized to charge any fees due during this proceeding to Deposit Account No. 50-5906.

## IV.   GROUNDS FOR STANDING

Petitioner certifies that the '097 patent is available for review and Petitioner is not barred/estopped from requesting review on the following grounds.

## V.   PRECISE RELIEF REQUESTED AND GROUNDS

The challenged claims should be cancelled as unpatentable based on:

**Ground 1:**  Claims 1-9, 12-24, and 26-30 are unpatentable under 35 U.S.C. § 102(a)(1) as anticipated by U.S. Patent No. 5,725,473 ("*Taylor*") (Ex. 1004).

**Ground 2:**  Claims 1-30 are unpatentable under 35 U.S.C. § 103 as obvious over *Taylor* and U.S. Patent No. 6,964,643 ("*Hovland*") (Ex. 1005).

**Ground 3:**  Claims 1-30 are unpatentable under 35 U.S.C. § 103 as obvious over U.S. Patent No. 7,828,717 ("*Lee*") (Ex. 1006), Chinese Patent No. 2153351

("*Guan*") (Ex. 1007), and *Hovland*.[2]

The application of the '097 patent was filed on April 13, 2017, as a continuation of the '981 application, which was a national stage of Application No. PCT/EP2015/06017, filed on July 24, 2015, which claims priority to German Application No. DE 102015103694, filed on March 13, 2015.  Ex. 1001 at 1.  For the purposes of this proceeding only, Petitioner assumes the priority date of the '097 patent is March 13, 2015.

Each of *Taylor*, *Hovland*, *Lee*, and *Guan* published more than a year before March 13, 2015, and are prior art under 35 U.S.C. § 102(a)(1).

## VI.    LEVEL OF ORDINARY SKILL

A person of ordinary skill in the art ("POSITA") as of the claimed priority date of the '097 patent would have had a bachelor's degree in mechanical engineering, biomechanical engineering, or the equivalent, and three or more years of experience in fluid mechanics and pump-based medical devices.  Ex. 1002 at

---

[2] For each Ground, Petitioner does not rely on any reference other than those listed here.  Other references are discussed to show the state of the art at the time of the invention.  *See Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015).

3

¶¶18-22.  More practical experience could qualify one not having the aforementioned education as a POSITA, while a higher level of education could offset lesser experience.  *Id.*

## VII.   THE '097 PATENT AND PRIOR ART

### A.     The '097 Patent

The '097 patent describes stimulation device 1 for erogenous zones, in particular, the clitoris.  Ex. 1001 at 1:17-20; Ex. 1002 at ¶¶29-46.



Stimulation device 1 includes housing 8 and "pressure field generating arrangement 2 … [including] a first chamber 3 in the interior of stimulation device 1, a second chamber 4 for placing on a body part 11 to be stimulated, and a connection element 5 that connects the first chamber 3 to the second chamber 4."  Ex. 1001 at 9:21-24, 42-46, Fig. 3; Ex. 1002 at ¶¶30-31.

The '097 patent contemplates deflecting wall 31 of first chamber 3 to reciprocally vary the volume of chamber 3.  *See* Ex. 1001 at 3:15-19, 11:31–12:3, Figs. 4-6.  This is done via a "drive unit … in physical communication with the flexible wall portion so as to cause deflections of the flexible wall portion in

opposing directions." Ex. 1001 at 3:15-19. Specifically, "a drive unit 6, for example an electric motor, drives the first chamber 3 via a shaft 61 and by means of a cam 62 … such that the volume of the first chamber 3 changes in accordance with rotation of the shaft 61." *Id.* at 3:15-19, 3:46-49, 9:47-51. "The changing volume of the chamber results in modulated positive and negative pressures with respect to a reference pressure [e.g., atmospheric pressure]." Ex. 1001 at 3:19-21, 5:16-27. "Preferably, the variation over time in the pressure field can have a regular or recurring (stimulation) pattern, such as pulses at a predetermined cycle rate or regularly alternating pulse sequences." *Id.* at 7:22-26.



The '097 patent states that, when drive unit 6 is activated, and "the second chamber 4 is placed on the body part [11] to be stimulated such that it is largely air-tight," pressure field generating arrangement 2 generates a pressure field that stimulates body part 11. Ex. 1001 at 15:37-44; Ex. 1002 at ¶33. The '097 patent defines "pressure field" as:

> a field of medium pressures that is variable over time and has temporary positive pressures and

5

temporary negative pressures, a negative pressure being a pressure of medium that is below the reference pressure and a positive pressure being a pressure of medium that is above the reference pressure. As a result, the medium flows back and forth in the pressure field.

Ex. 1001 at 4:63-5:3.

In Fig. 14a, the '097 patent explains that "[i]n phases of pressure increase, air is blown against or massages the erogenous zone to be stimulated, whereas at times when a negative pressure prevails, the blood circulation in the body part 11, for example the clitoris, is favored." *Id.* at 15:51-55.



Fig. 4    Fig. 5    Fig. 6

In use, second chamber 4 is placed on body part 11 to be stimulated so as to form an air-tight enclosure with the surface of body part 11. *See* Ex. 1001 at 11:5-12, Figs. 4-6; Ex. 1002 at ¶33. In this configuration, when no external forces act on first chamber 3, "volume V1 of the first chamber is the standard [or neutral] volume of this chamber 3." Ex. 1001 at 10:55-66, Fig. 4. When a force A acting on first chamber 3 causes it to expand and increase in volume to V2 (V2 > V1),

6

"[t]o equalize the difference in pressure created between the chambers 3 and 4, the medium or air now flows from the second chamber 4 into the first chamber 3." *Id.* at 11:46-53; Ex. 1002 at ¶¶34-36. If the pressure in chambers 3 and 4 in the first state of Fig. 4 is assumed to be the "currently prevailing external reference pressure (e.g., air pressure), the overall pressure that is present in the second state will be lower than the external reference pressure." *Id.* When a force B acting on first chamber 3 causes a volume reduction or compression in chamber 3 such that its volume reduces to V3 (V3 < V1), a positive pressure results in chamber 3, "which is equalized by a medium or air flow [from chamber 3 to] second chamber 4." Ex. 1001 at 11:58-12:3; Ex. 1002 at ¶36. Thus, when there is positive pressure in chamber 3 (see Fig. 6), air is blown against or massages the erogenous zone to be stimulated, and when there is negative pressure in chamber 3, a vacuum stimulates blood flow to the body part. *See* Ex. 1001 at 15:53-57; Ex. 1002 at ¶¶35-36.

Stimulation device 1 also includes appendage 140, which is preferably a stimulation aid for insertion into the body, e.g., a dildo. *See* Ex. 1001 at 9:63-65, 10:9-12. Appendage 140 "can also be used as a handle in order to hold the stimulation device 1 comfortably." Ex. 1001 at 10:15-17; Ex. 1002 at ¶32.

## B.    Prosecution Summary of the '097 patent

The '097 patent was filed as Application No. 15/487,123 ("the '123

application") on April 13, 2017. Except for the absence of the limitation, "wherein the appendage is a dildo configured to be inserted into a vagina," the claims originally-filed in the '123 application are substantively identical to the challenged claims.[3] *Compare* Ex. 1003 at 350-353, *with* Ex. 1001 at 17:1-18:61.

In a first Office Action, the originally-filed claims were rejected over prior art. In response, claims 1, 12, 17, and 26 were amended to recite: "the appendage is a dildo configured to be inserted into a vagina." Ex. 1003 at 235-239. The amended claims were subsequently allowed upon the filing of a Terminal Disclaimer. *Id.* at 50-54, 68-69.

### C.    The '851 patent family

Although not identified as either progenitor or progeny of the '097 patent, U.S. Patent No. 9,763,851 B2 ("the '851 patent") (Ex. 1010), also assigned to Patent Owner, discloses a substantially similar device, as claimed in the '097 patent. *Compare* Ex. 1010, *with* Ex. 1001 (showing the '097 patent and '851 patent disclosures describing a substantially similar stimulation device).

The '851 patent claims priority to German Patent No. 102013110501 ("the '510 patent") (Ex. 1013), which was revoked by the German Patent and Trade

---

[3] An amendment on September 1, 2017, clarified that, in claim 26, the claimed "pressure field generator [was] of a stimulation device." Ex. 1003 at 238.

8

Mark Office (GPTO) (*See* Ex. 1008) following opposition proceedings.  Except for requiring "an appendage [that] is a dildo configured to be inserted into a vagina, revoked claim 1 of the '510 patent includes many of the limitations of claims 1 and 17 of the '097 patent and much more.  *Compare* Ex. 1013 at 30-31, *with* Ex. 1001 at 17:2-16, 18:1-13.  Even so, in its Decision, the GPTO determined that the claims of the '510 patent are unpatentable over *Guan* (Ex. 1007) and other references, and revoked the '510 patent.  Ex. 1008 at 2, 3, 12-13, 15.

### D.    The Prior Art

The claimed features of the '097 patent were well-known at the time of the alleged invention.   Ex. 1002 at ¶¶23-28, 73-269.

#### 1.    *Taylor*

*Taylor* discloses a "sexual aid" that includes a first stimulator 154, superposed above a dildo 50, that "provides intimate engagement with and appropriate stimulation of a clitoris."  Ex. 1004, Abstract, 1:48-49, 5:4-5, 16-17, 29-33, Fig. 3; Ex. 1002 at ¶¶55-58.

Stimulator 154 includes a suction cup member 156 that is configured to conformingly and sealingly receive the upper portion of the vulva, specifically the clitoris. Ex. 1004 at 5:29-33; Ex. 1002 at ¶¶55-58.  Suction cup member 156 is in fluid communication with bellows 160 via flexible conduit 162.  *Taylor* then teaches that



FIG. 3

> [a]s the arm 26 oscillates relative to the housing, the arm 26 ***compresses*** and ***expands*** the bellows 160 relative to the housing 12.  The arm 26 and bellows 160 cyclically introduce a vacuum in the volume defined by the suction cup member 156 and the portion of the vulva received therein.

Ex. 1004 at 5:29-40 (emphasis added); Ex. 1002 at ¶¶57-58.

### 2.    *Hovland*

*Hovland* discloses electrically-operated stimulation devices for stimulating a clitoris.  Ex. 1005 at Abstract, 8:49-54; 10:34-37; 19:39-41; Ex. 1002 at ¶¶59-65.  "Embodiments of the invention increase blood flow by creating a vacuum around

10

*and/or* using increasing pressure to produce percussion and/or *massage* of e.g., the clitoris." Ex. 1005 at 8:49-52 (emphasis added); *see also* 6:18-23, 21:40-55; Ex. 1002 at ¶¶60-62. Like vacuum or suction, *Hovland* recognizes that percussion or massage of the clitoris caused by super-atmospheric pressures also can increase blood flow, promote engorgement, and increase the likelihood of short-term pleasure effect. Ex. 1004 at 4:22-29; Ex. 1002 at ¶¶60-62.

In Fig. 15, *Hovland* teaches that pump/motor assembly 300 is turned on prior to placing vacuum cup 240 over the clitoris. *See* Ex. 1005 at 14:3-16; Ex. 1002 at ¶62. Pump/motor assembly 300 is configured to provide "pneumatic and/or hydraulic actuation to create e.g. vibration, percussion, subatmospheric pressure *and/or* super-atmospheric pressure, *or modulation of these effects*." Ex. 1005 at 13:20-24 (emphases added); Ex. 1002 at ¶62.



11

In another embodiment, *Hovland* discloses a stimulation device having vacuum cup 505 and motor assembly 540.  Ex. 1005 at 38-48, Fig. 19; Ex. 1002 at ¶64.  Motor assembly 540 includes a sleeve with a "penis-like" shape "for insertion into the vagina."  *Id.*  *Hovland* teaches that any of the disclosed vacuum cup embodiments can be used with any of the disclosed housings or casings.  *See* Ex. 1005 at 21:53-22:2; Ex. 1002 at ¶65.

### 3.    *Guan*



*Guan* discloses a "gas health massager" that uses "pulsating air pressure to stimulate" portions of a human body via a rubber mouth 1.  Ex. 1007 at 1; Ex. 1002 at ¶¶66-70.  In *Guan*'s sole figure, the pulsating air pressure is produced by reciprocally moving a wall of air bag 2.  *Id.*  *Guan*'s device includes lever 3 physically connected to one end of air bag 2.  Ex. 1007 at 3, 5; Ex. 1002 at ¶¶66, 67.  Lever 3 also includes a magnet 4 at one end thereof.  *Id.*  *Guan* states that

12

"electromagnet (5) drives the magnet (4), the lever (3), and the wall of the air bag (2) to have reciprocating motion, [while] the rubber mouth (1) on the air bag (2) contacts the body." Ex. 1007 at 3; Ex. 1002 at ¶67.

    **4.**    *Lee*



Fig. 1

*Lee* discloses a dildo 10 that includes a phallic sleeve 16 and "an arm member 40 that is formed as a lateral extension of the phallic sleeve 16 in a shape and dimension preferably facilitating contact with the clitoris of a user of the dildo." Ex. 1006 at 3:48-53; Ex. 1002 at ¶¶71-72. Arm member 40 encloses first vibrator 42 (see Fig. 2) that is to stimulate the clitoris. *Id.*

## VIII. CLAIM CONSTRUCTION

13

The claims of the '097 patent should be construed under the Phillips standard. 37 C.F.R. § 42.100(b); *see generally Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). Under *Phillips*, claim terms are typically given their ordinary and customary meanings, as would have been understood by a POSITA, at the time of the invention, having taken into consideration the language of the claims, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1313; *see also id.* at 1312–16. The Board, however, only construes the claims when necessary to resolve the underlying controversy. *Toyota Motor Corp. v. Cellport Sys., Inc.*, IPR2015-00633, Paper No. 11 at 16 (Aug. 14, 2015). Except for "pressure field generator," Petitioner believes that no express constructions of the claims are necessary to assess whether the prior art reads on the challenged claims.[4]

### A.    "pressure field generator"

_____

[4] Petitioner reserves all rights to raise claim construction and other arguments in district court. For example, Petitioner has not raised all challenges to the '097 patent in this petition, including validity under 35 U.S.C. § 112, and a comparison of the claims to any accused products in litigation may raise controversies needing resolution through claim constructions not presented here because of the similarities between the prior art and the '097 patent.

This term in claims 17, 21, 22, 26, 28, and 30 ("the pressure generator claims") should be construed pursuant to 35 U.S.C. § 112(f).  It is well settled that, even if a term does not use the specific word "means for", it is still a means-plus-function term where it fails "to recite sufficiently definite structure or recite function without reciting sufficient structure for performing that function." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).  Here, the term "pressure field generator" is functional language that refers to the function of generating a pressure field.  Ex. 1001 at 3:44-50, 3:59-65; Ex. 1002 at ¶¶47-50.

Moreover, inclusion of the generic term "generator" does not identify any specific structure for generating a pressure field.  Ex. 1002 at ¶49.  Indeed, "[g]eneric terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' … ."  *Williamson*, 792 F.3d at 1350. The term "generator" is interchangeable with "means."  *See, e.g., Advanced Ground Information Systems, Inc. v. Life360, Inc.*, 830 F.3d 1341, 1348 (Fed. Cir. 2016) (finding that the claim term "symbol generator," by itself, does not identify a structure by its function.).  Thus, "pressure field generator" – unbounded by means-plus-function limitations – could arguably (and improperly) be *anything* that generates a pressure field.  This is exactly what Section 112(f) was intended to avoid.

Construing a means-plus-function limitation is a two-step process:  first, identifying the claimed function, and second, ascertaining the corresponding structure.  *Omega Eng'g, Inc. v. Raytek Cor*, 334 F.3d 1314, 1331 (Fed. Cir. 2003).

Claim 17 recites that "the changing volume of the pressure field generator resulting in modulated positive and negative pressures with respect to a reference pressure."  Ex. 1001 at 18:7-9.  Thus, the claimed function of pressure field generator is generating modulated positive and negative pressures with respect to a reference pressure.  This is consistent with the '097 patent.  Ex. 1001 at 3:50-52, 3:60-64, 4:57-5:3; Ex. 1002 at ¶¶37-46, 51-54.

The '097 patent discloses that the function of the term "pressure field generator" is performed by a pressure field generating arrangement 2 ("arrangement 2").  Though the '097 patent discloses multiple embodiments of arrangement 2, in each and every case the "pressure field generating arrangement of the stimulation device has at least one first chamber and at least one second chamber … and at least one connection element that connects the first chamber to the second chamber."  Ex. 1001 at 4:51-56; Ex. 1002 at ¶¶37-46, 51-54.  With specific reference to the embodiments depicted in Figs. 4-6, the '097 patent teaches that the "pressure field generating arrangement 2 … has a first chamber 3 … , a second chamber 4 … , and a connection element 5 that connects the first chamber

16

3 to the second chamber 4." Ex. 1001 at 9:41-46; Ex. 1002 at ¶¶36, 39; *see also* Ex. 1001 at Figs. 7-12f and the corresponding written description.

Indeed, the '981 application (the parent of the application maturing as the '097 patent and which the '097 patent incorporates by reference (Ex. 1001 at 1:7-13) states that the pressure field generator "**[a]ccording to the invention**, … has at least one first chamber and at least one second chamber … and at least one connection element that connects the first chamber to the second chamber.") Ex. 1012 at 4 (emphasis added); *see also Toro Co. v. White Consolidated Industries Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) (noting that the specification described particular structure as "important to the invention"); *Trading Techs Int'l, Inc. v. eSpeed, Inc.,* 595 F.3d 1340 (Fed. Cir. 2010). The '981 application then links these structures (i.e., first chamber 3, second chamber 4, and connection element 5) with the claimed function by explaining that "chambers in fluidic communication via at least one connection element, allows simple generation of a pressure field … ." Ex. 1012 at 4-5.

Accordingly, the structure of "pressure field generator" should be construed as **at least a first chamber, at least a second chamber, and at least one connection element that connects the first chamber to the second chamber and equivalents**. Ex. 1002 at ¶¶53-54.

If the Board determines that "pressure field generator" is not a means-plus-function claim term, then, under the *Phillips* standard, this term should be interpreted to mean "**a first chamber, a second chamber, and a connection element that connects the first chamber to the second chamber**." Ex. 1002 at ¶54. This construction is consistent with the usage of "pressure field generator" (or "pressure field generating arrangement") in the '097 patent. Ex. 1002 at ¶¶37-46, 52, 54. For example, notwithstanding the changes to the '097 patent (Ex. 1001) relative to the '891 application (Ex. 1012), as a result of incorporating the '891 application, the '097 patent defines that "[a]ccording to the invention, a pressure field generating apparatus arrangement of the stimulation device has at least one first chamber and at least one second chamber … and at least one connection element that connects the first chamber to the second chamber." Ex. 1002 at ¶¶46, 53, 54. That is, "the chambers are in fluidic communication via the at least one connection element **to allow the simple generation of a pressure field** … ." *Id.* at 4:57-62 (emphasis added); Ex. 1002 at ¶53.

Accordingly, whether the term "pressure field generator" is governed by Section 112(f) does not impact the analysis below. Ex. 1002 at ¶54. In fact, even under a broader construction, the cited references would still render unpatentable the pressure generator claims.

## IX.   DETAILED EXPLANATION OF GROUNDS

18

**A.    Ground 1:  *Taylor* Anticipates Claims 1-9, 12-24, and 26-30**

**1.    Claim 1**

**1.1    "A stimulation device, comprising:" (Element 1a)**

*Taylor* discloses a sexual stimulation device.  Ex. 1004 at 1:6-8 (disclosing a "sexual aid" for "sexual stimulation"); Ex. 1002 at ¶74.

**1.2    "a chamber having a flexible wall portion;" (Element 1b)**



**Annotated Excerpt of *Taylor* Figure 3**

*Taylor's* first stimulator 154 is in communication with bellows 160.  Ex. 1002 at ¶¶57, 74.  Bellows 160 is configured to "compress[] and expand[]."  Ex. 1004 at 5:35-36; Ex. 1002 at ¶¶57, 74.  As indicated in the figure above, bellows 160 corresponds to the recited "chamber," and the accordion-like top wall of bellows 160, which permits bellows 160 to "compress[] and expand[ ],"  corresponds to the "flexible wall portion."  Ex. 1002 at ¶74.

19

**1.3**  **"a drive unit in physical communication with the flexible wall portion so as to cause deflections of the flexible wall portion in opposing directions, thereby resulting in a changing volume of the chamber,"** (Element 1c)



**Annotated Excerpt of *Taylor* Figure 3**

*Taylor* describes an electric motor 18 physically coupled to arm 26, which, taken together or alone as the claimed "drive unit," is physically coupled to the flexible walls of bellows 160. Also, *Taylor* discloses that "motor 18 [is] mounted on the arm 26." Ex. 1004 at 4:52-53. And, "[a]s the arm 26 oscillates … , arm 26 compresses and expands bellows 160." *Id.* at 5:34-36; Ex. 1002 at ¶¶57, 74. By disclosing that bellows 160 compresses and expands, *Taylor* discloses that the

20

flexible walls of bellows deflect in opposing directions, which results in a changing volume of bellows 160.  Ex. 1002 at ¶74.

### 1.4 "the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure;" (Element 1d)



**Annotated Excerpt of *Taylor* Figure 3**

First stimulator 154 includes a suction cup member 156 that conformingly and "**sealingly** receives" the vulva or the clitoris.  Ex. 1004 at 5:29-34 (emphasis added).  Suction cup member 156 is fluidly coupled to bellows 160 via a flexible conduit 162.  *Id.* at 5:34-35.  When *Taylor*'s drive unit "compresses and expands bellows 160," the resulting increase and decrease in the volume of bellows 160 "cyclically introduce[s] a vacuum in the volume defined by the suction cup member 156 and the portion of the vulva received therein."  Ex. 1004 at 5:29-40; Ex. 1002 at ¶¶57-58, 74.

If it is argued that *Taylor*'s disclosure is limited to only applying a **vacuum** (or pressures below a reference pressure), Petitioner submits that *Taylor* states that "suction cup member 156 [ ] conformingly and **sealingly** receives" the vulva. Ex. 1004 at 5:30-31 (emphasis added). During prosecution of related U.S. Application No. 15/354,599, Patent Owner asserts that "if the opening of the stimulation device … did not sealingly engage with the portion of the user's body including the clitoris, then the changing volume of the chamber would not result in modulated positive and negative pressures with respect to an ambient pressure as set forth in claim 1." Ex. 1009 at 216, 229, 238-242. When bellows 160 is neither compressed nor expanded, the air within bellows 160 is at atmospheric pressure (i.e., the reference pressure). Ex. 1002 at ¶¶58, 74. However, when arm 26 "expands" the bellows 160, with the suction cup member 156 "sealingly" engaged with the vulva, the volume in bellows 160 expands, and therefore, the pressure of the air within bellows 160 falls below the atmospheric pressure (i.e., at a negative pressure with respect to the reference pressure). *Id*. The converse also is true. *Id*. When arm 26 "compresses" bellows 160, with suction cup member 156 "sealingly" engaged with the vulva, the air in bellows 160 and suction cup member 156 also gets compressed, and therefore, the pressure of the air within bellows 160 is above the atmospheric pressure (i.e., at a positive pressure with respect to the reference pressure). *Id*. Thus, during cyclical time periods of "vacuum" in suction

cup member 156, the air in suction cup member 156 and bellows 160 is at a negative pressure with respect to the atmospheric pressure.  And, during the time periods between back-to-back vacuum periods, the air pressure in bellows 160 and suction cup member 156 is above the atmospheric pressure, or at a positive pressure with respect to the atmospheric pressure, because *Taylor* teaches **compression** of bellows 160, not just expansion.  *Id*.  Thus, the changing volume of bellows 160 results in modulated positive and negative pressures with respect to a reference pressure.  *Id*.

> **1.5** **"an opening for applying the modulated positive and negative pressures to a body part;" (Element 1e)**

*Taylor* describes that suction cup member 156 is for receiving the upper portion of the vulva, in particular, the clitoris.  Ex. 1004 at 5:28-32.  Moreover, *Taylor* teaches that a cyclical "vacuum is introduced in the volume defined by the suction cup member 156 and the portion of the vulva received therein.  The cyclical vacuum phenomenon stimulates the clitoris."  *Id*. at 5:37-41.  Thus, *Taylor* discloses "an opening for applying the modulated positive and negative pressures to a body part."  Ex. 1002 at ¶74(v).

### 1.6    a control device for controlling the drive unit; and" (Element 1f)



Annotated Figure of *Taylor* Figure 2

*Taylor* includes a drive unit in the form of an "electric motor 18." Ex. 1004 at 4:20-21. *Taylor* also depicts a plug configured for connection to an electrical outlet, to operate (e.g., turn on/off) motor 18. Ex. 1002 at ¶74(vi). That is, the plug **controls** the power supplied to electric motor 18. Accordingly, *Taylor* discloses a "control device for controlling" the drive unit. *Id*.

24

### 1.7    "an appendage, wherein the appendage is a dildo configured to be inserted into a vagina." (Element 1g)



**Annotated Figure of *Taylor* Figure 3**

*Taylor*'s device includes an appendage, i.e., a "dildo 50 [configured to be] slidingly received in (i.e., inserted into) the user's vagina 52." Ex.1004 at 5:7-8, 5:20-23; Ex. 1002 at ¶¶55, 74(vii).

### 2.    Claim 2

**2.1** **"The stimulation device as recited in claim 1, wherein the appendage is a handle for holding the stimulation device."**



FIG. 3

Dildo can be used as a handle

**Annotated Figure of *Taylor* Figure 3**

*Taylor*'s "dildo 50 is slidingly received in the user's vagina 52." Ex. 1004 at 5:6-7. First, the POSITA would have recognized that *Taylor*'s device may be held or otherwise manipulated by dildo 50. Ex. 1002 at ¶75. Also, the POSITA would have understood that, in order to position dildo 50 in a vagina, a user would likely have had to use a hand to hold and guide dildo 50 into the vagina. *Id*. Thus, *Taylor*'s dildo 50 is an appendage that is a handle for holding *Taylor*'s stimulation device. *Id*.

**3.    Claim 3**

26

**3.1**    **"The stimulation device as recited in claim 1, wherein the opening is further for placing over the body part."**

The opening of suction cup member 156 receives the clitoris by being placed over the clitoris.  Ex. 1002 at ¶76; *see also supra* Section IX(A)(1)(1.5).

**4.    Claim 4**

**4.1**    **"The stimulation device as recited in claim 1, wherein the body part is a clitoris."**

"Suction cup member 156 of the first stimulator 154 is more specifically directed at receiving the clitoris."  Ex. 1004 at 5:31-33; Ex. 1002 at ¶77.

**5.    Claim 5**

**5.1**    **"The stimulation device as recited in claim 1, further comprising a second chamber."**



**Annotated Excerpt of *Taylor* Figure 3**

*Taylor* teaches that "suction cup member 156 [] conformingly and sealingly receives the upper portion of the vulva."  Ex. 1004 at 29-30; Fig. 3.  The volume

27

defined by the interior of suction cup member 156 (and the vulva received therein) defines "a second chamber."  Ex. 1002 at ¶78.

> **6.    Claim 6**
>
>> **6.1    "The stimulation device as recited in claim 1, wherein the flexible wall portion is integral with the chamber."**



**Annotated Excerpt of *Taylor* Figure 3**

Bellows 160 is the claimed "chamber" and the claimed "flexible wall portion," which corresponds to the flexible top wall of bellows 160, is integral with bellows 160.  *See* supra Section IX(A)(1)(1.2); Ex. 1002 at ¶79.

> **7.    Claim 8**
>
>> **7.1    "The stimulation device as recited in claim 1, wherein the stimulation device has no valves."**

*Taylor* does not include a single occurrence of the word "valve" or an illustration of a "valve."  *See* Figs. 1-3; Ex. 1002 at ¶80.

> **8.    Claim 9**

28

### 8.1 "The stimulation device as recited in claim 1, wherein the stimulation device is a portable hand-held device."

*Taylor* includes a "housing 12 [that] is detachably mounted on two legs 16." Ex. 1004 at 4:11-2. Indeed, "[t]he detachability of housing 12 and legs 16 renders the invention 10 more **easily transportable**." *Id.* at 4:18-19. Moreover, "housing 12 includes a first handle 14 for convenient transportation thereof." *Id*. at 4: 2-3. Thus, a user can hold the entire *Taylor* device in their hands via handles 14, 15, to e.g., transport the device. Thus, a POSITA would have recognized that *Taylor*'s device is a portable hand-held device. Ex. 1002 at ¶81.

### 9. Claim 12

### 9.1 "A method comprising:" (Element 12a)

*Taylor* discloses "an invention that provides for satisfaction of primal sexual drive." Ex. 1004 at 1:44-45. Indeed, *Taylor* describes methods for using first stimulator 154 and dildo 50 to "confer on its users real-world satisfaction of sexual drive." *Id.* at 6:51-52; Ex. 1002 at ¶¶55-58, 82(i).

29

**9.2** **"causing deflections of a flexible wall portion of a chamber of a stimulation device in opposing directions, thereby resulting in a changing volume of the chamber," (Element 12b)**



**Annotated Excerpt of *Taylor* Figure 3**

*Taylor* describes a stimulation device having bellows 160 corresponding to the claimed "chamber." In operation, motor 18, via arm 26, compresses and expands bellows 160. *See* Ex. 1004 at 34-36; *supra* Section IX(A)(1)(1.3); Ex. 1002 at ¶¶57, 82(ii). Thus, the POSITA would have understood that in order for arm 26 to compress and expand bellows 160, at least one accordion-like wall of bellows 160 would be deflected in opposite directions. Ex. 1002 at ¶¶57, 82(ii). The POSITA would also have understood that an internal volume of bellows 160 would necessarily change during compression and expansion, especially when suction cup member 154 sealingly receives the vulva. *Id*.

30

Thus, operation of *Taylor*'s device includes causing deflection of the flexible walls of bellows 160 in opposing directions to result in a changing volume thereof.

### 9.3 "the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure; and" (Element 12c)

This limitation of claim 12 is identical to the limitation of claim 1. Thus, the analysis presented above in Section IX(A)(1)(1.4) applies. As explained above, compression and expansion of bellows 160 results in modulated positive and negative pressures with respect to a reference pressure. *See supr*a Section IX(A)(1)(1.4); Ex. 1002 at ¶¶57, 58, 82(iii).

### 9.4 "applying the modulated positive and negative pressures to a body part through an opening, wherein the stimulation device is positioned by a user for applying the modulated positive and negative pressures using an appendage of the stimulation device, wherein the appendage is a dildo configured to be inserted into a vagina." (Element 12d)

The phrase "wherein the appendage is a dildo configured to be inserted into a vagina" does not appear to be a limitation on this claim. Instead, it is directed to structure, and not limiting steps of the method. Ex. 1002 at ¶175. Moreover, for the purposes of clarity, claim 12 does not require the dildo to be actually inserted into the vagina -- just **configured for** insertion into a vagina.

As explained above, the cyclical compression and expansion of bellows 160 produces modulated positive and negative pressures with respect to a reference

31

pressure.  *Supra* Section IX(A)(1)(1.4); Ex. 1002 at ¶¶57, 58, 82(iv).  The modulated positive and negative pressures are then introduced into the volume defined by suction cup member 156 and applied through the opening of the cup to the body part received therein.  Ex. 1004 at 5:29-40; *see also supra* Section IX(A)(1)(1.5); Ex. 1002 at ¶82(iv).

Taylor contemplates using the described stimulation device when the "vagina is subjacent to the clitoris, thereby providing simultaneous engagement with and excitation of the vagina and clitoris."  Ex. 1004 at 5:19-22.  Moreover, *Taylor* includes an appendage in the form of dildo 50 that "is slidingly received in the user's vagina."  *Id.* at 5:7-8.  With reference to Fig. 3, dildo 50 is positioned and oriented with respect to the suction cup member 156, such that a user's clitoris is received in suction cup member 156 when dildo 50 is received in a vagina.  Ex. 1002 at ¶82(iv).  Thus, in order to appropriately position *Taylor's* device such that the user's clitoris is received in suction cup member 156, user would need to insert dildo 50 (i.e., the claimed "appendage") into the vagina so as to appropriately position the entire stimulation device.  *Id*.

32



**Annotated Figure of *Taylor* Figure 3**

10.     Claim 13

**10.1** **"The method as recited in claim 12, wherein the appendage is a handle for holding the stimulation device."**



FIG. 3

Dildo can be used as a handle

**Annotated Figure of *Taylor* Figure 3**

Dildo 50 (i.e., the claimed "appendage") is a handle for holding the stimulation device.  Ex. 1002 at ¶82; *supra* Section IX(A)(2).

**11.  Claim 14**

**11.1** **"The method as recited in claim 12, wherein the changing volume of the chamber results in the modulated positive and negative pressures in a second chamber."**

As explained above for claim 5, the volume of space defined by the interior of suction cup member 156 and the body part received therein defines "a second chamber" of *Taylor*.  *See supra* Section IX(A)(5); Ex. 1002 at ¶84.  And, since

34

suction cup member 156 is in fluid communication with bellows 160 via flexible conduit 162, the POSITA would have recognized that the modulated positive and negative pressures produced by compression and expansion of bellows 160 (*see, e.g., supra* Section IX(A)(9)(9.3)) results modulated positive and negative pressures in the space defined by the interior of suction cup member 156 when it sealingly receives the clitoris. Ex. 1002 at ¶84. Thus, the changing volume of bellows 160 results in modulated positive and negative pressures in a second chamber. *Id.*



**Annotated Excerpt of *Taylor* Figure 3**

12. **Claim 15**

12.1 **"The method as recited in claim 12, wherein the body part is a clitoris and the opening is placed over the clitoris."**

Suction cup member 156 includes an opening for placing over and applying pressures to the clitoris. *See supra* Sections IX(A)(1)(1.5), IX(A)(3)-(4); Ex. 1004

35

at 28-40; Ex. 1002 at ¶85.

### 13.    Claim 16

#### 13.1    "The method as recited in claim 12, wherein the flexible wall portion is integral with the chamber."



**Annotated Excerpt of *Taylor* Figure 3**

Bellows 160 corresponds to the claimed "chamber", and at least one accordion-like wall of bellows 160 is integral with bellows 160. *Supra* Sections IX(A)(1), IX(A)(9)(9.2); Ex. 1002 at ¶86.

### 14.    Claim 17

Claim 17 is identical to claim 1 with the exception that each occurrence of "chamber" in claim 1 is replaced with "pressure field generator" in claim 17. *Compare* Ex. 1001 at 17:2-16, *with* Ex. 1001 at 18:1-14; Ex. 1002 at ¶87.

Nonetheless, *Taylor* anticipates each limitation of claim 17, as set forth above relative to claim 1.  Ex. 1002 at ¶¶87(i)–87(vii); *see supra* Section IX(A)(1)(addressing each corresponding limitation of claim 1).

36

As discussed above, "pressure field generator" is a means-plus-function limitation – the function is generating "**modulated positive and negative pressures with respect to a reference pressure**", and the structure is "**at least a first chamber and at least a second chamber and at least one connection element that connects the first chamber to the second chamber and equivalents**". *See supra* Section VIII(A); Ex. 1002 at ¶¶49-53, 87(ii). As explained below, *Taylor* discloses both the claimed function and the corresponding structure, as described in the '097 patent.

*Taylor* discloses first stimulator 154 including suction cup member 156. Ex. 1004 at 29-30. Suction cup member 156 is connected to bellows 160 via flexible conduit 162. *Id.* at 5:32-34. As described above for claim 1, when *Taylor*'s drive unit "compresses and expands the bellows 160," the increase and decrease in the volume of bellows 160 "cyclically introduce[s] a vacuum in the volume defined by the suction cup member 156 and the portion of the vulva received therein." Ex. 1004 at 5:29-40; Ex. 1002 at ¶¶57, 58, 87(ii); *see supra* Section IX(A)(1)(1.4) (providing analysis for claim 1). Thus, bellows 160 corresponds to "first chamber 3", suction cup member 156 corresponds to the "second chamber 4", and flexible conduit 162 corresponds to the "connection element 5". Indeed, bellows 160, suction cup member 156, and flexible conduit 162, taken together, correspond to the claimed "pressure field generator" because, working together, they generate a

varying pressure for application to a body part received in suction cup member 156. Ex. 1002 at ¶87(ii); *see supra* Section IX(A)(1). That is to say, bellows 160, suction cup member 156, and flexible conduit 162, working together, generate modulated positive and negative pressures with respect to a reference pressure. *Id.*



**Annotated Excerpt of *Taylor* Figure 3**

Furthermore, since bellows 160 is part of the claimed "pressure field generator," the accordion-like top wall of bellows 160 corresponds to the "flexible wall portion" of the claimed "pressure field generator." Ex. 1002 at ¶87(ii).

Since *Taylor* discloses a "pressure field generator," *Taylor* also anticipates independent claim 17 because each limitation of claim 17 is met, as described above in connection with independent claim 1. *See supra* Section IX(A)(1) (addressing each corresponding limitation of claim 1); Ex. 1002 at ¶¶87(i) – 87(vii).

38

**15.    Claim 18**

    **15.1    "The stimulation device as recited in claim 17, wherein the appendage is a handle for holding the stimulation device."**

Dildo 50 is an appendage that can be used as a handle for holding *Taylor*'s device.  *See supra* Section IX(A)(1)(2.1); Ex. 1002 at ¶88.

**16.    Claim 19**

    **16.1    "The stimulation device as recited in claim 17, wherein the body part is a clitoris and the opening is further for placing over the body part."**

Suction cup member 156 has an opening for placing over the clitoris, as discussed above in the analysis for claims 3-4.  *See supra* Sections IX(A)(1)(3.1)-(4.1); Ex. 1002 at ¶89.

**17.    Claim 20**

    **17.1    "The stimulation device as recited in claim 17, wherein the body part is a clitoris."**

Suction cup member 156 is directed at receiving the clitoris.  *Supra* Section IX(A)(1)(4.1); Ex. 1002 at ¶90.

**18.    Claim 21**

    **18.1    "The stimulation device as recited in claim 17, wherein the pressure field generator comprises a first chamber and a second chamber."**



**Annotated Excerpt of *Taylor* Figure 3**

As described above for claim 17, bellows 160 corresponds to the claimed "first chamber" and the volume defined by suction cup member 156 corresponds to the claimed "second chamber." *Supra* Section IX(A)(14); Ex. 1002 at ¶91. Thus, *Taylor* includes a "pressure field generator" having a first chamber and a second chamber. *Id*.

### 19.    Claim 22

> **19.1   "The stimulation device as recited in claim 17, wherein the flexible wall portion is integral with the pressure field generator."**

As explained above in connection with claim 17, bellows 160 forms a part of the claimed "pressure field generator." *Supra* Section IX(A)(14); Ex. 1002 at ¶92. And, the accordion-like wall of bellows 160 is integral therewith, and thus, integral with the "pressure field generator." *Id*.

### 20.    Claim 23

> **20.1  "The stimulation device as recited in claim 17, wherein the stimulation device has no valves."**

*Taylor*'s device has no valves.  *See supra* Section IX(A)(7); Ex. 1002 at ¶93.

> **21.  Claim 24**

> **21.1  "The stimulation device as recited in claim 17, wherein the stimulation device is a portable hand-held device."**

*Taylor*'s device is a portable hand-held device.  *See supra* Section IX(A)(8); Ex. 1002 at ¶94.

> **22.  Claim 26**

Claim 26 is identical to claim 12 with the exception that each occurrence of "chamber" in claim 12 is replaced with "pressure field generator" in claim 26. *Compare* Ex. 1001 at 17:50-53, *with* Ex. 1001 at 18:32-46; Ex. 1002 at ¶95.

Nonetheless, *Taylor* anticipates each limitation of claim 26, as set forth above with respect to claim 12.  Ex. 1002 at ¶¶95(i)–95(iv); *see supra* Section IX(A)(9)(addressing each corresponding limitation of claim 12).

As explained above with respect to claim 17, bellows 160, suction cup member 156, and flexible conduit 162 correspond to the "first chamber 3", "second chamber 4", and "connection element 5" of the claimed "pressure field generator" because together they generate a varying pressure for application to a body part received in suction cup member 156.  Ex. 1002 at ¶¶49-53, 95(ii); *see supra* Section IX(A)(14).  The remaining limitations of claim 26 also are met by Taylor,

as explained above in connection with claim 12. *See supra* Section IX(A)(9)

(providing limitation-by-limitation analysis for claim 12); Ex. 1002 at ¶¶95(i) –

95(iv).



**Annotated Excerpt of *Taylor* Figure 3**

### 23. Claim 27

**23.1** **"The method as recited in claim 26, wherein the appendage is a handle for holding the stimulation device."**



**Annotated Figure of *Taylor* Figure 3**

Dildo 50 is an appendage that is a handle for holding the stimulation device.

Ex. 1002 at ¶96; *supra* Section IX(A)(10).

24.    **Claim 28**

24.1    **"The method as recited in claim 26, wherein causing deflections in a flexible wall portion of a pressure field generator in opposing directions comprises:**

**causing deflections in the flexible wall portion of a first chamber of the pressure field generator, thereby resulting in the modulated positive and negative pressures in a second chamber of the pressure field generator."**

As explained above for claim 26, bellows 160, suction cup member 156, and

flexible conduit 162 correspond to the "first chamber 3", "second chamber 4", and

43

"connection element 5", respectively, of the claimed "pressure field generator". *Supra* Section IX(A)(22); Ex. 1002 at ¶¶95(ii), 97.

*Taylor* teaches that compression and expansion (e.g., deflection of the flexible accordion-like top wall in opposing directions) of bellows 160 "cyclically introduce[s] a vacuum in the volume defined by the suction cup member 156." Ex. 1004 at 5:34-50; Ex. 1002 at ¶97. Thus, the changing volume of bellows 160 (caused by deflection of its walls) results in modulated positive and negative pressures in a second chamber (suction cup member 156). *Id*.



**Annotated Excerpt of *Taylor* Figure 3**

25.    **Claim 29**

**25.1** **"The method as recited in claim 26, wherein the body part is a clitoris and the opening is placed over the clitoris."**

Suction cup member 156 includes an opening for placing over the clitoris.

S*ee supra* Section IX(A)(1)(1.5) and Section IX(A)(1)(12.1); Ex. 1004 at 5:28-40;

Ex. 1002 at ¶98.

**26.** **Claim 30**

**26.1** **"The method as recited in claim 26, wherein the flexible wall portion is integral with the pressure field generator."**

The accordion-like wall of bellows 160 is integral with the claimed

"pressure field generator" because it is integral with bellows 160. *See supra*

Section IX(A)(19); Ex. 1002 at ¶99.

**B.** **Ground 2 - Claims 1-30 Are Unpatentable Over *Taylor* and *Hovland***

Claims 1-30 are unpatentable under 35 U.S.C. § 103 over *Taylor* and

*Hovland*.

**1.** **Claims 1, 12, 17, 26**

As discussed above for claims 1, 12, 17, and 26 in Ground 1, Taylor

anticipates each limitation of these claims. *See supra* Sections IX(A)(1), IX(A)(9),

IX(A)(14), and IX(A)(14). Ex. 1002 at ¶¶74(i)-74(vii), 82(i)-82(iv), 87(i)-87(vii),

95(i)-95(iv), 100. If it is argued that **compression** and **expansion** of bellows 160

does not result in "modulated positive and negative pressures with respect to a

45

reference pressure," as required by each of claims 1, 12, 17, and 26, which Petitioner does not concede, it would have been obvious to a POSITA to modify *Taylor* with the teachings of *Hovland* to apply modulated super-atmospheric (i.e., "positive") and subatmospheric (i.e., "negative") pressures, with respect to atmospheric pressure, to achieve the benefits described by *Hovland* and articulated in more detail below. *Id.*; Ex. 1002 at ¶¶101-102.

*Hovland* discloses electrically-operated, hand-held devices used to stimulate a clitoris. Ex. 1005 at Abstract, 8:49-54, 9:40-43; Fig. 15; Ex. 1002 at ¶¶59-65, 102. "Embodiments of the invention increase blood flow by creating a vacuum around ***and/or*** using increasing pressure to produce **percussion and/or *massage*** of e.g., the clitoris." Ex. 1005 at 8:49-52 (emphases added); *see also id.* at 6:18-23, 21:40-55. Like vacuum/suction, *Hovland* recognizes that **percussion** or **massage** of the clitoris caused by the application of super-atmospheric pressures also can increase blood flow and promote engorgement of the clitoris. *Id.* at 4:22-29; Ex. 1002 at ¶¶60, 102. Indeed, *Hovland* teaches that it is known that a "pressure differential [in the clitoris] tends to promote engorgement of the clitoris with blood and/or otherwise stimulate blood flow, providing [] benefits … while increasing the likelihood of short-term pleasurable effect and beneficial longer-term usage." *Id.*; Ex. 1002 at ¶¶60, 102.

46

In Fig. 15, *Hovland* teaches that the pump/motor assembly 300 may be turned on prior to placing vacuum cup 240 over the clitoris. *See id. at* 14:3-16. The pump/motor assembly 300 is configured to provide "pneumatic and/or hydraulic actuation to create e.g. vibration, percussion, **subatmospheric pressure and/or super-atmospheric pressure, or modulation of these effects**." *Id.* at 13:20-24 (emphases added); *see also id.* at 15:23-24.

A POSITA would have recognized that reference to "subatmospheric pressure," "suction", and "vacuum" was intended to encompass "pressure levels lower than atmospheric or ambient." Ex. 1005 at 21: 47-50; Ex. 1002 at ¶¶61-63, 103. The POSITA also would have understood that reference to pressures (e.g., super-atmospheric pressure) for providing "percussion or massage" was intended to encompass "pressures higher than ambient or atmospheric." Ex. 1005 at 21: 50-52; Ex. 1002 at ¶104.

Therefore, it would have been obvious to a POSITA to modify Taylor with the teachings of *Hovland* to apply modulated subatmospheric and super-atmospheric pressures so as to take advantage of percussion and/or massage of the clitoris, in order to achieve improved and faster clitoral engorgement known to result from a pressure differential in the clitoris and/or surrounding areas. Ex. 1005 at 4:19-28; Ex. 1002 at ¶105. Moreover, modification of *Taylor* with the teachings of *Hovland* would have amounted to nothing more than the use of a

47

known technique to improve a similar device, and the results of the modification would have been predictable. *See KSR Int'l. Co. v. Teleflex, Inc.*, 550 U.S. 398, 417 (2007). This is because at the time of the invention, a POSITA would have had the requisite skill level to readily modify the device disclosed by *Taylor* to implement the teachings of *Hovland* without any problem.

With specific reference to claims 1 and 17, *Taylor* depicts an electrical plug (Fig. 2) that anticipates the "control device" limitations. *See supra* Sections IX(A)(1.6), IX(A)(14); Ex. 1002 at ¶¶74(vi), 87(vi), 106. However, if *Taylor*'s plug does not anticipate the claimed "control device" because it is not "for controlling the drive unit," which Petitioner does not concede, it would have been obvious to the POSITA to provide *Taylor* with one or both of an "on/off switch 30" or "control electronics 80", disclosed by *Hovland*. Ex. 1002 at ¶106.

*Hovland*'s "electronics 80 can include vacuum regulation protocols." Ex. 1005 at 10:52-54. Moreover, *Hovland* discloses that the "patient or partner activates device 200 by activating on/off switch 270, turning pump/motor assembly 300 on and thereby drawing air into and through applicator 220." *Id.* at 14:3-10. Thus, it would have been obvious to the POSITA to provide the *Taylor* stimulation device with one or both of *Hovland*'s electronics 80 or on/off switch 270 to regulate the pressures provided to the user and/or facilitate easy activation/deactivation of the stimulation provided without requiring the user to

48

insert/remove *Taylor's* plug from a wall outlet. Ex. 1002 at ¶¶23, 106. Moreover, such modifications of *Taylor* would have been routine to the POSITA as they unite old elements with no change in their respective functions. *See KSR*, 550 U.S. at 417.

### 2.    Claims 2-6, 8, 9, 13-16, 18-24, and 27-30

*Taylor* discloses each limitation of claims 2-6, 8, 9, 13-16, 18-24, and 27-30, as discussed above in connection with Ground 1. *See supra* Sections IX(A)(2)-(8), IX(A) (10)-(13), IX(A) (15)-(21), and IX(A)(23)-26).

Therefore, the combination of *Taylor* and *Hovland* also renders obvious claims 2-6, 8, 9, 13-16, 18-24, and 27-30. Ex. 1002 at ¶¶107, 108.

### 3.    Claim 7

#### 3.1    "The stimulation device as recited in claim 1, wherein the flexible wall portion comprises silicone."

*Taylor's* bellows 160 corresponds to the claimed chamber, and the accordion-like wall of bellows 160 corresponds to the claimed flexible wall portion. *See supra* Section IX(A)(1)(1.2). *Taylor*, however, is silent with respect to the material of bellows 160. Nonetheless, *Taylor* teaches that bellows 160 is fluidly coupled to suction cup member 156 via flexible conduit 162. Ex. 1005 at 5:32-34. *Taylor* also teaches that suction cup member 156 is designed to receive a user's clitoris. *Id.* at 5:30-32. *Taylor* then teaches that bellows 160 cyclically introduces a vacuum in the volume defined by the suction cup member156. *Id.* at

5:39-40. Thus, the POSITA would have understood the potential for bodily fluids to be drawn into bellows 160. Ex. 1002 at ¶¶23,110.

*Hovland* teaches that silicone is a biocompatible material used in sexual stimulation devices. Ex. 1005 at 11:66-12:2.

Accordingly, it would have been obvious to the POSITA to fabricate bellows 160 from silicone. Ex. 1002 at ¶¶23, 109-111. Indeed, since there are only a limited number of biocompatible materials, a POSITA would have known that fabricating bellows 160 from silicone would have greater hygienic properties since silicone is a biocompatible material. *See KSR*, 550 U.S. at 421; *see also In re Leshin*, 277 F.2d 197, 299 (C.C.P.A. 1960) ("Mere selection of known plastics to make a container-dispenser of a type made of plastics prior to the invention, the selection of the plastics being on the basis of suitability for the intended use, would be entirely obvious."); Ex. 1002 at ¶¶23, 109-111.

### 4. Claim 10

#### 4.1 "The stimulation device as recited in claim 1, wherein the stimulation device is battery powered."

*Taylor* discloses a motor 18. Ex. 1004 at 4:20-31. Motor 18 includes, but is not limited to, "solar-energy powered motors **and the like**." *Id.* (emphasis added). While a POSITA would have recognized that *Taylor* likely includes a battery for use with solar-energy motors, *Taylor* does not expressly disclose that invention 10 is battery-powered. Ex. 1002 at ¶113. Nonetheless, inclusion of "**and the like**" in

50

*Taylor* would have been understood by a POSITA as suggesting that any suitable motor, including a battery-powered motor, may be used to drive invention 10.

Moreover, *Hovland* discloses battery-operated stimulation devices. *See, e.g.*, Ex. 1005 at 10:34-35; 12:21-26; 13:34-42; 15:49-55; 17:8-11. And, that batteries and A/C electrical power are suitable alternatives for each other. *See, e.g., id.* at 10:36-7; 12:21-26; Ex. 1002 at ¶115.

Thus, it would have been obvious to a POSITA to modify *Taylor* with the teachings of *Hovland* to replace *Taylor*'s power source (i.e., the plug depicted in Fig. 2 of *Taylor*) with batteries to facilitate *Taylor*'s stated objectives of portability and concealed use. Ex. 1002 at ¶¶23, 112-115. Such a modification would have amounted to nothing more than the use of a known technique to improve a similar device, and the results of the modification would have been predictable. *See KSR*, 550 U.S. at 417. Indeed, *Taylor* teaches that sometimes it is desired for invention 10 to be transported and/or concealed beneath clothing. Ex. 1004 at 4:40-5:3; Ex. 1002 at ¶114.

### 5.    Claim 11

#### 5.1    "The stimulation device as recited in claim 1, further comprising: a water resistant housing comprising acrylonitrile butadiene styrene (ABS)."

*Taylor* discloses a housing 12. Ex. 1004 at 3:66-67. However, *Taylor* fails to disclose that housing 12 is a water resistant housing comprising ABS. Ex. 1002

at ¶117.  Based on the teachings of *Hovland*, it would have been obvious to a POSITA to modify *Taylor*'s housing 12 to make it both water resistant and from ABS.  Ex. 1002 at ¶¶116-118.

*Hovland* teaches that casing 210 can be "formed of ABS Class 6 medical-grade plastic."  Ex. 1005 at 11:26-29.  *Hovland* explains that "a biocompatible material is highly preferred, to ensure that it will not cause adverse tissue reactions when placed in contact with the patient's skin."  *Id.* at 11:31-34.  Moreover, *Hovland* teaches that casing 210 can be water resistant or waterproof.  *Id.* at 11:38-39.

Accordingly, it would have been obvious to a POSITA to make *Taylor*'s housing waterproof to prevent bodily fluids entering into the housing during use.  Ex. 1002 at ¶¶23, 117-118.  Such a modification would have amounted to nothing more than the use of a known technique to improve a similar device, and the results of the modification would have been predictable.  *See KSR*, 550 U.S. at 417.

It also would have been obvious to a POSITA to construct *Taylor*'s housing 12 from ABS to ensure that housing 12 "will not cause adverse tissue reactions when placed in contact with the patient's skin," as taught by *Hovland*.  Ex. 1002 at ¶¶23, 118.  Indeed, because there are a limited number of biocompatible materials, such a modification would have amounted to nothing more than the use of a known technique to improve a similar device, and the results of the modification would

52

have been predictable.  *See KSR*, 550 U.S. at 421; *see also In re Leshin*, 277 F.2d 197, 299 (C.C.P.A. 1960) ("Mere selection of known plastics to make a container-dispenser of a type made of plastics prior to the invention, the selection of the plastics being on the basis of suitability for the intended use, would be entirely obvious."); Ex. 1002 at ¶¶117, 118.

### 6.    Claim 25

#### 6.1    "The stimulation device as recited in claim 17, wherein the stimulation device is battery powered."

As explained above for claim 10, it would have been obvious to a POSITA to modify *Taylor* with the teachings of *Hovland* to make *Taylor*'s device battery-powered.  *See supra* Section IX(B)(4); Ex. 1002 at ¶¶23, 119-121.

### C.    Ground 3 - Claims 1-30 Are Unpatentable Over *Guan*, *Lee*, and *Hovland*

Claims 1-30 are unpatentable under 35 U.S.C. § 103 over *Guan*, *Lee*, and *Hovland*.[5]  Ex. 1002 at ¶¶23-28, 122-267.

### 1.    Claim 1

---

[5] *Guan* was used to revoke the '510 patent.  *See* Ex. 1008 at 11-16 (discussing *Guan*'s relevance to claim 1 of the '510 patent.); *see also* Ex. 1015 at 3-12 (rejecting substantially similar claims over *Guan* in a related application undergoing examination.)

53

### 1.1    Element 1a

*Guan* discloses a "gas health massager" that uses "pulsating air pressure to stimulate" parts of the human body.  Ex. 1007 at Abstract.  Thus, *Guan* discloses a "stimulation device."

### 1.2    Element 1b



**Annotated Figure of *Guan***

*Guan*'s massager includes air bag 2.  Lever 3 is connected to one end of air bag 2, and the other end of air bag 2 is movably connected to rubber mouth 1.  *Id.* at 3; Ex. 1002 at ¶¶124-125.  *Guan* discloses that a wall of air bag 2 is reciprocally moved by lever 3 to generate a pulsating air pressure.  *Id.*  Accordingly, air bag 2 corresponds to the claimed "chamber," and the wall that is moved must be flexible

54

to permit the described motion so as to generate a pulsating air pressure.  Ex. 1002 at ¶125.

### 1.3    Element 1c

*Guan* discloses a drive unit having lever 3 and magnet 4.  Ex. 1007 at 3; Ex. 1002 at ¶126.  As shown in the figure above, lever 3 is physically connected to the wall of air bag 2.  *Id.*  In operation, magnet 4 and lever 3 move forwardly and backwardly to impart a reciprocating motion on air bag 2.  *Id.*  This causes air bag 2 to compress and expand.  *Id.*  The reciprocating motion of magnet 4 and lever 3 (i.e., "drive unit") causes deflections of the flexible wall portion of air bag 2 in opposing directions – thus causing a changing volume of the air bag 2.  *Id.*  In this way, air bag 2 "generate(s) a pulsating air pressure."  *Id.*

### 1.4    Element 1d

As already explained, *Guan*'s massager generates a pulsating air pressure as air bag 2 compresses and expands in response to the reciprocating motion imparted upon its wall.  Ex. 1007 at 3; Ex. 1002 at ¶¶126, 127; *see supra* Section IX(C)(1)(1.3).  The pulsating air pressure resulting from the changing volume of air bag 2 corresponds to the modulated positive and negative pressures described in the '097 patent.  Ex. 1002 at ¶¶68-70, 127-129.

Prior to lever 3 imparting any motion on air bag 2, the air within air bag 2 and at mouth 1 is at the prevailing atmospheric pressure (i.e., "a reference

pressure"). Ex. 1002 at ¶¶70, 128-129. However, when lever 3 imparts motion (as on the left below) to compress air bag 2 in the direction toward mouth 1, the volume within air bag 2 reduces, thereby increasing the pressure within air bag 2 and at mouth 1 to a pressure above the atmospheric pressure (i.e., "reference pressure"). *Id.* This results in a "modulated positive pressure." *Id.* Conversely, when lever 3 imparts motion (as shown on the right below) to expand air bag 2 in the direction away from mouth 1, the volume within air bag 2 increases, thereby reducing the pressure within air bag 2 and at mouth 1 below the atmospheric pressure (i.e., "reference pressure"). *Id.*



**Annotated Figure of *Guan***



**Annotated Figure of *Guan***

### 1.5    Element 1e

*Guan* applies the generated pulsating air pressure (i.e., the claimed "modulated positive and negative pressures) to a body part via rubber mouth 1

56

when it contacts the body.  Ex. 1007 at 3; Ex. 1002 at ¶130.  To do so, as shown in

the figure below, rubber mouth 1 includes an opening.  Ex. 1002 at ¶130.



**Annotated Figure of *Guan***

### 1.6    Element 1f

*Guan* discloses that the reciprocating motion of magnet 4 and lever 3 (i.e.,

the claimed drive unit) is controlled by the application of power to electromagnet

5.  Ex. 1007 at 3; Ex. 1002 at ¶¶69, 131.  Thus, electromagnet 5 is a "control

device for controlling" magnet 4 and lever 3.  Ex. 1002 at ¶131.



**Annotated Figure of *Guan***

### 1.7    Element 1g

It would have been obvious to modify *Guan's* device to include an appendage that is a dildo for insertion into a vagina, as explained below.  Ex. 1002 at ¶¶23-28, 132-137.

As alluded to above, *Guan*'s massager generates pulsating air pressure to stimulate discrete locations (e.g., meridians) on the body.  Ex. 1002 at ¶132.  Thus, a POSITA reviewing *Guan* at the time of invention of the '097 patent would have understood that *Guan*'s device may be used to stimulate any location on the body, including, but not limited to, the meridians, erogenous zones, and/or muscles.  *Id*.

Moreover, *Guan* includes no disclosure precluding the use of its massager on the

58

clitoris. Indeed, a POSITA in possession of *Guan*'s disclosure at the time of invention of the '097 patent would have recognized the benefits of stimulating a clitoris with pulsating air pressure. *Id*. at ¶¶132, 133.

It was well-established at the time of the alleged invention that direct contact stimulators (e.g., mechanical vibrators) were not as effective in treating female sexual dysfunction when diseased vessels inhibited blood flow. Ex. 1014 at 2; Ex. 1002 at ¶¶24-28. Instead, indirect stimulators (e.g., stimulators that subject the clitoris to a pressure differential) were known to be more suitable for achieving clitoral engorgement in the presence of diseased blood vessels. *Id.* (finding that the "ability to engorge the clitoris even if genital blood flow is diminished may have important implications for treatment efficacy.")

The '097 patent also recognizes that the drawbacks of direct contact stimulation were known at the time of the alleged invention. In the **Background** section, it is admitted that "[d]irect stimulation of the clitoris, for example using a clitoral massage vibrator, is frequently problematic." Ex. 1001 at 1:29-30. Indeed, *Hovland* teaches that use of indirect stimulation on the clitoris "may reduce the likelihood of fibrosis[] at the clitoris … and consequent reduced clitoral and urethral physiological function." Ex. 1005 at 19:27-31. Thus, at the time of the alleged invention, the POSITA was aware of the benefits associated with indirect

59

clitoral stimulation, and would have had a reasonable expectation of success in using *Guan*'s device as a clitoral stimulator.

Moreover, a stimulation device having both a stimulation element for the clitoris and a dildo was well-known before the alleged date of invention.  Ex. 1002 at ¶¶24-26, 135-137; Ex. 1005 at 15:36-48, Fig. 19 (disclosing that pressure modulation can be coupled with a dildo); *see also* Ex. 1004 (teaching that the benefits of combining two stimulus means, e.g., providing simultaneous engagement with and excitation of the vagina and clitoris, were well-known in the art at the time of the alleged invention.)

For example, *Lee* discloses a dildo 10 that includes a phallic sleeve 16 configured for insertion into a vagina.  Ex. 1006 at 3:48-53; Ex. 1002 at ¶136. Dildo 10 includes "an arm member 40 that is formed as a lateral extension of phallic sleeve 16 in a shape and dimension preferably facilitating contact with the clitoris of a user of the dildo."  *Id*.  Arm member 40 encloses a mechanical vibrator 42 (see Fig. 2) for using vibration to stimulate the clitoris.  *Id.*

60



**Annotated Figures of *Lee* and *Guan***

Thus, a POSITA at the time of the alleged invention, recognizing the drawbacks of direct mechanical stimulation and the benefits of indirect stimulation via air pressure differential on the clitoris, would have had a reasonable expectation of success in replacing *Lee*'s mechanical vibrator with *Guan's* massager to take advantage of the benefits of indirect stimulation discussed above. Ex. 1002 at ¶¶26-28, 134-137. Accordingly, the POSITA would have been motivated to incorporate *Guan*'s massager in *Lee*'s dildo so as to replace direct vibratory stimulation with pulsating air pressure during use of dildo 10. *Id*. Such a modification would have amounted to nothing more than a simple substitution of one known element for another to obtain predictable results. *See KSR*, 550 U.S. at 417. This is because at the time of the invention, a POSITA would have the

61

requisite skill level to replace *Lee*'s mechanical vibrator with *Guan's* massager without any problem.  In such a modified device, sleeve 16 would correspond to the claimed appendage in the form of a "dildo configured to be inserted into the vagina."  Ex. 1002 at ¶137.

### 2.    Claim 2

A POSITA would have recognized that the *Guan-Lee-Hovland* device may be held by sleeve 16.  Ex. 1002 at ¶¶138-140.  Moreover, in order to position sleeve 16 in a vagina, a user would likely have to use a hand to hold and appropriately guide sleeve 16 into the vagina.  Ex. 1002 at ¶140.  Thus, sleeve 16 is an appendage that is a handle for holding the *Guan-Lee-Hovland* device.  *Id.*

### 3.    Claim 3

*Guan* states that "the rubber mouth 1 on the air bag 2 contacts the body." Ex. 1007 at 3.  Therefore, in the *Guan-Lee-Hovland* device, the opening of mouth 1 is for placing over the body part.  Ex. 1002 at ¶¶141-143.

### 4.    Claim 4

As discussed above in connection with claim 1, the POSITA would have had a reasonable expectation of success in using the *Guan-Lee-Hovland* device on a clitoris.  *See supra* Section IX(C)(1)(1.7); Ex. 1002 at ¶¶144-146.

### 5.    Claim 5

The *Guan-Lee-Hovland* device includes a second chamber formed by the volume defined within rubber mouth 1, as shown in the figure below.  Ex. 1002 at

62

¶¶147-149.



**Annotated Figure of *Guan***

### 6.    Claim 6

The *Guan-Lee-Hovland* device includes air bag 2 (i.e., the claimed chamber) having a flexible wall portion integral therewith. *See supra* Section IX(C)(1)(1.2); Ex. 1002 at ¶¶150-152.

63



**Annotated Figure of *Guan***

### 7. Claim 7

The *Guan-Lee-Hovland* device includes air bag 2 (i.e., the claimed chamber) having a flexible wall portion. *See supra* Section IX(C)(1)(1.2); Ex. 1002 at ¶¶153-155. However, *Guan* fails to teach that the walls of air bag 2 are made of silicone.

*Hovland* teaches that silicone is a known biocompatible material suitable for use in sexual stimulation devices. Ex. 1005 at 11:66-12:2.

Thus, it would have been obvious to the POSITA to fabricate air bag 2 from silicone. Ex. 1002 at ¶¶23, 155. Indeed, the POSITA would have been motivated to use silicone to improve hygiene of devices intended for use with the body. Since there are a limited number of biocompatible materials, a POSITA would have had a reasonable expectation of success in fabricating air bag 2 from silicone

64

to achieve greater hygienic properties. *Id.*; *see KSR*, 550 U.S. at 421; *see also In re Leshin*, 277 F.2d 197, 299 (C.C.P.A. 1960) ("Mere selection of known plastics to make a container-dispenser of a type made of plastics prior to the invention, the selection of the plastics being on the basis of suitability for the intended use, would be entirely obvious."); Ex. 1002 at ¶155.

### 8. Claim 8



As described for claim 1, the *Guan-Lee-Hovland* device does not include valves. Ex. 1002 at ¶¶156-158; *see supra Section* IX(C)(1).

### 9. Claim 9

The *Guan-Lee-Hovland* device is a portable hand-held device. Ex. 1002 at ¶¶159-161. Indeed, *Guan*'s massager is "small in size, convenient to carry and easy to operate." Ex. 1007 at 3. Moreover, *Lee*'s dildo 10 and *Hovland*'s

65

stimulation device also are portable hand-held devices.  *See, e.g., Ex*. 1006 at 3:30-30, Fig. 1; Ex. 1005 at  Fig. 15; Ex. 1002 at ¶161.

### 10.    Claim 10

The *Guan-Lee-Hovland* device is battery powered.  Ex. 1002 at ¶¶162-165.  *Guan* discloses that power must be supplied to electromagnet 5 to generate the pulsating air pressure, but is silent with regard to the power source.  Ex. 1007 at 3.  There is nothing in *Guan* that would preclude battery operation.  Indeed, *Guan* is intended to be "small in size, convenient to carry and easy to operate."

*Lee* and *Hovland* disclose the use of batteries.  *See* Ex. 1006 at 4:26-27; Ex. 1005 at 12:20-21.  Thus, it would have been obvious to a POSITA at the time of the alleged invention to make the *Guan-Lee-Hovland* device battery powered to improve size and portability.  Ex. 1002 at ¶¶164-165.  Such a modification would have amounted to nothing more than the use of a known technique to improve a similar device, and the results of the modification would have been predictable.  *See KSR*, 550 U.S. at 147.  Indeed, the POSITA would have had the requisite skill to make such a modification, and a reasonable expectation of success in achieving greater ease of use and portability.

### 11.    Claim 11

As shown below, *Guan*'s massager includes a housing.



**Annotated Figure of _Guan_**

However, _Guan_ fails to disclose that the housing is water resistant and comprises ABS. Nonetheless, based on the teachings of _Lee_ and/or _Hovland_ discussed below, it would have been obvious to a POSITA to make _Guan_'s housing from ABS and water-resistant.

_Lee_ discloses that ABS is a suitable material for vibrator housings 46 and housing 50. Ex. 1006 at 4:18-26. _Hovland_ discloses that casing 210 can be "formed of ABS … ." Ex. 1005 at 11:26-29. Indeed, _Hovland_ explains that "a biocompatible material is highly preferred, to ensure that it will not cause adverse tissue reactions" when in contact with skin. _Id._ at 11:31-34. Moreover, _Hovland_ teaches that casing 210 can be water-resistant. _Id._ at 11: 38-39.

67

Accordingly, it would have been obvious to a POSITA to make *Guan*'s housing water-resistant to prevent fluids from entering into the housing.  Ex. 1002 at ¶¶23, 166-169.  Such a modification would have amounted to nothing more than the use of a known technique to improve a similar device, and the results of the modification would have been predictable.  *See KSR*, 550 U.S. at 417.

It also would have been obvious to a POSITA to construct *Guan*'s housing from ABS to avoid adverse skin reactions, as taught by *Hovland*.  Ex. 1002 at ¶¶23, 169.  Indeed, given that there are a limited number of biocompatible materials, such a modification would have amounted to nothing more than the use of a known technique to improve a similar device, and the results of the modification would have been predictable.  *See KSR*, 550 U.S. at 421; *see also In re Leshin*, 277 F.2d 197, 299 (C.C.P.A. 1960) ("Mere selection of known plastics to make a container-dispenser of a type made of plastics prior to the invention, the selection of the plastics being on the basis of suitability for the intended use, would be entirely obvious."); Ex. 1002 at ¶¶23, 168-169.

### 12.    Claim 12

#### 12.1   Element 12a

*Guan* discloses a method for generating pulsating air pressure using a massager to stimulate a body part (e.g., meridian points).  Ex. 1007 at 3.

68

### 12.2   Element 12b



**Annotated Figure of *Guan***

*Guan* discloses causing deflections of a flexible wall portion of air bag 2 in opposing directions upon application of power to electromagnet 5, thereby resulting in a changing volume of air bag 2.  Ex. 1002 at ¶¶170-172.

Specifically, *Guan* discloses air bag 2 is movably connected to rubber mouth 1.  Ex. 1007 at 3.  Here, air bag 2 (i.e., a balloon) is the chamber of the claim.  Ex. 1002 at ¶¶66-70, 172.  Air bag 2 includes a wall that is connected to a lever 3 such that when lever 3 moves from right to left and vice versa (when the electromagnet 5 drives magnet 4), the "wall of the air bag (2) [has a] reciprocating motion".  Ex. 1007 at 3.  The wall of air bag 2 which is connected to the lever 3 must be flexible

69

to permit the described reciprocating motion of air bag 2.  Ex. 1002 at ¶¶66-70, 172.  The reciprocating motion of magnet 4 and lever 3 (i.e., the drive unit of claim 12) causes deflections of the flexible wall portion of air bag 2 in opposing directions – thereby resulting in a changing volume of air bag 2.  *Id.*  In this way, air bag 2 "generate(s) a pulsating air pressure." Ex. 1007 at 3; Ex. 1002 at ¶¶66-70, 172.

### 12.3   Element 12c

This limitation is similar to the corresponding limitation of claim 1.  *See supra* Section IX(C)(1.4).

*Guan* discloses that the changing volume of the chamber results in modulated positive and negative pressures with respect to a reference pressure, as explained above in connection with claim 1.  Ex. 1002 at ¶¶173-174; *supra* Section IX(C)(1.4).   As discussed in Section IX(C)(12.2), the motion of lever 3 reciprocally compresses and expands air bag 2 to "generate a pulsating air pressure … to stimulate [a body part]."  Ex. 1007 at 3; Ex. 1002 at ¶¶66-70, 172; *see also supra* Section IX(C)(1.4).  The "pulsating air pressure" amounts to pressures above (i.e., positive pressures) and below (i.e., negative pressures) the prevailing atmospheric pressure in air bag 2 prior to operation.  Ex. 1002 at ¶¶173-174.

### 12.4   Element 12d

70

As explained above, the phrase "wherein the appendage is a dildo configured to be inserted into a vagina" does not appear to be a limitation on the claimed method, nor does it require the dildo to be inserted into the vagina. *Supra* Section IX(A)(9)(9.4); Ex. 1002 at ¶175.

*Guan* discloses that a "pulsating air pressure" is generated at mouth 1 when air bag 2 is compressed/expanded and mouth 1 is contacting the body. Ex. 1007 at 3; Ex. 1002 at ¶¶67-70, 176. Thus, *Guan* discloses applying the "modulated positive and negative pressures" to a body part through the opening of mouth 1. Ex. 1002 at ¶¶173-174, 176.

Stated differently, in order for a user to stimulate a desired body part, the user must position rubber mouth 1 to be in contact with the desired body part. *Id.* In this way, the *Guan-Lee-Hovland* combination provides for positioning the stimulation device to apply the generated pulsating air pressure by using an appendage configured to be inserted into a vagina. Ex. 1002 at ¶¶176-181.

71



*Lee*'s Dildo

*Guan*'s massager

Fig. 1

**Annotated Figures of *Lee* and *Guan***

Indeed, *Lee*'s "dildo 10 has an arm member 40 that is formed as a lateral extension of the sleeve 16 in a shape and dimension **preferably facilitating contact with the clitoris of a user of the dildo**." Ex. 1006 at 3:48-53 (emphasis added). And, a stimulation device having both a stimulation element for a body part (e.g., the clitoris) as well as a dildo for insertion into a vagina was well-known before the alleged date invention. Thus, as explained above for claim 1, it would have been obvious to a POSITA to replace the vibration-based arm member 40 of *Lee*'s dildo 10 with the *Guan* massager so as to stimulate the clitoris with pulsating air pressure as a result of positioning the dildo in a vagina, in order to realize the benefits of stimulating the clitoris with pulsating air pressure. Ex. 1002 at ¶¶23-28,

177-181; *see supra* Section IX(C)(1)(1.7).  Such a modification would have

amounted to nothing more than a simple substitution of one known element for

another to obtain predictable results.  *See KSR*, 550 U.S. at 417.  This is because at

the time of the invention, a POSITA would have the requisite skill level to replace

*Lee*'s vibrator with *Guan's* massage device without any problem.

### 13.    Claim 13

A POSITA would have recognized that the *Guan-Lee-Hovland* device may

be held by sleeve 16.  Ex. 1002 at ¶¶182-184; *supra* Section IX(C)(2).  Thus,

sleeve 16 is a handle for holding the *Guan-Lee-Hovland* device.  Ex. 1002 at ¶184.

### 14.    Claim 14



**Annotated Figure of *Guan***

As explained above for claim 5, the *Guan-Lee-Hovland* device includes a second chamber formed by the interior of mouth 1.  Ex. 1002 at ¶¶185-187; *see supra* Section IX(C)(5)(5.1).

Further, as explained for claim 12, the reciprocating motion of air bag 2 causes a change in volume of air bag 2 that results in pulsating air pressure (i.e., modulated positive and negative pressures) that is applied to the body through mouth 1 (via the second chamber).  Ex. 1002 at ¶¶173-174, 187; *see supra* Section IX(C)(12)(12.3)-(12.4).  Thus, the changing volume of air bag 2 results in providing the modulated positive and negative pressures to the second chamber. Ex. 1002 at ¶187.

### 15.    Claim 15

*Guan* discloses a method of stimulating sensitive body parts, e.g., the six meridians.  Ex. 1007 at Abstract.  The '097 patent admits that it was well-known that the clitoris is a sensitive and stimulative body part.  *See, e.g.*, Ex. 1001 at 1:24–2:47, 1:43-48; Ex. 1002 at ¶190.  Also, *Hovland* and *Lee* describe the benefits of stimulating the clitoris.  *See generally* Exs. 1005 and 1006.  Thus, it would have been obvious to a POSITA before the alleged date of invention to employ the method of claim 12, as disclosed by the *Guan-Lee-Hovland* combination, to stimulate the clitoris via the opening in mouth 1.  Ex. 1002 at ¶¶23-28, 188-190. This is because at the time of the alleged invention, based on the teachings of *Lee*

74

and *Hovland*, a POSITA would have a reasonable expectation of success in using *Guan*'s stimulation on the clitoris, and the results would have been predictable. *See KSR*, 550 U.S. at 417.

### 16.    Claim 16

As discussed for claim 6, the flexible walls of air bag 2 (i.e., the claimed chamber) are integral therewith.  Ex. 1002 at ¶¶191-193; *see supra* Section IX(C)(6).

### 17.    Claim 17

Claim 17 is identical to claim 1 with the exception that each occurrence of "chamber" in claim 1 is replaced with "pressure field generator" in claim 17. *Compare* Ex. 1001 at 17:2-16, *with* Ex. 1001 at 18:1-14; Ex. 1002 at ¶195.

Nonetheless, the device of the *Guan-Lee-Hovland* combination, as set forth above with respect to claim 1, renders obvious claim 17.  Ex. 1002 at ¶¶194-214; *see supra* Section IX(C)(1)( addressing each corresponding limitation of claim 1).

As discussed, "pressure field generator" is a mean-plus-function limitation – the function is to generating "**modulated positive and negative pressures with respect to a reference pressure**", and the structure is "**at least a first chamber and at least a second chamber and at least one connection element that connects the first chamber to the second chamber and equivalents**".  *See supra* Section VIII(A); Ex. 1002 at ¶¶50-54, 197-199.

75

*Guan* discloses that air bag 2 is fluidly connected to mouth 1 for applying the generated pulsating air pressure to a body part. Ex. 1007 at 3; Ex. 1002 at ¶¶200-201. *Guan* teaches that the reciprocating motion imparted upon a wall of air bag 2 results generating pulsating air pressure. Ex. 1007 at 3; Ex. 1002 at ¶200. The pulsating air pressure is applied to a body part in contact with mouth 1 to stimulate the body (e.g., the six meridians).

In the figure below, air bag 2 corresponds to "first chamber 3." Ex. 1002 at ¶198. The portion of mouth 1 highlighted in pink corresponds to the "second chamber 4." *Id.* And, the portion of mouth 1 (highlighted in green) corresponds to "connection element 5." *Id.*



**Annotated Figure of *Guan***

Indeed, *Guan*'s air bag 2 and rubber mouth 1, taken together, correspond to

76

the claimed "pressure field generator" because they generate a pulsating air pressure for application to a body part.  *Id.*; *see supra* Section IX(C)(1).

Furthermore, since air bag 2 constitutes a part of the claimed "pressure field generator", the walls of air bag 2 correspond to the "flexible wall portion" of the "pressure field generator."  *Id.*

Since *Guan* discloses a "pressure field generator," the stimulation device disclosed by the *Guan-Lee-Hovland* combination also renders unpatentable claim 17 because each limitation is met.  *See supra* Section IX(C)(1) (addressing each corresponding limitation of claim 1); Ex. 1002 at ¶¶194-214.

### 18.    Claim 18

The *Guan-Lee-Hovland* device includes a sleeve 16 that is a handle for holding the stimulation device.  *See supra* Section IX(C)(2); Ex. 1002 at ¶¶215-217.

### 19.    Claim 19

The *Guan-Lee-Hovland* device includes a mouth 1 having an opening for placing over the clitoris.  *See supra* Sections IX(C)(3)-(4); Ex. 1002 at ¶¶218-220.

### 20.    Claim 20

The *Guan-Lee-Hovland* device applies the pulsating air pressure to the clitoris.  *See supra* Section IX(C)(4); Ex. 1002 at ¶¶221-223.

### 21.    Claim 21

As described for claim 17, the *Guan-Lee-Hovland* device includes a "pressure field generator." *See Supra* Section IX(C)(17). *Guan*'s air bag 2 corresponds to the claimed "first chamber," and the portion of mouth 1 highlighted in pink corresponds to the claimed "second chamber." *See Supra* Section IX(C)(17); Ex. 1002 at ¶¶224-226.



**Annotated Figure of *Guan***

### 22.    Claim 22

As explained for claim 17, air bag 2 forms a part of the claimed "pressure field generator." *Supra* Section IX(C)(17). And, the walls of air bag 2 are integral therewith, and, thus, integral with the "claimed pressure field generator." Ex. 1002 at ¶¶227-229.



**Annotated Figure of *Guan***

### 23.    Claim 23

The *Guan-Lee-Hovland* device does not include any valves.  *See supra*

Section IX(C)(8); Ex. 1002 at ¶¶230-232.

### 24.    Claim 24

The *Guan-Lee-Hovland* stimulation device is a portable hand-held device.

*See supra* Section IX(C)(9)(9.1);  Ex. 1002 at ¶¶233-235.

### 25.    Claim 25

The *Guan-Lee-Hovland* device is battery-powered.  *See supra* Section

IX(C)(10); Ex. 1002 at ¶¶236-239.

### 26.    Claim 26

Claim 26 is identical to claim 12 with the exception that each occurrence of

"chamber" in claim 12 is replaced with "pressure field generator" in claim 26.

79

*Compare* Ex. 1001 at 17:50-53, *with* Ex. 1001 at 18:32-46; Ex. 1002 at ¶241.

Nonetheless, the *Guan-Lee-Hovland* combination, as set forth above with respect to claim 12, renders obvious claim 26. Ex. 1002 at ¶¶240-256; *see supra* Section IX(C)(12)(addressing each corresponding limitation of claim 12).

As explained above with respect to claim 17, *Guan*'s air bag 2 and mouth 1, taken together, meet the limitations of the claimed "pressure field generator" because together they generate a pulsating air pressure for application to a body part. *See supra* Section IX(C)(17); Ex. 1002 at ¶¶243-245. The remaining limitations of claim 26 are also met by the *Guan-Lee-Hovland* combination. *See supra* Section IX(C)(12) (providing limitation-by-limitation analysis for claim 12). Ex. 1002 at ¶¶230-256.

### 27. Claim 27

The *Guan-Lee-Hovland* device includes a sleeve 16 that is a handle for holding the stimulation device. *See supra* Section IX(C)(13); Ex. 1002 at ¶¶257-259.

### 28. Claim 28

As described above for claim 17, air bag 2 corresponds to the claimed "first chamber," and the portion of mouth 1highlighted in pink defines the claimed "second chamber." *See supra* Section IX(C)(17); Ex. 1002 at ¶262.

80



**Annotated Figure of *Guan***

Moreover, since mouth 1 is fluidly connected with air bag 2 via the connection portion highlighted in green, the pulsating air pressure (i.e., the claimed "modulated positive and negative pressures") generated by deflecting walls of air bag 2 results in a pulsating air pressure in inside rubber mouth 1. *See supra* Section IX(C)(12)(12.2)-(12.3); Ex. 1002 at ¶¶260-262.

### 29.    Claim 29

The *Guan-Lee-Hovland* device includes an opening for applying the pulsating air pressure to a clitoris. *See supra* Section IX(C)(15); Ex. 1002 at ¶¶263-265.

### 30.    Claim 30

As explained above, the walls of air bag 2 are integral with the claimed "pressure field generator." *See supra* Section IX(C)(22); Ex. 1002 at ¶¶266-268.

## X.    ARGUMENTS FOR DISCRETIONARY DENIAL SHOULD BE REJECTED

*Taylor* and *Lee* were not identified during prosecution of the '097 patent. Ex. 1001 at 1-2; s*ee* also Ex. 1003.

Also, while it appears that the applicant of the '097 patent tried citing *Guan* during prosecution, *Guan* was identified as CN 215335**2** instead of CN 215335**1**. Ex. 1001 at 1; Ex. 1003 at 309. Notwithstanding this error, the Applicant provided the  examiner with a machine-produced language translation of only *Guan*'s Abstract. Ex. 1011 at 1. When compared with the full translation, the machine-translated Abstract fails to provide sufficient technical detail of *Guan*'s apparatus and mode of operation, including, e.g., the mechanism for reciprocally moving a wall of air bag 2 to generate a pulsating air pressure. *Compare* Ex. 1011 at 1, *with* Ex. 1007 at 1-4; *see also* Ex. 1015 at 3-15 (showing that the Office was able to fully appreciate *Guan* only after it independently obtained a more complete translation).

The patent application publication (i.e., U.S. 2002/01202190) of *Hovland* is identified on the '097 patent. Ex. 1001 at 1. However, *Hovland* was not relied upon during prosecution. Indeed, there is no evidence that the examiner reviewed *Hovland* or *Guan* in detail, and that arguments the same as or substantially the

82

same as those presented herein were ever presented and/or considered by the examiner. *See Fox Factory, Inc. v. SRAM, LLC*, IPR2017-00472, at \*6-8 (PTAB Apr. 21, 2017) (Paper 10) (instituting IPR after noting that the record contained no evidence that a reference cited during prosecution had been considered "in more than a cursory manner"); *Pure Storage, Inc. v. Realtime Data LLC*, Case No. IPR2018-00549, slip op. at 11 (PTAB July 23, 2018) (Paper 7) (noting that "there is no evidence of record that [the prior art references] were substantively considered by the Examiner."); *Comcast Cable Communs., LLC v. Promptu Sys. Corp.*, Case No. IPR2018-00342, slip op. at 17 (PTAB July 19, 2018) (Paper 13) (granting institution "because [the prior art] was only cited in an IDS and not applied by the examiner in the reissue application process in any rejection of claims").

Accordingly, the Board should reach the merits of this petition, and institute review of all challenged claims, especially in light of the accompanying expert testimony, which was not before the Office during prosecution.

## XI.    CONCLUSION

For the reasons above, Petitioner requests institution of IPR of the challenged claims based on all grounds.

Respectfully submitted,

Dated:  July 3, 2019

Dinesh N. Melwani (Reg. No. 60,670)
Bookoff McAndrews, PLLC
2020 K Street NW, Suite 400
Washington, D.C.  20006
202-808-3497

Attorneys for Petitioner
EIS GmbH

84

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 C.F.R. § 42.24(d), the undersigned certifies that the foregoing

Petition for *Inter Partes* Review of U.S. Patent No. 9,937,097 contains, as

measured by the word-processing system used to prepare this paper, 13,991 words.

This word count does not include the items excluded by 37 C.F.R. § 42.24 as not

counting towards the word limit.

Dated:  July 3, 2019                                    Respectfully submitted,

                                                        By:  _____
                                                             Dinesh N. Melwani (Reg. No.60,670)
                                                             Counsel for Petitioner

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6(e) and 37 C.F.R. § 42.105(a), I hereby certify

that on July 3, 2019, I caused a true and correct copy of the foregoing "PETITION

FOR INTER PARTES REVIEW OF U.S. PATENT NO. 9,937,097" and

supporting exhibits to be served via Federal Express on the Patent Owner at the

following correspondence address of record as listed on PAIR:

HANLEY, FLIGHT & ZIMMERMAN, LLC
150 S. WACKER DRIVE
SUITE 2200
CHICAGO IL 60606

Dated:  July 3, 2019                                       Respectfully submitted,

                                                    By:  _____
                                                         Dinesh N. Melwani (Reg. No.60,670)
                                                         Counsel for Petitioner

# EXHIBIT 3

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

EIS GMBH
Petitioner

v.

NOVOLUTO GMBH
Patent Owner

_____

Patent No. 9,763,851

_____

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 9,763,851**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

LISTING OF EXHIBITS ................................................................................. v

I.     INTRODUCTION ................................................................................. 1

II.    MANDATORY NOTICES ..................................................................... 1

III.   PAYMENT OF FEES ........................................................................... 2

IV.    GROUNDS FOR STANDING ............................................................... 2

V.     PRECISE RELIEF REQUESTED AND GROUNDS ................................... 2

VI.    LEVEL OF ORDINARY SKILL ............................................................ 4

VII.   THE '851 PATENT AND PRIOR ART ................................................... 4

       A.     The '851 patent ....................................................................... 4

       B.     Prosecution Summary of the '851 patent ..................................... 11

       C.     Prosecution Summary of Related Patent Applications ................... 13

       D.     The Prior Art ........................................................................... 14

              1.     *Guan* (Ex. 1004) ........................................................... 14

              2.     *Hovland* (Ex. 1005) ....................................................... 16

              3.     *Makower* (Ex. 1006) ...................................................... 18

              4.     *Gloth* (Ex. 1007) ........................................................... 20

VIII.  CLAIM CONSTRUCTION .................................................................. 22

IX.    DETAILED EXPLANATION OF GROUNDS ........................................... 23

       A.     Ground 1: *GUAN* IN VIEW OF *HOVLAND* RENDER
              OBVIOUS CLAIMS 1-2 AND 4-6 ...................................... 23

              1.     Claim 1 ............................................................ 23

i

2. Claim 2.................................................................53

3. Claim 4.................................................................56

4. Claim 5.................................................................58

5. Claim 6.................................................................60

B. Ground 2: *GUAN* AND *HOVLAND* FURTHER IN VIEW OF *GLOTH* RENDER OBVIOUS CLAIM 3 ....................................64

1. Claim 3.................................................................64

C. Ground 3: *GUAN* AND *HOVLAND* FURTHER IN VIEW OF *MAKOWER* RENDER OBVIOUS CLAIMS 5-6 ........................69

1. Claim 5.................................................................70

2. Claim 6.................................................................72

X. ARGUMENTS FOR DISCRETIONARY DENIAL SHOULD BE REJECTED..............................................................................76

XI. CONCLUSION...............................................................78

# TABLE OF AUTHORITIES

**Cases**

*Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015)3

*Comcast Cable Communs., LLC v. Promptu Sys. Corp.*, Case No. IPR2018-00342,

   slip op. (PTAB July 19, 2018) (Paper 13)..........................................................78

*Fox Factory, Inc. v. SRAM, LLC*, IPR2017-00472 (PTAB Apr. 21, 2017) (Paper

   10)......................................................................................................................77

*KSR Int'l. Co. v. Teleflex, Inc.*, 550 U.S. 398  (2007) ..................................... passim

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) .........................................22

*Pure Storage, Inc. v. Realtime Data LLC*, Case No. IPR2018-00549, slip op.

   (PTAB July 23, 2018) (Paper 7).........................................................................78

*Toyota Motor Corp. v. Cellport Sys., Inc.*, IPR2015-00633, Paper No. 11 (Aug. 14,

   2015).................................................................................................................22

**Statutes**

35 U.S.C. § 102(a)(1)............................................................................................3, 4

35 U.S.C. § 102(a)(2)...............................................................................................4

35 U.S.C. § 103 ........................................................................................................3

35 U.S.C. § 112........................................................................................................22

35 U.S.C. §102(b)(1)................................................................................................4

35 U.S.C. §102(b)(2)................................................................................................4

iii

## Other Authorities

37 C.F.R. § 42.105(a)........................................................................................80

37 C.F.R. § 42.24(d) .......................................................................................79

37 C.F.R. § 42.6(e)..........................................................................................80

## LISTING OF EXHIBITS[1]

| Exhibit | Description |
|---|---|
| Exhibit 1001 | U.S. Patent No. 9,763,851 B2 |
| Exhibit 1002 | Declaration of Michael R. Prisco, P.E., Ph.D. |
| Exhibit 1003 | Prosecution History of U.S. Patent No. 9,763,851 B2 |
| Exhibit 1004 | Chinese Patent No. CN 2153351 to Guan ("*Guan*") and Certified Translation thereof |
| Exhibit 1005 | U.S. Patent No. 6,964,643 B2 to *Hovland* et al. ("*Hovland*") |
| Exhibit 1006 | U.S. Patent No. 8,579,837 B1 to Makower et al. ("*Makower*") |
| Exhibit 1007 | U.S. Patent No. 5,813,973 to Gloth ("*Gloth*") |
| Exhibit 1008 | German Patent and Trade Mark Office Decision on Opposition Proceedings of German Patent DE 102013110501 and Certified Translation thereof |
| Exhibit 1009 | Kevin L. Billups, *The Role of Mechanical Devices in Treating Female Sexual Dysfunction and Enhancing the Female Sexual Response*, 20 World J. Urol. 137 (2002) |
| Exhibit 1010 | German Patent No. 102013110501 and Certified Translation Thereof |
| Exhibit 1011 | Copy of CN 2153351 to Guan submitted by Applicant during prosecution of the '851 patent |

---

[1] Citations to Exhibits 1001 and 1005-1007 are to column:line number. Citations to Exhibit 1002 is to paragraph number. And, citations to the remaining Exhibits are to the page numbers to the respective exhibits.

v

| Exhibit 1012 | Prosecution History of U.S. Patent Application No. 15/965,117 |

## I.    INTRODUCTION

EIS GmbH ("Petitioner") requests *inter partes* review (IPR) of claims 1-6 ("the challenged claims") of U.S. Patent No. 9,763,851 ("the '851 patent") (Ex. 1001), assigned to Novoluto GmbH ("Patent Owner").  As explained below, the challenged claims should be found unpatentable and cancelled.

## II.    MANDATORY NOTICES

**Real Party-in-Interest**:  Petitioner identifies the following as real parties-in-interest:  EIS GmbH; EIS Inc.; Triple A Import GmbH; Triple A Marketing GmbH; Triple A Sales GmbH; and Triple A Internetshops GmbH (formerly known as "Internetsupport Bielefeld").

**Related Matters**:  The '851 patent claims priority to German Patent DE 10 2013 110 501 ("the DE501 patent").  The DE501 patent was revoked by the German Patent and Trade Mark Office (GPTO) following opposition proceedings. The revocation has been appealed.

U.S. Application Nos. 15/354,599, 15/965,117, and 15/965,208 are pending continuation applications of the '851 patent.  As of filing of this Petition, all of the claims in these applications have been rejected by the U.S. Patent and Trademark Office (USPTO).

In addition, U.S. Patent No. 9,937,097 B2 ("the '097 patent"), also assigned to Patent Owner, discloses a substantially similar device, as that claimed in the

1

'851 patent.  Petitioner has filed a petition for IPR (IPR2019-01302) challenging claims 1-30 of the '097 patent on July 3, 2019.  This petition is currently pending institution.  U.S. Application No. 15/888,568 ("the '568 application") is a pending continuation application of the '097 patent.  The '568 application currently stands rejected by the USPTO.

**Counsel and Service Information**: Lead counsel is Dinesh N. Melwani (Reg. No. 60,670), and Backup counsel is Biju I. Chandran (Reg. No. 63,684). Service information is:  Bookoff McAndrews, PLLC, 2020 K Street, NW, Suite 400, Washington, DC 20006; Tel.: 202.808.3497; Fax.: 202.450.5538; email: docketing@bomcip.com, dmelwani@bomcip.com, and bchandran@bomcip.com. Petitioner consents to electronic service.

## III.    PAYMENT OF FEES

The PTO is authorized to charge any fees due during this proceeding to Deposit Account No. 50-5906.

## IV.    GROUNDS FOR STANDING

Petitioner certifies that the '851 patent is available for review and Petitioner is not barred/estopped from requesting review on the following grounds.

## V.    PRECISE RELIEF REQUESTED AND GROUNDS

The challenged claims should be cancelled as unpatentable based on:

**Ground 1:** Claims 1-2 and 4-6 are unpatentable under 35 U.S.C. § 103 as obvious over Chinese Patent No. CN 2153351 Guan ("*Guan*") (Ex. 1004) in view of U.S. Patent No. 6,964,643 ("*Hovland*") (Ex. 1005).

**Ground 2:** Claim 3 is unpatentable under 35 U.S.C. § 103 as obvious over *Guan* and *Hovland* further in view of U.S. Patent No. 5,813,973 ("*Gloth*") (Ex. 1007).

**Ground 3:** Claims 5- 6 are unpatentable under 35 U.S.C. § 103 as obvious over *Guan* and *Hovland* further in view of U.S. Patent No. 8,579,837 B1 ("*Makower*") (Ex. 1006).[2]

The application that issued as the '851 patent was filed on March 21, 2016, as a national stage of Application No. PCT/EP2014/065734, which claims priority to German Patent Application No. DE 102013110501, filed on September 23, 2013 ("the DE501 application"). Ex. 1001 at 1. For the purposes of this proceeding only, Petitioner assumes the priority date of the '851 patent is September 23, 2013.

---

[2] For each Ground, Petitioner does not rely on any reference other than those listed here. Other references are discussed to show the state of the art at the time of the invention. *See Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015).

*Guan* issued on December 11, 1993.  Ex. 1004 at 1.  *Hovland*  issued on

November 15, 2005.  Ex. 1005 at 1.  *Gloth* issued on September 29, 1998.  Ex.

1007 at 1.  Therefore, *Guan*, *Hovland* , and *Gloth* are prior art to the '851 patent at

least under 35 U.S.C. § 102(a)(1).  *Makower* was filed on April 30, 2013, and

issued on November 12, 2013.  Ex. 1006 at 1.  There is no evidence to indicate that

any of the prior art exceptions under 35 U.S.C. §102(b)(1) and 35 U.S.C.

§102(b)(2) apply to *Makower*.  Therefore, *Makower* is prior art to the '851 patent

under 35 U.S.C. § 102(a)(2).  Thus, the references applied in Grounds 1-3 above

are prior art to the '851 patent.

## VI.   LEVEL OF ORDINARY SKILL

A person of ordinary skill in the art ("POSITA") as of the assumed priority

date of the '851 patent (i.e., September 23, 2013) would have had a bachelor's

degree in mechanical engineering, biomechanical engineering, or the equivalent,

and three or more years of experience in fluid mechanics and pump-based medical

or personal use devices.  Ex. 1002 at ¶¶18-22.   More practical experience could

qualify one not having the aforementioned education as a POSITA, while a higher

level of education could offset lesser experience.  *Id.*

## VII.  THE '851 PATENT AND PRIOR ART

### A.   The '851 patent

4



The '851 patent discloses stimulation devices having a pressure field generator to generate a "pressure field" that stimulates the clitoris or other body parts. Ex. 1001 at Abstract, 3:58-4:8, 8:60-65; Ex. 1002 at ¶¶26-27. The '851 patent explains that "[a] pressure field in terms of the invention is a temporally modifiable field of media pressures, with occasional positive-pressures and occasional negative-pressures, a negative-pressure being a media pressure below the reference pressure and an [sic] positive-pressure being a media pressure above the reference pressure." Ex. 1001 at 4:3-8. The media may be air or a liquid medium (e.g., water, lubricant, etc.), and the reference pressure is the existing

5

ambient pressure prior to placing the stimulation device on the region of skin to be stimulated.  *Id*. at 4:9-11, 4:20-23; Ex. 1002 at ¶28.

The stimulation device 1 is a "preferably electric or small device" with housing 8 and pressure field generator 2 having "first chamber 3 in the interior of stimulation device 1, second chamber 4 for placing on a body part 11 to be stimulated, and connection element 5, which connects first chamber 3 with second chamber 4."  Ex. 1001 at 7:40-42, 8:16-20; *see* Fig. 3 (reproduced above).  And, that "wall 31 of the first chamber 3 is preferably made of a flexible medium- or air-tight material such as a rubber."  *Id.* at 9:21-22.  Drive unit 6 deflects wall 31 to vary the volume of the first chamber (via axis 61 and eccentric 62) in accordance with the rotation of axis 61.  *Id.* at 8:21-25; Ex. 1002 at ¶¶29-30.  Drive unit 6 may be an electric motor, or a hydraulic, pneumatic, piezoelectric, mechanical or electromagnetic mechanism.  Ex. 1001 at 8:25-30; Ex. 1002 at ¶¶29-30.



Fig. 4      Fig. 5      Fig. 6

With reference to Figs. 4-6, when second chamber 4 is sealed tightly against body part 11 (e.g., clitoris 12) to be stimulated, and drive unit 6 is activated, "the volume of the first chamber 3 and thus the total pressure in pressure field generator

6

2 are modified, with the pressure modifications being modified to the reference pressure." Ex. 1001 at 12:53-64, *see also id.* at 8:50-52, 8:58-60, 8:66-9:8; Ex. 1002 at ¶¶31-32. Moreover, when first chamber 3 is compressed to create a positive-pressure in chamber 3, the resulting "media flow [from chamber 3 to chamber 4] is [ ] preferably directed by the orientation of opening 51 and/or of connection element 5 towards the body part 11 to be stimulated, in particular towards the glans of clitoris 12. The indirect (pressure) massage according to the invention ensues due to the medium flowing onto body part 11." Ex. 1001 at 9:59-64; Ex. 1002 at ¶¶33-36.



With reference to the exemplary pressure field illustrated in Fig. 14a, it is explained that "[i]n phases of pressure increase, the erogenous zone to be stimulated is blown on or massaged, while in the times when a negative-pressure prevails, the blood circulation of body part 11, the clitoris for example, is promoted." Ex. 1001 at 12:66-13:3; Ex. 1002 at ¶¶31-32.

7

The '851 patent states that "**[a]ccording to the invention**, a pressure field generator in the stimulation device has at least one first chamber and at least one second chamber with at least one opening for placing on a body part or on the erogenous zone and at least one connection element that connects the first chamber with the second chamber." Ex. 1001 at 3:58-63 (emphasis added); Ex. 1002 at ¶¶37-38. The '851 patent explains that "[t]his embodiment of chambers according to the invention communicating in a fluidic manner via at least one connection element allows the first chamber to simply generate a pressure field in the second chamber by modifying the volume in the first chamber, which is occasionally directed at the area of skin to be stimulated." Ex. 1001 at 3:64-4:2.

8



Fig. 4

Fig. 7

Fig. 8

Fig. 9

Consistent with the definition of the pressure field generator above, the '851 patent discloses multiple embodiments of pressure field generators 2, each including a first chamber 3 fluidly coupled to a second chamber 4 by a connection element 5. Ex. 1001 at Figs. 4-12f and corresponding written descriptions; Ex. 1002 at ¶¶39-47. In one embodiment of pressure field generator 2 (illustrated in Fig. 7), "[w]alls 31 and 41 of the first and second chambers 3 and 4 respectively [] engage with one another in such a way that they [] form two communicating chambers with a connection element 5." Ex. 1001 at 10:17-22; Ex. 1002 at ¶41. In

9

another embodiment, a "piston 63 is [] moved backwards and forwards by the drive unit" such that the "volume in chamber 3 is modified in a similar way to a piston pump." Ex. 1001 at 10:60-63, Fig. 9; Ex. 1002 at ¶43.

Furthermore, the '851 patent states that "[t]he orientation of the at least one connection element [5] towards the area of skin to be stimulated allows the pressure field to work directly …[on] the body part to be stimulated." Ex. 1001 at 4:64-5:6; Ex. 1002 at ¶¶36-37. And, that "the pressure field is decisively influenced by the configuration of the at least one connection element [5] and of the at least one opening [51] from the connection element [5] into the second chamber [4]. … [f]or example, the at least one opening [51] of the connection element [5] may be located opposite and preferably directly opposite the body part to be stimulated." *Id*. Moreover, in contrast to a stimulation device used to stimulate a larger area of skin that includes a plurality of connection elements between the first and second chambers, "connection element [5] in a stimulation device intended for the clitoris may have a single passageway … between the first and second chamber" to create a "nozzle effect on the clitoris." Ex. 1001 at 5:6-12; Ex. 1002 at ¶¶36-37.

Although the described stimulation devices are used to stimulate the clitoris 12, the '851 patent clarifies that, "[t]he use of the present invention is thus not limited to the female clitoris [], instead stimulation device 1 can be used on **all**

10

**body parts** … which can be stimulated by means of media- or air-pressure massage and/or negative-pressure." Ex. 1001 at 8:58-65 (emphasis added); Ex. 1002 at ¶48.

### B.    Prosecution Summary of the '851 patent

The '851 patent was filed as Application No. 15/023,471 ("the '471 application") on March 21, 2016, as a national stage application of PCT application PCT/EP2014/065734 filed on July 22, 2014. Ex. 1001 at 1. The PCT application claimed priority to the DE501 application. *Id*. A request to participate in the Global Patent Prosecution Highway (PPH) Pilot Program was filed based on a Decision to Grant in the DE501 application by the German Patent and Trademark Office (GPTO). Ex. 1003 at 680-696. As part of this request, the claims of the '471 application were amended to be substantively similar to the claims allowed in the DE501 application. *Compare id*. at 699-701, *with id*. at 692-693; *see also* Ex. 1010 at 30-32. After these claims were rejected and amended multiple times, the Applicant held an interview with the Examiner to discuss proposed claim amendments for allowance. *Id*. at 37, 47-51, 79-99, 291-318, 404-426, 437-461. Subsequently, all the independent claims were amended to recite that "a housing enclose[s] the pressure field generator, the drive unit, and the control device," and the claims were then allowed. *Id*. at 27-36, 47-51.

Indeed, in allowing the claims, the Examiner noted that the "closest prior art

11

of record … do not specifically disclose the claimed structure …, [e]specially, a stimulation device for a clitoris comprising a pressure field generator that comprises a first chamber having a single opening, a second chamber having first and second openings, a connection element, the first chamber is connected with the second chamber solely by the connection element, a drive unit, a control device, and a housing enclosing the pressure field generator, the drive unit, and the control device, and wherein the stimulation device has no valves." *Id.* at 34.

It should be noted that, while *Guan* (Ex. 1004) was cited in an Information Disclosure Statement (IDS) during prosecution (*id*. at 113), there is no indication in the record that the Examiner considered *Guan* in detail.  This may be because *Guan* was one of over 80 references cited by the applicant during prosecution.  Ex. 1001 at 1-2.  Furthermore, the applicant provided the Examiner with only a machine-produced English language translation of *Guan*'s Abstract.  Ex. 1003 at 118-123 (submitted as Ex. 1011).  When compared with the full translation, the machine-translated Abstract fails to provide sufficient technical detail of *Guan*'s apparatus and mode of operation, including, e.g., the mechanism for reciprocally moving a wall of air bag 2 to generate a pulsating air pressure.  *Compare* Ex. 1011 at 1, *with* Ex. 1004 at 1-4.  As evident from the prosecution summaries of related patent applications discussed below, after patent examiners (USPTO and GPTO Examiners) noticed and reviewed the complete translation of *Guan*, claims similar

12

to the claims of the '851 patent were rejected as being unpatentable over *Guan*. *See infra* Section VII(C).

### C. Prosecution Summary of Related Patent Applications

The DE501 application, which is the German priority application of the '851 patent, originally issued as the DE501 patent (Ex. 1010). Except for the "housing" limitation discussed above (*see supra* Section VII(B), the claims of the DE501 patent are substantially identical to the claims of the '851 patent. *Compare* Ex. 1001 at 14:15-16:21, *with* Ex. 1010 at 30-32.

Currently, the DE501 patent stands revoked by the GPTO following opposition proceedings. *See* Ex. 1008 at 2-3. In its revocation Decision (Ex. 1008), the GPTO determined that all claims of the DE501 patent are unpatentable over *Guan* (Ex. 1004). Ex. 1008 at 12-13, 15. In its rejection of independent claim 1 of the DE501 patent, the GPTO noted that *Guan* disclosed all the claimed features except using a "battery" and using the device to stimulate the clitoris. *Id*. at 12-13.

Regarding the battery, the GPTO pointed out that the "use of batteries as the energy source in portable handheld devices" was well-known, and that *Guan* "suggests the use of a battery" for improved portability. *Id*. at 13-14. And, with respect to using *Guan*'s device to stimulate the clitoris, the GPTO determined that *Guan*'s device is suitable for stimulating the clitoris since the pressure field

13

generators of *Guan* and the DE501 patent are substantially similar.  *Id*. at 14.  In this regard, the GPTO noted that this is especially so "since the alternating compression and decompression of the airbag (2), which is analogous to the first chamber (3) of the Patent in Suit, also generates a pressure field consisting of a pattern of overpressures and negative pressures that is modulated to the normal pressure."  *Id*.  Thus, the GPTO determined that claims substantially similar to the claims of the '851 patent are unpatentable over *Guan*.

U.S. Patent Application No. 15/965,117 ("the '117 application") is a pending continuation application of the '851 patent.  Ex. 1012 at 1042-1049.  The currently pending claims for the '177 application include features similar to those claimed in the '851 patent.  *Id*. at 324-332.  In the most recent Office Action (issued on June 27, 2019), these claims were rejected as being unpatentable over *Guan* (and other references).   Thus, claims having features similar to the claims of the '851 patent currently stand rejected as being unpatentable over *Guan* by both the GPTO and USPTO.

### D.    The Prior Art

The claimed features of the '851 patent were well-known at the time of the alleged invention.  Ex. 1002 at ¶¶15-25, 68-149.

#### 1.    *Guan* (Ex. 1004)



With reference to the sole figure of *Guan* reproduced above, *Guan* discloses a "gas health massager" that uses "pulsating air pressure to stimulate" portions of a human body via a rubber mouth 1. Ex. 1004 at 1; Ex. 1002 at ¶¶51-52. In *Guan*, the "pulsating air pressure" is produced by reciprocally moving a wall of air bag 2 to compress and expand air bag 2. Ex. 1004 at 3; Ex. 1002 at ¶¶52-55. The "pulsating air pressure," produced by compression and expansion of *Guan*'s air bag 2, provides pressure waves having pressures above and below a reference pressure. Ex. 1002 at ¶¶54-55. *Guan* compares generating the "pulsating air pressure" by the reciprocating motion of the wall of air bag 2 to be equivalent to generating a "pulsating air pressure" generated by driving a piston to have a reciprocating motion in a piston sleeve. Ex. 1004 at 3; Ex. 1002 at ¶¶53-55.

15

*Guan*'s device includes lever 3 physically connected to one end of air bag 2. Ex. 1004 at 3, 5; Ex. 1002 at ¶51.  Lever 3 also includes a magnet 4 at one end thereof.  *Id*.  *Guan* states that "electromagnet (5) drives the magnet (4), the lever (3), and the wall of the air bag (2) to have reciprocating motion, [while] the rubber mouth (1) on the air bag (2) contacts the body."  Ex. 1004 at 3; Ex. 1002 at ¶¶51-52.

### 2.      *Hovland* (Ex. 1005)

*Hovland* discloses electrically-operated stimulation devices for stimulating different body parts, such as, "the genital region, clitoris or clitoral region, the external urethral orifice, and/or other designated areas, e.g. physically stimulating the sacral/pudendal nerves and/or nerve roots."  Ex. 1005 at Abstract, *see also id*. at 8:49-54; 10:34-37; 19:39-41; Ex. 1002 at ¶56.



In the embodiment illustrated in Fig. 4 reproduced above, *Hovland*'s stimulation device 200 includes a waterproof casing 210 configured for

16

"convenient gripping by a human hand." Ex. 1005 at 11:24-27, 29-40. Casing 210 includes batteries and a motor assembly 300. *Id*. at 12:21-22, 13:35-39; Ex. 1002 at ¶57. Extending from casing 210 is a suction applicator 220 that includes a neck 230 and a vacuum cup 240 having a rigid portion 243 and a soft skin-contacting portion 245 shaped to form a vacuum-tight seal. Ex. 1005 at 11:48-50, 11:61-63, 11:66-12:5; Ex. 1002 at ¶57. In some embodiments, applicator 220 and vacuum cup 240 are "specifically sized to suit the typical female clitoris or other desired organ or region." Ex. 1005 at 13:56-58, *see also* 13:46-48.



In use, as illustrated in Fig. 14 reproduced above, applicator 220 is attached to casing 210 and on/off switch 270 (see Fig. 4) is activated to turn on motor assembly 300. Ex. 1005 at 14:3-5; Ex. 1002 at ¶58. Vacuum cup 240 is then placed over the clitoris and a slight pressure is applied to "gently compress soft portion 245 between rigid portion 243 and clitoral region 410, as shown in FIG. 15,

17

[to] obtain[ ] a seal around the clitoris." Ex. 1005 at 14:13-19. *Hovland* states that motor assembly 300 "provides pneumatic and/or hydraulic actuation to create e.g. vibration, percussion, **subatmospheric pressure and**/or **super-atmospheric pressure**, or **modulation** of these effects." *Id*. at 13:22-25 (emphasis added). *Hovland* states that blood flow may be increased "by **creating a vacuum around and**/or using **increasing pressure** to produce percussion and/or **massage** of e.g., the clitoris." *Id*. at 8:49-52 (emphasis added), *see also* 6:18-23, 21:40-55; Ex. 1002 at ¶58. *Hovland* states that applying suction, results in engorgement of the clitoris and "may reduce the likelihood of fibrosis, at the clitoris and at the urethral sphincter, e.g., and consequent reduced clitoral and urethral physiological function." Ex. 1005 at 19:24-32; Ex. 1002 at ¶¶58-59.

       **3.**     *Makower* **(Ex. 1006)**



FIG. 32A

*Makower* discloses multiple embodiments of clitoral stimulation devices having different configurations.  Ex. 1006 at Abstract, 1:25-27, Figs. 1-33 and their corresponding written descriptions; Ex. 1002 at ¶60.



FIG. 8A                    FIG. 8C

In the embodiment illustrated in Figs. 8A and 8C reproduced above, device 200 includes a device body 210 with a suction chamber 220 having a sealing edge 225 formed of a soft, flexible, compliant material and "adapted to provide a substantially airtight seal against tissue."  Ex. 1006 at 13:23-27, 13:57-59.  Suction chamber 220 of *Makower*'s device 200 is sized and shaped to fit over the clitoris. *Id*. at 14:12-20; Ex. 1002 at ¶¶61-62.

A suction port 230 "provides fluid communication between the interior of suction [chamber] 220 and a suction device (not pictured)."  Ex. 1006 at 13:27-29. Any type of suction device may be used with device 200.  *Id*. at 18:26-32-34.  In some embodiments, a "squeeze bulb" is coupled to suction chamber 220 and used

19

to provide suction. *Id*. at 9:40-43. As a POSITA would recognize, a squeeze bulb is a chamber with a flexible wall that is compressed and released to provide suction in suction chamber 220. Ex. 1002 at ¶63.

Device body 210 also "house[s] controller circuitry[]." *Id*. at 14:1-2. The controller circuitry can be accessed by a user using an interface mounted on device body 210 and/or via a remote controller that is tethered to device body 210 or wirelessly connected. *Id*. at 2-6; Ex. 1002 at ¶61. Device body 210 also includes a battery 212 to power the device, and a controller block 215 and activation button 205 that a user may use to activate the device locally or remotely. Ex. 1006 at 13:29-33, 13:40-43, 21:37-42; Ex. 1002 at ¶61.

### 4.    *Gloth* (Ex. 1007)



**Figure 2A**

*Gloth* discloses a female urinary incontinence device 10 comprising a device body 11 and a urethra obstructing member 16 configured to obstruct the urethra

20

and alleviate urinary incontinence.  Ex. 1007 at Abstract, 5:53-56, 5:66-6:4; Ex. 1002 at ¶¶64-67.  Device body 11 defines a cavity 18 having a vacuum producing portion 12 and a body contacting portion 14.  Ex. 1007 at 5:57-60; Ex. 1002 at ¶65.



Figure 2B

Body contacting portion 14 has a frustoconical portion 15 and an encircling rim 17.  Ex. 1007 at 6:66-7:2.  When attached to the body, body contacting portion 14 contacts the user's skin to form a complete seal between the user's body and device 10 to prevent any fluids from entering or escaping cavity 18.  *Id*. at 7:11-20; Ex. 1002 at ¶¶66-67.  In *Gloth*, device 10 is a unitary part formed out of one piece of material that is resilient, partially flexible, and suitable for application around the urethral opening.  Ex. 1007 at 5:60-66; Ex. 1002 at ¶65.  During use, device 10 is positioned over the user's urethral opening, and a vacuum is produced in cavity 18 by squeezing vacuum producing portion 12 to hold device 10 onto the user's body.  Ex. 1007 at 6:24-26; Ex. 1002 at ¶¶66-67.

21

## VIII.  CLAIM CONSTRUCTION

The claims of the '851 patent should be construed under the Phillips standard.  37 C.F.R. § 42.100(b); *see generally Phillips v. AWH Corp*., 415 F.3d 1303 (Fed. Cir. 2005).  Under *Phillips*, claim terms are typically given their ordinary and customary meanings, as would have been understood by a POSITA, at the time of the invention, having taken into consideration the language of the claims, the specification, and the prosecution history.  *Phillips*, 415 F.3d at 1313; *see also id.* at 1312–16.  The Board, however, only construes the claims when necessary to resolve the underlying controversy.  *Toyota Motor Corp. v. Cellport Sys., Inc*., IPR2015-00633, Paper No. 11 at 16 (Aug. 14, 2015).  Petitioner believes that no express constructions of any claim term is necessary to assess whether the prior art reads on the challenged claims.[3]  Ex. 1002 at ¶¶49-50.

---

[3] Petitioner reserves all rights to raise claim construction and other arguments in district court.  For example, Petitioner has not raised all challenges to the '851 patent in this petition, including validity under 35 U.S.C. § 112, and a comparison of the claims to any accused products in litigation may raise controversies needing resolution through claim constructions not presented here because of the similarities between the prior art and the '851 patent.

## IX.    DETAILED EXPLANATION OF GROUNDS

### A.    Ground 1:  *GUAN* IN VIEW OF *HOVLAND* RENDER OBVIOUS CLAIMS 1-2 AND 4-6

#### 1.    Claim 1

##### i.  "A stimulation device for a clitoris, comprising:"

*Guan* discloses a "gas health massager" that uses "pulsating air pressure to stimulate the six meridians" of a human body.  Ex. 1004 at 1-4.  Thus, the Guan massager is a stimulation device that uses pulsating air pressure to stimulate discrete locations (i.e., meridians) on the human body.  *Id*. at 3; Ex. 1002 at ¶70.

While *Guan* does not expressly disclose stimulating the clitoris using the disclosed stimulation device, *Guan* includes no disclosure whatsoever precluding the use of its stimulation device on the clitoris or any part of the body for that matter.  Ex. 1002 at ¶¶71-72.  A POSITA at the time of the invention of the '851 patent would not have considered that a stimulation device described as intended for stimulating the six meridians of a human body was so limited or otherwise unsuitable for stimulating the clitoris.  *Id*.  In fact, even the '851 patent states that its disclosed "stimulation device is [] not limited to the female clitoris [], instead stimulation device 1 can be used on all body parts … which can be stimulated by means of media- or air-pressure massage and/or negative pressure."  Ex. 1001 at 8:60-65; Ex. 1002 at ¶¶71-72.  A POSITA reviewing *Guan* at the time of invention of the '851 patent would have understood that *Guan*'s device may also be used to

23

stimulate any location on the human body, including, but not limited to, the stated meridians, clitoris and other erogenous zones, and/or muscles. Ex. 1002 at ¶¶70-72.

The benefits of stimulating the clitoris for female sexual satisfaction and sexual health also were well known before the date of invention of the '851 patent. *Id*. For example, the '851 patent itself admits that "medical studies conducted in 2006 determined the female clitoris as [the] definitive starting point of the female climax and … according to the most recent medical research, the stimulation of the clitoris, rather than the vagina, is considered the starting point of a woman's sexual arousal and thereby the key to female 'sexual pleasure'." Ex. 1001 at 1:36-43; Ex. 1002 at ¶¶23-25, 72-73. It was also well known that female sexual dysfunction may be treated using both direct and indirect clitoral stimulation, but indirect clitoral stimulation (e.g., by causing clitoral vascular engorgement by applying differential air pressure to the clitoris) was more effective than directly stimulating the clitoris using conventional mechanical vibrators. Ex. 1009 at 1-2; Ex. 1002 at ¶¶24, 72. For example, it was known that conventional mechanical vibrators were not as effective in treating female sexual dysfunction when diseased vessels inhibited blood flow. Ex. 1009 at 2; Ex. 1002 at ¶72. Instead, indirect stimulators that stimulated the clitoris by applying an air pressure differential (e.g., cyclic vacuum) were known to be more suitable at achieving clitoral engorgement even in

24

the presence of diseased blood vessels. *Id.* In fact, the '851 patent also recognizes that indirect stimulation of the clitoris (e.g., by applying vacuum) was known by a POSITA to be better or otherwise more effective than direct stimulation of the clitoris at the time of the alleged invention. Ex. 1001 at 1:16-54. For example, the '851 patent admits that "[d]irect stimulation of the clitoris with a clitoral massage vibrator, for example, is fraught with problems, …" and that "… various indirect forms of stimulation [e.g., conventional vacuum devices] are common practice as alternatives to direct stimulation." *Id.* Given this preexisting knowledge and the level of skill in the art, a POSITA in possession of *Guan*'s disclosure at the time of invention of the '851 patent would have recognized the benefits of stimulating a clitoris with the "pulsating air pressure" produced by *Guan*'s stimulation device, and would have applied *Guan*'s stimulation device to stimulate the clitoris. Ex. 1002 at ¶¶71-72. Indeed, a POSITA would have had a reasonable expectation of success in achieving sexual pleasure by using the *Guan* device to stimulate a clitoris. *Id.*

Additionally, *Hovland* teaches stimulation devices that can be used to stimulate various body parts (e.g., "sacral nerves and nerve roots and/or other nerves or areas to reduce or eliminate urinary incontinence") using air pressure in addition to stimulating the clitoris. Ex. 1005 at 7:40-48; Ex. 1002 at ¶73. That is, *Hovland* teaches that a stimulation device used to stimulate other body locations

25

(e.g., the sacral nerves) can also be used to stimulate the clitoris.  Ex. 1002 at ¶73. *Hovland* also teaches that consistent use of indirect stimulation on the clitoris using varying air pressure "may reduce the likelihood of fibrosis, at the clitoris and at the urethral sphincter, for example, and consequent reduced clitoral and urethral physiological function."  Ex. 1005 at 19:27-31.  Thus, based on the preexisting knowledge in the art and the disclosure of *Hovland*, a POSITA would have been well aware of the benefits associated with indirectly stimulating the clitoris using the pulsating air pressure produced by *Guan*'s stimulation device, and would have been motivated to use *Guan*'s stimulation device to stimulate the clitoris.  Since both *Hovland*'s and *Guan*'s stimulation devices are relatively simple mechanical devices that can be adapted for different applications, a POSITA would have had a reasonable expectation of success in using *Guan*'s gas health massager to stimulate the clitoris.  Ex. 1002 at ¶72.  Such use would have amounted to nothing more than applying a known technique to a known device (or method) ready for improvement to yield predictable results.  *See KSR Int'l. Co. v. Teleflex, Inc.*, 550 U.S. 398, 417 (2007).  At the time of the invention, a POSITA would have had the requisite skill level to readily apply *Guan*'s device to implement the teachings of *Hovland* without any problem.

Thus, *Guan*, alone or in combination with *Hovland*, discloses a stimulation device for a clitoris.

### ii. "a pressure field generator comprising:"



**Annotated Figure of *Guan***

In *Guan*'s stimulation device, "electromagnet (5) drives the magnet (4), the lever (3), and the wall of the air bag (2) to have reciprocating motion, and the rubber mouth (1) on the air bag (2) contacts the body." Ex. 1004. at 3. *Guan* states that "[p]ower is turned on to generate a pulsating air pressure and to stimulate the meridian points." *Id*. When power is turned on, electromagnet 5 drives magnet 4, lever 3, and the wall of air bag 2 to have a reciprocating motion to generate a pulsating air pressure at rubber mouth 1. *Id*.; Ex. 1002 at ¶74. That is, in *Guan*'s stimulation device, the compression and expansion of air bag 2 (produced by the "wall of the air bag (2) [undergoing] reciprocating motion") produces the "pulsating air pressure" that is applied to the body via rubber mouth 1

27

that is kept in contact with a body part. *Id.*.



**Annotated Figure of *Guan***

As illustrated in the figure above, air bag 2 (red-colored) and mouth 1 (orange-colored) fluidly connected together by the connection element (blue-colored) between them is *Guan*'s "pressure field generator" that produces the pulsating air pressure. Ex. 1002 at ¶¶75-76.

Note that *Guan*'s "pressure field generator" described above is similar in structure and operation to the embodiment of pressure field generator 2 disclosed in Fig. 7 of the '851 patent.

28



Annotated Figure 7 of the '851 patent

The '851 patent discloses that in pressure field generator 2 of Fig. 7, the walls of first and second chambers 3 and 4 engage with one another to form two communicating chambers with a connection element 5 between chambers 3, 4. Ex. 1001 at 12:30-36; Ex. 1002 at ¶76. Specifically, as seen in the figure above, a wall of first chamber 3 engages (or fits into) a channel or groove on second chamber 4 to couple the chambers together. Ex. 1002 at ¶76. Similarly, in *Guan*, the wall of air bag 2 fits into a channel or groove on mouth 1 to couple air bag 2 and mouth 1 together and form two communicating chambers with a connection element (having a passageway) therebetween. *Id.*, *see* Figure of *Guan* on the previous page. A pressure field is generated in pressure field generator 2 of Fig. 7 of the '851 patent by changing the volume of first chamber 3 (i.e., expanding and compressing first chamber 3) by deflecting a wall of first chamber 3 in opposite directions (*see* arrow C in the figure immediately above). Ex. 1001 at 12:49-52;

29

Ex. 1002 at ¶76.  In a similar manner, "pulsating air pressure" is created in the stimulation device of *Guan* by causing the "wall of the air bag (2) to have [a] reciprocating motion, [with] the rubber mouth (1) on the air bag (2) contact[ing] the body."  Ex. 1004 at 3; Ex. 1002 at ¶76.  That is, *Guan*'s pressure field generator is substantially similar in structure and function to the pressure field generator disclosed in the '851 patent (and covered by its claims).  Ex. 1002 at ¶76.

> **(1)    "a first chamber having a single opening;"**



**Annotated Figure of *Guan***

As illustrated in the figure above *Guan*'s air bag 2 is the claimed "first chamber."  Ex. 1002 at ¶77.  As evident from this figure, air bag 2 has only one opening that fluidly couples air bag 2 to mouth 1.  This opening is the claimed "single opening" of the first chamber.  *Id.*

In *Guan*'s stimulation device, the compression and expansion of air bag 2

30

(i.e., the first chamber of *Guan*'s pressure field generator) produces the "pulsating air pressure" that is applied to the portion of the body kept in contact with rubber mouth 1. *Id.*

> **(2)** **"a second chamber having first and second openings, the second opening of the second chamber for placing over the clitoris; and"**



**Annotated Figure of *Guan***

In *Guan*, the orange-colored volume in the figure above (defined by mouth 1) is the claimed "second chamber" of *Guan*'s pressure field generator. Ex. 1002 at ¶¶78-79. This orange-colored volume has a "first opening" (see figure above) that fluidly couples air bag 2 to (and directs the pulsating air pressure from air bag 2 into) the "second chamber." *Id.* As illustrated in the figure above, this orange-colored volume (i.e., the second chamber) also has a "second opening" that directs the pulsating air pressure from mouth 1 on to the body. *Id.* *Guan* states that

31

"rubber mouth (1) on the air bag (2) contacts the body."  Ex. 1004 at 3.  That is, in *Guan*, the second opening of the second chamber is for placing over the body part intended for stimulation.  *Id*.; Ex. 1002 at ¶¶78-79.

As explained previously, although *Guan* does not expressly disclose using the stimulation device to stimulate the clitoris, based on the level of ordinary skill in the art and the teachings of *Hovland*, it would have been obvious to a POSITA to use *Guan*'s stimulation device to stimulate the clitoris via the second opening in rubber mouth 1.  *See supra* Section IX(A)(1)(i).  Thus, in *Guan*'s stimulation device as modified by *Hovland*, the second opening of *Guan*'s rubber mouth 1 will be placed over the clitoris.  Ex. 1002 at ¶80.

> **(3)    "a connection element having a first opening and a separate second opening thereby forming a straight channel connecting the single opening of the first chamber with the first opening of the second chamber;"**



**Annotated Figure of *Guan***

As explained previously, compression and expansion of *Guan*'s air bag 2 (i.e., "first chamber" of *Guan*'s pressure field generator) produces a "pulsating air pressure" that is applied to the body part kept in contact with rubber mouth 1. Ex. 1002 at ¶¶81-82. This "pulsating air pressure" is directed from air bag 2 into mouth 1 through the blue-colored conduit that fluidly couples air bag 2 to mouth 1. *Id*. This blue-colored conduit corresponds to the claimed "connection element" of *Guan*'s pressure field generator.

As can be seen in the figure above, *Guan*'s connection element forms a straight channel with a first opening and a second opening positioned at opposite ends. *Id*. And, this connection element connects the single opening of air bag 2 (i.e., the claimed "first chamber") to the first opening of *Guan*'s "second chamber" (i.e., orange-colored volume). *Id*.

33

> **iii. "a drive unit that changes a volume of the first chamber in such a manner that a stimulating pressure field is generated in the second chamber via the connection element; and"**



Annotated Figure of *Guan*

In *Guan*, "electromagnet 5 drives the magnet 4, the lever 3, and the wall of the air bag 2 to have reciprocating motion." Ex. 1004 at 3. When power is turned on, the reciprocating motion of the wall of air bag 2 results in a "pulsating air pressure" at mouth 1 to stimulate the meridian points. *Id.*; Ex. 1002 at ¶83. As illustrated in the figure above, the drive unit of *Guan* is made up of lever 3 and magnet 4. Ex. 1002 at ¶84.

As shown, lever 3 is physically connected to the wall of air bag 2. *Id.* In operation, magnet 4 and lever 3 move forwardly and backwardly, in an alternating manner, to impart a reciprocating motion on airbag 2. *Id;* Ex. 1004 at 3. In response, air bag 2 compresses and expands to accommodate the imparted

34

reciprocating motion.  Ex. 1002 at ¶¶83-84.  Thus, magnet 4 and lever 3 (i.e., *Guan*'s "drive unit") impart a reciprocating motion on the wall of air bag 2, resulting in a changing volume of air bag 2 (which corresponds to the claimed "first chamber").  *Id.*  *Guan* states that the reciprocating motion of the wall of air bag 2 results in a "pulsating air pressure" in mouth 1 (which corresponds to the claimed "second chamber").  As seen in the figure above, air bag 2 is fluidly coupled to mouth 1 only by the blue-colored conduit ("connection element") that connects them.  *Id.*  Therefore, in *Guan*, the changing volume of air bag 2 generates the "pulsating air pressure" in mouth 1 via the connection element coupling them together.

As will be described below, the "pulsating air pressure" generated by the compression and expansion of air bag 2 corresponds to the claimed stimulating pressure field.  *See infra* Section IX(A)(1)(v)(1); Ex. 1002 at ¶¶84, 89-92.

### iv. "a control device that actuates the drive unit; and"



**Annotated Figure of *Guan***

*Guan* discloses that "[p]ower is turned on" to activate "electromagnet 5 [which] drives the magnet 4, the lever 3, and the wall of the air bag 2 to have reciprocating motion."  Ex. 1004 at 3.  That is, in *Guan*, the reciprocating motion of magnet 4 and lever 3 (which together correspond to the claimed "drive unit") are controlled by the application of power to electromagnet 5.  *Id.*; Ex. 1002 at ¶85. Thus, as illustrated in the figure above, electromagnet 5 and the circuit that energizes or otherwise activates (i.e., controls the delivery of power to) electromagnet 5 corresponds to the claimed "control device" that actuates the drive unit (i.e., lever 3 and magnet 4) in *Guan*.  *Id*.

36

### v. "a housing enclosing the pressure field generator, the drive unit, and the control device;"



Annotated Figure of *Guan*

As illustrated in the figure above, *Guan*'s stimulation device includes a housing that encloses the pressure field generator (air bag 2, mouth 1, and the connection element between them), the control device (the electromagnet 5 and the circuit that energizes electromagnet 5), and the drive unit (lever 3 and magnet 4) of *Guan.* Ex. 1002 at ¶86. The housing is indicated by the rectangular outline surrounding these components. *Id.*

If it is argued that *Guan*'s pressure field generator is not entirely "enclosed" by *Guan*'s housing because a portion of mouth 1 (an interior volume of which corresponds to the claimed "second chamber") protrudes externally of the housing, it should be noted that at least a portion of pressure field generator 2 disclosed in the '851 patent similarly protrudes externally of housing 8. *See* Ex. 1001 at Figs.

37

3, 7-8, and 11 (reproduced below with the portion of the pressure field generator 2 positioned external to housing 8 circled with a dashed circle); Ex. 1002 at ¶¶87-88. Therefore, *Guan*'s pressure field generator is enclosed by *Guan*'s housing in a similar manner that pressure field generator 2 of the '851 patent is enclosed by its housing 8. *Id*.



  (1) **"wherein: the pressure field generated in the second chamber consists of a pattern of negative and positive pressures modulated with respect to a reference pressure,"**

38

As explained above, the reciprocating motion of the wall of air bag 2 generates a "pulsating air pressure" at mouth 1 for stimulating skin surface locations corresponding to meridian points. *See supra* Section IX(A)(1)(iii); Ex. 1004 at 3; Ex. 1002 at ¶¶51-55, 89.

*Guan* compares generating the "pulsating air pressure" by the reciprocating motion of the wall of air bag 2 to be equivalent to generating a "pulsating air pressure" by driving a piston to have a reciprocating motion in a piston sleeve. Ex. 1004 at 3; Ex. 1002 at ¶¶90-91. As a POSITA would have recognized at the time of the alleged invention, a piston reciprocating in a piston sleeve results in a pressure pulse having a magnitude greater than a reference pressure (e.g., a pressure when the piston is not reciprocating) when the piston compresses the volume (of air or another medium) in the piston sleeve, and a pressure pulse having a magnitude less than the reference pressure when the piston expands the volume in the piston sleeve. Ex. 1002 at ¶¶90-91.



Moreover, the '851 patent also discloses an embodiment of a pressure field generator where the first chamber (i.e., the chamber whose volume is changed "in

39

such a manner that a stimulating pressure field is generated in the second chamber via the connection element," (*see supra* Section IX(A)(1)(iii)) is configured similar to a piston pump. See Ex. 1001 at Fig. 9; Ex. 1002 at ¶¶90-91. With reference to this embodiment of pressure field generator 2, the '851 patent explains that "the volume of [first] chamber 3 is modified in a similar way to a piston pump … [where] [a] piston 63 is moved backwards and forwards by the drive unit." Ex. 1001 at 9:60-63, Fig. 9. The '851 patent describes such a movement of piston 63 as generating a "pressure field" having a pattern as illustrated, e.g., in Fig. 14a (reproduced above). Ex. 1001 at 11:3, 12:49-53, 12:58-64. That is, with respect to an embodiment of the pressure field generator disclosed in, and covered by claim 1 of, the '851 patent, the '851 patent analogizes the structure and functioning of the pressure field generator to a piston pump. *Id.*; Ex. 1002 at ¶¶90-91.



Annotated Figure of *Guan*          Annotated Figure of *Guan*

40

In *Guan*, similar to a piston reciprocating in a piston sleeve, when the wall of *Guan*'s first chamber (air bag 2) is not undergoing reciprocating motion, the pressure in air bag 2 (and in mouth 1) is the prevailing ambient or atmospheric pressure (i.e., a reference pressure).  Ex. 1002 at ¶91.  When rubber mouth 1 contacts the body, and the wall of air bag 2 moves towards mouth 1 (i.e., moves in the direction of the arrow in the figure in the left above), the volume of air bag 2 decreases, compressing the air in air bag 2 and increasing the pressure of the air within air bag 2 to a value above the prevailing atmospheric pressure.  *Id*. Therefore, when the wall of air bag 2 moves in the direction of the arrow in the annotated figure in the left above, the pressure in air bag 2 is a positive pressure modulated with respect to the reference pressure.  *Id*.  And, when the wall of air bag 2 moves away from mouth 1 (i.e., moves in the direction of the arrow in the figure in the right above), the volume within air bag 2 increases and the pressure of the air in air bag 2 (and at mouth 1) decreases below the prevailing atmospheric pressure as air rushes into air bag 2 to occupy the increased volume of air bag 2. Therefore, when the wall of air bag 2 moves in the direction of the arrow in the annotated figure on the right above, the pressure in air bag 2 is a negative pressure modulated with respect to the reference pressure.  *Id*.  Thus, the reciprocating motion of air bag 2 (i.e., the claimed "first chamber") that causes the "pulsating air

41

pressure" in mouth 1 results in "a pattern of negative and positive pressures modulated with respect to a reference pressure" in *Guan*'s second chamber. *Id.*



It should be noted that *Guan*'s "pressure field generator" is similar in structure and functioning to the embodiment of the '851 patent's pressure field generator illustrated and described with reference to Fig. 7. Ex. 1002 at ¶92; *compare* Ex. 1001 at Fig. 7, *with* Ex. 1004 at sole figure. For example, in pressure field generator 2 of Fig. 7 (of the '851 patent), the walls of first and second chambers 3, 4 engage with one another to form two communicating chambers with a connection element 5 therebetween. Ex. 1001 at 1:17-22; Ex. 1002 at ¶92. That is, as seen in the annotated Fig. 7 reproduction above, the wall of first chamber 3 engages with a circumferential channel or groove on the second chamber 4 to form two fluidly communicating chambers. Ex. 1002 at ¶92. Similarly, in *Guan*, the wall of air bag 2 fits into a circumferential groove on mouth 1 to form two

42

communicating chambers.  Id., *see* figure of *Guan* above.  *Guan* also states that "rubber mouth (1) on the air bag 2 contacts the body."  Ex. 1004 at 3.

The '851 patent explains that expanding and compressing first chamber 3 when second chamber 4 is placed on the body part 11 such that it is largely air-tight will result in positive and negative pressures modulated with respect to a reference pressure.  Ex. 1001 at 10:35-40, 8:66-9:8, 12:49-64, Fig. 14a-14c; Ex. 1002 at ¶¶91-92.  Consequently, a POSITA would have readily recognized that, when the "rubber" mouth 1 of *Guan* is in contact with the body, the volume inside the mouth 1 is largely air-tight.  Ex. 1002 at ¶92.  Therefore, for the same reasons described in the '851 patent, compression and expansion of air bag 2 by the "reciprocating motion" of the wall of air bag 2 also will result in the claimed pressure field consisting of a pattern of negative and positive pressures modulated with respect to a reference pressure in mouth 1 (the orange-colored internal volume which corresponds to the claimed "second chamber").  *Id*.

> **(2)    "the first chamber is connected with the second chamber solely by the connection element,"**

43



**Annotated Figure of *Guan***

As evident from the figure above, air bag 2 (i.e., the claimed "first chamber") is connected with the orange-colored volume in mouth 1 (which corresponds to the claimed "second chamber") solely by the blue-colored conduit (i.e., the claimed "connection element") between them.  Ex. 1002 at ¶93.

### (3) "the stimulation device has no valves,"

As evident from the figure of *Guan* reproduced above, the stimulation device of *Guan* does not have valves.  Ex. 1002 at ¶94.  Moreover, the translated disclosure of *Guan* does not include even a single occurrence of the term "valve." *Id*.

### (4) "the stimulation device is a portable hand-held device with a battery,"

44

*Guan* states that the "gas health massager [ ] is small in size [and] convenient to carry." Ex. 1004 at 3. That is, *Guan*'s stimulation device is a portable hand-held device. Ex. 1002 at ¶95.

*Guan* discloses that power must be supplied to electromagnet 5 to generate the pulsating air pressure, but is silent with regard to the power source. Ex. 1004 at 3. However, a POSITA would have recognized that *Guan* does not preclude the use of a battery to power electromagnet 5. Ex. 1002 at ¶96. In addition, *Guan* teaches that the disclosed stimulation device "is small in size, convenient to carry and easy to operate." Ex. 1004 at 3; Ex. 1002 at ¶96. In *Hovland*, the disclosed stimulation devices are handheld and battery powered. Ex. 1005 at 9:26-27, 10:34-35, 12:21-23, 13:35-39, 15:52-55; Ex. 1002 at ¶96. *Hovland* also discloses that generally "A/C or D/C power sources" are considered to be alternatives of each other and may be used interchangeably in the disclosed stimulation devices. Ex. 1005 at 12:23-24, *see also* 10:36-37; Ex. 1002 at ¶96. If *Guan*'s stimulation device is not already battery powered, it would have been obvious for a POSITA to replace any A/C power source with a battery to further advance *Guan*'s goals for being "convenient to carry." Ex. 1002 at ¶¶95-97; *see also* Ex. 1008 at 14 (explaining that it would have been obvious to make *Guan*'s stimulation device battery powered to improve portability and ease of use.). As evidenced by *Hovland*, a POSITA would have recognized that, in general, stimulation devices

45

may use "A/C or D/C power sources." Ex. 1005 at 12:23-24, *see also* 10:36-37; Ex. 1002 at ¶¶96-97. Accordingly, a POSITA would have been motivated to make *Guan*'s stimulation device battery-powered since doing so would make the device convenient to carry and also easier to use as *Guan* contemplates. Ex. 1002 at ¶¶96-97. Such a modification would have amounted to nothing more than a simple substitution of one known element for another to obtain predictable results. *See KSR*, 550 U.S. at 417. Indeed, at the time of the invention, a POSITA would have had the requisite skill level to readily modify *Guan*'s stimulation device to make it battery-powered (as taught by *Hovland*) without any problem. Ex. 1002 at ¶¶96-97. And, based on the level of skill in the art, a POSITA would also have had a reasonable expectation of success in making *Guan*'s stimulation device battery-powered to achieve greater ease of use and portability. *Id*.

> **(5)** **"the connection element is rigid and the first and second openings of the connection element are aligned to one another so that a media flow during a compression of the first chamber is directed to the clitoris through the straight channel with a nozzle effect, and"**

46



**Annotated Figure of *Guan***

With reference to the figure above, *Guan*'s blue-colored connection element connects red-colored air bag 2 (i.e., the claimed "first chamber) to the orange-colored volume (i.e., the claimed "second chamber") of mouth 1. Ex. 1002 at ¶98.

Moreover, *Guan* discloses that mouth 1 is made of "rubber." Ex. 1004 at 3. A POSITA would recognize that, in general, rubber could be constructed to be flexible or rigid. Ex. 1002 at ¶98. However, as evident from the annotated Guan figure above, the region of mouth 1 that defines the connection element is configured like a block and is significantly thicker than the region that surrounds the portion of mouth 1 that defines the claimed "second chamber." *Id*. As is also evident therefrom, the housing of the stimulation device is circumferentially connected to mouth 1 in the region of the connection element. *Id*. Therefore, the

47

housing imparts additional stiffness to mouth 1 around the connection element. *Id*.

A POSITA therefore would have recognized that, because of the thickness of the

walls of the connection element and the reinforcement provided by the housing,

*Guan*'s connection element is rigid. *Id*.



In *Guan*, the first and second openings of its "connection element" (blue-

colored conduit) are aligned with one another. Ex. 1002 at ¶99. With reference to

the annotated *Guan* figure, both of these openings are centered about a common

longitudinal axis. *Id*. Therefore, *Guan*'s "connection element" is a straight

channel having first and second openings aligned to one another with respect to the

longitudinal axis. *Id*.

As explained previously, in *Guan*, when electromagnet 5 is activated,

magnet 4 and lever 3 move forwardly and backwardly, in an alternating manner, to

impart a reciprocating motion on airbag 2. Ex. 1004 at 3; Ex. 1002 at ¶99. In

48

response, air bag 2 compresses and expands to accommodate the imparted reciprocating motion to generate a pulsating air pressure at mouth 1.  *Id.*  In *Guan*, "mouth (1) … contacts the body."  Ex. 1004 at 3.



**Annotated Figure of *Guan***

When magnet 4 and lever 3 move in the direction of mouth 1 (i.e., in the direction of the arrows shown in the figure above), the volume of air bag 2 is compressed, and, consequently, the pressure of the air within air bag 2 is increased. *See supra* Section IX(A)(1)(v)(1); Ex. 1004 at 3; Ex. 1002 at ¶99.  This high pressure air exits air bag 2 (i.e., the claimed "first chamber") through the blue-colored conduit (i.e., the claimed "connection element") and impinges on the body part that is kept in contact with the mouth 1.  *Id.*

Furthermore, a POSITA at the time of the invention would have known that a "nozzle" is a flow control device, conduit, tube or arrangement used to increase

the velocity of a fluid as its exits a chamber at the expense of its pressure energy.

Ex. 1002 at ¶100. The POSITA also would have recognized that a "nozzle effect"

will naturally result when high pressure air exits a chamber having a first relatively

larger cross-sectional dimension (such as air bag 2 of *Guan*) through a constricted

opening having a second relatively smaller cross-sectional dimension (such as

*Guan*'s blue-colored conduit in *Guan*'s figure above and below). *Id*.



Indeed, the '851 patent explains that a "nozzle effect" is created by

compressed air exiting a chamber (first chamber 3) through a constricted opening

(connection element 5). Ex. 1002 at ¶101. For example, the '851 patent explains

that, in contrast to a connection element having multiple passageways (e.g., four

passageways) to stimulate a larger area of skin, "the connection element in a

stimulation device intended for the clitoris may have a single passageway with

nozzle effect on the clitoris glans." Ex. 1001 at 5:6-12; Ex. 1002 at ¶101. Fig. 6 of

the '851 patent illustrates (using arrows) compressed media-flow from first

50

chamber 3 directed to clitoris 12 through connection element 5. *See* Ex. 1001 at 9:59-62. Indeed, the '851 patent explains that high-pressure air from first chamber 3 is directed to clitoris 12 through connection element 5, and that "[t]he size of opening 51 is dimensioned in such a way that it is small enough in ratio to the volume displaced in the first chamber 3 to sufficiently accelerate the medium for a perceptible massage effect." Ex. 1001 at 9:55-67. That is, the '851 patent describes that a nozzle effect is naturally created by directing high pressure air from the relatively larger chamber 3 through the constricted connection element 5. Ex. 1002 at ¶101; *see also* Ex. 1008 at 10 (explaining that the nozzle effect automatically results from a straight connecting element that is reduced in size in relation to the first and second chambers 3, 4). Since the cross-sectional dimension of the opening of *Guan*'s connection element is relatively smaller than the cross-sectional dimension of air bag 2 and mouth 1 (similar to the relative diameters of first chamber 3, second chamber 4, and connection element 5 of the '851 patent), as the high pressure air flows out of *Guan*'s air bag 2 and into the connection element within rubber mouth 1, the velocity of the air will increase (at the expense of its pressure) and the air pulse will impinge on the body part with a nozzle effect. Ex. 1002 at ¶¶100-103.

As explained previously, it would have been obvious to a POSITA to use *Guan*'s stimulation device to stimulate the clitoris by keeping the clitoris in contact

51

with the opening of the rubber mouth 1. *See supra* Section IX(A)(1)(i); Ex. 1002 at ¶104. When *Guan*'s stimulation device is used to stimulate the clitoris, the air pulse emanating from *Guan*'s connection element will impinge on the clitoris that is kept in contact with mouth 1 with a "nozzle effect." Ex. 1002 at ¶104.

**(6)** **"the second opening of the connection element is configured to face the clitoris through the second chamber."**



Annotated Figure of *Guan*

As also explained above, it would have been obvious to a POSITA to use *Guan*'s stimulation device to stimulate the clitoris, based on the teachings of *Hovland*, by keeping the clitoris in contact with the opening of rubber mouth 1. *See supra* Section IX(A)(1)(i); Ex. 1002 at ¶105. When the stimulation device is used to stimulate the clitoris, the second opening of *Guan*'s blue-colored connection element will face the clitoris received at the opening of *Guan*'s mouth 1. Ex. 1002 at ¶105.

52

### 2.   Claim 2

> i.  **"The stimulation device according to claim 1, wherein the second chamber is made of a flexible material and/or is fitted to a shape of a vaginal labia minora in such a way that the latter is completely covered by the opening of the second chamber."**



**Annotated Figure of *Guan***

As explained previously, the orange-colored volume enclosed by *Guan*'s

mouth 1 corresponds to the claimed "second chamber."  *See supra* Section

IX(A)(1)(ii)(2).  *Guan* states that mouth 1 is made of rubber.  Ex. 1004 at 3.  As

would have been recognized by a POSITA, rubber is a material that may be

fabricated to have some degree of flexibility, depending on thickness, construction,

and/or other material properties.  Ex. 1002 at ¶¶107-108; s*ee also* Ex. 1008 at 17

(finding that mouth 1 is made of a "flexible material.").

Although *Guan*'s connection element is also formed from rubber, as explained previously, a POSITA would have understood that *Guan*'s connection element is rigid because of its increased wall thickness and construction, as well as the reinforcement provided by housing of *Guan*'s device.  S*ee supra* Section IX(A)(1)(v)(5); Ex. 1002 at ¶109.  Thus, *Guan*'s second chamber being flexible is not inconsistent with its connection element being rigid, even though both elements are constructed from the same material.  Ex. 1002 at ¶¶109-110.

Although claim 2 does not also require (because of the "and/or" language) that the second chamber be "fitted to a shape of a vaginal labia minora in such a way that the latter is completely covered by the opening of the second chamber," as explained below, in the stimulation device of *Guan* as modified by *Hovland*, the opening of mouth 1 (i.e., the opening of *Guan*'s second chamber) completely covers the vaginal labia minora of the user.  *Id*.  In the analysis below, it is assumed that the "opening  of the second chamber" referred to claim 2 is the "second opening" of the second chamber referenced in claim 1.  *See supra* Section IX)(A)(1)(ii)(2).

As explained previously, although *Guan* does not disclose using the stimulation device to stimulate the clitoris, it would have been obvious for a POSITA to use *Guan*'s stimulation device to stimulate the clitoris based on the teachings of *Hovland*.  *See supra* Section IX(A)(1)(i).  When *Guan*'s stimulation

54

device is used to stimulate the clitoris, the opening of *Guan*'s mouth 1 will be in contact with the clitoris.  Ex. 1002 at ¶111.



In the stimulation device of *Hovland*, "the suction applicator can be constructed **to completely cover the vaginal labia** of a female patient."  Ex. 1005 at 4:57-59 (emphasis added).  A POSITA would have recognized that "vaginal labia" in *Hovland* is intended to include the labia majora and the labia minora, which are positioned within the labia majora.  *See, e.g., id*. at 2:54-59; Ex. 1002 at ¶112.  Therefore, *Hovland*'s suction applicator that "completely cover[s] the vaginal labia" completely covers both the labia majora and the labia minora. Indeed, *Hovland* teaches that "[e]mbodiments of the invention increase blood flow by creating a vacuum around and/or using increasing pressure to produce percussion and/or massage of e.g. the clitoris, **the labia**, the external urethral orifice and/or other areas of the female genital region."  Ex. 1005 at 8:49-54

55

(emphasis added); *see also id.* at 17:2-5 (explaining that "[o]ther cup sizes are contemplated according to embodiments of the invention, large enough to **cover the vagina or entire vaginal/labial region** … ) (emphasis added.).

Therefore, based on the teachings of *Hovland*, a POSITA would have recognized that, when *Guan*'s stimulation device (as modified by the teachings of *Hovland*) is used to stimulate the clitoris, the user will position mouth 1 in such a way that the vaginal labia (including both the labia majora and the labia minora) are completely covered by the opening of mouth 1.  Ex. 1002 at ¶¶112-113.

### 3.    Claim 4

> i.  **"The stimulation device according to claim 1, wherein the second chamber of the stimulation device is arranged to be replaceable."**



56

*Guan* discloses that "multiple treatment probes" may be used with its device. Ex. 1004 at 4. *Guan* also states that "rubber mouth (1) is a straight mouth or a reducing mouth." *Id.* at 2-3. Further, *Guan*'s figure illustrates that the wall of air bag 2 is fitted in a circumferential channel or groove formed on the outer surface of mouth 1 to couple mouth 1 to air bag 2. Ex. 1002 at ¶¶114-116. Based on these disclosures, a POSITA would have recognized that mouth 1, which defines *Guan*'s second chamber, is replaceable (e.g., to replace a straight mouth 1 with a reducing mouth 1). *Id.* *See also* Ex. 1008 at 17 (explaining that mouth 1 being replaceable is implicit in *Guan*).



It should be noted that the embodiment of the pressure field generator (of Fig. 7) that the '851 patent describes as having a replaceable second chamber is substantially similar in structure and construction to *Guan*'s pressure field

57

generator.  *See* figure above; Ex. 1002 at ¶117.  Accordingly, a POSITA would have recognized that *Guan*'s mouth 1 can also be replaced in a manner similar to the way second chamber 4 (in Fig. 7) of the '851 patent is replaced.

    **4.**    **Claim 5**

        **i.**  **"The stimulation device according to claim 1, wherein the second chamber has a sealing bearing part to enlarge a contact surface of the second chamber on a skin."**



**Annotated Figure of *Guan***

In *Guan*, "rubber mouth (1) on the air bag (2) contacts the body," and the generated pulsating air pressure is applied to the body via mouth 1.  Ex. 1004 at 3; Ex. 1002 at ¶¶118-120.  A POSITA would have recognized that an area (i.e., the distalmost portion) of mouth 1 around its opening will contact the body when "mouth (1) … contacts the body."  Ex. 1002 at ¶120.  This area is the claimed "sealing bearing part" that serves as a contact surface of the second chamber to the

skin of a user. *Id*. A POSITA also would have recognized that, because the portion of mouth 1 that contacts the skin is made of relatively thin rubber walls, that portion of mouth 1 will be flexible such that it compresses when pushed against the user's skin. *Id*. And, as the peripheral wall of rubber mouth 1 that contacts the user's skin compresses, it will bulge radially such that portions proximal to the distalmost portion of mouth 1 also come into contact with the user's skin, thereby enlarging the contact surface of *Guan*'s rubber mouth 1 with the user's skin. *Id*. Thus, the sealing bearing part of *Guan* will enlarge the contact surface of the second chamber to the skin when mouth 1 is in contact with the body.

If it is argued that *Guan* does not disclose this feature, *Hovland* discloses that the contact surface of a compliant vacuum cup will increase the contact surface when placed against a body part. *Id*.



*Hovland*'s vacuum cup 240 includes rigid portion 243, soft portion 245, and contact surface 390, which is specifically constructed for application to the user's

59

clitoral region.  Ex. 1005 at 13:43-48.  During use, vacuum cup 240 is placed over the clitoris, and a slight pressure is applied to compress soft portion 245 between rigid portion 243 and clitoral region 410 (as shown in Fig. 15) to form a seal around the clitoris.  *Id*. at 14:15-18.  A POSITA would have recognized that, due to Poisson's effect, when soft portion 245 of vacuum cup 240 is compressed in the direction of rigid portion 243 (*see* Fig. 13), the material of soft portion 245 will expand in the lateral directions to increase the area of contact of soft portion 245 on the body.  Ex. 1002 at ¶¶121-122.  Thus, it would have been obvious to a POSITA to apply a slight pressure with *Guan*'s mouth 1 against the skin to increase its contact surface with the skin and thus obtain a better seal with the body, as taught by *Hovland*.  *Id*.  Such use would have amounted to nothing more than applying a known technique to a known device (or method) ready for improvement to yield predictable results.  *See KSR*, 550 U.S. at 417.  At the time of the invention, a POSITA would have had the requisite skill level to readily apply *Guan*'s device to implement the teachings of *Hovland* without any problem.

     **5.**    **Claim 6**

i. **"The stimulation device according to claim 1, wherein the respective modulation of the pressure field is modifiable by means of an operating element."**



**Annotated Figure of *Guan***

As explained previously, and as illustrated in the figure above, *Guan*'s lever 3 and magnet 4 form the claimed "drive unit," and electromagnet 5 and the circuit that energizes electromagnet 5 form the claimed "control device" of *Guan*. *See supra* Section IX(A)(1)(iii)-(iv); Ex. 1002 at ¶¶123-125.

*Guan*'s massager is presented as a solution to previous techniques where "it is difficult to increase and decrease the amount of stimuli." Ex. 1004 at 3. Based at least upon this disclosure, a POSITA would have recognized *Guan*'s intent to provide a device wherein the "amount of stimuli" applied by the pulsating air pressure can be increased and decreased. Ex. 1002 at ¶125. However, *Guan* does not expressly describe an operating element for modulating the generating

61

pulsating air pressure. Nevertheless, a POSITA would have recognized that, since *Guan* intended for the pulsating air pressure to be modulated, *Guan*'s stimulation device must have a mechanism or an operating element to perform such modulation. Indeed, a POSITA would have known that, in *Guan*, the parameters (e.g., amplitude, frequency, etc.) of the pulsating air pressure generated by air bag 2 can easily be varied or modulated by varying the characteristics (e.g., magnitude, frequency, etc.) of the electrical signal applied to electromagnet 5. *Id*. Thus, a POSITA would have recognized that *Guan*'s stimulation device obviously included an operating element for modulating the pulsating air pressure. *Id*. Additionally, modulating air pulsations produced by a stimulation device by adjusting the electrical signals used to produce the air pulsations was well known in the art at the time of invention.



*Hovland*'s Fig. 3 shows the internal components of a stimulation device, which includes control electronics 80 that "comprise one or more signal handling devices for handling electrical signals." *Id*. at 10:19-25.  Control electronics 80 are operably coupled to the vacuum pump/motor device 90 and includes a microprocessor and "vacuum regulation protocols" to vary the vacuum or suction in the vacuum cup that is applied to the clitoral region.  *Id*. at 9:56-65, 10:25-28, 10:52-55.  Therefore, notwithstanding *Guan*'s intrinsic teachings discussed above, *Hovland*'s disclosure would have motivated a POSITA to modulate the pulsating air pressure generated by *Guan*'s air bag 2 by means of an operating element.  Ex. 1002 at ¶¶126-127.  Specifically, based on the teachings of *Hovland*, it would have

been obvious to a POSITA to incorporate suitable control electronics in *Guan*'s stimulation device to modulate the air pressure produced by air bag 2 by, e.g., modulating the electrical power delivered to electromagnet 5. *Id.* Based on the level of skill in the art, it would have been a simple matter for a POSITA to incorporate suitable control electronics in *Guan*'s massager to, e.g., increase/decrease the amplitudes of the positive/negative pressure pulses of the pulsating air pressure. *Id.* Such a modification would have amounted to nothing more than the use of a known technique to improve a similar device in the same way to obtain predictable results. *See KSR*, 550 U.S. at 417. Indeed, , a POSITA would have had the requisite skill level to modify *Guan*'s stimulation device to incorporate the control electronics taught by *Hovland* without any problem, and would have had a reasonable expectation of success in such modification. Ex. 1002 at ¶¶126-127.

**B.   Ground 2:  *GUAN* AND *HOVLAND* FURTHER IN VIEW OF *GLOTH* RENDER OBVIOUS CLAIM 3**

**1.   Claim 3**

i.  "**The stimulation device according to claim 1, wherein the second chamber is designed in one-piece with the connection element and the first chamber.**"



**Annotated Figure of *Guan***

As explained previously, air bag 2 corresponds to the claimed "first chamber," the orange-colored volume in mouth 1 corresponds to the claimed "second chamber," and the blue-colored conduit between the first and second chambers corresponds to the claimed "connection element." *See supra* Section IX(A)(1)(ii)(1)-(3).  Since both the second chamber and the connection element of *Guan* are defined within mouth 1, the second chamber is designed in one-piece with the connection element.  However, as explained previously with reference to claim 4, mouth 1 is described as replaceably attached to air bag 2 to accommodate the "multiple treatment probes" provided with *Guan*'s device.  *See supra* Section

65

IX(A)(4)(i); Ex. 1004 at 4.   Indeed, a POSITA would have recognized that, mouth 1 is replaceably attached to air bag 2 primarily to allow the use of different "treatment probes" with *Guan*'s device.  Ex. 1002 at ¶¶128-132.  Accordingly, there is no technical reason why mouth 1 cannot be made as one-piece with air bag 2, e.g., in applications where reduction in cost is more important than the ability to use different treatment probes.  *Id.*  Moreover, air bag 2 is made of a flexible material to allow the wall of air bag 2 to have a reciprocating motion.  *See* Ex. 1004 at 3; Ex. 1002 at ¶132.  And, *Guan* states that mouth 1 is made of rubber, which is flexible material.  *Id.*; *see supra* Section IX(A)(1)(v)(5).  Accordingly, a POSITA would have recognized that cost savings can be achieved by designing and making air bag 2 and mouth 1 as one-piece.  As described below, such one-piece devices with multiple air chambers used in applications related to the female genital area were well-known at the time of invention of the '851 patent.



Figure 2B    Figure 14A

*Gloth* discloses a urinary incontinence device 10 used to form a vacuum seal around the urethral opening of a female user. Ex. 1007 at Abstract, 5:65-67, 6:24-26, 7:11-20, Fig. 14A.  Device 10 includes device body 11 defining cavity 18 with vacuum producing portion 12 and body contacting portion 14.  *Id*. at 5:53-59. Body contacting portion 14 includes intermediate frustoconical portion 15 and encircling rim 17, both of which contact the user's skin to provide a continuous and complete seal between the user's body and the device 10.  *Id*. at 5:59-60, 7:2-3, 7:11-20; Ex. 1002 at ¶¶133-134.  Once device 10 is positioned on the user's body, a vacuum is produced in cavity 18 by squeezing the vacuum producing portion 12 to hold device 10 onto the user's body.  Ex. 1007 at 6:14-17, 6:21-24; Ex. 1002 at ¶¶133-134.



Figure 2B

As can be seen in the figure above, *Gloth*'s cavity 18 includes multiple chambers, e.g., at least vacuum producing portion 12 (marked "1") and body contacting portion 14 (marked "2"). Ex. 1002 at ¶134. Vacuum producing portion 12 is made of a flexible resilient material that can be compressed by light hand pressure and can maintain a sufficient degree of suction. Ex. 1007 at 6:29-31, 6:51-54. And, body contacting portion 14 is made of a flexible material that is capable of sealing device 10 against the body and preventing air from entering the device 10. *Id*. at 7:14-20. Note that, in material requirements and function, *Gloth*'s vacuum producing portion 12 is similar to *Guan*'s air bag 2, and *Gloth*'s body contacting portion 14 is similar to *Guan*'s mouth 1. Ex. 1002 at ¶134. *Gloth* states that device 10 may be formed as a unitary part out of one piece of material

(as depicted in Fig. 2B) or may be formed of multiple pieces of material joined together.  Ex. 1007 at 5:60-63.  That is, in *Gloth*, the multiple chambers (of cavity 18) that have similar material requirements and function can be designed and formed as one-piece.  Ex. 1002 at ¶134.

Based on the teachings of *Gloth*, it would have been obvious for a POSITA to design *Guan*'s mouth 1 and air bag 2 as one-piece.  *Id*.  The POSITA would have recognized that designing and making these components as one-piece would have reduced manufacturing cost and simplified assembly, and also improve the operation of the device by reducing the likelihood of air leaks from occurring at the junction between mouth 1 and air bag 2.  *Id*.  Such a modification would have amounted to nothing more than the use of a known technique to improve a similar device in the same way to obtain predictable results.  *See KSR*, 550 U.S. at 417.  Indeed, a POSITA would have had the requisite skill level to modify *Guan*'s device to make air bag 2 and mouth 1 as one-piece, as taught by *Gloth*, without any problem.  Ex. 1002 at ¶¶134-135.  And, given the level of skill in the art, the POSITA would have had a reasonable expectation of success in making such a modification.  *Id*.

### C.    Ground 3:  *GUAN* AND *HOVLAND* FURTHER IN VIEW OF *MAKOWER* RENDER OBVIOUS CLAIMS 5-6

As discussed above, *Guan* in view of *Hovland* disclose all limitations of claims 5-6.  *See supra* Section IX)(A)(4)-(5).  However, if it is argued that *Guan*'s

device, as modified by *Hovland*, somehow does not disclose these features as intended in the '851 patent, then, as explained above, it would have been obvious to a POSITA to incorporate the teachings of *Makower* into the *Guan-Hovland* stimulation device to achieve the benefits described by *Makower*.  Ex. 1002 at ¶136.

   **1.**  **Claim 5**



**FIG. 32A**

  *Makower* discloses embodiments of stimulation devices for stimulating the clitoris using air pressure.  Ex. 1006 at Abstract, 1:25-27, 23:3-8, Figs. 1-33 and corresponding written descriptions.



FIG. 8A          FIG. 8C

In the embodiment illustrated in Figs. 8A and 8C, device 200 includes device body 210 with suction chamber 220 having sealing edge 225 that is "adapted to provide a substantially airtight seal against tissue." *Id*. at 13:23-27; *see also id*. at 10:29-31, 14:6-8, 17:56-58, 21:25-27. Sealing edge 225 may be a flange that is formed of a soft, flexible, compliant material, such as silicone or closed cell polyurethane form. *Id*. at 10:29-31, 13:25-27, 13:57-59. Suction chamber 220 of device 200 is sized and shaped to fit over the clitoris of the user. *Id*. at 14:12-16; Ex. 1002 at ¶¶137-140.



71

It is worth noting that sealing edge 225 is similar in structure to sealing bearing part 43, which the '851 patent describes as enlarging the contact surface of second chamber 4 on skin.  Ex. 1001 at 11:64-12:7, Figs. 12e-12f; Ex. 1002 at ¶141.

Thus, based on *Makower*, it would have been obvious for a POSITA to incorporate *Makower*'s sealing edge 225 on to mouth 1 of the *Guan-Hovland* stimulation device "to provide a substantially airtight seal against tissue," as taught by *Makower*.  Ex. 1007 13:23-27; *see also id*. at 10:29-31, 14:6-8, 17:56-58, 21:25-27; Ex. 1002 at ¶142.  A POSITA would have recognized that structures that facilitate a substantially airtight seal between mouth 1 and tissue would increase the effectiveness of the pulsating air pressure in stimulating the tissue.  Such modification of mouth 1 would have amounted to nothing more than the use of a known technique to improve a similar device in the same way to obtain predictable results.  *See KSR*, 550 U.S. at 417.  Indeed, a POSITA would have had the requisite skill level to readily modify *Guan*'s stimulation device to incorporate *Makower*'s sealing edge 225 without any problem, and would have had a reasonable expectation of success in making such a modification.  Ex. 1002 at ¶142.

    **2.**    **Claim 6**

72



**Annotated Figure of *Guan***

As explained previously, and as illustrated in the figure above, lever 3 and magnet 4 form *Guan*'s "drive unit," and electromagnet 5 and the circuit that energizes electromagnet 5 form *Guan*'s "control device."  *See supra* Section IX(A)(1)(iv).  In *Guan*, the disclosed stimulation device is presented as a solution to a previous massage technique where "it is difficult to increase and decrease the amount of stimuli."  Ex. 1004 at 3.  Accordingly, a POSITA would have recognized that the characteristics (e.g., amplitude, frequency, etc.) of the pulsating air pressure generated at the mouth 1 can easily be varied by varying the characteristics of power provided to the electromagnet 5.  Ex. 1002 at ¶¶143-145.  However, *Guan* does not expressly disclose using an operating element to modulate the pulsating air pressure produced by the air bag 2.

73



**FIG. 32C**

With reference to Fig. 32C, *Makower* discloses stimulation devices that provide "clitoral engorgement using suction over the clitoris combined with vibratory stimulation" for "enhancing sexual desire, arousal or satisfaction in a female." Ex. 1006 at Abstract, 1:25-27.



With reference to Figs. 8A and 8C, device 200 includes device body 210 with suction chamber 220 and controller block 215 that may be remotely

74

controlled by a user using remote control 1550. *Id*. at 8:5-12, 13:23-25, 13:40-43, 14:1-2, 24:11-19. In some embodiments, "the device provide[s] variable suction. In such embodiments, the user may rapidly and easily adjust the suction levels. Further, in certain embodiments the variable suction is programmable such that the amount of suction applied by the device can vary according to a pattern." *Id*. at 10:6-10, 23:3-6. Using remote control 1550, the user may select a pre-loaded suction pattern or design and select customized patterns for "precise and customizable stimulation." *Id*. at 10:15-19, 18:60-62. "Such complex suction patterns can provide a comparatively organic stimulation experience." *Id*. at 6:25-27. "For some users, the variable suction patterns, algorithms waveforms of certain embodiments can provide engorgement and stimulation such that effective arousal is achieved." *Id*. at 6:28-31. *Makower* explains that:

> the user is able to customize the suction pattern and save/recall the customized pattern. Studies have shown that different areas of the female brain are activated when the clitoris is self-stimulated than when the clitoris is stimulated by a partner and that often times a female can achieve orgasm easier through self-stimulation than when stimulated by a partner. With the certain embodiments of the devices described herein, the female can record the stimulation pattern that allows her to achieve orgasm through self-stimulation and store it in the devices memory. Subsequently, the device can be used during

75

> intercourse to play the saved pattern such that the female
> can achieve orgasm as if she were self-stimulating.

Ex. 1006 at 9:12-24.

Based on these teachings, it would have been obvious to a POSITA to incorporate into the *Guan-Hovland* stimulation device, a controller block 215 and remote control 1550 that enable a user to vary and customize (i.e., modulate) the air pulsations produced by the device for more effective and satisfying stimulation, as taught by *Makower*. Ex. 1002 at ¶¶146-148. Such a modification would have amounted to nothing more than the use of a known technique to improve a similar device in the same way to obtain predictable results. *See KSR*, 550 U.S. at 417. Indeed, at the time of the invention, a POSITA would have had the requisite skill level to readily modify *Guan*'s stimulation device to incorporate *Makower*'s controller block 215 and remote control 1550 without any problem. And, given the level of skill in the art, the POSITA would also have had a reasonable expectation of success in incorporating these features from *Makower* into the *Guan-Hovland* stimulation device. Ex. 1002 at ¶¶147-148.

## X.    ARGUMENTS FOR DISCRETIONARY DENIAL SHOULD BE REJECTED

*Gloth* was not identified during prosecution of the '851 patent. Ex. 1001 at 1-2; *see also* Ex. 1003.

76

As explained previously, while *Guan* was cited in an IDS during prosecution, only a machine-produced English language translation of *Guan*'s Abstract was submitted with the IDS. *See supra* Section VII(B); Ex. 1003 at 113, 118-123. And, when compared with the full translation, the machine-translated Abstract fails to provide sufficient technical detail of *Guan*'s apparatus and mode of operation, including, e.g., the mechanism for reciprocally moving a wall of air bag 2 to generate a pulsating air pressure. *Compare* Ex. 1011 at 1, *with* Ex. 1004 at 1-4; *see also* Ex. 1012 at 3-15 (showing that the USPTO was only able to fully appreciate *Guan* only after it independently obtained a more complete translation).

The patent application publications of *Hovland* (i.e., U.S. 2002/0120219 A1) and *Makower*'s parent application (i.e., 2014/0142374 A1) are identified on the '851 patent. Ex. 1001 at 2. However, *Hovland* and *Makower* were not relied upon during prosecution. Indeed, there is no evidence that the examiner reviewed *Hovland*, *Makower*, or *Guan* in detail, and that arguments the same as or substantially the same as those presented herein were ever presented and/or considered by the examiner. *See Fox Factory, Inc. v. SRAM, LLC*, IPR2017-00472, at *6-8 (PTAB Apr. 21, 2017) (Paper 10) (instituting IPR after noting that the record contained no evidence that a reference cited during prosecution had been considered "in more than a cursory manner"); *Pure Storage, Inc. v. Realtime Data LLC*, Case No. IPR2018-00549, slip op. at 11 (PTAB July 23, 2018) (Paper

77

7) (noting that "there is no evidence of record that [the prior art references] were substantively considered by the Examiner."); *Comcast Cable Communs., LLC v. Promptu Sys. Corp.*, Case No. IPR2018-00342, slip op. at 17 (PTAB July 19, 2018) (Paper 13) (granting institution "because [the prior art] was only cited in an IDS and not applied by the examiner in the reissue application process in any rejection of claims").

Accordingly, the Board should reach the merits of this petition, and institute review of all challenged claims, especially in light of the accompanying expert testimony, which was not before the Office during prosecution.

## XI.   CONCLUSION

For the reasons above, Petitioner requests institution of IPR of the challenged claims based on all grounds.

Respectfully submitted,

Dated:  July 31, 2019

_____

Dinesh N. Melwani (Reg. No. 60,670)
Bookoff McAndrews, PLLC
2020 K Street NW, Suite 400
Washington, D.C.  20006
202-808-3497

Attorneys for Petitioner
EIS GmbH

78

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 C.F.R. § 42.24(d), the undersigned certifies that the foregoing

Petition for *Inter Partes* Review of U.S. Patent No. 9,763,851 contains, as

measured by the word-processing system used to prepare this paper, 13,503 words.

This word count does not include the items excluded by 37 C.F.R. § 42.24 as not

counting towards the word limit.

Dated: <u>July 31, 2019</u>                                 Respectfully submitted,

By: _____
　　Dinesh N. Melwani (Reg. No.60,670)
　　Counsel for Petitioner

# CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6(e) and 37 C.F.R. § 42.105(a), I hereby certify

that on July 31, 2019, I caused a true and correct copy of the foregoing

"PETITION FOR INTER PARTES REVIEW OF U.S. PATENT NO. 9,763,851"

and supporting exhibits to be served via Federal Express on the Patent Owner at

the following correspondence address of record as listed on PAIR:

HANLEY, FLIGHT & ZIMMERMAN, LLC
150 S. WACKER DRIVE
SUITE 2200
CHICAGO IL 60606

Dated:  July 31, 2019                              Respectfully submitted,

By:  _____

Dinesh N. Melwani (Reg. No.60,670)
Counsel for Petitioner

# EXHIBIT 4

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

EIS GMBH
Petitioner

v.

NOVOLUTO GMBH
Patent Owner

_____

Patent No. 9,849,061

_____

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 9,849,061**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iv

LISTING OF EXHIBITS.................................................................................. vi

I.     INTRODUCTION ................................................................................1

II.    MANDATORY NOTICES ...................................................................1

III.   PAYMENT OF FEES ..........................................................................3

IV.    GROUNDS FOR STANDING.............................................................3

V.     PRECISE RELIEF REQUESTED AND GROUNDS ...................................3

VI.    LEVEL OF ORDINARY SKILL .......................................................4

VII.   THE '061 PATENT AND PRIOR ART .............................................5

       A.    The '061 patent ......................................................................5

       B.    Prosecution Summary of the '061 patent.........................10

       C.    Prosecution Summary of Related Patent Applications .................11

       D.    The Prior Art .......................................................................11

             1.    *Taylor* (Ex. 1004)..............................................12

             2.    *Hovland* (Ex. 1006) ...........................................13

             3.    *Zipper* (Ex. 1007)................................................15

VIII.  CLAIM CONSTRUCTION .............................................................17

       A.    "pressure field generating arrangement".........................18

IX.    DETAILED EXPLANATION OF GROUNDS..............................20

       A.    GROUND 1: *TAYLOR* ANTICIPATES CLAIMS 1-3, 5, 7, 11, 14-15, 17-19, 21, AND 23-26.......................................20

             1.    Independent Claim 1......................................20

i

2.  Claim 2....................................................................................38

3.  Claim 3....................................................................................41

4.  Claim 5....................................................................................42

5.  Claim 7....................................................................................42

6.  Claim 11..................................................................................44

7.  Claim 14..................................................................................44

8.  Claim 15..................................................................................45

9.  Claim 17..................................................................................45

10.  Claim 18................................................................................48

11.  Claim 19................................................................................51

12.  Independent Claim 21...........................................................54

13.  Claim 23................................................................................62

14.  Claim 24................................................................................64

15.  Claim 25................................................................................65

16.  Claim 26................................................................................66

B.  GROUND 2:  *TAYLOR* IN VIEW OF *HOVLAND* RENDERS OBVIOUS CLAIMS 1-3, 5, 7, 8, 11, 14, 17-19, 21-24, AND 26....66

1.  Independent Claims 1 and 21 .........................................66

2.  Claims 2, 3, 5, 7, 11, 14-15, 17-19, and 23-26...............71

3.  Claim 8....................................................................................73

4.  Claim 22..................................................................................77

C.  GROUND 3:  *TAYLOR* IN VIEW OF *ZIPPER* RENDERS OBVIOUS CLAIM 20....................................................................78

1.  Independent Claim 20.........................................................78

ii

D.  GROUND 4: *TAYLOR* IN VIEW OF *ZIPPER* AND *HOVLAND* RENDERS OBVIOUS CLAIM 20 ...............................................84

   1.  Independent Claim 20........................................................85

X.  ARGUMENTS FOR DISCRETIONARY DENIAL SHOULD BE REJECTED...................................................................................86

XI.  CONCLUSION.................................................................................87

## TABLE OF AUTHORITIES

**Cases**

*Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015)3

*Comcast Cable Communs., LLC v. Promptu Sys. Corp.*, Case No. IPR2018-00342,

slip op. (PTAB July 19, 2018) (Paper 13)..........................................................87

*Fox Factory, Inc. v. SRAM, LLC*, IPR2017-00472 (PTAB Apr. 21, 2017) (Paper

10)......................................................................................................................86

*KSR Int'l. Co. v. Teleflex, Inc.*, 550 U.S. 398, 417 (2007) .............................. passim

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) .........................................17

*Pure Storage, Inc. v. Realtime Data LLC*, Case No. IPR2018-00549, slip op.

(PTAB July 23, 2018) (Paper 7)...........................................................................87

*Toyota Motor Corp. v. Cellport Sys., Inc.*, IPR2015-00633, Paper No. 11 (Aug. 14,

2015).....................................................................................................................17

**Statutes**

35 U.S.C. § 102(a)(1).........................................................................................3, 4

35 U.S.C. § 103 ...................................................................................................3, 4

35 U.S.C. § 112 ......................................................................................................17

**Other Authorities**

37 C.F.R. § 42.105(a)............................................................................................89

37 C.F.R. § 42.24(d) .............................................................................................88

iv

37 C.F.R. § 42.6(e)............................................................................................89

## LISTING OF EXHIBITS[1]

| Exhibit | Description |
| --- | --- |
| Exhibit 1001 | U.S. Patent No. 9,849,061 B2 |
| Exhibit 1002 | Declaration of Michael R. Prisco, P.E., Ph.D. |
| Exhibit 1003 | Prosecution History of U.S. Patent No. 9,849,061 B2 |
| Exhibit 1004 | U.S. Patent No. 5,725,473 to Taylor ("*Taylor*") |
| Exhibit 1005 | Reserved |
| Exhibit 1006 | U.S. Patent No. 6,964,643 B2 to Hovland et al. ("*Hovland*") |
| Exhibit 1007 | U.S. Patent Publication No. 2013/0261385 A1 to Zipper ("*Zipper*") |
| Exhibit 1008 | First Amended Complaint in *EIS Inc. v. WOW Tech International GmbH et al.*, No. 1:19-cv-01227-LPS, (D. Del.) |
| Exhibit 1009 | Reserved |
| Exhibit 1010 | Kevin L. Billups, *The Role of Mechanical Devices in Treating Female Sexual Dysfunction and Enhancing the Female Sexual Response*, 20 World J. Urol. 137 (2002) |
| Exhibit 1011 | U.S. Patent No. 9,763,851 B2 |
| Exhibit 1012 | German Patent No. 10 2013 110 501 and Certified Translation |
| Exhibit 1013 | German Patent and Trade Mark Office Decision on Opposition |

---

[1] Citations to Exhibits 1001, 1006, and 1011 are to column:line number. Citations to Exhibits 1002 and 1007 are to paragraph number. And, citations to the remaining Exhibits are to the page numbers to the respective exhibits.

|  | Proceedings of German Patent DE 10 2013 110 501 and Certified Translation |
| --- | --- |

## I.    INTRODUCTION

EIS GmbH ("Petitioner") requests *inter partes* review (IPR) of claims 1-3, 5, 7, 8, 11, 14-15, and 17-26 ("the challenged claims") of U.S. Patent No. 9,849,061 ("the '061 patent") (Ex. 1001), assigned to Novoluto GmbH ("Patent Owner").  As explained below, the challenged claims should be found unpatentable and cancelled.

## II.    MANDATORY NOTICES

**Real Party-in-Interest**:  Petitioner identifies the following as real parties-in-interest:  EIS GmbH; EIS Inc.; Triple A Import GmbH; Triple A Marketing GmbH; Triple A Sales GmbH; and Triple A Internetshops GmbH (formerly known as "Internetsupport Bielefeld").

**Related Matters**:  The application that issued as the '061 patent is a national stage application of International Application No. PCT/EP2015/067017, which claims priority to German Patent No. DE 102015103694.  U.S. Patent No. 9,937,097 ("the '097 patent") is a continuation application of the '061 patent, and U.S. Patent Application No. 15/888,568 ("the '568 application") is a continuation application of the '097 patent.  Petitioner filed a petition for IPR (IPR2019-01302) challenging claims 1-30 of the '097 patent on July 3, 2019.  This petition is currently pending institution.  The '568 application is currently pending at the U.S. Patent and Trademark Office.

1

U.S. Patent No. 9,763,851 B2 ("the '851 patent") discloses subject matter substantially similar to that in the '061 patent.  The '851 patent claims priority to German Patent DE 102013110501 ("the DE'501 patent").  The DE'501 patent was revoked by the German Patent and Trade Mark Office (GPTO) following opposition proceedings.  The revocation has been appealed at the GPTO.  Petitioner filed a petition for IPR (IPR2019-01444) challenging claims 1-6 of the '851 patent on July 31, 2019.  This petition is currently pending institution.  U.S. Application Nos. 15/354,599 ("the '599 application"), 15/965,117 ("the '177 application"), and 15/965,208 ("the '208 application") are pending continuation applications of the '851 patent.  A notice of allowance was issued for the '599 application on August 29, 2019.

In addition, EIS Inc. is seeking in the District of Delaware a judgment declaring the claims of the '061 patent unenforceable:  *EIS Inc. v. WOW Tech International GmbH et al.*, No. 1:19-cv-01227-LPS, (D. Del.).  *See* Ex. 1008.

**Counsel and Service Information**: Lead counsel is Dinesh N. Melwani (Reg. No. 60,670), and Backup counsel is Biju I. Chandran (Reg. No. 63,684).  Service information is:  Bookoff McAndrews, PLLC, 2020 K Street, NW, Suite 400, Washington, DC 20006; Tel.: 202.808.3497; Fax.: 202.450.5538; email: docketing@bomcip.com, dmelwani@bomcip.com, and bchandran@bomcip.com.  Petitioner consents to electronic service.

2

### III.    PAYMENT OF FEES

The PTO is authorized to charge any fees due during this proceeding to Deposit Account No. 50-5906.

### IV.    GROUNDS FOR STANDING

Petitioner certifies that the '061 patent is available for review and Petitioner is not barred/estopped from requesting review on the following grounds.

### V.    PRECISE RELIEF REQUESTED AND GROUNDS

The challenged claims should be cancelled as unpatentable based on the following Grounds[2]:

**Ground 1:**  Claims 1-3, 5, 7, 11, 14-15, 17-19, 21, and 23-26 are unpatentable under 35 U.S.C. § 102(a)(1) over *Taylor* (U.S. Patent No. 5,725,473, Ex. 1004).

**Ground 2:**  Claim 1-3, 5, 7-8, 11, 14-15, 17-19, and 21-26 are unpatentable under 35 U.S.C. § 103 over *Taylor* in view of *Hovland* (U.S. Patent No. 6,964,643,

---

[2] For each Ground, Petitioner does not rely on any reference other than those listed here.  Other references are discussed to show the state of the art at the time of the invention.  *See Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015).

Ex. 1006).

**Ground 3:**  Claim 20 is unpatentable under 35 U.S.C. § 103 over *Taylor* in view of *Zipper* (U.S. Patent Publication No. 2013/0261385, Ex. 1007).

**Ground 4:**  Claim 20 is unpatentable under 35 U.S.C. § 103 over *Taylor* in view of *Zipper* and further in view of *Hovland*.

The earliest claimed priority of the '061 patent is March 13, 2015.  Ex. 1001 at 1.  For the purposes of this proceeding only, Petitioner assumes the priority date of the '061 patent is March 13, 2015.

*Taylor* issued on March 10, 1998.  Ex. 1004 at 1.  *Hovland* issued on November 15, 2005.  Ex. 1006 at 1.  And, *Zipper* was published on October 3, 2013.  Ex. 1007 at 1.  Therefore, these references are prior art to the '061 patent at least under 35 U.S.C. § 102(a)(1).

## VI.    LEVEL OF ORDINARY SKILL

A person of ordinary skill in the art ("POSITA") as of March 13, 2015 would have had a bachelor's degree in mechanical engineering, biomechanical engineering, or the equivalent, and three or more years of experience in fluid mechanics and pump-based medical or personal use devices.  Ex. 1002 at ¶¶18-22.  More practical experience could qualify one not having the aforementioned education as a POSITA, while a higher level of education could offset lesser experience.  *Id.*

## VII.   THE '061 PATENT AND PRIOR ART

### A.    The '061 patent

The '061 patent's "invention relates to a stimulation device (1) for … clitoris (12)." Ex. 1001 at Abstract, 10:9-11.  Although the invention is described with reference to a clitoris 12, the '061 patent emphasizes that "use of the present invention is not limited to the female clitoris 11 [sic], however; rather, the stimulation device 1 can be applied to **all body parts** … which can be stimulated by means of medium- or air-pressure massage and/or negative pressure." *Id.* at 10:10-17 (emphasis added); *see also id.* at 6:4-6; 15:15-16.

"According to the invention, a pressure field generating arrangement of the stimulation device has at least one first chamber and at least one second chamber having at least one opening for placing on a body part or on the erogenous zone and at least one connection element that connects the first chamber to the second chamber." Ex. 1001 at 3:5-10.  Regarding the importance of the above-described construction, the '061 patent explains that two "chambers [being] in fluidic communication via at least one connection element, allows [for the] simple generation of a pressure field in the second chamber by changing the volume in the first chamber, this pressure field being temporarily directed at the area of skin to be stimulated." *Id.* at 3:11-16.  "[P]ressure field, in the context of the invention, is a field of medium pressures that is variable over time and has temporary positive

pressures and temporary negative pressures, a negative pressure being a pressure of medium that is below the reference pressure and a positive pressure being a pressure of medium that is above the reference pressure." *Id.* at 3:17-22. Ex. 1002 at ¶¶29-32.



Fig. 3

With reference to Fig. 3, to stimulate a body part 11 using stimulation device 1, the opening of second chamber 4 is placed on body part 11 and drive unit 6 is activated to increase and decrease the volume of first chamber 3, thereby resulting in a pressure field or a stimulation pattern (as illustrated in Fig. 14a) that is applied to body part 11 via second chamber 4. *Id.* at 8:60-64, 10:2-3, 14:58-67; Ex. 1002 at ¶¶33-34.

6



Fig. 14a

In the exemplary pressure field of Fig. 14a (generated by pressure field generating arrangement 2), "[t]he broken line indicates the reference pressure, for example the currently prevailing atmospheric pressure, outside the pressure field generating arrangement (2)." Ex. 1001 at 14:51-55. The '061 patent explains that:

> [i]f the second chamber 4 is now placed on the body part 11 to be stimulated, the initially prevailing ambient pressure remains approximately constant in the pressure field generating arrangement (2). It is assumed that the second chamber 4 is placed on the body part to be stimulated such that it is largely air-tight. Once the stimulation device is activated, … the volume of the first chamber 3 and thus the overall pressure in the pressure field generating arrangement 2 are changed, with the changes in pressure being modulated onto the reference pressure.

Id. at 14:54-66. During "phases of pressure increase, air is blown against or massages the erogenous zone to be stimulated, whereas at times when a negative

7

pressure prevails the blood circulation in the body part 11, for example the clitoris, is favored." *Id.* at 15:1-6; Ex. 1002 at ¶¶35-40.



Fig. 4                    Fig. 5                    Fig. 6

With reference to Figs. 4-6, the '061 patent explains that, when second chamber 4 is sealed against body part 11, and when drive unit 6 does not expand or compress first chamber 3 (see Fig. 4), the pressure in chambers 3 and 4 is the currently prevailing atmospheric pressure (represented by the dashed line in Fig. 14a). *See* Ex. 1001 at 10:2-8, 61-63; Ex. 1002 at ¶¶35-36. And, when chamber 3 is compressed by drive unit 6 (see Fig. 6), the pressure in first chamber 3 increases above the atmospheric pressure and causes the air from first chamber 3 to flow into second chamber 4 (to equalize the pressure in chambers 3 and 4), and blow against body part 11. *See* Ex. 1001 at 10:58-59; 11:3-15; Ex. 1002 at ¶¶36-40. Conversely, when first chamber 3 is expanded, the pressure in first chamber 3 decreases below the atmospheric pressure, and the air from second chamber 4 flows into first chamber 3 (to equalize the difference in pressure in chambers 3 and 4). *See* Ex. 1001 at 10:49-60; Ex. 1002 at ¶¶36-40. This negative pressure applied

8

to body part 11 increases the blood circulation in body part 11. *See* Ex. 1001 at 10:65-11:2; Ex. 1002 at ¶40.



The '061 patent discloses multiple embodiments of pressure field generating arrangements 2, each including a first chamber 3 connected to a second chamber 4 by a connection element 5. Ex. 1001 at Figs. 4-12f and corresponding written descriptions; Ex. 1002 at ¶¶41-51. In each embodiment, second chamber 4 includes an opening for placing on body part 11, and the volume of first chamber 3 is expanded and compressed to generate the pressure field, which is communicated

9

to second chamber 4 via connection element 5, and applied to body part 11 via the opening. *Id.*



The '061 patent further discloses that stimulation device 1 has an appendage 140, which "is preferably a stimulation aid for insertion into the human body, . . . for example as a conventional dildo." Ex. 1001 at 9:22-25. In some embodiments, appendage 140 may be used as a handle to hold the stimulation device, and, further, may include a vibration device 142. *Id.* at 9:29-35, 44-47; Ex. 1002 at ¶52.

## B.    Prosecution Summary of the '061 patent

The '061 patent was filed as Application No. 15/302,981 on October 7, 2016, as a national stage application of PCT application PCT/EP2015/067017 filed on July 24, 2015, which claimed priority to German Patent Application No. 102015103694.0 filed March 13, 2015. Ex. 1003 at 471, 1187-1367, 1198-1199.

In a first Office Action, all claims were rejected. *Id*. at 189-205. In response, among other amendments, independent claims 1 and 20 were amended to recite that "the appendage is a dildo configured to be inserted into a vagina." *Id*. at 172-178. And, independent method claim 21 was similarly amended to specify that the claimed "appendage" was inserted into a "vagina." *Id*. The amended claims were subsequently allowed. *Id*. at 14, 159-163.

### C.     Prosecution Summary of Related Patent Applications

Although not identified as a progenitor or progeny of the '061 patent, the '851 patent (Ex. 1011) discloses a substantially similar stimulation device. *Compare* Ex. 1011, *with* Ex. 1001 (showing that the '061 patent and the '851 patent describes a substantially similar stimulation device). The '851 patent claims priority to German Patent No. 102013110501 ("the DE'501 patent") (Ex. 1012), which was revoked by the GPTO (*See* Ex. 1013) following opposition proceedings. Except for requiring "an appendage [that] is a dildo configured to be inserted into a vagina," revoked claim 1 of the DE'501 patent includes many of the limitations of the independent claims of the '061 patent and much more. *Compare* Ex. 1012 at 30-31, *with* Ex. 1001 at 16:23-45, 17:23-18:34. Even so, the GPTO determined that the claims of the DE'501 patent are unpatentable over prior art references, and revoked the DE'501 patent. Ex. 1013 at 2, 3, 12-13, 15.

### D.     The Prior Art

11

The claimed features of the '061 patent were well known at the time of the alleged invention. Ex. 1002 at ¶¶17, 23-28, 75-135.

### 1.    *Taylor* (Ex. 1004)

*Taylor* discloses a "sexual aid" that includes a first stimulator 154, superposed above a dildo 50, that "provides intimate engagement with and appropriate stimulation of a clitoris." Ex. 1004 at 1:48-49, 5:16-17, 29-33, Fig. 3; Ex. 1002 at ¶¶59-62.



Stimulator 154 includes a suction cup member 156 configured to "conformingly and sealingly receive the upper portion of the vulva," specifically

the clitoris.  Ex. 1004 at 5:29-33; Ex. 1002 at ¶62.  Suction cup member 156 is connected to bellows 160 via flexible conduit 162.  *Taylor* teaches that

> [a]s the arm 26 oscillates relative to the housing, the arm 26 **compresses** and **expands** the bellows 160 relative to the housing 12.  The arm 26 and bellows 160 cyclically introduce a vacuum in the volume defined by the suction cup member 156 and the portion of the vulva received therein.

Ex. 1004 at 5:29-40 (emphasis added); Ex. 1002 at ¶¶62-64.

In *Taylor*, when suction cup member 156 is "sealingly" engaged with the vulva, and bellows 160 is compressed, air pressure in bellows 160 increases above the atmospheric pressure, and this high pressure air flows through flexible conduit 162 into suction cup member 156 to blow against the vulva.  Ex. 1002 at ¶¶62-64.  Similarly, when suction cup member 156 is "sealingly" engaged with the vulva, and bellows 160 "expands," the air pressure in bellows 160 decreases below atmospheric pressure, and air flows from suction cup member 156 into bellows 160, thereby applying a suction force on the vulva.  *Id.*

### 2.    *Hovland* (Ex. 1006)

*Hovland* discloses stimulation devices for stimulating the clitoris and other body parts.  Ex. 1006 at Abstract, 8:49-54, 10:34-37, 19:39-41; Ex. 1002 at ¶65.

13



Fig. 14 illustrates one embodiment of *Hovland*'s stimulation device and Fig. 15 illustrates a method of using the stimulation device of Fig. 14. Ex. 1006 at 6:63-64. With specific reference to the embodiment of Fig. 15, *Hovland* teaches that the pump/motor assembly 300 may be turned on and vacuum cup 240 placed over the clitoris. *Id.* at 14:3-16. The pump/motor assembly 300 of *Hovland* is configured to provide "pneumatic and/or hydraulic actuation to create e.g. vibration, percussion, **subatmospheric pressure and**/or **super-atmospheric pressure**, or modulation of these effects." *Id.* at 13:20-24 (emphases added). That is, *Hovland*'s stimulation device is configured to apply a modulated sub-atmospheric pressure (i.e., pressure below atmospheric pressure) and super-atmospheric pressure (i.e., pressure above atmospheric pressure) to the clitoris and other body parts. Ex. 1002 at ¶¶66-69. *Hovland* teaches that applying a vacuum on the clitoris increases blood flow and applying increased pressure on the clitoris

14

produces percussion and/or massage.  Ex. 1006 at 8:49-52; 6:18-23, 21:40-55; Ex. 1002 at ¶¶68-69.

### 3.    *Zipper* (Ex. 1007)



Fig. 1                                    Fig. 2

*Zipper* discloses a stimulation device for sexual stimulation.  Ex. 1007 at ¶[0029], Abstract.  *Zipper*'s sexual stimulation device includes a vaginal finger 200, and a clitoral finger 300.  *Id.* at ¶[0044].  The vaginal finger 200 includes a vaginal vibrator 204 for stimulation of the G-spot, and the clitoral finger 300 includes a clitoral vibrator 304 for stimulation of the clitoris.  *Id.*  at ¶¶[0032], [0044].  *Zipper* states that, in some embodiments, the mechanical vibrators in vaginal finger 200 and/or clitoral finger 300 may be replaced with another stimulator, such as, for example, a stimulator that produces another form of stimulation, such as, "rubbing," and "pressure that varies in intensity over time." *Id.* at ¶¶ [0030], [0043].  During use, a user slidingly engages vaginal finger 200 in

15

the vagina such that vaginal finger 200 applies vibration at or near the G-spot, while clitoral finger 300 applies vibration at or near the clitoris. *Id.* at ¶[0044].



Fig. 3

Fig. 8

*Zipper*'s stimulation device also includes a keypad 403 comprising depressible control buttons used to control the stimulators in vaginal and clitoral fingers 200, 300. *Id.* at ¶¶[0046], [0064]-[0065]. These control buttons are in electrical communication with a programmable controller 501 that can be programmed to provide any combination of stimulation (on/off, intensity, etc.) of the vaginal and clitoral stimulators. *Id.* at ¶¶[0046]; Ex. 1002 at ¶¶70-72. In *Zipper*, controller 501 includes a wireless interface to remotely control the stimulation device. Ex. 1007 at ¶[0060]; Ex. 1002 at ¶¶72-73. *Zipper* states that "mechanical stimulating components other than vibrating motors [e.g., components that produce … pressure that varies in intensity over time] may be substituted for

16

vibrating motors [in the vaginal and/or clitoral fingers 200, 300] and similarly controlled." *Id.* at ¶¶[0043], [0046]. *Zipper* explains that as of at least March 2013, "wireless interfaces [were] well known in the electronic arts and, as such, do not require undue experimentation to understand and implement." *Id.* at [0060].

## VIII.  CLAIM CONSTRUCTION

The claims of the '061 patent should be construed under the Phillips standard.  37 C.F.R. § 42.100(b); *see generally Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).  Under *Phillips*, claim terms are typically given their ordinary and customary meanings, as would have been understood by a POSITA, at the time of the invention, having taken into consideration the language of the claims, the specification, and the prosecution history.  *Phillips*, 415 F.3d at 1313; *see also id.* at 1312–16.  The Board, however, only construes the claims when necessary to resolve the underlying controversy.  *Toyota Motor Corp. v. Cellport Sys., Inc.*, IPR2015-00633, Paper No. 11 at 16 (Aug. 14, 2015).  Except for the term "pressure field generating arrangement" in claim 21, Petitioner believes that no express constructions of the claims are necessary to assess whether the prior art reads on the challenged claims.[3]  Ex. 1002 at ¶¶53-54.

---

[3] Petitioner reserves all rights to raise claim construction and other arguments, including validity under 35 U.S.C. § 112, in district court.

A.    "pressure field generating arrangement"

The term "pressure field generating arrangement" of independent claim 21 should be interpreted to require "at least one first chamber and at least one second chamber having at least one opening for placing on a body part and at least one connection element that connects the first chamber to the second chamber." Ex. 1002 at ¶¶55-58.

Independent claims 1, 20, and 21 recite the term "pressure field generating arrangement." While claims 1 and 20 expressly recite that the "pressure field generating arrangement" includes "at least one first chamber; at least one second chamber having at least one opening for placing on a body part; and at least one connection element that connects the at least one first chamber to the at least one second chamber," claim 21 does not. *Compare* Ex. 1001 at 16:24-30, 17:49-18:3, *with id.* at 18:27-29. Instead, claim 21 recites the step of forming, "by a pressure field generating arrangement of the stimulation device," a pressure field. *Id.* at 18:27-29.

The specification of the '061 patent teaches that "**[a]ccording to the invention**, a pressure field generating arrangement of the stimulation device has at least one first chamber and at least one second chamber having at least one opening for placing on a body part or on the erogenous zone and at least one connection element that connects the first chamber to the second chamber." *Id.* at

18

3:5-10 (emphasis added).  Thus, the specification teaches that "pressure field generating arrangement," as used in the '061 patent, includes at least one "first chamber and at least one second chamber having at least one opening for placing on a body part [] and at least one connection element that connects the first chamber to the second chamber."  Consistent with this definition, every embodiment of the pressure field generating arrangement 2 disclosed in the '061 patent includes a first chamber 3 connected to a second chamber 4 by a connection element 5.  *See id.* at Figs. 4-12f and the corresponding written description.

Moreover, consistent with the teachings of the '061 patent's specification, claims 1 and 20 expressly require that the claimed "pressure field generating arrangement" includes "at least one first chamber; at least one second chamber having at least one opening for placing on a body part; and at least one connection element that connects the at least one first chamber to the at least one second chamber."  *Id.* at 16:24-30, 17:49-18:3.  The '061 patent does not disclose or suggest that a pressure field generating arrangement can have a different configuration.

Therefore, consistent with the clear definition of this term in specification of the'061 patent and its use in claims 1 and 20, the term "pressure field generating arrangement" of claim 21 should be interpreted to require "at least one first chamber and at least one second chamber having at least one opening for placing

19

on a body part and at least one connection element that connects the first chamber to the second chamber."

## IX.   DETAILED EXPLANATION OF GROUNDS

### A.   GROUND 1:  *TAYLOR* ANTICIPATES CLAIMS 1-3, 5, 7, 11, 14-15, 17-19, 21, AND 23-26

#### 1.   Independent Claim 1

##### i.   "A stimulation device for erogenous zones, comprising:"

*Taylor* discloses a stimulation device for erogenous zones, such as the clitoris.  Ex. 1004 at 1:6-8 (disclosing  a "sexual aid" for "sexual stimulation"); Ex. 1002 at ¶75(i).

##### ii.   "at least one pressure field generating arrangement with:"



Annotated *Taylor* Fig. 3

20

In *Taylor*'s stimulation device, first stimulator 154, positioned above a dildo 50, is configured to stimulate the clitoris. Ex. 1004 at 3:1-5, 5:28-31; Ex. 1002 at ¶75(ii). First stimulator 154 is a pressure field generating arrangement that generates and applies a cyclical vacuum phenomenon, or a pressure field, on the clitoris. Ex. 1004 at 5:28-41; Ex. 1002 at ¶¶75(ii).



Annotated *Taylor* Fig. 3 and Excerpt

"[F]irst stimulator 154 includes suction cup member 156 that conformingly and sealingly receives the upper portion of the vulva …[or] the clitoris. Suction cup member 156 is in fluid communication with bellows 160 … via flexible

21

conduit 162." Ex. 1004 at 5:29-35. In *Taylor*, motor 18 is mounted on an arm 26 that is rotatably mounted on housing 12 of the device. *Id.* at 4:33-34, 53-54; Ex. 1002 at ¶¶61, 75(ii). As output shaft 20 of motor 18 rotates, arm 26 oscillates along with motor 18 "similar to a pendulum," as indicated by the curved double-headed arrow shown in red above. Ex. 1004 at 4:37, 57-59; Ex. 1002 at ¶¶61-62, 75(ii). "As the arm 26 oscillates relative to the housing, the arm 26 **compresses** and **expands** the bellows 160 relative to the housing 12. The arm 26 and bellows 160 cyclically introduce a vacuum in the volume defined by the suction cup member 156 and the portion of the vulva received therein. The cyclical vacuum phenomenon stimulates the clitoris." Ex. 1004 at 5:34-41 (emphasis added).



Annotated Excerpt of *Taylor* Fig. 3

22

*Taylor*'s first stimulator 154, including suction cup member 156 connected to bellows 160 via flexible conduit 162, is a "pressure field generating arrangement," that generates a "cyclical vacuum phenomenon," or a cyclically varying pressure field that stimulates the clitoris.  Ex. 1002 at ¶¶62, 75(ii).

Moreover, *Taylor*'s first stimulator 154 has the same structure as the pressure field generating arrangement 2 illustrated in Fig. 11 of the '061 patent. *Compare* Ex. 1001 at Fig. 3, *with* Ex. 1001 at Fig. 11; Ex. 1002 at ¶75(ii).  In the '061 patent's pressure field generating arrangement 2, a flexible-walled first chamber 3 is connected to a second chamber 4 via a flexible hose 5 or a pipe.  Ex. 1001 at 3:11-16, 10:43-44, 13:13-19.  Likewise, in *Taylor*'s pressure field generating arrangement, the flexible-walled bellows 160 is connected to suction cup member 156 via flexible conduit 162.  Ex. 1004 at 5:33-37.  Moreover, a POSITA would have recognized that the walls of  bellows 160 must be flexible since arm 26 "compresses and expands the bellows 160 relative to the housing 12." *Id*. at 5:35-37; Ex. 1002 at ¶75(ii).



First stimulator 154 also functions in the same manner as the above-described pressure field generating arrangement 2 of the '061 patent. Ex. 1002 at ¶75(ii). In the '061 patent, the pressure field (illustrated, for example, in Fig. 14a of the '061 patent) is generated by sealing second chamber 4 against the body part to be stimulated and expanding and compressing first chamber 3. *See* Ex. 1001 at 14:49-51, 54-66. Specifically, when second chamber 4 is sealed against the body part, expansion of first chamber 3 will result in a negative pressure with respect to a reference pressure, and compression of first chamber 3 will result in a positive pressure with respect to the reference pressure. *See id.* at 10:23-24, 49-65, 11:3-15, 14:54-66; Ex. 1002 at ¶¶62-64, 75(ii). In the same manner, a "cyclical vacuum phenomenon" is created by *Taylor*'s first stimulator 154 by sealing suction cup member 156 against the vulva and compressing/expanding bellows 160. *See* Ex.

24

1004 at 5:29-31, 35-41. Thus, first stimulator 154 has the same structure and functionality as pressure field generating arrangement 2 disclosed and claimed in the '061 patent. Ex. 1002 at ¶75(ii).

### iii. (a) "at least one first chamber;"



Annotated Excerpt of *Taylor* Fig. 3

As explained above, first stimulator 154 includes suction cup member 156 and bellows 160 connected together via flexible conduit 162. *Supra* Section IX(A)(1)(ii). As also explained, as motor 18 rotates, "arm 26 compresses and expands [] bellows 160 relative to [] housing 12," and "cyclically introduce[s] a vacuum in the volume defined by the suction cup member 156 and the portion of

25

the vulva received therein." *Id.*; Ex. 1004 at 5:35-40. Thus, bellows 160

corresponds to the recited "first chamber." Ex. 1002 at ¶75(iii)(a).

### iii. (b) "at least one second chamber having at least one opening for placing on a body part; and"



Annotated Excerpt of *Taylor* Fig. 3

In first stimulator 154, suction cup member 156 corresponds to the claimed

"second chamber." Ex. 1002 at ¶¶75(iii)(b).

*Taylor* teaches that "suction cup member 156 [] conformingly and sealingly

receives the upper portion of the vulva." Ex. 1004 at 5:29-31. And, when bellows

160 compresses and expands, a vacuum is cyclically introduced "in the volume

defined by the suction cup member 156 and the portion of the vulva received

26

therein. The cyclical vacuum phenomenon stimulates the clitoris." Ex. 1004 at 5:37-41. A POSITA would have recognized that suction cup member 156 must have an opening to "conformingly and sealingly receive[] the upper portion of the vulva," for a "volume [to be] defined by the suction cup member 156 and the portion of the vulva **received therein**," so that the "cyclical vacuum phenomenon stimulates the clitoris." *Id.* at 5:38-41 (emphasis added); Ex. 1002 at ¶75(iii)(b).

> ### iii. (c) "at least one connection element that connects the at least one first chamber to the at least one second chamber;"



Annotated Excerpt of *Taylor* Fig. 3

27

*Taylor* teaches that "suction cup member 156 is in fluid communication with [] bellows 160 … via flexible conduit 162." Ex. 1004 at 5:33-35. Consequently, a POSITA would have recognized that flexible conduit 162 connects bellows 160 (i.e., the claimed "first chamber") to suction cup member 156 (i.e., the claimed "second chamber"). Ex. 1002 at ¶75(iii)(c). Thus, flexible conduit 162 corresponds to the claimed "connection element."

**iv. "a drive unit that varies the volume of the at least one first chamber such that a stimulating pressure field is generated via the at least one connection element in the at least one second chamber;"**



Annotated Excerpt of *Taylor* Fig. 3

*Taylor*'s stimulation device includes a motor 18 that rotates a lever 22 in a "vertical, disc-shaped path." Ex. 1004 at 4:20-21, 26-29. A distal end 24 of lever 22 is rotatably coupled to one end of a connecting rod 36, and the opposite end of the connecting rod 36 is pivotably mounted on housing 12. Ex. 1004 at 4:44-46, 54-57. As shown in Fig. 3, motor 18 is mounted on arm 26, and first end 28 of arm

29

26 is rotatably mounted on housing 12 such that arm 26 pivots about first end 28 "similar to a pendulum" (as illustrated by the curved double-headed arrow shown in red in the figure above).  Ex. 1004 at 4:33-37, 52-54.  "As the output shaft 20 [of motor 18] rotates, the lever 22 urges the connecting rod 36 against the housing 12, oscillating the arm 26 along with the motor 18."  *Id.* at 4:57-59.  "As the arm 26 oscillates relative to the housing, the arm 26 compresses and expands the bellows 160 relative to the housing 12."  *Id.* at 5:35-37.  As a POSITA would have recognized, when bellows 160 "compresses," its volume decreases, and when "bellows 160 "expands," its volume increases.  Ex. 1002 at ¶75(iv).  As previously explained, bellows 160 corresponds to the claimed "first chamber."  *Supra* Section IX(A)(1)(iii)(a).  Thus, when motor 18 rotates, the volume of *Taylor*'s "first chamber" increases and decreases (i.e. varies).  Ex. 1002 at ¶75(iv).  Therefore, *Taylor*'s motor 18 (with our without arm 26) corresponds to the claimed "drive unit."

30



**Annotated Excerpt of *Taylor* Fig. 3**

In *Taylor*, when motor 18 "compresses and expands the bellows 160 relative to the housing 12," the resulting increase and decrease in the volume of bellows 160 "cyclically introduce[s] a vacuum in the volume defined by the suction cup member 156 and the portion of the vulva received therein. The cyclical vacuum phenomenon stimulates the clitoris." Ex. 1004 at 5:29-41. The "cyclical vacuum phenomenon" in suction cup member 156 as a result of "compress[ion] and expan[sion] [of] the bellows 160" corresponds to the claimed "stimulating pressure field" that stimulates the clitoris received in suction cup member 156. Ex. 1002 at ¶75(iv). Since "suction cup member 156 is in fluid communication with [] bellows 160" only via flexible conduit 162 (i.e., the claimed "connection element"), the

31

stimulating pressure field generated in suction cup member 156, as a result of the compression and expansion of bellows 160, is communicated from bellows 160 to suction cup member 156 via flexible conduit 162. *Id.* Thus, the varying pressure field is generated within suction cup member 156 via flexible conduit 162.

As will be explained below, this stimulating pressure field generated in suction cup member 156 comprises a pattern of negative and positive pressures modulated with respect to a reference pressure. *See infra* Section IX(A)(1)(vii).

### v. "a control device that activates the drive unit; and"



Annotated *Taylor* Fig. 2

As explained above, electric motor 18 corresponds to the claimed "drive unit." *Supra* Section IX(A)(1)(iv). As illustrated in the figure above, *Taylor*'s device includes a plug that a POSITA would have recognized is for plugging into a

32

power source (e.g., a conventional electrical wall outlet) to activate (e.g., turn on/off) motor 18. Ex. 1002 at ¶75(v). This plug is the claimed "control device" that "activates" motor 18. *Id.*

Further, although not described in *Taylor*, a POSITA would have recognized that *Taylor*'s stimulation device must include an "on/off" switch to control operation of the various stimulation devices. *Id.*

### vi. "an appendage;"



Annotated *Taylor* Fig. 3

*Taylor*'s stimulation device includes "dildo 50 [configured to be] slidingly received in the user's vagina 52." Ex. 1004 at 5:3-9. Dildo 50 corresponds to the

33

claimed "appendage."  Ex. 1002 at ¶75(vi).

> **vii. "wherein the stimulating pressure field generated in the at least one second chamber comprises a pattern of negative and positive pressures, modulated onto with respect to a reference pressure;"**

As explained previously, the "cyclical vacuum phenomenon" generated in suction cup member 156 (which corresponds to the claimed "second chamber") corresponds to the claimed "stimulating pressure field."  *See supra* Section IX(A)(1)(iv).  As explained below, this "cyclical vacuum phenomenon" in suction cup member 156 comprises a pattern of negative and positive pressures, modulated with respect to a reference pressure.

 

Annotated Excerpt of *Taylor* Fig. 3

*Taylor* states that "suction cup member 156 [ ] conformingly and **sealingly** receives the upper portion of the vulva." Ex. 1004 at 5:30-31 (emphasis added); Ex. 1002 at ¶75(vii). When suction cup member 156 is sealed against the vulva, and bellows 160 is not compressed or expanded, air within bellows 160 and suction cup member 156 is at atmospheric pressure (i.e., at a reference pressure). Ex. 1002 at ¶¶62-64, 75(vii). When arm 26 compresses bellows 160" (as shown in the left figure above) with suction cup member 156 "sealingly" engaged with the vulva, the volume within bellows 160 is reduced. *Id*. As a result, air within bellows 160 is pushed out of bellows 160, through flexible conduit 162, and into suction cup member 156. *Id*. And, since the volume within suction cup member 156 is fixed as a result of sealingly receiving the vulva, the pressure within suction cup member increases above atmospheric pressure (i.e., at a positive pressure with respect to the reference pressure). Ex. 1004 at 5:30-31, 36-37; Ex. 1002 at ¶75(vii). In contrast, when arm 26 expands bellows 160 (as shown in the right figure above) with suction cup member 156 "sealingly" engaged with the vulva, the volume within bellows 160 increases, and air from suction cup member 156 rushes out of suction cup member 156, through flexible conduit 162, and into bellows 160. Ex. 1002 at ¶75(vii). Consequently, the pressure within suction cup member 156 is reduced below atmospheric pressure (i.e., at a negative pressure with respect to the reference pressure). *Id*. Thus, during time periods of "vacuum"

35

in suction cup member 156, the pressure of the air in suction cup member 156 is

negative with respect to a reference pressure, and during the time periods in

between two successive vacuum time periods, the pressure of air in suction cup

member 156 is above the reference pressure, or positive with respect to the

reference pressure. Thus, the pressure field generated in suction cup member 156,

by the compression and expansion of bellows 160, "comprises a pattern of negative

and positive pressures, modulated with respect to a reference pressure." *Id.*



As explained previously, first stimulator 154 has the same structure and

functions in the same manner as the '061 patent's pressure field generating

arrangement 2 (e.g., illustrated in its Fig. 11). *See supra* Section IX(A)(1)(ii); Ex.

1002 at ¶75(vii). Since pressure field generating arrangement 2 of the '061 patent

and first stimulator 154 of *Taylor* have the same structure and function in the same

36

manner, both will generate a similar pressure field (i.e., "a pressure field that comprises a pattern of negative and positive pressures, modulated with respect to a reference pressure"). Ex. 1002 at ¶75(vii).

It should be noted that the term "onto" in this limitation is erroneously included in the publication of the '061 patent since it was deleted during prosecution of the '061 patent. Ex. 1003 at 172.

> viii. "wherein the at least one first chamber is connected to the at least one second chamber solely by the at least one connection element, and"



Annotated Excerpt of *Taylor* Fig. 3

As previously explained, bellows 160 corresponds to the claimed "first chamber," suction cup member 156 corresponds to the claimed "second chamber,"

and flexible conduit 162 corresponds to the claimed "connection element." *Supra* Sections IX(A)(1)(iii)(a)-IX(A)(1)(iii)(c).  Bellows 160 is connected to suction cup member 156 solely by flexible conduit 162.  Ex. 1004 at 5:33-35; Ex. 1002 at ¶75(viii).  Since no other connection exists between bellows 160 and suction cup member 156, flexible conduit 162 is the sole "connection element" therebetween. Ex. 1002 at ¶75(viii).

### ix. "wherein the appendage is a dildo configured to be inserted into a vagina."

Dildo 50 corresponds to the claimed "appendage."  *Supra* Section IX(A)(1)(vi).  *Taylor* teaches that "dildo 50 is slidingly received in the user's vagina."  Ex. 1004 at 5:3-9.  Thus, dildo 50 is configured for insertion into the vagina.  Ex. 1002 at ¶75(ix).

### 2.    Claim 2

i.  "The stimulation device as claimed in claim 1, wherein at least one opening of the at least one connection element is opposite the body part to be stimulated and is directed towards the body part to be stimulated."



Annotated Excerpt of *Taylor* Fig. 3

As explained above, flexible conduit 162 corresponds to the claimed "connection element." *Supra* Section IX(A)(1)(iii)(c). *Taylor* teaches that "suction cup member 156 is in fluid communication with a bellows 160 ... via flexible conduit 162. [And,] [a]s the arm 26 oscillates relative to the housing, the arm 26 compresses and expands the bellows 160 ... [and] cyclically introduce[s] a vacuum in the volume defined by the suction cup member 156 and the portion of the vulva received therein. The cyclical vacuum phenomenon stimulates the

39

clitoris." Ex. 1004 at 5:33-41. A POSITA would have recognized that in order for flexible conduit 162 to provide fluid communication between bellows 160 and suction cup member 156, flexible conduit 162 must include at least one opening to provide that communication. Moreover, a POSITA would have recognized that, for the compression and expansion of bellows 160 to result in a cyclical vacuum phenomenon in suction cup member 156, flexible conduit 162 must have an opening into the volume defined by suction cup member 156 (and an opening into bellows 160). Ex. 1002 at ¶76.



Annotated Excerpt of *Taylor* Fig. 3

*Taylor* states that "suction cup member 156 [] conformingly and sealingly receives the upper portion of the vulva." Ex. 1004 at 5:30-31. A POSITA would

have recognized that the vulva is sealingly received in an opening on the free end of suction cup member 156, as illustrated above. Ex. 1002 at ¶76. As shown above, the opening of flexible conduit 162 into suction cup member 156 is positioned opposite the opening of suction cup member 156 which is to receive the vulva (the body part to be stimulated). Thus, the opening of flexible conduit 162 into suction cup member 156 is directed towards the body part to be stimulated.

### 3. Claim 3

> **i. "The stimulation device as claimed in claim 1, wherein the at least one second chamber is at least one of:**
> **a flexible material,**
> **a transparent material, or**
> **fitted to the shape of a vaginal labia minora such that the vaginal labia minora is completely covered by the opening of the at least one second chamber."**

Suction cup member 156 corresponds to the claimed "second chamber." *Supra* Section IX(A)(1)(iii)(b).

Further, *Taylor* teaches that "suction cup member 156 [] **conformingly** and sealingly receives the upper portion of the vulva." Ex. 1004 at 5:30-31 (emphasis added). A POSITA would have recognized that the upper portion of the vulva has a non-planar topology, and for suction cup member 156 to "conformingly and sealingly receive[] the upper portion of the vulva," suction cup member 156 must be flexible. Ex. 1002 at ¶77. Furthermore, *Taylor* contemplates that its stimulation device will be used by different people. See Ex. 1004 at 1:44-49; Ex. 1002 at ¶77.

A POSITA would also have recognized that for suction cup member 156 to "conformingly and sealingly" receive the upper portion of the vulva of different users (at least some of whom will have a different surface topology in this region of the body), suction cup member 156 must be flexible. *Id.*

### 4. Claim 5

> **i. "The stimulation device as claimed in claim 1, wherein the at least one second chamber of the stimulation device is arranged to be replaceable."**

Suction cup member 156 corresponds to the claimed "second chamber." See *supra* Section IX(A)(1)(iii)(b). *Taylor* states that "suction cup member 156 … may be detached from the housing 12." Ex. 1004 at 5:53-55. Based on this teaching, a POSITA would have recognized that suction cup member 156 is arranged such that it may be removed/replaced. Ex. 1002 at ¶78. Therefore, suction cup member 156 "is arranged to be replaceable."

### 5. Claim 7

> **i. "The stimulation device as claimed in claim 1, wherein the at least one second chamber has a sealing support part for enlarging a contact surface of the at least one second chamber on skin."**

Suction cup member 156 corresponds to the claimed "second chamber." See *supra* Section IX(A)(1)(iii)(b).

42



**Annotated Excerpt of *Taylor* Fig. 3**

*Taylor* teaches that "suction cup member 156 [] **conformingly and sealingly** receives the upper portion of the vulva." Ex. 1004 at 5:30-31 (emphasis added). Based on this teaching, a POSITA would have recognized that when suction cup member 156 is brought into initial contact with a user's vulva, only the outermost peripheral rim of suction cup member 156 touches the user's skin. Ex. 1002 at ¶79. However, as suction cup member 156 is pressed into the user so as to "conformingly and sealingly" engage with the user's vulva, the walls of suction cup member156 will deform such that a greater surface area of those walls comes into contact with the vulva. *Id.* Thus, the walls and peripheral rim of *Taylor*'s

suction cup member 156 correspond to the claimed "sealing support part for enlarging a contact surface of the at least one second chamber on skin." *Id.*

### 6. Claim 11

#### i. "The stimulation device as claimed in claim 1, wherein the stimulation device is a hand-held device."

*Taylor* states that the stimulation device "is readily mobile" and "portable." Ex. 1004 at 3:36-37, 5:51, 6:2. *Taylor* teaches that the device's

> housing 12 includes a first handle 14 for convenient transportation thereof. Preferably, the first handle 14 is situated in the front of the housing 12, providing the user with convenient means for optimal positioning of the invention 10. Additionally, the housing 12 may include two second handles 15. The second handles 15 provide the user with means for maintaining the user's position relative to the invention 10 and/or adjusting the attitude of the invention 10 to suit the user's purposes.

*Id.* at 4:2-10. That is, *Taylor*'s device includes handles 14 and 15 to aid a user in holding the device by hand during use. Ex. 1002 at ¶80. Thus, a POSITA would have recognized that *Taylor*'s stimulation device is a "hand-held device."

### 7. Claim 14

      **i. "The stimulation device as claimed in claim 1, wherein the appendage is a stimulation aid for insertion into a human body."**

Dildo 50 corresponds to the claimed "appendage." *Supra* Section IX(A)(1)(vii). *Taylor* teaches that dildo 50 is slidingly received in a vagina lengthwise, and that "dildo 50 defines an arcuate path generally coincident with the user's vagina," because "[r]hythmic pressure against the walls of the vagina [by dildo 50] … is known to have a more stimulating effect." Ex. 1004 at 6:31-33, 44-46. Thus, dildo 50 is a stimulation aid for insertion into a human body. Ex. 1002 at ¶81.

### 8. Claim 15

      **i. "The stimulation device as claimed in claim 1, wherein the appendage has a vibration device."**

*Taylor*'s dildo 50 corresponds to the claimed "appendage." *Supra* Section IX(A)(1)(vii). *Taylor* teaches that "dildo 50 may include vibration means (not shown) for imparting vibration therein." Ex. 1004 at 5:6-7. Thus, dildo 50 includes a vibration device. Ex. 1002 at ¶82.

### 9. Claim 17

45

i. **"The stimulation device as claimed in claim 1, wherein the stimulation device is configured in size, movability and shape to fit a female anatomy such that the at least one pressure field generating arrangement is configured to indirectly stimulate a clitoris of a woman while the appendage is configured to simultaneously be inserted into a vagina of the woman."**

As explained above, first stimulator 154 corresponds to the claimed "pressure field generating arrangement," and dildo 50 corresponds to the claimed "appendage." *Supra* Sections IX(A)(1)(ii), IX(A)(1)(vi). *Taylor* contemplates using its stimulation device in a manner that provides "**simultaneous engagement with and excitation of the vagina and clitoris.**". Ex. 1004 at 5:19-22 (emphasis added).

46



Annotated *Taylor* Fig. 3

In *Taylor*, "dildo 50 is slidingly received in the user's vagina," and "suction cup member 156 [] conformingly and sealingly receives … the clitoris." *Id.* at 5:7-8, 29-33. The figure above also shows that dildo 50 is positioned and oriented with respect to suction cup member 156, such that the clitoris is received in suction cup member 156 when dildo 50 is received in the vagina. See, e.g., *id.* at 6:31-37; *see also id.* at 5:15-26; Ex. 1002 at ¶83. Thus, during use of *Taylor's* device, suction

47

cup member 156 "conformingly and sealingly receives" a user's clitoris for stimulation when dildo 50 is received in the user's vagina. *See* Ex. 1004 at 5:16-22, 30-41; Ex. 1002 at ¶83.

Therefore, first stimulator 154 (which includes bellows 160, suction cup member 156, and conduit 162) is configured to indirectly stimulate a clitoris via the cyclical vacuum phenomenon generated within suction cup member 156 while dildo 50 (which corresponds to the claimed "appendage") is configured for simultaneous insertion into the vagina. Ex. 1002 at ¶83.

### 10. Claim 18

**i. "The stimulation device as claimed in claim 1, wherein the appendage is a handle for holding the stimulation device."**

Dildo 50 corresponds to the claimed "appendage." *Supra* Section IX(A)(1)(vii).



Annotated *Taylor* Fig. 3

Housing 12 of *Taylor*'s stimulation device "includes a first handle 14" for transportation and for positioning of the device. Ex. 1004 at 4:2-6. "Additionally, the housing 12 may include two second handles 15" for positioning the device. *Id.* at 4:6-10; Ex. 1002 at ¶84. *Taylor* states that housing 12 and legs 16 are detachable to "render []the invention 10 more easily transportable." *Id.* at 4:18-19. A POSITA would have recognized that since handles 14 and 15 are attached to housing 12, when housing 12 (and legs 16) is detached to make the stimulation

49

device "more easily transportable," handles 14 and 15 also will be removed, and therefore can no longer be used to transport the stimulation device. Ex. 1002 at ¶84. A POSITA would have recognized that, in this configuration (i.e., when housing 12 is detached), dildo 50 can be used as a handle for holding and/or positioning the stimulation device. *Id.* A POSITA also would have recognized that the shape and configuration of dildo 50 makes it well-suited to be grasped in a user's hand for use as a handle for holding *Taylor*'s stimulation device during use and/or for transportation/positioning. *Id.*



Annotated Figs. 1 and 2 of the '061 patent

With reference to the figures above, the '061 patent states that "appendage 140 may take a form such that it can also be used as a handle in order to hold the stimulation device 1 comfortably." Ex. 1001 at 9:28-30. That is, in the '061

patent, appendage 140 serves as a handle only due to its form, i.e., appendage 140 includes a configuration well-suited to being grasped by a user's hand. Ex. 1002 at ¶84. A POSITA would have considered the shape of *Taylor*'s dildo 50 to be comparable to the shape of the '061 patent's appendage 140. *Id*. Therefore, the POSITA would have recognized that dildo 50 can also be used as a handle for holding and/or positioning *Taylor*'s stimulation device in much the same manner as appendage 140 is used as a handle for holding the '061 patent's stimulation device. *Id*.

### 11. Claim 19

#### i. "The stimulation device as claimed in claim 1, wherein the appendage is an elongate lens-shaped body configured to be inserted into the vagina."

As explained above, *Taylor*'s dildo 50 corresponds to the claimed "appendage." *Supra* Section IX(A)(1)(vii).



FIG. 3

Appendage

Annotated *Taylor* Fig. 3

*Taylor* states that "dildo 50 ha[s] a predetermined length … [and] may assume any shape or texture, respecting the user's preferences." Ex. 1004 at 5:3-6. *Taylor* also states that "[i]n operation, the dildo 50 is slidingly received in a vagina lengthwise." *Id.* at 6:31-32, 3:16-17. That is, dildo 50 is an elongate body that is configured to be inserted into the vagina. Ex. 1002 at ¶85.

52



Figs. 1 and 2 of the '061 patent

With regard to the appendage being "lens-shaped," the background of the invention section of '061 patent states that "appendage (140) is an elongate, lens-shaped or pillow-shaped body which is adapted such that the appendage can be inserted smoothly into the female vagina." Ex. 1001 at 6:51-54.  Figs. 1-2 of the '061 patent illustrate stimulation devices with an appendage 140. Ex. 1001 at 7:5-55, 8:26-32.  Additionally, the '061 patent teaches that "appendage 140 is shaped for example as a conventional dildo." *Id.* at 9:24-25.  *Taylor*'s dildo 50 is also shaped like a conventional dildo and is configured to be inserted into the vagina. *See* Ex. 1004 at 6:31-32; Ex. 1002 at ¶85.  Moreover, a POSITA would have considered *Taylor*'s dildo 50 to be shaped similar to the '061 patent's appendage 140.  Therefore, a POSITA would have considered *Taylor*'s dildo 50 to also be "lens-shaped," as the term is used in the '061 patent.

53

### 12. Independent Claim 21

#### i. "A method for stimulating erogenous zones for sexual pleasure, comprising:"

*Taylor* discloses a method of using a "sexual aid" for "sexual stimulation" of the vagina, clitoris, and anus.  Ex. 1004 at 1:6-8, 2:52-53.  A POSITA would have readily recognized that the clitoris and vagina make up a portion of the female erogenous zones.  Ex. 1002 at ¶86(i).  Thus, *Taylor* discloses a method for stimulating erogenous zones for sexual pleasure.  *Id*.

#### ii. "inserting an appendage of a stimulation device into a vagina;"

*Taylor*'s sexual aid includes an appendage in the form of a dildo 50.  Ex. 1004 at 5:3-4.  "In operation, the dildo 50 is slidingly received in a vagina lengthwise."  *Id.* at 6:31-32, 5:3:16-17, 5:7-8.  Therefore, *Taylor* discloses inserting an appendage (i.e., dildo 50) into the vagina.  Ex. 1002 at ¶86(ii).

### iii. "forming, by a pressure field generating arrangement of the stimulation device, a pressure field directed towards a body part; and"



Annotated *Taylor* Fig. 3 and Excerpt

As previously explained, *Taylor*'s sexual aid invention 10 includes a first stimulator 154 that generates a varying pressure field that is directed to and applied to the clitoris received within suction cup member 156. *See supra* Section IX(A)(1)(ii); Ex. 1004 at 5:28-41.

55

More particularly, *Taylor* teaches that "first stimulator 154 includes a suction cup member 156 that conformingly and sealingly receives the upper portion of the vulva.  The suction cup member 156 of the first stimulator 154 is more specifically directed at receiving the clitoris.  The suction cup member 156 is in fluid communication with a bellows 160 … via flexible conduit 162." *Id*. at 5:29-35.

*Taylor* then goes on to teach that its drive mechanism includes a motor 18 mounted on an arm 26 that is rotatably mounted on the housing 12 of the device. *Id*. at 4:33-34, 53-54.  As the output shaft 20 of the motor 18 rotates, the arm 26 oscillates along with the motor 18 "similar to a pendulum," as indicated by the double-headed arrow shown in red in the figure above.  *Id*. at 4:37, 57-59.  "As the arm 26 oscillates relative to the housing, the arm 26 compresses and expands the bellows 160 relative to the housing 12.  The arm 26 and bellows 160 cyclically introduce a vacuum in the volume defined by the suction cup member 156 and the portion of the vulva received therein." *Id*. at 5:35-40.  "The cyclical vacuum phenomenon stimulates the clitoris." *Id*. at 5:40-41.  As explained previously, a POSITA would have recognized that the "cyclical vacuum phenomenon" corresponds to the claimed "pressure field." *See supra* Section IX(A)(1)(iv); Ex. 1002 at ¶86(iii).

56

As also explained previously, consistent with the definition of the term "pressure field generating arrangement" in the specification of the '061 patent, and consistent with the usage of that term in other claims (e.g., claims 1 and 20) of the '061 patent, the term "pressure field generating arrangement" of this claim should be interpreted to require "at least one first chamber and at least one second chamber having at least one opening for placing on a body part and at least one connection element that connects the first chamber to the second chamber." *Supra* Section VIII(A).



**Annotated Excerpt of *Taylor* Fig. 3**

In *Taylor*'s first stimulator 154, bellows 160 corresponds to the claimed "first chamber," suction cup member 156 corresponds to the claimed "second

57

chamber," and the flexible conduit 162 that connects bellows 160 to the suction cup member corresponds to the claimed "connection element." *See supra* Sections IX(A)(1)(iii)(a), IX(A)(1)(iii)(b), IX(A)(1)(iii)(b). Thus, *Taylor*'s first stimulator 154 corresponds to the claimed "pressure field generating arrangement." *See supra* Section IX(A)(1)(ii).

It should be noted that even if the term "pressure field generating arrangement" is broadly interpreted to refer to any arrangement that generates a pressure field, *Taylor*'s first stimulator 154 is a "pressure field generating arrangement" because it generates a cyclically varying pressure field in the form of the "cyclical vacuum phenomenon" that stimulates the clitoris, as explained above. *See* Ex. 1004 at 5:5:35-41; Ex. 1002 at ¶86(iii).

As explained with reference to claim 1, *Taylor*'s first stimulator 154 (which includes bellows 160 and suction cup member 156 connected together by flexible conduit 162) has the same structure and functions in the same manner as the pressure field generating arrangement 2 illustrated in Fig. 11 and claimed in the '061 patent. *See supra* Section IX(A)(1)(ii); Ex. 1002 at ¶86(iii).

Since, the cyclically varying pressure field generated by *Taylor*'s first stimulator 154 "stimulates the clitoris," a person or ordinary skill in the art would have recognized that the cyclical vacuum phenomenon (which corresponds to the

58

claimed "pressure field") generated by the expansion and compression of bellows 160 is in fact directed to the clitoris of a user. Ex. 1002 at ¶86(iii).



Annotated Excerpt of *Taylor* Fig. 3

Indeed, as evident from the figure above, because the opening of flexible conduit 162 into the suction cup member 156 is positioned directly opposite the vulva/clitoris received therein, a POSITA would have understood that the varying pressures generated from bellows 160 are directed towards the body part received within suction cup member 156. *Id.*

Thus, *Taylor* discloses forming, by a pressure field generating arrangement of the sexual aid, a pressure field that is directed towards a body part.

59

> iv. **"modulating, by a drive unit of the stimulation device interacting with the pressure field generating arrangement, the pressure field in a pattern of negative and positive pressures with respect to a reference pressure."**



Annotated Excerpt of *Taylor* Fig. 3

As explained previously with reference to claim 1, *Taylor*'s stimulation device includes a "drive unit" in the form of an electric motor 18 mounted on an arm 26, and when motor 18 rotates, the arm 26 oscillates and "compresses and expands the bellows 160." Ex. 1004 at 4:33-37, 52-59, 5:35-37; *see supra* Section

60

IX(A)(1)(iv). That is, operation of electric motor 18 results in compression and expansion of bellows 160 of first stimulator 154 (which corresponds to the claimed "pressure field generating arrangement"). Ex. 1002 at ¶86(iv). Thus, by describing the effect of motor 18 on bellows 160, *Taylor* teaches that operation of electric motor 18 (i.e., the claimed "drive unit") results in interaction with first stimulator 154 (i.e., the claimed "pressure field generating arrangement").



**Annotated Excerpt of *Taylor* Fig. 3**

In *Taylor*'s first stimulator 154, suction cup member 156 is connected to bellows 160 via the flexible conduit 162, and suction cup member 156 "conformingly and sealingly receives" the upper portion of the vulva or the clitoris. Ex. 1004 at 5:29-35. When motor 18 (i.e., the claimed "drive unit") "compresses

61

and expands the bellows 160," a vacuum is cyclically introduced into "the volume defined by the suction cup member 156 and the portion of the vulva received therein.  The cyclical vacuum phenomenon stimulates the clitoris."  *Id.* at 5:29-41. Thus, the expansion and compression of bellows 160 generates the described cyclical vacuum phenomenon, i.e., the claimed "pressure field".  Id; Ex. 1002 at ¶86(iv).

As also explained previously with reference to claim 1, the "cyclical vacuum phenomenon" in the suction cup member 156 is a pressure field that comprises a pattern of negative and positive pressures modulated with respect to a reference pressure.  *See supra* Section IX(A)(1)(vii); Ex. 1002 at ¶86(iv).

### 13.  Claim 23

#### i.  "The method for stimulating erogenous zones as claimed in claim 21, wherein the modulating is pulsed."

As discussed with respect to claims 1 and 21, operating electric motor 18 (i.e., the claimed "drive unit") to compress and expand bellows 160 results in a pattern of negative and positive pressures modulated with respect to a reference pressure within suction cup member 156.  *See supra* Sections IX(A)(1)(vii), IX(A)(11)(iv).

62



Annotated Excerpt of *Taylor* Fig. 3

In *Taylor*, a first end 28 of arm 26 is rotatably mounted on the housing 12, and operation of the electric motor 18 causes "the arm 26 to **cyclically** pivot about the pivot point, or first end 28, of the arm 26," as illustrated by the curved double-headed arrow shown in read in the figure above.  Ex. 1004 at 4:49-50 (emphasis added).  "As the arm 26 oscillates relative to the housing, the arm 26 compresses and expands the bellows 160 relative to the housing 12 ... [to] **cyclically** introduce a vacuum in the volume defined by the suction cup member 156."  *Id.* at 5:35-39

63

(emphasis added).  Accordingly, *Taylor* teaches that the "vacuum phenomenon" generated in suction cup member 156 (by the cyclical motion of arm 26) is "cyclical."  Ex. 1004 at 5:37-41.  Based simply of this teaching of "cyclical," a POSITA would have readily recognized that the use of the term "cyclical" was intended to refer to repeatedly alternating the varying pressures introduced into suction cup member 156.  Ex. 1002 at ¶87.

As explained with reference to independent claim 1, during the cyclical time periods of "vacuum" in suction cup member 156, the pressure of the air in suction cup member 156 is negative with respect to the prevailing atmospheric pressure (reference pressure), and during the time periods in between two successive vacuum time periods, the pressure of air in suction cup member 156 is above the reference pressure, or positive with respect to the reference pressure.  *See supra* Section IX(A)(1)(vii); Ex. 1002 at ¶87.  Accordingly, based on the teaching that bellows 160 is cyclically compressed and expanded, a POSITA would have understood that the positive and negative pressures generated in suction cup 156 are pulsed in a cyclical or oscillatory manner.  Ex. 1002 at ¶87.

### 14.    Claim 24

> i. **"The method for stimulating erogenous zones as claimed in claim 21, further comprising: placing a chamber of the pressure field generating arrangement over the body part."**

As explained with reference to independent claim 21, *Taylor*'s first stimulator 154 corresponds to the claimed "pressure field generating arrangement." *Supra* Section IX(A)(11)(iii).

*Taylor* teaches that "first stimulator 154 includes a suction cup member 156 that conformingly and sealingly receives the upper portion of the vulva … [or] the clitoris," and the compression and expansion of bellows 160 "stimulates the clitoris." Ex. 1004 at 5:29-41. That is, *Taylor* discloses placing a chamber (i.e., suction cup member 156) of first stimulator 154 (which corresponds to the claimed "pressure field generating arrangement") over the clitoris (i.e., the claimed "body part"). Ex. 1002 at ¶88.

### 15. Claim 25

> i. **"The method for stimulating erogenous zones as claimed in claim 21, wherein the appendage vibrates after insertion."**

As discussed with reference to independent claim 21, dildo 50 corresponds to the claimed "appendage." *Supra* Section IX(A)(11)(ii). *Taylor* states that the "dildo 50 is slidingly received in the user's vagina 52," and that "dildo 50 may include vibration means (not shown) for imparting vibration therein." Ex. 1004 at

5:6-9, 7:4-6.  Thus, *Taylor* contemplates vibrating dildo 50 when it is "slidingly received in the user's vagina."  Ex. 1002 at ¶89.

### 16.    Claim 26

#### i.    "The method for stimulating erogenous zones as claimed in claim 21, wherein the body part is a clitoris."

In *Taylor*, "suction cup member 156 of the first stimulator 154 is more specifically directed at receiving the clitoris," and the "cyclical vacuum phenomenon stimulates the clitoris."  Ex. 1004 at 5:31-33, 40-41.  Thus, *Taylor* discloses that the body part that receives the generated pressure field is a clitoris.  Ex. 1002 at ¶90.

### B.    GROUND 2:  *TAYLOR* IN VIEW OF *HOVLAND* RENDERS OBVIOUS CLAIMS 1-3, 5, 7, 8, 11, 14, 17-19, 21-24, AND 26

#### 1.    Independent Claims 1 and 21

As discussed above with reference to independent claims 1 and 21, *Taylor* discloses each and every limitation of these claims.  *See supra* Sections IX(A)(1), IX(A)(11).

However, if it is argued that compression and expansion of *Taylor*'s bellows 160 somehow does not result in a pattern of negative and positive pressures, modulated with respect to a reference pressure, as required by claims 1 and 21, it would have been obvious to a POSITA to modify *Taylor*'s stimulation device with the teachings of *Hovland* to apply modulated super-atmospheric pressure along

with *Taylor*'s "cyclical vacuum" (i.e., sub-atmospheric pressure) to achieve the benefits described by *Hovland*.  Ex. 1002 at ¶¶91-96.

*Hovland* discloses multiple electrically operated, hand-held stimulation devices that may be used to stimulate many body parts including a clitoris.  Ex. 1006 at Abstract, 8:49-54, 9:40-43; Ex. 1002 at ¶¶93-94.  *Hovland* states that "[e]mbodiments of the invention increase blood flow by creating a vacuum around **and**/or **using increasing pressure** to produce percussion and/or massage of e.g., the clitoris."  Ex. 1006 at 8:49-52 (emphases added); *see also id.* at 6:18-23, 21:40-55.  Like the application of vacuum or suction, *Hovland* recognizes that percussion or massage of the clitoris caused by the application of super-atmospheric pressures also can increase blood flow and promote engorgement of the clitoris.  Ex. 1006 at 4:22-29; Ex. 1002 at ¶¶93-94.  In fact, *Hovland* discloses that it is well known that a "pressure differential [in the clitoris] tends to promote engorgement of the clitoris with blood and/or otherwise stimulate blood flow, providing [] benefits . . . while increasing the likelihood of short-term pleasurable effect and beneficial longer-term usage."  *Id.*

67



Fig. 15

With reference to the embodiment of Fig. 15 reproduced above, *Hovland* teaches that device 200 may be activated to turn on its pump/motor assembly 300 and a vacuum cup 240 of device 200 placed over the clitoris. *See* Ex. 1006 at 14:3-16. The pump/motor assembly 300 is configured to provide "pneumatic and/or hydraulic actuation to create e.g. vibration, percussion, **subatmospheric pressure and**/or **super-atmospheric pressure**, or **modulation of these effects**." *Id.* at 13:20-24 (emphases added); see also *id.* at 15:23-24.

Based on *Hovland*'s disclosure, a POSITA would have readily recognized that *Hovland*'s reference to "subatmospheric pressure," "suction", and "vacuum" is intended to encompass "pressure levels lower than atmospheric or ambient." *Id.* at 21: 47-50. A POSITA also would have understood that *Hovland*'s reference to super-atmospheric pressure for providing "percussion or massage" is intended to

68

encompass "pressures higher than ambient or atmospheric." *Id.* at 21: 50-52; Ex. 1002 at ¶¶93-96.

Therefore, even if it is argued that *Taylor*'s stimulation device only applies a cyclic vacuum (i.e., alternating sub-atmospheric pressure with periods of ambient pressures in between) to the clitoris, it would have been obvious to a POSITA to modify *Taylor*'s stimulation device with the teachings of *Hovland* to apply both modulated sub-atmospheric **and** super-atmospheric pressures to clitoris, to take advantage of percussion and/or massage of the clitoris, in order to achieve improved and quicker clitoral engorgement and tumescence known to result from a pressure differential in the clitoris and/or surrounding areas. *Id.* at 4:19-28 (emphasis added). Moreover, modification of *Taylor* with the teachings of *Hovland* would have amounted to nothing more than the use of a known technique to improve a similar device, and the results of the modification would have been predictable. *See KSR Int'l. Co. v. Teleflex, Inc.*, 550 U.S. 398, 417 (2007). This is because at the time of the invention, a POSITA would have had the requisite skill level to readily modify the device disclosed by *Taylor* to implement the teachings of *Hovland* without any problem.

As also discussed above with reference to independent claim 1, *Taylor* depicts an electrical plug in Fig. 2 that a POSITA would have recognized as a "control device" that "activates the drive unit" (i.e., electric motor 18) because it

69

controls the supply of power to motor 18. *See supra* Sections IX(A)(1)(v).

However, even if it is argued that *Taylor*'s plug does not correspond to the claimed "control device" because it somehow is not for "activat[ing] the drive unit," it would have been obvious for a POSITA to provide *Taylor*'s stimulation device with a control device to control its motor based on preexisting knowledge in the art. Ex. 1002 at ¶97. For example, *Hovland*'s stimulation device includes an on/off switch 30 operatively coupled to control electronics 80 to activate and control the pump/motor assembly of the device. Ex. 1006 at 10:19-28, 11:15-17. Based on the teachings of *Hovland*, it would have been obvious for a POSITA to provide *Taylor*'s stimulation device with one or both of an "on/off switch" and "control electronics 80" to activate and control *Taylor*'s motor 18. As explained by *Hovland*, "electronics 80 can include vacuum regulation protocols," and the user "or partner activates device 200 by activating on/off switch 270, turning pump/motor assembly 300 on and thereby drawing air into and through applicator 220." *Id.* at 10:52-54. 14:3-10. Therefore, based on *Hovland*'s teachings and common knowledge in the art, it would have been obvious to a POSITA to provide *Taylor*'s stimulation device with one or both of *Hovland*'s electronics 80 (to regulate the pressures applied to the clitoris and other stimulation provided to the user, for example, based on user's preferences) and/or an on/off switch to facilitate ease of activation/deactivation of *Taylor*'s stimulation device without requiring the

70

user to insert and/or remove the illustrated plug from a conventional electrical wall outlet. Ex. 1002 at ¶97. Such modification of *Taylor*'s device would have been routine to the POSITA as it only unites old elements with no change in their respective functions. *See KSR*, 550 U.S. at 417. Furthermore, including an on/off switch and/or control electronics to a stimulation device powered by an electric motor would have been entirely within the realm of skill for a POSITA.

### 2.      Claims 2, 3, 5, 7, 11, 14-15, 17-19, and 23-26

As explained above, *Taylor* expressly discloses all aspects of these claims. *See supra* Sections IX(A)(2)- IX(A)(11), IX(A)(13)- IX(A)(26). As a result, *Taylor*'s stimulation device as modified by *Hovland* (i.e., the *Taylor-Hovland* stimulation device) disclose all aspects of these claims. Ex. 1002 at ¶¶98-99.

With regard to claim 7, as previously explained, as a user presses *Taylor*'s suction cup member 156 (which corresponds to the claimed "second chamber") into conforming and sealing engagement with the user's vulva, the surface area of suction cup member 156 that contacts the user's skin increases. *See supra* Section IX(A)(5). However, even if it is argued that *Taylor*'s suction cup member 156 does not have the claimed "sealing support part for enlarging a contact surface of the least one second chamber on the skin," it would have been obvious to a POSITA to modify suction cup member 156 to include a sealing support part, as

71

taught by *Hovland*, so as to improve sealing engagement with the user's vulva.  Ex. 1002 at ¶¶100-101.



**Fig. 26**

Sealing support part

Annotated *Hovland* Fig. 26

In *Hovland*, vacuum cup 240 has a contact surface specifically constructed for application to the clitoral region of the patient.  Ex. 1006 at 13:46-48.  In some embodiments, vacuum cup 240 includes a rigid part 243 and a soft-skin contacting portion 245 made of a biocompatible material that is pliable enough to form a vacuum tight seal.  *Id.* at 11:66-12:3.  As seen in Fig. 26 above, the skin-contacting portion 245 has a sealing support part in the form of a wide rim or an enlarged area that increases the contact area of the vacuum cup 240 to the skin.  During use, vacuum cup 240 is placed over the clitoris, and a slight pressure is applied by hand to the cup to **compress** the soft portion 245 between the rigid portion 243 and the

72

clitoral region to form a vacuum tight seal around the clitoris. *Id.* at 14:12-18. A POSITA would have recognized that the wide rim of the skin-contacting portion 245 enlarges the contact area of the vacuum cup 240 to the skin. Ex. 1002 at ¶¶100-101. Additionally, when *Hovland*'s soft skin-contacting portion 245 is compressed, it will expand in the lateral directions (i.e., bulge slightly outward) due to Poisson's effect to further increase the area of contact of the soft portion 245 on the body. *Id*. Based on the teachings of *Hovland*, it would have been obvious for a POSITA to incorporate the soft skin-contacting portion 245 of vacuum cup 240 in *Taylor*'s suction cup member 156 to enlarge the contact area of suction cup member 156 on the skin and thereby form a vacuum tight seal around the clitoris. *Id*. Such a modification would have amounted to nothing more than the use of a known technique to improve a similar device, and the results of the modification would have been predictable. *See KSR*, 550 U.S. at 417. Indeed, modifying *Taylor*'s suction cup member 156 to include *Hovland*'s skin-contacting portion 245 would have been entirely within the realm of skill for a POSITA.

      **3.**    **Claim 8**

      i. **"The stimulation device as claimed in claim 1, wherein the respective modulation of the stimulating pressure field may be changed by means of an operating element."**

As discussed above, *Taylor* alone, or *Taylor* in combination with *Hovland*, discloses all of the features of independent claim 1. *See supra* Sections IX(A)(1), IX(B)(1).

In *Taylor*, the disclosed stimulation device is described as a device that is "adjustable to suit individual needs" for sexual stimulation. Ex. 1004 at 1: 44-49. *Taylor* recognizes that different individuals have different sexual needs or sexual drive. *See id*. at 1:37-39. Based at least upon this disclosure in *Taylor*, a POSITA would have recognized that the *Taylor* device would likely have been configured to increase and/or decrease at least the speed of electric motor 18 so as to modify the magnitude and/or frequency of the pressure field generated in suction cup member 156. Ex. 1002 at ¶¶102-106. However, *Taylor* does not expressly describe an operating element used to modify or otherwise modulate the pressure field generated in suction cup member 156. Nevertheless, based on *Taylor*'s express identification of the need "for a sexual aid that is adjustable to suit individual needs …", a POSITA would have recognized that adjusting the pressure generated in suction cup member 156 for individual needs and preference would require an operating element to control or otherwise effect the modulation of the generated pressure. *Id.*

74

Indeed, a POSITA would have known that, in *Taylor*, the parameters (e.g., amplitude, frequency, etc.) of the pressure field generated by bellows 160 in the suction cup member 156 can easily be modulated by varying the characteristics (e.g., magnitude, etc.) of the electric current used to power motor 18. *Id*. Thus, a POSITA would have recognized that it would have been obvious to provide *Taylor*'s stimulation device with an operating element for modulating or otherwise changing the pressure field generated in suction cup member 156. *Id*. Additionally, as explained below, modulating the pressure field produced by a stimulation device by adjusting the electrical signals provided to an oscillating motor used to produce air pulsations was well known in the art at the time of the invention. *Id*.



Notwithstanding *Taylor*'s express teachings, *Hovland*'s disclosure would have motivated a POSITA to modulate the generated pressure field by means of an operating element. *Id.* For example, as shown in Figure 3, *Hovland* teaches a stimulation device including control electronics 80 that "comprise one or more signal handling devices for handling electrical signals." Ex. 1006 at 10:22-25. Control electronics 80 are operably coupled to the vacuum pump/motor device 90 and includes a microprocessor and vacuum regulation protocols to vary the vacuum or suction in the vacuum cup that is applied to the clitoral region. *Id.* at 10:25-28, 9:56-65. Based on these teachings, it would have been obvious to a POSITA to incorporate suitable control electronics in *Taylor*'s stimulation device

76

to modulate the pressure field produced by bellows 160 by, for example, varying the characteristics (e.g., voltage, magnitude, etc.) of the electrical current supplied to motor 18. Ex. 1002 at ¶106. Based on the level of skill in the art, it would have been a simple matter for a POSITA to incorporate suitable control electronics in *Taylor*'s stimulation system to, for example, increase/decrease the amplitudes of the positive and negative pressure pulses generated by in suction cup member 156 by bellows 160, and/or vary the frequency of the generated pressure pulses. *Id.*

### 4. Claim 22

#### i. "The method for stimulating erogenous zones as claimed in claim 21, wherein a stimulation effect is individually influenced by modulating the pressure field by means of an operating element."

As discussed above, *Taylor* alone, or *Taylor* in combination with *Hovland*, discloses all of the features of independent claim 21. *See supra* Section IX(B)(1). Further, as discussed above with reference to claim 8, a POSITA would have recognized that since *Taylor*'s device is "adjustable to suit individual needs," it most likely has an operating element configured to increase/ decrease the pressure field generated in suction cup member 156. *See supra* Sections IX(B)(3); Ex. 1002 at ¶¶107-111. Notwithstanding this, as also discussed with reference to claim 8 above, based on the teachings of *Hovland*, it would have been obvious to a POSITA to incorporate suitable control electronics in *Taylor*'s stimulation device

77

to modulate the pressure field by, for example, varying the characteristics of the electrical current used to power *Taylor*'s motor 18. *Id.*

### C.    GROUND 3:  *TAYLOR* IN VIEW OF *ZIPPER* RENDERS OBVIOUS CLAIM 20

With the exception of requiring a "remote control," claim 20 is identical to claim 1.  As explained in more detail below, however, it would have been obvious to a person of ordinary skill in the art to modify *Taylor* with the teachings of *Zipper*, as provided below, to render claim 20 unpatentable.

#### 1.    Independent Claim 20

##### i.  "A system comprising:"

*Taylor* discloses a "sexual aid" system including "powered devices that engage with a user and promote sexual stimulation."  Ex. 1004 at 1:6-8; Ex. 1002 at ¶114.

##### ii.  "a stimulation device comprising:"

*Taylor*'s "sexual aid" includes "multiple excitation means that contact the vagina, clitoris and anus" and promote sexual stimulation.  Ex. 1004 at 1:6-8, 2:52-53.  That is, *Taylor*'s "sexual aid" includes a stimulation device.  Ex. 1002 at ¶115.

##### iii. "at least one pressure field generating arrangement with:"

This limitation is identically recited in claim 1.  *See supra* Section IX(A)(1)(ii); Ex. 1002 at ¶116.  Thus, for the same reasons discussed relative to claim 1, *Taylor* discloses this limitation.  *Id*.

#### iv. "at least one first chamber;"

This limitation is identically recited in claim 1.  *See supra* Section

IX(A)(1)(iii)(a); Ex. 1002 at ¶117.  Thus, for the same reasons discussed relative to

claim 1, *Taylor* discloses this limitation.  *Id*.

#### v. "at least one second chamber having at least one opening for placing on a body part; and"

This limitation is identically recited in claim 1.  *See supra* Section

IX(A)(1)(iii)(b); Ex. 1002 at ¶118.  Thus, for the same reasons discussed relative to

claim 1, *Taylor* discloses this limitation.  *Id*.

#### vi. "at least one connection element that connects the at least one first chamber to the at least one second chamber;"

This limitation is identically recited in claim 1.  *See supra* Section

IX(A)(1)(iii)(c); Ex. 1002 at ¶119.  Thus, for the same reasons discussed relative to

claim 1, *Taylor* discloses this limitation.  *Id*.

#### vii. "a drive unit that varies the volume of the at least one first chamber such that a stimulating pressure field is generated via the at least one connection element in the at least one second chamber;"

This limitation is identically recited in claim 1.  *See supra* Section

IX(A)(1)(iv); Ex. 1002 at ¶120.  Thus, for the same reasons discussed relative to

claim 1, *Taylor* discloses this limitation.  *Id*.

79

#### viii. "a control device that activates the drive unit; and"

This limitation is identically recited in claim 1. *See supra* Section

IX(A)(1)(v); Ex. 1002 at ¶121. Thus, for the same reasons discussed relative to

claim 1, *Taylor* discloses this limitation. *Id*.

#### ix. "an appendage; and"

This limitation is identically recited in claim 1. *See supra* Section

IX(A)(1)(vi); Ex. 1002 at ¶122. Thus, for the same reasons discussed relative to

claim 1, *Taylor* discloses this limitation. *Id*.

#### x. "a remote control device, arranged separately from the stimulation device, for remotely controlling the stimulation device;"

*Taylor* does not expressly disclose a remote control device, arranged

separately from the stimulation device, for remotely controlling the stimulation

device. However, sexual stimulation devices configured to be controlled remotely

were well known in the art at the time of invention of the '061 patent, and it would

have been obvious for a POSITA to incorporate a remote control device with

*Taylor*'s stimulation device to make the device more convenient for use, based on

preexisting knowledge in the art. Ex. 1002 at ¶¶123-128.

80



Fig. 2

*Zipper* discloses a stimulation device for sexual stimulation. Ex. 1007 at ¶[0029], Abstract. *Zipper*'s sexual stimulation device includes a handle 400 with a keypad 403, a vaginal finger 200, and a clitoral finger 300. *Id.* at ¶[0044]. The vaginal finger 200 includes a vaginal vibrator 204 for stimulation of the G-spot, and the clitoral finger 300 includes a clitoral vibrator 304 for stimulation of the clitoris. *Id.* at ¶¶[0032], [0044]. *Zipper* states that in some embodiments the mechanical vibrators in the vaginal finger 200 and/or the clitoral finger 300 may be replaced with another stimulator, such as, for example, a stimulator that generates "pressure that varies in intensity over time." *Id.* at ¶[0043]. During use, a user slidingly engages vaginal finger 200 in the vagina such that vaginal finger 200

81

applies vibration at or near the G-spot, while clitoral finger 300 applies vibration at or near the clitoris. *Id.* at ¶[0044].



Fig. 3

Fig. 8

Keypad 403 includes depressible control buttons used to control the stimulators in the vaginal and clitoral fingers 200, 300. *Id.* at ¶¶[0046], [0064]-[0065]. These control buttons are in electrical communication with a programmable controller 501 that can be programmed to provide any combination of stimulation of the vaginal and clitoral stimulators (clitoral and vaginal vibrator on, clitoral vibrator on, vaginal vibrator off, increase/decrease intensity, etc.). *Id.* at ¶¶[0046]; Ex. 1002 at ¶¶126-127. In *Zipper*, controller 501 includes a remote controller to a wireless interface to remotely control the stimulation device. Ex. 1007 at ¶[0060]; Ex. 1002 at ¶¶126-127. *Zipper* states that "mechanical stimulating components other than vibrating motors [e.g., components "that

82

produce … pressure that varies in intensity over time"] may be substituted for vibrating motors [in the vaginal and/or clitoral fingers 200, 300] and similarly controlled." *Id.* at ¶¶[0043], [0046].  Regarding remote control of the stimulation device, *Zipper* explains that "[s]uch wireless interfaces are **well known** in the electronic arts and, as such, do not require undue experimentation to understand and implement." *Id.* (emphasis added.)

Based on the teachings of *Zipper*, it would have been obvious for a POSITA to incorporate a remote control device to remotely control *Taylor*'s stimulation device.  Ex. 1002 at ¶¶124-128.  A POSITA would have recognized that incorporating such a remote control device in *Taylor*'s stimulation device will make the device more convenient to use.  *Id*.  For example, the POSITA would have known that incorporating a remote control device in *Taylor*'s stimulation device will enable a user to selectively activate (turn "on" and "off") and/or control the intensity of stimulation provided by *Taylor*'s vaginal stimulator (dildo 50) and clitoral stimulator (first stimulator 154) while in a recumbent position.  *Id*.  Moreover, modification of *Taylor* with the teachings of *Zipper* would have amounted to nothing more than the use of a known technique to improve a similar device, and the results of the modification would have been predictable.  *See KSR*, 550 U.S. at 417.  Furthermore, as stated in *Zipper*, "[s]uch wireless interfaces are well known in the electronic arts and, as such, do not require undue

83

experimentation to understand and implement." Ex. 1007 at ¶[0060]; Ex. 1002 at

¶128.

> **xi. "wherein the stimulating pressure field generated in the at least one second chamber comprises a pattern of negative and positive pressures, modulated with respect to a reference pressure;"**

Except for the word "onto" (which, as explained with reference to claim 1,

was deleted during prosecution of the '061 patent and erroneously included in the

printed publication of the '061 patent), this limitation identically recited in claim 1.

*See supra* Section IX(A)(1)(vii); Ex. 1002 at ¶129. Thus, for the same reasons

discussed relative to claim 1, *Taylor* discloses this limitation. *Id.*

> **xii. "wherein the at least one first chamber is connected to the at least one second chamber solely by the at least one connection element; and"**

This limitation is identically recited in claim 1. *See supra* Section

IX(A)(1)(viii); Ex. 1002 at ¶130. Thus, for the same reasons discussed relative to

claim 1, *Taylor* discloses this limitation. *Id.*

> **xiii."wherein the appendage is a dildo configured to be inserted into a vagina."**

This limitation is identically recited in claim 1. *See supra* Section

IX(A)(1)(ix); Ex. 1002 at ¶131. Thus, for the same reasons discussed relative to

claim 1, *Taylor* discloses this limitation. *Id.*

> **D.    GROUND 4: *TAYLOR* IN VIEW OF *ZIPPER* AND *HOVLAND* RENDERS OBVIOUS CLAIM 20**

### 1.    Independent Claim 20

As discussed above with reference to independent claim 20, *Taylor* in combination with *Zipper* discloses each and every limitation of claim 20. *Supra* Section IX(C)(1). However, if it is argued that the compression and expansion of *Taylor*'s bellows 160 in the *Taylor-Zipper* stimulation device somehow does not result in a pattern of negative and positive pressures, modulated with respect to a reference pressure, as required by claim 20, then as explained previously with respect to claim 1 (in Ground 2), it would have been obvious to the POSITA to modify *Taylor's* stimulation device with the teachings of *Hovland* to apply modulated super-atmospheric pressure along with *Taylor*'s "cyclical vacuum" (i.e., sub-atmospheric pressure) to achieve the benefits described by *Hovland*. *See supra* Section IX(B)(1); *See KSR*, 550 U.S. at 417; Ex. 1002 at ¶¶133-134.

As also explained with respect to claim 20 above, *Taylor*'s electrical plug (depicted in *Taylor*'s Fig. 2) is the claimed "control device" that controls power to, and therefore, "activates the drive unit" (*Taylor*'s electric motor 18), as required by claim 20. *See supra* Section IX(C)(1)(viii). Nevertheless, if it is argued that *Taylor*'s plug does not correspond to the claimed "control device," then as explained previously with respect to claim 1 (in Ground 2), it would have been obvious for a POSITA to provide *Taylor*'s stimulation device with one or both of (a) *Hovland*'s electronics 80 to regulate the pressures applied to the clitoris or (b)

85

an on/off switch 270 to facilitate ease of activation and deactivation of *Taylor*'s stimulation device without requiring the user to insert and remove the illustrated plug from a conventional electrical wall outlet. *See supra* Section IX(B)(1); Ex. 1002 at ¶135. As explained above, incorporating an on/off switch or control electronics in the *Taylor-Zipper* stimulation device would have been a simple matter for a POSITA since it would have amounted to nothing more than the use of a known technique to improve a similar device, and the results of the modification would have been predictable. *See KSR*, 550 U.S. at 417.

## X.   ARGUMENTS FOR DISCRETIONARY DENIAL SHOULD BE REJECTED

*Taylor* and *Zipper* were not identified during prosecution of the '061 patent. Ex. 1001 at 1-2; s*ee* also Ex. 1003. The patent application publication of *Hovland* (i.e., U.S. 2002/0120219 A1) is identified on the '061 patent. Ex. 1001 at 2. However, *Hovland* was not relied upon during prosecution, and there is no evidence that the examiner reviewed *Hovland* in detail, and that arguments the same as or substantially the same as those presented herein were ever presented and/or considered by the examiner. *See Fox Factory, Inc. v. SRAM, LLC*, IPR2017-00472, at *6-8 (PTAB Apr. 21, 2017) (Paper 10) (instituting IPR after noting that the record contained no evidence that a reference cited during prosecution had been considered "in more than a cursory manner"); *Pure Storage, Inc. v. Realtime Data LLC*, Case No. IPR2018-00549, slip op. at 11 (PTAB July

23, 2018) (Paper 7) (noting that "there is no evidence of record that [the prior art references] were substantively considered by the Examiner."); *Comcast Cable Communs., LLC v. Promptu Sys. Corp.*, Case No. IPR2018-00342, slip op. at 17 (PTAB July 19, 2018) (Paper 13) (granting institution "because [the prior art] was only cited in an IDS and not applied by the examiner in the reissue application process in any rejection of claims").

Accordingly, the Board should reach the merits of this petition, and institute review of all challenged claims, especially in light of the accompanying expert testimony, which was not before the Office during prosecution.

## XI.    CONCLUSION

For the reasons above, Petitioner requests institution of IPR of the challenged claims based on all grounds.

Respectfully submitted,

Dated:  October 2, 2019        _____
                              Dinesh N. Melwani (Reg. No. 60,670)
                              Bookoff McAndrews, PLLC
                              2020 K Street NW, Suite 400
                              Washington, D.C.  20006
                              202-808-3497

                              Attorneys for Petitioner
                              EIS GmbH

87

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to 37 C.F.R. § 42.24(d), the undersigned certifies that the foregoing Petition for *Inter Partes* Review of U.S. Patent No. 9,849,061 contains, as measured by the word-processing system used to prepare this paper, 13,997 words. This word count does not include the items excluded by 37 C.F.R. § 42.24 as not counting towards the word limit.

Dated:  <u>October 2, 2019</u>                    Respectfully submitted,

By:  _____

Dinesh N. Melwani (Reg. No.60,670)
Counsel for Petitioner

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6(e) and 37 C.F.R. § 42.105(a), I hereby certify

that on October  2, 2019, I caused a true and correct copy of the foregoing

"PETITION FOR INTER PARTES REVIEW OF U.S. PATENT NO. 9,849,061"

and supporting exhibits to be served via Federal Express on the Patent Owner at

the following correspondence address of record as listed on PAIR:

> HANLEY, FLIGHT & ZIMMERMAN, LLC
> 150 S. WACKER DRIVE
> SUITE 2200
> CHICAGO IL 60606

Pursuant to 37 C.F.R. § 42.105(a), I hereby certify that on October 2, 2019, I

caused a true and correct copy of the foregoing "PETITION FOR INTER PARTES

REVIEW OF U.S. PATENT NO. 9,849,061" and supporting exhibits to be served

via Federal Express on the Patent Owner at the following address known to the

Petitioner as likely to effect service:

> TAMMY J. DUNN
> OSHA LIANG LLP
> 909 FANNIN STREET, SUITE 3500
> HOUSTON, TX 77010

Dated: October 2, 2019                Respectfully submitted,

By: _____
    Dinesh N. Melwani (Reg. No.60,670)
    Counsel for Petitioner

89

# EXHIBIT 5

Trials@uspto.gov                                                        Paper 50
571-272-7822                                                  Date: June 14, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

EIS GMBH,
Petitioner,

v.

NOVOLUTO GMBH,
Patent Owner.

———————————

IPR2019-01302
Patent 9,937,097 B2

———————————

Before SUSAN L. C. MITCHELL, CHRISTOPHER G. PAULRAJ, and
JOHN E. SCHNEIDER, *Administrative Patent Judges.*

SCHNEIDER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Challenged Claims Not Unpatentable
*35 U.S.C. § 318(a)*
Denying Petitioner's Motion to Exclude
*37 C.F.R. § 42.64*

IPR2019-01302
Patent 9,937,097 B2

# I. INTRODUCTION

## A. Background and Summary

EIS GmH ("Petitioner") filed a Petition requesting *inter partes* review of claims 1–30 of U.S. Patent No. 9,937,097 B2 (Ex. 1001, "the '097 patent"). Paper 1. ("Pet."). NOVOLUTO GmbH ("Patent Owner") filed a Preliminary Response to the Petition. Paper 14. On January 13, 2020 we issued our Decision Denying Institution. Paper 17 ("Dec").

Petitioner filed a Request for Rehearing of our Decision Denying Institution under 37 C.F.R. § 42.71 (c) and (d). Paper 18 ("Req. Reh'g").[1] Upon reconsideration of the arguments and evidence of record at the time, we granted the Request for Rehearing and instituted *inter partes* review on all grounds presented in the Petition. Paper 23. ("Reh'g Dec." or "Rehearing Decision").

Patent Owner then filed a Response on September 11, 2020. Paper 30 ("Resp."). Petitioner filed a Reply on December 14, 2020. Paper 37 ("Reply"). Patent Owner filed a Sur-Reply on January 15, 2021. Paper 42 ("Sur-Reply"). On February 2, 2021, the parties jointly informed the Board that no oral hearing was needed in this case. Paper 44.

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the

---

[1] Petitioner also sought review of the Decision by the Precedential Opinion Panel. Ex. 3001. That request was denied on April 6, 2020. Paper 21. Following denial by the Precedential Opinion Panel, Petitioner brought an action in the United States District Court for the Eastern District of Virginia seeking review of denial by the Precedential Opinion Panel under the Administrative Procedure Act. Paper 22. The district court action was dismissed following our granting Petitioner's Request for Rehearing. Paper 34, 2.

2

IPR2019-01302
Patent 9,937,097 B2

claims on which we instituted trial. Based on the complete record before us, we determine that Petitioner has not shown, by a preponderance of the evidence, that claims 1–30 are unpatentable. In addition, for the reasons explained below, we deny Petitioner's Motion to Exclude evidence.

### B. Real Parties in Interest

Petitioner identifies the following entities as real parties-in-interest: EIS GmbH, EIS Inc., Triple A Import GmbH, Triple A Marketing GmbH, Triple A Sales GmbH, and Triple A Internetshops GmbH (formerly known as "Internetsupport Bielefeld"). Paper 43.

Patent Owner identifies itself as the real party-in-interest and that WOW Tech International GmbH is the corporate parent of Novoluto GmbH. Paper 41.

### C. Related Matters

Petitioner has stated that the '097 patent is the subject of litigation in two district court actions: *EIS Inc. v. WOW Tech International GmbH et al.*, No. 1:19-cv01227-LPS, (D. Del.) and *Novoluto, GmbH v. Uccellini LLC d/b/a Lora DiCarlo*, C.A. No. DOR-6-20-cv-02284-MTK (D. Ore.). Paper 43, 3.

Petitioner also states that two related patents, US 9,763,851 B2 and US 9,849,061 B2 are the subject of IPR2019-01444 and IPR2020-00007 respectively. *Id.* Both of those proceedings are currently pending before the Board.

### D. The '097 Patent

The '097 patent, titled Stimulation Device Having an Appendage, issued on April 10, 2018, from Application 15/487,123 filed on April 13, 2017. Ex. 1001, codes (10), (21), (22), (45)col. 3, , and (54). It claims

3

IPR2019-01302
Patent 9,937,097 B2

priority to German Patent Application No. 102015103694.0, filed March 13, 2015. Ex. 1001, col. 1, ll. 7–12.

The '097 patent relates to a sexual stimulation device which applies positive and negative pressure to a human body part, such as the clitoris. Ex. 1001, col. 3, ll. 21–22. The positive and negative pressures are created by changing the volume of a chamber in the device. *Id.* at col. 3, ll. 19–20. The volume of the chamber is changed by deflecting a flexible wall of the chamber. *Id.* at col. 3, ll. 16–19. Positive and negative pressures are determined relative to a "reference pressure." *Id.* col. 4, l. 63– col. 5, l. 4. The device may also have an appendage which can be used as a handle. *Id.* at col. 4, ll. 27–28. The appendage may be in the form of a dildo. *Id.* at col. 8, ll. 24–31.

### E.   Illustrative Claims

Claims 1 and 12 are representative of the challenged claims and read as follows:

1. A stimulation device comprising:
    a chamber having a flexible wall portion
    a drive unit in physical communication with the flexible wall portion so as to cause deflections of the flexible wall portion in opposing direction, thereby resulting in a changing volume of the chamber,
    the changing volume of the chamber resulting in modulating positive and negative pressures with respect to a reference pressure;
    an opening for applying the modulated positive and negative pressures to a body part;
    a control device for controlling the drive unit; and
    an appendage, wherein the appendage is a dildo configured to be inserted into a vagina.

12. A method comprising:

4

IPR2019-01302
Patent 9,937,097 B2

causing deflections of a flexible wall portion of a chamber of a stimulation device in opposing directions, thereby resulting in a changing volume of the chamber, the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure; and

applying the modulated positive and negative pressures to a body part through an opening, wherein the stimulation device is positioned by the user for applying the modulated positive and negative pressures using an appendage of the stimulation device, wherein the appendage is a dildo configured to be inserted into a vagina.

### F.  Evidence

Petitioner relies on the following references:

Taylor, US 5,725,473, issued March 10, 1998. (Ex. 1004) ("Taylor").

Hovland et al., US 6,964,643 B2, issued November 15, 2005. (Ex. 1005) ("Hovland").

Guan, CN2153351Y, issued December 11, 1993. (Ex. 1007) ("Guan").

Lee, US 7,828,717 B2, issued November 9, 2010. (Ex. 1006) ("Lee").

Petitioner also relies on the declarations of Michael R. Prisco, P.E., Ph.D., Exs. 1002 and 1018, and the declaration of Richard Meyst. Ex. 1020. Patent Owner relies on the declarations of Morton Olgaard Jensen, Ph. D., Dr. Med. (Exs. 2001 and 2026) and Debra Herbenick, Ph.D. (Ex. 2004 and 2028).

### G.  Prior Art and Asserted Grounds

Petitioner asserts that claims 1–30 would have been unpatentable on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–9, 12–24, 26–30 | 102 | Taylor |
| 1–30 | 103 | Taylor, Hovland |
| 1–30 | 103 | Guan, Lee, Hovland |

IPR2019-01302
Patent 9,937,097 B2

## II.  ANALYSIS

### A.  Legal Standards

#### 1.  Burden

In an *inter partes* review, the burden of proof is on the Petitioner to show that the challenged claims are unpatentable, and that burden never shifts to the patentee. 35 U.S.C. § 316(e); *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1375 (Fed. Cir. 2016).

#### 2.  Anticipation

Section 102(a) provides that "[a] person shall be entitled to a patent unless . . . the claimed invention was patented [or] described in a printed publication . . . before the effective filing date of the claimed invention." 35 U.S.C. § 102(a)(1) (2018).[2] Accordingly, unpatentability by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, arranged as in the claims. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999); *In re Paulsen*, 30 F.3d 1475, 1479 (Fed. Cir. 1994).

#### 3.  Obviousness

The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art, (2) any differences between the claimed subject matter and the prior art, (3)

---

[2] The provisions of the Leahy-Smith America Invents Act ("AIA") regarding novelty and obviousness apply to patents containing at least one claim having an effective filing date on or after March 16, 2013. Pub L. 112–29, 125 Stat. 284 (2011). On its face, the '097 patent has an effective filing date of July 24, 2015. Therefore, the AIA provisions of 35 U.S.C. §§ 102 and 103 apply to this decision.

IPR2019-01302
Patent 9,937,097 B2

the level of skill in the art, and (4) where in evidence, so-called secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). If the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains, the claim is unpatentable under 35 U.S.C. § 103. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).

A proper § 103 analysis requires "a searching comparison of the claimed invention—including all its limitations—with the teaching of the prior art." *In re Ochiai*, 71 F.3d 1565, 1572 (Fed. Cir. 1995).

"Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). "Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

"[O]bjective evidence of nonobviousness includes copying, long felt but unsolved need, failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, and skepticism of skilled artisans before the invention." *In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998) (citations omitted). "For objective [evidence of secondary considerations] to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the *claimed invention*." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010)

7

IPR2019-01302
Patent 9,937,097 B2

(alterations in original) (quoting *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995)).

### B.   Level of Ordinary Skill in the Art

The level of ordinary skill in the art is a factual determination that provides a primary guarantee of objectivity in an obviousness analysis. *Al-Site Corp. v. VSI Int'l Inc.*, 174 F.3d 1308, 1324 (Fed. Cir. 1999) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991)).

In our Decision on Institution, we adopted Petitioner's proposed definition of one skilled in the art as an individual with "a bachelor's degree in mechanical engineering, biomechanical engineering, or the equivalent, and three or more years of experience in fluid mechanics and pump-based medical devices," and Petitioner's proposal that "practical experience could qualify one not having the aforementioned education as a [person of ordinary skill in the art], while a higher level of education could offset lesser experience." Dec. 6–7.

Patent Owner renews its argument that in addition to the education level recited above, a person of ordinary skill in the art would have "three or more years of experience in research, development, or design of devices that interact with the human female body (and specifically the vulva)." Resp. 4. Patent Owner supports this contention by citing to the Technical Field discussion in the Specification where it states that field relates to "a stimulation device … for erogenous zones, in particular for the clitoris." *Id.* at 3 (citing Ex. 1001, col. 1, ll. 17–20). Patent Owner also contends that the claims support this definition as the claims

> explicitly define a stimulation device with "an opening for
> applying the modulated positive and negative pressures to a body

8

IPR2019-01302
Patent 9,937,097 B2

part" and a dildo appendage "configured to be inserted into a vagina" and associated methods of applying the modulated pressures to a body part, by the user having positioned the device using the vaginal dildo.

Resp. 3–4 (citing Ex. 1001, claims 1, 12, 17, and 26).

We have considered Patent Owner's argument and are not persuaded that our original definition of a person of ordinary skill in the art was in error. We do not agree that one of ordinary skill in the art requires such specific expertise for the subject matter set forth in the field of invention or the claims of the '097 patent. A "hypothetical 'person having ordinary skill in the art' to which the claimed subject matter pertains would, of necessity have the capability of understanding the scientific and engineering principles applicable to the pertinent art." *Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (BPAI 1988). Although the device disclosed in the '097 patent is a sexual stimulation device, the scientific and engineering principles applicable to the claimed device and method involve mechanical engineering and fluid flow that are not necessarily specific to the application of the device.

> As we previously noted in our Decision on Institution:

> While the invention generally relates to a device for stimulating female erogenous zones, as seen from the discussion below, the design and operation of the device largely relates to issues of mechanical engineering and fluid flow. Thus, we conclude that experience in developing devices that interact with the female body is not needed to define a person of ordinary skill in the art.

Dec. 7.

Based on the forgoing, we continue to apply the same definition of a person of ordinary skill in the art we used in our Decision Denying Institution.

9

IPR2019-01302
Patent 9,937,097 B2

### C.  Claim Construction

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* Furthermore we need only construe the claims to the extent necessary to determine the patentability of the challenged claims. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy . . . .'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

After considering all of the arguments presented by the parties we find that it is only necessary to construe the term "reference pressure." Although the parties have also presented arguments concerning the construction of the term "pressure field generator," we determine that it is not necessary to construe that term to determine the patentability of the challenged claims in light of the asserted grounds.[3]

### 1.  Reference Pressure

In our Decision Denying Institution, we construed the term "reference pressure" to mean "a prevailing pressure within the device prior to placing

---

[3] In section IX of its Reply, Petitioner presents argument that we were somehow misled by changes to the Specification of the '097 patent relating to the term "pressure field generator." Reply 27–28. As we declined to construe the term in our decision on institution and in this final decision, we do not address the arguments presented in Section IX of the Reply.

10

IPR2019-01302
Patent 9,937,097 B2

the stimulation device on the area of the skin to be stimulated." Dec. 10. While Patent Owner agrees with this construction, Petitioner contends that we improperly limited the construction to one example in the Specification. Resp. 19; Reply 9.

In the Petition, Petitioner originally asserted that the "reference pressure" is "atmospheric pressure." *See* Pet. 22 (stating "[w]hen the bellows 160 is neither compressed nor expanded, the air within the bellows 160 is at atmospheric pressure (i.e., the reference pressure)"). In its Reply, Petitioner presents a new interpretation of the term "reference pressure," contending that the term should be construed to mean a "given" pressure around which higher or lower pressures are generated for stimulating the body, which may be determined prior to application or after application of the device to the target body part. Reply 10. In support of this construction, Petitioner points to the discussion in the Specification involving pressures above and below systolic pressure. *Id.* (citing Ex. 1001, col. 11–57.).

Patent Owner contends that Petitioner is presenting a new argument not raised in the initial petition. Sur-Reply 2. Patent Owner argues that Petitioner has improperly argued that the construction adopted by the Board is limited to atmospheric pressure. *Id.* at 4. Patent Owner also contends that Petitioner's arguments with regard to systolic pressure are without merit and that the Board's original construction is proper. *Id.* at 5–6.

We have considered the arguments advanced by the parties and the evidence of record, and conclude that our original construction was proper. Contrary to Petitioner's contention, the construction is not limited to a single example, but is consistent with the overall teachings of the Specification. *See, e.g.,* Ex. 1001, col. 5, ll. 5–27; col. 15, ll. 34–37; Figure 14. The construction we adopted is not limited to atmospheric pressure (as originally

11

IPR2019-01302
Patent 9,937,097 B2

proposed in the Petition), but refers generally to the prevailing pressure in the device before it is applied to the body as described in the Specification of the '097 patent. This refers to the pressure within the device regardless of the environment in which it is used. For instance, the Specification of the '097 patent lists additional environments to include "a liquid medium, such as water or commercially available lubricant." *Id*. at col. 5, ll. 5–27.

Even if we consider Petitioner's new claim construction argument as being properly presented in its Reply, Petitioner's argument regarding systolic pressure is unconvincing. The entire paragraph regarding systolic pressure reads

> Assuming that in the first state the pressure in the chambers 3 and 4 corresponds to the currently prevailing external reference pressure (air pressure for example), the overall pressure that is present in the second state will be lower than the external reference pressure. This negative pressure is set such that it is preferably lower than the usual systolic blood pressure in the blood vessels of the body part 11. The blood circulation in this area thus increases, and the clitoris 12 is better supplied with blood in the second state.

Ex. 1001, col. 11, ll. 49–57. It is clear that, when read in context, the reference pressure referred to in this paragraph is the prevailing pressure in the device *before* the device is applied to the body part. Moreover, only the negative pressure is set with regard to systolic pressure, not the positive pressure. *Id.*

Based on the foregoing, we maintain our original construction of the term "reference pressure" as "a prevailing pressure within the device prior to placing the stimulation device on the area of the skin to be stimulated."

12

IPR2019-01302
Patent 9,937,097 B2

### D.  Anticipation by Taylor

Petitioner contends that claims 1–9, 12–24, and 26–30 are anticipated by Taylor. Pet. 19.

### 1.  Taylor

Taylor discloses a sexual aid that includes a means for introducing a vacuum to stimulate the clitoris. Ex. 1004, Abst. In this embodiment, the device comprises a suction cup which engages the upper portion of the vulva. *Id.* at col. 5, ll. 28–30. The suction cup is in fluid communication with a bellows that cyclically introduces a vacuum within the suction cup. *Id.* at col. 5, ll. 32–38. The cyclical vacuum stimulates the clitoris. *Id.* at ll. 40–41.

Taylor discloses:

> Referring to FIG. 3, an alternative embodiment of the drive mechanism is shown with the motor 18 mounted on the arm 26. As in the original embodiment the lever 22 mounted *55* on the output shaft 20 of the motor 18 is pivotally mounted on the connecting rod 36. The connecting rod 36 is pivotally mounted on the housing 12. As the output shaft 20 rotates, the lever 22 urges the connecting rod 36 against the housing 12 oscillating the arm 26 along with the motor 18.

Ex. 1004 col. 4, ll. 52–59. Petitioner's annotated version of an excerpt of Taylor Figure 3 is reproduced below.

13

IPR2019-01302
Patent 9,937,097 B2



Annotated Excerpt of *Taylor* Figure 3

Excerpt of Figure 3 of Taylor as annotated by Petitioner to show the relationship of the drive unit to the bellows. Pet. 20.

Taylor goes on to disclose:

> Referring only to FIG. 3, a second embodiment of the first stimulator 154 is shown. The first stimulator 154 includes a suction cup member 156 that conformingly and sealingly 30 receives the upper portion of the vulva. The suction cup member 156 of the first stimulator 154 is more specifically directed at receiving the clitoris. The suction cup member 156 is in fluid communication with a bellows 160 or squeeze ball (not shown) via flexible conduit 162. As the arm 26 oscillates relative to the housing, the arm 26 compresses and expands the bellows 160 relative to the housing 12. The arm 26 and bellows 160 cyclically introduce a vacuum in the volume defined by the suction cup member 156 and the portion of the vulva received therein. The cyclical vacuum phenomenon stimulates the clitoris.

Ex. 1004, col. 5, ll. 28–41.

### 2. *Analysis of Claim 1*

Petitioner contends that each of the limitations of claim 1 is disclosed by Taylor. Pet. 19. Patent Owner contends that Taylor does not teach the

14

IPR2019-01302
Patent 9,937,097 B2

following limitations of claim 1: (1) the changing volume of the chamber resulting in modulating positive and negative pressures with respect to a reference pressure; (2) an opening for applying the modulated positive and negative pressures to a body part; and (3) a control device for controlling the drive unit. Because we agree with Patent Owner that Petitioner has failed to show that Taylor teaches these three limitations, we determine that Petitioner has failed to show by a preponderance of the evidence that Taylor anticipates claim 1 of the '097 patent. We focus only on these limitations in our analysis below.

a) *The changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure*

Petitioner contends that the bellows of Taylor produces modulated positive and negative pressures with respect to a reference pressure, and thus satisfies this limitation. Pet. 22–23. In particular, Petitioner contends that when the bellows is in a position where it is neither contracted nor expanded, the air within the bellows is at atmospheric pressure—i.e., the reference pressure. *Id.* Petitioner contends that when the bellows expands, the pressure in the bellows falls below atmospheric pressure—a negative pressure. *Id.* Petitioner contends that as the bellows contracts past the midpoint, the air pressure increases above atmospheric pressure—i.e., a positive pressure. *Id.* Petitioner supports these contentions with the testimony of Dr. Prisco and Mr. Meyst. *Id.*; Reply 12–17; Ex. 1002 ¶¶ 58–74; Ex. 1020 ¶ 64.

Patent Owner contends that Taylor discloses a device that only provides suction, *i.e.*, negative pressure. Resp. 46. Patent Owner argues that Taylor does not disclose the use of positive pressure let alone modulating between positive and negative pressure. *Id.* Patent Owner contends that the

15

IPR2019-01302
Patent 9,937,097 B2

portions of Taylor cited by Petitioner do not disclose modulated positive and negative pressures with respect to a reference pressure, but are limited to varying negative pressure. *Id.* at 47.

Patent Owner further contends that Petitioner's argument is based on inherency and that Petitioner has failed to show that the mode of operation ascribed to Taylor by Petitioner's expert is necessarily present and that one skilled in the art would recognize that it is present. *Id.* at 47–48. Patent Owner also contends that Petitioner's argument relies on unsupported attorney argument and unsupported expert testimony. *Id.* at 48. Patent Owner contends that Petitioner's argument is premised on Taylor's bellows 160 at some point in operation being in a position that is neither fully open nor fully closed resulting in atmospheric pressure as the reference pressure. *Id.* Patent Owner contends that there is no basis for this assumption in Taylor as Taylor does not disclose such a point. Patent Owner contends that Taylor teaches that the bellows operates to provide a cyclic vacuum to the suction cups. *Id.* (citing Ex. 2026 ¶¶ 122, 128).

Patent Owner explains:

> As the bellows expands it creates a vacuum pulling air flow into the bellows—*i.e.*, creating negative pressure with respect to the reference Pressure. *Id.* As the bellows compresses, the vacuum releases and pressure in the bellows returns toward the reference pressure, *i.e.*, the prevailing pressure of the sexual aid. *Id.* This cycle is illustrated below.

16

IPR2019-01302
Patent 9,937,097 B2



*Id.* ¶ 123.  Although pressure within the bellows during compression may increase in the negative pressure region and may approach or reach atmospheric pressure, pressure within the bellows is never positive *with respect to the reference pressure*, which is required by the claims of the '097 patent.  *Id.*

Resp. 50.

In its Reply, Petitioner applies its construction for "reference pressure," which we have rejected above, and contends that the reference pressure can be the pressure in the device shortly after it begins operation. Reply 11. Petitioner states:

> The claimed reference pressure could instead be a reference pressure prior to activating the device or after (e.g., immediately after) applying the device [to] the vulva.  *Taylor* discloses compressing and then expanding the bellows after applying member 156 to the vulva, resulting in a positive and negative pressure relative to the pressure in bellows 160 (i.e., the reference pressure).

Reply 11 (citing Pet. 21; Ex. 1004, col. 5, ll. 29–40; Ex. 1002 ¶¶ 57–58, 74; Ex. 1018 ¶ 55; Ex. 1020 ¶¶ 55–56). Petitioner contends that using this definition of reference pressure, the cyclic vacuum of Taylor meets this limitation as the vacuum increases and decreases relative to the pressure shortly after activation. *Id.* at 11–12.

17

IPR2019-01302
Patent 9,937,097 B2

Petitioner also contends that when the suction cups are first applied, it creates a positive pressure with respect to the reference pressure and that the operation of the bellows would create a modulation of positive and negative pressure with respect to the reference pressure as it defines it as a "given pressure" during operation of the device. *Id.* at 12–16. Petitioner also contends that Taylor's disclosure that the suction cups seal against the skin does not preclude the presence of a positive pressure with respect to the reference pressure. *Id.* at 15–16.

In sur-reply, Patent Owner contends that Petitioner's argument is based on the incorrect assumption that the "reference pressure" can be any arbitrary "given pressure." Sur-Reply 9. Patent Owner also contends that Petitioner's argument with respect to the pressure in the suction cup being a positive pressure is unsupported by the record and is a new theory that should be disregarded. *Id.* at 10.

We have considered the arguments of the parties and the evidence of record and conclude that Petitioner has not demonstrated that Taylor discloses that the changing volume of the bellows results in modulation of positive and negative pressures with respect to a reference pressure.

First, Petitioner is basing its argument on a shifting and incorrect claim construction that "reference pressure" may include any "'given' pressure around which higher and lower pressures are generated for stimulating the body, which may be determined prior to application <u>or after application</u> of the device to the target body part." *Compare* Reply 10, *with* Pet. 21–23 (stating "reference pressure" is "atmospheric pressure"). Based on such reliance on an incorrect claim construction alone, we find that Taylor does not disclose the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference

18

IPR2019-01302
Patent 9,937,097 B2

pressure. But even if we were to adopt Petitioner's erroneous claim construction, we find Petitioner's substantive arguments concerning the teachings of Taylor are unavailing.

Petitioner's contentions with respect to this limitation are also based on the erroneous premise that the bellows in Taylor must necessarily start in a positon that is neither fully expanded nor fully compressed. Pet. 22 (stating "[w]hen bellows 160 is neither compressed nor expanded, the air within bellows 160 is at atmospheric pressure (i.e., the reference pressure)) (citing Ex. 1002 ¶¶ 58, 74; Ex. 1020 ¶ 64). Taylor, however is silent as to the starting position of the bellows. *See* Ex. 1004 col. 5, ll. 27–49; Ex. 2026 ¶ 121. Petitioner's declarant, Mr. Meyst, confirms this silence by drawing a negative inference from such silence that does not meet the inherency test. In particular, Mr. Meyst testifies:

> It is my opinion that pressures above and below the initial pressure would be generated by *Taylor*. This is at least because *there is no reason to assume* that an initially generated positive pressure in suction cup member 156 immediately after it is applied to the vulva would somehow be contrary to the operation of *Taylor*, and because there is no teaching that the device must begin operation with the bellows at its smallest volume.

Ex. 1020 ¶ 64 (emphasis added).

Thus, we agree with Patent Owner that Petitioner appears to argue that the starting positon would inherently be neither fully compressed nor fully expanded, *see* Resp. 48–50, which is simply not supported by Taylor or the testimony of Petitioner's declarants.

"A reference may anticipate inherently if a claim limitation that is not expressly disclosed 'is necessarily present, or inherent, in the single anticipating reference.' The inherent result must inevitably result from the

19

IPR2019-01302
Patent 9,937,097 B2

disclosed steps; '[i]nherency . . . may not be established by probabilities or possibilities.'" *In re Montgomery*, 677 F.3d 1375, 1379–80 (Fed. Cir. 2012) (citations omitted, alterations in original).

We discern nothing in Taylor, the testimony of Dr. Prisco, or the testimony of Mr. Meyst to support the conclusion that the device in Taylor starts with the bellows in a positon that is neither expanded nor compressed. *See* Ex. 1004, col. 5, ll. 27–49, Ex. 1002¶¶ 58; Ex. 1020 ¶ 64. In fact, given that Taylor explicitly teaches that the bellows acts to create a cyclic vacuum, one skilled in the art is just as likely to conclude that the bellow starts in the fully compressed positon creating a stronger vacuum as the bellows is expanded. *See* Ex. 1004, col. 5, ll. 27–49; Ex. 2026 ¶¶ 121 (stating "Taylor describes a bellows for cyclically introducing only a **vacuum** . . . a POSITA would understand a bellows selected for purposes of creating a vacuum to provide unidirectional medium flow").

For instance, as Dr. Jensen, Patent Owner's declarant, explains:

[A] POSITA reading Taylor would want to maximize Taylor's vacuum feature. As such, a POSITA might understand that the bellows is fully compressed initially. The way a POSITA would understand Taylor's bellows to work is likely the following: As the bellows is expanded, a vacuum is created that allows for air flow to be pulled into bellows. As the bellows is compressed, the pressure in the bellows returns toward the starting pressure, *i.e.*, the prevailing pressure of the sexual aid. In other words, as the bellows is expanded, a negative pressure with respect to a reference pressure is created in the bellows that draws air into the bellows. As the bellows is compressed, the pressure in the bellows returns toward the prevailing pressure of the sexual aid as the vacuum is released. Regardless of the starting point of the bellows, a POSITA would understand that atmospheric pressure would be the "reference pressure" as understood in the context of the '097 Patent. While the pressure within the bellows as the bellows is being compressed may increase, **the**

20

IPR2019-01302
Patent 9,937,097 B2

> **pressure within the bellows remains negative at all times and is never positive with respect to the reference pressure** as claimed. This is also the only explanation based on the suction cups as described and disclosed in Taylor. Every other working principle generating positive pressures would lead to the cups disengaging from the body or falling off.

Ex. 2026 ¶ 122 (emphasis in original). As we find that Dr. Jensen's analysis of the operation of Taylor's device is more consistent with Taylor's disclosure, we conclude that the evidence does not support Dr. Prisco's contention that the bellows in Taylor must necessarily start in a positon that is neither fully expanded nor fully compressed.

For all the reasons expressed above, we find that Petitioner has failed to show that Taylor discloses "the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure."

b) *An opening for applying the modulated positive and negative pressures to a body part*

Petitioner contends that Taylor teaches this limitation based on the disclosure that one of the suction cups receives a portion of the vulva and that a cyclic vacuum is applied to the vulva through the suction cup. Pet. 23.

Patent Owner contends that Taylor does not teach this limitation as the suction cups of Taylor do not apply a positive pressure. Resp. 56–57. Patent Owner contends that if a positive pressure were applied through the suction cups, the cups would fall off, rendering Taylor inoperative. *Id.*

As discussed above, we do not find that Taylor discloses applying positive and negative pressure. Therefore we agree with Patent Owner that Taylor also does not disclose this limitation.

21

IPR2019-01302
Patent 9,937,097 B2

c)   *A control element for controlling the drive unit*

Petitioner contends that Taylor meets this limitation in that Taylor discloses a power cord that supplies power to the electric motor. Pet. 24

Patent Owner contends that the power cord of Taylor is not a control element in that the cord does not control the function of the device, but merely provides power to the device. Resp. 57.

In its Reply, Petitioner argues that one skilled in the art would understand the power cord of Taylor to be a control device as it is the only element in Taylor that activates or deactivates the device. Reply 17–18. Petitioner contends that the Specification does not limit the term to a specific device. *Id.*

In Sur-Reply, Patent Owner contends that a power cord is not a control device as the term in used in the '097 patent in that it does not control the action of the device. Sur-Reply 12–13.

We have considered the arguments of the parties and the evidence of record and conclude that Petitioner has failed to establish that Taylor discloses this limitation.

While the Specification of the '097 patent does not specifically define the term control element, the Specification discloses that

> the variation over time in the pressure field or the modulation of the pressure field by the control device is controlled largely automatically. Thus, the modulation of the pressure field, such as intensity, time profile or sequence, can be previously stored in the control device.

Ex. 1001, col. 7, ll. 18–22. The Specification also discloses

> A control device 7 activates the drive unit 6, optional operating elements 71 and at least one optional display **72.** Here, the control device 7 and the drive unit 6 are supplied with power

22

IPR2019-01302
Patent 9,937,097 B2

> for example by the internal battery 76 and/or the external power supply 73.

*Id.* at col. 9, ll. 58–62. The Specification goes on to disclose "the control device controls the excitation of the drive unit such as the size of the deflection, the frequency, the modulation, etc." *Id.* at col. 14, ll. 60–62.

Thus, the Specification makes it clear that the control unit does more than simply turn the device on and off, but controls the operation of the unit including the modulation of positive and negative pressures. *See* Ex. 2026 ¶ 137. Moreover, as shown above, the Specification makes it clear that the control unit is separate from the power source. *Id.* ¶ 138. We discern nothing in Taylor, nor does Petitioner point to any disclosure in Taylor that the power cord shown in Fig. 2 of Taylor does anything but provide power to the device. *See* Pet. 24; Ex. 2026 ¶ 139.

Based on the foregoing we conclude that Taylor does not disclose this limitation.

### d)  Conclusion

Based on the foregoing analysis, we conclude that Petitioner has failed to show by a preponderance of the evidence that claim 1 is anticipated by Taylor.

### 3.  Claim 17

Claim 17 is an independent apparatus claim and like claim 1 includes the limitations calling for changing volume resulting in modulated positive and negative pressure, and for a control device. Ex. 1001, col. 18, ll. 1–13. The parties' arguments with respect to claim 17 mirror those made with respect to claim 1. Pet. 36–38; Resp. 46–52.

IPR2019-01302
Patent 9,937,097 B2

For the reasons set forth with respect to claim 1 above, we find that Petitioner has not shown by a preponderance of the evidence that claim 17 is anticipated by Taylor.

### 4. *Claims 2–6, 8, 9, and 18–24*

Claim 2–6, 8, 9, and 18–24 are apparatus claims that depend from claim 1 or 17. Petitioner contends that each of the additional elements recited in claims 2–6, 8, 9 and 18–24 are disclosed in Taylor. Pet. 25–29; 39–41.

In addition to its arguments regarding claim 1, Patent Owner also contends that Taylor does not disclose the additional elements recited in claims 2, 9, 13, 14, 18 and 24. Resp. 57–58.

"A dependent claim shall be construed to incorporate by reference all the limitations of the claim to which it refers." 35 U.S.C. § 112(d). Thus, the dependent claims include all of the limitations of claim 1 or claim 17. As discussed above, Petitioner has failed to show that all of the limitations recited in claim 1 and claim 17 are disclosed by Taylor; therefore, the same holds true for dependent claims 2–6, 8, 9, and 18–24.

### 5. *Claims 12 and 26*

Claim 12 is an independent claim and reads:

12. A method comprising:

causing deflections of a flexible wall portions of a

chamber of a stimulation device in opposing directions, thereby resulting in a changing volume of the chamber, the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure; and

applying the modulated positive and negative pressures to a body part through an opening, wherein the stimulation device is positioned by the user for applying the modulated positive and negative pressures using an appendage of the stimulation device,

24

IPR2019-01302
Patent 9,937,097 B2

wherein the appendage is a dildo configured to be inserted into a vagina.

Ex. 1001, col. 7, ll. 40–53. Claim 26 is similar to claim 12. Compare *id.*, *with id.* at col. 18, ll. 33–46.

Like claim 1, claim 12 includes limitations calling for modulating positive and negative pressures with respect to a reference pressure. *Id.* Claim 26 is similar to claim 12 in that it also calls for producing such modulated positive and negative pressures. *Id.* at col. 18, ll. 33–46.

Petitioner presents the same arguments with respect to these elements of claims 12 and 26 that it presented with respect to claim 1. Pet. 31, 41–42.

Patent Owner's arguments with respect to this element are also the same as those presented with respect to claim 1. *See* Resp. 46–52.

For the reasons set forth with respect to claim 1 above, we find that Petitioner has not shown by a preponderance of the evidence that claim 12 or claim 26 is anticipated by Taylor.

### 6. *Claims 13–16 and 27–30*

Claim 13–16 and 27–30 depend from claims 16 and 26. Ex. 1001, col. 17, ll. 53–62, col. 18, ll. 47–61. As they all include the limitation calling for modulated positive and negative pressures with respect to a reference pressure, we conclude that Petitioner has not shown that these claims are anticipated by Taylor.

### E. *Ground 2 – Obviousness based on Taylor Combined with Hovland*

Petitioner contends that claims 1–30 are unpatentable as obvious over Taylor combined with Hovland.

### 1. *Hovland*

Hovland generally discloses a stimulation device wherein suction or a vacuum is applied to the clitoris to promote engorgement of the clitoris with

25

IPR2019-01302
Patent 9,937,097 B2

blood. Ex. 1005, Abst. An alternative embodiment of Hovland teaches the use of super-atmospheric pressure to massage the clitoris. *Id.* at col. 4, ll. 22–24.

### 2.    *Claim 1*

Petitioner contends that Taylor combined with Hovland teaches all of the elements of claim 1. Pet. 45. As discussed with respect to the anticipation ground above, Petitioner contends that Taylor teaches or suggests all of the elements of claim 1. *Id.* Petitioner alternatively contends that to the extent Taylor does not teach modulated positive and negative pressures with respect to a reference pressure, Hovland teaches this limitation. *Id.* at 45–46.

Petitioner contends that Hovland teaches that both suction and increased pressure can be used to massage the clitoris, thereby increasing blood flow and engorgement of the clitoris. *Id.* Petitioner contends Hovland refers to creating a vacuum and/or using increased pressure to produce percussion and/or massage of the clitoris and that one skilled in the art would have interpreted this to teach the use of pressure below ambient and pressure above ambient—positive and negative pressures with respect to a reference pressure. *Id.* at 46–47. Petitioner contends that one skilled in the art would have been motivated to combine the teachings of Hovland and Taylor to produce a product that achieves improved and faster clitoral engorgement. *Id.* at 47–48.

Petitioner also contends that to the extent the power plug of Taylor is not a control device, Hovland teaches the use of a control device. Pet. 48.

Patent Owner contends that neither Hovland nor Taylor teach or suggest modulated positive and negative pressures with respect to a reference pressure. Resp. 52. Hovland teaches:  "According to other

26

IPR2019-01302
Patent 9,937,097 B2

embodiments, pump/motor assembly 300 provides pneumatic and/or
hydraulic actuation to create e.g. vibration, percussion, subatmospheric
pressure and/or superatmospheric pressure, or modulation of these effects."
Ex. 1005, col. 13, ll. 20–24. Patent Owner contends that this passage in
Hovland teaches the modulation of either a vacuum or super atmospheric
pressure, but not modulating between them. Resp. 53. Patent Owner
contends that while Hovland uses the term "and/or" with respect to certain
embodiments, one skilled in the art would not have considered the term to
refer to modulating between positive and negative pressures in the teachings
of the '097 patent. *Id.* at 53–54. Patent Owner contends that the use of the
term and/or refers to a choice of effects and not modulating between them.
*Id.* at 55. Patent Owner also argues that Hovland does not disclose any
structure or means for modulating between positive and negative pressures.
*Id.*

Patent Owner also contends that one skilled in the art would not have
been motivated to combine the teachings of Taylor and Hovland. Resp. 58–
59. Patent Owner argues that Petitioner has not adequately explained or
supported its contention that it would have been obvious to modify Taylor
with the teachings of Hovland to achieve the results stated in Hovland. *Id.*

Petitioner responds that the plain meaning of "and/or" supports its
interpretation that Hovland teaches modulation between positive and
negative pressures. Reply 8. Petitioner argues that Hovland specifically
teaches modulation between various effects, including between positive and
negative pressures. *Id.* Petitioner also contends that combining Taylor with
Hovland is nothing more than modifying Taylor with a known method to
produce a predictable result. *Id.* at 9.

27

IPR2019-01302
Patent 9,937,097 B2

In its Sur-Reply, Patent Owner contends that, when read in context, the term "and/or" as it appears in Hovland refers to a series of alternative modes, but not alternating between these modes to achieve modulation of positive and negative pressures with respect to a reference pressure. Sur-Reply 17–18. Patent Owner also contend that Petitioner misconstrues the teachings of Hovland with respect to using different pressures to stimulate the clitoris. *Id.* at 19–21.

As discussed above, we find that Taylor teaches all of the elements of claim 1 with the exception of the limitations calling for modulated positive and negative pressure, a control device, and an opening for applying positive and negative pressure. We now turn to the questions of whether those elements are taught by Hovland; whether Petitioner has shown that one skilled in the art would have been motivated to combine the teachings of Taylor and Hovland if Hovland teaches the missing limitations; and whether Patent Owner has offered sufficient evidence of objective indicia of patentability to overcome Petitioner's arguments that the subject matter of claim 1 would have been obvious.

### a)  *Modulated Positive and Negative Pressure*

Petitioner contends that, to the extent the elements of modulated positive and negative pressure and control device are not taught by Taylor, those elements are taught by Hovland. Pet. 46–48.

Hovland teaches that in one embodiment, the device disclosed therein has a "pump/motor assembly [which] provides pneumatic and/or hydraulic actuation to create e.g. vibration, percussion, subatmospheric pressure and/or superatmospheric pressure, or modulation of these effects." Ex. 1005, col. 13, ll. 21–24. Petitioner construes this passage as teaching that the device in Hovland can modulate both positive and negative pressures as required by

28

IPR2019-01302
Patent 9,937,097 B2

claim 1. Reply 6–9. Petitioner contends that the use of the term "and/or" would lead one skilled in the art to understand that the device of Hovland can modulate between subatmospheric and superatmospheric pressures. *Id.*

Patent Owner contends that although Hovland may teach a device that can produce positive (superatmospheric) or negative (subatmospheric) pressures, it does not teach modulating between those pressures. Resp. 53. Patent Owner contends that the recited paragraph only indicates that the individual effects can be modulated, but not that the device can modulate between the effects. *Id.* at 54.

We have considered the arguments advanced by the parties and the evidence of record and conclude that Patent Owner has the better argument. While we agree with Petitioner that Hovland teaches a device capable of producing positive and negative pressures individually, we do not find that Hovland discloses modulating between those effects. We agree with Patent Owner that, when read in context, the cited passage refers to modulation of the individual effects recited in the sentence, but not modulation between the effects. Resp. 54–55. As Patent Owner points out, this interpretation is consistent with the overall teachings of Hovland, which describe modulation of the vacuum or negative pressure effect. Resp. 55 (citing Ex. 2026 ¶161). For example, Hovland teaches the use of a vacuum modulator to vary the suction pressure applied by the device, in a manner similar to Taylor's device. Ex. 1005, col. 12, ll. 42–59. Hovland also teaches that the vacuum modulator can be used to pulsate the vacuum level of the device. *Id.* at col. 14, ll. 21–22. Hovland goes on to teach:

> When applied to the clitoris, the vacuum applied by device 200 will cause the clitoris to become engorged, i.e. filled with blood. Vacuum level and modulation can be adjusted by either the patient or her partner, as needed, to maintain engorgement.

IPR2019-01302
Patent 9,937,097 B2

> Thus, embodiments of the invention provide the ability both to rapidly *modulate vacuum pressure* with modulator 290, in a manner akin to the modulation of alternating current, for example, and simultaneously to more evenly hold underlying vacuum pressure at a substantially constant level or gradually change it, e.g. with wheel 280, in a manner akin to direct current. This dual functionality provides substantial advantages over the prior art.

*Id.* at col. 14, ll. 27–39 (emphasis added). Thus when read in the context of the entire disclosure of Hovland, we find that the reference in Hovland to modulation refers to modulation of one specific effect, not modulation between two or more effects.

Petitioner contends that Patent Owner's interpretation of Hovland limits the device to one which produces a vacuum or superatmospheric pressure. Reply 6–9. Petitioner contends that this ignores the use of the term "and/or" as it appears in Hovland, which calls for the device to create both effects. *Id.*; Ex. 1018 ¶¶ 42–55; Ex. 1020 ¶¶ 67–76.

While we agree with Petitioner that the term "and/or" calls for a device that can create both positive and negative pressures, as discussed above, we do not read Hovland as teaching modulating between effects, as required for claim 1. This is confirmed by the plain language of Hovland, which refers to "modulation of these effects" rather than "modulation between effects." Ex. 1005, col. 13, ll. 20–24. Moreover, when the cited paragraph is read in the context of the other disclosures in Hovland discussed above, we find that the overall teachings of Hovland are focused on modulation of the individual effects, not modulating between the effects. Ex. 1005, col. 12, ll. 21–24; Ex. 2026 ¶¶ 161–163. While Hovland teaches a device that can produce positive and negative pressures we discern nothing in Hovland that teaches modulating between these effects.

IPR2019-01302
Patent 9,937,097 B2

Therefore, we conclude that neither Taylor nor Hovland teach the feature of modulating positive and negative pressures with respect to a reference pressure in a sexual stimulation device.

b)  *Motivation to Combine*

As noted above, a determination of obviousness requires more that showing that all of the elements are present in the prior art. There must be a motivation to combine those elements to produce the claimed invention. *Unigene*, 655 F.3d at 1360. Because we have found that neither Taylor nor Hovland teach modulating between positive and negative pressures with respect to a reference pressure, we need not analyze whether Petitioner has failed to establish by a preponderance of the evidence that the combination of Taylor and Hovland renders obvious claim 1 of the '097 patent. Nonetheless, even assuming that the Hovland teaches this requirement based on the its disclosure of "subatmospheric pressure and/or superatmospheric pressure, or modulation of these effects," we further find that Petitioner has also failed to show a rationale as to why one of ordinary skill in the art would have combined the teachings of Taylor and Hovland to arrive at the claimed subject matter of the challenged claims.

In the present case, Petitioner contends that the motivation to combine the teaching of Taylor and Hovland arises from the teachings in Hovland that percussion and/or massage of the clitoris achieves improved and faster clitoral engorgement. Pet. 47 (citing Ex. 1005, col. 4, ll. 19–28; Ex. 1002 ¶ 105). Petitioner also contends that the combination of references is nothing more than using a known technique to improve a similar device. *Id.* at 47–48.

Patent Owner contends that Petitioner's argument is factually unsupported in that Petitioner does not explain how one skilled in the art

31

IPR2019-01302
Patent 9,937,097 B2

would have modified the references or how the references teach modulation between positive and negative pressures. Resp. 58–59.

We have considered the arguments presented by the parties and the evidence of record and find that Petitioner has not adequately explained why one skilled in the art would have been motivated to combine the teachings of Taylor and Hovland to produce a stimulation device that modulates between positive and negative pressure.

The paragraph relied upon by Petitioner for establishing such a rationale reads:

> A vacuum created over the clitoris, or suction applied to the clitoris, for example, creates a negative pressure in the clitoris that is or is likely to be lower than the systolic blood pressure. *Alternatively*, super-atmospheric pressure may be provided to produce massage or percussion of the clitoris and/or the surrounding area. *In either case*, the pressure differential tends to promote engorgement of the clitoris with blood and/or otherwise stimulate blood flow, providing the benefits described above while increasing the likelihood of short-term pleasurable effect and beneficial longer-term usage. Embodiments of the invention thus may encourage more regular and active compliance with a treatment program for urinary and/or fecal incontinence, while at the same time treating female sexual dysfunction if needed. Embodiments of the invention also are non-invasive, non-pharmacological, relatively inexpensive and easy to use.

Ex. 1005, col. 4, ll. 18–34 (emphasis added). It is clear from reading this paragraph that Hovland is talking about the benefits of using *either* negative or positive pressure, but not both. Thus, insofar as Hovland does not teach such modulation, Hovland does not provide the motivation to modify Taylor to modulate between positive and negative pressure.

Based on the foregoing we find that Petitioner has failed to establish a motivation to combine the teachings of Taylor with those of Hovland.

32

IPR2019-01302
Patent 9,937,097 B2

### c)   Objective Indicia

Before reaching an ultimate conclusion on obviousness, we must consider so-called objective indicia of non-obviousness when they are in evidence. *Graham*, 383 U.S. at 18. Objective indicia of non-obviousness, or "secondary considerations," guard against hindsight reasoning in an obviousness analysis, and are often "the most probative and cogent evidence in the record." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016) (citations omitted). As such, objective indicia of non-obviousness must be considered in every case in which they are presented. *Id.* (citing *Transocean Offshore Deepwater Drilling Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012)). The secondary considerations evidence we must consider, if presented, include "copying, long felt but unsolved need, failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, and skepticism of skilled artisans before the invention." *Rouffet*, 149 F.3d at 1355. We must also determine if Patent Owner has shown a nexus between the evidence and the merits of the claimed invention. *Wyers*, 616 F.3d at 1246.

### (1)   Nexus

There must be a "nexus" between the merits of the claimed invention and the evidence of secondary considerations for such evidence to be accorded substantial weight. *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011). Nexus is presumed if a marketed product embodies the claimed features and is coextensive with them. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1372 (Fed. Cir. 2013). A patent owner is entitled to a presumption of a nexus if it shows that "the asserted objective evidence is

33

IPR2019-01302
Patent 9,937,097 B2

tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP*, 829 F. 3d at 1335.

Patent Owner contends that two of its commercial products, the Womanizer® InsideOut and Womanizer® Duo, "embody and are coextensive with" the claims of the '097 patent. Resp. 67. In support of this contention Patent Owner relies on the testimony of its experts Drs. Jensen and Herbenick. Resp. 10 (citing Exs. 2006, 2026 and 2028).[4]

Both Dr. Herbenick and Dr. Jensen reviewed the Womanizer® InsideOut and concluded that the device was coextensive with at least claim 1 of the '097 patent. Ex. 2026 ¶ 41; Ex. 2028 ¶ 39. Dr. Herbenick prepared a detailed claim chart tracking each element of the independent claims to specific components of the Womanizer® InsideOut, concluding that the device contained each of the structural elements recited in the independent claims. Ex. 2028 ¶¶ 41–47; Ex. 2006. Dr. Jensen reviewed the device and Dr. Herbenick's claim charts and also concluded that all of the structural elements were present in the device. Ex. 2028 ¶ 41.

Dr. Jensen also conducted an experiment to determine whether the Womanizer® InsideOut produced modulated positive and negative pressures with respect to a reference pressure. Ex. 2028 ¶¶ 42–44. The following images from Dr. Jensen's declaration shows the equipment used to test the pressure of the InsideOut, as well as the pressure graph generated as a result of the tests:

---

[4] As both Dr. Herbenick and Jensen have testified, the Womanizer® InsideOut and Womanizer® Duo differ only in style features with the structure and mechanics of the two devices being the same. Ex. 2026 ¶ 41; Ex. 2028 ¶ 38. For this reason, Dr. Herbenick and Jensen focused their analyses on the Womanizer® InsideOut. Ex. 2026 ¶ 41; Ex. 2028 ¶ 38.

34

IPR2019-01302
Patent 9,937,097 B2



Ex. 2026 ¶ 42. As shown in the top images above, Dr. Jensen's testing set-up

included an oscilloscope, data acquisition equipment ("DAQ"), and a

pressure sensor with an air-tight pressure sensing plug connected to the

device. *Id.* In the pressure graph shown above, the y-axis indicates pressure

(as a voltage measurement) relative to ambient or atmospheric pressure (zero

line) and the x-axis indicates time (milliseconds). *Id.* Based on the results of

that experiment and the product literature relating to the Womanizer®

InsideOut, Dr. Jensen concluded that the commercial devices meet the

limitations calling for modulated positive and negative pressures with

respect to a reference pressure. Ex. 2028 ¶¶ 43–44.

IPR2019-01302
Patent 9,937,097 B2

Petitioner contends that Patent Owner has failed to establish a nexus between the commercial products and the challenged claims. Resp. 21. Petitioner contends that Patent Owner's arguments are largely based on the testimony of Dr. Herbenick, who Petitioner contends is not qualified to render such opinions. *Id.*

Petitioner contends that Patent Owner is not entitled to a presumption that the commercial devices embody the claimed invention as they include features not recited in the claims. *Id.* at 22.  Petitioner also argues that Dr. Jensen's testing of the alleged commercial embodiment is unsound and does not establish a nexus between the device and the claims. *Id.*

We have considered the arguments presented by the parties and the evidence of record and find that Patent Owner has established a nexus between the claims of the '097 patent and its commercial products. The testimony of both Dr. Herbenick and Dr. Jensen demonstrate that the elements of the claims are present in the Womanizer® InsideOut and Womanizer® Duo products and that the products are essentially the claimed invention. Ex. 2026 ¶¶ 40–44; Ex. 2028 ¶¶ 36–47.

Petitioner contends that the presence of additional, unclaimed features precludes a presumption of a nexus between the commercial embodiments and the claims of the '097 patent. Reply 22. In support of this contention Petitioner cites to *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366 (Fed. Cir. 2019). Petitioner's reliance on *Fox Factory* is misplaced. As the court in *Fox Factory* stated:

> To be sure, we have never held that the existence of one or more unclaimed features, standing alone, means nexus may not be presumed. Indeed, there is rarely a perfect correspondence between the claimed invention and the product. As we explained, the purpose of the coextensiveness requirement is to ensure that

36

IPR2019-01302
Patent 9,937,097 B2

> nexus is only presumed when the product tied to the evidence of secondary considerations "is the invention disclosed and claimed." Thus, if the unclaimed features amount to nothing more than additional insignificant features, presuming nexus may nevertheless be appropriate.

*Id.* at 1375. The court went on to state: "Although we do not require the patentee to prove perfect correspondence to meet the coextensiveness requirement, what we do require is that the patentee demonstrate that the product is essentially the claimed invention." *Id.*

In *Fox Factory*, the alleged commercial embodiment included unclaimed features that the patentee described as critical to the products' performance. *Id.* at 1374–1375. It was the presence of these critical, unclaimed features that lead the court to hold: "A patent claim is not coextensive with a product that includes a 'critical' unclaimed feature that is claimed by a different patent and that materially impacts the product's functionality." *Id.*

The case before us is factually distinct from *Fox Factory*. While Petitioner has identified several features of the Womanizer® products that are not recited in the claims, Petitioner has not pointed to nor do we discern any evidence to suggest that these unclaimed features are critical to the products and impact the products' functionality. *See* Reply 22. While Dr. Herbenick testified that additional features were present in the Womanizer® devices, Petitioner has not pointed to any testimony by Dr. Herbenick or other evidence to support the contention that these additional features significantly affect the functionality of the devices. *See* Reply 22–23; Ex. 1023, 115–116.

Petitioner also contends that Patent Owner's evidence that the commercial products are coextensive with the claims of the patent is

37

IPR2019-01302
Patent 9,937,097 B2

unreliable. Reply 23. Petitioner contends that Dr. Herbenick did not perform a technical analysis of the devices herself and lacks the technical expertise to perform such an analysis. *Id.* With respect to Dr. Jensen's testimony, Petitioner contends that Dr. Jensen's testing technique is unsound and should not be relied upon. *Id.* at 23–24. We find both of these argument unpersuasive.

While we agree with Petitioner that Dr. Herbenick does not have a technical degree that would enable her to opine about the operation of various components in the commercial embodiments, we note that she has studied and tested various sexual stimulation devices. Ex. 2018 ¶¶ 12–13. Based on her experience with such devices we find that Dr. Herbenick is qualified to identify the various components of the commercial embodiments as she did in her declaration and claim chart. Ex. 2006; Ex. 2028 ¶¶ 39–47. Moreover, Dr. Jensen, who has a background in medical devices, examined the commercial embodiments and Dr. Herbenick's analysis and claim charts and concurred in Dr. Herbenick's findings. Ex. 2026 ¶¶ 41, 170.

We are similarly unpersauded by Petitioner's critique of Dr. Jensen's testing methodology. In particular, Petitioner and Dr. Prisco point to Dr. Jensen's deposition testimony indicating that he used a rubber plug or bottle stopper with the pressure sensor for his testing. Ex. 1018 ¶¶ 77–78; Ex. 2022, 61:2–20. Petitioner contends that this technique is unreliable because the rubber stopper used by Dr. Jensen 'could be filling most of the chamber." Reply 23–24. In support of this contention Petitioner cites to Dr. Prisco's and Mr. Meyst's testimony concerning the use of the stopper by Dr. Jensen. *Id.* Dr. Prisco, however, never testified that the stopper might fill the chamber, but rather that the use of the stopper could affect the pressures generated. Ex. 1018 ¶ 78. Dr. Prisco offers no explanation why this might be

38

IPR2019-01302
Patent 9,937,097 B2

so or that it actually occurred when Dr. Jensen conducted his experiments. For this reason, we give little weight to Dr. Prisco's critique of Dr. Jensen's methodology. *Ebit Sys. Am., LLC v. Thales Visonix, Inc.*, 881 F.3d 1354, 1358 (Fed. Cir. 2018) ("The PTAB [i]s entitled to weigh the credibility of the witnesses . . . .") (internal citation omitted).

Mr. Meyst also testified that he had issues with how Dr. Jensen conducted his experiments. Ex. 1020 ¶¶ 91–95. As part of his critique, Mr. Meyst identified several potential issues with respect to Dr. Jensen's test method. *Id.* While Mr. Meyst opines that he would have conducted the experiments differently, Mr. Meyst does not explain how the alleged irregularities affected the results achieved by Dr. Jensen that the Womanizer® devices modulated positive and negative pressure with respect to a reference pressure. *Id.*

Dr. Prisco also testified that the data produced by Dr. Jensen shows that the pressure in the device modulated at a pressure greater that atmospheric pressure. Ex. 1018 ¶¶ 82–83. Petitioner contends that this further supports the conclusion that Dr. Jensen's test results are unreliable. *See* Reply 24. Again, we are not persuaded by this argument. Even if we were to accept Petitioner's argument that the reference pressure in Dr. Jensen's test was something other than atmospheric pressure, our construction of reference pressure does not limit the term to atmospheric pressure, but only the pressure in the device before it is placed in operation. Petitioner does not dispute that the data produced by Dr. Jensen show modulation of positive and negative pressure with respect to a reference pressure regardless of whether it is atmospheric pressure. *See id.*; Ex. 1018 ¶¶ 82–83.

39

IPR2019-01302
Patent 9,937,097 B2

Based on the foregoing we conclude that Patent Owner has established a nexus between the Womanizer® InsideOut and Womanizer® Duo products and the claims of the '097 patent.

### (2) Commercial Success

The commercial response to an invention is significant to determinations of obviousness and is entitled to fair weight. *Demaco Corp. v. F.von Langsdroff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988).

Patent Owner contends that the Womanizer® products are "stand-out successes." Resp. 67. In support of this contention, Patent Owner points to various consumer testimonials as well as Dr. Herbenick's testimony regarding the sales of Womanizer® products. *Id.*

Petitioner contends that Dr. Herbenick's testimony should be given little weight as Patent Owner did not produce the sales data referenced in Dr. Herbenick's testimony. Reply 25.

Patent Owner responds that the failure to produce revenue data is irrelevant given the significant number of consumer reviews and Dr. Herbenick's testimony. Sur-Reply 25.

We have considered the arguments presented by the parties and the testimony of Dr. Herbenick and evidence of record and find that Patent Owner has not shown that the Womanizer® products are commercially successful.

Commercial success in the context of secondary considerations is typically established by evidence of sales of the product embodying the claimed invention and relevant market share.[5] *In re Applied Materials, Inc.*,

---

[5] The analysis also requires a showing of a nexus between the claimed features and the sales of the relevant product. *Applied Materials*. 692 F.3d at 1299.

40

IPR2019-01302
Patent 9,937,097 B2

692 F.3d 1289, 1299 (Fed Cir. 2012). In the present case Patent Owner has

only offered the testimony of Dr. Herbenick that the relevant products have

achieved significant sales volumes and that sales continue to increase. Resp.

67 (citing Ex. 2028 ¶ 49). However, Patent Owner has not produced the

sales data that served as the basis for Dr. Herbenick's conclusion, precluding

an independent analysis of the data. *See* Reply 24; Sur-Reply 24; Ex. 2028

¶ 49, n.11.[6] Moreover, Dr. Herbenick did not offer any testimony regarding

the market share for the relevant products. *See* Ex. 2028 ¶ 49.

Patent Owner contends Dr. Herbenick's testimony, coupled with the

consumer reviews of the relevant products, is sufficient to establish

commercial success. Sur-Reply 25. We are not persuaded by this argument.

While the customer reviews may be relevant to showing a nexus between the

commercial sales and the claimed features, the reviews do not provide any

information regarding the actual sales and relevant market share.

Absent sales and market share information, we cannot determine if the

relevant products enjoyed commercial success sufficient to support a finding

of non-obviousness. *Applied Materials*, 692 F.3d at 1299.

### (3) Long-Felt Need

"Evidence of a long felt but unsolved need that is met by the claimed

invention is further evidence of non-obviousness." *Millennium Pharms., Inc.

v. Sandoz Inc.*, 862 F.3d 1356, 1369 (Fed. Cir. 2017). Evidence of a long felt

---

[6] Dr. Herbenick states that the reason the underlying data was not produced
was that the standard protective order did not provide sufficient protection
for this highly confidential material. Ex. 2028 ¶ 49, n.11. We note that if
Patent Owner had wished to rely on the sales data shown to Dr. Herbenick,
Patent Owner could have requested a modification of the Protective Order to
protect its highly confidential information. *See* 37 C.F.R. § 42.52(a)(7).
Patent Owner did not avail itself of this option.

41

IPR2019-01302
Patent 9,937,097 B2

but unresolved need tends to show non-obviousness because it is reasonable to infer that the need would have not persisted had the solution been obvious. *WBIP*, 829 F.3d at 1332.

Patent Owner contends that there was a long-felt but unmet need for a sexual stimulation device that provided sexual pleasure while minimizing potential side effects. Resp. 68 (citing Ex. 2028 ¶ 50). Patent Owner contends that the use of prior art stimulation devices could cause numbness or damage to genitalia creating a need for a device which avoided these effects. Resp. 68. Citing the testimony of Dr. Herbenick, Patent Owner contends that the Womanizer® products satisfied this need. *Id.* at 69 (citing Ex. 2028 ¶¶ 52–54).

In its Reply, Petitioner contends that indirect stimulation devices such as the claimed device were known in the art before the invention of the claimed device and that such devices would have avoided the side effects recited by Dr. Herbenick. Reply 25–26. Petitioner also contends that Patent Owner has not presented any empirical data to show that the commercial embodiments filled the long-felt need. *Id.* at 26.

In its Sur-Reply, Patent Owner contends that the testimony of Dr. Herbenick is sufficient to support a finding that the Womanizer® products satisfied a long-felt need. Sur-Reply 25.

We have considered the arguments presented by the parties and the evidence of record and conclude that Patent Owner has shown that there was a long-felt need that was satisfied by the Womanizer® products.

Dr. Herbenick testified that she led a study of women who used vibrators and found that 28.5% of women who used vibrators experienced one or more side effects including genital numbness, pain, irritation, inflammation/swelling, tears or cuts. Ex. 2028 ¶ 51 (citing Ex. 2008, 1861–

42

IPR2019-01302
Patent 9,937,097 B2

1863, Table 5). Dr. Herbenick testified that these injuries resulted in the need for a sexual stimulation device "that was effective at facilitating sexual pleasure and/or orgasm while minimizing the potential for side effects." *Id.* Dr. Herbenick testified that the Womanizer® products satisfied this need by "providing alternating positive and negative pressures to the clitoris so as to provide indirect stimulation to the clitoris sufficient to facilitate female orgasm. This is important as physical contact has caused numbness or even tears or cuts in a subset of female vibrator users." Dr. Herbenick also testified that the prior art devices, including the device disclosed in Taylor, failed to meet this need. *Id.* ¶ 53.

Petitioner contends that indirect stimulation devices were known in the art and that such devices could also cause unwanted effects. Reply 25–26. We find this argument unpersuasive. Petitioner cites to the testimony of Dr. Herbenick to support this contention. *Id.* However, a careful reading of the cited pages reveals that Dr. Herbenick testified that, in the study she conducted, women were merely asked what type of vibrator was used but not whether the vibrator was used directly or indirectly. Ex. 1023, 61–62. We also note that Dr. Herbenick testified that at the time she conducted her study most of the vibrators available in the market would have been direct vibration without a lot of indirect possibilities. Ex. 1023, 62–63. While she testified that there were some devices in the market that provided indirect stimulation, they were suction-only devices that were less popular. *Id.* Dr. Herbenick testified that these suction-only devices are not the same as the Womanizer® devices, which apply alternating positive and negative pressures. *Id.*

Petitioner also contends that Patent Owner has failed to present any empirical data to support show that the Womanizer® products fulfill the

43

IPR2019-01302
Patent 9,937,097 B2

alleged long-felt need. Reply, 26. Again we are unpersuaded by Petitioner's argument. Petitioner has not stated what specific "empirical data" is needed to show that the Womanizer® products fulfill the need, nor has Petitioner cited any case law holding that such data is required. *Id.* Moreover, Petitioner has not presented any evidence to rebut Dr. Herbenick's conclusion that the Womanizer® devices do fulfill the long-felt need.

In reaching our decision that the Womanizer® products fulfilled a long-felt need in the market for female sexual stimulation devices, we credit Dr. Herbenick's extensive experience in studying sexual health and behavior, including vulvar and vaginal health, as well as the use of sexual enhancement products such as vibrators including her detailed studies reported in Exhibit 2008. Ex. 2028 ¶¶ 7, 12, 13, 16, 50–54. Petitioner did not offer any expert with a similar background to rebut Dr. Herbenick's testimony.

### (4) Failure of Others

Evidence that others tried but failed to develop a claimed invention may carry significant weight in an obviousness inquiry. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1081 (Fed. Cir. 2012). This objective indicia factor is closely tied to the long-felt need factor discussed above. *Id.* at 1082 ("Longfelt need is closely related to failure of others.").

Patent Owner contends that prior to the development of the Womanizer® products, "experts in sexual health and behavior were well aware of the potential adverse side effects of using vibrators for sexual stimulation, yet no one had successfully designed a product that facilitated orgasm while physically contacting the clitoris without also having these potential side effects, despite numerous attempts." Resp. 69. In support of

44

IPR2019-01302
Patent 9,937,097 B2

this contention, Patent Owner cites Dr. Herbenick's testimony that while experts in the field were aware of the issues of clitoral discomfort and numbness that arose from direct clitoral contact, none of the prior art devices accomplished the goal of providing a stimulation device without discomfort or numbness. *Id.*; Ex. 2028 ¶¶ 53–57.

Petitioner does not address Patent Owner's argument or evidence. *See* Reply 21–26.

We find that Patent Owner has persuasively shown that others in the field failed to develop a sexual stimulation device that avoided the issues of clitoral discomfort or numbness.

Dr. Herbenick testified based on her own experience in teaching the use of various stimulation devices and her work in developing such devices that no one had developed a product that achieved sexual stimulation in the same manner as the Womanizer® devices. Ex. 2012 ¶¶ 55–57. Dr. Herbenick testified that each prior device of which she was aware was limited to "either direct contact (such as vibrator or flicking) or was limited to providing suction." *Id.* ¶ 57. Neither of these approaches solved the issue of clitoral discomfort or numbness. *See id.*

### (5) Skepticism

Evidence of industry skepticism about whether or how a problem could be solved, or the workability of the claimed solution, weighs in favor of nonobviousness of the claimed invention. *United States v. Adams*, 383 U.S. 39, 52 (1966); *WBIP*, 829 F.3d at 1335.

Patent Owner contends that "industry experts and participants were skeptical about the commercial embodiments and, specifically, about how modulating between positive and negative air pressure might facilitate orgasm." Resp. 70 citing Ex. 2028 ¶¶ 58–61.

45

IPR2019-01302
Patent 9,937,097 B2

Petitioner contends that skepticism must be evaluated from the viewpoint of industry experts and that, with the exception of Dr. Herbenick, the evidence submitted by Patent Owner is limited to consumer reviews. Reply 26 (citing *WBIP*, 829 F.3d at 1335; *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1365 (Fed. Cir. 2007)).

We have considered the arguments presented by the parties and the evidence of record and find that Patent Owner has shown industry skepticism relating to the Womanizer® products. Although we agree with Patent Owner that most of the reviews cited by Dr. Herbenick are consumer reviews and not experts in the field, the compilation of reviews cited by Dr. Herbenick include reviews from experts who expressed skepticism about the products. For example, there is a review by Dr. Emily Morse, "a sexologist with a doctorate in human sexuality," who expressed skepticism about the product in her review. Ex. 2015, 1–2. Another expert is Vanessa Marin, a licensed psychotherapist specializing in sex therapy, who reviewed the product and expressed skepticism about it. Ex. 2016, 124–130. These reviews plus the testimony of Dr. Herbenick show industry skepticism about the Womanizer® products. Ex. 2028 ¶¶ 58–61.

### (6)  Praise by Others

Evidence of industry praise of the claimed invention weighs in favor of nonobviousness. *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016). Evidence of industry praise may include evidence of industry awards given to commercial embodiments of the claimed invention. *See Henny Penny Corp. v. Frymaster, LLC*, 938 F.3d 1324, 1333–1334 (Fed. Cir. 2019) (finding evidence of industry praise, including industry awards for the patented product).

IPR2019-01302
Patent 9,937,097 B2

Patent Owner contends that, notwithstanding the industry skepticism discussed above, the industry has also praised the Womanizer® products extensively. Resp. 70. Patent Owner contends that reviews of the Womanizer® products have described them as "innovative, unique, and [in] other similar terms." *Id.* at 71 (citing Ex. 2028 ¶¶ 62–69). Patent Owner also contends that the Womanizer® products have received at least 18 industry awards including the Most Innovative Product award at the 2018 ADULTEX Awards. *Id.*

Petitioner has not presented any arguments in response to Patent Owner's showing. *See* Reply 23–26.

We find that Patent Owner has presented evidence showing praise in the industry favoring a finding of non-obviousness. As Dr. Herbenick testified, the Womanizer® InsideOut was named the most innovative Product at the 2018 ADULTEX Awards. Ex. 2028 ¶ 68; Ex. 2017, 1–4. The Womanizer® Duo was recognized and the Luxury Product/Range of the Year at the 13th annual StorErotica Awards in 2019 and was named the Sex Toy Product/Line of the Year – Powered (Vibrating) at the XBIZ Europa Awards. Ex. 2028 ¶ 68; Ex. 2017, 5–25. Dr. Herbenick also testified that the Womanizer® Duo was praised by Cosmopolitan magazine as having pressure waves that "gently suck the clitoris to give you an entirely different orgasmic sensation." Ex. 2028 ¶ 65; Ex. 2016, 64. In addition, the Womanizer® products have received praise by both sex toy retailers and consumers. Ex. 2028 ¶¶ 62–69.

### (7) Copying

"Copying may indeed be another form of flattering praise for inventive features." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1311 (Fed. Cir. 2010).

47

IPR2019-01302
Patent 9,937,097 B2

Patent Owner contends that Petitioner and others have copied that Womanizer® products and that this supports a finding on non-obviousness. Resp. 72–73. To support this contention, Patent Owner points to descriptions of competitors' devices which describe the devices as offering "pleasure air technology" or "touchless air technology," which Dr. Herbenick contends describes modulated positive and negative pressures with respect to a reference pressure. *Id.*; Ex. 2028 ¶ 71.

Petitioner contends that Patent Owner has not shown sufficient evidence of copying to support a finding of non-obviousness. Reply 25. Petitioner contends that Dr. Herbenick did not review tests of the competitors' devices, nor could she describe how the products worked. *Id.*

In reply, Patent Owner contends that Petitioner mischaracterizes Dr. Herbenick's testimony and fails to rebut the evidence of copying. Sur-Reply 25.

Copying in the context of objective indicia of non-obviousness can be demonstrated either through internal documents, direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica, or access to, and substantial similarity to, the patented product (as opposed to the patent). *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). Marketing materials may also be used to show copying. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1368 (Fed. Cir. 2012).

We have considered the arguments presented by the parties and the evidence of record and find that Patent Owner has presented sufficient evidence of copying to support to finding of non-obviousness. Although Dr. Herbenick did not physically examine the competitors' devices, she did

48

IPR2019-01302
Patent 9,937,097 B2

review various product descriptions which either compared the competitors' devices to the Womanizer® products or described the action of the products in a way that mirrored the actions of the Womanizer® products. Ex. 2028 ¶¶ 70–71. For example, a review of the Blowfish clitoral stimulator was described by Cosmopolitan magazine as "Mimicking the technology of the Cosmo-loved Womanizer." Ex. 2034. Similarly the Satisfier website described the Satisfyer Pro G-Spot Rabbit as offering a "rapid change between suction and pressure." Ex. 2024, 4.

Given this evidence of the similarity of the competitive products to the Womanizer® products and Petitioner's failure to offer any evidence in rebuttal, we find that Patent Owner has presented persuasive evidence of copying to support a conclusion of non-obviousness.

### (8) Conclusion

Based on the foregoing we conclude that Patent Owner has presented sufficient evidence relating to objective indicia to support a finding of non-obviousness. Although Patent Owner failed to present persuasive evidence relating to commercial success, Patent Owner has presented persuasive evidence relating to long-felt need, failure of others, praise by others, and copying. Patent Owner has also shown a nexus between its commercial products and the claimed invention. In sum, the objective indicia evidence in the record supports the non-obviousness of the challenged claims.

### 3. The Remaining Claims

As discussed above with respect to Ground 1, all of the remaining claims include a limitation calling for modulation of positive and negative pressures with respect to a reference pressure. Based on our analysis above, we find that Petitioner has not presented sufficient persuasive evidence that the subject matter of the remaining claims would have been obvious over

49

IPR2019-01302
Patent 9,937,097 B2

Taylor combined with Hovland and that Patent Owner has presented persuasive evidence regarding objective indicia of non-obviousness.

### 4.   Conclusion

From the foregoing analysis we conclude that Petitioner has not demonstrated that the subject matter of claims 1–30 would have been obvious to one of ordinary skill in the art over Taylor combined with Hovland.

### F.   Ground 3 – Obviousness Based on Guan Combined with Lee and Hovland

Petitioner contends that claims 1–30 are unpatentable as obvious over Guan combined with Lee and Hovland. Pet. 53.

### 1.   Guan

Guan discloses a gas health massager that generates pulsating air pressure to stimulate meridian points for therapeutic purposes. Ex. 1007, 3. Guan teaches the contraction of an air bag to produce the pulsating air pressure. *Id.*

### 2.   Lee

Lee discloses a mechanized dildo having vibratory elements placed on the dildo so as to stimulate a clitoris. Ex. 1006, Abst.

### 3.   Non-Analogous Art

Before we begin our analysis of the claims we first address Patent Owner's contention that Guan cannot be properly combined with Lee as Guan is non-analogous art. Resp. 42–45.

"Two criteria have evolved for determining whether prior art is analogous: (1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to

50

IPR2019-01302
Patent 9,937,097 B2

the particular problem with which the inventor is involved." *In re Clay*, 966 F.2d 656, 658–59 (Fed. Cir. 1992).

Patent Owner argues that the field of endeavor for the present invention is sex toys whereas Guan is directed to medical treatment using a variation of acupuncture. Resp. 43. Patent Owner supports this argument by pointing to the teachings in the Specification that the claimed device is designed to be used to stimulate erogenous zones. *Id.* at 43–45. Patent Owner contends that Guan is directed to acupressure/acupuncture and is not relevant to sexual stimulation. *Id.*

Petitioner contends that acupressure can be used in the genital region. Reply 19. Petitioner also contends that Patent Owner's contention that the device described in the '097 patent is limited to stimulating erogenous zones is contradicted by the teachings of the '097 patent and by Patent Owner's experts. *Id.* at 20. Petitioner also argues that Patent Owner's argument that Guan is not relevant because the invention is limited to sex toys fails. *Id.* at 21 (citing 21 C.F.R. § 884.5960 (categorizing genital vibrators as medical devices); Ex. 1034).

Patent Owner responds by contending that the presence of acupressure points in the genital region does not render Guan relevant prior art. Sur-Reply 21. In support of this contention Patent Owner points to the testimony of Dr. Herbenick that acupressure meridian theory is not concerned with sexual arousal and orgasms and that one skilled in the art would not look to meridian theory to aid in developing a sex toy. *Id.* (citing Ex. 2028 ¶ 78; Ex. 1023, 97).

Patent Owner also argues that Petitioner's reliance on the location of meridians in the perineum or genitals is misplaced. *Id.* at 21–22. Petitioner contends that treatment for sexual dysfunction is different than sexual

51

IPR2019-01302
Patent 9,937,097 B2

stimulation and that they entail different approaches. *Id.* at 22. Patent Owner also contends that the regions where the meridians are located, e.g., the perineum, are significantly different than the vulva or the clitoris. *Id.*

In our Rehearing Decision, we addressed Patent Owner's contention that Guan is non-analogous art and held that although Guan is not directed to a sex toy, it is reasonably pertinent to the problem faced by the inventor. Reh'g Dec. 6. Having considered the arguments of the parties and the evidence of record, we affirm our original conclusion that Guan is analogous art.

Guan is directed to a device that uses pulses of air to massage or stimulate a body part. *See* Ex. 1007, 1; Ex. 1002 ¶ 70. Although we agree with Patent Owner that the principle use of the claimed device is stimulation of the clitoris, the '097 patent teaches its general applicability to stimulating a body part. Ex. 1001, Abst.; col. 1, ll. 19–20, col. 4, ll. 51–56, col. 10, l. 63 to col. 11, l. 4, claim 1.

Moreover, the Specification teaches that the disclosed device creates a massaging effect on the body part in an indirect way. Ex. 1001, col. 5, ll. 39–41. Guan also massages a body part indirectly. *See* Ex. 1007, 3. Thus, both the present invention and Guan address similar issues and Guan can be considered analogous art.

### 4. *Analysis of Claim 1*

Petitioner contends that the combination of Guan, Lee, and Hovland teaches each of the limitations recited in claim 1. Pet. 53–62. Because we find that Petitioner has not shown by a preponderance of the evidence that the challenged claims are unpatentable as obvious over the combination of Guan, Lee, and Hovland, we will concentrate our analysis on only the limitation that Petitioner has failed to show taught by the combination,

52

IPR2019-01302
Patent 9,937,097 B2

which is the requirement for "the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure."

   a) *The changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure*

Petitioner contends that Guan teaches this limitation. Pet. 55–56. Petitioner contends that prior to starting any motion of the air bag, the pressure in the device is the reference pressure. *Id.* (citing Ex. 1002 ¶¶ 70, 128–129). Petitioner contends that as the lever in Guan compresses the air bag, it creates a positive pressure with respect to the reference pressure. *Id.* Petitioner contends that as the lever expands the airbag, it creates a negative pressure with respect to the reference pressure. *Id.* Petitioner contends that this results in modulated positive and negative pressures with respect to a reference pressure. *Id.*

In support of these arguments Petitioner initially relies on the following testimony of Dr. Prisco:

> 69. In *Guan*, when power is turned on to activate electromagnet 5, the electromagnet 5 will drive the magnet 4 and the lever 3 to oscillate about the pinned connection (as annotated using the curved arrow in the figure of *Guan* reproduced above), and cause the wall of air bag 2 marked A (in the figure above) to reciprocate towards and away from mouth 1 to cyclically expand and contract the air bag 2. (*Id.*)

> 70. Before wall A starts to reciprocate, the pressure of air in air bag 2 is at the prevailing atmospheric pressure. When mouth 1 is in contact with the body and air bag 2 contracts, the air in air bag 2 gets compressed, and its pressure increases to a value above the prevailing atmospheric pressure. Similarly, when mouth 1 is in contact with the body and air bag 2 expands, the air in air bag 2 also expands, and its pressure decreases below the prevailing atmospheric pressure. As the pressure inside air bag 2 increases above the prevailing atmospheric pressure, air

53

IPR2019-01302
Patent 9,937,097 B2

> flows from the air bag 2 through the mouth 1 on to the body part that is in contact with the mouth 1. (*Id.*) And, when the pressure inside air bag 2 decreases below the prevailing atmospheric pressure, air flows from the mouth 1 into the air bag 2 and applies a suction force on the body part. In this manner, activation of the electromagnet 5 generates and applies a "pulsating air pressure" on the body for stimulation.

Ex. 1002 ¶¶ 69–70; *see also id.* ¶¶ 127–129. Dr. Prisco testified that the operation of Guan as he described would result in "modulated positive and negative pressures with respect to a reference pressure." *Id.* ¶ 128.

Patent Owner responds that Guan does not disclose modulated positive and negative pressures, but is limited to pulsing positive pressure. Resp. 30–31. Patent Owner contends that Petitioner's contentions with respect to Guan teaching modulated positive and negative pressures is not supported by the limited disclosure in Guan. Resp. 32–34.

Patent Owner supports these arguments with the testimony of Dr. Jensen who testified:

> Guan fails to provide a complete or clear description of the device's elements or the interactions and functioning of its elements. Guan fails to provide specific details of, for example, the coupling of lever (3) to other components, the orientations of the electromagnet and magnet (*e.g.*, orientations of the charges and poles), which are required to determine the movement of the lever (3) and the magnet (4), and details regarding how air enters and exits the air bag or even deformation of the airbag.

Ex. 2027 ¶ 103. Dr. Jensen goes on to note that Dr. Prisco's analysis of Guan is not supported by the teachings of Guan, but are based on assumptions using information gleaned solely from the '097 patent in an inappropriate hindsight analysis. *Id.* ¶ 104 (stating "[n]othing in Guan discloses an air-tight seal between the mouth (1) and the body. . . A POSITA

54

IPR2019-01302
Patent 9,937,097 B2

would not interpret Guan as Petitioner and Dr. Prisco have, without knowledge gleaned from the '097 Patent").

Patent Owner also contends that the reciprocating motion of Guan only creates a variation in positive pressure and does not result in a negative pressure. Resp. 34–35. Patent Owner contends that one skilled in the art would have understood the device described in Guan to pulse air in only one direction and not between positive and negative pressures. *Id.*

Patent Owner contends that one skilled in the art would not have been motivated to modify Guan to modulate positive and negative pressures. Resp. 35–36. Patent Owner contends that Guan is directed to mimicking meridian-based therapies, which use either positive pressure or negative pressure, but not both. *Id.* Patent Owner contends that nothing in Guan would have led one skilled in the art to modify the device to produce both positive and negative pressures. *Id.* Patent Owner contends that Petitioner's experts improperly used the '097 patent as a guide in their analyses. *Id.*

Petitioner contends that one skilled in the art would have understood that the air bag in Guan is in an intermediate position and that the action of the lever causes the air bag to expand and contract, thereby creating positive and negative pressures. Reply 2–3. Petitioner also contends that the plain meaning of the term pulsation supports the conclusion that the device in Guan produces positive and negative pressures. *Id.* at 4. Petitioner also contends that Guan's teaching of both acupressure and cupping indicates that the device in Guan can create both positive and negative pressures. *Id.* at 5.

In addition to relying on the testimony of Dr. Prisco, Petitioner also cites to the testimony of Mr. Meyst. *Id.* Mr. Meyst testified that:

55

IPR2019-01302
Patent 9,937,097 B2

A person of skill in the art, prior to March 2015, would have understood, based on the figure of *Guan*, that because the lever 3 is described as reciprocating and driving the air bag 2, and because the lever 3 is depicted in an intermediate/neutral position (i.e., the lever 3 is expected to move both left and right of the depicted position in the figure), the resulting motion would generate modulated positive and negative pressures. Further, a person of ordinary skill in the art would have expected that, other than when a seal is created against mouth 1 when the air bag 2 is completely expanded or compressed, Guan would always generate modulated positive and negative pressures, relative to ambient air pressure, due to the electromagnet 5 driving the magnet 4, lever 3, and the wall of air bag 2 to have a reciprocating motion during operation.

Ex. 1020 ¶ 86.

Patent Owner responds that the teachings of Guan do not support Petitioner's analysis and that Guan is limited to producing only positive pressures. Sur-Reply 14.

We have considered the arguments presented by the parties and the evidence of record conclude that Petitioner has not demonstrated that Guan teaches the element "the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure."

Both Dr. Prisco and Mr. Meyst based their opinions on the premise that the air bag of Guan is in an intermediate position that would allow it to expand creating a pressure below the reference pressure. Ex. 1002 ¶¶ 69–70; Ex. 1018 ¶ 34; *see* Ex. 1020 ¶ 87. Guan, however is silent with respect to the starting position of the airbag. As Mr. Meyst testified, if the airbag were in the fully expanded position or in the fully compressed position, the airbag would not create positive and negative pressures relative to a reference pressure. Ex. 1020 ¶¶ 86–87.

56

IPR2019-01302
Patent 9,937,097 B2

Given Guan's silence as to the starting positon of the air bag, Petitioner and its experts appear to rely on an assumption that Guan inherently teaches that the air bag always starts in a position that is neither fully expanded nor fully compressed. Although inherency may supply a missing element in an obviousness analysis, the petitioner must show that it is a natural result flowing from the operation of the device. *PAR Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014). In the instant case, Petitioner has not established that the intermediate positon would naturally result from the operation of the device.

Mr. Meyst testified that Guan shows the lever that drives the airbag in an intermediate positon and that because the lever can reciprocate, the airbag must also must generate positive or negative pressures with respect to a reference pressure. Ex. 1020 ¶ 86. However, Mr. Meyst does not state, nor does Guan teach, that an intermediate position is always the starting positon. *See id.* Thus it cannot be said that Guan inherently starts in the neutral position and invariably produces a positive and negative pressure with respect to a reference pressure without such a teaching.

Petitioner contends that the device of Guan can also be used for cupping, which in turn is a teaching that the device can be used to generate positive and negative pressures. Reply 5. We are not persuaded by this argument. The discussion of cupping in Guan appears as part of a discussion of prior art solutions. Ex. 1007, 3. We do not discern, nor does Petitioner point to, any specific teaching in Guan that the device of Guan can be used for cupping.[7] Moreover, even if the device could be used for cupping,

---

[7] Cupping is a traditional Chinses medical therapy that involves the application of negative pressure for therapeutic purposes. Ex. 1033, 8.

IPR2019-01302
Patent 9,937,097 B2

Petitioner has not pointed to any teaching that would have led one skilled in the art to combine cupping with acupressure. *See* Reply at 5.

Petitioner contends that Patent Owner has failed to identify any structure in Guan that would prevent the device from operating in the manner described by Petitioner's experts. Reply 4. Petitioner, however, inappropriately places the burden of persuasion on Patent Owner. It is Petitioner's burden to establish that the subject matter of the claims would have been obvious, not Patent Owner's burden to establish the negative, that such subject matter would not have been obvious. *See Magnum*, 829 F.3d at 1375.

### b) Conclusion

For the reasons set forth above, Petitioner has not demonstrated that Guan teaches "the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure." Additionally, as discussed above with regard to Petitioner's Ground 2 contentions, we find that Hovland also fails to teach this limitation. Petitioner does not rely upon Lee to satisfy this limitation. Based on the foregoing, we conclude that Petitioner has not demonstrated that the combination of Guan, Lee, and Hovland teaches all of the elements of claim 1.

### 5. Claims 2–11

Claims 2–11 depend from claim 1 and therefore include all of the limitations of claim 1. 35 U.S.C. § 112 (d). As discussed above, Petitioner has not shown that Guan combined with Lee and Hovland teaches the claim element calling for the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference

58

IPR2019-01302
Patent 9,937,097 B2

pressure. Therefore, we conclude that Petitioner has not demonstrated that Guan, Lee, and Hovland teach all of the elements of claims 2–11.

### 6.   Claims 12–16 and 16–30

Claims 12 and 26 are independent method claims, which also include the limitation that the changing volume of the chamber or the pressure field generator results in modulated positive and negative pressure with respect to a reference pressure. Ex. 1001, col. 17, ll. 36–62; Col. 18, ll. 33–61. Claims 13–16 and 27–30 depend from claims 12 and 26, respectively.

As discussed above, the combination of Guan, Lee, and Hovland does not teach modulated positive and negative pressures with respect to a reference pressure. Therefore we find that Guan combined with Lee and Hovland does not teach all of the elements of claims 12–16 and 26–30.

### 7.   Claims 17–25

Claim 17 is an independent apparatus claim, which also includes a claim element calling for the production of positive and negative pressures with respect to a reference pressure. Ex. 1001, col. 17, ll. 1–13. Claims 18–25 depend from claim 17. *Id.* at col. 17, ll. 14–31.

As discussed above, the combination of Guan, Lee, and Hovland does not teach modulated positive and negative pressures with respect to a reference pressure. Therefore we find that Guan combined with Lee and Hovland does not teach all of the elements of claims 17–25.

### 8.   Motivation to Combine Guan, Lee, and Hovland

Having addressed the question of whether the combined teachings of Guan, Lee, and Hovland teach or suggest all of the elements of the claims, we now turn to the question of whether one skilled in the art would have been motivated to make such a combination.

59

IPR2019-01302
Patent 9,937,097 B2

"Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination." *Unigene*, 655 F.3d at 1360. "Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

Petitioner contends that one skilled in the art would have been motivated to combine the teachings of Guan with those of Lee and Hovland because Guan teaches that the massager can be used to stimulate any region of the body including erogenous zones such as the clitoris. Pet. 58–59. Petitioner contends that one skilled in the art would have been aware of the disadvantages of direct stimulation of the clitoris and that indirect systems were better suited. *Id.* at 59 (citing Exs. 1001, 1005). Petitioner contends that it was well known in the art to provide a device such as Lee, which combines a dildo with a stimulation element for the clitoris. *Id.* at 60.

Petitioner goes on to contend:

> Thus, a POSITA at the time of the alleged invention, recognizing the drawbacks of direct mechanical stimulation and the benefits of indirect stimulation via air pressure differential on the clitoris, would have had a reasonable expectation of success in replacing *Lee*'s mechanical vibrator with *Guan's* massager to take advantage of the benefits of indirect stimulation discussed above. Ex. 1002 at ¶¶26-28, 134-137. Accordingly, the POSITA would have been motivated to incorporate *Guan*'s massager in *Lee*'s dildo so as to replace direct vibratory stimulation with pulsating air pressure during use of dildo 10. *Id*. Such a modification would have amounted to nothing more than a simple substitution of one known element for another to obtain predictable results. *See KSR*, 550 U.S. at 417. This is because at the time of the invention, a POSITA would have the requisite

60

IPR2019-01302
Patent 9,937,097 B2

> skill level to replace *Lee*'s mechanical vibrator with *Guan's* massager without any problem. In such a modified device, sleeve 16 would correspond to the claimed appendage in the form of a "dildo configured to be inserted into the vagina." Ex. 1002 at ¶137.

*Id.* at 61–62.

Patent Owner contends that one skilled in the art would not have been motivated to combine the teachings of Guan and Lee. Resp. 62–65. Patent Owner contends that one skilled in the art would not have viewed Guan as teaching stimulation of erogenous zones as Guan deals with acupressure, which relates to stimulating meridians that do not include erogenous zones. *Id.* at 62.

Patent Owner also contends that although one skilled in the art may have known of the disadvantages of direct clitoral stimulation, one skilled in the art would not have looked to Guan for the solution insofar as Guan is not related to treating sexual dysfunction of clitoral engorgement. *Id.* at 63.

Patent Owner also contends that one skilled in the art would not have had a reasonable expectation of success in combining the device of Guan into the dildo of Lee. *Id.* at 63–64.

Patent Owner also contends that it would not have been a matter of simple substitution of the massager of Guan for the direct stimulator of Lee. *Id.* at 64. Patent Owner contend that such a modification would have required a complete redesign of the dildo and arm member. *Id.*

In response, Petitioner contends there are acupoints or meridians in the female genitalia, thus Guan would be applicable to stimulating these regions. Reply 19–20. Petitioner also points out that the broader claims are not limited to stimulating erogenous zones or the clitoris. *Id.*

In its Sur-Reply, Patent Owner contends that as

61

IPR2019-01302
Patent 9,937,097 B2

> the unrebutted testimony of Dr. Herbenick makes clear, a
> POSITA looking to design a sex toy that enhances sexual arousal
> and orgasm by stimulating the clitoris with modulated positive
> and negative pressures relative to the reference pressure would
> not have looked to meridian-based therapies to do so because—
> unlike the '097 Patent—meridian theory is not concerned with
> enhancing sexual arousal and orgasm.

Sur-Reply 21 (citing Ex. 2028 ¶ 78); Ex. 1023. 97.

Patent Owner also contends that while references may teach applying
acupressure to the perineum or genitalia, it is to treat sexual dysfunction.
Sur-Reply 21–22. Patent Owner contends that treatment of sexual
dysfunction is different from enhancing sexual arousal and that one would
not look to a device for treating sexual dysfunction to enhance sexual
arousal. *Id.*

We have considered the arguments presented by the parties and the
evidence of record and find that Petitioner has not demonstrated that one
skilled in the art would have been motivated to combine the teachings of
Guan with Lee.

While Guan is silent as to which part of the body the device is to be
applied, Guan teaches that the device "has good curative effect on blood
pressure, heart disease, cerebral thrombosis, coronary heart disease,
digestive system, nervous system and various pains." Ex. 1007, Abst.
Nothing in Guan suggests that it has any effect on sexual arousal or sexual
dysfunction. *See id.* In addition, Dr. Herbenick, who has extensive
experience in evaluating and developing sex toys, testified that:

> As a POSITA myself, I do not recall conversations with design
> team colleagues in which anyone referenced meridian-based
> therapy devices, which makes sense because meridian-based
> therapy is not relevant to erogenous zones or sexual arousal.
> Additionally, even if a POSITA had come across Guan, I cannot

62

IPR2019-01302
Patent 9,937,097 B2

imagine why they would have been motivated to combine the device of Guan with other patents or devices to create something akin to the '097 Patent. This is because I do not think most POSITAs would be skilled in the arts of both meridian therapies and sexual stimulation, and would certainly not learn anything about pressures applied to genital parts from reading Guan. Also, I cannot imagine a POSITA reading Guan, which at most teaches pulsating pressures for purposes of treating illness and health problems associated with the meridian channels (which themselves have nothing to do with sexual arousal), and coming up with the modulation between positive and negative pressures with respect to a reference pressure, for purposes of sexual stimulation. In my opinion, a person of ordinary skill in the art would not and did not find that feature (the modulation of positive and negative pressures with respect to a reference pressure) obvious prior to the invention of the Womanizer products as claimed in the '097 Patent. In addition to the reasons already noted, it occurs to me that those skilled in the art often considered features that in some way mimicked common human forms of sexual stimulation (e.g., vibration mimicking rapid touch, vacuum suction mimicking mouth suction, dildos mimicking the penis, dildos with a thrusting motion mimicking intercourse). As a sexuality researcher, educator, and POSITA, I have never heard anyone describe using modulated pressures in rapid succession (such as from their mouth) and thus I cannot imagine that creating this style of stimulation would have been obvious to sexual stimulation device designers. Again, this is why the '097 Patent was truly inventive. I also cannot imagine why a POSITA would have read Guan and thought to add an appendage or dildo to it, again, because Guan is not a sexual stimulation device, and because there is nothing in the disclosure of Guan that would suggest to a POSITA that Guan could or should be combined with another device, let alone a dildo.

Ex. 2028 ¶ 78.

Although we acknowledge that Dr. Prisco testified that one skilled in the art would have been motivated to combine the teachings of Guan and Lee to take advantage of Guan's indirect stimulation, we note that Dr. Prisco

63

IPR2019-01302
Patent 9,937,097 B2

has no direct experience in developing sex toys. *See* Ex. 1002 ¶¶ 132–131; Ex. 1019. Dr. Herbenick, on the other hand, has extensive experience in evaluating and developing sex toys. Ex. 2028 ¶¶ 7–17; Ex. 2029. For this reason we give greater weight to Dr. Herbenick's testimony on this issue.

Although we agree with Petitioner that acupressure and acupuncture have been used in the genital region, it has been used to relieve pain or to treat infections. *See* Exs. 1030, 1032, 1033. We do not see how the teaching of the use of acupressure for treating pain or illness would have led one skilled in the art to use the same methods to increase sexual arousal.

Petitioner also contends that Hovland provides a motivation to combine the teachings of Guan and Lee. Pet. 59. We are not persuaded. Petitioner argues that Hovland teaches that the advantage of indirect stimulation of the clitoris "may reduce the likelihood of fibrosis[] at the clitoris … and consequent reduced clitoral and urethral physiological function." *Id.* (quoting Ex. 1005 at 19:27–31). Like Guan and the acupressure references cited by Petitioner, Hovland is describing the use of indirect pressure to treat or prevent a medical condition. Like the acupressure references, Petitioner does not explain adequately why one skilled in the art would have combined a device used for sexual stimulation such as Lee with a device like Guan that is used to treat a medical condition.

Based on the foregoing we conclude that Petitioner has failed to show why one skilled in the art would have been motivated to combine the teachings of Guan with those of Lee and Hovland to produce the claimed invention.

### 9.   *Objective Indicia*

Our analysis of Petitioner's obviousness contention is not complete without considering Patent Owner's evidence of objective indicia of non-

64

IPR2019-01302
Patent 9,937,097 B2

obviousness. *Graham*, 383 U.S. at 18. As discussed above in Section II.E.2.c), we find that Patent Owner has put forth sufficient evidence of objective indicia to establish that the claims of the '097 patent are not obvious.

### *10. Conclusion*

Based on the foregoing, we conclude that Petitioner has not demonstrated that the subject matter of the challenged claims would have been obvious to one of ordinary skill in the art at the time the invention was made over Guan combined with Lee and Hovland.

### III. PETITIONER'S MOTION TO EXCLUDE

Petitioner has moved to exclude Patent Owner's expert declarations (Exhibits 2026 and 2028), as well as Exhibit 2032. Paper 45 ("MTE"). For the reasons set forth below, Petitioner's Motion is denied.

### A. *Exhibit 2026 — Declaration of Dr. Herbenick*

Petitioner contends that we should either exclude the testimony of Dr. Herbenick or afford it little weight for several reasons. First, Petitioner contends that Patent Owner failed to comply with 37 C.F.R. § 42.65(b) in that Patent Owner failed to provide an affidavit explaining how certain tests that Dr. Herbenick relied upon were performed. MTE 2–4. Second, Petitioner contends that Patent Owner failed to produce all documents relied upon by Dr. Herbenick in rendering her opinions. *Id.* at 5–8. Third, Petitioner contends that the testimony of Dr. Herbenick should be excluded because of allegedly improper objections made by counsel for Patent Owner during Dr. Herbenick's deposition. *Id.* at 9–12. Fourth, Petitioner contends that Dr. Herbenick is not qualified to testify as a technical expert. *Id.* at 14–15. Finally, Petitioner contends that we should strike Dr. Herbenick's

65

IPR2019-01302
Patent 9,937,097 B2

testimony as she did not disclose her work as a witness in other proceedings. MTE 7–8; Paper 47, 5 ("MTE Reply").

We address each of these arguments in turn.

### 1. Failure to Comply with 37 C.F.R. § 42.65(b)

Petitioner contends that we should exclude or give little weight to all of Dr. Herbenick's testimony because her declaration does not provide any information relating to the experiments that produced the graph discussed in paragraph 43 of her declaration. MTE 2–3. While Petitioner may be correct with respect to Dr. Herbenick's failure to adequately describe what tests led to the graph on paragraph 43 of her declaration, we find this objection moot as we did not rely on that part of her testimony.

Petitioner also argues that we should exclude or give little weight to Dr. Herbenick's testimony about the different components in the Womanizer® products as Patent Owner did not provide an affidavit concerning the deconstruction and observation of the devices. MTE 4–5. We do not find that this a sufficient reason to exclude or discount Dr. Herbenick's testimony. Rule 42.65(b) refers to "technical" tests. We find that dismantling a device and identifying the components of the device does not constitute a "technical" test within the scope of the Rule. We therefore decline to exclude or give little weight to that portion of her testimony.

### 2. Withheld Documents and Information

Petitioner contends that we should exclude or give little weight to the testimony of Dr. Herbenick because Patent Owner failed to provide all the relevant facts and data that support Dr. Herbenick's opinions. Specifically Petitioner contends that Patent Owner failed to produce sales data and research that supported Dr. Herbenick's testimony relating commercial success to Patent Owner's products; drafts of Dr. Jensen's declaration that

66

IPR2019-01302
Patent 9,937,097 B2

Dr. Herbenick reviewed in connection with her declaration; and documents relating to the differences between the InsideOut and Duo products. MTE 5–7. Petitioner also points to Dr. Herbenick's failure to disclose the fact that she has testified for Patent Owner in other matters as evidence that Patent Owner has withheld other information and documents. MTE 7–8. We address each of these issues in turn.[8]

### a)  Sales Data

Petitioner's motion to exclude with respect to sales data is moot. As discussed above in Section II.E.2.c(2) above, we found that Patent Owner had failed to establish commercial success, in part, because Patent Owner failed to produce the relevant sales data.

### b)  Draft Declarations

We find that Petitioner's objection to Dr. Herbenick's declaration on the basis that Patent Owner did not produce the draft of Dr. Jensen's declaration that Dr. Herbenick reviewed in connection with her declaration to be without merit. We agree with Patent Owner that the declarations of the other experts do not constitute facts or data as that term is used in 37 C.F.R. § 42.65(b). Paper 46, 5–6 ("MTE Reps.") Documents relating to Patent Owner's Products

Petitioner contends that Patent Owner failed to produce documents relating to the differences between the InsideOut and Duo products and that those difference show that there are technical differences between the products. MTE 7. Petitioner contends that this contradicts the testimony of

---

[8] We note that at no time during this proceeding did Petitioner seek assistance from the panel to obtain the documents it now says warrant excluding Dr. Herbenick's testimony.

67

IPR2019-01302
Patent 9,937,097 B2

Patent Owner's experts that the mechanics of the two products are the same. *Id.*

We find that Petitioner's objection on this ground is without merit. To begin, Patent Owner's experts acknowledged that the InsideOut and Duo products were different but that the difference did not affect their analyses. Ex. 2026 ¶ 41; Ex. 2028 ¶ 38. Moreover, the first "technical difference" identified by Petitioner relates to the number and location of control buttons on the Duo device, a feature that does not appear to be related to the issue of whether the Duo device embodies the claimed invention. Ex. 1023, 117. The other "technical difference" identified by Petitioner is the addition of a light. Ex. 1053, 146. Again this is not a feature relevant to the issue of whether the commercial products embody the claimed invention.

### 3. *Dr. Herbenick's Bias*

Petitioner contends that Dr. Herbenick failed to disclose that she had testified for Patent Owner in other proceedings, which demonstrates Dr. Herbenick's bias and Patent Owner's withholding of relevant information. MTE 7–8; MTE Reply 5. We are not persuaded that this warrants excluding Dr. Herbenick's testimony. Although the testimony regarding Dr. Herbenick's work for Patent Owner may be relevant, it goes to the issue of credibility, not admissibility. *See, e.g., NuVasive, Inc. v. Iancu*, 752 F. App'x 986, 996 (Fed. Cir. 2018) ("While the Board can and should weigh the credibility of any expert testimony, it should not outright disregard expert testimony from a witness simply because that individual is compensated for his time and expense in testifying.").

### 4. *Patent Owner's Alleged Misconduct*

Petitioner contends that the testimony of Dr. Herbenick should be excluded because of alleged misconduct by Patent Owner's counsel during

IPR2019-01302
Patent 9,937,097 B2

the depositions Dr. Herbenick and Dr. Jensen. MTE 8–12. Petitioner contends that counsel for Patent Owner repeatedly made speaking objections which coached the witness and affected Petitioner's ability to obtain discovery. *Id.*

Patent Owner contends that the objections were proper and necessitated by misrepresentations made by Petitioner's counsel. MTE Resp. 10–13. Patent Owner also argues that even if the objections were improper, exclusion of the expert's declarations is not the proper remedy. *Id.* at 13.

We begin by noting that several of the alleged speaking objections identified by Petitioner were from depositions in other proceedings and are not relevant to the issue of excluding testimony in this proceeding. Exhibits 1051 and 1052 are transcripts from IPR2019-01444 and Exhibits 1053 and 105 are from IPR2020-00007.

With respect to this proceeding, Petitioner has identified only three possible instances of speaking objections. We do not find this to be such egregious conduct as to warrant excluding Dr. Herbenick's testimony. Moreover the testimony affected by the alleged improper objections has no bearing on our decision. For example, one objection related to the issue of the definition of a pressure field generator which does not play a part in our decision. *See* Ex. 1023, 149–151. The other concerned the operation of the device in Guan. *Id.* at 168. Dr. Herbenick offered no direct testimony concerning the operation of Guan nor do we rely on Dr. Herbenick's testimony regarding Guan in reaching our decision. *See* Ex. 2028.

Given the limited number of alleged speaking objections and the fact that the affected testimony is not relevant to our decision, we decline to impose the sanction of excluding Dr. Herbenick's testimony.

69

IPR2019-01302
Patent 9,937,097 B2

### 5.   *Dr. Herbenick's Expertise*

Petitioner contends that Dr. Herbenick lacks the relevant technical expertise to testify about the validity of the '097 patent or whether Patent Owner's commercial products embody the claims of the '097 patent. MTE 14–15. We do not find that Petitioner has stated sufficient grounds to exclude Dr. Herbenick's testimony.

While Dr. Herbenick does not have a technical degree or an extensive technical background, her testimony was from the point of view of one with experience evaluating and designing sex toys. *See, e.g.*, Ex. 2028 ¶¶ 50–54 (evaluation of the long-felt need in the industry). It is in this context that Dr. Herbenick's testimony has been offered and relied upon by us in reaching our decision.

On the issue of validity, most of Dr. Herbenick's testimony has been with respect to objective indicia, an issue about which we find Dr. Herbenick well qualified to opine. The only "technical" testimony offered by Dr. Herbenick that we rely upon is her identification of the various components found in the Womanizer® devices. Ex. 2028 ¶¶ 39–47. With the exception of her opinion regarding modulation of positive and negative pressures, we find that her experience in evaluating and designing sex toys gives her the relevant experience to identify the various components of the devices. *See* Ex. 2028 ¶¶ 4–17.

With respect to Dr. Herbenick's testimony regarding modulation of positive and negative pressures, we have not relied on Dr. Herbenick's testimony in reaching our decision.

Dr. Herbenick did not offer any technical analysis of the prior art, therefore her lack of understanding regarding how the prior art operated is irrelevant to the question of whether her testimony should be excluded.

70

IPR2019-01302
Patent 9,937,097 B2

### 6. Conclusion

From the foregoing analysis we see no reason to exclude Dr. Herbenick's testimony or to give it little weight. For this reason, that portion of Petitioner's Motion to Exclude is denied.

### B. Exhibit 2028 — Declaration of Dr. Jensen

Petitioner contends that the testimony of Dr. Jensen should be excluded or given little weight. MTE 1. As with Dr. Herbenick's testimony, Petitioner cites several reasons to exclude Dr. Jensen's testimony. First, Petitioner contends that Patent Owner violated 37 C.F.R. § 42.65(b) by not providing a proper affidavit describing Dr. Jensen's experiment. *Id.* at 2–3. Second, Petitioner contends that Patent Owner did not produce all documents Dr. Jensen relied upon in reaching his opinions. *Id.* at 5–8. Finally, Petitioner contends that the improper conduct by Patent Owner's counsel during the deposition of Dr. Jensen warrants exclusion of Dr. Jensen's testimony. *Id.* at 8–11.

### 1. Failure to Comply with 37 C.F.R. § 42.65(b)

While Petitioner contends that Dr. Jensen's declaration does not comply with 37 C.F.R. § 42.65(b), Petitioner does not state how the declaration fails to comply with the Rule. *See* MTE 2–4. Petitioner's arguments focus on alleged deficiencies in Dr. Jensen's methodology, which would go to the weight to be afforded such testimony, and do not address any failure to comply with our Rules.[9] *Id.*

---

[9] Petitioner contends that Dr. Jensen's procedure does not comply with the FDA's guidance for good laboratory practices found at 21 C.F.R. § 58. That section of the regulations relates to product safety testing and is irrelevant to any issue before us. *See* 21 C.F.R. § 58.1(a). Moreover, Petitioner's argument regarding compliance with the FDA rules and well as Petitioner's argument that Dr. Jensen's test is impossible to replicate is unsupported by

IPR2019-01302
Patent 9,937,097 B2

Moreover, failure to comply with 37 C.F.R. § 42.65(b) also goes to the weight given the evidence. *Emerson Elec. Co. v. IPCO, LLC*, IPR2017-00213, Paper 42, 25–26 (PTAB May 11, 2018) (affording expert testimony no weight for failure to comply with 37 C.F.R. § 42.65(b)); *Altair Pharm., Inc. v. Paragon Bioteck, Inc.*, Paper 48, 16–17 (PTAB Nov. 14, 2016) ("Without the necessary information prescribed in §42.65(b), we cannot determine whether the evidence … is credible."). Therefore we decline to exclude Dr. Jensen's for failure to comply with 37 C.F.R. § 42.65(b).

### 2. Withheld Documents and Information

Petitioner's arguments with respect to this issue are the same as for Dr. Herbenick's declaration discussed above. MTE 5–8. For the same reasons given above, we decline to exclude Dr. Jensen's declaration.

### 3. Patent Owner's Alleged Misconduct

Petitioner's arguments with respect to this issue are the same as for Dr. Herbenick's declaration discussed above. MTE 8–12.

We note that, with respect to Dr. Jensen's deposition in this proceeding, Petitioner identified only one allegedly improper objection. MTE 11. A review of the testimony reveals that the questions relate to the issue of a pressure field generator, a term not in dispute in this proceeding. Ex. 1022, 74–75. We do not believe that a single alleged speaking objection about a term that is not in dispute warrants excluding Dr. Jensen's declaration.

---

any evidence. "Attorneys' argument is no substitute for evidence." *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1581 (Fed. Cir. 1989).

IPR2019-01302
Patent 9,937,097 B2

### 4.   Conclusion

Based on the foregoing we deny Petitioner's Motion to Exclude as it relates to Exhibit 2028.

### C.  Exhibit 2032

Petitioner contends that Exhibit 2032 should be excluded on the grounds of hearsay and lack of authenticity. MTE 12–14.

In reaching our decision we did not rely on Exhibit 2032. We therefore deny as moot Petitioner's motion with respect to Exhibit 2032.

### D.  Conclusion

For the reasons stated above, we deny Petitioner's Motion to Exclude in its entirety.

## IV. CONCLUSION

Weighing the evidence of the disclosures of the references, the competing testimony, the reasoning to combine the references, and the evidence showing secondary indicia of non-obviousness, we determine that Petitioner has failed to show, by a preponderance of the evidence, that any of claims 1–30 of the '097 patent is unpatentable.

We also deny Petitioner's Motion to Exclude.

## V.  ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–30 of the '097 patent are not determined to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is denied; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

73

IPR2019-01302
Patent 9,937,097 B2

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–9, 12–24, 26–30 | 102 | Taylor | | 1–9, 12–24, 26–30 |
| 1–30 | 103 | Taylor, Hovland | | 1–30 |
| 1–30 | 103 | Guan, Lee, Hovland | | 1–30 |
| **Overall Outcome** | | | | 1–30 |

74

IPR2019-01302
Patent 9,937,097 B2

For PETITIONER:

Dinesh Melwani
Andrew Sutton
BOOKOFF MCANDREWS, PLLC
dmelwani@bomcip.com
asutton@bomcip.com


For PATENT OWNER:

Tammy Dunn
Lisa Margonis
Califf Cooper
Peter Schechter
OSHA BERGMAN WATANABE & BURTON
terry@obwbip.com
margonis@obwbip.com
cooper@obwbip.com
schechter@obwbip.com

# EXHIBIT 6

Trials@uspto.gov
571-272-7822

Paper 45
Entered: August 5, 2021

# UNITED STATES PATENT AND TRADEMARK OFFICE

---

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

EIS GMBH,
Petitioner,

v.

NOVOLUTO GMBH,
Patent Owner.

---

IPR2019-01444
Patent 9,763,851 B2

---

Before SUSAN L. C. MITCHELL, SCOTT C. MOORE, and
JOHN E. SCHNEIDER, *Administrative Patent Judges.*

SCHNEIDER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Denying Motion to Exclude
*37 C.F.R. § 42.64*

IPR2019-01444
Patent 9,763,851 B2

# I.   INTRODUCTION

## A.   Background and Summary

EIS GmbH ("Petitioner") filed a Petition requesting *inter partes* review of claims 1–6 of U.S. Patent No. 9,763,851 B2 (Ex. 1001, "the '851 patent"). Paper 1 ("Pet."). NOVOLUTO GmbH ("Patent Owner") filed a Preliminary Response to the Petition. Paper 11. On January 13, 2020 we issued our Decision Denying Institution. Paper 12 ("Dec.").

Petitioner filed a Request for Rehearing of our Decision Denying Institution under 37 C.F.R. § 42.71(c) and (d). Paper 14 ("Req. Reh'g").[1] Upon reconsideration of the arguments and evidence of record at the time, we granted the Request for Rehearing and instituted *inter partes* review on all grounds presented in the Petition. Paper 18 ("Reh'g Dec." or "Rehearing Decision").

Patent Owner then filed a Response on November 3, 2020. Paper 28 ("Resp."). Petitioner filed a Reply on January 26, 2021. Paper 35 ("Reply"). Patent Owner filed a Sur-Reply on March 9, 2021. Paper 37 ("Sur-Reply"). On March 30, 2021, the parties jointly informed the Board that no oral hearing was needed in this case. Paper 38.

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the

---

[1] Petitioner also sought review of the Decision by the Precedential Opinion Panel. Ex. 3001. That request was denied on April 6, 2020. Paper 16. Following denial by the Precedential Opinion Panel, Petitioner brought an action in the United States District Court for the Eastern District of Virginia seeking review of denial by the Precedential Opinion Panel under the Administrative Procedure Act. Paper 22. The district court action was dismissed following our grant of Petitioner's Request for Rehearing. Paper 34, 2.

2

IPR2019-01444
Patent 9,763,851 B2

claims on which we instituted trial. Based on the complete record before us, we determine that Petitioner has not shown, by a preponderance of the evidence, that claims 1–6 are unpatentable. In addition, for the reasons explained below, we deny Petitioner's Motion to Exclude evidence.

### B.  Real Parties in Interest

Petitioner identifies the following entities as real parties-in-interest: EIS GmbH, EIS Inc., Triple A Import GmbH, Triple A Marketing GmbH, Triple A Sales GmbH, and Triple A Internetshops GmbH (formerly known as "Internetsupport Bielefeld"). Paper 34.

Patent Owner identifies itself as the real party-in-interest and that WOW Tech International GmbH is the corporate parent of Novoluto GmbH. Paper 39.

### C.  Related Matters

Petitioner has stated that the '851 patent is the subject of litigation in two district court actions: *EIS Inc. v. WOW Tech International GmbH et al.*, No. 1:19-cv-01227-LPS, (D. Del.) and *Novoluto, GmbH v. Uccellini LLC d/b/a Lora DiCarlo*, No. DOR-6-20-cv-02284-MTK (D. Ore.). Paper 34, 3.

Petitioner also states that two related patents, US 9,937,097 B2 and US 9,849,061 B2 are the subject of IPR2019-01302 and IPR2020-00007 respectively. *Id.* We issued a Final Written Decision in IPR2019-01302 on June 14, 2021. IPR 2020-00007 remains pending.

### D.  The '851 Patent

The '851 patent, titled Stimulation Device, issued on September 19, 2017, from Application 15/023,471 filed on March 21, 2016. Ex. 1001, codes (10), (21), (22), (45), and (86). It claims priority to German Patent Application No. 102013110501, filed September 23, 2013. *Id.*, col. 1, ll. 6–10.

3

IPR2019-01444
Patent 9,763,851 B2

The '851 patent relates to a sexual stimulation device for erogenous zones, in particular the clitoris. Ex. 1001, col. 1, ll. 12–13. The stimulation is produced by the application of positive and negative pressures with negative pressure defined as "a media pressure below the reference pressure" and a positive pressure being defined as "a media pressure above the reference pressure." *Id.* at col. 4, ll. 3–8. The reference pressure is expressly defined in the Specification of the '851 patent as "the existing ambient pressure in relation to the stimulation device at the beginning of use (i.e. prior to placing the stimulation device on the area of skin to be stimulated). In the preferred use of the stimulation device with air, the reference pressure is the currently existing air pressure or normal pressure." *Id.* at col. 4, ll. 20–25. The positive and negative pressures are created by changing the volume of a chamber in the device. *Id.* at col. 9, ll. 27–58.

### E.   Illustrative Claims

Claims 1 is representative of the challenged claims and reads as follows:

1.    A stimulation device for a clitoris, comprising:
      a pressure field generator comprising:
      a first chamber having a single opening;
      a second chamber having first and second openings, the second opening of the second chamber for placing over the clitoris; and
      a connection element having a first opening and a separate second opening thereby forming a straight channel connecting the single opening of the first chamber with the first opening of the second chamber;
      a drive unit that changes a volume of the first chamber in such a manner that a stimulating pressure field is generated in the second chamber via the connection element; and

4

IPR2019-01444
Patent 9,763,851 B2

a control device that actuates the drive unit; and a housing enclosing the pressure field generator, the drive unit, and the control device; wherein:

*the pressure field generated in the second chamber consists of a pattern of negative and positive pressures modulated with respect to a reference pressure,*

the first chamber is connected with the second chamber solely by the connection element,

the stimulation device has no valves,

the stimulation device is a portable hand-held device with a battery,

the connection element is rigid and the first and second openings of the connection element are aligned to one another so that a media flow during a compression of the first chamber is directed to the clitoris through the straight channel with a nozzle effect, and

the second opening of the connection element is configured to face the clitoris through the second chamber.

Ex. 1001, col. 14, ll. 16–50 (emphasis added).

### F. Evidence

Petitioner relies on the following references:

Guan, CN2153351Y, issued December 11, 1993 (Ex. 1004) ("Guan").

Hovland et al., US 6,964,643 B2, issued November 15, 2005 (Ex. 1005) ("Hovland").

Gloth, US 5,813,973, issued September 29, 1998 (Ex. 1007) ("Gloth").

Makower et al., US 8,579,837 B1, issued November 12, 2013 (Ex. 1006) ("Makower").

Petitioner also relies on the declarations of Michael R. Prisco, P.E., Ph.D., Exs. 1002 and 1018, and the declaration of Richard Meyst.

5

IPR2019-01444
Patent 9,763,851 B2

Ex. 1020. Patent Owner relies on the declarations of Morton Olgaard Jensen, Ph.D., Dr. Med. (Exs. 2001 and 2036) and Debra Herbenick, Ph.D. (Exs. 2004 and 2038).

## G. Prior Art and Asserted Grounds

Petitioner asserts that claims 1–6 would have been unpatentable on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 4–6 | 103[2] | Guan, Hovland |
| 3 | 103 | Guan, Hovland, Gloth |
| 5, 6 | 103 | Guan, Hovland, Makower |

## II. ANALYSIS

### A. Legal Standards

#### 1. Burden

In an *inter partes* review, the burden of proof is on the Petitioner to show that the challenged claims are unpatentable, and that burden never shifts to the patentee. 35 U.S.C. § 316(e) (2018); *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1375 (Fed. Cir. 2016).

#### 2. Obviousness

The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art,

---

[2] The provisions of the Leahy-Smith America Invents Act ("AIA") regarding obviousness apply to patents containing at least one claim having an effective filing date on or after March 16, 2013. Pub L. 112–29, 125 Stat. 284 (2011). On its face, the '851 patent has an effective filing date of July 22, 2014. Therefore, the post-AIA version of 35 U.S.C. § 103 applies to this Decision.

6

IPR2019-01444
Patent 9,763,851 B2

(2) any differences between the claimed subject matter and the prior art, (3) the level of skill in the art, and (4) where in evidence, so-called secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). If the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains, the claim is unpatentable under 35 U.S.C. § 103. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).

A proper § 103 analysis requires "a searching comparison of the claimed invention—including all its limitations—with the teaching of the prior art." *In re Ochiai*, 71 F.3d 1565, 1572 (Fed. Cir. 1995).

"Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). "Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

"[O]bjective evidence of nonobviousness includes copying, long felt but unsolved need, failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, and skepticism of skilled artisans before the invention." *In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998) (citations omitted). "For objective [evidence of secondary considerations] to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the *claimed invention*." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010)

7

IPR2019-01444
Patent 9,763,851 B2

(alterations in original) (quoting *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995)).

### B.  Level of Ordinary Skill in the Art

The level of ordinary skill in the art is a factual determination that provides a primary guarantee of objectivity in an obviousness analysis. *Al-Site Corp. v. VSI Int'l Inc.*, 174 F.3d 1308, 1324 (Fed. Cir. 1999) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991)).

In our Decision on Institution, we adopted Petitioner's proposed definition of one skilled in the art as an individual with "a bachelor's degree in mechanical engineering, biomechanical engineering, or the equivalent, and three or more years of experience in fluid mechanics and pump-based medical devices," and Petitioner's proposal that "practical experience could qualify one not having the aforementioned education as a [person of ordinary skill in the art], while a higher level of education could offset lesser experience." Dec. 6–7 (alteration in original).

Focusing on use of the claimed stimulation device specifically for erogenous zones, Patent Owner renews its argument that in addition to the education level recited above, a person of ordinary skill in the art would have "three or more years of experience in research, development, or design of devices that interact with the human female body (and specifically the vulva)." Resp. 2. Patent Owner supports this contention by citing to the Technical Field discussion in the Specification where it states that the field relates to "a stimulation device for erogenous zones, in particular for the clitoris." *Id.* (citing Ex. 1001, col. 1, ll. 12–13). Patent Owner also contends that the claims support this definition as the claims recite a stimulation device and system that directs "media flow . . . to the clitoris" with an

8

IPR2019-01444
Patent 9,763,851 B2

opening "configured to face the clitoris." *Id.* (quoting Ex. 1001, claims 1–6)
(alteration in original).

We have considered Patent Owner's argument and are not persuaded
that our original definition of a person of ordinary skill in the art was in
error. We do not agree that one of ordinary skill in the art requires such
specific expertise for the subject matter set forth in the field of invention or
the claims of the '851 patent. A "hypothetical 'person having ordinary skill
in the art' to which the claimed subject matter pertains would, of necessity
have the capability of understanding the scientific and engineering principles
applicable to the pertinent art." *Ex parte Hiyamizu*, 10 USPQ 2d 1393, 1394
(BPAI 1988). Although the device disclosed in the '851 patent is a sexual
stimulation device, the scientific and engineering principles applicable to the
claimed device and method involve mechanical engineering and fluid flow
and are not necessarily specific to the application of such a device.

As we previously noted in our Decision on Institution:

Although the invention generally relates to a device for
stimulating female erogenous zones, as seen from the discussion
below, the design and operation of the device largely relates to
issues of mechanical engineering and fluid flow. Thus, we
conclude that experience in developing devices that interact with
the female body is not needed to define a person of ordinary skill
in the art.

Dec. 7.

Based on the forgoing, we continue to apply the same definition of a
person of ordinary skill in the art we used in our Decision on Institution.
However, the findings and conclusions set forth below would have been the
same had we instead adopted Patent Owner's proposed definition.

9

IPR2019-01444
Patent 9,763,851 B2

### C. Claim Construction

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* Furthermore we need only construe the claims to the extent necessary to determine the patentability of the challenged claims. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy . . . .'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

In our Decision on Institution, we declined to construe any term because the parties contended that no construction was needed at that stage. Dec. 8. Petitioner now proposes an express construction for the term "reference pressure," arguing that Patent Owner has improperly defined reference pressure to be only the existing ambient pressure in the device prior to use. Reply 8. Petitioner contends that this construction is improper as it is limited to a specific embodiment of the '851 patent and ignores the broader teachings of the '851 patent. *Id.* at 8–9.

Petitioner now contends that the proper construction of the term reference pressure should be "a 'given' pressure around which higher and lower pressures are generated for stimulating the body, which may be determined prior to or after application of the device to the body." Reply, 9 (emphasis omitted). Petitioner explains:

10

IPR2019-01444
Patent 9,763,851 B2

> The specification describes atmospheric pressure as exemplary, not required. *See* Ex. 1001, 4:20–25, 12:51–53; Ex. 1018 ¶¶11–18; Ex. 1020 ¶¶36–42. Indeed, the '851 teaches that "negative-pressure…is preferably less than the usual systolic blood pressure in the blood vessels of body part 11." Ex. 1001, 9:38–46 (emphasis added), 1:62–65. Accordingly, setting a "negative" pressure that is above systolic pressure–which is indisputably higher than ambient pressure–would require a reference pressure that is also above systolic pressure, and accordingly, above ambient pressure. Ex. 1018 ¶¶14–15; Ex. 1020 ¶¶43–46; Ex. 1049; Ex. 1017 ¶88.

Reply 8–9.

Petitioner supports this proposed construction with the testimony of Messrs. Prisco and Meyst as well as citations to portions of the '851 patent. *Id.* (citing Ex. 1018 ¶¶ 17–18; Ex. 1020 ¶ 46; Ex. 1001, col. 4, ll. 20–25).

Patent Owner responds that both Patent Owner and Petitioner initially applied the same definition of "reference pressure" as the ambient pressure in the device prior to use. Sur-Reply 2. Patent Owner contends that Petitioner's newly proposed construction here is improper and is not supported by the '851 patent. *Id.* at 2–5.

We have considered the arguments advanced by the parties and the evidence of record, and conclude that the original construction used by the parties was proper. Contrary to Petitioner's contention, the construction set forth in our Institution Decision is not limited to a single example, but is consistent with the overall teachings of the Specification of the '851 patent. *See, e.g.*, Ex. 1001, col. 4, ll. 20–25, col. 12, ll. 51–53, Fig. 14. Also, the construction originally used by the parties is not limited to atmospheric pressure, but refers generally to the prevailing pressure in the device before it is applied to the body, *i.e.*, the ambient pressure, as described in the

11

IPR2019-01444
Patent 9,763,851 B2

Specification of the '851 patent. *See* Pet. 5–6 (stating "the reference pressure is the existing ambient pressure prior to placing the stimulation device on the region of skin to be stimulated"); Ex. 1002 ¶ 28 (same); Prelim. Resp. 5 (stating "[t]he reference pressure is usually the existing ambient pressure in relation to the stimulation device at the beginning of use (*i.e.*, prior to placing the device on the area to be stimulated [Ex. 1001], 4:20–25)"). This "ambient pressure" as described in the Specification of the '851 patent that both parties referenced refers to the pressure within the device regardless of the environment in which it is used. For instance, the Specification of the '851 patent lists additional environments for use of the claimed device to include "a liquid medium, such as water or commercially available lubricant." *Id*. at col. 4, ll. 9–19.

Even if agree with Petitioner that the proposed new construction is in response to arguments raised by Dr. Jensen, Petitioner's reliance on the teachings with regard to systolic pressure does not support its position that the "reference pressure" may not be the prevailing pressure or ambient pressure in the device before it is applied to the body. The entire paragraph regarding systolic pressure, which relates to Figure 5 of the '851 patent, reads:

> Assuming that in the first state the pressure in the chambers 3 and 4 corresponds to the currently prevailing external reference pressure (air pressure for example), the overall pressure that is present in the second state will be lower than the external reference pressure. This negative pressure is set such that it is preferably lower than the usual systolic blood pressure in the blood vessels of the body part 11. The blood circulation in this area thus increases, and the clitoris 12 is better supplied with blood in the second state.

12

IPR2019-01444
Patent 9,763,851 B2

Ex. 1001, col. 9, ll. 38–46. It is clear that, when read in context, the reference pressure referred to in this paragraph is the prevailing pressure in the device.

Based on the foregoing, we construe the term "reference pressure" as "a prevailing pressure within the device prior to placing the stimulation device on the area of the skin to be stimulated."

### D. Obviousness Based on Guan Combined with Hovland

Petitioner contends that the subject matter of claims 1, 2, and 4–6 would have been obvious to one of ordinary skill in the art at the time the invention was made over Guan combined with Hovland. Pet. 23.

### 1. Guan

Guan discloses a health massager which generates pulsating air pressure to stimulate meridian points for therapeutic purposes. Ex. 1004, 3. Guan teaches the contraction of an air bag to produce the pulsating air pressure. *Id.*

### 2. Hovland

Hovland discloses an electrically-operated stimulation device which can be used to stimulate various body parts including the clitoris. Ex. 1005, Abst.

### 3. Non-Analogous Art

Before we begin our analysis of the claims we first address Patent Owner's contention that Guan cannot be properly combined with Hovland as Guan is non-analogous art. Resp. 40–42.

"Two criteria have evolved for determining whether prior art is analogous: (1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to

13

IPR2019-01444
Patent 9,763,851 B2

the particular problem with which the inventor is involved." *In re Clay*, 966 F.2d 656, 658–59 (Fed. Cir. 1992).

Patent Owner argues that the field of endeavor for the present invention is sex toys whereas Guan is directed to medical treatment using a variation of acupuncture. Resp. 40. Patent Owner supports this argument by pointing to the teachings in the Specification that the claimed device is designed to be used to stimulate erogenous zones. *Id.* at 43–45. Patent Owner contends that Guan is directed to acupressure/acupuncture and is not relevant to sexual stimulation. *Id.*

Petitioner contends that acupressure can be used in the genital region. Reply 10. Petitioner also contends that Patent Owner's contention that the device described in the '851 patent is limited to stimulating erogenous zones is contradicted by the teachings of the '851 patent and by Patent Owner's experts. *Id.* at 11.

Patent Owner responds by contending that the presence of acupressure points in the genital region does not render Guan relevant prior art. Sur-Reply 16–17. In support of this contention Patent Owner points to the testimony of Dr. Herbenick that acupressure meridian theory is not concerned with sexual arousal and orgasms and that one skilled in the art would not look to meridian theory to aid in developing a sex toy. *Id.* (citing Ex. 2038 ¶ 91; Ex. 1016, 191–194 (first Herbenick deposition); Ex. 1023, 97 (second Herbenick deposition)).

Patent Owner also argues that Petitioner's reliance on the location of meridians in the perineum or genitals is misplaced. Sur-Reply, 17. Patent Owner contends that treatment for sexual dysfunction is different than sexual stimulation and that they entail different approaches. *Id.* Patent

14

IPR2019-01444
Patent 9,763,851 B2

Owner also contends that the regions where the meridians are located, e.g., the perineum, are significantly different than the vulva or the clitoris. *Id.*

Finally, Patent Owner contends that while the Specification of the '851 patent may include a reference to stimulating other body parts, the challenged claims are specifically limited to stimulating the clitoris. *Id.* at 18. Patent Owner contends that Guan is directed to treatment of various ailments and is not relevant to sexual stimulation of erogenous zones. *Id.*

In our Rehearing Decision, we addressed Patent Owner's contention that Guan is non-analogous art and held that although Guan is not directed to a sex toy, it is reasonably pertinent to the problem faced by the inventor. Reh'g Dec. 6. Having considered the arguments of the parties and the evidence of record, we affirm our original conclusion that Guan is analogous art.

Guan is directed to a device that uses pulses of air to massage or stimulate a body part. *See* Ex. 1004, 1; Ex. 1002 ¶ 70. Although we agree with Patent Owner that the claims are directed to a device for stimulation of the clitoris, the '851 patent teaches its general applicability to stimulating a body part. Ex. 1001, col. 8, ll. 60–65. Patent Owner's description of the field of endeavor as sex toys is too narrow in light of the breadth of the teachings of the '851 patent of stimulating a body part. We find that both Guan and the '851 patent relate to the same field of endeavor of stimulating a body part. *See* Ex. 1020 ¶¶ 68–71.

Moreover, the Specification of the '851 patent teaches that the disclosed device stimulates the body part in an indirect way. Ex. 1001, col. 2, ll. 60–62; col. 4, ll. 26–29. Guan also massages a body part indirectly. *See* Ex. 1004, 3. Thus, both the present invention and Guan address similar problems, and Guan is considered analogous art.

15

IPR2019-01444
Patent 9,763,851 B2

### 4.   *Analysis of Claim 1*

Petitioner contends that the combination of Guan and Hovland teaches each of the limitations recited in claim 1. Pet. 23–52. Because we find that Petitioner has not shown by a preponderance of the evidence that the challenged claims are unpatentable as obvious over the combination of Guan Hovland, we will concentrate our analysis on only the limitation that Petitioner has failed to show is taught by the combination, which is the requirement for "the pressure field generated in the second chamber consists of a pattern of negative and positive pressure modulated with respect to a reference pressure."

Petitioner contends that Guan teaches this limitation. Pet. 38–43. Petitioner contends that prior to starting any motion of the air bag, the pressure in the device is the reference pressure. *Id.* (citing Ex. 1002 ¶¶ 90–91). Petitioner contends that as the lever in Guan compresses the air bag, it creates a positive pressure with respect to the reference pressure. *Id.* Petitioner contends that as the lever expands the airbag, it creates a negative pressure with respect to the reference pressure. *Id.* Petitioner contends that this results in modulated positive and negative pressures with respect to a reference pressure. *Id.*

In support of this contention, Petitioner initially relies on the testimony of Dr. Prisco where he compares the operation of Guan with an embodiment disclosed in the '851 patent. Pet., 38–43. In his testimony, Dr. Prisco testifies that the '851 patent discloses an embodiment that operates in the same manner as a piston pump. Ex. 1002 ¶ 90. Dr. Prisco then testifies that the device in Guan operates in the same manner as the piston pump disclosed in the '851 patent, and therefore it modulates between positive and negative pressure as required by the claims. *Id.* ¶¶ 91–92.

16

IPR2019-01444
Patent 9,763,851 B2

Patent Owner responds that Guan does not disclose modulated positive and negative pressures, but is limited to pulsing positive pressure. Resp. 30–31. Patent Owner contends that Petitioner's contentions with respect to Guan teaching modulated positive and negative pressures are not supported by the limited disclosure in Guan. *Id.* at 31–33.

Patent Owner supports these arguments with the testimony of Dr. Jensen who testified:

> It is worth noting that Guan fails to provide a complete or clear description of the device's elements or the interactions and functioning of its elements. Guan fails to provide specific details of, for example, the coupling of lever (3) to other components, the orientations of the electromagnet and magnet (*e.g.*, orientations of the charges and poles), which are required to determine the movement of the lever (3) and the magnet (4), and details regarding how air enters and exits the air bag or even deformation of the airbag.

Ex. 2036 ¶ 94. Dr. Jensen goes on to note that Dr. Prisco's analysis of Guan is not supported by the teachings of Guan, but is instead based on assumptions using information gleaned solely from the '851 patent in an inappropriate hindsight analysis. *Id.* ¶ 93 ("Dr. Prisco's arguments that Guan teaches or suggests this limitation of claim 1 of the '851 Patent appear to be guided solely by having read the '851 Patent first and then improperly applying hindsight to reconstruct Guan.").

Patent Owner also contends that the reciprocating motion of Guan only creates a variation in positive pressure and does not result in a negative pressure. Resp. 34–35. Patent Owner contends that one skilled in the art would have understood the device described in Guan to pulse air in only one direction and not between positive and negative pressures. *Id.*

17

IPR2019-01444
Patent 9,763,851 B2

Patent Owner contends that Petitioner's analysis of Guan improperly uses the '851 patent as a road map. Resp. 37–41.

Petitioner contends that one skilled in the art would have understood that the air bag in Guan is in an intermediate position and that the action of the lever causes the air bag to expand and contract, thereby creating positive and negative pressures. Reply 2–3. Petitioner also contends that the plain meaning of the term pulsation supports the conclusion that the device in Guan produces positive and negative pressures. *Id.* at 4–5. Petitioner also contends that Guan's teaching of both acupressure and cupping indicates that the device in Guan can create both positive and negative pressures. *Id.* at 6.

For the first time, Petitioner advances the argument in its Reply that if Guan alone does not teach modulation between positive and negative pressure, this element is taught by Hovland.[3] Reply 12. Petitioner points to the following paragraph in Hovland as supporting its contention that Hovland teaches modulation between positive and negative pressure:

> According to other embodiments, pump/motor assembly 300 provides pneumatic and/or hydraulic actuation to create e.g., vibration, percussion, subatmospheric pressure and/or superatmospheric pressure, or modulation of these effects.

Ex. 1005, col. 13, ll. 20–24. Petitioner contends that one skilled in the art would have interpreted this passage as referring to modulation between the effects recited. Reply 13–14.

Patent Owner responds that the teachings of Guan do not support Petitioner's analysis and that Guan is limited to producing only positive

---

[3] Petitioner contends that Patent Owner "opened the door" to this argument by asserting that Hovland does not tech modulation of pressures in its Response. Reply 12.

IPR2019-01444
Patent 9,763,851 B2

pressures. Sur-Reply 6–11. With respect to Hovland, Patent Owner contends that Petitioner is improperly offering a new grounds of unpatentability in Petitioner's Reply. *Id.* at 1, 11–12. Patent Owner also contends that Hovland does not teach modulation between positive and negative pressures. *Id.* at 11–16.

We have considered the arguments presented by the parties and the evidence of record and conclude that Petitioner has not demonstrated that Guan teaches or suggests the claim element "the pressure field generated in the second chamber consists of a pattern of negative and positive pressure modulated with respect to a reference pressure."

Petitioner's arguments with respect to Guan creating a positive and negative pressure with respect to a reference pressure are based on the bag in Guan starting in an intermediate positon. Reply 5 (citing Ex. 1018 ¶¶ 30–34 and Ex. 1020 ¶¶ 50–61); *see* Ex. 1020 ¶ 54–57. Guan, however, is silent with respect to the starting position of the airbag. *See* Ex. 1011. Moreover, Dr. Prisco testified:

> A person of skill in the art would also have understood that the depicted position in *Guan*'s would not necessarily be the starting position when the device is placed on the body and powered on. Ex. 1004. *Guan* does not provide a mechanism or teaching for returning the air bag to the depicted position prior or after use.

Ex. 1018 ¶ 32; *see also* Ex. 1020 ¶ 54 (absent a reverse polarity, there is no magnetic force to return the magnet to the starting position).

Given Guan's silence as to the starting positon of the air bag, Petitioner and its experts appear to rely on an assumption that Guan inherently teaches that the air bag always starts in a position that is neither fully expanded nor fully compressed. Although inherency may supply a missing element in an obviousness analysis, the petitioner must show that it

19

IPR2019-01444
Patent 9,763,851 B2

is a natural result flowing from the operation of the device. *PAR Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014). In the instant case, Petitioner has not established that the intermediate positon would naturally result from the operation of the device.

While Dr. Prisco and Mr. Meyst based their opinions on the air bag of Guan being in an intermediate position, as Dr. Prisco testified, there is no mechanism to return the bag to that position for each use. Ex. 1018 ¶ 32. Thus the intermediate positon of the air bag is not a natural result that necessarily flows from the use of the bag as described in Guan.

Petitioner contends that the device of Guan can also be used for cupping, which in turn is a teaching that the device can be used to generate positive and negative pressures. Reply 6. We are not persuaded by this argument. The discussion of cupping in Guan appears as part of a discussion of prior art solutions. Ex. 1004, 3. We do not discern, nor does Petitioner point to, any specific teaching in Guan that the device of Guan can be used for cupping.[4] Moreover, even if Guan's device could be used for cupping, Petitioner has not pointed to any reasoning or teaching that would have led one skilled in the art to combine cupping with acupressure as used in Guan's device. *See* Reply 6.

Petitioner contends that Patent Owner has failed to identify any structure in Guan that would prevent the device from operating in the manner described by Petitioner's experts. Reply 3. Petitioner, however, inappropriately places the burden of persuasion on Patent Owner. It is Petitioner's burden to establish that the subject matter of the claims would

---

[4] Cupping is a traditional Chinese medical therapy that involves the application of negative pressure for therapeutic purposes. Ex. 1033, 8 (Liu alternative medicine article).

20

IPR2019-01444
Patent 9,763,851 B2

have been obvious, not Patent Owner's burden to establish the negative, that such subject matter would not have been obvious. *See Magnum*, 829 F.3d at 1375.

Turning to Petitioner's argument with respect to Hovland, we agree with Patent Owner that this represents a new argument that is not properly raised on Reply. Sur-Reply 1. As we noted in our Decision on Institution, in the Petition, "Petitioner does not point to any teaching in Hovland regarding the modulation of positive and negative pressure relative to a reference pressure. *See* Pet. 38–43." Dec. 13. The argument that Hovland supplies the necessary teaching of modulation of positive and negative pressures is a new theory advanced in Petitioner's reply.

Petitioner contends that Patent Owner "opened the door" for it to assert Hovland teaches modulation of pressures by contending that Hovland does not tech modulation between positive and negative pressures. Reply 12. We are not persuaded. While Patent Owner made the argument, we do not find that it was sufficient to permit Petitioner to introduce a new theory of unpatentability in its Reply. As the Supreme Court has found, it is the Petition that defines the scope of *inter partes* review. *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348, 1356 (2018); *see Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1286 (Fed. Cir. 2017) (rejecting petitioner's attempt to cure a petition's deficiencies in reply, noting the "obligation for petitioners to make their case in their petition"); PTAB Consolidated Trial Practice Guide 74 (November 2019)[5] ("[A] reply or sur-reply that raises a new issue or belatedly presents evidence may not be considered.").

---

[5] The Consolidated Trial Practice Guide can be found at https://www.uspto.gov/TrialPracticeGuideConsolidated

21

IPR2019-01444
Patent 9,763,851 B2

The case cited by Petitioner in support of its argument does not require a different result. In *Belden*, the issue before the court was whether the Board properly denied patent owner's motion to exclude the reply declaration of petitioner's expert. *Belden Inc. v. Ber-Tek LLC*, 805 F.3d 1064, 1078 (Fed. Cir. 2015). The Board declined to exclude the declaration, concluding that the declaration responded to patent owner's expert declaration and patent owner's response to the petition. *Id.* Our reviewing court determined that the Board's decision was not in error. *Id.* The court found that the reply declaration of petitioner's expert responded only to arguments made in patent owner's response and by patent owner's expert. *Id.*

Unlike the situation in *Belden*, Petitioner here does not merely seek to introduce evidence to rebut positions taken by Patent Owner, but instead seeks to introduce an entirely new theory on unpatentability. This is not permitted.

Moreover, even if we were to permit Petitioner to introduce a new argument based on Hovland, we do not find that argument persuasive.

Petitioner contends that, to the extent the element of modulated positive and negative pressure is not taught by Guan, that element is taught by Hovland. *See* Reply. 12–15.

Hovland teaches that in one embodiment, the device disclosed therein has a "pump/motor assembly [which] provides pneumatic and/or hydraulic actuation to create e.g. vibration, percussion, subatmospheric pressure and/or superatmospheric pressure, or modulation of these effects." Ex. 1005, col. 13, ll. 21–24. Petitioner construes this passage as teaching that the device in

22

IPR2019-01444
Patent 9,763,851 B2

Hovland can modulate both positive and negative pressures as required by claim 1. *Id*. Petitioner contends that the use of the term "and/or" would lead one skilled in the art to understand that the device of Hovland can modulate between subatmospheric and superatmospheric pressures. *Id*.

Patent Owner contends that although Hovland may teach a device that can produce positive (superatmospheric) or negative (subatmospheric) pressures, it does not teach modulating between those pressures. Sur-Reply 12. Patent Owner contends that the recited paragraph only indicates that the individual effects can be modulated, but not that the device can modulate between the effects. *Id*. at 13.

We have considered the arguments advanced by the parties and the evidence of record and conclude that Patent Owner has the more persuasive argument. While we agree with Petitioner that Hovland teaches a device capable of producing positive and negative pressures individually, we do not find that Hovland discloses modulating between those effects. We agree with Patent Owner that, when read in context, the cited passage refers to modulation of the individual effects recited in the sentence, but not modulation between the effects. Sur-Reply 13. This interpretation is consistent with the overall teachings of Hovland, which describe modulation of the vacuum or negative pressure effect. For example, Hovland teaches the use of a vacuum modulator to vary the suction pressure applied by the device. Ex. 1005, col. 12, ll. 42–59. Hovland also teaches that the vacuum modulator can be used to pulsate the vacuum level of the device. *Id*. at col. 14, ll. 21–22. Hovland goes on to teach:

> When applied to the clitoris, the vacuum applied by device 200 will cause the clitoris to become engorged, i.e. filled with blood. Vacuum level and modulation can be adjusted by either the patient or her partner, as needed, to maintain engorgement.

23

IPR2019-01444
Patent 9,763,851 B2

> Thus, embodiments of the invention provide the ability both to rapidly *modulate vacuum pressure* with modulator 290, in a manner akin to the modulation of alternating current, for example, and simultaneously to more evenly hold underlying vacuum pressure at a substantially constant level or gradually change it, e.g. with wheel 280, in a manner akin to direct current. This dual functionality provides substantial advantages over the prior art.

*Id.* at col. 14, ll. 27–39 (emphasis added). Thus when read in the context of the entire disclosure of Hovland, we find that the reference in Hovland to modulation refers to modulation of one specific effect, not modulation between two or more effects.

Petitioner contends that the use of the term "and/or" as it appears in Hovland, calls for the device to create both effects. Reply 14–15; Ex. 1018 ¶¶ 53–55.

While we agree with Petitioner that the term "and/or" calls for a device that can create both positive and negative pressures, as discussed above, we do not read Hovland as teaching modulating between effects, as required for claim 1. This is confirmed by the plain language of Hovland, which refers to "modulation of these effects" rather than "modulation between effects." Ex. 1005, col. 13, ll. 20–24. Moreover, when the cited paragraph is read in the context of the other disclosures in Hovland discussed above, we find that the overall teachings of Hovland are focused on modulation of the individual effects, not modulating between the effects. Ex. 1005, col. 12, ll. 21–24; Ex. 2026 ¶¶ 161–163. While Hovland teaches a device that can produce positive and negative pressures we discern nothing in Hovland that teaches modulating between these effects.

24

IPR2019-01444
Patent 9,763,851 B2

### 5.    Objective Indicia

Before reaching an ultimate conclusion on obviousness, we must consider so-called objective indicia of non-obviousness when they are in evidence. *Graham*, 383 U.S. at 18. Objective indicia of non-obviousness, or "secondary considerations," guard against hindsight reasoning in an obviousness analysis, and are often "the most probative and cogent evidence in the record." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016) (citations omitted). As such, objective indicia of non-obviousness must be considered in every case in which they are presented. *Id.* (citing *Transocean Offshore Deepwater Drilling Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012)). The objective indicia evidence we must consider, if presented, includes "copying, long felt but unsolved need, failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, and skepticism of skilled artisans before the invention." *Rouffet*, 149 F.3d at 1355. We must also determine if Patent Owner has shown a nexus between the evidence and the merits of the claimed invention. *Wyers*, 616 F.3d at 1246.

### a)    Nexus

There must be a "nexus" between the merits of the claimed invention and the evidence of secondary considerations for such evidence to be accorded substantial weight. *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011). Nexus is presumed if a marketed product embodies the claimed features and is coextensive with them. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1372 (Fed. Cir. 2013). A patent owner is entitled to a presumption of a nexus if it shows that "the asserted objective evidence is

25

IPR2019-01444
Patent 9,763,851 B2

tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP*, 829 F. 3d at 1335.

Patent Owner contends that five of its commercial products, the Womanizer® Classic, Premium, Starlet, Liberty, and Pro, "are covered by the challenged claims." Resp. 8. In support of this contention Patent Owner relies on the testimony of its experts Drs. Jensen and Herbenick. *Id.* at 8–14 (citing Exs. 2036 and 2038).[6]

Both Dr. Herbenick and Dr. Jensen reviewed the Womanizer® Classic and concluded that the device was coextensive with at least claim 1 of the '851 patent. Ex. 2036 ¶ 46; Ex. 2038 ¶ 36. Dr. Herbenick prepared a detailed claim chart tracking each element of the independent claims to specific components of the Womanizer® Classic, concluding that the device contains each of the structural elements recited in the independent claims. Ex. 2038 ¶¶ 37–52; Ex. 2041. Dr. Jensen reviewed the device and Dr. Herbenick's claim charts and also concluded that all of the structural elements are present in the device. Ex. 2036 ¶ 46–51.

Dr. Jensen also conducted an experiment to determine whether the Womanizer® Classic produced modulated positive and negative pressures with respect to a reference pressure. Ex. 2036 ¶¶ 48–49. The following images from Dr. Jensen's declaration shows the equipment used to test the pressure of the Womanizer® Classic, as well as the pressure graph generated as a result of the tests:

---

[6] As Dr. Herbenick has testified, the Womanizer® Classic, Premium, Starlet, Liberty, and Pro differ only in style features with the structure and mechanics of the devices being the same. Ex. 2038 ¶ 35. For this reason, Dr. Herbenick and Jensen focused their analyses only on the Womanizer® Classic. Ex. 2036 ¶ 45; Ex. 2038 ¶ 35.

26

IPR2019-01444
Patent 9,763,851 B2



Figures from Ex. 2036 ¶ 48 showing equipment set up used by Dr. Jensen.



Figure from Ex. 2036 ¶ 48 showing pressure recorded in the Womanizer®
Classic evaluated by Dr. Jensen.

27

IPR2019-01444
Patent 9,763,851 B2

As shown in the top images above, Dr. Jensen's testing set-up included an oscilloscope, data acquisition equipment ("DAQ"), and a pressure sensor with an air-tight pressure sensing plug connected to the device. *Id.* In the pressure graph shown above, the y-axis indicates pressure (as a voltage measurement) relative to ambient or atmospheric pressure (zero line) and the x-axis indicates time (milliseconds). *Id.* Based on the results of that experiment and the product literature relating to the Womanizer® Classic, Dr. Jensen concludes that the commercial devices meet the limitations calling for modulated positive and negative pressures with respect to a reference pressure. *Id.* ¶¶ 48–49.

Petitioner contends that Patent Owner is attempting to mislead the board by alleging that there are no relevant technical differences between the various commercial products where, in fact, there are. Reply 21. Petitioner also contends that Patent Owner has failed to establish a nexus between the commercial products and the challenged claims. Reply 22. Petitioner contends that Patent Owner's arguments are largely based on the testimony of Dr. Herbenick, who Petitioner contends is not qualified to render such testimony. *Id.* at 23.

Petitioner contends that Patent Owner is not entitled to a presumption that the commercial devices embody the claimed invention as they include features not recited in the claims. Reply 21–23. Petitioner also argues that Dr. Jensen's testing of the alleged commercial embodiment is unsound and does not establish a nexus between the device and the claims. *Id.* at 23–24.

We have considered the arguments presented by the parties and the evidence of record and find that Patent Owner has established a nexus between the claims of the '851 patent and its commercial products. The testimony of both Dr. Herbenick and Dr. Jensen demonstrate that all of the

28

IPR2019-01444
Patent 9,763,851 B2

elements of the claims are present in the Womanizer® Classic, Premium, Starlet, Liberty, and Pro products and that the products are essentially the claimed inventions. Ex. 2036 ¶¶ 45–51; Ex. 2038 ¶¶ 35–52.

Petitioner contends that the presence of additional, unclaimed features precludes a presumption of a nexus between the commercial embodiments and the claims of the '851 patent. Reply 23. In support of this contention Petitioner cites to *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366 (Fed. Cir. 2019). Petitioner's reliance on *Fox Factory* is misplaced. As the court in *Fox Factory* stated:

> To be sure, we have never held that the existence of one or more unclaimed features, standing alone, means nexus may not be presumed. Indeed, there is rarely a perfect correspondence between the claimed invention and the product. As we explained, the purpose of the coextensiveness requirement is to ensure that nexus is only presumed when the product tied to the evidence of secondary considerations "is the invention disclosed and claimed." Thus, if the unclaimed features amount to nothing more than additional insignificant features, presuming nexus may nevertheless be appropriate.

*Id.* at 1375. The court went on to state: "Although we do not require the patentee to prove perfect correspondence to meet the coextensiveness requirement, what we do require is that the patentee demonstrate that the product is essentially the claimed invention." *Id.*

In *Fox Factory*, the alleged commercial embodiment included unclaimed features that the patentee described as critical to the products' performance. *Id.* at 1374–1375. It was the presence of these critical, unclaimed features that lead the court to hold: "A patent claim is not coextensive with a product that includes a 'critical' unclaimed feature that is claimed by a different patent and that materially impacts the product's functionality." *Id.*

29

IPR2019-01444
Patent 9,763,851 B2

The case before us is factually distinct from *Fox Factory*. While Petitioner has identified several features of the Womanizer® products that are not recited in the claims, we do not discern any evidence to suggest that these unclaimed features are critical to the products and impact the products' functionality. *See* Reply 23. While Dr. Herbenick testified that additional features were present in the Womanizer® devices, Petitioner has not pointed to any testimony by Dr. Herbenick or other evidence to support the contention that these additional features significantly affect the functionality of the devices. *See id.* at 22; Ex. 1023, 116–121.

Petitioner also contends that Patent Owner's evidence that the commercial products are coextensive with the claims of the patent is unreliable. Reply 23. Petitioner contends that Dr. Herbenick testimony regarding the Womanizer® Classic that Dr. Herbenick did not actually observe the connection element. *Id.* With respect to Dr. Jensen's testimony, Petitioner contends that Dr. Jensen's testing technique is unsound and should not be relied upon. *Id.* at 23–24. We find both of these arguments unpersuasive.

We are not convinced that Dr. Herbenick has not established that there is a connection element as required by the challenged claims in the commercial device. In her Declaration, Dr. Herbenick specifically identified item 13 in the photos below as the connection element. Ex. 2038 ¶ 51.

30

IPR2019-01444
Patent 9,763,851 B2



Figure from Ex. 2038 ¶ 51 showing the inner and outer chambers of the Womanizer® Classic device.

Dr. Herbenick unequivocally testified that element 13 in the photograph is the connection element. Ex. 1016, 82. In addition, Dr. Jensen also testified that a connection element is present in the commercial embodiment. Ex. 2036 ¶¶ 46–47, 51.

We are similarly unpersauded by Petitioner's critique of Dr. Jensen's testing methodology. In particular, Petitioner and Dr. Prisco and Mr. Meyst point to Dr. Jensen's deposition testimony indicating that he used a rubber plug or bottle stopper with the pressure sensor for his testing. Ex. 1018 ¶¶ 82–94; Ex. 1020 ¶¶ 72–76. Petitioner contends that this technique is

31

IPR2019-01444
Patent 9,763,851 B2

unreliable because the rubber stopper used by Dr. Jensen "could be filling most of the chamber." Reply 23–24. In support of this contention Petitioner cites to Dr. Prisco's and Mr. Meyst's testimony concerning the use of the stopper by Dr. Jensen. *Id.* Dr. Prisco, however, never testified that the stopper might fill the chamber, but rather that the use of the stopper could affect the pressures generated. Ex. 1018 ¶ 84. Dr. Prisco offers no explanation why this might be so or that it actually occurred when Dr. Jensen conducted his experiments. For this reason, we give little weight to Dr. Prisco's critique of Dr. Jensen's methodology. *Ebit Sys. Am., LLC v. Thales Visonix, Inc.*, 881 F.3d 1354, 1358 (Fed. Cir. 2018) ("The PTAB [i]s entitled to weigh the credibility of the witnesses . . . .") (alteration in original); *see* 37 C.F.R. § 42.65 (Expert testimony that does not disclose underlying facts or data is entitled to little weight.).

Mr. Meyst also testified that he had issues with how Dr. Jensen conducted his experiments. Ex. 1020 ¶¶ 72–76. As part of his critique, Mr. Meyst identified several potential issues with respect to Dr. Jensen's test method. *Id.* While Mr. Meyst opines that he would have conducted the experiments differently, Mr. Meyst does not explain how the alleged irregularities affected the results achieved by Dr. Jensen that the Womanizer® devices modulate positive and negative pressure with respect to a reference pressure. *Id.*

Dr. Prisco also testified that the data produced by Dr. Jensen shows that the pressure in the device modulated at a pressure greater than atmospheric pressure. Ex. 1018 ¶¶ 84–90. Petitioner contends that this further supports the conclusion that Dr. Jensen's test results are unreliable. *See* Reply 24. Again, we are not persuaded by this argument. Even if we were to accept Petitioner's argument that the reference pressure in

32

IPR2019-01444
Patent 9,763,851 B2

Dr. Jensen's test was something other than atmospheric pressure, our construction of reference pressure does not limit the term to atmospheric pressure, but only the pressure in the device before it is applied to the body. Petitioner does not dispute that the data produced by Dr. Jensen shows modulation of positive and negative pressure with respect to a reference pressure regardless of whether it is atmospheric pressure. *See id.*; Ex. 1018 ¶¶ 82–83.

Based on the foregoing we conclude that Patent Owner has established a nexus between the Womanizer® devices and the challenged claims of the '851 patent.

### b) *Commercial Success*

The commercial response to an invention is significant to determinations of obviousness and is entitled to fair weight. *Demaco Corp. v. F. von Langsdroff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988).

Patent Owner contends that the Womanizer® products are "stand-out successes." Resp. 71. In support of this contention, Patent Owner points to various consumer testimonials as well as Dr. Herbenick's testimony regarding the sales of Womanizer® products. *Id.* Patent Owner also points to its sales data for the Womanizer® products. *Id.*

Petitioner contends that Dr. Herbenick's testimony should be given little weight as Patent Owner did not produce evidence relating to market share, sales expectations or other evidence showing the comparative success of the Womanizer® devices with other products. Reply 25.

We have considered the arguments presented by the parties and the testimony of Dr. Herbenick and evidence of record and find that Patent Owner has not shown that the Womanizer® products are commercially successful on the record before us.

33

IPR2019-01444
Patent 9,763,851 B2

Commercial success in the context of secondary considerations is typically established by evidence of sales of the product embodying the claimed invention and relevant market share.[7] *In re Applied Materials, Inc.*, 692 F.3d 1289, 1299 (Fed Cir. 2012). In the present case Patent Owner has not offered any testimony regarding the market share for the relevant products. *See* Ex. 2038 ¶¶ 53–54.

Absent market share information, we cannot determine if the relevant products enjoyed commercial success sufficient to support a finding of non-obviousness. *Applied Materials*, 692 F.3d at 1299.

### c) Long-Felt Need

"Evidence of a long felt but unsolved need that is met by the claimed invention is further evidence of non-obviousness." *Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1369 (Fed. Cir. 2017). Evidence of a long felt but unresolved need tends to show non-obviousness because it is reasonable to infer that the need would have not persisted had the solution been obvious. *WBIP*, 829 F.3d at 1332.

Patent Owner contends that there was a long-felt but unmet need for a sexual stimulation device that provided sexual pleasure while minimizing potential side effects. Resp. 71 (citing Ex. 2038 ¶¶ 55–57). Patent Owner contends that the use of prior art stimulation devices could cause numbness or damage to genitalia creating a need for a device which avoided these effects. Resp. 72. Citing the testimony of Dr. Herbenick, Patent Owner contends that the Womanizer® products satisfied this need. *Id.* at 71–72 (citing Ex. 2038 ¶¶ 55–57).

---

[7] The analysis also requires a showing of a nexus between the claimed features and the sales of the relevant product. *Applied Materials*, 692 F.3d at 1299.

34

IPR2019-01444
Patent 9,763,851 B2

In its Reply, Petitioner contends that indirect stimulation devices such as the claimed device were known in the art before the invention of the claimed device and that such devices would have avoided the side effects recited by Dr. Herbenick. Reply 26. Petitioner also contends that Patent Owner has not presented any empirical data to show that the commercial embodiments filled the long-felt need. *Id.*

In its Sur-Reply, Patent Owner contends that the testimony of Dr. Herbenick is sufficient to support a finding that the Womanizer® products satisfied a long-felt need. Sur-Reply 24.

We have considered the arguments presented by the parties and the evidence of record and conclude that Patent Owner has shown that there was a long-felt need that was satisfied by the Womanizer® products. Dr. Herbenick testified that she led a study of women who used vibrators and found that 28.5% of those women experienced one or more side effects including genital numbness, pain, irritation, inflammation/swelling, tears or cuts. Ex. 2038 ¶ 56 (citing Ex. 2011, 1861–63, Table 5). Dr. Herbenick testified that these injuries resulted in the need for a sexual stimulation device that "met the need for sexual stimulation devices that facilitate orgasm but without physically coming into contact with the clitoris." *See id.* ¶ 57. Dr. Herbenick testified that the Womanizer® products satisfied this need

> by providing alternating positive and negative pressures to the clitoris so as to provide indirect stimulation to the clitoris sufficient to facilitate female orgasm. This is important as my research, published in a 2009 issue of the Journal of Sexual Medicine, had found that physical contact has caused numbness or even tears or cuts in a subset of female vibrator users.

IPR2019-01444
Patent 9,763,851 B2

*Id.* Dr. Herbenick also testified that the prior art devices failed to meet this need. *Id.* ¶ 58.

Petitioner contends that indirect stimulation devices were known in the art. Reply 26. We find this argument unpersuasive. Petitioner cites to the testimony of Dr. Herbenick to support this contention. *Id.* However, a careful reading of the cited pages reveals that Dr. Herbenick testified that, in the study she conducted, women were merely asked what type of vibrator they used, but not whether the vibrator was used directly or indirectly. Ex. 1023, 61–62. We also note that Dr. Herbenick testified that at the time she conducted her study, most of the vibrators available in the market would have been direct vibration without a lot of indirect stimulation devices. Ex. 1023, 62–63. While she testified that there were some devices in the market that provided indirect stimulation, they were suction-only devices that were less popular. *Id.* Dr. Herbenick testified that these suction-only devices are not the same as the Womanizer® devices, which apply alternating positive and negative pressures. *Id.*

Petitioner also contends that Patent Owner has failed to present any empirical data to support that the Womanizer® products fulfill the long-felt need. Reply 26. Again we are unpersuaded by Petitioner's argument. Petitioner has not stated what specific "empirical data" is needed to show that the Womanizer® products fulfill the need, nor has Petitioner cited any case law holding that such data is required. *Id.* Moreover, Petitioner has not presented any evidence to rebut Dr. Herbenick's conclusion that the Womanizer® devices fulfill the long-felt need.

In reaching our decision that the Womanizer® products fulfilled a long-felt need in the market for female sexual stimulation devices that have fewer detrimental side effects, we credit Dr. Herbenick's extensive

36

IPR2019-01444
Patent 9,763,851 B2

experience in studying sexual health and behavior, including vulvar and vaginal health, as well as the use of sexual enhancement products such as vibrators including her detailed studies reported in Exhibit 2010. Ex. 2038 ¶¶ 7, 12, 13, 16, 55–59. Petitioner did not offer any expert with a similar expertise to rebut Dr. Herbenick's testimony.

### d)    Failure of Others

Evidence that others tried but failed to develop a claimed invention may carry significant weight in an obviousness inquiry. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1081 (Fed. Cir. 2012). This objective indicia factor is closely tied to the long-felt need factor discussed above. *Id.* at 1082 ("Longfelt need is closely related to failure of others.").

Patent Owner contends that prior to the development of the Womanizer® products, "experts in sexual health and behavior were well aware of the potential adverse side effects of using vibrators for sexual stimulation, yet no one had successfully designed a product that facilitated orgasm while physically contacting the clitoris without also having these potential side effects, despite numerous attempts." Resp. 72. In support of this contention, Patent Owner cites Dr. Herbenick's testimony that while experts in the field were aware of the issues of clitoral discomfort and numbness that arose from direct clitoral contact, none of the prior art devices accomplished the goal of providing a stimulation device without discomfort or numbness. *Id.*; Ex. 2038 ¶¶ 58–61.

Petitioner does not address Patent Owner's argument or evidence. *See* Reply 22–27.

37

IPR2019-01444
Patent 9,763,851 B2

We find that Patent Owner has persuasively shown that others in the field failed to develop a sexual stimulation device that avoided the issues of clitoral discomfort or numbness.

Dr. Herbenick testified based on her own experience in teaching the use of various stimulation devices and her work in developing such devices that no one had developed a product that achieved sexual stimulation in the same manner as the Womanizer® devices. Ex. 2038 ¶¶ 60–62. Dr. Herbenick testified that each prior device of which she was aware was limited to "either direct contact (such as a vibrator or flicking) or was limited to providing suction." *Id.* ¶ 62. Neither of these approaches solved the issue of clitoral discomfort or numbness. *See id.*

### e) *Skepticism*

Evidence of industry skepticism about whether or how a problem could be solved, or the workability of the claimed solution, weighs in favor of nonobviousness of the claimed invention. *United States v. Adams*, 383 U.S. 39, 52 (1966); *WBIP*, 829 F.3d at 1335.

Patent Owner contends that "industry experts and participants were skeptical about the commercial embodiments and, specifically, about how modulating between positive and negative air pressure might facilitate orgasm." Resp. 73 (citing Ex. 2038 ¶¶ 63–67).

Petitioner contends that skepticism must be evaluated from the viewpoint of industry experts and that, with the exception of Dr. Herbenick, the evidence submitted by Patent Owner is limited to consumer reviews. Reply 27 (citing *WBIP*, 829 F.3d at 1335; *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1365 (Fed. Cir. 2007)).

We have considered the arguments presented by the parties and the evidence of record and find that Patent Owner has shown industry

38

IPR2019-01444
Patent 9,763,851 B2

skepticism relating to the Womanizer® products. Although we agree with Patent Owner that most of the reviews cited by Dr. Herbenick are consumer reviews and not experts in the field, the compilation of reviews cited by Dr. Herbenick includes reviews from experts who expressed skepticism about the products. For example, there is a review by Dr. Emily Morse, "a sexologist with a doctorate in human sexuality," who expressed skepticism about the product in her review. Ex. 2018, 78. Another expert is Vanessa Marin, a licensed psychotherapist specializing in sex therapy, who reviewed the product and expressed skepticism about it. Ex. 2016, 124–128. These reviews in addition to the testimony of Dr. Herbenick show industry skepticism about the Womanizer® products. Ex. 2038 ¶¶ 63–67.

### f)    Praise by Others

Evidence of industry praise of the claimed invention weighs in favor of nonobviousness. *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016). Evidence of industry praise may include evidence of industry awards given to commercial embodiments of the claimed invention. *See Henny Penny Corp. v. Frymaster, LLC*, 938 F.3d 1324, 1333–1334 (Fed. Cir. 2019) (finding evidence of industry praise, including industry awards for the patented product).

Patent Owner contends that, notwithstanding the industry skepticism discussed above, the industry has also praised the Womanizer® products extensively. Resp. 73. Patent Owner contends that reviews of the Womanizer® products have described them as "innovative, unique, and [in] other similar terms." *Id.* at 73–74 (citing Ex. 2038 ¶ 68). Patent Owner also contends that the Womanizer® has been honored with many awards. *Id.* at 75.

39

IPR2019-01444
Patent 9,763,851 B2

Petitioner has not presented any arguments in response to Patent Owner's showing. *See* Reply 21–27.

We find that Patent Owner has presented sufficient evidence showing praise in the industry favoring a finding of non-obviousness. As Dr. Herbenick testified,

> [t]he Womanizer has been honored with many awards, several of them recognizing the entire brand or product line. As examples, the Womanizer W-100 was named the Most Innovative Female Product at the ADULTEX Awards on May 3, 2015. On May 30, 2015, the Womanizer was named Best New Female Product by the ETO Awards. In January 2016, the Womanizer W-100 was named Outstanding Product for Women at the Adult Video News (AVN) O Awards hosted at the AVN Novelty Expo in Las Vegas, Nevada. The Womanizer was also named Product of the Year in each of 2015 and 2016, as well as Product Line of the Year in 2017 by the EROTIX Awards.

Ex. 2038 ¶ 74 (footnotes omitted, citing Ex. 2044, 1, 6, 13, 17, 13, and 30). In addition, the Womanizer® products have received praise by both sex toy retailers and consumers. Ex. 2038 ¶¶ 68–75.

### g) Copying

"Copying may indeed be another form of flattering praise for inventive features." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1311 (Fed. Cir. 2010).

Patent Owner contends that Petitioner and others have copied the Womanizer® products and that this copying supports a finding on non-obviousness. Resp. 75–80. In support of this contention Patent Owner points to Petitioner's statement that it would stop selling devices that violated Patent Owner's German equivalent of the '851 patent as well as a decision of a German court that a later version of Petitioner's product infringed that patent. *Id.* at 75–77. Patent Owner also points to a statement submitted by

40

IPR2019-01444
Patent 9,763,851 B2

Petitioner in an unfair competition lawsuit where a store owner stated that Petitioner had "ripped off the technology of Womanizer." *Id.* at 77. Patent Owner also cites to various product reviews comparing Petitioner's products to Patent Owner's. *Id.* at 77–79. Patent Owner also cites to reviews of other products which compare the products to the Womanizer. *Id.* at 79–80.

Petitioner contends that Patent Owner's evidence of copying is insufficient as it comprises conclusory statements based on undisclosed testing and data. Reply 25. With respect to the decision of the German court, Petitioner contends that this is not evidence of copying as there is no evidence that Petitioner or anyone else "changed any designs to copy the '851 after learning of the patent." *Id.* at 25–26.

Patent Owner responds by again pointing to Petitioner's statement regarding infringing the German equivalent of the '851 patent. Sur-Reply 23–24. Patent Owner contends that Petitioner has offered only attorney argument that does not rebut the evidence of copying. *Id.*

Copying in the context of objective indicia of non-obviousness can be demonstrated either through internal documents, direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica, or access to, and substantial similarity to, the patented product (as opposed to the patent). *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). Marketing materials may also be used to show copying. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1368 (Fed. Cir. 2012).

We have considered the arguments presented by the parties and the evidence of record and find that Patent Owner has presented sufficient evidence of copying to support a finding of non-obviousness. Patent Owner

41

IPR2019-01444
Patent 9,763,851 B2

first marketed its Womanizer product in 2014. Ex. 2038 ¶ 77. Petitioner produced its first Satisfyer product just over a year later. *Id.* Petitioner acknowledged that this device violated Patent Owner's "technical property rights" and withdrew the product from the market. *Id.* ¶ 78; Ex. 2045 (Novoluto press release).

Petitioner then launched a second version of the product which Petitioner described as offering "pressure wave stimulation and contactless clitoral stimulation." Ex. 2038 ¶ 79; Ex. 2019. Petitioner also describes its Satisfyer products as providing "a touch-free climax" and offering a "rapid change between suction and pressure." Ex. 2038 ¶ 83; Ex. 2021. Patent Owner has also introduced evidence that shows that Petitioner's products are substantially similar to the Womanizer products. Ex. 2038 ¶¶ 82–83, 86–87; *see, e.g.*, Ex. 2016, 102–105; Ex. 2020. This demonstrates that Petitioner had access to the Womanizer products and produced products substantially similar to the patented product.

Patent Owner has also introduced persuasive evidence that other manufacturers have copied the Womanizer products. Ex. 2038 ¶¶ 84–85, 88; *see, e.g.*, Exs. 2046–2049. One example of a device sold by other manufacturers that copies the claimed invention is the Blowfish clitoral stimulator which was described as mimicking the technology of the Womanizer. Ex. 2049; Ex. 2038 ¶ 84.

Given this evidence of the similarity of the competitive products to the Womanizer® products and Petitioner's failure to offer any persuasive evidence in rebuttal, we find that Patent Owner has presented persuasive evidence of copying to support a conclusion of non-obviousness.

42

IPR2019-01444
Patent 9,763,851 B2

### h) Conclusion

Based on the foregoing we conclude that Patent Owner has presented sufficient evidence relating to objective indicia to support a finding of non-obviousness. Although Patent Owner failed to present persuasive evidence relating to commercial success, Patent Owner has presented persuasive evidence relating to long-felt need, failure of others, praise by others, and copying. Patent Owner has also shown a nexus between its commercial products and the claimed invention. In sum, several types of objective indicia evidence in the record weigh in favor of a determination that the challenged claims are non-obviousness.

### 6. The Remaining Claims

All of the remaining claims challenged in Ground 1 include a limitation calling for modulation of positive and negative pressures with respect to a reference pressure. Based on our analysis above, we find that Petitioner has not presented sufficient persuasive evidence that the subject matter of the remaining claims would have been obvious over Guan combined with Hovland and that Patent Owner has presented persuasive evidence regarding objective indicia of non-obviousness.

### 7. Conclusion

From the foregoing analysis, and weighing all of the evidence and arguments presented by both sides, we conclude that Petitioner has not demonstrated by a preponderance of the evidence that the subject matter of 1, 2, and 4–6 would have been obvious to one of ordinary skill in the art over Guan combined with Hovland.

### E. Grounds 2 and 3

The remaining grounds rely on the combination of Guan and Hovland as advanced in Ground 1. *See* Pet. 64–72. Petitioner does not point to nor do

43

IPR2019-01444
Patent 9,763,851 B2

we discern any teaching in Gloth or Makower that remedies the deficiencies of Guan and Hovland discussed above. *See id.* Thus, for the reasons stated above for Ground 1, we find that Petitioner has not demonstrated that claims 3, 5, and 6 are unpatentable as obvious.

### III. PETITIONER'S MOTION TO EXCLUDE

Petitioner has moved to exclude Patent Owner's two expert declarations (Exhibits 2036 and 2038), as well as Exhibit 2048. Paper 40 ("MTE"). For the reasons set forth below, Petitioner's Motion is denied.

#### A. Exhibit 2038 — Declaration of Dr. Herbenick

Petitioner contends that we should either exclude the testimony of Dr. Herbenick or afford it little weight for several reasons. First, Petitioner contends that Patent Owner failed to comply with 37 C.F.R. § 42.65(b) in that Patent Owner failed to provide an affidavit explaining how certain tests that Dr. Herbenick relied upon were performed. MTE 2–5. Second, Petitioner contends that Patent Owner failed to produce all documents relied upon by Dr. Herbenick in rendering her opinions. *Id.* at 6–9. Third, Petitioner contends that the testimony of Dr. Herbenick should be excluded because of allegedly improper objections made by counsel for Patent Owner during Dr. Herbenick's deposition. *Id.* at 9–13. Fourth, Petitioner contends that Dr. Herbenick is not qualified to testify as a technical expert. *Id.* at 15. Finally, Petitioner contends that we should strike Dr. Herbenick's testimony as she did not disclose her work as a witness in other proceedings. Paper 43, 5 ("MTE Reply").

We address each of these arguments in turn.

#### 1. Failure to Comply with 37 C.F.R. § 42.65(b)

Petitioner contends that we should exclude or give little weight to all of Dr. Herbenick's testimony because her declaration does not provide any

44

IPR2019-01444
Patent 9,763,851 B2

information relating to the experiments that produced the graph discussed in paragraph 47 of her declaration. MTE 2–3. While Petitioner may be correct with respect to Dr. Herbenick's failure to adequately describe what tests led to the graph on paragraph 47 of her declaration, we find this objection moot as we did not rely on that part of her testimony.

Petitioner also argues that we should exclude or give little weight to Dr. Herbenick's testimony about the different components in the Womanizer® products as Patent Owner did not provide an affidavit concerning the deconstruction and observation of the devices. MTE 4–5. We do not find that this is a sufficient reason to exclude or discount Dr. Herbenick's testimony. Rule 42.65(b) refers to "technical" tests. We find that dismantling a device and identifying the components of the device does not constitute a "technical" test within the scope of the Rule. We therefore decline to exclude or give little weight to that portion of her testimony.

### 2.  Withheld Documents and Information

Petitioner contends that we should exclude or give little weight to the testimony of Dr. Herbenick because Patent Owner failed to provide all the relevant facts and data that support Dr. Herbenick's opinions. Specifically, Petitioner contends that Patent Owner failed to produce drafts of Dr. Jensen's declaration that Dr. Herbenick reviewed in connection with her declaration and documents relating to the differences between the various Womanizer products. MTE 5–8. Petitioner also points to Dr. Herbenick's failure to disclose the fact that she has testified for Patent Owner in other

45

IPR2019-01444
Patent 9,763,851 B2

matters as evidence that Patent Owner has withheld other information and documents. MTE 8–9. We address each of these issues in turn.[8]

### a) Draft Declarations

We find that Petitioner's objection to Dr. Herbenick's declaration on the basis that Patent Owner did not produce the draft of Dr. Jensen's declaration that Dr. Herbenick reviewed in connection with her declaration to be without merit. We agree with Patent Owner that the declarations of the other experts do not constitute facts or data as that term is used in 37 C.F.R. § 42.65(b) that would be required to be produced. Paper 41, 6–7 ("MTE Resp.")

Petitioner contends that Patent Owner failed to produce documents relating to the differences between the various Womanizer products and that those difference show that there are technical differences between the products. MTE 7–8. Petitioner contends that this contradicts the testimony of Patent Owner's experts that the mechanics of the two products are the same. *Id.*

We find that Petitioner's objection on this ground is without merit. To begin, Patent Owner's experts acknowledged that the various Womanizer products were different but that the difference did not affect their analyses. Ex. 2036 ¶ 41; Ex. 2038 ¶ 35. Moreover, the "technical difference" identified by Petitioner relates to lights on the device, a feature that does not appear to be related to the issue of whether the devices embody the claimed inventions. MTE 7.

---

[8] We note that at no time during this proceeding did Petitioner seek assistance from the panel to obtain the documents it now says warrant excluding Dr. Herbenick's testimony.

46

IPR2019-01444
Patent 9,763,851 B2

### b) Dr. Herbenick's Alleged Bias

Petitioner contends that Dr. Herbenick failed to disclose that she had testified for Patent Owner in other proceedings, which demonstrates Dr. Herbenick's bias and Patent Owner's withholding of relevant information. MTE 7–8; MTE Reply 5. We are not persuaded that this warrants excluding Dr. Herbenick's testimony. Although the testimony regarding Dr. Herbenick's work for Patent Owner may be relevant, it goes to the issue of credibility, not admissibility. *See, e.g.*, *NuVasive, Inc. v. Iancu*, 752 F. App'x 985, 996 (Fed. Cir. 2018) ("While the Board can and should weigh the credibility of any expert testimony, it should not outright disregard expert testimony from a witness simply because that individual is compensated for his time and expense in testifying.").

### 3.  Patent Owner's Alleged Misconduct

Petitioner contends that the testimony of Dr. Herbenick should be excluded because of alleged misconduct by Patent Owner's counsel during the depositions Dr. Herbenick and Dr. Jensen. MTE 9–13. Petitioner contends that counsel for Patent Owner repeatedly made speaking objections which coached the witness and affected Petitioner's ability to obtain discovery. *Id.*

Patent Owner contends that the objections were proper and necessitated by misrepresentations made by Petitioner's counsel. MTE Resp. 10–12. Patent Owner also argues that even if the objections were improper, exclusion of the expert's declarations is not the proper remedy. *Id.* at 12.

We begin by noting that several of the alleged speaking objections identified by Petitioner were from depositions in other proceedings and are not relevant to the issue of excluding testimony in this proceeding. Exhibits

47

IPR2019-01444
Patent 9,763,851 B2

1022 and 1023 are transcripts from IPR2019-01444 and Exhibits 1053 and 1054 are from IPR2020-00007.

With respect to this proceeding, Petitioner has identified only one possible instance of a speaking objection. We do not find this to be such egregious conduct as to warrant excluding Dr. Herbenick's testimony. Moreover, the testimony affected by the alleged improper objections has no bearing on our decision. The question related to the teachings of the Taylor references which are not at issue in this proceeding. Ex. 1016, 183.

Given the single alleged speaking objection and the fact that the affected testimony is not relevant to our decision, we decline to exclude Dr. Herbenick's testimony.

### 4.  Dr. Herbenick's Expertise

Petitioner contends that Dr. Herbenick lacks the relevant technical expertise to testify about the validity of the '851 patent or whether Patent Owner's commercial products embody the claims of the '851 patent. MTE 15. We do not find that Petitioner has stated sufficient grounds to exclude Dr. Herbenick's testimony.

While Dr. Herbenick does not have a technical degree or an extensive technical background, she has extensive experience evaluating and designing sex toys. *See, e.g.*, Ex. 2038 ¶¶ 55–59 (evaluation of the long-felt need in the industry). It is in this context that Dr. Herbenick's testimony has been offered and relied upon by us in reaching our decision. *See SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360, 1373 (Fed. Cir. 2010) (noting that there is no requirement of a perfect match between the expert's experience and the relevant field).

On the issue of validity, most of Dr. Herbenick's testimony has been with respect to objective indicia, an issue about which we find

48

IPR2019-01444
Patent 9,763,851 B2

Dr. Herbenick well qualified to opine. The only "technical" testimony offered by Dr. Herbenick that we rely upon is her identification of the various components found in the Womanizer® devices. Ex. 2038 ¶¶ 35–52. With the exception of her opinion regarding modulation of positive and negative pressures, we find that her experience in evaluating and designing sex toys gives her a sufficient background to provide opinion testimony regarding various components of the devices. *See* Ex. 2038 ¶¶ 4–17.

With respect to Dr. Herbenick's testimony regarding modulation of positive and negative pressures, we have not relied on Dr. Herbenick's testimony in reaching our decision.

Dr. Herbenick did not offer any technical analysis of the prior art, therefore her alleged lack of understanding regarding how the prior art operated is irrelevant to the question of whether her testimony should be excluded.

### 5. Conclusion

From the foregoing analysis we see no reason to exclude Dr. Herbenick's testimony or to give it little weight. For this reason, that portion of Petitioner's Motion to Exclude is denied.

### B. Exhibit 2036 — Declaration of Dr. Jensen

Petitioner contends that the testimony of Dr. Jensen should be excluded or given little weight. MTE 1. As with Dr. Herbenick's testimony, Petitioner cites several reasons to exclude Dr. Jensen's testimony. First, Petitioner contends that Patent Owner violated 37 C.F.R. § 42.65(b) by not providing a proper affidavit describing Dr. Jensen's experiment. *Id.* at 2–4. Second, Petitioner contends that Patent Owner did not produce all documents Dr. Jensen relied upon in reaching his opinions. *Id.* at 6–9. Finally, Petitioner contends that improper conduct by Patent Owner's

49

IPR2019-01444
Patent 9,763,851 B2

counsel during the deposition of Dr. Jensen warrants exclusion of Dr. Jensen's testimony. *Id.* at 9–13.

### 1. Failure to Comply with 37 C.F.R. § 42.65(b)

While Petitioner contends that Dr. Jensen's declaration does not comply with 37 C.F.R. § 42.65(b), Petitioner does not state how the declaration fails to comply with the Rule. *See* MTE 2–4. Petitioner's arguments focus on alleged deficiencies in Dr. Jensen's methodology, which would go to the weight to be afforded such testimony, and do not address any failure to comply with our Rules.[9] *Id.*

Moreover, failure to comply with 37 C.F.R. § 42.65(b) also goes to the weight given the evidence. *Emerson Elec. Co. v. IPCO, LLC*, IPR2017-00213, Paper 42 at 25–26 (PTAB May 11, 2018) (affording expert testimony no weight for failure to comply with 37 C.F.R. § 42.65(b)); *Altair Pharm., Inc. v. Paragon Bioteck, Inc.*, PGR2015-00011, Paper 48 at 16–17 (PTAB Nov. 14, 2016) ("Without the necessary information prescribed in §42.65(b), we cannot determine whether the evidence . . . is credible."). Therefore we decline to exclude Dr. Jensen's for failure to comply with 37 C.F.R. § 42.65(b).

---

[9] Petitioner contends that Dr. Jensen's procedure does not comply with the FDA's guidance for good laboratory practices found at 21 C.F.R. § 58. That section of the regulations relates to product safety testing and is irrelevant to any issue before us. *See* 21 C.F.R. § 58.1(a). Moreover, Petitioner's argument regarding compliance with the FDA rules and well as Petitioner's argument that Dr. Jensen's test is impossible to replicate is unsupported by any evidence. "Attorneys' argument is no substitute for evidence." *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1581 (Fed. Cir. 1989).

50

IPR2019-01444
Patent 9,763,851 B2

### 2. Withheld Documents and Information

Petitioner's arguments with respect to this issue are the same as for Dr. Herbenick's declaration discussed above. MTE 6–9. For the same reasons given above, we decline to exclude Dr. Jensen's declaration.

### 3. Patent Owner's Alleged Misconduct

Petitioner's arguments with respect to this issue are the same as for Dr. Herbenick's declaration discussed above. MTE 8–12.

We note that, with respect to Dr. Jensen's deposition in this proceeding, Petitioner identified only two allegedly improper objections. MTE 11–12. A review of the testimony reveals that the questions relate to the definition of the term "sexual pleasure" as it is used in the '851 patent. Ex. 1015, 56–58. The term "sexual pleasure" is not in dispute in this proceeding. We do not believe that two alleged speaking objections about a term that is not in dispute warrants excluding Dr. Jensen's declaration.

### 4. Conclusion

Based on the foregoing we deny Petitioner's Motion to Exclude as it relates to Exhibit 2036.

## C. Exhibit 2048

Petitioner contends that Exhibit 2048 should be excluded on the grounds of hearsay and lack of authenticity. MTE 13.

In reaching our decision we did not rely on Exhibit 2048. We therefore dismiss as moot Petitioner's motion with respect to Exhibit 2048.

## D. Conclusion

For the reasons stated above, we deny Petitioner's Motion to Exclude in its entirety.

51

IPR2019-01444
Patent 9,763,851 B2

## IV. CONCLUSION

Weighing the evidence of the disclosures of the references, the competing testimony, the reasoning to combine the references, and the evidence showing secondary indicia of non-obviousness, we determine that Petitioner has failed to show, by a preponderance of the evidence, that any of claims 1–6 of the '851 patent is unpatentable.

We also deny Petitioner's Motion to Exclude.

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–6 of the '851 patent are not determined to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is denied; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–2, 4–6 | 103 | Guan, Hovland | | 1, 2, 4–6 |
| 3 | 103 | Guan, Hovland, Gloth | | 3 |
| 5, 6 | 103 | Guan, Hovland, Makower | | 5, 6 |
| **Overall Outcome** | | | | 1–6 |

52

IPR2019-01444
Patent 9,763,851 B2

FOR PETITIONER:

Dinesh Melwani
Andrew Sutton
BOOKOFF McANDREWS, PLLC
dmelwani@bomcip.com
asutton@bomcip.com


FOR PATENT OWNER:

Tammy Dunn
Lisa Margonis
Califf Cooper
Peter Schechter
OSHA BERGMAN WATANABE & BURTON LLP
terry@obwbip.com
margonis@obwbip.com
cooper@obwbip.com
schechter@obwbip.com

53

# EXHIBIT 7

Trials@uspto.gov
Tel: 571-272-7822

Paper 41
Entered: September 23, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

EIS GMBH,
Petitioner,

v.

NOVOLUTO GMBH,
Patent Owner.

Case IPR2020-00007
Patent 9,849,061 B2

Before SUSAN L. C. MITCHELL, SCOTT C. MOORE, and JOHN E. SCHNEIDER, *Administrative Patent Judges*.

MITCHELL, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Challenged Claims Not Unpatentable
*35 U.S.C. § 318(a)*
Granting Patent Owner's Motion to Seal and for Entry of a Protective Order
*37 C.F.R. §§ 42.14, 42.54*
Granting Patent Owner's Unopposed Motion to
Submit Supplemental Information
*37 C.F.R. § 42.123(b)*
Denying Petitioner's Motion to Exclude
*37 C.F.R. § 42.64*

IPR2020-00007
Patent 9,849,061 B2

## I.  INTRODUCTION

### A.  *Background and Summary*

On October 2, 2019, EIS GmbH ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 1–3, 5, 7, 8, 11, 14, 15, 17–19, and 20–26 (the "challenged claims") of U.S. Patent No. 9,849,061 B2 (Ex. 1001, "the '061 patent"). *See* 35 U.S.C. §§ 311–319.  On January 8, 2020, Novoluto GmbH ("Patent Owner") filed a Preliminary Response to the Petition.  Paper 6 ("Prelim. Resp.").  On April 6, 2020, we denied institution of an *inter partes* review.  *See* Paper 8, 2, 30 ("Dec.").

Petitioner filed a Request for Rehearing of the Decision Denying Institution of *Inter Partes* Review of the challenged claims of the '061 patent.  Paper 9, "Req. Reh'g."[1]  Upon reconsideration of the arguments and evidence of record at the time, we found that at least a fact question exists concerning whether Taylor or Hovland teaches or suggests positive and negative pressures with respect to a reference pressure, an issue of fact that we resolved in favor or Petitioner at institution, and instituted *inter partes* review on all grounds presented in the Petition.  Paper 15, 16–20 ("Reh'g Dec." or "Rehearing Decision"); *see* 37 C.F.R. § 42.108(c) (2020).[2]  We also

---

[1] Petitioner also sought review of the Decision by the Precedential Opinion Panel. Ex. 3001.  That request was denied on June 16, 2020.  Paper 11. Following denial by the Precedential Opinion Panel, on June 25, 2020, Petitioner brought an action in the United States District Court for the Eastern District of Virginia seeking review of denial by the Precedential Opinion Panel under the Administrative Procedure Act.  Paper 12, 1–2.  The district court action was dismissed following our granting Petitioner's Request for Rehearing.  Paper 19, 4–5; Paper 21, 2.

[2] This Rule has since been amended to delete the requirement that an issue of fact created by testimonial evidence at the institution stage be viewed in

2

IPR2020-00007
Patent 9,849,061 B2

vacated the portion of our previous Decision on Institution regarding construction of "reference pressure" and invited further briefing by the parties. *Id*. at 20–21.

Patent Owner filed a Response on December 18, 2020. Papers 23, 24 ("Resp."). Petitioner filed a Reply on March 12, 2021. Paper 25 ("Reply"). Patent Owner filed its Sur-Reply on April 23, 2021. Paper 35 ("Sur-Reply"). On May 14, 2021, the parties jointly informed the Board that no oral hearing was necessary in this case. Paper 37.

This is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the challenged claims on which we instituted trial. Based on the complete record before us, we determine that Petitioner has not shown, by a preponderance of the evidence, that claims 1–3, 5, 7, 8, 11, 14, 15, 17–19, and 20–26 are unpatentable. In addition, for the reasons set forth below, we grant Patent Owner's Combined Motion to Seal and Motion for a Protective Order, and we deny Petitioner's Motion to Exclude Evidence. *See* Papers 25, 38.

### B.  *Real Parties in Interest*

Petitioner identifies EIS GmbH, EIS Inc., Triple A Import GmbH, Triple A Marketing GmbH, Triple A Sales GmbH, Triple A Finance GmbH & Co. KG, and Triple A Internetshops GmbH (formerly known as "Internetsupport Bielefeld"), as the real parties in interest. Pet. 1; Paper 7, 1; Paper 12, 1; Paper 21, 1; Paper 31, 1. Patent Owner identifies itself as the owner of the '061 patent and WOW Tech International GmbH, Patent

---

the light most favorable to the petitioner. *See* 85 Fed. Reg. 79,120, 79,122, 79,129 (Dec. 9, 2020).

IPR2020-00007
Patent 9,849,061 B2

Owner's corporate parent, which later changed to IntiHealth Ger GmbH, as the real parties in interest.  Paper 4, 2; Paper 13, 2; Paper 14, 2; Paper 19, 2; Paper 27, 2; Paper 33, 2 (identifying IntiHealth Ger GmbH as the corporate parent); Paper 36, 2 (same).

## C.  Related Proceedings

The parties identify two ongoing court proceedings involving the '061 patent:  *EIS, Inc. v. IntiHealth Ger GmbH,* No. 19-1227 (LPS) (D. Del.) and *Novoluto, GmbH v. Uccellini LLC d/b/a Lora DiCarlo,* C.A. No. DOR-6-20-cv-02284-MTK (D. Ore.).  Pet. 1; Paper 4, 3; Paper 36, 2–3.  The parties also identify U.S. Patent No. 9,937,097 ("the '097 patent") that issued from a continuation application of the '061 patent, which has been challenged in IPR2019-01302.  Pet. 1; Paper 4, 3.  An *inter partes* review in IPR2019-01302 has been conducted, and all claims were found not unpatentable.  *See EIS GmbH v. Novoluto GmbH*, IPR2019-01302, Paper 50, 73 (PTAB June 14, 2021).

The parties also identify U.S. Patent No. 9,763,851 B2 ("the '851 patent") that they assert discloses related subject matter that has been challenged by Petitioner in IPR2019-01444.  *See* Pet. 2; Paper 4, 3.  An *inter partes* review in IPR2019-01444 has been conducted, and all claims were found not unpatentable.  *See EIS GmbH v. Novoluto, GmbH*, IPR2019-01444, Paper 45, 52 (PTAB Aug. 5, 2021).

Patent Owner also identifies several patent applications pending before the Office that are related to either the '097 or '851 patents.  Paper 4, 2–4.

4

IPR2020-00007
Patent 9,849,061 B2

### D. The '061 Patent

The '061 patent, titled "Stimulation Device Having an Appendage," generally relates to a device having a pressure field generating arrangement with a first chamber connected to a second chamber with an opening for placing on a body part, and a drive unit that varies the volume of the first chamber such that a pressure field that serves for stimulation is generated in the second chamber. Ex. 1001, Abst. The pressure field generating arrangement is more specifically described as follows.

> This embodiment according to the invention, of chambers in fluidic communication via at least one connection element, allows simple generation of a pressure field in the second chamber by changing the volume in the first chamber, this pressure field being temporarily directed at the area of skin to be stimulated.

> A pressure field, in the context of the invention, is a field of medium pressures that is variable over time and has temporary positive pressures and temporary negative pressures, a negative pressure being a pressure of medium that is below the reference pressure and a positive pressure being a pressure of medium that is above the reference pressure. As a result, the medium flows back and forth in the pressure field according to the invention. Thus, preferably a (largely) intermittent exchange of said medium can occur.

*Id.* at 3:11–25.

The described reference pressure "is usually the atmospheric pressure acting on the stimulation device that prevails when application begins (i.e. prior to placing the stimulation device on the area of skin to be stimulated)." *Id.* at 3:38–41. In the preferred embodiment that uses air as the medium, the reference pressure "is the currently prevailing air pressure or normal pressure." *Id.* at 3:41–43.

5

IPR2020-00007
Patent 9,849,061 B2

The pressure field generating arrangement is described further by reference to Figures 4 through 6 reproduced below.

Fig. 4



Figure 4 depicted above shows:

[T]he pressure field generating arrangement 2 in a first state, with the second chamber 4 placed on the area of skin or body part 11 to be stimulated. The first state of the pressure field generating arrangement 2 is characterized by a neutral deflection of the first chamber 3, i.e. no external force acts on the first chamber 3, for example from the drive unit. Here, the volume V1 of the first chamber is the standard volume of this chamber 3.

. . . .

Because it is placed on the body part 11 to be stimulated, the second chamber 4 forms a chamber that is largely or completely closed off from the exterior of the pressure field generating arrangement 2 and whereof the only remaining connection to the second chamber is via the connection element 5, wherein the edges of chamber 4 ideally form an air-tight enclosure with the surface of the body part II. Two communicating chamber 3 and 4 are created in this way, wherein a corresponding pressure equalization between the chambers 3 and 4 via the connection element 5 occurs in the event of a change in volume in one of the chambers 3 or 4.

*Id*. at 10:1–8, 18–28.

Figure 5 depicted below shows the pressure field generating arrangement in a second state.

6

IPR2020-00007
Patent 9,849,061 B2



Fig. 5

The second state of the pressure field generating arrangement shown in Figure 5 above is

> [C]haracterized in that a force A acting on the first chamber 3 causes the chamber 3 to expand. To be precise, in this exemplary embodiment the force A draws the wall 31 of the first chamber 3 in a direction away from the second chamber 4.

> This increases the volume V2 in the chamber 3, i.e. V2>V1. To equalize the difference in pressure created between the chambers 3 and 4, the medium or air now flows from the second chamber 4 into the first chamber 3.

> Assuming that in the first state the pressure in the chambers 3 and 4 corresponds to the currently prevailing external reference pressure (air pressure for example), the overall pressure that is present in the second state will be lower than the external reference pressure. This negative pressure is set such that it is preferably lower than the usual systolic blood pressure in the blood vessels of the body part 11.

*Id.* at 10:52–67.

Figure 6 depicted below shows the pressure field generating arrangement in a third state.

7

IPR2020-00007
Patent 9,849,061 B2

Fig. 6



The third state of the pressure field generating arrangement shown in

Figure 6 above is

> [C]haracterized in that a force B acting on the first chamber 3
> causes a volume reduction or compression in the chamber 3. To
> be precise, the direction of the force B is opposed to the direction
> of the force A and deforms the wall 31 of the first chamber such
> that the resulting volume V3 of the chamber is smaller than the
> volume V1. The compression of the chamber 3 causes a positive
> pressure in the chamber 3, which is equalized by the medium or
> air flow through the connection element 5 in the direction of the
> second chamber 4.

*Id.* at 11:3–15.

This oscillation between positive and negatives pressures in relation to

a reference pressure is touted as superior to previous devices that utilized a

vacuum or negative pressure alone. *See id.* at 1:53–2:63. The '061 patent

lists several disadvantages of using negative pressure alone for stimulation.

One disadvantage entails habituation effects that may occur with long-term

continuous use of negative pressures. Negative pressure also has to be

limited by a control valve, and injury may be caused by improper use of the

device or by malfunction where a valve for releasing the negative pressure

does not work properly to release the device from the skin. *Id.* at 2:51–63.

8

IPR2020-00007
Patent 9,849,061 B2

### E.   Challenged Claims

Petitioner challenges claims 1–3, 5, 7, 11, 14, 15, 17–19, and 20–26 of the '061 patent.  Claims 1, 20, and 21 are the only challenged independent claims.  Challenged claims 2, 3, 5, 7, 11, 14, 15, and 17–19 depend directly from claim 1, and challenged claims 22 through 26 depend directly from claim 21.  Claim 1 is illustrative and recites with emphasis on the claim limitation at issue:

1.      A stimulation device for erogenous zones, comprising:

at least one pressure field generating arrangement with:

at least one first chamber;

at least one second chamber having at least one opening for placing on a body part; and

at least one connection element that connects the at least one first chamber to the at least one second chamber;

a drive unit that varies the volume of the at least one first chamber such that a stimulating pressure field is generated via the at least one connection element in the at least one second chamber;

a control device that activates the drive unit; and

an appendage;

wherein the stimulating pressure field generated in the at least one second chamber comprises *a pattern of negative and positive pressures, modulated []*[3] *with respect to a reference pressure*;

wherein the at least one first chamber is connected to the at least one second chamber solely by the at least one connection element, and

---

[3] Petitioner explains that the word "onto" represented by the empty brackets in claim 1 was deleted during prosecution, but erroneously included in the '061 patent.  Pet. 37 (citing Ex. 1003, 172).  Patent Owner has since received a Certificate of Correction deleting the word "onto" that was erroneously included in the claim.  *See* Ex. 2073.  Throughout this proceeding, the parties have treated claim 1 as not including the word "onto."  *See, e.g.* Papers 1, 6, 24, 31.

9

IPR2020-00007
Patent 9,849,061 B2

wherein the appendage is a dildo configured to be inserted into a vagina.

Ex. 1001, 16:23–45.

### F. Prior Art and Asserted Grounds of Unpatentability

Petitioner argues that claims 1–3, 5, 7, 11, 14, 15, 17–19, and 20–26 would have been unpatentable based on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–3, 5, 7, 11, 14, 15, 17–19, 21, 23–26 | 102(a)(1) | Taylor[4] |
| 1–3, 5, 7, 8, 11, 14, 15, 17–19, 21–26 | 103 | Taylor, Hovland[5] |
| 20 | 103 | Taylor, Zipper[6] |
| 20 | 103 | Taylor, Zipper, Hovland |

Petitioner submits the Declarations of Michael R. Prisco, P.E., Ph.D. and Richard P. Meyst in support of its positions. *See* Ex. 1002; 1018, 1020. Patent Owner submits the Declarations of Morten Olgaard Jensen, Ph.D., Dr. Med, and Debra Herbenick, Ph.D. *See* Exs. 2001, 2004, 2034, 2035.

## II.    ANALYSIS

### A. Principles of Law

#### 1. Burden

In an *inter partes* review, the burden of proof is on the Petitioner to show that the challenged claims are unpatentable, and that burden never

---

[4] Taylor, U.S. Patent No. 5,725,473, issued Mar. 10, 1998 (Ex. 1004, "Taylor").

[5] Hovland et al., U.S. Patent No. 6,964,643 B2, issued Nov. 15, 2005 (Ex. 1006, "Hovland").

[6] Zipper, US 2013/0261385 A1, published Oct. 3, 2013 (Ex. 1007, "Zipper").

10

IPR2020-00007
Patent 9,849,061 B2

shifts to the patentee.  *See* 35 U.S.C. § 316(e); *in re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1375 (Fed. Cir. 2016) (citing *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015)).

### 2.    Anticipation

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).  "A reference anticipates a claim if it discloses the claimed invention 'such that a skilled artisan could take its teachings in combination with his own knowledge of the particular art and be in possession of the invention.'" *In re Graves*, 69 F.3d 1147, 1152 (Fed. Cir. 1995) (internal citation and emphasis omitted).  Moreover, "it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968); *see Eli Lilly and Co. v. Los Angeles Biomedical Res. Inst. at Harbor-UCLA Medical Center*, 849 F.3d 1073, 1074–75 (Fed. Cir. 2017).  "A single prior art reference may anticipate without disclosing a feature of the claimed invention if such feature is necessarily present, or inherent, in that reference." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958 (Fed. Cir. 2014) (citing *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003)).  "A reference may anticipate inherently if a claim limitation that is not expressly disclosed 'is necessarily present, or inherent, in the single anticipating reference.'  The inherent result must inevitably result from the disclosed steps; '[i]nherency . . . may not be

11

IPR2020-00007
Patent 9,849,061 B2

established by probabilities or possibilities.'" *In re Montgomery*, 677 F.3d 1375, 1379–80 (Fed. Cir. 2012) (citations omitted, alterations in original).

### 3. Obviousness

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which said subject matter pertains ("POSITA"). *KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co*., 383 U.S. 1, 17–18 (1966). In determining obviousness when all elements of a claim are found in various pieces of prior art, "the factfinder must further consider the factual questions of whether a person of ordinary skill in the art would be motivated to combine those references, and whether in making that combination, a person of ordinary skill would have had a reasonable expectation of success." *Dome Patent L.P. v. Lee*, 799 F.3d 1372, 1380 (Fed. Cir. 2015); *see also WMS Gaming, Inc. v. Int'l Game Tech*., 184 F.3d 1339, 1355 (Fed. Cir. 1999) ("When an obviousness determination relies on the combination of two or more references, there must be some suggestion or motivation to combine the references."). "Both the suggestion and the expectation of success must be founded in the prior art, not in the applicant's disclosure." *In re Dow Chemical Co*., 837 F.2d 469, 473 (Fed. Cir. 1988).

12

IPR2020-00007
Patent 9,849,061 B2

An obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418; *see In re Translogic Tech, Inc.*, 504 F.3d 1249, 1259 (Fed. Cir. 2007). In *KSR*, the Supreme Court also stated that an invention may be found obvious if trying a course of conduct would have been obvious to a POSITA:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

550 U.S. at 421. "*KSR* affirmed the logical inverse of this statement by stating that § 103 bars patentability unless 'the improvement is more than the predictable use of prior art elements according to their established functions.'" *In re Kubin*, 561 F.3d 1351, 1359–60 (Fed. Cir. 2009) (citing *KSR*, 550 U.S. at 417).

"[O]bjective evidence of nonobviousness includes copying, long felt but unsolved need, failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, and skepticism of skilled artisans before the invention." *In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998) (internal citations omitted). "For objective [evidence of secondary considerations] to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the *claimed invention*." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed.

13

IPR2020-00007
Patent 9,849,061 B2

Cir. 2010) (alterations in original) (quoting *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995)).

We analyze the asserted grounds of unpatentability in accordance with the above-stated principles. In making such an analysis, we find that Petitioner has failed to show by a preponderance of the evidence that any challenged claims is unpatentable, because for each challenge, Petitioner has failed to show that all of the limitations of any challenged claim are taught or suggested by the asserted art. We also found Patent Owner's evidence of secondary consideration of non-obviousness persuasive.

*B.   Level of Ordinary Skill in the Art*

We consider the asserted grounds of unpatentability in view of the understanding of a person of ordinary skill in the art. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 399 (2007) (stating that obviousness is determined against the backdrop of the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the art). Factual indicators of the level of ordinary skill in the art include "the various prior art approaches employed, the types of problems encountered in the art, the rapidity with which innovations are made, the sophistication of the technology involved, and the educational background of those actively working in the field." *Jacobson Bros., Inc. v. U.S.*, 512 F.2d 1065, 1071 (Ct. Cl. 1975); *see also Orthopedic Equip. Co. v. U.S.*, 702 F.2d 1005, 1011 (Fed. Cir. 1983) (quoting with approval *Jacobson Bros.*).

In our Decision on Institution, we applied Petitioner's proposed definition of one skilled in the art as an individual with "a bachelor's degree in mechanical engineering, biomechanical engineering, or the equivalent,

14

IPR2020-00007
Patent 9,849,061 B2

and three or more years of experience in fluid mechanics and pump-based medical or personal use devices," and that "practical experience could qualify one not having the aforementioned education as a [person of ordinary skill in the art], while a higher level of education could offset lesser experience." Dec. 10–11.

Patent Owner renews its argument that in addition to the education level recited above, a person of ordinary skill in the art would also have "at least three years' experience in research, development, or design of devices that interact with and sexually stimulate the human female vulva," with more experience offsetting the requisite amount of education and *vice versa*. Resp. 3. Patent Owner concludes that "Petitioner's proposed POSITA fails to consider the necessary relevant experience related to female sexual stimulation." *Id*. (citing Ex. 2034 ¶¶ 68–69; Ex. 2035 ¶ 28).

Patent Owner supports this contention by citing to the Technical Field discussion in the Specification of the '061 patent where it states that field relates to "a stimulation device . . . *for erogenous zones, in particular for the clitoris*." *Id*. (citing Ex. 1001, 1:16–19). Patent Owner also contends that the language recited in the claims supports this definition. *Id*.

We have considered Patent Owner's argument and are not persuaded that our original definition of a person of ordinary skill in the art was in error. We do not agree that one of ordinary skill in the art requires such specific expertise for the subject matter set forth in the field of invention or the claims of the '061 patent. As Petitioner points out and Patent owner acknowledges in its discussion of the hypothetical person or ordinary skill in the art, the claims are not limited to stimulating the human female vulva, but more generally to "a body part." *See* Reply 2; Resp. 3 (citing claims 1–20).

15

IPR2020-00007
Patent 9,849,061 B2

Thus, Patent Owner's definition of one of ordinary skill in the art appears to be too narrow based on the claim language of the '061 patent. *See also* Ex. 1001, 10:9–17 (stating the body part to be stimulated includes "all body parts or erogenous zones (such as the inside of the thighs, lumbar region, nape of the neck, nipples, etc.) which can be stimulated by means of medium- or air-pressure massage and/or negative pressure").

A "hypothetical 'person having ordinary skill in the art' to which the claimed subject matter pertains would, of necessity have the capability of understanding the scientific and engineering principles applicable to the pertinent art." *Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (BPAI 1988). Although the device disclosed in the '061 patent is a stimulation device for erogenous zones, the scientific and engineering principles applicable to the claimed device and method involve mechanical engineering and fluid flow that are not necessarily specific to the application of the device, especially the more narrow focus of Patent Owner's definition of sexual stimulation of the human female vulva.

As we previously noted in our Decision on Institution:

> Although the invention generally relates to a device for stimulating female erogenous zones, as seen from the discussion below, the design and operation of the device largely relates to issues of mechanical engineering and fluid flow. Thus, we conclude that experience in developing devices that interact with the female body [and specifically the human female vulva] is not needed to define a person of ordinary skill in the art.

Dec. 11.

Based on the forgoing, we continue to apply the same definition of a person of ordinary skill in the art we used in our Decision Denying Institution.

16

IPR2020-00007
Patent 9,849,061 B2

### C.  *Claim Construction*

We construe claims using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b).  37 C.F.R. § 42.100 (2019).  Therefore, we construe the challenged claims under the framework set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–19 (Fed. Cir. 2005) (en banc).  Under this framework, claim terms are given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art ("POSITA"), at the time of the invention, in light of the language of the claims, the specification, and the prosecution history of record.  *Id.*  Only those terms that are in controversy need be construed and only to the extent necessary to resolve the controversy.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

At this stage of the proceeding, we find that it is only necessary to construe expressly the term "reference pressure."  Although the parties have also presented arguments concerning the term "pressure field generating arrangement," *see* Pet. 18–20; Resp. 19–22, we determine that it is not necessary to construe that term to determine the patentability of the challenged claims in light of the asserted grounds.[7]

---

[7] Petitioner presents argument that the term "pressure field generator" should be construed as a means-plus-function term limited to the following structure:  at least one first chamber, at least one second chamber, and at least one connection element.  Reply 25–26.  As we find that it is not necessary to construe this term to resolve the issues before us, we do not address these arguments presented by Petitioner.

17

IPR2020-00007
Patent 9,849,061 B2

*Reference Pressure*

In our Decision Denying Institution, we construed the term "reference pressure" to mean "a prevailing pressure within the device prior to placing the stimulation device on the area of the skin to be stimulated." Dec. 14. In our Decision on Rehearing, we vacated this construction because we found on rehearing that at least a fact question exists concerning whether Taylor teaches positive and negative pressures with respect to a reference pressure, which we resolved in favor of Petitioner at the institution stage. Reh'g Dec. 20–21. We invited the parties to provide further briefing concerning how "reference pressure" should be construed. *Id*. at 21.

Although Patent Owner agrees with this construction with a slight modification of "the prevailing pressure 'acting on' the device, rather than 'within' the device," *see* Resp. 22–26, Petitioner contends that we improperly limited the construction to one example in the Specification, *see* Reply 3–4.

In the Petition, Petitioner originally asserted that the "reference pressure" is "atmospheric pressure." *See* Dec. 12–13; Pet. 7, 35, 64, 69; Ex. 1002 ¶¶ 64, 87. Petitioner presented an alternative construction—"reference pressure" should mean "given pressure"—for the first time in its Rehearing Request. *See* Req. Reh'g 4. In its Request for Rehearing, Petitioner states that "the plain meaning of 'reference pressure' is a 'given pressure' around which higher and lower pressures are generated." *Id*.

Petitioner reiterates this position in its Reply stating again that "reference pressure" should be given its plain meaning, "which is a 'given' pressure around which higher and lower pressures are generated for stimulating the body, which may be determined prior to application <u>or after</u>

18

IPR2020-00007
Patent 9,849,061 B2

application of the device to the target body part." Reply 4 (citing Ex. 1018 ¶ 18; Ex. 1020 ¶ 51, Ex. 1001, 3:38–41. In support of this construction, Petitioner points to the discussion in the Specification involving pressures above and below systolic pressure. Reply 3–4. Petitioner asserts that the statement in the Specification of the '061 patent that "negative pressure is set such that it is *preferably* lower than the usual systolic blood pressure" would encompass embodiments where the negative pressure is above systolic blood pressure, which one of skill in the art would understand is always above ambient pressure, leading to the conclusion that any reference pressure in such a scenario would be above ambient pressure. *See* Reply 3–4 (quoting Ex. 1001, 10:61–67 (emphasis added) (citing Ex. 1018 ¶¶ 12–18; Ex. 1020 ¶¶ 43–51; Ex. 1034 ¶ 88; Ex. 1040)); *see also* Ex. 1001, 3:26–37 (discussing use of the claimed devices with liquid media such as water or lubricants); Ex. 1018 ¶ 17.

Patent Owner responds that Petitioner is inappropriately presenting a new argument that was nowhere raised in the Petition or Dr. Prisco's Declaration (Ex. 1002). Sur-Reply 5–6. Patent Owner also asserts that Petitioner's argument addresses an incorrect construction—that "reference pressure" is limited to atmospheric pressure. *Id*. at 5. Patent Owner asserts that it

> has never taken the position that "reference pressure" must be limited to atmospheric pressure, nor would it, as doing so would ignore the plain language of the '061 Patent. The patent explains the device may be used in various environments, meaning the prevailing pressure acting on the device prior to operation (the reference pressure) would have a different value depending on the environment (*e.g*.., in a bathtub versus on a bed). Ex. 1001, 3:26–49. But always, the reference pressure is that prevailing pressure acting on the device prior to placing the

19

IPR2020-00007
Patent 9,849,061 B2

> device on the area of skin to be stimulated. *Id*. Petitioner's argument that Novoluto's proffered construction would limit the term to a single embodiment (Reply 3–4) is baseless and misleading.

Sur-Reply 6. Patent Owner also notes that the reference pressure is not an absolute value because the measure for ambient pressure would change based on location. *Id*. at 4 (citing Ex. 1001, 3:26–49). Patent Owner points out that Petitioner's new argument concerning systolic blood pressure does not take this into account. *Id*. at 6.

We have considered the arguments advanced by the parties and the evidence of record, and conclude that our original construction set forth in our Decision Denying Institution was proper. Contrary to Petitioner's contention, the construction is not limited to a single example, but is consistent with the overall teachings of the Specification. *See, e.g.*, Ex. 1001, 3:26–49, 14:49–54, Figure 14. For instance, the Specification of the '061 patent sets forth that "[t]he reference pressure is usually the atmospheric pressure acting on the stimulation device that prevails when application begins (i.e. prior to placing the stimulation device on the area of skin to be stimulated)." Ex. 1001, 3:38–41.

The construction we adopted is not limited to atmospheric pressure (as originally proposed in the Petition), but refers generally to the prevailing pressure in the device before it is applied to the body as described in the Specification of the '061 patent. This refers to the prevailing pressure within the device regardless of the environment in which it is used. For instance, the Specification of the '061 patent lists additional environments to include "a liquid medium, such as water or commercially available lubricant." *Id*. at 3:26–28. This is also consistent with the position advanced by Patent Owner

20

IPR2020-00007
Patent 9,849,061 B2

during prosecution stating that the claimed pattern of negative and positive pressures was not taught by a device that "purely acts with negative pressure (i.e., as a vacuum) on the skin." Ex. 1003, 183.

Even if we consider Petitioner's shifting claim construction argument, Petitioner's argument regarding systolic pressure is unconvincing. The entire paragraph regarding systolic pressure reads

> Assuming that in the first state the pressure in the chambers 3 and 4 corresponds to the currently prevailing external reference pressure (air pressure for example), the overall pressure that is present in the second state will be lower than the external reference pressure. This negative pressure is set such that it is preferably lower than the usual systolic blood pressure in the blood vessels of the body part 11. The blood circulation in this area thus increases, and the clitoris 12 is better supplied with blood in the second state.

Ex. 1001, 10:61–11:2. Petitioner's reading of this description to include a negative pressure that is set *higher* than systolic blood pressure is too strained a reading to support Petitioner's conclusions. When read in context, the reference pressure referred to in this paragraph is the prevailing pressure in the device *before* the device is applied to the body part, which is consistent with our original construction.

Based on this analysis, we conclude that the construction of the term "reference pressure" should be "a prevailing pressure acting on the device prior to placing the stimulation device on the area of skin to be stimulated."[8]

---

[8] We agree with Patent Owner that "acting on" as opposed to "within" is more consistent with what is described in the Specification of the '061 patent. *See* Ex. 1001, 3:38–41.

21

IPR2020-00007
Patent 9,849,061 B2

### D.  Anticipation by Taylor

Petitioner asserts that claims 1–3, 5, 7, 11, 14, 15, 17–19, 21, and 23–26 are anticipated by Taylor.  Pet. 3.  Petitioner provides an analysis of how each claim limitation is taught by Taylor.  Pet. 20–66.  Petitioner relies on the declaration of Dr. Prisco in support of its positions.  *See generally* Ex. 1002.  We focus our analysis on claims 1 and 21 as they are the only independent claims at issue in this ground.

Patent Owner asserts that Taylor teaches a cyclical vacuum, and not modulated negative and positive pressures with respect to a reference pressure as required by the challenged claims.  Resp. 32–49.  Patent Owner relies on the declarations of Morten Olgaard Jensen, Ph.D., Dr. Med, and Debra Herbenick, Ph.D., in support of its positions.  *See generally* Exs. 2001, 2003, respectively.

For the following reasons, we find that Petitioner has failed to show by a preponderance of the evidence that any of the challenged claims are anticipated by Taylor because we agree with Patent Owner that Petitioner has not sufficiently shown how Taylor teaches "a pattern of negative and positive pressures, modulated with respect to a reference pressure," as required by claims 1–20, or modulating "the pressure field in a pattern of negative and positive pressures with respect to a reference pressure" as required by claims 21–26.  We begin our analysis of Petitioner's first challenge with a description of the pertinent teachings of Taylor.

### 1.  Taylor (Ex. 1004)

Taylor discloses a sexual aid that includes a means for introducing a vacuum to stimulate the clitoris.  Ex. 1004, Abstr.  In one embodiment, the device comprises a suction cup which engages the upper portion of the

22

IPR2020-00007
Patent 9,849,061 B2

vulva. *Id.* at 5:28–30. The suction cup is in fluid communication with a bellows which cyclically introduces a vacuum within the suction cup. *Id.* at 5:32–38. The cyclical vacuum stimulates the clitoris. *Id.* at ll. 40–41.

Taylor discloses:

> Referring to FIG. 3, an alternative embodiment of the drive mechanism is shown with the motor 18 mounted on the arm 26. As in the original embodiment, the level 22 mounted on the output shaft 20 of the motor 18 is pivotally mounted on the connecting rod 36. The connecting rod 36 is pivotally mounted on the housing 12. As the output shaft 20 rotates, the lever 22 urges the connecting rod 36 against the housing 12 oscillating the arm 26 along with the motor 18.

Ex. 1004, 4:52–59. Petitioner's annotated version of an excerpt of Taylor Figure 3 is reproduced below. Pet. 14.

23

IPR2020-00007
Patent 9,849,061 B2



Annotated Excerpt of *Taylor* Fig. 3

The annotated portion of Figure 3 of Taylor shown above describes a second embodiment of first stimulator 154 that introduces a vacuum to stimulate the clitoris using a drive unit, arm, and bellows.

Taylor states:

> Referring only to FIG. 3, a second embodiment of the first stimulator 154 is shown. The first stimulator 154 includes a suction cup member 156 that conformingly and sealingly receives the upper portion of the vulva. The suction cup member 156 of the first stimulator 154 is more specifically directed at receiving the clitoris. The suction cup member 156 is in fluid communication with a bellows 160 or squeeze ball (not shown) via flexible conduit 162. As the arm 26 oscillates relative to the housing, the arm 26 compresses and expands the bellows 160 relative to the housing 12. The arm 26 and bellows

24

IPR2020-00007
Patent 9,849,061 B2

> 160 cyclically introduce a vacuum in the volume defined by the suction cup member 156 and the portion of the vulva received therein. The cyclical vacuum phenomenon stimulates the clitoris.

Ex. 1004, 5:28–41.

### 2. Analysis

Petitioner relies heavily on Taylor's statement that the suction cup member 156 *sealingly* receives the upper portion of the vulva. Pet. 35. Petitioner asserts that when this seal is engaged, the cyclical vacuum oscillates between positive and negative pressures with respect to a reference pressure or atmospheric pressure. *Id*. at 35–36.

With reference to Taylor's Figure 3 shown above, Petitioner explains this position as follows.

> When suction cup member 156 is sealed against the vulva, and bellows 160 is not compressed or expanded, air within bellows 160 and suction cup member 156 is at atmospheric pressure (i.e., at a reference pressure). Ex. 1002 at ¶¶ 62–64, 75(vii). When arm 26 compresses bellows 160 . . . with suction cup member 156 "sealingly" engaged with the vulva, the volume within bellows 160 is reduced. *Id*. As a result, air within bellows 160 is pushed out of bellows 160, through flexible conduit 162, and into suction cup member 156. *Id*. *And, since the volume within suction cup member 156 is fixed as a result of sealingly receiving the vulva, the pressure within suction cup member increases above atmospheric pressure (i.e., at a positive pressure with respect to the reference pressure).* Ex. 1004 at 5:30–31, 36–37; Ex. 1002 at ¶75(vii). In contrast, when arm 26 expands bellows 160 . . . with suction cup member 156 "sealingly" engaged with the vulva, the volume within bellows 160 increases, and air from suction cup member 156 rushes out of suction cup member 156, through flexible conduit 162, and into bellows 160. Ex. 1002 at ¶75(vii). Consequently, the pressure within suction cup member 156 is reduced below atmospheric pressure (i.e., at a negative pressure with respect to the reference

25

IPR2020-00007
Patent 9,849,061 B2

> pressure). *Id. Thus, during time periods of "vacuum" in suction cup member 156, the pressure of the air in suction cup member 156 is negative with respect to a reference pressure, and during the time periods in between two successive vacuum time periods, the pressure of air in suction cup member 156 is above the reference pressure, or positive with respect to the pressure.* Thus, the pressure field generated in suction cup member 156, by the compression and expansion of bellows 160, "comprises a pattern of negative and positive pressures, modulated with respect to a reference pressure." *Id.*

Pet. 35–36 (emphases added).

Patent Owner asserts that Taylor discloses a suction-only system that applies only negative pressures to a body part, and does not teach positive pressure at all, much less the modulated pressures required by the challenged claims. *See* Resp. 31–34 (citing Ex. 2034 ¶¶ 102–104). Patent Owner explains that "[a]t most, Taylor discloses a suction cup with a vacuum feature based on negative pressure, *not* positive pressure." *Id.* at 34 (citing Ex. 2034 ¶ 109).

Patent Owner also asserts that Taylor does not inherently disclose the modulation of negative and positive pressures with respect to a reference pressure because Taylor's description does not support a teaching of a closed system as being necessarily present such that one of skill in the art would recognize this teaching, which is required for inherency. *Id.* at 34–48. Petitioner's inherency argument, Patent Owner asserts, relies on a single sentence in Taylor that states a suction cup "conformingly and sealingly receives" the vulva. Resp. 34 (citing Pet. 35). Patent Owner asserts that Petitioner's inherency argument assumes that the bellows in Taylor is a sealed container with only one opening. *Id.* at 35–36. Patent Owner also asserts that such a conclusion is counter to the ordinary and customary

26

IPR2020-00007
Patent 9,849,061 B2

meaning of "bellows" as a unidirectional device "that by alternate expansion and contraction draws in air through a valve or orifice and expels it through a tube." *Id*. at 36 (citing Ex. 2003 (dictionary); Ex. 2034 ¶¶ 108–109). Based on this understanding of the meaning of "bellows," Patent Owner asserts that one of skill in the art "would understand Taylor's bellows to provide suction only at the *suction* cup," and would not interpret Taylor as a closed system. *Id*.

In reviewing Petitioner's explanation of how Taylor discloses negative and positive pressures modulated with respect to a reference pressure set forth above, Patent Owner asserts that such an argument requires that Taylor discloses: (1) the suction cup member being sealed against the vulva; (2) simultaneously with the bellows being in a state that is neither compressed nor expanded, and (3) that, also at the same time, the air within the bellows is at atmospheric pressure. *Id*. at 37. Patent Owner points out that Taylor does not teach that the bellows is ever in a state that it is not compressed or expanded, nor does it describe the suction cup being sealed against the vulva when the bellows are in such a state. *Id*. at 37, 48–49. "Rather, Taylor discloses that the suction cup 'sealingly receives' the vulva when Taylor's bellows creates a vacuum within the suction cup. A POSITA would easily understand that when the vacuum releases, the seal and suction cup likely release as well." *Id*. (citing Ex. 2034 ¶¶ 121–122).

Patent Owner explains that nothing in Taylor discloses Petitioner's proposed arbitrary point when Taylor's bellows are not compressed or expanded. *Id*. at 39–40 (citing Ex. 1004; Ex. 2034 ¶¶ 108–115).

> Taylor discloses a bellows that cyclically introduces a vacuum to a suction cup sealed against the body. [Ex. 2034 ¶¶ 108–115.] Regardless of the starting point of the bellows, a

27

IPR2020-00007
Patent 9,849,061 B2

> POSITA would understand that the pressure acting on Taylor's device does not change based on the initial position of the bellows. *Id.*, ¶ 110. As the bellows expands it creates a vacuum pulling air flow into the bellows—*i.e.*, creating negative pressure with respect to the reference Pressure. *Id.* As the bellows compresses, the vacuum releases and pressure in the bellows returns toward (and may or may not reach) the reference pressure, *i.e.*, the prevailing pressure of the sexual aid. *Id.* This cycle is illustrated below.



> *Id.* ¶ 111. Whether or not negative pressure returns to atmospheric pressure, Taylor's cyclical vacuum would create negative pressure that would never pass atmospheric pressure to reach positive pressure with respect to atmospheric pressure, because Taylor discloses a suction-only system. Thus, although the pressure within the bellows during compression may increase in the negative pressure region, the pressure within the bellows is never positive *with respect to the reference pressure*, regardless of the starting point of the bellows. *Id.*

Resp. 39–40.

Patent Owner concludes that "[n]othing about Taylor's bellows suggests that compressing the bellows would create a positive pressure, as Petitioner has argued, particularly because Taylor's bellows operates to introduce cyclical vacuum to *suction* cups." *Id.* at 40.

28

IPR2020-00007
Patent 9,849,061 B2

Patent Owner also asserts that Petitioner's inappropriately belated argument that a squeeze ball may be used adds support to its conclusion that Taylor teaches a closed system is incorrect.[9]  Patent Owner explains that "Taylor's only description of the squeeze ball's function is in the context of a non-dildo alternative 'secretable embodiment' that relies on suction cups applied to the user's vulva and nipples, illustrated in Fig. 4," set forth below.



FIG. 4

Resp. 44.  Patent Owner explains that Taylor describes this embodiment as follows.

> To begin, Taylor's Fig. 4 shows a squeeze ball resembling a nasal aspirator that is separate from the wearable embodiment, which consists of three suction cups connected by open-ended flexible conduits and straps. This is not a closed system. 2034, ¶ 127-129.  Next, Taylor explains the squeeze ball is for introducing "cyclical vacuum" (*i.e.*, negative pressure) to the *suction* cups. Ex. 1004, 5:60-64. Cyclical vacuum is not modulating positive and negative pressures with respect to a

---

[9] Patent Owner asserts that we should not consider this argument as it was not made in the Petition.  Resp. 33, n.3.

IPR2020-00007
Patent 9,849,061 B2

reference pressure. To introduce a cyclical vacuum, which is Taylor's only stated purpose for the suction-cup embodiments, a user would need to squeeze the ball, connect it to the tube, release (to create *suction* in the *suction* cup), disconnect, and repeat the process. Exs. 1004, Fig. 4; 2034, ¶ 129; 2035, ¶ 102. That process would not result in modulation of positive and negative pressures relative to the reference pressure. Nor would squeezing the ball repeatedly while keeping it connected to the tube. That process would simply return the air sucked from the space within the sealed *suction* cup back into the *suction* cup, causing a *return to reference pressure*. *Id*. Significantly, and as in Taylor's other suction-cup embodiments, introducing positive pressure relative to the prevailing ambient pressure of the device, *i.e.*, the reference pressure, would stop the "cyclical vacuum," cause the suction cups to disengage or fall off, and thereby render the device inoperable. *Id*.

Resp. 45–46. Patent Owner also explains that one of skill in the art would be familiar with the use of squeeze balls and would not view Taylor's squeeze ball as "generating a pressure field in the *suction* cups with a pattern of positive and negative pressures modulated with respect to a reference pressure." *Id*. (citing Ex. 2034 ¶ 129; Ex. 2034 ¶ 102).

In its Reply, Petitioner refutes Patent Owner's position that one of skill in the art would assume bellows 160 contains a valve because there are many examples of bellows with a single opening such as lungs, squeeze balls, squeak toys, and pen fillers. Reply 5 (citing Ex. 1018 ¶¶ 24–32; Ex. 1020 PP 63–67; Ex. 1036, 6–7; Ex. 1017, 95:12–96:25). Petitioner states:

> Flexible conduit 162 is the only opening shown in bellows 160. Ex. 1004, 5:28–41, Fig. 3; Ex. 1018 ¶¶ 29–32. There is no basis to conclude from *Taylor* that there must be another opening or that air in bellows 160 must flow unidirectionally, especially where the bellows 160 is interchangeable with squeeze ball 74. Ex. 1004, Fig. 4, 5:33–

30

IPR2020-00007
Patent 9,849,061 B2

> 35, 5:50–63; Ex. 1018 ¶¶ 29–32; Ex. 1020 ¶¶ 63–67.  A
> POSITA would infer that bellows 160 has only one opening
> because squeeze ball 74 also has a single opening forming a
> closed system with bidirectional flow.  Ex. 1018 ¶¶ 29–32.

Reply 5–6 (internal citations and footnotes omitted).

Petitioner then applies its construction for "reference pressure," which we have rejected as set forth above in Section II.C., and contends that the reference pressure can be the pressure in the device shortly after it begins operation.  Reply 7–10.  Petitioner states:

> The claimed reference pressure could instead be a reference
> pressure <u>prior to activating</u> the device or after (*e.g.*,
> immediately after) applying the device [to] the vulva.  *Taylor*
> discloses <u>compressing</u> and then <u>expanding</u> the bellows after
> applying member 156 to the vulva, resulting in a positive and
> negative pressure relative to the pressure in bellows 160 (*i.e.*,
> the reference pressure).

Reply 8 (citing Pet. 12–13; Ex. 1018 ¶ 46; Ex. 1002 ¶¶ 59–64).  Petitioner contends that using this definition of reference pressure, the cyclic vacuum of Taylor meets the modulation of positive and negative pressures relative to a reference pressure limitation as the vacuum increases and decreases relative to the pressure shortly after activation.  *Id.* at 8–14.  For instance, Petitioner argues "*Taylor* discloses that arm 26 'compresses . . . and then expands bellows 160' <u>after</u> member 156 'sealingly' engages the vulva.  That is, *Taylor* teaches to first compress bellows 160 to a smaller size, and then to expand to a larger size, <u>after</u> member 156 is placed on the vulva as shown in Fig. 3."  Reply 9 (internal citations omitted); *see also* Reply 14 (asserting Taylor has an air-tight seal).  Petitioner also asserts that Taylor teaches the bellows start in a neutral position because in Figure 3 of Taylor "the depicted position of bellows 160 is an intermediate or neutral state, and not

IPR2020-00007
Patent 9,849,061 B2

its most compressed (or expanded) state." *Id.* at 10 (citing Ex. 1018 ¶¶ 49–52).

Petitioner explains that even if Taylor's device does not start in a neutral position, it would still create positive and negative pressures with respect to a reference pressure. *See* Reply 12–14. Petitioner explains:

> A POSITA would have understood [as shown in the figures set forth below] that when member 156 (blue) is pressed into the body using force F1 (*e.g.*, by hand), an *above ambient* positive pressure is generated in member 156 due to the change in volume defined by member 156 resulting therefrom:



> Ex. 1018 ¶ 52. Accordingly, because the volume of member 156 decreases after force is applied, a positive pressure is generated even if the bellows was fully compressed at the beginning of operation, resulting in positive and negative pressures modulated with respect to a reference pressure when the device is powered on. Ex. 1018 ¶ 52. Further, F1 would be greater than the F2 generated by positive/negative pressures inside member 156, which is why member 156 does not detach or become rendered inoperable when positive pressure is generated.

32

IPR2020-00007
Patent 9,849,061 B2

Reply 12–13.

In Sur-Reply, Patent Owner contends that Petitioner's argument is based on the incorrect assumption that the "reference pressure" can be any arbitrary "given pressure." Sur-Reply 12. Patent Owner contends that such a definition creates a moving target for the claimed "reference pressure," which contravenes the '061 patent's definition of surrounding pressure acting on a device prior to operation that provides an understandable, consistent, and reliable baseline from which to judge whether positive and negative pressures are applied to a body part. *Id*.

Patent Owner also contends that Petitioner's argument with respect to the pressure in the suction cup being a positive pressure is based on demonstrative drawings set forth for the first time in Petitioner's Reply, which is nowhere found or taught by Taylor. *Id*. at 13. Patent Owner states:

> Taylor discloses a suction-only system that, in one embodiment (the only embodiment Petitioner relies on in the Petition), uses a bellows to apply "cyclical vacuum phenomenon" to suction cups to stimulate the upper vulva and nipples. Ex. 1004, 5:29–49; Ex. 2034 ¶¶ 104–112. Regardless of what position the bellows begins operation, cyclical vacuum is repetitive negative, *not* modulation of positive and negative pressures.

Sur-Reply 14. Therefore, Patent Owner asserts, discussion of whether Taylor's bellows have a valve or the use of a squeeze ball in place of the bellows does not alter the teaching of Taylor of creation of a "cyclical vacuum" through a suction cup. *Id*. at 15–17.

We have considered the arguments of the parties and the evidence of record and conclude that Petitioner has not demonstrated that Taylor discloses that the changing volume of the bellows results in modulation of positive and negative pressures with respect to a reference pressure.

33

IPR2020-00007
Patent 9,849,061 B2

First, Petitioner is basing its argument on a shifting and incorrect claim construction that "reference pressure" may include any "'given' pressure around which higher and lower pressures are generated for stimulating the body, which may be determined prior to application or after application of the device to the target body part." *Compare* Reply 4, *with* Pet. 21–23 (stating "reference pressure" is "atmospheric pressure"). Based on such reliance on an incorrect claim construction alone, we find that Petitioner has failed to prove by a preponderance of the evidence that Taylor discloses the changing volume of the chamber resulting in modulated positive and negative pressures with respect to a reference pressure.

We also find that Petitioner's explanation of what Taylor teaches to support that application of its erroneous claim construction is also flawed. We find Petitioner's substantive arguments concerning the teachings of Taylor are not supported by Taylor's disclosure.

For instance, Taylor expressly and consistently teaches applying a cyclical vacuum or negative pressure using suction cups. *See* Ex. 1004, 5:35–48; *see* Ex. 2034 ¶¶ 104–106. As Dr. Jensen states, "Taylor provides a device that introduces a vacuum, and releases the vacuum." Ex. 2034 ¶ 106. Petitioner's attempt to assert that Taylor teaches positive, as well as negative pressures, that are modulated with respect to a reference pressure is unconvincing and not supported by the express disclosure of Taylor.

Petitioner relies almost exclusively on Taylor's statement that the suction cup member 156 *sealingly* receives the upper portion of the vulva to attempt to prove that Taylor teaches modulation of positive and negative pressures with respect to a reference pressure because such a sealing to the body part creates a closed system. Pet. 35; *see* Ex. 1002 ¶ 64; Resp. 35. As

34

IPR2020-00007
Patent 9,849,061 B2

Patent Owner notes, however, Taylor does not disclose such a closed system either expressly or inherently.

We agree with Dr. Jensen that when read in context, Taylor's disclosure of a suction cup "sealingly" receiving the vulva occurs when the vacuum is applied, not before. *See* Ex. 2034 ¶ 121. We disagree with Petitioner's conclusion that "*Taylor* discloses that arm 26 'compresses . . . and then expands bellows 160' <u>after</u> member 156 'sealingly' engages the vulva." Reply 9. The single statement in Taylor on which Petitioner relies states, with reference to Figure 3 set forth above in Section II.D.1, "[t]he first stimulator 154 includes a suction cup member 156 that conformingly and sealingly receives the upper portion of the vulva." Ex. 1004, 5:29–31. We agree with Dr. Jensen that this does not support Petitioner's conclusion that a seal is achieved before the vacuum is applied, and credit Dr. Jensen's testimony that reads as follows as consistent with Taylor's disclosure.

> Petitioner alleges Taylor discloses a positive pressure with respect to the reference pressure in the bellows, because Taylor states that "suction cup member 156 ... conformingly and sealingly receives" the vulva. Petition at 34-35. Specifically, Petitioner appears to argue that because there is a seal, there must be modulated positive and negative pressure. Petitioner's logic is clearly flawed. As an initial matter, Taylor's disclosure of a suction cup "sealingly" receiving the vulva is in the context of when the vacuum is applied. Based on Taylor's disclosure, the suction cup member of Taylor would not stay sealingly engaged if a positive pressure is applied. Again, Taylor discloses a cyclical vacuum, which most likely returns to atmospheric pressure every time the bellows is compressed, resulting in the suction cup releasing from the vulva. Regardless, Petitioner's argument is also flawed because providing a seal does not mean a positive pressure with respect to the reference pressure is applied to the suction cup. Taylor only

35

IPR2020-00007
Patent 9,849,061 B2

discloses a vacuum is applied.  The fact that the suction cup "sealingly" receives the vulva is not itself evidence of both a negative pressure and a positive pressure.  Rather, a *suction* cup that *sealingly* receives a vulva while a vacuum or negative pressure is applied is further evidence that Taylor provides only a negative pressure, **not** a positive pressure.

If Taylor were to provide a positive pressure, the "suction" cup would not "sealingly receive" the vulva as Taylor describes.  A POSITA would understand that a positive pressure would unseal suction cup member 156 from the vulva.  Moreover, the additional suction cup members 58 for receiving a user's nipples and areolae that are in fluid communication with the bellows would also be nonfunctional if a positive pressure with respect to the reference pressure resulted from a varied volume of the chamber, as the cups would detach and fall off the nipple area in response to the positive pressure.  Once the suction cups disengage from the body, the cyclical vacuum can no longer be applied to the body, and, therefore, there can be no pattern of negative and positive pressures modulated with respect to the reference pressure, as alleged by Petitioner.  Thus, Petitioner's modulated pressure scenario relies on modifications to the Taylor system – introduction of a positive pressure and modulation of negative and positive pressures – that are entirely inconsistent with Taylor's disclosure and render Taylor's system inoperable.  Because Taylor discloses a vacuum-only system, further evidenced by the inclusion of sealed suction cups, a POSITA would not find that Taylor necessarily provides a positive pressure as alleged by Petitioner. Therefore, Taylor does not inherently disclose modulated positive and negative pressures.

Ex. 2034 ¶¶ 121–122; *see* Ex. 1022, 202:22–205:6.

Petitioner's contentions with respect to this limitation are also based on the erroneous premise that the bellows in Taylor must necessarily start in a positon that is neither fully expanded nor fully compressed.  Pet. 35 (stating "[w]hen bellows 160 is neither compressed nor expanded, the air

36

IPR2020-00007
Patent 9,849,061 B2

within bellows 160 is at atmospheric pressure (i.e., the reference pressure)")
(citing Ex. 1002 ¶¶ 62–64, 75(vii)). Taylor, however is silent as to the
starting position of the bellows. *See* Ex. 1004, 5:27–49; Ex. 2034 ¶ 110.
Petitioner's declarant, Mr. Meyst, confirms this silence by drawing a
negative inference from such silence. Such a negative inference, however,
does not meet the inherency test as it must because there is no such express
disclosure. In particular, Mr. Meyst testifies:

> It is my opinion that pressures above and below the initial
> pressure would be generated by *Taylor*. This is at least because
> *there is no reason to assume* that an initially generated positive
> pressure in suction cup member 156 immediately after it is
> applied to the vulva would somehow be contrary to the
> operation of *Taylor*, and because there is no teaching that the
> device must begin operation with the bellows at its smallest
> volume.

Ex. 1020 ¶ 61 (emphasis added).

Thus, we agree with Patent Owner that Petitioner appears to argue that
the starting positon would inherently be neither fully compressed nor fully
expanded, *see* Resp. 36–41, which is simply not supported by Taylor or the
testimony of Petitioner's declarants.

We discern nothing in Taylor, the testimony of Dr. Prisco, or the
testimony of Mr. Meyst to support the conclusion that the device in Taylor
starts with the bellows in a positon that is neither expanded nor compressed.
*See* Ex. 1004, 5:27–49; Ex. 1002 ¶¶ 62–64; Ex. 1020 ¶ 61. In fact, given
that Taylor explicitly teaches that the bellows acts to create a cyclic vacuum,
one skilled in the art is just as likely to conclude that the bellow starts in the
fully compressed positon creating a stronger vacuum as the bellows is
expanded. *See* Ex. 1004, 5: 27–49; Ex. 2034 ¶ 109 (stating "Taylor describes
a bellows for cyclically introducing only a **vacuum** . . . [a] POSITA would

37

IPR2020-00007
Patent 9,849,061 B2

understand a bellows selected for purposes of creating a vacuum to provide unidirectional fluid flow").

For instance, as Dr. Jensen, Patent Owner's declarant, explains:

> According to Petitioner, Taylor's bellows creates both negative and positive pressures with respect to a reference pressure because Taylor's bellows begins in a state of being neither compressed nor expanded. *See* Pet., 35. It is unclear what Petitioner actually means by this point. However, the starting point of Taylor's bellows is irrelevant. Taylor describes a bellows system for creating a vacuum-only system, and a POSITA would therefore understand that the bellows is designed such that it creates a vacuum, regardless of the position of the bellows when it starts. Further, Taylor does not disclose anything that would tell a POSITA that the bellows begins in a state of being neither compressed nor expanded, which to me, as a POSITA, is further evidence that the bellows included in the Taylor system is an ordinary vacuum bellows. Moreover, regardless of the "starting point" of the bellows, a POSITA would understand that atmospheric pressure would be the "reference pressure" as understood in the context of the '061 Patent, because it is the prevailing pressure <u>acting on the stimulation device prior to operation</u>. '061 Patent, 3:38-41. The pressure acting on Taylor's device does not change based on the initial position of the bellows. Even if the starting position did matter, following Petitioner's logic, then it doesn't make sense for the starting position of the bellows to be in a neither compressed nor expanded position. Rather, the logical starting position of the bellows would be a fully compressed position to maximize Taylor's vacuum feature. Ultimately, a POSITA would recognize that if the bellows is designed to introduce a vacuum as Taylor describes, the bellows will introduce a vacuum regardless of where the bellows starts. A POSITA would understand Taylor's bellows to work as follows, regardless of its starting position: As the bellows is expanded, a vacuum (negative pressure with respect to the reference pressure) is created. As the bellows is compressed and the

38

IPR2020-00007
Patent 9,849,061 B2

> vacuum is released, the pressure in the bellows returns toward the starting pressure, *i.e.*, the prevailing pressure of the sexual aid (reference pressure). While the pressure within the bellows may increase relative to the negative pressure as the bellows is being compressed, **the pressure within the bellows remains negative with respect to the reference pressure at all times and is never positive with respect to the reference pressure** as claimed.

Ex. 2034 ¶ 110 (emphasis in original). As we find that Dr. Jensen's analysis of the operation of Taylor's device is more consistent with Taylor's disclosure, we conclude that the evidence does not support Dr. Prisco's contention that the bellows in Taylor must necessarily start in a positon that is neither fully expanded nor fully compressed.

For all the reasons expressed above, we find that Petitioner has failed to show that Taylor discloses "a pattern of negative and positive pressures, modulated with respect to a reference pressure" or "a pattern of negative and positive pressures, modulated with respect to a reference pressure."

### 3. Conclusion

Based on the foregoing analysis, we conclude that Petitioner has failed to show by a preponderance of the evidence that the challenged claims are anticipated by Taylor.

### E. Obviousness Grounds

Petitioner asserts that claims 1–3, 5, 7, 8, 11, 14, 15, 17–19, and 21–26 are unpatentable under 35 U.S.C. § 103 as obvious over Taylor and Hovland. Pet. 3, 66–78. Again, we focus on independent claims 1 and 21 at issue in this challenge. We find that Petitioner has not shown sufficiently that the combination of the teachings of Taylor and Hovland teach or suggest "a pattern of negative and positive pressures, modulated with respect

39

IPR2020-00007
Patent 9,849,061 B2

to a reference pressure" of claim 1 or the similar limitation "a pattern of negative and positive pressures, modulated with respect to a reference pressure" of claim 21.   We also address Patent Owner's objective evidence of non-obviousness, which supports our view that the challenged claims are not unpatentable on the record before us.  Prelim. Resp. 35–53; Ex. 2003.

### 1.   *Hovland (Ex. 1006)*

Hovland discloses a stimulation device wherein suction or a vacuum is applied to the clitoris to promote engorgement of the clitoris with blood. Ex. 1006, Abstr.  An alternative embodiment of Hovland teaches the use of super-atmospheric pressure to massage the clitoris.  *Id.* at 4:22–24.

### 2.   *Analysis*

Petitioner contends that if Taylor does not teach modulated positive and negative pressures with respect to a reference pressure, "it would have been obvious to a POSITA to modify *Taylor's* stimulation device with the teachings of *Hovland* to apply modulated super-atmospheric pressure along with *Taylor's* 'cyclical vacuum' (i.e., sub-atmospheric pressure) to achieve the benefits described by *Hovland*."  Pet. 66–67 (citing Ex. 1002 ¶¶ 91–96). Petitioner points to statements in Hovland discussing embodiments that increase blood flow to the clitoris "by creating a vacuum around **and**/or **using increasing pressure** to produce percussion and/or massage of e.g., the clitoris."  Pet. 67 (citing Ex. 1006, 8:49–52).  With particular reference to Figure 15, Petitioner points to a statement that the pump/motor assembly of the embodiment can provide "pneumatic and/or hydraulic actuation to create e.g. vibration, percussion, **subatmospheric pressure and**/or **super-atmospheric pressure**, or **modulation of these effects**."  Pet. 68 (citing Ex. 1006, 13:20–24 (emphasis in original), 15:23–24).

IPR2020-00007
Patent 9,849,061 B2

From these statements, Petitioner concludes:

Based on *Hovland's* disclosure, a POSITA would have readily recognized that *Hovland's* reference to "subatmospheric pressure," "suction," and "vacuum" is intended to encompass "pressure levels lower than atmospheric or ambient." [Ex. 1006,] 21:47–50. A POSITA also would have understood that *Hovland's* reference to super-atmospheric pressure for providing "percussion or massage" is intended to encompass "pressures higher than ambient or atmospheric." *Id*. at 21:50–52; Ex. 1002 at ¶¶ 93–96.

[I]t would have been obvious to a POSITA to modify *Taylor's* stimulation device with the teachings of *Hovland* to apply both modulated sub-atmospheric **and** super-atmospheric pressures to clitoris, to take advantage of percussion and/or massage of the clitoris, in order to achieve improved and quicker clitoral engorgement and tumescence known to result from a pressure differential in the clitoris and/or surrounding areas. *Id*. at 4:19–28 (emphasis added). Moreover, modification of *Taylor* with the teachings of *Hovland* would have amounted to nothing more than the use of a known technique to improve a similar device, and the results of the modification would have been predictable. *See KSR Int'l. Co. v. Teleflex, Inc*., 550 U.S. 398, 417 (2007). This is because at the time of the invention, a POSITA would have had the requisite skill level to readily modify the device disclosed by *Taylor* to implement the teachings of *Hovland* without any problem.

Pet. 68–69.

Patent Owner contends that neither Hovland nor Taylor teach or suggest modulated positive and negative pressures with respect to a reference pressure. Resp. 49. Hovland teaches: "According to other embodiments, pump/motor assembly 300 provides pneumatic and/or hydraulic actuation to create e.g. vibration, percussion, subatmospheric pressure and/or superatmospheric pressure, or modulation of these effects." Ex. 1006, 13:20–24. Patent Owner contends that this passage in Hovland

41

IPR2020-00007
Patent 9,849,061 B2

teaches the modulation of either a vacuum or super atmospheric pressure, but not modulating between them. Resp. 50–52. Patent Owner contends that while Hovland uses the term "and/or" with respect to certain embodiments, one skilled in the art would not have considered the term to refer to modulating between positive and negative pressures in the teachings of the '061 patent. *Id.* Patent Owner contends that the use of the term and/or refers to a choice of effects and not modulating between them. *Id.* at 51–53. Patent Owner also argues that Hovland does not disclose any structure or means for modulating between positive and negative pressures. *Id.* at 51–52. Patent Owner concludes that "[o]ther than having seemingly searched for isolated statements or phrases (*e.g.*, "and/or") in Hovland based exclusively on knowledge gleaned from the '061 Patent, Petitioner presents no evidence that Hovland actually discloses this missing limitation." *Id.* at 51 (citing Ex. 2034 ¶¶ 135–137).

Patent Owner also contends that one skilled in the art would not have been motivated to combine the teachings of Taylor and Hovland. Resp. 54–57. Patent Owner argues that Petitioner has not adequately explained or supported its contention that it would have been obvious to modify Taylor with the teachings of Hovland to achieve the results stated in Hovland. *Id.*

Petitioner responds that the plain meaning of "and/or" supports its interpretation that Hovland teaches modulation between positive and negative pressures. Reply 16–18. Petitioner argues that Hovland specifically teaches modulation between various effects, including between positive and negative pressures. *Id.* Petitioner also contends that combining Taylor with Hovland is nothing more than modifying Taylor with a known method to produce a predictable result. *Id.* at 18–19.

42

IPR2020-00007
Patent 9,849,061 B2

In its Sur-Reply, Patent Owner contends that, when read in context, the term "and/or" as it appears in Hovland refers to a series of alternative modes, but not alternating between these modes to achieve modulation of positive and negative pressures with respect to a reference pressure. Sur-Reply 17–18. Patent Owner also contend that Petitioner misconstrues the teachings of Hovland with respect to using different pressures to stimulate the clitoris. *Id.* at 19–22.

As discussed above, we find that Taylor does not teach the limitations calling for modulated positive and negative pressure with respect to a reference pressure that are required by all challenged claims. We now turn to the questions of whether those elements are taught by Hovland; whether Petitioner has shown that one skilled in the art would have been motivated to combine the teachings of Taylor and Hovland; and whether Patent Owner has offered sufficient evidence of objective indicia of patentability to overcome Petitioner's arguments that the subject matter of the challenged claims would have been obvious.

### a. Modulated Positive and Negative Pressure

Petitioner contends that, to the extent the elements of modulated positive and negative pressure are not taught by Taylor, those elements are taught by Hovland. Pet. 66–71.

Hovland teaches that in one embodiment, the device disclosed therein has a "pump/motor assembly [which] provides pneumatic and/or hydraulic actuation to create e.g. vibration, percussion, subatmospheric pressure and/or superatmospheric pressure, or modulation of these effects." Ex. 1006, 13:21–24. Petitioner construes this passage as teaching that the device in Hovland can modulate both positive and negative pressures as required by

43

IPR2020-00007
Patent 9,849,061 B2

claim 1.  Reply 15–19.  Petitioner contends that the use of the term "and/or" would lead one skilled in the art to understand that the device of Hovland can modulate between subatmospheric and superatmospheric pressures.  *Id.*

Patent Owner contends that although Hovland may teach a device that can produce positive (superatmospheric) or negative (subatmospheric) pressures, it does not teach modulating between those pressures.  Resp. 49–54.  Patent Owner contends that the recited paragraph only indicates that the individual effects can be modulated, but not that the device can modulate between the effects.  *Id.*

We have considered the arguments advanced by the parties and the evidence of record and conclude that Patent Owner has the better argument.  Although we agree with Petitioner that Hovland teaches a device capable of producing positive and negative pressures individually, we do not find that Hovland discloses modulating between those effects.  We agree with Patent Owner that, when read in context, the cited passage refers to modulation of the individual effects recited in the sentence, but not modulation between the effects.  *See* Resp. 49–54.  As Patent Owner points out, this interpretation is consistent with the overall teachings of Hovland, in which "[e]ach instance of 'modulate' or 'modulated' or 'modulator' refers to varying or adjusting the level of a particular effect, *e.g.*, the vacuum effect."  Resp. 51 (citing Ex. 2034 ¶ 135 (citing various examples in Hovland).

For example, Hovland teaches the use of a vacuum modulator to vary the suction pressure applied by the device, in a manner similar to Taylor's device.  Ex. 1006, 12:42–59.  Hovland also teaches that the vacuum modulator can be used to pulsate the vacuum level of the device.  *Id.* at 14:21–22.  Hovland further teaches:

44

IPR2020-00007
Patent 9,849,061 B2

> When applied to the clitoris, the vacuum applied by device 200 will cause the clitoris to become engorged, i.e. filled with blood. Vacuum level and modulation can be adjusted by either the patient or her partner, as needed, to maintain engorgement. Thus, embodiments of the invention provide the ability both to rapidly *modulate vacuum pressure* with modulator 290, in a manner akin to the modulation of alternating current, for example, and simultaneously to more evenly hold underlying vacuum pressure at a substantially constant level or gradually change it, e.g. with wheel 280, in a manner akin to direct current. This dual functionality provides substantial advantages over the prior art.

*Id.* at 14:27–39 (emphasis added).  Thus when read in the context of the entire disclosure of Hovland, we find that the reference in Hovland to modulation refers to modulation of one specific effect, not modulation between two or more effects.

Petitioner disagrees with Patent Owner's interpretation of Hovland as disclosing a device that produces only a vacuum.  Reply 15–16.  Petitioner contends that this ignores the use of the term "and/or" as it appears in Hovland, which calls for the device to create both effects.  *Id.*; Ex. 1018 ¶¶ 44–45; Ex. 1020 ¶¶ 69–70.

Although we agree with Petitioner that the term "and/or" may be read as a device that can create both positive and negative pressures, as discussed above, we do not read Hovland as teaching modulating between effects, as required for the challenged claims.  This is confirmed by the plain language of Hovland, which refers to "modulation of these effects" rather than "modulation between effects."  Ex. 1006, 13:20–24.  Moreover, when the cited paragraph is read in the context of the other disclosures in Hovland discussed above, we find that the overall teachings of Hovland are focused on modulation of the individual effects, not modulating between the effects.

45

IPR2020-00007
Patent 9,849,061 B2

Ex. 1006, 12:21–24; Ex. 2034 ¶¶ 132–138.  Although Hovland teaches a device that can produce positive and negative pressures, we discern nothing in Hovland that teaches modulating between these effects.

Therefore, we conclude that neither Taylor nor Hovland teach the feature of modulating positive and negative pressures with respect to a reference pressure in a sexual stimulation device.

### b.  Motivation to Combine

As noted above, a determination of obviousness requires more than showing that all of the elements are present in the prior art.  There must be a motivation to combine those elements to produce the claimed invention. *See WMS Gaming*, 184 F.3d at 1355.  Because we have found that neither Taylor nor Hovland teach modulating between positive and negative pressures with respect to a reference pressure, we need not analyze whether Petitioner has established by a preponderance of the evidence that the combination of Taylor and Hovland renders obvious the challenged claims of the '061 patent.  Nonetheless, even assuming that the Hovland teaches this requirement based on the single phrase in its disclosure of "subatmospheric pressure and/or superatmospheric pressure, or modulation of these effects," we also find that Petitioner has failed to show a rationale as to why one of ordinary skill in the art would have combined the teachings of Taylor and Hovland to arrive at the claimed subject matter of the challenged claims.

In the present case, Petitioner contends that the motivation to combine the teachings of Taylor and Hovland arises from the teachings in Hovland that percussion and/or massage of the clitoris achieves improved and faster clitoral engorgement.  Pet. 68–69 (citing Ex. 1006, 4:19–28; Ex. 1002

46

IPR2020-00007
Patent 9,849,061 B2

¶¶ 93–96).  Petitioner also contends that the combination of references is nothing more than using a known technique to improve a similar device.  *Id.* at 69.

Patent Owner contends that Petitioner's argument is factually unsupported in that Petitioner does not explain how one skilled in the art would have modified the references or how the references teach modulation between positive and negative pressures.  Resp. 54–57.

We have considered the arguments presented by the parties and the evidence of record and find that Petitioner has not adequately explained why one skilled in the art would have been motivated to combine the teachings of Taylor and Hovland to produce a stimulation device that modulates between positive and negative pressure with respect to a reference pressure.

The paragraph from Hovland relied upon by Petitioner for establishing such a rationale reads:

> A vacuum created over the clitoris, or suction applied to the clitoris, for example, creates a negative pressure in the clitoris that is or is likely to be lower than the systolic blood pressure. *Alternatively*, super-atmospheric pressure may be provided to produce massage or percussion of the clitoris and/or the surrounding area.  *In either case*, the pressure differential tends to promote engorgement of the clitoris with blood and/or otherwise stimulate blood flow, providing the benefits described above while increasing the likelihood of short-term pleasurable effect and beneficial longer-term usage. Embodiments of the invention thus may encourage more regular and active compliance with a treatment program for urinary and/or fecal incontinence, while at the same time treating female sexual dysfunction if needed.  Embodiments of the invention also are non-invasive, non-pharmacological, relatively inexpensive and easy to use.

47

IPR2020-00007
Patent 9,849,061 B2

Ex. 1006, 4:18–34 (emphasis added).  It is clear from reading this paragraph that Hovland is talking about the benefits of using *either* negative or positive pressure, but not alternating between both.  Thus, insofar as Hovland does not teach such modulation, Hovland does not provide the motivation to modify Taylor to modulate between positive and negative pressure.

Based on the foregoing we find that Petitioner has failed to establish a motivation to combine the teachings of Taylor with those of Hovland.

### c.  Objective Indicia

Although the above conclusions would be enough for us to find that Petitioner has failed to show by a preponderance of the evidence that the challenged claims are unpatentable based on Taylor and Hovland, we also find that the objective indicia of non-obviousness supports our conclusion that these challenged claims are not unpatentable on the record before us. Objective indicia of non-obviousness, or "secondary considerations," guard against hindsight reasoning in an obviousness analysis, and are often "the most probative and cogent evidence in the record." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016) (citations omitted).

The secondary considerations evidence we must consider, if presented, include "copying, long felt but unsolved need, failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, and skepticism of skilled artisans before the invention." *Rouffet*, 149 F.3d at 1355.  We must also determine if Patent Owner has shown a nexus between the evidence and the merits of the claimed invention. *Wyers*, 616 F.3d at 1246.

48

IPR2020-00007
Patent 9,849,061 B2

### (1)   Nexus

There must be a "nexus" between the merits of the claimed invention and the evidence of secondary considerations for such evidence to be accorded substantial weight.  *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011).  Nexus is presumed if a marketed product embodies the claimed features and is coextensive with them.  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1372 (Fed. Cir. 2013).  A patent owner is entitled to a presumption of a nexus if it shows that "the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'"  *WBIP*, 829 F.3d at 1335.

Patent Owner contends that two of its commercial products, the Womanizer® InsideOut and Womanizer® Duo, "embody and are coextensive with" the claims of the '061 patent.  Resp. 62.  In support of this contention Patent Owner relies on the testimony of its experts Drs. Jensen and Herbenick.  Resp. 62 (citing Exs. 2037, 2034 ¶¶ 46–54, 2035 ¶¶ 48–64).[10]

Both Dr. Herbenick and Dr. Jensen reviewed the Womanizer® InsideOut and concluded that the device was coextensive with at least the challenged independent claims of the '061 patent.  Ex. 2034 ¶ 47; Ex. 2035 ¶ 49.  Dr. Herbenick prepared a detailed claim chart tracking each element of the independent claims to specific components of the Womanizer® InsideOut, concluding that the device contained each of the structural

---

[10] As both Dr. Herbenick and Jensen have testified, the Womanizer® InsideOut and Womanizer® Duo differ only in style features with the structure and mechanics of the two devices being the same.  Ex. 2034 ¶ 46; Ex. 2035 ¶ 48.  For this reason, Dr. Herbenick and Jensen focused their analyses on the Womanizer® InsideOut.  Ex. 2034 ¶ 46; Ex. 2035 ¶ 48.

49

IPR2020-00007
Patent 9,849,061 B2

elements recited in the independent claims. Ex. 2035 ¶¶ 49–64; Ex. 2037. Dr. Jensen reviewed the device and Dr. Herbenick's claim charts and also concluded that all of the structural elements were present in the device. Ex. 2034 ¶ 47.

Dr. Jensen also conducted an experiment to determine whether the Womanizer® InsideOut produced modulated positive and negative pressures with respect to a reference pressure. Ex. 2034 ¶¶ 50–54. The following images from Dr. Jensen's declaration show the equipment used to test the pressure of the InsideOut, as well as the pressure graph generated as a result of the tests:



IPR2020-00007
Patent 9,849,061 B2

Ex. 2034 ¶ 52. As shown in the top images above, Dr. Jensen's testing set-up included an oscilloscope, data acquisition equipment ("DAQ"), and a pressure sensor with an air-tight pressure sensing plug connected to the device. *Id.* In the pressure graph shown above, the y-axis indicates pressure (as a voltage measurement) relative to ambient or atmospheric pressure (zero line) and the x-axis indicates time (milliseconds). *Id.* Based on the results of that experiment and the product literature relating to the Womanizer® InsideOut, Dr. Jensen concluded that the commercial devices meet the limitations calling for modulated positive and negative pressures with respect to a reference pressure. Ex. 2034 ¶¶ 50–54.

Petitioner contends that Patent Owner has failed to establish a nexus between the commercial products and the challenged claims. Reply 20–22. Petitioner contends that Patent Owner's arguments are largely based on the testimony of Dr. Herbenick, who Petitioner contends is not qualified to render such opinions. *Id.*

Petitioner contends that Patent Owner is not entitled to a presumption that the commercial devices embody the claimed invention as they include beneficial features not recited in the claims. *Id.* at 20–21. Petitioner also argues that Dr. Jensen's testing of the alleged commercial embodiment is unsound and does not establish a nexus between the device and the claims. *Id.* at 22.

We have considered the arguments presented by the parties and the evidence of record and find that Patent Owner has established a nexus between the claims of the '061 patent and its commercial products. The testimony of both Dr. Herbenick and Dr. Jensen demonstrate that the elements of the claims are present in the Womanizer® InsideOut and

51

IPR2020-00007
Patent 9,849,061 B2

Womanizer® Duo products and that the products are essentially the claimed invention. *See* Ex. 2034 ¶¶ 50–54; Ex. 2035 ¶¶ 45–64.

Petitioner contends that the presence of additional, unclaimed features precludes a presumption of a nexus between the commercial embodiments and the claims of the '061 patent. Reply 20–22. In support of this contention Petitioner cites to *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366 (Fed. Cir. 2019). Petitioner's reliance on *Fox Factory* is misplaced. As the court in *Fox Factory* stated:

> To be sure, we have never held that the existence of one or more unclaimed features, standing alone, means nexus may not be presumed. Indeed, there is rarely a *perfect correspondence* between the claimed invention and the product. As we explained, the purpose of the coextensiveness requirement is to ensure that nexus is only presumed when the product tied to the evidence of secondary considerations "*is* the invention disclosed and claimed." Thus, if the unclaimed features amount to nothing more than additional insignificant features, presuming nexus may nevertheless be appropriate.

*Id.* at 1375. The court went on to state: "Although we do not require the patentee to prove perfect correspondence to meet the coextensiveness requirement, what we do require is that the patentee demonstrate that the product is essentially the claimed invention." *Id.*

In *Fox Factory*, the alleged commercial embodiment included unclaimed features that the patentee described as critical to the products' performance. *Id.* at 1374–1375. It was the presence of these critical, unclaimed features that lead the court to hold: "A patent claim is not coextensive with a product that includes a 'critical' unclaimed feature that is claimed by a different patent and that materially impacts the product's functionality." *Id.*

52

IPR2020-00007
Patent 9,849,061 B2

The case before us is factually distinct from *Fox Factory*. Although Petitioner has identified several features of the Womanizer® products that are not recited in the claims, Petitioner has not pointed to nor do we discern any evidence to suggest that these unclaimed features are critical to the products and impact the products' functionality. *See* Reply 21. Although Dr. Herbenick testified that additional features were present in the Womanizer® devices, Petitioner has not pointed to any testimony by Dr. Herbenick or other evidence to support the contention that these additional features significantly affect the functionality of the devices. *See* Reply 21; Ex. 1023, 115–116.

Petitioner also contends that Patent Owner's evidence that the commercial products are coextensive with the claims of the patent is unreliable. Reply 21–22. Petitioner contends that Dr. Herbenick did not perform a technical analysis of the devices herself and lacks the technical expertise to perform such an analysis. *Id.* at 21. With respect to Dr. Jensen's testimony, Petitioner contends that Dr. Jensen's testing technique is unsound and should not be relied upon. *Id.* at 22. We find both of these argument unpersuasive.

Although we agree with Petitioner that Dr. Herbenick does not have a technical degree that would enable her to opine about the operation of various components in the commercial embodiments, we note that she has studied and tested various sexual stimulation devices. Ex. 2035 ¶¶ 12–13. Based on her experience with such devices we find that Dr. Herbenick is qualified to identify the various components of the commercial embodiments as she did in her declaration and claim chart. Ex. 2037; Ex. 2035 ¶¶ 49–60. Moreover, Dr. Jensen, who has a background in medical devices, examined

53

IPR2020-00007
Patent 9,849,061 B2

the commercial embodiments and Dr. Herbenick's analysis and claim charts and concurred in Dr. Herbenick's findings.  Ex. 2034 ¶¶ 46, 47, 157.

We are similarly unpersuaded by Petitioner's critique of Dr. Jensen's testing methodology.  In particular, Petitioner and Dr. Prisco point to Dr. Jensen's deposition testimony indicating that he used a rubber plug or bottle stopper with the pressure sensor for his testing, which Dr. Prisco asserts would modify the size of the mouth of the device.  Ex. 1018 ¶¶ 66–67; Ex. 2022, 61:2–20.  Dr. Prisco testifies that such use of a stopper could affect the pressures generated, but offers insufficient explanation as to why this might be so or that it actually occurred when Dr. Jensen conducted his experiments.  For this reason, we give little weight to Dr. Prisco's critique of Dr. Jensen's methodology.  *Ebit Sys. Am., LLC v. Thales Visonix, Inc.*, 881 F.3d 1354, 1358 (Fed. Cir. 2018) ("The PTAB [i]s entitled to weigh the credibility of the witnesses . . . .") (internal citation omitted).

Dr. Prisco also testified that the data produced by Dr. Jensen shows that the pressure in the device modulated at a pressure greater that atmospheric pressure. Ex. 1018 ¶¶ 71–73.  Petitioner contends that this further supports the conclusion that Dr. Jensen's test results are unreliable. *See* Reply 22.  Again, we are not persuaded by this argument. Even if we were to accept Petitioner's argument that the reference pressure in Dr. Jensen's test was something other than atmospheric pressure, our construction of reference pressure does not limit the term to atmospheric pressure, but only the pressure in the device before it is placed in operation. Petitioner does not dispute that the data produced by Dr. Jensen show modulation of positive and negative pressure with respect to a reference

54

IPR2020-00007
Patent 9,849,061 B2

pressure regardless of whether it is atmospheric pressure. *See id.*; Ex. 1018 ¶¶ 71–73.

Based on the foregoing we conclude that Patent Owner has established a nexus between the Womanizer® InsideOut and Womanizer® Duo products and the claims of the '061 patent.

(2)    *Commercial Success*

The commercial response to an invention is significant to determinations of obviousness and is entitled to fair weight. *Demaco Corp. v. F.von Langsdroff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988).

Patent Owner contends that the Womanizer® products are "stand-out successes." Resp. 63. In support of this contention, Patent Owner points to various consumer testimonials as well as Dr. Herbenick's testimony regarding the sales of Womanizer® products and an exhibit detailing sales revenues. *Id.* (citing Exs. 2017–2019; 2035 ¶ 66; 2056).

Petitioner contends that raw sales data without sufficient context does not establish commercial success. Reply 22–23. Petitioner asserts "[t]here is no evidence of market share, sales expectations, or anything showing comparative success of the Embodiments in relation to other products on the market. And, anonymous online reviews are not relevant to commercial success." *Id.* at 23.

We have considered the arguments presented by the parties and the testimony of Dr. Herbenick and evidence of record and find that Patent Owner has not shown that the Womanizer® products are commercially successful.

Commercial success in the context of secondary considerations is typically established by evidence of sales of the product embodying the

55

IPR2020-00007
Patent 9,849,061 B2

claimed invention and relevant market share.[11]  *In re Applied Materials, Inc.*, 692 F.3d 1289, 1299 (Fed Cir. 2012).  In the present case Patent Owner has  offered the testimony of Dr. Herbenick that the relevant products have achieved significant sales volumes, that sales continue to increase, and raw sales data.  Resp. 63 (citing Ex. 2035 ¶ 66; Ex. 2056).  Dr. Herbenick, however, did not offer any testimony regarding any market context for the raw sales data.  *See* Ex. 2035 ¶ 66.  Petitioner offered one estimate of the total market size of the sex toy market as $29 billion, which adds some context for the sales data offered by Patent Owner.  *See* Reply 23, n.14 (citing Ex. 1024).  Patent Owner did not comment on this estimate.  *See generally* Sur-Reply.

Petitioner offers some context for the raw sales data proffered by Patent Owner that tends to show Patent Owner's products may not have enjoyed such a level of sales that would indicate commercial success. Without more context for the raw sales data, we cannot determine if the relevant products enjoyed commercial success sufficient to support a finding of non-obviousness.  *Applied Materials*, 692 F.3d at 1299.

(3)     Long-Felt Need

"Existence of a long felt but unsolved need that is met by the claimed invention is further evidence of non-obviousness." *Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1369 (Fed. Cir. 2017).  Evidence of a long felt but unresolved need tends to show non-obviousness because it is

---

[11] The analysis also requires a showing of a nexus between the claimed features and the sales of the relevant product. *Applied Materials*. 692 F.3d at 1299.

56

IPR2020-00007
Patent 9,849,061 B2

reasonable to infer that the need would have not persisted had the solution been obvious.  *WBIP*, 829 F.3d at 1332.

Patent Owner contends that there was a long-felt but unmet need for a sexual stimulation device that provided sexual pleasure while minimizing potential side effects.  Resp. 63 (citing Ex. 2035 ¶¶ 67–68; Ex. 2058).  Patent Owner contends that the use of prior art stimulation devices could cause numbness or damage to genitalia creating a need for a device which avoided these effects.  Resp. 64.  Citing the testimony of Dr. Herbenick, Patent Owner contends that the Womanizer® products satisfied this need.  *Id.* at 64–65 (citing Ex. 2035 ¶¶ 69–71).

In its Reply, Petitioner contends that indirect stimulation devices such as the claimed device were known in the art before the invention of the claimed device and that such devices would have avoided the side effects recited by Dr. Herbenick.  Reply 24.  Petitioner also contends that Patent Owner has not presented any empirical data to show that the commercial embodiments filled the long-felt need.  *Id.*

In its Sur-Reply, Patent Owner contends that the testimony of Dr. Herbenick is sufficient to support a finding that the Womanizer® products satisfied a long-felt need.  Sur-Reply 26–27.

We have considered the arguments presented by the parties and the evidence of record and conclude that Patent Owner has shown that there was a long-felt need that was satisfied by the Womanizer® products.

Dr. Herbenick testified that she led a study of women who used vibrators and found that 28.5% of women who used vibrators experienced one or more side effects including genital numbness, pain, irritation, inflammation/swelling, tears or cuts.  Ex. 2035 ¶ 68 (citing Ex. 2008, 1861–

57

IPR2020-00007
Patent 9,849,061 B2

1863, Table 5).  Dr. Herbenick testified that these injuries resulted in the need for a sexual stimulation device "that was effective at facilitating sexual pleasure and/or orgasm while minimizing the potential for side effects."  *Id.*  Dr. Herbenick testified that the Womanizer® products satisfied this need by "providing alternating positive and negative pressures to the clitoris so as to provide indirect stimulation to the clitoris sufficient to facilitate female orgasm. This is important as my research, published in a 2009 issue of the Journal of Sexual Medicine, had found that the use of mechanical vibrators (i.e., those involving direct physical contact) had caused numbness, irritation, pain, or even tears or cuts in a subset of female vibrator users."  *Id.* ¶ 69.  Dr. Herbenick also testified that the prior art devices, including the device disclosed in Taylor, failed to meet this need.  *Id.* ¶ 70.

Petitioner contends that indirect stimulation devices were known in the art and that such devices do not meet a long felt need.  Reply 24.  We find this argument unpersuasive.  Petitioner cites to the testimony of Dr. Herbenick to support this contention.  *Id.* (citing Ex. 1023, 61:14–20, 62:20–63:21).  A careful reading of the cited pages, however, reveals that Dr. Herbenick testified that, in the study she conducted, women were merely asked what type of vibrator was used but not whether the vibrator was used directly or indirectly.  Ex. 1023, 61–62.  We also note that Dr. Herbenick testified that at the time she conducted her study most of the vibrators available in the market would have been direct vibration without a lot of indirect possibilities.  Ex. 1023, 62–63.  While she testified that there were some devices in the market that provided indirect stimulation, they were suction-only devices that were less popular.  *Id.*  Dr. Herbenick testified that

58

IPR2020-00007
Patent 9,849,061 B2

these suction-only devices are not the same as the Womanizer® devices, which apply alternating positive and negative pressures. *Id.*

Petitioner also contends that Patent Owner has failed to present any empirical data to support show that the Womanizer® products fulfill the alleged long-felt need. Reply 24. Again we are unpersuaded by Petitioner's argument. Petitioner has not stated what specific "empirical data" is needed to show that the Womanizer® products fulfill the need, nor has Petitioner cited any case law holding that such data is required. *Id.* Moreover, Petitioner has not presented any evidence to rebut Dr. Herbenick's conclusion that the Womanizer® devices do fulfill the long-felt need.

In reaching our decision that the Womanizer® products fulfilled a long-felt need in the market for female sexual stimulation devices, we credit Dr. Herbenick's extensive experience in studying sexual health and behavior, including vulvar and vaginal health, as well as the use of sexual enhancement products such as vibrators including her detailed studies reported in Exhibit 2008. Ex. 2035 ¶¶ 11–14, 67–71. Petitioner did not offer any expert with a similar background to rebut Dr. Herbenick's testimony.

### (4)     *Failure of Others*

Evidence that others tried but failed to develop a claimed invention may carry significant weight in an obviousness inquiry. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1081 (Fed. Cir. 2012). This objective indicia factor is closely tied to the long-felt need factor discussed above. *Id.* at 1082 ("Longfelt need is closely related to the failure of others.").

59

IPR2020-00007
Patent 9,849,061 B2

Patent Owner contends that prior to the development of the Womanizer® products, "experts in sexual health and behavior were well aware of the potential adverse side effects of using vibrators for sexual stimulation, yet no one had successfully designed a product that facilitated orgasm while physically contacting the clitoris without also having these potential side effects, despite numerous attempts." Resp. 65 (citing Ex. 2035 ¶¶ 72–74; Exs. 2012–2016). In support of this contention, Patent Owner cites Dr. Herbenick's testimony that although experts in the field were aware of the issues of clitoral discomfort and numbness that arose from direct clitoral contact, none of the prior art devices accomplished the goal of providing a stimulation device without discomfort or numbness. *Id.*; Ex. 2035 ¶¶ 72–74.

Petitioner does not address Patent Owner's argument or evidence. *See* Reply 20–25.

We find that Patent Owner has persuasively shown that others in the field failed to develop a sexual stimulation device that avoided the issues of clitoral discomfort or numbness.

Dr. Herbenick testified based on her own experience in teaching the use of various stimulation devices and her work in developing such devices that no one had developed a product that achieved sexual stimulation in the same manner as the Womanizer® devices. Ex. 2035 ¶¶ 55–57. Dr. Herbenick testified that each prior device of which she was aware was limited to "either direct contact (such as vibrator or flicking) or was limited to providing suction." *Id.* ¶ 57. Neither of these approaches solved the issue of clitoral discomfort or numbness. *See id.*

60

IPR2020-00007
Patent 9,849,061 B2

(5)    *Skepticism*

Evidence of industry skepticism about whether or how a problem could be solved, or the workability of the claimed solution, weighs in favor of nonobviousness of the claimed invention. *United States v. Adams*, 383 U.S. 39, 52 (1966); *WBIP*, 829 F.3d at 1335.

Patent Owner contends that "industry experts and participants were skeptical about the Womanizer product and, in particular, skeptical about how modulating between positive and negative air pressure might facilitate orgasm." Resp. 66 (citing Ex. 2035 ¶¶ 75–81; Ex. 2059).

Petitioner contends that skepticism must be evaluated from the viewpoint of industry experts and that, with the exception of Dr. Herbenick, the evidence submitted by Patent Owner is limited to consumer reviews. Reply 24–25 (citing *WBIP*, 829 F.3d at 1335; *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1365 (Fed. Cir. 2007)).

We have considered the arguments presented by the parties and the evidence of record and find that Patent Owner has shown industry skepticism relating to the Womanizer® products. Although we agree with Petitioner that most of the reviews cited by Dr. Herbenick are consumer reviews and not experts in the field, the compilation of reviews cited by Dr. Herbenick includes reviews from experts who expressed skepticism about the products. For example, there is a review by Dr. Emily Morse, "a sexologist with a doctorate in human sexuality," who expressed skepticism about the product in her review. Ex. 2018, 1–2. Another expert is Vanessa Marin, a licensed psychotherapist specializing in sex therapy, who reviewed the product and expressed skepticism about it. Ex. 2019, 124–130. These

61

IPR2020-00007
Patent 9,849,061 B2

reviews in addition to the testimony of Dr. Herbenick show industry skepticism about the Womanizer® products. Ex. 2035 ¶¶ 75–81.

        (6)     *Praise by Others*

Evidence of industry praise of the claimed invention weighs in favor of nonobviousness. *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016). Evidence of industry praise may include evidence of industry awards given to commercial embodiments of the claimed invention. *See Henny Penny Corp. v. Frymaster, LLC*, 938 F.3d 1324, 1333–1334 (Fed. Cir. 2019) (finding evidence of industry praise, including industry awards for the patented product).

Patent Owner contends that, notwithstanding the industry skepticism discussed above, the industry has also praised the Womanizer® products extensively. Resp. 66. Patent Owner contends that reviews of the Womanizer® products have described them as "innovative, unique, and [in] other similar terms." *Id.* at 67 (citing Ex. 2035 ¶ 82). Patent Owner also contends that the Womanizer® products have received at least 18 industry awards including the Most Innovative Product award at the 2018 ADULTEX Awards. *Id.* at 68–69.

Petitioner has not presented any arguments in response to Patent Owner's showing. *See* Reply 23–26.

We find that Patent Owner has presented evidence showing praise in the industry favoring a finding of non-obviousness. As Dr. Herbenick testified, the Womanizer® InsideOut was named the most innovative Product at the 2018 ADULTEX Awards. Ex. 2035 ¶ 88; Ex. 2060, 8. The Womanizer® Duo was recognized and the Luxury Product/Range of the Year at the 13th annual StorErotica Awards in 2019 and was named the Sex

62

IPR2020-00007
Patent 9,849,061 B2

Toy Product/Line of the Year – Powered (Vibrating) at the XBIZ Europa Awards.  Ex. 2035 ¶ 88; Ex. 2060, 3, 61.  Dr. Herbenick also testified that the Womanizer® Duo was praised by Cosmopolitan magazine as having pressure waves that "gently suck the clitoris to give you an entirely different orgasmic sensation."  Ex. 2035 ¶ 85; Ex. 2019, 64.  In addition, the Womanizer® products have received praise by both sex toy retailers and consumers.  Ex. 2035 ¶¶ 82–89.

(7)    Copying

"Copying may indeed be another form of flattering praise for inventive features." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1311 (Fed. Cir. 2010).

Patent Owner contends that Petitioner and others have copied that Womanizer® products and that this supports a finding on non-obviousness.  Resp. 69–75.  To support this contention, Patent Owner points to descriptions of competitors' devices which describe the devices as offering "pleasure air technology" or "touchless air technology," which Dr. Herbenick contends describes modulated positive and negative pressures with respect to a reference pressure.  *Id.*at 75; Ex. 2035 ¶ 92.  Patent Owner also provides details about what Patent Owner asserts is Petitioner's copying of the '061 patent technology.  Resp. 70–74.

Petitioner contends that Patent Owner has not shown sufficient evidence of copying to support a finding of non-obviousness.  Reply 23–24.  Petitioner contends that Dr. Herbenick did not review tests of the competitors' devices, nor could she describe how the products worked.  *Id.*

63

IPR2020-00007
Patent 9,849,061 B2

In reply, Patent Owner contends that Petitioner mischaracterizes Dr. Herbenick's testimony and fails to rebut the evidence of copying. Sur-Reply 26.

Copying in the context of objective indicia of non-obviousness can be demonstrated either through internal documents, direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica, or access to, and substantial similarity to, the patented product (as opposed to the patent). *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). Marketing materials may also be used to show copying. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1368 (Fed. Cir. 2012).

We have considered the arguments presented by the parties and the evidence of record and find that Patent Owner has presented sufficient evidence of copying to support to finding of non-obviousness. Although Dr. Herbenick did not physically examine the competitors' devices, she did review various product descriptions which either compared the competitors' devices to the Womanizer® products or described the action of the products in a way that mirrored the actions of the Womanizer® products. Ex. 2035 ¶¶ 90–97. For example, the Satisfier website described the Satisfyer Pro G-Spot Rabbit as offering a "rapid change between suction and pressure." Ex. 2021, 4.

Given this evidence of the similarity of the competitive products to the Womanizer® products, specifically Petitioner's products, and Petitioner's failure to offer any evidence in rebuttal, we find that Patent

IPR2020-00007
Patent 9,849,061 B2

Owner has presented persuasive evidence of copying to support a conclusion of non-obviousness.

### (8)   Conclusion

Based on the foregoing we conclude that Patent Owner has presented sufficient evidence relating to objective indicia to support a finding of non-obviousness. Although Patent Owner failed to present persuasive evidence relating to commercial success, Patent Owner has presented persuasive evidence relating to long-felt need, failure of others, praise by others, and copying. Patent Owner has also shown a nexus between its commercial products and the claimed invention. In sum, the objective indicia evidence in the record supports the non-obviousness of the challenged claims.

### 3.   Conclusion

From the foregoing analysis we conclude that Petitioner has not demonstrated that the subject matter of claims 1–3, 5, 7, 8, 11, 14, 15, 17–19, or 21–26 would have been obvious to one of ordinary skill in the art over Taylor combined with Hovland.

### III.   OBVIOUSNESS OVER TAYLOR AND ZIPPER WITH OR WITHOUT HOVLAND

Petitioner asserts that claim 20 is unpatentable under 35 U.S.C. § 103 over Taylor and Zipper or Taylor, Zipper, and Hovland.  Petitioner asserts that Zipper teaches a remote control device, but is not offered for teaching the limitations requiring modulation of positive and negative pressures with respect to a reference pressure.  *See* Pet. 80, 85.  Petitioner continues to assert either Taylor alone or Taylor in combination with Hovland teaches these limitations.  Therefore, for the same reasons set forth above, we find that Petitioner has failed to show by a preponderance of the evidence that

65

IPR2020-00007
Patent 9,849,061 B2

claim 20 is unpatentable under 35 U.S.C. § 103 over Taylor and Zipper, or
Taylor, Zipper, and Hovland.

## IV.    PATENT OWNER'S MOTION TO SEAL AND FOR ENTRY OF A PROTECTIVE ORDER

Patent Owner moves to seal Exhibit 2056 as containing highly
confidential sales data relating to Patent Owner's commercial embodiments.
*See* Paper 25, 2.  Patent Owner asserts that the sales data such as invoice
information, sales units, and revenues that is disclosed in Exhibit 2056 is
relevant to demonstrate commercial success.  *Id*. at 3.

Patent Owner represents that there is good cause to seal Exhibit 2056
because access to such information by a competitor would be detrimental to
Patent Owner's business.  *Id*.  Patent Owner also represents that Petitioner
agrees that the information in Exhibit 2056 is highly sensitive.  *Id*.

We have considered Patent Owner's argument to seal Exhibit 2056
and determine that it has demonstrated good cause for sealing the exhibit.
Therefore, we grant Patent Owner's Motion to Seal.

Patent Owner also moves for entry of a Modified Protective Order
(Ex. 2070) that has been modified from the Default Protective Order to
include an "ATTORNEYS EYES ONLY" category, sets forth a mechanism
for a receiving party to challenge such designation, and sets forth who may
access such information.  *Id*. at 4–5.  Patent Owner also represents that
Petitioner is unopposed to the entry of this Modified Protective Order.  *Id*.
at 5.

We grant Patent Owner's request to enter the Modified Protective
Order (Ex. 2070) because the parties have agreed on the modifications to the

66

IPR2020-00007
Patent 9,849,061 B2

Default Protective Order and the modifications appear necessary to protect Patent Owner's sensitive sales data.

## V.    PATENT OWNER'S UNOPPOSED MOTION TO SUBMIT SUPPLEMENTAL INFORMATION PURSUANT TO 37 C.F.R. § 123(b)

Patent Owner moves to submit a Certificate of Correction ("COC") as supplemental information because it corrects a clerical error by the Office of including the word "onto" in claim 1 of the '061 patent although the word was removed in amendments prior to issuance. Paper 34, 1–2. Patent Owner represents that Petitioner is not opposed to this request. *Id*.

Patent Owner asserts that its request meets all the requirements for submitting supplemental information set forth in 37 C.F.R. § 42.123(b) concerning the timing of presentation of the evidence. *Id*. at 1. Patent Owner concludes that "[t]o have the recent COC reflecting the correction to claim 1 of the '061 Patent as part of the record is in the interests-of-justice and supports the long-standing policy of having a complete record." *Id*. at 2 (citing *Liberty Mutual Inc. Vo. v. Progressive Casualty Ins. Co*., No CBM2012-00002, Paper 66 at 60–61 (PTAB Jan. 23, 2014)).

We are persuaded that Patent Owner has met its burden because it satisfies the requirements of § 42.123(b). We agree that Patent Owner could not submit the supplemental information earlier (until the Office issued the COC), and that consideration of the supplemental information is in the interests-of-justice. In the Petition, Petitioner acknowledged the clerical error, and we and the parties have consistently treated claim 1 of the '061 patent as not containing the word "onto" that was removed from claim 1 in the COC. In other words, we have consistently analyzed claim 1 throughout this proceeding, with the agreement of the parties, as not containing the

67

IPR2020-00007
Patent 9,849,061 B2

word "onto" that was incorrectly included in the '061 patent.  Thus, acknowledgement and consideration of the COC does not affect our analysis of claim 1 here.

## VI.    PETITIONER'S MOTION TO EXCLUDE

Petitioner has moved to exclude Patent Owner's expert declarations (Exhibits 2034 (Declaration of Dr. Jensen) and 2035 (Declaration of Dr. Herbenick)), as well as Exhibit 2061, which Patent Owner offers as evidence of copying.  Paper 38 ("MTE").  For the reasons set forth below, Petitioner's Motion is denied.

### A.  Exhibit 2035 — Declaration of Dr. Herbenick

Petitioner contends that we should either exclude the testimony of Dr. Herbenick or afford it little weight for several reasons.  First, Petitioner contends that Patent Owner failed to comply with 37 C.F.R. § 42.65(b) in that Patent Owner failed to provide an affidavit explaining how certain tests that Dr. Herbenick relied upon were performed.  MTE 1–6; Paper 40, 3–5 ("MTE Reply").  Second, Petitioner contends that Patent Owner failed to produce all documents relied upon by Dr. Herbenick in rendering her opinions in violation of 37 C.F.R. § 42.61(a).  MTE 7–9; Paper 40, 5.  Third, Petitioner contends that the testimony of Dr. Herbenick should be excluded because of allegedly improper speaking objections made by counsel for Patent Owner during Dr. Herbenick's deposition.  MTE 9–12; Paper 40, 1–3.  Fourth, Petitioner contends that Dr. Herbenick is not qualified to testify as a technical expert.  MTE 14–15.  Finally, Petitioner contends that we should strike Dr. Herbenick's testimony as she did not disclose her work as a witness in other proceedings.  MTE 14–15; Paper 40, 5.

We address each of these arguments in turn.

68

IPR2020-00007
Patent 9,849,061 B2

### 1. *Failure to Comply with 37 C.F.R. § 42.65(b)*[12]

Petitioner contends that we should exclude or give little weight to all of Dr. Herbenick's testimony because her declaration does not provide any information relating to the experiments that produced the graph discussed in paragraph 58 of her declaration depicting pressures generated by Patent Owner's alleged commercial embodiments. MTE 2–6. Patent Owner responds that Dr. Herbenick "observed real-time pressure testing done by a WOW Tech employee to confirm what she had already directly observed [during a Zoom session]—that the commercial embodiments modulate positive and negative pressures with respect to a reference pressure." Paper 39, 4 ("MTE Resp."). Patent Owner also states that "[t]he graph in [Dr. Herbenick's] declaration was provided as the underlying facts and data under 37 C.F.R. § 42.65(b)." *Id*. We need not resolve whether Dr. Herbenick needed to provide further data to support the graph in Paragraph 58 of her Declaration because we find this objection moot as we did not rely on that part of her testimony.

Petitioner also argues that we should exclude or give little weight to Dr. Herbenick's testimony about the different components in the Womanizer® products that she observed over Zoom calls as Patent Owner did not provide an affidavit concerning the deconstruction and observation

---

[12] We note that failure to comply with 37 C.F.R. § 42.65(b) goes to the weight given the evidence, and does not necessarily call for the exclusion of that evidence. *Emerson Elec. Co. v. IPCO, LLC*, IPR2017-00213, Paper 42, 25–26 (PTAB May 11, 2018) (affording expert testimony no weight for failure to comply with 37 C.F.R. § 42.65(b)); *Altair Pharm., Inc. v. Paragon Bioteck, Inc.*, Paper 48, 16–17 (PTAB Nov. 14, 2016) ("Without the necessary information prescribed in §42.65(b), we cannot determine whether the evidence . . . is credible.").

IPR2020-00007
Patent 9,849,061 B2

of the devices.  MTE 6.  We do not find that this a sufficient reason to exclude or discount Dr. Herbenick's testimony.  Rule 42.65(b) refers to "technical" tests or data.  We find that dismantling a device and identifying the components of the device does not in this context of the graph presented in Paragraph 58 of Dr. Herbenick's Declaration constitute a "technical" test within the scope of the Rule.  Dr. Herbenick represents that the graph depicted in Paragraph 58 is a "pressure graph [that] shows the pattern of negative and positive pressures, modulated with respect to a reference pressure."  Ex. 2035 ¶ 58.  Dismantling a device and identifying its components is not technical data or a technical test upon which Dr. Herbenick relied to create such a graph.  We therefore decline to exclude or give little weight to that portion of her testimony.

### 2.   Withheld Documents and Information

Petitioner contends that we should exclude or give little weight to the testimony of Dr. Herbenick because Patent Owner failed to provide all the relevant facts and data that support Dr. Herbenick's opinions.  MTE 7–9.  Specifically, Petitioner contends that Patent Owner failed to produce drafts of Dr. Jensen's declaration that Dr. Herbenick reviewed in connection with her declaration and user manuals for the Womanizer® InsideOut and Duo products.  MTE 7–9.  Petitioner also points to Dr. Herbenick's failure to disclose the fact that she has testified for Patent Owner in other matters as evidence that Patent Owner has withheld other information and documents.  MTE 8–9.  We address each of these issues in turn.[13]

---

[13] We note that at no time during this proceeding did Petitioner seek assistance from the panel to obtain the documents it now says warrant excluding Dr. Herbenick's testimony.

70

IPR2020-00007
Patent 9,849,061 B2

### a. Draft Declarations

We find that Petitioner's objection to Dr. Herbenick's declaration on the basis that Patent Owner did not produce drafts of Dr. Jensen's declaration that Dr. Herbenick reviewed in connection with her declaration to be without merit.  The declarations of other experts do not constitute "a technical test or data from such a test" as that phrase is used in 37 C.F.R. § 42.65(b).  *See* MTE Resp. 5–6 ("MTE Reps.").

### b. Documents relating to Patent Owner's Products

Petitioner contends that Patent Owner failed to produce user manuals for the Womanizer® InsideOut and Duo products that Dr. Herbenick considered in rendering an opinion.  MTE 8.  Patent Owner responds that these manuals are exhibits in this proceeding—Exhibits 2066 and 2068.  MTE Resp. 5.

As the manuals are exhibits in this proceeding, we are not persuaded by Petitioner's argument here.

### c. Dr. Herbenick's Alleged Bias

Petitioner contends that Dr. Herbenick failed to disclose that she had testified for Patent Owner in other proceedings, which demonstrates Dr. Herbenick's bias and Patent Owner's withholding of relevant information.  MTE 14–15; MTE Reply 5.  We are not persuaded that this warrants excluding Dr. Herbenick's testimony.  Although the testimony regarding Dr. Herbenick's work for Patent Owner may be relevant, it goes to the issue of credibility, not admissibility. *See, e.g.*, *NuVasive, Inc. v. Iancu*, 752 F. App'x 986, 996 (Fed. Cir. 2018) ("While the Board can and should weigh the credibility of any expert testimony, it should not outright

71

IPR2020-00007
Patent 9,849,061 B2

disregard expert testimony from a witness simply because that individual is compensated for his time and expense in testifying.").

### 3.    Patent Owner's Alleged Misconduct

Petitioner contends that the testimony of Dr. Herbenick should be excluded because of alleged misconduct by Patent Owner's counsel during the depositions Dr. Herbenick and Dr. Jensen.  MTE 9–12.  Petitioner contends that counsel for Patent Owner repeatedly made speaking objections which coached the witness and affected Petitioner's ability to obtain discovery.  *Id.*

Patent Owner contends that the objections were proper, only one such alleged objection was made during this proceeding, and such objection was merely a clarification of the record.  MTE Resp. 10–13.  Patent Owner also argues that even if the objections were improper, exclusion of the expert's declarations is not the proper remedy.  *Id.* at 13.

Petitioner responds that the speaking objections in depositions in proceedings related to this one—IPR2019-01302 and IPR2019-01444— should be considered here in any remedy we may apply especially because they relate to differences in the patent at issue in those proceedings and the '061 patent at issue here.  MTE Reply 1–2.

With respect to this proceeding, Petitioner has identified one possible instance of a speaking objection.  We do not find this, even considering the examples provided from the two related proceedings, to be such egregious conduct as to warrant excluding Dr. Herbenick's testimony.

### 4.    Dr. Herbenick's Expertise

Petitioner contends that Dr. Herbenick lacks the relevant technical expertise to testify about the patentability of the challenged claims of the

72

IPR2020-00007
Patent 9,849,061 B2

'061 patent or whether Patent Owner's commercial products embody the claims of the '061 patent. MTE 14–15. We do not find that Petitioner has stated sufficient grounds to exclude Dr. Herbenick's testimony.

Although Dr. Herbenick does not have a technical degree or an extensive technical background, her testimony was from the point of view of one with experience evaluating and designing sex toys. *See, e.g.*, Ex. 2035 ¶¶ 65–71 (evaluation of the commercial success and long-felt need in the industry). It is in this context that Dr. Herbenick's testimony has been offered and relied upon by us in reaching our decision.

On the issue of patentability, most of Dr. Herbenick's testimony has been with respect to objective indicia, an issue about which we find Dr. Herbenick well qualified to opine. *See* Ex. 2035 ¶¶ 65–97. The only "technical" testimony offered by Dr. Herbenick that we rely upon is her identification of the various components found in the Womanizer® devices. Ex. 2035 ¶¶ 45–64. We find that her experience in evaluating and designing sex toys gives her the relevant experience to identify the various components of the devices. *See* Ex. 2035 ¶¶ 4–17.

### 5. *Conclusion*

For the reasons set forth above, we deny the portion of Petitioner's Motion to Exclude with regard to Dr. Herbinick's testimony in Exhibit 2035.

### B. *Exhibit 2034 — Declaration of Dr. Jensen*

Petitioner contends that the testimony of Dr. Jensen should be excluded or given no weight. MTE 1. As with Dr. Herbenick's testimony, Petitioner cites several reasons to exclude Dr. Jensen's testimony. First, Petitioner contends that Patent Owner violated 37 C.F.R. § 42.65(b) by not providing a proper affidavit describing Dr. Jensen's experiment. *Id.* at 4–5.

IPR2020-00007
Patent 9,849,061 B2

Second, Petitioner contends that Patent Owner did not produce all documents Dr. Jensen relied upon in reaching his opinions. *Id.* at 7–9. Finally, Petitioner contends that the improper conduct by Patent Owner's counsel during the deposition of Dr. Jensen warrants exclusion of Dr. Jensen's testimony. *Id.* at 9–12.

### 1. Failure to Comply with 37 C.F.R. § 42.65(b)

Although Petitioner contends that Dr. Jensen's declaration does not comply with 37 C.F.R. § 42.65(b), Petitioner does not state how the declaration fails to comply with the Rule. *See* MTE 4–5. Petitioner's arguments focus on alleged deficiencies in Dr. Jensen's methodology, which would go to the weight to be afforded such testimony, and do not address any failure to comply with our Rules.[14]  *Id.*

Therefore we decline to exclude Dr. Jensen's Declaration for failure to comply with 37 C.F.R. § 42.65(b).

### 2. Withheld Documents and Information

Petitioner's arguments with respect to this issue are the same as for Dr. Herbenick's declaration discussed above. MTE 7–9. For the same reasons given above, we decline to exclude Dr. Jensen's Declaration.

---

[14] Petitioner contends that Dr. Jensen's procedure does not comply with the FDA's guidance for good laboratory practices found at 21 C.F.R. § 58. That section of the regulations relates to product safety testing and is irrelevant to any issue before us. *See* 21 C.F.R. § 58.1(a). Moreover, Petitioner's argument regarding compliance with the FDA rules as well as Petitioner's argument that Dr. Jensen's test is impossible to replicate is unsupported by any evidence. "Attorneys' argument is no substitute for evidence." *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1581 (Fed. Cir. 1989).

74

IPR2020-00007
Patent 9,849,061 B2

### 3.   Patent Owner's Alleged Misconduct

Petitioner's arguments with respect to this issue are the same as for Dr. Herbenick's declaration discussed above.  MTE 9–12.  For the same reasons given above, we decline to exclude Dr. Jensen's Declaration.

### 4.   Conclusion

Based on the foregoing we deny Petitioner's Motion to Exclude as it relates to Exhibit 2034.

### 5.   Exhibit 2061

Petitioner contends that Exhibit 2061 should be excluded on the grounds of hearsay and lack of authenticity.  MTE 12–14.

In reaching our decision we did not rely on Exhibit 2061.  Therefore, we therefore deny as moot Petitioner's motion with respect to Exhibit 2061.

### C.   Conclusion

For the reasons stated above, we deny Petitioner's Motion to Exclude in its entirety.

## VII.   CONCLUSION

Weighing the evidence of the disclosures of the references, the competing testimony, the reasoning to combine the references, and the evidence showing secondary indicia of non-obviousness, we determine that Petitioner has failed to show, by a preponderance of the evidence, that any of the challenged claims of the '061 patent is unpatentable.

We also grant Patent Owner's Motion to Seal and for Entry of a Protective Order, grant Patent Owner's Motion to Submit Supplemental Information, and deny Petitioner's Motion to Exclude.

75

IPR2020-00007
Patent 9,849,061 B2

## VIII.  ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–3, 5, 7, 8, 11, 14, 15, 17–26 of the '061 patent are not determined to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Seal and for Entry of a Protective Order is *granted*;

FURTHER ORDERED that Petitioner's Motion to Submit Supplemental Information under 37 C.F.R. § 42.123(b) is *granted*;

FURTHER ORDERED that Petitioner's Motion to Exclude is *denied*;

FURTHER ORDERED that the Modified Protective Order (Ex. 2070) is hereby entered and shall govern the conduct of this proceeding unless otherwise modified;

FURTHER ORDERED that Ex. 2056 shall be sealed as "Board Only," and will be kept under seal; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-00007
Patent 9,849,061 B2

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–3, 5, 7, 11, 14, 15, 17–19, 21, 23–26 | 102 | Taylor | | 1–3, 5, 7, 11, 14, 15, 17–19, 21, 23–26 |
| 1–3, 5, 7, 8, 11, 14, 15, 17–19, 21–26 | 103 | Taylor, Hovland | | 1–3, 5, 7, 8, 11, 14, 15, 17–19, 21–26 |
| 20 | 103 | Taylor, Zipper | | 20 |
| 20 | 103 | Taylor, Hovland, Zipper | | 20 |
| **Overall Outcome** | | | | 1–3, 5, 7, 8, 11, 14, 15, 17–26 |

IPR2020-00007
Patent 9,849,061 B2

PETITIONER:

Dinesh N. Melwani
Andrew Sutton
Biju I. Chandran
BOOKOFF MCANDREWS, PLLC
dmelwani@bomcip.com
bchandran@bomcip.com
asutton@bomcip.com


PATENT OWNER:

Tammy Dunn
Lisa E. Margonis
Peter C. Schechter
Califf T. Cooper
OSHA LIANG LLP
TERRY@OBWBIP.COM
MARGONIS@OBWBIP.COM
SCHECHTER@OBWBIP.COM
cooper@obwip.com

78

# EXHIBIT 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EIS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | Civil Action No.: 19-cv-1227-GBW |
| INTIHEALTH GER GMBH, | § | |
| WOW TECH USA, LTD., WOW TECH | § | Demand For Jury Trial |
| CANADA, LTD. and NOVOLUTO GMBH, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| NOVOLUTO GMBH, | § | |
| | § | |
| Counterclaimant, | § | |
| | § | |
| v. | § | |
| | § | |
| EIS, INC., EIS GMBH, | § | |
| TRIPLE A IMPORT GMBH, | § | |
| and TRIPLE A MARKETING GMBH, | § | |
| | § | |
| Counterclaim Defendants. | | |

## <u>EXPERT REPORT OF ROBERT L. STOLL</u>

**Table of Contents**

I. INTRODUCTION ................................................................................................................ 1

II. BACKGROUND AND QUALIFICATIONS, PREVIOUS TESTIMONY AND
COMPENSATION ........................................................................................................... 1

    A.    Background and Qualifications ............................................................................. 1

    B.    Prior Testimony ................................................................................................... 5

    C.    Compensation ..................................................................................................... 6

III. MATERIALS AND INFORMATION CONSIDERED ...................................................... 6

IV. PARTS OF A PATENT APPLICATION ......................................................................... 6

    A.    Specification and Claims .................................................................................... 6

    B.    Prosecution or File History ................................................................................. 8

V. EXAMINATION OF PATENT APPLICATIONS IN THE U.S. PATENT OFFICE ............. 8

    A.    The Basis of the United States Patent System ..................................................... 8

    B.    The U.S. Patent and Trademark Office ............................................................... 9

    C.    Examining Patent Applications ........................................................................... 9

        1.    Office Actions ........................................................................................ 10

        2.    Applicants' Reply and Examiner's Response ......................................... 10

        3.    Information Disclosure Statements (IDS) ............................................... 12

        4.    How to Search at the Patent Office (MPEP § 904) ................................. 12

        5.    General Search Guidelines at the Patent Office (MPEP § 904.02) .......... 14

        6.    Classified Search (MPEP § 904.02(a)) ................................................... 16

        7.    Internet Searching (MPEP § 904.02(c)) ................................................. 18

        8.    Conducting the Search (MPEP § 904.03) ............................................... 19

        9.    Claim Construction ............................................................................... 20

VI. POST GRANT PROCEEDINGS ....................................................................... 26

VII. IPR FILINGS AGAINST THE CLAIMS OF THE '097, '851, AND '061 PATENTS ...... 32

    A.    EIS's Original References Cited in its Three (3) IPRs ......................................... 32

    B.    EIS's Invalidity Contentions and Narrowing of Asserted Prior Art .................... 36

VIII. EROS, WITT, AND YANG REASONABLY COULD HAVE BEEN RAISED IN THE PREVIOUS IPRS ................................................................................ 39

    A.    EIS reasonably could have raised Eros in the IPRs .............................................. 39

    B.    EIS reasonably could have raised Witt in the IPRs .............................................. 43

    B.    EIS reasonably could have raised Yang in the IPRs ............................................. 47

IX. TRIAL EXHIBITS ............................................................................................ 52

X. SUPPLEMENTATION ....................................................................................... 52

XI. CONCLUSIONS ................................................................................................ 52

## I.  INTRODUCTION

1.      I, Robert L. Stoll, have been retained by Osha Bergman Watanabe & Burton LLP as counsel for Defendant/Counterclaimant Novoluto GmbH ("Novoluto") in the captioned case on the front of my report to provide expert analysis and testimony, including with respect to United States patent practice and procedures generally, and specifically as they relate to US Patent No., 9,937,097 ("the '097 Patent"), U.S. Patent No. 9,763,851 ("the '851 Patent"), and U.S. Patent No. 9,849,061 ("the '061 Patent).  If called to be a witness at trial, I may testify regarding the subject matter outlined below.

## II.  BACKGROUND AND QUALIFICATIONS, PREVIOUS TESTIMONY AND COMPENSATION

### A.      **Background and Qualifications**

2.      I am employed by the law firm Faegre Drinker Biddle & Reath LLP, located at 1500 K St NW Ste. 1100, Washington, DC 20005, and have been asked to testify as an expert witness on behalf of counterclaimant and patent owner, Novoluto GmbH.  If called to testify as to the matters stated herein, I could and would do so competently.  My *curriculum vitae,* which includes the list of publications that I have authored, is attached hereto as Appendix A.

3.      I completed my undergraduate studies at University of Maryland in December 1979 with a B.S. degree in Chemical Engineering.  I attended the Catholic University of America, receiving my Juris Doctor in 1985.  I am a member of the Maryland State Bar, and the Bar of the District of Columbia.  I am registered to practice as a patent attorney before the U.S. Patent and Trademark Office.

4.      From October 2009 through December 2011, I served as Commissioner for Patents in the United States Patent and Trademark Office ("USPTO" or "Patent Office").  In my two years as Commissioner for Patents, I led an organization of about 8,000 employees and set policy for the

- 1 -

examination of US patent applications.  I also helped develop and plan strategic goals, as well as objectives and priorities, for the United States Patent and Trademark Office.  I also served as a liaison with patent and trademark bar groups, and academic and scientific communities.  I also have intimate knowledge about Patent Office practice and procedure from my almost three decades there.

5.      Before my appointment to the position of Commissioner for Patents, I served as Dean of Training and Education for the United States Patent and Trademark Office, from 2007 to 2009.  As Dean of Training and Education, I helped lead efforts to train foreign officials and the public on various matters of intellectual property.

6.      From 2002 until 2007 I served as Director of the Office of Enforcement for the United States Patent and Trademark Office. As Director, I worked to improve intellectual property protection, both in the United States, and abroad. Prior to my work as Director of the Office of Enforcement, I worked as Administrator of the Office of Legislative and International Affairs for the United States Patent and Trademark Office, from 1996 until 2002.  As Administrator of the Office of Legislative and International Affairs, I led a staff of attorneys representing the USPTO before Congress and in diplomatic and policy arenas worldwide. In this position I supervised the development of legislation in all areas of intellectual property, including the development of the America Invents Act, and was one of the country's leaders in establishing the United States government's position on international issues related to intellectual property. I frequently led delegations to negotiate treaties on IP for the USA.

7.      From November 1994 until February 1996, I served as Executive Assistant to the Director for Patents for the United States Patent and Trademark Office.

- 2 -

8.      From June 1982 through April 1990, I served as a Patent Examiner in the United States Patent and Trademark Office.  In 1990, I assumed the position of Supervisory Patent Examiner ("SPE"), which I held until 1994.  In this position, I supervised an art unit of approximately 15 patent examiners, reviewing and signing the actions of the non-primary examiners and monitoring the work of the primary examiners.  As both a patent examiner and SPE, I performed or supervised the work required to be performed by the examiner to (1) examine originally filed patent applications; and (2) examine continuing applications, including continuations, continuations-in-part, and divisional applications.

9.      Since leaving my position as Commissioner for Patents, I have used my knowledge and experience from my time with the United States Patent and Trademark Office to advise and educate judges and others in the intellectual property community regarding intellectual property issues.  In October of 2013, I was appointed by Chief Judge Rader to a three-year term as an Advisory Council Member to the U.S. Court of Appeals for the Federal Circuit. I was subsequently reappointed to two more three-year terms by Chief Judge Sharon Prost.  I also recently finished a three-year term on the board of the AIPLA and still serve on several committees there.

10.     I have considerable direct experience in reviewing the work of patent examiners to determine whether they followed existing patent policies, practices, and procedures and performed examinations of the required quality.  This experience came as a result of my serving as Supervisory Patent Examiner.  As Supervisory Patent Examiner, I was often called upon to review and sign the work of non-primary examiners, and monitor the work of primary examiners.

11.     Based on my experience from various examination and policy positions I held at the United States Patent and Trademark Office over the years, I have a significant familiarity with all aspects related to the examination of patent applications.  This includes knowledge about the

- 3 -

Manual of Patent Examining Procedure ("MPEP") [1], which the Patent Office publishes as a binding guide to examiners, as well as the rules and statutes relating to examination of applications set forth in Title 37 of the Code of Federal Regulations ("C.F.R.") and Title 35 of the United States Code ("U.S.C."), respectively.

12.    I have significant knowledge of the duty of disclosure and duty to make truthful representations concerning what patent practitioners must do to comply with the Patent Office requirements of candor, good-faith, truthful representations, and disclosure in dealing with Examiners.  This experience comes in significant part as a result of my decades of experience with the United States Patent and Trademark Office, culminating in my appointment as Commissioner for Patents.

13.    Since joining the law firm of Faegre Drinker Biddle & Reath LLP, I have routinely advised attorneys in the firm and clients on Patent Office practice and procedure, including their ethical obligations for compliance with the U.S. Patent Office codes of professional responsibility. I have also represented attorneys at the Office of Enrollment and Discipline (OED).  At Faegre Drinker Biddle & Reath LLP, I am a partner and the Deputy Chair of the Intellectual Property Group.

14.    Also, I have served as a testifying expert witness on the duty of disclosure and duty to make truthful representations concerning what patent practitioners must do to comply with the Patent Office requirements of candor, good-faith, truthful representations, and disclosure in dealing with Examiners on numerous occasions as evidenced by Appendix A for this expert witness report.

---

[1] http://www.uspto.gov/web/offices/pac/mpep/ (Ninth Edition, Revision 08.2017).

15.     I have considerable experience in reviewing patent prosecution histories, including specifications and interpreting claim language, as a result of the positions I held at the United States Patent and Trademark Office for 34 years, and as an attorney in private practice.

16.     I currently supervise the drafting and prosecution of applications and I am involved in setting parameters for different types of searches.  I advise associates on invalidity searches developed when clients want to challenge a patent at PTAB or in court.  I advise on "white space" searches and on searches related to opinion work.

17.     I have considerable experience in the different types of patent searches including, for example, patentability, clearance, white space searches, and invalidity searches.  Specific to invalidity searches, my experience has been the product of my involvement in many of the different activities of my IP group as co-chair of the group and my consultation with both partners and associates on the development of different patent searches for different purposes.  I am currently in the process of investigating new tools for searches for different purposes to use in my group.

18.     I do not profess to have special technical expertise in the patent-in-suit.  I have been asked only to opine on matters related to USPTO patent practice and procedures and their application to the patents-in-suit.  For technical matters in support of my opinions in this report, I am relying on the analysis and opinions of Novoluto's technical experts.

19.     I also only cite to case law to inform how I develop my opinions.  I recognize that a judge might have a different interpretation and that the judge's interpretation is what must be followed in the case.

### B.     Prior Testimony

20.     I have testified at a trial or deposition in the past four years.  A list of the cases in which I testified is attached to my *curriculum vitae*.

### C.     Compensation

21.     I am being compensated at my standard hourly rate of $1,020/hour for the time spent on this case.  My compensation is not contingent upon the outcome of this litigation.

## III.  MATERIALS AND INFORMATION CONSIDERED

22.     I have considered and reviewed the materials discussed in this report.  In forming my opinions, I have also relied on my training and experience.

## IV.  PARTS OF A PATENT APPLICATION

23.     I expect to provide testimony explaining and describing various parts of a patent application, including the information provided on the front page of an issued patent, the specification, the claims, and the prosecution history.

### A.     Specification and Claims

24.     I expect to testify about the purpose and function of the patent specification.  The specification is the technical disclosure describing the inventor's alleged innovation, including what the invention is, what it does, and how to make it.  A proper patent specification provides support for the claims.  *See* 37 C.F.R. § 1.71(a); MPEP § 608.01.  In addition, the specification may include examples, which are embodiments or variations of how the invention can be manifested.  It includes, among other things, title, continuity data, background, brief summary, and detailed description.  Based on my experience at the USPTO in many roles, I am familiar with the way examiners review a patent application, and examiners would closely review the specification of each application for compliance with its requirements and to ensure that the claims are supported by the specification.

25.     I expect to testify about the claims and their role.  *See* MPEP §§ 608.01(i), 2111, 2173, and 2181.  A patent concludes with one or more claims particularly pointing out and distinctly claiming the subject matter that the applicant regards as his invention.  *See* 35 U.S.C.

- 6 -

§ 112(b).  The claims are the numbered paragraphs at the end of the patent document, each of which defines a separate property right.  The scope or meaning of a claim (other than one reciting means- or step-plus-function limitations under 35 U.S.C. § 112(f)) is defined by the words of the claims, subject to any definitions or disclaimers in the patent or during prosecution.  In addition, the claims are supposed to provide specific notice to the public about the boundaries of the property right.  From my own time as an examiner and supervisor as well as numerous meetings with different groups of examiners as Commissioner, I know that examiners focus on the language of the claims when examining the patentability of an invention, often rejecting an applicant's arguments during prosecution that relate to features that are disclosed in the specification but not claimed.

26.     By statute, an applicant for a patent must include as part of the application a specification that contains a written description of the invention and the manner and process of making and using the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention." 35 U.S.C. § 112(a); MPEP § 608.01.  Indeed, Examiners at the USPTO are instructed to require applicants to revise an application when they determine that it "obviously fails to disclose an invention with the clarity required." MPEP § 608.01.

27.     As an examiner, I always read the claims of the application first, and in my numerous conversations with examiners, I learned that most of them do the same.  Afterwards, we read the specification in light of what is claimed without reading unclaimed limitations into the claims.

**B.      Prosecution or File History**

28.      I expect to provide testimony describing and explaining the various parts of a prosecution history or file history, which is the record of the examination of the patent application. It consists of, among other things, the Patent Applications as filed, the Examiner Search Notes, Examiner Interview Summaries, Declarations and Affidavits, Office Actions, Applicants' Amendments and Replies, and Inter Partes Reviews.  These documents provide a written record of all business conducted with the U.S. Patent Office including communications between the Applicants and the Examiners.  I also intend to provide testimony regarding the file histories of the patent-in-suit.

**V.  EXAMINATION OF PATENT APPLICATIONS IN THE U.S. PATENT OFFICE**

**A.      The Basis of the United States Patent System**

29.      I expect to testify about the basis for the laws and regulations governing the grant of patents.  The United States Constitution grants Congress the power to "promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."  U.S. Constitution, Article 1, § 8.  The patent laws enacted by Congress are designed to promote this progress by offering a right to exclude others for a limited time in exchange for providing the public with a complete disclosure of a new and non-obvious invention.  This disclosure of the invention, "is the quid pro quo of the patent system; the public must receive meaningful disclosure in exchange for being excluded from practicing the invention for a limited period of time."  *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 970 (Fed. Cir. 2002).  In particular, the right to exclude others extends for a period of 20 years from the patent application filing date for utility patents and 15 years from the date of grant for design patents. This period of exclusivity provides the patentee with a reasonable period of time in which the patented invention can be commercialized by the patentee or its licensees and the market

- 8 -

allowed to develop.  Meanwhile, the public has the benefit of the disclosure of the invention, and upon the patent's expiration, the invention is dedicated to the public.

30.    An applicant must establish that his or her invention is new and non-obvious, is eligible for patent protection (e.g., a process, machine, manufacture, composition of matter, or any new and useful improvement thereof), and that the patent application meets enablement and written description requirements.  Each of these requirements ensures that the public receives its end of the bargain (the promotion of scientific progress) and prevents applicants from appropriating, rather than contributing to, the available pool of knowledge.  Only if all of these requirements are met should a patent be granted.

### B.    The U.S. Patent and Trademark Office

31.    I expect to testify about the role and function of the United States Patent and Trademark Office, and the rules and procedures that govern patent application examination. Congress established the Patent Office (as part of the Department of Commerce), to administer the patent system contemplated by the Constitution.  The patent laws specify the subject matter for which a patent may be obtained and the conditions for patentability.  The statutory provisions relating to patents are set forth in Title 35 of the United States Code.

32.    The rules of practice for practitioners to follow in preparing and prosecuting applications before the Patent Office are codified in Section 1 of Title 37 of the C.F.R.  The Patent Office periodically publishes and updates a guide binding to examiners, and informative to patent attorneys and patent agents regarding examination of patent applications that is called the Manual of Patent Examining Procedure, or MPEP.

### C.    Examining Patent Applications

33.    The Patent Office assigns each patent application to one or more examiners with technical knowledge in the relevant field.  The examiner examines the application to determine

- 9 -

whether it meets the statutory requirements for patentability, including those set forth in 35 U.S.C. §§ 101, 102, 103, and 112.  Among other things, the examiner determines whether the invention defined by the claims is useful, novel, non-obvious, and adequately described, based on the record developed during the examination process.

34.    The examination process is an *ex parte* administrative proceeding.  The public and third parties generally do not have an opportunity to become involved in prosecution.[2]  Patent examiners substantively examine applications, including reading the patent application, analyzing the claims, searching for and reviewing the prior art, reviewing applicant-provided information, comparing the prior art to the claims, preparing Office Actions, reading and responding to the applicants' responses to Office Actions, amendments, and declarations, conducting interviews, and making patentability determinations.

### 1.    Office Actions

35.    As part of the prosecution process, the Examiner will examine the patentability of the application and make rejections based on, for example, lack of novelty and obviousness.  The Examiner will identify specific prior art references.

36.    The Examiner notifies the Applicants in writing of the Examiner's decision by an "Office Action," which is normally mailed to the attorney or agent of record.

### 2.    Applicants' Reply and Examiner's Response

37.    To obtain a patent, the Applicant must overcome all rejections of claims made by an Examiner.  The Applicant may accomplish this through (1) traversing a rejection and pointing out how and why the rejection was improper, (2) canceling or amending claims, or (3) submitting

---

[2] There are some procedures that allow the public to submit prior art, but these are generally not invitations to participate in the prosecution.  *See, e.g.,* 37 C.F.R. § 1.290.

affidavits or declarations providing evidence why the claims are patentable.  If the Applicant does not overcome the rejections of the claims, the Examiner will not issue the patent, unless the Applicant successfully appeals the rejections to the Patent Trial and Appeal Board ("PTAB," formerly known as the Board of Patent Appeals and Interferences), or, if necessary, ultimately to the Federal Circuit or Supreme Court (on grant of *certiorari*).

38.    When evaluating the patentability of application claims, Examiners primarily rely on the results of a prior art search of patents and printed publications and information provided by individuals having a duty of disclosure and duty to make truthful representations.  Examiners do not have access to laboratory testing facilities and, as such, are limited to evaluation of technical literature and information submitted by Applicants or to what they can find when performing patent examination.  *See* MPEP § 2113.

39.    Because of the limitations on access to evidence affecting claim patentability, Examiners must rely on Applicants to submit information from other proceedings (such as related foreign prosecution, co-pending applications, and related litigation) that would impact the patentability of the claims.  *See* MPEP §§ 2001.06(a), (b) & (c).  The MPEP specifically states that "[e]xamples of such material information include . . . allegations of 'fraud,' 'inequitable conduct,' and 'violation of duty of disclosure.'"  *Id.* at § 2001.06(c).  Individuals owing a duty of disclosure to the Patent Office, as set forth in 37 C.F.R. § 1.56(c), have a duty to bring to the Examiners' attention any such information that would establish a lack of patentability.

40.    Examiners must rely on Applicants to provide them with such information where the record does not reflect that such information was considered by the Examiner.

41.    When relying on an Applicant's proffer of evidence when traversing a rejection of then-pending patent application claims, the Examiner may sometimes expressly state that the

- 11 -

rejection in an Office Action was successfully overcome.  Other times, however, the Examiner will simply assert a new rejection of claims without formally withdrawing a prior rejection of claims.  In those situations, even if not expressly stated, the Examiner has relied on the Applicant's proffer of evidence as overcoming the rejection.

### 3.    Information Disclosure Statements (IDS)

42.    Inventors, their patent prosecution counsel, and other individuals substantively involved with the preparation or prosecution of the application, have a duty to submit to the Patent Office information which is material to patentability of which they are aware as defined in 37 C.F.R. § 1.56.  The provisions of 37 C.F.R. §§ 1.97 and 1.98 provide a mechanism by which patent applicants may comply with the duty of disclosure by submitting information to the examiner through an Information Disclosure Statement.  MPEP § 904 provides the examiner with instructions about how to search an application.

43.    When the patent issues all of the cited references by the applicant or the examiner in the Information Disclosure Statement are printed on the face of the application.  In addition to the references and their classification, the cover page also includes the inventors, filing date, priority information and publication and issue dates.  Assignee data, examiner data and attorney/agent information is also contained on this page.  In addition, the cover page contains the field of search and an abstract and drawing of the invention.

### 4.    How to Search at the Patent Office (MPEP § 904)

44.    The examiner, after having obtained a thorough understanding of the invention disclosed and claimed in the nonprovisional application, then searches the prior art as disclosed in patents and other published documents, i.e., nonpatent literature (NPL). Any document used in the rejection of a claim is called a reference. An inventor name search should be made to identify other

- 12 -

applications and/or patents which may be applicable as references for double patenting rejections. (MPEP § 804).

45.     In all continuing applications, the parent applications must be reviewed by the examiner for pertinent prior art. The examiner must consider prior art which was cited and considered in the parent application (MPEP §§ 609.02 and 2001.06(b)). Where the cited prior art of a parent application has been reviewed, this fact should be made of record in accordance with the procedure set forth at paragraph (J) of MPEP § 719.05, subsection II.A. For national stage applications filed under 35 U.S.C. 371, the examiner will consider the documents cited in an international search report when the Form PCT/DO/EO/903 indicates that both the international search report and the copies of the documents are present in the national stage application file (see MPEP § 609.03). The first search should cover the invention as described and claimed, including the inventive concepts toward which the claims appear to be directed. It should not be extended merely to add immaterial variants. The examiner's first Office action on the merits of an application relies on references identified in this initial search.

46.     Following the first Office action, the examiner need not ordinarily make a second search of the prior art, unless necessitated by amendments to the claims by the applicant in a reply to the first Office action, except to check to determine whether any reference which would appear to be substantially more pertinent than the prior art cited in the first Office action has become available subsequent to the initial prior art search.

47.     In the first action on the merits of an application, the examiner must complete the Image File Wrapper (IFW) search notes form in the Office Action Correspondence Subsystem (OACS) to include the classification locations of domestic and foreign patents, abstract collections, and publications in which the search for prior art was made. Other information collections and

- 13 -

sources in which the search for prior art was made must also be identified by the examiner.  The examiner must also indicate the date(s) on which the search was conducted (see MPEP § 719.05).

48.     In subsequent actions, where the search is brought up-to-date and/or where a further search is made, the examiner must indicate on the IFW search notes form that the search has been updated and/or identify the additional field(s) of search (see MPEP § 719.05).  Any search updates should include all of the relevant or pertinent databases and the search queries and classifications employed in the original search.

**5.     General Search Guidelines at the Patent Office (MPEP § 904.02)**

49.     In the examination of an application for patent, an examiner must conduct a thorough search of the prior art. Planning a thorough search of the prior art requires three distinct steps by the examiner: (1) identifying the field of search; (2) selecting the proper tool(s) to perform the search; and (3) determining the appropriate search strategy for each search tool selected. Each step is critical for a complete and thorough search.

50.     When determining the field of search, three reference sources must be considered - domestic patents (including patent application publications), foreign patent documents, and nonpatent literature (NPL). None of these sources can be eliminated from the search unless the examiner has and can justify a reasonable certainty that no references, more pertinent than those already identified, are likely to be found in the source(s) eliminated. The search should cover the claimed subject matter and should also cover the disclosed features which might reasonably be expected to be claimed. The field of search should be prioritized, starting with the area(s) where the invention would most likely be found in the prior art.

51.     Having determined the field of search, the examiner should then determine what search tools should be employed in conducting the search. Examiners are provided access to a wide variety of both manual and automated search tools. Choice of search tools is a key factor in

- 14 -

ensuring that the most relevant prior art is found during the search. The choice of search tools to be used is based on the examiner's knowledge of the coverage, strengths and weaknesses of the available search tools that are appropriate for use in an examiner's assigned art. For example, a search tool may cover foreign patent documents; but, if that coverage does not meet the examiner's current search needs, this should be taken into consideration by the examiner who may choose to employ other search tools in order to remedy the deficiency.

52.    Search tool knowledge is particularly important for examiners in arts where patent documents may seriously lag behind invention (e.g., very active, high technology) and, consequently, represent a reference source of limited value. These examiners must take special care to ensure that their searches include consideration of NPL and employ the effective use of tools specialized to cover NPL pertinent to their search needs.

53.    Search needs in some technologies, e.g., chemical structures, DNA sequences, are very specialized and can only be met through additional use of specific search tools specially constructed and maintained to respond to those needs. These tools cover all three reference sources - domestic patents (including patent application publications), foreign patent documents, and NPL.

54.    In crowded, highly developed arts where most claimed inventions are directed to improvements, patent documents, including patent application publications, may serve as the primary reference source. Search tool selection in such arts may focus heavily on those providing patent document coverage.

55.    Automated search tools covering patent documents usually provide both a classified and text search capability. Text search can be powerful, especially where the art includes well-established terminology and the search need can be expressed with reasonable accuracy in textual terms. However, it is rare that a text search alone will constitute a thorough search of patent

- 15 -

documents. Some combination of text search with other search criteria (e.g., classification, chemical structure, or molecular sequence) would be a normal expectation in most technologies.

56.     Examiners will recognize that it is sometimes difficult to express search needs accurately in textual terms. This occurs often, though not exclusively, in mechanical arts where, for example, spatial relationships or shapes of mechanical components constitute important aspects of the claimed invention. In such situations, text searching can still be useful by employing broader text terms, with or without classification parameters.

57.     Having determined what search tool(s) should be used to conduct the search, the examiner should then determine the appropriate search strategy for each search tool selected. The appropriate search strategy should be determined by the examiner on a case-by-case basis along with consultation with other examiners, supervisory patent examiners, and/or trained professional on-line search personnel, where appropriate.

58.     For examiners to acquire specialized skills needed to determine an appropriate field of search in their specific arts, each Technology Center may develop specific supplemental guidance and training for its examiners. This training will augment general training and information on search tools that is normally provided through the Office of Patent Training and Search and Information Resources Administration.

### 6.     Classified Search (MPEP § 904.02(a))

59.     A proper field of search normally includes the classification locations in which the claimed subject matter of an application would be properly classified at the time of the application's classification or grant of a patent. However, if the above proper classification does not correspond to the subject matter found in the claims (*e.g.*, a situation where the proper classification corresponds to a disclosed, but unclaimed, embodiment), it is not necessary to search areas in

- 16 -

which it could reasonably have been determined that there was a low probability of finding the best reference(s).

60.     In outlining a field of search, the examiner should note classification locations (*i.e.* group/subgroup of the Cooperative Patent Classification) under the utilized classification system and other organized systems of literature that may have material pertinent to the subject matter as claimed, including those which have been assigned by a foreign Office, another USPTO examiner, or by the classification contractor. The examiner should consult with other examiners and/or supervisory patent examiners, especially with regard to applications covering subject matter unfamiliar to the examiner.

61.     The areas to be searched should be prioritized so that the most likely areas of finding relevant prior art are searched first.  For documenting the field of search see MPEP § 719.05.  See MPEP § 1302.10 for search information printed on the face of a patent.

62.     Not only are there different searching strategies and different searching tools, there are different reasons to search and these have a different focus.  At the office, the examiner conducts a patentability search much as described above.  The examiner searches the claims read in light of the teachings of the specification and interprets the claims using the broadest reasonable interpretation standard.  But other searches focus on other things.  Frequently a patentee will want a "clearance" search to determine that there are no other patents that cover the product protected by the claims.  Sometimes a company will want a "white space" search, which focuses on areas related to what a company does to identify technological areas ripe for research as there are no related patents in that area.  In the instant case, EIS GmbH presumably requested one or more "invalidity" searches to find references that would invalidate each of three Novoluto patents, the '097 Patent, the '851 Patent, and the '061 Patent.  In court, and now at the PTAB, the standard for

- 17 -

claim interpretation would not be the broadest reasonable interpretation, but the Philip's standard which is much narrower.  Invalidity searches focus on the claims of the patents and focus on art that would clearly and convincingly invalidate those claims.

**7.    Internet Searching (MPEP § 904.02(c))**

63.    The Internet is an Office-approved search tool that may be considered when planning and conducting a search for an application. The Internet provides the Office the opportunity to enhance operations by enabling patent examiners to efficiently locate and retrieve additional sources of information relating to a patent application.

64.    The Office published a Patent Internet Usage Policy to establish a policy for use of the Internet by the patent examining corps and other organizations within the USPTO. *See Internet Usage Policy*, 64 F.R. 33056 (June 21, 1999). Article 10 of the Patent Internet Usage Policy, which is pertinent to documenting search strategies, is reproduced here:

Article 10.  Documenting Search Strategies

> *All Patent Organization users of the Internet for patent application searches must document their search strategies in accordance with established practices and procedures as set forth in MPEP § 719.05.*

65.    USPTO personnel may also use the Internet to search, browse, or retrieve information relating to the claimed invention(s) of a published application or proceeding including an application published pursuant to 35 U.S.C. 122(b), a reissue application, or a reexamination proceeding. These applications need not be kept in confidence; therefore, the restriction on the search queries used when performing an Internet search referenced in Article 9 below would not apply to these applications and proceedings. Any search query may include terminology related to the general state of the relevant technology, disclosed features from applicant's disclosure and claim terminology.  See MPEP § 707.05(e) for information pertaining to the citation of electronic

- 18 -

documents, MPEP § 719.05, subsection II for documenting an Internet search, and MPEP § 502.03 for information pertaining to communications via electronic mail.

66.    The Internet is generally a public forum and most communications made over the Internet are neither confidential nor secure. All use of the Internet by examiners must be conducted in a manner that ensures compliance with confidentiality requirements in the statutes, including 35 U.S. § 122, and regulations. Additionally, any Internet searching that is conducted is to be limited to searching for the information necessary for examination of the application or proceeding, such as the state of the art or the presence or absence of technical features in the prior art.

**8.    Conducting the Search (MPEP § 904.03)**

67.    It is a prerequisite to a speedy and just determination of the issues involved in the examination of an application that a careful and comprehensive search, commensurate with the limitations appearing in the most detailed claims in the case, be made in preparing the first action on the merits so that the second action on the merits can be made final or the application allowed with no further searching other than to update the original search.

68.    In selecting the references to be used in rejecting the claims, the examiner should carefully compare the references with one another and with the applicant's *disclosure* to avoid an unnecessary number of rejections over similar references. The examiner is not called upon to cite *all* references that may be available, but only the "best." (See 37 CFR 1.104(c)).  Multiplying references, any one of which is as good as, but no better than, the others, adds to the burden and cost of prosecution and should therefore be avoided. The examiner must fully consider all the prior art references cited in the application, including those cited by the applicant in a properly submitted Information Disclosure Statement.

- 19 -

69.    The best reference should always be the one used in rejecting the claims. Sometimes the best reference will have a publication date less than a year prior to the application filing date, hence it will be open to being overcome under 37 CFR 1.130 or 1.131.  In such circumstances, if a second reference exists which cannot be so overcome and which, though inferior, is an adequate basis for rejection, the claims should be *additionally* rejected thereon.

70.    In all references considered, including NPL, foreign patents, and domestic patents, the examiner should study the specification or description sufficiently to determine the full value of the reference disclosure relative to the claimed or claimable subject matter.

71.    While the MPEP is binding on the examiners it provides guidance to the applicants.  Searching is an art and searchers develop their own preferred ways of obtaining the best references.  Applicants are not required to undertake a search, but must provide any information of which they are aware that is material to the claims.

### 9.    Claim Construction

72.    A first step in the Examiner's patentability analysis of claims in a pending application in the USPTO is to determine what the claim terms mean in the process of claim construction.

73.    Examiners at the USPTO interpret the claims of a pending application according to their broadest reasonable interpretation consistent with the specification. MPEP § 2111; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (The USPTO "determines the scope of claims in patent applications not solely on the basis of the claim language, but upon giving claims their broadest reasonable construction 'in light of the specification as it would be interpreted by one of ordinary skill in the art.'").  A justification given for use of this standard at the USPTO is that during prosecution, applicants have the opportunity to amend the claims.  Accordingly, giving the terms their broadest reasonable interpretation and permitting amendment should "reduce the

- 20 -

possibility that the claim, once issued, will be interpreted more broadly than is justified." MPEP §

2111.  The broadest reasonable interpretation standard is also intended to "establish a clear record

of what applicant intends to claim." *Id.*  In my experience, this is an important feature related to

the USPTO's gatekeeping function to ensure that the claims of an issued patent accurately reflect

what an applicant has invented.

74.     Examiners apply this standard by giving the words of the claim their plain meaning,

"unless such meaning is inconsistent with the specification." MPEP § 2111.01.  This "plain

meaning" is the ordinary and customary meaning of the term as determined by a person of ordinary

skill in the art at the time of the invention (*i.e.*, the effective filing date of the patent application).

*Id.*

75.     The ordinary and customary meaning may be informed by a variety of sources,

which include "the words of the claims themselves, the specification, drawings, and prior art." *Id.*

The specification has been described as being the best source of evidence to determine the meaning

of a claim term because, at least in part, the statute requires that the specification describe the

manner of making and using the invention to a person of ordinary skill in the art. *Id.*; *Phillips*, 415

F.3d at 1313.  In addition to the intrinsic record, extrinsic evidence such as dictionaries, treatises,

and expert testimony may also be useful in understanding the meaning of claim terms but is given

less weight. *Phillips*, 415 F.3d at 1313.

76.     Even though an Examiner is to consult the specification in construing claims, it is

the claim that sets forth the patent grant.  "Ordinary, simple English words whose meaning is clear

and unquestionable, absent any indication that their use in a particular context changes their

meaning, are construed to mean exactly what they say." MPEP § 2111.01 (citing *Chef America,*

*Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1372 (Fed. Cir. 2004)).

- 21 -

77.     The statute requires that the claims of a patent particularly point out and distinctly claim the subject matter the applicant regards as the invention. 35 U.S.C. § 112.  Because the claim is what defines the scope of the patent grant, the language of the claims themselves is of primary importance when an Examiner is to construe the claims. *See Phillips*, 415 F.3d at 1312.

78.     The focus on the claim language in claim construction serves the public interest. Because the statute requires that an applicant define precisely what the invention is in the claims, construing a claim to mean something other than "the plain import of its terms" would be unjust to the public. *Id.*  In my experience, Examiners at the USPTO take this issue concerning notice to the public very seriously and will therefore closely stick to the claim language when determining a claimed invention's patentability.

79.     Two exceptions exist to the general rule that claims are to be given their ordinary and customary meaning: "(1) when the applicant acts as his own lexicographer; and (2) when the applicant disavows or disclaims the full scope of a claim term in the specification." MPEP § 2111.01.

80.     An Examiner's review of the specification may reveal that an applicant provides a special definition for a claim term that may differ from the meaning the term would otherwise possess.  In those cases, where a claim term is specially defined in the specification, the inventor's lexicography governs. *Phillips*, 415 F.3d at 1316; MPEP § 2111.01.  A claim term may, in some cases, be defined in the specification "by implication" where the term is used throughout the specification in a way that would be consistent with only one meaning. *Info-Hold, Inc. v. Applied Media Tech. Corp.*, 783 F.3d 1262, 1267 (Fed. Cir. 2015); MPEP § 2111.01.  However, when usage of the term in the specification is not clearly inconsistent with the term's ordinary meaning, the Examiner should apply the term's ordinary meaning. MPEP § 2111.01.

- 22 -

81.    An applicant may also intentionally disclaim or disavow claim scope in the specification.  In that case, Examiners are to construe the claims according to the inventor's intention expressed in the specification. *Phillips*, 415 F.3d at 1316; MPEP § 2111.01.  Disavowal of claim scope must be clear and unmistakable. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001); MPEP § 2111.01.  Disavowal could also be found in situations where the specification disparages a particular feature while it "repeatedly, consistently, and exclusively" depicts every embodiment of the invention excluding that feature. MPEP § 2111.01; *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1149-50 (Fed. Cir. 2012).

82.    Also, the mere absence of reference to a structure in the specification does not amount to a disclaimer of that subject matter.  Rather, the specification must make clear that the invention does not include the structure to constitute disclaimer. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908-09 (Fed. Cir. 2004).  Statements in the specification such as "the present invention is . . . ," and "all embodiments of the present invention are . . . " have been found to be examples of clear and unmistakable statements of disavowal or disclaimer. *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. July 22, 2016).  On the other hand, general statements regarding improvements of the invention over the prior art, without more, would typically not be considered a disclaimer of claim scope. *Ventana Medical Sys. Inc. v. Biogenex Laboratories Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006).

83.    The need to construe claim terms in view of the specification has given rise to concerns over improperly importing limitations from the specification into the claims when the claim language is broader than the embodiments disclosed in the specification—something that has been called "one of the cardinal sins of patent law." *Phillips*, 415 F.3d at 1320; *SciMed*, 242 F.3d at 1340.

- 23 -

84.    The MPEP instructs Examiners, "[t]hough understanding the claim language may be aided by explanations contained in the written description, it is important not to import into a claim limitations that are not part of the claim.  For example, a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." MPEP § 2111.01 (quoting *Superguide Corp. v. DirecTV Enterprises, Inc.,* 358 F.3d 870, 875 (Fed. Cir. 2004)).  This prohibition against importing limitations concerning disclosed but unclaimed embodiments makes sense.  If the claims were limited by imported, unclaimed features, a patentee's right to exclude others would be limited to specific embodiments as disclosed on the filing date.  In such a case, the claims would not cover later developed embodiments not specifically disclosed, but that would otherwise fall within the language of the claims as supported by the disclosure of the specification.

85.    When consulting the specification during claim construction, the Examiner's focus should be on understanding the claim terms' meaning without confining the scope of the claims to the embodiments that are disclosed in the specification. *Phillips*, 415 F.3d at 1323.  This generally does not apply when construing terms that invoke means-plus-function analysis because those terms "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *See* MPEP § 2111.01.

86.    Similarly, as I discussed above, the specification may serve to limit the scope of the claims where a claim term is specially defined or where the applicant has clearly disclaimed or disavowed claim scope.  Outside of these limited exceptions, the embodiments disclosed in the specification generally should not serve to limit the scope of the claims.  A reason for this is that the statute requires that the claims themselves, not the specification, define the limits of the patent grant.

- 24 -

87.     In my experience, the focus at the USPTO regarding what is explicitly recited in the claims is a very important—perhaps the most important—aspect of examination of pending applications.    For all the reasons discussed above, Examiners will make patentability determinations based on what is recited in the claims rather than what is disclosed in the specification.  In fact, even the MPEP provides Examiners with a relevant form paragraph to be used when responding to an applicant's arguments concerning the patentability of a claim during prosecution of an application.  The form paragraphs in the MPEP are passages with standard language that Examiners can insert into an Office Action based on the specific factual circumstances of an application.

88.     In situations where an applicant argues the patentability of a claim based on features that are not recited in the claims, the MPEP provides Examiners with a form paragraph that could be included in an Office Action in response.  The paragraph reads:

> In response to applicant's argument that the references fail to show certain features of applicant's invention, it is noted that the features upon which applicant relies (i.e., **[1]**) are not recited in the rejected claim(s).  Although the claims are interpreted in light of the specification, limitations from the specification are not read into the claims. See *In re Van Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993).
>
> **Examiner Note:**
>
> 1.  In bracket 1, recite the features upon which applicant relies, but which are not recited in the claim(s).
>
> 2.  This form paragraph must be preceded by form paragraph 7.37.

MPEP at Form Paragraph 7.37.08.  Thus, the requirement that the claims actually recite the features that are argued to be patentable and the prohibition against reading limitations from the specification into the claims is sufficiently important that the USPTO provides examiners with a form paragraph directly addressing the issue.

## VI. POST GRANT PROCEEDINGS

89.     Among the many changes implemented in the AIA was the creation of several post grant proceedings before the PTAB.  These proceedings included a transitional Covered Business Method ("CBM") Review, Post Grant Review ("PGR"), and *Inter Partes* Review ("IPR").

90.     Section 6 of the AIA created the IPR and PGR Proceedings, adding new sections 311-319 and 321-329, respectively, to Title 35, United States Code.  The rules governing IPR and PGR are codified, respectively, in Subparts B and C of Section 42 of Title 37 of the C.F.R.

91.     The general rules of practice applicable to each of the IPR, PGR, and CBM Proceedings are codified in Subpart A of Section 42 of Title 37 of the C.F.R., and were promulgated on August 14, 2012, at 77 Fed. Reg. 48612-48678. (It is noted that the CBM provisions have sunsetted)

92.     35 USC § 311 is the statute that sets forth the IPR, relevant parts of which are reproduced here:

(a) *In General*.—

Subject to the provisions of this chapter, a person who is not the owner of a patent may file with the Office a petition to institute an inter partes review of the patent. The Director shall establish, by regulation, fees to be paid by the person requesting the review, in such amounts as the Director determines to be reasonable, considering the aggregate costs of the review.

(b) *Scope*.—

A petitioner in an inter partes review may request to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications.

(c) *Filing Deadline*.—A petition for inter partes review shall be filed after the later of either—

(1) the date that is 9 months after the grant of a patent; or

(2) if a post-grant review is instituted under chapter 32, the date of the termination of such post-grant review.

93.     35 USC 315 (e) 1 and 2 set forth estoppel provisions that apply in IPRs and state:

- 26 -

(e) Estoppel.—

(1) Proceedings before the office.—

The petitioner in an inter partes review of a claim in a patent under this chapter that results in a final written decision under section 318(a), or the real party in interest or privy of the petitioner, may not request or maintain a proceeding before the Office with respect to that claim on any ground that the petitioner raised or reasonably could have raised during that inter partes review.

(2) Civil actions and other proceedings.—

The petitioner in an inter partes review of a claim in a patent under this chapter that results in a final written decision under section 318(a), or the real party in interest or privy of the petitioner, may not assert either in a civil action arising in whole or in part under section 1338 of title 28 or in a proceeding before the International Trade Commission under section 337 of the Tariff Act of 1930 that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review.

94.     These proceedings before the PTAB were established to provide parties with a more efficient and less costly alternative for resolving questions of patentability relative to litigation. This purpose is engrained in the rules governing each proceeding, providing that the rules are to be "construed to secure the just, speedy, and inexpensive resolution of every proceeding." 37 C.F.R. § 42.1(b).

95.     The APJs at the PTAB are some of the most skilled patent attorneys in the USPTO. They are required to meet all of the technical requirements of the patent examiners and be an active member of a bar.  In addition, they are typically required to have 10-15 years of patent experience including patent examination experience or work in the Solicitor's Office or the Court of Appeals for the Federal Circuit.  Applicants usually have well above the minimum requirements.

96.     The legislative history of the AIA relating to estoppels arising from written decisions emanating from the PTAB, indicates that the "reasonably could have raised" language was intended to extend the estoppel "to that prior art which a skilled searcher conducting a diligent

search reasonably could have been expected to discover," but not to prior art "only a scorched earth search" would have found.  157 Cong. Rec. S1375 (daily ed. March 8, 2011) (statement of Sen. Kyl).

97.    The AIA was enacted—and, specifically, the post grant proceedings created—against a backdrop of concerns related to the perceived unfairness and high cost associated with litigating patent infringement suits.  Of particular concern was the assertion of "dubious" patents, forcing companies to expend a great deal of resources defending themselves, resulting in reduced productivity and a drain on the economy.

98.    At the time of the AIA's passage, administrative procedures at the USPTO for addressing the patentability of issued patents as a potential alternative to costly litigation already existed.  These procedures included, for example, *ex parte* and *inter partes* reexamination.  However, improved administrative procedures were desired to more effectively serve as an alternative to litigation because the problems associated with the cost of litigation persisted despite the availability of reexamination.

99.    The AIA also softens the could-have-raised estoppel that is applied by inter partes review against subsequent civil litigation by adding the modifier "reasonably."  Adding the modifier "reasonably'" ensures that could-have-raised estoppel extends only to that prior art which a skilled searcher conducting a diligent search reasonably could have been expected to discover.

100.    Some of the concerns regarding the existing reexamination proceedings were discussed by Senator Kyl upon the introduction of a predecessor bill to the AIA, a bill called the Patent Reform Act of 2008 (S. 3600).  Senator Kyl explained that the proposed bill would repeal the *inter partes* reexamination procedure (similar to the AIA) and replace it with two types of post

- 28 -

grant review proceedings.  In describing the *inter partes* reexamination procedure, he stated as follows:

> The bill uses an oppositional model, which is favored by PTO as allowing speedier adjudication of claims.  Under a reexam system, the burden is always on PTO to show that a claim is not patentable.  Every time that new information is presented, PTO must reassess whether its burden has been met.  This model has proven unworkable in *inter partes* reexam, in which multiple parties can present information to PTO at various stages of the proceeding, and which system has experienced interminable delays.  Under an oppositional system, by contrast, the burden is always on the petitioner to show that a claim is not patentable.  Both parties present their evidence to the PTO, which then simply decides whether the petitioner has met his burden.

110 CONG. REC. S9987 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl).  In contrast to the "interminable delays" associated with reexamination proceedings, the duration of the new post-grant proceedings established by the AIA is limited to one year from the date of institution of trial, with a possible extension of six months for good cause. *See* 37 C.F.R. §§ 42.100(c) (IPR), 42.200(c) (PGR), 42.300(c) (CBM).

101.    Congress, partly in response to these concerns, created the CBM, IPR, and PGR administrative post grant proceedings as a more efficient and less expensive alternative for resolving patentability issues relative to litigation.  The legislative history in the passage of the AIA bears this out.

102.    According to Senator Hatch, "[t]he [AIA] will also establish another means to administratively challenge the validity of a patent at the U.S. Patent and Trademark Office, USPTO—creating a cost-effective alternative to formal litigation, which will further enhance our patent system." 112 CONG. REC. S951 (daily ed. Feb. 28, 2011) (statement of Sen. Hatch).

103.    Senator Leahy highlighted the problems of low-quality patents, stating that:

> Patents of low quality and dubious validity, by contrast, enable patent trolls and constitute a drag on innovation.  Too many dubious

- 29 -

patents also unjustly cast doubt on truly high quality patents." 112 CONG. REC. S131 (daily ed. Jan. 5, 2011) (statement of Sen. Leahy).  Senator Leahy again commented on problems associated with low quality patents.  He stated that "High quality patents are the key to our economic growth.  They benefit both patent owners and users who can be more confident in the validity of issued patents.  Patents of low quality and dubious validity, by contrast, enable patent trolls who extort unreasonable licensing fees from legitimate businesses, and constitute a drag on innovation.  Too many dubious patents also unjustly cast doubt on truly high quality patents.

112 CONG. REC. S1362 (daily ed. Mar. 8, 2011) (statement of Sen. Leahy).

104.    Senator Grassley explained some of the details of the proposed new post-grant procedures, and specifically, detailing safeguards against potential use of the procedures to harass patent owners as well as some benefits the procedures could provide.  "[T]he [AIA] would improve the current *inter partes* administrative process for challenging the validity of a patent. It would establish an adversarial *inter partes* review, with a higher threshold for initiating a proceeding, and procedural safeguards to prevent a challenger from using the process to harass patent owners." 112 CONG. REC. S952 (daily ed. Feb. 28, 2011) (statement of Sen. Grassley).

105.    Senator Whitehouse commented on the fears of his Rhode Island inventor constituents, who "made clear that the fear of protracted litigation also dampens innovation. Unfortunately, numerous poor-quality patents have issued in recent years, resulting in seemingly endless litigation that casts a cloud over patent ownership." 112 CONG. REC. S1053 (daily ed. Mar. 1, 2011) (statement of Sen. Whitehouse).  Senator Whitehouse also commented on the failure of available administrative processes to address the high cost of litigation.  "Administrative processes that should serve as an alternative to litigation also have broken down, resulting in further delay, cost, and confusion." *Id.*

106.    After passing the Senate, the House Judiciary Committee took up the bill, amended it, and issued a report on June 1, 2011. H.R. REP. NO. 112-89.

107.    Similar views as those expressed in the Senate were contained in the Report issued by the House Judiciary Committee.  "The voices heard during the debate over changes to the patent law have been diverse and their proposals have been far from uniform.  They have focused the Committee's attention on . . . improving patent quality and providing a more efficient system for challenging patents that should not have issued; and reducing unwarranted litigation costs and inconsistent damage awards." H.R. REP. NO. 112-89, pt. 1, at 39-40.

108.    The Report commented on the existing administrative procedures created as a potential tool for avoiding costly litigation.   "Nearly 30 years ago, Congress created the administrative 'reexamination' process . . . in the expectation that it would serve as an effective and efficient alternative to often costly and protracted district court litigation." *Id.* at 45.

109.    In a statement from the Secretary of Commerce provided in the Report, the Administration expressed support for the creation of the PGR Proceeding and "retooling the existing post-grant *inter partes* reexamination procedure," explaining that:

> These proceedings will serve to minimize costs and increase certainty by offering efficient and timely alternatives to litigation as a means of reviewing questions of patent validity.  Such proceedings also will provide a check on patent examination, ultimately resulting in higher quality patents.  It is important that post-grant review proceedings be designed to prevent delay and abusive challenges, but still enable valid challenges based on meritorious grounds.

*Id.* at 87.

110.    Thus, among other reasons, Congress created the CBM, IPR, and PGR post-grant procedures to provide an efficient and less costly administrative alternative to litigating the validity of a patent.  The existing reexamination procedures at the time were not fulfilling their promise of providing an effective alternative.

111.    The above problems were made worse by the assertion of patents of questionable quality and validity that should not have been issued in the first place.  Therefore, these new

procedures were also considered to be a check on the USPTO that would hopefully eliminate "dubious" patents.

112.    Many parties have made use of the post grant PTAB proceedings, filing a total of 15,236 Petitions as of November 30, 2022. *See* Trial Statistics Archive (https://www.uspto.gov/patents/ptab/statistics/aia-trial-statistics-archive).  The most popular trial type is the IPR proceeding, which accounted for 14,245 of the 15,236 Petitions.

113.    Post grant proceedings, and particularly IPRs, have been popular tools used by many parties to challenge the patentability of issued patents. *See* Scott A. McKeown, "Patent Trial and Appeal Board Year in Review: The Top Five PTAB Developments of 2021" (https://ipwatchdog.com/2021/12/28/patent-trial-appeal-board-year-review-top-five-ptab-developments-2021/id=141065/); *see also* https://www.patexia.com/feed/patexia-insight-160-top-ipr-attorneys-of-2022-20221123.

## VII.  IPR FILINGS AGAINST THE CLAIMS OF THE '097, '851, AND '061 PATENTS

### A.    EIS's Original References Cited in its Three (3) IPRs

114.    Anyone can file an IPR at any time as long as they are not barred from doing so by other actions.  For example, under 35 U.S.C. § 315(b), an IPR may not be instituted if the petition requesting IPR was filed more than one year after the petitioner was "served with a complaint alleging infringement of the patent" the petitioner is seeking to challenge.

115.    EIS GmbH ("EIS") filed three separate petitions with the Patent Trial and Appeal Board ("PTAB") to institute three separate IPRs against claims in each of Novoluto's '097, '851, and '061 Patents.

116.  **<u>IPR2019-01302 against the '097 Patent</u>**.  On July 3, 2019, EIS filed a petition with the PTAB to institute an IPR against all thirty (30) claims of the '097 Patent in IPR2019-01302 ("the '1302 IPR").[3]  EIS's petition included four (4) prior art references as shown below.[4]

- U.S. Patent No. 5,725,473 ("*Taylor*")

- Chinese Utility Model Patent No. 2153351 Y ("*Guan*")

- U.S. Patent No. 6,964,643 B2 ("*Hovland*")

- U.S. Patent No. 7,828,717 B2 ("*Lee*")

117.  EIS asserted that all thirty (30) claims were invalid for being either anticipated or obvious over one or more of the four (4) identified prior art references, in different combinations.[5]

118.  EIS also supplied additional materials in support of its IPR petition, such as articles, patents, and excerpts of prosecution histories from the challenged patents, related patents, and other patents, including the following article:

- Kevin L. Billups, *The Role of Mechanical Devices in Treating Female Sexual Dysfunction and Enhancing the Female Sexual Response*, 20 World J. Urol. 137 (2002)

119.  Initially, the Board denied institution on January 13, 2020.[6]  EIS filed a request for rehearing, a request for Precedential Opinion Panel ("POP") review, and after POP review was denied, EIS filed a lawsuit against the USPTO and the Director, claiming the denial of POP Review was "arbitrary and capricious" and violated the Administrative Procedures Act ("APA").[7] Subsequently, the Board granted EIS's rehearing request, and on June 17, 2020, the PTAB instituted the IPR.[8]

---

[3] IPR2019-01302, Paper 1.

[4] *Id.*

[5] *Id.*

[6] IPR2019-01302, Paper 17.

[7] IPR2019-01302, Papers 18-21.

[8] IPR2019-01302, Paper 23.

120.     On June 14, 2021, the PTAB issued a final written decision confirming the validity of all thirty (30) challenged claims in the '097 Patent over the cited references.[9]

121.     **IPR2019-01444 against the '851 Patent**.  On July 31, 2019, EIS filed a second petition with the PTAB, this time to institute an IPR against six (6) of eight claims of the '851 Patent in IPR2019-01444 ("the '1444 IPR").[10]  EIS's petition included four (4) prior art references as shown below.[11]

- Chinese Utility Model Patent No. 2153351 Y ("*Guan*")

- U.S. Patent No. 6,964,643 B2 ("*Hovland*")

- U.S. Patent No. 5,813,973 to Gloth ("*Gloth*")

- U.S. Patent No. 8,579,837 B1 ("*Makower*")

122.     EIS asserted that six (6) of the '851 Patent's eight (8) claims were invalid for being obvious over the four (4) identified prior art references, in different combinations.[12]

123.     EIS also supplied additional articles, patents, and excerpts of prosecution histories from the challenged and related patents in support of its IPR petition, including the following article:

- Kevin L. Billups, *The Role of Mechanical Devices in Treating Female Sexual Dysfunction and Enhancing the Female Sexual Response*, 20 World J. Urol. 137 (2002)

124.     Initially, the Board denied institution on February 10, 2020.[13]  EIS filed a request for rehearing and a request for Precedential Opinion Panel ("POP") review, and after POP review was denied, EIS amended their already-filed against the USPTO and the Director, adding

---

[9] IPR2019-01302, Paper 50.
[10] IPR2019-01444, Paper 1.
[11] *Id.*
[12] *Id.*
[13] IPR2019-01444, Paper 12.

allegations that the denial of POP Review in the '1444 IPR also violated the APA.[14]  Subsequently, the Board granted EIS's rehearing request, and on August 11, 2020, the PTAB instituted the IPR.[15]

125.    On August 5, 2021, the PTAB issued a final written decision confirming the validity of all six (6) challenged claims in the '851 Patent over the cited references.[16]

126.    **IPR2020-00007 against the '061 Patent**.  On October 2, 2019, EIS filed a third petition with the PTAB, this time to institute an IPR against all twenty-six (26) claims of the '061 Patent in IPR2020-00007 ("the '0007 IPR").[17]  EIS's petition included three (3) prior art references as shown below.[18]

- U.S. Patent No. 5,725,473 ("*Taylor*")

- U.S. Patent No. 6,964,643 B2 ("*Hovland*")

- U.S. Patent Publication No. 2013/0261385 A1 ("*Zipper*")

127.    EIS asserted that all twenty-six (26) of the '061 Patent's claims were invalid for being either anticipated or obvious over one or more of the three (3) identified prior art references, in different combinations.[19]

128.    EIS also supplied additional articles, patents, and excerpts of prosecution histories from the challenged and related patents in support of its IPR petition, including the following article:

- Kevin L. Billups, *The Role of Mechanical Devices in Treating Female Sexual Dysfunction and Enhancing the Female Sexual Response*, 20 World J. Urol. 137 (2002)

---

[14] IPR2019-01444, Papers 14-17.

[15] IPR2019-01444, Paper 18.

[16] IPR2019-01302, Paper 45.

[17] IPR2019-01444, Paper 1.

[18] *Id.*

[19] *Id.*

129.    Again, the Board initially denied institution, this time on April 6, 2020.[20] EIS again filed a request for rehearing and a request for Precedential Opinion Panel ("POP") review, and after POP review was denied, EIS amended their already-filed against the USPTO and the Director, adding allegations that the denial of POP Review in the '0007 IPR also violated APA.[21] Subsequently, the Board granted EIS's rehearing request, and on September 25, 2020, the PTAB instituted the IPR.[22]

130.    On September 23, 2021, the PTAB issued a final written decision confirming the validity of all twenty-six (26) challenged claims in the '061 Patent over the cited references.[23]

**B.    EIS's Invalidity Contentions and Narrowing of Asserted Prior Art**

131.    EIS, Inc., a subsidiary of EIS GmbH, filed this lawsuit with Lanham Act and other business tort claims against Novoluto, its sister companies WOW Tech Canada, Ltd. and WOW Tech USA, Ltd., and their parent company, WOW Tech International GmbH (now IntiHealth Ger GmbH) (collectively, "the WOW Tech Group"), on June 28, 2019.[24] This case turned into a patent infringement case involving Novoluto's '097, '851, and '061 Patents when EIS, Inc. added counts for declaratory judgment of non-infringement of the '097, '851, and '061 Patents in its second amended complaint, filed on December 22, 2020.[25]    Novoluto asserted counterclaims of infringement against EIS, Inc. on February 2, 2021.[26] EIS, Inc. amended the complaint a third time on September 16, 2021,[27] adding two patents that had issued since the second amended

---

[20] IPR2020-00007, Paper 8.

[21] IPR2020-00007, Paper 11.

[22] IPR2020-00007, Paper 15.

[23] IPR2020-00007, Paper 41.

[24] D.I. 1.

[25] D.I. 53.

[26] D.I. 57.

[27] D.I. 111.

complaint, U.S. Patent No. 11,090,220 ("the '220 Patent") and U.S. Patent No. 11,102,418 ("the '418 Patent"). The '220 and '418 Patents are continuations of the '851 Patent. EIS GmbH, Triple A Marketing GmbH, and Triple A Import GmbH were added as parties on September 28, 2021, when Novoluto added counterclaims of infringement of the '220 and '418 Patents.[28]

132.    In response to Novoluto's patent infringement counterclaims, the counterclaim defendants (EIS, Inc., EIS GmbH, Triple A Import GmbH, and Triple A Marketing GmbH, collectively, "the EIS Group"), filed answers in which they contended that all of the claims of the Patents-in-Suit were invalid.[29]

133.    The Court issued a scheduling order that instructed the counterclaim defendants to file initial invalidity contentions by October 8, 2021, for the '851, '061, and '097 Patents, and by February 25, 2022, for the '220 and '418 Patents.[30] On November 17, 2021, the WOW Tech Group moved to strike EIS's initial invalidity contentions for violating 35 U.S.C. § 315(e)(2). The WOW Tech Group argued that the invalidity contentions relied on documents that EIS would be estopped from raising in this case under 35 U.S.C. § 315(e)(2) because they were either actually raised or relied upon by EIS in its IPR petitions or reasonably could have been raised.[31] The Court denied the motion to strike on February 14, 2022, stating:

> The Court concludes that the most appropriate exercise of its discretion, under the circumstances presented here, is not to address estoppel issues in a piecemeal manner at this time. The PTAB's final written decisions are on appeal to the Federal Circuit; Defendants have asserted multiple patents, some of which have not been the subject of IPRs; and Defendants' request for broad relief is not matched by specific, supporting argument and evidence that might justify such an award.[32]

---

[28] D.I. 118.
[29] D.I. 62 and 132.
[30] D.I. 129.
[31] D.I. 134.
[32] D.I. 192.

134.    Final invalidity contentions were due September 16, 2022,[33] and the EIS Group was to narrow its asserted prior art references to "no more than 20 prior-art references and no more than 72 prior-art-based invalidity arguments across the 5 asserted patents"[34] by fourteen (14) days after the Court's *Markman* order.[35]  The Court issued its *Markman* order on January 9, 2023.[36]  On January 23, 2023, the EIS Group served its narrowed "Election of Prior-Art-Based Invalidity Arguments,"[37] identifying these seven (7) references as being asserted against the '097, '851, and '061 Patents[38]:

- Taylor

- Guan

- Lee

- Hovland

- Eros Clitoral Therapy Device, SKU:  364215376135191 ("Eros" or "the Eros CTD")

- U.S. Patent Pub. No. 2017/0281457 A1 ("Witt")

- Chinese Utility Model No. 201139737Y ("Yang")

---

[33] *Id.*  The one-year time bar under 35 U.S.C. § 315(b) for the '220 and '418 Patents was on September 28, 2022.  EIS did not file IPR petitions against the '220 and '418 Patents.

[34] D.I. 288.

[35] D.I. 288 and 299.

[36] D.I. 300 and 301.

[37] D.I. 305  and Exh. 1 (EIS's Election of Prior Art served on January 2, 2023).

[38] The EIS Group also identified U.S. Patent No. 1,502,440 A ("*Robert*") as a reference asserted against certain claims of the '220 and '418 Patents, and Canadian Patent No. 2,896,744 C ("*Makower '744*") as a reference asserted against one claim of the '418 Patent.  *Id.*  Robert was cited by the Examiner during prosecution of the '220 Patent on June 27, 2019, cited by the Examiner during prosecution of the '418 Patent on August 22, 2019, identified in the Espacenet Citations List for the '851 Patent Family, and shares two International Patent Classification (IPC) and Cooperative Patent Classification (CPC) Primary Classification Codes with the '097 Patent (namely, A61H9/00 and A61H9/005). Makower '744 has overlapping subject matter to the Makower reference EIS relied on in the '1444 IPR against the '851 Patent (parent to the '220 and '418 Patents), and its German foreign equivalent, DE212013000024 was cited on the face of the '061, '097, '851, '220, and '418 Patents.

135.    Of those seven references, the first four listed above were specifically asserted in grounds submitted to the PTAB during the IPRs, the fifth is a "therapy device" that is described in one of previously asserted IPR references and in the Billups article EIS submitted in all three IPRs, and the last two references were new and had neither been cited nor considered before with respect to the '097, '851, and '061 Patents.  The following table illustrates references that were previously relied on in **bold**, the device that was previously described in **bold italics**, and the newly-identified references in regular type.

| Patent | Asserted Prior Art |
|---|---|
| '097 Patent | **Taylor**, **Guan**, **Lee**, **Hovland**, ***Eros***, Witt, Yang |
| '851 Patent | **Guan**, **Hovland**, ***Eros***, Yang |
| '061 Patent | **Taylor**, **Guan**, **Hovland**, ***Eros***, Yang |

136.    The question in this case is whether the later supplied references, Eros, Witt, and Yang, could have reasonably been raised during the previous IPRs.

## VIII.   EROS, WITT, AND YANG REASONABLY COULD HAVE BEEN RAISED IN THE PREVIOUS IPRS

137.    The following sections address the question of whether Eros, Witt, or Yang could have been considered when the original IPR was filed.

### A.    EIS reasonably could have raised Eros in the IPRs

138.    Although only printed publications can be used as evidence for grounds asserted in IPRs, a physical object can be estopped if there were publications that describe that physical object that could have been raised in the IPR.  *Wasica Finance GmbH v. Schrader Intl., Inc.*, 432 F.Supp.3d 448 (D. Del. 2020).  In *Wasica*, Judge Stark noted that 35 U.S.C. § 312(a)(3), which sets the statutory requirements for an IPR petition, identifies as separate requirements the

"grounds" and the "evidence" that supports the "grounds" for the challenge to each patent claim, while § 315(e)(2) (the estoppel statute) applies to "grounds." Therefore, even if a piece of "evidence" was not available for IPR purposes, a party would still be estopped from asserting IPR-rejected "grounds" that were based on different "evidence" that contained essentially the same information. *Id.* at 445-6.

139.    The Eros Clitoral Therapy Device was invented by Claire Hovland,[39] who obtained several patents related to the device.[40]  Hovland's Eros device was described in the same Hovland patent that EIS relied on in asserted grounds in all three IPRs[41] and in the Billups article that EIS submitted with the petitions in all three IPRs.[42]

140.    Hovland, for example, describes the Eros device in significant detail, including 34 figures and more than 21 columns worth of textual description in the specification (not including the claims).  Hovland's Figure 4, reproduced below, is representative of an Eros device from one perspective:





---

[39] Mary Ellen Egan, *The Love Machine*, Forbes, July 3, 2000. (available at https://www.forbes.com/forbes/2000/0703/6601124a.html?sh=60a69607757f).

[40] *See*, *e.g.*, U.S. Patent No. 6,964,643 and U.S. Patent No. 6,464,653, each to Hovland.

[41] IPR2019-01302, Ex. 1005; IPR2019-01444, Ex. 10005; IPR2019-01302, Ex. 1006.

[42] IPR2019-01302, Ex. 1014; IPR2019-01444, Ex. 1009; IPR2019-01302, Ex. 1010.

141.    Billups also describes the Eros, as shown, for example, in the following excerpt:

**The eros therapy as a model mechanical device to treat FSD**

The Eros Therapy is a mechanical device designed to assist in achieving and maintaining clitoral engorgement, to increase blood flow to the clitoris, and, ultimately, to enhance arousal and orgasm (Fig. 1). The Eros Therapy device is placed over the clitoris and the vacuum pump is then activated. A gentle vacuum is created over the clitoris, which causes increased blood flow and engorgement. The patient can adjust the vacuum level during use. At the patient's discretion, the desired vacuum level can be held constant or rapidly



**Fig. 1.** The eros clitoral therapy device

142.    Eros was also described in U.S. Patent No. 6,464,653 ("Hovland '653"), which is another Hovland patent that was also cited on the face of each of the '097, '851, and '061 Patents.

143.    Because these printed publications that describe Eros were (a) submitted by EIS with the IPR petitions, and/or (b) cited on the patents EIS challenged in those IPRs, the printed publications were actually known by EIS when it filed the IPR petitions in July and October of 2019.

144.    Additionally, before Hovland issued as a patent, the underlying patent application published as U.S. Publication No. 2002/0120219, and *that* publication was also cited on the face

- 41 -

of each of the '097, '851, and '061 Patents.  The Examiner of the international application of the '061 Patent cited the Hovland publication in an International Search Report dated July 14, 2016, and mailed July 22, 2016,[43] which is how the publication eventually printed on the face of the '061 Patent, the '097 Patent, and the 851 Patent.  These facts tell me that in addition to Hovland, Hovland '653, and Billups, the Hovland publication was also reasonably available and was found by at least one skilled searcher (the Examiner of the international application of the '061 Patent).

145.    In summary, these references, all of which described Eros in far more detail than the Eros product itself reveals, not only reasonably could have been raised, but were *actually considered* in either the prosecution of or in the IPRs concerning the '097, '851, and '061 Patents.[44] For these reasons, in my opinion, EIS should be estopped from relying on Eros now.  *Wasica*, 432 F.Supp.3d 448 (D. Del. 2020).

---

[43] International Search Report, PCT/EP2015/067017, mailed July 22, 2016.

[44] Eros was also discussed during the deposition of one of Novoluto's expert during the IPRs, the transcript of which EIS submitted to the PTAB in all three IPRs.  IPR2019-01302, Ex. 1052, p. 46, lines 19-22; IPR2019-01444, Ex. 1016, p. 46, lines 19-22; IPR2020-00007, Ex. 1016, p. 46, lines 19-22. This is more evidence that Eros was actually known by EIS during the IPRs.

B.    **EIS reasonably could have raised Witt in the IPRs**

146.    Witt is an EIS-owned reference, the application for which EIS filed in 2016, as shown here:

(19) **United States**
(12) **Patent Application Publication**     (10) Pub. No.: US 2017/0281457 A1
Witt                                                                    (43) Pub. Date:          Oct. 5, 2017

(54)  **COMPRESSION WAVE MASSAGE DEVICE**

(71)  Applicant: **EIS GmbH**, Bielefeld (DE)

(72)  Inventor:  **Florian M. Witt**, Wentorf (DE)

(21)  Appl. No.: **15/260,947**

(22)  Filed:      **Sep. 9, 2016**

(30)          **Foreign Application Priority Data**

    Apr. 4, 2016   (DE) ......................... 102016106120.4
    May 12, 2016   (EP) ............................... 16169444.3

          **Publication Classification**

(51)  Int. Cl.
      *A61H 19/00*          (2006.01)

(52)  U.S. Cl.
      CPC ..... *A61H 19/34* (2013.01); *A61H 2201/1207* (2013.01)

(57)                  **ABSTRACT**

A compression wave massage device for body parts is described, particularly for erogenous zones such as the clitoris, comprising a pressure field generation device and a drive device. The pressure field generation device has at least one cavity with a first end and a second end, located opposite the first end and distanced from said first end, with the first end being provided with at least one opening for placement on a body part. The drive device causes a change of the volume of at least one cavity between a minimal volume and a maximal volume such that in at least one opening a stimulating pressure field is generated. The cavity is formed by a single chamber, and the ratio of the volume change to the minimal volume is not below 1/10, preferably not below 1/8.

147.    EIS asserts Witt against only the '097 Patent in this district court case. Witt is not prior art because its filing date is after the earliest effective filing date of the '097 Patent (March 13, 2015). EIS has asserted Witt against the '097 patent based on EIS's theory that the '097 Patent is not entitled to the priority date because the '097 Patent, a continuation of the '061 Patent, allegedly improperly added new matter to the specification as compared to the specification of its parent patent. EIS raised this issue in the IPR against the '097 Patent[45], but for whatever reason chose not to formally attack the priority date of the '097 Patent in that proceeding.

---

[45] IPR2019-01302, Paper 37, pages 27-28.

- 43 -

148.    Regardless, because EIS filed the Witt application in 2016,[46] Witt was known to EIS when it filed the IPR petition against the '097 Patent in July 2019 and, therefore, could have been considered in the IPRs.

149.    Even if EIS denies knowing about its own application (Witt), in my opinion a skilled searcher conducting a diligent search reasonably would have been expected to discover Witt.  I base that opinion on the fact that Witt turned up in my own search and in a third-party search that assumed that the '097 Patent would not be entitled to the priority date of March 13, 2015, and would instead have an earliest effective filing date of April 13, 2017, as EIS argued in the IPRs.

150.    In my search, I used "key word" and classification searching together.  The search parameters I used are detailed below.

151.    Because the USPTO has adopted the Cooperative Patent Classification (CPC) system, I started with the main CPC classes identified in bold on the face of the '097 patent together with keywords based on the language in the claims and specification of the '097 patent.  I then used those same keywords combined with the International Patent Classification (IPC) classes identified on the face of the '097 patent.  I used the same approach of searching combinations of classes and keywords for the '851 and '061 patents.

152.    The specific combination of keywords that I used included the following, where "*" is a wildcard operator that represents a string of characters of any length and "all text fields" includes the title, abstract, claims, and description:

---

[46] Exh. 2 (Application Data Sheet identifying EIS GmbH as applicant in filing documents for U.S. Pub. No. US 2017/0281457, dated September 9, 2016).

- In all text fields, "stimulat*" within 5 words away from "vagina* OR clitor* OR skin* OR body* OR erogen*" OR "massag*" within 5 words away from "vagina* OR clitor* OR skin* OR body* OR erogen*" AND

- In all text fields, any of "press* OR vacuum* OR suct* AND

- In all text fields, any of "vibrat* OR reciproca* OR translat*" AND

- In all text fields, any of "driv* OR motor*" AND

- In all text fields, any of "open* OR chamber* OR flex* OR connect*"

153.    The above keywords were searched in combination with each of the following classes, and the results were filtered to those having an earliest priority date before April 13, 2017, which is the filing date of the '097 patent[47]:

- CPC any of "A61H19/30 OR A61H9/005 OR A61H19/34 OR A61H19/40 OR A61H19/44 OR A61H9/0057 OR A61H23/02" (4,161 records), with a specific class breakdown as follows[48]:

    o  CPC A61H19/30 – 359 records

    o  CPC A61H9/005 – 686 records

    o  CPC A61H19/34 – 775 records

    o  CPC A61H19/40 – 378 records

    o  CPC A61H19/44 – 547 records

    o  CPC A61H9/0057 – 407 records

---

[47] The actual filing date of the '097 patent was used to account for EIS's theory that the '097 Patent is not entitled to the priority date of March 13, 2015.

[48] The total records for each individual CPC class were not filtered to remove duplicate records that also appear in one of the other searched CPC classes. Therefore, the number of records for each CPC class is likely higher than it would be if duplicate records were removed.

- o CPC A61H23/02 – 3,624 records

- IPC any of "A61F5/00 OR A61H19/00 OR A61H9/00 OR A61H23/02" (4,122 records), with a specific class breakdown as follows[49]:

  - o IPC A61F5/00 – 260 records

  - o IPC A61H19/00 – 1,037 records

  - o IPC A61H9/00 – 1,009 records

  - o IPC A61H32/02 – 2,710

154.    I used PatSnap to conduct my searches.  PatSnap is an innovation intelligence platform that provides intellectual property and R&D intelligence.[50]  One of the solutions offered by PatSnap is a comprehensive global patent search and analysis platform that connects 126 jurisdictions, 170 million patents, and over 250 million innovation datapoints from around the world.[51]  In addition to offering a user-friendly interface for searches, PatSnap allows the user to include thumbnail images in the search results to facilitate analysis.  The results of the searches are shown in Exhibit 3.

155.    The Witt reference turned up within approximately three hours of searching.

156.    In addition to my search, Clarivate, a skilled patent search firm, conducted a separate search.  Mr. Long B. Nguyen, a Team Leader in mechanical engineering at Clarivate directed the search, which turned up the Witt reference within approximately 1 hour of searching.

---

[49] The total records for each individual IPC class were not filtered to remove duplicate records that also appear in one of the other searched IPC classes.  Therefore, the number of records for each IPC class is likely higher than it would be if duplicate records were removed.

[50] https://www.patsnap.com/solutions/ip-intelligence/.

[51] *Id.*

157.    Clarivate searched worldwide patents and published applications on Questel Orbit and the search focused on CPC classes A61H 9/005, A61H 9/0057, and A61H 9/0071, using the following search string, in which "+" operated as a wildcard and "5D" was a proximity operator for keywords within 5 words of each other in any order:

(((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX).

158.    A copy of the Clarivate search report for this search is included in Exhibit 4 to this report.

159.    The combination of the amount of time, effectiveness of the search resulting in locating the Witt reference, and the databases searched, demonstrates a reasonable level of diligence in Mr. Nguyen's searching.

**B.    EIS reasonably could have raised Yang in the IPRs**

160.    Yang is the only reference for which I have not yet seen direct evidence showing that EIS had actual knowledge of it at the time EIS filed the IPR petitions in July and October 2019.  The question, therefore, is whether EIS reasonably could have raised Yang in the IPRs (assuming EIS did not actually have Yang in its possession in July or October 2019, when EIS filed the three IPR petitions).

161.    To answer that question, I have been asked to direct my own searches and review searches performed by a third-party searcher to show whether Yang would have turned up in a diligent search by a skilled searcher.  In both instances, searches conducted with reasonable diligence turned up Yang.

162.    In my search, I used "key word" and classification searching together.  The search parameters I used are detailed below.

163.    I started with the main CPC classes identified in bold on the face of the '097 patent together with keywords based on the language in the claims and specification of the '097 patent. I then used those same keywords combined with the IPC classes identified on the face of the '097 patent.  The same approach of searching combinations of classes and keywords was used for the '851 and '061 patents.

164.    Because of the overlap in subject matter and the similarity of the language used in the claims and specifications of the '097, '061, and '851 patents, I used the same set of keywords when searching each of the '097, '061, and '851 patents.  The specific combination of keywords that I used included the following, where "*" is a wildcard operator that represents a string of characters of any length and "all text fields" includes the title, abstract, claims, and description:

- In all text fields, "stimulat*" within 5 words away from "vagina* OR clitor* OR skin* OR body* OR erogen*" OR "massag*" within 5 words away from "vagina* OR clitor* OR skin* OR body* OR erogen*" AND

- In all text fields, any of "press* OR vacuum* OR suct* AND

- In all text fields, any of "vibrat* OR reciproca* OR translat*" AND

- In all text fields, any of "driv* OR motor*" AND

- In all text fields, any of "open* OR chamber* OR flex* OR connect*"

165.    For the '097 and '061 patents, the above keywords were searched in combination with each of the following classes, and the results were filtered to those having an earliest priority date before March 13, 2015:

- 48 -

- CPC any of "A61H19/30 OR A61H9/005 OR A61H19/34 OR A61H19/40 OR A61H19/44 OR A61H9/0057 OR A61H23/02" (3,516 records), with a specific class breakdown as follows[52]:

  o CPC A61H19/30 – 288 records

  o CPC A61H9/005 – 550 records

  o CPC A61H19/34 – 624 records

  o CPC A61H19/40 – 342 records

  o CPC A61H19/44 – 434 records

  o CPC A61H9/0057 – 291 records

  o CPC A61H23/02 – 3,117 records

- IPC any of "A61F5/00 OR A61H19/00 OR A61H9/00 OR A61H23/02" (3,586 records), with a specific class breakdown as follows[53]:

  o IPC A61F5/00 – 239 records

  o IPC A61H19/00 – 795 records

  o IPC A61H9/00 – 831 records

  o IPC A61H23/02 – 2,407 records

166. For the '851 patent, the keywords were searched in combination with each of the following classes, and the results were filtered to those having an earliest priority date before September 23, 2013:

---

[52] The total records for each individual CPC class were not filtered to remove duplicate records that also appear in one of the other searched CPC classes. Therefore, the number of records for each CPC class is likely higher than it would be if duplicate records were removed.

[53] The total records for each individual IPC class were not filtered to remove duplicate records that also appear in one of the other searched IPC classes. Therefore, the number of records for each IPC class is likely higher than it would be if duplicate records were removed.

- 49 -

- CPC any of "A61H9/00 OR A61H9/005 OR A61H19/34 OR A61H9/0007 OR A61H9/0057 OR A61H19/30 OR A61H19/00" (1,504 records), with a specific class breakdown as follows[54]:

  - CPC A61H9/00 – 1,002 records

  - CPC A61H9/005 – 473 records

  - CPC A61H19/34 – 482 records

  - CPC A61H9/0007 – 73 records

  - CPC A61H9/0057 – 221 records

  - CPC A61H19/30 – 214 records

  - CPC A61H19/00 – 214 records

- IPC any of "A61H19/00 OR A61H9/00" (1,248 records), with a specific class breakdown as follows[55]:

  - IPC A61H19/00 – 615 records

  - IPC A61H9/00 – 723 records

167.    I used PatSnap to conduct my searches.  In addition to offering a user-friendly interface for searches, PatSnap allows the user to include thumbnail images in the search results to facilitate analysis.  The results of the searches are shown in Exhibits 5 & 6.

168.    The Yang reference turned up within approximately ten hours of searching.

---

[54] The total records for each individual CPC class were not filtered to remove duplicate records that also appear in one of the other searched CPC classes.  Therefore, the number of records for each CPC class is likely higher than it would be if duplicate records were removed.

[55] The total records for each individual IPC class were not filtered to remove duplicate records that also appear in one of the other searched IPC classes.  Therefore, the number of records for each IPC class is likely higher than it would be if duplicate records were removed.

169.    Clarivate also conducted searches for the '097, '851, and '061 Patents with respect to Yang.  Mr. Nguyen directed the searches, which turned up the Yang reference within approximately 9 hours of searching worldwide patents and published applications on Questel Orbit.

170.    Searches used the following search string of keywords, in which "+" operated as a wildcard and "5D" was a proximity operator for keywords within 5 words of each other in any order:

(((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX).

171.    The above keywords were searched in combination with each of the following classes, and for the '097 and '061 patents the results were filtered to those having an earliest priority date before March 13, 2015, while for the '851 patent, the results were filtered to those having an earliest priority date before September 23, 2013:

- CPC Classes:
  - (A61H-009/00/5 OR A61H-009/00/57 OR A61H-009/00/71)
  - (A61H-019/00 OR A61H-019/30 OR A61H-019/34 OR A61H-019/40 OR A61H-019/44)
  - (A61H-023/00 OR A61H-023/02 OR A61H-023/02/63)
  - (A61H-2009/0064)
  - (A61H-2201/0107 OR A61H-2201/0153 OR A61H-2201/0157 OR A61H-2201/0192 OR A61H-2201/1207 OR A61H-2201/12157)

- o (A61H-2205/087)

- IPC Classes

    - o (A61H-019/00)

    - o (A61H-009/00)

172.    Copies of the Clarivate search reports for these searches are included in Exhibit 4 to this report.

173.    The combination of the amount of time, effectiveness of the search resulting in locating Yang, and the databases searched, demonstrates a reasonable level of diligence in Clarivate's searching.

## IX.  TRIAL EXHIBITS

174.    I have not yet prepared any exhibits or demonstrative evidence for trial, but I intend to do so pursuant to the schedule set by the court.

## X.  SUPPLEMENTATION

175.    I reserve the right to amend or supplement this report based on further discovery and preparation in this action, including my review of any expert report submitted on behalf of Plaintiffs by any fact or expert witness, or any ruling on claim construction by the Court.

## XI.  CONCLUSIONS

176.    By asserting Hovland and submitting Billups, both of which described Eros, against the '097, '851, and '061 Patents, each of which cited other Hovland patents and publications that also described Eros, EIS clearly had possession of printed publications describing Eros prior to filing the three IPRs.  Because Witt is EIS's own reference, EIS also clearly had possession of Witt prior to filing the three IPRs.  EIS also reasonably could have raised Yang as a basis for claim cancellation during the IPRs because although I have not seen evidence that EIS had Yang in its possession, skilled searchers conducting diligent searches actually did find Yang using reasonable

- 52 -

searching methods.  EIS should be barred from presenting grounds that include the Eros, Witt, and Yang patents during this case because grounds including those references reasonably could have been raised when EIS filed its IPR petitions against the '097, '851, and '061 Patents in July and October 2019.

Dated:    February 8, 2023

Robert L. Stoll

- 53 -

# APPENDIX A

**ROBERT L. STOLL**
**1500 K Street, NW, Suite 1100**
**Washington, DC  20005**
**(202)-230-5176 (Work), (202) 657-8390 (Cell)**
**robert.stoll@faegredrinker.com**

## ACADEMIC DEGREES

**J.D.**        Catholic University of America 1985
**B.S.**        University of Maryland December 1979, Chemical Engineering

## PROFESSIONAL EXPERIENCE

Robert Stoll is a partner on the Patent team at Faegre Drinker Biddle & Reath LLP and Deputy Practice Group Leader of the Intellectual Property Practice Group.  In October of 2013, Chief Judge Rader appointed him to a three-year term on the CAFC Advisory Council, and Chief Judge Sharon Prost reappointed him for an additional three-year term in 2016.  Bob retired from the USPTO as Commissioner for Patents at the end of 2011 after a distinguished 34-year government career.  He was instrumental in the passage of landmark patent legislation, the America Invents Act, and lauded for his efforts to reduce patent pendency and improve patent quality.  Bob served as a patent examiner at the USPTO from 1982 to 1990.  He then assumed the position of supervisory patent examiner from 1990 to 1994.  In this position, Bob supervised an art unit of approximately 15 patent examiners, reviewing and signing the actions of the non-primary examiners and monitoring the work of the primary examiners.  In 1994 Bob was promoted to executive assistant to the Commissioner for Patents.  After a series of further promotions, Secretary of Commerce Gary Locke appointed Bob as Commissioner for Patents in 2009.  Having risen from the rank of examiner to lead an organization of about 8,000 employees, he has spent his career improving the intellectual property system.  He focused on educating the public, applicants, corporations and foreign governments on the criticality of intellectual property to economic growth and job creation and stressed the importance of a comprehensive understanding of the complex intellectual property laws to best use the system to protect an invention.  Having led the PTO's legislative efforts, the international group, the training academy and the enforcement initiative, Bob has a deep understanding of domestic and foreign intellectual property law.  He developed and delivered programs worldwide to educate foreign officials and the public. He was instrumental in the development and analysis of legislation concerning all areas of intellectual property and was one of the country's leaders in establishing the US government's positions on international issues related to intellectual property.  He also helped develop and plan USPTO strategic goals, objectives and priorities, and served as a liaison with patent and trademark bar groups and academic and scientific communities.

## Positions Held:

February 1, 2020 to Present                 *Partner*
                                            Faegre Drinker Biddle & Reath LLP
                                            (Drinker Biddle & Reath LLP merged with Faegre Baker Daniels)

January 2012 to Present                     *Partner*
                                            Drinker Biddle & Reath LLP

### U.S. Patent and Trademark Office:

October 2009 to December 2011               *Commissioner for Patents*
                                            U.S. Patent and Trademark Office

October 2007 to October 2009                *Dean of Training and Education*
                                            U.S. Patent and Trademark Office

November 2002 to October 2007               *Director of the Office of Enforcement*
                                            U.S. Patent and Trademark Office

February 1996 to November 2002              *Administrator of the Office of Legislative and International Affairs*

US.262092012.01

|  | U.S. Patent and Trademark Office |
|---|---|
| November 1994 to February 1996 | *Executive Assistant to the Director* U.S. Patent and Trademark Office |
| April 1990 to November 1994 | *Supervisory Patent Examiner* U.S. Patent and Trademark Office |
| June 1982 to April 1990 | *Patent Examiner* U.S. Patent and Trademark Office |

**Other Professional Experience:**

| December 1979 to June 1982 | *Chemical Engineering Research* U.S. Bureau of Mines (overseen by U.S. Department of the Interior until closure in 1985) |
|---|---|
| January 1977 to December 1979 | *Co-op Student* U.S. Bureau of Mines (overseen by U.S. Department of the Interior until closure in 1985) |

## HONORS

2023 *Patent and Trademark Office Society's* Federico Award

2023 *IAM Global Leaders* – Recognized as a Global Leader – United States DC Metro Area

*Managing Intellectual Property Magazine's* IP Stars 2022 Edition

2022 *World IP Forum* – Recognized as an Influential Leader of All Time

2022 *IAM Patent 1000* – United States DC Metro Area

29th Edition of *The Best Lawyers in America*© Best Lawyers in America 2023 – Patent Law: Washington, DC

2022 *International Advisory Experts* Award Winner – Intellectual Property Lawyer of the Year in Washington, DC

2022 *Who's Who Legal* – Nominated as one of the World's Leading Practitioners in Intellectual Property-Patents

2022 *Chambers USA* – Intellectual Property: Patent Prosecution in the District of Columbia

2022 *IAM Global Leaders* – Recognized as a Global Leader – United States DC Metro Area

28th Edition of *The Best Lawyers in America*© Best Lawyers in America 2022 – Patent Law: Washington, DC

2021 *Who's Who Legal – Nominated as one of the World's Leading Practitioners in Intellectual Property*

2021 *IAM Patent 1000* – Recognized as Luminary in the United States DC Metro Area

*Managing Intellectual Property Magazine's* IP Stars 2021 Edition

2021 *Chambers USA* – Intellectual Property: Patent Prosecution in the District of Columbia

27th Edition of *The Best Lawyers in America*© Best Lawyers in America 2021 – Patent Law: Washington, DC

2020 *IAM Global Leaders* – Recognized as a Global Leader – United States DC Metro Area, January 2020

26th Edition of *The Best Lawyers in America*© Best Lawyers in America 2020 – Patent Law: Washington, DC

Reappointed as Advisory Council Member to the U.S. Court of Appeals for the Federal Circuit for a three-year term in October 2019

2019 *IAM Patent 1000* – Recognized as Luminary in the United States DC Metro Area

2019 *Who's Who Legal* – Nominated as one of the World's Leading Practitioners in Patents

Elected as a Member of the Board of the American Intellectual Property Law Association (AIPLA) for a three-year term (2018-2021).

*Managing Intellectual Property Magazine's* IP Stars 2018 Edition

Who's Who Legal:  Patents 2017

Appointed as Advisory Council Member to the U.S. Court of Appeals for the Federal Circuit for a three-year term in October 2016.

Acquisition International - 2016 Intellectual Property Award

National Law Journal – 2016 Trailblazers – Intellectual Property

Who's Who Legal (WWL) – One of the World's Leading Practitioners in Patents 2016

Selected in 2015 as a panelist in IP *Law360*'s article series, "Voices of the Bar."

Selected in 2015 as one of Intellectual Asset Management (IAM) Patents 1000 and one of IAM Strategy 300 as one of the world leaders in the patent field.

A Contributor to "The Hill"

Received "Lifetime Achievement Award" from Managing Intellectual Property in 2012.

## PUBLICATIONS/ARTICLES

*Managing IP,* "5G SEP Leadership in 2021," October 3, 2021
*IP Watchdog,* "Mysterious patent Attacks: Policymakers Must Stand Up and Require Patent Membership
    Organizations Reveal Themselves," March 19, 2021
*Managing IP,* "5G SEP leadership in 2020," October 27, 2020
*IAM*, "How the USPTO has responded to the covid-19 pandemic," May 6, 2020
*Law 360,* IP Policy Must Focus on COVID-19 Cure, Not Special Interest," April 16, 2020
*IP Watchdog*, "The New Essential Patents Statement – Safeguarding the Integrity of the Patent System," March 30,
    2020
*Patent Lawyer Magazine*, Patents Are Not The Way To Fix Drug Pricing Issues, Issue 1, 2020
*Innovate AIPLA*, "Can We Get An Administration Standard On Tech Standards?" December 12, 2019
*Law 360*, "Can We Get An Administration Standard On Tech Standards?" December 6, 2019
*IAM,* Issue 97, "Guidance as a cultural tool at the USPTO," Autumn 2019
*IP Watchdog*, "Reflections on World IP Day: Where We've Been and What's to Come," April 26, 2019
*IP Watchdog*, "What Happens to Diagnostic Patents After Athena," March 7, 2019
*IP Watchdog*, "Looking Forward:  Predictions and Thoughts for 2019," January 2, 2019
*IP Watchdog*, "Industry Insiders Maker Patent Wishes for 2019," January 1, 2019
*IP Watchdog*, "What Mattered in 2018: Industry Insiders Reflect on the Biggest Moments in IP," December 30,
    2018

US.262092012.01

*IP Watchdog*, "More Bites at the Apple?" July 23, 2018

*Law 360*, "We Must Modernize USPTO's Fee System, July 6, 2018

*IP Watchdog*, "Alternative Routes to Protection of Innovation," June 13, 2018

*IP Watchdog*, "SAS: When the Patent Office institutes IPR it must decide patentability of all challenged claims," April 25, 2018

*IP Watchdog*, "Industry Reaction to Supreme Court Decision on Oil States v. Green Energy," April 24, 2018

*Law 360,* "Alice Angst Intensifies," March 23, 2018

*IP Watchdog,* "What Should USPTO Director Andrei Iancu Do First?" February 11, 2018

*IP Watchdog,* Looking Forward: Predictions and Thoughts about 2018, January 4, 2018

*IP Watchdog*, "Industry Insiders:  Opinion Mixed in Aftermath of Supreme Court Holding in *Helsinn*, January 23, 2019

*IP Watchdog*, What Mattered in 2017: Industry Insiders Reflect Biggest Moments in IP, December 28, 2017

*Law 360*, "Building A Better Patent System," December 15, 2017

*IP Watchdog*, "Director Andrei Iancu's Act One," November 26, 2017

*IP Watchdog*, "Predicting SAS Institute in Advance of SCOTUS Oral Arguments," November 13, 2017

*IP Watchdog*, "Predicting Oil States in Advance of SCOTUS Oral Arguments," November 12, 2017

*IP Watchdog, "*Questions Raised by the Lexmark Decision," October 19, 2017

*IP Watchdog*, "A Review at Five Years of *Inter Partes* Review, September 12, 2017

*IP Watchdog*, "What Changes Result from the Supreme Court Decision in TC Heartland?*"* September 6, 2017

*IP Watchdog*, "Patent Bar Groups Propose Legislation to Fix Patent Subject Matter Eligibility Problems," July 25, 2017

*IP Watchdog,* "Industry Reaction to SCOTUS Patent Venue Decision in TC Heartland v. Kraft Food Group," May 22, 2017

*IP Watchdog*, "Patent and IP Wishes for 2017," January 3, 2017

*IP Watchdog*, "2016 Patent Year End Review: Insiders Reflect on the Biggest Patent Moments of the Year," December 28, 2016

*The Hill*, 5 Ways Trump Can Prevent Inventors' Hard Work, November 30, 2016

*The Hill,* "The Importance of Issuing High Quality Patents," October 24, 2016

*IP Watchdog*, "New Legislation is not needed to Fix Post Grant Procedures at the USPTO," September 8, 2016

*Bloomberg BNA*, "Patience Needed for the Patent System:  Federal Circuit Offers Room for Cautious Optimism on Eligibility," July 14, 2016

*The Hill,* "Are Patent Decisions Strangling Our Economy," May 13, 2016

*IP Watchdog*, "Predicting Cuozzo in Advance of SCOTUS Oral Arguments," April 24, 2016,

*IP Watchdog,* "The Patent System:  It is Important for America that we get it right," February 25, 2016

*The Hill*, "New Patent Subject-Matter Eligibility Test Hurts US Competitiveness," January 27, 2016

*IP Watchdog*, "Patent and Trade Secret Wishes for 2016," January 3, 2016

*IP Watchdog*, "What Mattered in 2015:  Insiders Reflect on Biggest Moments in IP," December 29, 2015

*Law 360*, "Which IP Issues Ducked the Radar in 2015?" December 23, 2015

*The Hill*, "A Quiet Erosion of Patent Rights," December 17, 2015

*The Hill,* "Attacks on Patent System are Unfounded," October 22, 2015

*Law 360*, "What Shall We Do About 'Orphan Works'?", September 29, 2015

*The Hill*, "Implementing the 101 Guidelines at the Patent Office," September 11, 2015

*Law 360,* "Do the Proposed AIA Rule Changes Go Far Enough?" August 29, 2015

*IP* Watchdog, "Study of the Post Grant Procedures Is Needed Now," July 19, 2015

*The Hill*, "Courts are Making Bad Patent Law," July 16, 2015

*Law 360, "*With High Court Mum On Java Copyrights, Is Innovation Safe?" July 1, 2015

*Law 360, "*Where Do We Stand One Year After *Alice*?" June 17, 2015

*The Hill*, "Light at the End of the Tunnel for Patent Reform, or an Oncoming Train?" June 3, 2015

*The Hill*, "US Patent Reform's International Impact," May 22, 2015

*The Hill*, "Patent Reform at a Fever Pitch," April 29, 2015

*Patently-O*, "Federal Circuit Cases to Watch on Software Patentability – Planet Blue, April 6, 2015

*The Hill*, "Finally, a New Director at the Patent and Trademark Office," March 19, 2015

*IP Watchdog, "*Methods of Organizing Human Activities," March 10, 2015

*IP Watchdog, "*What Mattered in 2014: Reflecting on the Biggest Moments in IP," December 28, 2014

*The Hill*, "What Patents and Obscenity Have in Common," December 12, 2014

*The Hill,* "Patent Reform – Not too fast," December 5, 2014

Page 4 of 23

US.262092012.01

*Law 360,* "On the Way to a Better Patent System," August 18, 2014

*Wall Street Journal,* "Decide Patent Cases in Courts With Expertise in Patents," July 15, 2014

*IP Watchdog, "*Fear of the Troll Has Many Crying Foul*,"* April 23, 2014

Stoll, Robert L., "Patent Trolls:  Friend or Foe?" *WIPO Magazine*, April 214

*IP Watchdog*, "Industry Insiders Reflect on the Biggest Moments of 2013," January 3, 2014

*IP Watchdog.* "What Happens to IP Law in 2014," January 2, 2014

Robert L. Stoll, "Maintaining Post-Grant Review Estoppel in the American Invents Acts Revisited: A Call for Legislative Restraint," <u>Federal Circuit Bar Journal</u>, Volume 23, Number 1, pp. 15-54, 2013

*Law 360*, "What You Should Know About US Standard-Essential Patents," September 26, 2013

Stoll, Robert L. 2013. "Patently Practical Advice: The Impact of Recent Supreme Court and Federal Circuit Cases on Patent Law and How They Affect the Advice We Give Our Clients." *The Impact of Recent Patent Law Cases and Developments, 2013 ed.*, 41-74. Aspatore Books from Thomson Reuters Westlaw.

*Seattle Times,* Op-ed:  "U.S. Patent and Trademark Office examiners need time to ramp up," February 18, 2013

Stoll, Robert L. 2012. "Election Issues Affecting IP Law and the Global Business Market Place." *Aspatore Special Report, Navigating Government Election Issues, 19-28.* Aspatore Books from Thomson Reuters Westlaw.

*Patently-O, "*Maintaining Post-Grant Review Estoppel in the America Invents Act: A Call for Legislative Restraint," November 13, 2012

*The Hill, "*Patent Perspective," September 7, 2012

*Inventors Digest*, "What's the Hold-Up With E-Filing?  Ask the Commish," November 8, 2011

*Inventors Digest, "*What Patent Reform Means for First-to-File," September 7, 2011

*Inventors Digest*, "Ask the U.S. Patent and Trademark Office," May 16, 2011

*Inventors Digest*, "Ask the Commish," February 25, 2011

*Inventors Digest*, "Ask the USPTO," December 3, 2010

*Inventors Digest*, "Who Owns Patents: Students or Universities?" June 29, 2010

*Inventors Digest*, "Ask the (Patent) Commish," March 22, 2010

*Inventors Digest*, "Ask the Patent Commissioner," February 11, 2010

## RECENT PRESENTATIONS

Panelist, "Patent Prosecution– Proposals for Reforming "Prep and Pros" for the 21st Century" Leahy Institute of Advanced Patent Studies' Naples Roundtable 8th Annual Conference, Naples, FL, January 16, 2023

Speaker, "Clause 8 Podcast: The Voice of IP," IPWatchdog, December 14, 2022

Moderator, "Role of Misinformation in Driving IP Policy and Legislation," Federal Circuit Bar Association's 2022 Global Series Conference, Amsterdam, Netherlands, October 17, 2022

Panelist, "How to Increase Your Likelihood of Success and Manage Costs in US Infringement Litigation," and "What Countries Need to Do to Use the IP System to Foster Innovation and Economic Development," 2022 World IP Forum, Bangkok, Thailand, October 10-12, 2022

Moderator, "Politics, Policy and Legislation at the Intersection of Intellectual Property," 2022 IPWatchdog Live, Dallas, TX, September 12, 2022

Speaker, "WTO patent waiver for COVID-19 vaccines," The Heritage Foundation's Intellectual Property Working Group, Washington, DC, July 5, 2022

Moderator, "The COVID Waiver Issue and the Impact of the Pandemic on the U.S. Position on TRIPs," Federal Circuit Bar Association's 2022 Bench & Bar Conference, Sea Island, GA, June 17, 2022

Panelist, "World IP Day Panel," Exploring Intersections: UNH Franklin Pierce Summit on SEPs and FRAND, Bretton Woods, NH, April 26, 2022

US.262092012.01

Panelist, "Does the current US Patent System meet its primary objectives of incentivizing innovation and competition?" Leahy Institute of Advanced Patent Studies' Virtual Naples Roundtable 7th Annual Conference, March 16-18, 2022

Moderator, "International Innovation and Patents: TRIPS and Vaccine Waivers," Federal Circuit Bar Association's (FCBA) Global Series Fall 2021, November 18, 2021

Speaker, "Annual Meeting Kick-Off," 2021 AIPLA Annual Meeting, National Harbor, MD, October 28, 2021

Speaker, "Patents, Big Tech and Antitrust, and Data Privacy," Franklin Pierce University's Hybrid JD Program's Immersive Weekend, October 16, 2021

Panelist, "Inventions in Life Sciences – Is There Anything Left To Patent," Association of University Technology Managers (AUTM) 2021 Virtual Eastern Regional Meeting, September 30, 2021

Moderator, "Is the Federal Circuit Killing Software Patents?" 2021 IPWatchdog Live, September 14, 2021

Panelist, "Trends in Recent SEP Judgements and Future Perspectives from the Lawyer's Viewpoint" 2021 LESI Virtual Conference, May 27, 2021

"Patent Subject Matter Eligibility in the United States" 2021 World Intellectual Property Forum, April 29, 2021

Panelist, "Global Patent System Challenges" Federal Circuit Bar Association (FCBA) Global Series 2021, April 20, 2021

Moderator, "Round Table Talk on Patent Examiner Interviews" 2021 AIPLA Virtual Mid-Winter Institute, February 3, 2021

"Avoiding 101 Problems," All Ohio Annual Institute On Intellectual Property, October 8, 2020, Virtual Meeting

"USPTO/PTAB Recent Developments," US Bar - EPO Partnership for Quality Meeting, October 6, 2020, Virtual Meeting

Moderator, "The Future of the CAFC: Is the Court Still Relevant," IPWatchdog Conference Webcast, September 2, 2020

Panelist, "Critical Developments in the West," Federal Circuit Bar Association Global Series 2020 Spring Dialogue (Webcast), May 19, 2020

Panelist, "The Patent Bargain: Innovation's Past, Present and Future," KnowIt, Intellectual Property in a Digital World, Live Stream, May 11, 2020

Moderator, "Phoenix Issue IV – Section 101 – Leahy Institute of Advanced Patent Studies," Naples Roundtable 5th Annual Conference, Naples, FL, February 16-18, 2020

Panelist, "U.S. Practice – IPR and Litigation Update and Strategies," World IP Forum, Taipei, Taiwan, November 7, 2019

Panelist, "Recent Developments in Patent Law 2019," World IP Forum, Taipei, Taiwan, November 6, 2019

Panelist, "Comprehensive and Progressive Agreement for Trans-Pacific Partnership (CPTPP) - Where to From Here?" 18th Open Forum of the International Federation of Intellectual Property Attorneys, Vienna, Austria, October 10, 2019

"Update On 35 U.S.C. § 101 USPTO Guidelines, Their Effects, and Legislative Proposals," Association of University Technology Managers (AUTM) Eastern Region Meeting, Raleigh, NC, October 4, 2019

US.262092012.01

"Update on 35 U.S.C. 101 Cases & Recent Legislation," Kim & Chang, Seoul, Korea, September 24, 2019

Panelist, "112 Case Law Review," "102 Case Law Review," and "103 Case Law Review," Annual Summit of the National Association of Patent Practitioners, Seattle, WA, July 23, 2019

"Patent Eligibility in the U.S. and Europe," Global Innovation Law Summit, Seattle, WA, July 22, 2019

Panelist, "Panel 1 – Section 101, *Bilski & Alice* and Abstract Ideas, Sedona Patent Conference Promoting Invention, Entrepreneurship, Economic Growth, and Job Creation (Part 2), Washington, DC, June 28, 2019

"Update on 35 U.S.C. 101 Cases & Recent Legislation," Association of Corporate Patent Counsel (ACPC), Memphis, TN, June 26, 2019

"Update on 35 U.S.C. 101 Cases & Recent Legislation," International Association for the Protection of Intellectual Property (AIPPI Japan), Tokyo, Japan, June 20, 2019

"Return Mail Inc. v. United States, Postal Service," International Association for the Protection of Intellectual Property (AIPPI Japan), Tokyo, Japan, June 20, 2019

"Update on 35 U.S.C. 101 Cases & Recent Legislation," Japan Patent Attorneys' Association (JPAA), Tokyo, Japan, June 19, 2019

"Return Mail Inc. v. United States, Postal Service," Japan Patent Attorneys' Association (JPAA), Tokyo, Japan, June 19, 2019

"Update on 35 U.S.C. 101 Cases & Recent Legislation," Japan Patent Attorneys' Association (JPAA), Osaka, Japan, June 17, 2019

"Return Mail Inc. v. United States, Postal Service," Japan Patent Attorneys' Association (JPAA), Osaka, Japan, June 17, 2019

Panelist, "The Economics of Patent "Value," Federal Circuit Bar Association 2019 Global Series, Washington, DC, April 29, 2019

"Section 101 and Drafting Implications:  Lifesciences," University of Texas Law School 14th Annual Advanced Patent Law Institute, Alexandria, VA, March 21, 2019

"The Uneven Impact of Alice/Mayo: Where Are We After the CAFC Decision in Athena?" IPWatchdog Webinar, March 7, 2019

Moderator, "Phoenix Issues VIII," Leahy Institute of Advanced Patent Studies Naples Roundtable, Naples, FL, February 19, 2019

Panelist, "President's Forum - Section 101 in 2019: A Look Ahead," AIPLA Mid-Winter Institute, Tampa, FL, February 2, 2019

Panelist, "Adapting to Adapting Technologies", AIPLA Mid-Winter Institute, Tampa, FL, January 31, 2019

"Rapid Response: Revised USPTO Guidance Sections 101 and 102," American Intellectual Property Association, CLE Webinar, January 15, 2019

Moderator, "In Conversation on IP Litigation," San Francisco Intellectual Property Law Association Annual Seminar, Sonoma, CA, September 22, 2018

"The State of the IP Union," Dolby Roundtable, Los Angeles, CA, September 16, 2018

US.262092012.01

"USPTO Update," IP Watchdog Patent Masters Program, Washington, DC, July 30, 2018

"IP Innovations & Hot Topics," BASF Corporation, Wilmington, DE, July 9, 2018

"Patent Trolls and Patent Legislation," BASF Corporation, Wilmington, DE, July 9, 2018

"New Directions for DOJ in Approaching FTC SEPS," Japan, Fair Trade Commission, Tokyo, Japan, June 2018

"What is Happening with Patent Eligible Subject Matter in the USA," Japan Patent Attorneys' Association (JPAA), Tokyo, Japan, June 2018

"What is Happening with Patent Eligible Subject Matter in the USA," Japan Intellectual Property Association, Tokyo, Japan, June 2018

"What is Happening with Patent Eligible Subject Matter in the USA," International Association for Protection of Intellectual Property, Tokyo, Japan, June 2018

 "Role of IP on Innovation," Dolby Laboratories Legal Summit, April 19, 2018, Half Moon Bay, CA

Panelist, "*Aspirations Toward Attaining Effective, Global IP Protections*," 2018 Sedona Conference on International Patent Litigation, Reston, VA, February 27, 2018.

Moderator, "Phoenix Issue III – Is the current level of implementation of Section 101 supportive of having a strong patent system or has it gone too far? If it should be changed then what judicial and legislative actions regarding patent eligibility under Section 101 would best serve the patent system?" 2018 Leahy Institute of Advanced Patent Studies, Third Annual Naples Roundtable, February 19, 2018.

Keynote Speaker, "A View of Patent Law Issues From The Other Washington," Washington State Bar Association, Redmond, WA, January 17, 2018

Panelist, "Patent Practice Updates," Washington State Bar Association, Redmond, WA, January 17, 2018

Panelist, "The PTAB is Not an Article III Court: What Every IP Lawyer Should Know about Administrative Law," Pauline Newman American Inn of Court, Alexandria, VA, November 8, 2017

Moderator, "In Conversation on IP Litigation," San Francisco Intellectual Property Law Association Annual Seminar, Sonoma, CA, September 23, 2017

"Subject Matter Eligibility," AIPLA Webinar, Washington, DC, August 30, 2017

"Harmonization Efforts in Moving Forward," CASRIP Global Innovation Law Summit, Seattle, WA, July 14, 2017

"Subject Matter Eligibility," 2017 Bio International Convention, San Diego, CA, June 12, 2017

"Subject Matter Eligibility," Japan Patent Attorneys' Association (JPAA), Tokyo, Japan, June 12, 2017

"Subject Matter Eligibility," Japan Patent Attorneys' Association (JPAA), Osaka, Japan, June 13, 2017

"Subject Matter Eligibility," AIPPI/LES Chapters, Tokyo, Japan, June 14, 2017

"SEP – Value, Limitation, and Sensible Balance between Both," Japan Fair Trade Commission (JFTC), Tokyo, Japan, June 15, 2017

Keynote Address, National Hispanic Bar Association, Washington, DC, June 5, 2017

US.262092012.01

"Patent Trolls and Patent Legislation," BASF Corporation, Wilmington, DE, June 5, 2017

"What Counsel Needs to Know About Practice at USPTO," BASF Corporation, Wilmington, DE, June 5, 2017

Panelist, "The 101 Million Dollar Question:  Is it Patentable Subject Matter?," AIPLA Spring Meeting, San Diego, CA, May 17, 2017

Panelist, "Trump on IP Patent Reform," World IP Forum 2017, Bengaluru, India, April 26, 2017

Moderator, "The Rise of Sovereign Patent Funds: Implications on Patent Enforcement and Patent Assertion," World IP Forum 2017, Bengaluru, India, April 28, 2017

Keynote Address, Intellectual Property Summit, Salt Lake City, UT, February 24, 2017

Panelist, "Section 101 Issues," Naples Roundtable Patent Experts Conference, Naples, FL, January 16, 2017

Panelist, "Dialogue Between Bench and Bar," National CLE Conference, Snowmass, CO, January 7, 2017

Moderator, "Innovation, Quality, Enforceability: Systems," Federal Circuit Bar Association Global Series, Paris France, October 13, 2016

"*Inter Partes* Review – Current Issues, Policy, and Practice Tips," San Francisco Intellectual Property Law Association Annual Seminar, Sonoma, CA, September 17, 2016

"Subject Matter Eligibility," Center for Advanced Study and Research on Innovation Policy, University of Washington School of Law, Seattle, WA, July 22, 2016

"Subject Matter Eligibility," AIPPI, Tokyo, Japan, June 23, 2016

"What Counsel Needs to Know About Practice at USPTO, AIPPI, Tokyo, Japan, June 23, 2016

"Subject Matter Eligibility," JPAA, Tokyo, Japan, June 22, 2016

"What Counsel Needs to Know About Practice at USPTO, JPAA, Tokyo, Japan, June 22, 2016

"Subject Matter Eligibility," JIPA, Tokyo, Japan, June 21, 2016

"What Counsel Needs to Know About Practice at USPTO, JIPA, Tokyo, Japan, June 21, 2016

"Subject Matter Eligibility," JPAA, Osaka, Japan, June 20, 2016

"What Counsel Needs to Know About Practice at USPTO, JPAA, Osaka, Japan, June 20, 2016

"Subject Matter Eligibility," Heritage Foundation, Washington, DC, June 14, 2016

"Patent Subject Matter Eligibility and What Counsel Needs to Know About Practice at USPTO," Los Angeles Intellectual Property Law Association, San Diego, CA, June 11, 2016

Panelist, "Trade Agreements, the TPP, Intellectual Property and the New World of International Trade," 2016 Global Series:  Innovation and Trade, Federal Circuit Bar, May 13, 2016

"What GE Counsel Needs to Know About Practice at USPTO," General Electric Company, Washington, DC, April 20, 2016

US.262092012.01

Panelist, "The Patent Landscape: Economics of Enforceability and Licensing," 11th Annual Advance Patent Law Institute co-hosted by the USPTO, the University of Texas School of Law, and George Mason University School of Law, Alexandria, VA, March 20, 2016

"The Patent Landscape: Economics of Enforceability and Licensing," 11th Annual Advanced Patent Law Institute co-hosted by the USPTO, the University of Texas School of Law and George Mason University School of Law, Alexandria, VA, March 10, 2016

"What Counsel Needs to Know About Practice at USPTO," Cleveland Intellectual Property Law Association, Cleveland, OH, March 3, 2016

"An Examination of Changes to the U.S. Patent System and Impacts on America's Small Businesses," Testimony before the Senate Committee on Small Business and Entrepreneurship, Washington, DC, February 25, 2016

Panelist, "Phoenix Issues IV, (Topics ranged from how to limit the bad effects of recent decisions on patent subject matter eligibility to the effects of "proportionality" on discovery during litigation to patent quality", Naples Roundtable 2016 Patent Experts Conference, Naples, FL, February 15. 2016

"What Counsel Needs to Know About Practice at USPTO," ACPC Winter Meeting, Miami, FL, January 24-27, 2016

Keynote Speaker and Panelist, "Patent Drafting & Prosecution in Different Jurisdictions," 8th Global Intellectual Property Convention, New Delhi, India, January 7-9, 2016

"Future of Innovation in Medicine," University of Washington Law School, Seattle, WA, December 4, 2015

Moderator, "Innovation and IP Judicial Process Panel, Federal Circuit Bar Association" International Forum on Intellectual Property, and Trade 2015: Adjudication, Administration, and Innovation, Shanghai, China, October 20, 2015

Keynote Speaker "Patent Policy and Patent Legislative Developments" Funders of Intellectual Ventures, Seattle, WA, October 1, 2015

Keynote Speaker, "Tips for Getting Applications Allowed at the USPTO" Microsoft Patent Group and Outside Counsel, Microsoft Corporation, Seattle, WA, September 30, 2015

Panelist, panel focused on the effects recent cases and guidelines are having on the high-tech industries with respect to computer implemented inventions, FCBA World Intellectual Property Forum, Bangkok, Thailand, September 16, 2015

Panelist, "Alice vs. CLS Bank: Ramifications on Computer Implemented Invention and Business Method," FCBA World Intellectual Property Forum, Bangkok, Thailand, September 16, 2015.

Speaker, Inaugural Ceremony for the opening of the FCBA World Intellectual Property Forum, Bangkok, Thailand, September 15, 2015

Roundtable discussion on US policy to promote technology-based startups/entrepreneurships and the possible collaborations between US and Thailand in focusing the next generation on inventiveness, Thailand's Office of National Science Technology and Innovation Policy (NSTI), Bangkok, Thailand, September 14, 2015

"Practical Considerations for 101 and 102," Thammasat University, Bangkok, Thailand, September 14, 2015

"American Invents Act Trials at Patent Trial Appeal Board," Thammasat University, Bangkok, Thailand, September 14, 2015

Page 10 of 23

Panelist, "Challenging Software Business Method Patent Eligibility in Civil Actions & Post-Grant Review," CASRIP High Tech Summit, Seattle, WA, July 24, 2015

"Patent Legislative Initiatives and Likely Outcomes," Linn Inn of Court, Tokyo, Japan, June 25, 2015

"Patent Legislative Initiatives and Likely Outcomes" and "PTAB Developments and Advanced Post-Grant Strategies," AIPPI, Tokyo, Japan, June 25, 2015

"The Patentability of Software and Business Methods After the *Alice* Court Decision," "Patent Legislative Initiatives and Likely Outcomes," and "PTAB Developments and Advanced Post-Grant Strategies," JPAA, Tokyo, Japan, June 24, 2015

"The Patentability of Software and Business Methods After the *Alice* Court Decision," "Patent Legislative Initiatives and Likely Outcomes," and "PTAB Developments and Advanced Post-Grant Strategies," JPAA, Osaka, Japan, June 22, 2015

Presenter, "Patent Reform Seminar," IPWatchDog Inc. and Drinker Biddle & Reath LLP Webinar, June 12, 2015

"Patent Cases – Year in Review," San Francisco Intellectual Property Law Association, Healdsburg, CA, June 5-7, 2015

Speaker, "Emerging issues and careers in Intellectual Property," National Hispanic Bar Association (NHBA). Washington, DC, June 1, 2015.

Presenter, "Surviving Alice in the Age of Software Innovation," IPWatchDog, Inc., Drinker Biddle & Reath LLP, and Innography, Inc. Webinar, May 28, 2015

Panelist, "Issues related to needed legislative changes to the patent system and patent subject matter eligibility issues," Intellectual Property and Trade Seminar of the Federal Circuit Bar Association at the U.S. Chamber of Commerce, Washington, DC, May 11, 2015

"Patent Quality in Biotech and Chem," Biotech Chem® Partnership, United States Patent and Trademark Office, Alexandria, VA, April 7, 2015

"Patent Litigation After the America Invents Act," Catholic University of America Law Review Symposium, Washington, DC, March 27, 2015

"Back to the Future:  A History and Prediction for Software," Patent Law Institute, San Francisco, CA, March 16-17, 2015

Panelist and Speaker, "Putting Your Face on Technology Transfer-Why and How We All Need to Advocate for Your Profession," Association of University Technology Managers (AUTM) Annual Meeting, New Orleans, LA, February 22-25, 2015.

Panelist and Faculty Member on cutting-edge patent issues, University of Akron Law School Mid-Winter Patent Experts Conference, Naples, FL, February 9-10, 2015

"Back to the Future:  A History and Prediction for Software," Patent Law Institute, New York, NY, February 2-3, 2015

Testimony on "Subject Matter Eligibility," USPTO's Patent Eligibility Forum, Alexandria, VA, January 21, 2015

"Some Recent Issues in Patent Law in the U.S. on Patent Eligibility," 2015 World IP Forum, New Delhi, India, January 10, 2015

US.262092012.01

Roundtable on Patent Matter Subject Eligibility, George Mason University School of Law, Center for The Protection of Intellectual Property, Arlington, VA, December 11, 2014

Panelist, "Patent Prosecution: What Do I Do Now?" 52nd Annual Conference on Intellectual Property Law, Plano, Texas, November 2014

Moderator, "Enacting, Implementing, and Interpreting Patent Laws: Hypothetical 101 Reform," AIPLA 2014 Annual Meeting, Washington, DC - October 24, 2014

Moderator, "The International Intellectual Property System and Trade Policy" Panel, FCBA International Series, Geneva Switzerland, October 20, 2014

"Computer Software Inventions," Wisconsin Alumni Research Foundation Essential Topics Series, Madison, WI, September 23, 2014

"Patent Trolls and Patent Legislation," 2014 CASRIP High Technology Protection Summit, Seattle, WA, July 25-26, 2014

Roundtable on Patent Issues – JIPA, Tokyo, Japan, July 16, 2014

"American Invents Act Trials at Patent Trial Appeal Board," AIPPI, Tokyo, Japan, July 16, 2014

"American Invents Act Trials at Patent Trial Appeal Board," JPAA, Tokyo, Japan, July 15, 2014

"American Invents Act Trials at Patent Trial Appeal Board," JPAA, Osaka, Japan, July 14, 2014

Panelist, Silcon Valley Intellectual Property Law Association, Palo Alto, CA, June 9, 2014

"Patent Law: Year in Review," San Francisco Intellectual Property Law Association, Healdsburg, CA, June 6-8, 2014

"The America Invents Act Key Provisions (a former insider's view), HNBA/Microsoft IP Law Institute, Washington, DC, June 4, 2014

"Patent Trolls and Patent Legislation," BASF Corporation, Wilmington, DE, April 24, 2014

"Patent Practice at the USPTO: Tips and Recent Development," BASF Corporation, Wilmington, DE, April 24, 2014

"Patent Trolls and Patent Legislation," Pennsylvania Law Inn of Court, Philadelphia, PA, March 18, 2014

"Patent Practice at the USPTO: Tips and Recent Development, Johnson & Johnson, New Brunswick, NJ, March 17, 2014

"SEP and NPE/PAE," Ministry of Economy, Trade, and Industry, Tokyo, Japan, February 27, 2014

"SEP – Value, Limitation, and Sensible Balance Between Both," SEP Study Group, Ministry of Economy Trade, and Industry, Tokyo, Japan, February 26, 2014

Panelist, "Getting the Word Out - Technology Transfer Works" Panel, 2014 AUTM Annual Meeting, San Francisco, CA, February 19-21, 2014.

"Standard Essential Patents in the U.S.," The University of Texas School of Law 9th Annual Advanced Patent Law Institute, Alexandria, VA, January 23-24, 2014.

US.262092012.01

"Legislative and Administrative Patent Initiatives in the U.S. Relating to Patent Assertion Entities," IP Leadership Forum 2014, New Delhi, India, January 7-9, 2014.

"Patent Eligibility in an Unsettled Time," Practicing Law Institute Patent Briefing Series Web Ex, November 4, 2013

Panelist, "Patent Linkage System" Panel, 2013 Korea-U.S. IP Judicial Conference, COEX, Seoul, Korea, October 20-22, 2013.

Moderator, "IP-Related Legislation in the Two Systems" Panel, 2013 Korea-U.S. IP Judicial Conference, COEX, Seoul, Korea, October 20-22, 2013.

"Patent Practice at the USPTO: (Tips and Recent Developments) and the AIA Post-Grant Processes," Web Ex, IBM Corporation, October 15, 2013.

"Unity of Invention and Restriction Requirement in Different Jurisdictions," FICPI Open Forum Session 2.1, FICPI 14th Open Forum, Sorrento, Italy, October 2-5, 2013.

"A Former Insider's View to the Implementation of the AIA – Is It Working the Way It should or Are More changes Needed," All Ohio Annual Institute, Cincinnati & Cleveland, OH, September 26-27, 2013.

"Legislative and Administrative Patent Initiatives in the U.S.," Japan Patent Attorneys Associations, Tokyo and Osaka, Japan, August 29-30, 2013.

"Standard Essential Patents in the U.S.," Center for Advanced Study and Research on Intellectual Property, University of Washington, Seattle, WA, July 26, 2013.

"The America Invents Act Key Provisions (a former insider's view) - What the USPTO is Doing to Improve Examination," HNBA/Microsoft IP Law Institute, Washington, DC, July 11, 2013

"The America Invents Act Key Provisions (a former insider's view) - What the USPTO is Doing to Improve Examination," American Institute of Chemical Engineers Webinar, June 26, 2013

"Four Case of the Apocalypse," San Francisco Intellectual Property Law Association, Healdsburg, CA, June 8, 2013

"Patent Practice At The USPTO (Tips and Recent Developments)," Shiga International Patent Office, Tokyo, Japan, May 28, 2013

Moderator, "Innovation and Trade – Best Practices in the Patent, Trademark, Copyright, and Procurement Subject Matter Areas," Federal Circuit Bar Association, Washington, DC, May 13, 2013

"Effective Responses to Patent Trolls:  We Can Cross That Bridge," Drinker Biddle & NERA Consulting Program, Palo Alto, CA, May 8, 2013

"Some Recent Issues in Patent Law in the U.S. on Patent Eligibility," AIPLA Spring Meeting, Seattle, WA, May 2, 2013

"U.S. Patent Board Information," International Association for the Protection of Intellectual Property (AIPPI), Tokyo, Japan, April 17, 2013

Keynote Address at the Inaugural Ceremony of the Tokyo IP American Inn of Court, Tokyo, Japan, April 16, 2013.

"The America Invents Act, Key Provisions (Issues Resolved and Unresolved)," The Center for American and International Law Advanced Practice Under the America Invents Act Conference, Dallas, TX, April 11-12, 2013

Panelist for 28th Annual Intellectual Property Law Conference, "Copyright Infringement in Patent Prosecution:  Might Your Firm Be the Next Litigation Target?" Arlington, VA, April 3-5, 2013

Page 13 of 23

US.262092012.01

*"The America Invents Act, Key Provisions (a former insider's view) & Tips on U.S. Patent Office Practice,"* Michigan State Bar 2013 Intellectual Property Law Spring Seminar, East Lansing, MI, March 25, 2013

*"Patents in an Age of Software,"* The George Washington University Law School, Washington, DC, March 20, 2013

*"The America Invents Act, Key Provisions (a former insider's view) & Tips on U.S. Patent Office Practice,"* Cummins, Inc. WebEx, March 6, 2013

"First-Inventor-to-File: New USPTO Rules & Examiner Guidelines," Law Seminars International Telebriefing, March 4, 2013

Panelist for Capitol Hill Briefing, "Capitalizing on Technology Innovation High-Quality Software Patents and Manufacturing Growth," Sponsored by BSA, The Software Alliance, and the National Association of Manufacturers, Washington, DC, February 21, 2013

*"The America Invents Act, Key Provisions (a former insider's view) & Tips on U.S. Patent Office Practice,"* Chemical Heritage Foundation, Philadelphia, February 14, 2013

"Patentable Subject Matter Related to the Life Sciences," Syngenta Biotechnology, Inc., February 13, 2013

"Technical Corrections to the America Invents Act," Naples Midwinter Patent Law Experts Conference, Naples, FL, February 5, 2013

*"The America Invents Act, Key Provisions (a former insider's view) & Tips on U.S. Patent Office Practice,"* 2013 Global IP Convention, Bangalore, India, January 30, 2013

"The America Invents Act – What You Need to Know Now," 2013 National CLE Conference, Snowmass Village, CO, January 4, 2013

*"The America Invents Act, Key Provisions (a former insider's view) & Tips on U.S. Patent Office Practice,"* Air Products and Chemicals, Inc., Allentown, PA, December 11, 2012

*"The America Invents Act, Key Provisions (a former insider's view) & Tips on U.S. Patent Office Practice,"* International Association for the Protection of Intellectual Property (AIPPI), Tokyo, Japan, December 7, 2012

"Patent Prosecution at the USPTO: Tips and Recent Development," Shiga International Patent Office, Tokyo, Japan, December 6, 2012

"Overcoming the Challenges and Grasping the Opportunities Presented by Post-Grant Review and Inter Partes Review," 14th Advanced Forum on Biotech Patents, Boston, MA, November 29, 2012

"The America Invents Act, Key Provisions (a former insider's view) & Tips on U.S. Patent Office Practice," Hogarth Chambers' Patent Seminar, London, England, November 14, 2012

"The America Invents Act, Key Provisions (a former insider's view) & Tips on U.S. Patent Office Practice," Philadelphia Intellectual Property Law Association Meeting, Philadelphia, PA, October 23, 2012

"The America Invents Act (a former insider's view)," Murata Manufacturing Co., Ltd., Kyoto, Japan, October 19, 2012

"The America Invents Act, Key Provisions (a former insider's view) & Tips on U.S. Patent Office Practice," Aoyama & Partners, Osaka, Japan, October 17, 2012

"The America Invents Act, Key Provisions (a former insider's view) & Tips on U.S. Patent Office Practice," Shiga International Patent Office, Tokyo, Japan, October 9, 2012

US.262092012.01

"Intellectual Property Rights," Panel speaker at "Intellectual Properties Rights," STS Forum, Kyoto, Japan, October 8, 2012

"Overview of the America Invents Act," SCA Hygiene Products AB, Mölndal, Sweden, September 19, 2012

"Discussion of considerations on what drove enactment of America Invents Act," Panel Member for Federal Circuit Bar Association Global Fellows Program, Washington, DC, September 11, 2012

"Overview of the New Rules," Seminar for the Japan Patent Attorneys Association on The Leahy Smith America Invents Act, Tokyo, Japan, September 7, 2012

"Overview of the New Rules," Seminar for the Japan Patent Attorneys Association on The Leahy Smith America Invents Act, Osaka, Japan, September 6, 2012

"An Insider's View of the America Invents Act," Baxter Healthcare Corporation, Deerfield, IL, August 9, 2012

"An Insider's View of the America Invents Act," Motorola Mobility, Libertyville, IL, August 2, 2012

"First Inventor to File," Center for Advanced Study and Research in Intellectual Property (CASRIP), University of Washington, 2012 High Technology Summit Conference, Seattle, WA, July 27-28, 2012

Panel speaker on America Invents Act, Association of Corporate Patent Counsel Meeting, Beaverton, CO, June 27, 2012

"Key Provisions of the First Year of the America Invents Act," LG Electronics, Seoul, South Korea, June 21, 2012

"Key Provisions of the First Year of the America Invents Act," LG Display, Seoul, South Korea, June 21, 2012

"Key Provisions of the First Year of the America Invents Act," Lee International Law Firm, Seoul, South Korea, June 20, 2012

"Key Provisions of the First Year of the America Invents Act," Samsung Electronics, Suwon, South Korea, June 19, 2012

"Key Provisions of the First Year of the America Invents Act," Darae Law & Patent Firm, Seoul, South Korea, June 18, 2012

"Key Provisions of the First Year of the America Invents Act," Presentation to Murgitroyd & Co. and invited guests at the National History Museum, London, England, June 16, 2012

"Key Provisions of the First Year of the America Invents Act," Various law firms in London, England, June 11, 2012

"Key Provisions of the First Year of the America Invents Act," San Francisco Intellectual Property Law Association, Healdsburg, CA, June 3, 2012

Panel Speaker at the US-China Intellectual Property Adjudication Conference Sponsored by the China Law Society and The Federal Circuit Bar Association, Beijing, China, May 28-30, 2012

"Key Provisions of the First Year of the America Invents Act," San Diego Intellectual Property Law Association, San Diego, CA, May 24, 2012

"An Insider's View of the America Invents Act," BASF, Florham Park, NJ, May 23, 2012

"Key Provisions for the First Year of the America Invents Act," Bristol-Myers Squibb, Lawrenceville, NJ, May 22, 2012

Page 15 of 23

US.262092012.01

"The American Invents Act and Its Impact on Patent Litigation," 4th Annual Corporate IP Counsel Forum, New York, NY, May 16, 2012

Law Practice Management/Women in IP Law Joint Breakfast Meeting, American Intellectual Property Law Association Spring Meeting 2012, May 11, 2012

"The America Invents Act – Key Provisions for the First Year of the America Invents Act," Lutron Electronics Co., Coopersburg, PA, April 19, 2012

"Navigating the New AIA Rules from an Insider's Perspective," Delaware Valley Corporate Counsel Association, Philadelphia, PA, April 16, 2012

"Key Provisions for the First Year of the America Invents Act," Wisconsin Alumni Research Foundation, University of Wisconsin, Madison, WI, April 12, 2012

Discussion Panel Member, William Mitchell College of Law, Minneapolis, MN, April 9, 2012

"Inventing the Future: What you Really Need to Know About Patent Reform," The Association of Corporate Counsel, Chicago, IL, April 5, 2012

"American Invents Act: Overview and Update," 6th Annual Philadelphia Bar Association, Intellectual Property Law Institute, Philadelphia, PA, March 29, 2012

"USPTO Activities and the America Invents Act," Managing Intellectual Property, live broadcast at the Willard Hotel, Washington, DC, March 27, 2012

"USPTO Activities and the America Invents Act," 6th Annual Patent Law Institute, San Francisco, CA, March 19, 2012

"Issues related to implementing the America Invents Act," Licensing Executives Society, Tokyo, Japan, March 9, 2012

"Medical Patents – Recent Developments in the USA," Meiji University, Tokyo Japan, March 8, 2012

"Post Grant Procedures of the American Invents Act," Osaka, Japan, March 6, 2012

"Post Grant Procedures of the American Invents Act," Tokyo, Japan, March 5, 2012

"USPTO Activities and the America Invents Act," 6th Annual Patent Law Institute, New York, NY, February 12-17, 2012

"The Comprehensive Guide to Patent Reform for Life Science Companies," American Conference Institute on Patent Reform for Life Sciences Companies, New York, New York, January 31-February 1, 2012

"USPTO Overview and The America Invents Act," Midwinter meeting of the American Intellectual Property Law Association, Las Vegas, NV, January 23-25, 2012

"America Invents Act Post Grant Procedures – Implications & Strategies for In-House Counsel," Midwinter meeting of the Association of Corporate Patent Counsel, San Diego, CA, January 15-18, 2012

"PTO Year in Review," 22nd Annual Conference on USPTO Law and Practice, USPTO Day, December 5, 2011
"The Status of the U.S. Patent and Trademark Office and the State of U.S. Patent Law," New York State Bar Association: Intellectual Property Law Section, November 22, 2011

Page 16 of 23

US.262092012.01

"The America Invents Act:  Perspectives from the PT0 and the Bar," Washington, DC, Bar Association, November 9, 2011

"The Status of the U.S. Patent and Trademark Office and The State of U.S. Patent Law," Biotechnology Industry Organization Intellectual Property Counsels Committee Conference, November 3, 2011

"Patent Reform-What it Means to You," BIOCOM, October 27, 2011

"Overview of the U.S. Patent and Trademark Office with Update on Initiatives and How the New America Invents Act Relates to Operations," American Intellectual Property Law Association Annual Meeting: Patent Agents/Patent Relations with the USPTO Joint Committee Meeting, October 21, 2011

"Breakout Session III: Recent Trends in Patent Law- Chances for Transatlantic Cooperation," The 5th Transatlantic Market Conference, October 17, 2011

"A World in Change – Changing IPR Changing the Intellectual Property Systems in Order to Meet Tomorrow's Needs for Global Businesses? A U.S. Perspective," Norwegian Industrial Property Office, October 12, 2011

"The America Invents Act Discussion of Provisions and Enactment Timelines," Chief Housewares Executives Shoer Session, Chicago, IL, October 5, 2011

"The America Invents Act Discussion of Provisions and Enactment Timelines," Got Invention Radio Show hosted by Brian Fried, September 29, 2011

"The America Invents Act Discussion of Provisions and Enactment Timelines," Webinar, September 27, 2011

"Programs and Processes within the U.S. Patent and Trademark Office to Support Applicants and Practitioners," Virginia State Bar Association Intellectual Property Law Section, September 23, 2011

"A Discussion of the America Invents Act," The 21st All Ohio Annual Institute on Intellectual Property, September 21, 2011

"Patentability and Patentable Subject Matter; Discussion of Pivotal Court Cases," Intellectual Property Owners Association 2011 Annual Meeting, Los Angeles, CA, September 13, 2011

Patent Public Advisory Committee – Patent Remarks, Patent Public Advisory Committee, September 1, 2011

"A Conversation with the President's Council on Jobs and Competitiveness:  Innovation Drives Economic Growth and Job Creations," President's Council on Jobs and Competitiveness, August 19, 2011

"Discussion of Intellectual Property and the U.S. Patent and Trademark Office Processes and Operations," Korean-American Scientists and Engineers Association; USKorea Conference on Science, Technology and Entrepreneurship, August 13, 2011

2011 American Bar Association Annual Meeting, American Bar Association, August 5, 2011

"Overview of the U.S. Patent and Trademark Office with an Update on Initiatives," Intellectual Property Management and Monetization Forum, July 24, 2011

"Overview of the U.S. Patent and Trademark Office with an Update on Initiatives," China Intellectual Property Symposium 2011, International Federation of Intellectual Property Attorneys and All China Patent Attorneys Association, Shanghai, China, June 23, 2011

"Managing Intellectual Property China-International Intellectual Property Forum: "Bilski Guidance and USPTO Overviews," Managing Intellectual Property China, June 22, 2011

US.262092012.01

"Supplementary Examination Guidelines for Determining Compliance with 35 U.S.C. § 112: Berkeley Conference for Improving the Interface between the USPTO and the Federal District Courts" (Speaker=Robert Bahr), Berkeley Center for Law and Technology, June 7, 2011

"Overview of the U.S. Patent and Trademark Office with an Update on Initiatives," San Francisco Intellectual Property Law Association Spring Seminar 2011, June 4, 2011

"Overview of the U.S. Patent and Trademark Office with an Update on Initiatives," Minnesota Intellectual Property Law Association, May 23, 2011

American Intellectual Property Law Association 2011 Spring Meeting (Speaker=Teresa Stanek Rea), American Intellectual Property Law Association, May 13, 2011

"Overview of the U.S. Patent and Trademark Office with an Update on Initiatives," Florida Bar's 2nd Annual Intellectual Property Symposium, April 15, 2011

"Overview of the U.S. Patent and Trademark Office with an Update on Initiatives," IP Law European Summit 11, Montreux, Switzerland, April 10, 2011

"Overview of the U.S. Patent and Trademark Office with an Update on Initiatives," Bay Area In-house Medical Device Attorneys (GAIMA), Palo Alto, California, April 6, 2011

"Overview of the U.S. Patent and Trademark Office with an Update on Initiatives," San Francisco Intellectual Property Law Association, April 5, 2011

"Overview of the U.S. Patent and Trademark Office with an Update on Initiatives," The 6th Annual Patent Law Institute, San Francisco, CA, March 19-20, 2011

"Overview of the U.S. Patent and Trademark Office with an Update on Initiatives," Biotechnology/Chemical/Pharmaceutical Customer Partnership Meeting, March 2, 2011

"Overview of the U.S. Patent and Trademark Office with an Update on Initiatives," The 5th Annual Global Intellectual Property Exchange International Quality and Productivity Center, March 1, 2011

"Overview of the U.S. Patent and Trademark Office with an Update on Initiatives," The 6th Annual Patent Law Institute, New York, New York, February 16-17, 2011

"Overview of the U.S. Patent and Trademark Office," American Intellectual Property Law Association Mid-Winter Institute, February 3, 2011

"Overview of the U.S. Patent and Trademark Office with an Update on Initiatives," American Bar Association Intellectual Property Law Section: Mid-Winter Leadership Conference, January 31, 2011

"The America Invents Act:  Discussion of Provisions and Enactment Timelines," Washington State Patent Law Association, Seattle, WA, January 19, 2011

## LIST OF CASES WHERE ROBERT L. STOLL HAS SERVED AS AN EXPERT WITNESS

1.    Fujitsu Limited v. **Tellabs Operations, Inc. and Tellabs, Inc.**  (Civil Action No. 1:08-cv-03379), United States District Court for the Northern District of Illinois Eastern Division. [report & deposition]

2.    TiVO, Inc. v. **Verizon Communications, Inc.**  (Civil Action No. 2:09-cv-257-JRG), United States District Court for the Eastern District of Texas Marshall Division. [report & deposition]

Page 18 of 23

US.262092012.01

3.      **The Toro Company** v. MTD Products Inc., MTD Consumer Group Inc., Cub Cadet LLC (Civil Action No. 10-cv-00756-JNE-FLN), United States District Court, District of Minnesota [report & deposition]

4.      Innovative Sonic Limited v. **Research in Motion Limited and Research in Motion Corporation** (Civil Action NO. 3:11-cv-00706-K), United States District Court, Northern District of Texas, Dallas Division [report & deposition]

5.      **Motorola Mobility, Inc. and General Instrument Corporation** v. TiVo Inc**.** (Civil Action No. 5:11-cv-00053-MHS-CMC), United States District Court, Eastern District of Texas, Texarkana Division [report and deposition]

6.      TracBeam L.L.C. v. **AT&T, et al.** (Consolidated Case Nos. 6:11-cv-00096-LED and 6:12-cv-00058-LED), United States District Court for the Eastern District of Texas, Tyler Division [report and deposition]

7.      Complainants Interdigital Communications, Inc.; Interdigital Technology Corporation; IPR Licensing, Inc.; and Interdigital Holdings, Inc. v. Respondents **Nokia Corporation/Nokia Inc.** in the Matter of Certain Wireless Devices With 3G and/or 4G Capabilities and Components Thereof – USTC Investigation No. 337-TA-868, United States International Trade Commission, Washington, DC [report and deposition]

8.      In Re:  **TransData, Inc.** Smart Meters Patent Litigation (Case No. 5:12-ml-02309-C), United States District Court for the Western District of Oklahoma [report and deposition]

9.      Vital Needs International, L.P., v. **Kinetic Concepts, Inc. and KCI Licensing, Inc.** (No. 70 122 Y 00575 13) American Arbitration Association [report, deposition, and testimony]

10.     **Regeneron Pharmaceuticals, Inc**., v. Merus B.V. (14-CV-1650 (KBF) (rel. 14-CV-1651 (KBF), United States District Court for the Southern Distrit of New York [report and deposition]

11.     **Magna Electronics Inc.** v. TRW Automative Holdings Corp., et al (1:12-cv-00654) United District Court for the Western District of Michigan [report and deposition]

12.     **ShieldMark, Inc.** v. Creative Safety Supply, LLC (1:12 cv-00221-CAB) United States District Court Northern District of Ohio Eastern Division [report and deposition]

13.     Adaptix, Inc. v. **Alcatel-Lucent USA, Inc., *et al*** (12-CV-22) United States District Court, Eastern Division of Texas, Tyler Division [report, deposition, and testimony]

14.     **Genband US LLC** v. Metaswitch Networks Corp., ET AL (2:14-cv-33-JRG-RSP) United States District Court for the Eastern District of Texas, Marshall Division [report and deposition]

15.     TracBeam, L.L.C. v. **T-Mobile US, Inc. and T-Mobile USA, Inc.** (6:14-cv-678-RWS Lead Case) United States District Court, Eastern Division of Texas, Tyler Division [report and deposition]

16.     Chrimar Systems, Inc., *et al.* v. **ADTRAN, Inc., *et al*** (6:15-cv-00618-JRG-JDL Lead Case) United States District Court, Eastern Division of Texas, Tyler Division [report for **D-Link Systems, Inc.]**

17.     **Western Plastics, Inc.** v. DuBose Strapping, Inc. (5:15-cv-00294-D) United States District Court, Eastern District of Norther Carolina, Western Division [report and deposition]

18.     Monkey Media, Inc. v. **Buena Vista Home Entertainment, Inc., d/b/a Walt Disney Studios Home Entertainment, Twentieth Century Fox Home Entertainment, LLC, Lions Gate Entertainment, Inc., Paramount Pictures Corporation**, Sony Pictures Home Entertainment, Sony Electronics Inc., Sony Computer Entertainment America LLC, **Warner Home Video, Inc**., and **Universal Studios, Inc.** (1:10-CV-00533) United States District Court for the Western District of Texas, Austin Division [report]

US.262092012.01

19.    **Luminara Worldwide, LLC**, v. Liown Electronics Ltd., Shenzhen Liown, Electronics Co. Ltd., Liown, Technologies/Beauty Electronics, LLC, RAZ Imports, Inc., M&B Products, LLC, Boston Warehouse Trading Corp., The Light Garden, Inc., and Central Garden & Pet Co. (15-cv-3028-SRN-FLN, United States District Court District of Minnesota [report and deposition]

20.    **Westlake Services, LLC, d/b/a Westlake Financial Services** v. Credit Acceptance Corporation (2:15-cv-07490 SJO (MRWx), United States District Court, Central District of California, Western Division [report and deposition]

21.    **Samson Lift Technologies, LLC** v. Jerr-Dan Corporation, a/k/a Jerrdan Corporation, and Oshkosh Corporation (Index No. 653586/2011), Supreme Court of the State of New York, New York County [report and deposition]

22.    Claudio de Simone v. **VSL Pharmaceuticals, Inc.,** Leadiant Biosciences, Inc., and Alphasigma USA, Inc. v. Exegi Pharma, LLC, and Danisco USA, Inc. (Civil Action No. 8:15-cv-01356-TDC), United States District Court for the District of Maryland, Southern Division [report]

23.    Inline Packaging, LLC v. **Graphic Packaging International, Inc.** (Case No. 0:15-cv-03183-ADM-LIB), United States District Court for the District of Minnesota [report and deposition]

24.    Apple, Inc. v. **Wi-Lan, Inc**. (Case No. 14-cv-2235-DMS (BLM), United States District Court for the Southern District of California [report and deposition]

25.    Mondis Technology Ltd. v. **LG Electronics, Inc. and LG Electronics, USA, Inc.** (Civil Action No.  15-cv-4431 (SRC)(CLW)), United States District Court for the District of New Jersey [report and deposition]

26.    Galas v. **Alere Inc.** (Case No. 37-2017-00016861-CU-BC-CTL), Superior Court of the State of California County of San Diego, Central Division [deposition]

27.    Fontem Holdings 1 B.V. et al. v. **R.J. Reynolds Vapor Company**. Civil Action Nos.: 1:16-cv-01255 United States District Court for the Middle District of North Carolina [Settled before Report]

28.    In the Matter of Certain Blow-Molded Bag-In-Container Devices, Associated Components and End Products Containing or Using Same (Investigation No. 337-TA-1115), United States International Trade Commission – **InBev** v. Heineken [report and deposition]

29.    In the Matter of Certain Beverage Dispensing Systems and Components Thereof (Investigation No. 337-TA-1130), United States International Trade Commission - Heineken v. **InBev** [report, deposition, and testimony]

30.    **Pavo Solutions, LLC** v. Kingston Technology Company, Inc. (Case No. 8:14-cv-01352-JLS- KES), United States District Court for the Central District of California [report and deposition]

31.    **Endo Pharmaceuticals, Inc.** v. Lupin Atlantis Holdings SA and Lupin, Inc. (Civil Action No. 18-10952 (FLW)(TJB)), United States District Court, District of New Jersey [report]

32.    In the Matter of an Arbitration Under the Rules of Arbitration of the International Chamber of Commerce between Phibro Animal Health Corporation (U.S.A.) and Abic Biological Laboratories Ltd. (Israel) - Claimants and **Merial SAS (France) - Respondent** ICC Arbitration No. 23306/MK [report and testimony]

33.    Finjan, Inc. v. **Juniper Networks, Inc.** (Case No. 3:17 cv-05659-WHA), United States District Court Northern District of California San Francisco Division [report]

34.    **Edgewell Personal Care Brands LLC** and International Refills Company, Ltd. v. Munchin, Inc. (Case No. 2:18-CV-03005-PSG-JPR), United States District Court Central District of California Western Division [report and deposition]

Page 20 of 23

35.     Portus Singapore PTE LTD v. **Kenyon & Kenyon LLP** (Case No. 1:16-cv-06865-JGK), United States District Court, Southern District of New York [report and deposition]

36.     Palomar Technologies, Inc. v. **MRSI Systems, LLC** (Civil Action No. 1:18-cv-10236-FDS), United States District Court for the of Massachusetts [report, deposition, and testimony]

37.     Finjan Inc. v. **Bitdefender Inc., Bitdefender S.R.L.** (Case No. 4:17-cv-04790-HSG), United States District Court, Northern District of California, Oakland Division [report and deposition]

38.     Deep Fix LLC v. **Marine Well Containment Company** (Civil Action No. 4:18-cv-948), United States District Court for the Southern District of Texas, Houston Division [report and Trial]

39.     **Shire Viropharma Incorporated** v. CSL Behring LLC and CSL Behring GmbH (C.A. No. 17-414 (MSG) Consolidated), United States District Court for the District of Delaware [report and Deposition]

40.     **Glaukos Corporation** v. Ivantis, Inc. (Civil Action No. 8:18-cv-00620-JVS-JDE), United States District Court for the Central District of California [report and deposition]

41.     MV3 Partners LLC v. **Roku, Inc.** (Case No. 6:18-cv-00308), United States District Court for the Western District of Texas [report and deposition]

42.     **Mitsubishi Tanabe Pharma Corporation**, Janssen Pharmaceuticals Inc., Janssen Pharmaceutica NV, Janssen Research and Development, LLC, and CILAG GMBH International v. Sandoz Inc. et al. (Civil Action No. 17-5319(FLW)(DEA)), (Civil Action No. 17-6375(FLW)(DEA)), (Civil Action No. 17-12082(FLW)(DEA)), (Civil Action No. 18-112(FLW)(DEA)) (Consolidated), United States District Court District of New Jersey [deposition and trial]

43.     **Personalized Media Communications** v. Google, LLC (Case 219-cv-0090), United States District Court for the Eastern District of Texas, Marshall Division [report and deposition]

44.     **Maxell, Ltd.** v. Apple, Inc. (Case No. 5:19-cv-0003), United States District Court, Eastern District of Texas, Texarkana Division [report and deposition]

45.     **TecSec, Inc.** v. International Business Machines Corp. (Civil Action No. 1:10-CV-115-LOTCB), United States District Court, Eastern District of Virginia, Alexandria Division [report and deposition]

46.     **Vivint, Inc.** v. Alarm.com Inc. (Case No. 2:15-cv-00392-CW-BCW), United States District Court for the District of Utah, Central Division [report and deposition]

47.     MQ Gaming LLC and Creative Kingdoms Technologies LLC v. **Lego Systems, Inc., Lego Brand Retail, Inc., Warner Bros. Home Entertainment Inc., Warner Bros. Interactive Entertainment Inc. and WB Games Inc.** (Case No. 1:19-cv-00905-MN), United States District Court for the District of Delaware [report]

48.     **Freshub Inc. and Freshub Ltd.** V. Amazon.com Inc., Amazon.com Services LLC, Prime Now LLC, and Whole Foods Market Services Inc. (Case No. 1:19-cv-00885-ADA), United States District Court for the Western District of Texas, Austin Division [report]

49.     **Huawei Technologies Co. Ltd.** V. Verizon Communications Inc., Verizon Business Network Services, Inc., Verizon Enterprise Solutions LLC, Cellco Partnership d/b/a Verizon Wireless Inc., Verizon Data Services LLC, Verizon Business Global LLC and Verizon Services Corp. (Case No. 2:20-cv-00030), United States District Court for the Eastern District of Texas, Marshall Division [report]

50.     Capella Photonics Inc. v. **Infinera Corporation, et al.** (Case No. 2:20-cv-0077-JRG), United States District Court for the Eastern District of Texas, Marshall Division [report]

US.262092012.01

51.   Hi-Dow International Inc. and Eric Chen v. **Harness, Dickey & Pierce, PLC**, and Bryan Wheelock (Case No. 01-20-0005-3647), American Arbitration Association [report and deposition]

52.   **Personalized Media Communications** v. Netflix, Inc. (Case No. 1:20-cv-03708), United States District Court for the Southern District of New York [report]

53.   **Huawei Technologies Co., Ltd., Huawei Device Co., Ltd., and Huawei Digital Technologies (Chengdu) Co., Ltd.** v. Verizon Communications, Inc., Cellco Partnership d/b/a Verizon Wireless and Verizon Business Network Services Inc. (Case No. 6:20-cv-090-ADA), United States District Court for the Western District of Texas, Waco Division [report]

54.   Shure Inc. v. **ClearOne, Inc.** (Case No. 1:17-cv-03078), United States District Court for the Northern District of Illinois [rebuttal report and deposition]

55.   **Natera, Inc.** v. Archerdx, Inc., Archerdx LLC, and Invitae Corp. (Case No. 1:20-cv-00125), United States District Court for the District of Delaware [rebuttal report and deposition]

56.   **Chiesi USA, Inc. and Chiesi Farmaceutici SPA** v. Aurobindo Pharma USA, Inc. and Aurobindo Pharma Ltd. (Case No. 3:19-cv-18756-FLW-LHG), United States District Court for the Central District of New Jersey [rebuttal report, deposition and trial]

57.   In the Matter of: Certain Fitness Devices, Streaming Components Thereof, and Systems Containing Same (Investigation No. 337-TA-1265), United States International Trade Commission – DISH DBS Corporation et al. v. **Peloton Interactive, Inc.** et al. [report, deposition, and trial]

58.   Bausch Health Ireland Limited, et al. v. **Padagis Israel Pharmaceuticals Limited**, et al. (Case No. 2:20-cv-05426), Untied States District Court for the District of New Jersey [report]

59.   **Palantir Technologies, Inc.** v. Marc L. Abramowitz et al. (Case No. 5:19-cv-06879), United States District Court for the Northern District of California [report & deposition]

60.   United States of America v. **Gilead Sciences, Inc. and Gilead Sciences Ireland UC** (Case No. 19-02103-MN), United States District Court for the District of Delaware; **Gilead Sciences Inc.** v. United States of America (Case No. 20-499C-CFL), United States Court of Federal Claims [reports and depositions]

61.   In the Matter of: Certain Light-Based Physiological Measurement Devices and Components Thereof (Investigation No. 337-TA-1276), United States International Trade Commission – **Masimo Corporation and Cercacor Laboratories, Inc.** v. Apple Inc. [report, deposition, and testimony]

62.   Stoller Enterprises, Inc. v. **Fine Agrochemicals Ltd., Fine Americas, Inc., CJB Industries, Inc. and Vivid Life Sciences, LLC** (Case No. 4:20-cv-00750), United States District Court for the Southern District of Texas, Houston Division [report and deposition]

63.   Pact XXP AG v. **Intel Corporation** (Case No. 1:19-cv-01006-RGA), United States District Court for the District of Delaware [report and deposition]

64.   **Zest Labs, Inc. f/k/a Intelleflex Corporation and Ecoark Holdings, Inc.** v. Walmart Inc. f/k/a Wal-Mart Stores, Inc. (Case No. 4:18-cv-500-JM), United States District Court for the Eastern District of Arkansas, Central Division [report]

65.   StratosAudio, Inc. v. **Subaru of America, Inc.** (Case No. 6:20-cv-1128-ADA), United States District Court for the Western District of Texas, Waco Division [report and deposition]

66.   C&M Oilfield Rentals, LLC d/b/a C-MOR Energy Services v. **Apollo Lighting Solutions, Inc. and Cleantek Industries, Inc.** (Case No. 6:21-cv-00544-ADA), United States District Court for the Western District of Texas, Waco Division [report and deposition]

US.262092012.01

67.    Clifford A. Lowe, et al. v. **ShieldMark, Inc.** et al (Case No. 1:19-cv-00748), United States District Court for the Northern District of Ohio, Eastern Division [report]

68.    **Allergan, Inc.**, Opposition Against European Patent (EP Patent No. 3 068 403) [declaration]

69.    In the Matter of: Certain Knitted Footwear (Inv. No. 337-TA-1289), United States International Trade Commission – Nike Inc. v. **adidas AG, adidas North America, Inc., adidas America, Inc., and adidas International Trading AG** [report and deposition]

70.    MasterObjects, Inc. v. **Meta Platforms, Inc.** (Case No. 3:21-cv-05428-WHA), United States District Court for the Northern District of California, San Francisco Division [report and deposition]

71.    Global Tubing, LLC v. **Tenaris Coiled Tubes, LLC and Tenaris, S.A.** (Case No. 4:17-cv-03299), United States District Court for the Southern District of Texas, Houston Division [report and deposition]

72.    Oxygenator Water Technologies, Inc. v. **Tennant Company** (Case No. 0:20-cv-00358), United States District Court for the District of Minnesota [report]

73.    SB IP Holdings LLC v. **Vivint, Inc.** (Case No. 4:20-cv-00886), United States District Court for the Eastern District of Texas, Sherman Division [report]

US.262092012.01

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EIS, INC.,

       Plaintiff,

       v.

INTIHEALTH GER GMBH, WOW TECH USA, LTD., WOW TECH CANADA, LTD. AND NOVOLUTO GMBH,

       Defendants.

Civil Action No. 19-1227 (GBW) (MPT)

NOVOLUTO GMBH,

       Counterclaimant,

       v.

EIS, INC., EIS GMBH,
TRIPLE A IMPORT GMBH,
and TRIPLE A MARKETING GMBH

       Counterclaim Defendants.

## PLAINTIFF AND COUNTERCLAIM–DEFENDANTS'
## ELECTION OF PRIOR-ART-BASED INVALIDITY ARGUMENTS

In accordance with the Scheduling Order (D.I. 288, ¶ 1) and the Stipulation and Order Extending Certain Case Deadlines (D.I. 299), Plaintiff EIS, Inc., and Counterclaim–Defendants EIS GmbH, Triple A Import GmbH, and Triple A Marketing GmbH (collectively, "EIS") hereby elect the below asserted prior art and prior-art-based invalidity arguments.  As provided in the Scheduling Order (D.I. 288, ¶ 1 n.3), the elected prior art below does not extend to or include prior art references used to illustrate the state of the art, the knowledge possessed by a person of ordinary skill, to address alleged secondary considerations, for any other context surrounding obviousness for which prior art is commonly introduced in a patent trial, with respect to any damages theory, or for any purpose in connection with any claim or defense other than anticipation or obviousness.

## I.    U.S. PATENT NO. 9,763,851

| Claim | EIS's Election of Prior-Art-Based Invalidity Arguments |
|---|---|
| 1 | <ul><li>Yang – Obviousness</li><li>Eros & Yang – Obviousness</li><li>Guan & Yang – Obviousness</li><li>Guan & Hovland – Obviousness</li></ul> |
| 2 | <ul><li>Yang – Obviousness</li><li>Eros & Yang – Obviousness</li><li>Guan & Yang – Obviousness</li><li>Guan & Hovland– Obviousness</li></ul> |
| 4 | <ul><li>Yang – Obviousness</li><li>Eros & Yang – Obviousness</li><li>Guan & Yang – Obviousness</li><li>Guan & Hovland – Obviousness</li></ul> |
| 5 | <ul><li>Yang – Obviousness</li><li>Eros & Yang – Obviousness</li><li>Guan & Yang – Obviousness</li><li>Guan & Hovland – Obviousness</li></ul> |
| 6 | <ul><li>Yang – Obviousness</li><li>Eros & Yang – Obviousness</li><li>Guan & Yang – Obviousness</li><li>Guan & Hovland – Obviousness</li></ul> |

## II.    U.S. PATENT NO. 11,090,220

| Claim | EIS's Election of Prior-Art-Based Invalidity Arguments |
|---|---|
| 1 | • Witt – Anticipation<br>• Yang & Hovland – Obviousness<br>• Robert & Yang & Hovland – Obviousness<br>• Guan & Hovland – Obviousness |
| 3 | • Witt – Anticipation<br>• Yang & Hovland – Obviousness<br>• Robert & Yang & Hovland– Obviousness<br>• Guan & Hovland – Obviousness |
| 4 | • Witt – Anticipation<br>• Yang & Hovland – Obviousness<br>• Robert & Yang & Hovland – Obviousness<br>• Guan & Hovland – Obviousness |
| 16 | • Witt & Makower 744– Obviousness<br>• Yang & Hovland & Makower 744 – Obviousness<br>• Robert & Yang & Hovland & Makower 744 – Obviousness<br>• Guan & Hovland & Makower 744– Obviousness |

## III.    U.S. PATENT NO. 11,103,418

| Claim | EIS's Election of Prior-Art-Based Invalidity Arguments |
|---|---|
| 1 | • Witt & Hovland – Obviousness<br>• Yang & Hovland – Obviousness<br>• Robert & Yang & Hovland – Obviousness<br>• Guan & Hovland – Obviousness |
| 4 | • Witt & Hovland – Obviousness<br>• Yang & Hovland – Obviousness<br>• Robert & Yang & Hovland – Obviousness<br>• Guan & Hovland – Obviousness |
| 10 | • Witt & Hovland & Makower 744 – Obviousness<br>• Yang & Hovland & Makower 744 – Obviousness<br>• Robert & Yang & Makower 744 – Obviousness<br>• Guan & Hovland & Makower 744– Obviousness |

## IV.    U.S. PATENT NO. 9,849,061

| Claim | EIS's Election of Prior-Art-Based Invalidity Arguments |
|---|---|
| 1 | • Yang & Taylor – Obviousness<br>• Eros & Yang & Taylor – Obviousness<br>• Guan & Taylor – Obviousness<br>• Taylor – Anticipation |
| 8 | • Yang & Taylor – Obviousness<br>• Eros & Yang & Taylor – Obviousness<br>• Guan & Taylor – Obviousness<br>• Taylor & Hovland – Obviousness |

2

| 21 | • Yang & Taylor – Obviousness<br>• Eros & Yang & Taylor – Obviousness<br>• Guan & Taylor – Obviousness<br>• Taylor – Anticipation |
|---|---|

## V.    U.S. PATENT NO. 9,937,097

| Claim | EIS's Election of Prior-Art-Based Invalidity Arguments |
|---|---|
| 1 | • Witt & Taylor – Obviousness<br>• Yang & Taylor – Obviousness<br>• Eros & Yang & Taylor – Obviousness<br>• Guan & Lee & Hovland– Obviousness |
| 10 | • Witt & Taylor – Obviousness<br>• Yang & Taylor – Obviousness<br>• Eros & Yang & Taylor – Obviousness<br>• Guan & Lee & Hovland – Obviousness |
| 12 | • Witt & Taylor – Obviousness<br>• Yang & Taylor – Obviousness<br>• Eros & Yang & Taylor – Obviousness<br>• Guan & Lee & Hovland – Obviousness |

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnicholls.com
began@morrisnichols.com
*Attorneys for Plaintiff*

OF COUNSEL:

Naveen Modi
Allan M. Soobert
Chetan Bansal
David Valente
James Razick
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700
January 23, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 23, 2023, I caused the foregoing to be foregoing document

to be served upon the following in the manner indicated:

Paul D. Brown, Esquire                                              *VIA ELECTRONIC MAIL*
Joseph B. Cicero, Esquire
Gregory E. Stuhlman, Esquire
CHIPMAN BROWN CICERO & COLE, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801
*Attorneys for Defendants IntiHealth Ger GmbH,*
*WOW Tech USA, Ltd., WOW Tech Canada, Ltd.*
*and Novoluto GmbH*

Tammy J. Terry, Esquire                                            *VIA ELECTRONIC MAIL*
Califf T. Cooper, Esquire
OSHA BERGMAN WATANABE & BURTON LLP
1100 Louisiana Street, Suite 4900
Houston, TX 77002
*Attorneys for Defendants IntiHealth Ger GmbH,*
*WOW Tech USA, Ltd., WOW Tech Canada, Ltd.*
*and Novoluto GmbH*

*/s/Jack B. Blumenfeld*
_____
Jack B. Blumenfeld (#1014)

4

# EXHIBIT 2

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | ESP.035.US2 |
|---|---|---|
| | Application Number | |

| Title of Invention | Compression Wave Massage Device |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2:

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2  (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Inventor Information:

| Inventor | 1 | | Remove |
|---|---|---|---|

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Florian | M. | Witt | |

**Residence Information (Select One)**   US Residency   ●   Non US Residency   Active US Military Service

| City | Wentorf | Country of Residence [i] | DE |
|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | Am Feldrand 5b | | |
|---|---|---|---|
| Address 2 | | | |
| City | Wentorf | State/Province | |
| Postal Code | 21465 | Country [i] | DE |

All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.   | Add |

## Correspondence Information:

**Enter either Customer Number or complete the Correspondence Information section below.
For further information see 37 CFR 1.33(a).**

☐ **An Address is being provided for the correspondence Information of this application.**

| Customer Number | 76385 | | |
|---|---|---|---|
| Email Address | tdotter@hdpatlaw.com | Add Email | Remove Email |

## Application Information:

| Title of the Invention | Compression Wave Massage Device | | |
|---|---|---|---|
| Attorney Docket Number | ESP.035.US2 | Small Entity Status Claimed | ☒ |
| Application Type | Nonprovisional | | |
| Subject Matter | Utility | | |
| Total Number of Drawing Sheets (if any) | 5 | Suggested Figure for Publication (if any) | |

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | ESP.035.US2 |
| --- | --- | --- |
|  | Application Number | |

| Title of Invention | Compression Wave Massage Device |
| --- | --- |

## Filing By Reference:

Only complete this section when filing an application by reference under 35 U.S.C. 111(c) and 37 CFR 1.57(a). Do not complete this section if application papers including a specification and any drawings are being filed. Any domestic benefit or foreign priority information must be provided in the appropriate section(s) below (i.e., "Domestic Benefit/National Stage Information" and "Foreign Priority Information").

For the purposes of a filing date under 37 CFR 1.53(b), the description and any drawings of the present application are replaced by this reference to the previously filed application, subject to conditions and requirements of 37 CFR 1.57(a).

| Application number of the previously filed application | Filing date (YYYY-MM-DD) | Intellectual Property Authority or Country |
| --- | --- | --- |
|  |  |  |

## Publication Information:

| | |
| --- | --- |
| ☐ | Request Early Publication (Fee required at time of Request 37 CFR 1.219) |
| ☐ | **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing. |

## Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32). Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| Please Select One: | ● Customer Number | US Patent Practitioner | ○ Limited Recognition (37 CFR 11.9) |
| --- | --- | --- | --- |
| Customer Number | 76385 | | |

## Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, 365(c), or 386(c) or indicate National Stage entry from a PCT application. Providing benefit claim information in the Application Data Sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.
When referring to the current application, please leave the "Application Number" field blank.

| Prior Application Status | | | | Remove |
| --- | --- | --- | --- | --- |
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) | |
|  |  |  |  | |

| Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button. | Add |
| --- | --- |

EFS Web 2.2.12

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | ESP.035.US2 |
|---|---|---|
| | Application Number | |

| Title of Invention | Compression Wave Massage Device |
|---|---|

## Foreign Priority Information:

This section allows for the applicant to claim priority to a foreign application. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55. When priority is claimed to a foreign application that is eligible for retrieval under the priority document exchange program (PDX)[i] the information will be used by the Office to automatically attempt retrieval pursuant to 37 CFR 1.55(i)(1) and (2). Under the PDX program, applicant bears the ultimate responsibility for ensuring that a copy of the foreign application is received by the Office from the participating foreign intellectual property office, or a certified copy of the foreign priority application is filed, within the time period specified in 37 CFR 1.55(g)(1).

| | | | Remove |
|---|---|---|---|
| Application Number | Country[i] | Filing Date (YYYY-MM-DD) | Access Code[i] (if applicable) |
| 102016106120.4 | DE | 2016-04-04 | |

| | | | Remove |
|---|---|---|---|
| Application Number | Country[i] | Filing Date (YYYY-MM-DD) | Access Code[i] (if applicable) |
| 16169444.3 | EP | 2016-05-12 | |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button.

Add

## Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications

☐ This application (1) claims priority to or the benefit of an application filed before March 16, 2013 and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.
NOTE: By providing this statement under 37 CFR 1.55 or 1.78, this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA.

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | ESP.035.US2 |
|---|---|---|
| | Application Number | |

| Title of Invention | Compression Wave Massage Device |
|---|---|

# Authorization or Opt-Out of Authorization to Permit Access:

When this Application Data Sheet is properly signed and filed with the application, applicant has provided written authority to permit a participating foreign intellectual property (IP) office access to the instant application-as-filed (see paragraph A in subsection 1 below) and the European Patent Office (EPO) access to any search results from the instant application (see paragraph B in subsection 1 below).

Should applicant choose not to provide an authorization identified in subsection 1 below, applicant **must opt-out** of the authorization by checking the corresponding box A or B or both in subsection 2 below.

**NOTE**: This section of the Application Data Sheet is **ONLY** reviewed and processed with the **INITIAL** filing of an application. After the initial filing of an application, an Application Data Sheet cannot be used to provide or rescind authorization for access by a foreign IP office(s). Instead, Form PTO/SB/39 or PTO/SB/69 must be used as appropriate.

**1. Authorization to Permit Access by a Foreign Intellectual Property Office(s)**

**A. Priority Document Exchange (PDX)** - Unless box A in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the State Intellectual Property Office of the People's Republic of China (SIPO), the World Intellectual Property Organization (WIPO), and any other foreign intellectual property office participating with the USPTO in a bilateral or multilateral priority document exchange agreement in which a foreign application claiming priority to the instant patent application is filed, access to: (1) the instant patent application-as-filed and its related bibliographic data, (2) any foreign or domestic application to which priority or benefit is claimed by the instant application and its related bibliographic data, and (3) the date of filing of this Authorization. See 37 CFR 1.14(h)(1).

**B. Search Results from U.S. Application to EPO** - Unless box B in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the EPO access to the bibliographic data and search results from the instant patent application when a European patent application claiming priority to the instant patent application is filed. See 37 CFR 1.14(h)(2).

The applicant is reminded that the EPO's Rule 141(1) EPC (European Patent Convention) requires applicants to submit a copy of search results from the instant application without delay in a European patent application that claims priority to the instant application.

**2. Opt-Out of Authorizations to Permit Access by a Foreign Intellectual Property Office(s)**

☐ A. Applicant **DOES NOT** authorize the USPTO to permit a participating foreign IP office access to the instant application-as-filed. If this box is checked, the USPTO will not be providing a participating foreign IP office with any documents and information identified in subsection 1A above.

☐ B. Applicant **DOES NOT** authorize the USPTO to transmit to the EPO any search results from the instant patent application. If this box is checked, the USPTO will not be providing the EPO with search results from the instant application.

**NOTE:** Once the application has published or is otherwise publicly available, the USPTO may provide access to the application in accordance with 37 CFR 1.14.

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | ESP.035.US2 |
|---|---|---|
| | Application Number | |

| Title of Invention | Compression Wave Massage Device |
|---|---|

# Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

| **Applicant** | 1 | Remove |
|---|---|---|

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed. The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR 1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be identified in this section.

Clear

| ● Assignee | Legal Representative under 35 U.S.C. 117 | Joint Inventor |
|---|---|---|
| Person to whom the inventor is obligated to assign. | Person who shows sufficient proprietary interest | |

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

| | ▼ |
|---|---|

Name of the Deceased or Legally Incapacitated Inventor:

If the Applicant is an Organization check here.    ☒

| Organization Name | EIS GmbH |
|---|---|

**Mailing Address Information For Applicant:**

| **Address 1** | Am Lenkwerk 3 | | |
|---|---|---|---|
| Address 2 | | | |
| **City** | Bielefeld | **State/Province** | |
| **Country** | DE | Postal Code | 33609 |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Applicant Data may be generated within this form by selecting the Add button.    Add

# Assignee Information including Non-Applicant Assignee Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | ESP.035.US2 |
|---|---|---|
| | Application Number | |

| Title of Invention | Compression Wave Massage Device |
|---|---|

---

**Assignee** | 1

Complete this section if assignee information, including non-applicant assignee information, is desired to be included on the patent application publication. An assignee-applicant identified in the "Applicant Information" section will appear on the patent application publication as an applicant. For an assignee-applicant, complete this section only if identification as an assignee is also desired on the patent application publication.

Remove

If the Assignee or Non-Applicant Assignee is an Organization check here.  ☐

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | | | | |

**Mailing Address Information For Assignee including Non-Applicant Assignee:**

| Address 1 | |
|---|---|
| Address 2 | |

| City | | State/Province | |
|---|---|---|---|
| Country i | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee or Non-Applicant Assignee Data may be generated within this form by selecting the Add button.    Add

---

## Signature:    Remove

**NOTE:** This Application Data Sheet must be signed in accordance with 37 CFR 1.33(b). **However, if this Application Data Sheet is submitted with the <u>INITIAL</u> filing of the application <u>and</u> either box A or B is <u>not</u> checked in subsection 2 of the "Authorization or Opt-Out of Authorization to Permit Access" section, then this form must also be signed in accordance with 37 CFR 1.14(c).**

This Application Data Sheet **must** be signed by a patent practitioner if one or more of the applicants is **a juristic entity** (e.g., corporation or association). If the applicant is two or more joint inventors, this form must be signed by a patent practitioner, **all** joint inventors who are the applicant, or one or more joint inventor-applicants who have been given power of attorney (e.g., see USPTO Form PTO/AIA/81) on behalf of **all** joint inventor-applicants.

See 37 CFR 1.4(d) for the manner of making signatures and certifications.

| Signature | /Erin Nichols Matkaiti/ | | | Date (YYYY-MM-DD) | 2016-09-09 |
|---|---|---|---|---|---|
| First Name | Erin | Last Name | Nichols Matkaiti | Registration Number | 57125 |

Additional Signature may be generated within this form by selecting the Add button.    Add

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | ESP.035.US2 |
| | Application Number | |

| Title of Invention | Compression Wave Massage Device |

This collection of information is required by 37 CFR 1.76. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent CooperationTreaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.2.12

# EXHIBIT 3

Search Results of U.S. Patent No. 9,937,097
Results Limited to Priority Date Before April 13, 2017

| Number | Query | Result Count |
|---|---|---|
| 1 | (((CPC:(A61H19/30 OR A61H9/005 OR A61H19/34 OR A61H19/40 OR A61H19/44 OR A61H9/0057 OR A61H23/02) OR IPC:(A61F5/00 OR A61H19/00 OR A61H9/00 OR A61H23/02)) AND (PRIORITY_DATE:[* TO 20170412])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 5,400 |
| 2 | IPC:(A61H23/02) AND (PRIORITY_DATE:[* TO 20170412]) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 2,710 |
| 3 | IPC:(A61H9/00) AND (PRIORITY_DATE:[* TO 20170412]) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 1,009 |
| 4 | IPC:(A61H19/00) AND (PRIORITY_DATE:[* TO 20170412]) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 1,037 |
| 5 | IPC:(A61F5/00) AND (PRIORITY_DATE:[* TO 20170412]) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 260 |
| 6 | ((CPC:(A61H23/02) AND (PRIORITY_DATE:[* TO 20170412])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 3,624 |
| 7 | ((CPC:(A61H9/0057) AND (PRIORITY_DATE:[* TO 20170412])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 407 |
| 8 | ((CPC:(A61H19/44) AND (PRIORITY_DATE:[* TO 20170412])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 547 |
| 9 | ((CPC:(A61H19/40) AND (PRIORITY_DATE:[* TO 20170412])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 378 |
| 10 | ((CPC:(A61H19/34) AND (PRIORITY_DATE:[* TO 20170412])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 775 |
| 11 | ((CPC:(A61H9/005) AND (PRIORITY_DATE:[* TO 20170412])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 686 |
| 12 | ((CPC:(A61H19/30) AND (PRIORITY_DATE:[* TO 20170412])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 359 |

DocuSign Envelope ID: 17529819-E56C-43E7-9911-030AB8E8AB2C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EIS, INC., §
§
Plaintiff, §
§
v. §
§
§  Civil Action No.: 19-cv-1227-GBW
INTIHEALTH GER GMBH, §
WOW TECH USA, LTD., WOW TECH §  Demand For Jury Trial
CANADA, LTD. and NOVOLUTO GMBH, §
§
Defendants. §


NOVOLUTO GMBH, §
§
Counterclaimant, §
§
v. §
§
EIS, INC., EIS GMBH, §
TRIPLE A IMPORT GMBH, §
and TRIPLE A MARKETING GMBH, §
§
Counterclaim Defendants.

## DECLARATION OF LONG B. NGUYEN

1.    I, Long B. Nguyen, work at Clarivate and have 26 plus years of experience conducting patent research. My title is Associate Director of Service Operations.

2.    I obtained Bachelor of Science in Mechanical Engineering from Syracuse University in 1996. I am also a former Patent Examiner at the US Patent and Trademark Office.

3.    Clarivate has provided prior art searches for clients since 1961 and is one of the largest search firms in the United States.

DocuSign Envelope ID: 17529819-E56C-43E7-9911-030AB8E8AB2C

4.   On January 27, 2023, Clarivate was requested by Osha Bergman Watanabe & Burton ("OBWB") to conduct invalidity prior art searches for U.S. Patent Nos. 9,763,851, 9,937,097, and 9,849,061 on behalf of Novoluto GmbH ("Novoluto").  The invalidity prior art searches were performed by Clarivate with a team of skilled researchers, as requested by OBWB on January 27 and February 2, 2023. OBWB explicitly requested Clarivate perform the search until we had confirmed a particular set of known pieces of art were included within the results of the search queries. As such, we did not perform forward and backward citations and assignee searches on the search queries once the known art was identified.

5.   The cost of these searches was $1,560.  Search results were forwarded to OBWB on January 31 and February 3, 2023.  The results of these searches are shown in Attachments 1-4.

6.   Our standard practice is to search relevant classifications and keywords and to perform forward and backward citations and assignee searches.  Based on OBWB's instruction, we instead ceased search activity for each patent once we had confirmed a particular set of known pieces of art were included within the results of the search queries; therefore, if the search of the relevant classifications and keywords confirmed a particular set of known pieces of art, we did not perform forward and backward citations and assignee searches for those patents.

7.   Attachments 1-4 show the search strategy used, including the list of relevant classes and subclasses searched for Cooperative Patent Classification (CPC) and International Patent Classification (IPC).  Our standard practice is to also search multiple classifications if available.  For IPC, the classes/subclasses were based on the 2013 version.  For CPC, the classes/subclasses were based on the 2006 version.

8.   Chinese Utility Model CN201139797Y ("Yang") was a result from our searches.  Yang appeared as reference number 99 of 173 documents in search query 17 for the '097 Patent;

2

DocuSign Envelope ID: 17529819-E56C-43E7-9911-030AB8E8AB2C

reference number 89 of 156 documents in search query 17 for the '851 Patent; and reference number 99 of 173 documents in search query 17 for the '061 Patent. Yang was a result of our searches after 9 hours of searching for the '097 Patent, 1 hour of searching for the '851 Patent, and 1 hour of searching for the '061 Patent.

9. Because we found Yang in a search query, based on OBWB instruction, we did not perform the forward and backward citations and assignee searches.

10. U.S. Patent Publication No. 2017/0281457 ("Witt") was a result of our search for the '097 Patent, assuming an earliest effective filing date of April 13, 2017. Witt appeared as reference number 4 of 381 in search query 3 for the '097 Patent.

11. Because we found Witt in a search query, based on OBWB instruction, we did not perform the forward and backward citations and assignee searches.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: 08 February 2023 | 14:26 EST

DocuSigned by:

*Long B Nguyen*

DC0D22FB20924BB

Name:

3

# ATTACHMENT 1



# Clarivate™

# US9937097B2 to Lenke

## Validity Search Results

February 3, 2023
Client ref.: TBD
Clarivate ref.: 350309

**Clarivate Contact Information:**
*Karrie Rollison, Ph.D.*
*Director*
karrie.rollison@clarivate.com

**Confidential**

## Search History

| | Questel Orbit | |
|---|---|---|
| **Search #** | **Search Query** | **Results** |
| 1 | (PRD < 2017-04-17) | 55230362 |
| 2 | (A61H-009/00/5 OR A61H-009/00/57 OR A61H-009/00/71)/CPC | 3606 |
| **3** | **((  2 AND   1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX)** | **334** |

| Classes Searched |
|---|
| CPC |
| A61H 9/005:  {Pneumatic massage} [2013-01] |
| A61H 9/0057:  {Suction (suction kneading A61H 7/008)} [2013-01] |
| A61H 9/0071:  {by localized pressure, e.g. air streams or jets} [2013-01] |

© 2021, Clarivate. All rights reserved.



| Notes |
| --- |
| Consider documents with priority date before April 17, 2017. |
| Search CPC classes |
| Limit results of step 2 with keywords and critical date. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |

**US20170281457 uncovered in step 3.  It shows up as record #4 of 381 records.**

© 2021, Clarivate. All rights reserved.



## Disclaimer

*Clarivate may have used one or more third party databases, data feeds and related translations in preparing this report and cannot warrant the accuracy of third party databases and related translations.*

*Clarivate is not engaged in the practice of law, nor is Clarivate providing advice of any kind with this report. Accordingly, this report is technical in nature.  The characterization, paraphrasing, quotation, inclusion or omission of any content with regard to this report represents the non-legal judgment of one or more technical researchers involved in the preparation of this report. Customer's interpretations, conclusions, decisions or other actions in relation to this report are Customer's own, for which the Customer has full responsibility. As such, Customer acknowledges that Clarivate is not responsible for any damages resulting from any decisions Customer, or any other party accessing this report through the Customer, may make in reliance on the report.*

*This report is for Customer's internal use and may not be copied, reproduced or otherwise distributed without Clarivate's written permission.*

*Clarivate warrants that Clarivate prepared this report using commercially reasonable skill and care. Clarivate will rectify issues with this report if Customer provides Clarivate a written notice of a valid warranty claim within 30 days of delivery. If Clarivate cannot rectify any valid warranty claim within a reasonable period, Clarivate will, without any further liability, refund all applicable charges and Clarivate may terminate the affected service by written notice to Customer. This warranty is the exclusive warranty from Clarivate and replaces all other warranties, representations and*

© 2021, Clarivate. All rights reserved.



# ATTACHMENT 2



# US9937097B2 to Lenke

## Validity Search Results

Client ref.: TBD

Clarivate ref.: 350309

**Clarivate Contact Information:**
*Karrie Rollison, Ph.D.*
*Director*
karrie.rollison@clarivate.com

**Confidential**

| Search History | | |
|---|---|---|
| **Questel Orbit** | | |
| **Search #** | **Search Query** | **Results** |
| 1 | (PRD < 2015-03-13) | 49186262 |
| 2 | (A61H-009/00/5 OR A61H-009/00/57 OR A61H-009/00/71)/CPC | 3606 |
| **3** | **(( 2 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX)** | **269** |
| 4 | (A61H-019/00 OR A61H-019/30 OR A61H-019/34 OR A61H-019/40 OR A61H-019/44)/CPC | 2424 |
| **5** | **(( 4 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 3)** | **259** |
| 6 | (A61H-023/00 OR A61H-023/02 OR A61H-023/02/63)/CPC | 18178 |
| **7** | **(( 6 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 5 OR  3)** | **780** |
| 8 | (A61H-2009/0064)/CPC | 181 |
| **9** | **(( 8 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 7 OR  5 OR  3)** | **2** |
| 10 | (A61H-2201/0107 OR A61H-2201/0153 OR A61H-2201/0157 OR A61H-2201/0192 OR A61H-2201/1207 OR A61H-2201/12157)/CPC | 21490 |
| **11** | **(( 10 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 9 OR  7 OR  5 OR  3)** | **79** |

© 2021, Clarivate. All rights reserved.



| 12 | (A61H-2205/087)/CPC | 1496 |
|---|---|---|
| **13** | **(( 12 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 11 OR  9 OR  7 OR  5 OR  3)** | **4** |
| 14 | (A61H-019/00)/IPC | 4992 |
| **15** | **(( 14 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT (  13 OR  11 OR  9 OR  7 OR  5 OR  3)** | **110** |
| 16 | (A61H-009/00)/IPC | 20165 |
| **17** | **(( 16 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 15 OR  13 OR  11 OR  9 OR  7 OR  5 OR  3)** | **173** |

| Classes Searched |
|---|
| **CPC** |
| A61H 9/005:  {Pneumatic massage} [2013-01] |
| A61H 9/0057:  {Suction (suction kneading A61H 7/008)} [2013-01] |
| A61H 9/0071:  {by localized pressure, e.g. air streams or jets} [2013-01] |
| A61H 19/00:  Massage for the genitals; {Devices for improving sexual intercourse (penis erection devices A61F |
| A61H 19/30:  {Devices for external stimulation of the genitals} [2015-07] |
| A61H 19/34:  {For clitoral stimulation} [2013-01] |
| A61H 19/40:  {Devices insertable in the genitals} [2015-07] |
| A61H 19/44:  {Having substantially cylindrical shape, e.g. dildos} [2013-01] |
| A61H 23/00:  Percussion or vibration massage, e.g. using supersonic vibration; Suction-vibration massage; |
| A61H 23/02:  with electric or magnetic drive [2013-01] |
| A61H 23/0263:  {using rotating unbalanced masses} [2013-01] |
| A61H 2009/0064:  {suction by releasing a flexible cup after deformation, i.e. without further vacuum source} [2013-01] |
| A61H 2201/0107:  modular [2013-01] |

© 2021, Clarivate. All rights reserved.



| | |
|---|---|
| A61H 2201/0153: hand-held [2013-01] | |
| A61H 2201/0157: portable [2013-01] | |
| A61H 2201/0192: Specific means for adjusting dimensions [2013-01] | |
| A61H 2201/1207: with electric or magnetic drive [2013-01] | |
| A61H 2201/1215: Rotary drive [2013-01] | |
| A61H 2205/087: Genitals [2013-01] | |
| **IPC** | |
| A61H 19/00: Massage of the genitals [2006.01] | |
| A61H 9/00: Pneumatic or hydraulic massage [2006.01] | |

© 2021, Clarivate. All rights reserved.



Confidential

| Notes |
|---|
| Consider documents with priority date before 2015-03-13. |
| Search CPC classes |
| Limit results of step 2 with keywords and critical date. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search CPC classes |
| Limit results of step 4 with keywords and critical date and to not include results of step 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search CPC classes |
| Limit results of step 6 with keywords and critical date and to not include results of steps 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search CPC class |
| Limit results of step 8 with keywords and critical date and to not include results of steps 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search CPC classes |
| Limit results of step 10 with keywords and critical date and to not include results of steps 9 or 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |

© 2021, Clarivate. All rights reserved.



Confidential

| Search CPC class |
|---|
| Limit results of step 12 with keywords and critical date and to not include results of steps 11 or 9 or 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search IPC class |
| Limit results of step 14 with keywords and critical date and to not include results of steps 13 or 11 or 9 or 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search IPC class |
| Limit results of step 16 with keywords and critical date and to not include results of steps 15 or 13 or 11 or 9 or 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |

**CN201139737 uncovered in step 17.  It shows up as record #99 of 173 records.**

© 2021, Clarivate. All rights reserved.



| Disclaimer |
| --- |
| *Clarivate may have used one or more third party databases, data feeds and related translations in preparing this report and cannot warrant the accuracy of third party databases and related translations.* |

*Clarivate is not engaged in the practice of law, nor is Clarivate providing advice of any kind with this report. Accordingly, this report is technical in nature.  The characterization, paraphrasing, quotation, inclusion or omission of any content with regard to this report represents the non-legal judgment of one or more technical researchers involved in the preparation of this report. Customer's interpretations, conclusions, decisions or other actions in relation to this report are Customer's own, for which the Customer has full responsibility. As such, Customer acknowledges that Clarivate is not responsible for any damages resulting from any decisions Customer, or any other party accessing this report through the Customer, may make in reliance on the report.*

*This report is for Customer's internal use and may not be copied, reproduced or otherwise distributed without Clarivate's written permission.*

*Clarivate warrants that Clarivate prepared this report using commercially reasonable skill and care. Clarivate will rectify issues with this report if Customer provides Clarivate a written notice of a valid warranty claim within 30 days of delivery. If Clarivate cannot rectify any valid warranty claim within a reasonable period, Clarivate will, without any further liability, refund all applicable charges and Clarivate may terminate the affected service by written notice to Customer. This warranty is the exclusive warranty from Clarivate and replaces all other warranties, representations and*

© 2021, Clarivate. All rights reserved.



# ATTACHMENT 3



## Clarivate™

# US9763851B2 to Lenke

## Validity Search Results

Client ref.: TBD

Clarivate ref.: 350309

**Clarivate Contact Information:**
*Karrie Rollison, Ph.D.*
*Director*
karrie.rollison@clarivate.com

**Confidential**

| Search History | | |
|---|---|---|
| **Questel Orbit** | | |
| Search # | Search Query | Results |
| 1 | (PRD < 2013-09-23) | 45873836 |
| 2 | (A61H-009/00/5 OR A61H-009/00/57 OR A61H-009/00/71)/CPC | 3606 |
| **3** | **(( 2 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX)** | **249** |
| 4 | (A61H-019/00 OR A61H-019/30 OR A61H-019/34 OR A61H-019/40 OR A61H-019/44)/CPC | 2424 |
| **5** | **(( 4 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 3)** | **226** |
| 6 | (A61H-023/00 OR A61H-023/02 OR A61H-023/02/63)/CPC | 18178 |
| **7** | **(( 6 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 5 OR  3)** | **687** |
| 8 | (A61H-2009/0064)/CPC | 181 |
| **9** | **(( 8 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 7 OR  5 OR  3)** | **2** |
| 10 | (A61H-2201/0107 OR A61H-2201/0153 OR A61H-2201/0157 OR A61H-2201/0192 OR A61H-2201/1207 OR A61H-2201/12157)/CPC | 21490 |
| **11** | **(( 10 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 9 OR  7 OR  5 OR  3)** | **59** |

© 2021, Clarivate. All rights reserved.



Confidential

| | | |
|---|---|---|
| 12 | (A61H-2205/087)/CPC | 1496 |
| **13** | **(( 12 AND   1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 11 OR   9 OR   7 OR   5 OR   3)** | **4** |
| 14 | (A61H-019/00)/IPC | 4992 |
| **15** | **(( 14 AND   1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT (  13 OR  11 OR   9 OR   7 OR   5 OR   3)** | **102** |
| 16 | (A61H-009/00)/IPC | 20165 |
| **17** | **(( 16 AND   1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 15 OR  13 OR  11 OR   9 OR   7 OR  5 OR   3)** | **156** |

| Classes Searched |
|---|
| **CPC** |
| A61H 9/005:  {Pneumatic massage} [2013-01] |
| A61H 9/0057:  {Suction (suction kneading A61H 7/008)} [2013-01] |
| A61H 9/0071:  {by localized pressure, e.g. air streams or jets} [2013-01] |
| A61H 19/00:  Massage for the genitals; {Devices for improving sexual intercourse (penis erection devices A61F |
| A61H 19/30:  {Devices for external stimulation of the genitals} [2015-07] |
| A61H 19/34:  {For clitoral stimulation} [2013-01] |
| A61H 19/40:  {Devices insertable in the genitals} [2015-07] |
| A61H 19/44:  {Having substantially cylindrical shape, e.g. dildos} [2013-01] |
| A61H 23/00:  Percussion or vibration massage, e.g. using supersonic vibration; Suction-vibration massage; |
| A61H 23/02:  with electric or magnetic drive [2013-01] |
| A61H 23/0263:  {using rotating unbalanced masses} [2013-01] |
| A61H 2009/0064:  {suction by releasing a flexible cup after deformation, i.e. without further vacuum source} [2013-01] |
| A61H 2201/0107:  modular [2013-01] |

© 2021, Clarivate. All rights reserved.



| | |
|---|---|
| A61H 2201/0153: hand-held [2013-01] | |
| A61H 2201/0157: portable [2013-01] | |
| A61H 2201/0192: Specific means for adjusting dimensions [2013-01] | |
| A61H 2201/1207: with electric or magnetic drive [2013-01] | |
| A61H 2201/1215: Rotary drive [2013-01] | |
| A61H 2205/087: Genitals [2013-01] | |
| **IPC** | |
| A61H 19/00: Massage of the genitals [2006.01] | |
| A61H 9/00: Pneumatic or hydraulic massage [2006.01] | |

© 2021, Clarivate. All rights reserved.



Confidential

| Notes |
|---|
| Consider documents with priority date before 2013-09-23 |
| Search CPC classes |
| Limit results of step 2 with keywords and critical date. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search CPC classes |
| Limit results of step 4 with keywords and critical date and to not include results of step 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search CPC classes |
| Limit results of step 6 with keywords and critical date and to not include results of steps 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search CPC class |
| Limit results of step 8 with keywords and critical date and to not include results of steps 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search CPC classes |
| Limit results of step 10 with keywords and critical date and to not include results of steps 9 or 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |

© 2021, Clarivate. All rights reserved.



| Search CPC class |
| --- |
| Limit results of step 12 with keywords and critical date and to not include results of steps 11 or 9 or 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search IPC class |
| Limit results of step 14 with keywords and critical date and to not include results of steps 13 or 11 or 9 or 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search IPC class |
| Limit results of step 16 with keywords and critical date and to not include results of steps 15 or 13 or 11 or 9 or 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |

**CN201139737 uncovered in step 17.  It shows up as record #89 of 156 records.**

© 2021, Clarivate. All rights reserved.



| Disclaimer |
| --- |
| Clarivate may have used one or more third party databases, data feeds and related translations in preparing this report and cannot warrant the accuracy of third party databases and related translations.<br><br>Clarivate is not engaged in the practice of law, nor is Clarivate providing advice of any kind with this report. Accordingly, this report is technical in nature.  The characterization, paraphrasing, quotation, inclusion or omission of any content with regard to this report represents the non-legal judgment of one or more technical researchers involved in the preparation of this report. Customer's interpretations, conclusions, decisions or other actions in relation to this report are Customer's own, for which the Customer has full responsibility. As such, Customer acknowledges that Clarivate is not responsible for any damages resulting from any decisions Customer, or any other party accessing this report through the Customer, may make in reliance on the report.<br><br>This report is for Customer's internal use and may not be copied, reproduced or otherwise distributed without Clarivate's written permission.<br><br>Clarivate warrants that Clarivate prepared this report using commercially reasonable skill and care. Clarivate will rectify issues with this report if Customer provides Clarivate a written notice of a valid warranty claim within 30 days of delivery. If Clarivate cannot rectify any valid warranty claim within a reasonable period, Clarivate will, without any further liability, refund all applicable charges and Clarivate may terminate the affected service by written notice to Customer. This warranty is the exclusive warranty from Clarivate and replaces all other warranties, representations and |

© 2021, Clarivate. All rights reserved.



# ATTACHMENT 4



# US9849061B2 to Lenke

## Validity Search Results

Client ref.: TBD

Clarivate ref.: 350309

**Clarivate Contact Information:**
*Karrie Rollison, Ph.D.*
*Director*
karrie.rollison@clarivate.com

**Confidential**

| Search History | | |
|---|---|---|
| **Questel Orbit** | | |
| **Search #** | **Search Query** | **Results** |
| 1 | (PRD < 2015-03-13) | 49186262 |
| 2 | (A61H-009/00/5 OR A61H-009/00/57 OR A61H-009/00/71)/CPC | 3606 |
| **3** | **(( 2 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX)** | **269** |
| 4 | (A61H-019/00 OR A61H-019/30 OR A61H-019/34 OR A61H-019/40 OR A61H-019/44)/CPC | 2424 |
| **5** | **(( 4 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 3)** | **259** |
| 6 | (A61H-023/00 OR A61H-023/02 OR A61H-023/02/63)/CPC | 18178 |
| **7** | **(( 6 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 5 OR  3)** | **780** |
| 8 | (A61H-2009/0064)/CPC | 181 |
| **9** | **(( 8 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 7 OR  5 OR  3)** | **2** |
| 10 | (A61H-2201/0107 OR A61H-2201/0153 OR A61H-2201/0157 OR A61H-2201/0192 OR A61H-2201/1207 OR A61H-2201/12157)/CPC | 21490 |
| **11** | **(( 10 AND  1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 9 OR  7 OR  5 OR  3)** | **79** |

© 2021, Clarivate. All rights reserved.



| 12 | (A61H-2205/087)/CPC | 1496 |
|---|---|---|
| **13** | **(( 12 AND 1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 11 OR 9 OR 7 OR 5 OR 3)** | **4** |
| 14 | (A61H-019/00)/IPC | 4992 |
| **15** | **(( 14 AND 1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 13 OR 11 OR 9 OR 7 OR 5 OR 3)** | **110** |
| 16 | (A61H-009/00)/IPC | 20165 |
| **17** | **(( 16 AND 1) AND (((STIMULAT+ OR MASSAG+) 5D (VAGINA+ OR CLITOR+ OR EROGEN+ OR SKIN+)) AND (PRESS+ OR FORC+ OR VACUUM+) AND (CHAMBER+ OR COMPARTMENT+ OR FLEX+ OR VIBRAT+ OR RECIPROCAT+ OR TRANSLAT+) AND (DRIV+ OR MOTOR+))/BI/TX) NOT ( 15 OR 13 OR 11 OR 9 OR 7 OR 5 OR 3)** | **173** |

| **Classes Searched** |
|---|
| **CPC** |
| A61H 9/005: {Pneumatic massage} [2013-01] |
| A61H 9/0057: {Suction (suction kneading A61H 7/008)} [2013-01] |
| A61H 9/0071: {by localized pressure, e.g. air streams or jets} [2013-01] |
| A61H 19/00: Massage for the genitals; {Devices for improving sexual intercourse (penis erection devices A61F |
| A61H 19/30: {Devices for external stimulation of the genitals} [2015-07] |
| A61H 19/34: {For clitoral stimulation} [2013-01] |
| A61H 19/40: {Devices insertable in the genitals} [2015-07] |
| A61H 19/44: {Having substantially cylindrical shape, e.g. dildos} [2013-01] |
| A61H 23/00: Percussion or vibration massage, e.g. using supersonic vibration; Suction-vibration massage; |
| A61H 23/02: with electric or magnetic drive [2013-01] |
| A61H 23/0263: {using rotating unbalanced masses} [2013-01] |
| A61H 2009/0064: {suction by releasing a flexible cup after deformation, i.e. without further vacuum source} [2013-01] |
| A61H 2201/0107: modular [2013-01] |

© 2021, Clarivate. All rights reserved.



| A61H 2201/0153:  hand-held [2013-01] |
| A61H 2201/0157:  portable [2013-01] |
| A61H 2201/0192:  Specific means for adjusting dimensions [2013-01] |
| A61H 2201/1207:  with electric or magnetic drive [2013-01] |
| A61H 2201/1215:  Rotary drive [2013-01] |
| A61H 2205/087:  Genitals [2013-01] |
| **IPC** |
| A61H 19/00:  Massage of the genitals [2006.01] |
| A61H 9/00:  Pneumatic or hydraulic massage [2006.01] |

© 2021, Clarivate. All rights reserved.



| Notes |
| --- |
| Consider documents with priority date before 2015-03-13 |
| Search CPC classes |
| Limit results of step 2 with keywords and critical date. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search CPC classes |
| Limit results of step 4 with keywords and critical date and to not include results of step 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search CPC classes |
| Limit results of step 6 with keywords and critical date and to not include results of steps 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search CPC class |
| Limit results of step 8 with keywords and critical date and to not include results of steps 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search CPC classes |
| Limit results of step 10 with keywords and critical date and to not include results of steps 9 or 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |

© 2021, Clarivate. All rights reserved.



Confidential

Clarivate Search Results (LIP 350309) - US '061 For Yang.xlsx

Search History

| Search CPC class |
| --- |
| Limit results of step 12 with keywords and critical date and to not include results of steps 11 or 9 or 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search IPC class |
| Limit results of step 14 with keywords and critical date and to not include results of steps 13 or 11 or 9 or 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |
| Search IPC class |
| Limit results of step 16 with keywords and critical date and to not include results of steps 15 or 13 or 11 or 9 or 7 or 5 or 3. "+" is a wildcard operator for 0 or more characters. "5D" is a proximity operator for keywords within 5 words of each other in any order. |

**CN201139737 uncovered in step 17 - It shows up as record #99 of 173 records.**

© 2021, Clarivate. All rights reserved.



| Disclaimer |
|---|
| *Clarivate may have used one or more third party databases, data feeds and related translations in preparing this report and cannot warrant the accuracy of third party databases and related translations.*<br><br>*Clarivate is not engaged in the practice of law, nor is Clarivate providing advice of any kind with this report. Accordingly, this report is technical in nature. The characterization, paraphrasing, quotation, inclusion or omission of any content with regard to this report represents the non-legal judgment of one or more technical researchers involved in the preparation of this report. Customer's interpretations, conclusions, decisions or other actions in relation to this report are Customer's own, for which the Customer has full responsibility. As such, Customer acknowledges that Clarivate is not responsible for any damages resulting from any decisions Customer, or any other party accessing this report through the Customer, may make in reliance on the report.*<br><br>*This report is for Customer's internal use and may not be copied, reproduced or otherwise distributed without Clarivate's written permission.*<br><br>*Clarivate warrants that Clarivate prepared this report using commercially reasonable skill and care. Clarivate will rectify issues with this report if Customer provides Clarivate a written notice of a valid warranty claim within 30 days of delivery. If Clarivate cannot rectify any valid warranty claim within a reasonable period, Clarivate will, without any further liability, refund all applicable charges and Clarivate may terminate the affected service by written notice to Customer. This warranty is the exclusive warranty from Clarivate and replaces all other warranties, representations and* |

© 2021, Clarivate. All rights reserved.



# EXHIBIT 5

**Search Results of U.S. Patent No. 9,937,097 and 9,849,061**
**Results Limited to Priority Date Before March 13, 2015**

| Number | Query | Result Count |
|---|---|---|
| 1 | (((CPC:(A61H19/30 OR A61H9/005 OR A61H19/34 OR A61H9/0057 OR A61H19/40 OR A61H19/44 OR A61H23/02) OR IPC:(A61F5/00 OR A61H19/00 OR A61H9/00 OR A61H23/02)) AND (PRIORITY_DATE:[* TO 20150312])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 4,714 |
| 2 | (((CPC:(A61H19/30) AND (PRIORITY_DATE:[* TO 20150312])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 288 |
| 3 | (((CPC:(A61H9/005) AND (PRIORITY_DATE:[* TO 20150312])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 554 |
| 4 | (((CPC:(A61H19/34) AND (PRIORITY_DATE:[* TO 20150312])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 624 |
| 5 | (((CPC:(A61H9/0057) AND (PRIORITY_DATE:[* TO 20150312])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 292 |
| 6 | (((CPC:(A61H19/40) AND (PRIORITY_DATE:[* TO 20150312])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 342 |
| 7 | (((CPC:(A61H19/44) AND (PRIORITY_DATE:[* TO 20150312])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 434 |
| 8 | (((CPC:(A61H23/02) AND (PRIORITY_DATE:[* TO 20150312])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 3,133 |
| 9 | ((((IPC:(A61F5/00) AND (PRIORITY_DATE:[* TO 20150312])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 242 |
| 10 | ((((IPC:(A61H19/00)) AND (PRIORITY_DATE:[* TO 20150312])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 798 |
| 11 | ((((IPC:(A61H9/00)) AND (PRIORITY_DATE:[* TO 20150312])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 840 |
| 12 | ((((IPC:(A61H23/02)) AND (PRIORITY_DATE:[* TO 20150312])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 2,423 |

# EXHIBIT 6

Search Results of U.S. Patent No. 9,763,851
Results Limited to Priority Date Before September 23, 2015

| Number | Query | Result Cou |
|---|---|---|
| 1 | ((((CPC:(A61H9/00 OR A61H9/005 OR A61H19/34 OR A61H9/0007 OR A61H9/0057 OR A61H19/30 OR A61H19/00) OR IPC:(A61H19/00 OR A61H9/00)) AND (PRIORITY_DATE:[* TO 20150922])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 2,260 |
| 2 | (IPC:(A61H9/00)) AND (PRIORITY_DATE:[* TO 20150922]) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 901 |
| 3 | (IPC:(A61H19/00) AND (PRIORITY_DATE:[* TO 20150922]) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 873 |
| 4 | ((CPC:(A61H19/00) AND (PRIORITY_DATE:[* TO 20150922])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 body*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 313 |
| 5 | ((CPC:(A61H19/30) AND (PRIORITY_DATE:[* TO 20150922])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 318 |
| 6 | ((CPC:(A61H9/0057) AND (PRIORITY_DATE:[* TO 20150922])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 330 |
| 7 | ((CPC:(A61H9/0007) AND (PRIORITY_DATE:[* TO 20150922])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 136 |
| 8 | ((CPC:(A61H19/34) AND (PRIORITY_DATE:[* TO 20150922])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 676 |
| 9 | ((CPC:(A61H9/005) AND (PRIORITY_DATE:[* TO 20150922])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 594 |
| 10 | ((CPC:(A61H9/00) AND (PRIORITY_DATE:[* TO 20150922])) AND (TACD:((stimulat* $W5 vagina*) OR (stimulat* $W5 clitor*) OR (stimulat* $W5 skin*) OR (stimulat* $W5 body*) OR (stimulat* $W5 erogen*) OR (massag* $W5 vagina*) OR (massag* $W5 clitor*) OR (massag* $W5 skin*) OR (massag* $W5 erogen*)))) AND (TACD:(press* OR vacuum* OR suct*) AND TACD:(vibrat* OR reciproca* OR translat*) AND TACD:(driv* OR motor*) AND TACD:(open* OR chamber* OR flex* OR connect*)) | 1,236 |

# EXHIBIT 9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EIS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | Civil Action No.: 19-cv-1227-GBW |
| INTIHEALTH GER GMBH, | § | |
| WOW TECH USA, LTD., WOW TECH | § | Demand For Jury Trial |
| CANADA, LTD. and NOVOLUTO GMBH, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| NOVOLUTO GMBH, | § | |
| | § | |
| Counterclaimant, | § | |
| | § | |
| v. | § | |
| | § | |
| EIS, INC., EIS GMBH, | § | |
| TRIPLE A IMPORT GMBH, | § | |
| and TRIPLE A MARKETING GMBH, | § | |
| | § | |
| Counterclaim Defendants. | | |

### DECLARATION OF DR. KIMBERLY CAMERON, PH.D. IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT NOVOLUTO GMBH'S MOTION TO STRIKE PLAINTIFF AND COUNTERCLAIM-DEFENDANTS' ELECTION OF PRIOR-ART-BASED INVALIDITY ARGUMENTS

I, Kimberly Cameron, declare:

1.     My name is Kimberly Cameron.  I have been retained by Osha Bergman Watanabe & Burton LLP, the firm representing Defendants IntiHealth Ger GmbH, WOW Tech USA, Ltd., WOW Tech Canada, Ltd., and Novoluto GmbH (collectively "WOW Tech").  I am over twenty-one years of age and fully competent to make this declaration.  I have personal knowledge of the facts set forth in this declaration and, if called upon as a witness, I could and would testify to such facts under oath.

2.      Attached as Exhibit A is a true and correct copy of a photograph I took of the packaging of the EROS Clitoral Therapy Device at Plaintiff's counsel's offices in Washington, D.C. office on March 1, 2023.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 8, 2023.

_Kimberly Cameron_

_____

Kimberly Cameron

2

# EXHIBIT A

