Joint Proposed Pretrial Order

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EIS, INC.,<br><br>       Plaintiff,<br><br>       v.<br><br>INTIHEALTH GER GMBH, WOW TECH USA, LTD., WOW TECH CANADA, LTD. AND NOVOLUTO GMBH,<br><br>       Defendants. | Civil Action No. 19-1227-GBW |
| NOVOLUTO GMBH,<br><br>       Counterclaimant,<br><br>       v.<br><br>EIS, INC., EIS GMBH,<br>TRIPLE A IMPORT GMBH,<br>and TRIPLE A MARKETING GMBH<br><br>       Counterclaim Defendants. | |

## JOINT STATEMENT OF UNCONTESTED FACTS

Exhibit 1.001

The parties submit this Joint Statement of Uncontested Facts. These uncontested facts shall require no proof at trial and will become part of the evidentiary record at trial once introduced to the jury. Any party may read or introduce any of the uncontested facts to the jury at any time without prior notice. By agreeing to this joint statement, neither party admits that any stated fact is relevant to any material issue of dispute.

## I.      THE PARTIES

1.      EIS, Inc. is a Delaware corporation.  It has a principal place of business at 110 Wall Street, New York, New York, 10005.

2.      EIS GmbH is a company incorporated under the laws of Germany. It has a principal place of business at AM Lenkwerk 3, 33609 Bielefeld, Germany.

3.      Triple A Marketing GmbH is a company incorporated under the laws of Germany. It has a principal place of business in at AM Lenkwerk 3, 33609 Bielefeld, Germany.

4.      Triple A Import GmbH is a company incorporated under the laws of Germany. It has a principal place of business in at AM Lenkwerk 3, 33609 Bielefeld, Germany.

5.      InitHealth Ger GmbH is a company organized and existing under the laws of Germany.

6.      WOW Tech USA, Ltd. is a Delaware corporation.  It has a mailing address at 103 Foulk Road, Suite 202, Wilmington, Delaware, 19803.

7.      WOW Tech Canada, Ltd. is a company organized and existing under the laws of Canada.

8.      Novoluto GmbH is a company organized and existing under the laws of Germany.

## II.      THE PATENTS-IN-SUIT

9.      The United States Patent and Trademark Office issued United States Patent No. 9,763,851 ("'851 Patent") on September 19, 2017.

**Exhibit 1.002**

10.     The title of the '851 Patent is "Stimulation Device."

11.     Novoluto GmbH is the assignee of the '851 Patent.

12.     The '851 Patent claims priority on its face to Novoluto's German Patent No. DE 10 2013 110 501 ("German '501 Patent"), which was filed on September 23, 2013.

13.     The '851 Patent was filed as Application No. 15/023,471.

14.     The United States Patent and Trademark Office issued United States Patent No. 9,849,061 ("'061 Patent") on December 26, 2017.

15.     The title of the '061 Patent is "Stimulation Device Having An Appendage."

16.     Novoluto GmbH is the assignee of the '061 Patent.

17.     The '061 Patent claims priority on its face to Novoluto's German Patent No. DE 10 2015 103 694, which was filed on March 13, 2015.

18.     The '061 Patent was filed as Application No. 15/302,981.

19.     The United States Patent and Trademark Office issued United States Patent No. 9,937,097 ("'097 Patent") on April 10, 2018.

20.     The title of the '097 Patent is "Stimulation Device Having An Appendage."

21.     Novoluto GmbH is the assignee of the '097 Patent.

22.     The '097 Patent claims priority on its face to Novoluto's German Patent No. DE 10 2015 103 694, which was filed on March 13, 2015.

23.     The United States Patent and Trademark Office issued United States Patent No. 11,090,220 ("'220 patent") on August 17, 2021.

24.     The title of the '220 Patent is "Stimulation Device."

25.     Novoluto GmbH is the assignee of the '220 Patent.

Exhibit 1.003

26.     The '220 Patent claims priority on its face to Novoluto's German '501 Patent, which was filed on September 23, 2013.

27.     The United States Patent and Trademark Office issued United States Patent No. 11,103,418 ("'418 Patent") on August 31, 2021.

28.     The title of the '418 Patent is "Stimulation Device."

29.     Novoluto GmbH is the assignee of the '418 Patent.

30.     The '418 Patent claims priority on its face to Novoluto's German '501 Patent, which was filed on September 23, 2013.

## III.   CLAIM CONSTRUCTION

31.     On January 9, 2023, the Court construed the terms below to have the following meanings (D.I. 301):

| Claim Term | Court's Construction |
|---|---|
| "connection element" | "structure that connects two structures" |
| "stimulation device" | "a device that is capable of sexually arousing or exciting" |
| "opening" | "hole" |
| "flexible wall"/"flexible wall portion" | "a wall that is able to bend or to be bent easily without breaking" |
| "pressure field generator" | "a component that generates a pressure field" |
| "chamber" | "compartment" |
| "based on modulated frequencies" | "based on changes in drive unit speed" |
| "sealingly engage a portion of the body of a user including a clitoris" | "a sufficient enough seal, which does not have to be a perfect 100 percent seal, on a portion of a body of a user including a clitoris to allow the creation of positive and negative pressures relative to ambient pressure" |
| "reference pressure" | "a prevailing pressure acting on the device prior to placing the stimulation device on the area of skin to be stimulated" |

## IV.   THE PRIOR ART

32.     U.S. Patent No. 1,502,440 to Robert issued on July 22, 1924.

Exhibit 1.004

Joint Proposed Pretrial Order

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EIS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 19-1227-GBW |
| INTIHEALTH GER GMBH, WOW TECH USA, LTD., WOW TECH CANADA, LTD. AND NOVOLUTO GMBH, | |
| Defendants. | |
| | |
| NOVOLUTO GMBH, | |
| Counterclaimant, | |
| v. | |
| EIS, INC., EIS GMBH, TRIPLE A IMPORT GMBH, and TRIPLE A MARKETING GMBH | |
| Counterclaim Defendants. | |

**PLAINTIFF'S AND COUNTERCLAIM DEFENDANTS'
STATEMENT OF CONTESTED ISSUES OF FACT**

EIS, Inc., and EIS GmbH, Triple A Marketing GmbH, and Triple A Import GmbH

(collectively, "EIS") hereby provide the following issues of fact that remain to be litigated:[1]

---

[1] This statement is based on the claims the parties expect to present as well as Plaintiff's and Counterclaim Defendants' understanding of the claims that Defendants and Counterclaim Plaintiff seems likely to present. If Defendants and Counterclaim Plaintiff pursue additional or altered claims, or raises additional issues, Plaintiff and Counterclaim Defendants reserve the right to supplement this statement. If an issue identified herein is more properly considered an issue of law, it should be so considered. If an issue of law is more properly considered an issue of fact, that issue is incorporated into this statement. Plaintiff and Counterclaim Defendants reserve the right to revise this statement as necessary considering the Court's pretrial orders, including evidentiary rulings, or if any new allegations arise for which the submissions did not fairly put

**Exhibit 2.001**

I.      **Unfair Competition (Lanham Act and Delaware Common Law), Delaware Deceptive Trade Practices Act, and Delaware Common Law Tortious Interference with Business Relations**

1.      Whether the reviews published by Intihealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; and Novoluto GmbH (collectively, "Defendants" or "WOW Tech") of EIS, Inc.'s Satisfyer Air Pulse products were and/or are false and/or misleading.

2.      Whether Defendants' statements about alleged infringement of unenforceable and non-existent patent rights in relation to EIS, Inc.'s were and/or are false and/or misleading.

3.      Whether Defendants' statements about the Satisfyer Air Pulse products and alleged infringement of unenforceable patent rights to Amazon.com in order to have those products removed from Amazon.com were and/or are false and/or misleading.

4.      Whether Defendants' false and/or misleading statements regarding alleged infringement were made in bad faith.

5.      Whether EIS, Inc. had a reasonable probability of a business opportunity with another person or company, with which Defendants intentionally interfered; and, if so, whether Defendants' interference proximately caused damage to EIS, Inc.

6.      Whether EIS, Inc. can establish that Defendants made false and/or misleading statements that constitute false advertising in violation of § 43(a)(1)(B) of the Lanham Act—15 U.S.C. § 1125(a)(1)(B).

7.      Whether Defendants' have made false and/or misleading statements that constitute unfair competition under Delaware common law.

---

Plaintiff and Counterclaim Defendants on notice.  By including an issue of fact here, Plaintiff and Counterclaim Defendants do not assume the burden of proof or production regarding any issues that is Defendants' or Counterclaim Plaintiff's burden to prove.  Nor do Plaintiff and Counterclaim Defendants concede that any genuine factual dispute exists as to any of the issues listed.

**Exhibit 2.002**

8.      Whether Defendants have made false and/or misleading statements that violate the Delaware Deceptive Trade Practices Act.

9.      Whether EIS, Inc. may recover monetary damages for Defendants' false and/or misleading statements under the Lanham Act.

10.      The value of monetary damages EIS, Inc. may recover for Defendants' false and/or misleading statements under the Lanham Act.

11.      Whether EIS, Inc. may recover lost profits for Defendants' false and/or misleading statements under the Lanham Act.

12.      The value of lost profits related to Defendants' false and/or misleading statements under the Lanham Act.

13.      The amount of damages, including without limitation the amount of EIS, Inc.'s lost profits from Defendants' misconduct, that EIS, Inc. has proven by a preponderance of the evidence that it should be awarded due to Defendants' false and/or misleading statements.

14.      Whether EIS, Inc. should be entitled to recover its costs of this action under 15 U.S.C. § 1117 due to Defendants' false and/or misleading statements.

15.      Whether EIS, Inc. should be awarded treble the amount of damages pursuant to 15 U.S.C. § 1117 because Defendants' false and/or misleading statements were made intentionally and willfully.

16.      Whether EIS, Inc. should be awarded treble the amount of damages caused by Defendants' misconduct pursuant to 6 Del. C. § 2533(c).

17.      Whether because Defendants' actions have been willful, EIS, Inc. is entitled to exemplary and punitive damages, an award of costs, reasonable attorneys' fees, and prejudgment interest.

**Exhibit 2.003**

18.     Whether this is an exceptional case that entitles EIS, Inc. to an award of attorneys' fees and costs under 15 U.S.C. § 1117 and, if so, the amount.

19.     Whether EIS, Inc. is entitled to any other remedy or relief as a result of Defendants' false and/or misleading statements and if so, what remedy or relief.

**II.     Inequitable Conduct**

20.     Whether Plaintiff and Counterclaim Defendants have proven that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to deceive the United States Patent and Trademark Office ("USPTO") by failing to disclose the Guan reference during the prosecution of the '851 patent.

21.     Whether Plaintiff and Counterclaim Defendants have proven that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to deceive the United States Patent and Trademark Office ("USPTO") by failing to disclose the Guan reference during the prosecution of the '097 patent.

22.     Whether Plaintiff and Counterclaim Defendants have proven that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to deceive the United States Patent and Trademark Office ("USPTO") by failing to disclose the Guan reference during the prosecution of the '061 patent.

23.     Whether Plaintiff and Counterclaim Defendants have proven that the Guan reference meets a threshold level of materiality.

24.     Whether Plaintiff and Counterclaim Defendants have proven that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to deceive the United States Patent and Trademark Office ("USPTO") by failing to disclose that new matter was added and claimed to the patent applications leading to the '097, '220, and '418 patents.

Exhibit 2.004

25.     Whether Plaintiff and Counterclaim Defendants have proven that the new matter added and claimed meets a threshold level of materiality.

26.     Whether the inequitable conduct committed with respect to any of the '851 and/or '061 patents "infected" any of the '097, '220, and/or '418 patents, rendering each unenforceable.

**III.    *Walker Process* Fraud**

27.     Whether Defendants procured the '851, '061, '097, '220, and/or '418 patents by knowing and willful fraud on the patent office and maintained and enforced those patents, and/or otherwise misused those patents in their attempted monopolization, with knowledge of the fraudulent procurement.

28.     Whether Defendants have engaged in predatory or anticompetitive conduct with a specific intent to monopolize the market for sexual wellness devices incorporating pulsating air for clitoral stimulation in the United States.

29.     Whether Defendants had a dangerous probability of achieving monopoly power in the market for sexual wellness devices incorporating pulsating air for clitoral stimulation in the United States.

30.     Whether Defendants should be liable for the attorneys' fees and costs incurred bringing the antitrust suit and the attorneys' fees and costs incurred defending against the patent infringement suit; and, if so, the amounts thereof.

31.     Whether any other remedy or relief as a result of Defendants' *Walker Process* fraud is proper and if so, what remedy or relief.

**IV.    Non-Infringement and Lack of Willfulness**

32.     Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant literally and directly infringes claims 1, 2, and 4-6 of the '851 patent.

Exhibit 2.005

33.     Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant literally and directly infringes claims 1, 8, and 21 of the '061 patent.

34.     Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant literally and directly infringes claims 1, 10, and 12 of the '097 patent.

35.     Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant literally and directly infringes claims 1, 3, 4 and 16 of the '220 patent.

36.     Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant literally and directly infringes claims 1, 4, and 10 of the '418 patent.

37.     Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant induces customers to infringe claim 21 of the '061 patent.[2]

38.     Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant induces customers to infringe claim 12 of the '097 patent.

39.     Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant's alleged infringement of the '851 patent was willful.

40.     Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant's alleged infringement of the '061 patent was willful.

41.     Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant's alleged infringement of the '097 patent was willful.

42.     Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant's alleged infringement of the '220 patent was willful.

---

[2] Counterclaim Defendants dispute that Novoluto has preserved any indirect infringement argument other than the issue noted in this paragraph (37) and the paragraph directly below it (38).  To the extent Novoluto is permitted to present any additional indirect infringement allegation, Counterclaim Defendants dispute those allegations and those allegations are issues that remain to be litigated.

Exhibit 2.006

43.     Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant's alleged infringement of the '418 patent was willful.

**V.      Invalidity Under 35 U.S.C. §§ 102 and/or 103**

44.     Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 2, and 4-6 of the '851 patent are invalid as obvious under 35 U.S.C. § 103.

45.     Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 8, and 21 of the '061 patent are invalid obvious under 35 U.S.C. § 103.

46.     Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 10, and 12 of the '097 patent are invalid as obvious under 35 U.S.C. § 103.

47.     Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 3, and 4 of the '220 patent are invalid as anticipated under 35 U.S.C. § 102.   Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 3, 4, and 16 of the '220 patent are invalid as obvious under 35 U.S.C. § 103.

48.     Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 4, and 10 of the '418 patent are invalid as obvious under 35 U.S.C. § 103.

49.     Whether U.S. Patent Application No. 15/023,471 discloses the subject matter claimed in the '220 and '418 patents.

50.     Whether U.S. Patent Application No. 15/302,981 discloses the subject matter claimed in the '097 patent.

Exhibit 2.007

## VI.   Invalidity Under 35 U.S.C. § 112

51.   Whether claim 21 of the '061 patent when read in light of the specification delineating the '061 patent, and the prosecution history, fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

52.   Whether claims 1, 10, and 12 of the '097 patent when read in light of the specification delineating the '097 patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

53.   Whether claims 1, 3, 4, and 16 of the '220 patent when read in light of the specification delineating the '220 patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

54.   Whether claims 1, 4, and 10 of the '418 patent when read in light of the specification delineating the '418 patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

## VII.   Patent Misuse

55.   Whether WOW Tech's misconduct with respect to the asserted patents—including their false and misleading statements related to purported infringement and their use in having EIS's products removed from Amazon—impermissibly broadened the physical or temporal scope of the patents.

56.   Whether that impermissible broadening was done in a manner that has anticompetitive effects.

## VIII.   Unclean Hands

57.   Whether WOW Tech is guilty of conduct involving fraud, deceit, unconsionability, or bad faith related to the patents at issue in this case.

8

Exhibit 2.008

58.     Whether that conduct has injured EIS and affected the balance of the equities between WOW Tech and EIS.

## IX.     Equitable Estoppel

59.     Whether WOW Tech communicated in a misleading way that it would not enforce the asserted patents against EIS, including by words, conduct or silence.

60.     Whether EIS relied on that misleading communication.

61.     Whether EIS would be materially harmed if WOW Tech were now permitted to assert those patents against EIS.

## X.     Acquiescence

62.     Whether WOW Tech made an active representation of consent to EIS' purported use of the asserted patents.

## XI.     Waiver

63.     Whether WOW Tech had an actual intention to relinquish its right to enforce the asserted patents against EIS.

## XII.     IPR Estoppel

64.     Whether Novoluto has proven by a preponderance of the evidence that a skilled searcher conducting a diligent search reasonably could have been expected to discover any of the asserted grounds of prior art invalidity identified by Counterclaim Defendants for the '851 patent.

65.     Whether Novoluto has proven by a preponderance of the evidence that a skilled searcher conducting a diligent search reasonably could have been expected to discover any of the asserted grounds of prior art invalidity identified by Counterclaim Defendants for the '061 patent.

66.     Whether Novoluto has proven by a preponderance of the evidence that a skilled searcher conducting a diligent search reasonably could have been expected to discover any of the asserted grounds of prior art invalidity identified by Counterclaim Defendants for the '097 patent.

Exhibit 2.009

## XIII.   Patent Damages and Pre-Judgment Interest

67.     The amount of damages that Novoluto should be awarded for each Counterclaim Defendant's alleged infringement of the '851 patent.

68.     The amount of damages that Novoluto should be awarded for each Counterclaim Defendant's alleged infringement of the '061 patent.

69.     The amount of damages that Novoluto should be awarded for each Counterclaim Defendant's alleged infringement of the '097 patent.

70.     The amount of damages that Novoluto should be awarded for each Counterclaim Defendant's alleged infringement of the '220 patent.

71.     The amount of damages that Novoluto should be awarded for each Counterclaim Defendant's alleged infringement of the '418 patent.

72.     Whether and the amount of pre-judgment interest that should be awarded to Novoluto for alleged infringement of the '851, '061, '097, '220, and/or '418 patents.

## XIV.   Injunctive Relief for Alleged Patent Infringement

73.     Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant's alleged infringement of the '851, '061, '097, '220, and/or '418 patents has caused Novoluto irreparable injury.

74.     Whether Novoluto has proven by a preponderance of the evidence that remedies available at law, such as monetary damages, are inadequate to compensate Novoluto for its injury due to each Counterclaim Defendant's alleged infringement of the '851, '061, '097, '220, and/or '418 patents.

75.     Whether Novoluto has proven by a preponderance of the evidence in considering the balance of hardships between Novoluto and each Counterclaim Defendant, such hardships

**Exhibit 2.010**

favor Novoluto and a remedy in equity, based on each Counterclaim Defendant's alleged infringement of the '851, '061, '097, '220, and/or '418 patents, is warranted.

76.     Whether Novoluto has proven by a preponderance of the evidence that, based on each Counterclaim Defendant's alleged infringement of the '851, '061, '097, '220, and/or '418 patents, the public interest would not be disserved by a permanent injunction in its favor.

## XV.     Costs and Attorneys' Fees

77.     Whether Plaintiff and Counterclaim Defendants are entitled to their costs and attorneys' fees pursuant to 35 U.S.C. § 285.

11

**Exhibit 2.011**

Joint Proposed Pretrial Order

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EIS, INC., §<br>§<br>Plaintiff, §<br>§<br>v. §<br>§<br>INTIHEALTH GER GMBH, §<br>WOW TECH USA, LTD., WOW TECH §<br>CANADA, LTD. and NOVOLUTO GMBH, §<br>§<br>Defendants. § | Civil Action No.: 19-cv-1227-GBW |

| | |
|---|---|
| NOVOLUTO GMBH, §<br>§<br>Counterclaimant, §<br>§<br>v. §<br>§<br>EIS, INC., EIS GMBH, §<br>TRIPLE A IMPORT GMBH, §<br>and TRIPLE A MARKETING GMBH, §<br>§<br>Counterclaim Defendants. | |

**DEFENDANTS' AND COUNTERCLAIMANT'S**
**REVISED STATEMENT OF CONTESTED FACTS**

      Defendants IntiHealth Ger GmbH, Novoluto GmbH, WOW Tech USA, Ltd., and WOW

Tech Canada, Ltd., (collectively "WOW Tech") and Counterclaim Plaintiff and Defendant

Novoluto GmbH ("Novoluto") submit the following Revised Statement of Contested Facts that

remain to be litigated. WOW Tech reserves the right to supplement, amend, or modify this list,

for example, to respond to any issues, arguments, or evidence from any of Plaintiff and

Counterclaim Defendant EIS, Inc. and Counterclaim Defendants EIS GmbH, Triple A Marketing

GmbH, and Triple A Import GmbH (collectively, "EIS"), or in the event of any Court ruling that

might raise new issues. By including an issue in this list, WOW Tech does not assume the burden

1

**Exhibit 03.001**

of production or persuasion regarding that issue, nor does WOW Tech concede that any fact on this list ought to be contested by EIS.  WOW Tech reserves the right to prove any matters identified in its pleadings, contentions, interrogatory responses, and/or expert reports.  To the extent WOW Tech's Statement of Issues of Law for Issues on Which It Bears the Burden of Proof, as set forth in Exhibit 5, contains issues of fact, those issues are incorporated herein by reference.  Should the Court determine that any issue identified below is more appropriately considered an issue of law, WOW Tech incorporates such issue by reference into Exhibit 5.

**I.      ISSUES ON WHICH WOW TECH HAS THE BURDEN OF PROOF**

**A.      INFRINGEMENT**

1.      Whether WOW Tech can prove by a preponderance of the evidence that EIS's making, using, selling, and/or offering to sell in the United States, and/or importing into the United States the Accused Products directly, literally infringes the Asserted Claims of the '851 Patent, as those claims have been construed by the Court.

2.      Whether WOW Tech can prove by a preponderance of the evidence that EIS has and continues to induce customers to infringe the Asserted Claims of the '851 Patent.

3.      Whether WOW Tech can prove by a preponderance of the evidence that EIS's making, using, selling, and/or offering to sell in the United States, and/or importing into the United States the Accused Products directly infringes the Asserted Claims of the '061 Patent, as those claims have been construed by the Court.

4.      Whether WOW Tech can prove by a preponderance of the evidence that EIS has and continues to induce customers to infringe the Asserted Claims of the '061 Patent.

5.      Whether WOW Tech can prove by a preponderance of the evidence that EIS has and continues to contribute to the infringement of the Asserted Claims of the '061 Patent.

Exhibit 03.002

6.      Whether WOW Tech can prove by a preponderance of the evidence that EIS's making, using, selling, and/or offering to sell in the United States, and/or importing into the United States the Accused Products directly infringes the Asserted Claims of the '097 Patent, as those claims have been construed by the Court.

7.      Whether WOW Tech can prove by a preponderance of the evidence that EIS has and continues to induce customers to infringe the Asserted Claims of the '097 Patent.

8.      Whether WOW Tech can prove by a preponderance of the evidence that EIS has and continues to contribute to the infringement of the Asserted Claims of the '097 Patent.

9.      Whether WOW Tech can prove by a preponderance of the evidence that EIS's making, using, selling, and/or offering to sell in the United States, and/or importing into the United States the Accused Products directly infringes the Asserted Claims of the '220 Patent, as those claims have been construed by the Court.

10.     Whether WOW Tech can prove by a preponderance of the evidence that EIS has and continues to induce customers to infringe the Asserted Claims of the '220 Patent.

11.     Whether WOW Tech can prove by a preponderance of the evidence that EIS's making, using, selling, and/or offering to sell in the United States, and/or importing into the United States the Accused Products directly infringes the Asserted Claims of the '418 Patent, as those claims have been construed by the Court.

12.     Whether WOW Tech can prove by a preponderance of the evidence that EIS has and continues to induce customers to infringe the Asserted Claims of the '418 Patent.

13.     Whether EIS knew of the Asserted Patents during development of EIS's Accused Products.

3

Exhibit 03.003

**B.      WILLFUL INFRINGEMENT**

14.      Whether EIS willfully infringed one or more of the Asserted Claims of the Asserted Patents.

15.      Whether WOW Tech can prove by a preponderance of the evidence that EIS, after learning of any of the Asserted Patents, continued to infringe the Asserted Patent(s) with the knowledge that its conduct constituted infringement.

16.      Whether WOW Tech can prove by a preponderance of the evidence that EIS's infringement of the Asserted Patent(s) was malicious, deliberate, consciously wrongful, or done in bad faith.

**C.      OBJECTIVE INDICIA OF NON-OBVIOUSNESS**

17.      Whether objective evidence of non-obviousness shows that the Asserted Patents are not obvious.

18.      Whether objective evidence of non-obviousness shows WOW Tech's commercial embodiments have a nexus to the inventions of the Asserted Claims of the Asserted Patents.

19.      Whether objective evidence shows WOW Tech's commercial embodiments were commercially successful.

20.      Whether objective evidence shows the existence of a long felt but unsolved need that is met by the inventions of the Asserted Patents.

21.      Whether objective evidence shows others tried but failed to develop a product that solved the problems remedied by the claimed inventions of the Asserted Patents.

22.      Whether objective evidence shows industry skepticism about whether or how a problem could be solved, or the workability of the claimed solution with respect to the inventions of the Asserted Patents.

4

Exhibit 03.004

23.     Whether objective evidence shows industry recognition/praise by others of WOW Tech's commercial embodiments.

24.     Whether objective evidence shows others copied WOW Tech's commercial embodiments or the Asserted Patents.

**D.     IPR ESTOPPEL**

25.     Whether EIS raised or could have raised during *inter partes* review IPR2019-01302, IPR2019-01444, or IPR2020-00007 ("the IPRs") the prior art invalidity grounds that include Chinese Utility Model No. 201139737Y ("Yang") and/or Eros Clitoral Therapy Device, SKU: 364215376135191 ("Eros") that EIS asserts in its invalidity defenses against the '851, '061, and '097 Patents, in this action.

26.     Whether EIS reasonably could have found Yang when it filed the IPRs.

27.     Whether the Eros product was disclosed by IPR-asserted U.S. Patent No. 6,964,643 B2 ("Hovland").

**E.     REMEDIES**

28.     The amount of damages in reasonable royalties that WOW Tech is owed from EIS due to EIS's infringement of one or more of the Asserted Claims of the Asserted Patents through the date of the verdict.

29.     Whether WOW Tech notified EIS of EIS's infringement of the Asserted Patents.

30.     If WOW Tech did not notify EIS of EIS's infringement of the Asserted Patents, whether WOW Tech marked its commercial embodiments in compliance with 35 U.S.C. § 287.

31.     Whether WOW Tech can prove by a preponderance of the evidence that it is entitled to enhanced damages pursuant to 35 U.S.C. § 284 because of EIS's willful infringement of one or more Asserted Claims of the Asserted Patents.

Exhibit 03.005

32.     Whether WOW Tech can prove by a preponderance of the evidence that this is an exceptional case entitling WOW Tech to recover enhanced damages.

33.     The amount of enhanced damages WOW Tech is entitled to recover.

34.     Whether WOW Tech can prove by a preponderance of the evidence that it is entitled to a permanent injunction to enjoin EIS, its officers, agents, successors and assigns of each, from infringement of one or more Asserted Claims of the Asserted Patents.

35.     The amount of pre- and post-judgment interest to which WOW Tech is entitled to receive on the damages it is awarded.

36.     Whether WOW Tech can prove by a preponderance of the evidence that it is entitled to attorneys' fees and/or costs.

37.     Whether WOW Tech is entitled to any other relief that the Court deems appropriate for purposes of this action.

## II.     WOW TECH RESPONSE TO EIS'S STATEMENT OF FACTS ON ISSUES ON WHICH EIS HAS THE BURDEN OF PROOF

### A.     Unfair Competition (Lanham Act and Delaware Common Law), Delaware Deceptive Trade Practices Act, and Delaware Common Law Tortious Interference with Business Relations[1]

38.     Whether EIS, Inc. has proven that any review of EIS, Inc.'s Satisfyer Air Pulse products was posted on Amazon in 2016 by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH.

---

[1] WOW Tech disputes that any issues relating to alleged "false advertising" in violation of § 43(a)(1)(B) of the Lanham Act are issues to be litigated in this case as EIS identified in its Statement of Facts on Issues on which EIS has the Burden of Proof (Ex. 2, ¶ 6), as such issues have never been pled by EIS, Inc. or any other party in this case.

6

Exhibit 03.006

39.     Whether EIS, Inc. has proven that any review of EIS, Inc.'s Satisfyer Air Pulse products was posted on Amazon in 2016 by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH, and that any such review was false or misleading.

40.     Whether EIS, Inc. has proven that any review of EIS, Inc.'s Satisfyer Air Pulse products was posted on Amazon in 2016 by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH, and that any such review was not a statement of opinion.

41.     Whether EIS, Inc. has proven that any review of EIS, Inc.'s Satisfyer Air Pulse products was posted on Amazon in 2016 by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH; that any such review was false or misleading; and that such review caused EIS, Inc. any harm.

42.     Whether EIS, Inc. has proven that any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH made a false or misleading statement to Amazon.com regarding Satisfyer Air Pulse products during the fall of 2021 in the process of participating in Amazon's Utility Patent Neutral Evaluation ("UPNE") program.[2]

43.     Whether Novoluto GmbH had a good faith belief that Satisfyer Air Pulse products infringe one or more claims of the '220 Patent in the process of participating in Amazon's UPNE program.

44.     Whether Novoluto GmbH has had and continues to have a good faith belief that Satisfyer Air Pulse products infringe one or more claims of the Asserted Patents.

---

[2] WOW Tech disputes that any allegations regarding Amazon's UPNE program are issues to be litigated because these were never properly pled by EIS, Inc., as explained in WOW Tech's motion for partial summary judgment on this issue.  D.I. 370 (MSJ # 3, 4, 5) at 22-28 and D.I. 495 at 11-15.

Exhibit 03.007

45.     Whether EIS, Inc. has proven that it had a reasonable probability of a business opportunity with Eldorado Trading Company in July 2016.

46.     Whether EIS, Inc. has proven that any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH intentionally interfered with any reasonable probability of a business opportunity that EIS, Inc. had with Eldorado Trading Company in July 2016.

47.     Whether EIS, Inc. has proven that Eldorado Trading Company was dissuaded from entering into a business relationship with EIS, Inc. by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH.

48.     Whether EIS, Inc. has proven that any alleged intentional interference by IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH in July 2016 proximately caused damage to EIS, Inc.

49.     Whether EIS, Inc. has proven that any communication regarding Novoluto GmbH's patents made by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH to Eldorado Trading Company in July 2016 was false or misleading.

50.     Whether EIS, Inc. has proven that any communication regarding Novoluto GmbH's patents made by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH to Eldorado Trading Company in July 2016 was made in bad faith.

51.     Whether EIS, Inc. has proven that any communication regarding Satisfyer Air Pulse products made by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH to Eldorado Trading Company in July 2016 was false or misleading.

52.     Whether EIS, Inc. has proven that any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH made any false or misleading statements in

Exhibit 03.008

connection with the alleged Amazon review and/or the alleged Eldorado Trading Company communications that constitute unfair competition under Delaware common law.[3]

53.     Whether EIS, Inc. has proven that any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH made any false or misleading statements that violate Delaware Deceptive Trade Practices Act.[4]

54.     Whether EIS, Inc. has proven entitlement to recover monetary damages under the Lanham Act for the alleged posting of Amazon reviews and/or the alleged communications with Eldorado Trading Company by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH.

55.     The value of monetary damages under the Lanham Act, if any, that EIS, Inc. has proven for the alleged posting of Amazon reviews and/or the alleged communications with Eldorado Trading Company by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH.

56.     Whether EIS, Inc. has proven entitlement to recover lost profits under the Lanham Act for the alleged posting of Amazon reviews and/or the alleged communications with Eldorado Trading Company by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH.

57.     The value of lost profits under the Lanham Act, if any, that EIS, Inc. has proven for the alleged posting of Amazon reviews and/or the alleged communications with Eldorado Trading

---

[3] WOW Tech disputes that EIS should be permitted to argue unfair competition under Delaware common law beyond the allegations in EIS's Third Amended Complaint.

[4] WOW Tech disputes that EIS should be permitted to argue unfair competition under Delaware common law beyond the allegations in EIS's Third Amended Complaint.

Exhibit 03.009

Company by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH.

58.     Whether EIS, Inc. has proven by a preponderance of the evidence that it should be awarded any damages for the alleged posting of Amazon reviews and/or the alleged communications with Eldorado Trading Company by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH, and, if so, the amount EIS, Inc. has proven by a preponderance of the evidence.

59.     Whether EIS, Inc. has proven entitlement to costs of this action under 15 U.S.C. § 1117.

60.     Whether EIS, Inc. has proven entitlement to treble damages under 15 U.S.C. § 1117.

61.     Whether EIS, Inc. has proven any actions by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH, were willful.

62.     Whether EIS, Inc. has proven entitlement to exemplary and punitive damages, costs, reasonable attorneys' fees, and prejudgment interest.

63.     Whether EIS, Inc. has proven this is an exceptional case that entitles EIS, Inc. to an award of attorneys' fees and costs under 15 U.S.C. § 1117 where EIS, Inc. has engaged in predatory and abusive litigation tactics against Defendants, and, if so, the amount.

64.     Whether EIS, Inc. has proven entitlement to any other remedy or relief and, if so, what remedy or relief.

**B.     Inequitable Conduct**

*1.     EIS's Alleged Guan Theory*

65.     Whether Plaintiff and Counterclaim Defendants (collectively, "EIS") have proven by clear and convincing evidence that Guan, which was submitted to the United States Patent and

10

Exhibit 03.010

Trademark Office ("USTPO"), was withheld from the USPTO during the prosecution of the '851 Patent.

66.     Whether EIS has proven by clear and convincing evidence that a translation of Guan was not submitted by Novoluto to the USPTO during prosecution of the '851 Patent.

67.     Whether EIS has proven by clear and convincing evidence that the English language abstract of Guan that was submitted by Novoluto to the USPTO during prosecution of the '851 Patent did not fulfil the USPTO requirement of a concise explanation of relevance pursuant to MPEP 609.04(a).

68.     Whether EIS has proven by clear and convincing evidence that any translation of Guan that was not submitted by Novoluto to the USPTO during prosecution of the '851 Patent was but-for-material to the patentability of the claims of the '851 Patent.

69.     Whether EIS has proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to deceive the USTPO when Richard Cheng submitted Guan and a translation of Guan's abstract to the USPTO during the prosecution of the '851 Patent.

70.     Whether Plaintiff and Counterclaim Defendants (collectively, "EIS") have proven by clear and convincing evidence that Guan, which was submitted to the USTPO, was withheld from the USPTO during the prosecution of the '097 Patent.

71.     Whether EIS has proven by clear and convincing evidence that a translation of Guan was not submitted by Novoluto to the USPTO during prosecution of the '097 Patent.

72.     Whether EIS has proven by clear and convincing evidence that the English language abstract of Guan that was submitted by Novoluto to the USPTO during prosecution of

**Exhibit 03.011**

the '097 Patent did not fulfil the USPTO requirement of a concise explanation of relevance pursuant to MPEP 609.04(a).

73.     Whether EIS has proven by clear and convincing evidence that any translation of Guan that was not submitted by Novoluto to the USPTO during prosecution of the '097 Patent was but-for-material to the patentability of the claims of the '097 Patent.

74.     Whether EIS has proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to deceive the USTPO when Richard Cheng submitted Guan and a translation of Guan's abstract to the USPTO during the prosecution of the '097 Patent.

75.     Whether EIS has proven by clear and convincing evidence that Guan, which was submitted to the United States Patent and Trademark Office ("USTPO"), was withheld from the USPTO during the prosecution of the '061 Patent.

76.     Whether EIS has proven by clear and convincing evidence that a translation of Guan was not submitted by Novoluto to the USPTO during prosecution of the '061 Patent.

77.     Whether EIS has proven by clear and convincing evidence that the English language abstract of Guan that was submitted by Novoluto to the USPTO during prosecution of the '061 Patent did not fulfil the USPTO requirement of a concise explanation of relevance pursuant to MPEP 609.04(a).

78.     Whether EIS has proven by clear and convincing evidence that any translation of Guan that was not submitted by Novoluto to the USPTO during prosecution of the '061 Patent was but-for-material to the patentability of the claims of the '061 Patent.

79.     Whether EIS has proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to

Exhibit 03.012

deceive the USTPO when Richard Cheng submitted Guan and a translation of Guan's abstract to the USPTO during the prosecution of the '061 Patent.

## 2. *EIS's Alleged German Opposition Theory*

80.    Whether EIS had proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen withheld German Opposition proceedings from the USPTO during the prosecution of the '061 Patent where Richard Cheng submitted all cited prior art references in the German Opposition proceeding to the USPTO during the prosecution of the '851 Patent.

81.    Whether EIS has proven by clear and convincing evidence that third party attorney arguments about prior art references in a German Opposition involving one of Novoluto's German patents was but-for-material to the patentability of the claims of the '851 Patent.

82.    Whether EIS has proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to deceive the USTPO when Richard Cheng submitted all cited prior art references in the German Opposition proceeding to the USPTO during the prosecution of the '851 Patent.

83.    Whether EIS had proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen withheld German Opposition proceedings from the USPTO during the prosecution of the '061 Patent where Richard Cheng submitted all cited prior art references in the German Opposition proceeding to the USPTO during the prosecution of the '061 Patent.

84.    Whether EIS has proven by clear and convincing evidence that third party attorney arguments about prior art references in a German Opposition involving one of Novoluto's German patents was but-for-material to the patentability of the claims of the '061 Patent.

13

Exhibit 03.013

85.     Whether EIS has proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to deceive the USTPO when Richard Cheng submitted all cited prior art references in the German Opposition proceeding to the USPTO during the prosecution of the '061 Patent.

86.     Whether Plaintiff and Counterclaim Defendants (collectively, "EIS") have proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen withheld German Opposition proceedings from the USPTO during the prosecution of the '097 Patent where Richard Cheng submitted all cited prior art references in the German Opposition proceeding to the USPTO during the prosecution of the '097 Patent.

87.     Whether EIS has proven by clear and convincing evidence that third party attorney arguments about prior art references in a German Opposition involving one of Novoluto's German patents was but-for-material to the patentability of the claims of the '097 Patent.

88.     Whether EIS has proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to deceive the USTPO when Richard Cheng submitted all cited prior art references in the German Opposition proceeding to the USPTO during the prosecution of the '097 Patent.

### 3.     EIS's Alleged "New Matter" Theory

89.     Whether EIS has proven by clear and convincing evidence that any improper "new matter" as defined by the USPTO was added to the specification of the continuation application for the '097 Patent.

90.     Whether EIS has proven by clear and convincing evidence that filing of the application for the '097 Patent without a preliminary amendment was contrary to USPTO rules or requirements.

Exhibit 03.014

91.     Whether EIS has proven by clear and convincing evidence that the application for the '097 Patent was amended at the time of its filing to include subject matter not supported by the '061 Patent.

92.     Whether EIS has proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to deceive the USPTO when Richard Cheng filed the application for the '097 Patent without a preliminary amendment.

93.     Whether EIS has proven by clear and convincing evidence that any amendment to the application for the '097 Patent at the time of its filing was but-for-material to the patentability of the claims of the '097 Patent.

94.     Whether EIS has proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to deceive the USTPO when Richard Cheng submitted to the USPTO the continuation application for the '097 Patent with non-substantive edits to the continuation application's specification.

95.     Whether EIS has proven by clear and convincing evidence that any improper "new matter" as defined by the USPTO was added to the specifications of the continuation applications leading to the '220 Patent.

96.     Whether EIS has proven by clear and convincing evidence that filing of the applications leading to the '220 Patent without preliminary amendment(s) was contrary to USPTO rules or requirements.

97.     Whether EIS has proven by clear and convincing evidence that the applications leading to the '220 Patent were amended at the time of their filings to include subject matter not supported by the '851 Patent.

Exhibit 03.015

98.    Whether EIS has proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to deceive the USPTO when Richard Cheng filed the applications leading to the '220 Patent without preliminary amendment(s).

99.    Whether EIS has proven by clear and convincing evidence that any amendment to the applications leading to the '220 Patent at the time of their filings was but-for-material to the patentability of the claims of the'220 Patent.

100.    Whether EIS has proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to deceive the United States Patent and Trademark Office ("USTPO") when Richard Cheng submitted to the USPTO the continuation applications leading to the '220 Patent with non-substantive edits to the continuation applications' specifications.

101.    Whether EIS has proven by clear and convincing evidence that any improper "new matter" as defined by the USPTO was added to the specifications of the continuation applications leading to the '418 Patent.

102.    Whether EIS has proven by clear and convincing evidence that filing of the applications leading to the '418 Patent without preliminary amendment(s) was contrary to USPTO rules or requirements.

103.    Whether EIS has proven by clear and convincing evidence that the applications leading to the '418 Patent were amended at the time of their filings to include subject matter not supported by the '851 Patent.

104.    Whether EIS has proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to

16

Exhibit 03.016

deceive the USPTO when Richard Cheng filed the applications leading to the '418 Patent without preliminary amendment(s).

105.    Whether EIS has proven by clear and convincing evidence that any amendment to the applications leading to the '418 Patent at the time of their filings was but-for-material to the patentability of the claims of the '418 Patent.

106.    Whether EIS has proven by clear and convincing evidence that Richard Cheng, Marianne Buckley, Johannes Plettenberg and/or Tobias Zegenhagen acted with the intent to deceive the United States Patent and Trademark Office ("USTPO") when Richard Cheng submitted to the USPTO the continuation applications leading to the '418 Patent with non-substantive edits to the continuation applications' specifications.

107.    Whether EIS has proven by clear and convincing evidence that any inequitable conduct under any of its theories articulated for the '851 or '061 Patents "infected" any of the '220, '418, or '097 Patents such as to render any of the '220, '418, or '097 Patents unenforceable.

### C.    *Walker Process* Fraud

108.    Whether EIS has proven by clear and convincing evidence that Novoluto procured any of the '851, '061, '097, '220 or '418 Patents by knowing and willful fraud on the USPTO.

109.    Whether EIS has proven by clear and convincing evidence that Novoluto has maintained any of the '851, '061, '097, '220 or '418 Patents in an attempt to monopolize the sex toy industry, with knowledge of fraudulent procurement.

110.    Whether EIS has proven by clear and convincing evidence that Novoluto has enforced any of the '851, '061, '097, '220 or '418 Patents in an attempt to monopolize the sex toy industry, with knowledge of fraudulent procurement.

111.    If EIS has proven fraudulent procurement, maintenance, or enforcement of any of the Asserted Patents, whether EIS has also proven that any of IntiHealth Ger GmbH; WOW Tech

17

Exhibit 03.017

USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH has engaged in predatory or anticompetitive conduct with a specific intent to monopolize the U.S. market for sex toys incorporating Novoluto's patented technology through the alleged posting of four  Amazon reviews and alleged communications to Eldorado Trading Company in 2016.

112.    If EIS has proven fraudulent procurement, maintenance, or enforcement of any of the Asserted Patents, whether EIS has also proven that any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH had a dangerous probability of achieving monopoly power in the U.S. market for sex toys incorporating Novoluto's patented technology.

113.    Whether EIS has proven entitlement to attorneys' fees and costs incurred in bringing this suit where Novoluto has demonstrated repeatedly the validity of its patents and there is no evidence of fraudulent procurement, maintenance, or enforcement of any Novoluto patent, and, if so, in what amount.

114.    Whether EIS has proven entitlement to any other remedy or relief arising from its *Walker Process* fraud allegations and, if so, what remedy or relief.

### D.    Invalidity under 35 U.S.C. §§ 102 and/or 103

115.    Whether EIS has proven by clear and convincing evidence that the asserted claims of the '851 Patent are obvious under 35 U.S.C. § 103[5] in view of any of the following grounds: (1)

---

[5] Novoluto objects to EIS's Statement of Issues to be Litigated as including anticipation issues that are not a part of this case. There are no anticipation invalidity grounds in this case against the '851, '061, '097, or '418 Patent.  EIS's January 23, 2023 Election of Prior-Art-Based Invalidity Arguments pursuant to D.I. 299 only included anticipation grounds against two of the Patents-in-Suit: (1) Taylor against claim 21 of the '061 Patent; and (2) Witt against claims 1, 3, and 4 of the '220 Patent.  EIS did not identify any anticipation grounds against any asserted claim of the '851, '097, or '418 Patents in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments. This Court struck the Taylor anticipation ground against claim 21 of the '061 Patent due to IPR estoppel under 35 U.S.C. § 315(e) in D.I. 518. Therefore, the only remaining anticipation ground in this case is Witt (which is not prior art, see D.I. 370 (MSJ # 8) at 31-32 and D.I. 495 at 16-17) against claim 1 of the '220 Patent. To the extent EIS now attempts to introduce stricken grounds and/or grounds that were not included in its January 23,

Exhibit 03.018

Yang; (2) Eros and Yang; (3) Guan and Yang.[6]

116.    Whether EIS has proven by clear and convincing evidence that the asserted claims

of the '061 Patent are obvious under 35 U.S.C. § 103[7] in view of any of the following grounds: (1)

Yang and Taylor; (2) Eros, Yang, and Taylor.[8]

117.    Whether EIS has proven by clear and convincing evidence that the asserted claims

of the '097 Patent are obvious under 35 U.S.C. § 103[9] in view of any of the following grounds: (1)

Yang and Taylor; (2) Eros, Yang, and Taylor.[10]

---

2023 Election of Prior-Art-Based Invalidity Arguments, these attempts are in violation of Court orders and are highly prejudicial to Novoluto, and Novoluto will seek resolution of this issue from the Court.

[6] Novoluto disputes that any of these grounds are proper grounds to be asserted in this case as they are all subject to IPR estoppel under 35 U.S.C. § 315(e) as explained in Novoluto's motion for summary judgment on IPR estoppel. *See* D.I. 581-583, 597, and 598.  This Court struck the Guan & Hovland obviousness ground against all asserted claims of the '851 Patent due to IPR estoppel under 35 U.S.C. § 315(e) in D.I. 518. EIS did not identify any other prior-art-based invalidity grounds against the '851 Patent in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments. In the event the Court grants Novoluto's pending summary judgment motion on IPR estoppel, this issue will no longer be an issue to be litigated and questions regarding prior-art-based invalidity against the asserted claims of the '851 Patent should not be submitted to the jury.

[7] *See* footnote 2.

[8] Novoluto disputes that any of these grounds are proper grounds to be asserted in this case as they are all subject to IPR estoppel under 35 U.S.C. § 315(e) as explained in Novoluto's motion for summary judgment on IPR estoppel. *See* D.I. 581-583, 597, and 598.  This Court struck the Guan & Taylor obviousness ground against all asserted claims of the '061 Patent due to IPR estoppel under 35 U.S.C. § 315(e) in D.I. 518. EIS did not identify any other prior-art-based invalidity grounds against the '061 Patent in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments. In the event the Court grants Novoluto's pending summary judgment motion on IPR estoppel, this issue will no longer be an issue to be litigated and questions regarding prior-art-based invalidity against the asserted claims of the '061 Patent should not be submitted to the jury.

[9] *See* footnote 2.

[10] Novoluto disputes that any of these grounds are proper grounds to be asserted in this case as they are all subject to IPR estoppel under 35 U.S.C. § 315(e) as explained in Novoluto's motion

19

**Exhibit 03.019**

118.    Whether the '220 Patent is entitled to its earliest priority date of September 23, 2013.

119.    Whether EIS has proven by clear and convincing evidence that asserted claims 1, 3, and 4[11] of the '220 Patent are anticipated under 35 U.S.C. § 102 in view of Witt.[12]

120.    Whether EIS has proven by clear and convincing evidence that the asserted claims 1, 3 and 4 of the '220 Patent are obvious under 35 U.S.C. § 103 in view of any of the following grounds: (1) Yang and Hovland[13]; (2) Robert, Yang, and Hovland; or (4) Guan and Hovland.[14]

---

for summary judgment on IPR estoppel. *See* D.I. 581-583, 597, and 598. This Court struck the Witt & Taylor obviousness ground and the Guan & Lee & Hovland ground against all asserted claims of the '097 Patent due to IPR estoppel under 35 U.S.C. § 315(e) in D.I. 518. EIS did not identify any other prior-art-based invalidity grounds against the '061 Patent in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments. In the event the Court grants Novoluto's pending summary judgment motion on IPR estoppel, this issue will no longer be an issue to be litigated and questions regarding prior-art-based invalidity against the asserted claims of the '097 Patent should not be submitted to the jury.

[11] Novoluto objects to EIS's statement of issues to be litigated to the extent EIS attempts to add an anticipation ground against claim 16 of the '220 Patent. Regarding invalidity grounds asserted against the '220 Patent, EIS's January 23, 2023 Election of Prior-Art-Based Invalidity Arguments pursuant to D.I. 299 only included anticipation grounds against claims 1, 3, and 4 of the '220 Patent, not against claim 16. To the extent EIS now attempts to introduce grounds that were not included in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments, these attempts are in violation of Court orders and are highly prejudicial to Novoluto, and Novoluto will seek resolution of this issue from the Court.

[12] Novoluto disputes that this is a proper issue to be litigated because Witt is not prior art, as explained in Novoluto's motion for partial summary judgment that Witt is not prior art. *See* D.I. 370 (MSJ # 8) at 31-32 and D.I. 495 at 16-17).

[13] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19).

[14] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Guan alone or in combination with Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19).

Exhibit 03.020

121.    Whether EIS has proven by clear and convincing evidence that asserted claim 16 of the '220 Patent is obvious under 35 U.S.C. § 103[15] in view of any of the following grounds: (1) Witt[16] and Makower 744; (2) Yang, Hovland, [17] and Makower 744; (3) Robert, Yang, Hovland, and Makower 744; or (4) Guan, Hovland,[18] and Makower 744.

122.    Whether the '418 Patent is entitled to its earliest priority date of September 23, 2013.

123.    Whether EIS has proven by clear and convincing evidence that asserted claims 1 and 4 of the '418 Patent are obvious under 35 U.S.C. § 103[19] in view of any of the following

---

[15] Novoluto objects to EIS's statement of issues to be litigated to the extent it attempts to add anticipation grounds against the asserted claims of the '418 Patent. Regarding invalidity grounds asserted against the '418 Patent, EIS's January 23, 2023 Election of Prior-Art-Based Invalidity Arguments pursuant to D.I. 299 only included obviousness grounds against the asserted claims of the '418 Patent, not anticipation grounds. To the extent EIS now attempts to introduce grounds that were not included in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments, these attempts are in violation of Court orders and are highly prejudicial to Novoluto, and Novoluto will seek resolution of this issue from the Court.

[16] Novoluto disputes that this is a proper issue to be litigated because Witt is not prior art, as explained in Novoluto's motion for partial summary judgment that Witt is not prior art. *See* D.I. 370 (MSJ # 8) at 31-32 and D.I. 495 at 16-17).

[17] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19).

[18] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Guan alone or in combination with Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19).

[19] Novoluto objects to EIS's statement of issues to be litigated to the extent it attempts to add anticipation grounds against the asserted claims of the '418 Patent. Regarding invalidity grounds asserted against the '418 Patent, EIS's January 23, 2023 Election of Prior-Art-Based Invalidity Arguments pursuant to D.I. 299 only included obviousness grounds against the asserted claims of the '418 Patent, not anticipation grounds. To the extent EIS now attempts to introduce grounds that were not included in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments, these attempts are in violation of Court orders and are highly prejudicial to Novoluto, and

Exhibit 03.021

grounds: (1) Witt[20] and Hovland[21]; (2) Yang and Hovland; (3) Robert, Yang, and Hovland; or (4) Guan and Hovland.[22]

      124.    Whether EIS has proven by clear and convincing evidence that asserted claim 10 of the '418 Patent is obvious under 35 U.S.C. § 103[23] in view of any of the following grounds: (1) Witt[24], Hovland[25], and Makower 744; (2) Yang, Hovland, and Makower 744; (3) Robert, Yang,

---

Novoluto will seek resolution of this issue from the Court.

[20] Novoluto disputes that this is a proper issue to be litigated because Witt is not prior art, as explained in Novoluto's motion for partial summary judgment that Witt is not prior art. *See* D.I. 370 (MSJ # 8) at 31-32 and D.I. 495 at 16-17.

[21] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19.

[22] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Guan alone or in combination with Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19.

[23] Novoluto objects to EIS's statement of issues to be litigated to the extent it attempts to add anticipation grounds against the asserted claims of the '418 Patent.  Regarding invalidity grounds asserted against the '418 Patent, EIS's January 23, 2023 Election of Prior-Art-Based Invalidity Arguments pursuant to D.I. 299 only included obviousness grounds against the asserted claims of the '418 Patent, not anticipation grounds. To the extent EIS now attempts to introduce grounds that were not included in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments, these attempts are in violation of Court orders and are highly prejudicial to Novoluto, and Novoluto will seek resolution of this issue from the Court.

[24] Novoluto disputes that this is a proper issue to be litigated because Witt is not prior art, as explained in Novoluto's motion for partial summary judgment that Witt is not prior art. *See* D.I. 370 (MSJ # 8) at 31-32 and D.I. 495 at 16-17.

[25] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19.

Exhibit 03.022

and Makower 744; or (4) Guan, Hovland,[26] and Makower 744.

### E.  Indefiniteness under 35 U.S.C. § 112

125.    Whether EIS has proven by clear and convincing evidence that claim 21 of the '061 Patent is invalid under 35 U.S.C. § 112 based on EIS's theory that the limitation including "pressure field generating arrangement" is indefinite.[27]

126.    Whether EIS has proven by clear and convincing evidence that claims 1, 10, and 12 of the '097 Patent are invalid under 35 U.S.C. § 112 based on EIS's theory that that the Court's construction of the claim term "flexible wall" / "flexible wall portion" is indefinite.[28]

127.    Whether EIS has proven by clear and convincing evidence that claims 1, 3, 4, and 16 of the '220 Patent are invalid under 35 U.S.C. § 112 based on EIS's theory that the Court's construction of the claim term "sealingly engage a portion of a body of a user, including the clitoris" is indefinite, and/or that the Court's construction of the claim term "flexible wall" / "flexible wall portion" is indefinite.[29]

---

[26] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Guan alone or in combination with Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19).

[27] Novoluto disputes that this is a proper issue to be litigated because the Court already ruled on this issue during claim construction (D.I. 300 and 301) and to the extent EIS challenges the Court's construction, the arguments are untimely as explained in Novoluto's *Daubert* motion at D.I. 370 at 49-50.

[28] Novoluto disputes that this is a proper issue to be litigated because the Court already ruled on this issue during claim construction (D.I. 300 and 301) and to the extent EIS challenges the Court's construction, the arguments are untimely as explained in Novoluto's *Daubert* motion at D.I. 370 at 49-50.

[29] Novoluto disputes that this is a proper issue to be litigated because the Court already ruled on this issue during claim construction (D.I. 300 and 301) and to the extent EIS challenges the Court's construction, the arguments are untimely as explained in Novoluto's *Daubert* motion at D.I. 370 at 49-50.

**Exhibit 03.023**

128.     Whether EIS has proven by clear and convincing evidence that claims 1, 4, and 10 of the '418 Patent are invalid under 35 U.S.C. § 112 based on EIS's theory that the Court's construction of the claim term "flexible wall" / "flexible wall portion" is indefinite. [30]

### F.     EIS's Patent Misuse Defense to Patent Infringement

129.     Whether EIS has proven that any of any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH has impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect.

130.     Whether EIS has proven that any of any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH has imposed conditions that derive their force from the patents such that Novoluto GmbH has impermissibly broadened the scope of the patents with anticompetitive effect.

131.     Whether EIS has proven that any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH has a practice that has the effect of extending Novoluto's statutory rights.

132.     Whether EIS has proven that any such broadening of scope proven from the immediately preceding statement was done in a manner that has anticompetitive effects.

### G.     EIS's Unclean Hands Defense to Patent Infringement

133.     Whether EIS has proven by clear and convincing evidence that WOW Tech has engaged in conduct involving fraud, deceit, unconscionability, or bad faith related to the Asserted Patents in this case.

---

[30] Novoluto disputes that this is a proper issue to be litigated because the Court already ruled on this issue during claim construction (D.I. 300 and 301) and to the extent EIS challenges the Court's construction, the arguments are untimely as explained in Novoluto's *Daubert* motion at D.I. 370 at 49-50.

Exhibit 03.024

134.     Whether EIS has proven by clear and convincing evidence that EIS has been injured by any such conduct and that it has affected the balance of the equities between WOW Tech and EIS.

**H.      EIS's Equitable Estoppel Defense to Patent Infringement**

135.     Whether EIS has proven that any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH (collectively "WOW Tech") has communicated to EIS in a misleading way that WOW Tech would not enforce the asserted patents against EIS.

136.     Whether EIS has proven that it reasonably relied on any such communication by WOW Tech.

137.     Whether EIS has proven that it would be materially harmed if WOW Tech were permitted to enforce its valid and enforceable patents against EIS for EIS's willful infringement.

**I.      EIS's Acquiescence Defense to Patent Infringement**

138.     Whether EIS has proven that WOW Tech has ever made an active representation of consent to EIS's use of the Asserted Patents.

**J.      EIS's Waiver Defense to Patent Infringement**

139.     Whether EIS has proven that WOW Tech has ever engaged in affirmative conduct that amounts to an assurance to EIS that Novoluto would not assert its patents against EIS.

**K.      EIS's Claim for Costs and Attorneys' Fees**

140.     Whether EIS has proven entitlement for costs and attorneys' fees pursuant to 35 U.S.C. § 285 after EIS has engaged in egregious litigation abuse for more than four years in this Court.

141.     Whether EIS, Inc. has proven that they have prevailed in this case.

**Exhibit 03.025**

142.    Whether EIS, Inc. has proven that this case is exceptional due to the substantive strength of EIS, Inc.'s litigating position, considering both the governing law and the facts of the case.

143.    Whether EIS, Inc. has proven that Defendants have litigated this case in an unreasonable manner.

144.    Whether EIS, Inc. has proven that this case is exceptional due to the manner in which the case was litigated by Defendants.

145.    Whether EIS, Inc. has proven that they are entitled to attorneys' fees due to the exceptionality of the present case.

Exhibit 03.026

Joint Proposed Pretrial Order

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EIS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 19-1227-GBW |
| INTIHEALTH GER GMBH, WOW TECH USA, LTD., WOW TECH CANADA, LTD. AND NOVOLUTO GMBH, | |
| Defendants. | |
| | |
| NOVOLUTO GMBH, | |
| Counterclaimant, | |
| v. | |
| EIS, INC., EIS GMBH, TRIPLE A IMPORT GMBH, and TRIPLE A MARKETING GMBH | |
| Counterclaim Defendants. | |

## PLAINTIFF'S AND COUNTERCLAIM DEFENDANTS' STATEMENT OF CONTESTED ISSUES OF LAW

EIS, Inc., EIS GmbH, Triple A Marketing GmbH, and Triple A Import GmbH

(collectively, "EIS") hereby provide the following issues of law that remain to be litigated:[1]

---

[1] This statement is based on the claims the parties expect to present as well as Plaintiff's and Counterclaim Defendants' understanding of the claims that Defendants and Counterclaim Plaintiff seems likely to present.  If Defendants and Counterclaim Plaintiff pursue additional or altered claims, or raises additional issues, Plaintiff and Counterclaim Defendants reserve the right to supplement this statement.  If an issue identified herein is more properly considered an issue of fact, it should be so considered.  If an issue of fact is more properly considered an issue of law, that issue is incorporated into this statement.  Plaintiff and Counterclaim Defendants reserve the right to revise this statement as necessary considering the Court's pretrial orders, including evidentiary rulings, or if any new allegations arise for which the submissions did not fairly put

**Exhibit 4.001**

## I.  Lanham Act Unfair Competition

Issues To be Litigated

1.  Whether Intihealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; and Novoluto GmbH (collectively, "Defendants" or "WOW Tech") violated Section 43(a)(1)(B) of the Lanham Act—15 U.S.C. § 1125(a)(1)(B)—by publishing false and/or misleading reviews of EIS, Inc.'s products on Amazon.

2.  Whether Defendants violated Section 43(a)(1)(B) of the Lanham Act—15 U.S.C. § 1125(a)(1)(B)—by making false and/or misleading statements about alleged infringement of unenforceable and non-existent patent rights in relation to EIS, Inc.'s products.

3.  Whether Defendants violated Section 43(a)(1)(B) of the Lanham Act—15 U.S.C. § 1125(a)(1)(b)—by making false and/or misleading statements about the Satisfyer Air Pulse products and alleged infringement of unenforceable patent rights to Amazon.com in order to have those products removed from Amazon.com.

4.  The amount of damages owed by Defendants for violation of the Lanham Act.

5.  Whether costs and attorneys' fees should be awarded for Defendants' violation of the Lanham Act.

6.  Whether Defendants should be enjoined from continuing violations of the Lanham Act.

Legal Authority

---

Plaintiff and Counterclaim Defendants on notice.  By including an issue of law here, Plaintiff and Counterclaim Defendants do not assume the burden of proof or production regarding any issues that is Defendants' or Counterclaim Plaintiff's burden to prove.  Nor do Plaintiff and Counterclaim Defendants concede that any genuine dispute exists as to any of the issues listed.

Exhibit 4.002

7.   Section 43(a)(1)(B) of the Lanham Act—15 U.S.C § 1125(a)(1)(B)—provides that "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

8.   "When . . . a violation under section 1125(a) . . . of this title . . . shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  "The court shall assess such profits and damages or cause the same to be assessed under its direction. . . .   In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. . . .   The court in exceptional cases may award reasonable attorney fees to the prevailing party."  *Id.*

9.   "The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable . . . to prevent a violation under subsection (a) . . . of section 1125 of this title."  15 U.S.C. § 1116(a).  "A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction . . . ."  *Id.*

**Exhibit 4.003**

## II.      Delaware Uniform Deceptive Trade Practices Act

Issues To be Litigated

10. Whether Defendants violated the Delaware Uniform Deceptive Trade Practices Act ("DTPA") by publishing false and/or misleading reviews of EIS, Inc.'s products on Amazon.

11. Whether Defendants violated the DTPA by making false and/or misleading statements about alleged infringement of unenforceable and non-existent patent rights in relation to EIS, Inc.'s products.

12. Whether Defendants violated the DTPA by making false and/or misleading statements about the Satisfyer Air Pulse products and alleged infringement of unenforceable patent rights to Amazon.com in order to have those products removed from Amazon.com.

13. Whether damages owed by Defendants shall be trebled for violation of the DTPA.

14. Whether costs and attorneys' fees should be awarded for Defendants' violation of the DTPA.

15. Whether Defendants should be enjoined from continuing violations of the DTPA.

Legal Authority

16. Under the DTPA, "[a] person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he: . . . (8) [d]isparages the goods, services, or business of another by false or misleading representation of fact," or "(12) [e]ngages in . . . conduct which similarly creates a likelihood of confusion or of misunderstanding."  6 Del. C. §§ 2352(a)(8), (12); *see also QVC, Inc. v. Your Vitamins, Inc.*, 714 F. Supp. 2d 291, 298 (D. Del. 2010).

17. "[A] person likely to be damaged by deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court

4

**Exhibit 4.004**

considers reasonable.  Proof of monetary damage, loss of profits, or intent to deceive, is not required."  6 Del. C. § 2533(a).

18. "The court in exceptional cases may award reasonable attorneys' fees to the prevailing party.  Costs or attorneys' fees may be assessed against a defendant only if the court finds that defendant has willfully engaged in a deceptive trade practice."  6 Del. C. § 2533(b).

19. "The relief provided in this section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this State.  If damages are awarded to the aggrieved party under the common law or other statutes of this State, such damages awarded shall be treble the amount of the actual damages proved."  6 Del. C. § 2533(c).

## III.    Delaware Common Law Unfair Competition

<u>Issues To be Litigated</u>

20. Whether Defendants committed acts of unfair competition according to Delaware common law by publishing false and/or misleading reviews of EIS, Inc.'s products on Amazon.

21. Whether Defendants committed acts of unfair competition according to Delaware common law by making false and/or misleading statements about alleged infringement of unenforceable and non-existent patent rights in relation to EIS, Inc.'s products.

22. Whether Defendants committed acts of unfair competition according to Delaware common law by making false and/or misleading statements about the Satisfyer Air Pulse products and alleged infringement of unenforceable patent rights to Amazon.com in order to have those products removed from Amazon.com.

23. The amount of damages owed by Defendants for their unfair competition under the Delaware common law, including any punitive damages.

**Exhibit 4.005**

24. Whether costs and attorneys' fees should be awarded for Defendants' unfair competition under the Delaware common law.

25. Whether Defendants should be enjoined from continuing its unfair competition under the Delaware common law.

<u>Legal Authority</u>

26. A defendant is liable for unfair competition according to Delaware common law where "the plaintiff has a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm." *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1057 (Del. Super. Ct. 2001).

27. "The traditional forms of monetary recovery, in addition to costs, assessed against the perpetrators of . . . unfair competition are damages and profits." *Taussig v. Wellington Fund, Inc.*, 187 F. Supp. 179, 221-22 (D. Del. 1960), *aff'd*, 313 F.2d 472 (3d Cir. 1963).

28. "Punitive damages are recoverable under Delaware law when the defendant's conduct exhibits a wanton or willful disregard for the rights of the plaintiff." *Surgiquest v. Lexion Med., Inc.*, No. 14-382-GMS, 2018 WL 2247216, at *6 (D. Del. May 16, 2018); *see also Concors Supply Co. v. Giesecke Int'l Ltd.*, 1992 WL 91151, at *4-5 (Del. Super. Ct. Apr. 28, 1992).

29. "An injunction is the most common remedy in unfair competition cases." *Restatement* (Third) of Unfair Competition § 36 (1995).

**IV.    Delaware Common Law Tortious Interference with Business Relations**

<u>Issues To be Litigated</u>

6

**Exhibit 4.006**

30. Whether Defendants committed tortious interference with EIS, Inc.'s business relations by publishing false and/or misleading reviews of EIS, Inc.'s products on Amazon.

31. Whether Defendants committed tortious interference with EIS, Inc.'s business relations by making false and/or misleading statements about alleged infringement of unenforceable and non-existent patent rights in relation to EIS, Inc.'s products.

32. Whether Defendants committed tortious interference with EIS, Inc.'s business relations by making false and/or misleading statements about the Satisfyer Air Pulse products and alleged infringement of unenforceable patent rights to Amazon.com in order to have those products removed from Amazon.com.

33. The amount of damages owed by Defendants for their tortious interference with business relations under the Delaware common law, including any punitive damages.

34. Whether costs and attorneys' fees should be awarded for Defendants' tortious interference with business relations.

35. Whether Defendants should be enjoined from continuing its tortious interference with business relations under the Delaware common law.

Legal Authority

36. The elements of a tortious interference with business relations claim are: "(1) the reasonable probability of a business opportunity; (2) intentional interference; (3) proximate causation; and (4) damages, 'all of which must be considered in light of defendant's privilege to compete . . . in a fair and lawful manner.'" *Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 664 (D. Del. 2008) (quoting *Lipson v. Anesthesia SErvs., P.A.*, 790 A.2d 1261, 1285 (Del. Super. 2001)).

Exhibit 4.007

37. Lost profits are recoverable for tortious interference with business relations claims. *See, e.g.*, *Empire Fin. Servs., Inc. v. Bank of New York (Delaware)*, 900 A.2d 92, 98 (Del. 2006).

38. "Punitive damages are recoverable under Delaware law when the defendant's conduct exhibits a wanton or willful disregard for the rights of the plaintiff." *Surgiquest v. Lexion Med., Inc.*, No. 14-382-GMS, 2018 WL 2247216, at *6 (D. Del. May 16, 2018); *see also Concors Supply Co. v. Giesecke Int'l Ltd.*, 1992 WL 91151, at *4-5 (Del. Super. Ct. Apr. 28, 1992).

39. "[I]njunctive relief is a common and non-controversial remedy for tortious interference with prospective economic advantage." *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017); *Copi of Del., Inc. v. Kelly*, 1996 WL 633302, at *4-5 (Del. Ch. Oct. 25, 1996).

## V.     Inequitable Conduct

Issues To be Litigated

40. Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that the '851 patent is unenforceable due to inequitable conduct during prosecution of the patent before the United States Patent and Trademark Office ("USPTO").

41. Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that the '061 patent is unenforceable due to inequitable conduct during prosecution of the patent before the USPTO.

42. Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that the '097 patent is unenforceable due to inequitable conduct during prosecution of the patent before the USPTO.

Exhibit 4.008

43. Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that the '220 patent is unenforceable due to inequitable conduct during prosecution of the patent before the USPTO.

44. Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that the '418 patent is unenforceable due to inequitable conduct during prosecution of the patent before the USPTO.

45. Whether Plaintiff and Counterclaim Defendants have proven that inequitable conduct with respect to any of the '851 and/or '061 patents renders unenforceable the '097, '220, and/or '418 patents via the doctrine of "infectious unenforceability."

Legal Authority

46. "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (en banc). "Unlike validity defenses, which are claim specific, inequitable conduct regarding a single claim renders the entire patent unenforceable." *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1350 (Fed. Cir. 2017) (citing *Therasense*, 649 F.3d at 1288).

47. "[T]he taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family." *Therasense*, 649 F.3d at 1288-89.

48. "To prevail on a claim of inequitable conduct, the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO." *Therasense*, 649 F.3d at 1290 (citation omitted). The accused infringer "proves inequitable conduct by clear and convincing evidence that the patent applicant (1) misrepresented or omitted information material to

9

Exhibit 4.009

patentability, and (2) did so with specific intent to mislead or deceive the PTO." *American Calcar, Inc. v. American Honda Motor Co., Inc.*, 768 F.3d 1185, 1188-89 (Fed. Cir. 2014).

49. "In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference.  In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Therasense*, 649 F.3d at 1290 (cleaned up).

50. "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence.  However, to meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence." *Therasense*, 649 F.3d at 1290; *see also Regeneron Pharms.*, 864 F.3d at 1350-51.  "Partial disclosure of material information about the prior art to the PTO cannot absolve a patentee of intent if the disclosure is intentionally selective." *American Calcar*, 768 F.3d at 1190; *see also Semiconductor Energy Lab. Co., Ltd. v. Samsung Elecs. Co., Ltd.*, 204 F.3d 1368, 1376 (Fed. Cir. 2000) (failure to disclose full translation of reference even though one-page partial translation was disclosed constituted inequitable conduct).

51. Under 37 C.F.R. § 1.56(a), "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section." *See also* Manual of Patent Examining Procedure (MPEP) § 2001.06(c).

Exhibit 4.010

52. "[T]he materiality required to establish inequitable conduct is but-for materiality. When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art.  Hence, in assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference.  In making this patentability determination, the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction."  *Therasense*, 649 F.3d at 1291-92; *see also Regeneron Pharms.*, 864 F.3d at 1350.

53. "Although but-for materiality generally must be proved to satisfy the materiality prong of inequitable conduct, this court recognizes an exception in cases of affirmative egregious misconduct."  *Therasense*, 649 F.3d at 1292.  "When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material."  *Id.*

## VI.    Walker Process Fraud

Issues To be Litigated

54. Whether Defendants are liable for *Walker Process* fraud by enforcing patents that were fraudulently procured, and/or otherwise misusing those patents (e.g., in efforts to pressure retailers, distributors, and wholesalers not to carry competing products and to remove competitive products from Amazon.com), in an attempt to monopolize the market for sexual wellness devices incorporating pulsating air for clitoral stimulation in the United States.

55. If Defendants are liable for *Walker Process* fraud, the amount of damages owed, including the cost and attorney fees incurred prosecuting the antitrust suit and the attorneys fees incurred defending the infringement suit based on fraudulently procured patents.

11

**Exhibit 4.011**

56. Whether Defendants should be enjoined from their continued attempted monopolization.

<u>Legal Authority</u>

57. "In order to prevail on a *Walker Process* claim, the antitrust-plaintiff must show two things: first, that the anti-trust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced the patent with knowledge of the fraudulent procurement; and second, all the other elements necessary to establish a Sherman Act monopolization claim." *TransWeb, LLC v. 3M Innovative Properties Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016).

58. "A claim of attempted monopolization under § 2 of the Sherman Act must allege '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. 2007).

59. "Section 4 of the Clayton Act provides that 'any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." *TransWeb*, 812 F.3d at 1308 (citing 15 U.S.C. § 15(a)). "[A]ttorneys fees incurred defending [an] infringement suit are antitrust injury and thus can form the basis for damages under § 4 [of the Clayton Act]." *Id.* at 1312.

60. "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or

Exhibit 4.012

damage is granted by court of equity, under the rules governing such proceedings . . . ."  15 U.S.C. § 26.

## VII.    Non-Infringement

<u>Issues To be Litigated</u>

61. Whether Novoluto GmbH ("Novoluto") has proven by a preponderance of the evidence that each Counterclaim Defendant literally and directly infringes claims 1, 2, and 4-6 of the '851 patent.

62. Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant literally and directly infringes claims 1, 8, and 21 of the '061 patent.

63. Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant literally and directly infringes claims 1, 10, and 12 of the '097 patent.

64. Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant literally and directly infringes claims 1, 3, 4, and 16 of the '220 patent.

65. Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant literally and directly infringes claims 1, 4, and 10 of the '418 patent.

66. Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant induces customers to infringe claim 21 of the '061 patent.[2]

67. Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant induces customers to infringe claim 12 of the '097 patent.

---

[2] Counterclaim Defendants dispute that Novoluto has preserved any indirect infringement argument other than the issue noted in this paragraph (66) and the paragraph directly below it (67).  To the extent Novoluto is permitted to present any additional indirect infringement allegation, Counterclaim Defendants dispute those allegations and those allegations are issues that remain to be litigated.

**Exhibit 4.013**

Legal Authority

68. An accused infringer is liable for direct patent infringement if, without authorization from the patentee, the accused infringer "makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor." 35 U.S.C. § 271(a). Novoluto bears the burden of proving infringement by a preponderance of the evidence.

69. The infringement analysis comprises two steps. The first step is to define disputed terms of the asserted patent claims consistent with how those terms would be understood by a person of ordinary skill in the art. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996); *Phillips v. AWH Corp.*, 415 F.3d 13013, 1313 (Fed. Cir. 2005) (en banc).

70. The second step is to determine whether the accused products infringe the asserted patent claims, by comparing the accused products with the construed asserted patent claims. *Markman*, 52 F.3d at 976; *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1383 (Fed. Cir. 2000).

71. Mere speculation cannot satisfy the patentee's burden of proof for proving infringement. *See Brighman & Women's Hosp., Inc. v. Perrigo Co.*, 751 F. App'x 995, 1003-04 (Fed. Cir. 2019) ("At most, the study suggests that Pepcid Compete® might provide immediate and sustained relief; such speculative data, however, cannot sustain Brigham's burden of proof.")

72. Infringement must be proven for each accused product. *AFG Indus. Inc. v. Cardinal IG Co.*, 375 F.3d 1367, 1374 (Fed. Cir. 2004) (remanding for the district court to examine products separately). The patentee bears the burden of proof to show that each

14

Exhibit 4.014

accused product infringes.  *L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1317-18 (Fed. Cir. 2006).

73. To establish literal infringement, a patentee must prove "each and every limitation set forth in a claim" appears in the accused system or method.  *V-Formation, Inc. v. Bennetton Grp. SpA*, 401 F.3d 1307, 1313 (Fed. Cir. 2005); *see also DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1331 (Fed. Cir. 2001) ("Literal infringement of a claim occurs when every limitation in the claim appears in the accused device, i.e., when 'the properly construed claim reads on the accused device exactly.'") (citation omitted).

74. "Each element contained in a patent claim is deemed material to defining the scope of the patented invention." *WarnerJenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).  The absence of even one claim element of an asserted claim precludes literal infringement of that claim.  *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991); *NOMOS Corp. v. BrainLAB USA, Inc.*, 357 F.3d 1364, 1367 n.1 (Fed. Cir. 2004); *Khan v. GMC*, 135 F.3d 1472, 1477 (Fed. Cir. 1998).  If an accused product does not infringe an independent claim, it also does not infringe any claim depending therefrom.  *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989) ("It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed.")

75. "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).  "To prove inducement of infringement, the patentee must show that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute infringement.  In other words, [patentee is] required to prove that : (1) a third party directly infringed the asserted claims of the [asserted] patents; (2) [defendant]

**Exhibit 4.015**

induced those infringing acts; and (3) [defendant] knew the acts it induced constituted infringement." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016).

## VIII.   Patent Remedies

<u>Issues To be Litigated</u>

76. The amount of damages that Novoluto has proven by a preponderance of the evidence that it should be awarded for each Counterclaim Defendant's alleged infringement of the '851 patent.

77. The amount of damages that Novoluto has proven by a preponderance of the evidence that it should be awarded for each Counterclaim Defendant's alleged infringement of the '061 patent.

78. The amount of damages that Novoluto has proven by a preponderance of the evidence that it should be awarded for each Counterclaim Defendant's alleged infringement of the '097 patent.

79. The amount of damages that Novoluto has proven by a preponderance of the evidence that it should be awarded for each Counterclaim Defendant's alleged infringement of the '220 patent.

80. The amount of damages that Novoluto has proven by a preponderance of the evidence that it should be awarded for each Counterclaim Defendant's alleged infringement of the '418 patent.

81. Whether Novoluto has proven that it provided actual notice to each Counterclaim Defendant by an affirmative communication specifically charging a specific accused product

16

**Exhibit 4.016**

of infringement of each of the '851, '061, '097, '220, and '418 patents, pursuant to 35 U.S.C. § 287, prior to the filing of Novoluto's counterclaims against each Counterclaim Defendant.

82. Whether Novoluto has proven that it provided constructive notice to Counterclaim Defendants by marking products that practices the '851, '061 patent, '097, '220, and/or '418 patents with the respective patent numbers, pursuant to 35 U.S.C. § 287.

83. Whether Novoluto has proven that the products identified by Counterclaim Defendants as unmarked covered products were sufficiently marked pursuant to 35 U.S.C. § 287.

84. Whether Novoluto has proven that it took reasonable steps to ensure its licensees complied with the marking requirements pursuant to 35 U.S.C. § 287 and whether its licensees did comply with those marking requirements.

85. Whether Novoluto has proven entitlement to enhanced damages under 35 U.S.C. § 284.

86. Whether Novoluto has proven entitlement to injunctive relief.

87. Whether Novoluto has proven entitlement to any costs of this suit.

88. Whether Novoluto has proven entitlement to pre-judgment interest.

89. Whether Novoluto has proven entitlement to post-judgment interest.

<u>Legal Authority – Notice</u>

90. Failure to comply with the marking provisions of 35 U.S.C. § 287(a) bars all damages until notice is properly given. *See* 35 U.S.C. § 287(a). The notice provision in 35 U.S.C. § 287(a) states that "[i]n the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was [1] notified of the infringement and [2] continued to infringe thereafter."

17

Exhibit 4.017

91. The law requires "the affirmative communication of a specific charge of infringement by a specific accused product or device." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 950 F.3d 860, 864 (Fed. Cir. 2020) ("*Arctic Cat II*"). This obligation is imposed "on the patentee, and only the patentee is capable of discharging those obligations." *Id.* at 864, 866. Thus, "[t]he correct approach to determining notice under section 287 must focus on the action of the patentee, not the knowledge of the infringer." *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994); *Belden Techs. Inc. v. Superior Exxex Commc'ns LP*, 733 F. Supp. 2d 517, 536-37 (D. Del. 2010) ("Mere knowledge [by the alleged infringer] of the patent[] in suit is insufficient to place [the alleged infringer] on [actual] notice.")

92. "[T]he actual notice requirement of § 287(a) is satisfied when the recipient is informed of the identity of the patent and the activity that is believed to be an infringement, accompanied by a proposal to abate the infringement, whether by license or otherwise." *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997).

Legal Authority – Marking

93. 35 U.S.C. § 287(a) provides that if a product is not marked, "no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. . . ." *See also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 n.8 (Fed. Cir. 1995). Specifically, the statute requires that "[p]atentees . . . making [or] offering for sale . . . any patented article . . . give notice to the public that the same is patented, either by fixing thereon the word 'patent' or the abbreviation 'pat.,' together with the number of the patent, . . . or when, from the character of the article,

18

Exhibit 4.018

this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice." 35 U.S.C. § 287(a). "[A] patentee cannot receover damages in the absence of actual notice when it has not marked." *Rite-Hite Corp.*, 56 F.3d at 1549 n.8.

94. The patent holder "bears the burden of pleading and proving [it] complied with § 287(a)'s marking requirement." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017) ("*Arctic Cat I*"). "A patentee's licensees must also comply with § 287, because the statute extends to 'persons making or selling any patented article for or under [the patentee].'" *Id.* (quoting § 287(a)). A patentee fails to satisfy the marking requirements if it does not require its licensees to mark its licensed products with the patent numbers at issue, the licensee does not mark its licensed products with the patent numbers at issue, and the licensee sells licensed products covered by the patents at issue. *Id.* at 1367.

95. "Once an alleged infringer identifies products that it believes are unmarked patented articles subject to the notice requirements of § 287, the patentee bears the burden of proving that the identified products do not practice the claimed invention, or were adequately marked." *Arctic Cat II*, 950 F.3d at 864.

96. The patentee must show that "substantially all of [the patented product] being distributed were marked, and that once marking was begun, the marking was substantially consistent and continuous." *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998).

97. Once a patentee (or its licensee) is non-compliant with marking, damages are limited to either the period after the marking resumes or after actual notice is given. *Arctic Cat II*, 950 F.3d at 864.

Exhibit 4.019

Legal Authority – Reasonable Royalty

98. Upon a finding of infringement, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284.

99. The plaintiff must prove the amount of damages by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991).

100. To properly carry their burden of proving the amount of damages, the plaintiff must persuade the court using "reliable" and "legally sufficient evidence regarding an appropriate reasonable royalty." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010). The claim for damages cannot be speculative—there must be a reasonable certainty as to the amount of damages being claimed. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1335, 1340 (Fed. Cir. 2009) (vacating and remanding jury award as excessive); *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1029-30 (Fed. Cir. 1996). Plaintiffs "must show [their] damages by evidence." *Promega Corp.*, 875 F.3d at 660. "Damages 'must not be left to conjecture by the jury. They must be proved, and not guessed at.'" *Id.* (citation omitted).

101. A damages theory must be based on "sound economic and factual predicates." *Riles v. Shell Expl. & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002). "Any evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the state of the statute." *ResQNet*, 594 F.3d at 869. If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011).

20

**Exhibit 4.020**

102.     "A reasonable royalty is the predominant measure of damages in patent infringement cases." *Uniloc*, 632 F.3d at 1312.

103.     "The methodology of assessing and computing damages under 35 U.S.C. § 284 is within the sound discretion of the district court." *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 798 (Fed. Cir. 1988).  Deciding the amount of the reasonable royalty is a question of fact.  *See Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995).

104.     One approach for calculating a reasonable royalty is through a hypothetical negotiation analysis.  *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996) ("Lacking evidence of royalties in the marketplace, this court accepts evidence about hypothetical results of hypothetical negotiations between the patentee and infringer (both hypothetically willing) at the time infringement began.").  The aim of the hypothetical negotiation approach is to capture what the infringer, acting as a prudent licensee, would have been willing to pay as a royalty and yet be able to make a reasonable profit, and what amount would have been acceptable to the patent holder, acting as a prudent patentee who was willing to grant a license.  *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1121-22 (S.D.N.Y. 1970).  Thus, to determine a reasonable royalty under this approach, a jury must find the royalty that would have been agreed to in a hypothetical negotiation between a willing licensee and willing licensor.  *Lucent*, 580 F.3d at 1324-25.  A determination of the reasonable royalty under the hypothetical negotiation approach is usually made by assessing factors such as those set forth in *Georgia-Pacific*. *Rite-Hite*, 56 F.3d at 1554-55.

105.     The Federal Circuit has explained that "[t]he correct determination of [the hypothetical negotiation date] is essential for properly assessing damages."  *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2003), *vacated and remanded*

Exhibit 4.021

*on other grounds*, 545 U.S. 193 (2005). Generally, "the date of the hypothetical negotiation is the date that the infringement began." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012).

106.     "[T]he patent holder should only be compensated for the approximate incremental benefit derived from his invention." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014). The patent holder must accordingly "give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features. . . ." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). The Federal Circuit has held that "a reasonable royalty analysis requires a court to hypothesize, not to speculate . . . . [T]he trial court must carefully tie proof of damages to the claimed invention's footprint in the market place." *ResQNet*, 594 F.3d at 869; *see also Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1350-51 (Fed. Cir. 2018).

107.     The presence or absence of "non-infringing alternatives" is a "core economic question" in a hypothetical negotiation. *See Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014) ("In hypothetical negotiation terms, the core economic question is what the infringer, in a hypothetical pre-infringement negotiation under hypothetical conditions, would have anticipated the profit-making potential of use of the patented technology to be, compared to using noninfringing alternatives."); *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334-35 (Fed. Cir. 2015) ("[I]f avoiding the patent would be difficult, expensive, and time consuming, the amount the infringer would be willing to pay for a license is likely to be greater").

22

Exhibit 4.022

Legal Authority – Enhanced Damages

108.     Under 35 U.S.C. § 284, a court, in its discretion, "may increase the damages up to three times the amount found or assessed."  Enhanced damages "are not to be metered out in the typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior"; that is, conduct that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or . . . characteristic of a pirate."  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103-04 (2016).

109.     Willfulness is question of fact and "requires a showing that the totality of the circumstances evince the egregious conduct that constitutes willful infringement.  *nCube Corp. v. Seachange Int'l, Inc.*, 436 F.3d 1317, 1323-24 (Fed. Cir. 2006).  A plaintiff must provide "proof that the defendant knew about the asserted patents and knew or should have known that its conduct amounted to infringement of those patents."  *ZapFraud, Inc. v. Barracuda Networks, Inc.*, 528 F. Supp. 3d 247, 249 (D. Del. 2021).

Legal Authority – Injunctive Relief

110.     "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citing *Weinberger v. Romero-Barcelo*, 456 US 305, 311-12 (1982)).  "A plaintiff must demonstrate:  (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Id.*  "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court."  *Id.*

**Exhibit 4.023**

Legal Authority – Costs

111.     "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and *costs as fixed by the court*." 35 U.S.C. § 284 (emphasis added).

112.     Federal Rule of Civil Procedure 54(d)(1) "governs the award of costs.  It provides that unless a federal statute, these rules, or a court order provides otherwise, costs— other than attorney's fees—should be allowed to the prevailing party.  An award of costs thus involves two separate inquiries.  First, who is the prevailing party within the meaning of Rule 54(d)(1).  Second, how much (if any) costs should be awarded to the prevailing party." *Shum v. Intel Corp.*, 629 F.3d 1360, 1366 (Fed. Cir. 2010) (cleaned up).

Legal Authority – Pre-Judgment and Post-Judgment Interest

113.     "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with *interest* and costs *as fixed by the court*." 35 U.S.C. § 284 (emphasis added).

114.     "District courts have wide latitude in the selection of interest rates . . . ." *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 809 Fed. App'x 965, 977 (Fed. Cir. 2020).

115.     "Prejudgment interest may be abased only on the compensatory portion of the damages award." *Beatrice Foods Co. v. New England Printing and Lithographing Co.*, 923 F.2d 1576, 1589 (Fed. Cir. 1991).

116.     Section 284 does not require "the award of prejudgment interest whenever infringement is found.  That provision states that interest shall be 'fixed by the court,' and it

**Exhibit 4.024**

our view it leaves the court some discretion in awarding prejudgment interest.  For example, it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit.  There may be other circumstances in which it may be appropriate not to award prejudgment interest." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 656-57 (1983); *see also Conceptus, Inc. v. Hologic, Inc.*, 2012 WL 44064, at *4 (N.D. Cal. 2012); *St. Clair Intellectual Property Consultants, Inc. v. Motorola Mobility, LLC*, 292 F.R.D. 162 (D. Del. 2013).

117.     Post-judgment "[i]nterest shall be allowed on any money judgment in a civil case recovered in district court. . . .  Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."  28 U.S.C. § 1961(a).

## IX.     Invalidity

Issues To be Litigated

118.     Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 2, and 4-6 of the '851 patent are invalid as obvious under 35 U.S.C. § 103.

119.     Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 8, and 21 of the '061 patent are invalid as obvious under 35 U.S.C. § 103.

120.     Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 10, and 12 of the '097 patent are invalid as obvious under 35 U.S.C. § 103.

Exhibit 4.025

121.     Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 3, and 4 of the '220 patent are invalid as anticipated under 35 U.S.C. § 102.  Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 3, 4, and 16 of the '220 patent are invalid as obvious under 35 U.S.C. § 103.

122.     Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 4, and 10 of the '418 patent are invalid as obvious under 35 U.S.C. § 103.

123.     Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claim 21 of the '061 patent is indefinite under 35 U.S.C. § 112.

124.     Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 10, and 12 of the '097 patent are indefinite under 35 U.S.C. § 112.

125.     Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 3, 4, and 16 of the '220 patent are indefinite under 35 U.S.C. § 112.

126.     Whether Plaintiff and Counterclaim Defendants have proven by clear and convincing evidence that claims 1, 4, and 10 of the '418 patent are indefinite under 35 U.S.C. § 112.

127.     Whether secondary considerations indicate non-obviousness of any of claims 1, 2, and 4-6 of the '851.

128.     Whether secondary considerations indicate non-obviousness of any of 1, 8, and 21 of the '061 patent.

Exhibit 4.026

129.    Whether secondary considerations indicate non-obviousness of any of claims 1, 10, and 12 of the '097 patent.

130.    Whether secondary considerations indicate non-obviousness of any of claims 1, 3, 4, and 16 of the '220 patent.

131.    Whether secondary considerations indicate non-obviousness of any of claims 1, 4, and 10 of the '418 patent.

132.    Whether Novoluto has proven that claims 1, 3, 4, and 16 of the '220 patent are entitled to a priority date earlier than April 27, 2018.

133.    Whether Novoluto has proven that claims 1, 4, and 10 of the '418 patent are entitled to a priority date earlier than April 27, 2018.

134.    Whether Novoluto has proven that claims 1, 10, and 12 of the '097 patent are entitled to a priority date earlier than April 13, 2017.

135.    Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant is estopped under 35 U.S.C. § 315(e)(2) from asserting that certain prior art grounds render claims 1, 2, and 4-6 of the '851 patent invalid under 35 U.S.C. § 103.

136.    Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant is estopped under 35 U.S.C. § 315(e)(2) from asserting that certain prior art grounds render claims 1, 8, and 21 of the '061 patent invalid under 35 U.S.C. § 103.

137.    Whether Novoluto has proven by a preponderance of the evidence that each Counterclaim Defendant is estopped under 35 U.S.C. § 315(e)(2) from asserting that certain prior art grounds render claims 1, 10, and 12 of the '097 patent invalid under 35 U.S.C. § 103.

Exhibit 4.027

Legal Authority – Priority Date

138.     "An application for patent for an invention disclosed in the manner provided by section 112(a) (other than the requirement to disclose the best mode) in an application previously filed in the United States, or as provided by section 363 or 385, which names an inventor or joint inventor in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application."  35 U.S.C. §120.

139.     "It is elementary patent law that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112."  *In re Chu*, 66 F.3d 292, 297 (Fed. Cir. 1995) (citing 35 U.S.C. § 120 and *Mendenhall v. Cedarapids Inc.*, 5 F.3d 1557, 1566 (Fed. Cir. 1993) ("A patentee cannot obtain the benefit of the filing date of an earlier application where the claims in issue could not have been made in the earlier application.")).  Thus, a later filed patent application is only entitled to the benefit of the earlier filed application if the earlier filed application discloses the subject matter claimed in the later application.  *Id.*

Legal Authority – Anticipation

140.     Patents are presumed valid and a party challenging the validity of a patent must prove invalidity by clear and convincing evidence.  35 U.S.C. § 282(a); *see also Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011).  Clear and convincing evidence is evidence that "could place in the ultimate factfinder an abiding conviction that the truth of [the] factual

28

Exhibit 4.028

contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984); *see also Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009).

141.    Once the challenging party "has presented a prima facie case of invalidity, the patentee has the burden of going forward with rebuttal evidence." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007).  If the patentee fails to do so, the patent cannot be found valid.  *See, e.g.*, *Ralston Purina Co. v. Far- Mar-Co.*, 772 F.2d 1570, 1573 (Fed. Cir. 1985) ("If this burden [of making a prima face case of invalidity] is met, the party relying on validity is then obligated to come forward with evidence to the contrary.").

142.    "The courts are the final arbiter of patent validity and, although courts may take cognizance of, and benefit from, the proceedings before the patent examiner, the question is ultimately for the courts to decide, without deference to the rulings of the patent examiner." *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 876 (Fed. Cir. 1991).  Any relevant evidence, whether or not previously considered by the PTO, can be considered by the court in determining validity.  *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571-72 (Fed. Cir. 1988).

143.    A patent is invalid if "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention."  35 U.S.C. § 102(a)(1).

144.    "A finding of anticipation will invalidate the patent." *Apeldyn Corp. v. Sony Corp.*, 87 F. Supp. 3d 681, 689 (D. Del. 2015).  Anticipation is a question of fact, following the court's construction of the claims as a matter of law.  *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. Aug. 2002); *Key Pharm v. Hercon Labs. Corp.*, 161 F.3d 709, 714 (Fed. Cir. 1998) (the two-step anticipation and obviousness inquiries involve

Exhibit 4.029

"[f]irst [] construing the claim, a question of law for the court, followed by, in the case of anticipation or obviousness, a comparison of the construed claim to the prior art . . . [which] is for the fact-finder in the first instance").

145.     "To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently." *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997).  Anticipation thus "can occur when a claimed limitation is 'inherent' or otherwise implicit in the relevant reference." *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1369 (Fed. Cir. 1991).  "In other words, if granting patent protection on the disputed claim would allow the patentee to exclude the public from practicing the prior art, then that claim is anticipated, regardless of whether it also covers subject matter not in the prior art." *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999).

Legal Authority – Obviousness

146.     Obviousness is a question of law that is based on underlying issues of fact. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007).

147.     The standard for whether a patent claim is obvious is whether "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a).

148.     Obviousness is based on four underlying factual determinations:  (1) the scope and content of the prior art; (20 the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of

Exhibit 4.030

nonbviousness.  *KSR*, 550 U.S. at 406-07 (citing *Graham v. John Deere Co.*, 398 U.S. 1, 17-18 (1966)).

149.    "[T]he scope of the relevant prior art . . . include[s] that reasonably pertinent to the particular problem with which the inventor was involved."  *In re GPAC Inc.*, 57 F.3d 1573, 1577 (Fed. Cir. 1995) (quotation omitted).  "A reference is reasonably pertinent if, even though it may be in a different field of endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem."  *Id.* at 1578 (quotation omitted).  "If a reference disclosure relates to the same problem as that addressed by the claimed invention, that fact supports use of that reference in an obviousness [finding]."  *Id.* (quotation omitted).

150.    Obviousness can be established by noting that "there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims."  *KSR*, 550 U.S. at 420.  "In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls.  What matters is the objective reach of the claim."  *Id.* at 419.  Thus, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed."  *Id.* at 420.

151.    "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."  *Id.* at 416.  A critical issue is whether the "improvement is more than the predictable use of prior art elements according to their established functions."  *Id.* at 417.  "Common sense teaches . . . that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a

31

**Exhibit 4.031**

puzzle." *Id.* at 420; *see also Leapfrog Enters. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161-1162 (Fed. Cir. 2007).

152.     Obviousness is judged from the perspective of a person of ordinary skill in the art at the time the alleged invention was made. *Takeda Chem. Indus. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir. 2007). A person of ordinary skill is a hypothetical person who is "presumed to be aware of all the pertinent prior art." *Std. Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). In determining the level of ordinary skill in the art, a court should consider the following factors: (1) the types of problems encountered in the art; (2) prior art solutions to those problems; (3) the rapidity with which innovations are made; (4) the sophistication of the technology involved; and (5) the educational level of active works in the field. *Daiichi Sankyo Co., Ltd. v. Apotex Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1564 (Fed. Cir. 1997). "Not all such factors may be present in every case, and one or more . . . may predominate in a particular case." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696-97 (Fed. Cir. 1983).

153.     Obviousness is judged under "an expansive and flexible approach" driven by common sense. *KSR*, 550 U.S. at 415. The Court's obviousness "analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 418. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416.

154.     Where a claim "simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from

Exhibit 4.032

such an arrangement, the combination is obvious." *Id.* at 417 (quotation omitted).  In general, a claim is invalid for obviousness if "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention," and "would have had a reasonable expectation of success in doing so." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007).

155.    When "there are finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." *KSR*, 550 U.S. at 421.

156.    Routine experimentation on the part of an artisan does not support nonobviousness.  *See Pfizer*, 480 F.3d at 1368 ("The experimentation needed, then, to arrive at the subject matter claimed in the '303 patent was 'nothing more than routine' application of a well-known problem-solving strategy.") (citing *Merck & Co., Inc. v. Biocraft Labs.*, 874 F.2d 804, 809 (Fed. Cir. 1989)).

157.    Although it "can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements," a court "need not seek out precise teachings directed to the specific subject matter of the challenged claim." *KSR*, 550 U.S. at 418.  Nor can a court allow its "analysis" to "be confined by" an "overemphasis on the . . . explicit content" of prior art references.  *Id.* at 419.  Rather, a court must "take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 418.

158.    Finding a motivation to combine prior art references is not a rigid endeavor. "Far from requiring evidence of an explicit motivation to combine," the Federal Circuit has likewise made clear that "an implicit motivation" is enough.  *DyStar Textilfarben GmbH &*

33

Exhibit 4.033

*Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1366 (Fed. Cir. 2006) (emphasis removed).  The Federal Circuit has "repeatedly held" that a combination may be obvious "even absent any hint of suggesting in the [prior art] reference themselves." *Id.* at 1368.  A court that requires the prior art "clearly and unequivocally [to] disclose" a "motivation to combine" therefore "err[s] by taking an overly cramped view of what the prior art teaches." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 963-64 (Fed. Cir. 2014).  "[T]here is no requirement that the prior art contain an express suggestion to combine known elements to achieve the claimed invention." *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1472 (Fed. Cir. 1997).

159.    The subject matter of a patent claim can be proved obvious if there existed at the time of the alleged invention "a known problem for which there was an obvious solution encompassed by the patent's claims." *KSR*, 550 U.S. at 420.  If "a person of ordinary skill can implement a predictable variation" or if "a technique has been used to improve one device[] an a person of ordinary skill in the art would recognize that it would improve similar devices in the same way," Section 103 bars patentability.  *Id.* at 417.  "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420.  A person of skill in the art's motivation to optimize a piece of prior art or to combine pieces of prior art need not result from explicit teaching within the art but, instead, can result from "[t]he normal desire of scientists or artisans to improve upon what is already generally known" to satisfy the obviousness inquiry.  *See In re Peterson*, 315 F.3d 1325, 1330 (Fed. Cir. 2003).

160.    The question of obviousness may require consideration of objective indicia of nonobviousness.  *See KSR*, 550 U.S. at 406 (quoting *Graham*, 383 U.S. at 17-18).  "Objective evidence of nonobviousness can include copying, long felt but unresolved need,

34

**Exhibit 4.034**

failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, . . . skepticism of skilled artisans before the invention" and commercial success. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1368 (Fed. Cir. 2013); *see also WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1336 (Fed. Cir. 2016).

161.    A "nexus between the merits of the claimed invention and evidence of secondary considerations is required in order for the evidence to be given substantial weight in an obviousness decision.   Put another way, commercial success or other secondary considerations may presumptively be attributed to the patented invention only where the marketed product embodies the claimed features, and is coextensive with them." *Muniauction, Inc. v. Thomason Corp.*, 532 F.3d 1318, 1327-28 (Fed. Cir. 2008) (citations omitted).   "Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (emphasis omitted); *see also In re GPAC*, 57 f.3d at 1580 ("[F]or objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention.").   Even "impressive" evidence of secondary considerations is not "entitled to weight" unless "it is relevant to the claims at issue." *In re Paulsen*, 30 F.3d 1475, 1482 (Fed. Cir. 1994).  For commercial success, the proponent must offer proof "[that] sales were a direct result of the unique characteristics of the claimed invention." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996).

162.    Where "the inventions represented no more than 'the predictable use of prior art elements according to their established functions' . . . the secondary considerations

**Exhibit 4.035**

are inadequate to establish nonobviousness as a matter of law." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (quoting *KSR*, 550 U.S. at 417).   "[S]econdary considerations of non-obviousness . . . simply cannot overcome a strong prima facie case of obviousness." *Id.*; *see also Leapfrog*, 485 F.3d at 1162 ("[G]iven the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion [of obviousness].").

Legal Authority – Indefiniteness

163.     A patent must include "one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b).

164.     "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).   "Definiteness is to be evaluated from the perspective of someone skilled in the relevant art." *Id.* at 908.

165.     To satisfy the definiteness standard, "[t]he claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

Legal Authority – IPR Estoppel

166.     IPR estoppel prevents an IPR petitioner from asserting "any ground that the petitioner raised or reasonably could have raised during that inter partes review." 35 U.S.C. § 315(e)(2).

Exhibit 4.036

167.    IPR estoppel prevent an IPR petitioner from raising "invalidity grounds a skilled searcher conducting a diligent search reasonably could have been expected to discover." *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1298 (Fed. Cir. 2023). "[I]t is not enough simply to locate a reference; that reference must be read, and interpreted, and understood in the context of the patent." *Palomar Techs. , Inc. v. MRSI Sys., LLC*, 202 WL 2115625, at *14 (D. Mass. May 4, 2020).

168.    The patent holder has "the burden of proving, by a preponderance of the evidence, that a skilled searcher exercising reasonable diligence would have identified an invalidity ground." *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1299 (Fed. Cir. 2023).

169.    An IPR petitioner can only raise a "ground" that is based on "prior art consisting of patents or printed publications." 35 U.S.C. § 311(b). Thus, "[section] 315(e)(2) does not estop an IPR petitioner's use in litigation of an invalidity theory that relies upon a product as a prior art reference." *Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, No. 17-1612-MN, 2022 WL 2643517, at *1 (D. Del. July 8, 2022). "As a matter of statutory interpretation, estoppel does not apply to prior-art products . . . regardless of whether those products are 'cumulative'" of other printed publications that the IPR petitioner knew or could have reasonable discovered through a diligent search. *Id.*

## X.    Patent Misuse

Issues To be Litigated

170.    Whether WOW Tech has committed patent misuse with respect to the '851, '061, '097, '220, and/or '418 patents rendering them unenforceable.

Legal Authority

Exhibit 4.037

171.     "The doctrine of patent misuse is . . . grounded in the policy-based desire to prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right.  It follows that the key inquiry under the patent misuse doctrine is whether, by imposing the condition in question, the patentee has impermissibly broadened the physical or temporal scope of the patent grant and has done so in a manner that has anticompetitive effects."  *Princo Corp. v. International Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc) (cleaned up).

## XI.    Unclean Hands

Issues To be Litigated

172.     Whether EIS has proven that WOW Tech comes to this Court with unclean hands by clear and convincing evidence.

173.     Whether WOW Tech has proven that EIS comes to this Court with unclean hands by clear and convincing evidence.

Legal Authority

174.     "The doctrine of unclean hands applies when (1) a party seeking affirmative relief (2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith (3) directly related to the matter in issue (4) that injures the other party (5) and affects the balance of equities between the litigants."  *Sun Microsystems, Inc. v. Versata Enters., Inc.*, 630 F. Supp. 2d 395, 410 (D. Del. July 1, 2009) (cleaned up).

175.     The party asserting an unclean hands defense must prove the defense by clear and convincing evidence.  *See Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1374 (Fed. Cir. 2001).

38

Exhibit 4.038

## XII.    Equitable Estoppel

<u>Issues To be Litigated</u>

176.    Whether WOW Tech is equitably estopped from asserting the '851, '061, '097, '220, and/or '418 patents.

<u>Legal Authority</u>

177.    "An equitable estoppel case has three important elements.  [1] The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence.  [2] The other relies upon that communication.  [3] And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct."  *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992) (cleaned up)

## XIII.   Acquiescence

<u>Issues To be Litigated</u>

178.    Whether WOW Tech acquiesced to EIS's purported use of the '851, '061, '097, '220, and/or '418 patents.

<u>Legal Authority</u>

179.    "Acquiescence requires an active representation of consent."  *Sprint Commc'ns Co. v. Cequel Commc'ns, LLC*, No. 18-1752-RGA, 2022 WL 609213, at *3 (D. Del. Jan. 27, 2022) (cleaned up).

## XIV.   Waiver

<u>Issues To be Litigated</u>

180.    Whether WOW Tech has waived its right to assert the '851, '061, '097, '220, and/or '418 patents against EIS.

**Exhibit 4.039**

Legal Authority

181.     "Waiver requires an existing right, knowledge of the right, and an actual intention to relinquish the right." *Sprint Commc'ns Co. v. Cequel Commc'ns, LLC*, No. 18-1752-RGA, 2022 WL 609213, at *3 (D. Del. Jan. 27, 2022) (cleaned up).

## XV.   Fees

Issues To be Litigated

182.     Whether Plaintiff and Counterclaim Defendants or Counterclaim Plaintiff and Defendants are entitled to attorneys' fees pursuant to 35 U.S.C. § 285.

Legal Authority

183.     "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "[F]or a party to be a prevailing party, that party must win a dispute within the case in favor of it that materially alters the legal relationship between the parties at the time of the judgment." *Parallel Iron LLC v. NetApp Inc.*, 70 F. Supp. 3d 585, 589 (D. Del. 2014). "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). Further, "[d]istrict courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* In addition, the prevailing party must prove entitlement to attorney fees under § 285 by a preponderance of the evidence. *Id.* at 1758; *see also Chalumeau Power Sys. LLC v. Alcatel-Lucent*, No. CV 11-1175-RGA, 2014 WL 4675002, at *1 (D. Del. Sept. 12, 2014).

Exhibit 4.040

Joint Proposed Pretrial Order

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| EIS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.: 19-cv-1227-GBW |
| | § | |
| INTIHEALTH GER GMBH, | § | |
| WOW TECH USA, LTD., WOW TECH | § | |
| CANADA, LTD. and NOVOLUTO GMBH, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| NOVOLUTO GMBH, | § | |
| | § | |
| Counterclaimant, | § | |
| | § | |
| v. | § | |
| | § | |
| EIS, INC., EIS GMBH, | § | |
| TRIPLE A IMPORT GMBH, | § | |
| and TRIPLE A MARKETING GMBH, | § | |
| | § | |
| Counterclaim Defendants. | § | |

**DEFENDANTS' AND COUNTERCLAIMANT'S REVISED STATEMENT OF
ISSUES OF LAW FOR ISSUES THEY BEAR THE BURDEN OF PROOF**

Defendants IntiHealth Ger GmbH, Novoluto GmbH, WOW Tech USA, Ltd., and WOW

Tech Canada, Ltd., (collectively "WOW Tech") and Counterclaim Plaintiff and Defendant

Novoluto GmbH ("Novoluto") submit the following Revised Statement of Issues of Law for Issues

They Bear the Burden of Proof.  WOW Tech reserves the right to supplement, amend, or modify

this list, for example, to respond to any issues, arguments, or evidence from any of Plaintiff and

Counterclaim Defendant EIS, Inc. and Counterclaim Defendants EIS GmbH, Triple A Marketing

GmbH, and Triple A Import GmbH (collectively, "EIS"), or in the event of any Court ruling that

might raise new issues.  To the extent WOW Tech's Statement of Contested Facts, as set forth in

1

Exhibit 05.001

Exhibit 3, contains issues of law, those issues are incorporated herein by reference.  Should the Court determine that any issue identified below is more appropriately considered an issue of fact, WOW Tech incorporates such issue by reference into Exhibit 3.

## I.   CONTESTED ISSUES ON WHICH DEFENDANTS BEAR THE BURDEN OF PROOF

### A.   PATENT INFRINGEMENT

#### 1.  Issues of Law to be Litigated

1.     Whether Counterclaim Defendants have directly infringed the asserted claims under 35 U.S.C. § 271(a) by making, using, selling, and/or offering to sell in the United States, and/or importing into the United States the Accused Products . Specifically, whether Counterclaim Defendants have infringed the following Asserted Claims: claims 1, 2, 4-6 of U.S. Patent No. 9,763,851 ("the '851 Patent"), claims 1, 8, 21 of U.S. Patent No. 9,849,061 ("the '061 Patent"), claims 1, 10, 12 of U.S. Patent No. 9,937,097 ("the '097 Patent"), claims 1, 3, 4, 16 of U.S. Patent No. 11,090,220 ("the '220 Patent), and claims 1, 4, and 10 of U.S. Patent No. 11,103,418 ("the '418 Patent").

2.     Whether Counterclaim Defendants have and continue to induce customers to infringe the Asserted Claims of the '851 Patent.

3.     Whether Counterclaim Defendants have and continue to induce customers to infringe the Asserted Claims of the '061 Patent.

4.     Whether Counterclaim Defendants have and continue to induce customers to infringe the Asserted Claims of the '097 Patent.

5.     Whether Counterclaim Defendants have and continue to induce customers to infringe the Asserted Claims of the '220 Patent.

6.     Whether Counterclaim Defendants have and continue to induce customers to infringe the Asserted Claims of the '418 Patent.

**Exhibit 05.002**

7.     Whether Counterclaim Defendants have and continue to contribute to the infringement of claim 21 of the '061 Patent.

8.     Whether Counterclaim Defendants have and continue to contribute to the infringement of claim 12 of the '097 Patent.

### 2. Legal Authority

9.     "A patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor."  35 U.S.C. § 271(a).  A patentee bears the burden of proving infringement by a preponderance of the evidence, *i.e.*, that it is more likely than not, that an accused product embodies all limitations of the claim either literally or under the doctrine of equivalents.  *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005); *Nuance Commc'ns Inc. v. Tellme Networks Inc.*, 707 F. Supp. 2d 472, 481 (D. Del. 2010).  Infringement, whether literal or under the doctrine of equivalents, is a question of fact. *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1275 (Fed. Cir. 2013); *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1341 (Fed. Cir. 2001).

10.     "A patentee may prove infringement by any method of analysis that is probative of the fact of infringement, and circumstantial evidence may be sufficient." *Martek BioSciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) (internal citations and quotations omitted); *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006) ("A patentee may prove direct infringement or inducement of infringement by either direct or circumstantial evidence." (citation omitted)).

11.     Direct infringement is defined as the making, using, selling, or offering to sell a patented invention within the United States, or importing a patented invention into the United States, without authorization from the patent owner. 35 U.S.C. § 271(a). "Infringement, whether

Exhibit 05.003

literal or under the doctrine of equivalents, is a question of fact." *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1373 (Fed. Cir. 2006).

12.     To prove direct infringement of a claim in a patent, a patentee must show that an accused product meets every limitation of the claim, either literally or under the doctrine of equivalents. *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1376 (Fed. Cir. 2005). A two-step analysis is applied to determine infringement: first, the Court construes the asserted claims to determine their meaning and scope, and second the fact finder compares the accused product to the properly construed claims. *Nuance Commc'ns*, 707 F. Supp. 2d at 480-481.

13.     Section 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C § 271(b). To prove infringement by inducement, the patentee must demonstrate "first that there has been direct infringement," and "second that the [accused] infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304-05 (Fed. Cir. 2002); see also *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1321-23(Fed. Cir. 2009); *nCube Corp. v. Seachange Intern., Inc.*, 436 F.3d 1317, 1324-25 (Fed. Cir. 2006). Infringement by inducement thus attaches if the accused infringer "knew of the patent" and that "the induced acts constitute patent infringement." *Glob.-Tech Appliances, Inc.v. SEB S.A.*, 563 U.S. 754, 762-66 (2011).

14.     In the absence of actual knowledge, "willful blindness" can satisfy the knowledge requirement for active inducement. Id. at 766-67; see also *Warsaw Orthopedic, Inc. v. NuVasive*, Inc., 824 F.3d 1344, 1347-48 (Fed. Cir. 2016). Willful blindness has two requirements: "(1) [the accused infringer] must subjectively believe that there is a high probability that a fact exists and

4

Exhibit 05.004

(2) [the accused infringer] must take deliberate actions to avoid learning of that fact." *Global-Tech*, 563 U.S. at 769-70.

15.     Under 35 U.S.C. § 271(c), an accused infringer is liable for contributory infringement if it "offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use."

16.     A patentee can prove contributory infringement by showing that: "(1) there is direct infringement; (2) the accused infringer had knowledge of the patent at issue; (3) the component has no substantial noninfringing uses; and (4) the component is a material part of the invention." *Bone Care Int'l, L.L.C. v. Roxane Labs, Inc.*, No. 09-cv-285-GMS, 2012 WL 2126896, at *10 (D. Del. June 11, 2012) (citing *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010)); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009); 35 U.S.C. § 271(c).

17.     A product is a material component of a composition when it is the sole physical object necessary to practice the method claim. *Braintree Labs, Inc. v. Novel Labs, Inc.*, No. CIV.A. 11-1341 PGS, 2013 WL 211252, at *13 (D.N.J. Jan. 18, 2013), *vacated and remanded on other grounds*, 749 F.3d 1349 (Fed. Cir. 2014).  After a patent owner has made out its *prima facie* case showing that an accused product is not suitable for substantial non-infringing uses, the burden of production shifts to defendants to prove substantial non-infringing uses. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363 (Fed. Cir. 2006).

5

Exhibit 05.005

**B.**   **WILLFULNESS**

**1.**   **Issues to be Litigated**

18.   Whether EIS's infringement of the Asserted Claims of the '851 Patent was willful.

19.   Whether EIS's infringement of the Asserted Claims of the '061 Patent was willful.

20.   Whether EIS's infringement of the Asserted Claims of the '097 Patent was willful.

21.   Whether EIS's infringement of the Asserted Claims of the '220 Patent was willful.

22.   Whether EIS's infringement of the Asserted Claims of the '418 Patent was willful.

**2.**   **Legal Authority**

23.   Willful infringement is a question of fact. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1339-42 (Fed. Cir. 2016). To prove willful infringement, the patentee must establish by a preponderance of the evidence that the accused infringer's conduct was subjectively willful. *WBIP*, 829 F.3d at 1340; *see also Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1370-72 (Fed. Cir. 2017); *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1245-46 (Fed. Cir. 2017).

24.   Subjective willfulness is found when the risk of infringement was "either known or so obvious that it should have been known to the accused infringer." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1930-32 (2016); see also *WCM Indus., Inc. v. IPS Corp.*, 721 Fed. App'x 959, 969-71 (Fed. Cir. 2018). "Section 284 allows district courts to punish the full range of culpable behavior." *Halo*, 136 S. Ct. at 1933.

**C.**   **NOTICE AND PATENT MARKING**

**1.**   **Issues to be Litigated**

25.   Whether WOW Tech notified EIS of EIS's infringement of the Asserted Patents.

26.   If WOW Tech did not notify EIS of EIS's infringement of the Asserted Patents, whether WOW Tech marked its commercial embodiments in compliance with 35 U.S.C. § 287.

Exhibit 05.006

### 2. Legal Authority

27.     The patent marking "statute defines that 'a patentee is entitled to damages from the time when it either began marking its product in compliance with section 287(a), constructive notice, or when it actually notified the accused infringer of its infringement, whichever was earlier.'" *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996) (alterations omitted).

28.     Compliance with "the constructive notice requirements of § 287(a) is a question of fact." *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1373 (Fed. Cir. 2010); *see also Imagexpo, L.L.C. v. Microsoft Corp.*, 299 F. Supp. 2d 550, 554 (E.D. Va. 2003) ("Whether [a patentee] consistently marked 'substantially all' of the patented products and whether the evidence is credible and reliable, [are] classic issues for resolution by the trier of fact.").

29.     The Federal Circuit has held that the marking analysis is a flexible test that asks the jury whether the method of marking puts the public on notice that the product is the subject of a patent. *Glob. Traffic Techs. LLC v. Morgan*, 620 F. App'x 895, 905 (Fed. Cir. 2015) (jury found patent owner substantially complied with § 287 by marking the packaging).  The analysis considers the "character of the article" including articles used "out of the public view once unpackaged." *Id.*

30.     Courts also consider the custom in the trade when determining marking statute compliance. *Heraeus Electro-Nite Co. v. Midwest Instrument Co., Inc.*, No. 06-355, 2007 WL 3407128, at *3 (E.D. Pa. Nov. 14, 2007); *see also Wayne-Gossard Corp. v. Sondra Mfg. Co.*, 579 F.2d 41, 43 (3d Cir. 1978).

31.     Additionally, courts look to the expense and burden of marking the product to determine compliance with the marking provision when the packaging is marked. *Ethicon Endo-Surgery, Inc. v. Hologic, Inc.*, 689 F. Supp. 2d 929, 945 (S.D. Ohio 2010) (denying summary judgment seeking to bar pre-suit damages because the patentee marked the packaging and not the product itself).

**Exhibit 05.007**

D.     **SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS**

1.     **Issues to be Litigated**

32.     Whether secondary considerations such as commercial success, skepticism, long-felt unresolved need, failure of others, industry recognition/praise by others, and copying relating to Counterclaimant's commercial embodiments lead to a determination of non-obviousness.

33.     Whether a nexus exists between the evidence of secondary considerations and the claimed invention.

2.     **Legal Authority**

34.     Evidence of non-obviousness may often be the most probative and cogent evidence in the record and may often establish that an invention appearing to have been obvious in light of the prior art was not. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).

35.     There must be a "nexus" between the merits of the claimed invention and the evidence of secondary considerations for such evidence to be accorded substantial weight. *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011), *citing In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). Nexus is presumed if a marketed product embodies the claimed features and is coextensive with them. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1372 (Fed. Cir. 2013). A Patent Owner is entitled to a presumption of a nexus if it shows that "the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP*, 829 F.3d at 1335.

36.     The commercial response to an invention is significant to determinations of obviousness and is entitled to fair weight. *Demaco Corp. v. F.von Langsdroff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988). Commercial success in the context of secondary considerations is typically established by evidence of sales of the product embodying the claimed invention and relevant market share. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1299 (Fed Cir. 2012).

8

**Exhibit 05.008**

37.    "Existence of a long felt but unsolved need that is met by the claimed invention is further evidence of non-obviousness." *Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1369 (Fed. Cir. 2017).  Evidence of a long felt but unresolved need tends to show non-obviousness because it is reasonable to infer that the need would not have persisted had the solution been obvious.  *WBIP*, 829 F.3d at 1332.

38.    Evidence that others tried but failed to develop a claimed invention may carry significant weight in an obviousness inquiry.  *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1081 (Fed. Cir. 2012).  This objective indicia factor is closely tied to the long-felt need factor discussed above.  *Id.* at 1082 ("Longfelt need is closely related to the failure of others.").

39.    Evidence of industry skepticism about whether or how a problem could be solved, or the workability of the claimed solution, weighs in favor of nonobviousness of the claimed invention.  *United States v. Adams*, 383 U.S. 39, 52 (1966); *WBIP*, 829 F.3d at 1335.

40.    Evidence of industry recognition/praise by others of the claimed invention weighs in favor of nonobviousness.  *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016).  Evidence of industry praise may include evidence of industry awards given to commercial embodiments of the claimed invention.  See *Henny Penny Corp. v. Frymaster, LLC*, 938 F.3d 1324, 1333–1334 (Fed. Cir. 2019) (finding evidence of industry praise, including industry awards for the patented product).

41.    Copying may indeed be another form of flattering praise for inventive features." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1311 (Fed. Cir. 2010). Copying in the context of objective indicia of non-obviousness can be demonstrated either through internal documents, direct evidence such as disassembling a patented prototype, photographing its features, and using

9

Exhibit 05.009

the photograph as a blueprint to build a virtually identical replica, or access to, and substantial similarity to, the patented product (as opposed to the patent). *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). Marketing materials may also be used to show copying. See *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1368 (Fed. Cir. 2012).

### E. UNCLEAN HANDS

#### 1. Issues to be Litigated

42. Whether EIS comes to this court with unclean hands.

#### 2. Legal Authority

43. "Unclean hands is an equitable defense requiring the showing of five elements: (1) the party seeking affirmative relief (2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith (3) directly related to matter in issue (4) that injures other party (5) and affects balance of equities between litigants." *Allergan USA, Inc. v. Sun Pharm. Indus. Ltd.*, No. CV 19-1727-RGA, 2022 WL 11819975, at *3 (D. Del. Oct. 20, 2022).

### F. IPR ESTOPPEL

#### 1. Issues to be Litigated

44. Whether EIS is estopped under 35 U.S.C. § 315(e)(2) from arguing in this litigation that any previously-challenged patent claim is invalid on any ground that EIS GmbH raised or reasonably could have raised in any of the *inter partes* review proceedings Case Nos. IPR2019-01302, IPR2019-01444, and IPR2020-00007.

#### 2. Legal Authority

45. "The petitioner in an inter partes review of a claim in a patent ... that results in a final written decision ... may not assert ... in a civil action ... that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review." 35 U.S.C.

10

Exhibit 05.010

§ 315 (e)(2). "[E]stoppel under § 315(e) is 'broad and ... the prior art references or combinations a petitioner 'could have raised' includes any references that were known to the petitioner or that could reasonably have been discovered by 'a skilled researcher conducting a diligent search.'" *TrustID, Inc. v. Next Caller Inc.*, No. 18-172 (MN), 2021 WL 3015280, at *1 (D. Del. July 6, 2021) (citing *Parallel Networks Licensing, LLC v. Int'l Bus. Machs. Corp.*, No. 13-CV-2072 (KAJ), 2017 WL 1045912, at *11 (D. Del. Feb. 22, 2017)).

46.     A reasonably diligent search is at least one "where (1) the patentee identified a search string that, if used to search the same subclass as the patent-in-suit, would have identified the reference, and (2) the string included terms that appeared in the patent-in-suit numerous times." *Innovative Memory Sys., Inc. v. Micron Tech., Inc.*, No. 14-1480-RGA, 2022 WL 4548644, at **3-5 (D. Del. Sept. 29, 2022) (citations omitted). The fact that previous searches did not identify the reference in question is merely evidence that those searches were not diligent. *Id.*, at *4.

47.     Also, a petitioner may not escape IPR estoppel at trial by merely substituting a printed publication previously asserted in the failed IPR with a physical product that embodies that same printed publication. *Wasica Finance GmbH v. Schrader Int'l, Inc.*, 432 F. Supp. 3d 448, 453 (D. Del. 2020); *accord, Cal. Inst. Of Tech. v. Broadcom Ltd.*, No. CV 16-3714-GW(AGRx), 2019 WL 8192255, at *7 (C.D. Cal. Aug. 9, 2019) (courts should "attempt to discern if a patent challenge is simply swapping labels for what is otherwise a patent or printed publication invalidity ground in order to 'cloak' its prior art ground and 'skirt' estoppel"), *aff'd*, 25 F.4th 976 (Fed. Cir. 2022), *cert. denied*, __ S.Ct. __, 2023 WL 4163206 (2023).

48.     IPR estoppel precludes the accused infringer from asserting "grounds" at trial that were or reasonably could have been raised in an unsuccessful IPR, not specific "evidence" asserted in the IPR—therefore, mere substitution of the physical product embodying patents and printed

Exhibit 05.011

publications actually asserted in the IPR does not constitute a new "ground" that escapes statutory IPR estoppel. *Wasica Finance*, 432 F. Supp. 3d at 453-455; *accord, Oil-Dri Corp. of Am. v. Nestlé Purina Petcare Co.*, No. 15 C 1067, 2019 WL 861394, at *10 (N.D. Ill. Feb. 22, 2019) ("Where there is evidence that a petitioner had reasonable access to printed publications corresponding to or describing a product that it could have proffered during the IPR process, it cannot avoid estoppel simply by pointing to its finished product (rather than the printed materials) during litigation."); *Avanos Med. Sales, LLC v. Medtronic Sofamor Danek USA, Inc.*, No. 2:19-cv-02754-JPM-tmp, 2021 WL 8693677, at **1-2 (W.D. Tenn. Oct. 8, 2021); *Hafeman v. LG Elecs., Inc.*, No. 6:21-cv-00696-ADA, 2023 WL 4362863, at *1 (W.D. Tex. Apr. 14, 2023) (following and applying *Wasica Finance*). "Allowing [the losing IPR petitioner] to raise arguments here that it elected not to raise during the IPR would give it a second bite at the apple and allow it to reap the benefits of the IPR without the downside of meaningful estoppel." *Parallel Networks*, 2017 WL 1045912, at *12.

## G.   REMEDIES

### 1.   Issues to be Litigated

49.   If Counterclaim Defendants are found to have infringed a valid claim(s) of the Asserted Patents, whether WOW Tech has shown by a preponderance of the evidence that they are entitled to damages under 35 U.S.C. § 284, and the amount of said damages.

50.   Whether WOW Tech is entitled to costs and, if so, to what amount of costs is WOW Tech entitled.

51.   Whether this case is exceptional under 35 U.S.C. § 285 entitling WOW Tech to enhanced damages.

52.   Whether WOW Tech is entitled to an award of attorneys' fees.

53.   Whether WOW Tech is entitled to an award of pre-judgment and post-judgment interest and, if so, to what amount of interest is WOW Tech entitled.

**Exhibit 05.012**

54.   Whether WOW Tech is entitled to enhanced damages in the event that Counterclaim Defendants are found to have willfully infringed any Asserted Claim of the Asserted Patents.

55.   Whether WOW Tech is entitled to injunctive relief.

56.   Whether Counterclaim Defendants should be enjoined from continuing its infringement of Counterclaimant's patents.

57.   Whether Counterclaimant is entitled to any other relief.

### 2.   Legal Authority

58.   Section 284 provides that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."

59.   The reasonable royalty may be based on a determination of "the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began" – the "hypothetical negotiation." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1357 (Fed. Cir. 2012). "While the Federal Circuit has not prescribed a specific methodology for calculating a reasonable royalty, courts rely upon the fifteen factors set forth in *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)." *St. Clair Intellectual Prop. Consultants, Inc. v. Canon, Inc.*, 2004 WL 2213562 (D. Del. Sept. 28, 2004); *accord Lucent Techs., Inc.*, 580 F.3d at 1324. "[I]n conducting the hypothetical negotiation, the Court is permitted to look to events and facts that occurred after the infringement began." *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F. Supp. 1333, 1353 (D. Del. 1994) (citing *Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575-76 (Fed. Cir. 1988)).

**Exhibit 05.013**

60.    The fifteen factors established in *Georgia–Pacific Corp. v. United States Plywood Corp.* are as follows:

1)   The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty,

2)   The rates paid by Defendants to license other patents comparable to the Asserted Patents.

3)   The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold.

4)   The licensor's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that exclusivity.

5)   The commercial relationship between the licensor and the licensee, such as whether they are competitors in the same territory in the same line of business.

6)   The effect of selling the patented product in promoting other sales of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such convoyed sales.

7)   The duration of the Asserted Patents and the term of the license.

8)   The established profitability of the product made under the Asserted Patents; its commercial success; and its popularity.

9)   The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

10)   The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by or for the licensor; and the benefits to those who have used the invention.

11)   The extent to which Defendants have made use of the invention; and any evidence that shows the value of that use.

12)   The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13)   The portion of the profit that arises from the patented invention itself as opposed to profit arising from unpatented features, such as the manufacturing process, business risks, or significant features or improvements added by the accused infringer.

14

**Exhibit 05.014**

14) The opinion testimony of qualified experts.

15) The amount that a licensor and a licensee would have agreed upon at the time the infringement began if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license.

And any other economic factor that a normally prudent businessperson would, under similar circumstances, take into consideration in negotiating the hypothetical license.

61.     Section 284 provides that the Court "may increase the damages up to three times the amount found or assessed upon a finding of patent infringement." 35 U.S.C. § 284. Whether to award enhanced damages is within the discretion of the Court. *Id.*; *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1931-34 (2016). The Court should consider "the egregiousness of [the accused infringer's] conduct based on all the facts and circumstances." *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1385 (Fed. Cir. 2013). Egregious conduct can be "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or . . . characteristic of a pirate." *Halo*, 136 S. Ct. at 1932. The Federal Circuit has identified several factors that the Court may consider when determining whether to award enhanced damages:

- whether the infringer deliberately copied the ideas or design of another;

- whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;

- the infringer's behavior as a party to the litigation;

- defendant's size and financial condition;

- closeness of the case;

15

Exhibit 05.015

- duration of defendant's misconduct;

- remedial action by the defendant;

- defendant's motivation for harm; and

- whether defendant attempted to conceal its misconduct.

*Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1245-46, n.6 (Fed. Cir. 2017); *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006). Although there is no "rigid formula for awarding enhanced damages," the patentee must prove enhanced damages are warranted by a preponderance of the evidence. *Halo*, 136 S. Ct. at 1932-34.

62.     "[T]he patent owner bears the burden of proving by a preponderance of the evidence the quantum of damages, an issue of fact." *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002).

63.     "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The Supreme Court has defined an "exceptional" case as "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 554, 557 (2014). The district court "may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id*.

64.     Awarding pre-judgment interest "is the rule, not the exception." *Schwendimann v. Arkwright Adv. Coating, Inc.*, 959 F.3d 1065, 1076 (Fed. Cir. 2020); *see Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983) ("prejudgment interest should ordinarily be awarded absent some justification for withholding such an award"). Pre-judgment interest should be awarded from the date of infringement to the date of judgment. *Schwendimann*, 959 F.3d at 1076. And the rate

**Exhibit 05.016**

of pre-judgment interest "and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court." *Bio-Rad Lab'ys, Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986).  "In exercising that discretion, however, the district court must be guided by the purpose of pre[-]judgment interest, which is 'to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement.'" *Id*. (*quoting Gen. Motors*, 461 U.S. at 655).

65.     Similarly, courts in this District routinely award post-judgment interest in patent infringement cases. *See, e.g., Amgen Inc. v. Hospira, Inc.*, 336 F. Supp. 3d 333, 364-66 (D. Del. 2018); *see also Taltech Ltd. v. Esquel Enters. Ltd.*, 604 F.3d 1324, 1335 (Fed. Cir. 2010) (applying regional circuit law when reviewing post-judgment interest); *Travelers Cas. & Sur. Co. v. Ins. Co. of N.A.*, 609 F.3d 143, 174-75 (3d Cir. 2010). Post-judgment interest "serves to further compensate a winning plaintiff from the time of a judgment until payment is made." *Transmatic, Inc. v. Gulton Indus., Inc.*, 180 F.3d 1343, 1348-49 (Fed. Cir. 1999); 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."). As such, post-judgment interest begins to accrue on the date of the entry of judgment. 28 U.S.C. § 1961(a); *Travelers*, 609 F.3d at 174-75.

66.     Section 283 provides that the Court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. When seeking a permanent injunction, the patentee must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. The decision to grant or deny such relief is an act of

17

Exhibit 05.017

equitable discretion by the district court, reviewable on appeal for abuse of discretion." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 388 (2006).

67.    To satisfy the first factor, the patentee must prove that a "causal nexus relates the alleged harm to the alleged infringement." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 639-47 (Fed. Cir. 2015). However, "[w]here two companies are in competition against one another, the patentee suffers the harm—often irreparable— of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013).

68.    In balancing the hardships between the parties, the Court "assesses the relative effect of granting or denying an injunction." *Apple*, 809 F.3d at 645. Factors that the Court may consider include: "the parties' sizes, products, and revenue sources." *Evonik Degussa Gmbh v. Materia, Inc.*, No. 09-636 (NLH/JS), 2017 WL 3434156, at *3 (D. Del. Aug. 10, 2017) (citing *Microsoft*, 598 F.3d at 862). Notably, "[a] party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011). Nor can the party escape if any harms suffered from the injunction were "'almost entirely preventable' and were the result of its own calculated risk to launch its product pre-judgment." *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006).

18

Exhibit 05.018

II.    **WOW Tech's Revised Statement of Issues of Law (Response to EIS's Statement of Issues of Law On Which EIS Bears the Burden of Proof)**[1]

As set forth in WOW Tech's Statement of Intended Proofs (Ex. 13 at the Pretrial Order), which is incorporated herein by reference, EIS will be unable to prove by clear and convincing evidence that any of Novoluto's Asserted Claims are invalid.

A.    **Validity of the Patents-in-Suit**

1.    **Issues to be Litigated**

69.    Whether EIS has proven by clear and convincing evidence that the asserted claims of the '851 Patent are obvious under 35 U.S.C. § 103[2] in view of any of the following grounds: (1) Yang; (2) Eros and Yang; (3) Guan and Yang.[3]

---

[1] EIS bears the burden of proving they are entitled to any alleged remedies, including whether they are entitled to costs and attorneys' fees under 35 U.S.C. § 285.  WOW Tech, to the extent necessary, will introduce evidence to rebut Defendants' assertion that they are entitled to any remedies, including whether they are entitled to costs and attorneys' fees under 35 U.S.C. § 285.

[2] Novoluto objects to EIS's Statement of Issues to be Litigated as including anticipation issues that are not a part of this case. There are no anticipation invalidity grounds in this case against the '851, '061, '097, or '418 Patent.  EIS's January 23, 2023 Election of Prior-Art-Based Invalidity Arguments pursuant to D.I. 299 only included anticipation grounds against two of the Patents-in-Suit: (1) Taylor against claim 21 of the '061 Patent; and (2) Witt against claims 1, 3, and 4 of the '220 Patent.  EIS did not identify any anticipation grounds against any asserted claim of the '851, '097, or '418 Patents in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments. This Court struck the Taylor anticipation ground against claim 21 of the '061 Patent due to IPR estoppel under 35 U.S.C. § 315(e) in D.I. 518. Therefore, the only remaining anticipation ground in this case is Witt (which is not prior art, see D.I. 370 (MSJ # 8) at 31-32 and D.I. 495 at 16-17) against claim 1 of the '220 Patent. To the extent EIS now attempts to introduce stricken grounds and/or grounds that were not included in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments, these attempts are in violation of Court orders and are highly prejudicial to Novoluto, and Novoluto will seek resolution of this issue from the Court.

[3] Novoluto disputes that any of these grounds are proper grounds to be asserted in this case as they are all subject to IPR estoppel under 35 U.S.C. § 315(e) as explained in Novoluto's motion for summary judgment on IPR estoppel. *See* D.I. 581-583, 597, and 598.  This Court struck the Guan & Hovland obviousness ground against all asserted claims of the '851 Patent due to IPR estoppel under 35 U.S.C. § 315(e) in D.I. 518. EIS did not identify any other prior-art-based invalidity grounds against the '851 Patent in its January 23, 2023 Election of Prior-Art-Based

**Exhibit 05.019**

70.    Whether EIS has proven by clear and convincing evidence that the asserted claims of the '061 Patent are obvious under 35 U.S.C. § 103[4] in view of any of the following grounds: (1) Yang and Taylor; (2) Eros, Yang, and Taylor.[5]

71.    Whether EIS has proven by clear and convincing evidence that the asserted claims of the '097 Patent are obvious under 35 U.S.C. § 103[6] in view of any of the following grounds: (1) Yang and Taylor; (2) Eros, Yang, and Taylor.[7]

---

Invalidity Arguments. In the event the Court grants Novoluto's pending summary judgment motion on IPR estoppel, this issue will no longer be an issue to be litigated and questions regarding prior-art-based invalidity against the asserted claims of the '851 Patent should not be submitted to the jury.

[4] *See* footnote 2.

[5] Novoluto disputes that any of these grounds are proper grounds to be asserted in this case as they are all subject to IPR estoppel under 35 U.S.C. § 315(e) as explained in Novoluto's motion for summary judgment on IPR estoppel. *See* D.I. 581-583, 597, and 598.  This Court struck the Guan & Taylor obviousness ground against all asserted claims of the '061 Patent due to IPR estoppel under 35 U.S.C. § 315(e) in D.I. 518. EIS did not identify any other prior-art-based invalidity grounds against the '061 Patent in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments. In the event the Court grants Novoluto's pending summary judgment motion on IPR estoppel, this issue will no longer be an issue to be litigated and questions regarding prior-art-based invalidity against the asserted claims of the '061 Patent should not be submitted to the jury.

[6] *See* footnote 2.

[7] Novoluto disputes that any of these grounds are proper grounds to be asserted in this case as they are all subject to IPR estoppel under 35 U.S.C. § 315(e) as explained in Novoluto's motion for summary judgment on IPR estoppel. *See* D.I. 581-583, 597, and 598.  This Court struck the Witt & Taylor obviousness ground and the Guan & Lee & Hovland ground against all asserted claims of the '097 Patent due to IPR estoppel under 35 U.S.C. § 315(e) in D.I. 518. EIS did not identify any other prior-art-based invalidity grounds against the '061 Patent in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments. In the event the Court grants Novoluto's pending summary judgment motion on IPR estoppel, this issue will no longer be an issue to be litigated and questions regarding prior-art-based invalidity against the asserted claims of the '097 Patent should not be submitted to the jury.

**Exhibit 05.020**

72.     Whether the '220 Patent is entitled to its earliest priority date of September 23, 2013.

73.     Whether EIS has proven by clear and convincing evidence that asserted claims 1, 3, and 4[8] of the '220 Patent are anticipated under 35 U.S.C. § 102 in view of Witt.[9]

74.     Whether EIS has proven by clear and convincing evidence that the asserted claims 1, 3 and 4 of the '220 Patent are obvious under 35 U.S.C. § 103 in view of any of the following grounds: (1) Yang and Hovland[10]; (2) Robert, Yang, and Hovland; or (4) Guan and Hovland.[11]

75.     Whether EIS has proven by clear and convincing evidence that asserted claim 16 of the '220 Patent is obvious under 35 U.S.C. § 103[12] in view of any of the following grounds: (1)

---

[8] Novoluto objects to EIS's statement of issues to be litigated to the extent EIS attempts to add an anticipation ground against claim 16 of the '220 Patent.  Regarding invalidity grounds asserted against the '220 Patent, EIS's January 23, 2023 Election of Prior-Art-Based Invalidity Arguments pursuant to D.I. 299 only included anticipation grounds against claims 1, 3, and 4 of the '220 Patent, not against claim 16.  To the extent EIS now attempts to introduce grounds that were not included in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments, these attempts are in violation of Court orders and are highly prejudicial to Novoluto, and Novoluto will seek resolution of this issue from the Court.

[9] Novoluto disputes that this is a proper issue to be litigated because Witt is not prior art, as explained in Novoluto's motion for partial summary judgment that Witt is not prior art. *See* D.I. 370 (MSJ # 8) at 31-32 and D.I. 495 at 16-17).

[10] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19).

[11] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Guan alone or in combination with Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19).

[12] Novoluto objects to EIS's statement of issues to be litigated to the extent it attempts to add anticipation grounds against the asserted claims of the '418 Patent.  Regarding invalidity grounds asserted against the '418 Patent, EIS's January 23, 2023 Election of Prior-Art-Based Invalidity Arguments pursuant to D.I. 299 only included obviousness grounds against the asserted claims of the '418 Patent, not anticipation grounds. To the extent EIS now attempts to introduce grounds

Exhibit 05.021

Witt[13] and Makower 744; (2) Yang, Hovland,[14] and Makower 744; (3) Robert, Yang, Hovland, and Makower 744; or (4) Guan, Hovland,[15] and Makower 744.

76.    Whether the '418 Patent is entitled to its earliest priority date of September 23, 2013.

77.    Whether EIS has proven by clear and convincing evidence that asserted claims 1 and 4 of the '418 Patent are obvious under 35 U.S.C. § 103[16] in view of any of the following grounds: (1) Witt[17] and Hovland[18]; (2) Yang and Hovland; (3) Robert, Yang, and Hovland; or (4)

---

that were not included in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments, these attempts are in violation of Court orders and are highly prejudicial to Novoluto, and Novoluto will seek resolution of this issue from the Court.

[13] Novoluto disputes that this is a proper issue to be litigated because Witt is not prior art, as explained in Novoluto's motion for partial summary judgment that Witt is not prior art. *See* D.I. 370 (MSJ # 8) at 31-32 and D.I. 495 at 16-17.

[14] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19.

[15] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Guan alone or in combination with Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19.

[16] Novoluto objects to EIS's statement of issues to be litigated to the extent it attempts to add anticipation grounds against the asserted claims of the '418 Patent.  Regarding invalidity grounds asserted against the '418 Patent, EIS's January 23, 2023 Election of Prior-Art-Based Invalidity Arguments pursuant to D.I. 299 only included obviousness grounds against the asserted claims of the '418 Patent, not anticipation grounds. To the extent EIS now attempts to introduce grounds that were not included in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments, these attempts are in violation of Court orders and are highly prejudicial to Novoluto, and Novoluto will seek resolution of this issue from the Court.

[17] Novoluto disputes that this is a proper issue to be litigated because Witt is not prior art, as explained in Novoluto's motion for partial summary judgment that Witt is not prior art. *See* D.I. 370 (MSJ # 8) at 31-32 and D.I. 495 at 16-17.

[18] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the

Exhibit 05.022

Guan and Hovland.[19]

78.     Whether EIS has proven by clear and convincing evidence that asserted claim 10 of the '418 Patent is obvious under 35 U.S.C. § 103[20] in view of any of the following grounds: (1) Witt[21], Hovland[22], and Makower 744; (2) Yang, Hovland, and Makower 744; (3) Robert, Yang, and Makower 744; or (4) Guan, Hovland,[23] and Makower 744.

79.     Whether EIS has proven by clear and convincing evidence that claim 21 of the '061 Patent is invalid under 35 U.S.C. § 112 based on EIS's theory that the limitation including

---

disclosures of Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19).

[19] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Guan alone or in combination with Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19).

[20] Novoluto objects to EIS's statement of issues to be litigated to the extent it attempts to add anticipation grounds against the asserted claims of the '418 Patent.  Regarding invalidity grounds asserted against the '418 Patent, EIS's January 23, 2023 Election of Prior-Art-Based Invalidity Arguments pursuant to D.I. 299 only included obviousness grounds against the asserted claims of the '418 Patent, not anticipation grounds. To the extent EIS now attempts to introduce grounds that were not included in its January 23, 2023 Election of Prior-Art-Based Invalidity Arguments, these attempts are in violation of Court orders and are highly prejudicial to Novoluto, and Novoluto will seek resolution of this issue from the Court.

[21] Novoluto disputes that this is a proper issue to be litigated because Witt is not prior art, as explained in Novoluto's motion for partial summary judgment that Witt is not prior art. *See* D.I. 370 (MSJ # 8) at 31-32 and D.I. 495 at 16-17).

[22] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19).

[23] Novoluto disputes that this is a proper issue to be litigated because EIS's arguments as to the disclosures of Guan alone or in combination with Hovland should be precluded under the doctrine of issue preclusion, as explained in Novoluto's motion for partial summary judgment on issue preclusion. *See* D.I. 370 (MSJ # 9) at 32-38 and D.I. 495 at 17-19).

Exhibit 05.023

"pressure field generating arrangement" is indefinite.[24]

80.     Whether EIS has proven by clear and convincing evidence that claims 1, 10, and 12 of the '097 Patent are invalid under 35 U.S.C. § 112 based on EIS's theory that that the Court's construction of the claim term "flexible wall" / "flexible wall portion" is indefinite. [25]

81.     Whether EIS has proven by clear and convincing evidence that claims 1, 3, 4, and 16 of the '220 Patent are invalid under 35 U.S.C. § 112 based on EIS's theory that the Court's construction of the claim term "sealingly engage a portion of a body of a user, including the clitoris" is indefinite, and/or that the Court's construction of the claim term "flexible wall" / "flexible wall portion" is indefinite. [26]

82.     Whether EIS has proven by clear and convincing evidence that claims 1, 4, and 10 of the '418 Patent are invalid under 35 U.S.C. § 112 based on EIS's theory that the Court's construction of the claim term "flexible wall" / "flexible wall portion" is indefinite. [27]

### 2.     Legal Authority

83.     Under 35 U.S.C. § 282, patents are presumed valid.  35 U.S.C. § 282(a); *see also Microsoft Corp. v. i4i Ltd. Pship*, 564 U.S. 91, 95 (2011).

---

[24] Novoluto disputes that this is a proper issue to be litigated because the Court already ruled on this issue during claim construction (D.I. 300 and 301) and to the extent EIS challenges the Court's construction, the arguments are untimely as explained in Novoluto's *Daubert* motion at D.I. 370 at 49-50.

[25] Novoluto disputes that this is a proper issue to be litigated because the Court already ruled on this issue during claim construction (D.I. 300 and 301) and to the extent EIS challenges the Court's construction, the arguments are untimely as explained in Novoluto's *Daubert* motion at D.I. 370 at 49-50.

[26] Novoluto disputes that this is a proper issue to be litigated because the Court already ruled on this issue during claim construction (D.I. 300 and 301) and to the extent EIS challenges the Court's construction, the arguments are untimely as explained in Novoluto's *Daubert* motion at D.I. 370 at 49-50.

[27] Novoluto disputes that this is a proper issue to be litigated because the Court already ruled on this issue during claim construction (D.I. 300 and 301) and to the extent EIS challenges the Court's construction, the arguments are untimely as explained in Novoluto's *Daubert* motion at D.I. 370 at 49-50.

Exhibit 05.024

84.     A defendant challenging the validity of a patent bears the burden of proving invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 95 (2011). "A patent shall be presumed valid." 35 U.S.C. § 282.  A defendant that challenges patent validity "must overcome that presumption to prevail on an invalidity defense," *Microsoft Corp.*, 564 U.S. at 100 (2011), and a court may conclude that a patent is valid "*solely* on the failure of the patent challenger's evidence to convincingly establish the contrary." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed. Cir. 1986) (emphasis in original).

### a.     Priority Date

85.     When a party seeks the benefit of an earlier-filed United States patent application, the earlier application must meet the requirements of 35 U.S.C. § 120 and 35 U.S.C. § 112 ¶ 1, which means the earlier application must contain a written description of the subject matter and must meet the enablement requirement.  *See Hyatt v. Boone*, 146 F.3d 1348, 1352 (Fed. Cir. 1998).  35 U.S.C. § 120 allows a later-filed patent application to claim the benefit of an earlier filing date in the United States if "the claims of the later-filed application [are] supported by the written description in the parent 'in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought.'" *EnOcean GmbH v. Face Intern. Corp.*, 742 F.3d 955, 960 (Fed. Cir. 2014).

86.     If the party challenging validity comes forward with clear and convincing evidence of invalidating prior art that puts at issue the priority date of any claim of a patent, the burden shifts to the patentee "to come forward with evidence to prove entitlement to claim priority to a filing date that predates the filing date of the patent." *Fairchild Semiconductor Corp. v. Power Integrations*, 100 F. Supp. 3d 357, 368 (D. Del. 2015) (citing *PowerOasis, Inc. v. T-Mobile USA, Inc.,* 522 F.3d 1299, 1305-06 (Fed. Cir. 2008)).  To meet this burden, the patentee  must demonstrate that "the disclosure of the earlier application provides support for the

Exhibit 05.025

claims of the later application, as required by 35 U.S.C. § 112." *PowerOasis*, 522 F.3d at 1306 (citing *In re Chu*, 66 F.3d 292, 297 (Fed. Cir. 1995)).

87.     A "prior application need not contain precisely the same words as are found in the asserted claims," but "the prior application must indicate to a person skilled in the art that the inventor was 'in possession' of the invention as later claimed." *Id.* (citations omitted).  "[I]t is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention." *LizardTech Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005); *see also Eiselstein v. Frank*, 52 F.3d 1035, 1038 (Fed. Cir. 1995) ("[T]he prior application need not describe the claimed subject matter in exactly the same terms as used in the claims; it must simply indicate to persons skilled in the art that as of the earlier date the applicant had invented what is now claimed.").

### b.    Anticipation

88.     35 U.S.C. § 102(a) provides that: "A person shall be entitled to a patent unless— (1) the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention or (2) the claimed invention was described in a patent issued under section 151, or in an application for patent published or deemed published under section 122(b), in which the patent or application, as the case may be, names another inventor and was effectively filed before the effective filing date of the claimed invention."

89.     A patent claim is invalid if "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. § 102(a).  In order to show a patent is anticipated, a defendant must demonstrate by clear and convincing evidence that "each and every" element and

Exhibit 05.026

limitation of the claim was previously described in a single prior art reference, either expressly or inherently. *See Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958 (Fed. Cir. 2014); *Sanofi- Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1082 (Fed. Cir. 2008); *see also Microsoft Corp.*, 564 U.S. at 95. Showing that a "prior art reference discloses part of the claimed invention, which an ordinary artisan might supplement to make the whole, or that it includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention" is not enough for anticipation. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008).

90.     Further, the anticipating reference must be enabling. *Sanofi-Synthelabo,* 550 F.3d at 1082. "[I]nvalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys. Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). In trying to show anticipation, "one skilled in the art cannot supply missing elements through his or her knowledge." *Forest Labs., Inc. v. Ivax Pharms., Inc.*, 438 F. Supp. 2d 479, 485 (D. Del. 2006), *aff'd*, 501 F.3d 1263 (Fed. Cir. 2007). For anticipation, "[t]here must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991), *overruled in part for other reasons by Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009). A prior-art reference that does not disclose a limitation may inherently anticipate the limitation when the reference must "include the unstated limitation." *Transclean Corp. v. Bridgewood Servs.*, Inc., 290 F.3d 1364, 1373 (Fed. Cir. 2002). For a reference to be inherently anticipatory, the missing element *must necessarily be present*, not merely "probably or possibly present." *Trintec Indus. Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292 (Fed. Cir. 2002) (citing *In re*

Exhibit 05.027

*Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999).  Inherent anticipation cannot "be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268-69 (Fed. Cir. 1991) (internal quotation marks omitted).

### c.      Obviousness

91.      35 U.S.C. § 103 provides that: "A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made."

92.      Obviousness is a matter of law and depends on the following factual inquiries: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the relevant art; and (4) any objective indicia of nonobviousness. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)).  35 U.S.C. § 103 provides the following:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made.

35 U.S.C. § 103.

93.      A party seeking to invalidate a patent based on obviousness must demonstrate "by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan

28

Exhibit 05.028

would have had a reasonable expectation of success in doing so." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007); *see also In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068-69 (Fed. Cir. 2012).  In analyzing obviousness, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Inter. Co.*, 550 U.S. at 418.

94.     In analyzing obviousness, the inquiry is from the time of the invention.  *Canfield Sci., Inc. v. Melanoscan, LLC*, 987 F.3d 1375, 1382 (Fed. Cir. 2021).  Both the suggestion and the reasonable expectation of success "must be founded in the prior art, not in the applicant's disclosure." *Noelle v. Lederman*, 355 F.3d 1343, 1352 (Fed. Cir. 2004).  "Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination," *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011), and "[a] solution is not obvious simply because it was obvious to conduct experiments to try to solve the problem." *Vanda Pharms. Inc. v. Roxane Labs., Inc.*, 203 F. Supp. 3d 412, 427 (D. Del. 2016), *aff'd*, 887 F.3d 1117 (Fed. Cir. 2018); *see also Abbott Labs.*, 334 F.3d at 1357.

95.     To avoid "distortion caused by hindsight bias," there must be "a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *KSR Inter. Co.*, 550 U.S. at 418, 421; *see also id.* at 421 ("A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning."); *Novartis Pharms. Corp. v. Par Pharm., Inc.*, 48 F. Supp. 3d 733, 752 (D. Del. 2014) (a party seeking to invalidate a patent claim "must show that a PHOSITA would be motivated to combine the claimed combinations with a reasonable expectation of success.").

**Exhibit 05.029**

96.     An obviousness determination requires consideration of the objective indicia of nonobviousness (or "secondary considerations") such as licensing, praise, unexpected results, commercial success, copying, skepticism, failure of others, and long-felt but unresolved need. *KSR*, 550 U.S. at 406; *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (*en banc*) ("Objective indicia of nonobviousness must be considered in every case where present.").

97.     Evidence of non-obviousness may often be the most probative and cogent evidence in the record and may often establish that an invention appearing to have been obvious in light of the prior art was not. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).

98.     There must be a "nexus" between the merits of the claimed invention and the evidence of secondary considerations for such evidence to be accorded substantial weight. *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011), *citing In re GPAC Inc*., 57 F.3d 1573, 1580 (Fed. Cir. 1995). Nexus is presumed if a marketed product embodies the claimed features and is coextensive with them. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1372 (Fed. Cir. 2013). A Patent Owner is entitled to a presumption of a nexus if it shows that "the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP*, 829 F.3d at 1335.

99.     The commercial response to an invention is significant to determinations of obviousness and is entitled to fair weight. *Demaco Corp. v. F.von Langsdroff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988). Commercial success in the context of secondary considerations is typically established by evidence of sales of the product embodying the claimed invention and relevant market share. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1299 (Fed Cir. 2012).

**Exhibit 05.030**

100.    "Existence of a long felt but unsolved need that is met by the claimed invention is further evidence of non-obviousness." *Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1369 (Fed. Cir. 2017).  Evidence of a long felt but unresolved need tends to show non-obviousness because it is reasonable to infer that the need would not have persisted had the solution been obvious. *WBIP*, 829 F.3d at 1332.

101.    Evidence that others tried but failed to develop a claimed invention may carry significant weight in an obviousness inquiry. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1081 (Fed. Cir. 2012).  This objective indicia factor is closely tied to the long-felt need factor discussed above. *Id.* at 1082 ("Longfelt need is closely related to the failure of others.").

102.    Evidence of industry skepticism about whether or how a problem could be solved, or the workability of the claimed solution, weighs in favor of nonobviousness of the claimed invention. *United States v. Adams*, 383 U.S. 39, 52 (1966); *WBIP*, 829 F.3d at 1335.

103.    Evidence of industry recognition/praise by others of the claimed invention weighs in favor of nonobviousness. *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016).  Evidence of industry praise may include evidence of industry awards given to commercial embodiments of the claimed invention.  See *Henny Penny Corp. v. Frymaster, LLC*, 938 F.3d 1324, 1333–1334 (Fed. Cir. 2019) (finding evidence of industry praise, including industry awards for the patented product).

104.    Copying may indeed be another form of flattering praise for inventive features." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1311 (Fed. Cir. 2010). Copying in the context of objective indicia of non-obviousness can be demonstrated either through internal documents, direct evidence such as disassembling a patented prototype, photographing its features, and using

31

Exhibit 05.031

the photograph as a blueprint to build a virtually identical replica, or access to, and substantial similarity to, the patented product (as opposed to the patent). *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). Marketing materials may also be used to show copying. See *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1368 (Fed. Cir. 2012).

### d.    Definiteness[28]

105.    Section 112(b) of the Patent Act requires claims to "particularly point[] out and distinctly claim[] the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. §112(b). A determination of claim definiteness is a question of law. *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998). A defendant challenging a patent's validity has the burden to prove the indefiniteness requirement by clear and convincing evidence. *BSAF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

106.    Indefiniteness of a claim is evaluated from the perspective of a person skilled in the relevant art. *See Nautilus, Inc. v. BioSig Instruments, Inc.*, 572 U.S. 898, 908 (2014). Moreover, the claim is evaluated in light of the patent's specification and prosecution history, and measured as of the time of the patent application. *Id.* Thus, reference to publications or patents in the specification are part of that disclosure, and are included in the inquiry of whether a claim, read in light of the specification and prosecution history, informs "with reasonable certainty" those skilled in the art about the scope of the invention, even if such references are not incorporated by reference. *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374 1383 (Fed. Cir. 1999)

---

[28] WOW Tech objects to EIS's statement of this issue as an issue of law that remains to be litigated during the jury trial. This Court has already ruled on indefiniteness and found that any claim terms EIS challenged as indefinite were not indefinite. D.I. 300 at 37-43, and D.I. 301. WOW Tech requests that the Court address and rule on this issue to streamline the triable issues before the jury trial.

**Exhibit 05.032**

(stating that "the district court erred by failing to consider the knowledge of one skilled in the art that indicated, based on unrefuted testimony, that the specification disclosed sufficient structure corresponding to the high-voltage means limitation" by citing, but not describing, a technical article); *see also Eli Lilly & Co. v. Teva Parenteral Medicines Inc.*, 845 F.3d 1357, 1370-72 (Fed. Cir. 2017) (holding the claim term "vitamin B12" as not indefinite when a person of ordinary skill in the art would understand the claim term in the context of the claim language, specification, and prosecution history).

107.    "The claims as granted are accompanied by a presumption of validity based on compliance with, inter alia, § 112 ¶ 2." *S3 Inc. v. Nvidia Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001). A patent claim is not indefinite if "viewed in light of the specification and prosecution history," the claim "inform[s] those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910. The definiteness requirement is analyzed "not in a vacuum, but always in light of the teachings of the prior art and of the particular application disclosure as it would be interpreted by one possessing the ordinary level of skill in the pertinent art." *Energizer Holdings v. ITC*, 435 F.3d 1366, 1370 (Fed. Cir. 2006). The definiteness requirement "ensure[s] that patent claims are written in such a way that they give notice to the public of what is claimed, thus enabling [others] to determine whether they infringe." *Bayer Pharma AG v. Watson Labs., Inc.*, No. 12- 1726-LPS, 2014 WL 4954617, at *3 (D. Del. Sept. 30, 2014).

108.    A patent is "invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. BioSig Instruments, Inc.*, 572 U.S. 898, 901, 909- 10 (2014) (also noting that "the definiteness requirement must take into account the inherent limitations of language" as "absolute precision is unattainable.").

Exhibit 05.033

**B.     EIS, INC.'S INEQUITABLE CONDUCT CLAIMS AND THE EIS GROUP'S INEQUITABLE CONDUCT DEFENSE TO PATENT INFRINGEMENT**

**1.     Issues to be Litigated**

109.    Whether EIS has proven by clear and convincing evidence that the asserted claims of the '851 Patent are unenforceable due to inequitable conduct based on (1) WOW Tech's disclosure of Guan and a translated abstract of Guan to the USPTO or (2) WOW Tech's disclosure of all the references cited in the EcoAction and Fun Factory German Opposition without also including the Notice of Opposition containing EcoAction and Fun Factory's attorneys' arguments to the USPTO.

110.    Whether EIS has proven by clear and convincing evidence that the asserted claims of the '061 Patent are unenforceable due to inequitable conduct based on (1) WOW Tech's disclosure of Guan and a translated abstract of Guan to the USPTO or (2) WOW Tech's disclosure of all the references cited in the EcoAction and Fun Factory German Opposition without also including the Notice of Opposition containing EcoAction and Fun Factory's attorneys' arguments to the USPTO.

111.    Whether EIS has proven by clear and convincing evidence that the asserted claims of the '097 Patent are unenforceable due to inequitable conduct based on (1) WOW Tech's disclosure of Guan and a translated abstract of Guan to the USPTO; (2) WOW Tech's disclosure of all the references cited in the EcoAction and Fun Factory German Opposition to the USPTO without also including the Notice of Opposition containing EcoAction and Fun Factory's attorneys' arguments; or (3) WOW Tech's non-substantive edits to the specification in the continuation application for the '097 Patent that was filed with the USPTO.

112.    Whether EIS has proven by clear and convincing evidence that the asserted claims of the '220 Patent are unenforceable due to inequitable conduct based on WOW Tech's non-

**Exhibit 05.034**

substantive edits to the specification in the continuation application for the '220 Patent that was filed with the USPTO.

113.    Whether EIS has proven by clear and convincing evidence that the asserted claims of the '418 Patent are unenforceable due to inequitable conduct based on WOW Tech's non-substantive changes to the specification in the continuation application for the '418 Patent that was filed with the USPTO.

114.    Whether EIS has proven by clear and convincing evidence that any of the above-identified theories of inequitable conduct with respect to any of the '851, '061, '097, '220, and/or '418 Patents renders any of the '097, '220, or '418 Patents unenforceable via the doctrine of "infectious unenforceability."[29]

### 2.    Legal Authority

115.    "To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1289 (Fed. Cir. 2011) (en banc) (quotation omitted). "In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Id.*

116.    Materiality is a high threshold. "[T]he materiality required to establish inequitable conduct is but-for materiality." *Therasense*, 649 F.3d at 1291. To establish the information is material, the defendant must show by clear and convincing evidence that the patentee "withheld

---

[29] Novoluto disputes that this issue as phrased by EIS is a proper issue to be litigated to the extent EIS now seeks to expand its theory of "infectious unenforceability" to apply to all Asserted Patents. EIS only has ever pled "infectious unenforceability" as to the '097, '220, and '418 Patents.

**Exhibit 05.035**

or misrepresented information that, in the absence of the withholding or misrepresentation, would have prevented a patent claim from issuing." *Id*. at 1345.

117.    "Intent and materiality are separate requirements" and to establish specific intent under the clear and convincing evidence standard, "the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Therasense*, 649 F.3d at 1290.

118.    "To satisfy the requirement of the intent to deceive element of inequitable conduct, 'the involved conduct, viewed in light of all the evidence, including evidence of good faith, must indicate sufficient culpability to require a finding of intent to deceive.'" (citation omitted).  *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.*, 439 F.3d 1335, 1341 (Fed. Cir. 2006); *see also Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1134 (Fed. Cir. 2006) ("When determining whether intent has been shown, a court must weigh all evidence, including evidence of good faith.").

119.    A theory based on a "mere disagreement with . . . prosecution counsel as to whether certain amendments impermissibly added 'new matter'" along with other related concerns does not "give rise to a reasonable inference that prosecution counsel knew he was amending to add new matter and intended to deceive the PTO of this fact.". See *Softview LLC v. Apple Inc.*, No. CIV.A. 10-389-LPS, 2011 WL 4571793, at *1 (D. Del. Sept. 30, 2011) (citing *Astrazeneca Pharm. LP v. Teva Pharm. USA, Inc.*, 583 F.3d 766, 770 (Fed. Cir. 2009)).

120.    "Intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent." *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1289 (Fed. Cir. 2002) (quoting *Hebert v. Lisle Corp.*, 99 F.3d

36

Exhibit 05.036

1109, 1116 (Fed. Cir. 1996)); *see also Therasense*, 649 F.3d at 1290 ("[A] district court may not infer intent solely from materiality.").

121.    Conclusory statements are not sufficient to meet the patent challenger's burden to prove specific intent.  *See Optium Corp. v. Emcore Corp.*, 603 F.3d 1313, 1322 (Fed. Cir. 2010) ("The district court correctly ruled that on [patent challenger's] version of the facts, and accepting the disputed premise that Willems was highly material, [patent challenger] had offered no evidence that could succeed in proving deceptive intent by clear and convincing evidence."); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1332 (Fed. Cir. 2009) ("With no other evidence in the record, the district court correctly found that [patent challenger] made no genuine showing of deceptive intent.").

122.    The USPTO does not require the submission of a translation of the entirety of a non-English publication or patent.  Instead, 37 CFR 1.98 provides that the USPTO requires only a concise explanation of relevance for non-English publications or patents, and MPEP 609.04(a) specifically states that "[s]ubmission of an English language abstract of a reference, such as one generated by a foreign patent office, may fulfill the requirement for a concise explanation."

123.    Under 37 C.F.R. § 1.56(b), information is not material to patentability if it is cumulative to information already of record.

124.    "[I]t is the reference itself, not the information generated in prosecuting foreign counterparts, that is material to prosecution in the United States. The details of foreign prosecution are not an additional category of material information." *ATD Corp. v. Lydall, Inc.,* 159 F.3d 534, 547 (Fed. Cir. 1998).

Exhibit 05.037

125.    Under MPEP § 608.04(b), "[a]pplicants can avoid the need to file a preliminary amendment by incorporating any desired amendments into the text of the specification, even where the application is a continuation or divisional application of a prior-filed application. Applicants are strongly encouraged to avoid submitting any preliminary amendments so as to minimize the burden on the Office in processing preliminary amendments and reduce delays in processing the application."

126.    Under the theory of infectious unenforceability, "the inequitable conduct associated with one patent may render a related patent unenforceable if the inequitable conduct as to one patent bears 'an immediate and necessary relation' to the enforcement of the related patent." *Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, No. CV 15-137-LPS-CJB, 2017 WL 1349175, at *20 (D. Del. Apr. 10, 2017). "An 'immediate and necessary relation' requires that 'the inequitable conduct that occurred earlier in the chain [of issued patents] 'must be related to the targeted claims of the ultimately-issued patent or patents sought to be enforced'." *Id* (citing *eSpeed, Inc. v. Brokertec USA, L.L.C.*, 417 F. Supp. 2d 580, 595 (D. Del. 2006)).   The clear and convincing evidence standard applies to the doctrine of infectious unenforceability.   *Hoffman-La Roche, Inc. v. Promega Corp.*, 319 F. Supp. 2d 1011, 1021 (N.D. Cal. 2004).

## C.    EIS's *WALKER PROCESS* FRAUD DEFENSE TO PATENT INFRINGEMENT

### 1.  Issues to be Litigated

127.    Whether EIS has proven by clear and convincing evidence that Novoluto procured any of the '851, '061, '097, '220 or '418 Patents by knowing and willful fraud on the USPTO.

128.    Whether EIS has proven by clear and convincing evidence that Novoluto has maintained any of the '851, '061, '097, '220 or '418 Patents in an attempt to monopolize the sex toy industry, with knowledge of fraudulent procurement.

38

Exhibit 05.038

129.    Whether EIS has proven by clear and convincing evidence that Novoluto has enforced any of the '851, '061, '097, '220 or '418 Patents in an attempt to monopolize the sex toy industry, with knowledge of fraudulent procurement.

130.    If EIS has proven fraudulent procurement, maintenance, or enforcement of any of the Asserted Patents, whether EIS has also proven that any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH has engaged in predatory or anticompetitive conduct with a specific intent to monopolize the U.S. market for sex toys incorporating Novoluto's patented technology through the alleged posting of four Amazon reviews and alleged communications to Eldorado Trading Company in 2016.

131.    If EIS has proven fraudulent procurement, maintenance, or enforcement of any of the Asserted Patents, whether EIS has also proven that any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH had a dangerous probability of achieving monopoly power in the U.S. market for sex toys incorporating Novoluto's patented technology.

132.    Whether EIS has proven entitlement to attorneys' fees and costs incurred in bringing this suit where Novoluto has demonstrated repeatedly the validity of its patents and there is no evidence of fraudulent procurement, maintenance, or enforcement of any Novoluto patent, and, if so, in what amount.

133.    Whether EIS has proven entitlement to any other remedy or relief arising from its *Walker Process* fraud allegations and, if so, what remedy or relief.

### 2.   Legal Authority

134.    To start, a finding of no inequitable conduct necessarily precludes a finding of *Walker Process* fraud.  *See FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1418 (Fed. Cir. 1987) ("[T]hose seeking unenforceability [are] seen as raising a shield and those seeking antitrust

**Exhibit 05.039**

damages as unsheathing a sword. FMC broke its Walker Process sword when it failed to establish inequitable conduct.").

135.    "In order to prevail on a *Walker Process* claim, the antitrust-plaintiff must show two things: first, that the antitrust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced the patent with knowledge of the fraudulent procurement; and second, all the other elements necessary to establish a Sherman Act monopolization claim." *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016); *see also Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174 (1965).

136.    "The 'other elements' necessary to establish an attempted monopolization claim are: '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *TransWeb*, 812 F.3d at 1306 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

137.    "In a determination of dangerous probability ... factors such as significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand may be considered. No single factor is dispositive." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir. 2007) (internal citation omitted).

138.    "Monopoly power is the ability to control prices or exclude competition in a given market." *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, No. CV 15-108-RGA, 2016 WL 264909, at *7 (D. Del. Jan. 21, 2016). "To support an inference of monopoly power, a plaintiff typically must plead and prove that a firm has a dominant share in a relevant market, and that significant 'entry

Exhibit 05.040

barriers' protect that market." *Broadcom*, 501 F.3d at 307. "[A] patent does not necessarily confer market power." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 44 (2006).

### D.   EIS'S PATENT MISUSE DEFENSE TO PATENT INFRINGEMENT

#### 1.   Issues to be Litigated

139.   Whether EIS has proven that Novoluto has committed patent misuse with respect to the '851 Patent.

140.   Whether EIS has proven that Novoluto has committed patent misuse with respect to the '061 Patent.

141.   Whether EIS has proven that Novoluto has committed patent misuse with respect to the '097 Patent.

142.   Whether EIS has proven that Novoluto has committed patent misuse with respect to the '220 Patent.

143.   Whether EIS has proven that Novoluto has committed patent misuse with respect to the '418 Patent.

#### 2.   Legal Authority

144.   Patent misuse is an affirmative defense to an accusation of patent infringement, the successful assertion of which requires that the alleged infringer show that the patentee has impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect." *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868 (Fed. Cir. 1997) (internal quotation marks omitted).

145.   The key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998).

41

**Exhibit 05.041**

146.    "[T]ying arrangements in which a patentee conditions a license under the patent on the purchase of a separable, staple good and arrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties" are examples of per se patent misuse so long as such practices are undertaken when the patentee has market power in the relevant market.  *Va. Panel Corp.*, 133 F.3d at 869; 35 U.S.C. § 271(d).

147.    When a practice is not per se patent misuse, the practice may still constitute patent misuse if it "has the effect of extending the patentee's statutory rights and does so with an anti-competitive effect."  *Id*. at 869.

148.    "What patent misuse is about, in short, is 'patent leverage,' i.e., the use of the patent power to impose overbroad conditions on the use of the patent in suit that are 'not within the reach of the monopoly granted by the Government.'"  *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1331 (Fed. Cir. 2010).

149.    Additionally, for any patent misuse defense, EIS must show anticompetitive effect, or, in the case of the per se forms of patent misuse, market power. *Id*. at 1334; 35 U.S.C. § 271(d).

**E.     EIS'S UNCLEAN HANDS DEFENSE TO PATENT INFRINGEMENT**

**1.  Issues to be Litigated**

150.    Whether EIS has proven that Novoluto comes to this Court with unclean hands.

**2.  Legal Authority**

151.    "Unclean hands is an equitable defense requiring the showing of five elements: (1) the party seeking affirmative relief (2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith (3) directly related to matter in issue (4) that injures other party (5) and affects balance of equities between litigants." *Allergan USA, Inc. v. Sun Pharm. Indus. Ltd.*, No. CV 19-1727-RGA, 2022 WL 11819975, at *3 (D. Del. Oct. 20, 2022).

42

Exhibit 05.042

152.     Unclean hands requires clear and convincing evidence of an unconscionable act that was material to the litigation with specific bad-faith and willful intent to deceive the court. See *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933); *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). Mere patent enforcement does not rise to a claim of unclean hands. *C.R. Bard*, 157 F.3d at 1372–73.

## F.     EIS's EQUITABLE ESTOPPEL DEFENSE TO PATENT INFRINGEMENT

### 1.    Issues to be Litigated

153.     Whether EIS has proven that Novoluto is equitably estopped from asserting the '851 Patent.

154.     Whether EIS has proven that Novoluto is equitably estopped from asserting the '061 Patent.

155.     Whether EIS has proven that Novoluto is equitably estopped from asserting the '097 Patent.

156.     Whether EIS has proven that Novoluto is equitably estopped from asserting the '220 Patent.

157.     Whether EIS has proven that Novoluto is equitably estopped from asserting the '418 Patent.

### 2.    Legal Authority

158.     Equitable estoppel may be imposed in a patent case when a patentee induces another party to believe that it will not sue that party for infringement. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1042 (Fed. Cir. 1992) (en banc).

159.     Three elements must be established to bar a patentee's suit by means of equitable estoppel: 1) the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer, 2) the

43

**Exhibit 05.043**

alleged infringer relies on that conduct, and 3) due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim. See *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1371 (Fed. Cir. 2001).

160.    Silence cannot give rise to equitable estoppel.  See *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1294-95 (Fed. Cir. 1992) ("[T]here was no action by plaintiff that would lead a reasonable competitor to assume that continued infringement by defendant was condoned or approved by plaintiff.").

### G.    EIS'S ACQUIESCENCE DEFENSE TO PATENT INFRINGEMENT

#### 1.    Issues to be Litigated

161.    Whether EIS has proven that Novoluto acquiesced to EIS's purported use of the '851 Patent.

162.    Whether EIS has proven that Novoluto acquiesced to EIS's purported use of the '061 Patent.

163.    Whether EIS has proven that Novoluto acquiesced to EIS's purported use of the '097 Patent.

164.    Whether EIS has proven that Novoluto acquiesced to EIS's purported use of the '220 Patent.

165.    Whether EIS has proven that Novoluto acquiesced to EIS's purported use of the '418 Patent.

#### 2.    Legal Authority

166.    The defenses of waiver and acquiescence are similar to estoppel in that they also require some conduct on the patent owner's part that amounts to an assurance to the defendant, express or implied, that the patent owner would not assert his patent against the defendant. *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1020 (Fed. Cir. 2008) (affirming district court

**Exhibit 05.044**

jury instruction that waiver requires conduct so inconsistent with intent to enforce patent rights as to induce reasonable belief that right has been relinquished); *A.C. Aukerman*, 960 F.2d at 1042-44 (noting that "acquiescence that the defendant will be unmolested" is one way to establish equitable estoppel, but the plaintiff must nevertheless "communicate something in a misleading way").

### H. EIS'S WAIVER DEFENSE TO PATENT INFRINGEMENT

#### 1. Issues to be Litigated

167.   Whether EIS has proven that Novoluto has waived its right to assert the '851 Patent against EIS.

168.   Whether EIS has proven that Novoluto has waived its right to assert the '061 Patent against EIS.

169.   Whether EIS has proven that Novoluto has waived its right to assert the '097 Patent against EIS.

170.   Whether EIS has proven that Novoluto has waived its right to assert the '220 Patent against EIS.

171.   Whether EIS has proven that Novoluto has waived its right to assert the '418 Patent against EIS.

#### 2. Legal Authority

172.   The defenses of waiver and acquiescence are similar to estoppel in that they also require some conduct on the patent owner's part that amounts to an assurance to the defendant, express or implied, that the patent owner would not assert his patent against the defendant. *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1020 (Fed. Cir. 2008) (affirming district court jury instruction that waiver requires conduct so inconsistent with intent to enforce patent rights as to induce reasonable belief that right has been relinquished); *A.C. Aukerman*, 960 F.2d at 1042-44

Exhibit 05.045

(noting that "acquiescence that the defendant will be unmolested" is one way to establish equitable estoppel, but the plaintiff must nevertheless "communicate something in a misleading way").

I. **EIS INC.'S CLAIMS OF LANHAM ACT UNFAIR COMPETITION, DELAWARE DECEPTIVE TRADE PRACTICES ACT, AND DELAWARE COMMON LAW TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**

### 1. Issues to be Litigated

173.    Whether EIS, Inc. has proven that any review of EIS, Inc.'s Satisfyer Air Pulse products was posted on Amazon in 2016 by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH.

174.    Whether EIS, Inc. has proven that any review of EIS, Inc.'s Satisfyer Air Pulse products was posted on Amazon in 2016 by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH, and that any such review was false or misleading.

175.    Whether EIS, Inc. has proven that any review of EIS, Inc.'s Satisfyer Air Pulse products was posted on Amazon in 2016 by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH, and that any such review was not a statement of opinion.

176.    Whether EIS, Inc. has proven that any review of EIS, Inc.'s Satisfyer Air Pulse products was posted on Amazon in 2016 by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH; that any such review was false or misleading; and that such review caused EIS, Inc. any harm.

177.    Whether EIS, Inc. has proven that any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH made a false or misleading statement to

**Exhibit 05.046**

Amazon.com regarding Satisfyer Air Pulse products during the fall of 2021 in the process of participating in Amazon's Utility Patent Neutral Evaluation ("UPNE") program.[30]

178.   Whether Novoluto GmbH had a good faith belief that Satisfyer Air Pulse products infringe one or more claims of the '220 Patent in the process of participating in Amazon UPNE program.

179.   Whether Novoluto GmbH has had and continues to have a good faith belief that Satisfyer Air Pulse products infringe one or more claims of the Asserted Patents.

180.   Whether EIS, Inc. has proven that it had a reasonable probability of a business opportunity with Eldorado Trading Company in July 2016.

181.   Whether EIS, Inc. has proven that any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH intentionally interfered with any reasonable probability of a business opportunity that EIS, Inc. had with Eldorado Trading Company in July 2016.

182.   Whether EIS, Inc. has proven that any alleged intentional interference by IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH in July 2016 proximately caused damage to EIS, Inc.

183.   Whether EIS, Inc. has proven that any communication regarding Novoluto GmbH's patents made by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH to Eldorado Trading Company in July 2016 was false or misleading.

---

[30] WOW Tech disputes that any allegations regarding Amazon's UPNE program are issues to be litigated because these were never properly pled by EIS, Inc., as explained in WOW Tech's motion for partial summary judgment on this issue.  D.I. 370 (MSJ # 3) at 22 and D.I. 495 at 11-12.

Exhibit 05.047

184.    Whether EIS, Inc. has proven that any communication regarding Novoluto GmbH's patents made by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH to Eldorado Trading Company in July 2016 was made in bad faith.

185.    Whether EIS, Inc. has proven that any communication regarding Satisfyer Air Pulse products made by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH to Eldorado Trading Company in July 2016 was false or misleading.

186.    Whether EIS, Inc. has proven that any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH made any false or misleading statements in connection with the alleged Amazon reviews and/or the alleged Eldorado Trading Company communications that constitute unfair competition under Delaware common law.[31]

187.    Whether EIS, Inc. has proven that it pled a claim for injunctive relief at the time EIS, Inc. filed suit on June 28, 2019, regarding events that allegedly occurred in 2016 (two years earlier), or that EIS, Inc. pled a claim for injunctive relief at the time of EIS, Inc's third amended complaint filed on September 16, 2021, which repeated the same allegations regarding the same alleged 2016 events.

188.    Whether EIS, Inc. has proven that any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH made any false or misleading statements that violate Delaware Deceptive Trade Practices Act.[32]

189.    Whether EIS, Inc. has proven entitlement to recover monetary damages under the Lanham Act for the alleged posting of four Amazon reviews and/or the alleged communications

---

[31] WOW Tech disputes that EIS should be permitted to argue unfair competition under Delaware common law beyond the allegations in EIS's Third Amended Complaint.

[32] WOW Tech disputes that EIS should be permitted to argue unfair competition under Delaware common law beyond the allegations in EIS's Third Amended Complaint.

Exhibit 05.048

with Eldorado Trading Company in 2016 by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH.

190.    The value of monetary damages under the Lanham Act, if any, that EIS, Inc. has proven for the alleged posting of four Amazon reviews and/or the alleged communications with Eldorado Trading Company in 2016 by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH.

191.    Whether EIS, Inc. has proven entitlement to recover lost profits under the Lanham Act for the alleged posting of four Amazon reviews and/or the alleged communications with Eldorado Trading Company in 2016 by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH.

192.    The value of lost profits under the Lanham Act, if any, that EIS, Inc. has proven for the alleged posting of four Amazon reviews and/or the alleged communications with Eldorado Trading Company in 2016 by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH.

193.    Whether EIS, Inc. has proven by a preponderance of the evidence that it should be awarded any damages for the alleged posting of four Amazon reviews and/or the alleged communications with Eldorado Trading Company in 2016 by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH, and, if so, the amount EIS, Inc. has proven by a preponderance of the evidence.

194.    Whether EIS, Inc. has proven entitlement to costs of this action under 15 U.S.C. § 1117.

195.    Whether EIS, Inc. has proven entitlement to treble damages under 15 U.S.C. § 1117.

49

Exhibit 05.049

196.    Whether EIS, Inc. has proven any actions by any of IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; or Novoluto GmbH, were willful.

197.    Whether EIS, Inc. has proven entitlement to exemplary and punitive damages, costs, reasonable attorneys' fees, and prejudgment interest.

198.    Whether EIS, Inc. has proven this is an exceptional case that entitles EIS, Inc. to an award of attorneys' fees and costs under 15 U.S.C. § 1117 where EIS, Inc. has engaged in predatory and abusive litigation tactics against Defendants, and, if so, the amount.

199.    Whether EIS, Inc. has proven entitlement to any other remedy or relief and, if so, what remedy or relief.

### 2.    Legal Authority

#### a.    Lanham Act Legal Authority

200.    The Lanham Act forbids the use in commerce of "any . . . false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities ... of … another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a) (emphasis added).  Therefore, "exaggeration or overstatement expressed in broad, vague, and commendatory language," i.e., puffery, is not actionable.  *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993).  Similarly, the Lanham Act does not cover opinion statements.  *Robert Bosch LLC v. Pylon Mfg. Corp.*, 632 F.Supp.2d 362, 366 (D. Del. 2009).

201.    To establish a claim for false advertising, a plaintiff must prove five elements: 1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc. *Pernod Ricard USA, LLC v.*

50

Exhibit 05.050

*Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011) (alteration in original) (quoting *Warner–Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 91–92 (3d Cir. 2000)).

202.    Each challenged statement must "satisf[y] all [the] Lanham Act['s] requirements." *Registered Agent Sols., Inc. v. Corp. Serv. Co.*, No. 1:21-CV-786-SB, 2022 WL 911253, at *2 (D. Del. Mar. 28, 2022) (quoting *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 299 (4th Cir. 2017)).

203.    "Only statements of fact capable of being proven false are actionable under the Lanham Act because, when personal opinions on nonverifiable matters are given, the recipient is likely to assume only that the communicator believes the statement, not that the statement is true." *Parker v. Learn Skills Corp.*, 530 F.Supp.2d 661, 679 (D. Del. 2008).

204.    "The test for literal falsity is an objective one for the court's determination." *Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.*, C.A. No. 09-642-SLR, 2010 WL 1992247, at *3 (D. Del. May 18, 2010).

205.    Absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements. *See Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 230-32 (3d Cir. 1990); *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, No. 14-15180, 2016 WL 1460171, at *4 (9th Cir. Apr. 14, 2016) (affirming that statements that a product was "legal" or "DSHEA-compliant" were opinion statements because they purport to interpret the meaning of a statute or regulation).

206.    Lanham Act plaintiff must "prove actual damages and a causal link between those damages and the Lanham Act violation." *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 286 (4th Cir. 2003.

51

Exhibit 05.051

### b.   Delaware Trade Practices Act Legal Authority

207.   "A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person: …(8) [d]isparages the goods, services, or business of another by false or misleading representation of fact" or "(12) [e]ngages in … conduct which similarly creates a likelihood of confusion or of misunderstanding." §§ 2532(a)(8) and (12) of the Delaware DTPA.

208.   The DTPA is intended to address "patterns of deceptive conduct, not isolated incidents, [thus] relief under the statute is dependent on ... entitlement to injunctive relief." *Wright v. Portfolio Recovery Affiliates*, No. 09-612, 2011 WL 1226115, at *5 (D. Del. Mar. 30, 2011) (citation and internal quotations omitted).

209.   "[T]he failure of a party to be able to state a claim for injunctive relief at the time suit is brought is fatal to claims under the Deceptive Trade Practices Act." *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 537 (Del. Ch. 2005). A claim for injunctive relief under the DTPA "must be supported by the allegation of facts that 'create a reasonable apprehension of a future wrong.'" *Id*. at 536 (emphasis added).  "The Act is designed to encourage immediate or at least timely enforcement of its provisions to halt unfair or deceptive trade practices between [parties] …. it is not a vehicle for damages long after the immediacy of the grievance dissipates. When the press for instant action eases, so does the basis for possible [relief under the DTPA]." *Id.*

210.   The DTPA "does not provide for damages, treble or otherwise, or attorney fees in the absence of a claim for injunctive relief" because "[t]he DTPA is not a platform for an independent common law damage suit." *Dionisi v. DeCampli*, No. 9425, 1995 WL 398536, at *13 (Del. Ch. June 28, 1995) (citing *Wald v. Wilmington Trust Co.*, 522 A.2d 853, 855 (Del. Super. Ct. 1988)); *see also Grand Ventures, Inc. v. Whaley*, 622 A.2d 655, 662 (Del. Super. Ct. 1992), aff'd, 632 A.2d 63 (Del. 1993)  ("Any deception ... occurred in the past; plaintiff could not claim any

Exhibit 05.052

prospective 'likelihood of damage' ... common law tort remedies provide the proper mechanism ... to seek relief.") (citation omitted).

### c. Delaware Common Law Unfair Competition Legal Authority

211.    The elements of the tort of Delaware common law unfair competition are that the plaintiff has a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm." *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1057 (Del. Super. Ct. 2001) (internal quotation marks omitted).

### d. Delaware Common Law Tortious Interference with Business Relations Legal Authority

212.    Delaware common law tortious interference requires: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference that induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy was disrupted.  *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 5 F.Supp.2d 238, 243 (D. Del. 1998). These elements "must be considered in light of [a party's] privilege to compete or protect his business interests in a fair and lawful manner."  *Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, 581 F.Supp.2d 654, 664 (D. Del. 2008) (quoting *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1290 (Del. Super. Ct. 2001), 790 A.2d at 1285).

213.    "To the extent that unfair competition exists as an independent common-law tort, it is essentially the same tort [as] tortious interference with prospective business relations." *Presidio, Inc. v. Semler*, No. 20-965, 2020 WL 8619101, at *8 n.19 (D. Del. Sept. 28, 2020) (quoting *Preston Hollow Capital LLC v. Nuveen LLC*, No. 2019-0169, 2019 WL 3801471, at *9 n.96 (Del. Ch. Aug.

**Exhibit 05.053**

13, 2019)); see also *Accenture*, 581 F.Supp.2d at 666 (dismissing unfair competition claim for same reasons as tortious interference claim).

214.    A claim of tortious interference with business relations requires a *bona fide* business relation or expectancy with a third party. *Truinject Corp. v. Nestle Skin Health, S.A.*, No. 19-592, 2020 WL 70981, at *16 (D. Del. Jan. 7, 2020) (emphasis added) (citation omitted), adopted, 2020 WL 1270916 (D. Del. Mar. 17, 2020).  To be *bona fide*, the facts must show that "the third party 'was prepared to enter into a business relationship but was dissuaded from doing so by the defendant.'" *Id*. (emphases added) (quoting *GWO Litig. Trust v. Sprint Sols., Inc.*, No. 06-356, 2018 WL 5309477, at *12 (Del. Super. Ct. Oct. 25, 2018)).

215.    A business expectancy must also be reasonably probable—"something more than a mere hope or the innate optimism of the salesman or a mere perception of a prospective business relationship." *Agilent Techs., Inc. v. Kirkland*, No. 3512, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009) (internal quotations and citations omitted).

216.    Tortious interference requires "knowledge of the relationship or expectancy on the part of the interferer." *Am. Inst. for Chartered Prop. Cas. Underwriters v. Potter*, No. 19-1600, 2021 WL 431475, at **8-9 (D. Del. Feb. 8, 2021), adopted, 2021 WL 1152982 (D. Del. Mar. 26, 2021); *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F.Supp.2d 249, 288-89 (D.N.J. 2003) ("[I]t is axiomatic that a defendant cannot be held liable for interfering with a contract of which he or she was unaware.") (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1170 (3d Cir. 1993)).

## J.    EIS INC.'S CLAIM FOR FEES

### 1.    Issues to be Litigated

217.    Whether EIS, Inc. has proven that they have prevailed in this case.

**Exhibit 05.054**

218.    Whether EIS, Inc. has proven that this case is exceptional due to the substantive strength of EIS, Inc.'s litigating position, considering both the governing law and the facts of the case.

219.    Whether EIS, Inc. has proven that Defendants have litigated this case in an unreasonable manner.

220.    Whether EIS, Inc. has proven that this case is exceptional due to the manner in which the case was litigated by Defendants.

221.    Whether EIS, Inc. has proven that they are entitled to attorneys' fees due to the exceptionality of the present case.

### 2.    Legal Authority

222.    "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.

223.    The Supreme Court has defined an "exceptional" case as "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 554, 557 (2014). The district court "may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id*.

55

**Exhibit 05.055**

Joint Proposed Pretrial Order

# EXHIBIT 6A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EIS, INC.,<br><br>      Plaintiff,<br><br>      v.<br><br>INTIHEALTH GER GMBH, WOW TECH USA, LTD., WOW TECH CANADA, LTD. AND NOVOLUTO GMBH,<br><br>      Defendants. | Civil Action No. 19-1227-GBW |
| NOVOLUTO GMBH,<br><br>      Counterclaimant,<br><br>      v.<br><br>EIS, INC., EIS GMBH,<br>TRIPLE A IMPORT GMBH,<br>and TRIPLE A MARKETING GMBH<br><br>      Counterclaim Defendants. | |

**PLAINTIFF'S AND COUNTERCLAIM DEFENDANTS'
THIRD AMENDED WITNESS LIST**

Plaintiff and Counterclaim Defendant EIS, Inc. and Counterclaim Defendants EIS GmbH, Triple A Marketing GmbH, and Triple A Import GmbH (collectively, "EIS") hereby provide their witness list pursuant to Fed. R. Civ. P. 26(a)(3) and the Joint Stipulation and Order Regarding Schedule for Pretrial Exchanges (D.I. 577).

EIS identifies the name and, if not previously provided, the address and telephone number, of each witness it may present at trial other than solely for impeachment – separately identifying those it expects to present and those it may call if the need arises.  EIS reserves the right to amend

and/or supplement this disclosure as allowed by the Court and law, including in rebuttal to Counterclaim Plaintiff's and Defendants' case, arguments, or evidence, or as may be required for document authentication.

## 1. Witnesses EIS Will Present at Trial

| Name | Contact Information |
|---|---|
| Dr. John P. Abraham | Dr. Abraham may be contacted through the undersigned attorneys. |
| Stephen G. Kunin | Mr. Kunin may be contacted through the undersigned attorneys. |
| Dr. Kristen Mark | Dr. Mark may be contacted through the undersigned attorneys. |
| Phillip Messina | Mr. Messina may be contacted through the undersigned attorneys. |
| W. Todd Schoettelkotte | Mr. Schoettelkotte may be contacted through the undersigned attorneys. |
| Jerome Bensimon | Mr. Bensimon may be contacted through the undersigned attorneys. |
| Thomas Milewski | Mr. Milewski may be contacted through the undersigned attorneys. |
| Dr. Ewald Mittelstaedt | Dr. Mittelstaedt may be contacted through the undersigned attorneys. |
| Richard A. Cheng (Adverse) | Chiesa Shahinian & Giantomasi PC<br>One Boland Drive<br>West Orange Dr., West Orange, NJ 07052<br>973-530-2163<br>(The above address is listed on WOW Tech's Second Amended Initial Disclosures – the following address appears on their website: 105 Eisenhower Parkway Roseland, NJ  07068) |
| Stephanie Keating (Adverse, because WOW has indicated that Ms. Keating will attend trial) | Ms. Keating may be contacted through WOW Tech attorneys. |

Exhibit 6A.002

| | |
|---|---|
| Tobias Zegenhagen (Adverse, because WOW has indicated that Mr. Zegenhagen will attend trial) | Mr. Zegenhagen may be contacted through WOW Tech attorneys. |
| Johannes Plettenberg (Adverse, because WOW has indicated that Mr. Plettenberg will attend trial) | Mr. Plettenberg may be contacted through WOW Tech attorneys. |

**2. Witnesses EIS May Present at Trial**

| Name | Contact Information |
|---|---|
| Lydia Bakalova | Ms. Bakalova may be contacted through the undersigned attorneys. |
| Tammy Terry (limited to eliciting testimony regarding Ms. Terry's participation in WOW Tech's use of the Amazon UPNE process and emails Ms. Terry authored in that regard) | |

**3. Witnesses Who May Testify by Deposition**

EIS expects to present the testimony of the witnesses listed below by deposition designation.  EIS has provided the deposition designations for each of these witnesses.

- Intihealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; and Novoluto GmbH via their designated Rule 30(b)(6) corporate representatives Johannes Plettenberg and Tobias Zegenhagen

- Marianne Buckley

- Richard A. Cheng (to the extent he does not testify live)

- Stephanie Keating

- Johannes Plettenberg

- Simon Smith

- Lena Weiland

- Tobias Zegenhagen

**Exhibit 6A.003**

Joint Proposed Pretrial Order

# EXHIBIT 6B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| EIS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No.: 19-cv-1227-GBW |
| INTIHEALTH GER GMBH, | § | |
| WOW TECH USA, LTD., WOW TECH | § | |
| CANADA, LTD. and NOVOLUTO GMBH, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| NOVOLUTO GMBH, | § | |
| | § | |
| Counterclaimant, | § | |
| | § | |
| v. | § | |
| | § | |
| EIS, INC., EIS GMBH, | § | |
| TRIPLE A IMPORT GMBH, | § | |
| and TRIPLE A MARKETING GMBH, | § | |
| | § | |
| Counterclaim Defendants. | | |

### DEFENDANTS' AND COUNTERCLAIMANT'S OBJECTIONS TO PLAINTIFF'S AND COUNTERCLAIM DEFENDANTS' WITNESS LIST

Defendants IntiHealth Ger GmbH, Novoluto GmbH, WOW Tech USA, Ltd., and WOW Tech Canada, Ltd., (collectively "WOW Tech") and Counterclaim Plaintiff and Defendant Novoluto GmbH ("Novoluto") submit the following objections to Plaintiff and Counterclaim Defendant EIS, Inc.'s and Counterclaim Defendants' EIS GmbH, Triple A Marketing GmbH, and Triple A Import GmbH (collectively, "EIS") witness list. WOW Tech generally objects to the inclusion of objections made by counsel in any designated deposition testimony. WOW Tech objects to any witnesses designated by EIS that are the subjects of WOW Tech's motions for summary judgment, *Daubert* motions, and/or motions *in limine*. WOW Tech reserves the right to

1

amend, supplement, modify, or withdraw any of the objections leading up to and at trial. WOW Tech reserves the right to object to any testimony as inadmissible under the Federal Rules of Civil Procedure or the Federal Rules of Evidence. WOW Tech also reserves the right to seek to introduce any testimony and/or call any witness listed in EIS's Witness List, if otherwise admissible. WOW Tech also reserves the right to utilize deposition designations made by EIS, as well as undesignated portions of deposition testimony for demonstratives, impeachment purposes, or rebuttal.

1.  **Objections to Witnesses EIS Will Present at Trial**

| Name | Objection(s) |
|---|---|
| Dr. John P. Abraham | WOW Tech objects to the testimony of Dr. Abraham to the extent it is inadmissible under Federal Rules of Evidence 702 and 703. WOW Tech further objects that Dr. Abraham cannot offer any opinions that he has not sufficiently described in his expert reports. *See* Fed. R. Civ. P. 26, 37. WOW Tech objects to any testimony or opinion of Dr. Abraham to the extent they are excluded by WOW Tech's motions for summary judgment, *Daubert* motions, and/or motions *in limine*. |
| Stephen G. Kunin | WOW Tech objects to the testimony of Mr. Kunin to the extent it is inadmissible under Federal Rules of Evidence 702 and 703. WOW Tech further objects that Mr. Kunin cannot offer any opinions that he has not sufficiently described in his expert reports. *See* Fed. R. Civ. P. 26, 37. WOW Tech objects to any testimony or opinion of Mr. Kunin to the extent they are excluded by WOW Tech's motions for summary judgment, *Daubert* motions, and/or motions *in limine*. |
| Dr. Kristen Mark | WOW Tech objects to the testimony of Dr. Mark because it is inadmissible under Federal Rules of Evidence 702 and 703, is irrelevant under Federal Rule of Evidence 402, and would be confusing to the jury under Federal Rule of Evidence 403, given that Dr. Mark is |

| | |
|---|---|
| | not qualified to provide expert opinion testimony and EIS has declared that her opinions do not relate to issues of infringement or invalidity in this patent infringement case. D.I. 370 (*Daubert* # 3) at 46-49, D.I. 495 at 22-24. WOW Tech further objects that Dr. Mark cannot offer any opinions that she has not sufficiently described in her expert reports. *See* Fed. R. Civ. P. 26, 37. WOW Tech objects to any testimony or opinion of Dr. Mark to the extent they are excluded by WOW Tech's motions for summary judgment, *Daubert* motions, and/or motions *in limine*. |
| Phillip Messina | WOW Tech objects to EIS calling Mr. Messina to the extent they seek to introduce testimony for which the witness lacks personal knowledge or to the extent the witness is not competent to testify. *See* Fed. R. Evid. 601, 602. WOW Tech further objects to the extent EIS seeks to introduce testimony that constitutes improper lay witness opinion. *See* Fed. R. Evid. 701. WOW Tech further objects to the extent Mr. Messina's testimony is inadmissible under Federal Rules of Evidence 408 or 802, or is irrelevant and likely to confuse the jury. *See* Fed. R. Evid. 402, 403. WOW Tech objects to any testimony or opinion of Mr. Messina to the extent they are excluded by WOW Tech's motions for summary judgment, *Daubert* motions, and/or motions *in limine*. |
| W. Todd Schoettelkotte | WOW Tech objects to the testimony of Mr. Schoettelkotte to the extent it is inadmissible under Federal Rules of Evidence 702 and 703. WOW Tech further objects that Mr. Schoettelkotte cannot offer any opinions that he has not sufficiently described in his expert reports. *See* Fed. R. Civ. P. 26, 37. WOW Tech objects to any testimony or opinion of Mr. Schoettelkotte to the extent they are excluded by WOW Tech's motions for summary judgment, *Daubert* motions, and/or motions *in limine*. |

| | |
|---|---|
| Jerome Bensimon | WOW Tech objects to EIS calling Mr. Bensimon to the extent they seek to introduce deposition testimony that is outside of the scope of his 30(b)(6) designation, and for which the witness lacks personal knowledge or to the extent the witness is not competent to testify. *See* Fed. R. Evid. 601, 602. WOW Tech further objects to the extent EIS seeks to introduce testimony that constitutes improper lay witness opinion. *See* Fed. R. Evid. 701. WOW Tech further objects to the extent Mr. Bensimon's testimony is inadmissible under Federal Rules of Evidence 408 or 802, or is irrelevant and likely to confuse the jury. *See* Fed. R. Evid. 402, 403. |
| Thomas Milewski | WOW Tech objects to EIS calling Mr. Milewski to the extent they seek to introduce deposition testimony that is outside of the scope of his 30(b)(6) designation, and for which the witness lacks personal knowledge or to the extent the witness is not competent to testify. *See* Fed. R. Evid. 601, 602. WOW Tech further objects to the extent EIS seeks to introduce testimony that constitutes improper lay witness opinion. *See* Fed. R. Evid. 701. WOW Tech further objects to the extent Mr. Milewski's testimony is inadmissible under Federal Rules of Evidence 408 or 802, or is irrelevant and likely to confuse the jury. *See* Fed. R. Evid. 402, 403. |
| Dr. Ewald Mittelstaedt | WOW Tech objects to EIS calling Dr. Mittelstaedt to the extent they seek to introduce deposition testimony that is outside of the scope of his 30(b)(6) designation, and for which the witness lacks personal knowledge or to the extent the witness is not competent to testify. *See* Fed. R. Evid. 601, 602. WOW Tech further objects to the extent EIS seeks to introduce testimony that constitutes improper lay witness opinion. *See* Fed. R. Evid. 701. WOW Tech further objects to the extent Dr. Mittelstaedt's testimony is inadmissible under Federal Rules of Evidence 408 or 802, or is irrelevant and likely to |

| | |
|---|---|
| | confuse the jury. *See* Fed. R. Evid. 402, 403. |
| Richard A. Cheng | WOW Tech objects because Mr. Cheng's testimony is irrelevant and is prejudicial and/or likely to confuse the jury, and such prejudice/confusion outweighs the testimony's probative value.  *See* Fed. R. Evid. 402, 403.  WOW Tech further objects to the extent EIS seeks to introduce testimony that constitutes improper lay witness opinion. *See* Fed. R. Evid. 701.  WOW Tech further objects to the extent Mr. Cheng's testimony is inadmissible under Fed. R. Evid. 802.   WOW Tech further objects because Mr. Cheng's testimony is only relevant to inequitable conduct, which is not a proper issue for the jury. |
| Stephanie Keating | WOW Tech objects to EIS calling Ms. Keating to the extent it seeks to introduce testimony for which the witness lacks personal knowledge or to the extent the witness is not competent to testify.  *See* Fed. R. Evid. 601, 602.  WOW Tech further objects to the extent EIS seeks to introduce testimony that constitutes improper law witness opinion.  *See* Fed. R. Evid. 701.  WOW Tech further objects to the extent Ms. Keating's testimony is inadmissible under Federal Rules of Evidence 408 or 802, or is irrelevant and likely to confuse the jury.  *See* Fed. R. Evid. 402, 403.  WOW Tech further objects to the extent EIS's designation of deposition testimony is not permitted by Fed. R. Civ. P. 32. |
| Tobias Zegenhagen | WOW Tech objects to EIS calling Mr. Zegenhagen to the extent it seeks to introduce deposition testimony that is outside the scope of his 30(b)(6) designation, and for which the witness lacks personal knowledge or to the extent the witness is not competent to testify. *See* Fed. R. Evid. 601, 602.  WOW Tech further objects to the extent EIS seeks to introduce testimony that constitutes improper law witness opinion.  *See* Fed. R. Evid. 701.  WOW Tech further objects to the extent Mr. Zegenhagen's testimony is inadmissible under |

**Exhibit 6B.005**

| | |
|---|---|
| | Federal Rules of Evidence 408 or 802, or is irrelevant and likely to confuse the jury. *See* Fed. R. Evid. 402, 403. WOW Tech further objects to the extent EIS's designation of deposition testimony is not permitted by Fed. R. Civ. P. 32. |
| Johannes Plettenberg | WOW Tech objects to EIS calling Mr. Plettenberg to the extent it seeks to introduce deposition testimony that is outside the scope of his 30(b)(6) designation, and for which the witness lacks personal knowledge or to the extent the witness is not competent to testify. *See* Fed. R. Evid. 601, 602. WOW Tech further objects to the extent EIS seeks to introduce testimony that constitutes improper law witness opinion. *See* Fed. R. Evid. 701. WOW Tech further objects to the extent Mr. Plettenberg's testimony is inadmissible under Federal Rules of Evidence 408 or 802, or is irrelevant and likely to confuse the jury. *See* Fed. R. Evid. 402, 403. WOW Tech further objects to the extent EIS's designation of deposition testimony is not permitted by Fed. R. Civ. P. 32. |

## 2. Objections to Witnesses EIS May Present at Trial

| Name | Objection(s) |
|---|---|
| Lydia Bakalova | WOW Tech objects to the testimony of Ms. Bakalova to the extent it is inadmissible under Federal Rules of Evidence 702 and 703. WOW Tech further objects that Ms. Bakalova cannot offer any opinions that she has not sufficiently described in her expert reports. *See* Fed. R. Civ. P. 26, 37. WOW Tech objects to any testimony or opinion of Ms. Bakalova to the extent they are excluded by WOW Tech's motion for summary judgment. WOW Tech further objects to any testimony of Ms. Bakalova on the basis that she offers only testimony on IPR estoppel, which is not an appropriate question for the jury. *Innovative Memory Sys., Inc. v. Micron Tech., Inc.*, No. |

| | |
|---|---|
| | CV 14-1480-RGA, 2022 WL 4548644, at *5 (D. Del. Sept. 29, 2022). |
| Tammy Terry | WOW Tech incorporates by reference its Motion for Leave to file a Fourth Motion in Limine (D.I. 613). WOW Tech objects because the only subject matter EIS has identified for Ms. Terry's expected testimony relates to WOW Tech's participation in Amazon's UPNE program, an issue that is not properly in this case because it has never been properly pled, as discussed in WOW Tech's motion *in limine* #3 and WOW Tech's Motion for Partial Summary Judgment # 3, Section E and # 4 (D.I. 370, 22-23 and 23-25); *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005); *Zoppas Indus. de Mexico v. Backer EHP Inc.*, No. 18-1693-GBW, 2022 WL 10341384, at *3 (D. Del. Oct. 3, 2022) (finding claims were waived because plaintiff failed to amend its complaint to add new and separate factual allegations supporting its misappropriation of trade secrets claims). WOW Tech further objects because Ms. Terry is lead trial counsel for WOW Tech and therefore allowing EIS to call her to the witness stand would be highly prejudicial to WOW Tech and likely to confuse the jury, and such prejudice and confusion far outweighs any probative value. *See* Fed. R. Evid. 402, 403. |

**3. Objections to Witnesses EIS May Call to Testify By Deposition**

| Name | Objection(s) |
|---|---|
| IntiHealth Ger GmbH; WOW Tech USA, Ltd.; WOW Tech Canada, Ltd.; and Novoluto GmbH via their designated Rule 30(b)(6) corporate representatives Johannes Plettenberg and Tobias Zegenhagen | WOW Tech objects to the extent EIS's designation of deposition testimony is not permitted by Fed. R. Civ. P. 32. WOW Tech further objects to the extent such testimony is inadmissible under Fed. R. Evid. 408 or 802, or is irrelevant and likely to confuse the jury. *See* Fed. R. Evid. 402, 403. |

**Exhibit 6B.007**

| | |
|---|---|
| Marianne Buckley | WOW Tech objects to the extent EIS's designation of deposition testimony is not permitted by Fed. R. Civ. P. 32. WOW Tech further objects because Ms. Buckley's testimony is irrelevant and is prejudicial and/or likely to confuse the jury, and such prejudice/confusion outweighs the testimony's probative value. *See* Fed. R. Evid. 402, 403. WOW Tech further objects to the extent Ms. Buckley's testimony is inadmissible under Fed. R. Evid. 802. WOW Tech objects to any testimony of Ms. Buckley to the extent the underlying issues are excluded by WOW Tech's motions for summary judgment, *Daubert* motions, and/or motions *in limine*. |
| Richard A. Cheng | WOW Tech objects to the extent EIS's designation of deposition testimony is not permitted by Fed. R. Civ. P. 32. WOW Tech further objects because Mr. Cheng's testimony is irrelevant and is prejudicial and/or likely to confuse the jury, and such prejudice/confusion outweighs the testimony's probative value. *See* Fed. R. Evid. 402, 403. WOW Tech further objects to the extent Mr. Cheng's testimony is inadmissible under Fed. R. Evid. 802. WOW Tech objects to any testimony of Mr. Cheng to the extent the underlying issues are excluded by WOW Tech's motions for summary judgment, *Daubert* motions, and/or motions *in limine*. |
| Stephanie Keating | WOW Tech objects to the extent EIS's designation of deposition testimony is not permitted by Fed. R. Civ. P. 32. Ms. Keating's testimony is irrelevant and is prejudicial and/or likely to confuse the jury, and such prejudice/confusion outweighs the testimony's probative value. *See* Fed. R. Evid. 402, 403. WOW Tech further objects to the extent Ms. Weiland's testimony is inadmissible under Fed. R. Evid. 802. WOW Tech objects to any testimony of Ms. Keating to the extent the underlying issues are excluded by WOW Tech's motions for summary judgment, *Daubert* motions, and/or motions *in limine*. |

**Exhibit 6B.008**

| | |
|---|---|
| Johannes Plettenberg | WOW Tech objects to the extent EIS's designation of deposition testimony is not permitted by Fed. R. Civ. P. 32. WOW Tech further objects to the extent such testimony is inadmissible under Fed. R. Evid. 408 or 802, or is irrelevant and likely to confuse the jury. *See* Fed. R. Evid. 402, 403. |
| Simon Smith | WOW Tech objects to the extent EIS's designation of deposition testimony is not permitted by Fed. R. Civ. P. 32. WOW Tech further objects because Mr. Smith's testimony is irrelevant and is prejudicial and/or likely to confuse the jury, and such prejudice/confusion outweighs the testimony's probative value. *See* Fed. R. Evid. 402, 403. WOW Tech further objects to the extent Mr. Smith's testimony is inadmissible under Fed. R. Evid. 408 or 802. WOW Tech objects to any testimony of Mr. Smith to the extent the underlying issues are excluded by WOW Tech's motions for summary judgment, *Daubert* motions, and/or motions *in limine*. |
| Lena Weiland | WOW Tech objects to the extent EIS's designation of deposition testimony is not permitted by Fed. R. Civ. P. 32. WOW Tech further objects because Ms. Weiland's testimony is irrelevant and is prejudicial and/or likely to confuse the jury, and such prejudice/confusion outweighs the testimony's probative value. *See* Fed. R. Evid. 402, 403. WOW Tech further objects to the extent Ms. Weiland's testimony is inadmissible under Fed. R. Evid. 408 or 802. WOW Tech objects to any testimony of Ms. Weiland to the extent the underlying issues are excluded by WOW Tech's motions for summary judgment, *Daubert* motions, and/or motions *in limine*. |
| Tobias Zegenhagen | WOW Tech objects to the extent EIS's designation of deposition testimony is not permitted by Fed. R. Civ. P. 32. WOW Tech further objects to the extent such testimony is inadmissible under Fed. R. Evid. 408 or 802, or is irrelevant and likely to confuse the jury. |

9

|  | *See* Fed. R. Evid. 402, 403. |
|--|--|

**Exhibit 6B.010**

Joint Proposed Pretrial Order

# EXHIBIT 7A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| EIS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.: 19-cv-1227-GBW |
| | § | |
| INTIHEALTH GER GMBH, | § | |
| WOW TECH USA, LTD., WOW TECH | § | |
| CANADA, LTD. and NOVOLUTO GMBH, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| NOVOLUTO GMBH, | § | |
| | § | |
| Counterclaimant, | § | |
| | § | |
| v. | § | |
| | § | |
| EIS, INC., EIS GMBH, | § | |
| TRIPLE A IMPORT GMBH, | § | |
| and TRIPLE A MARKETING GMBH, | § | |
| | § | |
| Counterclaim Defendants. | | |

**DEFENDANTS' AND COUNTERCLAIMANT'S**
**SECOND AMENDED WITNESS LIST**

Pursuant to Fed. R. Civ. P. 26(a)(3) and the Joint Stipulation and Order Regarding Schedule for Pretrial Exchanges (D.I. 577), Defendants IntiHealth Ger GmbH, Novoluto GmbH, WOW Tech USA, Ltd., and WOW Tech Canada, Ltd., (collectively "WOW Tech") and Counterclaim Plaintiff and Defendant Novoluto GmbH ("Novoluto") provide their witness list, identifying the witnesses that WOW Tech and/or Novoluto may call live or by deposition at trial.

WOW Tech reserves the right to modify this list in accordance with Fed. R. Civ. P. 26(a)(3), D. Del. LR 16.3, or in view of other events or changed circumstances that may occur before or during trial. WOW Tech expressly reserves the right to call live or by deposition any witness on

1

its witness list or any witness on the witness list of Plaintiff and Counterclaim Defendant EIS, Inc.

and Counterclaim Defendants EIS GmbH, Triple A Marketing GmbH, and Triple A Import GmbH

(collectively, "EIS"). This list is not a commitment that WOW Tech will call any particular witness

at trial, or a representation that any witness listed is available or will appear for trial.  If any WOW

Tech, EIS, or third-party witness is unavailable or refuses to testify live, WOW Tech reserves the

right to use their deposition testimony. With respect to EIS's witnesses, WOW Tech reserves the

right to introduce testimony through deposition or live examination, as appropriate.  WOW Tech

also reserves the right to amend and/or supplement this disclosure as allowed by the Court and the

law, including in rebuttal to Plaintiff's and Counterclaim Defendants' case, arguments, or evidence,

or as may be required for document authentication.

Subject to the foregoing, WOW Tech's current list of witnesses that it may call to testify at

trial, either live or by deposition, is set forth below.

## 1.    Witnesses WOW Tech Will Present at Trial

| Witness | Contact Information |
| --- | --- |
| Justin Blok | Mr. Blok may be contacted through the undersigned attorneys. |
| Dr. Kimberly Cameron | Dr. Cameron may be contacted through the undersigned attorneys. |
| Andre Geske (adverse) | Mr. Geske may be contacted through EIS's attorneys. |
| Dr. Deborah Herbenick | Dr. Herbenick may be contacted through the undersigned attorneys. |
| Stephanie Keating | Ms. Keating may be contacted through the undersigned attorneys. |
| Thomas Milewski (adverse) | Mr. Milewksi may be contacted through EIS's attorneys. |
| Johannes Plettenberg | Mr. Plettenberg may be contacted through the undersigned attorneys. |
| Robert Stoll | Mr. Stoll may be contacted through the undersigned attorneys. |
| Tobias Zegenhagen | Mr. Zegenhagen may be contacted through the undersigned attorneys. |

Exhibit 07A.002

## 2. Witnesses WOW Tech May Present by Deposition

On July 28, 2023, EIS identified Mr. Andre Geske as a witness that EIS "may" present at trial. Out of an abundance of caution, in the event that Mr. Geske becomes unavailable, and EIS makes a showing of such unavailability, WOW Tech reserves the right to call Mr. Geske by deposition and has provided deposition designations accordingly.  WOW Tech also reserves the right to call Mr. Thomas Milewski in his personal capacity and as the corporate representative of EIS GmbH, Triple A Import GmbH, and Triple A Marketing GmbH, by deposition and has provided deposition designations accordingly.  WOW Tech reserves the right to not present the designated deposition testimony, or any portion thereof, or to present such additional portions as may be necessary to rebut testimony or evidence offered by EIS.  Objections and colloquy in the included designations will be omitted.

**Exhibit 07A.003**

Joint Proposed Pretrial Order

# EXHIBIT 7B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EIS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 19-1227-GBW |
| INTIHEALTH GER GMBH, WOW TECH USA, LTD., WOW TECH CANADA, LTD. AND NOVOLUTO GMBH, | |
| Defendants. | |
| NOVOLUTO GMBH, | |
| Counterclaimant, | |
| v. | |
| EIS, INC., EIS GMBH, TRIPLE A IMPORT GMBH, and TRIPLE A MARKETING GMBH | |
| Counterclaim Defendants. | |

**PLAINTIFF'S AND COUNTERCLAIM DEFENDANTS' OBJECTIONS TO
DEFENDANTS' AND COUNTERCLAIMANT'S WITNESS LIST**

EIS, Inc. (Plaintiff), EIS GmbH, Triple A Marketing GmbH, and Triple A Import GmbH

(collectively, Counterclaim Defendants) object to Defendants' and Counterclaimant's Witness

List. Plaintiff's and Counterclaim Defendants' objections are supplemental to any pending

motions, including without limitation Plaintiff's and Counterclaim Defendants' summary

judgment motions, *Daubert* motions, and forthcoming motions *in limine*, and are not intended to

limit the scope of any such motions.

**Exhibit 07B.001**

Plaintiff and Counterclaim Defendants object to the testimony of any witness presented by Defendants or Counterclaimant to the extent it is inadmissible under any rule of the Federal Rules of Evidence, the Federal Rules of Civil Procedure, or this Court's local rules, including but not limited to Federal Rule of Evidence 402, 403, 404, 408, 602, 608, 611, 701, 702, 703, 802, or 1002, and Federal Rules of Civil Procedure 26 or 37.

Plaintiff and Counterclaim Defendants object to the extent Novoluto GmbH (Counterclaimant), IntiHealth Ger GmbH, WOW Tech USA, Ltd., and WOW Tech Canada, Ltd. (collectively, Defendants) purport to require André Geske's or Thomas Milewski's attendance at trial. *See* Fed. R. Civ. P. 45(c)(1). Plaintiff and Counterclaim Defendants further object to Counterclaimant's and Defendants' statement that Plaintiff and Counterclaim Defendants need to make a showing that André Geske is unavailable. *See* Fed. R. Evid. 804. Plaintiff and Counterclaim Defendants further object to Counterclaimant and Defendants calling Thomas Milewski in his personal capacity at trial by deposition designation to the extent he is available to testify at trial.

Plaintiff and Counterclaim Defendants incorporate by reference their objections and counter-designations to Counterclaimant's and Defendants' deposition designations as well as any evidentiary issues to be raised at the pre-trial conference. Plaintiff and Counterclaim Defendants further reserve the right to object on any ground of improper or irrelevant testimony advanced at trial by any of Counterclaimant's and Defendants' witnesses (including on cross-examination of Counterclaimant's and Defendants' or third-party witnesses).

Plaintiff and Counterclaim Defendants do not know the precise nature or scope of the testimony and evidence that Counterclaimant and Defendants may seek to present at trial. As such, Plaintiff and Counterclaim Defendants reserve the right to modify, amend, or supplement their

**Exhibit 07B.002**

objections prior to or during trial including, by way of example and not of limitation, rulings by the Court including on any *Daubert* motions, summary judgment motions, and/or motions *in limine*, or any other case developments.

**Exhibit 07B.003**

Joint Proposed Pretrial Order

# EXHIBIT 8

PLAINTIFF AND COUNTERCLAIM DEFENDANTS' ("EIS") DEPOSITION DESIGNATIONS

**MARIANNE BUCKLEY**
**September 22, 2022**

| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 7 | 9 | 7 | 12 | MSJ | | | | | | | | | |
| 7 | 15 | 7 | 19 | MSJ | | | | | | | | | |
| 9 | 19 | 9 | 25 | MSJ | | | | | | | | | |
| 10 | 9 | 10 | 10 | MSJ | | | | | | | | | |
| 10 | 17 | 10 | 21 | MSJ | | | | | | | | | |
| 10 | 23 | 11 | 1 | MSJ | | | | | | | | | |
| 13 | 18 | 13 | 20 | MSJ | | | | | | | | | |
| 16 | 1 | 17 | 14 | MSJ | | | | | | | | | |
| 18 | 14 | 19 | 19 | IR, MSJ | | | | | | | | | |
| 19 | 22 | 20 | 15 | IR, MSJ | | | | | | | | | |
| 20 | 16 | 20 | 24 | IR, MSJ | | | | | | | | | |
| 21 | 2 | 21 | 2 | IR, MSJ | | | | | | | | | |
| 22 | 1 | 22 | 10 | IR, MSJ | 21 | 4 | 21 | 22 | IMP C, R | | | | |
| 23 | 8 | 23 | 18 | MSJ | | | | | | | | | |
| 23 | 19 | 23 | 24 | MSJ | | | | | | | | | |
| 24 | 3 | 24 | 10 | LF, MSJ | | | | | | | | | |
| 24 | 16 | 24 | 23 | AF, V, MSJ | | | | | | | | | |
| 25 | 3 | 27 | 8 | AF, IR, LF, V, MSJ | | | | | | | | | |
| 28 | 11 | 29 | 24 | AF, V, MSJ | | | | | | | | | |
| 30 | 3 | 30 | 9 | MSJ | 30 | 10 | 30 | 15 | IMP C, R | | | | |
| 30 | 24 | 31 | 6 | AF, CD, LF, V, MSJ | | | | | | | | | |
| 31 | 8 | 31 | 11 | | | | | | | | | | |
| 32 | 22 | 32 | 25 | S, V, MSJ | | | | | | | | | |
| 33 | 2 | 34 | 7 | CD, L, MSJ | | | | | | | | | |
| 34 | 9 | 35 | 2 | L, LF, V , MSJ | | | | | | | | | |
| 35 | 6 | 35 | 14 | L, LF, V , MSJ | | | | | | | | | |
| 35 | 16 | 35 | 23 | AF, L, LF, V, MSJ | | | | | | | | | |
| 35 | 25 | 38 | 15 | CD, L, LA, LF, V, MSJ | | | | | | | | | |
| 38 | 22 | 39 | 7 | AF, CD, LA, LF, V, MSJ | | | | | | | | | |
| 39 | 20 | 40 | 5 | AF, LA, V, MSJ | | | | | | | | | |
| 40 | 13 | 40 | 19 | LF, MSJ | | | | | | | | | |
| 40 | 21 | 41 | 12 | LF, MSJ | | | | | | | | | |
| 41 | 20 | 42 | 6 | CD, MSJ | | | | | | | | | |
| 42 | 11 | 42 | 19 | AF, LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 45 | 8 | 49 | 10 | AF, CD, LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 49 | 13 | 51 | 17 | AF, LF, MIS, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 51 | 18 | 51 | 21 | AF, LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 51 | 24 | 53 | 7 | AF, ARG, LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 53 | 10 | 54 | 10 | AF, CD, LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 55 | 14 | 55 | 18 | V, MSJ | 55 | 7 | 55 | 13 | R, 403 | | | | |

**Exhibit 8.001**

PLAINTIFF AND COUNTERCLAIM DEFENDANTS' ("EIS") DEPOSITION DESIGNATIONS

| MARIANNE BUCKLEY September 22, 2022 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **EIS's Designations** | | | | **WOW Tech's Objections** | **WOW Tech's Counter-Designations** | | | | **EIS's Objections to Counter-Designations** | **EIS's Completeness Designations** | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 57 | 2 | 58 | 17 | LC, V, MSJ | 58 | 18 | 59 | 6 | IMP C, 403, NR | | | | |
| | | | | | 59 | 9 | 59 | 9 | IMP C, 403, NR | | | | |
| | | | | | 61 | 10 | 61 | 15 | IMP C, 403 | 59 | 11 | 61 | 9 |
| | | | | | 61 | 18 | 61 | 18 | IMP C, 403 | | | | |
| 61 | 20 | 62 | 2 | ARG, IH, V, MSJ | 62 | 3 | 62 | 9 | 403, NR | | | | |
| | | | | | 62 | 12 | 62 | 18 | 403, NR | | | | |
| | | | | | 62 | 21 | 62 | 22 | 403, NR | | | | |
| | | | | | 63 | 7 | 63 | 13 | 403, CS | | | | |
| 63 | 16 | 64 | 4 | LF, V, MSJ | 64 | 11 | 64 | 23 | IMP C, 403, CS | 64 | 24 | 65 | 1 |
| | | | | | 65 | 2 | 65 | 5 | IMP C, 403, CS | | | | |
| 65 | 6 | 66 | 24 | IH, S, V, MSJ | | | | | | | | | |
| 65 | 16 | 65 | 21 | S, V, MSJ | | | | | | | | | |
| 65 | 22 | 66 | 2 | S, V, MSJ | | | | | | | | | |
| 68 | 2 | 68 | 7 | LF, S, V, MSJ | | | | | | | | | |
| 68 | 15 | 68 | 17 | LF, S, V, MSJ | | | | | | | | | |
| 68 | 19 | 68 | 20 | MSJ | | | | | | | | | |
| 68 | 22 | 68 | 24 | IH, S, V, MSJ | | | | | | | | | |
| 69 | 2 | 69 | 3 | MSJ | | | | | | | | | |
| 69 | 8 | 69 | 9 | SCOPE, V, MSJ | | | | | | | | | |
| 69 | 11 | 69 | 17 | SCOPE, MSJ | | | | | | | | | |
| 69 | 19 | 69 | 21 | LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 70 | 2 | 70 | 8 | AF, L, LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 70 | 10 | 70 | 23 | AF, L, LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 71 | 1 | 71 | 24 | AF, LF, PREJ, V, MSJ | | | | | | | | | |
| 72 | 1 | 72 | 12 | AF, LF, PREJ, V, MSJ | | | | | | | | | |
| 72 | 14 | 73 | 12 | ARG, V, MSJ | | | | | | | | | |
| 73 | 15 | 75 | 3 | AF, ARG, V, MSJ | | | | | | | | | |
| 75 | 6 | 75 | 10 | MSJ | | | | | | | | | |
| 75 | 14 | 76 | 6 | ARG, V, MSJ | | | | | | | | | |
| 76 | 11 | 78 | 5 | AF, LF, V, MSJ | | | | | | | | | |
| 78 | 7 | 78 | 16 | AF, LF, S, MSJ | | | | | | | | | |
| 78 | 19 | 79 | 7 | IC, LF, MSJ | | | | | | | | | |
| 79 | 11 | 79 | 12 | MSJ | | | | | | | | | |
| 81 | 15 | 83 | 19 | AF, LF, S, MSJ | | | | | | | | | |
| 83 | 22 | 83 | 24 | MSJ | | | | | | | | | |
| 84 | 1 | 84 | 10 | PREJ, V, MSJ | | | | | | | | | |
| 84 | 13 | 85 | 5 | AF, ARG, LF, MSJ | | | | | | | | | |
| 86 | 6 | 86 | 8 | MSJ | | | | | | | | | |
| 86 | 16 | 87 | 5 | AF, ARG, PREJ, MSJ | | | | | | | | | |
| 87 | 7 | 88 | 2 | AF, ARG, PREJ, S, MSJ | | | | | | | | | |
| 88 | 5 | 88 | 14 | CD, PREJ, S, MSJ | | | | | | | | | |
| 88 | 17 | 89 | 6 | CD, PREJ, V, MSJ | | | | | | | | | |

**Exhibit 8.002**

PLAINTIFF AND COUNTERCLAIM DEFENDANTS' ("EIS") DEPOSITION DESIGNATIONS

| MARIANNE BUCKLEY September 22, 2022 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 89 | 8 | 89 | 9 | MSJ | | | | | | | | | |
| 90 | 4 | 90 | 20 | MSJ | 89 | 21 | 89 | 23 | IMP C, R, 403, NT | | | | |
| | | | | | 91 | 1 | 91 | 3 | IMP C, 403, NR | | | | |
| 92 | 4 | 93 | 14 | CD, LA, LF, PREJ, V, MSJ | | | | | | | | | |
| 93 | 20 | 95 | 17 | LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 95 | 20 | 96 | 23 | LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 96 | 25 | 98 | 9 | LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 98 | 11 | 98 | 14 | MSJ | | | | | | | | | |
| 98 | 17 | 98 | 21 | MSJ | | | | | | | | | |
| 99 | 4 | 99 | 25 | LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 100 | 3 | 102 | 23 | AA, CD, LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 103 | 1 | 104 | 5 | CD, LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 104 | 8 | 105 | 6 | AA, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 105 | 8 | 106 | 19 | ARG, LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 106 | 22 | 108 | 5 | AF, LF, PREJ, SCOPE, S, V, MSJ | | | | | | | | | |
| 109 | 6 | 110 | 1 | AA, MIS, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 110 | 4 | 110 | 4 | | | | | | | | | | |
| 110 | 7 | 111 | 15 | AA, ARG, PREJ, SCOPE, V, WF, MSJ | | | | | | | | | |
| 112 | 8 | 112 | 11 | AA, ARG, PREJ, SCOPE, V, WF, MSJ | 112 | 5 | 112 | 7 | | | | | |
| 112 | 17 | 113 | 8 | AA, ARG, PREJ, SCOPE, V, WF, MSJ | | | | | | | | | |
| 113 | 11 | 116 | 10 | AA, LF, PREJ, SCOPE, V, WF, MSJ | | | | | | | | | |
| 116 | 13 | 116 | 21 | AA, ARG, PREJ, SCOPE, V, WF, MSJ | | | | | | | | | |
| 116 | 24 | 117 | 4 | MSJ | | | | | | | | | |
| 117 | 9 | 119 | 19 | AA, ARG, PREJ, SCOPE, V, WF, MSJ | | | | | | | | | |
| 119 | 23 | 120 | 22 | PREJ, S, SCOPE, WF, MSJ | | | | | | | | | |
| 121 | 7 | 122 | 3 | CD, SCOPE, MSJ | | | | | | | | | |
| 122 | 6 | 124 | 19 | AA, PREJ, SCOPE, MSJ | | | | | | | | | |
| 124 | 23 | 126 | 1 | PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 126 | 4 | 126 | 13 | AA, LF, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 126 | 19 | 129 | 15 | CD, IH, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 131 | 19 | 132 | 6 | PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 133 | 16 | 134 | 2 | AA, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 134 | 6 | 134 | 24 | AA, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 135 | 2 | 135 | 11 | AA, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 135 | 15 | 135 | 18 | AA, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 135 | 21 | 136 | 5 | AA, PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 136 | 7 | 136 | 10 | MSJ | | | | | | | | | |
| 137 | 8 | 137 | 24 | AA, LF, PREJ, SCOPE, S, V, MSJ | | | | | | | | | |
| 138 | 2 | 138 | 11 | PREJ, SCOPE, V, MSJ | | | | | | | | | |
| 138 | 13 | 138 | 21 | AA, PREJ, SCOPE, MSJ | | | | | | | | | |
| 138 | 23 | 139 | 8 | AA, PREJ, SCOPE, MSJ | | | | | | | | | |
| 139 | 10 | 139 | 17 | AA, PREJ, SCOPE, MSJ | | | | | | | | | |
| 139 | 19 | 139 | 20 | MSJ | | | | | | | | | |

**Exhibit 8.003**

| MARIANNE BUCKLEY September 22, 2022 ||||||||||||||||
| EIS's Designations |||| WOW Tech's Objections | WOW Tech's Counter-Designations |||| EIS's Objections to Counter-Designations | EIS's Completeness Designations ||||
| Start Page | Start Line | End Page | End Line || Start Page | Start Line | End Page | End Line || Start Page | Start Line | End Page | End Line |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 140 | 5 | 140 | 21 | LF, SCOPE, PREJ, MSJ |||||||||
| 140 | 24 | 141 | 5 | CD, SCOPE, PREJ, MSJ |||||||||
| 141 | 7 | 141 | 21 | CD, SCOPE, PREJ, MSJ |||||||||
| 141 | 23 | 141 | 24 | MSJ |||||||||
| 142 | 1 | 146 | 1 | CD, SCOPE, PREJ, MIS, MSJ |||||||||
| 146 | 8 | 146 | 10 | ARG, SCOPE, PREJ, V, MSJ |||||||||
| 146 | 13 | 146 | 14 | MSJ |||||||||
| 147 | 3 | 147 | 8 | SCOPE, PREJ, V, MSJ |||||||||
| 147 | 16 | 147 | 21 | ARG, IR, LC, LF, SCOPE, PREJ, V, MSJ |||||||||
| 147 | 25 | 148 | 11 | ARG, IR, LC, LF, SCOPE, PREJ, V, MSJ |||||||||
| 148 | 13 | 148 | 16 | MSJ |||||||||
| 148 | 18 | 149 | 4 | AA, LF, V, SCOPE, PREJ, MSJ |||||||||
| 149 | 8 | 149 | 11 | V, SCOPE, PREJ, MSJ |||||||||
| 149 | 13 | 150 | 4 | ARG, CD, SCOPE, PREJ, V, MSJ |||||||||
| 150 | 7 | 152 | 15 | ARG, CD, SCOPE, PREJ, V, MSJ |||||||||
| 152 | 17 | 152 | 19 | MSJ |||||||||
| 153 | 14 | 154 | 18 | AA, CD, LF, PREJ, SCOPE, V, MSJ |||||||||
| 154 | 21 | 154 | 22 | MSJ |||||||||
| 155 | 9 | 155 | 12 | IH, S, PREJ, V, MSJ |||||||||
| 155 | 15 | 155 | 16 | MSJ |||||||||
| 155 | 18 | 157 | 2 | ARG, IH, LF, S, PREJ, V, MSJ |||||||||
| 157 | 5 | 157 | 19 | ARG, LF, PREJ, SCOPE, V, MSJ |||||||||
| 157 | 21 | 158 | 6 | ARG, LF, PREJ, S, SCOPE, V, MSJ |||||||||
| 158 | 8 | 158 | 23 | ARG, LF, PREJ, S, SCOPE, V, MSJ |||||||||
| 159 | 5 | 159 | 9 | ARG, LF, PREJ, S, SCOPE, V, MSJ |||||||||
| 159 | 12 | 159 | 17 | ARG, LF, PREJ, S, SCOPE, V, MSJ |||||||||
| 159 | 20 | 159 | 25 | ARG, LF, PREJ, S, SCOPE, V, MSJ |||||||||
| 160 | 3 | 160 | 10 | ARG, CD, LF, PREJ, S, SCOPE, V, MSJ |||||||||
| 160 | 13 | 160 | 21 | ARG, CD, LF, PREJ, S, SCOPE, V, MSJ |||||||||
| 160 | 24 | 161 | 4 | ARG, CD, LF, PREJ, S, SCOPE, V, MSJ |||||||||
| 161 | 6 | 161 | 17 | ARG, CD, IH, LF, PREJ, S, SCOPE, V, MSJ |||||||||
| 161 | 21 | 162 | 7 | ARG, CD, IH, LF, PREJ, S, SCOPE, V, MSJ |||||||||
| 162 | 9 | 162 | 14 | MSJ |||||||||

**Exhibit 8.004**

**RICHARD A. CHENG**
**September 20, 2022**

| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 7 | 19 | 7 | 21 | MSJ | | | | | | | | | |
| 8 | 1 | 8 | 8 | MSJ | | | | | | | | | |
| 11 | 6 | 11 | 10 | MSJ | | | | | | | | | |
| 12 | 18 | 12 | 20 | MSJ | | | | | | | | | |
| 12 | 24 | 13 | 3 | MSJ | | | | | | | | | |
| 14 | 4 | 14 | 21 | MSJ | | | | | | | | | |
| 16 | 4 | 16 | 6 | MSJ | | | | | | | | | |
| 16 | 14 | 18 | 4 | MSJ | | | | | | | | | |
| 18 | 16 | 20 | 14 | MSJ | | | | | | | | | |
| 21 | 2 | 22 | 23 | MSJ | | | | | | | | | |
| 26 | 18 | 26 | 23 | MSJ | 24 | 19 | 25 | 1 | IMP C, 403, R | | | | |
| | | | | | 25 | 4 | 25 | 14 | IMP C, 403, R | | | | |
| | | | | | 25 | 18 | 26 | 4 | IMP C, 403, R | | | | |
| | | | | | 26 | 15 | 26 | 17 | IMP C, 403, R | | | | |
| | | | | | 26 | 24 | 27 | 2 | IMP C, 403, R | | | | |
| 27 | 3 | 28 | 10 | MSJ, LF, IR | | | | | | | | | |
| 29 | 1 | 29 | 13 | MSJ | | | | | | | | | |
| 29 | 19 | 31 | 1 | MSJ | | | | | | | | | |
| 31 | 6 | 31 | 8 | MSJ | | | | | | | | | |
| 31 | 17 | 32 | 6 | MSJ | | | | | | | | | |
| 32 | 20 | 32 | 22 | MSJ | | | | | | | | | |
| 33 | 21 | 34 | 6 | MSJ | | | | | | | | | |
| 34 | 12 | 34 | 14 | MSJ | 34 | 15 | 34 | 18 | CS, 403 | | | | |
| 35 | 18 | 35 | 20 | MSJ | | | | | | | | | |
| 37 | 1 | 43 | 15 | MSJ | | | | | | | | | |
| 44 | 11 | 44 | 19 | MSJ | | | | | | | | | |
| 44 | 24 | 45 | 4 | MSJ | | | | | | | | | |
| 45 | 7 | 45 | 7 | MSJ | | | | | | | | | |
| 46 | 1 | 46 | 5 | MSJ | | | | | | | | | |
| 46 | 13 | 46 | 23 | V, MSJ | | | | | | | | | |
| 47 | 6 | 47 | 20 | MSJ | 47 | 21 | 48 | 1 | 403, R | | | | |
| 48 | 2 | 48 | 4 | MSJ | 48 | 5 | 48 | 10 | 403, R | | | | |
| 48 | 11 | 48 | 16 | S, MSJ | 48 | 17 | 48 | 21 | 403, R | 48 | 22 | 48 | 24 |
| 49 | 1 | 50 | 15 | MSJ, IC, PREJ | 50 | 16 | 50 | 16 | | | | | |
| 50 | 17 | 50 | 23 | AF, MSJ | | | | | | | | | |
| 51 | 13 | 52 | 21 | AF, MSJ | 50 | 24 | 51 | 5 | IMP C, 403, R | | | | |
| | | | | | 52 | 22 | 53 | 1 | IMP C, 403, R | 53 | 11 | 54 | 1 |
| 53 | 2 | 53 | 9 | AF, MIS, MSJ | | | | | | | | | |
| 54 | 11 | 54 | 24 | AF, MIS, MSJ | | | | | | | | | |
| 55 | 1 | 55 | 3 | AF, MIS, PREJ, MSJ | | | | | | | | | |

**Exhibit 8.005**

| RICHARD A. CHENG September 20, 2022 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 55 | 6 | 56 | 9 | AF, MIS, PREJ, MSJ | 56 | 10 | 56 | 13 | | | | | |
| 57 | 5 | 57 | 18 | MSJ | 57 | 22 | 58 | 1 | IMP C, 403, R | 57 | 19 | 57 | 21 |
| 58 | 2 | 58 | 16 | MSJ | | | | | | | | | |
| 58 | 18 | 59 | 8 | MSJ | | | | | | | | | |
| 59 | 15 | 64 | 5 | MSJ | | | | | | | | | |
| 64 | 10 | 64 | 21 | MSJ | | | | | | | | | |
| 65 | 2 | 67 | 1 | ARG, MSJ | | | | | | | | | |
| 67 | 4 | 68 | 20 | ARG, LF, MSJ | 73 | 15 | 73 | 23 | IMP C, 403, R | | | | |
| 69 | 8 | 71 | 11 | ARG, LEAD, MSJ | | | | | | | | | |
| 72 | 3 | 72 | 17 | ARG, AF, LF, MSJ | | | | | | | | | |
| 72 | 20 | 73 | 10 | MSJ | | | | | | | | | |
| 74 | 7 | 74 | 21 | LF, MSJ | | | | | | | | | |
| 74 | 24 | 76 | 1 | MSJ | 76 | 2 | 76 | 5 | IMP C, 403, R, NR | | | | |
| | | | | | 76 | 7 | 76 | 14 | IMP C, 403, R, NR | | | | |
| 76 | 15 | 83 | 9 | MSJ | | | | | | | | | |
| 83 | 19 | 83 | 22 | LPK, MSJ | | | | | | | | | |
| 83 | 23 | 84 | 4 | LPK, MSJ | 84 | 10 | 84 | 18 | 403, F, CLC, LA | | | | |
| 84 | 7 | 84 | 8 | | | | | | | | | | |
| 84 | 22 | 84 | 24 | MSJ | 85 | 1 | 85 | 4 | 403, F, CLC, LA | | | | |
| 85 | 5 | 88 | 22 | MSJ | 88 | 23 | 89 | 2 | IMP C, 403 | | | | |
| 89 | 3 | 89 | 11 | MSJ | 89 | 12 | 89 | 17 | IMP C, 403, R | | | | |
| 89 | 18 | 92 | 21 | IH, ARG, MSJ | | | | | | | | | |
| 92 | 23 | 93 | 1 | | | | | | | | | | |
| 93 | 3 | 93 | 9 | MSJ | | | | | | | | | |
| 93 | 16 | 95 | 21 | MSJ | | | | | | | | | |
| 96 | 3 | 97 | 2 | MSJ | | | | | | | | | |
| 97 | 9 | 97 | 21 | V, MSJ | | | | | | | | | |
| 97 | 23 | 97 | 23 | | | | | | | | | | |
| 98 | 5 | 100 | 24 | S, V, MSJ | | | | | | | | | |
| 101 | 1 | 104 | 9 | S, V, CD, MSJ | | | | | | | | | |
| 105 | 2 | 105 | 13 | AF, LF, IR, MSJ | 104 | 11 | 104 | 13 | IMP C, 403, R | | | | |
| | | | | | 104 | 22 | 105 | 1 | IMP C, 403, R | | | | |
| | | | | | 105 | 14 | 105 | 19 | IMP C, 403, R | | | | |
| 105 | 20 | 107 | 17 | AF, V, MSJ | 107 | 24 | 108 | 8 | IMP C, 403, R | 107 | 18 | 107 | 23 |
| | | | | | | | | | | 108 | 9 | 108 | 22 |
| 108 | 23 | 112 | 9 | AF, LF, MIS, PREJ, S, MSJ | 112 | 10 | 113 | 11 | IMP C, 403, NR, F, CLC, LA | | | | |
| 113 | 13 | 114 | 24 | AF, LF, MIS, PREJ, S, MSJ | | | | | | | | | |
| 115 | 15 | 115 | 21 | MSJ | | | | | | | | | |
| 116 | 1 | 117 | 1 | AA, S, MSJ | | | | | | | | | |
| 117 | 22 | 117 | 22 | AA, S, MSJ | | | | | | | | | |

Exhibit 8.006

| RICHARD A. CHENG September 20, 2022 | | | | | | | | | | | | | |
| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 118 | 12 | 118 | 14 | AA, S, WF, MSJ | 118 | 20 | 118 | 21 | | | | | |
| 118 | 16 | 118 | 16 | AA, S, WF, MSJ | | | | | | | | | |
| 118 | 22 | 140 | 10 | AA, AF, CD, LF, MIS, PREJ, S, V, WF, MSJ | | | | | | | | | |
| 140 | 18 | 142 | 10 | MIS, V, MSJ | 142 | 11 | 142 | 13 | | | | | |
| 142 | 14 | 149 | 24 | AA, AF, CD, LA, LF, V, MSJ | | | | | | | | | |
| 150 | 1 | 154 | 4 | AA, AF, CD, LA, LF, V, MSJ | | | | | | | | | |
| 154 | 12 | 154 | 24 | AF, ARG, L, LF, PREJ, MSJ | | | | | | | | | |
| 155 | 2 | 156 | 1 | AF, LF, MSJ | | | | | | | | | |
| 156 | 9 | 156 | 14 | AF, ARG, CD, V, MSJ | | | | | | | | | |
| 156 | 16 | 157 | 6 | V, MSJ | 157 | 7 | 158 | 1 | | | | | |
| 158 | 22 | 159 | 10 | L, MSJ | | | | | | | | | |
| 159 | 12 | 160 | 4 | L, MSJ | | | | | | | | | |
| 160 | 14 | 160 | 16 | PREJ, MSJ | | | | | | | | | |
| 160 | 18 | 164 | 10 | PREJ, MSJ | | | | | | | | | |
| 164 | 13 | 165 | 23 | MSJ | | | | | | | | | |
| 166 | 12 | 166 | 20 | AF, LF, PREJ, MSJ | | | | | | | | | |
| 167 | 11 | 167 | 19 | AF, LF, PREJ, MSJ | | | | | | | | | |
| 167 | 22 | 167 | 23 | | | | | | | | | | |
| 168 | 1 | 168 | 6 | MIS, MSJ | | | | | | | | | |
| 168 | 14 | 171 | 2 | MIS, MSJ | | | | | | | | | |
| 171 | 14 | 172 | 10 | MSJ | | | | | | | | | |
| 172 | 15 | 173 | 4 | LF, MSJ | | | | | | | | | |
| 173 | 7 | 174 | 5 | MSJ | | | | | | | | | |
| 174 | 9 | 176 | 24 | MIS, V, MSJ | 177 | 14 | 177 | 17 | IMP C, 403 | | | | |
| 178 | 18 | 179 | 13 | IR, MSJ | 183 | 10 | 183 | 12 | IMP C, 403 | | | | |
| | | | | | 183 | 15 | 183 | 19 | IMP C, 403 | | | | |
| 179 | 14 | 179 | 19 | IR, MSJ | 183 | 10 | 183 | 12 | IMP C, 403 | | | | |
| | | | | | 183 | 15 | 183 | 19 | IMP C, 403 | | | | |
| 180 | 22 | 181 | 7 | IR, MSJ | 183 | 10 | 183 | 12 | IMP C, 403 | | | | |
| | | | | | 183 | 15 | 183 | 19 | IMP C, 403 | | | | |
| 181 | 10 | 183 | 9 | IR, MSJ | 183 | 10 | 183 | 12 | IMP C, 403 | | | | |
| | | | | | 183 | 15 | 183 | 19 | IMP C, 403 | | | | |
| 183 | 21 | 184 | 7 | MSJ | 184 | 8 | 184 | 12 | IMP C, 403 | | | | |
| | | | | | 184 | 16 | 184 | 19 | IMP C, 403 | | | | |
| 184 | 21 | 185 | 13 | AF, LF, S, MSJ | | | | | | | | | |
| 185 | 15 | 185 | 16 | | | | | | | | | | |
| 185 | 18 | 185 | 22 | PREJ, MSJ | | | | | | | | | |
| 186 | 8 | 186 | 21 | AA, MSJ | | | | | | | | | |
| 187 | 10 | 188 | 2 | MSJ | 188 | 6 | 188 | 11 | IMP C, 403 | | | | |

Exhibit 8.007

| RICHARD A. CHENG September 20, 2022 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 190 | 9 | 190 | 23 | MSJ | | | | | | | | | |
| 191 | 1 | 191 | 9 | MSJ | | | | | | | | | |

**Exhibit 8.008**

| STEPHANIE KEATING September 9, 2022 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **EIS's Designations** | | | | **WOW Tech's Objections** | **WOW Tech's Counter-Designations** | | | | **EIS's Objections to Counter-Designations** | **EIS's Completeness Designations** | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 7 | 14 | 7 | 17 | LW, MSJ | | | | | | | | | |
| 9 | 8 | 9 | 16 | LW, MSJ | | | | | | | | | |
| 10 | 10 | 10 | 13 | LW, MSJ | | | | | | | | | |
| 13 | 22 | 14 | 10 | LW, MSJ | | | | | | | | | |
| 14 | 14 | 19 | 16 | IR, LW, MSJ | | | | | | | | | |
| 19 | 20 | 20 | 2 | IR, LW, MSJ | | | | | | | | | |
| 20 | 7 | 21 | 11 | LW, MSJ | | | | | | | | | |
| 21 | 15 | 21 | 21 | LW, MSJ | 21 | 22 | 22 | 21 | | | | | |
| 22 | 8 | 24 | 1 | IR, LW, MSJ | | | | | | | | | |
| 24 | 4 | 27 | 11 | IR, LW, MSJ | | | | | | | | | |
| 27 | 15 | 27 | 20 | LW, MSJ | | | | | | | | | |
| 28 | 4 | 28 | 21 | IR, LW, MSJ | | | | | | | | | |
| 29 | 1 | 29 | 14 | LW, MSJ | | | | | | | | | |
| 29 | 20 | 30 | 4 | LW, MSJ | | | | | | | | | |
| 30 | 12 | 31 | 1 | LW, MSJ | | | | | | | | | |
| 32 | 17 | 32 | 21 | LW, MSJ | | | | | | | | | |
| 33 | 9 | 33 | 17 | IR, LW, MSJ | | | | | | | | | |
| 33 | 21 | 33 | 22 | IR, LW, MSJ | | | | | | | | | |
| 34 | 8 | 35 | 16 | S, V, LW, MSJ | | | | | | | | | |
| 35 | 19 | 36 | 4 | LPK, S, LW, MSJ | | | | | | | | | |
| 36 | 7 | 36 | 19 | LPK, S, LW, MSJ | | | | | | | | | |
| 37 | 6 | 37 | 15 | LW, MSJ | 37 | 16 | 37 | 20 | R | 38 | 2 | 38 | 7 |
| | | | | | | | | | | 38 | 11 | 38 | 13 |
| | | | | | | | | | | 38 | 18 | 39 | 15 |
| 39 | 16 | 45 | 7 | CD, LPK, S, V, LW, MSJ | | | | | | | | | |
| 45 | 17 | 45 | 19 | LW, MSJ | | | | | | | | | |
| 45 | 21 | 46 | 9 | LW, MSJ | | | | | | | | | |
| 46 | 14 | 46 | 16 | LW, MSJ | | | | | | | | | |
| 46 | 20 | 46 | 22 | LW, MSJ | 47 | 1 | 47 | 12 | | 47 | 17 | 48 | 15 |
| 48 | 16 | 49 | 11 | IR, LW, MSJ | | | | | | | | | |
| 49 | 20 | 51 | 6 | LW, MSJ | 50 | 7 | 50 | 14 | | | | | |
| 51 | 12 | 51 | 20 | IR, LW, MSJ | | | | | | | | | |
| 52 | 2 | 52 | 8 | IR, LW, MSJ | | | | | | | | | |
| 52 | 11 | 52 | 14 | LW, MSJ | | | | | | | | | |
| 53 | 8 | 53 | 16 | V, LW, MSJ | | | | | | | | | |
| 53 | 20 | 55 | 2 | LPK, V, PREJ, LW, MSJ | | | | | | | | | |
| 55 | 17 | 55 | 22 | IR, LW, MSJ | 55 | 14 | 55 | 16 | | | | | |
| 56 | 2 | 56 | 9 | CD, V, S, LPK, LW, MSJ | 55 | 14 | 55 | 16 | | | | | |
| 56 | 16 | 56 | 18 | V, LW, MSJ | 55 | 14 | 55 | 16 | | | | | |
| 56 | 21 | 57 | 1 | V, LW, MSJ | | | | | | | | | |
| 57 | 3 | 57 | 5 | LW, MSJ | | | | | | | | | |

**Exhibit 8.009**

**STEPHANIE KEATING**
**September 9, 2022**

| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 57 | 8 | 57 | 14 | LW, MSJ | 57 | 15 | 57 | 16 | R, 403 | | | | |
| 57 | 17 | 58 | 9 | IR, LW, MSJ | 58 | 10 | 58 | 12 | R | 58 | 13 | 58 | 21 |
| | | | | | 58 | 22 | 59 | 7 | | | | | |
| | | | | | 60 | 12 | 60 | 15 | R | | | | |
| 59 | 8 | 60 | 10 | IR, LW, MSJ | | | | | | | | | |
| 60 | 16 | 60 | 21 | MIS, IR, LW, MSJ | | | | | | | | | |
| 61 | 1 | 61 | 2 | LW, MSJ | 61 | 15 | 61 | 16 | R, 403 | | | | |
| 61 | 5 | 61 | 7 | LW, MSJ | 61 | 15 | 61 | 16 | R, 403 | | | | |
| 61 | 17 | 62 | 4 | LW, MSJ | | | | | | | | | |
| 63 | 11 | 63 | 16 | LW, MSJ | | | | | | | | | |
| 63 | 22 | 64 | 1 | LW, MSJ | | | | | | | | | |
| 64 | 5 | 64 | 18 | V, LW, MSJ | | | | | | | | | |
| 64 | 22 | 67 | 17 | V, S, CD, IR, LW, MSJ | | | | | | | | | |
| 68 | 2 | 68 | 16 | IH, V, S, LW, MSJ | | | | | | | | | |
| 68 | 21 | 69 | 3 | V, S, LW, MSJ | | | | | | | | | |
| 77 | 22 | 78 | 11 | IR, LW, MSJ | 78 | 12 | 78 | 13 | | | | | |
| 78 | 14 | 78 | 15 | LW, MSJ | 78 | 16 | 78 | 18 | | | | | |
| 78 | 19 | 78 | 21 | LW, MSJ | 78 | 22 | 79 | 7 | R | 79 | 8 | 79 | 11 |
| 79 | 12 | 79 | 13 | LW, MSJ | | | | | | | | | |
| 79 | 16 | 79 | 22 | LW, MSJ | 80 | 1 | 80 | 2 | R, 403 | | | | |
| 80 | 3 | 81 | 13 | IR, LW, MSJ | | | | | | | | | |
| 81 | 15 | 81 | 16 | IR, LW, MSJ | | | | | | | | | |
| 81 | 19 | 83 | 12 | IR, LW, MSJ | 83 | 13 | 83 | 15 | R | | | | |
| 83 | 16 | 83 | 22 | IR, PREJ, LPK, S, LW, MSJ | 84 | 1 | 84 | 3 | R | 84 | 4 | 84 | 6 |
| 84 | 7 | 86 | 12 | LW, MSJ | | | | | | | | | |
| 87 | 13 | 87 | 22 | V, LW, MSJ | | | | | | | | | |
| 88 | 16 | 89 | 15 | IR, PREJ, LW, MSJ | | | | | | | | | |
| 89 | 19 | 92 | 3 | IR, PREJ, LW, MSJ | | | | | | | | | |
| 92 | 16 | 92 | 20 | IR, PREJ, LW, MSJ | | | | | | | | | |
| 93 | 1 | 93 | 2 | IR, PREJ, LW, MSJ | | | | | | | | | |
| 93 | 5 | 93 | 13 | IR, PREJ, LW, MSJ | | | | | | | | | |
| 93 | 17 | 96 | 18 | IR, PREJ, V, S, LW, MSJ | | | | | | | | | |
| 96 | 19 | 97 | 9 | IR, PREJ, V, S, LW, MSJ | | | | | | | | | |
| 97 | 16 | 97 | 22 | IR, PREJ, HS, S, LW, MSJ | | | | | | | | | |
| 98 | 1 | 102 | 2 | IR, PREJ, HS, S, LW, MSJ | | | | | | | | | |
| 102 | 6 | 103 | 6 | IR, PREJ, HS, S, LW, MSJ | | | | | | | | | |
| 103 | 9 | 103 | 9 | IR, PREJ, LW, MSJ | | | | | | | | | |
| 103 | 14 | 103 | 19 | IR, PREJ, LW, MSJ | | | | | | | | | |
| 104 | 1 | 104 | 15 | IR, PREJ, HS, LW, MSJ | 104 | 16 | 104 | 20 | R, 403 | | | | |

**Exhibit 8.010**

| JOHANNES PLETTENBERG August 26, 2022 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 14 | 11 | 14 | 16 | LW | | | | | | | | | |
| 15 | 18 | 16 | 11 | LW | | | | | | | | | |
| 16 | 18 | 17 | 6 | LW | | | | | | | | | |
| 18 | 13 | 19 | 19 | LW | | | | | | | | | |
| 21 | 2 | 21 | 11 | LW | | | | | | | | | |
| 23 | 6 | 26 | 10 | IR, LW | | | | | | | | | |
| 26 | 13 | 27 | 13 | ARG, PREJ, WF, LW | | | | | | | | | |
| 27 | 15 | 27 | 15 | LW | | | | | | | | | |
| 33 | 19 | 33 | 21 | LW | 32 | 9 | 32 | 17 | CS | | | | |
| | | | | | 32 | 19 | 32 | 20 | CS | | | | |
| | | | | | 32 | 22 | 33 | 2 | | 33 | 3 | 33 | 6 |
| | | | | | 33 | 12 | 33 | 18 | | | | | |
| | | | | | 33 | 22 | 34 | 11 | IMP C, R, 403 | | | | |
| 34 | 17 | 34 | 21 | V, LW | 34 | 22 | 35 | 14 | IMP C, R, 403, 602 | | | | |
| | | | | | 35 | 19 | 36 | 6 | IMP C, R, 403 | | | | |
| | | | | | 36 | 19 | 36 | 21 | | 36 | 22 | 37 | 17 |
| 37 | 18 | 38 | 22 | V, LW | 39 | 1 | 39 | 16 | IMP C, R, 403 | | | | |
| 40 | 19 | 41 | 11 | IR, PREJ, LW | 40 | 16 | 40 | 18 | | | | | |
| | | | | | 41 | 19 | 42 | 2 | IMP C, R, 403 | | | | |
| 42 | 17 | 46 | 14 | AF, V, PREJ, IR, LW | | | | | | | | | |
| 46 | 18 | 46 | 21 | V, LW | | | | | | | | | |
| 47 | 6 | 47 | 10 | IC, IR, LW | | | | | | | | | |
| 48 | 14 | 49 | 4 | IR, V, LW | | | | | | | | | |
| 50 | 21 | 51 | 14 | IR, V, LW | | | | | | | | | |
| 71 | 10 | 71 | 11 | V, LW | | | | | | | | | |
| 71 | 13 | 71 | 20 | V, LW | | | | | | | | | |
| 71 | 22 | 72 | 5 | LW | 72 | 6 | 72 | 9 | 602, CS, R, 403 | | | | |
| 72 | 10 | 72 | 17 | AF, V, LW | | | | | | | | | |
| 72 | 19 | 73 | 7 | AF, V, LW | | | | | | | | | |
| 73 | 11 | 74 | 2 | V, LW | 74 | 3 | 74 | 5 | 602, R, 403 | | | | |
| 74 | 22 | 75 | 10 | LW | 75 | 11 | 75 | 18 | IMP C | | | | |
| 75 | 19 | 76 | 2 | V, LW | | | | | | | | | |
| 77 | 13 | 77 | 19 | V, S, LW | | | | | | | | | |
| 77 | 21 | 78 | 3 | LW | | | | | | | | | |
| 78 | 5 | 78 | 9 | AF, V, LW | | | | | | | | | |
| 78 | 13 | 79 | 15 | IC, LW | 79 | 16 | 79 | 19 | R, 403 | | | | |
| 79 | 20 | 80 | 3 | LW | 80 | 4 | 80 | 5 | R, 403 | | | | |
| 80 | 6 | 80 | 9 | V, LW | 80 | 10 | 81 | 21 | R, 403 | | | | |
| 81 | 22 | 85 | 4 | V, PREJ, LW | 356 | 5 | 357 | 6 | R, 403 | | | | |
| 87 | 13 | 87 | 18 | V, LF, LW | | | | | | | | | |
| 87 | 20 | 87 | 20 | LW | 87 | 22 | 88 | 4 | | 88 | 5 | 88 | 7 |
| 88 | 8 | 90 | 6 | LW | | | | | | | | | |
| 92 | 1 | 92 | 7 | LF, V, PREJ, LW | | | | | | | | | |

**Exhibit 8.011**

**JOHANNES PLETTENBERG**
**August 26, 2022**

| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 99 | 2 | 99 | 17 | LW | | | | | | | | | |
| 100 | 3 | 100 | 5 | V, LW | | | | | | | | | |
| 128 | 19 | 129 | 13 | V, LW, LPK, S, MSJ | | | | | | | | | |
| 130 | 12 | 139 | 13 | AF, V, LF, LW, LPK, S, MSJ | | | | | | | | | |
| 139 | 21 | 140 | 2 | AF, V, LF, LW, LPK, S, MSJ | | | | | | | | | |
| 140 | 4 | 140 | 9 | LW, MSJ | | | | | | | | | |
| 140 | 11 | 140 | 13 | AF, V, LW, MSJ | | | | | | | | | |
| 140 | 15 | 140 | 22 | AF, V, LW, MSJ | | | | | | | | | |
| 141 | 9 | 141 | 17 | AF, V, LW, MSJ | | | | | | | | | |
| 141 | 19 | 141 | 19 | AF, V, LW, MSJ | | | | | | | | | |
| 141 | 21 | 143 | 5 | AF, V, LW, MSJ | | | | | | | | | |
| 149 | 5 | 149 | 18 | V, LF, LW, MSJ | 148 | 5 | 148 | 12 | IMP C | | | | |
| | | | | | 148 | 16 | 148 | 20 | | | | | |
| 149 | 20 | 150 | 2 | LW, MSJ | | | | | | | | | |
| 150 | 4 | 150 | 10 | V, LF, LW, MSJ | 150 | 11 | 150 | 15 | IMP C | | | | |
| | | | | | 150 | 17 | 151 | 16 | IMP C | | | | |
| 156 | 1 | 156 | 14 | V, LF, LW, MSJ | 153 | 21 | 155 | 22 | IMP C, R, 403, 602, H | | | | |
| | | | | | 156 | 15 | 157 | 3 | IMP C, R, 403, 602, H | | | | |
| 158 | 4 | 161 | 6 | V, LF, LW, MSJ | | | | | | | | | |
| 161 | 8 | 184 | 4 | AF, CD, L, LA, LF, PREJ, SCOPE V, LW, MSJ | | | | | | | | | |
| 185 | 4 | 188 | 13 | AA, AF, CD, L, LA, LF, PREJ, SCOPE V, LW, MSJ | | | | | | | | | |
| 188 | 16 | 188 | 16 | AF, LA, LF, PREJ, SCOPE, V, LW, MSJ | | | | | | | | | |
| 188 | 19 | 189 | 2 | AF, LA, LF, PREJ, SCOPE, V, LW, MSJ | | | | | | | | | |
| 189 | 4 | 189 | 4 | LW | | | | | | | | | |
| 189 | 8 | 190 | 2 | LF, PREJ, SCOPE, V, LW, MSJ | | | | | | | | | |
| 194 | 15 | 196 | 19 | AF, LF, PREJ, V, LW, MSJ | | | | | | | | | |
| 196 | 21 | 197 | 21 | AF, LF, PREJ, V, LW, MSJ | | | | | | | | | |
| 202 | 12 | 203 | 4 | IR, V, LW, MSJ | | | | | | | | | |
| 203 | 9 | 206 | 18 | PREJ, V, LW | | | | | | | | | |
| 207 | 1 | 207 | 22 | PREJ, V, LW | | | | | | | | | |
| 208 | 5 | 208 | 12 | V, LW | | | | | | | | | |
| 208 | 15 | 211 | 10 | PREJ, V, LW | 211 | 11 | 211 | 19 | IMP C, 602, H, R, 403 | 211 | 20 | 214 | 2 |
| 214 | 10 | 215 | 5 | PREJ, V, LW | 215 | 8 | 215 | 20 | IMP C, 602, R, 403, NR, F | | | | |
| 216 | 8 | 221 | 6 | IR, HS, PREJ, SCOPE, V, LW | | | | | | | | | |
| 221 | 8 | 221 | 10 | LW | | | | | | | | | |
| 221 | 12 | 221 | 14 | AF, PREJ, SCOPE, V, LW | | | | | | | | | |
| 221 | 17 | 224 | 1 | AF, HS, LF, PREJ, SCOPE, V, LW | | | | | | | | | |
| 224 | 3 | 224 | 5 | LW | 224 | 7 | 227 | 2 | IMP C, R, 403, NR, F | | | | |
| 227 | 6 | 227 | 8 | AA, AF, LF, PREJ, SCOPE, V, LW | | | | | | | | | |
| 227 | 10 | 227 | 16 | AA, AF, LF, PREJ, SCOPE, V, LW | 227 | 17 | 228 | 1 | IMP C, R, 403 | 228 | 2 | 228 | 4 |
| 239 | 18 | 242 | 20 | LF, PREJ, SCOPE, V, LW | | | | | | | | | |
| 243 | 2 | 244 | 21 | AF, IR, LF, LPK, PREJ, SCOPE, V, LW | | | | | | | | | |

**Exhibit 8.012**

| JOHANNES PLETTENBERG | | | | | | | | | | | | | | |
| August 26, 2022 | | | | | | | | | | | | | | |
| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 251 | 4 | 263 | 5 | IR, LF, LPK, PREJ, S, SCOPE, LW | | | | | | | | | |
| 270 | 15 | 272 | 6 | LF, V, LW | | | | | | | | | |
| 276 | 18 | 278 | 6 | LF, LPK, PREJ, S, LW, MSJ | | | | | | | | | |
| 278 | 19 | 279 | 4 | LF, LPK, PREJ, S, LW, MSJ | | | | | | | | | |
| 279 | 8 | 280 | 11 | LF, LPK, IR, PREJ, S, LW, MSJ | 280 | 18 | 281 | 18 | IMP C, R, 403 | | | | |
| 282 | 4 | 282 | 8 | LF, LPK, IR, PREJ, S, LW, MSJ | 280 | 18 | 281 | 18 | IMP C, R, 403 | 282 | 9 | 284 | 15 |
| 285 | 21 | 286 | 1 | PREJ, V, LW | 286 | 6 | 286 | 13 | IMP C, R, 403, NR | 286 | 15 | 286 | 19 |
| | | | | | 287 | 1 | 287 | 6 | IMP C, R, 403, CS, NR | | | | |
| 289 | 22 | 300 | 18 | CD, IR, LF, LPK, PREJ, S, SCOPE, LW, MSJ | 300 | 19 | 301 | 2 | R, 403, 602 | | | | |
| 301 | 6 | 301 | 14 | IR, SCOPE, LW, MSJ | | | | | | | | | |
| 302 | 3 | 302 | 15 | IR, SCOPE, V, LW, MSJ | | | | | | | | | |
| 302 | 22 | 303 | 7 | IR, SCOPE, V, LW, MSJ | | | | | | | | | |
| 303 | 10 | 304 | 7 | IR, SCOPE, V, LW, MSJ | | | | | | | | | |
| 305 | 1 | 305 | 16 | IR, SCOPE, V, LW, MSJ | | | | | | | | | |
| 305 | 18 | 305 | 20 | IR, LW, MSJ | | | | | | | | | |
| 305 | 22 | 306 | 3 | IR, V, PREJ, LW, MSJ | | | | | | | | | |
| 306 | 5 | 306 | 13 | LW, MSJ | | | | | | | | | |
| 306 | 15 | 306 | 17 | IR, V, PREJ, LW, MSJ | | | | | | | | | |
| 306 | 19 | 307 | 6 | AF, IR, V, PREJ, LW, MSJ | 307 | 7 | 307 | 13 | IMP C | | | | |
| | | | | | 308 | 1 | 308 | 15 | | | | | |
| 307 | 15 | 307 | 22 | V, PREJ, LW, MSJ | | | | | | | | | |
| 308 | 17 | 308 | 20 | MIS, PREJ, V, LW, MSJ | | | | | | | | | |
| 308 | 22 | 309 | 12 | V, PREJ, LW, MSJ | | | | | | | | | |
| 309 | 14 | 309 | 14 | LW, MSJ | | | | | | | | | |
| 309 | 16 | 310 | 1 | V, PREJ, LW, MSJ | | | | | | | | | |
| 310 | 4 | 310 | 14 | LW, MSJ | | | | | | | | | |
| 310 | 16 | 310 | 20 | V, PREJ, LW, MSJ | | | | | | | | | |
| 316 | 7 | 316 | 12 | IR, V, PREJ, LW | | | | | | | | | |
| 316 | 16 | 318 | 7 | HS, PREJ, V, LW, MSJ | 318 | 8 | 318 | 20 | IMP C, R, 403, CS, 602 | | | | |
| 320 | 2 | 320 | 19 | HS, PREJ, S, LPK, V, LW, MSJ | | | | | | | | | |
| 320 | 21 | 320 | 21 | LW, MSJ | | | | | | | | | |
| 321 | 14 | 321 | 17 | V, PREJ, SCOPE, LW | | | | | | | | | |
| 322 | 22 | 332 | 8 | AF, LA, LF, HS, V, PREJ, SCOPE, LW, MSJ | | | | | | | | | |
| 334 | 1 | 334 | 9 | AF, LA, LF, HS, V, PREJ, SCOPE, LW, MSJ | | | | | | | | | |
| 334 | 12 | 335 | 17 | AF, LA, LF, HS, S, LPK, V, PREJ, SCOPE, LW, MSJ | | | | | | | | | |
| 335 | 19 | 336 | 3 | PREJ, HS, LW, MSJ | | | | | | | | | |
| 339 | 9 | 339 | 12 | CD, LA, LF, HS, S, LPK, V, PREJ, SCOPE, LW, MSJ | 338 | 16 | 339 | 7 | IMP C, 403 | 337 | 1 | 337 | 8 |
| | | | | | | | | | | 337 | 16 | 338 | 15 |
| 339 | 14 | 339 | 15 | HS, S, LW, MSJ | | | | | | | | | |
| 339 | 17 | 340 | 14 | CD, LA, LF, HS, S, LPK, V, PREJ, SCOPE, LW, MSJ | | | | | | | | | |
| 340 | 16 | 340 | 18 | HS, S, LW, MSJ | | | | | | | | | |

**Exhibit 8.013**

PLAINTIFF AND COUNTERCLAIM DEFENDANTS' ("EIS") DEPOSITION DESIGNATIONS

| JOHANNES PLETTENBERG August 26, 2022 | | | | | | | | | | | | | |
| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 354 | 5 | 354 | 18 | V, PREJ, LF, LW | | | | | | | | | |
| 354 | 20 | 354 | 20 | LW | 345 | 17 | 346 | 12 | L, R, 403, CS, 602, F | | | | |
| | | | | | 346 | 17 | 346 | 20 | L, R, 403, CS, 602, F | | | | |
| | | | | | 346 | 22 | 349 | 3 | L, R, 403, CS, 602, F | | | | |
| | | | | | 349 | 5 | 349 | 18 | L, R, 403, CS, 602, F | | | | |
| | | | | | 356 | 5 | 357 | 6 | IMP C, R, 403, NR | | | | |

**Exhibit 8.014**

| SIMON SMITH September 8, 2022 | | | | | | | | | | | | | |
| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 10 | 14 | 10 | 17 | PRIVACY | | | | | | | | | |
| 12 | 8 | 13 | 7 | | | | | | | | | | |
| 13 | 15 | 14 | 1 | | | | | | | | | | |
| 15 | 20 | 22 | 6 | | | | | | | | | | |
| 23 | 15 | 24 | 18 | LF, V | 24 | 19 | 25 | 8 | R, 403 | | | | |
| 25 | 9 | 25 | 18 | V | 25 | 19 | 26 | 1 | R, 403 | | | | |
| 26 | 2 | 26 | 8 | V | 26 | 9 | 26 | 14 | R, 403 | | | | |
| 26 | 15 | 27 | 2 | IR, PREJ, V | | | | | | | | | |
| 27 | 7 | 27 | 17 | IR, PREJ, LF, V | 27 | 18 | 27 | 19 | F, 602 | | | | |
| 27 | 20 | 28 | 17 | IR, PREJ, LF, V | | | | | | | | | |
| 29 | 9 | 30 | 9 | IR, LF, V | 30 | 10 | 30 | 17 | R | | | | |
| 30 | 21 | 31 | 2 | IR, PREJ, HS | 31 | 6 | 31 | 7 | R, 403 | | | | |
| 31 | 8 | 31 | 18 | IR, PREJ, HS | | | | | | | | | |
| 32 | 2 | 32 | 12 | IR, PREJ, HS | | | | | | | | | |
| 32 | 18 | 35 | 15 | AF, ARG, HS, IR, LPK, PREJ, S, SCOPE, V | | | | | | | | | |
| 36 | 16 | 37 | 1 | AF, ARG, HS, L, IR, LPK, PREJ, S, SCOPE, V | | | | | | | | | |
| 37 | 8 | 39 | 18 | AF, ARG, HS, L, IR, LPK, PREJ, S, SCOPE, V | | | | | | | | | |
| 39 | 21 | 41 | 10 | AF, ARG, HS, L, LPK, PREJ, S, SCOPE, V | | | | | | | | | |
| 41 | 13 | 43 | 20 | AF, ARG, HS, L, LPK, PREJ, S, SCOPE, V | | | | | | | | | |
| 44 | 10 | 45 | 3 | V | | | | | | | | | |
| 45 | 7 | 45 | 11 | V | | | | | | | | | |
| 47 | 13 | 48 | 20 | IR | | | | | | | | | |
| 49 | 3 | 49 | 7 | V | | | | | | | | | |
| 49 | 9 | 51 | 18 | ARG, CD, LF, MSJ, PREJ, V | | | | | | | | | |
| 52 | 1 | 52 | 3 | HS | 52 | 4 | 52 | 7 | R, 403 | | | | |
| 52 | 8 | 52 | 12 | HS, IR, PREJ, V | | | | | | | | | |
| 52 | 15 | 53 | 13 | HS, IR, PREJ, V | | | | | | | | | |
| 54 | 2 | 54 | 11 | HS, IR, PREJ, V | | | | | | | | | |
| 54 | 17 | 57 | 2 | ARG, HS, IR, PREJ, MIS, MSJ, V | 57 | 13 | 57 | 18 | R, 403 | | | | |
| 57 | 19 | 58 | 6 | ARG, CD, HS, IR, PREJ, MIS, MSJ, V | | | | | | | | | |
| 58 | 17 | 59 | 6 | LF, V, MSJ | | | | | | | | | |
| 59 | 8 | 59 | 16 | AF, V, MSJ | | | | | | | | | |
| 59 | 20 | 60 | 1 | CD, V, MSJ | | | | | | | | | |
| 60 | 3 | 61 | 5 | LF, V, MSJ | 61 | 6 | 62 | 2 | R, 403 | | | | |
| 62 | 7 | 62 | 14 | V, MSJ | | | | | | | | | |
| 63 | 20 | 64 | 14 | V, MSJ | | | | | | | | | |
| 65 | 3 | 65 | 13 | AA, V, MSJ | 65 | 14 | 65 | 21 | R, 403 | | | | |
| 66 | 8 | 66 | 13 | AA, L, V, MSJ | | | | | | | | | |
| 66 | 15 | 67 | 18 | AA, ARG, L, V, MSJ | | | | | | | | | |
| 67 | 22 | 68 | 9 | AA, ARG, L, V, MSJ | | | | | | | | | |
| 68 | 12 | 68 | 18 | AA, ARG, L, V, MSJ | | | | | | | | | |

**Exhibit 8.015**

| SIMON SMITH September 8, 2022 | | | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 69 | 7 | 70 | 12 | AA, ARG, L, PREJ, V, MSJ | | | | | | | | | |
| 70 | 15 | 71 | 20 | AA, ARG, L, PREJ, V, MSJ | | | | | | | | | |
| 72 | 6 | 72 | 9 | AA, ARG, L, PREJ, V, MSJ | | | | | | | | | |
| 72 | 11 | 72 | 13 | MSJ | | | | | | | | | |
| 72 | 22 | 74 | 2 | AA, ARG, HS, IR, PREJ, MIS, MSJ, V | | | | | | | | | |
| 74 | 5 | 74 | 7 | MSJ | | | | | | | | | |
| 74 | 16 | 75 | 15 | AA, ARG, HS, IR, L, PREJ, MIS, MSJ, V | | | | | | | | | |
| 75 | 17 | 76 | 1 | AA, ARG, HS, IR, L, PREJ, MIS, MSJ, V | | | | | | | | | |
| 76 | 4 | 76 | 20 | AA, ARG, L, PREJ, V, MSJ | | | | | | | | | |
| 77 | 1 | 77 | 1 | MSJ | 77 | 3 | 77 | 14 | NR, R, 403, COLLOQUY | | | | |
| 77 | 15 | 78 | 10 | AA, ARG, L, V, MSJ, MIS | | | | | | | | | |
| 78 | 12 | 78 | 12 | MSJ | | | | | | | | | |
| 78 | 17 | 79 | 1 | AA, ARG, IH, L, MSJ, S, V | | | | | | | | | |
| 79 | 3 | 79 | 8 | AA, ARG, IH, L, MSJ, S, V | | | | | | | | | |
| 79 | 10 | 80 | 9 | AA, ARG, IH, L, MIS, MSJ, S, V | | | | | | | | | |
| 80 | 13 | 81 | 11 | MSJ, V | | | | | | | | | |
| 81 | 17 | 84 | 19 | AA, ARG, L, MIS, MSJ, PREJ, V | | | | | | | | | |
| 85 | 3 | 86 | 1 | AA, ARG, L, MIS, MSJ, PREJ, V | | | | | | | | | |
| 86 | 4 | 86 | 7 | L, MIS, MSJ, PREJ, V | | | | | | | | | |
| 86 | 11 | 87 | 13 | L, LF, MSJ, PREJ, V | 87 | 14 | 88 | 9 | R | | | | |
| 88 | 10 | 89 | 16 | L, MIS, MSJ, PREJ, V | | | | | | | | | |
| 89 | 20 | 92 | 18 | L, MSJ, PREJ, V | | | | | | | | | |
| 92 | 21 | 93 | 4 | AF, LF, PREJ, V | | | | | | | | | |
| 93 | 14 | 95 | 1 | LF, MIS, MSJ, PREJ, V | | | | | | | | | |
| 95 | 6 | 96 | 8 | V, MSJ | | | | | | | | | |
| 96 | 12 | 96 | 20 | LF, HS, PREJ | | | | | | | | | |
| 97 | 2 | 98 | 13 | HS, IR, PREJ, V | | | | | | | | | |
| 98 | 17 | 99 | 13 | HS, IR, PREJ, V | | | | | | | | | |
| 100 | 3 | 100 | 5 | | | | | | | | | | |
| 100 | 8 | 101 | 12 | HS, IR, LF, PREJ, V | | | | | | | | | |
| 101 | 16 | 101 | 18 | HS, IR, LF, PREJ, V | 101 | 13 | 101 | 15 | F, 602 | | | | |
| | | | | | 101 | 19 | 101 | 22 | NR | | | | |
| 102 | 1 | 103 | 9 | HS, IR, LF, PREJ, V | | | | | | | | | |
| 103 | 22 | 104 | 3 | IR, LF, V | 104 | 4 | 104 | 12 | R | | | | |
| 104 | 13 | 105 | 21 | HS, IR, LF, PREJ, V, MSJ | | | | | | | | | |
| 106 | 4 | 106 | 9 | LF, PREJ, V, MSJ | | | | | | | | | |
| 106 | 12 | 106 | 22 | PREJ, MSJ, V | | | | | | | | | |
| 107 | 13 | 107 | 19 | HS, IR, MSJ | | | | | | | | | |
| 108 | 3 | 110 | 11 | HS, IR, PREJ, V, MSJ | | | | | | | | | |
| 110 | 16 | 111 | 14 | HS, IR, PREJ, V, MSJ | 110 | 14 | 110 | 15 | | | | | |
| 111 | 19 | 112 | 3 | IR, MSJ | | | | | | | | | |
| 112 | 11 | 113 | 11 | AA, LF, IR, PREJ, V, MSJ | | | | | | | | | |
| 113 | 15 | 113 | 18 | HS, MSJ | | | | | | | | | |

**Exhibit 8.016**

**SIMON SMITH**
**September 8, 2022**

| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 113 | 21 | 116 | 2 | HS, LF, IR, PREJ, V, MSJ | 116 | 3 | 116 | 5 | | | | | |
| 116 | 6 | 117 | 6 | HS, WF, IR, PREJ, V, MSJ | | | | | | | | | |
| 117 | 11 | 118 | 10 | HS, PREJ, V, MSJ | | | | | | | | | |
| 119 | 1 | 121 | 13 | HS, PREJ, V, MSJ, WF | | | | | | | | | |
| 121 | 21 | 122 | 1 | HS, PREJ, V, MSJ, WF | | | | | | | | | |
| 122 | 3 | 123 | 1 | HS, PREJ, V, MSJ, WF | | | | | | | | | |
| 123 | 12 | 123 | 16 | HS, PREJ, S, L, V, MSJ | | | | | | | | | |
| 123 | 19 | 124 | 10 | HS, PREJ, S, L, V, MSJ | | | | | | | | | |
| 124 | 15 | 125 | 11 | HS, PREJ, S, L, V, MSJ | | | | | | | | | |
| 125 | 15 | 126 | 4 | HS, PREJ, S, L, V, MSJ | | | | | | | | | |
| 126 | 8 | 127 | 14 | AA, ARG, CD, PREJ, S, V, MSJ | | | | | | | | | |
| 127 | 17 | 127 | 18 | HS, MSJ | | | | | | | | | |
| 127 | 20 | 129 | 10 | AA, ARG, HS, PREJ, S, V, MSJ | | | | | | | | | |
| 129 | 13 | 130 | 2 | ARG, PREJ, V, MSJ | | | | | | | | | |
| 130 | 5 | 130 | 8 | IR, PREJ, V, MSJ | | | | | | | | | |
| 130 | 10 | 130 | 13 | IR, PREJ, V, MSJ | | | | | | | | | |
| 130 | 17 | 133 | 6 | IR, HS, PREJ, S, V, MSJ | 133 | 7 | 134 | 12 | R, 403 | | | | |
| 134 | 13 | 138 | 12 | HS, L, PREJ, S, V, MSJ | | | | | | | | | |
| 138 | 16 | 140 | 3 | HS, PREJ, S, V, MSJ | | | | | | | | | |
| 140 | 11 | 141 | 8 | HS, MSJ | | | | | | | | | |
| 141 | 11 | 142 | 8 | ARG, HS, MIS, PREJ, S, V, MSJ | | | | | | | | | |
| 142 | 10 | 143 | 2 | HS, PREJ, S, V, MSJ | | | | | | | | | |
| 143 | 4 | 144 | 5 | HS, PREJ, S, V, MSJ | | | | | | | | | |
| 144 | 8 | 144 | 16 | AA, ARG, PREJ, V, MSJ | | | | | | | | | |
| 144 | 19 | 146 | 22 | AA, ARG, PREJ, S, V, MSJ | 147 | 1 | 147 | 4 | F, 602 | | | | |
| 147 | 5 | 149 | 14 | HS, S, V, PREJ, MSJ | | | | | | | | | |
| 149 | 22 | 150 | 2 | L, S, V, PREJ, MSJ | | | | | | | | | |
| 150 | 4 | 150 | 5 | MSJ | | | | | | | | | |
| 150 | 7 | 150 | 10 | AA, L, S, V, PREJ, MSJ | | | | | | | | | |
| 150 | 12 | 151 | 22 | AA, L, S, V, PREJ, MSJ | | | | | | | | | |
| 152 | 3 | 152 | 5 | AA, L, S, V, PREJ, MSJ | | | | | | | | | |
| 152 | 8 | 152 | 9 | MSJ | | | | | | | | | |
| 152 | 11 | 153 | 11 | HS, V, PREJ, MSJ | | | | | | | | | |
| 154 | 10 | 154 | 19 | HS, PREJ, MSJ | 154 | 20 | 155 | 3 | R, 403 | 155 | 4 | 155 | 6 |
| 155 | 7 | 155 | 8 | IR, MSJ | | | | | | | | | |
| 155 | 12 | 155 | 15 | HS, MSJ | | | | | | | | | |
| 156 | 5 | 156 | 17 | HS, S, V, PREJ, MSJ | | | | | | | | | |
| 157 | 3 | 157 | 9 | HS, S, V, PREJ, MSJ | | | | | | | | | |
| 157 | 14 | 159 | 4 | HS, L, PREJ, S, V, MSJ | | | | | | | | | |
| 159 | 7 | 159 | 19 | HS, L, PREJ, S, V, MSJ | | | | | | | | | |
| 160 | 8 | 163 | 4 | AA, ARG, HS, PREJ, S, V, MSJ | 163 | 5 | 163 | 9 | | 163 | 10 | 164 | 1 |
| | | | | | 164 | 3 | 164 | 9 | NR | | | | |
| 164 | 10 | 164 | 18 | HS, V, PREJ, MSJ | | | | | | | | | |

**Exhibit 8.017**

| SIMON SMITH September 8, 2022 | | | | | | | | | | | | | | |
| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 165 | 13 | 165 | 15 | V, MSJ | 165 | 2 | 165 | 12 | R, 403 | | | | |
| 165 | 22 | 166 | 17 | IR, V, PREJ, MSJ | | | | | | | | | |
| 167 | 8 | 167 | 20 | V | 166 | 20 | 167 | 3 | R, 403 | | | | |
| | | | | | 167 | 5 | 167 | 6 | R, 403 | | | | |
| 168 | 2 | 170 | 10 | CD, L, MIS, S, V, PREJ,  MSJ | 170 | 11 | 170 | 14 | R, 403, NR | | | | |
| 170 | 15 | 173 | 19 | L, S, PREJ | | | | | | | | | |
| 175 | 19 | 176 | 22 | MSJ | | | | | | | | | |
| 177 | 5 | 177 | 11 | HS, IR, MSJ | 177 | 12 | 177 | 19 | R, 403 | | | | |
| | | | | | 195 | 22 | 196 | 9 | R, 403 | | | | |
| 177 | 20 | 178 | 3 | HS, IR, PREJ, MSJ | | | | | | | | | |
| 178 | 6 | 181 | 4 | HS, IR, PREJ, S, MSJ | | | | | | | | | |
| 181 | 8 | 182 | 2 | HS, IR, PREJ, S, MIL, MSJ | | | | | | | | | |
| 183 | 14 | 184 | 1 | IR | | | | | | | | | |
| 184 | 13 | 185 | 8 | AF, LF, HS, IR, PREJ, V | 185 | 9 | 185 | 18 | NR | | | | |
| 185 | 19 | 185 | 22 | IR | | | | | | | | | |
| 187 | 1 | 187 | 17 | HS, IR, V | 196 | 14 | 196 | 22 | R, 403, L | | | | |
| | | | | | 197 | 2 | 197 | 19 | R, 403 | | | | |
| 187 | 20 | 189 | 16 | ARG, HS, IR, PREJ, V | | | | | | | | | |
| 190 | 1 | 190 | 14 | AA, ARG, HS, IR, PREJ, V | | | | | | | | | |
| 190 | 17 | 190 | 22 | AA, ARG, IR, PREJ | | | | | | | | | |
| 192 | 4 | 192 | 17 | | | | | | | | | | |
| 192 | 21 | 195 | 3 | IR, PREJ, V, MSJ | | | | | | | | | |

**Exhibit 8.018**

| LENA WEILAND August 11, 2022 | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 9 | 12 | 9 | 15 | PRIVACY, MIL, MSJ | | | | | | | | | |
| 10 | 8 | 11 | 3 | MIL, MSJ | | | | | | | | | |
| 12 | 1 | 12 | 24 | IR, MIL, MSJ | | | | | | | | | |
| 13 | 3 | 14 | 7 | IR, MIL, MSJ | | | | | | | | | |
| 13 | 14 | 13 | 17 | IR, MIL, MSJ | | | | | | | | | |
| 14 | 12 | 15 | 7 | IR, V, MIL, MSJ | | | | | | | | | |
| 15 | 18 | 15 | 24 | IR, PREJ, MIL, MSJ | | | | | | | | | |
| 16 | 4 | 17 | 13 | CD, IR, PREJ, MIL, MSJ | | | | | | | | | |
| 18 | 14 | 18 | 16 | CD, V, MIL, MSJ | | | | | | | | | |
| 18 | 21 | 18 | 25 | IR, V, MIL, MSJ | | | | | | | | | |
| 19 | 3 | 19 | 9 | IR, V, MIL, MSJ | | | | | | | | | |
| 20 | 15 | 20 | 23 | V, PREJ, MIL, MSJ | | | | | | | | | |
| 23 | 8 | 24 | 9 | HS, V, PREJ, MIL, MSJ | | | | | | | | | |
| 25 | 23 | 26 | 7 | V, PREJ, MIL, MSJ | 26 | 15 | 26 | 20 | R, 403 | 26 | 21 | 26 | 24 |
| 26 | 25 | 27 | 24 | IR, V, PREJ, MIL, MSJ | 27 | 9 | 27 | 19 | | | | | |
| 31 | 2 | 31 | 7 | PRIV, V, MIL, MSJ | | | | | | | | | |
| 31 | 13 | 31 | 16 | PRIV, V, PREJ, MIL, MSJ | | | | | | | | | |
| 31 | 23 | 31 | 23 | V, PREJ, MIL, MSJ | | | | | | | | | |
| 32 | 3 | 33 | 16 | V, PREJ, MIL, MSJ | | | | | | | | | |
| 33 | 22 | 33 | 23 | V, PREJ, MIL, MSJ | 33 | 17 | 33 | 21 | R, 403 | | | | |
| | | | | | 34 | 3 | 34 | 9 | R, 403 | | | | |
| 33 | 25 | 34 | 2 | MIL, MSJ | | | | | | | | | |
| 34 | 12 | 34 | 13 | V, PREJ, MIL, MSJ | | | | | | | | | |
| 34 | 15 | 34 | 16 | MIL, MSJ | | | | | | | | | |
| 34 | 23 | 35 | 18 | V, PREJ, MIL, MSJ | | | | | | | | | |
| 35 | 22 | 36 | 15 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 36 | 25 | 37 | 5 | LF, V, PREJ, MIL, MSJ | 37 | 6 | 37 | 8 | R, 403 | | | | |
| 37 | 21 | 38 | 5 | PRIV, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 38 | 11 | 38 | 13 | PRIV, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 38 | 19 | 38 | 25 | PRIV, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 39 | 4 | 39 | 9 | CD, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 39 | 13 | 39 | 15 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 39 | 17 | 40 | 2 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 40 | 4 | 40 | 7 | PRIV, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 40 | 12 | 40 | 16 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 41 | 14 | 42 | 1 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 42 | 4 | 42 | 6 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 42 | 8 | 42 | 11 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 42 | 13 | 42 | 19 | PRIV, V, PREJ, MIL, MSJ | | | | | | | | | |
| 43 | 1 | 43 | 4 | PRIV, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 43 | 9 | 43 | 9 | MIL, MSJ | | | | | | | | | |

**Exhibit 8.019**

**LENA WEILAND**
**August 11, 2022**

| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 44 | 3 | 44 | 10 | V, PREJ, MIL, MSJ | 44 | 18 | 45 | 2 | R, 403 | | | | |
| 44 | 12 | 44 | 17 | V, PREJ, MIL, MSJ | | | | | | | | | |
| 45 | 3 | 45 | 14 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 45 | 16 | 45 | 21 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 45 | 23 | 46 | 18 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 46 | 20 | 46 | 25 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 47 | 2 | 47 | 4 | V, PREJ, MIL, MSJ | 47 | 5 | 47 | 7 | R, 403, F | | | | |
| 47 | 8 | 47 | 10 | V, PREJ, MIL, MSJ | 47 | 11 | 47 | 18 | R, 403, COLLOQUY | | | | |
| 47 | 19 | 48 | 10 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 48 | 18 | 49 | 5 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 49 | 12 | 51 | 12 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 51 | 14 | 51 | 20 | CD, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 52 | 13 | 53 | 14 | AF, CD, IH, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 53 | 16 | 55 | 2 | AF, CD, IH, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 55 | 4 | 55 | 13 | AF, CD, IH, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 55 | 15 | 55 | 23 | AF, CD, IH, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 56 | 3 | 56 | 5 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 56 | 7 | 56 | 10 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 56 | 12 | 56 | 17 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 56 | 20 | 56 | 20 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 56 | 22 | 57 | 3 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 57 | 5 | 57 | 11 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 57 | 13 | 57 | 13 | MIL, MSJ | | | | | | | | | |
| 57 | 19 | 57 | 21 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 57 | 23 | 58 | 4 | PRIV, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 58 | 12 | 58 | 13 | PRIV, MIL, MSJ | 58 | 15 | 58 | 19 | R, 403, NR, COLLOQUY | | | | |
| 58 | 20 | 58 | 24 | LF, V, PREJ, MIL, MSJ | 58 | 25 | 59 | 3 | R, 403 | | | | |
| | | | | | 59 | 5 | 59 | 5 | R, 403 | | | | |
| 59 | 6 | 59 | 7 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 59 | 10 | 59 | 16 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 59 | 18 | 59 | 20 | MIL, MSJ | | | | | | | | | |
| 60 | 1 | 60 | 3 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 60 | 5 | 60 | 15 | AA, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 60 | 17 | 60 | 18 | MIL, MSJ | 60 | 19 | 60 | 20 | R, 403 | | | | |
| 60 | 24 | 61 | 2 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 61 | 4 | 61 | 10 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 61 | 21 | 61 | 24 | MIL, MSJ | | | | | | | | | |
| 62 | 5 | 62 | 7 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 62 | 9 | 62 | 12 | MIL, MSJ | | | | | | | | | |
| 63 | 1 | 63 | 5 | LF, MIL, MSJ | 63 | 18 | 63 | 23 | R, 403 | 63 | 24 | 64 | 1 |
| 64 | 2 | 67 | 17 | LF, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 67 | 19 | 68 | 12 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |

**Exhibit 8.020**

**LENA WEILAND**
**August 11, 2022**

| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 68 | 14 | 69 | 2 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 69 | 4 | 69 | 13 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 69 | 15 | 69 | 25 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 70 | 2 | 71 | 2 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 71 | 9 | 71 | 16 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | 71 | 17 | 71 | 19 | R, 403 | | | | |
| | | | | | 71 | 21 | 71 | 23 | R, 403 | | | | |
| 72 | 2 | 72 | 12 | PREJ, V, MIL, MSJ | 72 | 13 | 72 | 22 | R, 403, COLLOQUY | | | | |
| 72 | 23 | 73 | 6 | LF, PREJ, V, MIL, MSJ | | | | | | | | | |
| 73 | 20 | 73 | 21 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 73 | 23 | 74 | 1 | CD, LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 74 | 3 | 74 | 20 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 74 | 22 | 75 | 4 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 75 | 6 | 75 | 24 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 76 | 1 | 76 | 7 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | 76 | 9 | 76 | 9 | R, 403, NR | | | | |
| 76 | 10 | 76 | 10 | MIL, MSJ | | | | | | | | | |
| 76 | 12 | 76 | 17 | CD, MIL, MSJ | 76 | 18 | 76 | 25 | R, 403 | | | | |
| 77 | 1 | 78 | 2 | PREJ, V, MIL, MSJ | | | | | | | | | |
| 78 | 5 | 79 | 13 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 78 | 11 | 79 | 8 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 79 | 18 | 79 | 23 | LF, V, PREJ, MIL, MSJ | 79 | 24 | 80 | 2 | R, 403 | | | | |
| 80 | 12 | 82 | 7 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 82 | 11 | 84 | 2 | V, PREJ, MIL, MSJ | | | | | | | | | |
| 84 | 10 | 85 | 4 | CD, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 85 | 8 | 86 | 17 | CD, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 86 | 21 | 87 | 24 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 88 | 3 | 88 | 11 | V, PREJ, MIL, MSJ | 88 | 12 | 88 | 13 | R, 403, NR | | | | |
| 88 | 14 | 89 | 5 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | 89 | 12 | 89 | 15 | R, 403, NR | 89 | 6 | 89 | 9 |
| | | | | | | | | | | 89 | 11 | 89 | 11 |
| | | | | | 89 | 17 | 90 | 5 | R, 403, NR | | | | |
| 90 | 13 | 90 | 17 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 90 | 21 | 93 | 11 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 93 | 16 | 95 | 15 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 95 | 19 | 98 | 2 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 98 | 9 | 98 | 13 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 98 | 15 | 98 | 16 | MIL, MSJ | | | | | | | | | |
| 98 | 19 | 99 | 7 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | 99 | 8 | 99 | 15 | R, 403, NR | | | | |
| 99 | 18 | 99 | 21 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 99 | 23 | 99 | 24 | MIL, MSJ | | | | | | | | | |
| 100 | 3 | 100 | 9 | V, PREJ, MIL, MSJ | | | | | | | | | |
| 100 | 12 | 100 | 15 | MIL, MSJ | | | | | | | | | |
| 100 | 20 | 100 | 23 | V, MIL, MSJ | | | | | | | | | |

**Exhibit 8.021**

| LENA WEILAND August 11, 2022 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *EIS's Designations* | | | | *WOW Tech's Objections* | *WOW Tech's Counter-Designations* | | | | *EIS's Objections to Counter-Designations* | *EIS's Completeness Designations* | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 101 | 1 | 101 | 25 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 102 | 6 | 103 | 18 | CD, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 103 | 21 | 104 | 7 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 104 | 12 | 104 | 19 | CD, LF, V, PREJ, MIL, MSJ | 104 | 20 | 104 | 23 | R, 403 | | | | |
| | | | | | 104 | 25 | 105 | 3 | R, 403 | | | | |
| 105 | 4 | 105 | 8 | LF, V, PREJ, MIL, MSJ | 105 | 9 | 105 | 16 | R, 403, NR, COLLOQUY | | | | |
| 105 | 17 | 105 | 21 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 106 | 1 | 106 | 19 | IR, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 106 | 25 | 107 | 11 | PRIV, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 107 | 15 | 107 | 18 | PRIV, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 107 | 20 | 107 | 22 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 107 | 24 | 108 | 3 | PRIV, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 108 | 8 | 108 | 10 | PRIV, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 108 | 12 | 108 | 16 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 108 | 18 | 108 | 23 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 108 | 25 | 109 | 4 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 109 | 6 | 109 | 19 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 110 | 9 | 110 | 14 | LF, V, PREJ, MIL, MSJ | 110 | 15 | 110 | 18 | R, 403 | | | | |
| | | | | | 110 | 20 | 110 | 21 | R, 403 | | | | |
| 110 | 22 | 111 | 18 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 111 | 23 | 113 | 9 | LF, V, PREJ, MIL, MSJ | 113 | 15 | 113 | 18 | | 113 | 10 | 113 | 12 |
| | | | | | | | | | | 113 | 14 | 113 | 14 |
| 113 | 23 | 114 | 4 | V, PREJ, MIL, MSJ | | | | | | | | | |
| 114 | 6 | 114 | 22 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 115 | 9 | 116 | 5 | AA, ARG, L, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 116 | 8 | 116 | 8 | MIL, MSJ | | | | | | | | | |
| 116 | 10 | 116 | 22 | V, PREJ, MIL, MSJ | | | | | | | | | |
| 117 | 18 | 119 | 22 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 119 | 24 | 120 | 8 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 120 | 10 | 120 | 20 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 120 | 22 | 121 | 10 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 121 | 18 | 122 | 2 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 122 | 4 | 122 | 5 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 122 | 7 | 122 | 11 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 122 | 13 | 122 | 13 | MIL, MSJ | | | | | | | | | |
| 122 | 17 | 122 | 25 | V, PREJ, MIL, MSJ | 123 | 1 | 123 | 4 | R, 403 | | | | |
| 123 | 5 | 125 | 12 | AA, LF, V, PREJ, MIL, MSJ | 137 | 17 | 137 | 24 | R, 403, NR | | | | |
| 125 | 18 | 125 | 20 | V, PREJ, MIL, MSJ | 137 | 2 | 137 | 14 | R, 403, NR | 137 | 15 | 137 | 16 |
| | | | | | 139 | 7 | 139 | 12 | R, 403, NR | 139 | 13 | 139 | 17 |
| | | | | | | | | | | 139 | 20 | 139 | 22 |
| | | | | | | | | | | 139 | 24 | 140 | 2 |
| | | | | | | | | | | 140 | 4 | 140 | 11 |

**Exhibit 8.022**

PLAINTIFF AND COUNTERCLAIM DEFENDANTS' ("EIS") DEPOSITION DESIGNATIONS

| LENA WEILAND August 11, 2022 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *EIS's Designations* | | | | *WOW Tech's Objections* | *WOW Tech's Counter-Designations* | | | | *EIS's Objections to Counter-Designations* | *EIS's Completeness Designations* | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| | | | | | | | | | | 140 | 13 | 140 | 15 |
| | | | | | | | | | | 140 | 17 | 140 | 21 |
| | | | | | | | | | | 140 | 23 | 140 | 23 |
| 125 | 22 | 126 | 1 | V, PREJ, MIL, MSJ | 137 | 2 | 137 | 14 | R, 403, NR | 137 | 15 | 137 | 16 |
| | | | | | 139 | 7 | 139 | 12 | R, 403, NR | 139 | 13 | 139 | 17 |
| | | | | | | | | | | 139 | 20 | 139 | 22 |
| | | | | | | | | | | 139 | 24 | 140 | 2 |
| | | | | | | | | | | 140 | 4 | 140 | 11 |
| | | | | | | | | | | 140 | 13 | 140 | 15 |
| | | | | | | | | | | 140 | 17 | 140 | 21 |
| | | | | | | | | | | 140 | 23 | 140 | 23 |
| 126 | 3 | 126 | 7 | LF, LPK, S, V, PREJ, MIL, MSJ | | | | | | | | | |
| 126 | 9 | 126 | 17 | V, PREJ, MIL, MSJ | 137 | 2 | 137 | 14 | R, 403, NR | 137 | 15 | 137 | 16 |
| | | | | | 139 | 7 | 139 | 12 | R, 403, NR | 139 | 13 | 139 | 17 |
| | | | | | | | | | | 139 | 20 | 139 | 22 |
| | | | | | | | | | | 139 | 24 | 140 | 2 |
| | | | | | | | | | | 140 | 4 | 140 | 11 |
| | | | | | | | | | | 140 | 13 | 140 | 15 |
| | | | | | | | | | | 140 | 17 | 140 | 21 |
| | | | | | | | | | | 140 | 23 | 140 | 23 |
| 127 | 4 | 127 | 6 | V, PREJ, MIL, MSJ | 126 | 18 | 127 | 3 | R, 403, COLLOQUY | | | | |
| 127 | 8 | 128 | 9 | AA, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 128 | 13 | 131 | 7 | LF, LPK, S, V, PREJ, MIL, MSJ | | | | | | | | | |
| 131 | 11 | 132 | 7 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 132 | 9 | 132 | 12 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 132 | 14 | 132 | 17 | V, PREJ, MIL, MSJ | | | | | | | | | |
| 132 | 19 | 132 | 22 | V, PREJ, MIL, MSJ | | | | | | | | | |
| 132 | 24 | 132 | 24 | V, PREJ, MIL, MSJ | | | | | | | | | |
| 133 | 3 | 133 | 7 | HS, LPK, S, V, PREJ, MIL, MSJ | 133 | 8 | 133 | 14 | R, 403 | | | | |
| 133 | 20 | 136 | 4 | AA, HS, LPK, S, V, PREJ, MIL, MSJ | | | | | | | | | |
| 136 | 12 | 136 | 16 | AA, LPK, S, V, PREJ, MIL, MSJ | | | | | | | | | |
| 140 | 24 | 141 | 2 | AA, ARG, LF, V, PREJ, MIL, MSJ | 139 | 11 | 139 | 12 | R, 403, NR | | | | |
| 141 | 6 | 141 | 9 | AA, ARG, LF, V, PREJ, MIL, MSJ | 139 | 11 | 139 | 12 | R, 403, NR | | | | |
| 141 | 17 | 142 | 16 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 143 | 1 | 143 | 7 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 143 | 9 | 143 | 22 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 143 | 25 | 144 | 17 | AA, ARG, LF, V, PREJ, MIL, MSJ | 137 | 28 | 137 | 24 | R, 403, NR | 137 | 25 | 139 | 6 |
| 144 | 24 | 145 | 2 | AA, ARG, LF, V, PREJ, MIL, MSJ | 137 | 28 | 137 | 24 | R, 403, NR | 137 | 25 | 139 | 6 |
| 145 | 4 | 145 | 8 | AA, ARG, LF, V, PREJ, MIL, MSJ | 137 | 28 | 137 | 24 | R, 403, NR | 137 | 25 | 139 | 6 |
| 145 | 20 | 145 | 25 | AA, ARG, CD, LF, V, PREJ, MIL, MSJ | 146 | 3 | 146 | 5 | R, 403, NR | | | | |
| | | | | | 146 | 7 | 146 | 8 | R, 403, NR | | | | |

**Exhibit 8.023**

**LENA WEILAND**
**August 11, 2022**

| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 146 | 9 | 146 | 16 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 146 | 18 | 146 | 21 | AA, ARG, LF, V, PREJ, MIL, MSJ | 139 | 7 | 139 | 12 | R, 403, NR | 139 | 13 | 139 | 17 |
| | | | | | | | | | | 139 | 20 | 139 | 22 |
| | | | | | | | | | | 139 | 24 | 140 | 2 |
| | | | | | | | | | | 140 | 4 | 140 | 11 |
| | | | | | | | | | | 140 | 13 | 140 | 15 |
| | | | | | | | | | | 140 | 17 | 140 | 21 |
| | | | | | | | | | | 140 | 23 | 140 | 23 |
| 146 | 23 | 146 | 24 | MIL, MSJ | | | | | | | | | |
| 147 | 8 | 147 | 12 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 147 | 14 | 147 | 19 | LF, LPK, S, V, PREJ, MIS, MIL, MSJ | | | | | | | | | |
| 147 | 21 | 148 | 3 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 148 | 5 | 148 | 10 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 148 | 12 | 148 | 20 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 148 | 22 | 149 | 9 | AA, ARG, LF, V, PREJ, PRIV, MIL, MSJ | | | | | | | | | |
| 149 | 16 | 150 | 7 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 150 | 9 | 150 | 20 | AA, ARG, LF, MIS, V, PREJ, MIL, MSJ | 150 | 21 | 151 | 2 | R, 403, NR | | | | |
| | | | | | 151 | 4 | 152 | 5 | R, 403, NR, COLLOQUY | | | | |
| 152 | 6 | 153 | 4 | AA, ARG, CD, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 153 | 16 | 154 | 4 | AA, ARG, LF, V, PREJ, MIL, MSJ | 154 | 5 | 154 | 15 | R, 403, NR, COLLOQUY | | | | |
| 154 | 16 | 154 | 20 | AA, ARG, LF, V, PREJ, MIL, MSJ | 154 | 21 | 154 | 22 | | | | | |
| | | | | | 154 | 24 | 155 | 1 | | | | | |
| | | | | | 155 | 3 | 155 | 4 | R, 403, NR | | | | |
| 155 | 5 | 155 | 8 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 155 | 11 | 155 | 19 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 155 | 21 | 156 | 12 | AA, ARG, LF, V, PREJ, MIL, MSJ | 170 | 22 | 171 | 14 | R, 403, NR, COLLOQUY, IMP C | | | | |
| 156 | 14 | 156 | 25 | AA, ARG, CD, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 157 | 2 | 157 | 5 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 157 | 7 | 157 | 11 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 157 | 13 | 158 | 17 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 158 | 19 | 159 | 17 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 159 | 19 | 159 | 24 | AA, ARG, LF, S, V, PREJ, MIL, MSJ | | | | | | | | | |
| 160 | 1 | 160 | 7 | AA, ARG, LF, S, V, PREJ, MIL, MSJ | | | | | | | | | |
| 160 | 9 | 160 | 13 | HS, V, PREJ, MIL, MSJ | | | | | | | | | |
| 160 | 15 | 160 | 19 | ARG, HS, V, PREJ, MIL, MSJ | | | | | | | | | |
| 160 | 21 | 160 | 25 | ARG, HS, V, PREJ, MIL, MSJ | | | | | | | | | |
| 161 | 2 | 161 | 9 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 161 | 11 | 162 | 2 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |

**Exhibit 8.024**

| LENA WEILAND August 11, 2022 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *EIS's Designations* | | | | *WOW Tech's Objections* | *WOW Tech's Counter-Designations* | | | | *EIS's Objections to Counter-Designations* | *EIS's Completeness Designations* | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 162 | 5 | 162 | 9 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 162 | 11 | 162 | 21 | AA, ARG, LF, V, PREJ, MIL, MSJ | 169 | 20 | 170 | 17 | R, 403, IMP C | | | | |
| 162 | 23 | 163 | 8 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 163 | 10 | 163 | 15 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 163 | 17 | 163 | 22 | AA, ARG, LF, S, V, PREJ, MIL, MSJ | | | | | | | | | |
| 163 | 23 | 164 | 5 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 164 | 7 | 164 | 14 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 164 | 16 | 164 | 21 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 164 | 25 | 165 | 5 | MIL, MSJ | | | | | | | | | |
| 165 | 9 | 165 | 15 | MIL, MSJ | | | | | | | | | |
| 165 | 21 | 166 | 6 | MIL, MSJ | | | | | | | | | |
| 173 | 20 | 174 | 9 | HS, LF, PREJ, MIL, MSJ | 174 | 10 | 174 | 11 | R, 403 | | | | |
| 174 | 12 | 175 | 1 | AA, CD, LF, PREJ, V, MIL, MSJ | | | | | | | | | |
| 175 | 15 | 175 | 17 | HS, IR, PRIV, PREJ, MIL, MSJ | | | | | | | | | |
| 175 | 23 | 176 | 13 | PRIV, HS, IR, PREJ, MIL, MSJ | | | | | | | | | |
| 175 | 24 | 176 | 6 | PRIV, AF, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 176 | 19 | 177 | 5 | IR, V, PREJ, MIL, MSJ | | | | | | | | | |
| 178 | 12 | 178 | 19 | LF, V, PREJ, MIL, MSJ | 177 | 21 | 178 | 11 | R, 403, COLLOQUY, IMP C | | | | |
| 178 | 25 | 179 | 11 | AF, HS, MIS, V, PREJ, MIL, MSJ | 178 | 20 | 178 | 24 | R, 403, COLLOQUY, IMP C | | | | |
| 179 | 22 | 180 | 12 | AF, HS, MIS, V, PREJ, MIL, MSJ | | | | | | | | | |
| 181 | 8 | 181 | 12 | AF, IH, V, PREJ, IOP, LPK, S, MIL, MSJ | | | | | | | | | |
| 181 | 14 | 181 | 18 | AF, IH, V, PREJ, IOP, LPK, S, MIL, MSJ | | | | | | | | | |
| 181 | 20 | 182 | 9 | LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 182 | 12 | 182 | 16 | AA, ARG, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 183 | 3 | 184 | 13 | AA, LF, V, PREJ, MIL, MSJ | 184 | 20 | 185 | 8 | R, 403 | | | | |
| | | | | | 185 | 14 | 185 | 21 | R, 403, L | | | | |
| | | | | | 185 | 23 | 185 | 23 | R, 403, F, 602, CS, L | | | | |
| | | | | | 187 | 6 | 187 | 11 | R, 403, IMP C | 166 | 23 | 167 | 21 |
| | | | | | | | | | | 167 | 23 | 168 | 11 |
| | | | | | | | | | | 169 | 5 | 169 | 19 |
| 187 | 17 | 188 | 14 | AA, LF, V, PREJ, MIL, MSJ | | | | | | | | | |
| 188 | 18 | 188 | 18 | MIL, MSJ | | | | | | | | | |
| 188 | 20 | 188 | 21 | MIL, MSJ | | | | | | | | | |

**Exhibit 8.025**

| MARK TOBIAS ZEGENHAGEN September 12, 2022 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | |
| 11 | 14 | 11 | 20 | LW | | | | | | | | | | | |
| 24 | 20 | 25 | 2 | LW | | | | | | | | | | | |
| 30 | 11 | 31 | 4 | LW | | | | | | | | | | | |
| 31 | 9 | 32 | 2 | LW | 32 | 3 | 32 | 17 | IMP C, 602, CS, F | | | | | | |
| 36 | 8 | 36 | 18 | LW | | | | | | | | | | | |
| 44 | 14 | 44 | 22 | V, LW | | | | | | | | | | | |
| 46 | 2 | 46 | 8 | AF, CD, V, LW, MSJ | | | | | | | | | | | |
| 46 | 14 | 46 | 20 | LW, MSJ | | | | | | | | | | | |
| 47 | 17 | 48 | 2 | AF, V, PREJ, SCOPE, LW, MSJ | | | | | | | | | | | |
| 48 | 7 | 48 | 19 | AF, V, PREJ, SCOPE, LW, MSJ | | | | | | | | | | | |
| 49 | 5 | 49 | 14 | AF, V, PREJ, SCOPE, LW, MSJ | | | | | | | | | | | |
| 57 | 6 | 57 | 9 | AF, V, PREJ, LF, LW, MSJ | | | | | | | | | | | |
| 99 | 6 | 101 | 2 | AF, CD, V, SCOPE, PREJ, LF, LW, MSJ | | | | | | | | | | | |
| 106 | 9 | 110 | 20 | AF, CD, V, SCOPE, PREJ, LF, LW, MSJ | 110 | 21 | 111 | 13 | IMP C, R, 403, NR, INQA | 111 | 14 | 111 | 17 | | |
| 111 | 18 | 111 | 22 | V, PREJ, LF, LW, MSJ | 112 | 1 | 112 | 5 | IMP C, R, 403, NR | 112 | 6 | 112 | 21 | | |
| | | | | | | | | | | 113 | 15 | 114 | 16 | | |
| | | | | | | | | | | 114 | 21 | 115 | 11 | | |
| 115 | 21 | 116 | 13 | V, PREJ, LF, LW, MSJ | 116 | 14 | 117 | 1 | R, 403 | 117 | 2 | 117 | 6 | | |
| | | | | | 117 | 7 | 118 | 1 | IMP C, R, 403, NR, 602 | | | | | | |
| 118 | 2 | 119 | 1 | LF, MIS, V, PREJ, LW, MSJ | | | | | | | | | | | |
| 119 | 5 | 119 | 7 | LF, MIS, V, PREJ, LW, MSJ | | | | | | | | | | | |
| 120 | 7 | 120 | 21 | LF, MIS, V, LW, MSJ | | | | | | | | | | | |
| 121 | 5 | 122 | 5 | LF, V, PREJ, SCOPE, LW, MSJ | | | | | | | | | | | |
| 125 | 1 | 126 | 5 | MIS, V, PREJ, SCOPE, S, LW, MSJ | | | | | | | | | | | |
| 139 | 21 | 140 | 10 | V, PREJ, SCOPE, S, LPK, LW, MSJ | | | | | | | | | | | |
| 177 | 8 | 177 | 17 | V, PREJ, IR, S, LF, LW, MSJ | 178 | 11 | 180 | 8 | IMP C, R, 403 | 178 | 7 | 178 | 10 | | |
| | | | | | 180 | 19 | 181 | 7 | IMP C, R, 403 | 180 | 9 | 180 | 18 | | |
| | | | | | | | | | | 183 | 15 | 183 | 22 | | |
| 205 | 20 | 206 | 6 | LF, V, PREJ, LW, MSJ | | | | | | | | | | | |
| 206 | 17 | 207 | 5 | LW, MSJ | | | | | | | | | | | |
| 208 | 8 | 209 | 1 | CD, LF, PREJ, V, LW, MSJ | | | | | | | | | | | |
| 209 | 15 | 210 | 1 | LW, MSJ | | | | | | | | | | | |
| 211 | 3 | 211 | 6 | AF, ARG, LF, PREJ, LW, MSJ | 210 | 2 | 210 | 5 | IMP C, R, 403 | 210 | 6 | 211 | 1 | | |
| 211 | 8 | 211 | 16 | AF, L, LF, PREJ, LW, MSJ | | | | | | | | | | | |
| 212 | 11 | 212 | 19 | AF, LF, PREJ, LW, MSJ | | | | | | | | | | | |
| 214 | 2 | 214 | 7 | LF, V, PREJ, LW, MSJ | | | | | | | | | | | |
| 214 | 10 | 214 | 12 | LF, V, PREJ, LW, MSJ | | | | | | | | | | | |
| 214 | 14 | 215 | 12 | ARG, LF, V, PREJ, LW, MSJ | 215 | 13 | 216 | 6 | IMP C, R, 403 | 213 | 1 | 213 | 7 | | |
| | | | | | 216 | 9 | 217 | 3 | IMP C, R, 403, 602, NR, CS | 217 | 4 | 217 | 18 | | |
| 218 | 5 | 218 | 22 | ARG, LF, V, PREJ, LW, MSJ | 219 | 1 | 219 | 10 | IMP C, R, 403, 602, NR | | | | | | |

Exhibit 8.026

**MARK TOBIAS ZEGENHAGEN**
**September 12, 2022**

| EIS's Designations | | | | WOW Tech's Objections | WOW Tech's Counter-Designations | | | | EIS's Objections to Counter-Designations | EIS's Completeness Designations | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 224 | 5 | 224 | 17 | LW, MSJ | | | | | | | | | |
| 225 | 15 | 226 | 9 | ARG, LF, V, PREJ, LW, MSJ | 226 | 10 | 226 | 17 | IMP C, R, 403, NR, 701 | | | | |
| 226 | 18 | 227 | 22 | ARG, LF, V, PREJ, LW, MSJ | | | | | | | | | |
| 228 | 1 | 228 | 11 | ARG, LF, V, PREJ, LW, MSJ | 228 | 12 | 228 | 21 | IMP C, R, 403, 602, 701 | | | | |
| 228 | 22 | 229 | 10 | ARG, LF, V, PREJ, LW, MSJ | | | | | | | | | |
| 229 | 14 | 229 | 18 | ARG, LF, V, PREJ, LW, MSJ | | | | | | | | | |
| 230 | 14 | 230 | 21 | ARG, LF, V, PREJ, LW, MSJ | 229 | 19 | 230 | 13 | IMP C, R, 403, 602, 701 | | | | |
| 231 | 2 | 231 | 10 | ARG, LF, V, PREJ, LW, MSJ | | | | | | | | | |
| 231 | 13 | 231 | 14 | LW, MSJ | 231 | 16 | 231 | 20 | 403, 602, NR | 231 | 21 | 232 | 3 |
| 233 | 20 | 234 | 17 | ARG, LF, V, PREJ, LW, MSJ | 234 | 18 | 235 | 1 | 403, 602, NR | 235 | 2 | 235 | 3 |
| 238 | 11 | 238 | 16 | ARG, LF, V, PREJ, LW, MSJ | | | | | | | | | |
| 244 | 12 | 245 | 6 | ARG, LF, V, PREJ, LW, MSJ | | | | | | | | | |
| 245 | 18 | 246 | 10 | ARG, LF, V, PREJ, LW, MSJ | | | | | | | | | |
| 246 | 12 | 247 | 12 | ARG, LF, V, PREJ, LW, MSJ | | | | | | | | | |
| 247 | 17 | 248 | 7 | ARG, LF, V, PREJ, LW, MSJ | | | | | | | | | |
| 258 | 1 | 258 | 5 | V, LF, PREJ, LW, MSJ | | | | | | | | | |
| 264 | 8 | 264 | 16 | V, LF, S, PREJ, LW, MSJ | | | | | | | | | |
| 266 | 10 | 266 | 22 | CD, V, LF, S, PREJ, LW, MSJ | | | | | | | | | |
| 267 | 1 | 267 | 13 | CD, V, LF, S, PREJ, LW, MSJ | | | | | | | | | |
| 275 | 16 | 275 | 22 | V, LF, S, PREJ, LW, MSJ | 276 | 1 | 276 | 5 | R, 403, 602, H | | | | |
| 276 | 6 | 276 | 10 | CD, V, LF, S, PREJ, LW, MSJ | | | | | | | | | |
| 279 | 2 | 279 | 18 | IR, LF, PREJ, V, LW, MSJ | | | | | | | | | |
| 282 | 16 | 282 | 19 | LF, PREJ, V, LW, MSJ | | | | | | | | | |

**Exhibit 8.027**

| | WOW TECH OBJECTION KEY | |
|---|---|---|
| AA | Asked and Answered | |
| AF | Assumes Facts | |
| ARG | Argumentative | |
| CD | Compound | |
| DB | Subject to pending *Daubert* motion | |
| DES | Improper Description | |
| HS | Hearsay; Hearsay within Hearsay (FRE 805) | |
| IC | Incomplete (FRE 106) | |
| ICD | Improper Confidentiality Designation | |
| ID | Improper Use of Deposition (FRE 801/802; FRCP 32) | |
| IH | Incomplete Hypothetical | |
| IL | Illegible | |
| IOP | Improper Opinion Testimony (FRE 701/702) | |
| IR | Irrelevant (FRE 401/402) | |
| L | Legal Conclusion (FRE 701) | |
| LA | Lack of Authentication (FRE 901) | |
| LEAD | Leading | |
| LF | Lack of Foundation | |
| LPK | Lacks Personal Knowledge | |
| LW | Witness will testify live | |
| MIL | Subject to pending Motion *in Limine* | |
| MIS | Misstates Testimony (FRE 403/611(a)) | |
| NP | Not Produced in Discovery | |
| NRJ | Not Relevant to Jury Issue | |
| PREJ | Prejudicial/Misleading/Confusing (FRE 403) | |
| PRIV | Calls for atttorney-client privileged/attorney-work product information | |
| PRIVACY | Contains private personal information | |
| S | Speculation (FRE 602/701/702) | |
| SCOPE | Beyond the Scope (FRE 611) | |
| SJ/MSJ | Subject to Pending Summary Judgment Motion | |
| V | Vague (FRE 611(a)) | |
| WF | Wasteful/Harassing (FRE 611) | |

Exhibit 8.028

**EIS OBJECTION CODES**

While Plaintiff and Counterclaim Defendants have listed individual completeness designations with individual counter designations in this exhibit, Plaintiff and Counterclaim Defendants incorporate by reference each completeness designation against each counter designation. Plaintiff and Counterclaim Defendants expressly reserve the right to play any completeness designation in response to any counter designation. *See, e.g.*, Fed. R. Civ. P. 32(a)(6).

| Code | Objection Description |
|------|----------------------|
| AAA | Asked and answered |
| AF | Assumes facts not in evidence |
| ARG | Argumentative |
| CLC | Calls for a legal conclusion |
| COLLOQUY | Improper attorney colloquy |
| COMP | Compound |
| CS | Calls for speculation |
| F | Lacks foundation |
| H | Hearsay |
| IMP C | Improper counter |
| IMP T | Improper translation |
| INQA | Incomplete question or answer |
| L | Leading |
| LA | Legal argument |
| MD | Mischaracterizes document |
| MT | Misstates testimony |
| NP | Not produced during discovery or cited in any expert report or pleading |
| NT | Not Testimony |
| O | Original/duplicate not produced |
| PRIV | Privileged |
| R | Relevance |
| SCOPE | Beyond the scope of the 30(b)(6) notice |
| SRM | Subsequent remedial measures |
| T | Foreign-language document that lacks certified translation |
| UNE | Unavailability not established |
| V | Vague |
| NR | Non-responsive |
| 403 | Prejudice, confusion, misleading, cumulative, waste of time |
| 404 | Improper character, crime, wrong, or act evidence |
| 408 | Compromise offers and negotiations |
| 602 | Witness lacks personal knowledge |
| 701 | Improper opinion testimony by lay witness |
| 1006 | Summary, chart, or calculation for which originals were never made available |

**Exhibit 8.029**

Joint Proposed Pretrial Order

# EXHIBIT 9

| Andre Geske October 11, 2022 | | | | | | | | | | | | | | | |
| WOW's Designations | | | | EIS's Objections | EIS's Counter-Designations* | | | | WOW's Objections to Counter-Designations | WOW's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 11 | 16 | 11 | 18 | SCOPE | 11 | 19 | 11 | 21 | IR | | | | |
| 12 | 17 | 12 | 18 | R, 403, SCOPE | 12 | 19 | 12 | 20 | IR | | | | |
| | | | | | 12 | 22 | 13 | 4 | IR, PREJ, AF, ARG | | | | |
| 14 | 3 | 14 | 6 | SCOPE | | | | | | | | | |
| 14 | 7 | 14 | 11 | SCOPE | 15 | 12 | 16 | 2 | IR, PREJ | | | | |
| 16 | 3 | 16 | 10 | R, 403, SCOPE | | | | | | | | | |
| 16 | 11 | 16 | 15 | SCOPE | | | | | | | | | |
| 16 | 16 | 17 | 7 | R, 403, SCOPE | 17 | 12 | 18 | 2 | IR, PREJ, V | | | | |
| 18 | 3 | 18 | 6 | R, 403, SCOPE | | | | | | | | | |
| 18 | 7 | 18 | 9 | R, 403, F, SCOPE | | | | | | | | | |
| 18 | 10 | 18 | 16 | R, 403, SCOPE | 18 | 17 | 18 | 19 | | | | | |
| | | | | | 20 | 21 | 21 | 1 | | | | | |
| 22 | 14 | 22 | 15 | R, 403, F, SCOPE | | | | | | | | | |
| 22 | 16 | 23 | 5 | R, 403, F, SCOPE | 23 | 6 | 23 | 7 | | | | | |
| 25 | 9 | 25 | 10 | R, 403, F, CLC, PRIV, SCOPE | 25 | 11 | 25 | 13 | Improperly Includes Aty Objection | | | | |
| 25 | 14 | 25 | 15 | R, 403, F, CLC, PRIV, SCOPE | | | | | | | | | |
| 25 | 17 | 25 | 20 | R, 403, F, CLC, PRIV, SCOPE | 25 | 21 | 26 | 1 | Improperly Includes Aty Objection | | | | |
| 26 | 2 | 26 | 6 | R, 403, F, CLC, PRIV, SCOPE | 26 | 8 | 26 | 10 | | | | | |
| 26 | 11 | 26 | 14 | R, 403, F, CLC, PRIV, SCOPE | 26 | 15 | 26 | 18 | | | | | |
| 26 | 19 | 26 | 20 | R, 403, F, CLC, PRIV, SCOPE | 26 | 21 | 26 | 22 | Improperly Includes Aty Objection | | | | |
| 27 | 1 | 27 | 2 | R, 403, F, CLC, PRIV, SCOPE | | | | | | | | | |
| 27 | 4 | 27 | 6 | R, 403, F, CLC, PRIV, SCOPE | 27 | 7 | 28 | 11 | IR, PREJ | | | | |
| 28 | 16 | 29 | 2 | R, 403, F, CLC, PRIV, V, SCOPE | 28 | 14 | 28 | 15 | IR, PREJ | | | | |
| 29 | 8 | 30 | 17 | R, 403, F, CLC, PRIV, V, SCOPE | | | | | | | | | |
| 31 | 14 | 36 | 3 | R, 403, SCOPE | 31 | 6 | 31 | 10 | IR, PREJ | | | | |
| | | | | | 36 | 4 | 37 | 22 | IR, PREJ | | | | |
| 38 | 1 | 39 | 14 | R, 403, SCOPE | 39 | 15 | 40 | 21 | IR, PREJ | | | | |
| 40 | 22 | 41 | 12 | R, 403, SCOPE | 41 | 13 | 42 | 2 | IR, PREJ | | | | |
| 42 | 22 | 44 | 8 | SCOPE | 42 | 3 | 42 | 21 | IR, PREJ | | | | |
| 48 | 4 | 49 | 1 | R, 403, SCOPE | 44 | 17 | 48 | 3 | IR, PREJ | | | | |
| 49 | 2 | 49 | 11 | R, F, SCOPE | 49 | 12 | 50 | 17 | IR, PREJ, V | | | | |
| 50 | 18 | 51 | 1 | R, 403, F, SCOPE | | | | | | | | | |
| 51 | 15 | 51 | 21 | R, 403, SCOPE | | | | | | | | | |
| 52 | 11 | 52 | 13 | R, 403, SCOPE | | | | | | | | | |
| 53 | 17 | 53 | 20 | R, 403, SCOPE | 53 | 21 | 54 | 11 | IR, PREJ | | | | |
| 54 | 17 | 55 | 11 | R, 403, SCOPE | | | | | | | | | |
| 57 | 3 | 58 | 7 | R, 403, F, SCOPE | 58 | 12 | 59 | 5 | LPK, IR, PREJ, V | 59 | 6 | 59 | 10 |
| 59 | 11 | 61 | 18 | R, 403, F, 602, CS, CLC, SCOPE | 61 | 19 | 62 | 11 | LPK, IR, PREJ, V | | | | |
| 62 | 12 | 63 | 20 | R, 403, F, 602, CS, CLC, SCOPE | | | | | | | | | |
| 64 | 6 | 64 | 7 | SCOPE | 64 | 15 | 64 | 20 | IR, PREJ, V | | | | |
| | | | | | 65 | 7 | 65 | 18 | LPK, PREJ, V | | | | |

**Exhibit 9.001**

| Andre Geske October 11, 2022 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **WOW's Designations** | | | | **EIS's Objections** | **EIS's Counter-Designations*** | | | | **WOW's Objections to Counter-Designations** | **WOW's Completeness Designations** | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 65 | 19 | 65 | 21 | R, 403, F, 602, CS, CLC, SCOPE | 65 | 22 | 66 | 3 | LPK, PREJ, V | | | | |
| 66 | 4 | 66 | 16 | R, 403, F, 602, CS, CLC, SCOPE | 66 | 17 | 67 | 2 | LPK, PREJ, V | | | | |
| 67 | 6 | 67 | 15 | R, 403, F, 602, CS, CLC, SCOPE | 67 | 16 | 68 | 7 | LPK, PREJ, V | | | | |
| | | | | | 68 | 12 | 69 | 13 | LPK, PREJ, V | | | | |
| | | | | | 69 | 14 | 69 | 16 | LPK, PREJ, V | | | | |
| | | | | | 69 | 19 | 70 | 7 | LPK, PREJ, V | | | | |
| 70 | 8 | 70 | 21 | R, 403, F, 602, CS, CLC, SCOPE | 70 | 22 | 71 | 20 | LPK, PREJ, V | | | | |
| | | | | | 71 | 21 | 72 | 4 | LPK, PREJ, V | | | | |
| | | | | | 72 | 12 | 74 | 8 | LPK, PREJ, V | | | | |
| 74 | 9 | 74 | 9 | 403, F, 602, CS, CLC, INQA, SCOPE | 74 | 10 | 74 | 13 | LPK | | | | |
| 74 | 14 | 74 | 22 | 403, F, 602, CS, SCOPE | | | | | | | | | |
| 78 | 1 | 78 | 6 | R, 403, F, 602, CS, CLC, SCOPE | 77 | 5 | 77 | 22 | LPK, PREJ, V | | | | |
| | | | | | 78 | 17 | 78 | 22 | IR | | | | |
| 80 | 13 | 81 | 5 | R, 403, SCOPE | 81 | 6 | 82 | 5 | IR | | | | |
| 83 | 9 | 83 | 14 | R, 403, F, 602, CS, CLC, SCOPE | 82 | 6 | 83 | 4 | | | | | |
| | | | | | 83 | 15 | 83 | 16 | | 83 | 15 | 83 | 19 |
| | | | | | 84 | 2 | 84 | 7 | | 84 | 8 | 84 | 12 |
| 84 | 18 | 85 | 5 | R, 403, F, 602, CS, CLC, SCOPE | | | | | | | | | |
| 91 | 5 | 92 | 16 | R, 403, F, CS, SCOPE | 92 | 17 | 92 | 19 | IR | | | | |
| | | | | | 92 | 20 | 93 | 2 | IR | | | | |
| 97 | 20 | 103 | 5 | R, 403, F, ARG, 404, V, CS, SCOPE | 103 | 7 | 103 | 19 | | | | | |
| | | | | | 103 | 20 | 103 | 21 | | | | | |
| | | | | | 104 | 1 | 104 | 3 | | | | | |
| 104 | 19 | 106 | 14 | R, 403, F, 404, CS, SCOPE | 104 | 5 | 104 | 18 | | | | | |
| 106 | 17 | 107 | 2 | R, 403, F, 404, CS, V, SCOPE | | | | | | | | | |
| 107 | 4 | 109 | 21 | R, 403, F, 404, CS, V, SCOPE | | | | | | | | | |
| 110 | 10 | 110 | 22 | R, 403, F, SCOPE | 111 | 1 | 111 | 5 | IR, WF | | | | |
| 111 | 6 | 113 | 6 | R, 403, F, SCOPE | 113 | 7 | 113 | 18 | IR, WF | | | | |
| 113 | 19 | 114 | 4 | R, 403, SCOPE | 114 | 5 | 115 | 14 | IR, WF | | | | |
| 116 | 11 | 117 | 14 | INQA, SCOPE | 117 | 15 | 117 | 17 | | | | | |
| 117 | 18 | 117 | 21 | SCOPE | | | | | | | | | |
| 118 | 18 | 118 | 19 | R, 403, V, CS, F, 602, SCOPE | | | | | | | | | |
| 118 | 21 | 121 | 18 | R, 403, V, CS, F, 602, SCOPE | | | | | | | | | |
| 121 | 19 | 122 | 21 | R, 403, SCOPE | | | | | | | | | |
| 122 | 22 | 123 | 16 | R, 403, SCOPE | 123 | 17 | 124 | 12 | IR, V | | | | |
| 124 | 13 | 124 | 16 | R, 403, CS, F, 602, SCOPE | 124 | 17 | 124 | 18 | | | | | |
| | | | | | 124 | 20 | 125 | 4 | | | | | |
| 125 | 5 | 125 | 9 | R, 403, CS, F, 602, SCOPE | | | | | | | | | |
| 125 | 18 | 125 | 19 | R, 403, F, V, SCOPE | | | | | | | | | |
| 125 | 21 | 127 | 9 | R, 403, F, V, CLC, SCOPE | | | | | | | | | |
| 128 | 9 | 128 | 10 | R, 403, F, V, CLC, H, SCOPE | | | | | | | | | |
| 128 | 12 | 128 | 18 | R, 403, F, V, CLC, SCOPE | | | | | | | | | |
| 128 | 20 | 128 | 20 | R, 403, F, V, CLC, SCOPE | 128 | 22 | 129 | 5 | IR | | | | |

**Exhibit 9.002**

WOW TECH'S SECOND AMENDED DEPOSITION DESIGNATIONS

C.A. No. 1:19-cv-01227-GBW

| Andre Geske October 11, 2022 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WOW's Designations | | | | EIS's Objections | EIS's Counter-Designations* | | | | WOW's Objections to Counter-Designations | WOW's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 129 | 6 | 130 | 5 | R, 403, F, V, CLC, H, SCOPE | | | | | | | | | |

3

**Exhibit 9.003**

| Andre Geske October 11, 2022 | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| WOW's Designations | | | | EIS's Objections | EIS's Counter-Designations* | | | | WOW's Objections to Counter-Designations | WOW's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 130 | 16 | 130 | 19 | R, 403, MT, ARG, F, SCOPE | | | | | | | | | |
| 130 | 22 | 131 | 14 | R, 403, MT, ARG, F, SCOPE | 131 | 15 | 132 | 6 | IR, LPK, PREJ | | | | |
| | | | | | 132 | 15 | 132 | 16 | IR | | | | |
| | | | | | 132 | 20 | 132 | 21 | IR | | | | |
| | | | | | 133 | 6 | 133 | 11 | IR, WF | | | | |
| | | | | | 133 | 14 | 133 | 17 | IR, WF | | | | |
| 133 | 19 | 134 | 15 | R, 403, F, V, CLC, SCOPE | | | | | | | | | |
| 134 | 18 | 135 | 12 | R, 403, F, V, CLC, SCOPE | | | | | | | | | |
| 135 | 15 | 139 | 9 | R, 403, V, F, 602, CLC, PRIV, SCOPE | | | | | | | | | |
| 139 | 10 | 141 | 9 | R, 403, F, 602, SCOPE | 141 | 10 | 141 | 21 | IR, PREJ, WF | | | | |
| | | | | | 142 | 2 | 143 | 5 | IR, PREJ, WF | | | | |
| 153 | 6 | 153 | 11 | R, 403, F, SCOPE | | | | | | | | | |
| 153 | 14 | 153 | 15 | R, 403, F, SCOPE | 153 | 17 | 154 | 4 | IR, PREJ, WF | | | | |
| 154 | 5 | 154 | 6 | R, 403, F, PRIV, SCOPE | | | | | | | | | |
| 154 | 10 | 154 | 11 | R, 403, F, PRIV, SCOPE | 154 | 13 | 154 | 17 | IR, PREJ, WF | | | | |
| 154 | 18 | 157 | 3 | R, 403, F, PRIV, SCOPE | 157 | 4 | 157 | 13 | | 157 | 14 | 157 | 22 |
| 157 | 14 | 159 | 14 | R, 403, F, 404, V, SCOPE | | | | | | | | | |
| 159 | 21 | 163 | 3 | R, 403, H, 408, SCOPE | | | | | | | | | |
| 163 | 4 | 163 | 22 | R, 403, F, H, 408, SCOPE | 164 | 1 | 165 | 14 | IR, PREJ, V, WF | | | | |
| | | | | | 165 | 15 | 165 | 19 | IR, PREJ | | | | |
| | | | | | 166 | 19 | 167 | 3 | IR, PREJ | | | | |
| | | | | | 167 | 4 | 167 | 14 | IR, PREJ | | | | |
| | | | | | 167 | 15 | 168 | 6 | IR, PREJ | | | | |
| 172 | 1 | 172 | 10 | R, 403, F, H, 408, SCOPE | 169 | 8 | 169 | 15 | PREJ | | | | |
| | | | | | 169 | 16 | 171 | 22 | PREJ | | | | |
| | | | | | 172 | 11 | 172 | 19 | PREJ | | | | |
| 172 | 20 | 173 | 8 | R, 403, SCOPE | 173 | 15 | 174 | 4 | | 174 | 5 | 176 | 6 |
| 176 | 7 | 176 | 15 | R, 403, F, H, 408, SCOPE | 176 | 16 | 176 | 19 | IR, PREJ, WF | | | | |
| 178 | 6 | 178 | 11 | R, 403, F, H, 408, SCOPE | 178 | 12 | 178 | 20 | IR, PREJ, WF | 178 | 22 | 180 | 1 |
| 180 | 8 | 180 | 13 | R, 403, F, H, PRIV, 408, SCOPE | 180 | 2 | 180 | 7 | | | | | |
| | | | | | 180 | 16 | 181 | 3 | | | | | |
| | | | | | 181 | 5 | 181 | 7 | IR, PREJ, WF | | | | |
| 181 | 9 | 181 | 18 | R, 403, F, H, 408, SCOPE | 181 | 19 | 182 | 1 | IR, PREJ, WF | | | | |
| 183 | 21 | 184 | 21 | R, 403, SCOPE | 183 | 17 | 183 | 19 | | 183 | 20 | 183 | 20 |
| 185 | 2 | 185 | 10 | SCOPE | | | | | | | | | |
| 186 | 9 | 186 | 20 | R, 403, F, H, SCOPE | | | | | | | | | |
| 187 | 14 | 187 | 20 | R, 403, H, SCOPE | | | | | | | | | |
| 187 | 21 | 188 | 1 | R, 403, F, H, SCOPE | 188 | 2 | 188 | 16 | WF | | | | |
| 188 | 17 | 188 | 20 | R, 403, SCOPE | 188 | 21 | 189 | 5 | PREJ, WF | | | | |
| | | | | | 189 | 6 | 189 | 19 | WF | | | | |
| 190 | 22 | 191 | 2 | R, 403, F, 602, CLC, SCOPE | 190 | 17 | 190 | 21 | PREJ | | | | |
| 191 | 14 | 191 | 22 | R, 403, F, H, 602, SCOPE | | | | | | | | | |
| 192 | 1 | 192 | 19 | R, 403, F, H, 602, SCOPE | | | | | | | | | |

**Exhibit 9.004**

WOW TECH'S SECOND AMENDED DEPOSITION DESIGNATIONS

| Andre Geske October 11, 2022 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **WOW's Designations** | | | | **EIS's Objections** | **EIS's Counter-Designations*** | | | | **WOW's Objections to Counter-Designations** | **WOW's Completeness Designations** | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 194 | 13 | 194 | 15 | R, 403, F, H, 602, 408, SCOPE | 194 | 16 | 196 | 2 | | | | | |
| 197 | 5 | 197 | 12 | R, 403, F, H, 602, 408, SCOPE | 197 | 13 | 197 | 15 | | | | | |
| | | | | | 197 | 17 | 197 | 18 | | | | | |
| | | | | | 198 | 17 | 199 | 15 | | | | | |
| 201 | 15 | 202 | 7 | R, 403, F, H, 602, 408, SCOPE | | | | | | | | | |
| 202 | 15 | 202 | 18 | R, 403, F, H, 602, 408, SCOPE | | | | | | | | | |
| 202 | 20 | 203 | 5 | R, 403, F, H, 602, 408, SCOPE | | | | | | | | | |
| 203 | 7 | 203 | 20 | SCOPE | | | | | | | | | |
| 203 | 21 | 204 | 3 | F, SCOPE | 204 | 4 | 204 | 8 | | | | | |
| 204 | 12 | 206 | 10 | R, 403, F, H, 408, SCOPE | 206 | 11 | 206 | 20 | | | | | |
| 212 | 15 | 213 | 11 | R, 403, F, H, 408, SCOPE | 209 | 17 | 211 | 4 | PREJ | | | | |
| | | | | | 211 | 19 | 212 | 14 | PREJ | | | | |
| 213 | 12 | 213 | 21 | R, 403, F, H, 408, SCOPE | 213 | 22 | 214 | 18 | IR, WF | | | | |
| 214 | 19 | 215 | 20 | R, 403, F, H, 408, SCOPE | 215 | 21 | 216 | 9 | IR, PREJ, WF | | | | |
| | | | | | 216 | 12 | 216 | 15 | IR, PREJ, WF | | | | |
| | | | | | 216 | 17 | 218 | 2 | IR, PREJ, WF | | | | |
| 218 | 6 | 218 | 9 | F, H, 408, SCOPE | 218 | 12 | 218 | 18 | IR, PREJ, WF | | | | |
| 222 | 12 | 222 | 13 | H, 408, SCOPE | 222 | 14 | 223 | 1 | PREJ, WF | | | | |
| | | | | | 223 | 5 | 224 | 19 | PREJ, WF | | | | |
| | | | | | 224 | 20 | 225 | 10 | PREJ, WF | 225 | 11 | 226 | 7 |
| 226 | 21 | 229 | 13 | R, 403, F, H, 408, SCOPE | 229 | 22 | 230 | 15 | PREJ | | | | |
| 230 | 16 | 231 | 8 | R, 403, F, H, 408, SCOPE | 231 | 9 | 232 | 1 | PREJ | | | | |
| 232 | 2 | 233 | 4 | R, 403, F, H, 408, CLC, SCOPE | | | | | | | | | |
| 233 | 7 | 233 | 9 | R, 403, F, H, 408, CLC, SCOPE | | | | | | | | | |
| 233 | 10 | 233 | 15 | R, 403, F, H, 408, CLC, PRIV, SCOPE | 233 | 16 | 234 | 22 | N, NR, PREJ | | | | |
| 235 | 13 | 236 | 1 | R, 403, F, H, SCOPE | | | | | | | | | |
| 236 | 2 | 236 | 10 | R, 403, F, H, SCOPE | 236 | 11 | 239 | 19 | IR, PREJ, WF | | | | |
| 240 | 14 | 240 | 17 | F, SCOPE | 240 | 6 | 240 | 13 | IR, PREJ, WF | | | | |
| | | | | | 240 | 18 | 243 | 4 | IR, PREJ, WF | | | | |
| 243 | 5 | 243 | 18 | R, 403, F, 408, SCOPE | 243 | 19 | 243 | 22 | IR, PREJ, WF | | | | |
| | | | | | 244 | 15 | 244 | 17 | LPK, IR, PREJ, V | | | | |
| 245 | 7 | 245 | 10 | R, 403, F, H, 408, SCOPE | 245 | 13 | 245 | 17 | | 245 | 18 | 246 | 5 |
| 247 | 4 | 247 | 6 | R, 403, F, H, 408, SCOPE | 247 | 7 | 247 | 11 | | | | | |
| 248 | 18 | 249 | 8 | R, 403, F, H, 408, PRIV, SCOPE | 249 | 9 | 251 | 1 | PREJ, V | | | | |
| 251 | 16 | 252 | 4 | R, 403, F, H, 408, SCOPE | 252 | 5 | 254 | 2 | NR, IR, PREJ, WF | | | | |
| 254 | 3 | 254 | 17 | R, 403, F, H, 408, PRIV, SCOPE | 254 | 18 | 254 | 22 | NR, IR, PREJ, WF | | | | |
| 255 | 4 | 255 | 8 | R, 403, F, H, 408, SCOPE | 255 | 9 | 255 | 13 | NR, IR, PREJ, WF | | | | |
| 255 | 16 | 256 | 3 | R, 403, F, H, 408, SCOPE | 256 | 6 | 256 | 17 | NR, IR, PREJ, WF | | | | |
| 256 | 21 | 256 | 22 | R, 403, F, H, 408, AAA, SCOPE | | | | | | | | | |
| 257 | 3 | 257 | 4 | R, 403, F, H, 408, AAA, SCOPE | 257 | 6 | 258 | 9 | NR, IR, PREJ, WF | | | | |
| 258 | 13 | 258 | 20 | R, 403, F, H, 408, SCOPE | 258 | 21 | 259 | 1 | PREJ, WF | | | | |
| 259 | 7 | 260 | 2 | R, 403, F, H, 408, SCOPE | 260 | 3 | 260 | 17 | PREJ, WF | | | | |
| 261 | 2 | 261 | 6 | R, 403, F, H, 408, SCOPE | | | | | | | | | |

**Exhibit 9.005**

WOW TECH'S SECOND AMENDED DEPOSITION DESIGNATIONS

**Andre Geske**
**October 11, 2022**

| WOW's Designations | | | | EIS's Objections | EIS's Counter-Designations* | | | | WOW's Objections to Counter-Designations | WOW's Completeness Designations | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 261 | 19 | 262 | 8 | R, 403, F, H, 408, PRIV, SCOPE | 262 | 9 | 262 | 14 | PREJ, WF | | | | |
| 262 | 15 | 262 | 19 | R, 403, F, H, 408, PRIV, SCOPE | 262 | 20 | 262 | 22 | | 263 | 1 | 263 | 5 |
| | | | | | 263 | 6 | 264 | 20 | PREJ, V | | | | |
| | | | | | 265 | 6 | 266 | 3 | N, NR, PREJ, V | | | | |
| | | | | | 266 | 8 | 268 | 4 | N, NR, PREJ, V | | | | |
| 268 | 5 | 268 | 21 | R, 403, F, CLC, SCOPE | | | | | | | | | |
| 269 | 3 | 269 | 15 | R, 403, F, H, 408, SCOPE | | | | | | | | | |
| 269 | 16 | 271 | 19 | R, 403, F, H, 408, PRIV, SCOPE | 271 | 20 | 272 | 20 | N, NR, PREJ, V | | | | |
| 272 | 21 | 273 | 19 | R, 403, F, 408, SCOPE | | | | | | | | | |
| 274 | 21 | 275 | 10 | R, 403, F, H, MT, ARG, 408, SCOPE | 275 | 11 | 275 | 17 | | | | | |
| | | | | | 275 | 22 | 281 | 11 | IR, N, NR, PREJ, V | | | | |
| 285 | 9 | 285 | 14 | R, 403, F, H, 408, SCOPE | 285 | 16 | 285 | 21 | NR, WF | | | | |
| | | | | | 286 | 5 | 286 | 8 | | | | | |
| | | | | | 286 | 14 | 287 | 14 | IR, NR, PREJ, V | | | | |
| 288 | 3 | 288 | 7 | R, 403, F, H, 408, SCOPE | 288 | 8 | 288 | 12 | | | | | |
| 289 | 19 | 290 | 17 | R, 403, F, H, 408, SCOPE | 288 | 17 | 289 | 18 | IR, NR, PREJ, V | | | | |
| 290 | 20 | 293 | 4 | R, 403, F, H, 408, SCOPE | | | | | | | | | |
| 293 | 22 | 294 | 22 | R, 403, F, H, CLC, MT, 408, PRIV, SCOPE | | | | | | | | | |
| 300 | 16 | 300 | 19 | R, 403, F, 408, SCOPE | 297 | 17 | 300 | 15 | IR, N, NR, PREJ, V | | | | |
| 300 | 20 | 301 | 4 | R, 403, F, SCOPE | | | | | | | | | |
| 301 | 17 | 302 | 8 | R, 403, F, 408, SCOPE | | | | | | | | | |
| 302 | 9 | 302 | 18 | R, 403, F, COMP, V, ARG, 404, SCOPE | | | | | | | | | |
| 303 | 4 | 303 | 6 | 403, F, 408, SCOPE | | | | | | | | | |
| 304 | 1 | 304 | 3 | 408, SCOPE | 304 | 16 | 306 | 18 | IR, N, NR, PREJ, V | | | | |
| | | | | | 307 | 9 | 308 | 7 | IR, PREJ, WF | | | | |
| 308 | 17 | 308 | 20 | R, 403, F, 408, CLC, PRIV, SCOPE | 309 | 2 | 309 | 6 | IR, PREJ | | | | |
| 320 | 9 | 321 | 20 | 403, F, CLC, PRIV, V, CS, H, SCOPE | 321 | 21 | 322 | 1 | NR, PREJ, WF | | | | |
| | | | | SCOPE | 322 | 3 | 325 | 2 | NR, PREJ, V, WF | | | | |
| | | | | SCOPE | 325 | 5 | 326 | 6 | NR, PREJ, V, WF | | | | |
| 326 | 7 | 327 | 6 | R, 403, F, CLC, PRIV, V, SCOPE | | | | | | | | | |
| 336 | 11 | 337 | 8 | R, 403, F, CS, SCOPE | 335 | 12 | 336 | 1 | NR, PREJ, V, WF | | | | |
| | | | | | 340 | 16 | 340 | 18 | NR, PREJ, V, WF | | | | |
| | | | | | 344 | 7 | 346 | 2 | NR, PREJ, V, WF | | | | |
| 346 | 3 | 346 | 18 | R, 403, F, CS, CLC, SCOPE | 340 | 16 | 340 | 18 | NR, PREJ, V, WF | | | | |
| | | | | | 343 | 17 | 343 | 19 | NR, PREJ, V, WF | | | | |
| | | | | | 344 | 7 | 346 | 2 | NR, PREJ, V, WF | | | | |
| | | | | | 346 | 19 | 347 | 22 | NR, PREJ, V, WF | | | | |
| | | | | | 348 | 2 | 348 | 6 | NR, PREJ, V, WF | | | | |
| 350 | 2 | 350 | 10 | R, 403, SCOPE | | | | | | | | | |
| 350 | 12 | 350 | 12 | INQA, SCOPE | | | | | | | | | |
| 350 | 16 | 351 | 5 | R, 403, F, H, SCOPE | 351 | 6 | 351 | 16 | PREJ, V, WF | | | | |
| 352 | 11 | 352 | 12 | R, 403, AAA, V, F, SCOPE | | | | | | | | | |

**Exhibit 9.006**

| Andre Geske October 11, 2022 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **WOW's Designations** | | | | **EIS's Objections** | **EIS's Counter-Designations*** | | | | **WOW's Objections to Counter-Designations** | **WOW's Completeness Designations** | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 352 | 15 | 352 | 18 | R, 403, AAA, V, F, SCOPE | 352 | 21 | 352 | 22 | NR, PREJ, V, WF | | | | |
| 353 | 1 | 353 | 3 | R, 403, AAA, V, F, SCOPE | 353 | 4 | 353 | 16 | IR, PREJ, WF | | | | |
| 353 | 17 | 354 | 10 | R, 403, F, SCOPE | | | | | | | | | |
| 354 | 15 | 356 | 5 | R, 403, F, H, SCOPE | | | | | | | | | |
| 359 | 6 | 359 | 13 | R, 403, F, SCOPE | 359 | 14 | 360 | 1 | NR, PREJ, V, WF | | | | |
| | | | | | 360 | 5 | 361 | 6 | NR, PREJ, V, WF | | | | |
| | | | | | 361 | 7 | 361 | 19 | IR, NR, PREJ, V, WF | | | | |
| | | | | | 362 | 2 | 365 | 13 | IR, NR, PREJ, V, WF | | | | |
| 365 | 14 | 366 | 2 | R, 403, F, SCOPE | 366 | 3 | 366 | 6 | IR | | | | |
| 367 | 1 | 367 | 3 | R, 403, F, SCOPE | | | | | | | | | |
| 367 | 21 | 368 | 20 | R, 403, F, SCOPE | | | | | | | | | |
| 372 | 22 | 373 | 7 | R, 403, SCOPE | 373 | 8 | 373 | 12 | | | | | |
| 373 | 13 | 374 | 7 | R, 403, SCOPE | 374 | 8 | 374 | 20 | | | | | |
| 374 | 21 | 375 | 10 | R, 403, SCOPE | 375 | 11 | 376 | 21 | NR, PREJ, V, WF | | | | |
| 376 | 22 | 377 | 16 | R, 403, SCOPE | | | | | | | | | |
| 377 | 21 | 378 | 11 | R, 403, F, H, SCOPE | | | | | | | | | |
| 378 | 12 | 379 | 15 | R, 403, F, H, CS, SCOPE | 379 | 22 | 380 | 16 | NR, N, PREJ, V, WF | | | | |
| 380 | 17 | 381 | 1 | R, 403, SCOPE | 381 | 2 | 381 | 13 | NR, N, PREJ, V, WF | | | | |
| 381 | 14 | 382 | 3 | R, 403, F, H, SCOPE | 382 | 5 | 383 | 8 | NR, N, PREJ, V, WF | | | | |
| 384 | 19 | 385 | 13 | R, 403, SCOPE | 385 | 14 | 385 | 17 | LPK | | | | |
| 385 | 18 | 386 | 7 | R, 403, SCOPE | | | | | | | | | |
| 386 | 8 | 388 | 5 | R, 403, F, CS, SCOPE | | | | | | | | | |
| 389 | 7 | 389 | 10 | R, 403, F, H, SCOPE | 389 | 11 | 389 | 16 | PREJ | | | | |
| | | | | | 390 | 11 | 390 | 20 | NR, N, PREJ, V, WF | | | | |
| 391 | 10 | 391 | 18 | R, 403, F, H, SCOPE | 391 | 3 | 391 | 9 | NR, N, PREJ, V, WF | | | | |
| 391 | 19 | 392 | 2 | R, 403, F, H, CS, SCOPE | | | | | | | | | |
| 392 | 9 | 392 | 19 | R, 403, F, CS, SCOPE | | | | | | | | | |
| 393 | 2 | 393 | 7 | R, 403, F, H, SCOPE | 393 | 8 | 393 | 15 | NR, N, LPK | | | | |
| 394 | 3 | 395 | 4 | R, 403, F, CS, H, SCOPE | 395 | 5 | 397 | 2 | N, NR, PREJ, V, WF | | | | |

**Exhibit 9.007**

| Thomas Milewski August 31, 2022 | | | | | | | | | | | | | |
| WOW's Designations | | | | EIS's Objections | EIS's Counter-Designations* | | | | WOW's Objections to Counter-Designations | WOW's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | 11 | 17 | 16 | - | | | | | | | | | |
| 18 | 15 | 19 | 1 | - | | | | | | | | | |
| 19 | 14 | 19 | 17 | - | | | | | | | | | |
| 20 | 14 | 20 | 17 | - | | | | | | | | | |
| 22 | 6 | 22 | 8 | R, 403 | | | | | | | | | |
| 22 | 14 | 22 | 15 | R, 403 | | | | | | | | | |
| 22 | 20 | 23 | 2 | R, 403 | | | | | | | | | |
| 24 | 12 | 24 | 18 | - | 24 | 19 | 25 | 10 | IR, PREJ | | | | |
| 25 | 11 | 25 | 13 | - | 25 | 14 | 25 | 15 | IR, PREJ | | | | |
| 26 | 15 | 27 | 6 | - | 27 | 7 | 27 | 15 | IR, PREJ | | | | |
| 27 | 16 | 28 | 17 | - | | | | | | | | | |
| 28 | 18 | 28 | 19 | R, SCOPE | | | | | | | | | |
| 29 | 1 | 29 | 1 | R, SCOPE | | | | | | | | | |
| 29 | 6 | 29 | 10 | R, SCOPE | | | | | | | | | |
| 29 | 12 | 29 | 13 | R, 403, SCOPE | | | | | | | | | |
| 29 | 15 | 29 | 17 | R, 403, SCOPE | 29 | 18 | 29 | 19 | IR, PREJ | | | | |
| 29 | 20 | 29 | 21 | R, 403, SCOPE | | | | | | | | | |
| 30 | 2 | 30 | 6 | R, 403, SCOPE, F | | | | | | | | | |
| 31 | 17 | 31 | 22 | - | 32 | 1 | 32 | 11 | PREJ | 31 | 12 | 31 | 15 |
| 33 | 9 | 34 | 1 | SCOPE | | | | | | | | | |
| 37 | 3 | 37 | 5 | R, 403, F | 37 | 6 | 37 | 10 | PREJ, WF | | | | |
| 37 | 11 | 37 | 21 | - | | | | | | | | | |
| 37 | 22 | 38 | 5 | - | 38 | 6 | 38 | 13 | IR, PREJ | | | | |
| 38 | 14 | 38 | 16 | - | | | | | | | | | |
| 39 | 18 | 39 | 21 | R, 403 | | | | | | | | | |
| 39 | 22 | 40 | 2 | R, 403 | | | | | | | | | |
| 41 | 2 | 42 | 5 | R, 403 | | | | | | | | | |
| 43 | 9 | 43 | 17 | R, 403, F | | | | | | | | | |
| 45 | 12 | 46 | 6 | R, 403, F | | | | | | | | | |
| 46 | 19 | 47 | 1 | R, 403 | | | | | | | | | |
| 47 | 11 | 47 | 16 | R, 403, F | | | | | | | | | |
| 49 | 14 | 50 | 8 | R, 403 | | | | | | | | | |
| 50 | 9 | 50 | 16 | R, 403 | 51 | 2 | 51 | 4 | IR, PREJ | | | | |
| 52 | 4 | 52 | 13 | R, 403 | 52 | 14 | 52 | 16 | IR, PREJ | | | | |
| | | | | | 52 | 19 | 52 | 19 | IR, PREJ | | | | |
| 53 | 1 | 53 | 16 | R, 403, F, COMP | | | | | | | | | |
| 53 | 18 | 53 | 21 | R, 403, F, COMP | | | | | | | | | |
| 61 | 10 | 61 | 13 | R, 403, F, COMP, 701, ARG | 59 | 9 | 59 | 11 | IR, PREJ | | | | |
| | | | | | 59 | 15 | 60 | 10 | IR, PREJ | | | | |
| 61 | 15 | 61 | 16 | R, 403, F, COMP, 701, ARG | | | | | | | | | |

**Exhibit 9.008**

| Thomas Milewski August 31, 2022 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WOW's Designations | | | | EIS's Objections | EIS's Counter-Designations* | | | | WOW's Objections to Counter-Designations | WOW's Completeness Designations | | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 61 | 22 | 62 | 6 | R, 403 | 62 | 7 | 62 | 15 | IR, PREJ | | | | | |
| 62 | 16 | 62 | 18 | R, 403 | 62 | 19 | 62 | 22 | PREJ | | | | | |
| | | | | | 63 | 2 | 63 | 6 | PREJ | | | | | |
| | | | | | 63 | 9 | 63 | 11 | PREJ | | | | | |
| 63 | 12 | 63 | 14 | R, 403, COMP, MT | | | | | | | | | | |
| 63 | 16 | 63 | 18 | R, 403, COMP, MT | | | | | | | | | | |
| 63 | 20 | 63 | 21 | - | | | | | | | | | | |
| 65 | 21 | 66 | 20 | R, 403, F, CS | 65 | 7 | 65 | 10 | | 64 | 13 | 65 | 6 | |
| | | | | | 69 | 21 | 70 | 10 | IR, NR, PREJ, V | | | | | |
| 71 | 16 | 71 | 18 | R, 403, V | 70 | 21 | 71 | 15 | IR, NR, PREJ, V | | | | | |
| 71 | 20 | 71 | 20 | R, 403, V | | | | | | | | | | |
| 72 | 1 | 72 | 2 | R, 403 | | | | | | | | | | |
| 72 | 3 | 72 | 11 | R, 403 | | | | | | | | | | |
| 85 | 21 | 86 | 4 | R, 403, SCOPE, COMP | | | | | | | | | | |
| 86 | 6 | 86 | 14 | R, 403, SCOPE | | | | | | | | | | |
| 86 | 15 | 86 | 20 | R, 403, SCOPE | | | | | | | | | | |
| 90 | 13 | 90 | 22 | R, 403, SCOPE | | | | | | | | | | |
| 91 | 12 | 91 | 14 | R, 403 | | | | | | | | | | |
| 92 | 17 | 92 | 18 | R, 403, SCOPE, V | | | | | | | | | | |
| 92 | 20 | 92 | 20 | R, 403, SCOPE, V, INQA | 92 | 22 | 93 | 10 | IR, NR, PREJ, V | 93 | 14 | 93 | 17 | |
| 94 | 3 | 94 | 11 | 403, MT, ARG | | | | | | | | | | |
| 105 | 6 | 105 | 21 | R, 403, SCOPE, CS | | | | | | | | | | |
| 106 | 1 | 106 | 4 | R, 403, SCOPE, CS | | | | | | | | | | |
| 106 | 6 | 106 | 8 | R, 403, SCOPE, CS | | | | | | | | | | |
| 106 | 10 | 106 | 15 | R, 403, SCOPE | 106 | 16 | 106 | 19 | | 94 | 12 | 95 | 1 | |
| 108 | 16 | 109 | 1 | R, 403 | | | | | | | | | | |
| 118 | 1 | 118 | 7 | R, 403 | 119 | 21 | 120 | 9 | IR, PREJ | 94 | 12 | 95 | 1 | |
| 120 | 18 | 121 | 6 | - | | | | | | | | | | |
| 122 | 10 | 122 | 13 | R, 403, SCOPE, F, 602 | | | | | | | | | | |
| 123 | 15 | 123 | 19 | R, 403 | 123 | 20 | 124 | 10 | PREJ | | | | | |
| 124 | 12 | 125 | 6 | R, 403 | | | | | | | | | | |
| 127 | 20 | 128 | 12 | R, 403 | 128 | 13 | 128 | 16 | PREJ | | | | | |
| | | | | | 130 | 4 | 130 | 7 | PREJ | | | | | |
| | | | | | 130 | 10 | 130 | 12 | PREJ | | | | | |
| | | | | | 130 | 16 | 131 | 3 | PREJ | | | | | |
| 131 | 4 | 131 | 11 | - | | | | | | | | | | |
| 149 | 20 | 150 | 4 | F, V | | | | | | | | | | |
| 150 | 6 | 150 | 7 | F, V | 150 | 9 | 151 | 13 | | | | | | |
| 152 | 5 | 152 | 10 | R, 403 | | | | | | | | | | |
| 152 | 13 | 152 | 17 | R, 403 | | | | | | | | | | |

**Exhibit 9.009**

| Thomas Milewski August 31, 2022 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WOW's Designations | | | | EIS's Objections | EIS's Counter-Designations* | | | | WOW's Objections to Counter-Designations | WOW's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 152 | 18 | 152 | 18 | 403, F, ARG | | | | | | | | | |
| 152 | 19 | 152 | 22 | 403, F, ARG | 153 | 1 | 153 | 18 | LPK, IOP, PREJ | | | | |
| 155 | 19 | 155 | 21 | - | 155 | 22 | 156 | 7 | PREJ | | | | |
| 156 | 9 | 156 | 16 | F, ARG, COMP, CLC | | | | | | | | | |
| 156 | 20 | 157 | 12 | - | | | | | | | | | |
| 157 | 14 | 157 | 18 | F, CLC, ARG, MT | | | | | | | | | |
| 157 | 22 | 158 | 1 | F, CLC, ARG, MT | | | | | | | | | |
| 158 | 3 | 158 | 5 | F, CLC | | | | | | | | | |
| 158 | 10 | 158 | 16 | F, CLC, MT | | | | | | | | | |
| 158 | 18 | 158 | 18 | F, CLC, MT | | | | | | | | | |
| 158 | 20 | 159 | 6 | F, CLC, MT | | | | | | | | | |
| 159 | 9 | 159 | 9 | - | | | | | | | | | |
| 159 | 11 | 160 | 1 | - | | | | | | | | | |
| 160 | 10 | 161 | 2 | F, V, CLC | | | | | | | | | |
| 161 | 5 | 161 | 6 | F, V, CLC | | | | | | | | | |
| 164 | 1 | 164 | 6 | CLC | | | | | | | | | |
| 164 | 21 | 165 | 1 | CLC | | | | | | | | | |
| 167 | 10 | 167 | 17 | F, ARG | | | | | | | | | |
| 168 | 2 | 168 | 7 | R, 403 | 168 | 8 | 168 | 13 | IR, LPK, PREJ, SCOPE | | | | |
| 168 | 21 | 169 | 2 | - | | | | | | | | | |
| 170 | 5 | 170 | 13 | R, 403 | | | | | | | | | |
| 170 | 17 | 170 | 20 | - | | | | | | | | | |
| 172 | 3 | 172 | 6 | - | | | | | | | | | |
| 172 | 8 | 172 | 13 | R, 403 | | | | | | | | | |
| 172 | 14 | 172 | 15 | V | | | | | | | | | |
| 172 | 17 | 173 | 1 | V | | | | | | | | | |
| 175 | 5 | 175 | 22 | - | | | | | | | | | |
| 176 | 4 | 176 | 10 | - | | | | | | | | | |
| 178 | 1 | 178 | 21 | - | 178 | 22 | 179 | 10 | IR, LPK, PREJ, SCOPE, V | | | | |
| 180 | 21 | 181 | 3 | - | | | | | | | | | |
| 182 | 2 | 182 | 7 | - | 182 | 8 | 182 | 13 | | 182 | 14 | 182 | 17 |
| 182 | 21 | 183 | 6 | CLC, 403 | | | | | | | | | |
| 183 | 9 | 183 | 9 | CLC, 403 | | | | | | | | | |
| 183 | 13 | 183 | 14 | V, R, 403 | | | | | | | | | |
| 183 | 16 | 184 | 4 | R, 403, INQA, V | 184 | 5 | 184 | 6 | PREJ, V | | | | |
| 184 | 10 | 184 | 20 | - | | | | | | | | | |
| 184 | 21 | 185 | 7 | - | | | | | | | | | |
| 190 | 15 | 190 | 17 | CLC, 403 | | | | | | | | | |
| 190 | 21 | 191 | 4 | R, 403 | 191 | 7 | 191 | 9 | IR, PREJ, V | | | | |
| 191 | 10 | 191 | 17 | R, 403 | | | | | | | | | |

**Exhibit 9.010**

| Thomas Milewski August 31, 2022 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WOW's Designations | | | | EIS's Objections | EIS's Counter-Designations* | | | | WOW's Objections to Counter-Designations | WOW's Completeness Designations | | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 197 | 18 | 198 | 1 | - | | | | | | | | | |
| 198 | 19 | 199 | 1 | - | | | | | | | | | |
| 199 | 21 | 200 | 4 | - | | | | | | | | | |
| 200 | 18 | 200 | 22 | - | | | | | | | | | |
| 201 | 7 | 201 | 10 | - | | | | | | | | | |
| 201 | 20 | 202 | 1 | - | 202 | 2 | 202 | 11 | IC, LPK, PREJ, V | 202 | 12 | 202 | 21 |
| 202 | 22 | 203 | 2 | V, R, 403 | | | | | | | | | |
| 203 | 11 | 204 | 8 | - | | | | | | | | | |
| 204 | 11 | 204 | 17 | - | | | | | | | | | |
| 204 | 18 | 205 | 13 | - | | | | | | | | | |
| 206 | 17 | 206 | 20 | - | | | | | | | | | |
| 207 | 10 | 207 | 14 | - | 207 | 15 | 207 | 20 | PREJ, V | | | | |
| 208 | 3 | 210 | 4 | ARG, NT, V, INQA | | | | | | | | | |
| 211 | 5 | 211 | 8 | - | | | | | | | | | |
| 212 | 6 | 212 | 9 | - | 212 | 13 | 212 | 21 | | | | | |
| 213 | 7 | 213 | 9 | - | | | | | | | | | |
| 213 | 13 | 213 | 17 | - | | | | | | | | | |
| 213 | 18 | 213 | 19 | CLC | | | | | | | | | |
| 214 | 1 | 214 | 5 | CLC | | | | | | | | | |
| 214 | 6 | 214 | 8 | F, MT, 403, R | | | | | | | | | |
| 214 | 12 | 214 | 15 | - | | | | | | | | | |
| 215 | 16 | 215 | 19 | - | | | | | | | | | |
| 217 | 11 | 217 | 15 | R, 403, CLC | | | | | | | | | |
| 217 | 19 | 217 | 21 | R, 403, CLC | | | | | | | | | |
| 218 | 1 | 218 | 3 | R, 403, CLC | | | | | | | | | |
| 218 | 8 | 218 | 14 | R, 403, CLC | | | | | | | | | |
| 218 | 16 | 218 | 17 | R, 403, CLC | | | | | | | | | |
| 218 | 21 | 219 | 4 | R, 403, CLC | | | | | | | | | |
| 219 | 6 | 219 | 7 | R, 403, CLC | | | | | | | | | |
| 219 | 11 | 219 | 16 | V, R, 403 | | | | | | | | | |
| 219 | 18 | 219 | 18 | F, R, 403 | | | | | | | | | |
| 220 | 14 | 220 | 16 | V, R, 403 | | | | | | | | | |
| 220 | 18 | 220 | 18 | V, R, 403 | 220 | 20 | 220 | 21 | LPK, PREJ, V | | | | |
| | | | | | 221 | 2 | 221 | 3 | LPK, PREJ, V | | | | |
| 221 | 14 | 221 | 17 | - | 221 | 18 | 222 | 9 | LPK, PREJ, V | | | | |
| 222 | 10 | 222 | 18 | - | | | | | | | | | |
| 222 | 22 | 223 | 6 | SCOPE | | | | | | | | | |
| 224 | 3 | 224 | 10 | - | | | | | | | | | |
| 224 | 15 | 224 | 19 | - | | | | | | | | | |
| 224 | 22 | 225 | 2 | - | | | | | | | | | |

**Exhibit 9.011**

| Thomas Milewski August 31, 2022 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WOW's Designations | | | | EIS's Objections | EIS's Counter-Designations* | | | | WOW's Objections to Counter-Designations | WOW's Completeness Designations | | |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line |
| 225 | 5 | 225 | 18 | - | | | | | | | | | |
| 226 | 11 | 226 | 14 | - | | | | | | | | | |
| 227 | 8 | 227 | 10 | - | 227 | 11 | 227 | 13 | | | | | |
| 227 | 14 | 227 | 16 | - | 227 | 17 | 227 | 19 | | | | | |
| 227 | 20 | 228 | 2 | - | | | | | | | | | |
| 228 | 6 | 228 | 9 | - | | | | | | | | | |
| 228 | 10 | 228 | 12 | - | | | | | | | | | |
| 228 | 16 | 228 | 18 | - | | | | | | | | | |
| 228 | 20 | 229 | 1 | - | | | | | | | | | |
| 229 | 2 | 229 | 4 | - | 229 | 5 | 229 | 12 | | | | | |
| 229 | 17 | 229 | 20 | - | | | | | | | | | |
| 230 | 17 | 230 | 21 | - | | | | | | | | | |
| 231 | 21 | 232 | 2 | - | | | | | | | | | |
| 232 | 15 | 232 | 18 | - | | | | | | | | | |
| 233 | 7 | 233 | 10 | - | | | | | | | | | |
| 233 | 11 | 233 | 20 | - | | | | | | | | | |
| 234 | 3 | 234 | 7 | - | | | | | | | | | |
| 234 | 22 | 235 | 6 | - | | | | | | | | | |
| 235 | 10 | 235 | 13 | - | | | | | | | | | |
| 244 | 3 | 244 | 5 | - | | | | | | | | | |
| 244 | 10 | 244 | 17 | R, 403 | | | | | | | | | |
| 245 | 6 | 245 | 10 | R, 403 | 246 | 11 | 246 | 21 | LPK, PREJ, V | | | | |
| 247 | 10 | 247 | 20 | R, 403 | 247 | 21 | 248 | 22 | IR, PREJ, V | 249 | 1 | 249 | 3 |
| 249 | 9 | 249 | 16 | R, 403 | | | | | | | | | |
| 251 | 3 | 251 | 10 | R, 403, CLC | 251 | 16 | 251 | 19 | AF, IR, PREJ, V | 254 | 3 | 254 | 7 |
| | | | | | 253 | 2 | 254 | 2 | IR, PREJ, V | | | | |
| | | | | | 277 | 15 | 277 | 21 | NR, IR, PREJ, V | | | | |
| 251 | 13 | 251 | 14 | R, 403, CLC | | | | | | | | | |
| 278 | 19 | 279 | 11 | R, 403, SCOPE, V, F | | | | | | | | | |
| 279 | 13 | 279 | 15 | R, 403, SCOPE, V, F | | | | | | | | | |
| 279 | 17 | 279 | 18 | R, 403, SCOPE, V, F | | | | | | | | | |
| 279 | 20 | 279 | 21 | R, 403, SCOPE, V, F | | | | | | | | | |
| 287 | 14 | 287 | 21 | R, 403, SCOPE | | | | | | | | | |
| 298 | 12 | 299 | 9 | R, 403 | 297 | 3 | 297 | 4 | IR, NR, LPK, PREJ, S | | | | |
| | | | | | 297 | 8 | 298 | 5 | IR, NR, LPK, PREJ, S | | | | |
| | | | | | 298 | 8 | 298 | 8 | IR, NR, LPK, PREJ, S | | | | |
| | | | | | 298 | 10 | 298 | 11 | AA, IR, NR, LPK, PREJ, S | | | | |
| | | | | | 299 | 10 | 299 | 13 | LF, AF, IOP, IR, PREJ, V | | | | |
| 299 | 14 | 300 | 2 | R, 403 | | | | | | | | | |

**Exhibit 9.012**

| *WOW TECH OBJECTION KEY* | |
|---|---|
| AA | Asked and Answered |
| AF | Assumes Facts |
| ARG | Argumentative |
| CD | Compound |
| DB | Subject to pending *Daubert* motion |
| DES | Improper Description |
| HS | Hearsay; Hearsay within Hearsay (FRE 805) |
| IC | Incomplete (FRE 106) |
| ICD | Improper Confidentiality Designation |
| ID | Improper Use of Deposition (FRE 801/802; FRCP 32) |
| IH | Incomplete Hypothetical |
| IL | Illegible |
| IOP | Improper Opinion Testimony (FRE 701/702) |
| IR | Irrelevant (FRE 401/402) |
| L | Legal Conclusion (FRE 701) |
| LA | Lack of Authentication (FRE 901) |
| LEAD | Leading |
| LF | Lack of Foundation |
| LPK | Lacks Personal Knowledge |
| LW | Witness will testify live |
| MIL | Subject to pending Motion *in Limine* |
| MIS | Misstates Testimony (FRE 403/611(a)) |
| N | Improper Narrative |
| NP | Not Produced in Discovery |
| NR | Non-responsive |
| NRJ | Not Relevant to Jury Issue |
| PREJ | Prejudicial/Misleading/Confusing (FRE 403) |
| PRIV | Calls for atttorney-client privileged/attorney-work product information |
| PRIVACY | Contains private personal information |
| S | Speculation (FRE 602/701/702) |
| SCOPE | Beyond the Scope (FRE 611) |
| SJ/MSJ | Subject to Pending Summary Judgment Motion |
| V | Vague (FRE 611(a)) |
| WF | Wasteful/Harassing (FRE 611) |

**Exhibit 9.013**

**EIS OBJECTION CODES**

While Plaintiff and Counterclaim Defendants have listed individual counter designations with individual initial designations in this exhibit, Plaintiff and Counterclaim Defendants incorporate by reference each counter designation against each initial designation. Plaintiff and Counterclaim Defendants expressly reserve the right to play any counter designation as a counter to any individual designation. *See, e.g.*, Fed. R. Civ. P. 32(a)(6).

| Code | Objection Description |
|---|---|
| AAA | Asked and answered |
| AF | Assumes facts not in evidence |
| ARG | Argumentative |
| CLC | Calls for a legal conclusion |
| COMP | Compound |
| COLLOQUY | Improper attorney colloquy |
| CS | Calls for speculation |
| F | Lacks foundation |
| H | Hearsay |
| IMP C | Improper counter |
| IMP T | Improper translation |
| INQA | Incomplete question or answer |
| L | Leading |
| LA | Legal argument |
| MD | Mischaracterizes document |
| MT | Misstates testimony |
| NP | Not produced during discovery or cited in any expert report or pleading |
| NT | Not Testimony |
| O | Original/duplicate not produced |
| PRIV | Privileged |
| R | Relevance |
| SCOPE | Beyond the scope of the 30(b)(6) notice |
| SRM | Subsequent remedial measures |
| T | Foreign-language document that lacks certified translation |
| UNE | Unavailability not established |
| V | Vague |
| NR | Non-responsive |
| 403 | Prejudice, confusion, misleading, cumulative, waste of time |
| 404 | Improper character, crime, wrong, or act evidence |
| 408 | Compromise offers and negotiations |
| 602 | Witness lacks personal knowledge |
| 701 | Improper opinion testimony by lay witness |
| 1006 | Summary, chart, or calculation for which originals were never made available |

**Exhibit 9.014**

# EXHIBITS 10-12 REDACTED IN THEIR ENTIRETY

Joint Proposed Pretrial Order

# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| EIS, INC.,<br><br>        Plaintiff,<br><br>        v.<br><br>INTIHEALTH GER GMBH, WOW TECH<br>USA, LTD., WOW TECH CANADA, LTD.<br>AND NOVOLUTO GMBH,<br><br>        Defendants. | Civil Action No. 19-1227-GBW |
| NOVOLUTO GMBH,<br><br>        Counterclaimant,<br><br>        v.<br><br>EIS, INC., EIS GMBH,<br>TRIPLE A IMPORT GMBH,<br>and TRIPLE A MARKETING GMBH<br><br>        Counterclaim Defendants. |  |

## PLAINTIFF EIS, INC.'S BRIEF STATEMENT OF INTENDED PROOFS

EIS, Inc. intends to prove the following at trial in support of EIS, Inc.'s claims:

1.      EIS, Inc. intends to prove that Defendants are liable for unfair competition under Section 43(a)(1)(B) of the Lanham Act—15 U.S.C. § 1125(a)(1)(B).

2.      EIS, Inc. intends to prove that Defendants are liable for violating §§ 2532(a)(8) and/or (a)(12) of the Delaware Uniform Deceptive Trade Practices Act (6 Del. C. § 2531 et seq.) ("DTPA").

3.      EIS, Inc. intends to prove that Defendants are liable for unfair competition under the Delaware common law.

1

**Exhibit 13.001**

4.      EIS, Inc. intends to prove that Defendants are liable for tortious interference with EIS, Inc.'s business relations under Delaware common law.

5.      EIS, Inc. intends to prove damages for Defendants acts of unfair competition under the Lanham Act and Delaware common law, their violations of the DTPA, and Defendants' tortious interference with EIS, Inc.'s business relations—including EIS, Inc.'s lost profits from the takedown of its products from Amazon during the 2021 holiday shopping season.

6.      EIS, Inc. intends to prove that it should be awarded treble damages under DTPA § 2533(c) for Defendants' deceptive trade practices.

7.      EIS, Inc. intends to prove that EIS, Inc. should be awarded injunctive relief against Defendants' ongoing acts of unfair competition under the Lanham Act and Delaware common law, their violations of the DTPA, and Defendants' tortious interference with EIS, Inc.'s business relations.

8.      EIS, Inc. intends to prove that this case is exceptional under DTPA § 2533(b) and that Defendants willfully engaged in a deceptive trade practice and, therefore, EIS, Inc. is entitled to costs and reasonable attorneys' fees.

9.      EIS, Inc. intends to prove that it is entitled to the costs of this action under the Lanham Act—15 U.S.C. § 1117(a).

10.     EIS, Inc. intends to prove that this case is exceptional under the Lanham Act—15 U.S.C. § 1117(a)—and that EIS, Inc. is entitled to reasonable attorneys' fees.

11.     EIS, Inc. intends to prove that the '851 patent is unenforceable under the doctrine of inequitable conduct.

12.     EIS, Inc. intends to prove that the '061 patent is unenforceable under the doctrine of inequitable conduct.

Exhibit 13.002

13.     EIS, Inc. intends to prove that the '097 patent is unenforceable under the doctrine of inequitable conduct.[1]

14.     EIS, Inc. intends to prove that Defendants are liable under Section 2 of the Sherman Act—15 U.S.C. § 2—for attempted monopolization in the United States market for sexual wellness devices incorporating pulsating air for clitoral stimulation based on Defendants' *Walker Process* fraud.

15.     EIS, Inc. intends to prove damages for Defendants' attempted monopolization—including the costs and treble the reasonable attorneys' fees for the bringing of the antitrust suit and the defense against Defendants' patent claims.

16.     EIS, Inc. intends to prove that it is entitled to injunctive relief against Defendants' attempted monopolization.

17.     EIS, Inc. intends to prove that it is entitled to punitive damages for Defendants' misconduct.

18.     EIS, Inc. intends to prove that it is entitled to prejudgment and postjudgment interest on its damages claims noted above.

19.     Counterclaim Plaintiff Novoluto GmbH ("Novoluto") bears the burden of proving infringement, and cannot shift that burden.  EIS, Inc. intends to rebut any Novoluto claim that EIS, Inc. has literally infringed claims 1, 2, and 4-6 of the '851 patent.

20.     Counterclaim Plaintiff Novoluto bears the burden of proving infringement, and cannot shift that burden.  EIS, Inc. intends to rebut any Novoluto claim that EIS, Inc. has literally infringed claims 1, 8, and 21 of the '061 patent.

---

[1] For avoidance of doubt, EIS, Inc. also intends to prove that the '220 and '418 patents are unenforceable under the doctrine of inequitable conduct.

3

Exhibit 13.003

21.     Counterclaim Plaintiff Novoluto bears the burden of proving infringement, and cannot shift that burden.  EIS, Inc. intends to rebut any Novoluto claim that EIS, Inc. has literally infringed claims 1, 10, and 12 of the '097 patent.

22.     Counterclaim Plaintiff Novoluto bears the burden of proving infringement, and cannot shift that burden.  EIS, Inc. intends to rebut any Novoluto claim that EIS, Inc. has literally infringed claims 1, 3, 4, and 16 of the '220 patent.

23.     Counterclaim Plaintiff Novoluto bears the burden of proving infringement, and cannot shift that burden.  EIS, Inc. intends to rebut any Novoluto claim that EIS, Inc. has literally infringed claims 1, 4, and 10 of the '418 patent.

24.     EIS, Inc. intends to prove that this case is exceptional under 35 U.S.C. § 285 and that EIS, Inc. is entitled to its reasonable attorneys fees.

4

**Exhibit 13.004**

Joint Proposed Pretrial Order

# EXHIBIT 14

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| EIS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No.: 19-cv-1227-GBW |
| INTIHEALTH GER GMBH, | § | |
| WOW TECH USA, LTD., WOW TECH | § | |
| CANADA, LTD. and NOVOLUTO GMBH, | § | |
| | § | |
| Defendants. | § | |
| | | |
| | | |
| NOVOLUTO GMBH, | § | |
| | § | |
| Counterclaimant, | § | |
| | § | |
| v. | § | |
| | § | |
| EIS, INC., EIS GMBH, | § | |
| TRIPLE A IMPORT GMBH, | § | |
| and TRIPLE A MARKETING GMBH, | § | |
| | § | |
| Counterclaim Defendants. | | |

**DEFENDANTS' AND COUNTERCLAIMANT'S
BRIEF STATEMENT OF INTENDED PROOFS OF DEFENSES**

Pursuant to Delaware Local Rule 16.3(c)(8), Defendants IntiHealth Ger GmbH, Novoluto GmbH, WOW Tech USA, Ltd., and WOW Tech Canada, Ltd., (collectively "WOW Tech") and Counterclaimant and Defendant Novoluto GmbH ("Novoluto") hereby submit the following brief statement of what it intends to prove the following at trial in support of its defenses against the claims brought by Plaintiff and Counterclaim Defendant EIS, Inc. and Counterclaim Defendants EIS GmbH, Triple A Import GmbH, Triple A Marketing GmbH (collectively, "EIS"). This statement is not intended to be exhaustive, and WOW Tech reserves the right to prove any matters identified in the pleadings, fact and expert discovery, and any of the accompanying statements of

1

Exhibit 14.001

facts and legal issues to be litigated at trial. With respect to proof to be presented by expert testimony, WOW Tech incorporates by reference the reports and depositions of WOW Tech's expert witnesses addressing the issues identified below.

To the extent WOW Tech asserts that EIS has failed to meet its burden of proof on any issue, such statement does not constitute an admission that WOW Tech has any obligation to prove or disprove any element or any part of any claim or defense on which EIS bears the burden of proof or production. WOW Tech does not assume the burden of proof or production as to any matter set forth below unless required to do so by law. WOW Tech reserves the right to modify or supplement its pretrial order materials, including this statement of intended proof, in response to any additional disclosures.

WOW Tech further reserves the right to amend and/or supplement this statement to the extent necessary to respond to issues raised by EIS, and to rebut any alleged proof(s) offered by EIS before and during trial, in response to rulings by the Court, or for any other reason:

## I.    UNFAIR COMPETITION

1.    EIS, Inc. bears the burden of proof related to EIS Inc.'s allegations of liability for unfair competition under Section 43(a)(1)(B) of the Lanham Act – 15 U.S.C. § 1125(a)(1)(B), and they cannot shift that burden. WOW Tech intends to show that EIS, Inc. has failed to meet its burden of proof on this issue.

2.    EIS, Inc. bears the burden of proof related to EIS Inc.'s allegations of liability for violating §§ 2532(a)(8) and/or (a)(12) of the Delaware Uniform Deceptive Trade Practices Act (6 Del. C. § 2531 et seq.) ("DTPA"), and they cannot shift that burden. WOW Tech intends to show that EIS, Inc. has failed to meet its burden of proof on this issue.

**Exhibit 14.002**

3.      EIS, Inc. bears the burden of proof relating to EIS Inc.'s allegations of liability for unfair competition under Delaware common law, and they cannot shift that burden. WOW Tech intends to show that EIS, Inc. has failed to meet its burden of proof on this issue.

4.      EIS, Inc. bears the burden of proof related to EIS, Inc.'s allegations of liability for tortious interference with EIS, Inc.'s business relations under Delaware common law, and cannot shift that burden. WOW Tech intends to show that EIS, Inc. has failed to meet its burden of proof on this issue.

5.      EIS, Inc. bears the burden of proving damages related to their following allegations: unfair competition under the Lanham Act and Delaware common law, violations of the Delaware DTPA, and tortious interference with EIS, Inc.'s business relations. EIS, Inc. cannot shift that burden. WOW Tech intends to show that EIS, Inc. has failed to meet its burden of proof on this issue.

6.      EIS, Inc. bears the burden of proof related to EIS, Inc.'s demand for treble damages under DTPA § 2533(c) for deceptive trade practices, and cannot shift that burden. WOW Tech intends to show that EIS, Inc. has failed to meet its burden of proof on this issue.

7.      EIS, Inc. bears the burden of proving that EIS, Inc. is entitled to or properly pled a demand for injunctive relief against WOW Tech for acts of unfair competition under the Lanham Act and Delaware common law, violations of the Delaware  DTPA, and tortious interference with EIS, Inc.'s business relations, and cannot shift that burden. WOW Tech intends to show that EIS, Inc. has failed to meet its burden of proof on this issue.

8.      EIS, Inc. bears the burden of proving that this case is exceptional under Delaware DTPA § 2533(b) and that WOW Tech willfully engaged in a deceptive trade practice such that EIS,

3

Exhibit 14.003

Inc. is entitled to costs and reasonable attorneys' fees, and cannot shift that burden. WOW Tech intends to show that EIS, Inc. has failed to meet its burden of proof on this issue.

9.      EIS, Inc. bears the burden of proving that it is entitled to the costs of this action under the Lanham Act – 15 U.S.C. § 1117(a), and cannot shift that burden. WOW Tech intends to show that EIS, Inc. has failed to meet its burden of proof on this issue.

10.      EIS, Inc. bears the burden of proving that this case is exceptional under the Lanham Act – 15 U.S.C. § 1117(a) – and that EIS, Inc. is entitled to reasonable attorneys' fees. EIS, Inc. cannot shift that burden. WOW Tech intends to show that EIS, Inc. has failed to meet its burden of proof on this issue.

## II.      INEQUITABLE CONDUCT

11.      EIS bears the burden of proof related to EIS's allegations that the '851 Patent is unenforceable under the doctrine of inequitable conduct, and they cannot shift that burden. WOW Tech intends to show that EIS has failed to meet its burden of proof on this issue.

12.      EIS bears the burden of proof related to EIS's allegations that the '061 Patent is unenforceable under the doctrine of inequitable conduct, and they cannot shift that burden. WOW Tech intends to show that EIS has failed to meet its burden of proof on this issue.

13.      EIS bears the burden of proof related to EIS's allegations that the '097 Patent is unenforceable under the doctrine of inequitable conduct, and they cannot shift that burden. WOW Tech intends to show that EIS has failed to meet its burden of proof on this issue.

14.      EIS bears the burden of proof related to EIS's allegations that the '220 Patent is unenforceable under the doctrine of inequitable conduct, and they cannot shift that burden. WOW Tech intends to show that EIS has failed to meet its burden of proof on this issue.

Exhibit 14.004

15.    EIS bears the burden of proof related to EIS's allegations that the '418 Patent is unenforceable under the doctrine of inequitable conduct, and they cannot shift that burden. WOW Tech intends to show that EIS has failed to meet its burden of proof on this issue.

16.    EIS bears the burden of proof related to EIS's allegations that the '097 Patent is unenforceable under the doctrine of infectious unenforceability, and they cannot shift that burden. WOW Tech intends to show that EIS has failed to meet its burden of proof on this issue.

17.    EIS bears the burden of proof related to EIS's allegations that the '220 Patent is unenforceable under the doctrine of infectious unenforceability, and they cannot shift that burden. WOW Tech intends to show that EIS has failed to meet its burden of proof on this issue.

18.    EIS bears the burden of proof related to EIS's allegations that the '418 Patent is unenforceable under the doctrine of infectious unenforceability, and they cannot shift that burden. WOW Tech intends to show that EIS has failed to meet its burden of proof on this issue.

## III.    WALKER PROCESS

19.    EIS, Inc. bears the burden of proof related to EIS, Inc.'s allegations of liability under Section 2 of the Sherman Act – 15 U.S.C. § 2 – for WOW Tech's alleged attempted monopolization in the United States sex toys market based on alleged *Walker Process* fraud, and EIS, Inc. cannot shift that burden. WOW Tech intends to show that EIS, Inc. has failed to meet its burden of proof on this issue.

20.    EIS, Inc. bears the burden of proving that it is entitled to injunctive relief related to the allegation of attempted monopolization by WOW Tech and they cannot shift that burden. WOW Tech intends to show that EIS, Inc. has failed to meet its burden of proof on this issue.

**Exhibit 14.005**

21.     EIS, Inc. bears the burden of proving that it is entitled to punitive damages related to WOW Tech's alleged misconduct, and they cannot shift that burden. WOW Tech intends to show that EIS, Inc. has failed to meet its burden of proof on this issue.

22.     EIS, Inc. bears the burden of proving that it is entitled to prejudgment and post judgment interest on its damages claims, and they cannot shift that burden. WOW Tech intends to show that EIS has failed to meet its burden of proof on this issue.

## IV.    EIS'S DEFENSES

23.     EIS bears the burden of proving, by clear and convincing evidence, invalidity of the Asserted Claims of the '851 Patent, and they cannot shift that burden. WOW Tech intends to rebut any claim by EIS that the '851 Patent is invalid.

24.     EIS bears the burden of proving, by clear and convincing evidence, invalidity of the Asserted Claims of the '061 Patent, and they cannot shift that burden. WOW Tech intends to rebut any claim by EIS that the '061 Patent is invalid.

25.     EIS bears the burden of proving, by clear and convincing evidence, invalidity of the Asserted Claims of the '097 Patent, and they cannot shift that burden. WOW Tech intends to rebut any claim by EIS that the '097 Patent is invalid.

26.     EIS bears the burden of proving, by clear and convincing evidence, invalidity of the Asserted Claims of the '220 Patent, and they cannot shift that burden. WOW Tech intends to rebut any claim by EIS that the '220 Patent is invalid.

27.     EIS bears the burden of proving, by clear and convincing evidence, invalidity of the Asserted Claims of the '418 Patent, and they cannot shift that burden. WOW Tech intends to rebut any claim by EIS that the '418 Patent is invalid.

Exhibit 14.006

28.     EIS bears the burden of proving that WOW Tech has failed to state a claim against EIS for which relief can be granted, and they cannot shift that burden. WOW Tech intends to rebut any claim by EIS that WOW Tech has failed to state a claim upon which relief can be granted.

29.     EIS bears the burden of proving EIS's allegations that the '851 Patent is unenforceable due to patent misuse, and they cannot shift that burden. WOW Tech intends to rebut any claim by EIS that the '851 Patent is unenforceable due to patent misuse.

30.     EIS bears the burden of proving EIS's allegations that the '061 Patent is unenforceable due to patent misuse, and they cannot shift that burden. WOW Tech intends to rebut any claim by EIS that the '061 Patent is unenforceable due to patent misuse.

31.     EIS bears the burden of proving EIS's allegations that the '097 Patent is unenforceable due to patent misuse, and they cannot shift that burden. WOW Tech intends to rebut any claim by EIS that the '097 Patent is unenforceable due to patent misuse.

32.     EIS bears the burden of proving EIS's allegations that the '220 Patent is unenforceable due to patent misuse, and they cannot shift that burden. WOW Tech intends to rebut any claim by EIS that the '220 Patent is unenforceable due to patent misuse.

33.     EIS bears the burden of proving EIS's allegations that the '418 Patent is unenforceable due to patent misuse, and they cannot shift that burden. WOW Tech intends to rebut any claim by EIS that the '418 Patent is unenforceable due to patent misuse.

34.     EIS bears the burden of proving EIS's allegations that WOW Tech is barred by the equitable doctrines of waiver, estoppel, acquiescence, and/or unclean hands, and cannot shift that burden. WOW Tech intends to rebut any claim by EIS that WOW Tech is barred by the equitable doctrines of waiver, estoppel, acquiescence, and/or unclean hands.

Exhibit 14.007

## V. WOW TECH'S DEFENSES

35.     WOW Tech will prove that EIS is estopped under 35 U.S.C. § 315(e)(2) from arguing in this litigation that any previously challenged patent claim is invalid on any ground that EIS raised or reasonably could have raised in any of the *inter partes* review proceedings for the following Case Nos.: IPR2019-01302, IPR2019-01444, and IPR2020-00007.

36.     EIS, Inc. bears the burden of proving that any and all acts committed by WOW Tech, if performed, were performed with knowledge and willful intent. WOW Tech intends to show that EIS has failed to meet its burden of proof on this issue.

37.     WOW Tech will prove that, if any wrongful conduct was performed by WOW Tech, it was induced and/or caused by EIS Inc.'s conduct.

38.     WOW Tech will prove that, if any wrongful conduct was performed by WOW Tech, EIS, Inc. failed to take reasonable actions to mitigate any loss, injury, or damage allegedly suffered, and any recovery must be barred or diminished by reason thereof.

39.     WOW Tech will prove that, if any wrongful conduct was performed by WOW Tech, EIS, Inc. failed to show that WOW Tech profited from any actionable alleged conduct by WOW Tech.

**Exhibit 14.008**

Joint Proposed Pretrial Order

# EXHIBIT 15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EIS, INC., § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No.: 19-cv-1227-GBW |
| § | |
| INTIHEALTH GER GMBH, § | |
| WOW TECH USA, LTD., WOW TECH § | |
| CANADA, LTD. and NOVOLUTO GMBH, § | |
| § | |
| Defendants. § | |

| | |
|---|---|
| NOVOLUTO GMBH, § | |
| § | |
| Counterclaimant, § | |
| § | |
| v. § | |
| § | |
| EIS, INC., EIS GMBH, § | |
| TRIPLE A IMPORT GMBH, § | |
| and TRIPLE A MARKETING GMBH, § | |
| § | |
| Counterclaim Defendants. | |

**DEFENDANTS' AND COUNTERCLAIMANT'S**
**BRIEF STATEMENT OF INTENDED PROOFS OF CLAIMS**

Defendants IntiHealth Ger GmbH, Novoluto GmbH, WOW Tech USA, Ltd., and WOW Tech Canada, Ltd., (collectively "WOW Tech") and Counterclaimant and Defendant Novoluto GmbH ("Novoluto") intend to prove the following at trial in support of its claims against Plaintiff and Counterclaim Defendant EIS, Inc. and Counterclaim Defendants EIS GmbH, Triple A Import GmbH, Triple A Marketing GmbH (collectively, "EIS"):

1.  Novoluto intends to prove that under 35 U.S.C. § 271(a), EIS has and continues to infringe claims 1, 2, 4-6 of U.S. Patent No. 9,763,851 ("the '851 Patent").

1

**Exhibit 15.001**

2. Novoluto intends to prove that under 35 U.S.C. § 271(a), EIS has and continues to infringe claims 1, 8, 21 of U.S. Patent No. 9,849,061 ("the '061 Patent").

3. Novoluto intends to prove that under 35 U.S.C. § 271(a), EIS has and continues to infringe claims 1, 10, 12 of U.S. Patent No. 9,937,097 ("the '097 Patent").

4. Novoluto intends to prove that under 35 U.S.C. § 271(a), EIS has and continues to infringe claims 1, 3, 4, 16 of U.S. Patent No. 11,090,220 ("the '220 Patent").

5. Novoluto intends to prove that under 35 U.S.C. § 271(a), EIS has and continues to infringe claims 1, 4, and 10 of U.S. Patent No. 11,103,418 ("the '418 Patent").

6. Novoluto intends to prove that under 35 U.S.C. § 271(b), EIS has and continues to induce infringement of claims 1, 2, 4-6 of the '851 Patent.

7. Novoluto intends to prove that under 35 U.S.C. § 271(b), EIS has and continues to induce infringement of claims 1, 8, 21 of the '061 Patent.

8. Novoluto intends to prove that under 35 U.S.C. § 271(b), EIS has and continues to induce infringement of claims 1, 10, 12 of the '097 Patent.

9. Novoluto intends to prove that under 35 U.S.C. § 271(b), EIS has and continues to induce infringement of claims 1, 3, 4, 16 of the '220 Patent.

10. Novoluto intends to prove that under 35 U.S.C. § 271(b), EIS has and continues to induce infringement of claims 1, 4, and 10 of the '418 Patent.

11. Novoluto intends to prove that under 35 U.S.C. § 271(c), EIS has and continues to contributorily infringe claim 21 of the '061 Patent.

12. Novoluto intends to prove that under 35 U.S.C. § 271(c), EIS has and continues to contributorily infringe claim 12 of the '097 Patent.

**Exhibit 15.002**

13.     Novoluto intends to prove that there is a nexus between the evidence of secondary considerations of non-obviousness and the claimed invention, and further, that the secondary considerations support a determination of non-obviousness of the claimed invention.

14.     Novoluto intends to prove that they have sufficiently marked their products in accordance with 35 U.S.C. § 287(a).

15.     Novoluto intends to prove that it is entitled to damages pursuant to 35 U.S.C. § 284 for EIS's infringement of one or more of the Asserted Claims of the '851 Patent.

16.     Novoluto intends to prove that it is entitled to damages pursuant to 35 U.S.C. § 284 for EIS's infringement of one or more of the Asserted Claims of the '061 Patent.

17.     Novoluto intends to prove that it is entitled to damages pursuant to 35 U.S.C. § 284 for EIS's infringement of one or more of the Asserted Claims of the '097 Patent.

18.     Novoluto intends to prove that it is entitled to damages pursuant to 35 U.S.C. § 284 for EIS's infringement of one or more of the Asserted Claims of the '220 Patent.

19.     Novoluto intends to prove that it is entitled to damages pursuant to 35 U.S.C. § 284 for EIS's infringement of one or more of the Asserted Claims of the '418 Patent.

20.     Novoluto will prove that, pursuant to 35 U.S.C. § 283, it is entitled to a permanent injunction enjoining each Counterclaim Defendant, its officers, agents, employees, and those persons acting in active concert or participation with all or any of them from manufacturing, using, offering to sell, or selling in the United States and/or importing products into the United States that infringe the claims of the '851 Patent.

21.     Novoluto will prove that, pursuant to 35 U.S.C. § 283, it is entitled to a permanent injunction enjoining each Counterclaim Defendant, its officers, agents, employees, and those persons acting in active concert or participation with all or any of them from manufacturing, using,

Exhibit 15.003

offering to sell, or selling in the United States and/or importing products into the United States that infringe the claims of the '061 Patent.

22.     Novoluto will prove that, pursuant to 35 U.S.C. § 283, it is entitled to a permanent injunction enjoining each Counterclaim Defendant, its officers, agents, employees, and those persons acting in active concert or participation with all or any of them from manufacturing, using, offering to sell, or selling in the United States and/or importing products into the United States that infringe the claims of the '097 Patent.

23.     Novoluto will prove that, pursuant to 35 U.S.C. § 283, it is entitled to a permanent injunction enjoining each Counterclaim Defendant, its officers, agents, employees, and those persons acting in active concert or participation with all or any of them from manufacturing, using, offering to sell, or selling in the United States and/or importing products into the United States that infringe the claims of the '220 Patent.

24.     Novoluto will prove that, pursuant to 35 U.S.C. § 283, it is entitled to a permanent injunction enjoining each Counterclaim Defendant, its officers, agents, employees, and those persons acting in active concert or participation with all or any of them from manufacturing, using, offering to sell, or selling in the United States and/or importing products into the United States that infringe the claims of the '418 Patent.

25.     Novoluto intends to prove that EIS has and continues to willfully infringe the Asserted Claims of the '851 Patent and thus, Novoluto is to be awarded damages in accordance with 35 U.S.C. § 284.

26.     Novoluto intends to prove that EIS has and continues to willfully infringe the Asserted Claims of the '061 Patent and thus, Novoluto is to be awarded damages in accordance with 35 U.S.C. § 284.

Exhibit 15.004

27.     Novoluto intends to prove that EIS has and continues to willfully infringe the Asserted Claims of the '097 Patent and thus, Novoluto is to be awarded damages in accordance with 35 U.S.C. § 284.

28.     Novoluto intends to prove that EIS has and continues to willfully infringe the Asserted Claims of the '220 Patent and thus, Novoluto is to be awarded damages in accordance with 35 U.S.C. § 284.

29.     Novoluto intends to prove that EIS has and continues to willfully infringe the Asserted Claims of the '418 Patent and thus, Novoluto is to be awarded damages in accordance with 35 U.S.C. § 284.

30.     Novoluto intends to prove that it is entitled to enhanced damages pursuant to 35 U.S.C. § 284, including prejudgment and post-judgment interest, as a result of EIS's infringement of one or more of the Asserted Claims of the '851 Patent.

31.     Novoluto intends to prove that it is entitled to enhanced damages pursuant to 35 U.S.C. § 284, including prejudgment and post-judgment interest, as a result of EIS's infringement of one or more of the Asserted Claims of the '061 Patent.

32.     Novoluto intends to prove that it is entitled to enhanced damages pursuant to 35 U.S.C. § 284, including prejudgment and post-judgment interest, as a result of EIS's infringement of one or more of the Asserted Claims of the '097 Patent.

33.     Novoluto intends to prove that it is entitled to enhanced damages pursuant to 35 U.S.C. § 284, including prejudgment and post-judgment interest, as a result of EIS's infringement of one or more of the Asserted Claims of the '220 Patent.

Exhibit 15.005

34.     Novoluto intends to prove that it is entitled to enhanced damages pursuant to 35 U.S.C. § 284, including prejudgment and post-judgment interest, as a result of EIS's infringement of one or more of the Asserted Claims of the '418 Patent.

35.     Novoluto intends to prove by a preponderance of the evidence that they are entitled to attorneys' fees under 35 U.S.C. § 285.

**Exhibit 15.006**

Joint Proposed Pretrial Order

# EXHIBIT 16

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EIS, INC., <br><br> Plaintiff, <br><br> v. <br><br> INTIHEALTH GER GMBH, WOW TECH USA, LTD., WOW TECH CANADA, LTD. AND NOVOLUTO GMBH, <br><br> Defendants. | Civil Action No. 19-1227-GBW |
| NOVOLUTO GMBH, <br><br> Counterclaimant, <br><br> v. <br><br> EIS, INC., EIS GMBH, TRIPLE A IMPORT GMBH, and TRIPLE A MARKETING GMBH <br><br> Counterclaim Defendants. | |

**COUNTERCLAIM DEFENDANTS EIS, INC., EIS GMBH, TRIPLE A IMPORT GMBH, AND TRIPLE A MARKETING GMBH'S BRIEF STATEMENT OF INTENDED PROOFS AS DEFENSES**

EIS, Inc., EIS GmbH, Triple A Import GmbH, and Triple A Marketing GmbH (collectively, "Counterclaim Defendants" or "EIS") intend to prove the following at trial in defense of Novoluto GmbH's ("Novoluto") claims:

1.      Counterclaim Defendants intend to prove that claims 1, 2, 4-6 of U.S. Patent No. 9,763,851 ("the '851 patent"); claims 1, 10, 21 of U.S. Patent No. 9,849,061 ("the '061 patent"); claims 1, 10, 12 of U.S. Patent No. 9,937,097 ("the '097 patent"); claims 1, 3, 4, 16 of U.S. Patent No. 11,090,220 ("the '220 patent"); and claims 1, 4, and 10 of U.S. Patent No. 11,103,418 ("the

1

**Exhibit 16.001**

'418 patent") (collectively, "the Asserted Claims") are invalid under 35 U.S.C. §§ 102, 103, and/or 112.

2.      Counterclaim Defendants intend to prove that the '851, '061, '097, '220, and '418 patents are unenforceable for inequitable conduct, including, with respect to the '097, '220, and '418 patents, under the doctrine of "infectious unenforceability" wherein inequitable conduct with respect to one patent renders related patents unenforceable.

3.      Novoluto bears the burden of proving infringement, and cannot shift that burden. Counterclaim Defendants intend to rebut Novoluto's claims that Counterclaim Defendants have directly infringed the Asserted Claims.

4.      Novoluto bears the burden of proving infringement, and cannot shift that burden. Counterclaim Defendants intend to rebut Novoluto's claims that Counterclaim Defendants have induced infringement of claim 21 of the '061 patent and claim 12 of the '097 patent.[1]

5.      Counterclaim Defendants further intend to rebut Novoluto's claims that Counterclaim Defendants willfully infringed the Asserted Claims.

6.      Counterclaim Defendants intend to prove that the '851, '061, '097, '220, and '418 patents are unenforceable for patent misuse.

7.      Counterclaim Defendants intend to prove that Novoluto comes to this Court with unclean hands, rendering the '851, '061, '097, '220, and '418 patents unenforceable.

8.      Counterclaim Defendants intend to prove that Novoluto is equitably estopped from asserting the '851, '061, '097, '220, and '418 patents against the Counterclaim Defendants.

---

[1] Counterclaim Defendants dispute that Novoluto has preserved any indirect infringement argument other than the issue noted in this paragraph.  To the extent Novoluto is permitted to present any additional indirect infringement allegation, Counterclaim Defendants dispute those allegations and intend to rebut them.

Exhibit 16.002

9.     Counterclaim Defendants intend to prove that Novoluto acquiesced to any alleged use by Counterclaim Defendants of the '851, '061, '097, '220, and '418 patents.

10.     Counterclaim Defendants intend to prove that Novoluto waived any right it had to enforce the '851, '061, '097, '220, and '418 patents against the Counterclaim Defendants.

11.     Novoluto bears the burden of proving damages for alleged infringement. Counterclaim Defendants intend to rebut Novoluto's claims that it is entitled to infringement damages, and the amount of damages claimed by Novoluto.

12.     Counterclaim Defendants intend to prove that Novoluto's claims for damages for alleged infringement of the Asserted Claims are limited for failure to comply with 35 U.S.C. § 287.

13.     Counterclaim Defendants intend to prove that they should be awarded their costs and reasonable attorneys' fees under at least 35 U.S.C. § 285.  Counterclaim Defendants also intend to rebut Novoluto's claims that it is entitled to costs and reasonable attorneys' fees under at least 35 U.S.C. § 285.

14.     Novoluto bears the burden of proving entitlement to injunctive relief, and cannot shift that burden.  Counterclaim Defendants intend to rebut Novoluto's claim that Novoluto is entitled to injunctive relief.

**Exhibit 16.003**

Joint Proposed Pretrial Order

# EXHIBIT 17-1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EIS, INC., | |
|        Plaintiff, | |
|        v. | |
| INTIHEALTH GER GMBH, WOW TECH USA, LTD., WOW TECH CANADA, LTD. AND NOVOLUTO GMBH, | Civil Action No. 19-1227-GBW |
|        Defendants. | |

| | |
|---|---|
| NOVOLUTO GMBH, | |
|        Counterclaimant, | |
|        v. | |
| EIS, INC., EIS GMBH, TRIPLE A IMPORT GMBH, and TRIPLE A MARKETING GMBH | |
|        Counterclaim Defendants. | |

**PLAINTIFF EIS, INC.'S AND COUNTERCLAIM DEFENDANTS EIS, INC., EIS
GMBH, TRIPLE A IMPORT GMBH, AND TRIPLE A MARKETING GMBH'S
MOTION IN LIMINE NO. 1 TO PRECLUDE ARGUMENT
OR EVIDENCE OF THE "INVENTION STORY"**

**Exhibit 17-1.001**

## I.      INTRODUCTION

EIS moves to preclude WOW Tech, its lawyers, and witnesses from arguing, opining, or presenting evidence regarding the "story" of the purported invention of WOW Tech's Womanizer devices, or related topics including the conception and reduction to practice of the patents-in-suit, because that story is based entirely on inadmissible hearsay, and otherwise not relevant to the claims or defenses of any party.

## II.     ARGUMENT

### A.      The Invention Story Is Based Entirely On Inadmissible Hearsay

Mr. Lenke is the sole inventor on each of the patents-in-suit.  WOW Tech has no admissible evidence related to the story of how Mr. Lenke allegedly developed the technology of the patents-in-suit or WOW Tech's "Womanizer" brand devices.  It did not present Mr. Lenke or any other knowledgeable witness for deposition during discovery in this case, has no knowledgeable witness to present at trial, and its only documentary evidence is hearsay that should be excluded.

Mr. Lenke is no longer affiliated with WOW Tech and will not be one of its trial witnesses. *See* Ex. 7 to Joint Pretrial Order.  WOW Tech did not attempt to depose Mr. Lenke or otherwise secure his testimony, despite having contact with him during the pendency of this case (including about this case).  *See* Ex. A (Plettenberg Tr.) at 83:5-84:7.  Aside from Mr. Lenke (and perhaps his wife), there is nobody, let alone any trial witness, with personal knowledge of the invention story.  *See, e.g.*, *id.* at 71:16-73:17, 74:14-18, 78:5-9, 79:20-84:7, 256:5-357:6.

The rules against hearsay and requiring personal knowledge bar the admission of Mr. Lenke's invention story from other sources of evidence.  *See U.S. v. St. Vallier*, 404 F. App'x 651, 662 (3d Cir. 2010) ("The Federal Rules of Evidence forbid a witness from testifying as to a matter 'unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.'") (citations omitted).

**Exhibit 17-1.002**

Any attempt to tell the invention story (e.g., that Mr. Lenke performed certain acts) is hearsay because WOW Tech's only use would be for the truth of the matter asserted.  *See* Ex. B (*AstraZeneca AB v. Zydus Pharms (USA) Inc.*, C.A. No. 18-664-RGA, D.I. 137 at 3 n.4 (D. Del. May 6, 2021) ("I feel fairly confident that in more than fifty patent trials, I have not heard an 'invention story' told by someone who was not an inventor. Perhaps the hearsay rules have something to do with that.")); *see also* Fed. R. Evid. 802.  There is no applicable hearsay exception. For example, there are no business records of the invention story because Mr. Lenke did not provide WOW Tech with any such records.  *See* Ex. A at 73:8-17, 74:14-18, 78:5-9, 79:20-84:7.

WOW Tech's proposed trial exhibit list also confirms its plan to rely solely on hearsay to piece together an invention story, including through reliance on purported interviews with Mr. Lenke that were sourced from various websites.  *See, e.g.*, Exs. C, D (example proposed exhibits). These are classic examples of hearsay-within-hearsay, as they represent statements from authors who lack personal knowledge of Mr. Lenke's invention story.  *See* Fed. R. Evid. 805.  Like its failure to obtain discovery from Mr. Lenke, WOW Tech did not seek discovery from any of the authors, and none are appearing at trial.  It is doubtful that WOW Tech can even lay a foundation for these documents, but even if it could, they are still inadmissible hearsay.  *See* Ex. E (*Wi-LAN Inc., v. Sharp Elecs. Corp.*, C.A. No. 15-379-LPS, D.I. 487 at 9 (D. Del. Feb. 19, 2019) ("Evidence that is properly authenticated may nonetheless be inadmissible hearsay.") (citations omitted)).

The preclusion of WOW Tech from telling an invention story should also extend to its experts, two of whom recount the story in their expert reports.  Each expert lacks personal knowledge of the facts and has not obtained information about those supposed facts from any non-hearsay source.  Although Fed. R. Evid. 703 permits experts to rely on facts or data of which they have been made aware, it is not a backdoor for hearsay:

**Exhibit 17-1.003**

> Rule 703 allows an expert to rely on his or her own experiences, statements made by others, and data presented by others even when that evidence on which the expert has relied would itself be admissible only if it was authenticated. *See* Fed. R. Evid. 703, advisory committee's note on proposed rules. The Rule was not intended to create a "backdoor" to allow the admission into evidence of otherwise inadmissible . . . materials simply because they might assist the jury's evaluation of an expert's opinions.

*Wi-LAN Inc.* at 10; *see also Wi-LAN Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1375 (Fed. Cir. 2021) ("Wi-LAN attempts to do exactly what is impermissible under Rule 703 by using its expert as a substitute for a fact witness to circumvent the rules of evidence to admit otherwise inadmissible evidence."); *L-3 Commc'ns Corp. v. Sony Corp.*, C.A. No. 10-734-RGA, D.I. 231 at 2 n.1 (D. Del. Oct. 25, 2013) (excluding expert testimony that would present hearsay).

### B.    The Invention Story Lacks Relevance to WOW Tech

It is difficult to imagine how WOW Tech could present the invention story to the jury for anything but its truth.  But to the extent WOW Tech contends it has a non-hearsay use, there is limited probative value to any such use.  That probative value would be greatly outweighed by the prejudice of exposing the jury to an invention story lacking any guarantees of truthfulness, and for which EIS is unable to cross-examine the inventor or anyone with personal knowledge.  As such, WOW Tech's use of the invention story at trial should also be excluded under Rules 402 and 403.

### III.   CONCLUSION

Over the course of this four-year litigation, WOW Tech failed to make any efforts to obtain admissible evidence about the invention story for its own asserted patents.  Now, WOW Tech's evidence list contains only hearsay and it has no knowledgeable witness to appear at trial to discuss the conception or development of its technology.  Therefore, for the reasons discussed above, EIS respectfully requests that the Court preclude WOW Tech's from presenting the story of Mr. Lenke's purported invention of the Womanizer device or the patents-in-suit.

**Exhibit 17-1.004**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

_____

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Plaintiff and Counterclaim Defendants*

OF COUNSEL:

Naveen Modi
Allan M. Soobert
Stephen Kinnaird
Phillip W. Citroen
Chetan Bansal
David Valente
James Razick
Kevin Stewart
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700

Chad J. Peterman
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Andrea Pallios Roberts
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, CA 94304-1106
(650) 320-1800

August 17, 2023

4

Exhibit 17-1.005

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2023, I caused the foregoing to be foregoing document

to be served on August 17, 2023, upon the following in the manner indicated:

Paul D. Brown, Esquire                                          *VIA ELECTRONIC MAIL*
Joseph B. Cicero, Esquire
Gregory E. Stuhlman, Esquire
CHIPMAN BROWN CICERO & COLE, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801
*Attorneys for Defendants IntiHealth Ger GmbH,*
*WOW Tech USA, Ltd., WOW Tech Canada, Ltd.*
*and Novoluto GmbH*

Tammy J. Terry, Esquire                                         *VIA ELECTRONIC MAIL*
Califf T. Cooper, Esquire
OSHA BERGMAN WATANABE & BURTON LLP
1100 Louisiana Street, Suite 4900
Houston, TX 77002
*Attorneys for Defendants IntiHealth Ger GmbH,*
*WOW Tech USA, Ltd., WOW Tech Canada, Ltd.*
*and Novoluto GmbH*

/s/ Brian P. Egan

_____
Brian P. Egan (#6227)

**Exhibit 17-1.006**

# Exhibit A

**Exhibit 17-1.007**

**HIGHLY CONFIDENTIAL, ATTORNEY'S EYES ONLY**



Transcript of **Johannes Plettenberg**

Friday, August 26, 2022

*EIS, Inc. v. Intihealth Ger GmbH*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 120379

**Exhibit 17-1.008**

```
 1            IN  THE  UNITED  STATES  DISTRICT  COURT

 2              FOR  THE  DISTRICT  OF  DELAWARE

 3

 4       - - - - - - - - - - - - - - - X

 5    EIS, INC.,                        :

 6              Plaintiff,              :

 7              v.                      :

 8    INTIHEALTH GER GMBH, WOW TECH     :

 9    USA, LTD., WOW TECH CANADA,       :

10    LTD. AND NOVOLUTO GMBH,         X

11              Defendants.          Civil Action No.

12    - - - - - - - - - - - - - - -   19-cv-1227-VAC-

13    NOVOLUTO GMBH,                  MPT

14              Counterclaimant,

15              V.

16    EIS, INC., EIS GMBH, TRIPLE A

17    IMPORT GMBH, and TRIPLE A

18    MARKETING GMBH,

19              Counterclaim

20              Defendants.

21                      Friday, August 26, 2022

22        HIGHLY CONFIDENTIAL, ATTORNEY'S EYES ONLY
```

TP One
Scheduling@TP.One
www.TP.One
800.FOR.DEPO
(800.367.3376)
Exhibit 17-1.009



**Page 70**

1  page.

2      A.    Mm-hmm.

3      Q.    And it says September 23, 2013.  Do you

4  see that?

5      A.    Yes.

6      Q.    And that's consistent with your

7  understanding that the first patent Mr. Lenke filed

8  was on September 23, 2013?

9      A.    That's correct.

10     Q.    Are you familiar with the device that's

11  described in this patent?

12     A.    Can you define familiar with, being

13  familiar with the device?

14     Q.    Well, do you know what device is described

15  in here?

16     A.    Yes.

17     Q.    What is it, just generally?

18     A.    It's a device that leads to a female

19  getting an orgasm through modulation of positive and

20  negative pressures.

21     Q.    And what does positive and negative

22  pressures mean, if you know?

**Page 71**

1          MS. TERRY:  I'm going to object.

2          THE WITNESS:  I don't.  I'm not

3  designated.  You need to speak to the designee,

4  please.

5  BY MR. SOOBERT:

6      Q.    Well, just you personally, not the

7  company, do you understand what positive and negative

8  pressure means in the context of this patent?

9      A.    No.

10



**Page 74**

14  Q.   So as part of the deal that you struck to
15  purchase his companies, did you obtain any documents
16  regarding the development of this product that's
17  described in the patent?
18  A.   No.
19       (Plettenberg Exhibit No. 9 was
20       identified for the record.)
21  BY MR. SOOBERT:
22  Q.   We'll mark as Exhibit 9, the '061 patent.

**Page 75**

1  A.   Mm-hmm.
2  Q.   And this is another one of the patents at
3  issue in this case, correct?
4  A.   Correct.
5  Q.   And this one is also invented by
6  Mr. Lenke, correct?
7  A.   Correct.
8  Q.   And it's also assigned and owned by
9  Novoluto GmbH, correct?
10  A.   Correct.
11  Q.   And under the foreign application priority
12  data, this one is listed as March 13, 2015.  Do you
13  see that?
14  A.   Yes.
15  Q.   And is that consistent with your
16  understanding as to when the invention in this patent
17  was applied for?
18  A.   Yes.
19  Q.   Do you have any understanding as to what
20  the difference is, generally, between this patent,
21  the '061 patent, and the '051 patent we just looked
22  at?

**Page 76**

1  A.   This patent includes an appendage to be
2  inserted for vaginal stimulation.
3  Q.   And is appendage also known as a dildo as
4  well?
5  A.   Yeah, it can be.
6  Q.   But a dildo is -- strike that.
7  A.   A dildo works without a motor.  So when
8  the motor is in, it's not a dildo anymore.
9  Q.   But like a dildo, this appendage is
10  designed to be inserted into a vagina?
11  A.   That's correct.
12  Q.   And then that '851 patent was filed
13  September 23, 2013, as we talked about?
14  A.   Mm-hmm.
15  Q.   Correct?  And then this one is filed March
16  13, 2015, correct?
17  A.   Yes.
18  Q.   And so that's about 18 months apart,
19  roughly, you agree?
20  A.   Yes.

**Page 77**

 TP One

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

Exhibit 17-1.011

Johannes Plettenberg

8/26/2022
Page 21 (78 - 81)



Page 78

1 ███████████████████████████████

2 ███████████████████████████████

3 ██ ████████████████████████████

4 BY MR. SOOBERT:

5    Q.  And Mr. Lenke, as part of consummating the

6 deal with you, didn't provide you any documents

7 regarding the development of adding an appendage or

8 dildo to the device?

9    A.  No.

10        (Plettenberg Exhibit No. 10 was

11        identified for the record.)

12 BY MR. SOOBERT:

13    Q.  I'm going to mark as the next Exhibit 10,

14 defendants' first supplemental objections and answers

15 to plaintiff and counterclaim-defendants' first set

16 of interrogatories, number 1 through 5.

17       Mr. Plettenberg, if you would turn to the

18 page after 21, it's not numbered, but it's titled

19 verification.

20    A.  Yeah.

21    Q.  That's your signature there, correct?

22    A.  Yes.

Page 79

1    Q.  You verified the factual content of these

2 interrogatory responses, correct?

3    A.  That's correct.

4    Q.  And you did that under penalty of perjury,

5 correct?

6    A.  That's correct.

7    Q.  And you attested that the information in

8 this document is true and correct, to the best of

9 your information, knowledge, and belief, correct?

10    A.  Correct.

11    Q.  And you did that on July 11, 2022?

12    A.  (Witness gesturing.)

13    Q.  Or thereabouts?

14    A.  Yeah.

15    Q.  Do you recall verifying the content in

16 this document?

17    A.  Not without rereading it.  There are too

18 many documents that I have to go through.

19    Q.  I certainly agree with you on that.

20       All right.  If you would turn to page 9 of

21 the document.  And this page has interrogatory number

22 1, some text, and then a response that spills over to

Page 80

1 the next page, followed by a supplemental response.

2 Do you see that?

3    A.  Yes.

4    Q.  Do you recall this interrogatory?

5    A.  No.

6    Q.  This one relates to conception and

7 reduction to practice of each asserted claim of the

8 patents-in-suit.  Do you see that?

9    A.  Mm-hmm.

10    Q.  Do you understand what those concepts

11 mean?

12    A.  No.

13    Q.  So you don't understand what conception

14 means?

15    A.  No.

16    Q.  Do you understand what reduction to

17 practice means?

18    A.  No.

19    Q.  So I'll go ahead and represent to you, and

20 you can assume this to be correct, that reduction to

21 practice can be accomplished by either creating a

22 physical sample of the invention, or by writing a

Page 81

1 patent application describing the invention.

2    A.  Mm-hmm.

3    Q.  Okay.  In the last two lines of

4 interrogatory 1, so that's the first paragraph, it's

5 asking you, the defendants in this case, to identify

6 the documents or other evidence relating to any of

7 the issues in this interrogatory.  Do you see that?

8    A.  Yes.

9    Q.  And if you look through the response and

10 the supplemental response, there's not a single

11 document cited.

12    A.  Yes.

13    Q.  Are there no documents, then, as you

14 understand it, that support your response to this

15 interrogatory?

16    A.  I would have to read the entire response,

17 and I'm not even sure if I understand every single

18 sentence, because it has a lot of legal language.  So

19 maybe if you can phrase the question more precise of

20 what you're trying to find, and I can give you a

21 better answer.

22    Q.  Well, at the time you verified this


Exhibit 17-1.012

HIGHLY CONFIDENTIAL, ATTORNEY'S EYES ONLY

Johannes Plettenberg

8/26/2022

Page 22 (82 - 85)

Page 82

1  interrogatory response, you did take steps to make
2  sure that it was factually correct?
3      A.   Absolutely.
4      Q.   And the interrogatory called for an
5  identification of documents?
6      A.   Mm-hmm.
7      Q.   And you, in verifying this, didn't
8  identify any documents, correct?
9      A.   Correct.
10     Q.   And had there been any documents that you
11  were aware of at that time, you certainly would have
12  identified them, fair?
13     A.   Yeah.
14     Q.   Okay.  So all I'm asking you is that you
15  didn't deliberately leave out any documents from this
16  response?
17     A.   No.
18     Q.   Right?
19     A.   The opposite.  I searched for them, but I
20  couldn't find any.
21     Q.   What did you do to search for documents?
22     A.   I called the manufacturer, and I called

Page 83

1  Michael Lenke.  But not now, earlier already, because
2  when discovery started, we were supposed to find
3  that.  And I spoke to Lenke and the manufacturer, and
4  they had nothing.  Yeah, and that was it.
5      Q.   I understand.  When did you call
6  Mr. Lenke?
7      A.   I don't know.  Very early on.  I mean,
8  when did you send your first discovery list?
9  Probably that time.  Was it '19 or '20?  It must have
10  been that time, I guess.
11     Q.   So sometime after you received these
12  interrogatories, you called Mr. Lenke and said, hey,
13  I need some information?
14     A.   Counsel asked me for -- I need help with
15  translation of these interrogatories.  And counsel
16  advised me to go search.  And then I called him.
17     Q.   Okay.  And you talked to Mr. Lenke then,
18  correct?
19     A.   Mm-hmm.
20     Q.   And do you recall what he told you about
21  the information or documents related to this
22  interrogatory?

Page 84

1      A.   He doesn't have any.  He never had a
2  notebook, and he doesn't have any documents.  If he
3  ever had sketches, he doesn't have them anymore.  And
4  I asked him, can you go again and search, please, and
5  look into your emails, and look into your cupboards.
6  And he did, and he came back and said, I couldn't
7  find anything.
8      Q.   And those last two lines of the
9  interrogatory also ask you to identify, in addition
10  to documents, all persons with knowledge of the
11  relevant facts?
12     A.   Mm-hmm.
13     Q.   Do you see that?
14     A.   Mm-hmm.
15     Q.   And the only person -- strike that.
16         The only persons referenced in this
17  response, as I can see, are Michael Lenke and his
18  wife, Brigitte; is that correct?
19     A.   Mm-hmm.
20     Q.   Is that your understanding, that those are
21  the only two persons that would have knowledge of the
22  issues in this interrogatory response?

Page 85

1      A.   On the attempt to find any sketches of
2  drawings, that's why I called the manufacturer as
3  well.  This would have been another idea, but he also
4  didn't have anything.





Page 354

1  A.  No.

2  Q.  So you have no visibility into that,

3  correct?

4  A.  That's correct.

5  Q.  All right.  You were asked a couple

6  questions moments ago about notice.  Do you recall

7  that?

8  A.  What is notice?

9  Q.  Notice, your counsel asked with respect to

10  Exhibits 20 and 21.

11  A.  That was the email and the term sheet,

12  right?

13  Q.  Yes.

14  A.  Yes.

15  Q.  But the fact is you never not once

16  communicated to Andre Geske or anyone else at EIS,

17  the specific patent numbers that are at issue in this

18  litigation?

19  MS. TERRY:  Object to form.

20  THE WITNESS:  I don't think I have.

21  BY MR. SOOBERT:

22  Q.  You also testified moments ago about

Page 355

1  Mr. Lenke, and a story about someone stealing his

2  idea when he was young.

3  A.  Mm-hmm.

4  Q.  Where did you learn that information?

5  A.  From him.

6  Q.  He told you that in a conversation?

7  A.  Yes.

8  Q.  Have you reviewed any documents that

9  memorialize that contemporaneously?

10  A.  No.

11  Q.  With the events?  So your sole basis

12  regarding that story from Mr. Lenke and the prototype

13  testing and Mr. Lenke's development of the inventions

14  that are embodied in your patents are solely based on

15  oral conversations with Mr. Lenke?

16  MS. TERRY:  Object to form,

17  mischaracterizes testimony.

18  THE WITNESS:  Based on conversation with a

19  very trustworthy, reliable, honest man who told me he

20  had to sell his vacation home in Spain because of the

21  theft.  And his wife and him went into a depression

22  for two years based on that theft, and much more.

Page 356

1  Which doesn't give me any reason to not believe that.

2  MR. SOOBERT:  I'm going to move to strike

3  that.

4  BY MR. SOOBERT:

5  Q.  I'm just asking you, the entire basis for

6  your knowledge of Mr. Lenke's development of the

7  invention at issue in this case, the prototype, the

8  testing, and this additional story you just testified

9  about are all based on oral conversations that you

10  had with Mr. Lenke, correct?

11  MS. TERRY:  Object to form,

12  mischaracterizes the testimony.

13  THE WITNESS:  Oral communication with a

14  gentleman that I do not have a reason to not trust.

15  BY MR. SOOBERT:

16  Q.  And I'm not asking whether you trust him

17  or not.  I'm just confirming that the basis for your

18  understanding is based on his discussions with you

19  orally.  That's it?

20  MS. TERRY:  Object to --

21  THE WITNESS:  But the way you asked the

22  question, you implied.  So I'm not going to let that

Page 357

1  stand.

2  BY MR. SOOBERT:

3  Q.  So another way to say it is, everything

4  you know about that is what Mr. Lenke told you,

5  correct?

6  A.  Correct.

7  MR. SOOBERT:  Okay.  No further questions.

8  THE VIDEOGRAPHER:  This concludes today's

9  deposition.  The date is August 26, 2022.  The time

10  is 7:12 p.m.  We are now off the record.

11  (Whereupon, at 7:12 p.m., the instant

12  deposition ceased.)

13

14

15

16

17

18

19

20

21

22

 TP One

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

Exhibit 17-1.014

# Exhibit B

**Exhibit 17-1.015**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ASTRAZENECA AB,                          :
                                         :
                  Plaintiff,             :
                                         :
        v.                               :        Civil Action No. 1:18-cv-664-RGA
                                         :
ZYDUS PHARMACEUTICALS (USA)              :
INC.,                                    :
                                         :
                  Defendant.             :

ORDER ON MOTIONS IN LIMINE

In preparation for the pretrial conference scheduled for May 7, 2021, I rule on the four

motions in limine presented in the proposed pretrial order.

PMIL.  Plaintiff says Dr. Savic's supplemental expert report at ¶¶ 8-10 and 19-21

exceeded the scope permitted by the order allowing the supplemental report.  Plaintiff also states

that Dr. Savic is not qualified to offer the opinions in the last three paragraphs.  (D.I. 136, Ex. P,

at 217 of 444).   Defendant's response is that the six paragraphs are responsive to Dr. Thisted's

supplemental opinions, and that the last three paragraphs are within Dr. Savic's biostatistician

expertise.  (*Id*. at 269-71 of 444).

As for the first three paragraphs, they seem to be fairly basic background for what Dr.

Savic says thereafter.  As for the second three paragraphs, they seem to be responsive to what Dr.

Thisted said in his supplemental report; I do not believe they are beyond Dr. Savic's expertise,

Exhibit 17-1.016

although Plaintiff can certainly cross-examine her about that. I do not see a violation of the relevant court order.[1]  The motion in limine is **DENIED**.

DMIL #1.  Defendant seeks to exclude testimony and evidence that relate to positions it and its experts took in relation to the patent-in-suit (as prior art) in District of New Jersey litigation involving other patents.  (D.I. 136, Ex. Q, at 320 of 444).  The evidence, which is described as trial transcripts, expert reports, invalidity contentions, proposed findings of fact and conclusions of law, and "support documents" (consisting altogether of about fourteen proposed exhibits) is asserted to be irrelevant, hearsay, and in any event excludable under Rule 403.  (*Id.*). Plaintiff responds asserting that it seeks to use Defendant's "admissions."  (*Id.* at 331 of 444).  It argues that the expert testimony should be admitted as an adoptive admission or under the residual exception to the hearsay rule.  (*Id.* at 333 of 444).  It notes Defendant's focus on what the experts said in the prior litigation, and says the other items are conceded not to be hearsay and are not hearsay.  (*Id.*).

I am not too concerned about relevancy and Rule 403, because I expect I can ignore the irrelevant and the "unfair prejudice."  Hearsay, though, is an issue.  It applies to the trial transcripts, expert reports, the court's findings of fact and conclusions of law, and perhaps to the "support documents," whatever they may be.  On the other hand, invalidity contentions and proposed findings of facts and conclusions of law (PTX0154 & PTX0155) are statements of Defendant's authorized agents within the scope of their agency.  They are admissions.  I think the law is that sponsored expert testimony is not attributed to its sponsor, and it does not become an adoptive admission simply because the party advocates for its acceptance in a different case.

---

[1] I also note that Plaintiff had the opportunity to depose Dr. Savic after the supplemental report. (D.I. 136 at 224 of 444).  Even if there were a violation of the court order, there would be no prejudice to Plaintiff.

**Exhibit 17-1.017**

The residual exception reference is an undeveloped throw-away argument.  Thus, the motion in limine is **GRANTED** as to trial transcripts, expert reports, and the New Jersey court's opinion,[2] **DENIED** as to PTX0154 & PTX0155, and **DEFERRED** as to the "support documents," about which the parties should meet and confer to see if there remains a dispute about them.  If there is, the parties should present the dispute in some format so that I can resolve it before trial.

DMIL #2.  Defendant seeks to exclude evidence of reissue proceedings that were abandoned.  (D.I. 136 at 352 of 444).  On reply, Defendant emphasizes that it is seeking to preclude "argument," not evidence.[3]  (*Id.* at 410 of 444).

It seems to me that what is or is not a persuasive argument to the court in a bench trial is something that can be addressed in the post-trial briefing.  The motion in limine is **DENIED**.

DMIL #3.  Defendant seeks to prevent one of Plaintiff's experts from telling the invention story[4] of WO '128, which appears to claim some C-glucosides.  (D.I. 136 at 413 of 444).  Defendant says it is irrelevant to obviousness (which it says concerns "the selection of dapagliflozin from the genus of C-glucosides"), or, if it is relevant, that it should be excluded under Rule 403 because it will confuse me as to what is or is not prior art.  (*Id.* at 414-15 of 444).  Plaintiff responds that what led up to WO '128 is relevant to non-obviousness including secondary considerations.  (*Id.* at 433 of 444). Defendant replies that, since WO '128 is prior art,

---

[2] Simply because court opinions are published does not make the contents non-hearsay when the opinion is offered to prove what is said in the opinion is true.

[3] I note that Defendant literally did seek to "preclude Plaintiff from presenting evidence" in its motion.  (D.I. 136 at 352 of 444).

[4] As a side note, I feel fairly confident that in more than fifty patent trials, I have not heard an "invention story" told by someone who was not an inventor.  Perhaps the hearsay rules have something to do with that.

**Exhibit 17-1.018**

and the starting point for the invention story is the prior art, the invention story of WO '128 is irrelevant and a waste of time.   (*Id.* at 439 of 444).

I tend to think that the invention story of WO '128 is generally not the invention story of the asserted patent, but that does not mean it is irrelevant.  I expect Plaintiff's theory is something like, the story tends to show a problem that people were trying to solve, the difficulty in doing so, and that WO '128 was not a complete solution, with the inference that finding a complete solution was not so apparent.  In that sense, some history may be relevant.  In addition, at a broader level, the content and the teachings of the prior art are relevant, not just to obviousness, but perhaps also to enablement, which Defendant has on its laundry list of invalidity defenses.   And I think, with the able advocacy of Defendant's counsel, I can probably avoid becoming confused about what is or is not prior art.  Thus, the motion in limine will be **DENIED.**

IT IS SO ORDERED this 6th day of May 2021.

/s/ Richard G. Andrews
United States District Judge

**Exhibit 17-1.019**

# Exhibit C

**Exhibit 17-1.020**

Page 1
Sexspielzeug aus Niederbayern: Der "Womanizer" - Bayern - SZ.de
https://www.sueddeutsche.de/bayern/niederbayern-sexspielzeug-womanizer-1.3441440-0#seite-2



Süddeutsche Zeitung

Meine SZ | SZ Plus | Coronavirus | Ukraine | NRW | Politik | Wirtschaft | Seite Drei | Meinung | Panorama | Sport | München ⌄ | Ku... ›

Sexspielzeug

# Das angeblich ultimative Sexspielzeug

30. März 2017, 18:54 Uhr   Lesedauer: 4 min



Der "Womanizer" erinnert an eine Computermaus. – wie alle Erfindungen von Michael Lenke wurde auch er von seiner Ehefrau Brigitte getestet (Foto: Armin Weigel)

**Dem "Womanizer" erliege jede Frau, sagt Michael Lenke. Aus dem niederbayerischen Metten verkauft er Vibratoren-Alternativen in alle Welt.**

*Von Maximilian Gerl, Metten*



*Der Artikel wurde noch nicht vorlesen.*

Brigitte Lenke hatte am Ende ein gutes Gefühl. Als ihr Mann Michael ihr seine neueste Konstruktion vorstellte, da kam es ihr bald: Wenn er dieses Produkt noch verfeinert, dann wird das "zum Welthit". Klar, dass sich ihr Mann wieder in seine Keller-Werkstatt im niederbayerischen Metten verzog, um dort so lange an dem Prototypen zu tüfteln, bis die Angelegenheit für Frau Lenke wirklich zufriedenstellend funktionierte. Schließlich hatte er sie, die Gattin, wie schon so oft als Testperson erkoren.

"Als Versuchskaninchen", sagt sie. Das ist bei den Lenkes sozusagen Bestandteil des ehelichen Bundes, und dieser währt nun immerhin schon 30 Jahre. Manchmal sagte sie zwar: "Lass mich in Frieden damit", oft funktionierten die Prototypen nicht richtig. Doch er nahm das mit Haltung. "Als Erfinder muss man immerwieder aufstehen", sagt er. Und wenn die Frau schon neu konstruiertes Sexspielzeug auf Tauglichkeit prüfen soll, ja dann muss man ihre Kritik auch ernst nehmen.



SZ-Magazin  Nackte Zahlen: Sexkolumne
**Erotische Innovation: freihändig masturbieren**
Ein neues Sexspielzeug fängt automatisch zu vibrieren an, wenn im Hörbuch die erotischen Stellen kommen. Das eröffnet ungeahnte Perspektiven in Haushalt und Partnerschaft.

Captured by FireShot Pro: 18 May 2022, 15:30:56
https://getfireshot.com

IHG_00007563

**Exhibit 17-1.021**

Für innovatives Gerät zur Bereicherung der weiblichen Sexualität war Metten im Kreis Deggendorf mit seinen 4480 Einwohnern bislang nicht bekannt. Ein Markt wie aus einem niederbayerischen Bilderbuch. Wald, Hügel, Donau, Katholizismus.

Wobei man hier nun fairerweise sagen muss, dass dem Ort so einer wie Michael Lenke in all den Jahrhunderten nicht untergekommen ist. Einer, der mit Erfinden vermögend geworden ist. Einer, der sich längst zur Ruhe hätte setzen können, stattdessen aber in seinem Keller ein Sexspielzeug gebaut hat, das er nach der Versuchsreihe mit der Ehefrau inzwischen weltweit verkauft: den "Womanizer".

Der "Womanizer" ist ein Lustspielzeug für die Frau, das aber ganz und gar nicht nach Lust aussieht. Am ehesten erinnert es noch an eine Computermaus. "Das könnte alles sein", sagt Lenke. Im Internet dagegen sowie in Testberichten und Kundenrezensionen wird das Ding mit Attributen wie "Glücklichmacher" oder "Orgasmusgarant" versehen. Manche schreiben gar von einer "Revolution in der Sextoy-Branche", was auch immer das jetzt heißen mag.

Der Kopf hinter dieser angeblichen Revolution macht indes einen bürgerlichen Eindruck. Michael Lenke, 67 Jahre alt, könnte in seinem legeren Hemd als Kaufmann auf Urlaub durchgehen. Er formuliert seinen Erfolg nüchterner als das Internet, er braucht dazu nur drei Zahlen. Die erste: Der "Womanizer" sei nach der ehelichen Versuchsreihe noch an vielen Frauen unterschiedlichen Alters getestet worden, 99 Prozent von ihnen seien zum Orgasmus gekommen. Die zweite und dritte: Mehrere Hunderttausend "Womanizer" habe er in den letzten Jahren verkauft, weltweit, in mehr als 40 Ländern.



Michael Lenke und seine Frau Brigitte sind ein eingespieltes Team: Er erfindet Dinge, sie probiert sie auf Funktionstüchtigkeit aus. (Foto: Armin Weigel)

Wenn man so will, ist Lenke in einer leicht schmuddelig wirkenden Branche ein Kunststück gelungen. Weder sieht sein Ding wie ein klassisches Sexspielzeug aus, noch funktioniert es so. Oder, um hier jetzt einmal grundsätzlich zu werden: Seit der Erfindung des Vibrators vor 100 Jahren "habe es auf dem Markt "keine wirklich neuen Produkte für die Frau gegeben", sagt Lenke. Die Branche habe sich auf die Befriedigung des Mannes konzentriert. Für den weiblichen Orgasmus habe sich kaum wer interessiert, obwohl viele Frauen damit Probleme hätten. "Das wollte ich ändern", sagt Lenke.

### Der Erfinder sagt: "Ich will wissen, wie Dinge funktionieren"

Er sprach mit Frauenärzten und Therapeuten, tüftelte an einem neuen Konzept. Und dabei sei so viel verraten: Sein "Womanizer" kommt ohne Vibration aus, und er wird an einer sehr empfindlichen Stelle im weiblichen Intimbereich aufgesetzt, an der Klitoris. Auch das sei gesagt: Druckwellen spielen eine ganz entscheidende Rolle. "Die Frau kann sich nicht dagegen wehren", beschreibt Lenke die Wirkung seiner Konstruktion. Will sie aber wahrscheinlich auch gar nicht, denn sonst hätte sie den "Womanizer" gar nicht erst gekauft.

Captured by FireShot Pro: 18 May 2022, 15:30:56
https://getfireshot.com

IHG_00007964

**Exhibit 17-1.022**

Noch einmal: Mit der Erotikbranche hatte Lenke bis vor ein paar Jahren nichts zu tun. In mehreren dicken Ordnern hat er seine Erfindungen archiviert, Zeitungsausschnitte, Flyer, Fotos. Etwa 100 Erfindungen dürfte er bislang gemacht haben, schätzt Lenke. Im Register des Demschen Patentamts ist er unter anderem vermerkt für: einen Pflanztopf zum Kultivieren von Pflanzen mit bleibendem Zwergwachstum (angemeldet 1985), ein Massagegerät mit Saugnäpfen (1993), eine batteriebetriebene Erdbebenalarmvorrichtung (2000), ein Bestrahlungsgerät mit Leuchtdiode und Lichtleiter (2004).



SZ-Magazin  Nächste Zahlen: Die Sexkolumna
**Raupe mit Vibrationshintergrund**
Warum wird Deutschlands beliebtestes Sexspielzeug aus wie ein grünendes Insekt? Phallus-Traditionalisten sind entsetzt.

Einige Erfindungen erreichten nie die Marktreife, etwa ein SOS-Airbag fürs Autodach, der - einmal aufgeblasen - andere Autofahrer vor einem liegen gebliebenen Fahrzeug warnt. "Erkennbar aus bis zu zwei Kilometern Entfernung", sagt Lenke. Das Problem: Weil die zuständigen Behörden nicht wussten, wie sie einen DachAirbag gesetzlich einordnen sollten, musste Michael Lenke sein Projekt einfrieren.

Der 67-Jährige ist ein Quereinsteiger, der nach eigenem Bekunden selten Ahnung hat von dem, was er da baut. Sein Wissen eigne er sich von Idee zu Idee an. Er recherchiere, frage Experten, probiere aus. Erfinder zu sein, das könne man nicht lernen, sagt er. "Das ist eine Begabung, die hat man oder hat man nicht." Seine Frau sagt: "Einmal habe ich mir einen neuen Lockenstab gekauft. Zwei Tage später war er komplett auseinandergebaut." Er wiederum sagt: "Ich will wissen, wie Dinge funktionieren."

**Die Firmenzentrale zieht bald von Niederbayern nach Berlin um**

Für die Vermarktung und Verkauf des "Womanizers" hat Lenke eine eigene Firma gegründet. Im hauseigenen Online-Shop kostet der Standard "Womanizer" um die 100 Euro. Für ein Stück der limitierten Auflage, verziert mit Swarovski-Steinen, werden 499 Euro fällig. Das Geschäft rechnet sich offenbar, für die Firma arbeiten inzwischen rund 800 Menschen.

Produziert wird in einem Werk in Asien, die Zentrale zieht bald von Metten nach Berlin um, Niederbayern ist zu klein geworden. Lenke weiß, dass er es weit gebracht hat als Erfinder: "Ich habe viele Entwickler gesehen, die gescheitert sind." Manche scheiterten, weil sie tüftelten, bis ihnen das Geld ausging. Andere, weil ihnen die Erfindung gestohlen wurde, bevor sie geschützt war.

Manchmal geht beim Basteln und Schrauben allerdings noch mehr schief. Von seinem Haus blickt Lenke auf eine Ruine im Nachbargarten. Bis letzten Sommer stand dort ein Wohnhaus, dann flog es in die Luft, eine Explosion, überall Feuer. Wie durch ein Wunder wurde niemand schwer verletzt. Der Nachbar hatte ebenfalls im Keller getüftelt. Lenke sagt: "Er hat Nagelbomben gebaut."

IHG_00007965

**Exhibit 17-1.023**



Konferenz über Sexroboter

## "Diese Technik könnte Prostitution reduzieren"

Sind Sex-roboter gut oder schlecht? Das wollen Forscher auf einer Konferenz in London er@ründen. Organisatorin Kate Devlin hält mehr Gefühle zwischen Mensch und Maschine für möglich.

Interview von Christoph Behrens

   
Teilen   Feedback   Drucken

**Zur SZ-Startseite**

Friedlicher Protest gegen den Krieg

### Künstlerkollektiv spielt russischer Staatsführung einen riesigen Telefonstreich

Die Aktivisten haben 5000 Nummern von Militärs, Geheimdiensten und Polizeien erbeutet. Klickt man auf einer Website einen Button, startet eine Telefonkonferenz zwischen zwei zufällig ausgewählten Anschlüssen.

*Lesen Sie mehr zum Thema*

`Sexualität`  `Landkreis Deggendorf`  `Niederbayern`  `Bayern`
`Wirtschaft in Bayern`



Musik

**ESC-Sänger Malik Harris liegt krank im Bett**

Erst am Samstag die Niederlage beim Eurovision Song Contest, zwei Tage später dann der Start der Deutschlandtour - und jetzt liegt der Sänger Malik Harris ...



Brände - Bremen

**Brand im Recyclinghof löst Feuerwehrgroßeinsatz aus**

In einem Recyclingbetrieb in den Bremer Industriehäfen hat sich am Mittwoch Restmüll in einem Sammelbehälter entzündet. Die Feuerwehr war mit einem ...



Deutsche Bahn

**So sieht der neue ICE von innen aus**

Nach 30 Jahren bekommt das Flaggschiff der deutschen Bahn ein neues Innenleben. Die Plätze sollen den Wahrzimmer zu Hause zumindest etwas ähnlicher werden. Bei der ...

Von Markus Balser



Bodensee

**Die Not mit der Notdurft**

Der Fernsehstreich von Lindau-Reutin erhält öffentliche Toiletten – ein einziges WC. Na nach seiner Eröffnung. Nicht das einzige Ärgernis für Zugfahrer.

Glosse von Florian Fuchs



Fußball

**Frau schildert sexuelle Belästigung - Club fassungslos**

Fußball-Zweitligist 1. FC Nürnberg zeigt sich bestürzt über Schilderungen einer Frau, die nach eigenen Angaben nach der Partie gegen den FC Schalke 04 auf dem ...

I H G 00007568
Exhibit 17-1.024

Page 5
Sexspielzeug aus Niederbayern: Der "Womanizer" · Bayern · SZ.de
https://www.sueddeutsche.de/bayern/niederbayern-sexspielzeug-womanizer-1.3441440-0#seite-2

**Wetter**

### Heftige Unwetter erwartet - Es drohen sogar Tornados

Auf Sonne folgen Blitz und Donner: In Teilen Deutschlands drohen neue heftige Unwetter. Meteorologen erwarten die bisher schwerste Gewitterlage in diesem Jahr...

**Ibiza-Doku**

### "Da war ich überhaupt nicht"

Wie der österreichische Sender Puls 24 mit Heinz-Christian Strache noch einmal zu der berühmten Ibiza-Finca fuhr.

Von Cathrin Kahlweit

**Liveblog zum Krieg in der Ukraine**

### Kiew und Moskau setzen Verhandlungen aus

Eine gesichtswahrende Lösung für Kremlchef Wladimir Putin lehne man ab, heiße es aus der Ukraine. Die EU spricht von nie dagewesenen Verlusten, die die russische Armee im Krieg...



**Regierung - Hannover**

### Streit um Kanzler-Rundgang auf Hannover Messe

Im Streit um den Kanzler-Rundgang auf der Hannover Messe sieht die CDU den Bundeskanzler persönlich in der Verantwortung für die umstrittene Ausladung zweier...



**Radsport**

### Er kann alles - außer Sektflaschen öffnen

Biniam Girmay aus Eritrea soll dem afrikanischen Radsport zum Aufschwung verhelfen. Bei in Giro gelingt ihm der größte Triumph seiner Karriere - doch dann muss er ausstiegen, weil ihm bei der Siegehrung...

Von Johannes Aumüller



**Pullach**

### Eltern lassen falschen Lehrer auffliegen

Der 23-Jährige hatte sich die Aushilfsstelle in der Inter-Rupert-Mayer-Grundschule mit gefälschten Zeugnissen erschlichen.

VON Michael Morosow



**Auto**

### Tesla fliegt aus S&P-Nachhaltigkeitsindex - Musk empört

Der Elektroautobauer Tesla ist aus dem Aktienindex S&P 500 ESG für angeblich nachhaltige Investments geflogen worden - das gefällt Elon Musk überhaupt nicht.

---

Mehr zum Thema: Sexualität



SZ.de   SZ-Magazin   Sexualität

### "Die Mehrheit der Menschen ist wahrscheinlich bisexuell"

Die deutsch-kanadische Autorin und Kriminalpsychologin Julia Shaw forscht seit Jahren zum Thema Bisexualität und ist zu dem Schluss gekommen: Viele leben sie nicht aus. Sie empfiehlt: Einfach mal ausprobieren.



SZ.de   jetzt   Sex

### Wie gelingt ein guter Dreier?

Sexualtherapeutin Julia Henchen verrät, wie man sich beim Sex trotzt nicht ausgeschlossen fühlt, wer sich am besten als Sexpartner eignet - und warum man nach dem Dreier zusammen etwas trinken gehen sollte.



Pornografie

### Die Akte Schmuddelkram

Ein Unbekannter entführt in einem mittelfränkischen Straßengraben alte Sexheftchen. Nun droht ihm bis zu ein Jahr Haft, wegen illegaler Verbreitung von Pornografie. Ist das noch zeitgemäß?



Antidiskriminierung

### Katholische Kirchenmitarbeitende outen sich als queer



SZ.de   SZ-Magazin   Sexualität

### "Slow Sex hat etwas sehr Meditatives"

Viele Paare, denen im Alltagsstress die

jetzt   Sexualität

### Das Weihnachts-Sexperiment

Unser Autor ist seit über drei Jahren mit

Captured by FireShot Pro: 18 May 2022, 15:30:56
https://getfireshot.com

IHG_00007567

**Exhibit 17-1.025**

Die 125 Mitarbeiter riskieren damit ihren Job. In dem gemeinsamen Manifest fordern sie ein Ende ihrer Diskriminierung.

Intimität verloren gegangen war, haben mit "Slow Sex" wieder zueinander gefunden. Ihr Therapeut Andreas Jungickdas erklärt, was es mit der Methode auf sich hat - und warum weniger Leistungsdruck im Bett oft gut tun kann.

seiner Freundin zusammen: Das Problem: Sie haben immer seltener Sex. Bringt ein Sextoy-Weihnachtsgabe wieder Schwung in die Beziehung?

Zur Themenseite  →

ANZEIGE

**SZ Stellenmarkt**

**Entdecken Sie attraktive Jobs**

In anspruchsvollen Berufsfeldern im Stellenmarkt der SZ.

Medizin, Gesundheit & Soziales
Consulting & Beratung
Fahrzeugbau & Zulieferer
Tech-Management & Projektplanung
Forschung & Entwicklung

Tech, Entwicklung & Administration
Marketing, PR & Werbung
IT/TK-Software-Entwicklung
Vertrieb, Verkauf & Handel

Jetzt entdecken  →

Sie möchten die digitalen Produkte der SZ mit uns weiterentwickeln? Bewerben Sie sich jetzt!   Jobs bei der SZ Digitale Medien



• Live · Liveblog zum Krieg in der Ukraine

**Ringtausch: Deutschland liefert Leopard-Panzer an Tschechien**

Bei erste Lieferung umfasst fünf alte Panzer, die beiden Staaten verhandeln zusätzlich über eine weitere Lieferung von 50 Fahrzeugen in den nächsten Jahren. Die EU plant bis zu 300 ...



Unfälle · Einbeck

**Motorradfahrer stirbt nach Kollision mit Lastwagen**

Einbeck (dpa/lsw) - Bei einem Verkehrsunfall mit einem Lastwagen ist am Dienstagabend in der Nähe von Einbeck ein Motorradfahrer gestorben. Der 23 Jahre alte ...



Tunnelpläne in München

**Scharfe Kritik an "BMW-Autobahn"**

So nennen Klima- und Umweltschützer den geplanten Tunnel durch München. Mindestens 710 große Bäume müssten dafür womöglich gefällt werden, Oberbürgermeist ...

Von Thomas Anlauf und Anna Hoben



Global betrachtet

**Was das Kriegsende so ungewiss macht**

Mindestens so widersprüchlich wie die militärischen Signale aus der Ukraine sind die der internationalen Politik. Warum die Solidarität bröckelt.



Momentaufnahmen im Mai

**Bilder des Tages**

Schönes, Erschreckendes, Absurdes und ganz Alltägliches: Momentaufnahmen aus allen Ecken der Welt.



Tod von Adetmola Okwuja

**Er war ein Krieger und Gentleman**

Ob an Ball oder im richtigen Leben: Der Basketballer Adetmola Okwuja hat sich gegen sein Schicksal gestellt. Nun ist er plötzlich mit Alter von 46 Jahren gestorben.

Nachruf von Volker Kreisl.



Rassismus · Schneeberg

**Nach rassistischen Beleidigungen: Polizeischüler suspendiert**

Ein Polizeianwärter aus Sachsen soll an der Polizeischule in Schneeberg (Erzgebirgskreis) einen Kollegen rassistisch beleidigt haben. Es sei Strafanzeige...



Neu in Kino & Streaming

**Welche Filme sich lohnen - und welche nicht**

Eine Schildkröte, die einen Kriegstraumata verarbeitet, und Leander Haußmann verliebt sich ... Die Starts der Wochen in Kürze.

Von den SZ-Kritikern

I H G 00007568
Exhibit 17-1.026







● Live  Livablog zum Krieg in der Ukraine

**USA kehren nach Kiew zurück**

Die US-Botschaft nimmt ihren Betrieb in der Ukraine wieder auf. Russland entwickelt Lateinnahme zum Abschuss von Drohnen. Deutschland liefert Leopard-Panzer an ...

Aktien

**Dax schwächelt - hohe Verluste an US-Börsen**

Aus Furcht vor den Folgen der hohen Inflation meiden Anleger Aktien weltweit. Unternehmenserwartungen standen Übernahmen und Geschäftszahlen im Fokus.

Mein-AB  Allianz-Skandal

**Mein Name ist Bäte, ich weiß vonnichts**

Der Allianz-Führung geht es bei der Aufarbeitung des jüngsten Skandals vor allem um eins: Sie hat damit angeblich nichts zu tun. Das zeigt einem Muster, Verstand und ...

Kommentar von Herbert Fromme

ANZEIGE
GUTSCHEINE







SIXT

Booking.com Gutschein
Bis zu 28% Booking.com
Rabatt + gratis Frühstück

TUI Gutschein
300€ TUI Gutschein für
Ihren Urlaub

ab-in-den-urlaub Gutsc...
250€ ab-in-den-Urlaub
Rabattcode für Ihre ...

Sixt Gutschein
10% Sudenrabatt mit
Sixt Gutschein

ANZEIGE
VERGLEICHSPORTAL

Depot
Unser Aktien- und
Wertpapier-Depot

DSL
Die besten DSL Angebote
finden

Geschäftskonto
Kostenloses
Geschäftskonto eröffnen

Girokonto Vergleich
Das beste Girokonto mit
unserem Vergleichstool







Energie - Düsseldorf

**EnBW: Mechanismus zur Bezahlung russischer Gasimporte steht**

Der Energiekonzern EnBW hat für die Bezahlung russischer Gasimporte nach eigenen Angaben einen funktionierendes Verfahren entwickelt. Es gebe mittlerweile ein...

Kriminalität - Köln

**Streit unter mehreren Männern: 22-Jähriger getötet**

Bei einem Streit unter mehreren Männern ist in Köln ein 22-jähriger tödlich verletzt worden. Wie Polizei und Staatsanwaltschaft am Mittwoch mitteilten, nahm...

Verkehr - Wadgassen

**Lkw stürzt von Brücke: Fahrertot**

Ein Lastwagen-Fahrer ist am Mittwoch bei einem Unfall auf der A620 zwischen Völklingen und Wadgassen ums Leben gekommen. Sein Fahrzeug sei aus ...





Grundwasser-Notstand in Schwabing

**"Zwei Jahre in einem feuchten Haus"**

Wutende Anwohner, verärgerte Landtagsabgeordnete: Bei einem Ortstermin an der Gönner Straße sollen Behördenvertreter der Stadt München konstruktiv Rede und Antwort stehen - doch die Fronten ...

Von Nicole Graner

Kriminalität

**Millionen-Coup von Emmerich: Zollmann gibt heiße Spur**

Der Einbruch lief ab wie in einem Hollywood-Film: Drei Männer hebelten am Rheinufer vor dem Morgen die Kellertür eines Zollamtes in Emmerich am Niederrhein aus das am...

IHG00007569
**Exhibit 17-1.027**





**Feste**

### Prozess um Oktoberfest-Gutscheine

Eine Maß Bier auf dem Münchner Oktoberfest und Handi-Gutscheine für die Polizei: In der bayerischen Landeshauptstadt soll das Verfahren gegen Wiesn-Wirt Toni ...

**Literatur-Kolumne**

### Was lesen Sie?

In unserer Interviewkolumne fragen wir Schriftsteller und Schriftstellerinnen nach ihrer aktuellen Lektüre. In dieser Folge: Daniel Kehlmann.

Von Miryam Schellbach







**Fußball - Frankfurt am Main**

### Frankfurt im Finalfieber: Leere Straßen, Tausende im Stadion

Ganz Frankfurt war am Mittwochabend im Fußballfieber. Leuthenk unterstützten die Fans der Eintracht ihr Team beim hohen Sevilla um den Sieg in der Europa League ...

**Wetter - Hannover**

### Gewitter und Starkregen in Niedersachsen

Es wird nass und zwar richtig: Der Deutsche Wetterdienst (DWD) rechnet für Niedersachsen am Donnerstag und vor allem am Freitag mit kräftigen Gewitterwind mit ...

**Bauen**

### Täglich neue Preise

Stahl ist viel teurer geworden, andere Baustoffe sind gar nicht zu bekommen. Der Mangel an Material wird für viele Unternehmen zum Risiko - und zur ...

Von Roland Preuß





**Flüchtlinge in Bayern**

### Die Angst kommt nach

Neben der Unterbringung von Geflüchteten aus der Ukraine wird deren psychologische Betreuung immer wichtiger. In Bayern helfen Beratungsstellen - und warnen, dass sich die Probleme erst häufen ...

Von Clara Lipkowski und Viktoria Spinrad

**Öffentliche Gesundheit**

### Tabak tötet mehr als acht Millionen Menschen jährlich

Die weltweite Rauchersucht ist zwar gesunken, doch noch immer greift fast jeder fünfte Mensch regelmäßig zu Zigarette von einem in einem Bericht. Die Industrie erschließt neue Marketingstrategien.

Von Berit Uhlmann







**Tiere - Walldorf**

### Katzen-Lockdown: Vogelschutz-Maßnahme wird kritisiert

Freigang von Hauskatzen: Viele Hauskatzen dürfen in Walldorf (Rhein-Neckar-Kreis) bis Ende August das Haus nicht mehr verlassen. Um sie vom Aussterben...

**Landtag - Köln**

### Ex-Innenminister: FDP hat abwegiges Freiheitsverständnis

Der frühere Bundesinnenminister Gerhart Baum (FDP) sieht im Lockerungskurs der liberalen in der Corona-Pandemie einen der Gründe für das schlechte Abschneiden...

**Fachkräftemangel**

### "Wo sind die alle hin?"

Kleine Busfahrer, keine Lieferanten und Bedienungen: Unternehmer im Landkreis München schlagen Alarm, weil sich die Personaldrecken nach der Corona-Pandemie ...

Von Bernhard Lohr





**Kriminalität - München**

**Unfälle - Wurzbach**

I H G 00007570

**Exhibit 17-1.028**

Page 9
Screenshot aus Aus Niederbayern: Der "Womanizer" - Bayern - SZ.de
https://www.sueddeutsche.de/bayern/niederbayern-anmspiel-zeitup-womanizer-1.3441440-0#seite-2

## Mann niedergestochen: Polizei nimmt Tatverdächtigen fest

Nach einem Handstreichen Streit auf einer Straße in München ist ein Tatverdächtiger mittelt worden. Es handelt sich um einen 29-Jährigen, der am Dienstag in...

## Ehemann verursacht Traktor-Unfall: Frau schwerverletzt

Bei einem Traktor-Unfall zwischen Ehe-Grünen ist die 59-jährige Frau in Wurzbach (Saale-Orla-Kreis) schwerverletzt worden. Der 66 Jahre alte Ehemann nimmt...



**Sanktionen**

## Das EU-Parlament nimmt den Altkanzler ins Visier

EU-Abgeordnete verschiedener Parteien fordern Reaktionen, die Geld-Reform-Provel um verdienen. Auch die deutsche Sozialdemokraten wollen für die Resolution...

Von Josef Kelnberger



**Prozesse - Bremen**

## Drei Mordverdächtige in Bremen aus U-Haft entlassen

Drei in Mordverdächtige Männer in Bremen sind wegen Überlangen Weitens auf ihnen Prozess aus der Untersuchungshaft freigelassen worden. Das Hanseatische...



**Münchner High Society**

## Was ist Luxus? Ein Gespräch unter Experten

Vierständige Sommergästehaus über das echte Leben. Was zum Glücklichsein nötig ist. Zeit, Nachhaltigkeit - und war Esel.

Von Ulrike Heidenreich



**Stahl**

## Rohrkonzern Vallourec will deutsche Werke schließen

Der französische Stahlröhrenzern Vallourec will seine beiden traditionsreichen Werke in Düsseldorf und Mülheim an Ruhr schließen. Betroffen seien jetzt gesucht...



**US-Vorwahlen**

## Trumps Kandidaten schwächeln

Gleich an mehreren wichtigen Vorwahlen fallen Guns die die Ex-Präsident und wird. Warum Trumps Einfluss auf die Republikaner sinken erheblich ist.



**Kriminalität - Heide**

## Schlägerei mit Schwerverletztem: 65-Jähriger unter Verdacht

Nach einer Schlägerei in Heide (Kreis Dithmarschen) mit einem lebensgefährlich Verletzten hat sich nach Angaben der Polizei der Tatverdächtig gegen einen...

Bei einem schweren Verkehrsunfall auf der L85 habe Altzheim ben (Salzlandkreis) in eine i Menschen uns Leben gekommen, weitere Personen sind teils schwer...

mitfünfzehn: Das K8 bekommt in ersten Klasse Fenstern beitbat. Das ist aber Höchst nicht die einzige Änderung, und auch für...

Ein Oktoberfest in München so wie Höher, ohne Maske und Abstand: Es hält Bundesgesundheitsminister Karl Lauterbach (SPD) angesichts möglicherweise Varianten...

Captured by FireShot Pro: 18 May 2022, 15:30:56
https://getfireshot.com

IHG_00007571

**Exhibit 17-1.029**



IHG_00007572

**Exhibit 17-1.030**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document attached to this certification to the best of my knowledge and belief, is a true and accurate translation from **GERMAN** to **ENGLISH** of the original document bearing production numbers IHG_00007563 through IHG_00007572, provided to us by Osha Bergman Watanabe & Burton LLP on July 31, 2023.

I certify under penalty of perjury that the foregoing is true and correct.

_____
Jacqueline Yorke

Sworn to before me this
July 31, 2023

_____
Signature, Notary Public

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM

OFFICES IN 90 CITIES WORLDWIDE

**Exhibit 17-1.031**

Page 1
Sex toys from Lower Bavaria: The "Womanizer" – Bavaria – SZ.de
h ttps://www.sueddeutsche.de/bavern/nieder bayern-sexspielzeug-womanizer-1.3441440-0#w ite.2

SZ.de  Newspaper  Magazine  All SZ products ▾

# Süddeutsche Zeitung

☰ Menu ⌕                                              Subscriptions   Login

My SZ    SZ Plus    | Coronavirus    Ukraine    NRW    Politics    Economy    Pages three    Opinion    Panorama    Sports    Munich    —    Cool ▸

Home > Bavaria > Sexuality > Sex toys from Lower Bavaria: The "Womanizer"          State Theater  ( Enjoyment in studying  | Hair loss )    Leisure time in the region

Sex toys

## The supposedly ultimate sex toy

March 30th, 2017, 6:54 PM Reading time: 4 min



The "Womanizer" is reminiscent of a compct ear mouse – like all of Michael Lenke's inventions, it was also tested by his wife Brigitte (Pho to: Armin Weigel)

**Every woman succumbs to the "womanizer," says Michael Lenke. He sells vibratory alternatives from Lower Bavaria around the world.**

*By Maximilian Gerl, Metten*

▷         ⤴         ⏲         🖶
Listen     Share     Feedback     Print

*The item has not yet been narrated.*

Brigitte Lenke had a good feeling in the end. When her husband Michael presented his latest invention to her, it soon came to her: If he refines this product, then it becomes "a global hit". It is clear that her husband retreated to his basement workshop in Metten, Lower Bavaria, to tinker with the prototype there until it satisfied Mrs. Lenke. After all, he had chosen her, his wife, as a test subject, as he had so often done before.

"As a guinea pig," she says. With the Lenkes, this is par of the marriage bond, so to speak, and it has lasted for 30 years now. Sometimes she said: "Leave me alone with that", the prototypes often didn't work properly, But he took it in stride. "As an inventor, you have to get up and try again and again," he says. And if the woman is supposed to test the suitability of a newly constructed sex toy, then her criticism has to be taken seriously.



SZ women have 5 per cc: Sex columns
**Erotic innovation: masturbate by hand**
A new joy toy automatically stimulates where the erotic passage appear in the audio book. This opens up unexpected perspectives in the human-doll and relationship.

Captured by FireShot Pro: May 18th, 2022, 3:30:56 p.m.
1 https://getfireshot.com

IHG_00007563

**Exhibit 17-1.032**

Page 2
Sex toys from Lower Bavaria: The "Womanizer" – Bavaria – SZ.de
h ttps://www.sueddeutsche.de/bavern/nieder bayern-sexspielzeug-womanizer-1.3441440-0#wide-2

Met en in the district of Deggendorf with its 4480 inhabitants was previously not known for innovative devices to enrich female sexuality. A market like a Lower Bavarian picture book, forests, hills, the Danube, Catholicism.

It's fair to say that the place hasn't seen someone like Michael Lenke in all these centuries. Someone who made his fortune with inventions. Someone who could have retired long ago, but instead built a sex toy in his basement, which he now sells worldwide after a series of tests on his wife: the "Womanizer".

The "Womanizer" is a pleasure toy for women, but it doesn't look like pleasurable at all. It reminded me mostly of a computer mouse. "That could be all," says Lenke. On the Internet, on the other hand, as well as in test reports and customer reviews, the thing is given attributes such as "happy maker" or "orgasm guarantor". Some even write about a "revolution in the sex toy industry," which may be what it means now.

The mastermind behind this alleged revolution, however, makes a bourgeois impression. Michael Lenke, 67 years old, could go on vacation in his casual shirt as a businessman. He formulates his success more soberly than the internet, he only needs three numbers for this: The first one: The "Womanizer" was tested on many women of different ages after the marital test series. 99 percent of them had reached orgasm. The second and third: He has sold several hundred thousand "Womanizers" in recent years, worldwide, in more than 40 countries.



Michael Lenke and his wife Brigitte are a well-rehearsed team. He invents things, she makes sure they work properly. (Photo: Ann in Waagal)

If you like, Lenke has achieved a feat in what appears to be a slightly dirty industry. Neither does his thing look like a classic sex toy, nor does it work that way. Or, to get basic here: Since the invention of the vibrator 100 years ago, there have been "no really new products for women on the market," says Lenke. The industry focused on the satisfaction of the man. Hardly anyone was interested in the female orgasm, although many women had problems with it. "I wanted to change that," says Lenke.

## The inventor says: "I want to know how things work"

He talked to gynecologists and therapists, and worked on a new concept. And he found out so much: His "Womanizer" does not vibrate and is placed on a very sensitive part of the female genital area, the clitoris. He also said: Pressure waves play a very decisive role. "The woman cannot defend herself against it," says Lenke, describing the effect of his device. But she probably doesn't want to, because otherwise she wouldn't have bought the "Womanizer" in the first place.

IHG_00007564

**Exhibit 17-1.033**

Page 3
Sex toys from Lower Bavaria: The "Womanizer" - Bavaria - SZ.de
https://www.sueddeutsche.de/bayern/wieder-bayern-sexspielzeug-womanizer-1.3441440-0#wide/2

Again: Until a few years ago, Lenke had nothing to do with the erotic industry. He archived his inventions in several thick folders, newspaper cutouts, flyers, photos. Lenke estimates that he has made around 100 inventions to date. He is noted in the register of the German Patent Office for, among other things: a plant pot for cultivating plants with permanent dwarf growth (registered in 1985), a massage device with suction cups (1993), a battery-operated earthquake alarm device (2000), a radiation device with a light-emitting diode and fiber optics (2001).



**CaterPillar with vibration background**
Why does Germany's most popular sex toy look like a glowing insect? Phallus or Musashi: an artist leaves this open.

Some inventions never reached market maturity, such as an SOS airbag for the car roof, which - once inflated - warns other drivers of a brokendown vehicle. "Recognizable from a distance of up to two kilometers," says Lenke. The problem: Because the responsible authorities did not know how to legally classify a roof airbag, Michael Lenke had to freeze his project.

The 67-year-old is a career changer who, by his own admission, rarely has any idea of what he is building. He acquires his knowledge from idea to idea. He researches, asks experts, tries it out. To be an inventor, you can't learn that, he says. "That is a gift, you have it or you do not have it." His wife says: "I bought a new curling iron once. Two days later, it was completely disassembled." He says again: I like to know how things work.

**Headquarters will soon move from Lower Bavaria to Berlin**

Lenke has founded his own company for the marketing and sale of the "Womanizer". In the in-house online shop, the standard "Womanizer" costs around 100 euros. A limited edition piece, decorated with Swarovski stones, costs 499 euros. The business is obviously paying off, and around 800 people now work for the company.

It is produced in a plant in Asia, the headquarters will soon move from Metten to Berlin, Lower Bavaria has become too small. Lenke knows that he has taken it far as the inventor: I have seen a lot of developers that are stranded. Some failed because they fiddled until they ran out of money. Others because the invention was stolen before it was patented.

But sometimes even more goes wrong when tinkering and screwing. From his house, Lenke looks out at a ruin in the neighboring garden. There was a building there until last summer, then it blew up, an explosion, fire everywhere. Just like a miracle, nobody was seriously injured. The neighbor had also tinkered in the basement. Lenke says: "He built nail bombs."

Captured by FireShot Pro: May 18th, 2022, 3:30:56 p.m.
https://getfireshot.com

IHG_00007565

**Exhibit 17-1.034**

Page 4

Sex toys from Lower Bavaria: The "Womanizer" – Bavaria – SZ.de

https://www.sueddeutsche.de/bayern/nieder bayern-sexspielzeug-womanizer-1.3441440-0#page-2



Conference on sex robots:

## "This technique could reduce prostitution"

Are sex robots good or bad? Kassandra Wedel explores this at a conference in London. Oxymian Kate Devlin on why she thinks that flirting between man and machine are possible.

Interview by Christoph Behrens



" SZ plus 01 00 00 ? Hide / exploit the form you to purchase here...

    🔗 Share     💬 Feedback     🖨 Print         **To the SZ homepage**

Critical protest against war

### Artist collective plays a huge phone prank on the Russian government



The collective stole 5,000 numbers from the military, secret service officials and politicians. If you click a button on a website, a telephone conference starts between two randomly selected connections.

*Read more about the topic*

Sexuality   District of Deggendorf   Lower Bavaria   Bavaria

Economics in Bavaria



Music

**ESC singer Malik Harris lies in bed sick**

Only an Saturday the defeat at the Eurovision Song Contest two days later the start of the Germany tour – and now the singer Malik Harris...



Fire – Bremen

**Fire in the recycling center triggers large fire department deployment**

In a recycling plant in the Bremen industrial park, residual waste in a collection container ignited on Wednesday. The fire department was with a ...



Deutsche Bahn

**This is how the new ICE looks from the inside**

After 30 years, the flagship of the German railways is getting a new makeover. This is this should often at become a bit more similar to a living room at home. With the...

By Marlene Baber

PUBLISHING PAPER

SZ Department market & Construction       for medicine, Health       tech. Development



Lake Constance

**The need with the necessities**

The Lindau Events long-win wants a toilet to getting public toilet – a year and a half after it opened. Not the only money issue for this pressing as.
Glamour by: Florian Fuchs



Soccer

**Woman describes sexual harassment – Club unconscionable"**

Soccer second league 1. FC Nuremberg is showing itself up. Descriptions of a woman who, according to her own sentiments, after the game against FC Schalke 04 on the...

IHG_00007566

**Exhibit 17-1.035**

Page 5
Sex toys from Lower Bavaria: The "Womanizer" - Bavaria - SZ.de
https://www.sueddeutsche.de/bayern/niederbayern-sexspielzeug-womanizer-1.3441440-0#seite 2

Weather

**Severe weather expected - Threat of tornadoes**

Lightning and thunder before the sun: In parts of Germany, new severe weather is imminent. Meteorologists expect the most severe thunderstorm situation to date this year...

Brine Doncaster d?

**"I was not at all there"**

How far does a black actor feel? Feb 24 with Helena-Claudia Strockmann speaks down to the famous Brita fans...

By Catrina Kohlmann

· Live blog on the war in Ukraine

**Kiyv and Moscow suspend negotiations**

A free-run length basis for Kremlin chief Vladimir Putin is rejected, according to Ukraine. The EU speaks of unprecedented losses suffered by the Russian army in the war...



Government - Hanover

**Dispute about chancellor tour at Hannover Messe**

Is the dispute over the chancellor's tour of the Hannover Messe, the CDU sees the chancellor to personally pump-possible for the digital union. Wing of turn...



Cycling

**He can open everything except sparkling wine bottles**

Bini are Gimmy from Eritrea should help African 97,5 big to take well. At the Giro he achieves the biggest triumph of his career - but then he had to drop out because at that award ceremony...

By Johannes Aumüller



Pullach

**Parents blow the whistle on fake teacher**

The 23-year-old had given no temporary job at the Pater Ruppert Mayer elementary school by using forged certificates.

By Michael Morosaw



Car

**Tesla flies out of S&P sustainability index - Musk outraged**

The electric car maker Tesla has been removed from the S&P 500 ESG stock index for allegedly unethical business conduct - Elon Musk does not like that at all.

More on the topic: Sexuality



SZ Plus SZ-Magazin Sexuality

**"The majority of people are probably bisexual"**

The Ossmann-Cox relax earlier and criminal probably quite hair: Shove his been everything, the topic of bisexuality for years, and he seems to be everytime. Many party ki don't embrace it I its consumers do. Just trying it out



SZ Plus anna sex

**How does a good three-way match work?**

Sea therapist Julia Hanchman on sex to fear I half outta him having sex in a threesome, who's best ruined at a sex partner - and why you should go out for a drink together after the three some.



SZ Plus SZ-Magazin Sexuality

**"Slow sex has a certain meditative quality to it"**

Many couples who, under everyday stress,

Pornography

**The filthy stuff file**

A magpie's disposing of old sex booklets in a ditch in Central Franconia. Now he faces up to a year in prison for illegally distributing pornography. Is that so il up to date?



Anti-discrimination

**Catholic church employees are outed as queer**



sex sexuality

**The Christmas Experiment**

One author has to sex with

Captured by FireShot Pro: May 18th, 2022. 3:30:56 p.m.
https://getfireshot.com

IHG_00007567

**Exhibit 17-1.036**

Page 6
Sex toys from Lower Bavaria: The "Womanizer" - Bavaria - SZ.de
1.tips://www.sueddeutsche.de/bavern/niederbayern-sexspielzeug-womanizer-1.3441440-0#seite.2

[2] satisfy us are nothing more than a job, for this. In the joint months to there is intimacy in their relationship, found in a other again   his girlfriend for three years. The problem: They are having sex
they call for as much their dissatisfaction.   through "slow sex". The therapist Andreas forgebacks implies   are and less. Does a man try advert calander bring communation
a bit of back to do with the mother? - and why less gives us use an   back into the relationship?
pushernessin in bed can a fun be a good thing.

Go to the Theme §2§2 →

PUBLISHING OFFER

SZ Job Market                     Medical, Health & Social Affairs          Technical, Development & Design
Discover attractive jobs          Car skilled & Advice Attornetivs          Marketing, PR & Ads WhitedVIK
                                  & Based in Tech, Management &             Software Development Sales, Sales &
In demanding professional fields in the SZ job   Project Manages Research &     Commerce
market.                           Development

Hindenause 1 2019 →
Would you like to further develop SZ's digital products with us? Apply now! Jobs at SZ Digital Media



- Live blog on the war in Ukraine

**Ring exchange: Germany Delivers a leopard tank to the Czech Republic**

The first delivery includes fifteen Leo2's, the tow cation will also negotiate for another delivery of 50 vehicles in the next few years. The EU is planning up to 100...



Aredowa - Einbeck

**Motorcyclist dies after truck collision**

Einbeck ( dap/lm) - A motorcyclist died in a traffic accident with a truck on Tuesday evening near Einbeck. The 23-year-old...



Tunnelplatz in in Munich

**Sharp criticism of "BMW highway"**

That's what climate and environmentalists - a bitterly banned tunnel through Munich's Petuelring. 700 large trees would h ess to be felled for this. Mayor...

By Thomas Anhaef and Anna Hoben

   

Global news:

**What makes the end of war so uncertain**

International politics are at least as unwill, their they as the military signals from Ukraina. Why unbulary come dise.



May: Snapshots

**Images of the day**

Beautiful, frightening, sh med and everyday things:
Snapshots from av w/y corner of the world.



Death of Adenade Olinkga

**He was a warrior and gentleman**

Whether it's the event as brutal like The basketball player Adarade Olinkjo has passed away. He suddenly died at the age of 96.

Obituary of Volker Kreid



Racism - Schanberg

**Following racist insults: Police cadet suspended**

A police candidate from S xnary is said to have racially insul ted a colleague at the police school in Schanberg [?] - allegations atained. It is a criminal charge...



New in cinema & streaming

**Which movies are worthwhile - and which not**

A German shepherd has to wipe with war trauma, and Lsander Hansmann meets the Stasi. The new week starts soon.

F rom the SZ critics

Captured by FireShot Pro: May 18th, 2022, 3:30:56 p.m.
https://getfireshot.com

IHG_00007568

Exhibit 17-1.037



- Live blog on the war in Ukraine

### US: A return to Kyiv

The U.S. ambassy resumes its operations in Ukraine Russia develops China weapons to shoot down drones. Germany delivers leopard tanks ... to



**Shares**

### Dax weakens – high losses on US stock exchanges

Its yetzes are avoiding significant around the world for fear of high inflation. On the company side, the focus was on takeovers and business figures.



Opinion Allianz scandal

### My name is a piece of paper. I don't know anything about it

The ... Allianz leadership primarily concerned with one thing when dealing with the loss scandal: It has apparently nothing to do with this. This follows a pattern based somewhere and ...

Comment By Herbert Fromme

DISPLAY

## CREDITS






Booking.com voucher
Up to 20% booking.com discount + free early bird ...

TUI voucher
€100 TUI voucher for your vacation.

from-vacation voucher...
€250 off vacation discount code for your

Sixt voucher
10% student discount with Sixt voucher

DISPLAY

## COMPARISON PORTAL





Deposit account
Our stock and security deposit ...

DSL
Find the best DSL offers

Business Account
Free
Open Business Account

Checking account comparison
The best checking account with our comparison tool ...



Energy – Dritmskio I

### EnBW: mechanism for paying Russian gas imports

According to its own statement, the energy group EnBW has developed a mechanism-compliant procedure for paying for Russian gas imports. In the meantime, it appeared to say...



Crime – Cologne

### Dispute among several men: 22-year-old killed

In a dispute among several men, a 22-year-old was fatally injured in Cologne. As police and public prosecutor's office announced on Wednesday, took...

Traffic – Wadgassen

### Truck falls from bridge: Driver dead

A truck driver died in an accident on the A 620 between Völklingen and Wadgassen in the Saarland. His vehicle fell off ...



Groundwater emergency in Schrobing

### "Two years in a damp house"

A spray accident, 3483 years represented in an... At an on-site meeting on Gustav-Straße, officials from the City of M-send are supposed to answer questions emotionally – but the family...

By Nicole Grauer



Crime

### Emmerich's millions: Zollmann gives hot traces

The burglary played out like a Hollywood movie. In the early morning, three men pried open the baumentdoor of a customer office in Emmerichsn the law of Rhine, which...

IHG_00007569

**Exhibit 17-1.038**

Page 8
Sex toys from Lower Bavaria: The "Womanizer" - Bavaria - SZ.de
1.tps://www.sueddeutsche.de/bavern/nieder-bavern-sexspielzeug-womanizer-1.3441440-0@x-ide-2



**Fixed**

## Oktoberfest voucher process

A bet at 6@ is barbecue in Munich and Hendl vouchers for the parties in the Bavaria state capital, the proceedings against Wiesn-Wirt Toni ...



**Literature column**

## What are you reading?

In our interview column, we ask writers about what they're currently reading. In this episode: Daniel Kehlmann ...

**By Miryam Schellbach**



**Soccer - Frankfurt am Main**

### Frankfurt has final fever: Empty streets, thousands in the stadium

A lot of Frankfurt had seen the same Weekend of yearning: if-am of Eintracht really supports their next victory against Sevilla in the Europa Lea gue ...



**Weather - Hanover**

### Weather and heavy rain in Lower Saxony

It's getting wet, right: The German Weather Service (DWD) expects strong thunderstorms for Lower S axony on Thursday and especially on Friday and with ...



**Construction**

### New prices daily

Steel has become much more expensive, as other building materials are not available at all. The lack of material is a risk for many companies – and a risk for ...

**By Roland Preuß**



**refugees in Bavaria**

### The fear comes after

In addition to housing refugees from Ukraine, their psychological care is becoming increasingly important. Counseling centers are helping in Bavaria – and warning that the problem are getting worse ...

**By Clara Lipkowski and Matthias Spindler**



**Public Health**

### Tobacco kills more than eight million people annually

Although the global smoking rate has fallen almost one in five proof a still smoke regularly, according to a report. The industry is developing new methods to new young ...

**By David Klaubert**



**Animals - Walldorf**

### Cat lockdown: Bird protection measure is criticized

Free cat movement prohibited for the time being: Many domestic cats are not allowed to leave the house in Walldorf (Rhein-Neckar-Kreis) until the end of August. In order to protect the extinction ...



**Leutheusser - Cologne**

### Ex-Interior Minister: FDP has an absurd understanding of freedom

Former Interior Minister Gerhart Baum (FDP) sees one of the reasons for the poor performance in the liberals' missing of the corona pandemic ...



**Shortage of specialists**

### "Where did they all go?"

No bus drivers, no engineers and operations: Entrepreneurs in the district of Munich are sounding the alarm due to the shortage of staff after the corona ...

**By Bernhard Lohr**



**Crime - Munich**



**Accident - Wernbach**

IHG_000075610

**Exhibit 17-1.039**

Page 9

Sex toys from Lower Bavaria: The "Womanizer" – Bavaria – SZ.de

https://www.sueddeutsche.de/bayern/niederbayern-sexspielzeug-womanizer-1.3441440-0#seite-2

man stabbed: Police arrest suspects

After a violent argument on a street in Munich, a suspect has been identified. This is about a 19-year-old to the exit found by a...

Husband causes tractor accident: Wife severely injured

In a tractor and dust distance run sponsor, the 79-year-old woman in Württemb (Emile-Wels district) was seriously injured. The 80-year-old husband rammed...



Sanctions

### The EU Parliament is targeting the old chancellor

**MEPs call for penalties for ex-politicians who make money in Putin's empire. The German Social democrats also want to ...**

By Josef Kelnberger



Processes – Bremen

### Three suspects are dismissed from investigative custody in Bremen

**Three men suspected of murder in Bremen have been released from custody because they waited too long for their trial. The Hanseatic...**



Munich High Society

### What is luxury? A conversation between experts

Four members of the high society as general discuss real life. What is necessary for happiness: time, sustainability, and how do they...

By Ulrike Heidenreich



Steel

### Pipe corporation Vallourec wants to close German plants

The French steel tube giant Vallourec wants to close its two steel tonal plants in Düsseldorf and Mülheim on the Ruhr. This total affected are...



US elections

### Trump's candidates weaken

The former president's favorites fall through in several respective races. Why Trump's influence on the Republicans is still remains his.



Crime – Heide

### Fight with seriously injured: 65 year old under suspicion

After a brawl in Heide (Dithmarschen district) with a life-threatening injury, the suspicion of a crime has broken out, according to the police.

In a serious traffic accident on the L65 near Anzhar-Moos (Dahinalmm), three people died, other people are serious by...

being along: The ICE reserve's first-class window to be safe. But that is not the only along a rail also bec...

An Oberherber in Munich like a before, without a mask and distance? Federal Health Minister Karl Lauterbach (SPD) thinks he in view of possible new variants ...

IHG_000075611

**Exhibit 17-1.040**

Page 10

Sex toys from Lower Bavaria: The "Womanizer" - Bavaria - SZ.de

https://www.sueddeutsche.de/bayern/nieder-bayern-sexspielzeug-womanizer-1.3441460-0#wide.2



Süddeutsche Zeitung

To the SZ homepage

[logo] Süddeutsche Zeitung

Süddeutsche Zeitung

Media Data Newsletter Breaking News RSS Apps Jobs

Data protection Privacy settings Contact and legal notice General Terms and Conditions

IHG_000075612

**Exhibit 17-1.041**

# Exhibit D

Exhibit 17-1.042



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document bearing production numbers IHG_00007573 through IHG_00007578 to the best of my knowledge and belief, is a true and accurate translation from **GERMAN** to **ENGLISH** of the original document bearing production numbers IHG_00011045 through IHG_00011050, provided to us by Osha Bergman Watanabe & Burton LLP on July 31, 2023.

I certify under penalty of perjury that the foregoing is true and correct.



_____
Jacqueline Yorke

Sworn to before me this
July 31, 2023

_____
Signature, Notary Public

_____
Stamp, Notary Public

**Exhibit 17-1.043**

LIFE   STYLE   CULTURE   BODY & SOUL

# annabelle



body & soul

## Toy Story: The Womanizer inventor in an interview

Text: Kerstin Hasse; Photo: Markus

SHARES

The Womanizer is the most successful sex toy in recent years. Michael Lenke invented it and his wife Brigitte was the first to test it. We visited the couple in Bavaria.

The radio said that large parts of Germany were struggling with bad weather - except for Bavaria. Maybe that's why the people there are so happy, the moderator joked.

According to the Happiness Atlas, which Deutsche Post publishes every year, Bavaria is actually one of the happiest regions in Germany. One possibility is that this happiness is based on the favorable climatic conditions. Although, in late winter, the high fog tends to get on your spirits here too. So maybe it's the beer, a freshly tapped one, that's more likely. But maybe it's something else entirely. Perhaps the happiness of the Free State lies in deepest Lower Bavaria, more precisely in Metten - on Michael Lenke's kitchen table.

Michael Lenke sits on a bench covered with white leather, his wife Brigitte brings cappuccino and raspberry cake. The pieces are so big that they wobble. On the table are all devices that look like those devices you put in children s ears to take their body temperature. However, these colorful little things on the table have already brought millions of women into ecstasy, carried them to the climax. Multiple. Within seconds, report this at least the customers who used the Womanizer lay-on vibrator and then rated it online. Are the people here happier because they have you as their neighbors, Mr. Lenke?

The 67-year-old laughs, his eyes narrowing. He doesn't know if they're happier. Satisfied, that maybe. "In any case, the womanizer density is quite high in our district." Every now and then people stop by the Lenkes in the hope of getting hold of the Womanizer with a special discount, and they usually get it too. Because the promised orgasm guarantee has its price: In Switzerland, the cheapest version costs around 130 francs.

The house of the Lenke family is in a quiet area. Detached houses, front yards, iron fences. Just a few minutes away is the Benedictine Abbey, two large, mustard yellow onion domes reaching into the sky. The monastery houses the famous baroque library with over 35,000 books. The fact that the most successful sex toy of recent years was invented here is of a certain explosive nature. It's not as if the Vatican would praise the use of vibrators.

Captured by FireShot Pro: May 18, 2022, 3:33:59 p.m.
https://getfireshot.com

IHG_00007573

**Exhibit 17-1.044**

Page 574
Toy Story: Interview with the inventor of Womanizer - Annabelle
https://www.annabelle.ch/body-soul/toy-story-womanizermichael-lenke-47929/

And of course all the residents of the 4,400-strong village know what Michael Lenke invented. That these are not clinical thermometers, which he packs in elegant, black boxes. However, the fun business of the Lenkes is not a problem, as the couple emphasizes. "I was expecting the abbot to call me at some point and ask to keep the ball flat. But that never happened," says Michael Lenke. On the contrary. His company even sponsors the local girls' volleyball team, who train in the abbey's gymnasium in Womanizer shirts.

If Michael Lenke gets an idea, it won't let him go. His drive is always the same: he wants to find the solution to a riddle that he has set himself. That was already the case when he invented an earthquake early warning system. And also when he designed a flower pot that prevents the roots of plants from growing further. And that's how it was when he read a study that showed that more than fifty percent of women never or rarely climax. "I knew I had to change something about that." So he sits down with doctors, reads studies and research reports. He realizes that a toy that revolutionizes the market shouldn't just vibrate like most sex toys for women do. This satisfaction is too clumsy for Lenke, also because it usually leads to overstimulation or it becomes habitualizing over time. The vibration, which was initially stimulating, is no longer sufficient at some point. So a stronger vibrator is needed, then another stronger one - and at some point the nerve endings are numb. From their conversations, Lenke learns that he has to invent a toy that will gently satisfy the woman.

He opts for a non-contact variant that stimulates via pressure waves. Since the clitoris is particularly sensitive with over 8000 nerves, it should beguile this erogenous zone.

Brigitte Lenke can now decode her husband's moods. After almost thirty years of marriage, she knows when Michael is experiencing a creative boost and is therefore hardly approachable. She can see when she has to lure him out of the house because a depressive post-creative phase is paralyzing him. And she knows she has to be honest with her husband. That's her when he gave her the first prototype of the Womanizer for self-testing. A thing made out of an aquarium pump. The part is still somewhere in his workshop today. Michael Lenke disappears into the basement and comes back with a silver implement the size of a tangerine in his hand. A small hose protrudes from the heavy pump, and a screw is stuck in another opening. "I had to convert the pump so that she no longer sucks and blows, but only sucks", she says and smiles mischievously. Testing the prototype is no fun for Brigitte Lenke. Something like that might be used in the SM scene, she says with an ironic undertone. "The hose sucked too much, that wasn't nice." Her husband continues to tinker in the workshop in the basement of his house, which has five shelves filled with yellow, green and transparent boxes through which cables, plugs and screws shimmer. Drills, batteries and tool boxes are neatly lined up. She just cleaned up, says Brigitte Lenke. "Sometimes I have to help him, otherwise you can't get through here." she says with an ironic undertone. "The hose sucked too much, that wasn't nice." Her husband continues to tinker in the workshop in the basement of his house, which has five shelves filled with yellow, green and transparent boxes through which cables, plugs and screws shimmer. Drills, batteries and tool boxes are neatly lined up. She just cleaned up, says Brigitte Lenke. "Sometimes I have to help him, otherwise you can't get through here." she says with an ironic undertone. "The hose sucked too much, that wasn't nice." Her husband continues to tinker in the workshop in the basement of his house, which has five shelves filled with yellow, green and transparent boxes through which cables, plugs and screws shimmer.

Captured by FireShot Pro: May 18, 2022, 3:33:59 p.m.
https://getfireshot.com

IHG_00007574

**Exhibit 17-1.045**

Page 575
Toy Story: Interview with the inventor of Womanizer - Annabelle
https://www.annabelle.ch/body-soul/toy-story-womanizermichael-lenke-47929/

Drills, batteries and tool boxes are neatly lined up. She just cleaned up, says Brigitte Lenke. "Sometimes I have to help him, otherwise you can't get through here." says Brigitte Lenke. "Sometimes I have to help him, otherwise you can't get through here." says Brigitte Lenke. "Sometimes I have to help him, otherwise you can't get through here."

When her husband gave her the final prototype of the Womanizer after more than a year of tinkering in 2013 and she tested it, she knew that the invention would be a success. Actually, she is not a fan of sex toys, the things that her husband ordered in the previous years of marriage hardly interested her. Quite different with the Womanizer. "I said to him: "If you can produce it, it'll be a hit." The fact that she's acting as a test subject for her husband's inventions doesn't bother her. "On the contrary, we are a team - we have always been."

Today, Lenke has almost three million customers. He sold his company to investors because the company was getting too big. The Womanizer Group has over 800 employees today, the headquarters have been relocated from Bavaria to Berlin, and the company sells all over the world. Lenke has a stake in the company and is what you would probably call Head of Innovation in other companies. He's still the tinkerer in the background. The financial success is enormous, says Lenke. That's nice, because he and his wife could afford to own a house in Mallorca, for example, or to go on a cruise.

However, what is more important to Lenke than financial success is the fact that he was able to make a difference in the world with his invention. "That's what drives an inventor like me." A sex toy might not sound like a life-changing thing, but when he hears that women have an orgasm for the first time thanks to him, that they get to know themselves, their sexuality, their partner and their relationship better, then he knows that he invented something important. "I believed in the female orgasm - and it was worth it."

Sometimes Lenkes get fan mail. Once, says Lenke, they received a letter from Brazil. In it, one woman said her life was plagued by a difficult relationship with sex, a fact she was reluctant to share with others. But she just had to tell him about it - and thank him, he had changed her life. "We sat at the table with tears in our eyes," says Brigitte Lenke. Her husband nods. "It's shocking what you read about women who haven't had an orgasm in their seventies. It makes you wonder what happened there." Not only his wife and millions of customers are fans of the invention, but also his two daughters, who have grown up and have children and who each receive the latest version of the toy from their father. "We've always talked very openly about sexuality with our children, that's not a problem," says Lenke. On the contrary. His daughters are proud of their dad - they were never ashamed of his invention. "The Womanizer just comes across as a high-quality lifestyle product and not as a dirty toy." The Womanizer lies elegantly in the hand. And yes, to answer the question about the quality of the toy, it's true: The Womanizer can do what it promises. Using it is a bit like waiting for a bus at the curb. It takes a moment, you stand in one place, wait, at some point it gets exciting - and then he comes buzzing around the corner. It doesn't require a lot of work or excitement, but it serves its purpose. With a guarantee, as the Lenkes emphasize. "Friends of ours used the Womanizer, while watching horror movies, so not a stimulating program at all, and still they climaxed. You can't resist it, the orgasm just comes." From the start, the Lenkes left out porn fairs and positioned the vibrator as a high-quality device that you don't have to hide.

IHG_00007575

**Exhibit 17-1.046**

There is even a portable Womanizer variant that looks like a large lipstick. It shouldn't stand out in the luggage and, according to Lenke, should primarily conquer the Arab world. There is even a portable Womanizer variant that looks like a large lipstick. It shouldn't stand out in the luggage and, according to Lenke, should primarily conquer the Arab world. There is even a portable Womanizer variant that looks like a large lipstick. It shouldn't stand out in the luggage and, according to Lenke, should primarily conquer the Arab world.

The XL version of the Womanizer, on the other hand, was invented primarily for the US market. "We've had feedback that overweight women have trouble putting the Womanizer on, so we lengthened the handle. We try to really respond to our customers," says Lenke. He hopes that the Womanizer will eventually be registered as a medical device that gynecologists can prescribe for their patients. "We already know of doctors who have recommended the Womanizer for therapy."

Lenke hasn't figured it out yet. A new version of the Womanizer was launched in November, which is also equipped with a dildo that can be inserted. In this way, the clitoris and the vagina are stimulated at the same time. And next year there will be another toy based on a completely new technology. In addition, Lenke is working on an invention that has occupied him for a long time: the male counterpart to the Womanizer. This product is a big challenge, he says. Because even if female sexuality is more complex than male sexuality for reasons of physiognomy alone - the tip of the clitoris alone has twice as many nerves as the penis - there are hardly any toys that appeal to men. The big challenge is not only the structure, technology and design, but above all the size. "For men, there isn't even a rudimentary mean value. And try selling a man a toy that says S for size, forget that. Every man buys an XL - and then it doesn't fit." He already has the technology, now it's a matter of turning the device into reality. Lenke hopes that the "Manizer", which is the working title, will be ready for the market within the next two years. Bayern will then perhaps be even happier. And Metten, the small Benedictine village, the happiest place in Germany. Because here happiness comes from an inner satisfaction. Every man buys an XL - and then it doesn't fit." He already has the technology, now it's a matter of turning the device into reality. Lenke hopes that the "Manizer", which is the working title, will be ready for the market within the next two years. Bayern will then perhaps be even happier. And Metten, the small Benedictine village, the happiest place in Germany. Because here happiness comes from an inner satisfaction. Every man buys an XL - and then it doesn't fit." He already has the technology, now it's a matter of turning the device into reality. Lenke hopes that the "Manizer", which is the working title, will be ready for the market within the next two years. Bayern will then perhaps be even happier. And Metten, the small Benedictine village, the happiest place in Germany. Because here happiness comes from an inner satisfaction.

How do you like the article?   

Captured by FireShot Pro: May 18, 2022, 3:33:59 p.m.
https://getfireshot.com

IHG_00007576

**Exhibit 17-1.047**



*1.* In addition to the classic Womanizer (left), there is also a portable, unobtrusive version in the form of a lipstick. The newest product in the Womanizer fleet is called «Inside Out», this toy combines pressure wave stimulation with a vibrator.

---

DATES: 4/5/2010          SHARE     

HOW DO YOU
LIKE THE
ARTICLE?            

## Next Read



life

**"It's not about sex. It's all about power"**

from

## Discover more stories from BODY & SOUL

                                    

family                  beauty                body & soul                love & sex

IHG_00007577

**Exhibit 17-1.048**

Holidays with children:
These are our survival tips

Why skin care urgently needs
to become more diverse

Manuela (49): "I like having
my body under control"

Column "Single Way":
Suddenly my sex life is
overwhelming

by annabelle

by Alex Bohn

by Barbara Loop

by Rebekka Braem

# annabelle

| LIFE | STYLE | CULTURE | BODY & SOUL |
|---|---|---|---|
| politics | Fashion | Pop Culture | beauty |
| Zeitgeist | Shopping | Series & Movies | Astro |
| People | Interior | Literature & Music | love & sex |
| Work & Cash | Travel | | family |
| LGBTQIA+ | foods | | health |
| desire to have children | | | counselor |

ANNABELLE WEEKLY
Subscribe to the newsletter now and receive curated mail directly in your mailbox. Stories only, no spam!

| E-mail address | REGISTER |



SUBSCRIBE NOW!
Every issue in your mailbox and exclusive subscription benefits, starting at Just CHF 20!
Here is the e-paper

ANNABELLE FOLLOW      GET TO KNOW THE EDITORS!

IMPRINT    EDITORIAL STAFF    ADVERTISING    NEWSLETTER    E-PAPER    PRIVACY    CONDITIONS

© Medienart AG 2022

Captured by FireShot Pro: May 18, 2022, 3:33:59 p.m.
https://getfireshot.com

IHG_00007578

**Exhibit 17-1.049**

# Exhibit E

**Exhibit 17-1.050**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WI-LAN INC., | : | **UNSEALED ON** |
| | : | **FEBRUARY 19, 2019** |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 15-379-LPS |
| | : | |
| SHARP ELECTRONICS CORPORATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |

| | | |
|---|---|---|
| WI-LAN INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 15-788-LPS |
| | : | |
| VIZIO, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

Brian E. Farnan and Michael J. Farnan, FARNAN LLP, Wilmington, DE

Monte M. Bond, Jeffrey R. Bragalone, Patrick J. Conroy, Terry Saad, and James R. Perkins, BRAGALONE CONROY P.C., Dallas, TX

      Attorneys for Wi-Lan Inc.

Jack B. Blumenfeld and Stephen J. Kraftschik, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Gianni Cutri and Joel Merkin, KIRKLAND & ELLIS LLP, Chicago, IL

Michael W. De Vries, KIRKLAND & ELLIS LLP, Los Angeles, CA

Adam R. Alper and James Beard, KIRKLAND & ELLIS LLP, San Francisco, CA

Jared Bárcenas, KIRKLAND & ELLIS LLP, New York, NY

      Attorneys for Sharp Electronics Corporation.

**Exhibit 17-1.051**

Pilar Gabrielle Kraman, YOUNG, CONAWAY, STARGATT & TAYLOR, LLP, Wilmington, DE,

Rex Hwang, Stanley M. Gibson, and Jessica Newman, JEFFER MANGELS BUTLER & MITCHELL LLP, Los Angeles, CA,

     Attorneys for Vizio, Inc.

_____

### **MEMORANDUM OPINION**

February 14, 2019
Wilmington, Delaware

**Exhibit 17-1.052**

**STARK, U.S. District Judge:**

Pending before the Court are Plaintiff Wi-LAN Inc.'s ("**Plaintiff**") Motions for Summary

Judgment of Infringement (C.A. No. 15-379 D.I. 406; **C.A.** No. 15-788 D.I. 334), Defendants

Sharp Electronics Corporation and Vizio, Inc.'s (collectively, "**Defendants**") Motions to Preclude

the Expert Opinions of Craig K. Tanner (C.A. No. 15-379 D.I. 408; C.A. No. 15-788 D.I. 329),

Defendants' Motions to Preclude the Analysis of Rebecca Reed-Arthurs (C.A. No. 15-379 D.I.

410; C.A. No. 15-788 D.I. 330), Defendants' Motions to Preclude the Expert Opinions of Ionut

Mirel (C.A. No. 15-379 D.I. 411; C.A. No. 15-788 D.I. 331), Defendants' Motions to Preclude

the Expert Opinions of David A. Kennedy (C.A. No. 15-379 D.I. 412; C.A. No. 15-788 D.I. 332),

Plaintiff's Motions for Partial Summary Judgment of No Invalidity (C.A. No. 15-379 D.I. 414;

C.A. No. 15-788 D.I. 339), Defendants' Motions for Summary Judgment of Non-Infringement

(C.A. No. 15-379 D.I. 416; C.A. No. 15-788 D.I. 337), and Plaintiff's Motions to Preclude the

Infringement and Validity Expert Reports of Clifford Reader (C.A. No. 15-379 D.I. 419; C.A.

No. 15-788 D.I. 344).  The Court heard arguments on these motions on December 19, 2018 and

took all motions under advisement.  (*See* D.I. 471 ("Tr."))  The Court has also considered the

parties' supplemental briefs and letters responding to the Court's post-hearing questions (C.A.

No. 15-379 D.I. 470; C.A. No. 15-788 D.I. 399).  (*See* C.A. No. 15-379 D.I. 472, 473, 474, 475,

481, 482; C.A. No. 15-788 D.I. 401, 402, 403, 404, 410, 411)[1]

I.    **BACKGROUND**

While this was initially a three-patent case, only one patent remains asserted in this

---

[1]Further docket citations will be made to the C.A. No. 15-379 docket, but apply equally to corresponding filings in the C.A. No. 15-788 action, unless specified otherwise.

1

Exhibit 17-1.053

action: U.S. Patent No. 6,359,654 (the "'654 patent"). Plaintiff alleges that Defendants each infringe claims 1, 4, and 9 of the '654 patent, which are methods of displaying interlaced video data on non-interlaced monitors. The claimed methods require four steps: "capturing" two fields into buffers, "scaling" the fields, "adjusting" one of the fields, and "displaying" the two fields sequentially on a non-interlaced monitor. ('654 patent, cls. 1, 4, 9)

## II.    LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

2

**Exhibit 17-1.054**

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

## III.    DISCUSSION

The parties filed cross-motions for summary judgment regarding infringement of the '654 patent.[2]  (*See* D.I. 406, 416)  Plaintiff's case presents two theories of infringement against two

---

[2]The parties' *Daubert* motions do not impact the Court's analysis of the parties' cross-motions regarding infringement, so the Court need not first decide the *Daubert* motions.

3

**Exhibit 17-1.055**

sets of accused products. Plaintiff's first theory of infringement, asserted against a substantial

majority of the accused products, is that Defendants directly infringe by selling televisions that

automatically perform each step of the claimed methods. This theory of infringement is based on

the Federal Circuit's decision in *SiRF Technology, Inc. v. International Trade Commission*, 601

F.3d 1319 (Fed. Cir. 2010). For the remaining accused products, Plaintiff asserts that Defendants

directly infringe by testing those televisions in the United States in a manner that practices the

claimed methods.

Plaintiff's evidence of infringement includes (and essentially depends on) two sets of

declarations from the companies that manufacture for Defendants the System-on-Chips ("SoCs")

which house the accused functionality (the "SoC declarations"). Plaintiff's other principal

evidence of infringement is Register Transfer Level ("RTL") source code that provides the

blueprint to manufacture the hardware of the SoCs. As Plaintiff cannot prove infringement

without the source code, the Court will first consider the admissibility of the source code and the

SoC declarations.

For purposes of this Opinion, the Court will assume that every limitation of the asserted

claims is met by the accused products.[3] Under that assumption, it is undisputed that the accused

products themselves perform every step of the asserted claims. (*See, e.g.*, D.I. 407 at 1; D.I. 447

at 17-18)

---

[3]The Court recognizes that the parties dispute whether each limitation of the asserted
claims is met by the accused products. Indeed, both parties moved for summary judgment on
precisely whether or not certain limitations are met. As a result of the Court's conclusions in this
Opinion, it need not rule on those portions of the parties' motions.

Exhibit 17-1.056

### A.    Admissibility of Source Code and SoC Declarations

Given the nature of the alleged infringement, and Defendants' relationship to the asserted patented methods, Plaintiff has "been on notice since the very beginning of the case that [it was] going to need source code from third parties." (D.I. 182 at 25; *see also* D.I. 91 at 33)  That is, in order to meet its burden to prove infringement, Plaintiff has known that it would need to obtain source code from MediaTek, MStar, and Sigma (the "SoC manufacturers") – those third parties manufacture the SoCs that are accused of containing the infringing functionality in this case. (*See* D.I. 91 at 33; D.I. 182 at 25-26)  When Plaintiff approached the SoC manufacturers, they did not easily and voluntarily produce their proprietary code.  For example, in April 2017, MediaTek's counsel told Plaintiff's counsel that "MediaTek Inc. is not going to voluntarily produce each version of code that has existed for 15 chips over almost 8 years." (D.I. 423 Ex. 50 at 2; *see also id.* at 3 ("MediaTek Inc. does not have a single person, or even multiple people, who could state under oath that there are no 'material differences' for 15 chips over almost 8 years."))  The following month, Plaintiff sued the SoC manufacturers in this Court for patent infringement. (*See* D.I. 418 at 13)  Shortly thereafter, Plaintiff entered into termination agreements with the SoC manufacturers which provided that the SoC manufacturers would produce source code and the lawsuits against them would be dismissed without prejudice. (*See* D.I. 445 at 30; D.I. 446 Exs. 16-17)  Ultimately, the SoC manufacturers produced a single version of RTL source code with accompanying declarations stating that the code produced provides the implementation of the deinterlacing process for digital video data in a specified list

Exhibit 17-1.057

of chips, adding that there are "no material differences"[4] between the version of code produced

and any versions used since 2009. (*See* D.I. 446 Exs. 9-14) Following this production,

Defendants obtained a second set of SoC declarations in which the same declarants describe the

circuitry and operation of the SoCs at issue. (*See* D.I. 418 at 27-28) Neither party has deposed

any of the declarants. (*See id.* at 27) At the recent hearing, the parties told the Court that none of

the declarants will appear at trial. (*See* Tr. at 43-44)

Plaintiff argues that the source code and the first set of SoC declarations are admissible,

citing several grounds for admissibility. The Court addresses, and rejects, each in turn.[5]

First, Plaintiff argues that the source code and SoC declarations are admissible as records

of a regularly conducted business activity under Federal Rule of Evidence 803(6). (*See* D.I. 472

at 1-3; D.I. 474 at 1-2) Rule 803(6) provides that a business record is not excluded as hearsay if

"(A) the record was made at or near the time by . . . someone with knowledge; (B) the record was

kept in the course of a regularly conducted activity of a business . . . ; (C) making the record was

a regular practice of that activity; (D) all these conditions are shown . . . by a certification that

complies with Rule 902(11) or (12) . . . ; and (E) the opponent does not show that the source of

information or the method of circumstances of preparation indicate a lack of trustworthiness." A

business record is self-authenticating under Rule 902(11) as long as the requirements of Rule

---

[4]As almost all of the declarations that Plaintiff relies on predate the Court's issuance of its claim construction order (*see* Tr. at 46), the Court struggles to understand how the declarants could know whether distinctions among versions of the source code are "material" in a manner pertinent to this case. Plaintiff's counsel admitted at the hearing "clearly, there have been revisions to the source code." (*Id.* at 43)

[5]Defendants' position is that none of the SoC declarations should be admitted, but if the Court finds that the first set is admissible then the second set of SoC declarations should also be admitted for completeness. (*See* D.I. 418 at 27; D.I. 473 at 5 n.3)

Exhibit 17-1.058

803(6)(A)-(C) are shown by a certification of a qualifying person and the adverse party had reasonable notice of the record and certification. *See* Fed. R. Evid. 803(6)(D) & 902(11).

The SoC declarations, which Plaintiff contends are the Rule 902(11) certifications for the source code, state that the declarant either is familiar with or has personal knowledge of the contents and functionality of the code and that the declarant understands that the code is maintained as a business record in the ordinary course of the company's business. (*See* D.I. 446 Exs. 9-14)  However, as Defendants argue, the SoC declarations fail to demonstrate that the source code meets the requirements of Rule 803(6).  The SoC declarations merely provide conclusory statements that the code is a business record without providing any factual basis for those statements, let alone addressing the three requirements of 803(6).

Mere "boilerplate recitation of the requirements under 803(6) fails to provide sufficient detail necessary to authenticate the exhibits or satisfy the requirements of Rule 803(6)." *JPMorgan Chase Bank, N.A. v. AME Fin. Corp.*, 2009 WL 10668518, at *3 (N.D. Ga. Sept. 25, 2009).  In *JPMorgan*, the declarant attested that she is an employee of a particular office of the plaintiff, "that she has personal knowledge of Plaintiff's practice of maintaining these records; that these records were created or received by Plaintiff in its regularly conducted business activity; and that they were retained by Plaintiff in its file on Defendant in the course of its regular practice for making and keeping such records." *Id.*  The Court determined that such statements were too vague to meet the requirements of the Rule because the declarant failed to show her "familiarity with the creation and maintenance of these records" and failed to describe "any details about Plaintiff's record-keeping procedures." *Id.*  Here, the SoC declarations provide even less information regarding the SoC manufacturers' creation and maintenance of the

**Exhibit 17-1.059**

source code and, therefore, are not adequate Rule 902(11) certifications.

Moreover, Plaintiff cannot satisfy the fifth requirement of Rule 803(6).  Defendants have demonstrated a lack of trustworthiness in the materials; the source code contains inconsistent dates in the metadata, copyright, and revision histories[6] as well as added commentary on the printed excerpts.  (*See* D.I. 456 at 4-5; D.I. 473 at 7-8)  Plaintiff also failed to obtain change logs, file comparisons, or other evidence of code revisions that might clear up the inconsistencies in the code.  (*See* D.I. 456 at 5)  The circumstances surrounding the production, including the fact that the SoC manufacturers originally claimed that they could not produce one version of source code for all SoCs at issue in the case, raises further concern as to the credibility of both the source code and the SoC declarations seeking to authenticate the code.  Accordingly, the source code is not admissible under Rule 803(6).

The SoC declarations, too, are not admissible under Rule 803(6) because they were prepared for purposes of litigation, nor in the ordinary course of business, and, further, do not contain much indicia of trustworthiness.  (*See* D.I. 473 at 2-3; *see also United States v. Casoni*, 950 F.2d 893, 912 (3d Cir. 1991) (finding document not to be business record where it was "a tool of controversy, not a routine record of fact"); *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 323 (N.D. Ill. 2008) (noting "guarantors of reliability," such as employee's "strong motive to be accurate," are absent "when a document is created for a particular use that lies outside the business's usual operations – especially when that use involves litigation"))

Plaintiff's second asserted basis for admissibility of the source code is that it may be

---

[6]For example, the 2017 source code has a copyright date of 2006, a last modified date of 2010, and many undated revisions in the revision history.  (*See* D.I. 473 at 7)

**Exhibit 17-1.060**

authenticated under Rules 901(b)(1) and 901(b)(4).  However, Rule 901(b)(1), which permits

authentication via testimony, is not met because the SoC declarations are not trustworthy and

neither the declarants nor anyone else with knowledge of the source code has been deposed or

will be coming to trial.  (*See* Tr. at 43-44)  While Rule 901(b)(4) allows evidence to be

authenticated by distinctive characteristics, such as the "appearance, contents, substance, internal

patterns . . . taken together with all the circumstances," this provision is not satisfied here – even

if the source code is distinctive – given the highly dubious circumstances surrounding the

production and the lack of indicia of trustworthiness in the source code.  Furthermore, even if the

source code could be authenticated, it does not necessarily follow that the source code would also

be admissible.  *See, e.g.*, *Acceleration Bay LLC v. Activision Blizzard Inc.*, 2018 WL 5045186, at

*3 (D. Del. Oct. 17, 2018) ("Evidence that is properly authenticated may nonetheless be

inadmissible hearsay.").  Accordingly, the Court concludes that the source code and SoC

declarations are not admissible under Rules 901(b)(1) or 901(b)(4).

Plaintiff next argues that the source code is admissible under Federal Rule of Evidence

807(a)(3), because the SoC declarations are "more probative on the point for which [they are]

offered than any other evidence that the proponent can obtain through reasonable efforts."  (*See*

D.I. 472 at 5 n.6)  However, "equivalent circumstantial guarantees of trustworthiness" is also a

prerequisite under Rule 807 and, as already explained, the source code and declarations lack such

characteristics.  Fed. R. Evid. 807(a)(1).

Plaintiff additionally argues that, pursuant to Rule 703, its experts may reasonably rely on

the source code in forming their opinions and may also disclose the contents of the source code

to the jury because "their probative value in helping the jury evaluate the opinion substantially

**Exhibit 17-1.061**

outweighs their prejudicial effect." (*See* D.I. 472 at 5-6)  Plaintiff's interpretation of this provision lacks merit.  Rule 703 allows an expert to rely on his or her own experiences, statements made by others, and data presented by others even when that evidence on which the expert has relied would itself be admissible only if it was authenticated. *See* Fed. R. Evid. 703, advisory committee's note on proposed rules.  The Rule was not intended to create a "backdoor" to allow the admission into evidence of otherwise inadmissible declarations and other materials simply because they might assist the jury's evaluation of an expert's opinions.

Plaintiff also argues that the SoC declarations are admissible under Rule 801(d)(2)**(B)** as statements offered against Defendants that Defendants have "adopted or believed to be true." In particular, Plaintiff insists that since Defendants submitted their own SoC declarations and relied on them in support of their motions for summary judgment and expert reports, "the statements of authenticity and admissibility in those declarations that mirror the statements in Wi-LAN's SoC Declarations are *not hearsay*," because "Defendants have adopted these statements as true and therefore are precluded from now claiming them to be hearsay." (D.I. 472 at 2)  This contention is, in the apt characterization of Defendants, "wildly inaccurate." (D.I. 475 at 1)  Defendants' primary – and vehement – position has always been that all of the SoC declarations are inadmissible;[7] any reliance on them in Defendants' papers has been argued in the alternative, in case the Court were to find them to be admissible.

_____

[7]*See* D.I. 332 at 2 (June 22, 2018 letter arguing declarations cannot substitute for trial testimony); D.I. 342 at 1-2 (July 2, 2018 letter arguing declarations are inadmissible); D.I. 418 at 2 (arguing in opening summary judgment brief that declarations are "wildly unreliable and inadmissible"); D.I. 456 at 1 (arguing in reply summary judgment brief declarations are "inadmissible hearsay"); D.I. 473 at 5 n.2 ("Defendants do not believe either set of SoC declarations should be admitted into evidence.").

**Exhibit 17-1.062**

Finally, and most recently, Plaintiff requests that, should the Court finds the source code and SoC declarations inadmissible, it be given a further opportunity to cure any defects, citing Federal Rule of Civil Procedure 56(c)(2) as support. (*See* D.I. 474 at 2-3; D.I. 482 at 1)  Rule 56(c)(2) allows a party to object to material cited in a summary judgment motion if it cannot be presented in a form that would be admissible in evidence.  "The objection functions much as an objection at trial."  Fed. R. Civ. P. 56, committee notes on 2010 amendment.  If the inadmissible evidence cannot be converted into admissible form, it must be excluded.

Rule 56(c)(2) does not help Plaintiff here.  Plaintiff has had ample time and opportunities over years of litigation to obtain evidence of infringement from the SoC manufacturers.  As but one example, as long ago as September 2017 the Court stated there was already at that time "a really strong case" to deny Plaintiff another opportunity to obtain source code from third parties, as the issue had been litigated since early 2016.  (D.I. 182 at 25-26) (Sept. 11, 2017 Transcript)  This has now been an issue for approximately three years – and trial is now just two months away.  There is simply no reason to provide Plaintiff still another opportunity to fix its evidentiary deficiencies (even assuming Plaintiff could, somehow, do so).

Thus, the Court concludes that the source code and SoC declarations are inadmissible. They will be excluded from trial.[8]  Accordingly, the Court grants Defendants' objection to the evidence and excludes them from the record on which it must base its summary judgment determination.  *See* Fed. R. Civ. P. 56(c)(2).

---

[8]Given the Court's conclusions, it is unnecessary for the Court to evaluate Defendants' additional argument that the 2017 version of source code – which post-dates the expiration of the '654 patent and post-dates the period relevant to infringement, which begins in 2009 – is irrelevant.  (*See* D.I. 418 at 6-10)

11

Exhibit 17-1.063

Without source code from the SoC manufacturers, no reasonable juror could find that Defendants' accused televisions practice the limitations of the asserted claims. Therefore, Plaintiff cannot prove that Defendants directly infringe the '654 patent through sales or testing. It follows, then, that the Court must grant Defendants' motions for summary judgment of non-infringement and deny Plaintiff's motions for summary judgment of infringement.

### B.   Direct Infringement Through Sales Under *SiRF*

Defendants present an alternative basis on which the Court may – and is – also granting summary judgment of non-infringement. "A method claim is directly infringed when someone practices every step of the patented method." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1219 (Fed. Cir. 2014). Direct infringement may also be present when certain steps are performed by the accused product so long as that performance is controlled by the accused infringer. *See SiRF*, 601 F.3d at 1329. Plaintiff's contention that this latter theory of direct infringement can be found on the present record is unavailing.

In *SiRF*, the defendant developed, manufactured, and sold GPS chips to customers who incorporated the chips into end-user GPS devices. *See id.* at 1323. That defendant also provided data generated from its own servers to the end-user GPS devices. *See id.* at 1324. The defendant designed and built the technology such that when the GPS device was activated by the end-user, the defendant's servers, software, and chips automatically performed the method steps. *See id.* at 1331. Under these circumstances, the Federal Circuit found that the defendant directly infringed the patent-in-suit, because the defendant controlled the equipment that automatically performed the claimed method.

The Federal Circuit has explained that its "decision in *SiRF* did not create direct

12

**Exhibit 17-1.064**

infringement liability whenever an alleged infringer sells a product that is capable of executing the infringing method." *Ericsson*, 773 F.3d at 1221.  In fact, the Federal Circuit has never "found direct infringement of a method claim by sales of an end user product which performs the entire method." *Id.* at 1222.

Here, it is undisputed that no person or entity performs any steps of the asserted method claims; rather, it is the accused products themselves that perform every step of the claims.  (*See, e.g.*, D.I. 407 at 1-3; D.I. 447 at 17-18)  *SiRF*, then, is inapplicable.  No reasonable juror could find on the present record that Defendants control the performance (automatically or not) of the claimed method.  *See Ericsson*, 773 F.3d at 1221-22.

Plaintiff argues that Defendants directly infringe because they "control all aspects of the hardware within the accused televisions, including the [SoCs] and display modules."  (D.I. 407 at 2)  In fact, as any reasonable factfinder would have to conclude, if anyone actually controls the performance of the steps of the method it is not Defendants *but the SoC manufacturers*, because the SOC manufacturers design and implement the allegedly infringing deinterlacing functionality, which is protected by confidential and proprietary source code to which Defendants do not even have access.  (*See* D.I. 447 at 19)  While Defendants incorporate the SoCs into their televisions, there is no evidence that Defendants assert any control over the precise functionality of those chips.  Further, unlike in *SiRF*, where the defendant physically possessed and controlled the servers at the time of performance of the method, Defendants here have no control over performance of the method after they sell their televisions to end users.  As "there are no steps automatically performed by equipment controlled by [Defendants]," *SiRF* does not apply. *Ericsson*, 773 F.3d at 1222; *see also Adaptix, Inc. v. Apple, Inc.*, 78 F. Supp. 3d 952, 957 (N.D.

13

**Exhibit 17-1.065**

Cal. 2015) (noting *SiRF* does not apply when defendant does not "perform or control any claim step").[9]  Accordingly, Defendants are not direct infringers.

Plaintiff argues that having no direct infringer "provides an unjust and prejudicial exemption for Defendants' infringement" and that "*SiRF* serves the purpose of foreclosing such unintended results." (D.I. 472 at 9)  The Court is not persuaded that there must be a direct infringer in this case.[10]  While it seems likely that if the '654 patent claimed systems, rather than methods, Defendants would be direct infringers, the patentee here chose (for whatever reason) to claim methods.  If no one performs (or controls the performance of) the claimed methods (as is the case here), then it may be that those methods cannot be infringed by anyone.

Thus, again, the Court will grant Defendants' motions for summary judgment of non-infringement and deny Plaintiff's motions for summary judgment of infringement.

## C.      Direct Infringement By Testing

Plaintiff also contends that a reasonable jury could find infringement for a small portion of the accused products based on Defendants' testing of those products in a way that practices the claimed methods.  Defendants counter that Plaintiff has failed to identify evidence sufficient to

---

[9]Plaintiff's reliance on *Vehicle IP, LLC v. AT&T Mobility LLC*, 227 F. Supp. 3d 319 (D. Del. 2016), is misplaced.  There, unlike here, the claimed steps were performed by both the products and the defendants.

[10]Defendants' customers who purchase the accused televisions also do not control any steps of the asserted methods.  Even though they may choose to use their televisions in either an infringing or non-infringing manner (by using input sources that broadcast either interlaced or progressive signals, respectively), turning the television on, changing the channel, or changing the input is not part of the claimed methods.  As such, Defendants' customers neither perform nor control any steps of the claims and are not direct infringers.  *See SiRF*, 601 F.3d at 1331 (refusing to read limitations, such as "activating" device, into claims); *see also* D.I. 407 at 3; D.I. 445 at 4-6.

14

**Exhibit 17-1.066**

prove by a preponderance of the evidence that Defendants performed tests that practiced the claimed methods in the United States. (*See* D.I. 418 at 31-37)

Even assuming that a reasonable factfinder could find that Defendants have performed tests practicing the claimed methods in the United States, this evidence could not support a finding of direct infringement. This is because just as Defendants' end user customers are not direct infringers (*see supra* n.10), so, too, Defendants are not direct infringers by virtue of those occasions on which they plug in and turn on the accused televisions and obtain an interlaced signal. Additionally, Defendants have no control over the functionality in the SoCs installed in their televisions. Accordingly, those performing the testing on the accused products do not directly infringe the asserted claims.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motions for summary judgment of infringement will be denied and Defendants' motions for summary judgment of non-infringement will be granted. The Court will confer with the parties before determining whether it must resolve any or all of the remaining motions or any other issues.[11] An appropriate order follows.

---

[11]The Court understands that, as a result of the accompanying Order, the only remaining claim in this lawsuit is Defendants' counterclaim for declaratory judgment of invalidity of the '654 patent. (*See* D.I. 472 at 10; D.I. 473 at 9) The parties will be ordered to meet and confer and advise the Court as to whether this understanding is correct.

15

**Exhibit 17-1.067**

# WOW Tech Response in Opposition

**Exhibit 17-1.068**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| EIS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No.: 19-cv-1227-GBW |
| INTIHEALTH GER GMBH, | § | |
| WOW TECH USA, LTD., WOW TECH | § | Demand For Jury Trial |
| CANADA, LTD. and NOVOLUTO GMBH, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| NOVOLUTO GMBH, | § | |
| | § | |
| Counterclaimant, | § | |
| | § | |
| v. | § | |
| | § | |
| EIS, INC., EIS GMBH, | § | |
| TRIPLE A IMPORT GMBH, | § | |
| and TRIPLE A MARKETING GMBH, | § | |
| | § | |
| Counterclaim Defendants. | § | |

**DEFENDANTS' AND COUNTERCLAIMANT'S RESPONSE IN OPPOSITION TO
PLAINTIFF/COUNTERCLAIM DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO
<u>PRECLUDE ARGUMENT OR EVIDENCE OF THE "INVENTION STORY"</u>**

**Exhibit 17-1.069**

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Arista Recs. LLC v. Lime Grp. LLC,*
   784 F. Supp. 2d 398 (S.D.N.Y. 2011) ......................................................................... 3

*Brazos River Authority v. GE Ionics, Inc.,*
   469 F.3d 416 (5th Cir. 2006) ...................................................................................... 1

*U.S. v. Bacas,*
   662 F. Supp. 2d 481 (E.D. Va. 2009) .......................................................................... 3

*U.S. v. St. Vallier,*
   404 F. App'x 651 (3d Cir. 2010) ................................................................................. 3

*Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.,*
   68 F. Supp. 3d 917 (N.D. Ill. 2014) ........................................................................... 1


**Rules**

Fed. R. Civ. P. 30 ...................................................................................................... 1, 2

Fed. R. Evid. 803 ...................................................................................................... 2, 3

**Exhibit 17-1.070**

## TABLE OF ABBREVIATIONS

| Abbreviation | Full Description |
|---|---|
| EIS | Plaintiff EIS, Inc. and the related German entities EIS GmbH, Triple A Import GmbH, and Triple A Marketing GmbH |
| Novoluto | Counterclaimant/Defendant Novoluto GmbH |
| WOW | Novoluto and Defendants IntiHealth Ger GmbH, Novoluto GmbH, WOW Tech USA, Ltd., and WOW Tech Canada, Ltd. |
| '061 Patent | U.S. Patent No. 9,849,061 |
| '097 Patent | U.S. Patent No. 9,937,097 |
| '851 Patent | U.S. Patent No. 9,763,851 |
| '220 Patent | U.S. Patent No. 11,090,220 |
| '418 Patent | U.S. Patent No. 11,103,418 |
| Asserted Patents | The '061, '097, '851, '220, and '418 Patents |
| Continuation Patents | The '097 Patent, '220 Patent, and '418 Patent |
| IPR Patents | '097, '851, and '061 Patents |
| PTAB | Patent Trial and Appeal Board |
| USPTO | United States Patent and Trademark Office |
| CAFC | United States Court of Appeals for the Federal Circuit |

Exhibit 17-1.071

WOW opposes EIS's Motion *in Limine* ("MIL") No. 1 because the invention story is a matter of corporate knowledge supported by business records that fall within a hearsay exception.

## A. Corporate Representatives Can Testify at Trial as To The Invention Story

WOW will be able to tell the invention story at trial without hearsay through its designated corporate representatives. For that reason alone, EIS's motion should be denied.

Courts have held that a Rule 30(b)(6) witness may testify at trial "as to matters within corporate knowledge to which he testified in deposition." *Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006). Accordingly, "a Rule 30(b)(6) witness may testify both in a deposition and *at trial* to matters as to which [he] lacks personal knowledge." *Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 921 (N.D. Ill. 2014) (emphasis added).

WOW's Managing Director, Mr. Johannes Plettenberg, and Chief Technical Officer, Mr. Tobias Zegenhagen, both 30(b)(6) representatives for WOW, testified in deposition that Mr. Lenke was the inventor of the patented technology and made clear that matters related to the invention story are a matter of corporate knowledge. *See, e.g.*, Ex. 2, 35:13-14, 71:16–72:5, 75:1-7; Ex. 3, 97:9-15, 98:4-101:2. For example, Mr. Plettenberg, who is the person who bought the company from the inventor, Michael Lenke, and who retained Mr. Lenke as a consultant for the company after its purchase, testified that Mr. Lenke invented, developed the prototype, conducted testing, and filed a patent on the original Womanizer (the original commercial embodiment of the first Asserted Patent). Ex. 2, 35:13-14; 133:9-134:8. Meanwhile, Mr. Zegenhagen testified that corporate knowledge included that Mr. Lenke developed the device, that Mr. Lenke made a prototype that he tested on his wife, made a prototype he then tested on other women, and that he filed a patent on this invention on September 23, 2013. Ex. 3, 99:6-100:15.

The inventor story is necessary for the jury to understand WOW's defenses against EIS's unfair competition allegations (particularly because most of those allegations are based on

**Exhibit 17-1.072**

interactions with the inventor several years ago). This relevance far outweighs any prejudice to EIS, who brought this lawsuit accusing WOW of having a long-standing practice of unfair competition, among other wrongs. It is also relevant to rebut EIS's non-infringement and invalidity defenses, which also depend on similar allegations. *See, e.g.,* Ex. 4, 41:8-42:5, 299:18-300:2

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████). The inventor story also shows the research and development that went into the Asserted Patents, which rebuts EIS's non-infringement defense. To exclude this relevant evidence would be far more prejudicial to WOW than any prejudice that could befall EIS by its introduction at trial.

Having testified as 30(b)(6) witnesses regarding the invention story, Mr. Plettenberg and Mr. Zegenhagen should be able to testify at trial regarding such corporate knowledge.

## B.    The Business Records Exception to Hearsay Applies

F.R.E. 803(6) authorizes the admission, over a hearsay objection, of a record that is

> made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the [record], all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

During discovery, WOW provided all sorts of business records that illustrate the invention story, including internal interviews done by Mr. Lenke as a consultant for WOW. *See* Ex. 1. EIS misleadingly argues these records do not exist. EIS simply ignores internal business records memorializing the inventor story, which are permissible business records under F.R.E. 803(6). The internal business records were created at the time the information was transmitted, by a person with knowledge, during the regular course of business, and therefore, qualify as admissible business records. *See Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 421 (S.D.N.Y.

**Exhibit 17-1.073**

2011) ("The business records exception has been construed generously in favor of admissibility, due to the general trustworthiness of regularly kept records and the need for this type of evidence in many cases.").

EIS's argument that WOW should have deposed Mr. Lenke is also without merit. WOW did not need to, as it has corporate knowledge of the invention story supported by business records. If EIS truly believed it could rebut that corporate knowledge, EIS would have gone through the Hague Convention to depose Mr. Lenke. EIS did not. EIS cannot now prevent WOW from defending itself because EIS chose not to seek additional discovery.

EIS also argues the invention story is inadmissible due to witnesses' alleged lack of personal knowledge. But "[c]ourts interpret the 'qualified witness' broadly, requiring only someone familiar with the creation and maintenance of the records… [to] lay the foundation for records' introduction despite lacking personal knowledge of the preparation of the records…." *U.S. v. Bacas*, 662 F. Supp. 2d 481, 487 (E.D. Va. 2009). Mr. Johannes Plettenberg, among others, can authenticate these business records due to his knowledge of how records are kept at the company. EIS's reliance on *U.S. v. St. Vallier* is misplaced. There, the Court ruled that an individual who lacked personal knowledge about a settlement agreement could not testify as to that agreement. 404 F. App'x 651, 662 (3d Cir. 2010). But that case had nothing to do with corporate knowledge or whether the agreement was a business record under F.R.E. 803(6).

Finally, EIS argues that experts should also be precluded from telling the invention story because they lack personal knowledge and have not obtained knowledge from any non-hearsay source. This is not true. Dr. Herbenick, for example, learned at least some of this information in her independent research as a researcher at the time. Ex. 5, ¶¶ 67-75. Regardless, the documents relied on by the experts include admissible business records. EIS's motion should be denied.

Exhibit 17-1.074

Date:  August 22, 2023

OF COUNSEL:
Tammy J. Terry
Califf T. Cooper
Lisa E. Margonis
Peter C. Schechter
**OSHA BERGMAN WATANABE & BURTON LLP**
1100 Louisiana St., Suite 4900
Houston, TX 77002
(713) 228-8600
OLWOWTechDE@obwbip.com

**CHIPMAN BROWN CICERO & COLE, LLP**

 */s/ Gregory E. Stuhlman*
Gregory E. Stuhlman (No. 4765)
Paul D. Brown (No. 3903)
Joseph B. Cicero (No. 4388)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
(302) 295-0191
stuhlman@chipmanbrown.com
brown@chipmanbrown.com
cicero@chipmanbrown.com

*Attorneys for Defendants*

**Exhibit 17-1.075**

# EXHIBIT 1

**Exhibit 17-1.076**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IHG_00003104

**Exhibit 17-1.079**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IHG_00003105

**Exhibit 17-1.080**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IHG_00003106

**Exhibit 17-1.081**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IHG_00003107

**Exhibit 17-1.082**



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL





CONFIDENTIAL

IHG_00003072

**Exhibit 17-1.087**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IHG_00003091

**Exhibit 17-1.088**



CONFIDENTIAL - ATTORNEYS' EYES ONLY

IHG_00003092
**Exhibit 17-1.089**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 17-1.090**



TRANSPERFECT

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document attached to this certification to the best of my knowledge and belief, is a true and accurate translation from **GERMAN** to **ENGLISH** of the original document bearing production numbers IHG_00003091 through IHG_00003093, provided to us by Osha Bergman Watanabe & Burton LLP on July 31, 2023.

I certify under penalty of perjury that the foregoing is true and correct.

_____
Jacqueline Yorke

Sworn to before me this
July 31, 2023

_____
Signature, Notary Public



_____
Stamp, Notary Public

**Exhibit 17-1.091**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 17-1.092**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 17-1.093**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 17-1.094**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IHG_00003094

**Exhibit 17-1.095**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 17-1.097**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 17-1.099**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 17-1.100**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IHG_00003087

**Exhibit 17-1.101**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IHG_00003097

**Exhibit 17-1.103**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IHG_00003101

**Exhibit 17-1.107**

# EXHIBIT 2

**Exhibit 17-1.108**

**HIGHLY CONFIDENTIAL, ATTORNEY'S EYES ONLY**



Transcript of **Johannes Plettenberg**

Friday, August 26, 2022

*EIS, Inc. v. Intihealth Ger GmbH*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 120379

**Exhibit 17-1.109**

Johannes Plettenberg

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4      - - - - - - - - - - - - - - -  X

 5   EIS, INC.,                        :

 6            Plaintiff,               :

 7            v.                       :

 8   INTIHEALTH GER GMBH, WOW TECH     :

 9   USA, LTD., WOW TECH CANADA,       :

10   LTD. AND NOVOLUTO GMBH,           X

11            Defendants.           Civil Action No.

12   - - - - - - - - - - - - - - -    19-cv-1227-VAC-

13   NOVOLUTO GMBH,                   MPT

14            Counterclaimant,

15            V.

16   EIS, INC., EIS GMBH, TRIPLE A

17   IMPORT GMBH, and TRIPLE A

18   MARKETING GMBH,

19            Counterclaim

20            Defendants.

21                    Friday, August 26, 2022

22        HIGHLY CONFIDENTIAL, ATTORNEY'S EYES ONLY
```

**Exhibit 17-1.110**



**Page 34**

12    MS. TERRY:  I'm going to take a moment to
13 designate the transcript highly confidential,
14 attorney's eyes only, pursuant to the protective
15 order governing in this case.
16 BY MR. SOOBERT:
17    Q.   Were there any other entities besides
18 Epi24 Ger and Epi24 LLC?
19    A.   I think there was one more, but I don't
20 recall.  I think we didn't buy it.  I think they kept
21 it, but I don't recall.
22    Q.   And the products that were being sold, did

**Page 35**

1 those include Womanizer products at that point?
2    A.   Yes.
3    Q.   And were -- those products were already
4 designed and complete, correct?
5    A.   What does that mean?
6    Q.   They were already designed and being
7 manufactured and sold, correct?
8    A.   That's correct.
9    Q.   Did you contribute to the design of the
10 Womanizer products that were being sold at that
11 point?
12    A.   No.
13    Q.   Who, if you know, designed those products?
14    A.   Michael Lenke.
15    Q.   Anyone else?
16    A.   No, not to my knowledge.
17    Q.   And the manufacturing capability and --
18 strike that.
19      The manufacturing channels were already
20 set up at that time, correct?
21    A.   That's correct.
22    Q.   And did you, as part of your deal with

**Page 36**

1 Mr. Lenke, get the rights to continue making
2 products?
3    A.   Yes.
4    Q.   Were rights to the Womanizer brand name
5 included?
6    A.   Yes.

19    Q.   So in your deal with Mr. Lenke, were the
20 rights to any patents included?
21    A.   Yes.
22    Q.   Which patents?

**Page 37**

1    A.   I don't know about all the patents.
2 Certainly the German DE '501, that's the one I
3 recall.  And everything else that was there at the
4 time, whether awarded or just filed.  All patents,
5 everything that he did for the business was within
6 Novoluto GmbH.  And since we bought Novoluto GmbH,
7 the shares of Novoluto GmbH, all the assets of
8 Novoluto belonged to us.
9    Q.   And when you say "us," who is that?
10    A.   It's a group of private investors in
11 Munich, or around the Munich area, that I teamed up
12 to buy the company.
13    Q.   Are those investors still involved today?
14    A.   Nearly all, yeah.
15    Q.   Okay.  And how large of a group of
16 investors is it?
17    A.   50, plus or minus.
18    Q.   Were there employees at the companies that
19 you purchased already in place?
20    A.   So what I remember is there was one
21 employee in Metten, that's the hometown of Lenke's.
22 It was a young woman helping them with packing the



Page 70

1    page.

2       A.   Mm-hmm.

3       Q.   And it says September 23, 2013.  Do you

4    see that?

5       A.   Yes.

6       Q.   And that's consistent with your

7    understanding that the first patent Mr. Lenke filed

8    was on September 23, 2013?

9       A.   That's correct.

10      Q.   Are you familiar with the device that's

11   described in this patent?

12      A.   Can you define familiar with, being

13   familiar with the device?

14      Q.   Well, do you know what device is described

15   in here?

16      A.   Yes.

17      Q.   What is it, just generally?

18      A.   It's a device that leads to a female

19   getting an orgasm through modulation of positive and

20   negative pressures.

21      Q.   And what does positive and negative

22   pressures mean, if you know?

Page 71

1          MS. TERRY:  I'm going to object.

2          THE WITNESS:  I don't.  I'm not

3    designated.  You need to speak to the designee,

4    please.

5    BY MR. SOOBERT:

6       Q.   Well, just you personally, not the

7    company, do you understand what positive and negative

8    pressure means in the context of this patent?

9       A.   No.





Exhibit 17-1.112

HIGHLY CONFIDENTIAL, ATTORNEY'S EYES ONLY

Johannes Plettenberg

8/26/2022

Page 20 (74 - 77)



**Page 74**

14  Q.   So as part of the deal that you struck to

15 purchase his companies, did you obtain any documents

16 regarding the development of this product that's

17 described in the patent?

18  A.   No.

19        (Plettenberg Exhibit No. 9 was

20        identified for the record.)

21 BY MR. SOOBERT:

22  Q.   We'll mark as Exhibit 9, the '061 patent.

**Page 75**

1  A.   Mm-hmm.

2  Q.   And this is another one of the patents at

3 issue in this case, correct?

4  A.   Correct.

5  Q.   And this one is also invented by

6 Mr. Lenke, correct?

7  A.   Correct.

8  Q.   And it's also assigned and owned by

9 Novoluto GmbH, correct?

10  A.   Correct.

11  Q.   And under the foreign application priority

12 data, this one is listed as March 13, 2015.  Do you

13 see that?

14  A.   Yes.

15  Q.   And is that consistent with your

16 understanding as to when the invention in this patent

17 was applied for?

18  A.   Yes.

19  Q.   Do you have any understanding as to what

20 the difference is, generally, between this patent,

21 the '061 patent, and the '051 patent we just looked

22 at?

**Page 76**

1  A.   This patent includes an appendage to be

2 inserted for vaginal stimulation.

3  Q.   And is appendage also known as a dildo as

4 well?

5  A.   Yeah, it can be.

6  Q.   But a dildo is -- strike that.

7  A.   A dildo works without a motor.  So when

8 the motor is in, it's not a dildo anymore.

9  Q.   But like a dildo, this appendage is

10 designed to be inserted into a vagina?

11  A.   That's correct.

12  Q.   And then that '851 patent was filed

13 September 23, 2013, as we talked about?

14  A.   Mm-hmm.

15  Q.   Correct?  And then this one is filed March

16 13, 2015, correct?

17  A.   Yes.

18  Q.   And so that's about 18 months apart,

19 roughly, you agree?

20  A.   Yes.

**Page 77**



Exhibit 17-1.113



Johannes Plettenberg

HIGHLY CONFIDENTIAL, ATTORNEY'S EYES ONLY

8/26/2022

Page 34 (130 - 133)

Page 130

1    A.   Yes.

2    Q.   That's one of the patent applications that

3 ultimately issued as one of the patents-in-suit in

4 this case, do you agree?

5    A.   I don't know.

6    Q.   Well, I'll represent that it is.

7    A.   Okay.

8    Q.   So this relates to a patent application

9 that's at issue in this case.  And the communication

10 is dated 11/13/2017.  Do you see that?

11   A.   Yes.

12   Q.   And then at the bottom there, entry 1300,

13 Mr. Lenke's also CC'd.  Do you see that?

14   A.   Yes.

15   Q.   You're CC'd on that one as well.  Do you

16 see that?

17   A.   Correct.

18   Q.   And that one is relating to the '851

19 patent we looked at earlier, do you see that?

20   A.   Yes.

21   Q.   And it's dated 10/25/2017.

22   A.   Mm-hmm.

Page 131

1    Q.   So as of that date, Mr. Lenke was being

2 copied and included in the loop on communications

3 regarding prosecution of the patents-in-suit, true?

4    A.   That's correct.

5    Q.   And page 408, the next page, we see

6 another entry 1521.

7    A.   Yes.

8    Q.   And that one is sent to you, CCing Michael

9 Lenke, he's amongst those recipients?

10   A.   Yes.

11   Q.   And this one is also relating to a patent

12 application?

13   A.   Correct.

14   Q.   And it's dated 10/26/2017?

15   A.   Yes.

16   Q.   This came from Rainer Kuhnen's files.  Do

17 you know who Rainer Kuhnen is?

18   A.   He is the partner and owner of Kuhn &

19 Becker, a German IP company, or a company -- a PR law

20 firm north of Munich.  And the company that Michael

21 has used his entire inventor career to work with IP.

22   Q.   So he's one of the patent attorneys in

Page 132

1 Europe regarding the intellectual property in this

2 case?

3    A.   In Europe, you say?

4    Q.   Yes.

5    A.   Yes.

6    Q.   So as of October 2017, Mr. Lenke was still

7 in the loop on these applications, correct?

8    A.   Correct.

9    Q.   If we turn to page 643.

10   A.   Yep.

11   Q.   There's an item 2631.

12   A.   Mm-hmm.

13   Q.   Where Michael Lenke's copied, and it's

14 dealing with a continuation of the '981 application.

15 Do you see that?

16   A.   Yes.

17   Q.   And that's also from 2017?

18   A.   Correct.

19   Q.   And there's a similar entry --

20   A.   Right below.

21   Q.   -- right below.  And then on the --

22   A.   Next slide.

Page 133

1    Q.   On the next page as well, 2633, another

2 communication regarding the prosecution of an

3 application at issue in this case.  Do you see that?

4    A.   Yes.

5    Q.   So these are examples of Mr. Lenke being

6 involved in the communications regarding prosecution

7 of the patents-in-suit, correct?

8    A.   Yes.



Johannes Plettenberg

HIGHLY CONFIDENTIAL, ATTORNEY'S EYES ONLY

8/26/2022
Page 35 (134 - 137)




**Exhibit 17-1.115**

Page 354

1    A.   No.

2    Q.   So you have no visibility into that,

3 correct?

4    A.   That's correct.

5    Q.   All right.  You were asked a couple

6 questions moments ago about notice.  Do you recall

7 that?

8    A.   What is notice?

9    Q.   Notice, your counsel asked with respect to

10 Exhibits 20 and 21.

11    A.   That was the email and the term sheet,

12 right?

13    Q.   Yes.

14    A.   Yes.

15    Q.   But the fact is you never not once

16 communicated to Andre Geske or anyone else at EIS,

17 the specific patent numbers that are at issue in this

18 litigation?

19         MS. TERRY:  Object to form.

20         THE WITNESS:  I don't think I have.

21 BY MR. SOOBERT:

22    Q.   You also testified moments ago about

Page 355

1 Mr. Lenke, and a story about someone stealing his

2 idea when he was young.

3    A.   Mm-hmm.

4    Q.   Where did you learn that information?

5    A.   From him.

6    Q.   He told you that in a conversation?

7    A.   Yes.

8    Q.   Have you reviewed any documents that

9 memorialize that contemporaneously?

10    A.   No.

11    Q.   With the events?  So your sole basis

12 regarding that story from Mr. Lenke and the prototype

13 testing and Mr. Lenke's development of the inventions

14 that are embodied in your patents are solely based on

15 oral conversations with Mr. Lenke?

16         MS. TERRY:  Object to form,

17 mischaracterizes testimony.

18         THE WITNESS:  Based on conversation with a

19 very trustworthy, reliable, honest man who told me he

20 had to sell his vacation home in Spain because of the

21 theft.  And his wife and him went into a depression

22 for two years based on that theft, and much more.

Page 356

1 Which doesn't give me any reason to not believe that.

2         MR. SOOBERT:  I'm going to move to strike

3 that.

4 BY MR. SOOBERT:

5    Q.   I'm just asking you, the entire basis for

6 your knowledge of Mr. Lenke's development of the

7 invention at issue in this case, the prototype, the

8 testing, and this additional story you just testified

9 about are all based on oral conversations that you

10 had with Mr. Lenke, correct?

11         MS. TERRY:  Object to form,

12 mischaracterizes the testimony.

13         THE WITNESS:  Oral communication with a

14 gentleman that I do not have a reason to not trust.

15 BY MR. SOOBERT:

16    Q.   And I'm not asking whether you trust him

17 or not.  I'm just confirming that the basis for your

18 understanding is based on his discussions with you

19 orally.  That's it?

20         MS. TERRY:  Object to --

21         THE WITNESS:  But the way you asked the

22 question, you implied.  So I'm not going to let that

Page 357

1 stand.

2 BY MR. SOOBERT:

3    Q.   So another way to say it is, everything

4 you know about that is what Mr. Lenke told you,

5 correct?

6    A.   Correct.

7         MR. SOOBERT:  Okay.  No further questions.

8         THE VIDEOGRAPHER:  This concludes today's

9 deposition.  The date is August 26, 2022.  The time

10 is 7:12 p.m.  We are now off the record.

11         (Whereupon, at 7:12 p.m., the instant

12 deposition ceased.)

13

14

15

16

17

18

19

20

21

22



Page 358

1        CERTIFICATE OF REPORTER

2

3  UNITED STATES OF AMERICA   ) ss:

4  DISTRICT OF COLUMBIA        )

5      I, Desirae S. Jura, RPR, the officer before whom

6  the foregoing proceedings were taken, do hereby

7  certify that the foregoing transcript is a true and

8  correct record of the proceedings; that said

9  proceedings were taken by me stenographically to the

10  best of my ability and thereafter reduced to

11  typewriting under my supervision; and that I am

12  neither counsel for, related to, nor employed by any

13  parties to this case and have no interest, financial

14  or otherwise, in its outcome.

15

16

17    _____

18       Notary Public in and for

19       The District of Columbia

20

21

22  My commission expires:  1/31/2025



# EXHIBIT 3

**Exhibit 17-1.118**

**HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**



Transcript of
**Mark Tobias Zegenhagen 30(b)(6)**

Monday, September 12, 2022

*EIS, Inc. v. Intihealth Ger GmbH*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 120401

**Exhibit 17-1.119**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3      - - - - - - - - - - - - - - - X

 4      EIS, INC.,                    :

 5                 Plaintiff,         :

 6                 v.                 :

 7      INTIHEALTH GER GMBH, WOW TECH :

 8      USA, LTD., WOW TECH CANADA,   :

 9      LTD. AND NOVOLUTO GMBH,       :

10                 Defendants.        :   Civil Action No.

11      - - - - - - - - - - - - - - - :   19-cv-1227-VAC-

12      NOVOLUTO GMBH,                :   MPT

13                 Counterclaimant,   :

14                 V.                 :   HIGHLY

15      EIS, INC., EIS GMBH, TRIPLE A :   CONFIDENTIAL,

16      IMPORT GMBH, and TRIPLE A     :   ATTORNEYS' EYES

17      MARKETING GMBH,               :   ONLY

18                 Counterclaim       :

19                 Defendants.        :

20      - - - - - - - - - - - - - - - X

21                          Washington, D.C.

22                          Monday, September 12, 2022
```



Page 94

1 disclosure, are concepted or designed to seemingly
2 engage with the body of a user.
3     Q.   Uh-huh.
4     A.   So.
5     Q.   So are you saying that 5 connects or
6 seemingly engages with the user's body, or does 5
7 connect to another chamber that seemingly engages
8 with the user's body?
9     A.   That's not depicted here, but I guess that
10 the disclosure would allow for both.
11     Q.   Oh, i see.  So according to you, in view
12 of the entirety of the specification, the disclosure
13 would allow for both?
14     A.   It's not indicated differently anywhere
15 that I see.
16     Q.   Okay.  So then 5 would be a connection
17 element, according to you, of an example of 3
18 connecting directly to the body?
19     A.   Why 3?
20     Q.   Isn't 3 the first chamber?
21     A.   Correct.
22     Q.   And then 5 is connecting to the body,

Page 95

1 correct?
2     A.   5 is the connection limit according to the
3 nomenclature here.  And the first chamber connects to
4 5, the connection element.
5     Q.   And then 5 connects to what?
6     A.   Here in the depiction, to nothing.
7     Q.   Okay.  And so you are assuming that one
8 implementation would be 5 connects directly to the
9 body?
10     A.   I'm not presuming.  I'm saying it could be
11 another potential example of a commercial embodiment.
12     Q.   I see.
13     A.   But your original question, if I'm not
14 mistaken, was if there is a picture where there is
15 not a first and a second chamber, and figures 10A,
16 10B, and 10C do not depict a second chamber.
17     Q.   I see.  And you're ignoring the word
18 "partial cross-section" in line number 16, correct?
19     A.   I'm not --
20     MR. COOPER:  Objection, form.
21     THE WITNESS:  Why am I ignoring it?
22 BY MR. BANSAL:

Page 96

1     Q.   It says, partial cross-section of a
2 construction of a pressure field generator.
3     A.   Partial cross-section.  And as I read in
4 line 32, in detail, figure 10A shows pressure field
5 generator.
6     Q.   Mm-hmm.
7     A.   The word "partial" in line 16 says with
8 partial cross-sections.
9     Q.   Okay.  Can you return to column 7, line
10 number 19?
11     A.   Yes.
12     Q.   You see, it says figures 10A, B, and C
13 cross-sections through section AA -- A-A of a
14 pressure field generator of the stimulation device
15 shown in figure 1, according to -- do you see that?
16     A.   That's what it says here, yes.
17     Q.   Where is section A-A in this patent?
18     A.   Can you go to figure 1?
19     Q.   Mm-hmm.
20     A.   Do you see this A-A?  That's where it is.
21     Q.   Got it.
22     A.   That refers to the indication of the

Page 97

1 cross-section.
2     Q.   Got it.  Okay.  All Womanizer devices sold
3 in the United States have Pleasure Air Technology as
4 a core feature, correct?
5     A.   I believe so.
6     Q.   Has any Womanizer device ever been sold in
7 the United States without Pleasure Air Technology?
8     A.   Not that I can think of.
9     Q.   How did Mr. Lenke first conceive of the
10 idea for the device that is described and claimed in
11 the '851 patent?
12     A.   I believe that we have forwarded all
13 relevant documents in that description in this
14 litigation, right, in regard to the prosecution.  I
15 have nothing further to add to that.
16     Q.   The prosecution documents do not tell me
17 anything about Mr. Lenke's conception and development
18 of the idea for the device that is described in the
19 '851 patent.
20     A.   Is that a question?
21     Q.   Yeah.  Do you believe the prosecution
22 documents describe adequately how Mr. Lenke first



Mark Tobias Zegenhagen 30(b)(6)   HIGHLY CONFIDENTIAL   9/12/2022
ATTORNEYS' EYES ONLY   Page 26 (98 - 101)

Page 98

1  conceived of the idea for the device in the '851
2  patent?
3      A.   I do.
4      Q.   What is your understanding of how
5  Mr. Lenke first conceived of the idea for the device
6  claimed in the '851 patent?
7      A.   Personally, I was not working for the
8  company at the point in time.
9      Q.   Right.  But you're designated as someone
10  with knowledge on this topic.  Do you understand
11  that?
12      A.   That's correct, and I understand.  And the
13  corporate knowledge has been provided, all the
14  documents have been provided, all that info.  I don't
15  have anything to add to that.
16      Q.   Well, can you describe for me, given that
17  you are knowledgeable and you can speak on behalf of
18  the company, about those documents?  What do those
19  documents show?
20      A.   Which documents?
21      Q.   The documents you are talking about that
22  have been given to us.

Page 99

1      A.   The prosecution history of the patent, you
2  mean?
3      Q.   No, the conception -- do you understand
4  the word "conception"?
5      A.   I understand the conception.
6      Q.   So when did Mr. Lenke first conceive of
7  the idea for the device that is described in the '851
8  patent?
9      A.   Mm-hmm.
10      Q.   When?
11      A.   Before the filing of the patent.
12      Q.   When?  In 2012?  2011?  2010?  2013?
13      A.   I don't have an exact date of that.
14  There's no corporate knowledge about the exact date
15  of when he had the idea.
16      Q.   Okay.  There's nobody in the company who
17  has any knowledge about when Mr. Lenke first
18  conceived of the idea for the device described in the
19  '851 patent, correct?
20      A.   I believe so.
21      Q.   All right.  I understand you do not have a
22  specific date as to when Mr. Lenke first conceived of

Page 100

1  the idea for the device in the '851 patent.  But can
2  you talk to me about what did he do after he had the
3  idea for this device?
4      A.   Corporate knowledge.  Again, I was not
5  working for the company.
6      Q.   Mm-hmm.
7      A.   Corporate knowledge is that he developed
8  the device.  The first, I would say, system that he
9  used in development was a system based on an aquarium
10  pump that he tested on his wife, Brigitte.  And then
11  afterwards, I believe he made a prototype that he
12  took to a swinger club, and tested on women in the
13  swinger club.  And then he filed the patent, a German
14  patent, the '501 patent, in September 23rd, 2013, as
15  it is written here.
16      Q.   How did you obtain this corporate
17  knowledge?
18      A.   Pardon?
19      Q.   How did you obtain this corporate
20  knowledge?
21      A.   That was the documents that I have been
22  shown -- let me rephrase that.  That is the

Page 101

1  information that we have provided, and that is all
2  the information that we have --
3      Q.   Did you --
4      A.   -- as I said in the very beginning.
5      Q.   Did you obtain this information, in part,
6  from Mr. Plettenberg?
7      A.   Exactly.
8      Q.   Did you talk to Mr. Lenke about this?
9      A.   No.
10      Q.   Other than what you have learned from
11  Mr. Plettenberg, you have no other knowledge of
12  Mr. Lenke's conception and development process,
13  correct?
14          MR. COOPER:  Objection.  Are you asking
15  personally or as the corporate representative?
16  Because it's not exactly the clear in your question.
17  BY MR. BANSAL:
18      Q.   Well, why don't you answer in the
19  corporate capacity.
20      A.   The corporate capacity?  I answered that
21  as I already have, right?  All the information that
22  we have, and all the documents what we have -- that

Exhibit 17-1.122

Mark Tobias Zegenhagen 30(b)(6)        HIGHLY CONFIDENTIAL                    9/12/2022
                                       ATTORNEYS' EYES ONLY          Page 77 (302 - 304)

Page 302

1    Q.  Mr. Zegenhagen, for now we have no more
2  questions.  But if more documents come to light,
3  because there is right now a discovery dispute
4  between the parties on document production, if more
5  documents come to light, we may have to call you
6  back.  So I'm going to keep the deposition open for
7  now.
8    A.  Understood.
9       MR. BANSAL:  Thank you.
10      MR. COOPER:  You're passing the witness?
11      MR. BANSAL:  Yes.
12      MR. COOPER:  Okay.  So today's deposition
13 and the testimony provided today is after the fact
14 discovery cutoff of September 9, 2022, in this case,
15 and has therefore proceeded in violation of Federal
16 Rules of Civil Procedure 29 and Delaware local rule
17 16.4.
18      Defendants reserve all rights to move to
19 exclude the testimony provided today as impermissible
20 discovery after the discovery deadline under the
21 Federal Rules, if the parties cannot come to
22 agreement regarding depositions occurring after the

Page 303

1  discovery cutoff.  And further, if that agreement
2  does not result in a court-approved stipulation under
3  Federal Rules of Civil Procedure 29 and local rule
4  16.4.
5       And with that, we will reserve our
6  questions for trial.  Thank you.
7       THE VIDEOGRAPHER:  This concludes our
8  deposition.  We are off the record at 5:51 p.m.
9       (Whereupon, at 5:51 p.m., the instant
10 deposition ceased.)
11
12
13
14
15
16
17
18
19
20
21
22

Page 304

1       CERTIFICATE OF REPORTER
2  UNITED STATES OF AMERICA   ) ss:
3  DISTRICT OF COLUMBIA       )
4     I, Desirae S. Jura, RPR, the officer before whom
5  the foregoing proceedings were taken, do hereby
6  certify that the foregoing transcript is a true and
7  correct record of the proceedings; that said
8  proceedings were taken by me stenographically to the
9  best of my ability and thereafter reduced to
10 typewriting under my supervision; and that I am
11 neither counsel for, related to, nor employed by any
12 parties to this case and have no interest, financial
13 or otherwise, in its outcome.
14
15
16      _____
17         Notary Public in and for
18         The District of Columbia
19
20
21 My commission expires:  1/31/2025
22


Exhibit 17-1.123

# EXHIBIT 4

**Exhibit 17-1.124**



Transcript of **Thomas Milewski**

Wednesday, August 31, 2022

*EIS, Inc. v. Intihealth Ger GmbH*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 120508

**Exhibit 17-1.125**

Thomas Milewski

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3      - - - - - - - - - - - - - - X

 4      EIS, INC.,                       :

 5              Plaintiff,               :

 6              v.                        :

 7      INTIHEALTH GER GMBH, WOW TECH   :

 8      USA, LTD., WOW TECH CANADA,      :

 9      LTD. AND NOVOLUTO GMBH,          :

10              Defendants.             :   Civil Action No.

11      - - - - - - - - - - - - - - :   19-cv-1227-VAC-

12      NOVOLUTO GMBH,                   :   MPT

13              Counterclaimant,        :

14              V.                        :

15      EIS, INC., EIS GMBH, TRIPLE A   :

16      IMPORT GMBH, and TRIPLE A        :

17      MARKETING GMBH,                  :

18              Counterclaim            :

19              Defendants.             :

20      - - - - - - - - - - - - - - X

21                          Washington, D.C.

22                          Wednesday, August 31, 2022
```

**Exhibit 17-1.126**



Thomas Milewski                                                                                      8/31/2022



**Exhibit 17-1.128**



Thomas Milewski

8/31/2022
Page 77 (302 - 302)

Page 302

1        CERTIFICATE OF REPORTER

2

3   UNITED STATES OF AMERICA   ) ss:

4   DISTRICT OF COLUMBIA       )

5        I, Desirae S. Jura, RPR, the officer before whom

6   the foregoing proceedings were taken, do hereby

7   certify that the foregoing transcript is a true and

8   correct record of the proceedings; that said

9   proceedings were taken by me stenographically to the

10  best of my ability and thereafter reduced to

11  typewriting under my supervision; and that I am

12  neither counsel for, related to, nor employed by any

13  parties to this case and have no interest, financial

14  or otherwise, in its outcome.

15

16

17        _____

18        Notary Public in and for

19        The District of Columbia

20

21

22  My commission expires:  1/31/2025



# EXHIBIT 5

**Exhibit 17-1.131**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| EIS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | Civil Action No.: 19-cv-1227-GBW |
| INTIHEALTH GER GMBH, | § | |
| WOW TECH USA, LTD., WOW TECH | § | Demand For Jury Trial |
| CANADA, LTD. and NOVOLUTO GMBH, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| NOVOLUTO GMBH, | § | |
| | § | |
| Counterclaimant, | § | |
| | § | |
| v. | § | |
| | § | |
| EIS, INC., EIS GMBH, | § | |
| TRIPLE A IMPORT GMBH, | § | |
| and TRIPLE A MARKETING GMBH, | § | |
| | § | |
| Counterclaim Defendants. | | |

**REBUTTAL EXPERT REPORT OF**
**DR. DEBRA HERBENICK, PH.D. ON VALIDITY**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), Defendant/Counterclaimant

Novoluto GmbH ("Novoluto") submits this rebuttal report of Dr. Debra Herbenick, an expert

Novoluto expects to call to testify at trial, in support of counterclaims of infringement and in

defense of Declaratory Judgment claims of non-infringement of U.S. Patent No. 9,763,851 ("the

'851 Patent"), U.S. Patent No. 9,849,061 ("the '061 Patent"), U.S. Patent No. 9,937,097 ("the '097

Patent"), U.S. Patent No. 11,090,220 (the '220 Patent), and U.S. Patent No. 11,103,418 ("the '418

**Exhibit 17-1.132**

Patent") (collectively, "the Asserted Patents" or "the Patents-in-Suit").  This report is based on Dr. Herbenick's investigation to date.  Novoluto and Dr. Herbenick reserve the right to supplement this report in view of further investigation or discovery or in response to any reply report or testimony provided by Counterclaim Defendants EIS, Inc, EIS GmbH, Triple A Import GmbH, and Triple A Marketing GmbH or any of their purported experts (collectively, "EIS").

**Exhibit 17-1.133**

toward the development of safer sexual stimulation devices. As examples, this has meant safer materials being used as well as vibrators and dildos that, while textured, have been textured with design features that were smooth and/or rounded.

66.     Importantly, a person skilled in the art who is being thoughtful and careful of the vulva and human health would not look to apply something harmful to the clitoris, the vulva more generally, or the vagina—for example, something with sharp edges, uncomfortable ridges or textures that could cause discomfort, cuts, or abrasions. Doing so would be irresponsible. In my analyses, and in keeping with ethical principles in my professional field of public health,[18] I have considered the health, safety, and well-being of people and specifically the vulva and clitoris. For example, the American Public Health Association's Public Health Code of Ethics notes that, "Health and safety are essential conditions for human flourishing. Public health practitioners and organizations have an ethical responsibility to prevent, minimize, and. Mitigate health harms and to promote and protect public safety, health, and well-being."

### C.     Clitoral Stimulation Before the Asserted Patents

67.     Sexual stimulation devices are designed to enhance sexual arousal and usually to facilitate orgasm. Although sexual stimulation devices may be considered "taboo" in that people don't often talk openly about such devices, the fact is that about half of U.S. adults have used a sexual stimulation device, either during masturbation or during partnered sex. This was highlighted in a 2009 article in the New York Times titled "The Adult Store Goes Mainstream," which featured my team's research showing that more than half of US women ages 18 to 60 had

---

[18] Public Health Code of Ethics. American Public Health Association. Retrieved from: https://www.apha.org/-/media/files/pdf/membergroups/ethics/code_of_ethics.ashx

**Exhibit 17-1.134**

used a vibrator as had nearly have of men (men's use was mostly with a partner).[19] Below are two images from the article, describing how vibrators and other sex toys were—even in 2009— already being sold through Walmart, CVS, 7-Eleven, websites, as well as in-home sex toy parties (which the article describes as "Tupperware-style home parties").

While baby boomers, the first Americans to come of age in an era of loosened sexual strictures, were pioneers of vibrator acceptance, the data make clear that succeeding generations have surpassed them. Among boomer women, ages 45 to 60, 46.3 percent reported having used a vibrator at some point in their lives, compared to 59.5 percent of women, ages 23 to 44; and 32.7 percent of women, 18 to 22. For men, 45.2 percent, ages 45 to 60 reported having used one; 51.5 percent, ages 23 to 44; and 15.5 percent, ages 18 to 22.

The researchers attribute the widespread use to easier availability and a cultural shift away from the bad ol' boy, Triple-X-rated sex toy industry. Vibrators are now sold at Wal-Mart, 7-Eleven and CVS; new Internet sites for sex products feature middle-aged models and aim at mainstream couples. Several companies market sex toys to women as young as sorority sisters and as old as postmenopausal golden girls through Tupperware-style home parties.

---

[19] Winerip, M. (2009). The adult store goes mainstream. New York Times.
https://www.nytimes.com/2009/06/28/fashion/28generationb.html

Exhibit 17-1.135



**NOT THE AVON LADY** Alexa Varricchio, standing at top, hosts a Pure Romance party at her Ithaca, N.Y., home.
Mary Buttolph for The New York Times

68.    Historically, sex toys that focused on clitoral stimulation aimed to mimic other known stimulation methods that relied on applying direct contact (positive tactile pressure) to the clitoral region through oral, finger/hand, or penile contact. In other words, they most often aimed to mimic the feelings of oral sex, vaginal sex, or anal sex through direct contact. In my research, I have also found that sexual stimulation devices that are dildos tend to generally approximate the dimensions of the average sized penis,[20] likely because those are the dimensions most comfortable for users and least likely to cause vaginal discomfort, pain, or mechanical trauma.

---

[20] Herbenick, D., Barnhart, K. J., Beavers, K., & Benge, S. (2015). Vibrators and other sex toys are commonly recommended to patients, but does size matter? Dimensions of commonly sold products. *The Journal of Sexual Medicine*, *12*(3), 641-645.

**Exhibit 17-1.136**

69.     The state of the art for sexual stimulation devices that aimed to provide clitoral stimulation prior to September 23, 2013 (the earliest effective filing date for the '851 Patent) consisted of various forms of vibrators and some suction devices, though my recollection is that the suction-only devices were never very popular.[21]  When I would show people a variety of sex toys, passing them around a room and letting people turn them on and off and apply them to their hand, women would often recoil at the suction-only devices, sometimes making comments suggesting that they were concerned that the suction would be uncomfortable for (or even hurt) their clitoris. Thus, not surprisingly, vibrators were far more widely used sex toys. The below images are examples of sex toys that existed as of that time; they provided either direct contact vibration stimulation or suction only to a female's clitoris:

---

[21] CAMERON_0000573-575.

Exhibit 17-1.137



"The Original Pocket Rocket"
by Doc Johnson



"The Rabbit Vibrator" by Vibratex



"Silver Bullet" by Pure Romance

32

**Exhibit 17-1.138**





"Goddess" by Tantus

"Venus Butterfly" by Cal Exotics

70.     I understand that in 2013, Michael Lenke, the German inventor of the patents-in-suit, read about the existence of a significant orgasm gap between men and women in the general population.  That gap referred to research that showed that while the majority of men experience orgasm during sex, more than half of women rarely or never orgasm.  (Being in the general population, these were issues of orgasm in relation to pleasure or arousal, and not orgasm difficulties from medical issues).  I understand that Mr. Lenke, having been a long-time inventor, was inspired to do something to bridge that gap.  So, he studied female anatomy and consulted with experts, including gynecologists, and realized how important the female clitoris is to orgasm for the vast majority of women.  He also recognized shortcomings of then-existing technology, which did not adequately account for unique considerations concerning this highly sensitive part of the female body. See IHG_00011005-11014; IHG_00011039-11044; IHG_000111111.

71.     I understand from reading the Patents-in-Suit that Mr. Lenke recognized the importance of clitoral stimulation to sexual arousal and understood the disadvantages of sex toys available at the time. Specifically, he identified that vibration—while effective for facilitating

33

**Exhibit 17-1.139**

orgasm for many women—also carried some downsides in terms of people's concerns about becoming too used to vibration or needing to rely on greater intensities of vibration over time. Also, Mr. Lenke appears to have recognized the potential for direct mechanical stimulation of the clitoris to cause some discomfort or pain to the vulva. Further, he identified problems with some devices (including suction-only products) to dry out the clitoral area, further causing discomfort. See IHG_00011005-11014; IHG_00011039-11044; IHG_000111111.

72.     With these understandings, and with a thoughtful approach to creating a device that would be attentive to the health and safety of the clitoris, Mr. Lenke came up with an idea that ended up revolutionizing the sex toy industry.  Mr. Lenke's idea was to create a device that *indirectly* stimulated a woman's clitoris in a way that would avoid the negative side effects of the state-of-the-art stimulation devices on the market.  More specifically, he came up with an idea for a sexual stimulation device for women that would sexually stimulate a woman's clitoris with modulated positive and negative pressures with respect to the ambient pressure acting on the device.  If the concept worked the way Mr. Lenke envisioned, then those modulated pressures, when applied to the clitoris, would enhance arousal and help women experience orgasm, while simultaneously avoiding negative side effects of pain, discomfort, dryness, and habituation.  See IHG_00011005-11014; IHG_00011039-11044; IHG_000111111.

73.     I understand that Mr. Lenke built the prototype in his basement in Metten, Bavaria, in Germany, initially using an aquarium pump and a plastic hose.  To determine exactly how to create the right kind of sexually pleasing sensation via the right kind of pressure field, Mr. Lenke tested the prototype by asking his wife to use it. My understanding from reading interviews with Mr. Lenke and his wife is that initial tests were not promising, producing sensations that were painful, uncomfortable, or ineffective (resulting in boredom rather than sexual pleasure).  I

Exhibit 17-1.140

understand that after a process of trial and error, getting feedback from his wife, and making various adjustments, Mr. Lenke's prototype eventually produced the desired result, which was initially measured by the fact that his wife Brigitte enjoyed sexual stimulation and orgasm from the device, and indicated to him that she thought the device would be a "world success."[22] See below image from an article about the Womanizer and its invention. See IHG_00007373-7377; IHG_00011005-11014; IHG_00011039-11044; IHG_000111111.

> Finally, after two years of trial and error and tests by Brigitte, Lenke had it.
>
> "This is it," he recalls his wife saying. "This will be a world success."

74.     I understand that once Mr. Lenke determined that his prototype provided consistent results on his wife, the next step he took was to determine whether his prototype would produce consistent results with other women.  So, he conducted testing on 50 women who were willing to try the device and complete a survey, to report on their experience.  Of those 50 test subjects, 49 climaxed to orgasm within a few minutes. See IHG_00007373-7377; IHG_00011005-11014; IHG_00011039-11044; IHG_000111111.

75.     With a sense that he was on to something innovative, and wanting to protect his intellectual property, on September 23, 2013, Mr. Lenke filed for a patent in Germany.  A little more than a year later, in October 2014, Mr. Lenke released the first commercial embodiment of this invention in Germany.  Mr. Lenke's wife named the invention "Womanizer" in German—

---

[22] Weber-Steinhaus, F. How a sex tech device called the Womanizer led to female orgasms worldwide. Retrieved from: https://www.cnet.com/culture/how-a-sex-tech-device-called-the-womanizer-led-to-female-orgasms-worldwide/

35

**Exhibit 17-1.141**

this was a name to highlight that the product was entirely for women.  From the Lenke's perspective, the launch of the Womanizer was a celebration of sexual liberation for women, and although the Lenkes later became aware of the negative connotation the word "womanizer" carried in the English language, and particularly in American English, the product achieved such immediate success and widespread recognition that changing the name became impractical, as the brand was too well-established by that point. See IHG_00011005-11014; IHG_00011039-11044; IHG_000111111.

**D. Modulated Positive and Negative Pressures**

76.     Prior art sexual stimulation devices involved either direct vibration on the clitoris or suction, but never had chambers or pressure field generators that generated a stimulating pressure field with positive and negative pressures modulated relative to a reference pressure (ambient pressure) as claimed in the Patents-in-Suit.

77.     The graph below illustrates what suction-only devices might have provided in terms of a pressure pattern always in the negative relative to the reference pressure or ambient pressure at zero:



78.     In contrast, the graph below illustrates what direct contact vibration devices might have provided in terms of a pressure pattern, which would always in the positive with respect to the reference pressure or ambient pressure at zero:

36

Exhibit 17-1.142

Date:  March 22, 2023

_____
Debra Herbenick

Exhibit 17-1.143

# EIS Reply

**Exhibit 17-1.144**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

EIS, INC.,

        Plaintiff,

        v.

INTIHEALTH GER GMBH, WOW TECH
USA, LTD., WOW TECH CANADA, LTD.
AND NOVOLUTO GMBH,

        Defendants.

Civil Action No. 19-1227-GBW

NOVOLUTO GMBH,

        Counterclaimant,

        v.

EIS, INC., EIS GMBH,
TRIPLE A IMPORT GMBH,
and TRIPLE A MARKETING GMBH

        Counterclaim Defendants.

**PLAINTIFF EIS, INC.'S AND COUNTERCLAIM DEFENDANTS EIS, INC., EIS
GMBH, TRIPLE A IMPORT GMBH, AND TRIPLE A MARKETING GMBH'S REPLY
IN SUPPORT OF THEIR MOTION IN LIMINE NO. 1 TO PRECLUDE
<u>ARGUMENT OR EVIDENCE OF THE "INVENTION STORY"</u>**

**Exhibit 17-1.145**

A corporate representative is not free to testify about **anything** under the guise of "corporate knowledge."  WOW Tech misunderstands *Brazos*, which only permits an **adverse** party to elicit testimony on "matters within corporate knowledge" at trial, but otherwise prohibits a corporate representative from testifying outside of his personal knowledge absent an applicable hearsay exception.  *See Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 907–08 (5th Cir. 2010) (citing *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006)).  WOW Tech does not contend any representative has personal knowledge, and it has not otherwise identified an applicable hearsay exception available to it.

The business records hearsay exception does not apply at least because the alleged "business records" WOW Tech cites in Exhibit 1 were not made "at or near the time" of the events described and are untrustworthy self-serving statements.  Fed. R. Evid. 803(6).  The documents are undated, and Mr. Lenke transferred no records of the alleged 2013 invention in the 2017 sale of the company.  Ex. A, 73:8-17.  Therefore, the documents are from after 2017, which is at least four years later, not "at or near the time."  *See U.S. v. Lemire*, 720 F.2d 1327, 1350 (D.C. Cir. 1983) (holding 20 months too long).  Admission of those documents is also highly prejudicial because WOW Tech omitted them from its discovery responses and its corporate designee on the topic represented they did not exist.  Ex. A at 79:20-84:7; *compare* Ex. F at 9-12, *with* Ex. 1.

WOW Tech's representations regarding Dr. Herbenick stretch the truth.  She never stated she obtained knowledge of Mr. Lenke's invention story "as an independent researcher at the time," and every related document cited in the excerpt of her report attached to WOW Tech's motion is either hearsay or a confidential WOW Tech document that Dr. Herbenick did not have as an independent researcher, or both.  *See* Ex. 5 ¶¶ 67-75; Exs. G-K (documents cited in Exhibit 5).

The remainder of WOW Tech's arguments are similarly misleading and irrelevant.

**Exhibit 17-1.146**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

_____
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Plaintiff and Counterclaim*
*Defendants*

OF COUNSEL:

Naveen Modi
Allan M. Soobert
Stephen Kinnaird
Phillip W. Citroen
Chetan Bansal
David Valente
James Razick
Kevin Stewart
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700

Chad J. Peterman
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Andrea Pallios Roberts
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, CA 94304-1106
(650) 320-1800

August 25, 2023

**Exhibit 17-1.147**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2023, I caused the foregoing to be foregoing document

to be served on August 25, 2023, upon the following in the manner indicated:

Paul D. Brown, Esquire                                                        *VIA ELECTRONIC MAIL*
Joseph B. Cicero, Esquire
Gregory E. Stuhlman, Esquire
CHIPMAN BROWN CICERO & COLE, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801
*Attorneys for Defendants IntiHealth Ger GmbH,*
*WOW Tech USA, Ltd., WOW Tech Canada, Ltd.*
*and Novoluto GmbH*

Tammy J. Terry, Esquire                                                      *VIA ELECTRONIC MAIL*
Califf T. Cooper, Esquire
OSHA BERGMAN WATANABE & BURTON LLP
1100 Louisiana Street, Suite 4900
Houston, TX 77002
*Attorneys for Defendants IntiHealth Ger GmbH,*
*WOW Tech USA, Ltd., WOW Tech Canada, Ltd.*
*and Novoluto GmbH*

*/s/ Brian P. Egan*
_____
Brian P. Egan (#6227)

**Exhibit 17-1.148**

# Exhibit F

**Exhibit 17-1.149**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| EIS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No.: 19-cv-1227-GBW |
| INTIHEALTH GER GMBH, | § | |
| WOW TECH USA, LTD., WOW TECH | § | Demand For Jury Trial |
| CANADA, LTD. and NOVOLUTO GMBH, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| NOVOLUTO GMBH, | § | |
| | § | |
| Counterclaimant, | § | |
| | § | |
| v. | § | |
| | § | |
| EIS, INC., EIS GMBH, | § | |
| TRIPLE A IMPORT GMBH, | § | |
| and TRIPLE A MARKETING GMBH, | § | |
| | § | |
| Counterclaim Defendants. | | |

**DEFENDANTS SUPPLEMENTAL ANSWERS TO PLAINTIFF'S AND
COUNTERCLAIM DEFENDANTS' INTERROGTORIES (NOS. 1-22)**

To:   EIS, Inc., EIS GmbH, Triple A Import GmbH, and Triple A Marketing GmbH by and
through their attorneys of record Jack B. Blumenfeld and Brian P. Egan, at Morris, Nichols,
Arsht & Tunnell LLP, 1201 North Market St., P.O. Box 1347, Wilmington, DE 19899-
1347.

Defendants IntiHealth Ger GmbH, WOW Tech USA, Ltd., WOW Tech Canada, Ltd and

Novoluto GmbH (collectively "WOW Tech") hereby supplement their Answers to Plaintiff, EIS,

Inc.'s and EIS GmbH, Triple A Import GmbH, and Triple A Marketing GmbH's (collectively

"EIS" or "Plaintiff") Interrogatories to Defendants (Nos. 1-22) as follows:

1

**Exhibit 17-1.150**

## ANSWERS AND OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1:**

For each Asserted Claim of the Patents-in-Suit, describe in detail all facts and circumstances of alleged conception, reduction to practice (actual, and constructive), and diligence in such reduction to practice, including identifying the earliest date You contend that such claim was conceived of, the earliest date You contend that such claim was actually or constructively reduced to practice, all activities constituting any alleged diligence concerning any alleged reduction to practice, all persons with knowledge of the relevant facts, and all testimony, Documents (by Bates number) or other evidence relating to any of the foregoing.

**RESPONSE:**

WOW Tech incorporates by reference each of its General Objections as though set forth herein.  WOW Tech objects to this Interrogatory on the grounds that it seeks irrelevant information because each Patent-in-Suit is a post-AIA patent filed after March 16, 2013, rendering the topics of conception, reduction to practice, and diligence irrelevant to any claim or defense in this case. WOW Tech further objects to this Interrogatory to the extent that it seeks information protected by the attorney client privilege, the attorney work product doctrine, and/or the common interest privilege.  WOW Tech further objects to this Interrogatory to the extent that it seeks information not in WOW Tech's possession, custody, or control.   WOW Tech further objects to this Interrogatory to the extent it seeks information more readily available from third parties.  WOW Tech further objects to this Interrogatory on the grounds that it is unduly burdensome and oppressive in as much as it calls for information more properly obtained through other forms of discovery.

**Exhibit 17-1.151**

Subject to and without waiving these objections, WOW Tech answers as follows:

In 2013, German inventor Michael Lenke filed a patent application based on his invention of a handheld sexual stimulation device that, among other things, was designed to stimulate a woman's clitoris by applying modulated positive and negative pressures through the device's opening—a feature that later became known as "Pleasure Air Technology." Having read that 50% of women had trouble reaching orgasm, Michael Lenke sought to solve that problem with this invention and, according to many, he did just that. His invention opened a new door for women to achieve orgasms in a way that had not been contemplated by prior sexual stimulation devices on the market. Michael Lenke and his wife Brigitte worked together to commercialize this new invention through a small group of companies, one of which is the current patent owner and defendant/counter-plaintiff Novoluto GmbH. Not long thereafter, in 2014, the Lenkes released the first commercial embodiment of this invention.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

In 2013, the German inventor of the patents-in-suit, Michael Lenke, read that a significant orgasm gap existed between men and women– in other words, while the majority of men experience orgasm during sex, more than half of women rarely or never orgasm. A long-time inventor, Mr. Lenke was inspired to do something about this issue, to bridge that gap. In this pursuit, he studied female anatomy and consulted with experts, including gynecologists, and realized how the female clitoris really holds the key to orgasm for the vast majority of women. He also recognized shortcomings of then-existing technology, which did not adequately account for unique considerations concerning this highly sensitive part of the female body.

Recognizing the importance of clitoral stimulation to sexual arousal and understanding the disadvantages of sex toys available at the time, Mr. Lenke came up with an idea that would revolutionize the sex toy industry. The idea was to create a device that indirectly stimulated a woman's clitoris in a way that would avoid the negative side effects of then-existing sex toys on the market. To test his idea,

**Exhibit 17-1.152**

he set out to build a sexual stimulation device for women that would sexually stimulate a woman's clitoris with alternating puffing and sucking sensations. If the concept worked the way Mr. Lenke envisioned, then those modulated pressures, when applied to the clitoris, would bring a woman to climax, while simultaneously avoiding negative side effects of pain, discomfort, and habituation.

Mr. Lenke started with an aquarium pump and a plastic hose and built the prototype in his basement in Metten, Bavaria, in Germany. To optimize the pressure field, Mr. Lenke tested the prototype on his wife. Initial tests were not promising. The very first tests produced sensations that were painful at worst, and uncomfortable at best. Other tests produced results that were ineffective, or resulted in more boredom that sexual stimulation. Eventually, however, after various adjustments, Mr. Lenke's prototype produced the desired result, and his wife enjoyed consistent sexual stimulation and orgasm. The next question was whether other women would respond in the same way to his invention. To find out, Mr. Lenke found 50 women who were willing to try the device. Of those 50 test subjects, 49 climaxed to orgasm within a few minutes.

Mr. Lenke knew then he was definitely onto something and, on September 23, 2013, he filed for a patent in Germany. He released the first commercial embodiment of this invention in Germany a little more than a year later, in October 2014. The commercial name for his invention was "Womanizer," a name his German wife came up with to highlight that the product was entirely for women. The launch of the Womanizer was a celebration of sexual liberation for women, and although the Lenkes later became aware of the negative connotation the word "womanizer" carried in the English language, and particularly in American English, the product achieved such immediate success and widespread recognition that changing the name became impractical.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

WOW Tech further incorporates by reference as though stated here full its Technology Tutorial served on Plaintiff's counsel and submitted to the Court on June 30, 2022 (D.I. # 244 and 245), as well

Exhibit 17-1.153

as associated documents produced in this litigation, including, but not limited to, IHG_00010927-IHG_00011137. WOW Tech further incorporates by reference responsive testimony from deponents in this case, including from depositions that have yet to be taken, to the extent additional responsive testimony may develop. WOW Tech further identifies persons with knowledge of the relevant facts as including Michael Lenke, Brigitte Lenke, the 50 participants in the German testing of the prototype, and WOW Tech corporate representatives Johannes Plettenberg and Tobias Zegenhagen.

### THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

WOW Tech further incorporates by reference as though stated here in full its Opening Expert Reports of Dr. Cameron and Dr. Herbenick, and their associated documents and materials, served on Plaintiff's counsel on February 8, 2023, its Rebuttal Expert Reports of Dr. Cameron and Dr. Herbenick, and their associated documents and materials, served on Plaintiff's counsel on March 22, 2023, the deposition transcripts and associated exhibits of Tobias Zegenhagen and Johannes Plettenberg, as well as associated documents produced in this litigation, including, but not limited to, IHG_00007373-7377, IHG_00007573-7578, IHG_00007579-7584, IHG_00011039-IHG_00011044; IHG_00011045-11050; NOV061PAT_00001466-1476.

### INTERROGATORY NO. 2:

For each of the Patents-in-Suit, separately Identify each WOW Tech product that WOW Tech contends practices or was made in accordance with at least one claim of the respective Patent in-Suit, including, without limitation, the product name and model number of each such product, the approximate date on which development began for such product, the date of first sale and offer for sale for such product anywhere in the world, and Identify if, when, and how such products were marked pursuant to 35 U.S.C. § 287 (including Identifying all time periods during which any such products were not so marked and all Documents (by Bates number) allegedly evidencing such marking).

**Exhibit 17-1.154**

# Exhibit G

**Exhibit 17-1.155**



**Exhibit 17-1.156**

**Exhibit 17-1.157**



**Exhibit 17-1.158**

**Exhibit 17-1.159**



**Exhibit 17-1.160**

# Exhibit H

**Exhibit 17-1.161**

Page 1
Sexspielzeug aus Niederbayern: Der "Womanizer" - Bayern - SZ.de
https://www.sueddeutsche.de/bayern/niederbayern-sexspielzeug-womanizer1.3441440-0#seite-2

Süddeutsche Zeitung

Subscriptions Abos | Log in Login

My SZMeine SZ | SZ PlusSZ Plus | CoronavirusCoronavirus | UkraineUkraine | NRWNRW | politicsPolitik | Bus ›

Home › Bavaria › sexuality › Sex toys from Lower Bavaria: The "Womanizer"       state theatre | us je studying | hail less | freed ime in the region

**sex toy**

# The supposedly ultimate sex toy

Mar 30, 2017 6:54 pm   |   Reading time: 4 mins



The "Womanizer" is reminiscent of a computer mouse - like all of Michael Lenke's inventions. it was also tested by his wife Brigitte. (Photo: Armin Weigel)

**Every woman succumbs to the "womanizer." says Michael Lenke. From Metten in Lower Bavaria, he sells vibrator alternatives all over the world.**

By *Maximilian Gerl*, Metten

  
Give   Safe   feedback   Print

*The article has not yet been voiced.*

In the end, Brigitte Lenke had a good feeling. When her husband Michael presented his latest construction to her, she soon realized that if he refined this product, it would become "a world hit". It goes without saying that her husband retreated to his basement workshop in Metten , Lower Bavaria , to tinker with the prototype there until Mrs. Lenke was really satisfied with the matter. After all, he had chosen her, his wife, as a test subject, as he had so often done.

"As a guinea pig," she says. With the Lenkes, this is part of the marriage bond, so to speak, and it has lasted for 30 years now. Sometimes she said: "Leave me alone with that", the prototypes often didn't work properly. But he took it with aplomb. "As an inventor, you have to get up again and again," he says. And if the woman is supposed to test the suitability of a newly constructed sex toy, then her criticism has to be taken seriously.



*SZ magazine* Naked Numbers: Sex Column

**Erotic innovation: masturbate hands-free**

A new sex toy automatically starts to vibrate when the erotic passages appear in the audiobook. This opens up unexpected perspectives in the household and partnership.

Captured by FireShot Pro: 18 May 2022, 15:31:37
https://getfireshot.com

IHG_00011005

**Exhibit 17-1.162**

Metten in the district of Deggendorf with its 4480 inhabitants was previously not known for innovative devices to enrich female sexuality . A market straight out of a Lower Bavarian picture book, forest, Danube, Catholicism.

Although it is fair to say that the place has never seen someone like Michael Lenke in all the centuries. One who has become wealthy through invention. One who could have retired long ago, but instead built a sex toy in his basement, which he now sells worldwide after the series of tests with his wife: the "Womanizer".

The "Womanizer" is a pleasure toy for women, but it doesn't look like pleasure at all. It is most reminiscent of a computer mouse. "It could be anything," says Lenke. On the Internet, on the other hand, as well as in test reports and customer reviews, the thing is given attributes such as "happy maker" or "orgasm guarantee". Some even write of a "revolution in the sex toy industry", whatever that means now.

The mastermind behind this alleged revolution, however, makes a bourgeois impression. Michael Lenke, 67 years old, could pass for a businessman on vacation in his casual shirt. He formulates his success more soberly than the internet, he only needs three numbers. The first: The "Womanizer" was tested on many women of different ages after the marital test series, 99 percent of them had reached orgasm. The second and third: He has sold several hundred thousand "Womanizer" in recent years, worldwide, in more than 40 countries.



Michael Lenke and his wife Brigitte are a well-rehearsed team. He invents things, she tests them to see if they work. (Photo: Armin Weigel)

If you like, Lenke has achieved a feat in what appears to be a slightly dingy industry. His thing neither looks like a classic sex toy, nor does it work like one. Or, to get down to basics: Since the invention of the vibrator 100 years ago, "there have been no really new products for women on the market," says Lenke. The industry has focused on man's satisfaction. Hardly anyone was interested in the female orgasm, although many women had problems with it. "I wanted to change that," says Lenke.

**The inventor says: "I want to know how things work"**

He spoke to gynecologists and therapists and worked on a new concept. And so much can be revealed: His "Womanizer" does not vibrate, and it is placed on a very sensitive spot in the female genital area, on the clitoris. It should also be said that pressure waves play a very important role. "The woman cannot defend herself against it," says Lenke, describing the effect of his construction. But she probably doesn't want to, because otherwise she wouldn't have bought the "Womanizer" in the first place.

Once again: Until a few years ago, Lenke had nothing to do with the erotic industry. He has archived his inventions, newspaper clippings, flyers, photos, in several thick folders. Lenke estimates that he has made around 100 inventions to date. He is noted in the register of the German Patent Office for, among other things: a plant pot for cultivating plants with permanent dwarf growth (registered 1985), a

IHG_00011006

**Exhibit 17-1.163**

massage device with suction cups (1993), a battery-operated earthquake alarm device (2000), a radiation device with light-emitting diode and fiber optics (2004) .



SZ magazine    Naked Numbers: The Sex Column
### Caterpillar with vibration background
Why does Germany's most popular sex toy look like a grinning insect? Phallic traditionalists are appalled.

Some inventions never reached market maturity, such as an SOS airbag for the car roof, which - once inflated - warns other drivers of a broken-down vehicle. "Recognizable from a distance of up to two kilometers," says Lenke. The problem: Because the responsible authorities did not know how to legally classify a roof airbag, Michael Lenke had to freeze his project.

The 67-year-old is a career changer who, by his own admission, rarely has any idea of what he is building. He acquires his knowledge from idea to idea. He researches, asks experts, tries things out. You can't learn to be an inventor, he says. "It's a talent, you either have it or you don't." His wife says: "Once I bought a new curling iron. Two days later it was completely disassembled." He in turn says: "I want to know how things work."

**The company headquarters will soon move from Lower Bavaria to Berlin**

For the marketing and sale of the "Womanizer" Lenke founded his own company. In the in-house online shop, the standard "Womanizer" costs around 100 euros. A limited edition piece decorated with Swarovski crystals costs 499 euros. The business is obviously paying off, and around 800 people now work for the company.

Production takes place in a plant in Asia, the headquarters will soon be moving from Metten to Berlin, Lower Bavaria has become too small. Lenke knows he's come a long way as an inventor: "I've seen a lot of developers get stranded." Some failed because they tinkered until they ran out of money. Others because their invention was stolen before it was protected.

But sometimes even more goes wrong when tinkering and screwing. From his house, Lenke looks out over a ruin in the neighboring garden. There was an apartment building there until last summer, then it blew up, an explosion, fire everywhere. Miraculously, no one was seriously injured. The neighbor had also been tinkering in the basement. Lenke says: "He built nail bombs."



Conference on sex robots
**"This technique could reduce prostitution"**
Are sex robots good or bad? Researchers want to find out at a conference in London. Organizer Kate Devlin even believes that feelings between humans and machines are possible.
Interview by Christoph Behrens

Captured by FireShot Pro: 18 May 2022, 15:31:37
https://getfireshot.com

IHG_00011007

**Exhibit 17-1.164**

Page 4
Sexspielzeug aus Niederbayern: Der "Womanizer" - Bayern - SZ.de
https://www.sueddeutsche.de/bayern/niederbayern-sexspielzeug-womanizer.1.3441440-0#seite-2



**To the SZ homepage**

**Peaceful protest against the war**
**Artist collective plays a huge phone phone prank on the Russian government**

The activists stole 5,000 numbers from the military, secret service officials and politicians. If you click a button on a website, a telephone conference starts between two randomly selected connections.

*Read more on the topic*

`sexuality`  `district of Deggendorf`  `Lower Bavaria`  `Bavaria`
`economy in Bavaria`





music
**ESC singer Malik Harris is sick in bed**
Only on Saturday the defeat at the Eurovision Song Contest, two days later the start of the Germany tour - and now the singer Malik Harris...

Fires - Bremen
**Fire in the recycling center triggers a large-scale...**
In a recycling plant in Bremen's industrial ports, residual waste caught fire in a collection container on Wednesday. The fire brigade was with a large contingent...

Deutsche Bahn
**This is what the new ICE looks like from the inside**
After 30 years, the flagship of the Deutsche Bahn is getting a new interior. The places should at least be a little more similar to the living room at home. When it comes to ...

By Markus Balser




Lake Constance
**The need with the necessities**
The Lindau-Reutin long-distance train station is getting public toilets - a year and a half after it opened. Not the only annoyance for train drivers.
*Commentary by Florian Fuchs*

Soccer
**Woman describes sexual harassment - club stunned"**
Second division football club 1. FC Nürnberg is dismayed by the descriptions of a woman who, according to her own statements, after the game against FC Schalke 04 on the...





weather
**Heavy storms expected - There is even a risk of...**
The sun is followed by lightning and thunder: new severe storms threaten in parts of Germany. Meteorologists expect the heaviest thunderstorm situation so far this year...

Ibiza documentary
**"I wasn't there at all"**
Like the Austrian broadcaster Puls 24 with Heinz-Christian Strache once again drove to the famous Ibiza finca.

By Cathrin Kahlweit

● Live Live blog about the war in Ukraine
**Kyiv and Moscow suspend negotiations**
A face-saving solution for Kremlin chief Vladimir Putin is rejected, according to Ukraine. The EU speaks of unprecedented losses that the Russian army had to accept ...




IHG_00011008

**Exhibit 17-1.165**

Page 5
Sexspielzeug aus Niederbayern: Der "Womanizer" - Bayern - SZ.de
https://www.sueddeutsche.de/bayern/niederbayern-sexspielzeug-womanizer1.3441440-0#seite-2

**Government - Hanover**

**Dispute about the Chancellor's tour at the Hanover Fair**

In the dispute over the chancellor's tour of the Hanover Fair, the CDU sees the chancellor as personally responsible for the alleged uninviting of two...

**cycling**

**He can do anything except open champagne...**

Biniam Girmay from Eritrea should help African cycling to take off. At the Giro he achieved the biggest triumph of his career - but then he had to drop out because he had a crazy mishap at the award ceremony.

By Johannes Aumuller





**Pullach**

**Parents blow the whistle on the wrong teacher**

The 23-year-old had tricked himself into the temporary position at the Pater Rupert Mayer elementary school with forged certificates.

By Michael Morosow

**automobile**

**Tesla flies out of S&P sustainability index - Musk outraged**

The electric car maker Tesla has been removed from the S&P 500 ESG stock index for allegedly sustainable investments - Elon Musk does not like that at all.

---

More about: sexuality



SZ Plus  SZ magazine  sexuality

**"The majority of people are probably bisexual"**

The German-Canadian author and criminal psychologist Julia Shaw has been researching the subject of bisexuality for years and has come to the conclusion that many do not live it out. She recommends: Just try it out.



SZ Plus  now  sex

**How does a good three-some succeed?**

Sexualtherapeutin Julia Henchen verrät, wie man sich beim Sex zu dritt nicht ausgeschlossen fühlt, wer sich am besten als Sexpartner eignet - und warum man nach dem Dreier zusammen etwas trinken gehen sollte.



Pornografie

**Die Akte Schmuddelkram**

Ein Unbekannter entsorgt in einem mittelfränkischen Straßengraben alte Sexheftchen. Nun droht ihm bis zu ein Jahr Haft, wegen illegaler Verbreitung von Pornografie. Ist das noch zeitgemäß?



anti-discrimination

**Catholic church workers come out as queer**

The 125 employees are risking their jobs. In the joint manifesto they call for an end to their discrimination.



SZ Plus  SZ magazine  sexuality

**"There's something very meditative about slow sex"**

Many couples who had lost intimacy in the stress of everyday life have found each other again with "Slow Sex". The therapist Andreas Jürgelucks explains what the method is all about - and why less pressure to perform in bed can often do you good.



now  sexuality

**The Christmas Sex Experiment**

Our author has been with his girlfriend for over three years. The problem: you are having less and less sex. Does a sex toy Christmas calendar bring momentum back into the relationship?

To the topic page  →

Captured by FireShot Pro: 18 May 2022, 15:31:37
https://getfireshot.com

IHG_00011009

**Exhibit 17-1.166**

VERLAGSANGEBOT

**SZ job market**

**Discover attractive Jobs**

In demanding professional fields in the SZ job market.

| | |
|---|---|
| Medicine, health & social affairs | tech Development |
| Consulting & Advice | Marketing, PR & Advertising |
| Vehicle construction & suppliers | IT/TK software development |
| tech Management & project planning | Distribution, Sales & Trade |
| Research & Development | |

Discover now  →

Would you like to further develop SZ's digital products with us? Apply now!   Jobs at SZ Digitale Medien

---



● Live  Live blog about the war in Ukraine

**Ring exchange: Germany delivers Leopard tanks to the Czech Republic**

The first delivery includes fifteen tanks, and the two countries are also negotiating a further delivery of 50 vehicles in the next few years. The EU is planning up to 300 billion euros for ...



Accidents - Einbeck

**Motorcyclist dies after colliding with truck**

Einbeck (dap/lni) - A motorcyclist died in a traffic accident with a truck on Tuesday evening near Einbeck. The 23 year old ...



Tunnel plans in Munich

**Sharp criticism of "BMW Autobahn"**

That's what climate and environmentalists call the planned tunnel through Munich's Hasenbergl. 710 large trees would have to be felled for this. Mayor Reiter defends the ...

By Thomas Start and Anna Hoben

---



Viewed globally

**What makes the end of the war so uncertain**

International politics are at least as contradictory as the military signals from Ukraine. Why solidarity is crumbling.



Snapshots in May

**pictures of the day**

Beautiful, frightening, absurd and everyday things: snapshots from all corners of the world.



Death of Ademola Okulaja

**He was a warrior and a gentleman**

Whether on the ball or in real life: basketball player Ademola Okulaja has defied his fate. He suddenly died at the age of 46.

Obituary by Volker Kreisl

---



Racism - Schneeberg

**After racist insults: police student suspended**

A police candidate from Saxony is said to have racially insulted a colleague at the police school in Schneeberg (Erzgebirge district). It's a lawsuit...



New in cinema & streaming

**Which films are worthwhile - and which are not**

A German shepherd has to cope with war trauma, and Leander Haussmann mocks the Stasi. The starts of the week in brief.

From the SZ critics

---



● Live  Live blog about the war in Ukraine

**USA return to Kyiv**

The US Embassy resumes operations in Ukraine. Russia is developing a laser weapon to shoot down drones. Germany delivers Leopard tanks to the Czech Republic.


Süddeutsche Zeitung

Shares

**Dax weakens - high losses on US stock exchanges**

Investors are avoiding equities around the world for fear of the consequences of high inflation. On the company side, the focus was on takeovers and business figures.



Memory   Alliance scandal

**My name is Bäte, I don't know anything**

The Allianz leadership is primarily concerned with one thing when dealing with the latest scandal: it allegedly has nothing to do with it. This follows a pattern, board members and ...

Commentary by Herbert Fromme

---

Captured by FireShot Pro: 18 May 2022, 15:31:37
https://getfireshot.com

IHG_00011010

**Exhibit 17-1.167**

ADVERTISEMENT
COUPONS



**Booking.com coupon**
Up to 20% Booking.com discount + free breakfast...

**TUI voucher**
€300 TUI voucher for your holiday

**off-to-holiday voucher**
Get a €250 off holiday discount code for your...

**Sixt voucher**
10% student discount with Sixt voucher

ADVERTISEMENT
COMPARISON PORTAL



**depot**
Our stock and securities portfolio comparison

**broadband**
Find the best DSL deals

**business account**
Open a free business account

**Checking accounts co...**
Determine the best current account with ou



Energy - Dusseldorf
**EnBW: Mechanism for paying for Russian gas imports is in place**
According to the energy company EnBW, it has developed a sanctions-compliant procedure for paying for Russian gas imports. There is now a...

Crime - Cologne
**Dispute among several men: 22-year-old killed**
A 22-year-old was fatally injured in a dispute between several men in Cologne. As the police and prosecutors announced on Wednesday...

Traffic - Wadgassen
**Truck falls off bridge, driver dead**
A truck driver died in an accident on the A620 between Völklingen and Wadgassen on Wednesday. His vehicle is said to be of unclear...



Groundwater emergency in Schwabing
**"Two Years in a Damp House"**
Angry residents, angry members of the state parliament: At a site visit on Center Strasse, representatives of the city of Munich should answer questions constructively - but the fronts remain hardened.
By Nicole Graner

crime
**Million coup by Emmerich: Zollmann gives a hot lead**
The burglary happened like in a Hollywood film: early in the morning, three men pried open the cellar door of a customs office in Emmerich on the Lower Rhine, which...



festivals
**Process for Oktoberfest vouchers**
A pint of beer at the Munich Oktoberfest and chicken vouchers for the police: In the Bavarian capital, the case against Oktoberfest host Toni...

literature column
**What are you reading?**
In our interview column, we ask writers what they are currently reading. In this episode: Daniel Kehlmann.
By Miriam Schellbach

IHG_00011011
Exhibit 17-1.168



**Soccer - Frankfurt am Main**

### Frankfurt in final fever: empty streets, thousands in the stadium

The whole of Frankfurt was in football fever on Wednesday evening: Eintracht fans loudly supported their team in distant Seville for victory in the Europa League...



**Weather in Hanover**

### Thunderstorm and heavy rain in Lower Saxony

It's getting wet, and really: The German Weather Service (DWD) expects strong thunderstorms for Lower Saxony on Thursday and especially on Friday and with...



**To build**

### New prices every day

Steel has become much more expensive, other building materials are not available at all. The lack of material becomes a risk for many companies - and an ordeal.

By Roland Preuss



**refugees in Bavaria**

### The fear follows

In addition to housing refugees from Ukraine, their psychological care is becoming increasingly important. In Bavaria, advice centers are helping - and warn that the problems could worsen if more people come from ...

By Clara Lipkowski and Viktoria Spinrad



**Public Health**

### Tobacco kills more than eight million people annually

Although the global smoking rate has fallen, almost one in five people still smoke regularly, according to a report. The industry is developing new marketing strategies.

By Berit Uhlmann



**Animals - Walldorf**

### Cat lockdown: bird protection measure is criticized

Outdoor access is prohibited for the time being: Many domestic cats in Walldorf (Rhein-Neckar district) are no longer allowed to leave the house until the end of August. To those of ...



**State Parliament - Cologne**

### Ex-Interior Minister: FDP has misguided understanding of freedom

Former Interior Minister Gerhart Baum (FDP) sees one of the reasons for the poor performance in the liberals' easing of the corona pandemic...



**skills shortage**

### "Where did they all go?"

No bus drivers, no engineers and operators: Entrepreneurs in the district of Munich are sounding the alarm because the shortage of staff after the corona pandemic is coming to ...

By Bernhard Lohr



**Crime - Munich**

### Man stabbed: police arrest suspects

After a violent argument on a street in Munich, a suspect has been identified. It is a 29-year-old who died on Tuesday on...



**Accidents - Wurzbach**

### Husband causes tractor accident: wife seriously injured

In a tractor accident between two spouses, the 59-year-old woman in Wurzbach (Saale-Orla district) was seriously injured. The 66-year-old husband rammed ...



**sanctions**

### The EU Parliament is targeting the former...

MEPs are calling for penalties for ex-politicians



**Processes - Bremen**

### Three murder suspects released from custody in Bremen



**Munich high society**

### What is luxury? A conversation among experts

Four members of the upper class discuss real

Captured by FireShot Pro: 18 May 2022, 15:31:37
https://getfireshot.com

IHG_00011012

**Exhibit 17-1.169**

Page 9
Sexspielzeug aus Niederbayern: Der "Womanizer" - Bayern - SZ.de
https://www.sueddeutsche.de/bayern/niederbayern-sexspielzeug-womanizer.1.3441440-0#seite-2

who earn money in Putin's empire: The German Social Democrats also want to vote for the resolution.

By Josef Kelnberger

Three men suspected of murder in Bremen have been released from custody because they waited too long for their trial. The Hanseatic...

life. What is needed to be happy: time, sustainability - and four donkeys.

By Ulrike Heidenreich


stole
**Pipe company Vallourec wants to close German plants**
The French steel tube group Vallourec wants to close its two traditional plants in Düsseldorf and Mülheim an der Ruhr. A total of...


US area codes
**Trump's candidates are weakening**
The ex-president's favorites failed in several important primary elections. Why Trump's influence on Republicans is still significant.


Crime - Heath
**Brawl with seriously injured: 65-year-old suspected**
After a brawl in Heide (Dithmarschen district) with a life-threatening injury, the suspicion of a crime has increased, according to the police.


Accidents - Schackstedt
**Two people killed in traffic accident in Salzlandkreis**
In a serious traffic accident on the L85 near Aschersleben (Salzlandkreis), two people died, other people are sometimes seriously...


Rail
**Comfortable at 300 km/h - Bahn redesigns ICE**
You could even bring your houseplant: the ICE gets window sills in first class. But that is by no means the only change, and also for...


Festivals - Berlin
**Lauterbach and the ability to plan the Wiesn in Corona times**
An Oktoberfest in Munich like before, without a mask and distance? Federal Minister of Health Karl Lauterbach (SPD) thinks so in view of possible new variants...


Fairs - Hamburg
**Record number of visitors at the OMR digital trade fair**
Hollywood celebrities, lunch breaks with musical greats and lots of knowledge and expertise about digital business: the OMR industry festival in Hamburg...


Eintracht and Rangers fans: The giant party in Seville
Many hours before the start of the final in the Europa League, tens of thousands of fans of Glasgow Rangers and Eintracht Frankfurt celebrated - at several fan festivals in the...


**Scholz: Now is the time to start**
At a summit meeting of four North Sea countries in Denmark on Wednesday, Chancellor Olaf Scholz called for courage and speed in the expansion of wind energy.


Oktoberfest
**What the new Bräurosl tent should look like**
The Hacker-Pschorr brewery and the new landlord Peter Reichert presented their plans. The marquee is higher, airier, more modern - and yet traditional again: The first Sunday ...


Soccer - Seville
**Eintracht President Fischer renewed criticism of the final stadium**
Eintracht Frankfurt's club president Peter Fischer voiced his criticism of the choice of the comparatively small final stadium for the Europa League shortly before kick-off...


Soccer - Seville
**Tens of thousands of fans in Seville - Körbel: "Never seen it before"**
The fans sang their club anthems loudly in the pubs and narrow streets of downtown Seville - and also at the fan festivals on the big squares of the...

By Franz Kotteder


Measure


Cycling - Neuwied


SZ podcast "To the point"

Captured by FireShot Pro: 18 May 2022, 15:31:37
https://getfireshot.com

IHG_00011013

**Exhibit 17-1.170**

### Ashton Kutcher raves about Mila Kunis

The American actor Ashton Kutcher (44) made a public declaration of love for his wife Mila Kunis (38) at the OMR digital festival in Hamburg.

### Professional cyclist Walscheid after a training accident: "I'm scared"

Almost two months after his serious training accident, professional cyclist Max Walscheid continues to think about the risks of his sport. "I find it at all...

### Finland and Sweden joining NATO: Erdogan's calculations

Finland and Sweden want to join NATO. But Turkey shoots across. Can Erdogan still prevent accession?

By Matthias Kolb and Lars Langenau



Raumfahrt

### Boeing versucht noch einmal, die ISS zu erreichen

Der Konzern möchte endlich Astronauten zur astronauts to the space station. The first test flight of the "Starliner" capsule did not make it to the ISS - it looks very different from the ...

By Dieter Surig

Fußball- Sevilla

### Tausende Frankfurter Fans auf dem Weg zum Finalstadion

Around 10,000 football fans of Eintracht Frankfurt walked from the Prado de San Sebastian to the final stadium in Seville on Wednesday. At the fan march...

Meinung   Boris Johnson

### Worum geht's? Um ihn selbst

Der britische Premier will den Brexit-Vertrag the Brexit deal. In the fight for his own political survival, he needs the EU again as an enemy.

Commentary by Alexander Mühlauer

To the SZ homepage

Süddeutsche Zeitung

  

media data    Newsletter    breaking news    RSS    app    jobs

privacy    Privacy Settings    Contact and Imprint    Conditions

IHG_00011014

Exhibit 17-1.171

# Exhibit I

**Exhibit 17-1.172**

Page 1
Toy Story: Interview with the inventor of Womanizer - Annabelle
https://www.annabelle.ch/body-soul/toy-story-womanizer-michael-lenke-47929/

LIFE    STYLE    CULTURE    BODY & SOUL

# annabelle



body & soul

## Toy Story: The Womanizer inventor in an interview

Text: Kerstin Hasse  Photo: Markus

SHARES

The Womanizer is the most successful sex toy in recent years. Michael Lenke invented it and his wife Brigitte was the first to test it. We visited the couple in Bavaria.

The radio said that large parts of Germany were struggling with bad weather - except for Bavaria. Maybe that's why the people there are so happy, the moderator joked.

According to the Happiness Atlas, which Deutsche Post publishes every year, Bavaria is actually one of the happiest regions in Germany. One possibility is that this happiness is based on the favorable climatic conditions. Although, in late winter, the high fog tends to get on your spirits here too. So maybe it's the beer, a freshly tapped one, that's more likely. But maybe it's something else entirely. Perhaps the happiness of the Free State lies in deepest Lower Bavaria, more precisely in Metten - on Michael Lenke's kitchen table.

Michael Lenke sits on a bench covered with white leather, his wife Brigitte brings cappuccino and raspberry cake. The pieces are so big that they wobble. On the table are all devices that look like those devices you put in children's ears to take their body temperature. However, these colorful little things on the table have already brought millions of women into ecstasy, carried them to the climax. Multiple. Within seconds. report this

at least the customers who used the Womanizer lay-on vibrator and then rated it online. Are the people here happier because they have you as their neighbors, Mr. Lenke?

The 67-year-old laughs, his eyes narrowing. He doesn't know if they're happier. Satisfied, that maybe. "In any case, the womanizer density is quite high in our district." Every now and then people stop by the Lenkes in the hope of getting hold of the Womanizer with a special discount, and they usually get it too. Because the promised orgasm guarantee has its price: in Switzerland, the cheapest version costs around 130 francs.

The house of the Lenke family is in a quiet area. Detached houses, front yards, iron fences. Just a few minutes away is the Benedictine Abbey, two large, mustard yellow onion domes reaching into the sky. The monastery houses the famous baroque library with over 35,000 books. The fact that the most successful sex toy of recent years was invented here is of a certain explosive nature. It's not as if the

Captured by FireShot Pro: 18 May 2022, 15:33:59
https://getfireshot.com

IHG_00011039

**Exhibit 17-1.173**

Vatican would praise the use of vibrators. And of course all the residents of the 4,400-strong village know what Michael Lenke invented. That these are not clinical thermometers, which he packs in elegant, black boxes. However, the fun business of the Lenkes is not a problem, as the couple emphasizes. 'I was expecting the abbot to call me at some point and ask to keep the ball flat. But that never happened,' says Michael Lenke. On the contrary. His company even sponsors the local girls' volleyball team, who train in the abbey's gymnasium in Womanizer shirts.

If Michael Lenke gets an idea, it won't let him go. His drive is always the same: he wants to find the solution to a riddle that he has set himself. That was already the case when he invented an earthquake early warning system. And also when he designed a flower pot that prevents the roots of plants from growing further. And that's how it was when he read a study that showed that more than fifty percent of women never or rarely climax. 'I knew I had to change something about that.' So he sits down with doctors, reads studies and research reports. He realizes that a toy that revolutionizes the market shouldn't just vibrate like most sex toys for women do. This satisfaction is too clumsy for Lenke, also because it usually leads to overstimulation or it becomes habitualizing over time. The vibration, which was initially stimulating, is no longer sufficient at some point. So a stronger vibrator is needed, then another stronger one - and at some point the nerve endings are numb. From their conversations, Lenke learns that he has to invent a toy that will gently satisfy the woman.

He opts for a non-contact variant that stimulates via pressure waves. Since the clitoris is particularly sensitive with over 8000 nerves, it should beguile this erogenous zone.

Brigitte Lenke can now decode her husband's moods. After almost thirty years of marriage, she knows when Michael is experiencing a creative boost and is therefore hardly approachable. She can see when she has to lure him out of the house because a depressive post-creative phase is paralyzing him. And she knows she has to be honest with her husband. That's when he gave her the first prototype of the Womanizer for self-testing. A thing he made out of an aquarium pump. The part is still somewhere in his workshop today. Michael Lenke disappears into the basement and comes back with a silver implement the size of a tangerine in his hand. A small hose protrudes from the heavy pump, and a screw is stuck in another opening. «I had to convert the pump so that she no longer sucks and blows, but only sucks, she says and smiles mischievously. Testing the prototype is no fun for Brigitte Lenke. Something like that might be used in the SM scene, she says with an ironic undertone. 'The hose sucked too much, that wasn't nice.' Her husband continues to tinker in the workshop in the basement of his house, which has five shelves filled with yellow, green and transparent boxes through which cables, plugs and screws shimmer. Drills, batteries and tool boxes are neatly lined up. She just cleaned up, says Brigitte Lenke. 'Sometimes I have to help him, otherwise you can't get through here.' she says with an ironic undertone. 'The hose sucked too much, that wasn't nice.' Her husband continues to tinker in the workshop in the basement of his house, which has five shelves filled with yellow, green and transparent boxes through which cables, plugs and screws shimmer. Drills, batteries and tool boxes are neatly lined up. She just cleaned up, says Brigitte Lenke. 'Sometimes I have to help him, otherwise you can't get through here.' she says with an ironic undertone. 'The hose sucked too much, that wasn't nice.' Her husband continues to tinker in the workshop in the basement of his

IHG_00011040

**Exhibit 17-1.174**

Page 3
Toy Story: Interview with the inventor of Womanizer - Annabelle
https://www.annabelle.ch/body-soul/toy-story-womanizer-michael-lenke-47929/

house, which has five shelves filled with yellow, green and transparent boxes through which cables, plugs and screws shimmer. Drills, batteries and tool boxes are neatly lined up. She just cleaned up, says Brigitte Lenke. 'Sometimes I have to help him, otherwise you can't get through here.' says Brigitte Lenke. 'Sometimes I have to help him, otherwise you can't get through here.' says Brigitte Lenke. 'Sometimes I have to help him, otherwise you can't get through here.'

When her husband gave her the final prototype of the Womanizer after more than a year of tinkering in 2013 and she tested it, she knew that the invention would be a success. Actually, she is not a fan of sex toys, the things that her husband ordered in the previous years of marriage hardly interested her. Quite different with the Womanizer. 'I said to him: 'If you can produce it, it'll be a hit.' The fact that she's acting as a test subject for her husband's inventions doesn't bother her. 'On the contrary, we are a team - we have always been.'

Today, Lenke has almost three million customers. He sold his company to investors because the company was getting too big. The Womanizer Group has over 800 employees today, the headquarters have been relocated from Bavaria to Berlin, and the company sells all over the world. Lenke has a stake in the company and is what you would probably call Head of Innovation in other companies. He's still the tinkerer in the background. The financial success is enormous, says Lenke. That's nice, because he and his wife could afford to own a house in Mallorca, for example, or to go on a cruise.

However, what is more important to Lenke than financial success is the fact that he was able to make a difference in the world with his invention. 'That's what drives an inventor like me.' A sex toy might not sound like a life-changing thing, but when he hears that women have an orgasm for the first time thanks to him, that they get to know themselves, their sexuality, their partner and their relationship better, then he knows that he invented something important. 'I believed in the female orgasm - and it was worth it.'

Sometimes Lenkes get fan mail. Once, says Lenke, they received a letter from Brazil. In it, one woman said her life was plagued by a difficult relationship with sex, a fact she was reluctant to share with others. But she just had to tell him about it -- and thank him, he had changed her life. 'We sat at the table with tears in our eyes,' says Brigitte Lenke. Her husband nods. 'It's shocking what you read about women who haven't had an orgasm in their seventies. It makes you wonder what happened there.' Not only his wife and millions of customers are fans of the invention, but also his two daughters, who have grown up and have children and who each receive the latest version of the toy from their father. 'We've always talked very openly about sexuality with our children, that's not a problem,' says Lenke. On the contrary. His daughters are proud of their dad - they were never ashamed of his invention. 'The Womanizer just comes across as a high-quality lifestyle product and not as a dirty toy.' The Womanizer lies elegantly in the hand. And yes, to answer the question about the quality of the toy, it's true: The Womanizer can do what it promises. Using it is a bit like waiting for a bus at the curb. It takes a moment, you stand in one place, wait, at some point it gets exciting - and then he comes buzzing around the corner. It doesn't require a lot of work or excitement, but it serves its purpose. With a guarantee, as the Lenkes emphasize. «Friends of ours used the Womanizer, while watching horror movies, so not a stimulating program at all, and still they climaxed. You can't resist it, the orgasm just comes.' From the start, the Lenkes left out porn fairs and positioned the vibrator as a

Captured by FireShot Pro: 18 May 2022, 15:33:59
https://getfireshot.com

IHG_00011041

**Exhibit 17-1.175**

high-quality device that you don't have to hide. There is even a portable Womanizer variant that looks like a large lipstick. It shouldn't stand out in the luggage and, according to Lenke, should primarily conquer the Arab world. There is even a portable Womanizer variant that looks like a large lipstick. It shouldn't stand out in the luggage and, according to Lenke, should primarily conquer the Arab world. There is even a portable Womanizer variant that looks like a large lipstick. It shouldn't stand out in the luggage and, according to Lenke, should primarily conquer the Arab world.

The XL version of the Womanizer, on the other hand, was in-vented primarily for the US market. "We've had feedback that overweight women have trouble putting the Womanizer on, so we lengthened the handle. We try to really respond to our customers," says Lenke. He hopes that the Womanizer will eventually be registered as a medical device that gynecologists can prescribe for their patients. "We al-ready know of doctors who have recommended the Womanizer for therapy."

Lenke hasn't figured it out yet. A new version of the Womanizer was launched in November, which is also equipped with a dildo that can be inserted. In this way, the clitoris and the vagina are stimulated at the same time. And next year there will be another toy based on a completely new technology. In addition, Lenke is working on an invention that has occupied him for a long time: the male counterpart to the Womanizer. This product is a big challenge, he says. Because even if female sexuality is more complex than male sexuality for reasons of physiognomy alone - the tip of the clitoris alone has twice as many nerves as the penis - there are hardly any toys that appeal to men. The big challenge is not only the structure, technology and design, but above all the size. "For men, there isn't even a rudimentary mean value. And try selling a man a toy that says S for size, for-get that. Every man buys an XL - and then it doesn't fit." He already has the technology, now it's a matter of turning the device into reality. Lenke hopes that the 'Manizer', which is the working title, will be ready for the market within the next two years. Bayern will then perhaps be even happier. And Metten, the small Benedictine village, the happiest place in Germany. Because here happiness comes from an inner satisfaction. Every man buys an XL - and then it doesn't fit." He already has the technology, now it's a mat-ter of turning the device into reality. Lenke hopes that the 'Manizer', which is the working title, will be ready for the market within the next two years. Bayern will then perhaps be even happier. And Metten, the small Benedictine village, the happiest place in Germany. Because here happiness comes from an inner satisfaction. Every man buys an XL - and then it doesn't fit." He already has the technology, now it's a matter of turning the device into reality. Lenke hopes that the 'Manizer', which is the working title, will be ready for the market within the next two years. Bayern will then perhaps be even happier. And Metten, the small Benedictine village, the happiest place in Germany. Because here happi-ness comes from an inner satisfaction.

How do you like the article?   

IHG_00011042

**Exhibit 17-1.176**



*l.*  In addition to the classic Womanizer (left), there is also a portable, unobtrusive version in the form of a lipstick. The newest product in the Womanizer fleet is called «Inside Out», this toy combines pressure wave stimulation with a vibrator.

DATES:  4/5/2018        SHARE:  f  𝕏  ✉

HOW DO YOU
LIKE THE
ARTICLE?

## Next Read



life

'It's not about sex. It's all about power»

from

## Discover more stories from BODY & SOUL



family



beauty



body & soul



love & sex

Captured by FireShot Pro: 18 May 2022, 15:33:59
https://getfireshot.com

IHG_00011043

**Exhibit 17-1.177**

Page 6
Toy Story: Interview with the inventor of Womanizer - Annabelle
https://www.annabelle.ch/body-soul/toy-story-womanizer-michael-lenke-47929/

Holidays with
children: These are
our survival tips

by annabelle

Why skin care
urgently needs to
become more
diverse

by Alex Bohn

Manuela (49): "I like
having my body
under control"

by Barbara Loop

Column "Single Way":
Suddenly my sex life
is overwhelming

by Rebekka Braem

# annabelle

| LIFE | STYLE | CULTURE | BODY & SOUL |
|---|---|---|---|
| politics | Fashion | Pop Culture | beauty |
| Zeitgeist | Shopping | Series & Movies | Astro |
| People | Interior | Literature & Music | love & sex |
| Work & Cash | Travel | | family |
| LGBTQIA+ | foods | | health |
| desire to have children | | | counselor |

ANNABELLE WEEKLY
Subscribe to the newsletter now and receive curated mail directly in
your mailbox. Stories only, no spam!

[ E-mail address ]    [ REGISTER ]



SUBSCRIBE NOW!
Every issue in your mailbox and
exclusive subscription benefits,
starting at just CHF 20!
Here is the e-paper

ANNABELLE FOLLOW    (ⓘ)   GET TO KNOW THE EDITORS!

IMPRINT   EDITORIAL STAFF   ADVERTISING   NEWSLETTER   E-PAPER   PRIVACY   CONDITIONS

© Medienart AG 2022

Captured by FireShot Pro: 18 May 2022, 15:33:59
https://getfireshot.com

IHG_00011044

**Exhibit 17-1.178**

# Exhibit J

**Exhibit 17-1.179**

# How a sex tech device called the Womanizer led to female orgasms worldwide

*Fiona Weber-Steinhaus*

When Michael Lenke set out to battle inequality between men and women, he didn't travel far. He walked down a flight of stairs to his hobby cellar in Metten, Bavaria, in southern Germany, took an aquarium pump and a plastic hose and got to work. The inequality Lenke wanted to fix wasn't about money or leadership. It was about the female orgasm.

Many studies show that half of all women rarely or never orgasm. When Lenke read the statistic, he was astonished -- and determined to do something about it.

"I went through all the technical possibilities and soon thought: probably air pressure could work," Lenke said.

Seven years and millions of orgasms later, Lenke's creation, known as the Womanizer, has become one of the best-selling sex tech devices in the world -- despite a name that sounds more cringe-worthy in English than intended. According to Wow Tech, the Berlin-based company created from Lenke's business and another firm in 2018, sales of the Womanizer have topped 3 million, led by shoppers in Europe and the US.

The 70-year-old German inventor discovered that the female orgasm isn't actually that much of a mystery. It's more a question of pressure, suction and blood circulation. Meanwhile, the Womanizer exemplifies how sex tech devices for women have been shifting from the X-rated tools to lifestyle products marketed as a means of female empowerment.

For that to happen, however, the marketing and design of sex tech devices had to be de-sexed a bit. Not exactly an easy task.



HERBENICK_00000420

**Exhibit 17-1.180**



*The Womanizer Premium.*

Wow Tech

In January, for the first time in the 50-year history of the massive CES trade show in Las Vegas, sex tech devices will be allowed to exhibit under the health and wellness category if they are "innovative and include new or emerging tech." This follows a 2019 controversy about what is allowed and what isn't.

The parameters haven't been so clear in the past.

The Consumer Technology Association, which hosts CES, awarded sex tech company Lora DiCarlo a coveted Innovation Award in the robotics and drones category at the 2019 show. CTA revoked the award a month later and then reinstated it after public outcry. This set off a debate about gender bias and whether sex devices should be considered tech.

"There has always been a sexualization of technology at CES," said Carolina Milanesi, an analyst at Creative Strategies. "But until now, women were side actors for the pleasure of the attending dudes. So here we were for the first time with a device that was solely for the pleasure of women."

## The rocky road to female climax

Lenke, a self-taught inventor, patented a machine to combat hay fever and created an earthquake-alert system. The "Happy Bonsai," a process that shrinks plants without genetic engineering, made Lenke a millionaire at 27. But the road to female climax was "rockier" than he expected, he said. The most difficult part: As a man, he couldn't fathom how it felt.



HERBENICK_00000421

**Exhibit 17-1.181**

How a sex tech device called the Womanizer led to female orgasms wor...          https://www.cnet.com/culture/how-a-sex-tech-device-called-the-womani...



*Click for more on the intersection of technology and sex.*

He needed his 57-year-old wife, Brigitte Lenke, to collaborate and help test the prototypes he built. Brigitte is a banker and his long-time business partner. They've been married for 30 years and live in Metten, a small town nestled on the river Danube just down the road from a famous Benedictine monastery dating back to 766. Brigitte wasn't available for an interview.

Lenke discusses all his invention ideas with Brigitte at the kitchen table. She dismisses half of them. But with the Womanizer, Brigitte saw the potential straight away. And according to Lenke, she endured discomfort, pain and outright boredom to help bring the invention to life.



3/14/2023, 4:28 PM

HERBENICK_00000422
**Exhibit 17-1.182**



*Brigitte Lenke and Michael Lenke with some Womanizers.*

Wow Tech

The name was her idea, an attempt to highlight that this product was entirely for women. The first prototype Lenke put together in his basement looks more like a vintage bicycle dynamo than a slick consumer product. He asked his wife to test this metal aquarium pump innovation. She agreed, putting the hose over the most sensitive part of her body, according to an article in Süddeutsche Zeitung Magazin.



*The prototype of the Womanizer consisted of a modified aquarium pump and a plastic hose.*

Michael Lenke

"Technically, the modified aquarium pump worked," Lenke said. "But it didn't work for my wife. She

HERBENICK_00000423
Exhibit 17-1.183

still holds it against me."

The reason: The suction was too strong. The clitoris has 8,000 nerve endings, double the amount of the glans of the penis. The first attempt was just too much. Lenke added a second compressor. Sometimes, the vibration wasn't exactly right. Sometimes, Brigitte didn't feel anything at all. It took up substantial amounts of her time, she said in an interview with the German tabloid Bild. "After work, I was ironing, when he said: 'Come to the bedroom and test it.'"

Finally, after two years of trial and error and tests by Brigitte, Lenke had it.

"This is it," he recalls his wife saying. "This will be a world success."

## Beyond words

Five years after the launch of the first Womanizer, there are nearly a dozen versions of the product ranging in price from $69 to $299. Womanizer Pro40, which sells for $99 on Amazon, has an overall rating of 4.1 out of 5 stars and 68 percent of buyers give it a 5-star review. Among the comments:

"I honestly don't know how I lived life before this."

"Ten years post-menopause and typical medications left us without her satisfaction. This device cut through that like a ray of sunshine. I forgot how much fun it is to hear her moans. She is thrilled to feel such pleasure again."

"Jesus H. Christ on a biscuit. This thing is beyond words."

"I had to pry it from her hands to get her to stop. I think if you put it on a stick and dangled it in front of her, she could win the Boston Marathon."

"Only criticism: the name sucks. Who the heck sat down and gave it a sales pitch with that dumb name?!"



HERBENICK_00000424

**Exhibit 17-1.184**



*The Womanizer Classic.*

Wow Tech

How it works: A silicone head seals off the clitoris. Within this small area, there is constant change between vacuum and overpressure, which helps blood circulation. Lenke said his device has a 95% climax guarantee. "Women even get an orgasm if they don't want or intend to," he said.

This is also what some consumers criticized. For some, using a Womanizer felt like eating a meal replacement bar instead of enjoying a home-cooked stew. The bottom line is the same: You are well fed. Satisfaction, however, means different things for different people.

Some felt the climax was too mechanical, more of a sneeze and less of a sensual experience. To deal with this complaint, the company incorporated a new setting to take out the predictability of the bodily reaction.

Still, Lenke's touchless focus on the clitoris sets the Womanizer apart from other devices. "The key point was to develop something that didn't vibrate and didn't need any skin contact," he said.

The Womanizer works with air technology that Lenke patented.

"They were innovators in the market," said Coyote Amrich, who for the last 14 years, has worked as director for purchasing at the sex-positive adult shop Good Vibrations. The Womanizer is in the top five of its best-selling products, she said, No. 1 being the Magic Wand. But the Womanizer was a trailblazer: Many so-called "clit-suckers" have arrived after it, "trying to emulate its sensation," Amrich said.

## Bathtub jets

When it comes to female pleasure, the clitoris seemed to be some type of secret for much of world history. It was in the 1960s when feminists revoked the Freudian idea that female orgasm should only be vaginal and reached through intercourse.

Early sex tech largely was disguised as something else -- or household devices were used as sex toys. The Magic Wand, with its unprovocative aesthetic of a kitchen appliance, was initially built to relieve sore muscles. But soon, it was used in sessions of sex educator Betty Dodson. The bidet, a bathroom appliance that sprays water, helped women climax for years, not to mention shower heads and

HERBENICK_00000425

**Exhibit 17-1.185**

bathtub jets. Lenke, long before the Womanizer, learned about this. He had invented a device he called the Magic Finger, a vibrating applicator intended to massage moisturizer into the face.



Harvard University, Schlesinger Library on the History of Women in America, PC320290

*Sex educator Betty Dodson at the NOW's Sexuality Conference in 1974 with the Hitachi Magic Wand.*

Betty A. Dodson Foundation

"The Magic Finger was a flop," Lenke remembers. The TV shopping channel wanted to stop selling it. But Lenke wanted to try it with another host. He remembers the new host saying: "This is great for massages" while she touched her stomach.

Sales skyrocketed, according to Lenke. Perhaps he had been marketing the product in the wrong category, he thought. Lenke capitalized on the pleasurable side effects. He doubled the price of the Magic Finger, changed its name and sold the product at adult industry fairs. The Tantra Beam became a best-seller in Europe.

## Capitalizing on feminism

Over the years, vibrators seeped into mainstream culture, normalized by shows like Sex and the City. New brands of vibrators were bubblegum-colored, in the shape of blue dolphins or pink rabbits.

The Womanizer initially took this trend too far. Lenke and his wife's first designs reminded

HERBENICK_00000426

**Exhibit 17-1.186**

Cosmopolitan writer Krista McHarden of "[someone who gave Ed Hardy a glitter gun and told him to go to town decorating an ear thermometer.](#)" Women didn't buy it because of its design, but in spite of it.

But the Womanizer also arrived at the right time. After millennia of female pleasure being persecuted, shamed and ridiculed, there was a moment when many sex tech companies were capitalizing on feminism. The Womanizer offered women the right to orgasm and treated it like a fundamental need, alongside demands like equal pay and equal rights.



*The first Womanizer devices weren't purchased because of their design but in spite of it.*

Wow Tech

Amrich has witnessed the move from battery-driven to rechargeable, from remote controls to sex toy apps on smartphones.

"There is less personal shame," she said. "Now, sex toys have become a lifestyle product."

Wow Tech doesn't often exhibit at adult industry shows, said Denny Alexander, the company's spokesman. Instead, it targets affluent consumers at wellness festivals like [Wanderlust,](#) where people practice yoga, eat salad and meditate. Here, climaxing is considered part of a holistic lifestyle.

HERBENICK_00000427
**Exhibit 17-1.187**

It may be easy to dismiss the Womanizer as just another marketing trick to attach deeper meaning to a consumer product. But to this day, Lenke and his wife receive mail from all over the world, sometimes addressed to "Dr. Clit." Many are from older women, writing about their trauma or their inability to feel what they long to feel. Many sex experts agree that reaching climax is a skill you can acquire. And sex tech devices can help.

## Not toys anymore?

Also helping the industry and devices like the Womanizer is the fact that sex toys are now more regularly being referred to as sex tech devices, and their technological innovations are being lauded.

"The focus is now not only on the device but on the technology within the device," said the analyst Milanesi.

Take Lora DiCarlo's Osé, which received the CES award in 2019. The device (called Vela at the time of the company's application for the CES award) incorporated "five pending patents for robotics, biomimicry and engineering feats," according to the company.

When CTA revoked the honor, it cited a clause in the award's terms that disqualified products deemed "immoral, obscene, indecent, profane or not in keeping with CTA's image."

Lora DiCarlo CEO Lora Haddock criticized the move in an open letter, accusing CES of gender bias. The show, which banned sex tech devices, had allowed demonstrations of adult content for other gadgets in previous years. Naughty America, for instance, has showcased virtual reality pornography and a sex doll.

"It was just a head and tits for fellatio," Haddock said in an interview. "Some aspects of CES were very skewed toward the male view."

Since 2004, pornography has been banned at CES. Jean Foster, senior vice president of marketing and communications for CTA, acknowledged via e-mail that "there have been inconsistencies in enforcing this policy."

"We have taken additional steps to more strictly enforce this policy that will help us consistently create an environment that is welcoming and inclusive for all show attendees," Foster said.

Still, the controversy helped raise the profile of Lora DiCarlo and the Osé, which officially launched in November for $290.

CES has updated its policies for the 2020 show: Pornography still isn't allowed at the show but apparently the ban will be more aggressively enforced. Booth staff, regardless of gender, aren't allowed to wear clothing that "reveals an excess of bare skin, or body-conforming clothing that hugs genitalia," a move that seeks to completely end the long tradition of so-called CES "booth babes."

HERBENICK_00000428

Exhibit 17-1.188

And finally, sex tech companies could apply to exhibit on the CES show floor. The Lora DiCarlo saga made one thing clear: Even if sex toys are called sex tech devices and even if companies highlight their robotics and mechanics, they are still quite clearly tools to help women masturbate. And plenty of women want them.

Wow Tech isn't an exhibitor at CES 2020 but will be roaming the show floor.

As for Lenke, now that he's solved the mystery of female orgasm, he's looking into something even closer to home: a male masturbation device.

"It's going to be stylish, with carbon and you can leave it lying on your living room table as well," he said. And, name-wise he is hitting close to home again. The working title: "The Manizer."

**High-tech sex toys keep getting smarter (NSFW, seriously)**

[See all photos](#)

*This article was written as part of the Goethe-Institut's Close-Up journalist exchange program and Wunderbar Together-The Year of German-American Friendship. More information can be found at [www.goethe.de/nahaufnahme](http://www.goethe.de/nahaufnahme) and at #GoetheCloseUp and #WunderbarTogether.*

Originally published Jan. 3.
**Correction, Jan. 6, 5:09 p.m. PT:** This story originally misstated the number of devices sold. The number is 3 million.

HERBENICK_00000429
Exhibit 17-1.189

# Exhibit K

Exhibit 17-1.190

# IHG_00011111

# Screenshot from Video



**Exhibit 17-1.191**

Joint Proposed Pretrial Order

# EXHIBIT 17-2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EIS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 19-1227-GBW |
| INTIHEALTH GER GMBH, WOW TECH USA, LTD., WOW TECH CANADA, LTD. AND NOVOLUTO GMBH, | |
| Defendants. | |
| | |
| NOVOLUTO GMBH, | |
| Counterclaimant, | |
| v. | |
| EIS, INC., EIS GMBH, TRIPLE A IMPORT GMBH, and TRIPLE A MARKETING GMBH | |
| Counterclaim Defendants. | |

**PLAINTIFF EIS, INC.'S AND COUNTERCLAIM DEFENDANTS EIS, INC., EIS GMBH, TRIPLE A IMPORT GMBH, AND TRIPLE A MARKETING GMBH'S MOTION *IN LIMINE* NO. 2 TO PRECLUDE ARGUMENT, TESTIMONY, OR REFERENCES TO THE RESULTS OF *INTER PARTES* REVIEWS OF THE PATENTS-IN-SUIT**

**Exhibit 17-2.001**

## I.      INTRODUCTION

EIS moves to preclude WOW Tech and its lawyers and witnesses from arguing, opining, or presenting evidence regarding the results of *inter partes* reviews ("IPRs") of the '851, '061, and '097 patents.  The results of these IPRs should be excluded under Federal Rule of Evidence 402 as irrelevant because different invalidity grounds than those at issue in this case were presented there and different rules and procedures governed those IPRs.  Even if there were any probative value in this case to the results of those IPRs, reference to such results would be unfairly prejudicial to EIS, confuse and mislead the jury, and result in wasting time as each side explains and relitigates those IPRs.  Each of these dangers substantially outweighs any probative value and merits exclusion under Federal Rule of Evidence 403.  Finally, excluding the results will not foreclose proper uses of those IPRs—such as highlighting statements and positions taken therein by the parties and their witnesses that are contrary to their present litigation positions and statements.

## II.     ARGUMENT

### A.      <u>The Results of IPRs for the Patents-in-Suit Should Be Excluded</u>

The Court should preclude WOW Tech from presenting the results of IPRs of the '851, '061, and '097 patents because those results are irrelevant and, to the extent there is any probative value, that value is outweighed by the danger of unfair prejudice, confusing the issues to be decided in this case, misleading the jury, undue delay, and wasting time.  References to IPR decisions regarding patent validity or invalidity have little, if any, relevance, and regardless should be excluded under Federal Rule of Evidence 403.  *See, e.g.*, Federal Rules of Evidence 402, 403; *MiiCs & Partners Am. Inc. v. Toshiba Corp.*, No. 14-803-RGA, 2017 WL 11573565, at *1 (D. Del. Oct. 12, 2017) (excluding PTAB decision because its "at most minimal probative value" was "substantially outweighed by the dangers of its unfair prejudicial value, risk of jury confusion, and waste of time" and putting "it in context would require a significant detour from the main issues

**Exhibit 17-2.002**

in the case, and add another level of complexity to a case that does not need any more complexity"); *Liqwd, Inc. v. L'Oreal USA, Inc.*, No. 17-14-JFB-SRF, 2019 WL 2648008, at *1 (D. Del. June 26, 2019) ("There will be no references to any of these [post grant review] proceedings during trial.").

Here, Counterclaim Defendant EIS GmbH filed petitions for *inter partes* review for three of the five patents-in-suit: the '851, '061, and '097 patents. *See* D.I. 581 at 1 (noting the IPRs filed against the '851, '061, and '097 patents). The Patent Trial and Appeal Board ("PTAB") ultimately found that EIS GmbH had not shown that the challenged claims were unpatentable in each of the three IPRs. The Federal Circuit subsequently affirmed those decisions.

Each of these IPRs, however, involved different invalidity grounds than EIS intends to present to the jury in this litigation. And the IPRs were governed by different rules and procedures—including with respect to issues such as claim construction—than are present here in district court. Indeed, the parties proposed and the Court construed multiple terms in this litigation that were not construed by the PTAB during the IPRs. Each of these differences renders the decisions in the IPRs irrelevant and justifies precluding WOW Tech from referencing the results of those IPRs.

Even if not wholly irrelevant, the probative value of the IPR results is minimal and substantially outweighed by the dangers of unfair prejudice to EIS, confusing and misleading the jury, and unduly delaying and wasting time at trial. For example, the jury may give undue deference to the PTAB's analysis of validity during IPRs even though different grounds are at issues. And if WOW Tech were permitted to present the results of those IPRs, EIS would be forced to expend judicial and party time and resources to explain and distinguish the context, including the differing prior art and claim constructions at issue. Each danger justifies precluding WOW Tech from referencing the results of these IPRs under Federal Rule of Evidence 403.

Exhibit 17-2.003

### B. Precluding WOW Tech from Referencing the Results Does Not Foreclose Permissible Uses of IPRs

Although the Court should preclude WOW Tech from referencing the results of these IPRs, references to the existence of these "other matters" and use of certain materials developed during those IPRs may be appropriate and permissible—subject to the Federal Rules of Evidence and any rulings of this Court. References to the existence of and use of materials from IPRs may be proper if that reference and use is consistent with the Federal Rules of Evidence. *See Siemens Mobility Inc. v. Westinghouse Air Brake Techs. Corp.*, No. 16-284-LPS, 2019 WL 77046, at *1 (D. Del. Jan. 2, 2019) ("[E]vidence that has been developed in an IPR or other litigation – including testimonial as well as documentary evidence – may be used at trial, provided that it is done without referencing the IPR or other litigation (beyond, if necessary, a generic reference to 'another matter') and subject to the Federal Rules of Evidence and the [c]ourt's procedures."); *Liqwd, Inc.*, 2019 WL 2648008 at *1 (allowing information that occurred in post grant review proceeding subject to the other evidentiary rules "if the parties do not refer to the holdings"). Thus, for example, a party may properly use a transcript from an IPR for impeachment or hold an adverse party to statements made in an IPR, subject to other objections and rulings of this Court. The party can do so without referencing the IPR "beyond, if necessary, a generic reference to 'another matter.'" *Siemens*, 2019 WL 77046 at *1. EIS does not seek to preclude such uses via this motion.

## III. CONCLUSION

EIS respectfully requests that the Court preclude WOW Tech from arguing, opining, or presenting evidence regarding the results of IPRs of the '851, '061, and '097 patents, including any argument that the patents are valid because they were previously challenged and upheld at the PTAB during IPRs.

**Exhibit 17-2.004**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

_____

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Plaintiff and Counterclaim
Defendants*

OF COUNSEL:

Naveen Modi
Allan M. Soobert
Stephen Kinnaird
Phillip W. Citroen
Chetan Bansal
David Valente
James Razick
Kevin Stewart
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700

Chad J. Peterman
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Andrea Pallios Roberts
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, CA 94304-1106
(650) 320-1800

August 17, 2023

**Exhibit 17-2.005**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2023, I caused the foregoing to be foregoing document

to be served on August 17, 2023, upon the following in the manner indicated:

| | |
|---|---|
| Paul D. Brown, Esquire<br>Joseph B. Cicero, Esquire<br>Gregory E. Stuhlman, Esquire<br>CHIPMAN BROWN CICERO & COLE, LLP<br>Hercules Plaza<br>1313 North Market Street, Suite 5400<br>Wilmington, DE 19801<br>*Attorneys for Defendants IntiHealth Ger GmbH,*<br>*WOW Tech USA, Ltd., WOW Tech Canada, Ltd.*<br>*and Novoluto GmbH* | VIA ELECTRONIC MAIL |
| Tammy J. Terry, Esquire<br>Califf T. Cooper, Esquire<br>OSHA BERGMAN WATANABE & BURTON LLP<br>1100 Louisiana Street, Suite 4900<br>Houston, TX 77002<br>*Attorneys for Defendants IntiHealth Ger GmbH,*<br>*WOW Tech USA, Ltd., WOW Tech Canada, Ltd.*<br>*and Novoluto GmbH* | VIA ELECTRONIC MAIL |

*/s/ Brian P. Egan*

_____

Brian P. Egan

**Exhibit 17-2.006**

# WOW Tech Response in Opposition

**Exhibit 17-2.007**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| EIS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No.: 19-cv-1227-GBW |
| INTIHEALTH GER GMBH, | § | |
| WOW TECH USA, LTD., WOW TECH | § | Demand For Jury Trial |
| CANADA, LTD. and NOVOLUTO GMBH, | § | |
| | § | |
| Defendants. | § | |


| | | |
|---|---|---|
| NOVOLUTO GMBH, | § | |
| | § | |
| Counterclaimant, | § | |
| | § | |
| v. | § | |
| | § | |
| EIS, INC., EIS GMBH, | § | |
| TRIPLE A IMPORT GMBH, | § | |
| and TRIPLE A MARKETING GMBH, | § | |
| | § | |
| Counterclaim Defendants. | § | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF AND
COUNTERCLAIM DEFENDANTS' MOTION *IN LIMINE* NO. 2 TO PRECLUDE
ARGUMENT, TESTIMONY, OR REFERENCES TO THE RESULTS OF THE
*INTER PARTES* REVIEWS OF THE PATENTS-IN-SUIT**

Exhibit 17-2.008

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*Contour IP Holding, LLC v. GoPro, Inc.*,
  2021 WL 75666 (N.D. Cal. Jan. 8, 2021) ................................................................ 2

*Eagleview Techs., Inc. v. Xactware Sols., Inc.*,
  485 F. Supp. 3d 505 (D.N.J. 2020) ........................................................................ 2

*Finjan, Inc. v. Cisco Sys. Inc.*,
  2020 WL 13180008 (N.D. Cal. June 5, 2020) ........................................................ 2

*Finjan, Inc. v. Sophos, Inc.*,
  2016 WL 4560071 (N.D. Cal. Aug. 22, 2016) ........................................................ 2

*L.C. Eldridge Sales Co., Ltd. v. Azen Mfg. Pte., Ltd.*,
  2013 WL 7964028 (E.D. Tex. Nov. 14, 2013),
  *aff'd in part*, 610 Fed. Appx. 1015 (Fed. Cir. 2015) .............................................. 3

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
  2019 WL 2648008 (D. Del. June 26, 2019) ............................................................ 3

*MiiCs & Partners Am. Inc. v. Toshiba Corp.*,
  2017 WL 11573565 (D. Del. Oct. 12, 2017) ........................................................... 3

*Oracle Am., Inc. v. Google Inc.*,
  2012 WL 1189898 (N.D. Cal. Jan. 4, 2012) ........................................................... 3

*StoneEagle Servs., Inc. v. Pay-Plus Sols., Inc.*,
  2015 WL 3824208 (M.D. Fla. June 19, 2015) ........................................................ 3

*TransData, Inc. v. Centerpoint Energy Houston Elec. LLC*,
  2016 WL 11677492 (E.D. Tex. July 1, 2016) ......................................................... 3

*Universal Elecs. Inc. v. Universal Remote Control, Inc.*,
  2014 WL 8096334 (C.D. Cal. Apr. 21, 2014) ......................................................... 2

**Rules**

Fed. R. Evid. 403 ........................................................................................................ 3

Exhibit 17-2.009

## TABLE OF ABBREVIATIONS

| Abbreviation | Full Description |
|---|---|
| EIS | Plaintiff EIS, Inc. and the related German entities EIS GmbH, Triple A Import GmbH, and Triple A Marketing GmbH |
| Novoluto | Counterclaimant/Defendant Novoluto GmbH |
| WOW | Novoluto and Defendants IntiHealth Ger GmbH, Novoluto GmbH, WOW Tech USA, Ltd., and WOW Tech Canada, Ltd. |
| '061 Patent | U.S. Patent No. 9,849,061 |
| '097 Patent | U.S. Patent No. 9,937,097 |
| '851 Patent | U.S. Patent No. 9,763,851 |
| '220 Patent | U.S. Patent No. 11,090,220 |
| '418 Patent | U.S. Patent No. 11,103,418 |
| Asserted Patents | The '061, '097, '851, '220, and '418 Patents |
| IPR Patents | '097, '851, and '061 Patents |
| '1302 IPR | IPR2019-01302 |
| '1444 IPR | IPR2019-01444 |
| '0007 IPR | IPR2020-00007 |
| the IPRs | IPR2019-01302, IPR2019-01444, and/or IPR2020-00007 |
| FWD | Final Written Decision |
| UPNE | Amazon's Utility Patent Neutral Evaluation |
| USPTO | U.S. Patent and Trademark Office |
| PTAB | Patent Trial and Appeal Board |
| Guan | Chinese Utility Model Patent No. 2153351 Y |
| CAFC | United States Court of Appeals for the Federal Circuit |
| MIL | Motion in Limine |

**Exhibit 17-2.010**

EIS mischaracterizes the IPRs and their standards. A significant problem in this case has been EIS recycling its IPR grounds, forcing WOW to file three motions to strike and its pending IPR estoppel summary judgment motion.[1] EIS's claim that IPRs have different rules and procedures is a red herring. The same claim construction standard applies in IPRs and district court and EIS presented the same validity grounds in the IPRs and here. Also, the IPRs are intertwined with the facts of the case—they are part of the prosecution history and are relevant to numerous issues, including EIS's IP Webinar- and UPNE-based unfair competition claims, EIS's Guan-based *Walker Process* claims, and WOW's willfulness claims. EIS will not be unduly prejudiced.

A.     **The Completed IPRs Are Relevant and Highly Probative to Multiple Jury Issues**

The IPRs are central to numerous issues to be decided by the jury, including:

***The IP Webinar.*** EIS's counsel has informed WOW in a meet and confer that it plans to use a WOW presentation regarding patent rights (the "IP Webinar")—which specifically addressed the IPRs and related PTAB decisions timeline (Ex. 1, p. 11)—to support its unfair competition and *Walker Process* claims.[2] If EIS is allowed to argue these unpled claims, then WOW should be allowed to introduce the IPR decisions to show that WOW's statements were truthful and that WOW had a good faith belief that their patents were valid and enforceable. Precluding WOW from presenting the results of the IPRs would be highly prejudicial to WOW. The IPR results are highly probative and directly support WOW's statements regarding its battle-hardened patents.

***Amazon UPNE.*** Allowing WOW to discuss the timing and outcome of the IPR FWDs is also essential to WOW defending against EIS's UPNE-based unfair competition claims. WOW participated in Amazon's Utility Patent Neutral Evaluation (UPNE) program with a good faith belief that its patents were valid and enforceable. Winning all three IPRs confirmed that good faith

---

[1] *See* D.I. 133, 321, 554, and 581.
[2] WOW relies on meet and confers because EIS has not pled these issues. WOW's MIL No. 3.

**Exhibit 17-2.011**

belief. EIS's unfair competition claims are based on allegations that the patents are invalid and unenforceable—the IPR outcomes directly rebut those claims, and are therefore highly probative.

   ***Inequitable Conduct and Walker Process.***  EIS argues that the patents are unenforceable due to inequitable conduct for failure to provide a certain translation of *Guan* during the prosecution of the IPR Patents. EIS relied on *Guan* in two of the IPRs. Therefore, the IPR results— which found *Guan* did not disclose the claimed pressure modulation—speak directly to *Guan's* lack of materiality. The PTAB's *Guan* findings directly contradict EIS's inequitable conduct and *Walker Process* claims, and therefore, are highly probative of WOW's defense.

   ***Willfulness.***  "IPR evidence is of much more probative value regarding willfulness than it is in other contexts" and "[t]hat probative value is not outweighed by" the risk of jury confusion. *Contour IP Holding, LLC v. GoPro, Inc.*, 2021 WL 75666, at *8 (N.D. Cal. Jan. 8, 2021). The IPR decisions are highly relevant to WOW's willfulness claims based on EIS's post-IPR continued infringement. *See, e.g., Eagleview Techs., Inc. v. Xactware Sols., Inc.*, 485 F. Supp. 3d 505, 526 n.19 (D.N.J. 2020) ("Certainly, repeated failures to invalidate the patents are probative as to willfulness."); *Finjan, Inc. v. Cisco Sys. Inc.*, 2020 WL 13180008, at *10 (N.D. Cal. June 5, 2020) (admitting IPR evidence for willfulness and damages while observing "[t]he Court is also persuaded that the strength of the Asserted Patents is relevant to Cisco's good faith belief as to the validity of the Asserted Patents - and is therefore relevant to willfulness"). Additionally, "[a]ny potential confusion can be addressed by appropriate jury instructions." *Universal Elecs. Inc. v. Universal Remote Control, Inc.*, 2014 WL 8096334, at *7 (C.D. Cal. Apr. 21, 2014) (denying MIL to exclude IPR evidence). EIS's attempt to preclude evidence relating to the IPRs is unjustified, which is why "courts frequently allow evidence of this kind" at trial. *Finjan, Inc. v. Sophos, Inc.*, 2016 WL 4560071, at *14 (N.D. Cal. Aug. 22, 2016); *see also StoneEagle Servs., Inc. v. Pay-Plus*

**Exhibit 17-2.012**

*Sols., Inc.*, 2015 WL 3824208, at \*8-9 (M.D. Fla. June 19, 2015) (denying MIL to exclude IPR).

**B.      The IPR Decisions Will Not Unduly Prejudice EIS**

EIS's cases are distinguishable.  In *Toshiba*, the Court found that the PTAB's decision to *not* institute an IPR had minimal probative value. *MiiCs & Partners Am. Inc. v. Toshiba Corp.*, 2017 WL 11573565, at \*1 (D. Del. Oct. 12, 2017).  Here, the PTAB ***did*** institute in all three IPRs and issued FWDs after considering *Guan*. Therefore, the probative value in this case is much higher.  In *Liqwd*, an appeal of PGR proceedings to the CAFC was "still active and pending." *Liqwd, Inc. v. L'Oreal USA, Inc.*, 2019 WL 2648008, at \*1 (D. Del. June 26, 2019).  Here, the CAFC has already *affirmed* the PTAB's FWDs.

Where a proceeding is complete and the appeal is final, the jury should be presented with important information. *See TransData, Inc. v. Centerpoint Energy Houston Elec. LLC*, 2016 WL 11677492, at \*2 (E.D. Tex. July 1, 2016) (allowing evidence of six completed re-examination proceedings); *Oracle Am., Inc. v. Google Inc.*, 2012 WL 1189898, at \*3 (N.D. Cal. Jan. 4, 2012) ("[where] the examiners have gone to the end of their process[, it] would be wrong to conceal this important information from the jury"). Courts have permitted similar findings to be presented to the jury because such evidence is "highly probative." *L.C. Eldridge Sales Co., Ltd. v. Azen Mfg. Pte., Ltd.*, 2013 WL 7964028, at \*3 (E.D. Tex. Nov. 14, 2013), *aff'd in part*, 610 Fed. Appx. 1015 (Fed. Cir. 2015) (denying MIL to preclude evidence where USPTO confirmed patentability).

Thus, the probative value far outweighs any prejudice to EIS which could be cured by a jury instruction. *See* Fed. R. Evid. 403, Advisory Comm. Notes. Besides, EIS hypocritically plans to use at trial German proceedings based on German law and a German patent, while arguing that IPRs on the Asserted Patents evaluated under US law are irrelevant.  Precluding WOW's highly relevant evidence while allowing EIS's highly prejudicial irrelevant evidence would be an injustice. For the above reasons, EIS's MIL 2 should be denied.

**Exhibit 17-2.013**

Date:  August 22, 2023

**CHIPMAN BROWN CICERO & COLE, LLP**

OF COUNSEL:

_/s/ Gregory E. Stuhlman_

Tammy J. Terry

Gregory E. Stuhlman (No. 4765)

Califf T. Cooper

Paul D. Brown (No. 3903)

Lisa E. Margonis

Joseph B. Cicero (No. 4388)

Peter C. Schechter

Hercules Plaza

**OSHA BERGMAN WATANABE & BURTON LLP**

1313 North Market Street, Suite 5400

1100 Louisiana St., Suite 4900

Wilmington, Delaware 19801

Houston, TX 77002

(302) 295-0191

(713) 228-8600

stuhlman@chipmanbrown.com

OLWOWTechDE@obwbip.com

brown@chipmanbrown.com

cicero@chipmanbrown.com

_Attorneys for Defendants_

4

**Exhibit 17-2.014**

# EXHIBIT 1

Exhibit 17-2.015























HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 17-2.027**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

WTEC-00800592

**Exhibit 172.028**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

WTC-00000581

**Exhibit 172.029**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

WTEC_00000582

**Exhibit 17-2.030**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 172.031**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

WFC-00000594

**Exhibit 17-2.032**

# EIS Reply

**Exhibit 17-2.033**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EIS, INC., | |
| Plaintiff, | |
| v. | |
| INTIHEALTH GER GMBH, WOW TECH USA, LTD., WOW TECH CANADA, LTD. AND NOVOLUTO GMBH, | Civil Action No. 19-1227-GBW |
| Defendants. | |
| NOVOLUTO GMBH, | |
| Counterclaimant, | |
| v. | |
| EIS, INC., EIS GMBH, TRIPLE A IMPORT GMBH, and TRIPLE A MARKETING GMBH | |
| Counterclaim Defendants. | |

**PLAINTIFF EIS, INC.'S AND COUNTERCLAIM DEFENDANTS EIS, INC., EIS GMBH, TRIPLE A IMPORT GMBH, AND TRIPLE A MARKETING GMBH'S REPLY IN SUPPORT OF THEIR MOTION *IN LIMINE* NO. 2 TO PRECLUDE ARGUMENT, TESTIMONY, OR REFERENCES TO THE RESULTS OF *INTER PARTES* REVIEWS OF THE PATENTS-IN-SUIT**

**Exhibit 17-2.034**

The jury should determine whether the asserted patents are valid based on the argument and evidence presented at trial. WOW Tech seeks to introduce the results of IPRs on three of the five asserted patents, which will, instead, unfairly persuade the jury to defer to the PTAB even though different invalidity grounds and claim constructions are at issue here and two patents were never subject to IPR. It will also waste time as the parties would need to explain and relitigate the IPRs. The prejudice substantially outweighs any probative value, as discussed below.

**The IP Webinar.** (1) The webinar references WOW Tech's patent portfolio (*see* Ex. 1 at WTC_00000577)—not just the three patents subject to IPR. That three patents survived IPR does not validate an entire portfolio. (2) EIS's unfair competition and *Walker Process* claims are premised on patent unenforceability and lack of infringement, which are not analyzed in IPRs.

**Amazon UPNE.** WOW Tech used the '220 patent—which was never subject to any IPR—to take down EIS's products from Amazon via the UPNE process during the 2021 holiday season. The IPRs on the '851, '097, and '061 patents are irrelevant to those UPNE proceedings.

**Inequitable Conduct and Walker Process.** WOW Tech's argument regarding one limitation of *Guan* goes directly to the point of this motion: WOW Tech wants to taint the jury with the PTAB's patentability decisions instead of analyze the evidence and argument in this case.

**Willfulness.** EIS's willfulness defense for the patents subject to IPR focuses on noninfringement, including that EIS redesigned its products to use one chamber when the patents require two, and unenforceability. If there is any relevance to willfulness, this District has held that the prejudice outweighs the probative value. *IOENGINE LLC v. Paypal Holdings, Inc.*, No. 18-452-WCB, 2022 WL 2800911, *2 (D. Del. June 27, 2022); *Sysmex Corp. v. Beckman Coulter, Inc.*, No. 19-1642-JFB-CJB, 2022 WL 2292059, at *3 (D. Del. June 24, 2022).[1]

---

[1] To the extent there is any permissible use of the IPR results, WOW Tech should be limited to that use and the jury should be instructed accordingly.

**Exhibit 17-2.035**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

_____

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Plaintiff and Counterclaim Defendants*

OF COUNSEL:

Naveen Modi
Allan M. Soobert
Stephen Kinnaird
Phillip W. Citroen
Chetan Bansal
David Valente
James Razick
Kevin Stewart
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700

Chad J. Peterman
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Andrea Pallios Roberts
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, CA 94304-1106
(650) 320-1800

August 25, 2023

**Exhibit 17-2.036**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 25, 2023, I caused the foregoing to be foregoing document

to be served on August 25, 2023, upon the following in the manner indicated:

Paul D. Brown, Esquire                     VIA ELECTRONIC MAIL
Joseph B. Cicero, Esquire
Gregory E. Stuhlman, Esquire
CHIPMAN BROWN CICERO & COLE, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801
*Attorneys for Defendants IntiHealth Ger GmbH,*
*WOW Tech USA, Ltd., WOW Tech Canada, Ltd.*
*and Novoluto GmbH*

Tammy J. Terry, Esquire                    VIA ELECTRONIC MAIL
Califf T. Cooper, Esquire
OSHA BERGMAN WATANABE & BURTON LLP
1100 Louisiana Street, Suite 4900
Houston, TX 77002
*Attorneys for Defendants IntiHealth Ger GmbH,*
*WOW Tech USA, Ltd., WOW Tech Canada, Ltd.*
*and Novoluto GmbH*

                                           */s/ Brian P. Egan*
                                           _____
                                           Brian P. Egan (#6227)

**Exhibit 17-2.037**